# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

COMMITTEE ON THE JUDICIARY, )
UNITED STATES HOUSE )
OF REPRESENTATIVES, )
2138 Rayburn House Office Bldg. )
Washington, D.C.  20515, )
    )    **Case No. _____**
              *Plaintiff*, )
    )
      v. )
    )
HARRIET MIERS, )
12076 Tavel Circle )
Dallas, TX  75230 )
    )
      and )
    )
JOSHUA BOLTEN, )
in his capacity as custodian of )
White House records, )
1600 Pennsylvania Avenue, N.W. )
Washington, D.C.  20500, )
    )
              *Defendants*. )

———————————————————————

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is a civil action for declaratory and injunctive relief brought by Plaintiff Committee on the Judiciary of the United States House of Representatives ("Judiciary Committee") against Defendants Harriet Miers, former Counsel to the President, and White House Chief of Staff Joshua Bolten, as custodian of White House records.  The suit, which was expressly authorized by a Resolution of the United States House of Representatives ("House"), arises out of the Judiciary Committee's efforts to enforce two duly authorized, issued and served congressional subpoenas, one to Ms. Miers for testimony and documents, Subpoena to Harriet Miers (June 13, 2007), the

other to Mr. Bolten for documents, Subpoena to Joshua Bolten (June 13, 2007).[1]  The Judiciary

Committee alleges as follows:

## PRELIMINARY STATEMENT

1.     Since February 2007, the Judiciary Committee and its Subcommittee on

Commercial and Administrative Law ("Subcommittee") have been investigating the forced

resignations of nine United States Attorneys ("U.S. Attorneys") just prior to and following the

2006 federal and state elections, and related matters ("Investigation").  The Investigation was

launched to examine allegations of malfeasance, abuse of authority and violations of existing laws

by Executive Branch personnel, and to consider whether the conduct uncovered warrants

additions or modifications to existing federal laws.

2.     The uncompleted Investigation of the Judiciary Committee and its

Subcommittee (collectively, "Committee") has uncovered substantial evidence to support

allegations that the Administration of President George W. Bush ("Administration") and the

Department of Justice ("Department") injected partisan considerations into the forced resignations

or retention of U.S. Attorneys – the nation's principal officers responsible for administering the

federal criminal laws fairly and impartially.  Credible evidence has been presented to suggest that

U.S. Attorneys who failed to return desired indictments or failed to bring voter fraud prosecutions

that were considered politically useful to the Administration were forced to resign; that U.S.

Attorneys who prosecuted officeholders allied with the Administration were forced to resign; and

that U.S. Attorneys who prosecuted the Administration's political opponents were retained.

---

[1] The subpoenas, along with all of the letters, resolutions and reports referred to herein are
publicly available through the Judiciary Committee's website at
http://judiciary.house.gov/Printshop.aspx?Section=741.

3.     Throughout the course of their testimony before the Committee, various current and former Department personnel, including those who were in frequent contact with White House officials such as Ms. Miers, were unable to identify the sources of the recommendations to place many of the terminated U.S. Attorneys on a list for removal that was tendered to then-Attorney General Alberto Gonzales, Ms. Miers's predecessor as White House Counsel, and to several White House aides for approval.

4.     The record to date also reveals numerous questionable or outright false statements to Congress and the public on this issue, including the purported reasons for seeking the forced resignations and the nature and scope of the involvement of White House personnel in the matter.

5.     Because of the absence of any credible explanation for the forced resignations, and because of the unexplained involvement of Ms. Miers and other White House personnel in the decisions to seek these resignations, the Committee determined that it could not complete its Investigation, render conclusions or propose corrective legislation or other action without access to testimony from, and documents in the possession of, key White House personnel, including Ms. Miers and Mr. Bolten.

6.     While the Committee went to great lengths to secure such information from the Administration on a voluntary basis, detailed *infra* at ¶¶ 32-40, the Administration was uncooperative and did not offer a reasonable accommodation.  As a result, the Committee was compelled to and did issue subpoenas to Ms. Miers and Mr. Bolten in June 2007, utilizing its constitutional authority to compel testimony and the production of documents.

7.     Based on an unprecedented directive from the Counsel to the President, however, Ms. Miers failed to appear and testify before, and to produce responsive documents to,

the Subcommittee in defiance and disregard of her duly authorized, issued and served subpoena.

The Administration purported to claim that any testimony Ms. Miers might provide was covered

by executive privilege, and purported to bestow upon Ms. Miers an absolute "immunity" from her

obligation to appear before the Subcommittee by directing her not even to appear in response to

her subpoena.  This claim of privilege was not asserted directly by the President, as has been the

practice of past Administrations.  As a result of her contumacious conduct at the behest of the

Administration, Ms. Miers has been found by the House to be in contempt of Congress, pursuant

to 2 U.S.C. § 192.  That finding was certified by the Speaker of the House to the U.S. Attorney

for the District of Columbia on February 28, 2008, pursuant to 2 U.S.C. § 194.

       8.    This conduct by Ms. Miers is inconsistent with prior representations by the

Department's Office of Legal Counsel to Congress about the proper response to a subpoena by a

representative of the Executive Branch seeking to invoke executive privilege.  According to the

testimony provided to Congress by William H. Rehnquist, then-Assistant Attorney General for

the Office of Legal Counsel and later-Chief Justice of the Supreme Court, a witness intending to

invoke executive privilege may not simply ignore a congressional subpoena and fail to appear

before a congressional committee at a hearing at the designated time.  The future Chief Justice

explained:  "The fact that you plan to invoke the privilege . . . is not itself a basis for simply

ignoring a subpoena.  You have to report, give your name and address and so forth, and *then*

invoke the privilege."  *Hearings Before a Subcomm. of the Comm. on Gov't Ops.*, 92nd Cong., 1st

Sess. 385 (1971) (testimony of William H. Rehnquist, Assistant Attorney General) (emphasis

added).

       9.    In response to the Committee's subpoena that was duly authorized, issued and

served upon him, Mr. Bolten, also at the behest of the Administration, refused to produce a single

document, identify a single document that was withheld, or provide a privilege log of withheld documents. Instead, the Administration asserted a blanket claim of executive privilege with respect to all documents subpoenaed from Mr. Bolten. This broad claim was made despite the Administration maintaining that (1) the President was not personally involved in the communications reflected in the documents subpoenaed from Mr. Bolten, (2) the President was not involved in the decision to force U.S. Attorneys to resign, and (3) the matters reflected in those documents do not involve national security, state secrets or foreign affairs, nor do they concern open investigative or prosecutorial files. Moreover, the Administration's blanket claim encompassed even those documents reflecting unsolicited communications from third parties outside of the White House. As a result of his contumacious conduct at the behest of the Administration, Mr. Bolten has been found by the House to be in contempt of Congress, pursuant to 2 U.S.C. § 192. That finding was certified by the Speaker of the House to the U.S. Attorney for the District of Columbia on February 28, 2008, pursuant to 2 U.S.C. § 194.

10.    The Administration has acknowledged that critical documents relevant to the Committee's Investigation exist in the White House files. Upon reviewing internal White House documents responsive to Mr. Bolten's subpoena (which the Committee understands to number in the thousands), the Solicitor General (and then-Acting Attorney General) stated in a letter to the President that the documents "discuss the wisdom of [the proposal to force U.S. Attorneys to resign], specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals." Letter from Paul D. Clement, Solicitor General and Acting Attorney General, to The President (June 27, 2007). Moreover, with respect to the alleged misstatements made by those appearing before the Committee, the Solicitor General did not deny that such misstatements had been made, including

5

those about the role of White House personnel in the forced resignations.  Rather, he simply

asserted that "[o]fficials in the Department, not officials in the White House, presented the

challenged statements."  Thus, the letter did not exclude the possibility that White House

personnel, such as Ms. Miers, would have personal knowledge concerning the misstatements at

issue.

11.    Subsequent to the issuance and service of the two subpoenas, the Committee

continued to seek from the Administration, as detailed *infra* at ¶¶ 42-59, an amicable resolution of

the Committee's efforts to obtain testimony and documents from Ms. Miers and Mr. Bolten.

Those efforts have been repeatedly stymied by the Administration's sweeping and legally

unsound claims of absolute immunity and executive privilege, and its unwavering "take it or leave

it" approach to the negotiations.  In addition, the U.S. Attorney for the District of Columbia –

"whose duty it shall be to bring the matter [*i.e.*, a finding of contempt of Congress certified to him

by the Speaker of the House] before the grand jury for its action," 2 U.S.C. § 194 – has refused, at

the direction of the Attorney General, to present the matter of Ms. Miers's and Mr. Bolten's

conduct to a grand jury.  The Committee, therefore, seeks to enforce the subpoenas in a civil

action before this Court.

12.    Accordingly, in order to obtain the information necessary to fulfill its

oversight and legislative responsibilities to ensure that the federal criminal laws are enforced

fairly and impartially, and without improper partisan political interference, and to ensure that the

investigative processes of the Congress are respected, the Judiciary Committee, pursuant to the

express authorization of the House, seeks in this action to have the Court declare, *inter alia*, that:

(1) Ms. Miers is not "immune" from the obligation to appear before the Committee in response to

a duly authorized, issued and served Committee subpoena; (2) Ms. Miers and Mr. Bolten must

produce privilege logs identifying all documents withheld on grounds of executive privilege; and (3) Ms. Miers's and Mr. Bolten's claims of executive privilege are improper in the context of communications not involving the President or undertaken directly in preparation for advising the President, and that Ms. Miers's and Mr. Bolten's claims of executive privilege are, in any event, overcome by the Committee's demonstrated, specific need for the subpoenaed testimony and documents.  In addition, the Committee respectfully seeks an injunction:  (1) directing Ms. Miers to appear before the Committee to respond to questions pertinent to the Investigation and to invoke executive privilege on a question-by-question basis if and when appropriate; (2) directing Ms. Miers and Mr. Bolten to provide, as required by the subpoenas, a detailed privilege log, identifying by author, recipient, date and subject matter those documents responsive to the subpoena that have been withheld on executive privilege grounds; and (3) directing Ms. Miers and Mr. Bolten to produce all non-privileged documents responsive to the subpoenas.  Finally, the Court should retain jurisdiction (1) to review any assertions of privilege by Ms. Miers in response to questions put to her by the Committee, and any assertions of privilege by Ms. Miers and Mr. Bolten as to particular documents responsive to their subpoenas, and (2) to order the production of all testimony and documents where a valid assertion of executive privilege is outweighed by the needs of the Committee.

13.   The political branches are at an impasse and thus it is imperative that the Court entertains this action.  If the matter is left unresolved, the Committee will continue to suffer substantial injury as it will be prevented from obtaining the information necessary to fulfill its constitutional responsibilities to conduct meaningful oversight and enact necessary and appropriate legislation.

## PARTIES

14. Plaintiff Judiciary Committee is a standing committee of the House. It is vested with the authority, among other things, to oversee the administration of justice within the federal courts, administrative agencies and federal law enforcement entities.

15. Defendant Harriet Miers formerly served as Counsel to President George W. Bush and left government service on January 31, 2007, prior to her receipt of the Committee's subpoena. Ms. Miers is an active member of the Bar of the District of Columbia and, according to the website of the law firm of which she is a partner, Locke Liddell & Sapp LLP, maintains an office for the private practice of law in Washington, D.C., as well as in Dallas and Austin, Texas.

16. Defendant Joshua Bolten is, and has been since April 14, 2006, Chief of Staff to President George W. Bush. He is custodian of the White House documents being sought by the Committee under subpoena.

## JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345. This case arises under the Constitution and laws of the United States and is brought by the United States, *i.e.*, the House Judiciary Committee, pursuant to a Resolution of the House.

18. This Court has authority to issue a declaratory judgment and order other relief that is just and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

19. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and (e).

## GENERAL ALLEGATIONS

### The Committee Possesses the Constitutional Authority to Investigate the Forced Resignations of the Nine U.S. Attorneys

20. The Constitution bestows upon the House, by itself and through its committees, the power to investigate matters and conditions relating to subjects within Congress's

legislative jurisdiction, and to conduct oversight of the other branches of the federal government, including the Executive Branch. This power includes the constitutional authority to require the production of evidence – through subpoenas for testimony and documents – from Executive Branch officials.

21.    The Judiciary Committee is a standing committee of the House, duly established pursuant to House Rule X.1(k), Rules of the House of Representatives (110th Cong.), *available at* http://clerk.house.gov/legislative/rules110/index.html. The Rules of the House are adopted pursuant to the Rulemaking Clause of the Constitution. U.S. Const. art. I, § 5, cl. 2.

22.    House Rule X grants to the Judiciary Committee legislative and oversight jurisdiction over, *inter alia,* "judicial proceedings, civil and criminal," and "criminal law enforcement"; the "application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction"; the "operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within its jurisdiction"; and "any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction." House Rules X.1(k)(1), (7); House Rules X.2(b)(1)(A)-(C), *supra* ¶ 21.

23.    House Rule XI specifically authorizes the Judiciary Committee and its subcommittees to "require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary." *Id.* at XI.2(m)(1)(B). The Rule also provides that the power to issue subpoenas may be delegated to the Committee chairman. *Id.* at XI.2(m)(3)(A)(I).

24.    Under Rule V(b)(3) of the Judiciary Committee's Rules of Procedure, the Subcommittee has legislative and oversight jurisdiction over, *inter alia*, "appropriate matters as

referred by the Chairman."  Committee on the Judiciary Rules of Procedure, *available at*

http://www.gpo.gov/congress/house/house10cal/104con/ix.pdf.

**The Committee Investigates the Forced Resignations and
Attempts, Repeatedly, to Secure Necessary and Appropriate
Documents and Testimony from the Administration on a Voluntary Basis**

25.    Since February 2007, the Committee has been investigating the circumstances

and issues surrounding the forced resignations of nine U.S. Attorneys in 2006:  H.E. "Bud"

Cummins III (E.D. Ark.); John McKay (W.D. Wash.); David Iglesias (D.N.M.); Paul K. Charlton

(D. Ariz.); Carol Lam (S.D. Cal.); Daniel Bogden (D. Nev.); Kevin Ryan (N.D. Cal.); Margaret

Chiara (W.D. Mich.); and Todd Graves (W.D. Mo.).

26.    The Investigation, which encompasses the subpoenas that form the basis for

this lawsuit, was undertaken pursuant to the authority delegated by the House to the Judiciary

Committee as described above.

27.    The legislative purposes of the Investigation fall into two main categories:

(1) investigating and exposing malfeasance, abuse of authority and possible violations of law by

Executive Branch personnel; and (2) considering whether the conduct uncovered warrants

additions or modifications to existing federal law.  The specific legislation that may be considered

as a result of the Investigation includes, but is not limited to, the following:  (1) whether existing

laws governing the appointment of U.S. Attorneys should be modified; (2) whether legislation

should be enacted to impose restrictions on the removal of U.S. Attorneys; (3) whether existing

laws governing temporary appointment of acting or interim U.S. Attorneys should be modified;

(4) whether legislation should be enacted to address the Executive Branch's practice of dual

appointments under which sitting U.S. Attorneys hold, simultaneously, full-time high-level

leadership positions at Department headquarters in Washington, D.C.; (5) whether legislation

should be enacted to address issues that arise when elected or appointed political officials lobby Executive Branch officials for action on particular criminal investigations or for replacement of particular U.S. Attorneys; (6) whether existing laws dealing with the non-politicization of the Department should be strengthened; (7) whether existing laws adequately prevent prosecutorial powers from being used to serve improper political ends; (8) whether existing penalties for obstruction of justice should be strengthened; and (9) whether penalties for violating the Presidential Records Act, 44 U.S.C. §§ 2201-2207, should be added to the law.[2]

28.    In the course of its Investigation, the Committee uncovered evidence that the decision to force the resignation of or retain some U.S. Attorneys may have been based on improper partisan political factors, including whether their offices were pursuing public corruption or voter fraud cases believed politically desirable to the Administration, or whether their offices were investigating or prosecuting allies of the Administration.

29.    For example, one forced resignation covered by the Investigation concerned David Iglesias, former U.S. Attorney for the District of New Mexico.  From the time he was appointed U.S. Attorney in 2001, Mr. Iglesias consistently registered impressive approval ratings from the Department and was widely viewed in the Department as an up-and-coming star.  At no time in the development of lists of U.S. Attorneys for possible termination drawn up between early 2005 and mid-October 2006 did Mr. Iglesias's name surface.  On November 7, 2006, however, Mr. Iglesias's name appeared on such a list.  The Committee received evidence that this change in fortunes could be explained, at least in part, by two factors:  (1) local officials in New Mexico affiliated with the President's party complained to the Administration that Mr. Iglesias

---

[2] Additional legislative purposes of the Investigation may be found in the Committee's Additional Views of Chairman Conyers and Chair Sánchez in Support of the Committee's Contempt Report, *available at* http://judiciary.house.gov/Media/PDFS/MajorityView071105.pdf.

had refused to pursue so-called "voter fraud" claims which those officials perceived would assist their party in the 2006 elections; and (2) just prior to the 2006 elections, a U.S. Senator and a Member of the House who are members of the President's party contacted Mr. Iglesias in an apparent effort to expedite indictments in a locally prominent corruption case involving officials from the opposing party. Those conversations ended abruptly when Mr. Iglesias refused to provide the requested information or action. Complaints were thereafter communicated to White House personnel and, even before Mr. Iglesias's requested resignation was made public, Karl Rove, then-White House Deputy Chief of Staff, reportedly told local political allies of the Administration in New Mexico that Mr. Iglesias "was gone." No Department witness has been able to explain how Mr. Iglesias's name came to appear on the forced resignation list or who recommended that he be forced out, even though he was one of the final U.S. Attorneys placed on that list. Moreover, no one at the Department claims to have recommended that Mr. Iglesias's name be placed on that list.

30. The Committee also uncovered evidence that actions by some Department personnel may have violated civil service laws, and that actions by some White House personnel may have violated the Presidential Records Act.

31. On March 6, 2007, the Subcommittee held a hearing in connection with the Investigation. Among those appearing at the hearing were six of the recently replaced U.S. Attorneys (Mr. Bogden, Mr. Charlton, Mr. Cummins, Mr. Iglesias, Ms. Lam and Mr. McKay) along with William E. Moschella, then-Principal Associate Deputy Attorney General. The hearing elicited contradictory explanations for the reasons and circumstances surrounding the forced resignations.

32.    On March 8, 2007, Judiciary Committee Chairman John Conyers, Jr. and Subcommittee Chair Linda Sánchez wrote to then-Attorney General Gonzales, requesting, among other things, documents related to the Investigation and on-the-record interviews of Department employees.  Letter from John Conyers, Jr., Chairman of the House Comm. on the Judiciary, and Linda T. Sánchez, Chair of the Subcomm. on Commercial and Admin. Law, to Alberto Gonzales, Attorney General (Mar. 8, 2007).  Over the course of the ensuing four months, the Department produced approximately 8,500 pages of documents to the Committee, and on-the-record interviews or hearings were conducted with fourteen current and former Department employees, which answered some questions, but raised many others, particularly with respect to the role of White House personnel in the forced resignations.

33.    Based on the testimony at the March 6, 2007 hearing and the resulting questions regarding the White House's involvement, Chairman Conyers and Chair Linda Sánchez, on March 9, 2007, wrote to the Counsel to the President, Fred Fielding, requesting documents and other information relating to the forced resignations of the U.S. Attorneys and related matters.  Letter from Chairman Conyers and Chair Sánchez to Fred F. Fielding, Counsel to the President (Mar. 9, 2007).

34.    On March 20, 2007, the Counsel to the President responded that the Administration would only be willing to provide certain limited documents and that it would only consider allowing certain, unsworn, off-the-record interviews under a set of specified limitations and conditions.  Letter from Mr. Fielding to Chairman Conyers *et al.* (Mar. 20, 2007).  Most notably, the Counsel to the President demanded that any interviews be conducted in private by only one Member of Congress or "a limited number of Members," and "without the need [or possibility] for an oath, transcript, subsequent testimony, or the subsequent issuance of

subpoenas." The Counsel to the President also demanded that the subject matter of any such interviews be confined to "the subject of (a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests." Questions about internal staff discussions would not be allowed. In terms of documents, the Counsel to the President specifically indicated that the Administration was willing to release two categories of documents: "(a) communications between the White House and the Department of Justice concerning the request for resignations of the U.S. Attorneys in question; and (b) communications on the same subject between White House staff and third parties, including Members of Congress or their staffs on the subject." No internal documents of any kind would be released. In effect, the Administration offered to provide clearly unprivileged documents, and unsworn, untranscribed answers in return for a guarantee that the Committee would not thereafter seek sworn, transcribed testimony on these or any other topics, regardless of what was learned during the initial interviews and would relinquish its right to pursue any other documents.

35. The conditions set forth in the letter Counsel to the President's March 20, 2007 letter were unreasonable and overly restrictive, and would have unacceptably hindered the Committee's ability to conduct its Investigation. Accordingly, the Committee voted on March 21, 2007, to authorize the issuance of subpoenas to Ms. Miers and Mr. Bolten, among others.

36. In an effort to avoid issuing and serving the authorized subpoenas, Chairman Conyers and Chair Sánchez, on March 22, 2007, again wrote to the Counsel to the President, explaining that the Administration's conditions would unacceptably hinder the Committee's ability to conduct its Investigation, and asserting that the Committee still wished to negotiate a

mutually agreeable solution with the Administration.  Letter from Chairman Conyers and Chair

Sánchez to Mr. Fielding (Mar. 22, 2007).  The Committee received no response to this letter.

37.    On March 28, 2007, Chairman Conyers, together with Senator Patrick Leahy,

Chairman of the Senate Committee on the Judiciary, again wrote to the Counsel to the President,

explaining the importance of obtaining information relating not only to communications between

White House personnel and outside parties, but also internal White House communications.

Letter from Chairman Leahy and Chairman Conyers to Mr. Fielding (Mar. 28, 2007).  The letter

suggested that a useful initial step toward accommodation would be for the Administration to

produce the documents it had already indicated it was willing to produce, such as communications

between White House personnel and outside parties.

38.    On April 12, 2007, the Counsel to the President rejected the proposals set

forth in the letter of March 28, 2007, and reiterated the Administration's original pre-conditions

for providing information to the Committee, as set forth in his letter of March 20, 2007.  Letter

from Mr. Fielding to Chairman Leahy and Chairman Conyers (Apr. 12, 2007).

39.    On May 21, 2007, Chairman Conyers and Chair Sánchez sent a fourth letter

to the Counsel to the President, expressing their disappointment with the Administration's refusal

to negotiate and again declaring the Committee's willingness to "work out a voluntary resolution

of our requests for information from the White House."  Letter from Chairman Conyers and Chair

Sánchez to Mr. Fielding (May 21, 2007).

40.    On June 7, 2007, the Counsel to the President again reiterated the

Administration's initial position, and again declined to produce a single document, including the

two categories of documents he had effectively identified in his March 20, 2007 correspondence

as unprivileged.  Letter from Mr. Fielding to Chairman Conyers and Chair Sánchez (June 7, 2007).

**Harriet Miers Defies a Congressional
Subpoena As Directed by the Administration**

41.   Emails to or from Ms. Miers produced to the Committee by the Department, and testimony provided by various Department officials, demonstrate that Ms. Miers played a significant, but as yet not fully defined, role in the plans to force the resignations of the nine U.S. Attorneys.  The emails produced and testimony obtained revealed, among other things, that:

    a.  Following up on a question raised just after the 2004 reelection of the President from then-White House Deputy Chief of Staff Karl Rove, Ms. Miers asked the Department in early 2005 whether the Administration could fire and replace all of the U.S. Attorneys.  A top aide to the Attorney General, Kyle Sampson, informed Ms. Miers that it would not be wise to fire all the U.S. Attorneys.  He suggested, instead, that a list could be drawn up of selected U.S. Attorneys who could be asked to resign and then replaced.

    b.  Ms. Miers received multiple drafts of the forced resignation lists over the course of the process.  Indeed, Ms. Miers was a key point of contact for Department officials seeking approval for the plan to force the resignations of numerous U.S. Attorneys following the 2006 elections.

    c.  Ms. Miers personally confronted U.S. Attorney John McKay (W.D. Wash.) with complaints made by local party officials regarding Mr. McKay's failure to convene a federal grand jury to investigate

allegations of voter fraud during a very close gubernatorial election

in the State of Washington.  That confrontation occurred just

months before Ms. Miers approved the proposal to force Mr.

McKay to resign.

d.  When the final forced resignation list was developed, Ms. Miers

was one of the White House officials to whom the list was

circulated for approval.

42.  Accordingly, on June 13, 2007, the Subcommittee issued a subpoena,

returnable July 12, 2007, to Ms. Miers for testimony and documents relevant to the Investigation.

The subpoena was served that day by agreement upon Ms. Miers's counsel, George T. Manning.

The subpoena directed that, if Ms. Miers withheld any documents from production on grounds of

privilege, she must produce a privilege log, describing the withheld documents in a specified

manner to permit the Subcommittee to rule on the claims of privilege.

43.  On June 28, 2007, the Counsel to the President wrote to Mr. Manning, and

"directed" Ms. Miers not to produce "any documents in response to the subpoena" issued by the

Subcommittee because he considered such documents covered by executive privilege.  Letter

from Mr. Fielding to George T. Manning, Counsel for Harriet Miers (June 28, 2007).  On July 9,

2007, the Counsel to the President again wrote Mr. Manning, stating that testimony on the U.S.

Attorney matter would also be considered privileged and directed her "not to provide this

testimony."  Letter from Mr. Fielding to Mr. Manning (July 9, 2007).  That same day, Ms.

Miers's counsel informed the Subcommittee that she would follow the Administration's direction.

Letter from Mr. Manning to Chairman Conyers and Ranking Member Lamar S. Smith (July 9,

2007).

17

44.    The next day, July 10, 2007, Chairman Conyers and Chair Sánchez wrote to confirm their understanding that Ms. Miers would appear at the July 12 hearing.  Chairman Conyers and Chair Sánchez acknowledged their understanding that Ms. Miers intended "to decline to answer certain questions" based on the Counsel to the President's assertion of privilege and stated that such claims would be considered at the hearing.  Letter from Chairman Conyers and Chair Sánchez to Mr. Manning (July 10, 2007).  That evening, however, Mr. Manning wrote back stating that Ms. Miers had "recently" been directed by the Administration not even to attend the scheduled hearing, based on an internal opinion of the Office of Legal Counsel issued that very day by Principal Deputy Assistant Attorney General Steven Bradbury.  Letter from Mr. Manning to Chairman Conyers and Chair Sánchez (July 10, 2007).  Mr. Bradbury had opined that Ms. Miers, as a former "immediate adviser" to the President, was "absolutely immune" from testifying before Congress.

45.    On July 11, 2007, Chairman Conyers and Chair Sánchez informed Mr. Manning that there exists at law no privilege or immunity that allows a congressional subpoena recipient to refuse to appear at a hearing.  Letter from Chairman Conyers and Chair Sánchez to Mr. Manning (July 11, 2007).  The letter strongly urged that Ms. Miers appear, and explained that any claim of privilege should be asserted by Ms. Miers at the hearing.  The letter warned that if Ms. Miers did not appear at the hearing she would risk subjecting herself to proceedings for contempt of Congress.

46.    The same day, Mr. Manning sent a letter to Chairman Conyers and Chair Sánchez, reiterating that Ms. Miers would refuse to appear at the hearing.  Letter from Mr. Manning to Chairman Conyers and Chair Sánchez (July 11, 2007).

47.    The same day, former White House Political Director Sara Taylor appeared, pursuant to a subpoena, before the Senate Committee on the Judiciary which was also investigating the forced resignations of the nine U.S. Attorneys.  Represented at the hearing by personal counsel, Ms. Taylor invoked executive privilege as directed by the Administration in response to certain questions, but answered others.  Although Ms. Taylor – like Ms. Miers – was under subpoena and also under instructions from the Administration to assert executive privilege with respect to certain information, Ms. Taylor – unlike Ms. Miers – did not simply refuse to appear at the hearing, and – also unlike Ms. Miers – answered questions she believed were not covered by the privilege.

48.    On July 12, 2007, the Subcommittee met as scheduled, and Ms. Miers failed to appear.  Chair Sánchez issued a ruling, sustained by the Subcommittee, rejecting Ms. Miers's assertions that she was immune from Committee process and that her entire testimony and the contents of any documents that she might possess were covered by executive privilege.  *See* H.R. Rep. No. 110-423, at 6 (2007).

49.    On July 13, 2007, Chairman Conyers sent a letter to Mr. Manning, enclosing a copy of the ruling, warning of the possibility of contempt proceedings, and offering Ms. Miers a final opportunity to comply with the subpoena.  Letter from Chairman Conyers to Mr. Manning (July 13, 2007).

50.    On July 17, 2007, Mr. Manning replied to Chairman Conyers's July 13, 2007 letter, reiterating Ms. Miers's continued refusal to comply with her subpoena.  Letter from Mr. Manning to Chairman Conyers (July 17, 2007).

**Joshua Bolten Defies a Congressional
Subpoena As Directed by the Administration**

51.    Documents obtained by the Committee, and testimony provided by various Department officials, demonstrate that White House personnel played a significant role in the plans to force the resignations of the nine U.S. Attorneys.  Accordingly, the Committee reasonably concluded that Mr. Bolten is likely to have custody of documents in the White House critical to the Investigation.

52.    On June 13, 2007, the Committee issued a subpoena, returnable June 28, 2007, to Mr. Bolten for White House documents relevant to the Investigation.  The subpoena was served that day by agreement upon Emmet Flood of the Office of the Counsel to the President. The subpoena directed that, if Mr. Bolten withheld any documents from production on grounds of privilege, he must produce a privilege log, describing the withheld documents in a specified manner to permit the Committee to rule on the claims of privilege.  A similar subpoena was served on Mr. Bolten by the Senate Judiciary Committee.

53.    On June 28, 2007, the Counsel to the President sent a letter to Chairmen Conyers and Leahy stating that the Administration refused, on grounds of executive privilege, to produce a single document in response to Mr. Bolten's subpoena.  Letter from Mr. Fielding to Chairman Leahy and Chairman Conyers (June 28, 2007).  Mr. Bolten did not provide a privilege log for the withheld documents as required by the subpoena, and the letter claiming executive privilege was not signed by the President.  The letter did not mention the categories of documents that the Counsel to the President had previously stated could be provided without any assertion of privilege.

54.    On June 29, 2007, Chairmen Conyers and Leahy sent a letter to the Counsel to the President, expressing concern at the breadth of the Administration's privilege assertion,

reiterating that the documents should be produced, and stating that, if any documents were not produced, the Administration at a minimum must provide an appropriately specific privilege log as required by the subpoenas.  Letter from Chairman Leahy and Chairman Conyers to Mr. Fielding (June 29, 2007).  The letter also stated that any claim of executive privilege must be asserted personally by the President in writing.  The letter requested that the documents and/or privilege log, as well as the President's statement, if any, be provided by July 9, 2007.

55.    On July 9, 2007, the Counsel to the President responded that Mr. Bolten would continue to refuse to provide a privilege log as required by the subpoena, and that the claim of executive privilege would not be asserted personally by the President in writing.  Letter from Mr. Fielding to Chairman Leahy and Chairman Conyers (July 9, 2007).

56.    On July 17, 2007, Chairman Conyers and Chair Sánchez informed the Counsel to the President that the Committee would consider the Administration's claim of executive privilege at a July 19 hearing, and once again urged compliance with the subpoena. Letter from Chairman Conyers and Chair Sánchez to Mr. Fielding (July 17, 2007).

57.    On July 19, 2007, the Subcommittee met as scheduled.  Chair Sánchez issued a ruling rejecting the Administration's claim of executive privilege, and the Subcommittee sustained that ruling.  H.R. Rep. No. 110-423, at 6.

58.    The same day, Chairman Conyers sent a letter to the Counsel to the President, enclosing a copy of the ruling, warning of the possibility of contempt proceedings, and offering Mr. Bolten a final opportunity to comply with the subpoena.  Letter from Chairman Conyers to Mr. Fielding (July 19, 2007).

59.   On July 23, 2007, the Counsel to the President replied to Chairman Conyers, once again stating the Administration's refusal to comply with the subpoena.  Letter from Mr. Fielding to Chairman Conyers (July 23, 2007).

### The House Finds Ms. Miers and Mr. Bolten in Contempt of Congress But Only After Again Seeking a Voluntary Resolution

60.   The Judiciary Committee met in open session on July 25, 2007, to consider Ms. Miers's and Mr. Bolten's refusals to comply with the congressional subpoenas directed to them.  The Judiciary Committee voted to report their contumacious conduct to the full House.

61.   That same day, Chairman Conyers wrote to the Counsel to the President and provided him with a copy of the Committee's Report.  Chairman Conyers urged negotiations aimed at reaching a mutually agreeable compromise, noting that "[m]any possible paths are available to reach an agreement in this matter" and offering several different compromise proposals based on the Committee's earlier proposals and on recent examples of successful accommodation between Congress and the Executive Branch on other sensitive matters.  Letter from Chairman Conyers to Mr. Fielding (July 25, 2007).  The Administration did not respond to this letter.

62.   On November 5, 2007, the date the Committee's Report was filed with the Clerk of the House, Chairman Conyers again wrote the Counsel to the President, urging that efforts be made towards a cooperative resolution of the matter and offering a detailed proposal for resolving the dispute.  Letter from Chairman Conyers to Mr. Fielding (Nov. 5, 2007).  The Counsel to the President rejected this offer on November 9, 2007, and reiterated his previous unacceptable proposal.

63.   On February 14, 2008, the House passed H.R. Res. 982, which adopted both H.R. Res. 979, finding Ms. Miers and Mr. Bolten in contempt of Congress in violation of

2 U.S.C. § 192, and H.R. Res. 980.  H.R. Res. 979, 980, 982, 110th Cong. (Feb. 14, 2008).  H.R.

Res. 979 provides that, pursuant to 2 U.S.C. §§ 192 and 194, the Speaker of the House shall

certify the Committee's Report, H.R. 110-423, detailing the failures and refusals of Ms. Miers and

Mr. Bolten to comply with their congressional subpoenas, to the U.S. Attorney for the District of

Columbia.  When it voted, the House had before it the Committee's Report and supporting

Additional Views, which contained detailed information regarding the conduct and legal

assertions of Ms. Miers and Mr. Bolten as well as the facts and circumstances of the U.S.

Attorney controversy and related matters in the Investigation.

64.    Speaker of the House Nancy Pelosi certified the Committee's Report to

Jeffrey Taylor, U.S. Attorney for the District of Columbia, on February 28, 2008.  Letter from

Nancy Pelosi, Speaker of the House of Representatives, to Jeffrey A. Taylor, United States

Attorney (Feb. 28, 2008).

65.    Almost immediately thereafter, the Administration released a press statement

characterizing the House's actions as "truly contemptible," and asserting that the Department

would not comply with the law by presenting the matter of Ms. Miers's and Mr. Bolten's

contempt of Congress to a grand jury.  *See* Lara Jakes Jordan, *Pelosi Wants Bush Aides

Investigated*, Wash. Post (Feb. 28, 2008), *available at* http://www.washingtonpost.com/wp-

dyn/content/article/2008/02/28/AR2008022802793.html.

66.    On February 28, 2008, Speaker Pelosi also wrote to Attorney General

Michael B. Mukasey, stating that "[t]here is no authority by which persons may wholly ignore a

subpoena and fail to appear as directed because a President unilaterally instructs them to do so."

Letter from Speaker Pelosi to Michael B. Mukasey, Attorney General (Feb. 28, 2008).  The

Speaker noted that the Attorney General previously testified that he would not enforce the

contempt citation, and urged him "to reconsider your position and to ensure that our nation is operating under the rule of law and not at presidential whim."

67.    On February 29, 2008, Attorney General Mukasey responded that "the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers," Letter from Attorney General Mukasey to Speaker Pelosi (Feb. 29, 2008), despite the fact that 2 U.S.C. § 194 states specifically that a contempt citation is to be referred to the U.S. Attorney, "whose duty it shall be to bring the matter before the grand jury for its action."  The Attorney General asserted that it is the Department's "longstanding position . . . 'that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege.'"

68.    Pursuant to H.R. Res. 980, the House authorized the Chairman of the Judiciary Committee to, *inter alia*, initiate this suit on behalf of the Committee to enforce Ms. Miers's and Mr. Bolten's legal obligations to comply with their subpoenas.  Also, pursuant to H.R. Res. 980, the Speaker specifically authorized the House Office of General Counsel to represent the Judiciary Committee in this litigation.

69.    This lawsuit is necessary and appropriate because Ms. Miers and Mr. Bolten, at the direction of the White House, have wholly refused to comply with their subpoenas; because repeated efforts by the Committee to reach an accommodation have been unsuccessful; because there is no realistic possibility that such efforts will be successful in the future; and because the Department has refused to carry out its statutory obligation to present the House's contempt finding to a grand jury.

## SPECIFIC CLAIMS FOR RELIEF

### <u>Count I</u>
### Ms. Miers Violated Her Legal Obligations by Ignoring Her
### Congressional Subpoena and Refusing to Appear Before the Committee

70.    Plaintiff incorporates and realleges paragraphs 1 through 69 above, as if set forth fully herein.

71.    The Congress is vested by Article I of the Constitution with the power to investigate matters and conditions within Congress's legislative jurisdiction, and to conduct oversight over the other branches of the federal government, including the Executive Branch.

72.    The Investigation concerns matters that are within Congress's legislative and oversight jurisdiction.

73.    Ms. Miers had an enforceable legal obligation to appear before the Subcommittee in response to the congressional subpoena issued to her.  The Constitution does not provide any immunity regarding the obligation to appear, and neither the President nor any of his aides may "immunize" her from a valid congressional subpoena.  Any direction from the President or any of his aides to Ms. Miers not to appear before the Subcommittee in response to the subpoena issued to her is wholly invalid and ineffectual.  All citizens have a binding obligation to respond forthrightly to properly issued and served congressional subpoenas, to respect the processes and authority of the Congress and its committees and to respond appropriately with respect to matters under congressional investigation.

74.    A recipient of a congressional subpoena who wishes to decline, on grounds of executive privilege, to answer questions put to the witness by a congressional committee, is legally obligated to assert the privilege in the presence of that committee, and in response to specific questions put to him or her by that committee.

75.     Ms. Miers violated her legal obligations when she (1) refused to appear before the Subcommittee in response to the subpoena issued to her, and (2) failed to assert executive privilege in the presence of the Committee or in response to specific questions put to her by the Committee.

76.     The Administration's claim of executive privilege did not and could not, in response to the subpoena issued to Ms. Miers, relieve her of the obligation to appear before the Subcommittee and, if applicable, assert executive privilege on a question-by-questions basis.

77.     Ms. Miers's refusal to appear impugned the dignity of Congress and prevented the Committee from gaining access to information central to its legislative function, thereby constituting a concrete injury under the Constitution.

78.     Wherefore, the Judiciary Committee prays that this Court (a) declare that Ms. Miers's refusal to appear before the Committee in response to the subpoena issued to her was without legal justification and violated her legal obligations; (b) declare that Ms. Miers may assert executive privilege in response to Committee questions only in the presence of the Committee and only in response to particular questions; (c) declare that Ms. Miers must testify before the Committee about all subjects not covered by executive privilege; and (d) enjoin Ms. Miers to appear and testify forthwith before the Committee in compliance with the subpoena issued to her and all rulings of this Court.

## Count II
### Ms. Miers and Mr. Bolten Violated Their Legal Obligations by Ignoring Their Subpoenas and Refusing to Provide Privilege Logs As Required by the Subpoenas

79.    Plaintiff incorporates and realleges paragraphs 1 through 78 above, as if set forth fully herein.

80.    Upon reviewing potentially relevant documents in the White House's possession, the Department acknowledged that such documents include communications directly responsive to the Committee's subpoenas to Ms. Miers and Mr. Bolten.

81.    Ms. Miers and Mr. Bolten were legally obligated to provide the Committee with adequate privilege logs describing all documents withheld on grounds of executive privilege in response to the subpoenas, in order for the Committee to perform its constitutional duty to independently assess their privilege claims.

82.    Ms. Miers and Mr. Bolten violated their legal obligations by failing and refusing to provide the Committee with adequate privilege logs that described the documents withheld on grounds of executive privilege.

83.    Wherefore, the Judiciary Committee prays that this Court (a) declare that Ms. Miers's and Mr. Bolten's failures to produce privilege logs identifying all documents withheld on grounds of executive privilege in response to the congressional subpoenas were without legal justification and violated their legal obligations; and (b) enter an injunction directing Ms. Miers and Mr. Bolten forthwith to provide the Committee with privilege logs identifying by author, recipient, date and subject matter all documents withheld on grounds of executive privilege.

**Count III**
**Ms. Miers and Mr. Bolten Violated Their Legal Obligations by Failing and**
**Refusing to Provide Testimony and Documents that Are Incontrovertibly Unprivileged**

84.   Plaintiff incorporates and realleges paragraphs 1 through 83 above, as if set forth fully herein.

85.   When a claim of executive privilege in response to a congressional subpoena is based only on the President's generalized interest in confidentiality (*i.e.*, it does not involve national security, foreign relations or military affairs or direct communications with the President), the privilege covers, at most, communications authored or solicited and received by the President's closest advisers in the course of actively formulating advice for the President.

86.   With respect to the documents sought by the subpoenas to Ms. Miers and Mr. Bolten, the President only has, at best, a generalized interest in confidentiality and has no valid claim of executive privilege because (1) the Administration has represented that the President was not involved in any way in the forced resignations of the nine U.S. Attorneys, (2) the documents sought do not relate to national security, foreign policy or military affairs, nor do they involve open prosecutorial or investigative files, and (3) the White House has never asserted that the material and information at issue was gathered and discussed in preparation for directly advising the President.

87.   Ms. Miers and Mr. Bolten were legally obligated to produce to the Committee, in response to the subpoenas issued to them, all responsive documents as to which there could be no valid claim of executive privilege, and Ms. Miers was legally obligated to testify about subjects as to which there could be no valid claim of executive privilege.  Such documents and subjects for testimony include, but are not limited to, those referenced in the Counsel to the President's March 20, 2007 letter:  (1) communications between White House

28

personnel and the Department concerning the retention or forced resignation of the U.S. Attorneys in question; and (2) communications between White House personnel and third parties, including Members of Congress and their staffs, concerning the same.

88.    Ms. Miers and Mr. Bolten violated their legal obligations by failing and refusing to provide the Committee with (1) communications between White House personnel and the Department concerning the retention or forced resignation of the U.S. Attorneys in question, and (2) communications between White House personnel and third parties, including Members of Congress and their staffs, concerning the same.

89.    Wherefore, the Judiciary Committee prays that this Court (a) declare that Ms. Miers's failure to testify about, and Ms. Miers's and Mr. Bolten's failures to produce documents regarding, (i) communications between White House personnel and the Department concerning the retention or forced resignation of the U.S. Attorneys in question, and (ii) communications between White House personnel and third parties, including Members of Congress and their staffs, concerning the same, were without legal justification and violated their legal obligations; and (b) enter an injunction directing Ms. Miers forthwith to testify about, and Ms. Miers and Mr. Bolten forthwith to produce all responsive documents regarding, (i) communications between White House personnel and the Department concerning the retention or forced resignation of the U.S. Attorneys in question, and (ii) communications between White House personnel and third parties, including Members of Congress and their staffs, concerning the same.

**Count IV**
**Ms. Miers Violated Her Legal Obligations by Failing to Testify,**
**and Ms. Miers and Mr. Bolten Violated Their Legal Obligations**
**by Failing to Produce Documents Responsive to Their Subpoenas**

90.    Plaintiff incorporates and realleges paragraphs 1 through 89 above, as if set forth fully herein.

91.    When the President asserts executive privilege in response to a congressional subpoena, that assertion must be in writing and signed by the President.

92.    Executive privilege does not cover documents already released to the public or documents whose contents are widely known, and does not cover subject matter relating to the content of such documents.

93.    Executive privilege does not cover documents that are closely related to other documents the White House or the Department have already released to the public (*e.g.*, where the Department has released one e-mail within a single e-mail chain, the remainder of the e-mail chain is not covered by executive privilege).

94.    Executive privilege does not cover subject matter that is closely related to other subject matter about which the White House or the Department has already permitted Executive Branch officials to testify (*e.g.*, where Department officials have testified about their recollections of conversations with Ms. Miers, Ms. Miers's testimony as to her recollections of those same conversations is not covered by executive privilege).

95.    Executive privilege is a qualified privilege.  Therefore, even when documents responsive to a congressional subpoena – and information responsive to oral questions tendered by Members of Congress to a subpoena recipient – are within the scope of executive privilege, the documents must nevertheless be produced to the investigating committee – and the oral questions must nevertheless be answered – where the committee can demonstrate a specific need by

showing (1) the subpoenaed documents or testimony likely contain important evidence, and (2) the subpoenaed documents or testimony cannot be obtained elsewhere through the exercise of due diligence.

96.    The Committee has a demonstrated, specific need for Ms. Miers's testimony and for some or all of the documents sought by the subpoenas in Ms. Miers's and Mr. Bolten's possession, custody or control.  The Committee, through the exercise of due diligence, has been unable, during its year-long Investigation, to obtain elsewhere this demonstrably critical information that is available only from Ms. Miers and Mr. Bolten (the latter as custodian of White House records).

97.    The Committee's interest in securing Ms. Miers's testimony and the documents responsive to Ms. Miers's and Mr. Bolten's subpoenas, is particularly acute given that the documents and testimony may encompass or concern communications that reflect attempts either to obstruct justice by interfering with the due administration of the federal criminal justice system or to violate other federal laws.

98.    Ms. Miers and Mr. Bolten are legally obligated to produce to the Committee, in response to the subpoenas issued to them, all responsive documents not covered by executive privilege, and all responsive documents covered by the privilege but as to which the claim of privilege is outweighed by the Committee's demonstrated, specific need for the information sought.

99.    Ms. Miers is legally obligated to testify before the Committee, in response to the subpoena issued to her, about all matters not covered by executive privilege, and all matters covered by the privilege but as to which the claim of privilege is outweighed by the Committee's need for the information sought.

100. Ms. Miers and Mr. Bolten have violated their legal obligations to the Committee by failing and refusing to produce to the Committee all responsive documents not covered by executive privilege, and all responsive documents covered by the privilege but as to which the claim of privilege is outweighed by the Committee's need for the information sought.

101. Ms. Miers has violated her legal obligation to the Committee by failing and refusing to testify before the Committee about all matters not covered by executive privilege, and all matters covered by the privilege but as to which the claim of privilege is outweighed by the Committee's need for the information sought.

102. Wherefore, the Judiciary Committee prays that this Court (a) declare that Ms. Miers must testify before the Committee about (i) all matters not covered by executive privilege, and (ii) all matters covered by executive privilege but as to which the claim of executive privilege is outweighed by the Committee's need for the information sought; (b) enjoin Ms. Miers forthwith to appear and testify before the Committee about (i) all matters not covered by executive privilege, and (ii) all matters covered by executive privilege but as to which the claim of executive privilege is outweighed by the Committee's need for the information sought; and (c) enjoin Ms. Miers and Mr. Bolten forthwith to produce to the Committee, in response to the subpoenas issued to them, (i) all responsive documents not covered by executive privilege, and (ii) all responsive documents covered by executive privilege but as to which the claim of executive privilege is outweighed by the Committee's demonstrated, specific need for the information sought.

## PRAYER FOR RELIEF

WHEREFORE, the Judiciary Committee respectfully prays that this Court

A.  Enter declaratory and injunctive relief as follows:

1.  With respect to Count I:

    a.  a declaration that Ms. Miers's refusal (i) to appear before the
        Committee in response to the subpoena issued to her, (ii) to assert
        executive privilege in response to particular questions and (iii) to
        testify before the Committee about all subjects not covered by
        executive privilege was without legal justification and violated her
        legal obligations; and

    b.  an injunction directing Ms. Miers forthwith to appear before the
        Committee in compliance with the subpoena issued to her.

2.  With respect to Count II:

    a.  a declaration that Ms. Miers's and Mr. Bolten's failures to produce
        privilege logs identifying all documents withheld on grounds of
        executive privilege in response to the congressional subpoenas were
        without legal justification and violated their legal obligations; and

    b.  an injunction directing Ms. Miers and Mr. Bolten forthwith to
        provide the Committee with privilege logs identifying by author,
        recipient, date and subject matter all remaining documents withheld
        on grounds of executive privilege.

3.  With respect to Count III:

    a.  a declaration that Ms. Miers's failure to testify about, and Ms.
        Miers's and Mr. Bolten's failures to produce documents regarding,
        (i) communications between White House personnel and the
        Department concerning the retention or forced resignation of the

33

U.S. Attorneys in question, and (ii) communications between White House personnel and third parties, including Members of Congress and their staffs, concerning the same, were without legal justification and violated their legal obligations; and

b.    an injunction directing Ms. Miers to forthwith testify about, and Ms. Miers and Mr. Bolten to forthwith produce all responsive documents regarding, (i) communications between White House personnel and the Department concerning the retention or forced resignation of the U.S. Attorneys in question, and (ii) communications between White House personnel and third parties, including Members of Congress and their staffs, concerning the same.

4.   With respect to Count IV:

a.    at the appropriate time, a declaration that Ms. Miers must testify before the Committee about (i) all matters not covered by executive privilege, and (ii) all matters covered by executive privilege but as to which the claim of executive privilege is outweighed by the Committee's need for the information sought;

b.    at the appropriate time, enjoin Ms. Miers forthwith to appear and testify before the Committee about (i) all matters not covered by executive privilege, and (ii) all matters covered by executive privilege but as to which the claim of executive privilege is

        outweighed by the Committee's need for the information sought; and

    c.   at the appropriate time, enjoin Ms. Miers and Mr. Bolten forthwith to produce to the Committee, in response to the subpoenas issued to them, (i) all responsive documents not covered by executive privilege, and (ii) all responsive documents covered by executive privilege but as to which the claim of executive privilege is outweighed by the Committee's demonstrated, specific need for the information sought.

B.  Retain jurisdiction (i) to review any assertions of privilege by Ms. Miers in response to questions put to her by the Committee, and any assertions of privilege by Ms. Miers and Mr. Bolten as to particular documents responsive to their subpoenas, and (ii) to order the production of all testimony and documents where a valid assertion of executive privilege is outweighed by the needs of the Committee.

C.  Grant the Judiciary Committee such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel
DAVID PLOTINSKY
Assistant Counsel
CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR, D.C. Bar # 476240
Assistant Counsel
RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff
Committee on the Judiciary of the
U.S. House of Representatives

March 10, 2008

08- 409
JDB

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Committee on the Judiciary,
United States House of Representatives

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___11001___
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

Harriet Miers; Joshua Bolten, in his capacity as
custodian of White House records

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Dallas, TX
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Irvin B. Nathan, General Counsel; Kerry W. Kircher, Deputy General Counsel;
United States House of Representatives   Rick Kaplan, Assistant Counsel
219 Cannon House Office Building
Washington, D.C. 20515    202-225-9700

Case: 1:08-cv-00409
Assigned To : Bates, John D.
Assign. Date : 3/10/2008
Description: General Civil

1414

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☒ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### ☐ A.  Antitrust

☐ 410 Antitrust

### ☐ B.  Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C.  Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D.  Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ☒ E.  General Civil (Other) OR ☐ F.  Pro Se General Civil

☒ Declaratory and Injunctive Relief For Claims Arising Under the Constitution

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

④

| G. Habeas Corpus/ 2255 | H. Employment Discrimination | I. FOIA/PRIVACY ACT | J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| K. Labor/ERISA (non-employment) | L. Other Civil Rights (non-employment) | M. Contract | N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

U.S. Const. art. I.; failure and refusal to comply with congressional subpoenas

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   DEMAND $ _____  Check YES only if demanded in complaint  JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction) ☐ YES ☒ NO   If yes, please complete related case form.

DATE 3/10/08   SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.