# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
COMMITTEE ON THE JUDICIARY,                             )
UNITED STATES HOUSE                                     )
OF REPRESENTATIVES,                                     )
                                                        )        Case No. 1:08-cv-00409 (JDB)
                           *Plaintiff*,                 )
                                                        )
                 v.                                     )
                                                        )
HARRIET MIERS, *et al.*                                 )
                                                        )
                                                        )
                           *Defendants*.                )
_____)

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7 and 56.1, and based on the entire record, the Memorandum of Points and Authorities filed herewith, and the accompanying declaration and exhibits, Plaintiff Committee on the Judiciary of the U. S. House of Representatives ("Judiciary Committee"), by and through counsel, hereby respectfully moves the Court for entry of an Order granting summary judgment to Plaintiff on Counts I and II of its Complaint. On these two counts, there is no genuine issue as to any material fact and Plaintiff is entitled to judgment as a matter of law.

Accordingly, as to Count I, Plaintiff Judiciary Committee prays that this Court (a) declare that Harriet Miers's refusal to appear before the Judiciary Committee's Subcommittee on Commercial and Administrative Law (collectively, with Judiciary Committee, "Committee") in response to the subpoena issued to her was without legal justification and violated her legal obligations; (b) declare that Ms. Miers may assert executive privilege in response to Committee questions only in the presence of the Committee and only in response to particular questions,

where appropriate and if properly authorized to do so; (c) declare that Ms. Miers must testify

before the Committee about all subjects not covered by privilege; and (d) enjoin Ms. Miers to

appear and testify forthwith before the Committee in compliance with the subpoena served upon

her and the rulings of this Court.

As to Count II, Plaintiff Judiciary Committee prays that this Court (a) declare that the

failures of Ms. Miers and Joshua Bolten to produce privilege logs identifying all documents

withheld on grounds of executive privilege or any other basis in response to the duly issued and

served congressional subpoenas were without legal justification and violated their legal

obligations; and (b) enter an injunction directing Ms. Miers and Mr. Bolten forthwith to provide

the Committee with privilege logs identifying by author, recipient, date, and subject matter all

documents withheld on grounds of executive privilege or any other legal basis; and (c) enjoin the

Defendants forthwith to produce to the Committee all nonprivileged documents responsive to the

subpoenas.

A proposed order is submitted herewith.

Respectfully submitted,

 /s/ Irvin B. Nathan_____
IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel
CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR, D.C. Bar # 476240
Assistant Counsel
RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel
KATHERINE E. MCCARRON, D.C. Bar # 486335
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff
Committee on the Judiciary of the
U.S. House of Representatives

Dated:  April 10, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
COMMITTEE ON THE JUDICIARY,          )
UNITED STATES HOUSE                       )
OF REPRESENTATIVES,                        )
                                                    )          Case No. 1:08-cv-00409 (JDB)
                        *Plaintiff*,                 )
                                                    )
            v.                                       )
                                                    )
HARRIET MIERS, *et al.*                      )
                                                    )
                                                    )
                        *Defendants*.              )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel
CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR, D.C. Bar # 476240
Assistant Counsel
RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel
KATHERINE E. MCCARRON, D.C. Bar # 486335
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff Committee on the Judiciary
of the U.S. House of Representatives

Dated:  April 10, 2008

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………….…………………...………………..........iii

INTRODUCTION……………….……...………………………………………………………...1

SUMMARY OF THE ARGUMENT.………………………………………………..……...2

STATEMENT OF THE CASE………………………………..……………………………..……7

ARGUMENT………………….……………………………………………………………...…14

I.    THE COURT HAS THE POWER AND THE RESPONSBILITY TO RESOLVE
      THIS CASE AND CONTROVERSY.……………...………………………………………14

      A.    The Court Has Subject Matter Jurisdiction Under 28 U.S.C. §§ 1331
            and 1345……………………………………………………………………14

            1.    This Case Arises Under the Constitution and Laws of the
                  United States for Purposes of 28 U.S.C. § 1331……...…………………14

            2.    The Court Has Subject Matter Jurisdiction Under 28 U.S.C.
                  § 1345……………………………………………………….…...............16

      B.    The Committee Has Standing to Sue.…………………………………………18

      C.    This Matter Is Otherwise Justiciable Because The Parties Are at a
            Constitutional Impasse Requiring Judicial Resolution………………….…….21

II.   MS. MIERS HAS A LEGAL OBLIGATION TO APPEAR BEFORE THE
      COMMITTEE, AND MAY ONLY ASSERT EXECUTIVE PRIVILEGE ON
      BEHALF OF THE PRESIDENT IN RESPONSE TO SPECIFIC QUESTIONS….…….26

      A.    Ms. Miers's Reliance on the President's Direction to Her Not to Appear
            Is Unjustified, Unlawful and Ineffectual...............................................................27

      B.    Federal Court Decisions and Executive Branch Practice Make Clear
            That No Immunity Exists for Former Aides to the President……………..…….30

            1.    The Case Law Unequivocally Confirms that There Exists
                  No Absolute Privilege for Presidential Aides……………..………..……30

            2.    The Department's Justifications for Absolute Immunity for
                  Former Presidential Aides Are Contrary to Law and Unsound………....33

III.  MS. MIERS AND MR. BOLTEN MUST PRODUCE UNPRIVILEGED
      DOCUMENTS AND PROVIDE PRIVILEGE LOGS DESCRIBING THE

RESPONSIVE DOCUMENTS THEY HAVE WITHHELD IN RESPONSE
TO THEIR CONGRESSIONAL SUBPOENAS…………..……………………...…..…..36

A.      Defendants Are Legally Obligated to Produce Privilege Logs………..…….…...36

B.      The Constitution Requires that Defendants Provide a Privilege Log for
        Any Documents Responsive to Their Subpoenas that Are Withheld on
        the Basis of a Qualified Privilege in Order for the Committee to Fulfill
        Its Constitutional Responsibilities.………………..…………………………..42

CONCLUSION…………..…………………………………………..…………………………..45

# TABLE OF AUTHORITIES

**Federal Cases**

*Allen v. Wright*, 468 U.S. 737 (1984) .......................................................................18

*Barenblatt v. United States*, 360 U.S. 109 (1959) ..................................................14, 43

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ......................................18

*Black v. Sheraton Corp. of Am.*, 371 F. Supp. 97 (D.D.C. 1974) .................................38

*Black v. Sheraton Corp. of Am.*, 564 F.2d 531 (D.C. Cir. 1977) ..................................36

*Caribbean Shippers Ass'n, Inc. v. Surface Transp. Bd.*, 145 F.3d 1362 (D.C. Cir. 1998) ...........29

*Clinton v. Jones*, 520 U.S. 681 (1997) ..................................................................2, 34

*Davis v. Passman*, 442 U.S. 228 (1979) ....................................................................22

*Dellums v. Powell*:

     561 F.2d 242 (D.C. Cir. 1977) ("*Dellums I*") .............................................2, 36

     642 F.2d 1351 (D.C. Cir. 1980) ("*Dellums II*")....................................36, 37, 38

*Democratic Nat'l Comm. v. U.S. Dep't of Justice*, No. 07-712, 2008 WL 803421
     (D.D.C. March 27, 2008) .................................................................................41

*DiBenedetto v. Morgenthau*, 148 F.2d 223 (D.C. Cir. 1945)………….......................................25

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) ........................................27

*Edmonds Institute v. U.S. Dep't of the Interior*, 383 F. Supp. 2d 105 (D.D.C. 2005)..................39

*Emspak v. United States*, 349 U.S. 190 (1955).........................................................42

*Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236 (4th Cir. 1985) ..............................29

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*,
     528 U.S. 167 (2000)...............................................................................18, 20

*FTC v. Gagnon*, 390 F.2d 323 (8th Cir. 1968) ..........................................................17

*Goldwater v. Carter*, 444 U.S. 996 (1979) ...............................................................22

*Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974 (N.D. Cal. 2006) ...................................29

*Hutcheson v. United States*, 369 U.S. 599 (1962) .......................................................43

*In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997)....................25

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998)............................................................29

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).................................................38, 40

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) ...............................16

*Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 01-639,
2006 WL 2038513 (D.D.C. 2006) ...........................................................................39-40

*Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002)....................................................20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................18, 19

*Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509 (D.C. Cir. 1993) ...........17

*\*McGrain v. Daugherty*, 273 U.S. 135 (1927) .................................. 3, 14, 21, 27, 41-42

*Mead Data Cent., Inc. v. Air Force*, 566 F. 2d 242 (D.C. Cir. 1977)...........................39

*Medellin v. Texas*, No. 06-984, 2008 WL 762533 (U.S. Mar. 25, 2008) .....................27

*Murphy v. Waterfront Comm'n*, 378 U.S. 52 (1964)....................................................31

*\*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) ..........................1, 2, 24, 30, 34, 36, 37

*Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984) ............38

*Powell v. McCormack*, 395 U.S. 486 (1969) ...............................................................14

*Quinn v. United States*, 349 U.S. 155 (1955)...............................................................42

*Raines v. Byrd*, 521 U.S. 811 (1997) ....................................................................18, 20

*Sanders v. McClellan*, 463 F.2d 894 (D.C. Cir. 1972) .................................................42

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*:

    366 F. Supp. 51 (D.D.C. 1973) ("*S. Select Comm. I*") ................................15, 16

370 F. Supp. 521 (D.D.C. 1974) ("*S. Select Comm. II*") ...................................21

498 F.2d 725 (D.C. Cir. 1974) ("*S. Select Comm. III*")...........................19, 21

*Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899 (N.D. Ill. 2006) ......................................29

*TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007)...................26

*Townsend v. United States*, 95 F.2d 352 (D.C. Cir. 1938).............................................31

*\*U.S. House of Representatives v. U.S. Dep't of Commerce*,
11 F. Supp. 2d 76 (D.D.C. 1998) ...............................................................19, 22

*\*United States v. AT&T*:

551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*") ..........................................15, 18, 22, 23, 28, 29

567 F.2d 121 (D.C. Cir. 1977) ("*AT&T II*") .............................................21, 22, 23, 24

*United States v. Burr*, 25 F. Cas. 30 (D. Va. 1807) (No, 146920)................................31

*United States v. Bryan*, 339 U.S. 323 (1950)......................................................................27

*United States v. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) ........................15, 23

*United States v. Lee*, 106 U.S. 196 (1882).......................................................................30

*United States v. Murdock*, 290 U.S. 389 (1933) ..............................................................31

*United States v. Nixon*, 418 U.S. 706 (1974)................................................................2, 16, 30, 34

*United States v. Providence Journal Co.*, 485 U.S. 693 (1988) ....................................16

*United States v. Reynolds*, 345 U.S. 1 (1953) .................................................................30

*United States v. Tobin*, 195 F. Supp. 588 (D.D.C. 1961),
*rev'd on other grounds*, 306 F. 2d 270 (D.C. Cir. 1962) ....................................32

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*,
454 U.S. 464, 474 (1982)...............................................................................18

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ..........................................................39

*Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002)................................19, 20, 21, 24

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................21

*Watkins v. United States*, 354 U.S. 178 (1957)......................................4, 42

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................................ 4, 27-28

*Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2d Cir. 1991)......................................29

## International Cases

*Howard v. Gossett*, (1845) 10 Eng. Rep. 359, (Q.B.) ....................................................3

## Constitutional Provisions

U.S. Const. art. I, § 5, cl. 2........................................................................17

U.S. Const. art. II, § 1, cl. 8 .......................................................................29

## Statutes and Rules

2 U.S.C. § 130f (2006)..............................................................................17

2 U.S.C. § 192 (2006)..........................................................................28, 43

2 U.S.C. § 194 (2006)..............................................................................23

28 U.S.C. § 516 (2006) .......................................................................16, 17

28 U.S.C. § 530D (2006) ...........................................................................17

28 U.S.C. § 1331 (2006) ..................................................................14, 15, 16

28 U.S.C. § 1345 (2006) .....................................................................16, 17

28 U.S.C. § 2201 (2006) ...........................................................................25

28 U.S.C. § 2202 (2006) ...........................................................................25

Fed. R. Civ. P. 56...................................................................................26

Pub. L. No. 94-574, 90 Stat. 2721 (1976)........................................................15

Pub .L. No. 96-486, 94 Stat. 2369 (1980)........................................................15

**Legislative Materials**

H.R. Rep. No. 110-423 (2007), *available at*
      http://judiciary.house.gov/Media/PDFS/ContemptReport071105.pdf ................... *passim*

H. Res. 979, 110th Cong. (Feb. 14, 2008) ..................................................................21

H. Res. 980, 110th Cong. (Feb. 14, 2008) ..................................................................21

H. Res. 982, 110th Cong. (Feb. 14, 2008) ..................................................................21

*U.S. Government Information Policies and Practices—The Pentagon Papers:*
      *Hearing Before the Subcomm. on Foreign Operations and Gov't Info.*
      *of the H. Comm. on Gov't Operations*, 92nd Cong. 358 (1971)
      (testimony of William H. Rehnquist, Assistant Att'y Gen.)........................................34, 42

Rule II.8, Rules of the House of Representatives (110th Cong.)....................................17

*To Amend the Freedom of Information Act: Hearing on S. 1142 Before the*
      *Subcomm. on Admin. Practice and Procedure of the S. Comm. on the Judiciary,*
      93rd Cong. 229 (1973) (testimony of Att'y Gen. Elliot L. Richardson) ..........................24

**Other Authorities**

13 R. Chandler, History & Proceedings of the House of Commons (1743)....................................3

Erwin Chemerinsky, *Controlling Inherent Presidential Power:  Providing a Framework*
      *for Judicial Revie*w, 53 S. Cal. L. Rev. 863 (1983)..........................................25

*Excerpts from Interview with Nixon About Domestic Effects of Indochina War,*
      N.Y. Times, May 20, 1977, at A16...............................................................1

Eric Lichtblau, *Bush's Law* (2008) ...........................................................9

Harold C. Relyea & Todd B. Tatelman, *Presidential Advisors' Testimony Before*
*Congressional Committees:  An Overview*, Cong. Research Serv., Report for
Congress (updated Mar. 17, 2008)................................................................32

John McKay, *Train Wreck at the Justice Department: An Eyewitness Account*, 31 Seattle U.L.
Rev. 265 (2008) ...............................................................................8

Remarks Prepared for Delivery by Att'y Gen. Michael B. Mukasey (Mar. 27, 2008), *available at*
http://www.usdoj.gov/criminal/pr/speeches/2008/03/
03-27-08_rmrks-ag-ca-comwlth.pdf...............................................................9

Mark J. Rozell, *Executive Privilege:  Presidential Power,*

*Secrecy, and Accountability* (2002) ...........................................................................40, 41

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a
    Claim of Executive Privilege*,
    8 Op. Off. Legal Counsel 101 (1984) (Theodore Olson, Assistant Att'y Gen.)...............22

Raoul Berger, *Congressional Subpoenas to Executive Officials*,
    75 Colum. L. Rev. 865 (1975) ...................................................................................3

Randall K. Miller, *Congressional Inquests:  Suffocating the Constitutional
    Prerogatives of Executive Privilege*, 81 Minn. L. Rev. 631 (1997) .................................41

*Response to Congressional Request for Information Regarding Decisions
    Made Under the Independent Counsel Act*,
    10 Op. Off. Legal Counsel 68 (1986) (Charles J. Cooper, Assistant Att'y Gen.) .............15

1 The Works of James Wilson (R. McCloskey ed. 1967) .............................................3

## <u>INTRODUCTION</u>

Not since the days of Watergate have the Congress and the federal courts been confronted with such an expansive view of executive privilege as the one asserted by the current presidential administration ("Administration") and the individual Defendants in this case. At the heart of this case is an investigation undertaken by the Plaintiff Committee on the Judiciary of the U.S. House of Representatives ("Judiciary Committee") and its Subcommittee on Commercial and Administrative Law (collectively, "Committee") into whether partisan political considerations at the Department of Justice ("Department") and the White House undermined the fair and impartial administration of the federal criminal justice system and led to the unprecedented forced resignations in mid-Administration of nine United States Attorneys ("Investigation"). During the course of the Investigation, Harriet Miers, a private citizen and former Counsel to the President, asserted that a President's mere request that she not even appear to testify before, and produce documents to, the Committee is enough to bestow absolute immunity upon her from a validly issued congressional subpoena. Similarly, Joshua Bolten contended that, as White House Chief of Staff, he is "absolutely immune" from congressional process and thus is not required to comply in any manner with a Committee subpoena for documents. These extraordinary and wholly unsupportable claims flout established law and suggest a return to the long-since discredited executive mantra of "when the President does it, that means that it is not illegal."[1]

The Supreme Court and this Circuit, of course, have repeatedly made clear that no person "is above the law's commands." *Nixon v. Sirica*, 487 F.2d 700, 711 (D.C. Cir. 1973) (en banc) (per curiam). It is now well understood and widely accepted, for example, that there exists no general "unqualified presidential privilege of immunity from judicial process," *United States v.*

---

[1] *Excerpts from Interview with Nixon About Domestic Effects of Indochina War*, N.Y. Times, May 20, 1977, at A16.

*Nixon*, 418 U.S. 683, 707 (1974); that the qualified executive privilege can be overcome by a

showing of need not only in criminal process, but also in private civil litigation, *Dellums v.*

*Powell*, 561 F.2d 242, 245-46 (D.C. Cir. 1977) ("*Dellums I*"); that even the President is not

immune from civil process and a demand to appear for a deposition, *Clinton v. Jones*, 520 U.S.

681, 709-10 (1997); and that the Executive Branch is not the final arbiter of whether or not

executive privilege applies, *Sirica*, 487 F.2d at 713-14.

Based on the uncontroverted material facts of this case and applicable law, the Judiciary

Committee moves at this time for partial summary judgment on Counts I and II of the

Complaint.  In particular, the Committee now seeks (1) a declaration that Ms. Miers and Mr.

Bolten must comply with – and are not immune from – their duly authorized, issued and served

congressional subpoenas; (2) an injunction directing Ms. Miers to appear before the Committee,

be sworn, respond to questions and invoke executive privilege, if appropriate and properly

authorized to do so, in response to *specific* questions; (3) an injunction directing Ms. Miers and

Mr. Bolten to produce privilege logs, identifying with specificity which documents are being

withheld and on what precise legal grounds; and (4) an injunction directing Ms. Miers and Mr.

Bolten to produce promptly to the Committee all nonprivileged documents responsive to their

subpoenas.

## SUMMARY OF ARGUMENT

Partial summary judgment is appropriate at this time because this Court has jurisdiction,

and because the Committee is entitled to a judgment as a matter of law on Counts I and II.  With

respect to jurisdiction, this case and controversy arises under the Constitution and laws of the

United States and is ripe for adjudication.  The Congress, whose subpoena authority emanates

from the Constitution and is deeply rooted in English law, cannot fulfill its legislative and

oversight functions if its subpoenas, particularly those for information that is critically important

to such functions, can be countermanded by personal and presidential fiat.  To fulfill its role as

"the grand inquest of the state,"[2] the Congress must have access to testimony and documents

relevant to its Investigation.  For "the administration of the Department of Justice – whether its

functions were being properly discharged or were being neglected or misdirected, . . . [i]s one on

which legislation could be had and would be materially aided by the information which [the

Congress's] investigation [i]s calculated to elicit." *McGrain v. Daugherty*, 273 U.S. 135, 177

(1927).

As a result of Defendants' unlawful failure to comply with their subpoenas, and on the

heels of the Department's adamant refusal to carry out its statutory obligation to present to a

grand jury the contempt of Congress citations issued against Ms. Miers and Mr. Bolten, the

Committee has standing to bring this action.  The Committee has been concretely injured

because it has been deprived of information critical to the completion of its Investigation and

because, if the actions of the contumacious witnesses stand, the Committee will not be able to

function as the Constitution requires and as our Nation's citizens expect.  The Committee's

"informational injury" is likely to be redressed by the declaratory and injunctive relief it seeks, as

such relief will enable the Committee to inform itself fully prior to rendering meaningful

conclusions and proposing necessary corrective legislation.  It is for these reasons that the full

---

[2] 1 The Works of James Wilson 415 (R. McCloskey ed. 1967).  Similarly, in speaking about the House of Commons, former British Secretary of State and then-Member of Parliament William Pitt asserted:  "We are called the Grand Inquest of the Nation, and as such it is our Duty to inquire into every step of publick Management, either Abroad or at Home, in order to see that nothing has been done amiss."  Raoul Berger, *Congressional Subpoenas to Executive Officials*, 75 Colum. L. Rev. 865, 886 (1975) (quoting 13 R. Chandler, History & Proceedings of the House of Commons 172 (1743)); *see also Howard v. Gossett*, (1845) 10 Eng. Rep. 359, 379-80 (Q.B.) (asserting that the House of Commons "are general inquisitors of the realm" who "may inquire into every thing which it concerns the public weal for them to know").

U.S. House of Representatives ("House") has specifically authorized the Committee to seek and obtain appropriate declaratory and injunctive judicial relief.

The parties are unquestionably at a constitutional impasse. The Counsel to the President, on behalf of both Ms. Miers and Mr. Bolten, has made absolutely clear that the Administration will not compromise and has expressly acknowledged the impasse. The Administration will not permit *any* testimony by Ms. Miers on the record and under oath and will not produce a *single* document or even a routine itemization of the documents withheld. While the Committee has repeatedly attempted to reach an acceptable accommodation with the White House, the Administration has made only one take-or-leave it offer that it well understands the Committee cannot accept. The Administration offered to produce clearly unprivileged documents, and unsworn, untranscribed answers on limited topics in return for a guarantee that the Committee would not thereafter seek sworn, transcribed testimony on these or any other topics, regardless of what was learned during the initial interviews, and would relinquish its right to seek any other documents. Had the Committee accepted such a one-sided proposal, it would have violated the American people's trust to oversee the effective operation of their duly elected government.

It should be clear that were the Court to decline to rule on the merits of this suit, it would tacitly sanction, and make unreviewable, the Administration's unilateral claims of executive power. As former Attorney General and Supreme Court Justice Robert Jackson warned, a "presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

It may be suggested that the Congress could seek to enforce its will through its inherent power of Contempt of Congress. But even if the House were to exercise its inherent contempt

authority and arrest the Defendants, try them in the House and imprison them, Defendants would

undoubtedly petition this Court for writs of habeas corpus, once again placing the legality of

their actions squarely before this Court.  Thus, rather than divert congressional resources from

other pressing affairs, engage in unseemly actions and escalate tensions between the political

branches only to face the same, if not more complex, issues in short order, the Court should

entertain the Committee's suit.  This is why the Department's Office of Legal Counsel ("OLC")

has repeatedly asserted, in opinions signed by former Assistant Attorneys General Theodore B.

Olson and Charles J. Cooper, that the appropriate method to resolve such disputes is through a

civil action initiated by the Congress.

      With respect to the merits of Count I, the law of this Circuit makes clear that no citizen is

"immune" from a congressional subpoena.

> It is unquestionably the duty of all citizens to cooperate with the
> Congress in its efforts to obtain the facts needed for intelligent
> legislative action.  It is their *unremitting obligation* to respond to
> subpoenas, to respect the dignity of Congress and its committees
> and to testify fully with respect to matters within the province of
> proper investigation.

*Watkins v. United States*, 354 U.S. 178, 187-88 (1957) (emphasis added).  Ms. Miers's status as a

former aide does not absolve her of this responsibility.  She is being sued in her *personal*

capacity based on contumacious conduct that occurred while she was a *private* citizen.  The

President has no power, by statute or under the Constitution, to direct Ms. Miers to disobey or

disregard a congressional subpoena.  Accordingly, Ms. Miers had no right to rely on a wholly

unauthorized direction from the White House to ignore her legal obligation to the Committee.

There is simply no manner in which the Congress can fulfill its obligation under the Constitution

to legislate and perform oversight if the individuals it subpoenas – those who supply the

Congress with essential information – may unilaterally claim exemption from congressional process.

With respect to the merits of Count II, Defendants' unilateral and unsupported assertion that they do not have to produce privilege logs is akin to Ms. Miers's erroneous assertion of "absolute immunity."  Instead, the law is clear that, in the context of a congressional investigation, any person claiming a qualified privilege with respect to documents withheld must produce a detailed account of those documents and the basis for their withholding.  Such action is required to facilitate Congress's duty – and, if necessary, the court's – to assess independently claims of privilege.

Federal courts have insisted that when a member of the Executive Branch claims privilege – including executive privilege, which is qualified and may be overcome by need – he or she must provide a privilege log with sufficient detail to enable the Court to assess whether the claim is valid.  Cognizant of this judicial requirement and the need for the branches to assess independently the validity of any claim of privilege, prior Administrations have routinely provided privilege logs to Congress when asserting executive privilege.  Such logs are a critical first step in evaluating whether Congress's needs outweigh the executive's need for confidentiality of the documents itemized on the log.  This is why it has long been held that, even in the context of suits for information brought against the Executive Branch by private citizens under the Freedom of Information Act ("FOIA"), or in other private civil suits, that the Executive Branch is required to provide a privilege log to justify any claims of executive privilege.

In conjunction with entering judgment for the Committee on Counts I and II, the Court should also instruct Ms. Miers and Mr. Bolten forthwith to produce all responsive documents as

to which no reasonable claim of executive privilege can be asserted (including, for example, communications between the White House and third parties, such as the Department, state political operatives and Members of Congress).  Once Ms. Miers has appeared and, if appropriate, asserted executive privilege in response to specific questions, and after both Defendants have submitted privilege logs to the Committee, the Committee will make further determinations on Defendants' assertions of privilege, and if necessary, the Committee will file dispositive motions on the issues of whether the information withheld is privileged at all or, if covered by executive privilege, whether the privilege is outweighed by the Committee's needs.

### STATEMENT OF THE CASE[3]

As a result of widespread allegations that the sudden and unprecedented forced resignations of a number of United States Attorneys ("U.S. Attorneys") in late 2006 were the result of improper and unlawful partisan political considerations potentially undermining politically sensitive criminal investigations, the Committee in early 2007 commenced an oversight investigation to determine the validity of such allegations and whether corrective legislation was required.  *See* H.R. Rep. No. 110-423, at 15, 55-60 (2007), *available at* http://judiciary.house.gov/Media/PDFS/ContemptReport071105.pdf ("Report"), Exhibit 1.[4]  The circumstances of the forced resignations were quite suspicious:  the U.S. Attorneys were given no reasons for the requests that they resign promptly; few were given any advance warning or made aware of any performance deficiency they could have attempted to correct; and most had

---

[3] All of the citations to the record for the material statements contained in this Statement of the Case and the Memorandum generally are set forth in the accompanying Plaintiff Judiciary Committee's Statement of Material Facts As to Which There Is No Genuine Issue ("Statement").

[4] The Report consists of the Judiciary Committee's official report together with the "Additional Views" submitted by Judiciary Committee Chairman John Conyers, Jr. and Subcommittee on Commercial and Administrative Law Chair Linda Sánchez, *see id.* at 11-77, and the "Minority Views," *see id.* at 99-155.

received sterling reviews from the office at the Department tasked with evaluating their performance. *See id.* at 44.

Among the nine U.S. Attorneys asked to resign were: (1) Carol Lam of the Southern District of California, who successfully prosecuted Congressman Randy "Duke" Cunningham, a prominent member of the President's political party, and who was continuing to investigate Mr. Cunningham's associates, including a high-ranking political appointee in the Central Intelligence Agency ("CIA"); (2) John McKay of the Western District of Washington, who despite repeated calls by members of the President's political party for prosecutions of alleged "voter fraud" against their opponents during the hotly contested 2004 Washington State gubernatorial race, failed to indict any case of voter fraud there;[5] and (3) David Iglesias of the District of New Mexico, who was contacted just prior to the 2006 congressional elections by two Members of Congress – both members of the President's political party – disappointed to learn that he did not plan to return indictments *prior* to election day against members of the opposing political party that would have assisted one of the two Members who was seeking reelection.[6]  *Id.* at i-iii.

The need to investigate the real reasons for these forced resignations is manifest.  As Attorney General Michael B. Mukasey recently acknowledged, a "Department[] investigation[]

---

[5] *See generally* John McKay, *Train Wreck at the Justice Department: An Eyewitness Account*, 31 Seattle U. L. Rev. 265 (2008) (asserting that partisan political considerations led to request for his resignation; documenting the false statements made to Congress about that request; and suggesting that there could be criminal prosecutions for obstruction of justice and perjury by Department officials in connection these terminations).

[6] The suspect reasons offered to Congress for the forced resignations are illustrated most clearly in the case of Mr. Iglesias.  Since the Administration could not admit that he was forced out because he did not return an indictment against state officeholders prior to the congressional elections, or pursue other voter fraud cases demanded by local officials in the President's political party, the Principal Associate Deputy Attorney General testified to Congress that Mr. Iglesias was asked to leave (after six years in the job) because he was an "absentee landlord," *i.e.*, he was too often away from the office.  H.R. Rep. No. 110-423, at 48, Exhibit 1.  No one at the main headquarters of the Department, however, had ever heard of this charge of absenteeism prior to Mr. Iglesias' termination.  Pursuant to its Investigation, the Committee learned that this allegation first surfaced during an interview for Mr. Iglesias's replacement with Mr. Iglesias's First Assistant *after* Mr. Iglesias had been forced to resign.  Notwithstanding the characterization of his remarks by those interviewing him, the former assistant described Mr. Iglesias as "an excellent U.S. Attorney," and that he did not view Mr. Iglesias as an "absentee landlord."  *Id.*

of public corruption . . . that is motivated by partisan politics is just corruption by another name."
Remarks Prepared for Delivery by Attorney General Michael B. Mukasey (Mar. 27, 2008),
*available at* http://www.usdoj.gov/criminal/pr/speeches/2008/03/03-27-08_rmrks-ag-ca-
comwlth.pdf.  Discharging U.S. Attorneys because they fail to use the criminal justice system to
further the Administration's partisan political ends is not only improper retribution imposed on
those individual U.S. Attorneys, but it sends a powerful and inappropriate message to the U.S.
Attorneys remaining in office and may wrongfully subject individuals to prosecution for invalid
reasons.

    In public statements in early 2007, former Attorney General Alberto R. Gonzales, who
was Counsel to the President when the forced resignation process began, initially claimed that he
was not involved in any discussions about the matter.  In later congressional testimony, Mr.
Gonzales claimed to have very little memory of the matter.[7]  Statement ¶ 22; H.R. Rep. No. 110-
423, at 36, Exhibit 1.  Principle Associate Deputy Attorney General William Moschella testified
before Congress that the forced resignations were all performance related and that any White
House involvement was minimal and occurred only at the end of the process.  H.R. Rep. No.
110-423, at 19, Exhibit 1.  Subsequent testimony and documents provided by Department

---

[7] According to an author who researched the issue:

> Some aides wanted Gonzales to become more aggressive in confronting his accusers, but the more
> lawyerly minded aides in the room – apparently fearing a perjury trap if Gonzales misspoke again
> – favored a conservative approach, advising the Attorney General to point to his faulty memory
> when pressed for details.
>
>     The "I don't recall" strategy won out, and it was a disaster.  In one congressional appearance
> after another, Gonzales gave muddled or even contradictory responses about key issues in the
> controversy:  how the firing list was developed, who weighed in, his own level of personal
> involvement, the role of Karl Rove and the White House, the impact that sensitive political
> corruption investigations had in determining who was ousted, and more.  Sixty-four times at one
> particularly painful Senate Judiciary Committee appearance in April, Gonzales said he couldn't
> remember key details.

Eric Lichtblau, *Bush's Law* 295-96 (2008).

officials, however, suggested that the Gonzales and Moschella statements were false and misleading, thus still leaving unresolved precisely what the reasons were for the terminations and what role the White House played in them. Most significantly, the testimony of more than fifteen senior Department officials revealed that *none* of them could identify who at the Department had recommended the termination of many of those U.S. Attorneys on the list. *Id.* at 43. For example, with regard to Mr. Iglesias, one of the final U.S. Attorneys added to the termination list, not a single Department witness recalled who recommended his addition, and each claimed that he or she had not done so. *Id.* at 47-48. Former Deputy Attorney General James B. Comey testified that he had supervised the departed U.S. Attorneys, was fully familiar with their work, had never recommended that any of them (with one exception) be removed from office, and could not credit the reasons offered for the terminations of the others. *Id.* at 45-46.

Documents produced by the Department and testimony provided by D. Kyle Sampson, the Attorney General's Chief of Staff and a former staffer for Mr. Gonzales when he served as Counsel to the President, revealed that the entire U.S. Attorney removal process had begun in the White House just after the 2004 presidential elections. *Id.* at 43. According to Mr. Sampson, then-White House Deputy Chief of Staff Karl Rove asked someone in the White House Counsel's office whether all ninety-four U.S. Attorneys would be fired or whether some would be selectively replaced. *Id.* at 43-44. At the time of this inquiry, Mr. Rove was being investigated by the U.S. Attorney in Chicago, who was the Special Counsel investigating the disclosure of the identity of CIA covert operative Valerie Plame. *Id.* at 43. Ms. Miers raised the possibility of firing all U.S. Attorneys to Mr. Sampson, by then at the Department, who suggested instead that they force the resignations of a select number of U.S. Attorneys who were not "loyal Bushies." *Id.* at 41, 43-44. Thereafter, in regular consultation with Ms. Miers, Mr.

Sampson compiled from early 2005 through November 2006 a fluid list of U.S. Attorneys who would be asked to resign.  Mr. Sampson, under oath, explained that the firing process was a "collaborative back and forth" between the Department and White House personnel and claimed that he could not recall who recommended that a number of the nine U.S. Attorneys be placed on that list.  *Id.* at 52-53.

Having exhausted information sources at the Department, and with many questions left unanswered, *id.* at 43, the Committee turned to the White House for information regarding the compilation of the forced resignation list and related matters.  The Committee, however, was stonewalled by the White House.  Current Counsel to the President, Fred F. Fielding, insisted that he would not permit a single witness to be interviewed or produce a single document unless (1) the Committee agreed in advance that the interviews would be off-the-record and not under oath, (2) the only permissible subject of documents to be produced and interviews would be communications between the White House and third parties, with no document production or testimony allowed with respect to internal White House discussions, and (3) no matter what information emerged in the unrecorded, unsworn interviews or the "unprivileged" documents pre-selected by the White House, the Committee would foreswear in advance any follow-up requests for information and would forego any subpoenas.[8]  Statement ¶ 16; Exhibit 5 (Fielding letter of March 20, 2007).  Simply to state the conditions is to reveal their unacceptability to any self-respecting investigator, much less a committee of the Congress.  Despite numerous efforts initiated by the Committee and its staff to reach an acceptable compromise, all of which are

---

[8] Mr. Fielding specifically refused to provide the documents involving communications between the White House and third parties when the Committee did not accept his other conditions and these documents have been held hostage to his demands ever since.

documented in the Complaint and the attached Statement, the White House categorically refused to recede from its initial, wholly untenable position.

On June 13, 2007, the Committee issued and served a subpoena on Ms. Miers, who left government service in January 2007, and who was, at the time of service, an attorney in private practice with offices in Washington, D.C. and Dallas, Texas.  Statement ¶ 27; Exhibit 14 (Miers subpoena).  Based on the emails produced by and the testimony of Department officials, Ms. Miers appeared to be a person quite knowledgeable about the subjects involving the Committee's unanswered questions.  The same day, the Committee issued a subpoena *duces tecum* to Mr. Bolten, as custodian of White House records, for documents relating to the forced resignations and related matters.  Statement ¶ 26; Exhibit 13 (Bolten subpoena).

On June 28, Mr. Fielding sent a letter to the Committee Chairman stating that the Administration refused, on the ground of executive privilege, to produce a single document in response to Mr. Bolten's subpoena and refused to provide a privilege log or anything other than the most sweeping description of the documents withheld.  Statement ¶ 30; Exhibit 16 (Fielding letter of June 28, 2007).  The letter omitted mention of the unprivileged documents the White House had originally offered to provide in return for the Committee's forbearance in pursuing the matter further.

Also on June 28, Mr. Fielding sent a letter to Ms. Miers's private attorney, George T. Manning, that "directed" Ms. Miers to refrain from producing any documents pursuant to her subpoena (although the letter did not suggest that she should not produce a privilege log).  Statement ¶ 31; Exhibit 17 (Fielding letter of June 28, 2007).  On July 9, Mr. Fielding sent a second letter to Mr. Manning, purporting to direct Ms. Miers "not to provide . . . testimony" pursuant to the subpoena, on the ground that any such testimony would be covered by executive

privilege.  Statement ¶ 35; Exhibit 20 (Fielding letter of June 9, 2007).  The following day, which was only two days prior to Ms. Miers's scheduled hearing, Mr. Manning informed the Committee that based on the Administration's newly raised assertion of "absolute immunity," Ms. Miers would not even *appear* at the hearing as required by the subpoena.  Statement ¶ 39; Exhibit 24 (Manning letter of June 10, 2007).  The Committee rejected the Administration's position and advised Ms. Miers and Mr. Bolten of the risk of a contempt citation to no avail. Statement ¶ 40; Exhibit 25 (Committee letter of July 11, 2007).  Subsequent efforts on the part of the Committee to reach an accommodation were also futile.

On July 25, the Committee voted to hold Ms. Miers and Mr. Bolten in contempt. Statement ¶ 51; H.R. Rep. No. 110-423, at 60, Exhibit 1.  Additional efforts initiated by the Committee to reach an accommodation following its vote were met with silence.  Statement ¶¶ 52, 53; Exhibit 32 (Conyers letter of July 25, 2007), H.R. Rep. No. 110-423, at 60, Exhibit 1. The Committee filed its Report formally reporting the contempt resolution to the House in November 2007, and a subsequent letter from the Chairman seeking accommodation was rejected by Mr. Fielding.  Statement ¶¶ 55, 56; Exhibits 33 (Chairman Conyers letter of November 5, 2007), 34 (Fielding letter of November 9, 2007).

When all efforts at compromise had been exhausted, the matter was brought before the full House, which voted to hold Ms. Miers and Mr. Bolten in contempt of Congress on February 14, 2008 for their willful failure to comply with the Committee's subpoenas.  Statement ¶ 57; H. Res. 979, 980, 982 (Feb. 14, 2008), Exhibits 35, 36, 37.  On February 28, pursuant to 2 U.S.C. § 194, the Speaker of the House certified the Report to the U.S. Attorney for the District of Columbia, "whose duty it shall be to bring the matter before the grand jury for its action."  *See* Statement ¶ 61, Exhibit 38 (Speaker Pelosi letter of February 28, 2007).  The following day, the

Attorney General sent a letter to the Speaker, advising that the Department "will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers."  Statement ¶ 63; Exhibit 40 (Attorney General Mukasey letter of Feb. 29, 2008).  Thereafter, pursuant to H. Res. 980, 110th Cong. (Feb. 14, 2008), this suit was filed to "initiate . . . judicial proceedings . . . to seek [a] declaratory judgment[]" and other "appropriate relief, including injunctive relief" to enforce the subpoenas at issue.

## ARGUMENT

## I.   THE COURT HAS THE POWER AND THE RESPONSBILITY TO RESOLVE THIS CASE AND CONTROVERSY.

### A.   The Court Has Subject Matter Jurisdiction Under 28 U.S.C. §§ 1331 and 1345.

#### 1.   This Case Arises Under the Constitution and Laws of the United States for Purposes of 28 U.S.C. § 1331.

Under 28 U.S.C. § 1331, the district courts have original jurisdiction of civil actions that "arise[] under the Constitution, laws, or treaties of the United States."  The Supreme Court "has consistently held" that where "the resolution of [a] case depends directly on construction of the Constitution, . . . . such suits are authorized by the statute." *Powell v. McCormack*, 395 U.S. 486, 516 (1969).

This Court has subject matter jurisdiction under § 1331 because the Committee's claims arise under the Constitution and laws of the United States.  The gravamen of the Complaint is that Defendants violated their legal obligation to comply with duly issued and served congressional subpoenas.  Congress's power to subpoena witnesses and enforce subpoenas is derived from the Constitution, as "the constitutional provisions which commit the legislative function to the two houses are intended to include th[e power of inquiry] to the end that the function may be effectively exercised." *McGrain*, 273 U.S. at 175; *see also Barenblatt v. United States*, 360 U.S. 109, 111 (1959).  In reviewing the Committee's allegations, the Court will be

required to examine, among other things, the scope of Congress's constitutional power to subpoena witnesses, Congress's ability to compel their appearance and the production of documents, and whether the Constitution authorizes the President to grant immunity from congressional process to private citizens.

This Court previously considered its subject matter jurisdiction under § 1331 in a suit brought by a Senate committee to enforce a subpoena to President Nixon. The District Court held that it did not have jurisdiction under § 1331 because the committee did not satisfy the then-existing $10,000 jurisdictional amount in controversy requirement for federal questions. *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 59 (D.D.C. 1973) ("*Senate Select Committee I*"). As the Department itself has recognized, however, because the amount in controversy requirement has since been repealed, Pub. L. No. 94-574, 90 Stat. 2721 (1976); Pub. L. No. 96-486, 94 Stat. 2369 (1980), *Senate Select Committee I* stands as a "precedent[] for bringing such civil suits under the grant of federal question jurisdiction in 28 U.S.C. § 1331." *Response to Congressional Request for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. Off. Legal Counsel 68, 87 (1986) (Charles J. Cooper, Assistant Att'y Gen.) (hereinafter "1986 OLC Opinion").[9]

In *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*"), the Executive Branch brought suit to enjoin the enforcement of a congressional subpoena against a private party. The Court of Appeals determined that it had subject matter jurisdiction under § 1331 because "[t]he Executive brought the suit claiming that its constitutional powers with respect to national security and foreign affairs included the right to prevent [disclosing certain information]

---

[9] In fact, the Department specifically noted that it had sought to utilize § 1331 in a previous lawsuit against the House seeking a declaratory judgment that executive privilege justified the withholding of documents sought by a House committee and that the "rationale used by the Department in that suit would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena against executive privilege claims." *Id.* at 88 (referring to *United States v. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983)).

to Congress," and "[t]he action therefore arises under the Constitution of the United States." *Id.*
at 389.  In this case, the interests are simply inverted; the Committee asserts that it has the
constitutional power to compel the appearance and document production of former and current
presidential aides in the face of Executive Branch contentions that it possesses the constitutional
right to prohibit such appearances and productions.  If jurisdiction exists to consider Executive
Branch claims relating to privilege, as *AT&T I* says it does, then jurisdiction also exists under §
1331 to consider Legislative Branch claims relating to the same issues.

### 2.    The Court Has Subject Matter Jurisdiction Under 28 U.S.C. § 1345.

The Court also has subject matter jurisdiction under 28 U.S.C. § 1345, because this action
was commenced "by the United States."[10]  The Legislative Branch (and its authorized agent) is
clearly as much "the United States" as the Executive Branch.  Any argument that the Congress is
not part of the United States ultimately "presumes that there is more than one United States . . .
and that the United States is something other than the 'sovereign composed of the three
branches.'"  *United States v. Providence Journal Co.*, 485 U.S. 693, 701 (1988) (quoting *Nixon*,
418 U.S. at 696).  When presented with that contention in another context, the Supreme Court
dubbed it "somewhat startling," and asserted that "the three branches are but 'co-ordinate parts
of one government.'"  *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406
(1928)).

In *Senate Select Committee I*, this Court held that a subcommittee of the Senate was not
authorized to sue as "the United States."  366 F. Supp. at 56.  In reaching this conclusion, the
Court relied upon 28 U.S.C. § 516, which states:  "Except as otherwise authorized by law, the

---

[10] Section 1345 provides:  "Except as otherwise provided by Act of Congress, the district courts shall have original
jurisdiction of all civil actions, suits or proceedings commenced *by the United States*, or by any agency or officer
thereof expressly authorized to sue by Act of Congress." *Id.*  (emphasis added).

conduct of litigation in which the United States . . . is a party, or is interested . . . is reserved to officers of the Department of Justice." The Court ruled that § 516's language indicates that only the Department has "the right to sue as the United States when jurisdiction derives from § 1345." *Id.*

This decision, however, is not only patently incorrect,[11] but it also has been superseded by "law" authorizing the Office of General Counsel of the U.S. House of Representatives ("House") to represent the House in litigation. In 1992, pursuant to its authority under the Rulemaking Clause of the Constitution, U.S. Const. art. I, § 5, cl. 2, the House established by Rule "an Office of General Counsel for the purpose of providing legal assistance and representation to the House." Rule II.8, Rules of the House of Representatives (110th Cong.), *available at* http://clerk.house.gov/legislative/rules110/index.html. To effectuate this representation, in 1999 Congress enacted and the President signed into law, 2 U.S.C. § 130f, which states:

> The General Counsel of the House of Representatives and any other counsel in the Office of the General Counsel of the House of Representatives . . . shall be entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States . . . .

*Id.* § 130f(a). This statute was enacted, in part, to address cases, such as this one, where the Department is unable to represent the Congress. *See* 28 U.S.C. § 530D(a)(1)(B)(ii). Thus, § 130f "otherwise authorize[s] by law" the Office of General Counsel to sue as "the United States" on behalf of the Congress – or an authorized committee of Congress – for purposes of § 1345.

---

[11] Among other reasons, the District Court's conclusion was incorrect because § 516, which is codified with other provisions dealing with the internal administration of the Department, was not intended to deal with representation of the Congress or one of its committees. Section 516 is simply a housekeeping statute designed to resolve conflicts between governmental agencies and the Department over who will represent the former. *See, e.g., Mail Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 527 (D.C. Cir. 1993); *FTC v. Gagnon*, 390 F.2d 323, 324-35 (8th Cir. 1968).

**B.  The Committee Has Standing to Sue.**

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  To determine whether a "case" or "controversy" exists, the Court must assess whether a party has "standing" to bring its lawsuit:

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Where "constitutional question[s are] presented," federal courts have "strictly adhered to the standing requirements to ensure that [their] deliberations will have the benefit of adversary presentation and a full development of the relevant facts."  *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541-42 (1986); *see also Raines v. Byrd*, 521 U.S. 811, 819-20 (1997) (citing *Bender* for the proposition that the Court's standing analysis "has been especially rigorous" where the constitutionality of an action by one of the branches is challenged).  In such cases, the Supreme Court has asserted that while it need not "hospitably accept for adjudication claims of constitutional violation by other branches of government where the claimant has not suffered cognizable injury," "[p]roper regard for the complex nature of our constitutional structure requires . . . that the Judicial Branch [not] shrink from a confrontation with the other two coequal branches of the Federal Government."  *Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982).

This Circuit has repeatedly recognized that a House of Congress, or its authorized agent, has standing to bring suit to enforce a duly authorized and issued subpoena.  *AT&T I* asserted

18

without reservation that "[i]t is clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." 551 F.2d at 391; *see also*, *e.g.*, *Senate Select Comm. on Presidential Campaign Activities v. Nixon,* 498 F.2d 725 (D.C. Cir. 1974) ("*Senate Select Committee III*") (entertaining merits of Senate committee's claim to enforce subpoena).  This Court also has acknowledged that the "authority in this Circuit indicat[es] that a House of Congress or a committee of Congress [has] standing to sue to retrieve information to which it is entitled." *Walker v. Cheney*, 230 F. Supp. 2d 51, 68 (D.D.C. 2002). Indeed, it is "well established" in this Court "that a legislative body suffers a redressable injury when that body cannot receive information necessary to carry out its constitutional responsibilities." *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998).  Such injuries "arise[] primarily in subpoena enforcement cases, where a house of Congress or a congressional committee seeks to compel information in aid of its legislative function." *Id*.

The Committee's inability to obtain information from Ms. Miers and Mr. Bolten is plainly both an "'actual'" and "concrete and particularized" injury. *Lujan*, 504 U.S. at 560 (citation omitted).  The Committee has identified information reasonably believed to be in the possession of Ms. Miers and Mr. Bolten that, if revealed, would assist the Committee in answering questions that are critical to its lawful Investigation. *See* H.R. Rep. No. 110-423, at 54, Exhibit 1.  After failing to secure voluntary cooperation from Defendants, the Committee authorized and issued subpoenas that Defendants ignored.  Their refusal to comply inflicted upon the Committee "an 'informational injury,'" which this Court has held "sufficiently concrete so as to satisfy the irreducible constitutional minimum of Article III." *U.S. House of Representatives*,

11 F. Supp. 2d at 85 (citation omitted); *see also id.* at 86 ("[A] failure to receive sought-after information constitutes an Article III injury to the legislative body.").

The Committee has a sufficiently "'personal stake' in the alleged dispute." *Raines*, 521 U.S. at 819. The Committee invested a significant amount of time and resources to examine the conduct of the Department and White House officials in its effort to render meaningful conclusions. It conducted hearings, authorized and issued subpoenas, and now waits for the necessary testimony and documents to be provided. Unlike the lawsuits brought by *individuals* to vindicate institutional interests in cases such as *Raines* (six Members of Congress), *Walker* (the Comptroller General, by itself), and *Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002) (thirty-two House Members), in this instance the Committee *itself* is seeking to obtain judicial relief.

The Committee also satisfies the second and third prongs of the Court's standing inquiry. The Committee's injury – being denied information critical to its lawful investigation – is caused directly by (and thus is clearly traceable to) Defendants' failures to comply with their subpoenas. It is also very likely – and thus not "merely speculative," *Friends of the Earth, Inc.*, 528 U.S. at 181 – that a declaration and injunction by this Court mandating Defendants' adherence to their subpoenas would redress the Committee's informational injury.

The additional concerns raised by the Supreme Court regarding individual legislative actor standing in *Raines*, and by this Court in *Walker* and *Kucinich*, are not present here. *Raines* "attach[ed] some importance to the fact that [the suing Members] have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit."[12] 521 U.S. at 829. Here, however, the Committee and the full House have

---

[12] Similarly, in *Walker*, this Court noted that "the Comptroller General here has not been expressly authorized by Congress to represent its interests in this lawsuit," and the Comptroller General "has not identified any Member of

voted Defendants in contempt and the full House has voted to authorize the Committee to bring

this suit. *See* H. Res. 979, 980, 982, Exhibits 35, 36, 37. Moreover, unlike in *Walker*, where

"the record reflect[ed] that Congress as a whole has undertaken no effort to obtain the documents

at issue, that no committee has requested the documents, and that no congressional subpoena has

been issued," 230 F. Supp. 2d at 68, here, the Committee worked for more than a year to try to

acquire the relevant information in furtherance of that objection and authorized and issued

subpoenas to Defendants in June 2007.

"In essence the question of standing is whether the litigant is entitled to have the court

decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498

(1975). The Supreme Court long ago in *McGrain* recognized that "[a] legislative body cannot

legislate wisely or effectively in the absence of information respecting the conditions which the

legislation is intended to affect or change." 273 U.S. at 175. Based on the unwavering

precedents of this Court and the Court of Appeals, there is no question that the Committee has

suffered cognizable harm and is entitled to redress from this Court to remedy the injury inflicted

upon it by Ms. Miers's and Mr. Bolten's failure to comply with their subpoenas.

### C. This Matter Is Otherwise Justiciable Because the Parties Are at a Constitutional Impasse Requiring Judicial Resolution.

Neither the political question doctrine nor any other prudential or equitable concerns bar

this suit. Where the enforceability of a congressional subpoena to a member of the Executive

Branch is being examined, there is "no doubt that the issues presented . . . are justiciable."

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 370 F. Supp. 521, 522

(D.D.C. 1974) ("*Senate Select Committee II*"); *see also Senate Select Committee III*, 498 F.2d

---

Congress (other than [one Senator]), who has explicitly endorsed his recourse to the judicial branch." 230 F. Supp.
2d at 68; *see also Kucinich*, 236 F. Supp. 2d at 11 (noting that the individual Members suing President and others
"have not been authorized, implicitly or explicitly, to bring this lawsuit on behalf of the House, a committee of the
House, or Congress as a whole").

725 (reaching the merits of committee's attempt to enforce its subpoena civilly); *United States v. AT&T*, 567 F.2d 121, 126 (D.C. Cir. 1977) ("*AT&T II*") ("The simple fact of a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution."). Indeed, OLC has, on more than one occasion, opined that a civil action is "[t]he most likely route for Congress to take" to enforce its subpoenas. 1986 OLC Opinion at 87; *see also Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. Off. Legal Counsel 101, 137, 139 n.40 (1984) (Theodore B. Olson, Assistant Att'y Gen.) (asserting that when an Executive Branch official asserts executive privilege during a congressional investigation, "Congress has the clearly available alternative of civil enforcement proceedings"). The central question in such suits is whether the political branches have reached a "constitutional impasse." *U.S. House of Representatives*, 11 F. Supp. 2d at 94; *see also Goldwater v. Carter*, 444 U.S. 996, 996 (1979) (Powell, J., concurring in the judgment).

In *AT&T II*, the D.C. Circuit recognized that "neither the traditional political question doctrine nor any close adaptation thereof is appropriate where neither of the conflicting political branches has a clear and unequivocal constitutional title, and it is or may be possible to establish an effective judicial settlement." *AT&T II,* 567 F.2d at 127; *see Davis v. Passman*, 442 U.S. 228, 242 (1979) ("At least in the absence of 'a textually demonstrable constitutional commitment of [an] issue to a coordinate political department,' we presume that justiciable constitutional rights are to be enforced through the courts." (internal citation omitted)). Here, neither of the political branches can claim that the text of the Constitution gives it "a clear and unequivocal constitutional title" to determine the outcome of the dispute. Thus, the Court must look to the status of the parties' negotiations to determine whether judicial review is appropriate. This issue

was explored in *AT&T I*.  There, due largely to the fact that the parties had previously come close to a settlement, the Court abstained from reaching the merits.  *See AT&T I*, 551 F.2d at 394, 395. Rather than dismissing the suit, however, the court retained jurisdiction, left in place an injunction and set forth "the outlines of a possible settlement which may meet the mutual needs of the congressional and executive parties without requiring a judicial resolution of a head-on confrontation." *Id.* at 385.  When the parties failed to reach a mutually satisfactory resolution, however, the matter returned to the Court of Appeals, and after the Court outlined its views, the dispute was resolved.  *AT&T II*, 567 F.2d at 128.

This Court also has acknowledged that it would be appropriate – at the proper time – for a federal court to resolve inter-branch disputes.  In *U.S. v. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983), the Executive Branch brought suit seeking a declaration that then-EPA Administrator Anne Gorsuch "acted lawfully in refusing to release certain documents to a congressional subcommittee." *Id.* at 151.  The lawsuit was brought following the full House's citation of Ms. Gorsuch for contempt of Congress, but *prior to* the statutory certification of the contempt resolution by the Speaker of the House to the U.S. Attorney for the District of Columbia for presentment to the grand jury.  The Court asserted that it "must initially determine whether to resolve the constitutional controversy in the context of a civil action, or defer to established statutory procedures for deciding challenges to congressional contempt citations." *Id.* at 152.  It observed that the normal course is that such "objections to congressional investigatory procedures may be raised as *defenses* in a criminal prosecution" under 2 U.S.C. § 194.  *Id.* (emphasis added).  Accordingly, the Court refused to entertain the Executive Branch's suit, because "[j]udicial resolution of [its] constitutional claim . . . will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding *or*

*other legal action taken by Congress*." *Id.* at 153 (emphasis added). Thus, while the Court ruled that the Executive Branch's suit was premature, it clearly recognized that the Court would be the appropriate arbiter when and if a final impasse was reached. Here, there is no possibility of a contempt prosecution because the Attorney General refuses to allow the U.S. Attorney for the District of Columbia to fulfill his statutory duty and present the matter to a grand jury, and the Committee is bringing "other legal action" contemplated by the Court's decision.

Once a stalemate is reached, courts must entertain the matter. As the Court of Appeals, per Judge Leventhal explained:

> Where the dispute consists of a clash of authority between two branches . . . judicial abstention does not lead to orderly resolution of the dispute. No one branch is identified as having final authority in the area of concern. If negotiation fails as in a case where one party, because of chance circumstance, has no need to compromise a stalemate will result, with the possibility of detrimental effect on the smooth functioning of government.

*AT&T II*, 567 F.2d at 126. Likewise, in *Nixon v. Sirica*, also involving a controversy between the coordinate branches (*i.e.*, the Executive and Judicial Branches), the Court of Appeals stated:

> Throughout our history, there have frequently been conflicts between independent organs of the federal government. . . . When such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them-one Supreme Court. To leave the proper scope and application of Executive privilege to the President's sole discretion would represent a mixing, rather than a separation, of Executive and Judicial functions.

487 F.2d at 715.[13]

---

[13] Then-Attorney General Elliot L. Richardson testified to the same before Congress: "[I]t seems to me that if the courts of this country have, as they were held by Chief Justice Marshall and have ever since been recognized to have, the power to invalidate legislation or to set aside executive action . . ., then they ought to have the power to adjudicate a claim of privilege as between the other two branches." *To Amend the Freedom of Information Act: Hearing on S. 1142 Before the Subcomm. on Admin. Practice and Procedure of the S. Comm. on the Judiciary*, 93rd Cong. 229 (1973).

In this case, the Committee and the Defendants "have exhausted their attempts at settlement." *Walker*, 230 F. Supp. 2d at 62 n.8.  The Counsel to the President has made abundantly clear that the Administration does not want to compromise, and stated that the parties were at an "impasse."  *See* Statement ¶¶ 50, 56; Exhibits 31 (Fielding letter of July 23, 2007), 34 (Fielding letter of November 9, 2007).  The Committee has attempted, on at least six occasions (including two *following* its vote on contempt), to engage the White House in discussions aimed at reaching an accommodation.  *See* Statement ¶¶ 18, 19, 23, 33, 52, 55; Exhibits 6 (Committee letter of March 22, 2007), 7 (Chairmen letter of March 28, 2007), 10 (Committee letter of May 21, 2007), 18 (Chairmen letter of June 29, 2007), 32 (Conyers letter of July 25, 2007), 33 (Conyers letter of November 5, 2007).  Those efforts have been rebuffed repeatedly.  Thus, the parties are at a constitutional impasse that can only be resolved meaningfully by this Court.[14]

Finally, it should be clear that if the Court were to abstain, it effectively would be granting the Executive Branch *carte blanche* to control access to non-sensitive information, as the executive has often sought but frequently been denied.  *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 915 (8th Cir. 1997).  Thus, judicial restraint here would be, in actuality, judicial *acquiescence*.  *See* Erwin Chemerinsky, *Controlling Inherent Presidential Power:  Providing a Framework for Judicial Revie*w, 53 S. Cal. L. Rev. 863, 897 (1983) ("The Court's refusal to consider challenges to executive power is an implicit decision in favor of broad inherent presidential authority.").

These are the critical constitutional principles at stake.  Given that the Committee has met all of the relevant thresholds – demonstrating a concrete and particularized injury that is

---

[14] The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, is one such avenue for meaningful relief without resorting to extreme measures.  "The Declaratory Judgment Act is designed to provide a remedy in a case or controversy, while there is still opportunity for peaceable judicial settlement 'before blood has been drawn and tempers irretrievably lost.'"  *DiBenedetto v. Morgenthau*, 148 F.2d 223, 225 (D.C. Cir. 1945) (footnotes and citation omitted).

fairly traceable to Defendants' actions; the House's authorization to file and conduct this suit;

exhaustion of attempts to reach a reasonable compromise; and a readily available judicial remedy

– the Court must reach and decide the merits of the Committee's suit.

## II.    MS. MIERS HAS A LEGAL OBLIGATION TO APPEAR BEFORE THE COMMITTEE, AND MAY ONLY ASSERT EXECUTIVE PRIVILEGE ON BEHALF OF THE PRESIDENT IN RESPONSE TO SPECIFIC QUESTIONS.

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment . . . is appropriate

where the pleadings and the record 'show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law.'" *TermoRio S.A. E.S.P. v.*

*Electranta S.P.*, 487 F.3d 928, 941 (D.C. Cir. 2007) (citation omitted).  Count I of the

Committee's claim presents a pure question of law on which no genuine issue as to any material

fact exists, namely, whether Ms. Miers's failure to appear on grounds of "absolute immunity"

was unlawful.

Notwithstanding the possible availability of an assertion of executive privilege, the law

requires that all congressional subpoena recipients – including former presidential aides – appear

before the Committee when subpoenaed and assert privilege, if warranted, in response to specific

questions.  If the President himself is subject to judicial process from a grand jury and in a civil

suit – and he is – then certainly his *former* aide cannot elude her responsibility to comply with a

congressional subpoena.  No statute, constitutional provision or judicial precedent authorizes the

President to "immunize" a former aide from her obligation to appear in response to a legally

binding congressional subpoena.  As a result, Ms. Miers's sole legal obligation was to the

Committee – to appear and respond appropriately to the Committee's questions – and the

President's "directive" to do otherwise is of no force or effect.

**A.  Ms. Miers's Reliance on the President's Direction to Her Not to Appear Is Unjustified, Unlawful and Ineffectual.**

Citing the letters from the Counsel to the President "directing" Ms. Miers, on behalf of the President, not to appear or produce documents in response to her subpoena, Ms. Miers's private counsel claimed that she was "subject to conflicting demands" and thus had "no choice" but "to comply with direction given her by Counsel to the President."  Statement ¶ 36; Exhibit 21.  This assertion is specious.  The President has no power to require Ms. Miers not to appear, and Ms. Miers's only *legal* obligation – by virtue of the subpoena issued to her – was to the Committee.  There is, therefore, no legal ground that excused her appearance before the Committee.

Congressional subpoenas clearly have the force of law.  They have

> never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase.  [Otherwise], the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity. . . . [E]very person within the jurisdiction of the Government is bound to perform when properly summoned.

*United States v. Bryan*, 339 U.S. 323, 331 (1950); *see also McGrain*, 273 U.S. at 175 ("[W]here the legislative body does not itself possess the requisite information . . . recourse must be had to others who do possess it. . . . [S]o some means of compulsion are essential to obtain what is needed.").  Indeed, a committee's power to subpoena witnesses and documents is "an indispensable ingredient of lawmaking."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975).

On the other hand, no President has the authority to direct a private citizen such as Ms. Miers, to fail to comply with a congressional subpoena.  Not surprisingly, in his letter informing the Committee that his client would not be attending the hearing, Mr. Manning was unable to point to a single statute, provision in the Constitution or judicial interpretation that permits the President to direct the conduct of private citizens under such circumstances.

The Supreme Court recently reaffirmed that "[t]he President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, No. 06-984, 2008 WL 762533, at *3 (U.S. Mar. 25, 2008) (quoting *Youngstown*, 343 U.S. at 585); *cf. id.* at 29 ("'When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb.'" (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) (alteration omitted)).  This case presents the clear paradigm where the President both has no positive authority (and no right) to force Ms. Miers not to appear and where the President has acted contrary to the expressed will of Congress.  Ms. Miers can no more lawfully obey a presidential "directive" to break into a psychiatrist's office, ignore a judicial subpoena or bribe witnesses to be silent, than she can rely on a presidential "directive" to violate the Constitution and a criminal statute, *see* 2 U.S.C. § 192, by willfully disobeying a duly issued and served congressional subpoena.

When a President wishes to prevent congressional or judicial testimony, he or she must seek a judicial ruling to enjoin compliance with the subpoena.  This was the course followed by the Executive Branch in the *AT&T* cases, discussed above.  In 1976, the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce ("Oversight Subcommittee") subpoenaed AT&T for documents relating to warrantless wiretapping by the Administration.  The Oversight Subcommittee and the White House attempted to reach an accommodation, but ultimately negotiations broke down.  Then, "President Ford instructed AT&T, 'as an agent of the United States, to respectfully decline to comply with the Committee subpoena.'"  *AT&T I*, 551 F.2d at 387.[15]  AT&T understood, however – as

---

[15] In making this request, President Ford did not rely on a purported inherent authority to prevent private individuals or corporations from testifying on matters of national security; rather, he stated to AT&T's President only that "you are not authorized, *under your agreement with the Executive Branch of the United States Government*, to provide

apparently Ms. Miers does not – that the President lacked legal authority to direct noncompliance

with a congressional subpoena, and thus declared its intention to comply with the subpoena.  *Id.*

As a result, the Department sued AT&T to enjoin its compliance with the subpoena.  *Id.*[16]  In this

case, the President took no similar action before Ms. Miers engaged in a willful contempt of

Congress.

       Ms. Miers's claim that her former position as a presidential aide vests her with "absolute

immunity" from appearing is all the more egregious in light of the heightened obligation of

current and former government attorneys to respect the rule of law.  While all attorneys are

officers of the court and must conduct themselves accordingly, the D.C. Circuit has maintained

that government attorneys have an even greater responsibility because they are bound by oath to

"'preserve, protect and defend the Constitution of the United States.'"  *In re Lindsey*, 158 F.3d

1263, 1272 (D.C. Cir. 1998) (quoting U.S. Const. art. II, § 1, cl. 8).  The Court of Appeals noted

that "[t]his is a solemn undertaking, a binding of the person to the cause of constitutional

government," and thus "the loyalties of a government lawyer therefore cannot and must not lie

solely with his or her client agency."  *Id.* at 1273.  Ms. Miers thus has an obligation to address

the concerns raised by the Committee of improper partisan political considerations driving the

administration of the federal criminal justice system by the Department.  Her claim that she has

"absolute immunity" based on her former government employment while simultaneously

ignoring the obligations of her former government position to carry out her responsibilities "to

---

this information to the Committee."  Letter from President Gerald R. Ford to W.L. Lindholm, President, AT&T (July 22, 1976) (emphasis added), Exhibit 41.

[16] The Department well understands how to seek judicial relief in private litigation to avoid having witnesses testify about "state secrets" or other privileged matters.  *See, e.g.*, *Terkel v. AT&T Corp.*, 441 F. Supp. 2d 899, 917 (N.D. Ill. 2006); *Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974 (N.D. Cal. 2006); s*ee also Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544, 546 (2d Cir. 1991); *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1238 (4th Cir. 1985).

the cause of constitutional government" surely "runs afoul of the [D.C. Circuit's] chutzpah doctrine." *Caribbean Shippers Ass'n, Inc. v. Surface Transp. Bd.*, 145 F.3d 1362, 1365 n.3 (D.C. Cir. 1998).

At bottom, Ms. Miers can point to no source of authority that enables her – as a private citizen – to defy her obligation to respond to her subpoena.  The President did not seek an order to enjoin her appearance and thus she had no choice but to appear.

**B.    Federal Court Decisions and Executive Branch Practice Make Clear That No Immunity Exists for Former Aides to the President.**

**1.    The Case Law Unequivocally Confirms that There Exists No Absolute Privilege for Presidential Aides.**

In 1974, the Supreme Court laid to rest the Executive Branch's claim – that has resurfaced in this case – that the President possesses "an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Nixon*, 418 U.S. at 706. As the D.C. Circuit recognized a year earlier, the argument for an absolute executive privilege "[l]ack[s] textual support," because to "infer immunity from the President's political mandate, or from his vulnerability to impeachment, or from his broad discretionary powers . . . . are [improper] invitations to refashion the Constitution." *Sirica*, 487 F.2d at 711.  Both courts recognized that "control over the evidence in a case cannot be abdicated to the caprice of executive officers." *Id.* at 714 (quoting *United States v. Reynolds*, 345 U.S. 1, 9-10 (1953)).

Recognizing a claim of absolute immunity in this circumstance would do great violence to the separation of powers.  As the en banc Circuit Court in *Sirica* explained:

> If the claim of absolute privilege was recognized, its mere invocation by the President or his surrogates could deny access to all documents in all the Executive departments to all citizens and their representatives, including Congress, the courts as well as grand juries, state governments, state officials and all state subdivisions. . . .  Support for this kind of mischief simply cannot be spun from incantation of the doctrine of separation of powers.

30

487 F.2d at 715.  Indeed, "[n]o man in this country is so high that he is above the law," and "[a]ll the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it."  *United States v. Lee*, 106 U.S. 196, 220 (1882).

Indeed, this principle has been clear since the earliest days of the Republic, when former Vice President Aaron Burr sought leave of court to issue a subpoena to President Jefferson for a letter containing communications between the President and one of his generals.  President Jefferson opposed issuance of the subpoena, citing the separation of powers, and asserting that the document sought "was a private letter, and probably contained confidential communications, which the president ought not and could not be compelled to disclose."  *United States v. Burr*, 25 F. Cas. 30, 31 (D. Va. 1807) (No. 146920).  In ruling that a subpoena could properly be issued to the President, Chief Justice Marshall wrote that "the law does not discriminate between the president and a private citizen."  *Id.* at 34.  Chief Justice Marshall further stated that if the document did contain "matter which ought not to be disclosed," the proper time for the court to address that consideration would be "*on the return of the subpoena*."  *Id.* at 37 (emphasis added).

The Chief Justice's view comports with routine practice when privileges are asserted in response to congressional subpoenas in this Circuit.  *Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938), held that a congressional witness must *first* attend the hearing, and *then* "may exercise his privilege of refusing to answer questions and submit to a court the correctness of his judgment in so doing . . . ."  *Id.*  The Court of Appeals compared a congressional hearing to a judicial proceeding, stating that if a judicial witness thought the questions put to him were improper, "that is not a matter for a witness finally to decide," and "he would not be justified in leaving a courtroom."  *Id.*  It is therefore quite clear that if Ms. Miers wished to assert executive privilege in response to the Committee's questions, she was required to do so "by objection and

31

refusal to answer."[17]  *Id.  Cf. United States v. Murdock*, 290 U.S. 389, 397 (1933) (failure to

appear and failure to answer questions are "[t]wo distinct offenses"), *overruled on other grounds*

*by Murphy v. Waterfront Comm'n*, 378 U.S. 52 (1964).

This includes witnesses who are instructed to assert executive privilege.  In *United States*

*v. Tobin*, 195 F. Supp. 588 (D.D.C. 1961), *rev'd on other grounds*, 306 F. 2d 270 (D.C. Cir.

1962), the District Court convicted and sentenced a state employee for contempt of Congress

when he failed to appear pursuant to a subpoena, despite a defense of "executive privilege"

asserted by his employers, two state governors.  Accordingly, in a civil enforcement action, such

a "directive" from a President's lawyer to a *former* aide is similarly unavailing.

It also bears noting that White House aides, in the past, have appeared before

congressional committees in overwhelming numbers – both voluntarily and pursuant to

subpoenas.  Since World War II, close presidential advisers – including former Counsels and

Special Assistants – have appeared before congressional committees to offer their testimony on

more than *seventy* occasions.  *See* Harold C. Relyea & Todd B. Tatelman, *Presidential Advisors'*

*Testimony Before Congressional Committees:  An Overview*, Cong. Research Serv., Report for

Congress (updated Mar. 17, 2008), Exhibit 8.  For example, during her testimony before the

Committee in this matter, former Counsel to the President Beth Nolan stated that she had

appeared and testified before congressional committees three times while serving as Counsel to

the President, and as former Counsel on one other occasion.  *See* H.R. Rep. No. 110-423, at 66,

Exhibit 1.  The Committee is unaware of a single instance where a *former* presidential aide failed

---

[17] This was the course followed by Sara M. Taylor, the former White House Political Director, who appeared and testified about the forced resignations before the Senate Committee on the Judiciary the same day Ms. Miers refused to appear before the House Committee.  During the course of her testimony, Ms. Taylor asserted executive privilege at intermittent junctures.  She thus complied with the basic components of her subpoena while maintaining appropriate respect for the concerns of the Executive Branch.  *See* H.R. Rep. No. 110-423, at 6, 66, Exhibit 1.

to comply with a subpoena for his or her appearance and testimony and was not prosecuted for such contempt.

>    **2.    The Department's Justifications for Absolute Immunity for Former Presidential Aides Are Contrary to Law and Unsound.**

In claiming that a former aide to the President is "absolutely immune" from congressional process, the Administration relied heavily on a two-and-a-half page memorandum – issued the day Ms. Miers notified the Committee of her refusal to appear – by Steven G. Bradbury, the Principal Deputy Assistant Attorney General in OLC. *See* Memorandum from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Off. Legal Counsel, Dep't of Justice, to the President of the United States (July 10, 2007), Exhibit 42. In concluding that "Ms. Miers is immune from compulsion to testify before the Committee on this matter and, therefore, is not required to appear to testify," Mr. Bradbury did not cite a *single* judicial decision for this conclusion, but instead relied on former OLC opinions and memoranda as well as statements by a single President.

Mr. Bradbury primarily relied on an OLC memorandum authored in 1971 by former OLC head (and later Chief Justice) William H. Rehnquist. In Mr. Bradbury's memorandum, he quoted Mr. Rehnquist as stating:

> The President and his immediate advisors – that is, those who customarily meet with the President on a regular or frequent basis – should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

*Id.* (citing Memorandum from William H. Rehnquist, Assistant Attorney General, OLC, Dep't of Justice, to the President of the United States at 7 (Feb. 5, 1971) ("Rehnquist Memorandum"), Exhibit 43. Significantly, Mr. Bradbury failed to quote the remainder of that paragraph from Mr. Rehnquist's analysis, which supplied the reasoning for his *ex cathedra* statement:

> They [the President's immediate advisers] are presumptively available to the President 24 hours a day, and the necessity of either accommodating a congressional committee or persuading a court to arrange a more convenient time, could impair that availability.

Rehnquist Memorandum at 7, Exhibit 43.  Thus, Mr. Rehnquist opined that because the President's advisors *need to be available to him at all times*, they are not required to testify before Congress, or, *a fortiori*, the courts.[18]

It is now clear, as Mr. Rehnquist himself later conceded, that this reasoning is erroneous. As noted above, not long after Mr. Rehnquist's 1971 memorandum was issued, the Supreme Court and the D.C. Circuit rejected such claims of absolute immunity.  *See Nixon*, 418 U.S. at 707; *Sirica*, 487 F.2d at 713-15.  Indeed, while Chief Justice, Mr. Rehnquist joined a near-unanimous Court in *Clinton v. Jones* in holding that even the President's busy schedule could not postpone until after his term of service a lawsuit against him or his availability for a deposition in the case.  520 U.S. at 691-92.  The Supreme Court stated that it "assume[d] that the testimony of the President, both for discovery and for use at trial, may be taken at the White House."  *Id.* at 691.  That the President is subject to deposition disposes of the notion that the President is absolutely immune from service of process in a civil matter and from having to testify.  If the President's position and official duties do not preclude *him* from having to give testimony in appropriate circumstances, it follows *a fortiori* that he cannot bestow upon his former aides an "absolute immunity" from appearing in response to a congressional subpoena.

---

[18] It bears noting, in light of the great weight placed on Mr. Rehnquist's Memorandum, that just prior to explaining why aides may not be compelled to appear, Mr. Rehnquist stated that his conclusions were "tentative and sketchy." Rehnquist Memorandum at 7, Exhibit 43.  Indeed, Mr. Rehnquist himself contradicted his own position during congressional testimony later that year.  Just a few months after authoring his 1971 OLC Memorandum, Mr. Rehnquist stated correctly that when presidential aides wish to assert executive privilege, they must *first* appear before Congress and *then* assert the privilege.  *See U.S. Government Information Policies and Practices—The Pentagon Papers:  Hearing Before the Subcomm. on Foreign Operations and Gov't Info. of the H. Comm. on Gov't Operations*, 92nd Cong. 385 (1971) (testimony of William H. Rehnquist, Assistant Att'y Gen.) (hereinafter "Rehnquist Testimony") (noting that "member[s] of the executive branch . . . . have to report, give [their] name and address and so forth, and then invoke the privilege").

What is even more incredible about Mr. Bradbury's failure to quote the entire paragraph of the Rehnquist Memorandum, is that even if the memorandum's reasoning justified immunity for *current* aides (which it does not), under no circumstances would it validate a claim that a *former* aide is absolutely immune. Obviously, former aides do not need to be "available to the President 24 hours a day," and thus, the logic of the Rehnquist Memorandum cannot possibly serve as a justification for their failure to appear before a committee of the Congress.

For all of the foregoing reasons, the Committee is entitled at this time to summary judgment on Count I of its Complaint. Ms. Miers must appear and testify before the Committee, produce all nonprivileged documents responsive to the subpoena, assert claims of privilege when appropriate and testify about all subjects not covered by privilege.

### III. MS. MIERS AND MR. BOLTEN MUST PRODUCE UNPRIVILEGED DOCUMENTS AND PROVIDE PRIVILEGE LOGS DESCRIBING THE RESPONSIVE DOCUMENTS THEY HAVE WITHHELD IN RESPONSE TO THEIR CONGRESSIONAL SUBPOENAS.

Both Ms. Miers and Mr. Bolten claimed they were absolutely immune from producing documents and from providing privilege logs for the documents withheld. These immunity claims are entirely without merit. As demonstrated above, the Supreme Court and this Circuit have unequivocally held that executive privilege is only *qualified* and not absolute. Moreover, in nearly every circumstance in which executive privilege is asserted, Congress and the courts require that the party raising the privilege claim produce a privilege log. A privilege log is essential when a claim of executive privilege is asserted, because it is the only method by which the reviewing body can determine, short of looking at the purportedly privileged documents themselves, the validity of the party's assertions. Were this Court to sanction Defendants' immunity claims of immunity – and absolve them of the need to produce privilege logs – it would render nugatory Congress's authority to investigate matters within its legislative and

oversight jurisdiction, and claims of privilege would become, contrary to the courts' rulings,

functionally absolute. Accordingly, the Committee is entitled, as a matter of law, to all

nonprivileged documents, and Ms. Miers and Ms. Bolten each must produce a privilege log if

they withhold any documents responsive to their subpoenas on any ground, including executive

privilege.

### A.  Defendants Are Legally Obligated to Produce Privilege Logs.

Short of viewing the purportedly privileged documents themselves, the only manner in

which Congress and the courts can properly review the soundness of an executive privilege claim

is through an itemized description of the documents withheld. Federal courts have not found

such procedures to be overly burdensome, intrusive or unnecessary, and in fact, have held such

procedures to be necessary to the fair disposition of disputes involving the Executive Branch.

*See Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 543 (D.C. Cir. 1977) (asserting that an affiant

must "specify the documents for which protection is sought, and . . . explain why the specified

documents properly fall within the scope of the privilege"); *Sirica*, 487 F.2d at 721 ("Without

compromising the confidentiality of the information, the analysis should contain descriptions

specific enough to identify the basis of the particular claim or claims."). The principles

underlying those decisions apply with equal, if not greater, force to congressional subpoenas for

information.

The D.C. Circuit's decisions in *Dellums I* and *Dellums v. Powell*, 642 F.2d 1351 (D.C.

Cir. 1980) ("*Dellums II*") are dispositive. There, a group of antiwar demonstrators who were

arrested on the Capitol steps brought a class action suit against President Nixon and Attorney

General John Mitchell, among others, alleging that the defendants had engaged in a civil

conspiracy to arrest the class members in violation of the First Amendment. *See Dellums II*, 642

F.2d at 1353. In the course of discovery, President Nixon interposed an objection to the

production of all tapes and transcripts sought by the plaintiffs relating to conversations regarding the demonstrations at issue, asserting, *inter alia*, that executive privilege is an absolute bar to discovery of a former President's confidential conversations and documents, and that even if the privilege was not absolute, the plaintiffs did not make a sufficient showing of need.  *Id.* at 1353-54.

The D.C. Circuit rejected the President's claim of absolute privilege and affirmed the lower court's ruling that the plaintiffs had made a sufficient showing of need for the materials to overcome the qualified privilege.  The Court of Appeals then remanded the case, indicating the procedures the lower court should follow to balance the President's privacy interests with the plaintiff's and the court's need to assess the privilege claims.  *Id.* at 1354-55.  Most notably, the Court of Appeals required the President to "'present to the District Court all other items covered by the order, with specification of which segments he believes may be disclose and which not. This can be accomplished by itemizing and indexing the material, and correlating indexed items with particular claims of privilege.'"  *Id.* at 1355 n.12 (quoting *Sirica*, 487 F.2d at 724).

After the President submitted, on remand, his index of the portions of the transcripts which he claimed to be covered by executive privilege, both the District Court and the Court of Appeals rejected his effort as "'woefully inadequate.'"  *Id.* at 1358; *see id.* at 1352-53, 1363. The President fell short of what was required because (1) he failed to provide "an itemized explanation of each segment sought to be protected," (2) his "one-line summaries" of documents withheld were insufficiently detailed, (3) he did not "ma[k]e clear the basis for his claim that . . . the Presidential privilege . . . would be violated by the release of any of the conversations."  *Id.* at 1361.  The Court of Appeals again remanded the case, directing President Nixon to, among other things, "provide a clear and cogent summary of exactly what material is being withheld . . .

37

and what material is being produced without objection," and to "remember[] that the underlying purpose of the . . . index is to permit the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves." *Id.* at 1360.

As the *Dellums* cases make clear, even the *President himself* must produce a detailed privilege log when withholding documents on the ground of executive privilege. Privilege logs are essential for executive privilege review because without them (or similarly descriptive information to explain the basis for withholding a document), the reviewing body is unable to assess (1) what *kind* of executive privilege is being asserted (*i.e.*, presidential communications or deliberative process), (2) whether the material is actually privileged, and (3) whether the need of the party seeking the documents outweigh the public's interest in keeping those materials out of public view. *See In re Sealed Case*, 121 F.3d 729, 737-738 (D.C. Cir. 1997). For example, if it is unclear who authored or received a particular communication, it may be difficult to determine which executive privilege applies, if any. *See id.* at 745. In addition, without a privilege log, it is impossible for the reviewing body to balance the competing interests that must be weighed in assessing the applicability of the privilege. Put differently, "[t]he litigant's need for the information cannot be balanced against its sensitive and critical role in the government's decision making process *without any indication of what that information is*." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 404-05 (D.C. Cir. 1984) (emphasis added); *see also Black v. Sheraton Corp. of Am.,* 371 F. Supp. 97, 101 (D.D.C. 1974) ("Without this specificity, it is impossible for a court to analyze the claim short of disclosure of the very thing sought to be protected.").

The courts routinely require the Executive Branch to provide privilege logs for documents withheld on the basis of executive privilege.  In the FOIA context, for example, when a private citizen seeks information that is purportedly privileged, courts do not "accept conclusory and generalized allegations of exemptions," but rather "require a relatively detailed analysis" of why such exemptions apply to each document.  *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973).  Such "detailed analysis" takes the form of what is commonly known as a "'*Vaughn* index,'" *see Edmonds Inst. v. U.S. Dep't of the Interior*, 383 F. Supp. 2d 105, 107 (D.D.C. 2005), which is "achieved by formulating a system of itemizing and indexing that would correlate statements made in the Government's refusal justification with the actual portions of the document."  *Vaughn*, 484 F.2d at 827.

In *Vaughn*, the D.C. Circuit noted that "it is anomalous but obviously inevitable that the party with the greatest interest in obtaining disclosure is at a loss to argue with desirable legal precision for the revelation of the concealed information."  *Id.* at 823.  This is because "only one side to the controversy (the side opposing disclosure) is in a position confidently to make statements categorizing information."  *Id.*  Based on this reality, the Court of Appeals recognized that without an index, *i.e.*, a privilege log, "[t]he best [the requester] can do is to argue that the exception is very narrow and plead that the general nature of the documents sought make it unlikely that they contain [privileged] information."  *Id.* at 824.  Thus, this Circuit "require[s] that when an agency seeks to withhold information it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply."  *Mead Data Cen., Inc. v. Air Force*, 566 F.2d 242, 250-51 (D.C. Cir. 1977); *see also Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 01-6392006 WL 2038513, at *2 (D.D.C. July 19, 2006)

39

(asserting that "the agency's *Vaughn* index must set forth with particularity the justification for the exclusion, relating it to the particular part of the document to which it applies, and the agency's affidavits supporting the *Vaughn* Index must not be conclusory or too broadly sweeping").

It would be wholly anomalous if private citizens were generally entitled to privilege logs in FOIA cases, while the Congress was powerless to compel one during a valid investigation into the operation of the Executive Branch. This is likely why, prior to the current Administration, the executive has routinely produced privilege logs in response to congressional investigations. For example, in 1997 the House Committee on Government Reform and Oversight conducted an investigation into "whether the White House had improperly influenced a Department of Interior . . . decision to deny an application for a reservation gaming facility." Mark J. Rozell, *Executive Privilege: Presidential Power, Secrecy, and Accountability* 131 (2002). The White House sought to withhold documents sought by the Committee, and the "White House privilege log provided to the committee identified ten documents that were considered 'subject to executive privilege,' 'subject to attorney client communications privilege,' or 'subject to attorney work product privilege.'" *Id*. at 132. The White House subsequently gave the Committee access to documents while maintaining that they were subject to executive privilege, while the Committee rejected these privilege claims. *Id.* at 132-34.[19]

---

[19] This also commonly occurs in the grand jury context. For example, in response to a grand jury subpoena for documents issued by the Office of Independent Counsel during the Clinton administration, Special Counsel to the President, in response to a letter request from the Deputy Independent Counsel, supplied information specifically describing responsive documents withheld (including the date and author of documents), as well as the bases for withholding, which included executive privilege. Instructions for the subpoena specifically directed provision of a privilege log specifying the basis for withholding documents on executive privilege and other bases. *See* Grand Jury Subpoena to the White House and Letters from Jane C. Sherburne, Esq. to John Bates, Esq. (Attached collectively as Exhibit 44); *see also In re Sealed Case*, 121 F.3d at 735.

Similarly, in 1996, the House Committee on Government Reform and Oversight subpoenaed from the White House documents relevant its investigation of the 1993 firings of employees of the White House Travel Office. *Id*. at 125.  The White House initially produced approximately 40,000 pages of documents and withheld approximately 3,000 pages, on grounds of executive privilege, and provided only a description of three broad categories of withheld documents, which the Committee rejected as "'vague, broad and non-descriptive . . . [which] if accepted by the committee, would be tantamount to accepting a type of broad, undifferentiated claim of executive privilege which was rejected by the court in *U.S. v. Nixon*.'"  *Id*. at 125-26. As the House proceeded to consider a contempt resolution, the White House produced an additional 1,000 pages of previously withheld documents and a "privilege log which indexed the remaining withheld documents."  Randall K. Miller, *Congressional Inquests:  Suffocating the Constitutional Prerogatives of Executive Privilege*, 81 Minn. L. Rev. 631, 666 (1997). Ultimately, the White House made all of the remaining withheld documents available to the Committee.  *See* Rozell at 126.

It is also noteworthy that, in response to a FOIA request seeking documents related to the very same forced resignations of U.S. Attorneys underlying the Committee's Investigation, the Department provided a *Vaughn* index with respect to documents it withheld on the basis of the presidential communications and deliberative process privileges.  *See Democratic Nat'l Comm. v. U.S. Dep't of Justice*, No. 07-712, 2008 WL 803421, at *1, *2 (D.D.C. Mar. 27, 2008); DOJ *Vaughn* Index (providing group number, date, description, specific privilege asserted, and pages of documents withheld), Exhibit 45.  There is no reason why Ms. Miers and Mr. Bolten should be exempted here from producing privilege logs.

B.   **The Constitution Requires that Defendants Provide a Privilege Log for Any Documents Responsive to Their Subpoenas That Are Withheld on the Basis of a Qualified Privilege in Order for the Committee to Fulfill Its Constitutional Responsibilities.**

The implications of the Defendants' position are staggering for the separation of powers. As discussed above, Congress's power to investigate is deeply rooted in the Constitution.  *See McGrain*, 273 U.S. at 175.  Access to information is a key part of Congress's ability to legislate intelligently and to oversee effectively the proper functioning of the Government.  *See* Rehnquist Testimony at 360 ("It is well established that the power to legislate implies the power to obtain information necessary for Congress to inform itself about the subject to be legislated upon, in order that the legislative function may be exercised effectively and intelligently.").

Congress is impaired in fulfilling this duty where, as here, a privilege from disclosure is claimed.  No doubt, on occasion, a claim of privilege may be justified.  *See Watkins*, 354 U.S. at 188 (noting that "constitutional rights of witnesses [must] be respected by the Congress as they are in a court of justice").  In such instances, the subpoenaed party claiming privilege must first explain to the investigating committee in detail the basis for his or her privilege claim, and then the committee must assess the claim's validity.  *See Quinn v. United States*, 349 U.S. 155, 164 (1955) (noting that it is "incumbent on the committee" to decide whether "to accept the claim" of privilege); *Emspak v. United States*, 349 U.S. 190, 202 (1955) (same); *Sanders v. McClellan*, 463 F.2d 894, 899 (D.C. Cir. 1972) (describing the process of registering constitutional claims with a committee, including the committee's ability to weigh such objections).  If the committee finds the claim to be valid, then it will proceed without the documents or testimony in question. *Quinn*, 349 U.S. at 165.

Congress, however, cannot *blindly* accept a claim of privilege.  To do so would be to abdicate its responsibility under the Constitution to develop effective laws and to oversee the

manner in which the Executive Branch is implementing its legislation.  Moreover, such passive

acceptance would encourage subpoena recipients with frivolous claims of privilege to raise them

without fear of consequence.  The result would leave Congress without a meaningful manner in

which to compel production of significant information, thus effectively nullifying its power to

investigate.

The Supreme Court recognized the importance of *specific* privilege objections to

congressional committees in *Hutcheson v. United States*, 369 U.S. 599 (1962).  There, the

petitioner refused to answer questions posed by a Senate committee on the ground that they

related to a state court case in which he was under indictment.  He was subsequently found guilty

of violating 2 U.S.C. § 192, based on his refusal to answer those questions.  *Hutcheson*, 369 U.S.

at 600, 605-06.  On appeal, the petitioner restyled his objection to the committee's questions as a

violation of the Due Process Clause of the Fifth Amendment.  While the Court acknowledged

"that a congressional committee's right to inquire is 'subject to' all relevant 'limitations placed

by the Constitution on governmental action,'" *id.* at 610 (quoting *Barenblatt*, 360 U.S. at 112), it

explained that objections to questioning on such grounds "must be adequately raised before the

inquiring committee if [they are] to be fully preserved for review in this Court," *id.* at 611.  "To

hold otherwise," the Court stated, "would enable a witness to toy with a congressional committee

in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the

grounds on which a witness asserts a right of refusal to answer."  *Id.*

The Committee's subpoenas to Ms. Miers and Mr. Bolten instructed that if any

responsive documents were withheld on the basis of privilege, the respondents were to provide

information specifically describing the documents withheld and the basis for withholding them.

*See* Miers Subpoena, Definitions and Instructions ¶ 7, Exhibit 14; Bolten Subpoena, Instructions

¶ 9, Exhibit 13.  While counsel for Ms. Miers did not offer an explanation for her refusal to

provide a privilege log,[20] the Counsel to the President, on Mr. Bolten's behalf, asserted only that

he is

> aware of no authority by which a congressional committee may
> "direct" the Executive to undertake the task of creating and
> providing an extensive description of every document covered by
> an assertion of Executive Privilege.  Given the descriptions of the
> materials in question that have already been provided, this demand
> is unreasonable because it represents a substantial incursion into
> Presidential prerogatives and because, in view of the open-ended
> scope of the Committee's inquiry, it would impose a burden of
> very significant proportions.

Statement ¶ 34; Exhibit 19 (Fielding letter of July 9, 2007).  The only "descriptions" that had

been provided were the two categories of documents the Counsel to the President offered in his

March 20 correspondence and the statement in a Department letter to the President that the

withheld internal White House documents "discuss the wisdom of such a proposal [to replace

U.S. Attorneys], specific U.S. Attorneys who could be removed, potential replacement

candidates, and possible responses to congressional and media inquiries about the dismissal.  *See*

Statement ¶ 16, ¶ 28; Exhibits 5 (Fielding letter of March 20, 2007), 15 (Clement letter of June

27, 2007).  If anything, this latter description makes all the more clear the relevance of the

withheld documents to the Committee's inquires.  Without a more detailed explanation of what

documents were withheld and the reasons for their withholding, the Committee was unable to

assess whether it was prudent to accept any of Defendants' specific privilege claims with respect

to the documents withheld.  *See* H.R. Rep. No. 110-423, at 78, Exhibit 1 (noting that Ms. Miers

and Mr. Bolten improperly failed to provide privilege logs).

---

[20] Although counsel for Ms. Miers asserted that the White House directed her not to provide the Committee with documents or testimony, he cited no such directive in declining to produce a privilege log.  *See* Statement ¶ 39; Exhibit 24 (Manning letter of July 10, 2007).  The Committee offered Ms. Miers the option of confirming that she did not possess any documents responsive to her subpoena.  *See* Statement ¶ 45; Exhibit 27 (Chairman Conyers letter of July 13, 2007).  The offer was not accepted.

Moreover, the Counsel to the President's claim that preparation of a privilege log would be unreasonably burdensome is specious, because according to the Solicitor General, Mr. Fielding's office has already identified all of the "documents . . . responsive to the subpoenas," and the Solicitor General has reviewed them.  H.R. Rep. No. 110-423, at 2, 22, Exhibit 1.  The log can be prepared by clerical personnel and the asserted legal grounds can be supplied by attorneys in the White House Counsel's office, all without any disruption to the President. Accordingly, the Committee was left with no choice but to issue a general ruling rejecting Ms. Miers's and Mr. Bolten's claims of absolute immunity.  *See* H.R. Rep. No. 110-423, at 78, Exhibit 1.

Ms. Miers and Mr. Bolten have absolutely no legal basis for disobeying the subpoenas and refusing to produce a privilege log to itemize and support their invocations of executive privilege.  The Court should direct Ms. Miers and Mr. to produce privilege logs that explain what documents they have withheld and the purported legal reason for withholding them.  In addition, the Court should direct Defendants to produce forthwith any withheld documents that are nonprivileged, such as communications with third parties.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment at this time on Counts I and II, enforce the Committee's subpoenas, require Ms. Miers to appear and testify, raising claims of executive privilege only when appropriate and in response to specific questions; require both Defendants to produce nonprivileged responsive documents; and, for those documents withheld, require the Defendants to provide to the Committee and the Court a detailed privilege log specifying which documents have been withheld and on what legal ground.

Respectfully submitted,


_____/s/ Irvin B. Nathan_____
IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel
CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR, D.C. Bar # 476240
Assistant Counsel
RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel
KATHERINE E. MCCARRON, D.C. Bar #
486335
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff
Committee on the Judiciary of the
U.S. House of Representatives

Dated:  April 10, 2008

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

COMMITTEE ON THE JUDICIARY,    )
UNITED STATES HOUSE    )
OF REPRESENTATIVES    )
    )    Case No. 1:08-cv-004909 (JDB)
    )
                    *Plaintiff*,    )
    )
        v.    )
    )
    )
    )
HARRIET MIERS, et al.    )
    )
                    *Defendants*.    )
_____)

**PLAINTIFF JUDICIARY COMMITTEE'S STATEMENT OF MATERIAL**
**FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rules 7(h) and 56.1, Plaintiff

Committee on the Judiciary of the United States House of Representatives sets forth the

following statement of material facts as to which there is no genuine issue:

1.    Defendant Harriet Miers served as Counsel to President George W.

Bush from 2004 until she resigned from government service on January 31, 2007.  *See*

H.R. Rep. No. 110-423, at 64 (2007) ("Report").[1]

2.    Defendant Joshua Bolten is, and has been since April 14, 2006, Chief

of Staff to President George W. Bush.  *See* H.R. Rep. No. 110-423, at 63.  Exhibit 1.

_____

[1] Report of the Committee on the Judiciary, House of Representatives, together with
Additional Views and Minority Views ("Report")) (on file with the Committee and
*available at* http://judiciary.house.gov/Media/PDFS/ContemptReport071105.pdf).
Exhibit 1.  Mincberg Declaration ¶ 4.

3.     The Committee on the Judiciary is a standing Committee of the United States House of Representatives, duly established pursuant to House Rule X.1(k), Rules of the House of Representatives (110th Cong.).[2]  The Rules of the House are adopted pursuant to the Rulemaking Clause of the Constitution.  U.S. Const. art. I, § 5, cl. 2.

4.     House Rule X grants to the Judiciary Committee legislative and oversight jurisdiction over, *inter alia*, "judicial proceedings, civil and criminal," and "criminal law enforcement"; the "application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction"; the "operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within its jurisdiction"; and "any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction."  House Rules X.1(k)(1), (7); House Rules X.2(b)(1)(A)-(C).

5.     House Rule XI specifically authorizes the Judiciary Committee and its subcommittees to "require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."  *Id*. at XI.2(m)(1)(B).  The Rule also provides that the power to issue subpoenas may be delegated to the Committee chairman. *Id*. at Rule XI.2(m)(3)(A)(i).

6.     Under Rule V(b)(3) of the Judiciary Committee's Rules of Procedure, the Subcommittee on Commercial and Administrative Law has legislative and oversight jurisdiction over, *inter alia*, "appropriate matters as referred by the Chairman."

---

[2] The House Rules are *available at* http://clerk.house.gov/legislative/rules110/index.html.

Committee on the Judiciary Rules of Procedure, *available at*

http://www.gpo.gov/congress/house/house10cal/104con/ix.pdf.

      7.    On or about December 7, 2006, the Department of Justice asked for

the resignations of seven U.S. Attorneys: Daniel Bogden (D. Nev.); Paul K. Charlton (D.

Ariz.); Margaret Chiara (W.D. Mich.); David Iglesias (D. N.M.); Carol Lam (S.D. Cal.);

John McKay (W.D. Wash.); and Kevin Ryan (N.D. Cal.).  Earlier in the year, the

Department asked for the resignations of two other U.S. Attorneys: H.E. "Bud" Cummins

III (E.D. Ark.) and Todd Graves (W.D. Mo.).  All of these U.S. Attorneys submitted their

resignations.  H.R. Rep. No. 110-423, at 105.  Exhibit 1.

      8.    In early 2007, the Judiciary Committee and its Subcommittee on

Commercial and Administrative Law began investigating the forced resignations of the

nine United States Attorneys and related matters ("Investigation").  H.R. Rep. No. 110-

423, at 2, 22.  Exhibit 1.

      9.    The Investigation was undertaken pursuant to the authority delegated

by the House of Representatives to the Judiciary Committee.  *See* House Rules X.1(k)

and XI, Rules of the House of Representatives (110th Congress), *available at*

http://clerk.house.gov/legislative/rules110/110th.pdf.

      10.    The Report stated the legislative purposes of this Investigation fall

into two categories: "(1) investigating and exposing any possible malfeasance, abuse of

authority, or violation of existing laws on the part of the Executive Branch related to

these concerns, and (2) considering whether the conduct uncovered may warrant

additions or modifications to existing Federal law, such as more clearly prohibiting the

kinds of improper political interference with prosecutorial decisions as have been alleged here."  H.R. Rep. No. 110-423, at 7.  Exhibit 1.

11.    On March 6, 2007, the Committee held its first hearing in connection with the Investigation and took the testimony of six recently dismissed U.S. Attorneys and then-Principal Associate Deputy Attorney General of the Department of Justice, William E. Moschella.  *See* H.R. 580, *Restoring Checks and Balances in the Confirmation Process of U.S. Attorneys: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. (2007); H.R. Rep. No. 110-423, at 2.  Exhibit 1.

12.    On March 8, 2007, Committee Chairman John Conyers, Jr. and Subcommittee Chairwoman Linda T. Sánchez wrote to then-Attorney General Alberto R. Gonzales requesting that the Department make certain officials available for follow-up questioning and provide documents related to the Investigation.  A true and accurate copy of the letter is attached as Exhibit 2.  Mincberg Declaration, ¶ 5.

13.    On March 9, 2007, Chairman Conyers and Chairwoman Sánchez wrote Ms. Miers and requested to interview her on a voluntary basis about her knowledge and activities concerning the forced resignations of U.S. Attorneys and related matters.  A true and accurate copy of the letter is attached as Exhibit 3.  Mincberg Declaration, ¶ 6.

14.    Ms. Miers did not respond to this letter.  As set forth in the Report: "Chairman Conyers then attempted to engage the White House regarding the terms and conditions of interviews involving White House witnesses, including Ms. Miers."  H.R. Rep. No. 110-423, at 64.  Exhibit 1.

15.    On March 9, 2007, Chairman Conyers and Chairwoman Sánchez wrote to the Counsel to the President, Fred F. Fielding, and requested that the Administration produce several categories of documents and other information relating to the Investigation by March 16, 2007.  Further, the Committee asked that the Administration make certain White House officials available for interviews and questioning.  A true and accurate copy of the letter is attached as Exhibit 4.  Mincberg Declaration, ¶ 7.

16.    On March 20, 2007, Counsel to the President wrote to Chairman Conyers, Chairwoman Sánchez, Chairman of the Senate Judiciary Committee, Patrick Leahy, and the Ranking Members to set forth the following proposal:

> In response to the invitations for interviews extended by the Committees, I am prepared to agree to make available for interviews the President's former Counsel; current Deputy Chief of Staff and Senior Advisor; Deputy Counsel; and a Special Assistant in the Office of Political Affairs.  We are prepared to agree to the following terms, which, considering applicable constitutional principles relating to the Presidency and your Committees' interests, we believe are fair, reasonable, and respectful.  We believe that such interviews should be a last resort, and should be conducted, if needed, only after Congress has heard from Department of Justice officials about the decision to request resignations of the U.S. Attorneys.

> Such interviews may cover, and would be limited to, the subject of (a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests.  Those interviews should be conducted by both Committees jointly.  Questioning of White House officials would be conducted by a Member or limited number of Members, who would be accompanied by committee staff.  Such interviews would be private and conducted without the need for an oath, transcript, subsequent testimony, or the subsequent issuance of subpoenas.  A representative of the Office of the Counsel to the President would attend these interviews and personal counsel to the invited officials may be present at their election.

> As an additional accommodation, and as a party of this proposal, we are prepared to provide to your Committees copies of two categories of documents: (a)

communications between the White House and the Department of Justice concerning the request for resignations of the U.S. Attorneys in question; and (b) communications on the same subject between White House staff and third parties, including Members of Congress or their staffs on the subject.

A true and accurate copy of the letter is attached as Exhibit 5. Mincberg Declaration, ¶ 8.

17.    On March 21, 2007, the Committee voted to authorize the issuance of subpoenas to Ms. Miers and Mr. Bolten, among others. *Meeting to Consider Subpoena Authorization Concerning the Recent Termination of United States Attorneys and Related Subjects Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. (2007); H.R. Rep. No. 110-423, at 4, 61-62. Exhibit 1.

18.    On March 22, 2007, Chairman Conyers and Chairwoman Sánchez wrote to the Counsel to the President stating the Committee "cannot accept your proposal for a number of reasons" including its belief that:

[T]he failure to permit any transcript of our interviews with White House officials is an invitation to confusion and will not permit us to obtain a straightforward and clear record. Also, limiting the questioning (and document production) to discussions by and between outside parties will further prevent our Members from learning the full picture concerning the reasons for the firings and related issues.

The Report stated that "the letter made clear that the Committee was still willing to negotiate with the White House, and accordingly, Chairman Conyers withheld issuing subpoenas at that time." H.R. Rep. No. 110-423, at 62. Exhibit 1. A true and accurate copy of the letter is attached as Exhibit 6. Mincberg Declaration, ¶ 9.

19.    On March 28, 2007, Chairman Conyers and Chairman Leahy again wrote to the Counsel to the President, urging the Administration to provide all relevant documents without delay. As an initial step, the Chairmen asked the Administration to produce the documents it had indicated on March 20, 2007, it was willing to produce.

The Chairmen further suggested the parties narrow the dispute over White House documents to those the Administration referred to as "internal" and then devise a process for proceeding with those "internal" documents.  Finally, the Chairmen requested that the Administration collect and produce emails and documents from all relevant email accounts, addresses and domains, and that it not limit its production to official White House email and document retention systems.  A true and accurate copy of the letter is attached as Exhibit 7.  Mincberg Declaration, ¶ 10.

20.    A study by the Congressional Research Service documents some 74 instances where serving White House advisers have testified before Congress since World War II.  These instances have included White House Counsel on multiple occasions and other high-ranking White House aides.  Harold C. Relyea & Todd B. Tatelman, *Presidential Advisers' Testimony Before Congressional Committees: An Overview*, Cong. Research Serv., Report for Congress (updated Mar. 17, 2008). Exhibit 8.  H.R. Rep. No. 110-423, at 21, 66.  Exhibit 1.

21.    On April 12, 2007, Counsel to the President wrote to Chairman Leahy and Chairman Conyers and reiterated the Administration's original conditions for providing information to the Committee, as set forth in the letter of March 20, 2007.  Noting that Congress had "reject[ed] . . . the President's proposal," the Administration declined to produce the documents that it had been prepared to release as part of the "package of accommodations."  A true and accurate copy of the letter is attached as Exhibit 9.  Mincberg Declaration, ¶ 11.

22.    On May 10, 2007, Attorney General Gonzales appeared before the full Judicial Committee for an oversight hearing that focused on the U.S. Attorney

controversy.  During his testimony, Attorney General Gonzales did not decline to answer

any questions about the forced resignations on legal grounds, although he did not fully

answer many questions, citing a lack of recollection.  *See e.g. The Continuing*

*Investigation into the U.S. Attorneys Controversy: Hearing Before the H. Comm. on the*

*Judiciary*, 110th Cong. (2007) (testimony of Attorney General Gonzales) at 34-35, 38,

50-51, 68-69, 80-81, 87-89, 92-93, 166-167, 171, and 189.

23.    On May 21, 2007, Chairman Conyers and Chairwoman Sánchez

wrote to the Counsel to the President for a fourth time to make an appeal for voluntary

cooperation.  They stated "it is becoming increasingly clear that we will not be able to

complete our investigation without full and complete cooperation from the White

House."  Their letter concluded: "[i]f the White House persists in refusing to provide

information to the House Judiciary Committee, or even to discuss providing such

information, on a voluntary basis, we will have no alternative but to begin to resort to

compulsory process in order to carry out our oversight responsibilities."  A true and

accurate copy of the letter is attached as Exhibit 10.  Mincberg Declaration, ¶ 12.

24.    On May 23, 2007, Monica Goodling, former Senior Counsel to

Attorney General Gonzales and the Department's White House Liaison, appeared before

the full Committee after a grant of limited use immunity.  *See The Continuing*

*Investigation into the U.S. Attorneys Controversy: Hearing Before the H. Comm. on the*

*Judiciary*, 110th Cong. (2007) (testimony of Monica Goodling).  On March 30, 2007, her

counsel, John M. Dowd and Jeffrey M. King, of Akin Gump Strauss Hauer & Feld LLP,

had written to inform the Committee that "Ms. Gooding will assert her Fifth Amendment

right not to answer any questions regarding the firings of U.S. Attorneys, or any other

questions related to that subject matter."  A true and accurate copy of the letter is attached as Exhibit 11.  Mincberg Declaration, ¶ 13.

25.    On June 7, 2007, Counsel to the President wrote to Chairman Leahy, Chairman Conyers, and Chairwoman Sánchez, and reiterated the Administration's initial position and state "[w]e are not unmindful that the President's proposal does not comport fully with your Committees' original requests."  A true and accurate copy of the letter is attached as Exhibit 12.  Mincberg Declaration, ¶ 14.

26.    On June 13, 2007, the Committee issued a subpoena to Mr. Bolten, as the White House custodian of records, returnable by June 28, 2007, to produce documents related to the Investigation.  The subpoena directed that if the Administration withheld any documents from production on the grounds of privilege it must produce a privilege log.  A true and accurate copy of the subpoena is attached as Exhibit 13. Mincberg Declaration, ¶ 15.

27.    Also on June 13, 2007, the Subcommittee issued a subpoena to Ms. Miers, returnable July 12, 2007, for testimony and documents relevant to the Investigation.  The subpoena was served that day by agreement upon Ms. Miers's counsel, George T. Manning.  The subpoena directed that if Ms. Miers withheld any documents from production on the grounds of privilege she must produce a privilege log. A true and accurate copy of the subpoena is attached as Exhibit 14.  Mincberg Declaration, ¶ 16.

28.    On June 27, 2007, Solicitor General and Acting Attorney General, Paul D. Clement, provided the President with a letter stating: "It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and

testimony." That letter did not state or suggest that a former aide to a President could fail to appear before a Committee in response to a subpoena or offer any legal basis to decline to produce a privilege log for documents subpoenaed and withheld. A true and accurate copy of the letter is attached as Exhibit 15. Mincberg Declaration, ¶17.

29. The Report stated that in the June 27, 2007, letter, Solicitor General Clement acknowledged the existence of responsive White House documents that discuss "the wisdom of such a proposal [to force U.S. Attorneys to resign], specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals." *See* H.R. Rep. No. 110-423, at 52-53, 63 n.282. Exhibit 1.

30. On June 28, 2007, Counsel to the President wrote to Chairman Leahy and Chairman Conyers regarding the Administration's document production due that day. Counsel stated: "the President has decided to assert Executive Privilege and therefore the White House will not be making any production in response to these subpoenas for documents." Further, he informed the Committee that the President had directed Ms. Miers "not to produce any documents." A true and accurate copy of the letter is attached as Exhibit 16. Mincberg Declaration, ¶ 18.

31. Also on June 28, 2007, Counsel to the President wrote to Mr. Manning requesting that he inform his client, Ms. Miers, "that the President has directed her not to produce any documents in response to the subpoena," citing executive privilege. A true and accurate copy of the letter is attached as Exhibit 17. Mincberg Declaration, ¶ 19.

32.    Mr. Bolten did not produce any documents to the Committee as required by the subpoena.  H.R. Rep. No. 110-423, at 63-64.  Exhibit 1.

33.    On June 29, 2007, Chairman Leahy and Chairman Conyers wrote to the Counsel for the President, and requested that the White House "provide us with the specific factual and legal bases for your claims regarding each document withheld via a privilege log," as required by subpoena, by July 9, 2007.  The letter also requested a signed statement by the President "with respect to the assertion of privilege" by the same date.  A true and accurate copy of the letter is attached as Exhibit 18.  Mincberg Declaration, ¶ 20.

34.    On July 9, 2007, the Counsel to the President wrote Chairman Leahy and Chairman Conyers to decline to produce either a privilege log or a personal letter from the President asserting executive privilege.  A true and accurate copy of the letter is attached as Exhibit 19.  Mincberg Declaration, ¶ 21.

35.    Also on July 9, 2007, Counsel to the President wrote Mr. Manning to inform him that, consistent with the advice provided by the Acting Attorney General in his letter to the President of June 27, 2007, "the President had decided to assert Executive Privilege with respect to testimony sought from Ms. Miers."  Counsel requested that Ms. Miers be informed "that the President has directed her not to provide this testimony" and "continues to direct Ms. Miers not to produce such documents."  A true and accurate copy of the letter is attached as Exhibit 20.  Mincberg Declaration, ¶ 22.

36.    Later on July 9, 2007, Mr. Manning wrote to Chairman Conyers and Ranking Member Lamar S. Smith to inform them that, "in light of the President's assertion of Executive Privilege, Ms. Miers cannot provide the documents and testimony

that the Committee seeks."  A true and accurate copy of the letter is attached as Exhibit

21.  Mincberg Declaration, ¶ 23.

37.  On July 10, 2007, Chairman Conyers and Chairwoman Sánchez

wrote Mr. Manning confirming their understanding "that your client Ms. Harriet Miers

will appear to testify before the Subcommittee."  They reiterated their understanding that

Ms. Miers "may decline to produce documents or answer certain questions . . . but it is of

course incumbent on Ms. Miers to appear at the hearing pursuant to the subpoena."  A

true and accurate copy of the letter is attached as Exhibit 22.  Mincberg Declaration, ¶ 24.

38.  Also on July 10, 2007, Counsel to the President wrote Mr. Manning

concerning whether Ms. Miers was required to appear before the Subcommittee on July

12, 2007.  Citing a memorandum also dated July 10, 2007, Counsel wrote:

> We have been advised by the Department of Justice that Ms. Miers has
> absolute immunity from compelled Congressional testimony as to matters
> occurring while she was a senior advisor to the President.  *See* Attachment
> A (*Memorandum for the Counsel to the President re: Immunity of Former
> Counsel to the President from Compelled Congressional Testimony*, dated
> July 10, 2007).  As the Department's opinion points out, "[t]he President
> and his immediate advisors are absolutely immune from testimonial
> compulsion by a Congressional committee." … Ms. Miers cannot be
> compelled to appear before Congress.
>
> Therefore, in view of this constitutional immunity, I respectfully request
> that you inform Ms. Miers that the President has directed her not to appear
> at the House Judiciary Committee hearing on Thursday, July 12, 2007.

A true and accurate copy of the letter is attached as Exhibit 23.  Mincberg Declaration, ¶

25.

39.  Also on July 10, 2007, Mr. Manning wrote Chairman Conyers and

Chairwoman Sánchez to convey that "the Counsel to the President has recently informed

Ms. Miers that in view of the immunity of the President's senior advisors 'from

testimonial compulsion by a Congressional committee'. . . the President has directed"

Ms. Miers not to appear at the hearing.  A true and accurate copy of the letter is attached

as Exhibit 24.  Mincberg Declaration, ¶ 26.

40.    On July 11, 2007, Chairman Conyers and Chairwoman Sánchez

informed Mr. Manning by letter that "[w]e are aware of absolutely no court decision that

supports the notion that a former White House official has the option of refusing to even

appear in response to a Congressional subpoena."  The letter urged Ms. Miers to appear,

assert any claim of privilege at the hearing, or risk subjecting herself to proceedings for

contempt of Congress.   A true and accurate copy of the letter is attached as Exhibit 25.

Mincberg Declaration, ¶ 27.

41.    Later on July 11, 2007, Mr. Manning responded by letter to

Chairman Conyers and Chairwoman Sánchez, reiterating that "Ms. Miers will not appear

at the July 12, 2007 hearing."  A true and accurate copy of the letter is attached as Exhibit

26.  Mincberg Declaration, ¶ 28.

42.    Also on July 11, 2007, former White House Political Director Sara

M. Taylor appeared pursuant to a subpoena before the Senate Committee on the

Judiciary, which was also investigating the forced resignations of the nine U.S.

Attorneys.  *See* Rep. No. 110-423, at 6, 66 (2007).  Exhibit 1.  Represented at the hearing

by personal counsel, Ms. Taylor invoked executive privilege as directed by the

Administration in response to certain questions but answered others.  *See Preserving*

*Prosecutorial Independence: Is the Department of Justice Politicizing the Hiring and*

*Firing of U.S. Attorneys?—Part VI, Before the S. Comm. on the Judiciary*, 110th Cong.

(2007) (testimony of Sara M. Taylor, former Deputy Assistant to the President and the Director of the Office of Political Affairs at the White House).

43. On July 12, 2007, the Subcommittee met as scheduled and Ms. Miers failed to appear. *See The Continuing Investigation into the U.S. Attorneys Controversy: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. (2007) (statement of Linda T. Sánchez, Chairwoman).

44. At the July 12, 2007 hearing Chairwoman Sánchez issued a ruling, sustained by the Subcommittee by a vote of 7-5, which rejected Ms. Miers's privilege and immunity claims. The first count of the Resolution reflected Ms. Miers's refusal to appear at all; the second count reflected her refusal to testify; and the third count reflected her refusal to produce documents as required by the subpoena issued to her. 153 Cong. Rec. D967-01 (2007); H.R. Rep. No. 110-423, at 3, 6. Exhibit 1.

45. On July 13, 2007, Chairman Conyers wrote Mr. Manning, enclosed a copy of the ruling, warned of the possibility of contempt proceedings, and offered Ms. Miers a final opportunity to comply with the subpoena. A true and accurate copy of the letter is attached as Exhibit 27. Mincberg Declaration, ¶ 29.

46. On July 17, 2007, Mr. Manning replied to Chairman Conyers's July 13, 2007, letter. Citing executive privilege and immunity, counsel reiterated that Ms. Miers would not appear before the Committee, or otherwise produce documents or provide testimony. A true and accurate copy of the letter is attached as Exhibit 28. Mincberg Declaration, ¶ 30.

47. On July 17, 2007, Chairman Conyers and Chairwoman Sánchez wrote to the Counsel to the President to inform him that the Subcommittee would meet

on July 19, 2007 to consider Mr. Bolten's executive privilege claims. They stated refusal to produce documents could subject Mr. Bolten to contempt proceedings under 2 U.S.C. § 194 and under the inherent contempt authority of the Congress. A true and accurate copy of the letter is attached as Exhibit 29. Mincberg Declaration, ¶ 31.

48. On July 19, 2007, the Subcommittee met as scheduled. Chairwoman Sánchez issued a second ruling rejecting the Administration's claim of executive privilege, including refusal to provide a privilege log, and the Subcommittee sustained that ruling. H.R. Rep. No. 110-423, at 6. Exhibit 1.

49. On July 19, 2007, Chairman Conyers sent a letter to the Counsel to the President, enclosing a copy of the ruling, insisting on compliance with the subpoena, and informing him that failure to mitigate Mr. Bolten's noncompliance could result in contempt proceedings. The Chairman requested to know by July 23, 2007, whether the White House would comply with the subpoena. A true and accurate copy of the letter is attached as Exhibit 30. Mincberg Declaration, ¶ 32.

50. On July 23, 2007, Counsel to the President informed Chairman Conyers "the President's position remains unchanged." A true and accurate copy of the letter is attached as Exhibit 31. Mincberg Declaration, ¶ 33.

51. On July 25, 2007, the Committee met in open session and adopted a resolution "recommending that the House of Representatives find that former White House Counsel Harriet Miers and White House Chief of Staff Joshua Bolten be cited for contempt of Congress for refusal to comply with subpoenas issued by the Committee." The Committee voted to report their conduct to the full House. *See* 153 Cong. Rec. D1051-01 (2007); H.R. Rep. No. 110-423, at 8. Exhibit 1.

52.   On July 25, 2007, Chairman Conyers wrote to the Counsel to the President and provided him with a copy of the Committee's Report.  Chairman Conyers urged negotiations aimed at reaching a mutually agreeable compromise, noted that "[m]any possible paths are available to reach an agreement in this matter", and offered other compromise proposals based on the Committee's earlier suggestions and on a recent example of a successful accommodation between Congress and the Executive Branch on another sensitive matter.  A true and accurate copy of the letter is attached as Exhibit 32.  Mincberg Declaration, ¶ 34.

53.   As set forth in the Report, Congress received no response to this letter from the Administration.  *See* H.R. Rep. No. 110-423, at 60.  Exhibit 1.

54.   On November 5, 2007, the Committee filed its Report with the full House: "Recommending that the House of Representatives find Harriet Miers and Joshua Bolten, Chief of Staff, White House, in Contempt of Congress for Refusal to Comply with Subpoenas Duly Issued by the Committee on the Judiciary."  *See* 153 Cong. Rec. D1473-02 (2007).

55.   On November 5, 2007, Chairman Conyers wrote again to the Counsel to the President, seeking to resolve the issue on a cooperative basis and offering a proposal for resolving the dispute.  A true and accurate copy of the letter is attached as Exhibit 33.  Mincberg Declaration, ¶ 35.

56.   On November 9, 2007, Counsel to the President wrote Chairman Conyers to reject his offer and urge Congress to accept the Administration's original proposal.  A true and accurate copy of the letter is attached as Exhibit 34.  Mincberg Declaration, ¶ 36.

57. On February 14, 2008, the House of Representatives by a vote of 223-32 held Ms. Miers and Mr. Bolten in contempt of Congress and passed H. Res. 979, 980, and 982. H. Res. 979, 110th Cong. (Feb. 14, 2008). Exhibit 35. H. Res. 980, 110th Cong. (Feb. 14, 2008). Exhibit 36. H. Res. 982, 110th Cong. (Feb. 14, 2008). Exhibit 37.

58. H. Res. 979 provides that, "pursuant to 2 U.S.C. §§ 192 and 194, the Speaker of the House shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers" to appear before, to testify before, and to produce documents to, the Subcommittee, to the U.S. Attorney for the District of Columbia, "to the end that Ms. Miers be proceeded against in the manner and form provided by law." H. Res. 979 further provides that, "pursuant to 2 U.S.C. §§ 192 and 194, the Speaker of the House shall certify the report of the Committee on the Judiciary, detailing the refusal of White House Chief of Staff Joshua Bolten to produce documents to the Committee on the Judiciary as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Mr. Bolten be proceeded against in the manner and form provided by law." H. Res. 979, 110th Cong. (Feb. 14, 2008). Exhibit 35.

59. H. Res. 980 authorizes the Chairman of the Committee to "initiate or intervene in judicial proceedings in any Federal court of competent jurisdiction on behalf of the Committee . . . to seek declaratory judgments affirming the duty of any individual to comply with any subpoena that is a subject House Resolution 979" and "to seek appropriate ancillary relief, including injunctive relief." At the authorization of the Speaker, H. Res. 980 also authorizes the Office of General Counsel of the House of

Representatives to represent the Committee "in any legislation pursuant to this resolution."  *See* H. Res. 980, 110th Cong. (Feb. 14, 2008).  Exhibit 36.

60.    H. Res. 982 adopted both H. Res. 979 and H. Res. 980.  H. Res. 982, 110th Cong. (Feb. 14, 2008).  Exhibit 37.

61.    On February 28, 2008, Speaker of the House Nancy Pelosi certified the Committee's Report to Jeffrey A. Taylor, U.S. Attorney for the District of Columbia.  A true and accurate copy of the letter is attached as Exhibit 38.  Mincberg Declaration, ¶ 37.

62.    Also on February 28, 2008, Speaker Pelosi wrote to Attorney General Michael B. Mukasey, stating that "[t]here is no authority by which persons may wholly ignore a subpoena and fail to appear as directed because a President unilaterally instructs them to do so."  The Speaker noted that the Attorney General had previously testified that he would not allow the U.S. Attorney for the District of Columbia to enforce the contempt citation or to present the matter to the grand jury.  The Speaker urged him to reconsider his position.  A true and accurate copy of the letter is attached as Exhibit 39.  Mincberg Declaration, ¶ 38.

63.    On February 29, 2008, Attorney General Mukasey responded that "the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers."  A true and accurate copy of the letter is attached as Exhibit 40.  Mincberg Declaration, ¶ 39.


Respectfully submitted,

/s/ Irvin B. Nathan
IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel
CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR, D.C. Bar # 476240
Assistant Counsel
RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel
KATHERINE E. McCARRON, D.C. Bar # 486335
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff
Committee on the Judiciary of the
U.S. House of Representatives

DATED: April 10, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

COMMITTEE ON THE JUDICIARY,  )
UNITED STATES HOUSE          )
OF REPRESENTATIVES           )
                             )
                             )
                  *Plaintiff*,   )
                             )   Case No. 1:08-cv-00409 (JDB)
HARRIET MIERS, et al.        )
                             )
                  *Defendants*.  )
_____ )

## DECLARATION OF ELLIOT M. MINCBERG

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I am the Chief Counsel, for Oversight and Investigation, for the United States House of Representatives Committee on the Judiciary ("Committee"). I have been with the Committee since January, 2007.

2. I am one of the attorneys assigned to the investigation of the forced resignations of nine United States Attorneys and related matters. As such, I have personal knowledge of the correspondence sent to and received by the Committee.

3. I make this declaration in support of the Plaintiff Judiciary Committee's Statement of Material Facts As To Which There Is No Genuine Issue.

4. Exhibit 1 is a true and correct copy of H.R. Rep. No. 110-423 (2007) (Report of the Committee on the Judiciary, House of Representatives, together with Additional Views and Minority Views ("Report")) (on file with the Committee and *available at* http://judiciary.house.gov/Media/PDFS/ContemptReport071105.pdf).

5. Exhibit 2 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman of the House Judiciary Subcommittee on Commercial and Administrative Law ("Subcommittee"), to Alberto R. Gonzales, Attorney General (March 8, 2007) (on file with the Committee).

6. Exhibit 3 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee, to Harriet E. Miers (March 9, 2007) (on file with the Committee).

7. Exhibit 4 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee, to Fred F. Fielding, Counsel to the President (March 9, 2007) (on file with the Committee).

8. Exhibit 5 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to Patrick Leahy, Chairman, Senate Committee on the Judiciary, John Conyers, Jr., Chairman, Committee, Arlen Specter, Ranking Member, Senate Judiciary Committee, Lamar S. Smith, Ranking Member, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee (March 20, 2007) (on file with the Committee).

9. Exhibit 6 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee, to Fred F. Fielding, Counsel to the President (March 22, 2007) (on file with the Committee).

10. Exhibit 7 is a true and correct copy of the letter from Patrick Leahy, Chairman, Senate Committee on the Judiciary, and John Conyers, Jr., Chairman, Committee, to Fred F. Fielding, Counsel to the President (March 28, 2007) (on file with the Committee).

11. Exhibit 9 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to Patrick Leahy, Chairman, Senate Committee on the Judiciary, John Conyers, Jr., Chairman, Committee (April 12, 2007) (on file with the Committee).

12. Exhibit 10 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee, to Fred F. Fielding, Counsel to the President (May 21, 2007) (with enclosed documents from the U.S. Department of Justice, identified with Bates numbers DAG000000010-11) (on file with the Committee).

13. Exhibit 11 is a true and correct copy of the letter from John M. Dowd, Partner, and Jeffrey M. King, Partner, Akin Gump Strauss Hauer & Feld LLP, to John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee (March 30, 2007) (with enclosed Declaration of Monica M. Goodling) (on file with the Committee).

14. Exhibit 12 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to Patrick Leahy, Chairman, Senate Committee on the Judiciary, John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee (June 7, 2007) (on file with the Committee).

15. Exhibit 13 is a true and correct copy of the subpoena to Joshua Bolten, Chief of Staff, or appropriate custodian of records, White House, from the Committee (June 13, 2007) (on file with the Committee).

16. Exhibit 14 is a true and correct copy of the subpoena to Harriet Miers from the Subcommittee (June 13, 2007) (on file with the Committee).

17. Exhibit 15 is a true and correct copy of the letter from Paul D. Clement, Solicitor General and Acting Attorney General, to George W. Bush, President (June 27, 2007), that was enclosed with the letter from Fred F. Fielding, Counsel to the President, to Patrick Leahy, Chairman, Senate Committee on the Judiciary, John Conyers, Jr., Chairman, Committee (June 28, 2007) and also enclosed with the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee, and Lamar S. Smith, Ranking Member, Committee (July 9, 2007) (on file with the Committee).

18. Exhibit 16 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to Patrick Leahy, Chairman, Senate Committee on the Judiciary, John Conyers, Jr., Chairman, Committee (June 28, 2007) (with enclosed letter from Paul D. Clement, Solicitor General and Acting Attorney General, to George W. Bush, President (June 27, 2007)) (on file with the Committee).

19. Exhibit 17 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (June 28, 2007) that was enclosed with the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee, and Lamar S. Smith, Ranking Member, Committee (July 9, 2007) (on file with the Committee).

20. Exhibit 18 is a true and correct copy of the letter from Patrick Leahy, Chairman, Senate Committee on the Judiciary, and John Conyers, Jr., Chairman, Committee, to Fred F. Fielding, Counsel to the President (June 29, 2007) (on file with the Committee).

21. Exhibit 19 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to Patrick Leahy, Chairman, Senate Committee on the Judiciary, John Conyers, Jr., Chairman, Committee (July 9, 2007) (on file with the Committee).

22. Exhibit 20 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (July 9, 2007) that was enclosed with the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee, and Lamar S. Smith, Ranking Member, Committee (July 9, 2007) (on file with the Committee).

23. Exhibit 21 is a true and correct copy of the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee, and Lamar S. Smith, Ranking Member, Committee (July 9, 2007) (with enclosed letters from: Fred F. Fielding, Counsel to the President, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (June 28, 2007) and (July 9, 2007); and, from Paul D. Clement, Solicitor General and Acting Attorney General, to George W. Bush, President (June 27, 2007)) (on file with the Committee).

24. Exhibit 22 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (July 10, 2007) (on file with the Committee).

25. Exhibit 23 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (July 10, 2007) (Attachment A not included) that was enclosed with the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee (July 10, 2007) (on file with the Committee).

26. Exhibit 24 is a true and correct copy of the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee (July 10, 2007) (with enclosed letter from Fred F. Fielding, Counsel to the President, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (July 10, 2007)) (on file with the Committee).

27. Exhibit 25 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (July 11, 2007) (on file with the Committee).

28. Exhibit 26 is a true and correct copy of the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee (July 11, 2007) (on file with the Committee).

29. Exhibit 27 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, to George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers (July 13, 2007) (with enclosed "Ruling of Chairwoman Linda Sánchez on Related Executive Privilege and Immunity Claims") (on file with the Committee).

30. Exhibit 28 is a true and correct copy of the letter from George T. Manning, Partner, Jones Day, and Personal Counsel to Harriet E. Miers, to John Conyers, Jr., Chairman, Committee (July 17, 2007) (on file with the Committee).

31. Exhibit 29 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, and Linda T. Sánchez, Chairwoman, Subcommittee, to Fred F. Fielding, Counsel to the President (July 17, 2007) (on file with the Committee).

32. Exhibit 30 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, to Fred F. Fielding, Counsel to the President (July 19, 2007) (with enclosed "Ruling of Chairwoman Sánchez on White House Executive Privilege Claims") (on file with the Committee).

33. Exhibit 31 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to John Conyers, Jr., Chairman, Committee (July 23, 2007) (on file with the Committee).

34. Exhibit 32 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, to Fred F. Fielding, Counsel to the President (July 25, 2007) (with enclosed Committee Report, as approved by the House on July 25, 2007) (on file with the Committee).

35. Exhibit 33 is a true and correct copy of the letter from John Conyers, Jr., Chairman, Committee, to Fred F. Fielding, Counsel to the President (Nov. 5, 2007) (on file with the Committee).

36. Exhibit 34 is a true and correct copy of the letter from Fred F. Fielding, Counsel to the President, to John Conyers, Jr., Chairman, Committee (Nov. 9, 2007) (on file with the Committee).

37. Exhibit 38 is a true and correct copy of the letter from Nancy Pelosi, Speaker, United States House of Representatives, to Jeffrey A. Taylor, United States Attorney, District of Columbia (Feb. 28, 2008) (with enclosed H. Res. 979) (on file with the Committee).

38. Exhibit 39 is a true and correct copy of the letter from Nancy Pelosi, Speaker, United States House of Representatives, to Michael B. Mukasey, Attorney General (Feb. 28, 2008) (with enclosed H. Res. 979) (on file with the Committee).

39. Exhibit 40 is a true and correct copy of the letter from Michael B. Mukasey, Attorney General, to Nancy Pelosi, Speaker, United States House of Representatives (Feb. 29, 2008) (with enclosed letter from Brian A. Benczkowski, Principal Deputy Assistant Attorney General (July 24, 2007)) (on file with the Committee).

40. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of April 2008.

_____
Elliot M. Mincberg

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of April, 2008, a copy of the foregoing Plaintiff Committee on the Judiciary's Motion for Partial Summary Judgment, Memorandum of Points and Authorities in Support of Plaintiff Committee on the Judiciary's Motion for Partial Summary Judgment, Statement of Material Facts as to Which There Is No Genuine Issue, Declaration of Elliot M. Mincberg, Proposed Order Granting Plaintiff's Motion for Partial Summary Judgment, and accompanying Exhibits (in six parts) were filed electronically. Exhibit 1 was served in hard copy to the Clerk of the Court and to the Defendants pursuant to Local Rule 5.4(e)(1), which requires that parties filing "[e]xhibits or attachments that . . . exceed 500 pages" to serve such materials by mail or hand delivery with the Court. A courtesy copy of Exhibit 1 was provided to the Judge. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

_____/s/ Richard A. Kaplan_____
Richard A. Kaplan, D.C. Bar # 978813

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                          )
COMMITTEE ON THE JUDICIARY,                               )
UNITED STATES HOUSE                                       )
OF REPRESENTATIVES,                                       )
                                                          )     Case No. 1:08-cv-00409 (JDB)
                                    *Plaintiff*,          )
                                                          )
              v.                                          )
                                                          )
HARRIET MIERS, *et al.*                                   )
                                                          )
                                                          )
                                    *Defendants*.         )
———————————————————————)

**PROPOSED ORDER GRANTING PLAINTIFF'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

UPON CONSIDERATION of the Motion for Partial Summary Judgment of Plaintiff

Committee on the Judiciary of the U. S. House of Representatives ("Judiciary Committee"), the

opposition thereto, and the entire record herein, it is by the Court this ____day of ____, 2008,

hereby ORDERED

That the Motion is GRANTED.  As to Count I of the Complaint, it is

HEREBY DECLARED that Harriet Miers's refusal to appear before the Judiciary

Committee's Subcommittee on Commercial and Administrative Law (collectively, with

Judiciary Committee, "Committee") in response to the subpoena issued to her, to assert

executive privilege in response to particular questions, and to testify before the Committee about

all subjects not covered by executive privilege, was without legal justification and violated her

legal obligations; and

HEREBY DECLARED that Ms. Miers may assert executive privilege in response to Committee questions only in the presence of the Committee and only in response to particular questions, where appropriate and if properly authorized to do so; and

HEREBY DECLARED that Ms. Miers must testify before the Committee about all subjects not covered by privilege; and

ORDERED that Ms. Miers is enjoined forthwith to appear before the Committee in compliance with the Committee subpoena issued to her, to testify about all matters not covered by executive privilege and to assert executive privilege in response to questions put to her only in the presence of the Committee and only in response to particular questions, where appropriate and if properly authorized to do so.

As to Count II, it is:

HEREBY DECLARED that the failure of Ms. Miers and Joshua Bolten to produce privilege logs identifying all documents withheld on grounds of executive privilege or any other basis in response to the duly issued and served congressional subpoenas were without legal justification and violated their legal obligations; and

ORDERED that Ms. Miers and Mr. Bolten are enjoined forthwith to provide to the Committee privilege logs identifying by author, recipient, date, and subject matter all documents withheld on grounds of executive privilege or any other legal basis; and

ORDERED that Ms. Miers and Mr. Bolten are enjoined forthwith to produce to the Committee all nonprivileged documents that are responsive to the Committee subpoenas duly issued and served upon them.

_____
John D. Bates
United States District Judge

Exhibit 1

No. 08-409 (JDB)

H.R. Rep. No. 110-423 (2007) (Report of the Committee on the Judiciary, House of Representatives, together with Additional Views and Minority Views ("Report")) has been served on Defendants and filed in hard copy with the Court. The Report is on file with the U.S. House of Representatives Committee on the Judiciary and *available at* http://judiciary.house.gov/Media/PDFS/ContemptReport071105.pdf.

# Exhibit 2

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515—6216
#### One Hundred Tenth Congress

March 8, 2007

The Honorable Alberto R. Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530

Dear Mr. Attorney General:

We write to follow up on the hearings held in the House and Senate Judiciary Committees this week concerning the forced resignations of six U.S. Attorneys. At these hearings, a number of important disclosures were made, several of which raise very troubling legal questions about the conduct of officials at the Justice Department. Because of these concerns, and in order to further our investigation, we ask that you make available to us certain officials at the Department for follow-up questioning next week and that you provide us with certain critical documents and information.

At our hearings we learned of a number of troubling matters. Among other things:

- Two of the fired U.S. Attorneys, Mr. Bogden and Mr. Charlton, testified that they were told by Mr. William Mercer, the Acting Associate Attorney General, that they were fired for political reasons in order to put others in those positions so they could build their resumes, contrary to the claim by Justice Department officials that they were fired for "performance related" reasons. Many of the rationales for the terminations offered by Mr. Moschella at our hearing do not appear to hold up to scrutiny. For example, Mr. McKay was allegedly terminated because of his promotion of an information sharing program, even though he was praised for this work and his program was selected to be a pilot program by the Department. Mr. Cummins was allegedly terminated in part because he was rumored to want to leave before his term was finished, even though he testified he had never told that to anyone at the Department prior to his resignation. Mr. Charlton was allegedly terminated because he wanted the FBI to tape the confessions of alleged child molesters to facilitate their convictions, even though the Deputy Attorney General's office had asked him not to resign over this issue and asked him to initiate a pilot program on this matter.

- Mr. Iglesias and Mr. McKay testified that there were several efforts made to influence their prosecutorial decisions. For example, Mr. Iglesias testified that he felt "leaned on" and "sickened" by *ex parte* congressional contacts, and Mr. McKay testified that he

The Honorable Alberto R. Gonzales
Page Two
March 8, 2007

received a call from a congressional representative apparently intended to pressure him to pursue a criminal vote fraud investigation, and subsequently stated that he was asked during an interview with White House Counsel Harriet Miers to explain why he had "mishandled" that issue. This testimony raises serious issues concerning possible undue influence and obstruction of justice.

- Mr. Cummins testified that he received a call from Michael Elston, Mr. McNulty's Chief of Staff, who informed him that voluntary testimony to Congress by Mr. Cummins or any of his colleagues would be seen as "a major escalation of the conflict meriting some kind of unspecified form of retaliation." On its face, this testimony raises the possibility that the Department may have sought to obstruct Congress' efforts to ascertain the truth concerning these firings.

In order to further our investigation and resolve the many contradictions between statements by the Department and the terminated U.S. Attorneys, we need to interview several employees at the Department, and accordingly ask that you make them available to us to interview within the next week. These individuals include:

- Paul McNulty, Deputy Attorney General;

- D. Kyle Sampson, Chief of Staff to the Attorney General;

- Michael Elston, Chief of Staff to the Deputy Attorney General;

- Michael Battle, Director, Executive Office for U.S. Attorneys;

- Monica Goodling, Senior Counsel to the Attorney General and Liaison to the White House; and

- William Mercer, United States Attorney for Montana and Acting Associate Attorney General.

The Honorable Alberto R. Gonzales
Page Three
March 8, 2007

We will also require that you provide to us information and documents next week as well.[1] Specifically, we request that you supply the following documents and information in accordance with the definitions enclosed with this letter:

- copies of all documents (including but not limited to e-mails), either within the Department of Justice or relating to communications between anyone at the Department and the White House or any other person or entity, concerning the termination of the six U.S. Attorneys who testified at our hearing and the selection of their replacements. This includes, but is not limited to, any materials relating to the meetings held within the Justice Department on the subject, communications from or to the White House on the subject, any lists of U.S. Attorneys to be replaced, any lists of replacement candidates for their positions, the Justice Department and Administration responses to the controversy over the firings, and post-termination communications with the fired U.S. Attorneys;

- copies of all documents relating to communications between the Justice Department and Members of Congress concerning any of the terminated U.S. Attorneys in advance of their terminations;

- copies of all documents relating to communications that the Justice Department had with the terminated U.S. Attorneys during their tenure in office concerning any failure in their performance, including any failure to comply with the Justice Department's priorities or directives;

- the names of any Members of Congress who were given advance notification of the terminated U.S. Attorneys by anyone in the Justice Department, together with the dates of any such notification; and

- the names of all individuals in the White House and Justice Department who were in any respect involved in the decision to seek the resignation of the terminated U.S. Attorneys, in addition to those identified by Mr. Moschella in his testimony.

---

[1] Pursuant to a letter delivered to Mr. Moschella on Monday, March 5, 2007, we had hoped to receive certain requested documents and information in advance of the hearing. For purposes of this letter, any reference to the Justice Department encompasses all components thereof, e.g., the Executive Office for United States Attorneys.

The Honorable Alberto R. Gonzales
Page Four
March 8, 2007

      We request that you provide the requested documentary materials and other information to us by 6:00 p.m. on Thursday, March 15, 2007, and we will be in touch with your office concerning the above individuals. Responses and questions should be directed to the Judiciary Committee office, 2138 Rayburn House Office Building, Washington, DC 20515 (tel: 202-225-3951; fax: 202-225-7680). Thank you for your cooperation in this matter.

                Sincerely,

         John Conyers, Jr.               Linda T. Sánchez
         Chairman               Chairwoman, Subcommittee on Commercial
                                   and Administrative Law

Enclosure

cc:    Hon. Richard A. Hertling
       Hon. Lamar S. Smith
       Hon. Christopher B. Cannon

## Definitions

1.  The term "document" means any written, recorded or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, manuals, instructions, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazine or newspaper articles, interoffice and intra-office communications, electronic mail (e-mail), contracts, cables, notations of any type of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, transcripts, diaries, analyses, summaries, minutes, comparisons, messages, correspondence, press releases, circulars, reviews, opinions, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records of any kind (including without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotape, recordings and motion pictures), and electronic and mechanical records or representations of any kind (including without limitation, tapes, cassettes, disks, computer files, computer hard drive files, CDs, DVDs, memory sticks, and recordings) and other written, printed, typed or other graphic or recorded matter of any kind of nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.  The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, e-mail, telexes, discussions, releases, personal delivery, or otherwise.

Exhibit 3

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

# 𝕌.𝕊. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Tenth Congress

March 9, 2007

Ms. Harriet E. Miers
▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Dear Ms. Miers:

We write to follow up on the hearings held in the House and Senate Judiciary Committees this week concerning the forced resignations of six U.S. Attorneys. At these hearings, a number of important disclosures were made, several of which raise very troubling legal questions about the conduct of officials at the Justice Department. Questions have also been raised concerning the involvement of the White House, which of course made the final decision to discharge these U.S. Attorneys. Enclosed is a copy of a letter we have sent to the current White House counsel, Fred Fielding, on these matters.

In order to further our investigation, we would appreciate the opportunity to interview you, hopefully on a voluntary basis, about your knowledge and activities concerning the termination of these U.S. Attorneys. Please contact Elliot Mincberg or Lillian German in the Judiciary Committee office, 2138 Rayburn House Office Building, Washington, DC 20515 (tel: 202-225-3951; fax: 202-225-7680). Thank you for your cooperation in this matter.

Sincerely,

John Conyers, Jr.
Chairman

Linda T. Sánchez
Chairwoman, Subcommittee on Commercial
and Administrative Law

Enclosure

cc:    Hon. Richard A. Hertling
       Hon. Lamar S. Smith
       Hon. Christopher B. Cannon

# Exhibit 4

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Tenth Congress

March 9, 2007

Mr. Fred F. Fielding
Counsel to the President
Office of Counsel to the President
The White House
1600 Pennsylvania Avenue, NW
Washington, DC  20530

Dear Mr. Fielding:

We write to follow up on the hearings held in the House and Senate Judiciary Committees this week concerning the forced resignations of six U.S. Attorneys. At these hearings, a number of important disclosures were made, several of which raise very troubling legal questions about the conduct of officials at the Justice Department. Questions have also been raised concerning the involvement of the White House, which of course made the final decision to fire these U.S. Attorneys. Because of these concerns, and in order to further our investigation, we ask that you provide us with certain critical documents and information and make available to us certain White House officials for interviews and questioning.

At our hearings we learned of a number of troubling matters. Among other things:

- Two of the fired U.S. Attorneys, Mr. Bogden and Mr. Charlton, testified that they were told by Mr. William Mercer, the Acting Associate Attorney General, that they were fired for political reasons in order to put others in those positions so they could build their resumes, contrary to the claim by Justice Department officials that they were fired for "performance related" reasons. Many of the rationales for the terminations offered by Mr. Moschella at our hearing do not appear to hold up to scrutiny. For example, Mr. McKay was allegedly terminated because of his promotion of an information sharing program, even though he was praised for this work and his program was selected to be a pilot program by the Department. Mr. Cummins was allegedly terminated in part because he was rumored to want to leave before his term was finished, even though he testified he had never told that to anyone at the Department prior to his resignation. Mr. Charlton was allegedly terminated because he wanted the FBI to tape the confessions of alleged child molesters to facilitate their convictions, even though the Deputy Attorney General's office had asked him not to resign over this issue and asked him to initiate a pilot program on this matter.

Mr. Fred F. Fielding
Page Two
March 9, 2007

- Mr. Iglesias and Mr. McKay testified that there were several efforts made to influence their prosecutorial decisions. For example, Mr. Iglesias testified that he felt "leaned on" and "sickened" by *ex parte* congressional contacts, and Mr. McKay testified that he received a call from a congressional representative apparently intended to pressure him to pursue a criminal vote fraud investigation, and subsequently stated that he was asked during an interview with White House Counsel Harriet Miers to explain why he had "mishandled" that issue. This testimony raises serious issues concerning possible undue influence and obstruction of justice.

- Mr. Cummins testified that he received a call from Michael Elston, Mr. McNulty's Chief of Staff, who informed him that voluntary testimony to Congress by Mr. Cummins or any of his colleagues would be seen as "a major escalation of the conflict meriting some kind of unspecified form of retaliation." On its face, this testimony raises the possibility that the Department may have sought to obstruct Congress' efforts to ascertain the truth concerning these firings.

In order to further our investigation, we request that you supply the following documents and information in accordance with the definitions enclosed with this letter:

- copies of all documents (including but not limited to e-mails), either within the White House or relating to communications between anyone at the White House and the Department of Justice or any other person or entity, concerning the termination of the six U.S. Attorneys who testified at our hearing and the selection of their replacements. This includes, but is not limited to, any materials relating to the meetings held within the Justice Department on the subject, communications from or to the White House on the subject, any lists of U.S. Attorneys to be replaced, any lists of replacement candidates for their positions, the Justice Department and Administration responses to the controversy over the firings, and post-termination communications with the fired U.S. Attorneys;

- copies of all documents relating to communications between the White House and Members of Congress concerning any of the terminated U.S. Attorneys in advance of their terminations;

- the names of any Members of Congress who were given advance notification of the terminated U.S. Attorneys by anyone in the White House, together with the dates of any such notification; and

Mr. Fred F. Fielding
Page Three
March 9, 2007

- the names of all individuals in the White House who were in any respect involved or consulted or offered advice or suggestions concerning the decision to seek the resignation of the terminated U.S. Attorneys.

In addition, we will want to interview White House officials with information on these matters, including but not limited to William Kelly, Deputy Counsel to the President. To facilitate this process, we request that you provide the requested documentary materials and other information to us by 6:00 p.m. on Friday, March 16, 2007, and we will be in touch with your office concerning the individuals we wish to interview. Responses and questions should be directed to the Judiciary Committee office, 2138 Rayburn House Office Building, Washington, DC 20515 (tel: 202-225-3951; fax: 202-225-7680). Thank you for your cooperation in this matter.

Sincerely,

John Conyers, Jr.
Chairman

Linda T. Sánchez
Chairwoman, Subcommittee on Commercial
and Administrative Law

Enclosure

cc:    Hon. Richard A. Hertling
       Hon. Lamar S. Smith
       Hon. Christopher B. Cannon

## Definitions

1.    The term "document" means any written, recorded or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, manuals, instructions, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazine or newspaper articles, interoffice and intra-office communications, electronic mail (e-mail), contracts, cables, notations of any type of conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, transcripts, diaries, analyses, summaries, minutes, comparisons, messages, correspondence, press releases, circulars, reviews, opinions, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records of any kind (including without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotape, recordings and motion pictures), and electronic and mechanical records or representations of any kind (including without limitation, tapes, cassettes, disks, computer files, computer hard drive files, CDs, DVDs, memory sticks, and recordings) and other written, printed, typed or other graphic or recorded matter of any kind of nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2.    The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, e-mail, telexes, discussions, releases, personal delivery, or otherwise.

# Exhibit 5

No. 08-409 (JDB)

**THE WHITE HOUSE**

WASHINGTON

March 20, 2007

Dear Chairman Leahy, Chairman Conyers, Ranking Member Specter, Ranking Member Smith, and Congresswoman Sánchez:

I write in response to the letter of Chairman Leahy and Senator Specter dated March 13, 2007, and Chairman Conyers' and Congresswoman Sánchez's letter of March 9, 2007, regarding the Department of Justice's decision to request the resignations of United States Attorneys in December 2006. As you know, I have been working over the last week with your Committees to accommodate your interests, while at the same time respecting the constitutional prerogatives of the Presidency. I very much appreciate the time and consideration that you and other Members of Congress have provided me in the course of these discussions.

In keeping with the President's commitment to ensure that Congress and the American people understand the resignations of the U.S. Attorneys, the Department of Justice has produced more than 3,000 pages of documents relating to this matter. These documents do not reflect that any U.S. Attorney was replaced to interfere with a pending or future criminal investigation or for any other improper reason. These documents, together with the interviews to be provided by Department officials, will provide extensive background on the decisions in question, including an account of communications between the Department and senior White House officials. Congress, in short, is receiving a virtually unprecedented window into personnel decision-making within the Executive Branch.

In the midst of this current debate, the President must remain faithful to the fundamental interests of the Presidency and the requirements of the constitutional separation of powers. We wish to reach a reasonable accommodation so as to provide your Committees the information they are seeking in a way that will allow this President, and future Presidents, to continue to discharge their constitutional responsibilities effectively.

In response to the invitations for interviews extended by the Committees, I am prepared to agree to make available for interviews the President's former Counsel; current Deputy Chief of Staff and Senior Advisor; Deputy Counsel; and a Special Assistant in the Office of Political Affairs. We are prepared to agree to the following terms, which, considering applicable constitutional principles relating to the Presidency and your Committees' interests, we believe are fair, reasonable, and respectful. We believe that such interviews should be a last resort, and should be conducted, if needed, only after Congress has heard from Department of Justice officials about the decision to request the resignations of the U.S. Attorneys.

Such interviews may cover, and would be limited to, the subject of (a) communications between the White House and persons outside the White House concerning the request for resignations of

the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests. Those interviews should be conducted by both Committees jointly. Questioning of White House officials would be conducted by a Member or limited number of Members, who would be accompanied by committee staff. Such interviews would be private and conducted without the need for an oath, transcript, subsequent testimony, or the subsequent issuance of subpoenas. A representative of the Office of the Counsel to the President would attend these interviews and personal counsel to the invited officials may be present at their election.

As an additional accommodation, and as a part of this proposal, we are prepared to provide to your Committees copies of two categories of documents: (a) communications between the White House and the Department of Justice concerning the request for resignations of the U.S. Attorneys in question; and (b) communications on the same subject between White House staff and third parties, including Members of Congress or their staffs on the subject.

We trust and believe that the accommodation we offer here, in addition to what the Department of Justice has provided, should satisfy the Committees' interests.

Sincerely,

Fred F. Fielding
Counsel to the President

The Honorable Patrick Leahy
United States Senate
433 Russell Senate Office Building
Washington, D.C. 20510

The Honorable John Conyers
United States House of Representatives
2426 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Arlen Specter
United States Senate
711 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Lamar Smith
United States House of Representatives
2409 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Linda Sánchez
United States House of Representatives
1007 Longworth House Office Building
Washington, D.C. 20515

# Exhibit 6

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

# 𝔘.𝔖. 𝔥𝔬𝔲𝔰𝔢 𝔬𝔣 𝔯𝔢𝔭𝔯𝔢𝔰𝔢𝔫𝔱𝔞𝔱𝔦𝔳𝔢𝔰
## ℭ𝔬𝔪𝔪𝔦𝔱𝔱𝔢𝔢 𝔬𝔫 𝔱𝔥𝔢 𝔍𝔲𝔡𝔦𝔠𝔦𝔞𝔯𝔶
### 𝔚𝔞𝔰𝔥𝔦𝔫𝔤𝔱𝔬𝔫, 𝔇ℭ 20515–6216
#### 𝔒𝔫𝔢 𝔥𝔲𝔫𝔡𝔯𝔢𝔡 𝔱𝔢𝔫𝔱𝔥 ℭ𝔬𝔫𝔤𝔯𝔢𝔰𝔰

March 22, 2007

Mr. Fred F. Fielding
Counsel to the President
Office of Counsel to the President
The White House
1600 Pennsylvania Avenue, NW
Washington, DC  20530

Dear Mr. Fielding:

We are writing in response to your March 20 letter concerning our request for information relating to our investigation of the U.S. Attorney controversy. While we share the Administration's interest that the American people "hear the truth" concerning these matters, we cannot accept your proposal for a number of reasons, and would sincerely hope that your office will work with us to find a reasonable accommodation of the interests of both branches of government.

We write this because your proposal will not facilitate a full and fair inquiry. We believe the failure to permit any transcript of our interviews with White House officials is an invitation to confusion and will not permit us to obtain a straightforward and clear record. Also, limiting the questioning (and document production) to discussions by and between outside parties will further prevent our Members from learning the full picture concerning the reasons for the firings and related issues. As we are sure you are aware, limitations of this nature are completely unsupported by precedents applied to prior Administrations – both Democratic and Republican.

We would not be pursuing this matter absent the evidence of misconduct, misstatements and potential criminal wrongdoing that has already come to light. Among other things, the Department of Justice itself has acknowledged that its officials have misled Congress, with the Chief of Staff to the Attorney General resigning over his role in the matter. In addition, several U.S. Attorneys have testified that the firings may have been tied to improper contacts and threats. Evidence has also emerged that improper criteria may have been used not just for firing U.S. Attorneys, but also with decisions to retain them. Although there have been numerous and conflicting accounts concerning the process, there now appears to be little doubt that senior officials in the White House were involved in the firing plan, both in conception and implementation. Also, notwithstanding your characterization of the Department of Justice's provision of documentation and witnesses, the Department of Justice has failed to turn over a significant amount of critical information, and has not yet reached accord with us regarding witness interviews. Given these facts, it would be irresponsible if our Committee were to accept

Mr. Fred Fielding
Page Two
March 22, 2007

the limitations proposed in your letter, which would severely impede our ability to get to the truth on behalf of the American people.

We have approached this matter with a high degree of caution and seriousness. This is why we initiated the matter with a non-compulsory request for documents on March 9. We accepted your request to meet on March 13, and, again, at your request, deferred taking any further action, based on the expectation that documents would be made available to us and an appropriate arrangement for questioning White House officials agreed to by the March 16 deadline you suggested. Although we did not hear from you on that date, we again accepted your request to defer action until we could meet, at your further request, on March 20. At that time we received your official proposal that would impose unprecedented restrictions on our access to relevant officials and materials. In order to protect our prerogatives, the Commercial and Administrative Law Subcommittee of the Judiciary Committee authorized Chairman Conyers to issue subpoenas with regard to these matters; but even then, Mr. Conyers indicated that he would not issue the subpoenas pending further efforts to reach accommodation with the White House.

It is in that spirit that we remain committed to seeking a cooperative resolution to this matter on a voluntary basis, consistent with the oversight responsibilities of the House and the Senate. We would be pleased to discuss further proposals from you to achieve these objectives that provide us with the records and information we need to complete our investigation while respecting your needs and interests. In the meantime, we also ask that you ensure the preservation of relevant White House documents, as defined in our March 9 letter.

We would ask that you contact the House Committee on the Judiciary office at your very earliest convenience so that we may resolve this matter. If you are willing to work in good faith, we can assure you that we are as well.

Sincerely,

John Conyers, Jr.
Chairman

Linda T. Sanchez
Chairwoman, Subcommittee on Commercial
and Administrative Law

cc:   Hon. Lamar S. Smith
      Hon. Christopher B. Cannon

# Exhibit 7

No. 08-409 (JDB)

# Congress of the United States
## Washington, DC 20510

March 28, 2007

Fred Fielding, Esq.
Counsel to the President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Dear Mr. Fielding:

When we met recently, each of us agreed to continue to talk and keep the lines of communication open. Nevertheless, we have not heard from you. It is now more than a week since the last set of meetings and almost a week since you received March 23rd letters from each of us inviting the White House to agree to provide the investigating committees of the Congress, both House and Senate, with access to witnesses, information and relevant documents.

As we have previously noted, political influence in federal law enforcement is a serious matter. We need to get to the bottom of what happened, why, how and who was involved in the mass firings of United States attorneys; the criteria used to retain U.S. Attorneys; and possible misstatements to Congress. The fact that recent disclosures have called into question previous statements made by the Attorney General and a high ranking Department of Justice official asserted her fifth amendment rights magnifies the need for a prompt, thorough, and fair investigation.

Allow us to share another step you might consider. At the most recent Senate Judiciary Committee business meeting, Senators from both sides of the aisle made a number of statements seeking White House cooperation. Senator Specter, the Committee's Ranking Republican, said that despite what you, the President and the President's spokesman have been saying, the President was, in fact, willing to negotiate. Senators Hatch and Sessions suggested that the Committee proceed with preliminary interviews of the White House senior staff and then consider whether to authorize subpoenas and compel testimony. Given the terms included in your March 20 letter, that seemed to us disingenuous, to appear to accept your limited proposal and then ultimately to ignore the limitation that there be no follow up testimony to the off-the-record interview you demanded.

Mr. Fred Fielding, Esq.
March 28, 2007
Page 2 of 3

We do believe your willingness to provide documents is worth pursuing. We hope that you will reconsider your "all or nothing" approach with respect to documents you identified that you would be willing to provide. We urge you to provide all relevant documents without delay. The White House documents to and from the Department of Justice and with third parties, such as Republican state party officials, should be provided without delay. You have acknowledged your willingness to provide those to us previously.

That would narrow the dispute over White House documents to those you refer to as "internal". We believe that these are important to our investigation, as well. For example, if there is a memorandum or an e-mail from Karl Rove to Harriet Miers initiating consideration of firing some United States attorneys in order to impede an investigation, that would be very important for the Committees to know. Thus, while we do not agree with you that what you describe as "internal" White House documents should be off limits, we recognize that you view them as a separate category and you disagree whether those should be shared with the Committees. Recognizing we have a dispute over those documents should not delay the Committees receiving the other documents that you indicate you are willing to provide.

If we can narrow our dispute, we may then be able to work through it by agreeing, for example, that we initially designate as "Committee Confidential" what you refer to as "internal" White House documents. We could then consider a process by which we would consult with you prior to making them public.

In addition, we have become increasingly sensitized over the last several days to the White House staff wearing several "hats" and using Republican National Committee and campaign e-mail addresses. In fact, as Chairman Waxman has recently pointed out, congressional investigations, including this one, "have uncovered evidence that White House staff have used nongovernmental e-mail accounts to conduct official government business."

As Chairman Waxman has also pointed out, many exchanges between Jack Abramoff and White House officials were conducted via non-government e-mail accounts. Indeed, he quotes exchanges that suggest that Mr. Abramoff and White House officials were using the nongovernmental accounts specifically to avoid creating a White House "record" of the communications.

Mr. Fred Fielding, Esq.
March 28, 2007
Page 3 of 3


We hope you agree that such sleight of hand should not be used to circumvent and compromise the comprehensiveness of our investigation. In this matter we have already received a document showing communications between D. Kyle Sampson, the Attorney General's former chief of staff, and J. Scott Jennings, the Special Assistant to the President and Deputy Director of Political Affairs at the White House (who you offered for an off-the-record interview), in which Mr. Jennings does not use his White House e-mail account but an e-mail account at the Republican National Committee designated "gwb43.com." There is another, similar use of a nongovernmental e-mail account in an exchange including Mr. Jennings and Monica Goodling, the Justice Department official who was the White House liaison and who recently invoked her privilege against self incrimination.

Accordingly, we trust that you will be collecting and producing e-mails and documents from all e-mail accounts, addresses and domains and that you are not artificially limiting your production to the official White House e-mail and document retention system.

Again, we urge you to continue to work with us so that we can achieve our mutual goal of getting to the truth in this matter

Sincerely,


PATRICK LEAHY
Chairman
Senate Judiciary Committee

JOHN CONYERS, JR.
Chairman
House Judiciary Committee


cc: The Hon. Arlen Specter
    The Hon. Lamar Smith

# Exhibit 8

No. 08-409 (JDB)

Order Code RL31351

# CRS Report for Congress

## Presidential Advisers' Testimony Before Congressional Committees: An Overview

**Updated March 17, 2008**

Harold C. Relyea
Specialist in American National Government
Government and Finance Division

Todd B. Tatelman
Legislative Attorney
American Law Division



**Congressional Research Service**

**Prepared for Members and Committees of Congress**

## Contents

Executive Office of the President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Presidential Adviser Growth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Presidential Adviser Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Presidential Adviser Testimony Refused . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Why Presidential Advisers Do Not Regularly Testify Before Committees . 23
Congress's Right to Executive Branch Information . . . . . . . . . . . . . . . . . 24
Procedure for Obtaining Executive Branch Testimony . . . . . . . . . . . . . . . 28
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CRS-2

It is also very likely that some activist Presidents were ill suited to the group deliberation of the Cabinet. Similarly, many Cabinet members might have felt unqualified, or were unwilling, to offer counsel to the President on matters outside of their immediate portfolios; their advice was perhaps limited to, and protective of, departmental interests. Finally, personal hostilities between or among department heads could result in such tumult within the Cabinet that little useful advice could be gained.

Consequently, Presidents generally looked to other quarters for advisers. One development in this regard was the creation of circles of advisers composed of both public officials and private citizens. President Andrew Jackson, whose election and White House tenure occurred in an era marked by violent political controversy and party instability, utilized an informal group of advisers which came to be known as the Kitchen Cabinet. The members represented "rising social groups as yet denied the prestige to which they felt their power and energies entitled them" — newspapermen, the President's private secretary, campaign organizers and officials from prior administrations, and longtime personal friends.[2]

When John Tyler succeeded to the presidency upon the death of William Henry Harrison, he revived Jackson's practice. Deserted by Whigs and Democrats alike, Tyler resorted to a select circle of advisers composed of personal and political friends from his native Virginia — a college president, a state supreme court judge, four members of the state's delegation in the House of Representatives, and a Senator.[3] Following this practice, several succeeding Presidents had informal groups of advisers that were given colorful names by the press. For example, for Grover Cleveland, it was a Fishing Cabinet; for Theodore Roosevelt, a Tennis Cabinet; for Warren G. Harding, a Poker Cabinet; and for Herbert Hoover, a Medicine Ball Cabinet.

Jackson's inclusion of his personal secretary in his Kitchen Cabinet reflects another line of development regarding presidential advisers. Beginning with Washington, Presidents sought to meet the demands of their office with the assistance of a single personal secretary, usually a relative, compensated from their own private resources. In 1833, Congress authorized the President to appoint, with the advise and consent of the Senate, a secretary "whose duty it shall be, under the direction of the President, to sign in his name and for him, all patents for lands sold or granted under the authority of the United States."[4] Jackson named Andrew Jackson Donelson, his wife's nephew and current personal secretary, to this position, relieving himself of continued personal compensation of the young man. Ultimately, Congress appropriated funds to the Chief Executive in 1857 for an official household — a personal secretary, a steward to supervise the Executive Mansion, and a messenger.[5]

---

[2] Arthur M. Schlesinger, Jr., *The Age of Jackson* (Boston, MA: Little, Brown, 1945), p. 67.

[3] Louis W. Koenig, *The Invisible Presidency* (New York: Rinehart, 1960), p. 40.

[4] 4 Stat. 633.

[5] 11 Stat. 228.

CRS-4

departments from time to time for the assignment of persons who, after a tour of duty as his aides, might be restored to their old positions.[9]

In addition to the proposed addition of six assistants to the President's staff, the committee's report also recommended vesting responsibility in the President for the continuous reorganization of the executive branch. Released to Congress on January 12, 1937, the report soon became lost in high politics. Three weeks after submitting the Brownlow committee's report to Congress, Roosevelt announced he wanted to enlarge the membership of the Supreme Court. His "court packing" plan not only fed congressional fears of a presidential power grab, but also so preoccupied Congress that the Brownlow committee's recommendations were ignored.

## Executive Office of the President

Although efforts at gaining legislative approval of the Brownlow committee's recommendations lay in ruin in the spring of 1938, the President had not deserted the cause. By July, Roosevelt was meeting with Brownlow and the other committee members. The panel would not be officially reassembled, but he wanted each man's help with a reorganization authority proposal. The resulting measure empowered the President to propose reorganization plans, subject to a veto by a majority vote of disapproval in both houses of Congress, and to also appoint six administrative assistants.

After three days of discussion and debate, the House adopted the bill on March 8, 1939. Twelve days later, the Senate began considering the proposal. Following two days of sparring over amendments, the Senate adopted the bill. A quick conference cleared the measure for Roosevelt's signature on April 3.[10] Earlier, the President had asked the Brownlow committee members to assist with the preparation of his initial reorganization plans.[11]

Following consultations with Budget Bureau Director Harold D. Smith, the Brownlow group presented two reorganization proposals to Roosevelt on April 23. Plan 1, submitted to Congress on April 25, transferred certain agencies to the Executive Office of the President, but offered no explanation of that entity.[12] In Plan 2, a presidential emergency council was abolished and most of its functions were transferred to the Executive Office.[13] While both plans were acceptable to legislators, their effective dates were troublesome in terms of accommodating fiscal calendar necessities. By joint resolution, Congress provided that both plans would

---

[9] U.S. President's Committee on Administrative Management, *Report of the President's Committee* (Washington: GPO, 1937), p. 5.

[10] 53 Stat. 561.

[11] Richard Polenberg, *Reorganizing Roosevelt's Government* (Cambridge, MA: Harvard University Press, 1966), pp. 184-187.

[12] 53 Stat. 1423.

[13] 53 Stat. 1431 at 1435.

CRS-6

Fourth, in January 1973, President Richard M. Nixon vested his Secretary of the Treasury and his director of the Office of Management and Budget with dual White House Office positions, respectively, of Assistant to the President for Economic Affairs and Assistant to the President for Executive Management. He also vested his Secretary of Agriculture, Secretary of Health, Education, and Welfare, and Secretary of Housing and Urban Development with dual White House Office positions, respectively, of Counselor to the President for Natural Resources, Counselor to the President for Human Resources, and Counselor to the President for Community Development.[18] Having such dual White House Office titles was viewed as giving added emphasis, if not authority, to the role of these officials as presidential advisers.

In the aftermath of World War II, Congress statutorily chartered most of the agencies within the Executive Office of the President. Furthermore, Congress routinely appropriated funds for the operating expenses of these entities. In 1944, Congress had adopted an amendment to an appropriation bill that was designed to restrain the creation of Executive Office agencies by executive order — a frequent occurrence during 1941-1944. The amendment stated:

> After January 1, 1945, no part of any appropriation or fund made available by this or any other Act shall be allotted or made available to, or used to pay the expenses of, any agency or instrumentality including those established by Executive order after such agency or instrumentality has been in existence for more than one year, if the Congress has not appropriated any money specifically for such agency or instrumentality or specifically authorized the expenditure of funds by it.[19]

In 1982, when Title 31 of the United States Code was recodified, the amendment was repealed and replaced with new language at Section 1347.[20] The opening sentence of the new section, which remains as operative law, states: "An agency in existence for more than one year may not use amounts otherwise available for obligation to pay its expenses without a specific appropriation or specific authorization by law."

With their growing number and influence, senior staff members of the White House Office and certain other Executive Office agencies began to become of interest to congressional committees when accountability for policymaking and administrative or managerial actions prompted requests for their testimony. Some, like War Production Board chairman Donald M. Nelson,[21] who was popularly known as the "arms czar," appeared before and cooperated with the Senate Special

---

[18] *Weekly Compilation of Presidential Documents*, vol. 9, January 8, 1973, p. 7.

[19] 58 Stat. 387.

[20] 96 Stat. 877 at 925, 1076.

[21] Established by E.O. 9024 of January 16, 1942, the War Production Board was technically located within the Office for Emergency Management, an agency within the Executive Office of the President, but it operated independently as an arm of the President. The chairman of the board was presidentially appointed without Senate confirmation; eight other specified government officials were members of the board. The board was terminated by E.O. 9638 of October 4, 1945.

CRS-8

and 31, 1949, to discuss his personal involvement in certain government procurement contracts.[26]

- Donald S. Dawson, Administrative Assistant to the President, White House Office, appeared before the Senate Committee on Banking and Currency on May 10 and 11, 1951, to discuss allegations he had attempted to "dominate" the Reconstruction Finance Corporation and influence appointments to that body.[27]

- Sherman Adams, Assistant to the President, White House Office, appeared before the House Committee on Interstate and Foreign Commerce Committee on June 17, 1958, to discuss his involvement with certain lobbyists.[28]

- Edward E. David, Jr., Science Adviser to the President, White House Office, and director, Office of Science and Technology, appeared before the Senate Committee on Interior and Insular Affairs on June 15, 1971, to discuss the Nixon Administration's position on energy policy matters; he appeared again before the House Committee on Science and Astronautics on June 14, 1972, to discuss science policy matters relating to Soviet-American cooperation agreements.[29]

- Virginia H. Knauer, Special Assistant to the President for Consumer Affairs, White House Office, and director, Office of Consumer Affairs, appeared before the House Select Committee on Small Business on June 25, 1971, to discuss consumer protection and advertising standards.[30]

- Jerome H. Jaffe, Special Consultant to the President, White House Office, and director, Special Action Office for Drug Abuse Prevention, appeared before the House Committee on Interstate and Foreign Commerce on June 28, August 2, October 27, and

---

[26] U.S. Congress, Senate Committee on Expenditures in the Executive Departments, *Influence in Government Procurement*, hearings, 81st Cong., 1st sess. (Washington: GPO, 1949), pp. 495ff, 563ff.

[27] U.S. Congress, Senate Committee on Banking and Currency, *Study of Reconstruction Finance Corporation*, hearings, 82nd Cong., 1st sess. (Washington: GPO, 1951), pp. 1709ff, 1795ff.

[28] U.S. Congress, House Committee on Interstate and Foreign Commerce, *Investigation of Regulatory Commissions and Agencies*, hearings, 85th Cong., 2nd sess. (Washington: GPO, 1958), p. 3712 ff.

[29] U.S. Congress, Senate Committee on Interior and Insular Affairs, *The President's Energy Message*, hearings, 92nd Cong., 1st sess. (Washington: GPO, 1971), p. 12ff; U.S. Congress, House Committee on Science and Astronautics, *U.S.-U.S.S.R. Cooperative Agreements*, hearings, 92nd Cong., 2nd sess (Washington: GPO, 1972), p. 60ff.

[30] U.S. Congress, House Select Committee on Small Business, *Advertising and Small Business*, hearings, 92nd Cong., 1st sess. (Washington: GPO, 1971), p. 567ff.

CRS-10

Campaign Activities on March 22, 1974, to discuss matters related to the Watergate incident.[36]

- J. Frederick Buzhardt, Special Counsel to the President, White House Office, appeared before the Senate Select Committee on Presidential Campaign Activities on April 10 and May 7, 1974, to discuss matters related to the Watergate incident.[37]

- Alexander M. Haig, Jr., Staff Coordinator to the President, White House Office, appeared before the Senate Select Committee on Presidential Campaign Activities on May 2, and 15, 1974, to discuss matters related to the Watergate incident.[38]

- Leonard Garment, Assistant to the President, White House Office, appeared before the Senate Select Committee on Presidential Campaign Activities on May 17, 1974, to discuss matters related to the Watergate incident.[39]

- Lloyd Cutler, Counsel to the President, White House Office, appeared before the Senate Judiciary Subcommittee to Investigate the Activities of Individuals Representing the Interests of Foreign Governments on September 10, 1980, to discuss efforts by the President's brother, Billy Carter, to influence the federal government on behalf of the government of Libya.[40]

- Zbigniew Brzezinski, Assistant to the President for National Security Affairs, White House Office, appeared before the Senate Judiciary Subcommittee to Investigate the Activities of Individuals Representing the Interests of Foreign Governments on September 17, 1980, to discuss efforts by the President's brother, Billy Carter, to influence the federal government on behalf of the government of Libya.[41]

- Samuel Berger, Deputy Assistant to the President for National Security Affairs, White House Office, appeared before the Senate

---

[36] U.S. Congress, Senate Select Committee on Presidential Campaign Activities, *Presidential Campaign Activities of 1972*, hearings, 93rd Cong., 2nd sess. (Washington: GPO, 1974), p. 10193ff.

[37] Ibid., pp. 10539ff, 10877ff.

[38] Ibid., pp. 10849ff, 10998ff.

[39] Ibid., p. 11053ff.

[40] U.S. Congress, Senate Committee on the Judiciary, *Inquiry into the Matter of Billy Carter and Libya*, hearings, 96th Cong., 2nd sess. (Washington: GPO, 1981), p. 1195ff.

[41] Ibid., p. 1339ff.

CRS-12

Banking, Finance, and Urban Affairs on July 28, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[48]

- Bruce Lindsey, Assistant to the President and Senior Adviser, White House Office, appeared before the House Committee on Banking, Finance, and Urban Affairs on July 28, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[49]

- John D. Podesta, Assistant to the President and Staff Secretary, White House Office, appeared before the House Committee on Banking, Finance, and Urban Affairs on July 28, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[50]

- Clifford Sloan, Associate Counsel to the President, White House Office, appeared before the House Committee on Banking, Finance, and Urban Affairs on July 28, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[51]

- George R. Stephanopoulos, Senior Policy adviser to the President, appeared before the House Committee on Banking, Finance, and Urban Affairs on July 28, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[52]

- Margaret A. Williams, Chief of Staff to the First Lady, White House Office, appeared before the House Committee on Banking, Finance, and Urban Affairs on July 28, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[53]

- Lloyd N. Cutler, Special Counsel to the President, White House Office, appeared before the Senate Committee on Banking, Housing, and Urban Affairs on August 5, 1994, concerning whether White

---

[48] Ibid., p. 105ff.

[49] Ibid., p. 100ff.

[50] Ibid., p. 112ff.

[51] Ibid., p. 100ff.

[52] Ibid., p. 111ff.

[53] Ibid., p. 109ff.

CRS-14

and Urban Affairs on August 3, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[60]

- John D. Podesta, Assistant to the President and Staff Secretary, White House Office, appeared before the Senate Committee on Banking, Housing, and Urban Affairs on August 4, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[61]

- Clifford M. Sloan, Associate Counsel to the President, White House Office, appeared before the Senate Committee on Banking, Housing, and Urban Affairs on August 3, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[62]

- George R. Stephanopoulos, Senior Adviser to the President for Policy and Strategy, White House Office, appeared before the Senate Committee on Banking, Housing, and Urban Affairs on August 4, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[63]

- Margaret A. Williams, Assistant to the President and Chief of Staff to the First Lady, White House Office, appeared before the Senate Committee on Banking, Housing, and Urban Affairs on August 4, 1994, concerning whether White House aides had inappropriately learned details of an RTC investigation of the failed Madison Guaranty Savings and Loan.[64]

- Mark D. Gearan, Assistant to the President and Director of Communications and Strategic Planning, White House Office, appeared before the Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters on July 25, 1995, concerning whether White House staff had engaged in improper contacts regarding the Madison Guaranty Saving and Loan Association, the White Water Development Corporation, and other matters.[65]

---

[60] Ibid., p. 89ff.

[61] Ibid., p. 360ff.

[62] Ibid., p. 88ff.

[63] Ibid., p. 360ff.

[64] Ibid., p. 272ff.

[65] *Congressional Record*, vol. 141, July 25, 1995, p. D493; although the transcripts of the
(continued...)

CRS-16

Saving and Loan Association, the White Water Development Corporation, and other matters.[70]

- Capricia P. Marshall, Special Assistant to the First Lady, White House Office, appeared before the Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters on February 9, 1996, concerning whether White House staff had engaged in improper contacts regarding the Madison Guaranty Saving and Loan Association, the White Water Development Corporation, and other matters.[71]

- Thomas F. McLarty III, Counsel to the President, White House Office, appeared before the Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters on August 7, 1995, concerning whether White House staff had engaged in improper contacts regarding the Madison Guaranty Saving and Loan Association, the White Water Development Corporation, and other matters.[72]

- Bobby J. Nash, Assistant to the President and Director of Presidential Personnel, White House Office, appeared before the Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters on January 31 and April 30, 1996, concerning whether White House staff had engaged in improper contacts regarding the Madison Guaranty Saving and Loan Association, the White Water Development Corporation, and other matters.[73]

- Stephen R. Neuwirth, Associate Counsel to the President, White House Office, appeared before the Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters on August 3, 1995, concerning whether White House staff had engaged in improper contacts regarding the Madison Guaranty Saving and Loan Association, the White Water Development Corporation, and other matters.[74]

- John M. Quinn, Assistant to the President and Chief of Staff to the Vice President, White House Office, appeared before the Senate Special Committee to Investigate the Whitewater Development Corporation and Related Matters on August 7, 1995, concerning whether White House staff had engaged in improper contacts

---

[70] Ibid., August 8, 1995, p. D547; Ibid., November 28, 1995, p. D747; Ibid., vol. 142, January 16, 1996, p. D10.

[71] Ibid., vol. 142, February 9, 196, p. D35.

[72] Ibid., vol. 141, August 7, 1995, p. D544.

[73] Ibid., vol. 142, January 31, 1996, p. D22; Ibid., April 30, 1996, p. D195.

[74] Ibid., vol. 141, August 3, 1995, p. D532.

CRS-18

Bureau of Investigation background investigation reports and other information to the White House.[80]

- Lanny Breuer, Special Counsel to the President, White House Office, appeared before the House Committee on Government Reform and Oversight on November 7, 1997, concerning White House compliance with committee subpoenas issued in the course of an investigation into alleged fund-raising abuses and the funneling of foreign money into political campaigns.[81]

- Cheryl Mills, Deputy Assistant to the President and Deputy Counsel to the President, White House Office, appeared before the House Committee on Government Reform and Oversight on November 6 and 7, 1997, concerning White House compliance with committee subpoenas issued in the course of an investigation into alleged fund-raising abuses and the funneling of foreign money into political campaigns.[82]

- Dimitri Nionakis, Associate Counsel to the President, White House Office, appeared before the House Committee on Government Reform and Oversight on November 7, 1997, concerning White House compliance with committee subpoenas issued in the course of an investigation into alleged fund-raising abuses and the funneling of foreign money into political campaigns.[83]

- Charles F. C. Ruff, Counsel to the President, White House Office, appeared before the House Committee on Government Reform and Oversight on November 6 and 7, 1997, concerning White House compliance with committee subpoenas issued in the course of an investigation into alleged fund-raising abuses and the funneling of foreign money into political campaigns.[84]

- Nancy Heinreich, Deputy Assistant to the President for Appointments and Scheduling, White House Office, appeared before the House Committee on Government Reform and Oversight on November 13, 1997, concerning the White House access and political campaign donations of Johnny Chung.[85]

---

[80] Ibid., vol. 142, June 28, 1996, p. D362.

[81] U.S. Congress, House Committee on Government Reform and Oversight, *White House Compliance with Committee Subpoenas*, hearings, 105th Cong., 1st sess. (Washington: GPO, 1998), p. 219ff.

[82] Ibid., pp. 51ff, 157ff.

[83] Ibid., p. 218ff.

[84] Ibid., pp. 44ff, 152f.

[85] U.S. Congress, House Committee on Government Reform and Oversight, *Johnny Chung:*
(continued...)

CRS-20

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, appeared before the Senate Committee on the Judiciary on June 26, 2002, concerning the proposed Department of Homeland Security.[92]

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, appeared before the House Committee on the Judiciary on June 26, 2002, concerning the proposed Department of Homeland Security.[93]

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, appeared before the Senate Committee on Environment and Public Works on July 10, 2002, concerning the proposed Department of Homeland Security.[94]

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, appeared before the House Select Committee on Homeland Security on July 15, 2002, concerning the proposed Department of Homeland Security.[95]

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, appeared before the Senate Committee on Health, Education, Labor, and Pensions on July 16, 2002, concerning the proposed Department of Homeland Security.[96]

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, appeared before the Senate Committee on Agriculture, Nutrition, and Forestry on July 17, 2002, concerning the proposed Department of Homeland Security.[97]

- J. Scott Jennings, Special Assistant to the President and Deputy White House Political Director, appeared before the Senate

---

[91] (...continued)
2nd sess. (Washington: GPO, 2002), p. 14ff.

[92] *Congressional Record*, v. 148, June 26, 2002, p. D687.

[93] U.S. Congress, House Committee on the Judiciary, *Homeland Security Act of 2002*, hearing, 107th Cong. 2nd sess. (Washington: GPO, 2002), p. 5ff.

[94] *Congressional Record*, v. 148, July 10, 2002, p. D730.

[95] U.S. Congress, House Select Committee on Homeland Security, *H.R. 5005, the Homeland Security Act of 2002, Days 1 and 2*, hearings, 107th Cong., 2nd sess. (Washington: GPO, 2002), p. 7ff.

[96] U.S. Congress, Senate Committee on Health, Education, Labor, and Pensions, *Homeland Security*, hearing, 107th Cong., 2nd sess. (Washington: GPO, 2002), p. 8ff.

[97] *Congressional Record*, v. 148, July 17, 2002, p. D768.

CRS-22

- Henry A. Kissinger, Assistant to the President for National Security Affairs, White House Office, declined on February 28, 1972, to appear before the Senate Committee on Foreign Relations.[104]

- David Young, Special Assistant to the National Security Council, declined on April 29, 1972, to appear before the House Government Operations Subcommittee on Foreign Operations and Government Information.[105]

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, declined March 15 and April 4, 2002, requests to appear before the Senate Committee on Appropriations.[106]

- Thomas J. Ridge, Assistant to the President for Homeland Security, White House Office, after declining to appear before the House Appropriations Subcommittee on Treasury, Postal Service, and General Government in late March, agreed to an informal, closed, April 10, 2002, meeting of subcommittee members.[107]

- Douglas Badger, Special Assistant to the President for Economic Policy, Office of Policy Development, declined on March 31, 2004, to appear before the House Committee on Ways and Means.[108]

---

[104] *Congressional Record*, vol. 118, March 28, 1972, p. 10471; Kissinger "occasionally talked on the phone, or privately met, with top legislative leaders, briefed them at pro forma consultations before major military actions or on the occasion of big diplomatic agreements, and once in a while informally briefed larger congressional groups. Kissinger would go to the Hill, incognito as it were, a couple of times a year and he might entertain a congressional group in the OEOB [Old Executive Office Building] maybe once a year. In some of the sessions that did occur the Congress was misinformed on key issues ... in the cases of the Vietnam peace agreement and the first SALT agreements with the Soviets." John Prados, *Keepers of the Keys: A History of the National Security Council from Truman to Bush* (New York: William Morrow, 1991), p. 309.

[105] U.S. Congress, House Committee on Government Operations, *U.S. Government Information Policies and Practices — Security Classification Problems Involving (b)(1) of the Freedom of Information Act*, hearings, 92nd Cong., 2nd sess. (Washington: GPO, 1972), p. 2453.

[106] Associated Press, "Ridge Won't Tell Senate His Views on the War," *Washington Times*, March 5, 2002, p. A3; Alison Mitchell, "Congressional Hearings: Letter to Ridge Is Latest Jab in Fight Over Balance of Powers," *New York Times*, March 5, 2002, p. A8; Mark Preston, "Byrd Holds Firm," *Roll Call*, April 18, 2002, pp. 1, 26, 28.

[107] George Archibald, "Panel Ties Funding to Ridge Testimony," *Washington Times*, March 22, 2002, pp. A1, A14; George Archibald, "White House Mollifies House Panel," *Washington Times*, March 23, 2002, A1, A4; Elizabeth Becker, "Domestic Security: Ridge Briefs House Panel, but Discord Is Not Resolved," *New York Times*, April 11, 2002, p. A17.

[108] Amy Goldstein, "Democrats Ask Bush Aides to Explain Role on Medicare Cost," *Washington Post*, March 20, 2004, p. A5; "Ways and Means Republicans Allow Scully, White House to Avoid Answering Questions on Medicare Estimate Coverup," News Release
(continued...)

CRS-24

members of his staff not be so questioned, for their roles are in effect an extension of the Presidency."[113]

The separation of powers doctrine was also cited in guidelines for White House staff issued during the Carter Administration as the basis for the "immunity" of the staff from appearing before committees.[114] The guidelines "articulated the traditional arguments against compulsory testimony to Congress by White House advisers (i.e., need for 'frank and candid discussions,' personal advisers are agents of the President)."[115]

Executive privilege was invoked during the Nixon Administration when congressional committees sought the testimony of a White House aide at a Senate confirmation hearing[116] and the testimony of the White House Counsel at Senate committee hearings on the Watergate incident and related matters.[117]

## Congress's Right to Executive Branch Information

Congress has a constitutionally rooted right of access to the information it needs to perform its Article I legislative and oversight functions.[118] Generally, a

---

[113] Fisher, "White House Aides Testifying before Congress," p. 140 (quoting *Public Papers of the President, 1973* (Washington: GPO, 1975), at p. 160). The separation of powers doctrine was also cited by the Carter Administration as the rationale for White House advisers not appearing before Congress. Rozell, "Executive Privilege and the Modern Presidents: In Nixon's Shadow," pp. 1091-1092.

[114] Rozell, "Executive Privilege and the Modern Presidents: In Nixon's Shadow," p. 1091 and note 116 (citing to memorandum of February 8, 1979, from Robert Lipshutz to White House staff).

[115] Ibid., p.1091 and note 15 (citing to Lipshutz memorandum).

[116] Fisher, "White House Aides Testifying before Congress," p. 140.

[117] Ibid., pp. 140-141.

[118] *See McGrain v. Daugherty*, 273 U.S. 135, 177, 181-182 (1927). In a frequently quoted passage, the Court explained, at p. 174:

A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information — which not infrequently is true — recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed. All this was true before and when the Constitution was framed and adopted. In that period the power of inquiry — with enforcing process — was regarded and employed as a necessary and appropriate attribute of the power to legislate — indeed, was treated as inhering in it. Thus there is ample warrant for thinking, as we do, that the constitutional provisions which commit the legislative function to the two houses are intended to include this attribute to the end that the function may be effectively exercised.

(continued...)

CRS-26

A distinction has been recognized by the courts between two aspects of executive privilege — the presidential communications privilege and the deliberative process privilege.[125] The former has a constitutional basis in the separation of powers doctrine and is rooted in concern for presidential decision making,[126] whereas the latter "is primarily a common law privilege" applicable "to decisionmaking of executive officials generally."[127] The former applies to entire documents (including factual material) and "covers final and postdecisional materials as well as

---

[124] (...continued)

*United States* v. *Nixon* did not involve a presidential claim of executive privilege in response to a congressional subpoena. In *Senate Select Committee on Presidential Campaign Activities* v. *Nixon*, 498 F.2d 725 (D.C. Cir. 1974), the court reviewed the President's assertion of executive privilege as grounds for not complying with a committee subpoena for tape recordings of conversations between the President and his staff. The court found that "the presumption that the public interest favors confidentiality [in presidential communications] can be defeated only by a strong showing of need by another institution of government.... " Ibid., p. 730. Under the unusual circumstances of that case, the court found that the legislative and oversight needs of the committee were insufficient to overcome the claim of privilege. Ibid., p. 732.

[125] *In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997). For an analysis of *Espy*, see Rozell, "Executive Privilege and the Modern Presidents: In Nixon's Shadow," pp. 1119-1120.

[126] *Espy*, 121 F.3d at 745, 752. Confidential advice is critical to presidential decision making. Ibid., p. 751. To limit the privilege to its purpose (protecting "the confidentiality of the President's decision making process"), *Espy* construed the privilege narrowly. Ibid., p. 752. *Espy* held that the presidential communications privilege "extends to communications authored by or solicited and received by presidential advisers" when "preparing advice for the President," "even when these communications are not made directly to the President." Ibid., pp. 751-752, 762. *Espy* restricted the privilege to White House advisers with "operational proximity" to the President (ibid., p. 752) and found that the privilege "should not extend to staff outside the White House in executive branch agencies." Ibid. The privilege does not apply to White House advisers when they "exercise substantial independent authority or perform other functions in addition to advising the President .... " Ibid.

At issue in *Espy* was a grand jury subpoena for documents pertaining to an investigation by the White House Counsel. The documents "were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and nondelegable presidential power." Ibid.

The *Espy* court emphasized that its "opinion should not be read as in any way affecting the scope of the [presidential communications] privilege in the congressional-executive context.... The President's ability to withhold information from Congress implicates different constitutional considerations than the President's ability to withhold evidence in judicial proceedings." Ibid., p. 753. Furthermore, the court in *Espy* noted that its "determination of how far down into the executive branch the presidential communications privilege goes" was limited to the circumstances of the case. Ibid.

Arguably, the privilege must be asserted by the President personally. Ibid., p. 745 note 16 (collecting cases).

[127] Ibid., p. 745.

CRS-28

although at times such an official may invoke executive privilege. It is the view of the judiciary that the presidential communications privilege should be restricted to White House advisers when "preparing advice for the President.... "[136]

## Procedure for Obtaining Executive Branch Testimony

A congressional committee may request (informally or by a letter from the committee chair, perhaps cosigned by the ranking Member) or demand (pursuant to subpoena[137]) the testimony of a presidential adviser. However, Congress may encounter legal and political problems in attempting to enforce a subpoena to a presidential adviser.

Conflicts concerning congressional requests or demands for executive branch testimony or documents often involve extensive negotiations, and may be resolved by some form of compromise as to, inter alia, the scope of the testimony or information to be provided to Congress.[138] If the executive branch fails to comply with a committee subpoena, and if negotiations do not resolve the matter, the committee may employ Congress's inherent contempt authority (involving a trial at

---

[136] *See Espy*, 121 F.3d at 751-752.

[137] Standing committees of both the Senate (Rule XXVI(1)) and the House (Rule XI, cl. 2(m)) have subpoena power.

[138] A presidential adviser may provide information to a committee in a hearing (answering questions of members of a committee under applicable rules of the House or the committee), in an informal briefing (with only the chairman or with a few or all committee members), or in a deposition. *See*, e.g., Fisher, "White House Aides Testifying before Congress," p. 139. The appearance of a presidential adviser before a committee may be open to the public or it may be closed. His testimony at a hearing may be sworn or unsworn.

In response to congressional attempts to secure the testimony of Ridge (*see supra* note 112), Ridge offered to brief Members privately, but some Members objected. Subsequently, Ridge offered to brief Members of both the Senate and the House informally, but in public. Ridge argued that his proposal would satisfy congressional needs but "avoid the setting of a precedent that could undermine the constitutional separation of powers and the longstanding traditions and practices of both Congress and the executive branch." "A Nation Challenged: The Security Director," *New York Times*, March 26, 2002, p. 13. Ridge said that he would meet with Members in "briefings" but not in "hearings." Louis Fisher, *The Politics of Executive Privilege* (Durham, NC: Carolina Academic Press, 2004), p. 226.

Although the focus of this report is on issues raised by the testimony of presidential advisers before congressional committees, their testimony before other legislative branch entities raises similar issues. Condoleezza Rice, Assistant to the President for National Security Affairs, appeared twice before the National Commission on Terrorist Attacks Upon the United States. The commission, which reported to the Congress and the President, may be viewed as a legislative body because it was established in the legislative branch and because nine of its 10 members were appointed by the congressional leadership. Act of November 27, 2002, P.L. 107-306, 116 Stat. 2408 (amended 2004), 6 U.S.C. § 101 note. Rice was interviewed privately by the commission on February 7, 2004. "Refusal to Testify Has Precedent," *Washington Post*, March 27, 2004, p. A10. Although the Bush Administration at first argued that her appearance in public might prevent the President from receiving the "best and most candid possible advice," she subsequently testified in public and under oath on April 8, 2004. "Talking About Secrets," *Legal Times*, April 19, 2004, p. 66.

CRS-30

## Conclusion

(1) Legal and policy factors may explain why presidential advisers do not regularly testify before committees. (2) Generally, a congressional committee with jurisdiction over the subject matter, which is conducting an authorized investigation for legislative or oversight purposes, has a right to information held by the executive branch in the absence of either a valid claim of constitutional privilege by the executive or a statutory provision whereby Congress has limited its constitutional right to information. (3) A committee may request or demand the testimony of a presidential adviser. Legal mechanisms available for enforcing congressional subpoenas to the executive branch may fail to provide the committee with the desired information. (4) Negotiations may result in the production of at least some of the information sought.

---

[144] (...continued)
presidential advisers are in units of the Executive Office of the President established by law, and are also subject to confirmation by the Senate. *See*, e.g., 15 U.S.C. 1023 (Council of Economic Advisors); 42 U.S.C. 4321, 4372 (Office of Environmental Quality); 42 U.S.C. 6611, 6612 (Office of Science and Technology Policy); 31 U.S.C. 501, 502 (Office of Management and Budget (OMB)).

To increase its oversight of OMB, Congress passed legislation subjecting the Director to Senate confirmation, notwithstanding the objections of the Nixon Administration. *See* Donald S. Onley, "Treading on Sacred Ground: Congress's Power to Subject White House Advisers to Senate Confirmation," vol. 37, *William & Mary Law Review*, Spring 1996, pp. 1183-1184. Congress' constitutional authority over offices and officeholders is limited by separation of powers considerations and by constitutional powers of the President. *See ibid*., pp. 1187-1214. *See also* Aaron-Andrew Bruhl, "Using Statutes to Set Legislative Rules: Entrenchment, Separation of Powers, and the Rules of Proceedings Clause," vol. 19, *Journal of Law & Politics*, Fall 2003, pp. 345, 375 note 238. By subjecting a presidential adviser to confirmation by the Senate, Congress may obtain practical, although not necessarily legal leverage, in attempting to secure his testimony. *See generally* Louis Fisher, "Executive Privilege and the Bush Administration: Congressional Access to Information — -Using Legislative Will and Leverage," vol. 52, *Duke Law Journal*, November 2002, p. 323.

The Bush Administration resisted congressional attempts to have Tom Ridge, the Director of the Office of Homeland Security, testify. *See supra* note 112. The Office of Homeland Security was established within the Executive Office of the President pursuant to E.O. 13228, issued on October 8, 2001. *Federal Register*, vol. 66, October 10, 2001, pp. 51812-51817. Even before Congress requested Ridge's testimony, legislation had been introduced to create an office with homeland security functions. *See*, e.g., S. 1449, 107th Cong. (to establish within the White House a National Office for Combating Terrorism, with a director subject to Senate confirmation); S. 1534, 107th Cong. (to establish a "Department of National Homeland Security," with the Secretary subject to Senate confirmation). Upon the introduction of S. 1534, Sen. Joseph Lieberman observed that the Secretary "will be accountable to the Congress and the American people." *Congressional Record*, daily edition, vol. 147. October 10, 2001, p. S10646. Ultimately, Congress established the Department of Homeland Security. P.L. 107-296, § 101, 116 Stat. 2135 (2002). Ridge's nomination as the first Secretary of the new department was approved subject to his "commitment to respond to requests to appear and testify before any duly constituted committee of the Senate." *Congressional Record*, daily edition, vol. 149, January 22, 2003, p. S1372.

# Exhibit 9

No. 08-409 (JDB)

**THE WHITE HOUSE**

WASHINGTON

April 12, 2007

Dear Chairman Leahy and Chairman Conyers:

I write in response to your joint letter of March 28, as well as your separate March 22 letters in which others joined, regarding the accommodation I outlined in separate meetings with each of you and in my letter of March 20. I appreciate your contacting me jointly on this matter. I also agree with the observation that we should keep the lines of communication open between us, and will be pleased to entertain any further discussions that might clarify our respective positions. There can be no doubt that you and your colleagues had devoted, as have we, a great deal of time and consideration to this matter, as to how best to expeditiously achieve our separate objectives, while avoiding a constitutional clash.

The President has made a commitment to ensure that Congress receives adequate and appropriate information regarding the circumstances surrounding the resignation of the U.S. Attorneys from his Administration. We continue to believe that the path proposed in my March 20 letter is a proper course to meet this commitment while respecting and protecting the constitutional prerogatives of the President. We hope that you will reconsider your rejection of the President's proposal – one constructed and tendered in a spirit of cooperation and accommodation, and designed to share information with your Committees.

In response to your suggestion and invitation in the March 28 letter to attempt to "narrow the dispute," I should affirm that the President's proposal was intended to reflect just such an effort. The proposal reflects a series of balanced compromises designed to respect and accommodate your interests in obtaining information while also protecting the institution of the Presidency. Although it consists of individual components, the proposal reflects a unified offer that, if accepted, would result in your Committees receiving a significant amount of information. We, therefore, respectfully decline your suggestion to immediately produce the documents that we are prepared to release as part of a carefully and thoughtfully considered package of accommodations designed to avoid shifting the dispute to ground on which we need not tread. With all respect, your suggestion fails to credit fully the extraordinary nature of the disclosure we are prepared to provide, and might even prolong this dispute which the President is seeking to resolve in the most expeditious manner possible.

At the end of your March 28 letter, you raised an additional question regarding the scope of the document production we are prepared to make as part of the total accommodation outlined in the March 20 letter. We are aware that certain e-mail accounts supplied by the Republican National Committee may have been used by White House officials in sending or receiving e-mails that might fall within the production contemplated in our letter. Please be assured that it was and remains our intention to collect e-mails and documents from those accounts as well as the

official White House e-mail and document retention system, for production under the terms we outlined.

We continue to believe that the accommodation we offered on March 20, in addition to what the Department of Justice has and will provide, will satisfy the Committees' interests.  It is hoped that upon reflection you may concur in that conclusion.

Sincerely,

Fred F. Fielding
Counsel to the President

The Honorable Patrick J. Leahy
United States Senate
Washington, D.C.  20510

The Honorable John Conyers, Jr.
United States House of Representatives
Washington, D.C.  20515

cc:     The Honorable Arlen Specter
        The Honorable Chris Cannon

# Exhibit 10

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

(202) 225-3951

http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR., Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

May 21, 2007

Mr. Fred F. Fielding, Esq.
Counsel to the President
Office of Counsel to the President
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20530

Dear Mr. Fielding:

We are today writing to express our extreme disappointment in the White House's rebuff of efforts by the Judiciary Committee to obtain voluntary cooperation with our investigation concerning the firing of at least nine U.S. Attorneys in 2006 and related matters. We write to make one last appeal for such voluntary cooperation.

As you know, we first wrote to you on March 9, 2007, in an effort to obtain your voluntary cooperation with our investigation. On March 21, 2007, the Judiciary Committee's Subcommittee on Commercial and Administrative Law voted to authorize the issuance of subpoenas for the testimony of former White House Counsel Harriet Miers, Deputy Chief of Staff and Senior Advisor to the President Karl Rove and Special Assistant to the President J. Scott Jennings and for documents in the custody or control of Deputy White House Counsel William Kelley, White House Chief of Staff Joshua Bolton, Ms. Miers, Mr. Rove, Mr. Jennings and yourself. Pursuant to letters dated March 22, 2007, both Chairman Leahy and Chairman Conyers have rejected your offer of limited interviews with White House officials, to be conducted without a transcript and without the possibility of subsequent public testimony. Since that time, we have been willing and able to meet to consider other means of resolving our dispute, but we have received no response to our letters or proposals to you.

Even without a single document or witness interview provided by the White House, it is clear that the White House played an important role in the events concerning the U.S. Attorney controversy. In addition to the facts recited in Senator Leahy's letter of May 16, 2007, for example, we would note that Karl Rove has stated to White House officials that he relayed complaints about former U.S. Attorney David Iglesias to both the White House Counsel's Office

Mr. Fred F. Fielding, Esq.
Page Two
May 21, 2007

and the Justice Department.[1]  Testimony from a Department official has revealed that Mr. Rove was specifically enlisted by several prominent New Mexico Republicans in their efforts to have Mr. Iglesias fired. Mr. Iglesias' name first appeared on the firing list just last November (see enclosed), but no one at the Department seems to recall who specifically suggested he be fired or why.  In the context, it is becoming increasingly clear that we will not be able to complete our investigation absent full and complete cooperation from the White House.

We continue to be willing, as discussed in earlier letters and meetings with you, to work out a voluntary resolution of our requests for information from the White House. As previously explained, however, it would be constitutionally irresponsible to accept your "all or nothing" limitations that would completely preclude any access to on-the-record statements by current and former White House personnel or access to internal White House communications. If the White House persists in refusing to provide information to the House Judiciary Committee, or even to discuss providing such information, on a voluntary basis, we will have no alternative but to begin to resort to compulsory process in order to carry out our oversight responsibilities.

Sincerely,

John Conyers, Jr.                              Linda T. Sánchez
Chairman                                       Chairwoman, Subcommittee on Commercial
                                               and Administrative Law

Enclosure

cc:    Hon. Lamar S. Smith
       Hon. Chris Cannon

---

[1]Ron Hutcheson, Marisa Taylor & Margaret Talev, *White House says Rove relayed complaints about prosecutors*, MCCLATCHY NEWSPAPERS, Mar. 11, 2007.

McNulty, Paul J

| From: | Elston, Michael (ODAG) |
|---|---|
| Sent: | Tuesday, November 07, 2006 6:24 PM |
| To: | McNulty, Paul J |
| Subject: | Fw: U.S. Attorney Replacement Plan |

Importance:     High

Attachments:    USA replacement plan.doc


-----Original Message-----
From: Sampson, Kyle
To: Elston, Michael (ODAG)
Sent: Tue Nov 07 18:21:01 2006
Subject: U.S. Attorney Replacement Plan

Please review and provide comments ASAP.  I'd like to get this to Harriet tonight, if
possible.  I've pasted it into the e-mail for your convenience.

PLAN FOR REPLACING CERTAIN
UNITED STATES ATTORNEYS

November 7, 2006


STEP 1

U.S. Attorney calls:  On or about November 8-10, Mike Battle contacts the following U.S.
Attorneys:

*    Paul Charlton (D. Ariz.)
*    Carol Lam (S.D. Cal.)
*
*
*    Margaret Chiara (W.D. Mich.)
*    Dan Bogden (D. Nev.)
*
*    John McKay (W.D. Wash.)
*    David Iglesias (D.N.M.)

Battle informs the U.S. Attorneys as follows:

*    What are your plans with regard to continued service as U.S. Attorney?
*    The Administration is grateful for your service as U.S. Attorney, but has determined
to give someone else the opportunity to serve as U.S. Attorney in your district for the
final two years of the Administration.
*    We will work with you to make sure that there is a smooth transition, but intend to
have a new Acting or Interim U.S. Attorney in place by January 1st.


STEP 2

     Senator calls:  On or about November 8-10 (very important that Senator calls and
U.S. Attorney calls happen simultaneously), Bill Kelley or appropriate Associate Counsel
contacts the following Senators:

*    Jon Kyl (re Charlton)
*
*
*
*    John Ensign (re Bogden)

1

DAG000000010

\*
\*      Pete Domenici (re Iglesias)

Kelley informs the Senators as follows:

\*      The Administration has determined to give someone else the opportunity to serve as
U.S. Attorney in [relevant district] for the final two years of the Administration. [If
pushed, this determination is based on a thorough review of the U.S. Attorney's
performance.]
\*      [Relevant U.S. Attorney] has been informed of this determination and knows that we
intend to have a new Acting or Interim U.S. Attorney in place by the end of the year.
\*      We will look to you, Senator, to recommend candidates that we should consider for
appointment as the new U.S. Attorney. As always, we ask that you recommend at least three
candidates for the President's consideration.

STEP 3

        Evaluation and Selection of "Interim" Candidates:  During November-December 2006,
the Department of Justice, in consultation with the Office of the Counsel to the
President, evaluates and selects candidates for Attorney General-appointment (or
candidates who may become Acting U.S. Attorney by operation of law) to serve upon the
resignation of above-listed U.S. Attorneys.

STEP 4

        Selection, Nomination, and Appointment of New U.S. Attorneys:  Beginning as soon as
possible in November 2006, Office of the Counsel to the President and Department of
Justice carry out (albeit on an expedited basis) the regular U.S. Attorney appointment
process:  obtain recommendations from Senators, other state political leadership, and
other sources; evaluate candidates; make recommendations to the President; conduct
background investigations; have President make nominations and work to secure confi



USA replacement
plan.doc (36 K...       mations of U.S. Attorney nominees.

  <<USA replacement plan.doc>>

Kyle Sampson
Chief of Staff
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530
(202) 514-2001 wk.
(202) 305-5289 cell
kyle.sampson@usdoj.gov

2

DAG000000011

Exhibit 11

No. 08-409 (JDB)

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

Attorneys at Law

JOHN M. DOWD
202 887 4386/fax: 202 887 4288
jdowd@akingump.com

March 30, 2007

VIA FACSIMILE AND OVERNIGHT DELIVERY

Hon. John Conyers, Jr.
Chairman
Committee on the Judiciary
United States House of Representatives
2426 Rayburn Building
Washington, DC 20515

Re:  House Judiciary Committee Hearings on the Firings of United States Attorneys

Dear Mr. Chairman:

We represent Ms. Monica M. Goodling, Counsel to the Attorney General and White House Liaison. We are aware of your letter of March 8, 2007 to the Attorney General requesting, among other things, an interview with Ms. Goodling with respect to the Committee's inquiry into the firings of United States Attorneys. We are also aware that your office announced in a press release yesterday both that Ms. Goodling will be included in a group of eight Department of Justice officials who will appear for transcribed interviews with the Committee and that Ms. Goodling has already announced that she will assert her Fifth Amendment right not to answer any questions.

Ms. Goodling remains actively employed by the Department of Justice, though she is temporarily and voluntarily using some of her accrued leave time. Nevertheless, we – not the Department of Justice or the White House Counsel – represent Ms. Goodling on the matter of your inquiry. It is our understanding that the Department of Justice so advised Committee staff of our representation. To date, no member of your staff or the House Judiciary Committee's staff has ever contacted us about interviewing Ms. Goodling. Any arrangements for interviews that have been negotiated between the Department and your staff will not include Ms. Goodling.

Additionally, as Ms. Goodling's counsel, we are informing you, as we have already informed the Senate Judiciary Committee, that Ms. Goodling will assert her Fifth Amendment right not to answer any questions regarding the firings of U.S. Attorneys, or any other questions related to that subject matter.

Ms. Goodling's exercise of her Fifth Amendment rights should in no way be interpreted as suggesting that Ms. Goodling herself participated in any criminal activity, as has been

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━ Attorneys at Law

Hon. John Conyers, Jr.
United States House of Representatives
March 30, 2007
Page 2

suggested by Senator Leahy. See 3/26/07 Leahy Press Release. Ms. Goodling has simply
chosen, upon the advice of counsel, to assert the right of any innocent person not to testify in the
circumstances described by the Supreme Court in Ohio v. Reiner. In that case, the United States
Supreme Court re-affirmed that one of the basic functions of the Fifth Amendment is to protect
the "innocent[,] ... who otherwise might be ensnared by ambiguous circumstances." See Ohio v
Reiner, 532 U.S. 17, 21 (2001) (emphasis added). The hostile and questionable environment in
the present proceedings is at best ambiguous; more accurately the environment can be described
as legally perilous for Ms. Goodling for the following reasons.

First, the public record is clear that certain members of the House Judiciary Committee
have already reached conclusions about the matter under investigation and the veracity of
testimony provided by the Department of Justice to date. For example, Representative Sanchez,
the Chairman of the Committee's Subcommittee on Commercial and Administrative Law, has
publicly stated that there have been "attempts to mislead the public on this issue[.]" (Press
Release, March 15, 2007, Office of Congresswoman Sanchez). In a March 22, 2007 letter to the
White House Counsel jointly signed by you and Congresswoman Sanchez, you stated that
"evidence of misconduct, misstatements . . . has already come to light" and that "the Department
of Justice itself has acknowledged that its officials have misled Congress."

We further understand that the House Judiciary Committee is working jointly with the
Senate's Judiciary Committee, whose Chairman and other members have similarly concluded in
numerous public remarks that Congress has received false testimony about this subject.

Second, it has come to our attention that a senior Department of Justice official has
privately told a member of the Senate Judiciary Committee that he (the official) was not entirely
candid in his report to the Senate's Committee, and that the official allegedly claimed that our
client and others did not inform him of certain pertinent facts.

Ms. Goodling will not answer questions presented by the Committee or its staff under
these circumstances. The potential for legal jeopardy for Ms. Goodling from even her most
truthful and accurate testimony under these circumstances is very real. As we already suggested
to the Senate Committee, one need look no further than the recent circumstances and
proceedings involving Lewis Libby.

It is not uncommon for witnesses who answer questions before the Congress to face
criminal investigations and even indictments for perjury, false statements, or obstruction of

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━━━ Attorneys at Law

Hon. John Conyers, Jr.
United States House of Representatives
March 30, 2007
Page 3


congressional proceedings.  See, e.g., United States v. Poindexter, 725 F. Supp. 13 (D.D.C. 1989)
(indictment alleging false statements to House Intelligence Committee); United States v. North,
716 F. Supp. 644 (D.D.C. 1989) (indictment alleging aiding and abetting obstruction of
Congressional investigation).  See also United States v. Safavian, 429 F. Supp. 2d 156 (D.D.C.
2006) (indictment alleging obstruction of investigation and false statements before the Senate);
United States v. Weissman, No. S2 94 Cr. 760, 1996 U.S. Dist. LEXIS 19125 (D.D.C. Dec. 19,
1996) (indictment alleging perjury before the Senate).

        Where members of the Committee have already reached conclusions about the matter
under investigation and the veracity of the Department's testimony; where the forum is
politically charged; and most importantly, where a senior Department official is making
accusations about others including our client, we have advised Ms. Goodling (and she has
decided) to invoke her Constitutional right not to answer any questions.  We have enclosed an
affidavit from Ms. Goodling to that effect.

        Accordingly, we request that the Committee not seek to call Ms. Goodling for an
interview or for a hearing.

                                            Sincerely,

                                            John M. Dowd
                                            Jeffrey M. King


Enclosure

cc:      Hon. Lamar S. Smith
            Ranking Member
         Ms. Monica M. Goodling

**BEFORE THE UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON THE JUDICIARY**

– – – – – – – – – – – –
                                        :
**In the matter of the**                :
**Investigation into the**              :
**Firings of U.S. Attorneys**           :
                                        :
– – – – – – – – – – – – :

### Declaration of Monica M. Goodling

    1        I am presently employed by the Department of Justice as Counsel to the Attorney

General and White House Liaison.

    2.       I understand that the United States House of Representatives, Committee on the

Judiciary, is conducting hearings regarding the firings of certain U.S. Attorneys and has sought

my testimony in connection with those hearings.  I have directed my counsel to submit this

declaration to the Committee on my behalf.

    3.       I understand from media accounts that the House and Senate Committees on the

Judiciary are working together.

    4.       I have read public remarks by members of both the House and Senate Committees

on the Judiciary in which those members have drawn conclusions about the subject matter and

the testimony now under investigation by the Committee.  For example, Representative Sanchez,

the Chairman of the House Judiciary Committee's Subcommittee on Commercial and

Administrative Law, has publicly stated that there have been "attempts to mislead the public on

this issue[.]"  (Press Release, March 15, 2007, Office of Congresswoman Sanchez).  I have read

that Senator Leahy announced that the Attorney General and Deputy Attorney General "failed to

tell Congress the whole truth about this matter under oath." (Press Release, March 15, 2007,

Office of Senator Leahy). Additionally, I read that Senator Schumer in a March 13 press conference called the Department of Justice's testimony to date "false," a "falsehood," and "misleading statement after misleading statement -- deliberate misleading statements."

5.    I have also become aware that a senior Department of Justice official has privately told Senator Schumer, who is a member of the Senate Judiciary Committee, that he (the official) was not entirely candid in his report to the Committee, and that the official allegedly claimed that others at the Department of Justice, including me, did not inform him of certain pertinent facts prior to his testimony.

6.    I have been advised by my counsel John M. Dowd of Akin Gump Strauss Hauer & Feld, LLP, that under the above-described circumstances I should invoke my Fifth Amendment privilege against self incrimination and decline to answer any and all questions from the Committee or its staff about the firings of U.S. Attorneys or related questions.

7.    I have decided to follow my lawyer's advice and respectfully invoke my constitutional right, because the above-described circumstances present a perilous environment in which to testify. I understand that the United States Supreme Court in decisions such as Ohio v. Reiner and others recognizes that I am afforded by the Fifth Amendment, as is any innocent person, the right to decline to answer questions in such circumstances.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 30, 2007, in Washington, D.C.

Executed:

Monica M. Goodling

2

# Exhibit 12

No. 08-409 (JDB)

**THE WHITE HOUSE**

WASHINGTON

June 7, 2007

Dear Chairman Leahy, Chairman Conyers and Chairwoman Sánchez:

I write in response to your letters of May 16 and May 21, 2007, regarding your Committees' inquiries into the resignation of certain United States Attorneys. We share the Committees' goal of finding a way of making available additional information on the subject to you, and we are sure we share a desire to accomplish that goal in a manner that avoids a constitutional confrontation. In particular, I express the hope that together we can avoid the prospect of "subpoenas" and "compulsory process" referred to in your recent letters and statement.

Let me begin by noting that your Committees and the White House have made efforts to resolve our differences on this issue in a mutually acceptable fashion. I met with members of your respective committees on March 20, 2007, and since that date members of my staff have met separately with counsel for both Committees in an effort to address issues relating to the U.S. Attorneys matter. Moreover, although the May 21 letter from Chairman Conyers and Chairwoman Sanchez states that since March 22, 2007, the Committees have received "no response to [its] letters or proposals" to the White House, you may recall that on April 12, I wrote to Chairmen Leahy and Conyers expressing the President's continued commitment to ensure that Congress receives information relating to this matter without sacrificing the prerogatives of this Office, and urging careful consideration of his proposal.

To put the state of our differences in current context, it should be pointed out that your Committees have already had broad access to a very substantial body of information relating to the U.S. Attorneys issue. Chairman Leahy's letter describes "evidence gathered ... in five hearings [and] eight interviews with current and former officials from the Department of Justice," and his letter refers to "a review of documents produced by the Department" of Justice relating to its communications with the White House on the U.S. Attorneys issue. We understand that the Department has produced more than 7000 pages of documents relating to the U.S. Attorneys matter, including a significant number of communications between the White House and the Department on the subject of U.S. Attorneys.

Throughout the foregoing, substantial efforts made by the Department, which (as mentioned above) have included disclosure of written communications from the White House to the Department of Justice on this very subject without White House objection, we are not aware that any witness or document has provided any evidence supportive of the notion that any U.S. Attorney was asked to resign in order to interfere with a pending or future criminal investigation or for any other improper reason. Thus, we think that the Committees' suggested next steps in this matter must be fairly assessed against the backdrop of the extraordinary access acquired to date and the absence of any evidence of wrongdoing by White House officials.

After initial discussions and in our oral and written communications to date, the President has proposed an accommodation that would provide the Committees with still more information on the U.S. Attorneys matter, and in a manner that is respectful both of the Committees' needs and Presidential prerogatives. The offer would enable the Committees to inquire into all U.S. Attorney resignation-related communications between, on the one hand, the President's former Counsel, current Deputy Chief of Staff and Senior Advisor, Deputy Counsel, and Deputy and Special Assistants in the Office of Political Affairs and, on the other, Department of Justice Officials and any other persons outside the White House. The Committee could conduct these interviews with the benefit of the information learned from DOJ witnesses and documents, and with the additional benefit of all White House documents reflecting communications between the White House and the Department of Justice concerning the U.S. Attorney resignations and communications between the White House and third parties on that same subject. It is difficult to see how this proposal will not provide your Committees with all information necessary to evaluate the White House's connection to the Department's request for U.S. Attorney resignations, which could completely inform any legislative proposals to be put forward by your Committees.

We are not unmindful that the President's proposal does not comport fully with your Committees' original requests. We do believe that in situations as this one, each branch has an obligation to seek accommodation of the other's interests and we do believe the President's proposal must be fairly regarded as a genuine and substantial accommodation, a true middle ground that can provide the Committees all necessary information without undue incursion into Executive prerogatives. In view of all that your Committees have learned in its inquiries to the Department of Justice and its employees, it is our strong hope that the Committees will not feel compelled to elevate the stakes by pursuing the path of subpoenas and compulsory process referred to in your recent letters, which will only prolong this debate, but instead come to agreement with us on a way to go forward.

Sincerely,

Fred F. Fielding
Counsel to the President

Exhibit 13

No. 08-409 (JDB)

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

_To_ Joshua Bolten, White House Chief of Staff, or appropriate custodian of records, White House

You are hereby commanded to be and appear before the Committee on the Judiciary

of the House of Representatives of the United States at the place, date and time specified below.

☐ **to testify** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time: _____

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 2138 Rayburn House Office Building, Washington, D.C. 20515
>
> Date: June 28, 2007          Time: 10:00 a.m.

_To_ _____
any authorized staff member of the Committee on the Judiciary _____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at the city of Washington, this 13th day of June . 2007

Attest:                                              _Chairman or Authorized Member_

Clerk

# PROOF OF SERVICE

Subpoena for Joshua Bolten, White House Chf of Stff, or appropriate custodian of recds, White House

Address   White House, 1600 Pennsylvania Ave. N.W.

before the   Committee on the Judiciary

*U.S. House of Representatives*
*110th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address

# SCHEDULE OF
# DOCUMENT REQUESTS
# SUBPOENA TO THE WHITE HOUSE CHIEF OF STAFF
# JUNE 13, 2007

## Documents requested

1. Complete and unredacted versions, including complete paper and electronic versions, of any and all documents in the possession, custody, or control of the White House related to the Committee's investigation into the preservation of prosecutorial independence and the Department of Justice's politicization of the hiring and firing of United States Attorneys, including possible misrepresentations to Congress and other violations of federal law. The documents produced shall include:

a.    Any and all documents the White House Counsel agreed in the March 20, 2007, letter of Fred F. Fielding, Counsel to the President, to Chairman Leahy, Chairman Conyers, Ranking Member Specter, Ranking Member Smith, and Congresswoman Sanchez to produce in conjunction with off-the-record interviews, including documents consisting of or relating to all communications between any official or employee of the White House and any official or employee of the Department of Justice or any third party "concerning the request for resignations of the U.S Attorneys in question."

b.    Any and all documents related to the: 1) evaluation of or decision to dismiss former U.S. Attorneys David Iglesias, H.E. "Bud" Cummins, John McKay, Carol Lam, Daniel Bogden, Paul Charlton, Kevin Ryan, Margaret Chiara, Todd Graves, or any other U.S. Attorney(s) dismissed since President Bush's re-election (hereinafter "dismissed U.S. Attorneys"); 2) evaluation of any U.S. Attorney(s) considered for dismissal since President Bush's re-election (hereinafter "U.S. Attorneys considered for dismissal"); 3) the implementation of the dismissal and replacement of the dismissed U.S. Attorneys; and 4) the selection, discussion and evaluation of any possible replacement or interim or acting appointment to fill any vacancy with respect to dismissed U.S. Attorneys and U.S. Attorneys considered for dismissal.

c.    Any and all documents related to the involvement of Karl Rove, Harriet E. Miers, William Kelley, J. Scott Jennings, Sara M. Taylor, or any other current or former White House employee or official, in matters set forth in paragraph b, above.

d.    Any and all documents related to the testimony of any official at the Department of Justice to the United States Congress regarding any of the matters set forth in paragraph b, above.

e.  Any and all documents related to the "reviews by White House staff" that led the President to conclude as of March 20, 2007, and to reiterate as recently as June 11, 2007, that there was no wrongdoing in the mass firings and replacements of U.S. Attorneys since President Bush's re-election, including any information that has led the President to discount evidence obtained by the investigating Committees in documents and hearing testimony.

# INSTRUCTIONS, DEFINITIONS, AND RULES OF CONSTRUCTION
## FOR SCHEDULE OF DOCUMENT REQUESTS
## SUBPOENA TO THE WHITE HOUSE CHIEF OF STAFF
## JUNE 13, 2007

## **Instructions**

1.    In complying with this Subpoena, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agent, employee, or representative acting on your behalf. You are also required to produce documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party. No records, documents, data, or information called for by this request shall be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

2.    Production with respect to each document shall include all electronic versions and data files from word processing, spreadsheet, e-mail, or instant messaging applications, and other electronic data repositories, and shall be provided to the Committee in its native file format and shall include all original metadata for each electronic document or data file. Productions shall be provided on CD, DVD, or USB external hard drive.

3     Any draft, preliminary version, modification, revision, or amendment of a document, and any version that otherwise differs in any respect, such as having marginalia, markings, other notations or attachments, or otherwise, shall be considered a separate document and shall also be furnished as responsive.

4.    In the event that any entity, organization, or individual denoted in this subpoena is or has been also known by any other name than that herein denoted, the subpoena shall be read also to include them under that alternative identification.

5.    Each form in which a document is produced shall be capable of being copied in that form.

6.    Documents shall be produced as they are kept in the usual course of your business, including with any file labels, dividers, or other identifying markers with which they were associated when this subpoena was served. Also identify to which paragraph from the subpoena such documents are responsive.

3

7.  It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same document.

8.  If compliance with the subpoena cannot be made in full, compliance shall be made to the fullest extent possible and shall include an explanation of how the compliance is less than full and why fuller compliance is not possible.

9.  In the event that any document which you have reason to believe the Committee might regard as responsive is being withheld for any reason, provide the following information concerning such document:

    a.  the nature, source, and date of the document;

    b.  a description of the document's subject matter;

    c.  the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

    d.  the name and address of any other person to whom any of the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure; and

    e.  the basis for withholding the document from the Committee, including the nature of any privilege or rule of law relied upon, the identity of the person or persons asserting any such privilege or rule, and the legal basis for asserting the privilege or rule.

10. In the event that any document which you have reason to believe the Committee might regard as responsive is claimed to have been destroyed or to otherwise be no longer within your possession, custody, or control, provide the following information concerning such document:

    a.  the nature, source, and date of the document;

    b.  a description of the document's subject matter;

    c.  the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

4

d.  the name and address of any other person to whom any of the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure;

e.  the date the document was destroyed, or ceased to be within your possession, custody, or control;

f.  the person who ordered or authorized such destruction or removal from your possession, custody, or control;

g.  the reason for the document's destruction or removal from your possession, custody, or control, and the policy and authority on which such destruction or removal was based; and

h.  the custodian of the document on the date of such destruction or removal.

11. If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

12. All documents shall be bates-stamped sequentially and produced sequentially, with an indication as to which paragraph of the schedule it is responsive.

13. This request is continuing in nature and applies to any newly-discovered information. Any document not produced because it has not been located or discovered by the return date shall be produced immediately upon location or discovery subsequent thereto.

14. Two identical sets of responsive documents shall be delivered contemporaneously, one to the Majority Staff and one to the Minority Staff. Production sets shall be delivered to the Majority Staff in Room 2138, Rayburn House Office Building, and to the Minority Staff in Room 2142, Rayburn House Office Building.

## Definitions and Rules of Construction

As used anywhere in this subpoena or in the schedule, instructions, definitions, or rules of construction thereto –

1.  The term "document" is meant to carry, without limitation, the full breadth of that term as it is used in the Federal Rules of Civil Procedure. It includes, as applicable, any memorialization, whether typed, written, recorded, printed or otherwise produced by hand, or produced by any electronic or digital process or otherwise. It includes, without limitation, agreements, contracts, letters or other correspondence, facsimile or e-mail transmissions, telephone messages, logs or records, memoranda, notes, diaries, graphs, formulas, models, bulletins, computer printouts, transcripts, analyses, returns, summaries, accounts, estimates, projections, comparisons, messages, press releases, circulars, reviews, opinions, offers, studies, photographs, investigations, questionnaires, surveys, work sheets, statistical data, reports, notebooks, manuals, charts or other graphic matter, plans, journals, ledgers, bank records, financial statements, summaries, analyses, commentary, expense reports, books, instructions, financial reports, working papers, records notes, notices, confirmations, telegrams, teletypes, interoffice or intra office communications, cables, and minutes or notations or other records of any type of any conversation, interview, telephone call, meeting, conference, discussion, or other communication. It includes any transmittal slip, attachment, appendix, or other document referenced therein. It includes, without limitation, any information contained on audiotape, videotape, microfilm, or microfiche, as well as any electronically stored information that has been created using, or is otherwise maintained on, digital repositories or other electronic media including, but not limited to, personal computers, office workstations, laptops, hard drives, handheld devices (such as Palm, Trio or Blackberry), phones (office, mobile and/or home), removable electronic storage devices (such as CDs, DVDs, and USB or thumb drives), shared network drives and servers (including e-mail and/or file servers) and back-up tapes (or other disaster recovery/archiving media).

2.  The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information which might otherwise be construed to be outside its scope. The singular includes the plural number, and vice versa, so that neither shall be construed as a limitation. The masculine, feminine, and neuter genders each include the others.

3.  The terms "person", "persons", and "anyone" includes, without limitation, natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or

6

government entities, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

4.  The terms "referring," "relating," "related to," and "concerning," with respect to any given subject, shall be construed broadly to mean anything that constitutes, contains, embodies, reflects, identifies, concerns, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

5.  The terms "including" and "includes," with respect to any given subject, shall be construed broadly so that specification of any particular matter shall not be construed to exclude any documents that you have reason to believe the Committee might regard as responsive.

6.  The terms "Department of Justice" and "Department" include, without limitation, anyone presently or formerly employed there, suspended from employment there, or on administrative leave from employment there.

7.  The term "White House" includes, without limitation, anyone presently or formerly employed there, suspended from employment there, or on administrative leave from employment there.

8.  The terms "you" and "your" include you individually, in your capacity as Chief of Staff, or appropriate custodian of records, as the case may be, as well as the White House and, without limitation, anyone presently or formerly employed there, suspended from employment there, or on administrative leave from employment there.

# Exhibit 14

No. 08-409 (JDB)

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

———————————

*To*  Harriet Miers

You are hereby commanded to be and appear before the Committee on the Judiciary

Subcommittee on Commercial and Administrative Law

of the House of Representatives of the United States at the place, date and time specified below.

☑  **to testify** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 2141 Rayburn House Office Building, Washington, D.C. 20515
>
> Date: July 12, 2007                          Time: 10:00 a.m.

☑  **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: 2141 Rayburn House Office Building (at hearing at which you are testifying)
>
> Date: July 12, 2007                          Time: 10:00 a.m.

*To*  any authorized staff member of the Committee on the Judiciary (service via fax, per prior agreement with

Ms. Miers) _____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States,

at the city of Washington, this 13th day of June , 20 07 .

Attest:

*Clerk*

*Chairman or Authorized Member*

# PROOF OF SERVICE

Subpoena for  Harriet Miers

Address   c/o Locke Liddell & Sapp, 2200 Ross Ave., Suite 2200, Dallas, TX  75201

before the  Committee on the Judiciary

Subcommittee on Commercial and Administrative Law

*U.S. House of Representatives*
*110th Congress*

Served by (print name)  *Elliot Mincberg*

Title  *Chief counsel, Oversight and Investigation, House Judiciary Comm.*

Manner of service  *via fax to Geoge Manning pursuant to authorization*

*from the Manning firm on behalf of Ms Miers as her attorney*

Date  *6/13/07*

Signature of Server  *Elliot Mincberg*

Address  *2138 Rayburn House Office Building*

*Washington DC 20515*

**Schedule for Documents Sought in Subpoena
For Harriet Miers
Subcommittee on Commercial and Administrative Law
House Committee on the Judiciary
June 13, 2007**

## Items Requested

Complete and unredacted versions, including complete paper and electronic versions, of any and all documents in your possession, custody, or control related to the Committee's investigation into the preservation of prosecutorial independence and the Department of Justice's politicization of the hiring and firing of United States Attorneys, including possible misrepresentations to Congress and other violations of federal law. This includes any and all documents related to:

1) the evaluation of or decision to dismiss former U.S. Attorneys David Iglesias, H.E. "Bud" Cummins, John McKay, Carol Lam, Daniel Bogden, Paul Charlton, Kevin Ryan, Margaret Chiara, Todd Graves, or any of them, or any other U.S. Attorney dismissed or considered for dismissal since President Bush's re-election;

2) the implementation of the dismissal and replacement of any such U.S. Attorney;

3) the selection, discussion, or evaluation of any possible replacement or interim or acting appointment to fill any vacancy with respect to dismissed U.S. Attorneys and U.S. Attorneys considered for dismissal; or

4) the testimony of, or representations by, any official at the Department of Justice to the United States Congress regarding any of the matters set forth in (1) - (3).

## Definitions and Instructions

(1) The term "document" is meant to carry, without limitation, the full breadth of that term as it is used in the Federal Rules of Civil Procedure. It includes, as applicable, any memorialization, whether typed, written, recorded, printed or otherwise produced by hand, or produced by any electronic or digital process or otherwise. It includes, without limitation, agreements, contracts, letters or other correspondence, facsimile or e-mail transmissions, telephone messages, logs or records, memoranda, notes, diaries, graphs, formulas, models, bulletins, computer printouts, transcripts, analyses, returns, summaries, accounts, estimates, projections, comparisons, messages, press releases, circulars, reviews, opinions, offers, studies, photographs, investigations, questionnaires, surveys,

work sheets, statistical data, reports, notebooks, manuals, charts or other graphic matter, plans, journals, ledgers, bank records, financial statements, summaries, analyses, commentary, expense reports, books, instructions, financial reports, working papers, records notes, notices, confirmations, telegrams, teletypes, interoffice or intra office communications, cables, and minutes or notations or other records of any type of any conversation, interview, telephone call, meeting, conference, discussion, or other communication. It includes any transmittal slip, attachment, appendix, or other document referenced therein. It includes, without limitation, any information contained on audiotape, videotape, microfilm, or microfiche, as well as any electronically stored information that has been created using, or is otherwise maintained on, digital repositories or other electronic media including, but not limited to, personal computers, office workstations, laptops, hard drives, handheld devices (such as Palm, Trio or Blackberry), phones (office, mobile and/or home), removable electronic storage devices (such as CDs, DVDs, and USB or thumb drives), shared network drives and servers (including e-mail and/or file servers) and back-up tapes (or other disaster recovery/archiving media).

(2) The terms "including," "includes," and "related to" are used in the broadest sense of the term and specification of a particular matter included in a request is not meant to exclude any other documents that might be responsive to a specific request.

(3) Use of either the singular or plural should not be deemed a limitation and the use of the singular should be construed, where applicable, the plural and vice versa.

(4) The conjunctive form "and" and the disjunctive form "or" are mutually interchangeable and are meant to encompass each other.

(5) In complying with this Subpoena, you are required to produce all responsive documents in your possession, custody, or control, whether held by you or by past or present agents or representatives, including documents you have placed in the temporary possession, custody, or control of a third party. No documents requested herein shall be destroyed, modified, removed, transferred or otherwise made inaccessible to the Committee.

(6) In complying with this subpoena, you are to include a copy of the original, as well as any copy that differs in any respect, such as one with marginalia or other notations. You are also to include any markings, post-it notes, or other documents attached thereto, as well as any attachment relating to or incorporated by the document.

(7) With respect to any and all documents requested herein that are being withheld on the ground of privilege, furnish a list specifying the following information:

- the nature, source and date of the document;

- a description of the document's subject matter;

- the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

- the names and addresses of all other persons to whom the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure; and

- the nature of the privilege or rule of law relied upon, including the identity of the person or persons asserting the privilege or rule as well as the legal basis for asserting that privilege or rule, or other reason for non-production.

(8)  All electronic documents shall be provided in full on CD, DVD, or USB external hard drive, as well as in hard copy.

(9)  The obligations created by this document request are continuing and you shall supplement your production if you locate additional responsive documents in your possession, custody, or control.

(10)  Two separate sets of the documents shall be brought to 2141 Rayburn at the time of the hearing, one set for the Majority and one set for the Minority.  Documents discovered after the hearing shall be promptly delivered to the Majority at 2138 Rayburn and to the Minority at 2142 Rayburn.

# Exhibit 15

No. 08-409 (JDB)



**U. S. Department of Justice**

Office of the Solicitor General

---

Solicitor General

*Washington, D.C. 20530*

June 27, 2007

The President
The White House
Washington, D.C.  20500

Dear Mr. President,

The Senate Committee on the Judiciary and the House Committee on the Judiciary recently issued five subpoenas in connection with their inquiries into the resignation of several United States Attorneys in 2006.  Broadly speaking, four of the five subpoenas seek documents in the custody of current or former White House officials ("White House documents") concerning the dismissal and replacement of the U.S. Attorneys.  In addition, two of the five subpoenas demand testimony about these matters from two former White House officials, Harriet Miers, former Counsel to the President, and Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs.

You have requested my legal advice as to whether you may assert executive privilege with respect to the subpoenaed documents and testimony concerning the categories of information described in this letter.  It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and testimony.

**I.**

The documents that the Office of the Counsel to the President has identified as responsive to the subpoenas fall into three broad categories related to the possible dismissal and replacement of U.S. Attorneys, including congressional and media inquiries about the dismissals:  (1) internal White House communications; (2) communications by White House officials with individuals outside the Executive Branch, including with individuals in the Legislative Branch; and (3) communications between White House officials and Department of Justice officials.  The Committees' subpoenas also seek testimony from Ms. Miers and Ms. Taylor concerning the same subject matters, and the assertion of privilege with respect to such testimony requires the same legal analysis.

The Office of Legal Counsel of the Department of Justice has reviewed the documents identified by the Counsel to the President as responsive to the subpoenas and is satisfied that the documents fall within the scope of executive privilege.  The Office further believes that Congress's interests in the documents and related testimony would not be sufficient to override an executive privilege claim.  For the reasons discussed below, I concur with both assessments.

## A.

The initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys. Among other things, these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals. These types of internal deliberations among White House officials fall squarely within the scope of executive privilege. One of the underlying purposes of the privilege is to promote sound decisionmaking by ensuring that senior Government officials and their advisers speak frankly and candidly during the decisionmaking process. As the Supreme Court has explained, "A President and those who assist him must be free to explore alternatives in the process of shaping policies and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also* Letter for the President from John Ashcroft, Attorney General, *Re: Assertion of Executive Privilege with Respect to Prosecutorial Documents* at 2 (Dec. 10, 2001) (available at http://www.usdoj.gov/ olc/executiveprivilege/htm) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) ("[N]ot only does executive privilege apply to confidential communications to the President, but also to 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'") (quoting *Nixon*, 418 U.S. at 705). These confidentiality interests are particularly strong where, as here, the communications may implicate a "quintessential and nondelegable Presidential power," such as the authority to nominate or to remove U.S. Attorneys. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 2-3 (finding that executive privilege protected Department and White House deliberations related to decision to grant clemency).

Under D.C. Circuit precedent, a congressional committee may not overcome an assertion of executive privilege unless it establishes that the documents and information are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution.").

As a threshold matter, it is not at all clear that internal White House communications about the possible dismissal and replacement of U.S. Attorneys fall within the scope of *McGrain* and its progeny. The Supreme Court has held that Congress's oversight powers do not reach "matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v United States*, 360 U.S. 109, 112 (1959). The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults

2

with Members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.[1]  Consequently, there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision [because the decision to grant clemency is an exclusive Executive Branch function]."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain").

        In any event, even if the Committees have oversight authority, there is no doubt that the materials sought qualify for the privilege and the Committees have not demonstrated that their interests justify overriding a claim of executive privilege as to the matters at issue.  The House Committee, for instance, asserts in its letter accompanying the subpoenas that "[c]ommunications among the White House staff involved in the U.S. Attorney replacement plan are obviously of paramount importance to any understanding of how and why these U.S. Attorneys were selected to be fired." Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). But the Committees never explain how or why this information is "demonstrably critical" to any "legislative judgments" Congress might be able to exercise in the U.S. Attorney matter. *Senate Select Comm.*, 498 F.2d at 732. Broad, generalized assertions that the requested materials are of public import are simply insufficient under the "demonstrably critical" standard. Under *Senate Select Committee*, to override a privilege claim the Committees must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Id.* at 733.

        Moreover, any legitimate oversight interest the Committees might have in internal White House communications about the proposal is sharply reduced by the thousands of documents and dozens of hours of interviews and testimony already provided to the Committees by the Department of Justice as part of its extraordinary effort at accommodation.[2] This information

---

[1] *See, e.g., Public Citizen v. Department of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring) ("[T]he Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment."); *Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

[2] During the past three months, the Department has released or made available for review to the Committees approximately 8,500 pages of documents concerning the U.S. Attorney resignations. The Department

has given the Committees extraordinary—and indeed, unprecedented—insight into the Department's decision to request the U.S. Attorney resignations, including the role of White House officials in the process. *See, e.g., History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 758-59, 767 (1982) (documenting refusals by Presidents Jackson, Tyler, and Cleveland to provide information related to the decision to remove Executive Branch officials, including a U.S. Attorney).

In a letter accompanying the subpoenas, the House Committee references the alleged "written misstatements" and "false statements" provided by the Department to the Committees about the U.S. Attorney dismissals. *See* Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). The Department has recognized the Committees' interest in investigating the extent to which Department officials may have provided inaccurate or incomplete information to Congress. This interest does not, however, justify the Committees' demand for White House documents and information about the U.S. Attorney resignations. Officials in the Department, not officials in the White House, presented the challenged statements, and as noted, the Department has provided unprecedented information to Congress concerning, *inter alia*, the process that led to the Department's statements. The Committees' legitimate oversight interests therefore have already been addressed by the Department, which has sought to provide the Committees with all documents related to the preparation of any inaccurate information given to Congress.

Given the amount of information the Committees already possess about the Department's decision to remove the U.S. Attorneys (including the involvement of White House officials), there would be little additional legislative purpose served by revealing internal White House communications about the U.S. Attorney matter, and, in any event, none that would outweigh the

---

has included in its productions many sensitive, deliberative documents related to the resignation requests, including e-mails and other communications with White House officials. The Committees' staffs have also interviewed, at length and on the record, a number of senior Department officials, including, among others, the Deputy Attorney General, the Acting Associate Attorney General, the Attorney General's former chief of staff, the Deputy Attorney General's chief of staff, and two former Directors of the Executive Office for U.S. Attorneys. During these interviews, the Committees' staffs explored in great depth all aspects of the decision to request the U.S. Attorney resignations, including the role of White House officials in the decisionmaking process. In addition, the Attorney General, the Deputy Attorney General, the Principal Associate Deputy Attorney General, the Attorney General's former chief of staff, and the Department's former White House Liaison have testified before one or both of the Committees about the terminations and explained, under oath, their understanding of such involvement.

The President has also made significant efforts to accommodate the Committees' needs. More than three months ago, the Counsel to the President proposed to make senior White House officials, including Ms. Miers, available for informal interviews about "(a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests," and he offered to give the Committees access to White House documents on the same subjects. Letter for the Hon. Patrick Leahy, United States Senate, et al., from Fred F. Fielding, Counsel to the President at 1-2 (Mar. 20, 2007). The Committees declined this offer. The Counsel to the President has since reiterated this offer of accommodation but to no avail. *See* Letter for the Hon. Patrick Leahy, United States Senate, and John Conyers Jr., United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1 (Apr. 12, 2007); Letter for the Hon. Patrick Leahy, United States Senate, the Hon. John Conyers Jr., United States House of Representatives, and the Hon. Linda T. Sanchez, the United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1-2 (June 7, 2007).

President's interest in maintaining the confidentiality of such internal deliberations. *See Senate Select Comm.*, 498 F.2d at 732-33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources). Consequently, I do not believe that the Committees have shown a "demonstrably critical" need for internal White House communications on this matter.

**B.**

For many of the same reasons, I believe that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege. Courts have long recognized the importance of information gathering in presidential decisionmaking. *See, e.g., In re Sealed Case*, 121 F.3d at 751-52 (describing role of investigation and information collection in presidential decisionmaking). Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch. This need is particularly strong when the decision involved is whether to remove political appointees, such as U.S. Attorneys, who serve in local districts spread throughout the United States. In those situations, the President and his advisers will be fully informed only if they solicit and receive advice from a range of individuals. Yet the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential. *See Nixon*, 418 U.S. at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."); *In re Sealed Case*, 121 F.3d at 751 ("In many instances, potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President. Without protection of her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability.").

That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests. The communications at issue occurred with the understanding that they would be held in confidence, and they related to decisionmaking regarding U.S. Attorney removals or replacements or responding to congressional or media inquiries about the U.S. Attorney matter. Under these circumstances, the communications retain their confidential and Executive Branch character and remain protected. *See In re Sealed Case*, 121 F.3d at 752 ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [presidential communications component of executive] privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").[3]

---

[3] Moreover, the Department has previously conveyed to the Committees its concern that there would be a substantial inhibiting effect on future informal confidential communications between Executive Branch and Legislative Branch representatives if such communications were to be produced in the normal course of congressional oversight.

5

Again, the Committees offer no compelling explanation or analysis as to why access to confidential communications between White House officials and individuals outside the Executive Branch is "demonstrably critical to the responsible fulfillment of the [Committees'] functions." *Senate Select Comm.*, 498 F.2d at 731. Absent such a showing, the Committees may not override an executive privilege claim.

## C.

The final category of documents and testimony concerns communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations. These communications are deliberative and clearly fall within the scope of executive privilege.[4] *See supra* at 2. In this case, however, the Department has already disclosed to Congress a substantial amount of documents and information related to White House communications about the U.S. Attorney matter. Consequently, in assessing whether it would be legally permissible to assert executive privilege, it is useful to divide this category into three subcategories, each with slightly different considerations: (1) documents and testimony related to communications between the Department and White House officials that have not already been disclosed by the Department; (2) documents concerning White House-Department communications previously disclosed to the Committees by the Department; and (3) testimony from current or former White House officials (such as the testimony sought from Ms. Miers or Ms. Taylor) about previously disclosed White House-Department communications. After carefully considering the matter, I believe there is a strong legal basis for asserting executive privilege over each of these subcategories.

The President's interest in protecting the confidentiality of documents and information about undisclosed White House-Department communications is powerful. Most, if not all, of these communications concern either potential replacements for the dismissed U.S. Attorneys or possible responses to inquiries from Congress and the media about the U.S. Attorney resignations. As discussed above, the President's need to protect deliberations about the selection of U.S. Attorneys is compelling, particularly given Congress's lack of legislative authority over the nomination or replacement of U.S. Attorneys. *See In re Sealed Case*, 121 F.3d at 751-52. The President also has undeniable confidentiality interests in discussions between White House and Department officials over how to respond to congressional and media inquiries about the U.S. Attorney matter. As Attorney General Janet Reno advised the President in 1996, the ability of the Office of the Counsel to the President to assist the President in responding to investigations "would be significantly impaired" if a congressional committee could review "confidential documents . . . prepared in order to assist the President and his staff in responding to an investigation by the [committee] seeking the documents." *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996). Despite extensive communications with officials at the Department and the White House, the

---

[4] To the extent they exist, White House communications approving the Department's actions by or on behalf of the President would receive particularly strong protection under executive privilege. *See, e.g., In re Sealed Case*, 121 F.3d at 752-53 (describing heightened protection provided to presidential communications).

6

Committees have yet to articulate any "demonstrably critical" oversight interest that would justify overriding these compelling confidentiality concerns.

There are also legitimate reasons to assert executive privilege over White House documents reflecting White House-Department communications that have been previously disclosed to the Committees by the Department. As discussed, these documents are deliberative in nature and clearly fall within the scope of executive privilege. The Department's accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications. The D.C. Circuit has recognized that each Branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). If the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations. Thus, in order to preserve the constitutional process of interbranch accommodation, the President may claim privilege over documents and information concerning the communications that the Department of Justice has previously disclosed to the Committees. Indeed, the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.

Here, the Committees' need for White House documents concerning these communications is weak. The Committees already possess the relevant communications, and it is well established that Congress may not override executive privilege to obtain materials that are cumulative or that could be obtained from an alternative source. *See Senate Select Comm.*, 498 F.2d at 732-33 (holding public release of redacted audio tape transcripts "substantially undermined" any legislative need for tapes themselves); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony"). Accordingly, the Committees do not have a "demonstrably critical" need to collect White House documents reflecting previously disclosed White House-Department communications.

Finally, the Committees have also failed to establish the requisite need for testimony from current or former White House officials about previously disclosed White House-Department communications. Congressional interest in investigating the replacement of U.S. Attorneys clearly falls outside its core constitutional responsibilities, and any legitimate interest Congress may have in the disclosed communications has been satisfied by the Department's extraordinary accommodation involving the extensive production of documents to the Committees, interviews, and hearing testimony concerning these communications. As the D.C. Circuit has explained, because "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability," Congress will rarely need or be entitled to a "precise reconstruction of past events" to carry out its legislative

responsibilities. *Senate Select Comm.*, 498 F.2d at 732.[5] On the other hand, the White House has very legitimate interests in protecting the confidentiality of this information because it would be very difficult, if not impossible, for current or former White House officials testifying about the disclosed communications to separate in their minds knowledge that is derived from the Department's disclosures from knowledge that is derived from other privileged sources, such as internal White House communications. Consequently, given the President's strong confidentiality interests and the Committees' limited legislative needs, I believe that White House information about previously disclosed White House-Department communications may properly be subject to an executive privilege claim.

## II.

In sum, I believe that executive privilege may properly be asserted with respect to the subpoenaed documents and testimony as described above.

Sincerely,

Paul D. Clement
Solicitor General and Acting Attorney General

---

[5] *See also Senate Select Comm.*, 498 F.2d at 732 (explaining that Congress "frequently legislates on the basis of conflicting information provided in its hearings"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").

# Exhibit 16

No. 08-409 (JDB)

### THE WHITE HOUSE

WASHINGTON

June 28, 2007

Dear Chairman Leahy and Chairman Conyers:

On June 13, 2007, the White House received two subpoenas from your Committees requesting documents relating to the replacement of United States Attorneys, calling for the documents to be produced by June 28, 2007. I write at the direction of the President to advise and inform you that the President has decided to assert Executive Privilege and therefore the White House will not be making any production in response to these subpoenas for documents. In addition, Chairman Leahy subpoenaed documents from former Deputy Assistant to the President and Director of Political Affairs Sara M. Taylor, with the same return date of June 28, 2007. Chairman Conyers has subpoenaed documents from former Counsel to the President Harriet E. Miers, with a return date of July 12, 2007. Counsel for Ms. Taylor and Ms. Miers have been informed of the President's decision to assert Executive Privilege and have been asked to relay to Ms. Taylor and Ms. Miers a direction from the President not to produce any documents.

With respect, it is with much regret that we are forced down this unfortunate path which we sought to avoid by finding grounds for mutual accommodation. We had hoped this matter could conclude with your Committees receiving information in lieu of having to invoke Executive Privilege. Instead, we are at this conclusion.

At the outset of this controversy, the President attempted to chart a course of cooperation. It was his intent that Congress receives information in a manner that accommodated Presidential prerogatives. The Department of Justice, for its part, has produced or made available for review more than 8,500 pages of documents, including scores of documents containing communications with White House personnel. In addition, the Attorney General, Deputy Attorney General, Principal Associate Deputy Attorney General, Attorney General's former Chief of Staff, former White House Liaison, and other senior Department officials have testified in public hearings and, in some instances, submitted to interviews with Committee staff. As a result, your Committees have received an extraordinary amount of information regarding the U.S. Attorney replacement issue by way of accommodation.

In keeping with the established tradition of Congress and the Executive Branch working together to accommodate each others' interests, the President was willing to go even further in response to your inquiries. At his direction, we proposed and offered to provide you with documents containing communications between the White House and Department of Justice regarding the request for the resignation of the U.S. Attorneys in question, as well as documents containing communications on the same subject between the White House staff and third parties, including Congress. We also offered to make available for interviews the President's former Counsel; current Deputy Chief of Staff

and Senior Advisor; Deputy Counsel; former Director of Political Affairs; and a Special Assistant to the President in the Office of Political Affairs.

The President's offer reflected his desire to cooperate and accommodate. It was designed to provide your Committees with additional documents, and the rare opportunity to participate in interviews and question close advisors to the President about the matters under inquiry. With the benefit not only of the enormous amount of information you received from the Department of Justice, but also additional White House documents, you would have been able to further inquire about these matters.

To be sure, the President's offer also took care to protect fundamental interests of the Presidency and the constitutional principle of separation of powers. Specifically, the President was not willing to provide your Committees with documents revealing internal White House communications or to accede to your desire for senior advisors to testify at public hearings. The reason for these distinctions rests upon a bedrock Presidential prerogative: for the President to perform his constitutional duties, it is imperative that he receive candid and unfettered advice and that free and open discussions and deliberations occur among his advisors and between those advisors and others within and outside the Executive Branch. Presidents would not be able to fulfill their responsibilities if their advisors—on fear of being commanded to Capitol Hill to testify or having their documents produced to Congress—were reluctant to communicate openly and honestly in the course of rendering advice and reaching decisions. These confidentiality interests are especially strong in situations like the present controversy, where the inquiry seeks information relating to the President's powers to appoint and remove U.S. Attorneys – authority granted exclusively to the President by the Constitution.

The principles at stake here are of the utmost importance and find meaningful parallels in any number of other settings. For example, Messrs. Chairmen, I am sure you would wish to protect the confidentiality of deliberations between Members of Congress and their staff. So, too, do I believe that most judges would be quick to stress the importance to their decision-making processes of maintaining the confidentiality of their deliberations with their colleagues and law clerks. So, too, here: for the Presidency to operate consistent with the Constitution's design, Presidents must be able to depend upon their advisors and other Executive Branch officials speaking candidly and without inhibition while deliberating and working to advise the President. The doctrine of Executive Privilege exists, at least in part, to protect such communications from compelled disclosure to Congress, especially where, as here, the President's interests in maintaining confidentiality far outweigh Congress's interests in obtaining deliberative White House communications. I refer you to the attached opinion from the Acting Attorney General to the President, discussing this in further detail as well as informing him as to the appropriateness of an assertion of Executive Privilege in these circumstances.

Further, it remains unclear precisely how and why your Committees are unable to fulfill your legislative and oversight interests without the unfettered requests you have made in your subpoenas. Put differently, there is no demonstration that the documents and

information you seek by subpoena are critically important to any legislative initiatives that you may be pursuing or intending to pursue.

By contrast, the President has frequently, plainly, and completely explained that his position, and now his decision, is rooted in a need to protect the institution of the Presidency. The President's assertion of Executive Privilege is not designed to shield information in a particular situation, but to help protect the ability of Presidents to ensure that decisions reflect and benefit from the exchange of informed and diverse viewpoints and open and frank deliberations. Issuing subpoenas and seeking to compel the disclosure of information in lieu of accepting the President's reasonable offer of accommodation has led to confrontation.

Consistent with the analysis of the Acting Attorney General, the President is satisfied that the testimony sought from Sara Taylor and Harriet Miers is subject to a valid claim of Executive Privilege and is prepared to assert the Privilege with respect to that testimony if the matter cannot be resolved. However, the President has further instructed me to confirm that while unwilling to submit to subpoenas compelling the production of documents and testimony, in the absence of any subpoenas he continues to be willing to provide you with information as previously offered. In short, the President requests that your inquiry proceed in a balanced manner, respectful of important constitutional principles of both institutions, rather than through confrontation. It is hoped you will reconsider your present position, accept the President's offer, and bring closure to this controversy so we may all return to more productive activity on behalf of the Nation.

Respectfully yours,

Fred F. Fielding
Counsel to the President

Attachment

The Honorable Patrick J. Leahy
United States Senate
Washington, D.C. 20510

The Honorable John Conyers
United States House of Representatives
Washington, D.C. 20515



**U. S. Department of Justice**

Office of the Solicitor General

---

Solicitor General                          *Washington, D C  20530*

June 27, 2007

The President
The White House
Washington, D.C.  20500

Dear Mr. President,

    The Senate Committee on the Judiciary and the House Committee on the Judiciary recently issued five subpoenas in connection with their inquiries into the resignation of several United States Attorneys in 2006.  Broadly speaking, four of the five subpoenas seek documents in the custody of current or former White House officials ("White House documents") concerning the dismissal and replacement of the U.S. Attorneys.  In addition, two of the five subpoenas demand testimony about these matters from two former White House officials, Harriet Miers, former Counsel to the President, and Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs.

    You have requested my legal advice as to whether you may assert executive privilege with respect to the subpoenaed documents and testimony concerning the categories of information described in this letter.  It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and testimony.

I.

    The documents that the Office of the Counsel to the President has identified as responsive to the subpoenas fall into three broad categories related to the possible dismissal and replacement of U.S. Attorneys, including congressional and media inquiries about the dismissals: (1) internal White House communications; (2) communications by White House officials with individuals outside the Executive Branch, including with individuals in the Legislative Branch; and (3) communications between White House officials and Department of Justice officials.  The Committees' subpoenas also seek testimony from Ms. Miers and Ms. Taylor concerning the same subject matters, and the assertion of privilege with respect to such testimony requires the same legal analysis.

    The Office of Legal Counsel of the Department of Justice has reviewed the documents identified by the Counsel to the President as responsive to the subpoenas and is satisfied that the documents fall within the scope of executive privilege.  The Office further believes that Congress's interests in the documents and related testimony would not be sufficient to override an executive privilege claim.  For the reasons discussed below, I concur with both assessments.

### A.

The initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys. Among other things, these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals. These types of internal deliberations among White House officials fall squarely within the scope of executive privilege. One of the underlying purposes of the privilege is to promote sound decisionmaking by ensuring that senior Government officials and their advisers speak frankly and candidly during the decisionmaking process. As the Supreme Court has explained, "A President and those who assist him must be free to explore alternatives in the process of shaping policies and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also* Letter for the President from John Ashcroft, Attorney General, *Re: Assertion of Executive Privilege with Respect to Prosecutorial Documents* at 2 (Dec. 10, 2001) (available at http://www.usdoj.gov/ olc/executiveprivilege/htm) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) ("[N]ot only does executive privilege apply to confidential communications to the President, but also to 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'") (quoting *Nixon*, 418 U.S. at 705). These confidentiality interests are particularly strong where, as here, the communications may implicate a "quintessential and nondelegable Presidential power," such as the authority to nominate or to remove U.S. Attorneys. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 2-3 (finding that executive privilege protected Department and White House deliberations related to decision to grant clemency).

Under D.C. Circuit precedent, a congressional committee may not overcome an assertion of executive privilege unless it establishes that the documents and information are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution.").

As a threshold matter, it is not at all clear that internal White House communications about the possible dismissal and replacement of U.S. Attorneys fall within the scope of *McGrain* and its progeny. The Supreme Court has held that Congress's oversight powers do not reach "matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults

2

with Members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.[1]  Consequently, there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision [because the decision to grant clemency is an exclusive Executive Branch function].");  *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain").

In any event, even if the Committees have oversight authority, there is no doubt that the materials sought qualify for the privilege and the Committees have not demonstrated that their interests justify overriding a claim of executive privilege as to the matters at issue.  The House Committee, for instance, asserts in its letter accompanying the subpoenas that "[c]ommunications among the White House staff involved in the U.S. Attorney replacement plan are obviously of paramount importance to any understanding of how and why these U.S. Attorneys were selected to be fired."  Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007).  But the Committees never explain how or why this information is "demonstrably critical" to any "legislative judgments" Congress might be able to exercise in the U.S. Attorney matter.  *Senate Select Comm.*, 498 F.2d at 732.  Broad, generalized assertions that the requested materials are of public import are simply insufficient under the "demonstrably critical" standard.  Under *Senate Select Committee*, to override a privilege claim the Committees must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials."  *Id.* at 733.

Moreover, any legitimate oversight interest the Committees might have in internal White House communications about the proposal is sharply reduced by the thousands of documents and dozens of hours of interviews and testimony already provided to the Committees by the Department of Justice as part of its extraordinary effort at accommodation.[2]  This information

---

[1]  *See, e.g., Public Citizen v. Department of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring) ("[T]he Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.'  No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment."); *Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

[2]  During the past three months, the Department has released or made available for review to the Committees approximately 8,500 pages of documents concerning the U.S. Attorney resignations.  The Department

3

has given the Committees extraordinary—and indeed, unprecedented—insight into the Department's decision to request the U.S. Attorney resignations, including the role of White House officials in the process. *See, e.g., History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 758-59, 767 (1982) (documenting refusals by Presidents Jackson, Tyler, and Cleveland to provide information related to the decision to remove Executive Branch officials, including a U.S. Attorney).

In a letter accompanying the subpoenas, the House Committee references the alleged "written misstatements" and "false statements" provided by the Department to the Committees about the U.S. Attorney dismissals. *See* Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). The Department has recognized the Committees' interest in investigating the extent to which Department officials may have provided inaccurate or incomplete information to Congress. This interest does not, however, justify the Committees' demand for White House documents and information about the U.S. Attorney resignations. Officials in the Department, not officials in the White House, presented the challenged statements, and as noted, the Department has provided unprecedented information to Congress concerning, *inter alia*, the process that led to the Department's statements. The Committees' legitimate oversight interests therefore have already been addressed by the Department, which has sought to provide the Committees with all documents related to the preparation of any inaccurate information given to Congress.

Given the amount of information the Committees already possess about the Department's decision to remove the U.S. Attorneys (including the involvement of White House officials), there would be little additional legislative purpose served by revealing internal White House communications about the U.S. Attorney matter, and, in any event, none that would outweigh the

---

has included in its productions many sensitive, deliberative documents related to the resignation requests, including e-mails and other communications with White House officials. The Committees' staffs have also interviewed, at length and on the record, a number of senior Department officials, including, among others, the Deputy Attorney General, the Acting Associate Attorney General, the Attorney General's former chief of staff, the Deputy Attorney General's chief of staff, and two former Directors of the Executive Office for U.S. Attorneys. During these interviews, the Committees' staffs explored in great depth all aspects of the decision to request the U.S. Attorney resignations, including the role of White House officials in the decisionmaking process. In addition, the Attorney General, the Deputy Attorney General, the Principal Associate Deputy Attorney General, the Attorney General's former chief of staff, and the Department's former White House Liaison have testified before one or both of the Committees about the terminations and explained, under oath, their understanding of such involvement.

The President has also made significant efforts to accommodate the Committees' needs. More than three months ago, the Counsel to the President proposed to make senior White House officials, including Ms. Miers, available for informal interviews about "(a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests," and he offered to give the Committees access to White House documents on the same subjects. Letter for the Hon. Patrick Leahy, United States Senate, et al., from Fred F. Fielding, Counsel to the President at 1-2 (Mar. 20, 2007). The Committees declined this offer. The Counsel to the President has since reiterated this offer of accommodation but to no avail. *See* Letter for the Hon. Patrick Leahy, United States Senate, and John Conyers Jr., United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1 (Apr. 12, 2007); Letter for the Hon. Patrick Leahy, United States Senate, the Hon. John Conyers Jr., United States House of Representatives, and the Hon. Linda T. Sanchez, the United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1-2 (June 7, 2007).

President's interest in maintaining the confidentiality of such internal deliberations. *See Senate Select Comm.*, 498 F.2d at 732-33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources). Consequently, I do not believe that the Committees have shown a "demonstrably critical" need for internal White House communications on this matter.

**B.**

For many of the same reasons, I believe that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege. Courts have long recognized the importance of information gathering in presidential decisionmaking. *See, e.g., In re Sealed Case*, 121 F.3d at 751-52 (describing role of investigation and information collection in presidential decisionmaking). Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch. This need is particularly strong when the decision involved is whether to remove political appointees, such as U.S. Attorneys, who serve in local districts spread throughout the United States. In those situations, the President and his advisers will be fully informed only if they solicit and receive advice from a range of individuals. Yet the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential. *See Nixon*, 418 U.S. at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."); *In re Sealed Case*, 121 F.3d at 751 ("In many instances, potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President. Without protection of her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability.").

That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests. The communications at issue occurred with the understanding that they would be held in confidence, and they related to decisionmaking regarding U.S. Attorney removals or replacements or responding to congressional or media inquiries about the U.S. Attorney matter. Under these circumstances, the communications retain their confidential and Executive Branch character and remain protected. *See In re Sealed Case*, 121 F.3d at 752 ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [presidential communications component of executive] privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").[3]

---

[3] Moreover, the Department has previously conveyed to the Committees its concern that there would be a substantial inhibiting effect on future informal confidential communications between Executive Branch and Legislative Branch representatives if such communications were to be produced in the normal course of congressional oversight.

Again, the Committees offer no compelling explanation or analysis as to why access to confidential communications between White House officials and individuals outside the Executive Branch is "demonstrably critical to the responsible fulfillment of the [Committees'] functions." *Senate Select Comm.*, 498 F.2d at 731. Absent such a showing, the Committees may not override an executive privilege claim.

**C.**

The final category of documents and testimony concerns communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations. These communications are deliberative and clearly fall within the scope of executive privilege.[4] *See supra* at 2. In this case, however, the Department has already disclosed to Congress a substantial amount of documents and information related to White House communications about the U.S. Attorney matter. Consequently, in assessing whether it would be legally permissible to assert executive privilege, it is useful to divide this category into three subcategories, each with slightly different considerations: (1) documents and testimony related to communications between the Department and White House officials that have not already been disclosed by the Department; (2) documents concerning White House-Department communications previously disclosed to the Committees by the Department; and (3) testimony from current or former White House officials (such as the testimony sought from Ms. Miers or Ms. Taylor) about previously disclosed White House-Department communications. After carefully considering the matter, I believe there is a strong legal basis for asserting executive privilege over each of these subcategories.

The President's interest in protecting the confidentiality of documents and information about undisclosed White House-Department communications is powerful. Most, if not all, of these communications concern either potential replacements for the dismissed U.S. Attorneys or possible responses to inquiries from Congress and the media about the U.S. Attorney resignations. As discussed above, the President's need to protect deliberations about the selection of U.S. Attorneys is compelling, particularly given Congress's lack of legislative authority over the nomination or replacement of U.S. Attorneys. *See In re Sealed Case*, 121 F.3d at 751-52. The President also has undeniable confidentiality interests in discussions between White House and Department officials over how to respond to congressional and media inquiries about the U.S. Attorney matter. As Attorney General Janet Reno advised the President in 1996, the ability of the Office of the Counsel to the President to assist the President in responding to investigations "would be significantly impaired" if a congressional committee could review "confidential documents . . . prepared in order to assist the President and his staff in responding to an investigation by the [committee] seeking the documents." *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996). Despite extensive communications with officials at the Department and the White House, the

---

[4] To the extent they exist, White House communications approving the Department's actions by or on behalf of the President would receive particularly strong protection under executive privilege. *See, e.g., In re Sealed Case*, 121 F.3d at 752-53 (describing heightened protection provided to presidential communications).

Committees have yet to articulate any "demonstrably critical" oversight interest that would justify overriding these compelling confidentiality concerns.

There are also legitimate reasons to assert executive privilege over White House documents reflecting White House-Department communications that have been previously disclosed to the Committees by the Department. As discussed, these documents are deliberative in nature and clearly fall within the scope of executive privilege. The Department's accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications. The D.C. Circuit has recognized that each Branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). If the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations. Thus, in order to preserve the constitutional process of interbranch accommodation, the President may claim privilege over documents and information concerning the communications that the Department of Justice has previously disclosed to the Committees. Indeed, the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.

Here, the Committees' need for White House documents concerning these communications is weak. The Committees already possess the relevant communications, and it is well established that Congress may not override executive privilege to obtain materials that are cumulative or that could be obtained from an alternative source. *See Senate Select Comm.*, 498 F.2d at 732-33 (holding public release of redacted audio tape transcripts "substantially undermined" any legislative need for tapes themselves); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony"). Accordingly, the Committees do not have a "demonstrably critical" need to collect White House documents reflecting previously disclosed White House-Department communications.

Finally, the Committees have also failed to establish the requisite need for testimony from current or former White House officials about previously disclosed White House-Department communications. Congressional interest in investigating the replacement of U.S. Attorneys clearly falls outside its core constitutional responsibilities, and any legitimate interest Congress may have in the disclosed communications has been satisfied by the Department's extraordinary accommodation involving the extensive production of documents to the Committees, interviews, and hearing testimony concerning these communications. As the D.C. Circuit has explained, because "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability," Congress will rarely need or be entitled to a "precise reconstruction of past events" to carry out its legislative

responsibilities. *Senate Select Comm.*, 498 F.2d at 732.[5] On the other hand, the White House has very legitimate interests in protecting the confidentiality of this information because it would be very difficult, if not impossible, for current or former White House officials testifying about the disclosed communications to separate in their minds knowledge that is derived from the Department's disclosures from knowledge that is derived from other privileged sources, such as internal White House communications. Consequently, given the President's strong confidentiality interests and the Committees' limited legislative needs, I believe that White House information about previously disclosed White House-Department communications may properly be subject to an executive privilege claim.

## II.

In sum, I believe that executive privilege may properly be asserted with respect to the subpoenaed documents and testimony as described above.

Sincerely,

Paul D. Clement
Solicitor General and Acting Attorney General

---

[5] *See also Senate Select Comm.*, 498 F.2d at 732 (explaining that Congress "frequently legislates on the basis of conflicting information provided in its hearings"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").

# Exhibit 17

-

No. 08-409 (JDB)

**THE WHITE HOUSE**

WASHINGTON

June 28, 2007

HAND DELIVERED

Dear Mr Manning:

As you are aware, on June 13, 2007, the House Judiciary Committee issued a subpoena to your client, Harriet E. Miers, seeking production, by July 12, 2007, of documents concerning the dismissal and replacement of United States Attorneys. On the same day, the White House received two subpoenas, one each from the Senate Judiciary Committee and the House Judiciary Committee, seeking substantially the same materials.

The President has decided to assert Executive Privilege with respect to documents gathered by the Office of Counsel to the President that are responsive to the subpoenas issued to the White House. Accordingly, I am writing to notify you that the President also has asserted Executive Privilege as to any documents that Ms. Miers may possess that would be responsive to the subpoena issued to her on June 13, 2007, by the House Judiciary Committee. I respectfully request that you inform Ms. Miers that the President has directed her not to produce any documents in response to the subpoena.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J Francisco, Esq
Jones Day
51 Louisiana Avenue, NW
Washington, D C  20001

Exhibit 18

No. 08-409 (JDB)

# Congress of the United States

## Washington, DC 20515

June 29, 2007

Fred Fielding, Esq.
Counsel to the President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Dear Mr. Fielding:

The return date and time for the White House Chief of Staff, Joshua Bolten, to appear
before our Committees on behalf of the White House and bring with him the documents
compelled by the subpoenas we issued on June 13 was yesterday at 10 a.m. Mr. Bolten
did not do so. Instead, you wrote us that, despite conceding that you have responsive
documents in your possession, you refuse to produce even a single one based on a blanket
executive privilege claim. We had hoped our Committees' subpoenas would be met with
compliance and not a Nixonian stonewalling that reveals the White House's disdain for
our system of checks and balances.

We urge the President to reconsider this step and withdraw his privilege claim so the
American people can learn the truth about these firings. If he is unwilling to withdraw
these claims, we call on you to provide more specific information to facilitate ruling on
those claims and our consideration of appropriate action to enforce our subpoenas.

On June 13, we issued subpoenas compelling the White House to produce documents
related to our Committees' investigations into the mass firings and replacements of U.S.
Attorneys and politicization at the Department of Justice. We did so reluctantly after
seeking voluntary cooperation from the White House for three months. Even though the
evidence gathered by our Committees shows that White House officials were heavily
involved in these firings and in the Justice Department's response to congressional
inquiries about them, the White House has not produced a single document or allowed
even one White House official involved in these matters to be interviewed.

Our Committees rejected your "take it or leave it" offer of off-the-record, backroom
interviews and severe limits on the scope of our requests as unacceptable, more than three
months ago. Since that time, despite our many attempts to narrow the dispute and begin
to obtain the information we need, you have not made any effort to work with us on a
voluntary basis. Even now, in response to subpoenas authorized by our Committees, you
have again merely restated your initial, unacceptable offer. Your proposal is not
commensurate with our exercise of the broad investigatory power of Congress.

Mr. Fred Fielding, Esq.
June 29, 2007
Page 2 of 4

Our power to investigate has been described as essential to the legislative function by the Supreme Court and "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland v United States Serviceman's Fund*, 421 U.S. 491, 504, n. 15 (1975). Indeed, the Court has specifically recognized that Congress' "broad" investigatory authority "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes," and includes the power to "inquire into and publicize corruption, maladministration, or inefficiencies" in the Executive Branch. *Watkins v. United States*, 354 U.S. 178, 182, 200 n.33 (1957). Moreover, as we have said many times, your proposal would constrain not only our investigation, but also the ability of the American people to learn the truth about these firings.

In fact, the letter you enclosed from Acting Attorney General Clement makes clear that internal White House documents, which you have refused even to discuss making available, contain information directly responsive to our subpoenas. According to Mr. Clement, those documents specifically discuss "the possible dismissal and replacement of U.S. Attorneys," the "wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals." The subject matter of these documents heightens our concern about the involvement of White House officials in these firings and in the inaccurate testimony given to our Committees about them, including possible obstruction of justice and other violations of federal law. It is precisely for these reasons that we have sought for many months to obtain information from the White House.

Your action today in stonewalling the Committees' investigations is also inconsistent with the practices of every Administration since World War II in responding to congressional oversight. In that time, presidential advisers have testified before congressional committees 74 times voluntarily or compelled by subpoenas. During the Clinton Administration, White House and Administration advisors were routinely subpoenaed for documents or to appear before Congress. For example, in 1996 alone, the House Government Reform Committee issued at least 27 subpoenas to White House advisors. The veil of secrecy you have attempted to pull over the White House by withholding documents and witnesses is unprecedented and damaging to the tradition of open government by and for the people that has been a hallmark of the Republic.

Moreover, your blanket assertion of executive privilege belies any good faith attempt to determine where privilege truly does and does not apply. A serious assertion of privilege would include an effort to demonstrate to the Committees which documents, and which parts of those documents, are covered by any privilege that may apply.

Mr. Fred Fielding, Esq.
June 29, 2007
Page 3 of 4

Indeed, the subpoenas themselves specifically stated that for each document withheld, you should provide a description of the nature, source, subject matter, and date of the document; the name and address of each recipient of an original or copy of the document and the date received; the name and address of each additional person to whom any of the contents of the document were disclosed along with the date and manner of disclosure; and the specific legal basis for the assertion of privilege. Such privilege logs have been provided by the White House in previous Administrations, and this Justice Department has provided similar logs in this very matter, which have been used to help resolve disputes about the production of documents. Yet, you have failed to provide any such information.

In addition, at least since the Reagan Administration in 1982, there has been a specific determination and signed statement by the President when executive privilege has been asserted. In accord with this procedure, President Bush himself has issued such assertions during his Administration. See, e.g., Memorandum for the Attorney General re Congressional Subpoena for Executive Branch Documents (December 12, 2001). See also "Procedures Governing Responses to Congressional Requests for Information," issued on November 4, 1982, and 6 Op. OLC 31 (1982). Yet you have failed to include any such Presidential assertion or even state whether you have now decided to disregard this established procedure.

Please provide the documents compelled by the subpoenas without further delay. If you continue to decline to do so, you should immediately provide us with the specific factual and legal bases for your claims regarding each document withheld via a privilege log as described above and a copy of any explicit determination by the President with respect to the assertion of privilege. You have until July 9, 2007, at 10 a.m. to bring this and any other information you wish to submit to our attention before we move to proceedings to rule on your claims and consider whether the White House is in contempt of Congress.

We were disappointed that we had to turn to these subpoenas in order to obtain information needed by the Committees to learn the truth about these firings and the erosion of independence at the Justice Department. We are even more disappointed now with yet further stonewalling.

Mr. Fred Fielding, Esq.
June 29, 2007
Page 4 of 4

Whether or not we have the benefit of the information we have directed you to provide by July 9, we will take the necessary steps to rule on your privilege claims and appropriately enforce our subpoenas backed by the full force of law.

Sincerely,

PATRICK LEAHY
Chairman
Senate Judiciary Committee

JOHN CONYERS, JR.
Chairman
House Judiciary Committee

cc: The Honorable Arlen Specter
    The Honorable Lamar S. Smith

# Exhibit 19

No. 08-409 (JDB)

**THE WHITE HOUSE**

WASHINGTON

July 9, 2007

Dear Chairman Leahy and Chairman Conyers:

I write in response to your letter of June 29, 2007.

Let me begin by conveying a note of concern over your letter's tone and apparent direction in dealing with a situation of this gravity. We are troubled to read the letter's charge that the President's "assertion of Executive Privilege belies any good faith attempt to determine where privilege truly does and does not apply." Although we each speak on behalf of different branches of government, and perhaps for that reason cannot help having different perspectives on the matter, it is hoped you will agree, upon further reflection, that it is incorrect to say that the President's assertion of Executive Privilege was performed without "good faith."

As the letter from the Acting Attorney General explained in considerable detail, the assertion of Executive Privilege here is intended to protect a fundamental interest of the Presidency: the necessity that a President receive candid advice from his advisors and that those advisors be able to communicate freely and openly with the President, with each other, and with others inside and outside the Executive Branch. In the present setting, where the President's authority to appoint and remove U.S. Attorneys is at stake, the institutional interest of the Executive Branch is very strong. The Acting Attorney General's letter clearly identifies the subject matter of the deliberations and communications at issue and provides an extensive treatment of the issues implicated by the subpoenas and the legal basis for the President's assertion of Executive Privilege.

Your letter does not dispute these principles. It does not take issue with the practical fact that, in order to fulfill his constitutional functions, the President, no less than Members of Congress and federal judges, needs the protection of a principle that shields his close advisors from open-ended inquiry by another branch of government. The letter does not challenge the exclusive character of the President's appointment and removal power, nor does the letter attempt to establish a constitutional basis for the Committees' inquiry into this matter. Although the letter sets forth certain generalizations relating to Congress's investigatory authority, it does not explain how that authority extends to White House communications about the possible dismissal and replacement of U.S. Attorneys. And, even if Congress's authority might be deemed to extend that far, the question remains whether the Committees have demonstrated that the information sought here is demonstrably critical to the responsible fulfillment of the Committees' legislative functions.

In response to your inquiry concerning the mechanics of the President's assertion of the privilege, you may be assured that the President's assertion here comports with prior practices in similar contexts, and that it has been appropriately documented. I do hope that your Committees

will appreciate that I write on behalf of the President and therefore understand that my letter of June 28, 2007 precisely expresses the President's position on this matter.

Your letter also "direct[s]" the President to provide certain additional information to the Committees before 10:00 a.m. on July 9, 2007. The letter goes on to say that a very detailed "privilege log" is necessary "to facilitate ruling on" claims of Executive Privilege and your letter thereafter announces an intention to "take the necessary steps to rule on [the President's executive] privilege claims." We are aware of no authority by which a congressional committee may "direct" the Executive to undertake the task of creating and providing an extensive description of every document covered by an assertion of Executive Privilege. Given the descriptions of the materials in question that have already been provided, this demand is unreasonable because it represents a substantial incursion into Presidential prerogatives and because, in view of the open-ended scope of the Committees' inquiry, it would impose a burden of very significant proportions.

One final observation underscores the preordained futility of any White House compliance with this demand. When your letter states that your Committees "will take the necessary steps to rule on [the President's] privilege claims and appropriately enforce our subpoenas" and that *the Committees will enforce their subpoenas "[w]hether or not [they] have the benefit of the information"* (emphasis added), only one conclusion is evident: the Committees have already prejudged the question, regardless of the production of any privilege log. In such circumstances, we will not be undertaking such a project, even as a further accommodation.

As noted in my previous letter, as we remain at the present impasse, the President feels compelled to assert Executive Privilege with respect to the testimony sought from Sara M. Taylor and Harriet E. Miers covering White House consideration, deliberations or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys, including consideration of possible responses to congressional and media inquiries on the United States Attorneys matter, consistent with the advice provided by the Acting Attorney General. The President has instructed me to notify you and the counsel for Ms. Taylor and Ms. Miers of his decision and to inform counsel of his direction to Ms. Taylor and Ms. Miers not to provide this testimony.

I renew again the President's offer: in the absence of subpoenas he remains willing to provide you with information as previously offered. And I likewise convey the President's request that further interbranch relations in this matter be distinguished by respect for the constitutional principles of both institutions and marked by a presumption of goodwill on all sides.

Respectfully yours,

Fred F. Fielding
Counsel to the President

The Honorable Patrick J. Leahy
United States Senate
Washington, D.C. 20510

The Honorable John Conyers, Jr
United States House of Representatives
Washington, D.C. 20515

# Exhibit 20

No. 08-409 (JDB)

THE WHITE HOUSE

WASHINGTON

July 9, 2007

Dear Mr. Manning:

As you are aware, on June 13, 2007, the House Judiciary Committee issued a subpoena to your client, Harriet E. Miers, seeking her appearance, on July 12, 2007, for testimony and production of documents in her possession, custody, or control concerning the dismissal and replacement of United States Attorneys

Consistent with the advice provided by the Acting Attorney General in his letter to the President of June 27, 2007, the President has decided to assert Executive Privilege with respect to the testimony sought from Ms. Miers concerning White House consideration, deliberations, or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys, including consideration of possible responses to congressional and media inquiries on the United States Attorneys matter. Accordingly, I respectfully request that you inform Ms. Miers that the President has directed her not to provide this testimony

In my letter of June 28, 2007, I informed you that the President had asserted Executive Privilege as to any documents that Ms. Miers possessed that would be responsive to the subpoena from the House Judiciary Committee. The President continues to assert Executive Privilege over any such documents and continues to direct Ms. Miers not to produce such documents.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

Exhibit 21

No. 08-409 (JDB)

# JONES DAY

1420 PEACHTREE STREET, N.E.  •  SUITE 800  •  ATLANTA, GEORGIA 30309 3053

July 9, 2007

GEORGE T. MANNING
PARTNER-IN-CHARGE

404 581 8400

The Honorable John Conyers, Jr.
Chairman
U.S. House of Representatives
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Lamar S. Smith
Ranking Member
U.S. House of Representatives
Committee on the Judiciary
2142 Rayburn House Office Building
Washington, D.C. 20515

Re:    Congressional Inquiry Into U.S. Attorneys Matters

Dear Sirs:

I write in response to the subpoena issued to Harriet Miers by the House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, on June 13, 2007 (the "Committee"). As I have advised your staff member Elliot Mincberg, we have been informed that the Executive Privilege has been asserted over all documents and testimony that would be responsive to the subpoena. In addition, we have been directed that Ms. Miers is "not to produce any documents in response to the subpoena," Letter from Fred F. Fielding to George T. Manning, June 28, 2007 (attached hereto), and not to provide "testimony ... concerning White House consideration, deliberations, or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys," Letter from Fred F. Fielding to George T. Manning, July 9, 2007 (attached hereto). Ms. Miers is thus subject to conflicting commands, with Congress demanding the production of information that the Counsel to the President has informed her she is prohibited from disclosing.

Ms. Miers is, of course, respectful of her obligations to respond appropriately to the subpoena issued and served upon her. In these circumstances, however, as I am sure you know, Ms. Miers has no choice other than to comply with direction given her by Counsel to the President in his letters mentioned above. This is particularly so because, as the members of the Committee are aware, the assertion of the privilege in this circumstance is supported by the thorough and reasoned opinion of the Solicitor General of the United States. *See* Letter from Paul D. Clement, Solicitor General, to the President, June 27, 2007 (attached hereto).

Accordingly, and with all due respect, I must inform you that in light of the President's assertion of Executive Privilege, Ms. Miers cannot provide the documents and testimony that the Committee seeks.

Kind regards,

George T. Manning

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MENLO PARK • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Enclosures

cc:     Mr. Fred F. Fielding, Esq.

THE WHITE HOUSE

WASHINGTON

June 28, 2007

HAND DELIVERED

Dear Mr. Manning:

As you are aware, on June 13, 2007, the House Judiciary Committee issued a subpoena to your client, Harriet E. Miers, seeking production, by July 12, 2007, of documents concerning the dismissal and replacement of United States Attorneys. On the same day, the White House received two subpoenas, one each from the Senate Judiciary Committee and the House Judiciary Committee, seeking substantially the same materials.

The President has decided to assert Executive Privilege with respect to documents gathered by the Office of Counsel to the President that are responsive to the subpoenas issued to the White House. Accordingly, I am writing to notify you that the President also has asserted Executive Privilege as to any documents that Ms. Miers may possess that would be responsive to the subpoena issued to her on June 13, 2007, by the House Judiciary Committee. I respectfully request that you inform Ms. Miers that the President has directed her not to produce any documents in response to the subpoena.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Avenue, NW
Washington, D.C. 20001

THE WHITE HOUSE

WASHINGTON

July 9, 2007

Dear Mr. Manning:

As you are aware, on June 13, 2007, the House Judiciary Committee issued a subpoena to your client, Harriet E. Miers, seeking her appearance, on July 12, 2007, for testimony and production of documents in her possession, custody, or control concerning the dismissal and replacement of United States Attorneys.

Consistent with the advice provided by the Acting Attorney General in his letter to the President of June 27, 2007, the President has decided to assert Executive Privilege with respect to the testimony sought from Ms. Miers concerning White House consideration, deliberations, or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys, including consideration of possible responses to congressional and media inquiries on the United States Attorneys matter. Accordingly, I respectfully request that you inform Ms. Miers that the President has directed her not to provide this testimony.

In my letter of June 28, 2007, I informed you that the President had asserted Executive Privilege as to any documents that Ms. Miers possessed that would be responsive to the subpoena from the House Judiciary Committee. The President continues to assert Executive Privilege over any such documents and continues to direct Ms. Miers not to produce such documents.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001



**U. S. Department of Justice**

Office of the Solicitor General

---

Solicitor General

*Washington, D.C. 20530*

June 27, 2007

The President
The White House
Washington, D.C.  20500

Dear Mr  President,

The Senate Committee on the Judiciary and the House Committee on the Judiciary recently issued five subpoenas in connection with their inquiries into the resignation of several United States Attorneys in 2006. Broadly speaking, four of the five subpoenas seek documents in the custody of current or former White House officials ("White House documents") concerning the dismissal and replacement of the U.S. Attorneys. In addition, two of the five subpoenas demand testimony about these matters from two former White House officials, Harriet Miers, former Counsel to the President, and Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs.

You have requested my legal advice as to whether you may assert executive privilege with respect to the subpoenaed documents and testimony concerning the categories of information described in this letter. It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and testimony.

## I.

The documents that the Office of the Counsel to the President has identified as responsive to the subpoenas fall into three broad categories related to the possible dismissal and replacement of U.S. Attorneys, including congressional and media inquiries about the dismissals: (1) internal White House communications; (2) communications by White House officials with individuals outside the Executive Branch, including with individuals in the Legislative Branch; and (3) communications between White House officials and Department of Justice officials. The Committees' subpoenas also seek testimony from Ms. Miers and Ms. Taylor concerning the same subject matters, and the assertion of privilege with respect to such testimony requires the same legal analysis.

The Office of Legal Counsel of the Department of Justice has reviewed the documents identified by the Counsel to the President as responsive to the subpoenas and is satisfied that the documents fall within the scope of executive privilege. The Office further believes that Congress's interests in the documents and related testimony would not be sufficient to override an executive privilege claim. For the reasons discussed below, I concur with both assessments

## A.

The initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys. Among other things, these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals. These types of internal deliberations among White House officials fall squarely within the scope of executive privilege. One of the underlying purposes of the privilege is to promote sound decisionmaking by ensuring that senior Government officials and their advisers speak frankly and candidly during the decisionmaking process. As the Supreme Court has explained, "A President and those who assist him must be free to explore alternatives in the process of shaping policies and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also* Letter for the President from John Ashcroft, Attorney General, Re: *Assertion of Executive Privilege with Respect to Prosecutorial Documents* at 2 (Dec. 10, 2001) (available at http://www.usdoj.gov/ olc/executiveprivilege/htm) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) ("[N]ot only does executive privilege apply to confidential communications to the President, but also to 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'") (quoting *Nixon*, 418 U.S. at 705). These confidentiality interests are particularly strong where, as here, the communications may implicate a "quintessential and nondelegable Presidential power," such as the authority to nominate or to remove U.S. Attorneys. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 2-3 (finding that executive privilege protected Department and White House deliberations related to decision to grant clemency).

Under D.C. Circuit precedent, a congressional committee may not overcome an assertion of executive privilege unless it establishes that the documents and information are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution.").

As a threshold matter, it is not at all clear that internal White House communications about the possible dismissal and replacement of U.S. Attorneys fall within the scope of *McGrain* and its progeny. The Supreme Court has held that Congress's oversight powers do not reach "matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults

with Members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.[1] Consequently, there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision [because the decision to grant clemency is an exclusive Executive Branch function]."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain").

In any event, even if the Committees have oversight authority, there is no doubt that the materials sought qualify for the privilege and the Committees have not demonstrated that their interests justify overriding a claim of executive privilege as to the matters at issue. The House Committee, for instance, asserts in its letter accompanying the subpoenas that "[c]ommunications among the White House staff involved in the U.S. Attorney replacement plan are obviously of paramount importance to any understanding of how and why these U.S. Attorneys were selected to be fired." Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). But the Committees never explain how or why this information is "demonstrably critical" to any "legislative judgments" Congress might be able to exercise in the U.S. Attorney matter. *Senate Select Comm.*, 498 F.2d at 732. Broad, generalized assertions that the requested materials are of public import are simply insufficient under the "demonstrably critical" standard. Under *Senate Select Committee*, to override a privilege claim the Committees must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Id.* at 733.

Moreover, any legitimate oversight interest the Committees might have in internal White House communications about the proposal is sharply reduced by the thousands of documents and dozens of hours of interviews and testimony already provided to the Committees by the Department of Justice as part of its extraordinary effort at accommodation.[2] This information

---

[1] *See, e.g., Public Citizen v. Department of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring) ("[T]he Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment."); *Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.")

[2] During the past three months, the Department has released or made available for review to the Committees approximately 8,500 pages of documents concerning the U.S. Attorney resignations. The Department

has given the Committees extraordinary—and indeed, unprecedented—insight into the Department's decision to request the U.S. Attorney resignations, including the role of White House officials in the process. *See, e.g., History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 758-59, 767 (1982) (documenting refusals by Presidents Jackson, Tyler, and Cleveland to provide information related to the decision to remove Executive Branch officials, including a U.S. Attorney)

In a letter accompanying the subpoenas, the House Committee references the alleged "written misstatements" and "false statements" provided by the Department to the Committees about the U.S. Attorney dismissals. *See* Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). The Department has recognized the Committees' interest in investigating the extent to which Department officials may have provided inaccurate or incomplete information to Congress. This interest does not, however, justify the Committees' demand for White House documents and information about the U.S. Attorney resignations. Officials in the Department, not officials in the White House, presented the challenged statements, and as noted, the Department has provided unprecedented information to Congress concerning, *inter alia*, the process that led to the Department's statements. The Committees' legitimate oversight interests therefore have already been addressed by the Department, which has sought to provide the Committees with all documents related to the preparation of any inaccurate information given to Congress.

Given the amount of information the Committees already possess about the Department's decision to remove the U.S. Attorneys (including the involvement of White House officials), there would be little additional legislative purpose served by revealing internal White House communications about the U.S. Attorney matter, and, in any event, none that would outweigh the

---

has included in its productions many sensitive, deliberative documents related to the resignation requests, including e-mails and other communications with White House officials. The Committees' staffs have also interviewed, at length and on the record, a number of senior Department officials, including, among others, the Deputy Attorney General, the Acting Associate Attorney General, the Attorney General's former chief of staff, the Deputy Attorney General's chief of staff, and two former Directors of the Executive Office for U.S. Attorneys. During these interviews, the Committees' staffs explored in great depth all aspects of the decision to request the U.S. Attorney resignations, including the role of White House officials in the decisionmaking process. In addition, the Attorney General, the Deputy Attorney General, the Principal Associate Deputy Attorney General, the Attorney General's former chief of staff, and the Department's former White House Liaison have testified before one or both of the Committees about the terminations and explained, under oath, their understanding of such involvement.

The President has also made significant efforts to accommodate the Committees' needs. More than three months ago, the Counsel to the President proposed to make senior White House officials, including Ms. Miers, available for informal interviews about "(a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests," and he offered to give the Committees access to White House documents on the same subjects. Letter for the Hon. Patrick Leahy, United States Senate, et al., from Fred F. Fielding, Counsel to the President at 1-2 (Mar. 20, 2007). The Committees declined this offer. The Counsel to the President has since reiterated this offer of accommodation but to no avail. *See* Letter for the Hon. Patrick Leahy, United States Senate, and John Conyers Jr., United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1 (Apr. 12, 2007); Letter for the Hon. Patrick Leahy, United States Senate, the Hon. John Conyers Jr., United States House of Representatives, and the Hon. Linda T. Sanchez, the United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1-2 (June 7, 2007).

President's interest in maintaining the confidentiality of such internal deliberations. *See Senate Select Comm.*, 498 F.2d at 732-33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources). Consequently, I do not believe that the Committees have shown a "demonstrably critical" need for internal White House communications on this matter.

**B.**

For many of the same reasons, I believe that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege. Courts have long recognized the importance of information gathering in presidential decisionmaking. *See, e.g., In re Sealed Case*, 121 F.3d at 751-52 (describing role of investigation and information collection in presidential decisionmaking). Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch. This need is particularly strong when the decision involved is whether to remove political appointees, such as U.S. Attorneys, who serve in local districts spread throughout the United States. In those situations, the President and his advisers will be fully informed only if they solicit and receive advice from a range of individuals. Yet the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential. *See Nixon*, 418 U.S. at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."); *In re Sealed Case*, 121 F.3d at 751 ("In many instances, potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President. Without protection of her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability.").

That the communications involve individuals outside the Executive Branch does *not* undermine the President's confidentiality interests. The communications at issue occurred with the understanding that they would be held in confidence, and they related to decisionmaking regarding U.S. Attorney removals or replacements or responding to congressional or media inquiries about the U.S. Attorney matter. Under these circumstances, the communications retain their confidential and Executive Branch character and remain protected. *See In re Sealed Case*, 121 F.3d at 752 ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [presidential communications component of executive] privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").[3]

---

[3] Moreover, the Department has previously conveyed to the Committees its concern that there would be a substantial inhibiting effect on future informal confidential communications between Executive Branch and Legislative Branch representatives if such communications were to be produced in the normal course of congressional oversight

5

Again, the Committees offer no compelling explanation or analysis as to why access to confidential communications between White House officials and individuals outside the Executive Branch is "demonstrably critical to the responsible fulfillment of the [Committees'] functions." *Senate Select Comm.*, 498 F.2d at 731. Absent such a showing, the Committees may not override an executive privilege claim.

## C.

The final category of documents and testimony concerns communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations. These communications are deliberative and clearly fall within the scope of executive privilege.[4] *See supra* at 2. In this case, however, the Department has already disclosed to Congress a substantial amount of documents and information related to White House communications about the U.S. Attorney matter. Consequently, in assessing whether it would be legally permissible to assert executive privilege, it is useful to divide this category into three subcategories, each with slightly different considerations: (1) documents and testimony related to communications between the Department and White House officials that have not already been disclosed by the Department; (2) documents concerning White House-Department communications previously disclosed to the Committees by the Department; and (3) testimony from current or former White House officials (such as the testimony sought from Ms. Miers or Ms. Taylor) about previously disclosed White House-Department communications. After carefully considering the matter, I believe there is a strong legal basis for asserting executive privilege over each of these subcategories.

The President's interest in protecting the confidentiality of documents and information about undisclosed White House-Department communications is powerful. Most, if not all, of these communications concern either potential replacements for the dismissed U.S. Attorneys or possible responses to inquiries from Congress and the media about the U.S. Attorney resignations. As discussed above, the President's need to protect deliberations about the selection of U.S. Attorneys is compelling, particularly given Congress's lack of legislative authority over the nomination or replacement of U.S. Attorneys. *See In re Sealed Case*, 121 F.3d at 751-52. The President also has undeniable confidentiality interests in discussions between White House and Department officials over how to respond to congressional and media inquiries about the U.S. Attorney matter. As Attorney General Janet Reno advised the President in 1996, the ability of the Office of the Counsel to the President to assist the President in responding to investigations "would be significantly impaired" if a congressional committee could review "confidential documents . . . prepared in order to assist the President and his staff in responding to an investigation by the [committee] seeking the documents." *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996). Despite extensive communications with officials at the Department and the White House, the

---

[4] To the extent they exist, White House communications approving the Department's actions by or on behalf of the President would receive particularly strong protection under executive privilege. *See, e.g., In re Sealed Case*, 121 F.3d at 752-53 (describing heightened protection provided to presidential communications).

Committees have yet to articulate any "demonstrably critical" oversight interest that would justify overriding these compelling confidentiality concerns.

There are also legitimate reasons to assert executive privilege over White House documents reflecting White House-Department communications that have been previously disclosed to the Committees by the Department. As discussed, these documents are deliberative in nature and clearly fall within the scope of executive privilege. The Department's accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications. The D.C. Circuit has recognized that each Branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). If the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations. Thus, in order to preserve the constitutional process of interbranch accommodation, the President may claim privilege over documents and information concerning the communications that the Department of Justice has previously disclosed to the Committees. Indeed, the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.

Here, the Committees' need for White House documents concerning these communications is weak. The Committees already possess the relevant communications, and it is well established that Congress may not override executive privilege to obtain materials that are cumulative or that could be obtained from an alternative source. *See Senate Select Comm.*, 498 F.2d at 732-33 (holding public release of redacted audio tape transcripts "substantially undermined" any legislative need for tapes themselves); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony"). Accordingly, the Committees do not have a "demonstrably critical" need to collect White House documents reflecting previously disclosed White House-Department communications.

Finally, the Committees have also failed to establish the requisite need for testimony from current or former White House officials about previously disclosed White House-Department communications. Congressional interest in investigating the replacement of U.S. Attorneys clearly falls outside its core constitutional responsibilities, and any legitimate interest Congress may have in the disclosed communications has been satisfied by the Department's extraordinary accommodation involving the extensive production of documents to the Committees, interviews, and hearing testimony concerning these communications. As the D.C. Circuit has explained, because "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability," Congress will rarely need or be entitled to a "precise reconstruction of past events" to carry out its legislative

7

responsibilities. *Senate Select Comm.*, 498 F.2d at 732.[5] On the other hand, the White House has very legitimate interests in protecting the confidentiality of this information because it would be very difficult, if not impossible, for current or former White House officials testifying about the disclosed communications to separate in their minds knowledge that is derived from the Department's disclosures from knowledge that is derived from other privileged sources, such as internal White House communications. Consequently, given the President's strong confidentiality interests and the Committees' limited legislative needs, I believe that White House information about previously disclosed White House-Department communications may properly be subject to an executive privilege claim.

## II.

In sum, I believe that executive privilege may properly be asserted with respect to the subpoenaed documents and testimony as described above.

Sincerely,

Paul D. Clement
Solicitor General and Acting Attorney General

---

[5] *See also Senate Select Comm.*, 498 F.2d at 732 (explaining that Congress "frequently legislates on the basis of conflicting information provided in its hearings"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials ").

8

# Exhibit 22

No. 08-409 (JDB)

JOHN CONYERS JR., Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR. Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951

http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR. Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

July 10, 2007

BY FAX AND U.S. MAIL

George T. Manning, Esq.
Jones Day
1420 Peachtree Street N.E. Suite 800
Atlanta, GA 30309-3053

Dear Mr. Manning:

I am writing to confirm, as you told committee counsel yesterday, that your client Ms. Harriet Miers will appear to testify before the Subcommittee on Commercial and Administrative Law at 10 a.m. on Thursday, July 12, 2007, pursuant to the subpoena served on her on June 13. I understand from your letter yesterday that Ms. Miers may decline to produce documents or answer certain questions based upon your interpretation of letters you have received from the White House, and those claims will be considered at the hearing, but it is of course incumbent on Ms. Miers to appear at the hearing pursuant to the subpoena. Please do not hesitate to contact the Committee if you have further questions, and we will look forward to seeing you and Ms. Miers on Thursday.

Sincerely,

John Conyers, Jr.
Chairman

Linda T. Sánchez
Chairwoman, Subcommittee on Commercial
and Administrative Law

cc:    Hon. Lamar S. Smith
       Hon. Chris Cannon

# Exhibit 23

No. 08-409 (JDB)

**THE WHITE HOUSE**

WASHINGTON

July 10, 2007

Dear Mr. Manning:

On behalf of your client, former Counsel to the President Harriet E. Miers, you have asked us whether, in view of the President's assertion of Executive Privilege over Ms. Miers' testimony relating to the U.S. Attorneys matter, she must appear at the House Judiciary Committee meeting scheduled for Thursday, July 12, 2007.

We have been advised by the Department of Justice that Ms. Miers has absolute immunity from compelled Congressional testimony as to matters occurring while she was a senior advisor to the President. *See* Attachment A (*Memorandum for the Counsel to the President re: Immunity of Former Counsel to the President from Compelled Congressional Testimony*, dated July 10, 2007). As the Department's opinion points out, "[t]he President and his immediate advisors are absolutely immune from testimonial compulsion by a Congressional committee." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno). That immunity arises from the President's position as head of the Executive Branch and from Ms. Miers' former position as a senior advisor to the President. Ms. Miers cannot be compelled to appear before Congress because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to his constitutionally assigned functions." 23 Op. O.L.C. at 5. As Congress is aware, this constitutional immunity exists to protect the institution of the Presidency and, as the Department's opinion illustrates, this position has been shared by numerous Administrations, Republican and Democratic, for more than 60 years.

Therefore, in view of this constitutional immunity, I respectfully request that you inform Ms. Miers that the President has directed her not to appear at the House Judiciary Committee hearing on Thursday, July 12, 2007.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

Exhibit 24

No. 08-409 (JDB)

# JONES DAY

1420 PEACHTREE STREET, N.E. • SUITE 800 • ATLANTA, GEORGIA 30309-3053

gtmanning@jonesday.com
404·581·8400

**GEORGE T. MANNING**
PARTNER·IN·CHARGE

JP269370                        July 10, 2007

Honorable John Conyers, Jr.
Chairman, Committee on the Judiciary
U.S. House of Representatives
2138 Rayburn House Office Building
Washington, D.C. 20515

Honorable Linda T. Sanchez
Chairwoman, Subcommittee on Commercial and Administrative Law
U.S. House of Representatives
2138 Rayburn House Office Building
Washington, D.C. 20515

            Re:   Congressional Inquiry into U.S. Attorneys Matters

Dear Mr. Conyers and Ms. Sanchez:

        I am in receipt of your July 10, 2007 letter. With all due respect, in my conversation with Elliot Mincberg, the majority committee counsel with whom I spoke, I did not confirm that Ms. Miers will appear on Thursday to testify before the Subcommittee on Commercial and Administrative Law. Rather, at committee counsel's suggestion, I discussed some logistical arrangements should Ms. Miers appear. The President's previous instructions to Ms. Miers are set forth in my July 9, 2007 letter. In addition, the Counsel to the President has recently informed Ms. Miers that in view of the immunity of the President's senior advisors "'from testimonial compulsion by a Congressional committee' ... the President has directed [Ms. Miers] not to appear at the House Judiciary Committee hearing on Thursday, July 12, 2007." Letter from Fred F. Fielding to George T. Manning, July 10, 2007 (attached hereto). Accordingly, I must respectfully inform you that Ms. Miers will not appear at the July 12, 2007 hearing.

                        Very truly yours,

                        George T. Manning

cc:    Hon. Lamar S. Smith
       Hon. Chris Cannon
       Fred F. Fielding, Esq.

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MENLO PARK • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**THE WHITE HOUSE**

WASHINGTON

July 10, 2007

Dear Mr. Manning:

On behalf of your client, former Counsel to the President Harriet E. Miers, you have asked us whether, in view of the President's assertion of Executive Privilege over Ms. Miers' testimony relating to the U.S. Attorneys matter, she must appear at the House Judiciary Committee meeting scheduled for Thursday, July 12, 2007.

We have been advised by the Department of Justice that Ms. Miers has absolute immunity from compelled Congressional testimony as to matters occurring while she was a senior advisor to the President. *See* Attachment A (*Memorandum for the Counsel to the President re: Immunity of Former Counsel to the President from Compelled Congressional Testimony*, dated July 10, 2007). As the Department's opinion points out, "[t]he President and his immediate advisors are absolutely immune from testimonial compulsion by a Congressional committee." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno). That immunity arises from the President's position as head of the Executive Branch and from Ms. Miers' former position as a senior advisor to the President. Ms. Miers cannot be compelled to appear before Congress because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to his constitutionally assigned functions." 23 Op. O.L.C. at 5. As Congress is aware, this constitutional immunity exists to protect the institution of the Presidency and, as the Department's opinion illustrates, this position has been shared by numerous Administrations, Republican and Democratic, for more than 60 years.

Therefore, in view of this constitutional immunity, I respectfully request that you inform Ms. Miers that the President has directed her not to appear at the House Judiciary Committee hearing on Thursday, July 12, 2007.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

# Exhibit 25

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR. Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON THE JUDICIARY
2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

(202) 225-3951

http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR. Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

July 11, 2007

BY FAX AND U.S. MAIL

Mr. George Manning
Jones Day
1420 Peachtree St., NE, Suite 800
Atlanta, GA 30309-3053

Dear Mr. Manning:

We write in response to your letter dated July 10, which was not faxed to us until 7:15 pm last night. We are disappointed and very concerned by your statement that, based upon a July 10 letter to you from White House Counsel Fred Fielding, your client Harriet Miers intends to disregard the subpoena that was duly issued to her by the Committee on the Judiciary, and refuse even to appear at tomorrow's hearing of the Subcommittee on Commercial and Administrative Law. A congressional subpoena, such as the one issued to Ms. Miers, carries with it two obligations: the obligation to appear, and the obligation to testify and/or produce documents. Even if a witness intends to assert privilege in response to a subpoena, that intention to assert privilege does not obviate the obligation to appear.

We are aware of absolutely no court decision that supports the notion that a former White House official has the option of refusing to even appear in response to a Congressional subpoena. To the contrary, the courts have made clear that no present or former government official – even the President – is above the law and may completely disregard a legal directive such as the Committee's subpoena. In fact, both present and former White House officials have testified before Congress numerous times, including both then-serving and former White House counsel. For example, former White House Counsel Beth Nolan explained to our Subcommittee that she testified before Congressional committees four times, three times while serving as White House counsel and once as former White House counsel. A Congressional Research Service study documents some 74 instances where serving White House advisers have testified before

Mr. George Manning
Page Two
July 11, 2007

Congress since World War II.[1]  Moreover, even the 1999 OLC opinion referred to in
Mr. Fielding's July 10 letter refers only to current White House advisers and not to former
advisers and acknowledges that the courts might not agree with its conclusion. Such Justice
Department opinions are not law, state only the Executive Branch's view of the law, and have no
legal force whatsoever.  We note finally that another former White House adviser subpoenaed by
the Senate Judiciary Committee in the U.S. Attorney matter, Sara Taylor, appeared today
pursuant to Congressional subpoena and testified about many of the relevant facts while also
declining to testify about other relevant facts based on the assertion of executive privilege.

        A refusal to appear before the Subcommittee tomorrow could subject Ms. Miers to
contempt proceedings, including but not limited to proceedings under 2 U.S.C. § 194 and under
the inherent contempt authority of the House of Representatives.

        We are prepared at the hearing tomorrow to consider and rule on any specific assertions
of privilege in response to  specific questions.  We strongly urge you to reconsider, and to advise
your client to appear before the Subcommittee tomorrow pursuant to her legal obligations.  The
Subcommittee will convene as scheduled and expects Ms. Miers to appear as required by her
subpoena.

                            Sincerely,


_____          _____
        John Conyers, Jr.                          Linda T. Sanchez
          Chairman                        Chairwoman, Subcommittee on Commercial
                                                and Administrative Law


cc:     The Honorable Lamar S. Smith
        The Honorable Chris Cannon

---

        [1] Harold C. Relyea & Todd B. Tatelman, Presidential Advisers' Testimony Before Congressional
Committees: An Overview, CRS Report for Congress, RL 31351 (April 10, 2007)

# Exhibit 26

No. 08-409 (JDB)

**JONES DAY**

1420 PEACHTREE STREET, N E • SUITE 800 • ATLANTA, GEORGIA 30309-3053

gtmanning@jonesday.com

404-581-8400

GEORGE T. MANNING
PARTNER-IN-CHARGE

JP269370                          July 11, 2007

Honorable John Conyers, Jr.
Chairman, Committee on the Judiciary
U.S. House of Representatives
2138 Rayburn House Office Building
Washington, D.C. 20515

Honorable Linda T. Sanchez
Chairwoman, Subcommittee on Commercial and Administrative Law
U.S. House of Representatives
2138 Rayburn House Office Building
Washington, D.C. 20515

           Re:    Congressional Inquiry into U.S. Attorneys Matters

Dear Mr. Conyers and Ms. Sanchez:

        I am in receipt of your July 11, 2007 letter. I must respectfully take issue with your
characterization of Ms. Miers' circumstances and her intent. Ms. Miers has promptly and
appropriately responded to the Committee's subpoena. She has been explicitly directed in
correspondence from Counsel to the President dated June 28, July 9, and July 10, 2007 to neither
testify nor appear at tomorrow's hearing of the Subcommittee on Commercial and
Administrative Law. With all due respect, this dispute is between the Executive and Legislative
branches. What is truly at stake here are the rights and privileges of two co-equal branches of
government in our system of separated powers.

        Accordingly, in view of the President's directions, Ms. Miers will not appear at the July
12, 2007 hearing.

                              Very truly yours,

                              George T. Manning

cc:    Hon. Lamar S. Smith
       Hon. Chris Cannon
       Fred F. Fielding, Esq.

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MENLO PARK • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Exhibit 27

No. 08-409 (JDB)

JOHN CONYERS, JR., Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTHUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

(202) 225-3951
http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR., Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

July 13, 2007

BY FAX AND U.S. MAIL

Mr. George T. Manning
Jones Day
1420 Peachtree Street N.E. Suite 800
Atlanta, GA 30309-3053

Dear Mr. Manning:

We were very disappointed that your client Harriet Miers disobeyed the subpoena served on her and did not even appear–much less testify or produce documents as required–before the Subcommittee on Commercial and Administrative Law at 10 a.m. yesterday, July 12, 2007. Enclosed with this letter is a copy of the text of the ruling by Chairwoman Sánchez at yesterday's hearing, rejecting the claims of immunity and privilege as legally invalid, and stating that Ms. Miers is required pursuant to the subpoena to appear in order to testify and produce documents. As the ruling explains, as a private party, Ms. Miers could not legally be compelled by the White House to disregard the subpoena, but instead made her own decision to disregard it and to cite Mr. Fielding's letter.

Federal law makes it very clear that recipients of a congressional subpoena must appear–regardless of whether or not they intend to assert privilege once they arrive. 2 U.S.C. § 192 provides: "Every person who having been summoned as a witness by the authority of either House of Congress . . . willfully makes default, or who, having appeared, refuses to answer any question . . . shall be guilty of a misdemeanor . . . ." 2 U.S.C. § 194 further states that a witness may be held in contempt and prosecuted for three distinct acts: 1) failing "to appear to testify" in response to a subpoena; 2) failing to produce documents pursuant to the subpoena; and 3) failing to answer questions pursuant to the subpoena.

The D.C. Circuit has ruled that "[a] reasonable interpretation of the statute . . . is that a witness is in default if he fails not only to appear but fails to attend, following appearance, so long as the committee requires his attendance." *Townsend v. United States*, 95 F.2d 352, 357 (D.C. Cir. 1938). The Second Circuit has similarly stated: "The statute, 2 U.S.C.A. § 192,

Mr. George T. Manning
Page Two
July 13, 2007

embraces two offenses. . . . The first consists of the willfull default of one who has been summoned as a witness. This offense, obviously, may be committed by willfully refraining, without adequate excuse, from appearing in response to a lawful summons and it may also be committed by appearing and then willfully terminating attendance before being excused." *United States v. Josephson*, 165 F.2d 82, 85 (2d Cir. 1947) (citing *Townsend*, 95 F.2d 352). *See also United States v. Groves*, 18 F.Supp. 3 (W.D. Penn. 1937); *United States v. Hintz*, 193 F.Supp. 325 (N.D. Ill. 1961).

This letter is to formally notify you that we must insist on compliance with the subpoena, and that your client's failure to promptly mitigate her noncompliance could subject her to contempt proceedings, including but not limited to proceedings under 2 U.S.C. §§ 192, 194 and under the inherent contempt authority of the House of Representatives. In light of Chairwoman Sánchez's ruling, we strongly urge Ms. Miers to appear before the Subcommittee pursuant to her subpoena. Please let me know in writing by 5 p.m. this Tuesday, July 17, whether Ms. Miers will comply with the subpoena. If I do not hear from you in the affirmative by then, the Committee will have no choice but to consider appropriate recourse.

With respect to the subpoena's directive that Ms. Miers produce documents, we realize it is possible that Ms. Miers in fact does not possess documents responsive to the subpoena. If that is the case, please notify us of that as well by July 17, in which event that issue can hopefully be resolved.

Sincerely,

John Conyers,
Chairman

Enclosure

cc:     The Honorable Lamar S. Smith
        The Honorable Linda T. Sánchez
        The Honorable Chris Cannon

# Ruling of Chairwoman Linda Sánchez on Related Executive Privilege and Immunity Claims

According to letters we have received from Ms. Harriet Miers' counsel, her refusal to answer questions and produce relevant documents in accordance with her obligations under the subpoena served on her June 13 is based on letters she has received from current White House Counsel Fred Fielding, asserting related claims of executive privilege and immunity. Many of these claims had already been raised and communicated to us previously.

We have given all these claims careful consideration, and I hereby rule that those claims are not legally valid and that Ms. Miers is required pursuant to the subpoena to be here now and to produce documents and answer questions.

I will presently entertain a motion to sustain this ruling, but first I would like to set forth the grounds for it. They are as follows:

**First,** the claims of privilege and immunity are not properly asserted. Ms. Miers is no longer an employee of the White House and is simply relying on a claim of Presidential executive privilege and immunity communicated by the current White House Counsel. No one is here today on behalf of the White House raising that claim.

In previous cases, when a private party such as Ms. Miers has been subpoenaed and the Executive Branch has objected on privilege grounds, the private party has respected the subpoena and the Executive Branch has been obliged to go to court to seek to prevent compliance with the subpoena.

We have not even received a statement from the President himself asserting privilege, even though Chairman Conyers has asked for one. The courts have stated that a personal assertion of executive privilege by the President is legally required for the privilege claim to be valid.

For instance, the Shultz case stated that even a statement from a White House counsel that he is authorized to invoke executive privilege is "wholly insufficient to activate a formal claim of executive privilege," and that such a claim must be made by the "President, as head of the 'agency,' the White House."[1]

---

[1] Center on Corporate Responsibility v. Shultz, 368 F. Supp. 863, 872-73 (D.D.C. 1973).

**Second**, we are aware of absolutely no possible proper basis for Ms. Miers' refusing even to appear today as required by subpoena. The White House Counsel's letter to Ms. Miers's attorney, and her attorney's letters to the Subcommittee, fail to cite a single case in support of the notion that a witness under federal subpoena may simply decline to show up to a hearing. Indeed, no court decision that we are aware of supports the White House's astounding claim that a former White House official has the option of refusing to even appear in response to a Congressional subpoena.

To the contrary, the courts have made clear that no present or former government official – even the President – is so above the law that he or she may completely disregard a legal directive such as the Committee's subpoena.

And in keeping with this principle, both present and former White House officials have testified before Congress numerous times, including incumbent and former White House Counsels. For example, I mentioned earlier that Beth Nolan has told our Subcommittee that she appeared before Congressional committees four times on matters directly related to her duties as White House Counsel, three of those times while she was still in that position.

As I also mentioned earlier, a Congressional Research Service study documents some 74 instances where White House advisers have testified before Congress since World War II.[2]

Moreover, even the 1999 Office of Legal Counsel opinion referred to in Mr. Fielding's July 10 letter refers only to **current** White House advisers, and not to former advisers; and it acknowledges that the courts might not agree with its conclusion as to current advisors. Such Justice Department opinions, including a new one issued just yesterday to try to support this claim, are not law, they state only the Executive Branch's own view of the law, and have no legal force whatsoever.

It is also noteworthy that both of the Justice Department opinions relied on by the White House and Ms. Miers fail to support a single court case in support of their novel legal conclusions.

Just yesterday, another former White House adviser, Sara Taylor, appeared before the Senate Judiciary Committee pursuant to subpoena and testified about at least some of the relevant facts in this matter despite the White House's assertion of executive privilege.

---

[2] Harold C. Relyea & Todd B. Tatelman, Presidential Advisers' Testimony Before Congressional Committees: An Overview, CRS Report for Congress, RL 31351 (April 10, 2007).

2

This White House's asserted right to secrecy goes beyond even Richard Nixon, who initially refused to allow his White House Counsel, John Dean, to testify before Congress, on almost exactly the same grounds being asserted now, but then agreed that Mr. Dean and other White House officials could testify.[3]

**Third**, the White House has failed to demonstrate that the information we are seeking from Ms. Miers – testimony and documents as called for by the subpoena – is covered by executive privilege. We were not expecting Ms. Miers to be revealing any communications to or from the President himself, which is the most commonly recognized scope of the presidential communications privilege.

In fact, as recently as June 28, a senior White House official at an authorized background briefing specifically stated that the President had "no personal involvement" in receiving advice about the firing of the U.S. Attorneys or in approving or adjusting the list. Ms. Taylor testified yesterday that she was not aware of any personal involvement by the President. We are seeking information from Ms. Miers and other White House officials about their **own** communications and their **own** involvement in the process.

The White House claims that executive privilege nevertheless applies, because it also covers documents and testimony by White House staff who **advise** the President, apparently based on the Espy decision.[4]

But the Espy court made clear that its expansion of the presidential communications privilege applied only when information is sought in a judicial proceeding and "should not be read as in any way affecting the scope of the privilege in the congressional-executive context."[5]

And the Espy court also made clear that the privilege extends only to communications from or to presidential advisers "in the course of preparing advice for the President."[6] But the White House has maintained that the President **never received any advice on, and was not**

---

[3] L. Fisher, The Politics of Executive Privilege 59-60 (2004).

[4] In re Sealed Case, 121 F.3d 729, 752 (D.C. Cir. 1997).

[5] Id. at 753.

[6] Id. at 752.

**himself involved in,** the U.S. Attorney firings. The presidential communications privilege, even as expanded by the Espy case, simply does not apply here.

**Fourth,** with respect to our subpoena's request for documents from Ms. Miers, the courts have required a party raising a claim of privilege to provide a "descriptive, full, and specific itemization of the various documents being claimed as privileged" and "precise and certain reasons for preserving their confidentiality."

These words are from the Smith v. FTC case and the Black v. Sheraton case.[7]

Here, no such itemized privilege log has been provided by Ms. Miers or her counsel. In effect, the White House is telling Congress and the American people that documents and testimony are privileged without deigning to explain why. In other words, the White House is simply saying, "Trust us. We will decide."

Fifth, even assuming that the information we have asked for fell within the scope of a properly asserted executive privilege, any such privilege is outweighed by the compelling need for the House and the public to have access to this information.

As the Supreme Court held in U.S. v. Nixon, claims of executive privilege are not absolute, and depend on a balancing of the need for privilege versus the need for the information being sought. Here that balance clearly weighs against sustaining any privilege claim.

The privilege claims here are weak. In addition to the points I have made already, it is important to note that the claims by the White House are not limited to specific discussions or documents but are an attempt at a blanket prohibition against **any** documents being provided and **any** testimony from present or former aides whatsoever, including concerning communications with people outside the Executive Branch altogether.

And the need for the information we seek from the White House is very strong. We have tried extensively to obtain information from other sources, including reviewing thousands of documents provided by the Justice Department, and hearing testimony or conducting on-the-record interviews with 20 current or former DOJ officials.

_____

[7] Smith v. FTC, 403 F. Supp. 1000, 1018 (D. Del. 1975); Black v. Sheraton Corp., 371 F.Supp. 97, 101 (D.D.C. 1974).

4

Yet we still don't know, for example, how or why or by whom Mr. Iglesias was put on the list to be fired. We still don't know what actions, if any, were taken by Karl Rove or other White House officials on the firing of Mr. Iglesias.

Similar questions remain unanswered about the firing of other U.S. Attorneys and about the involvement of White House officials in the misleading information provided to Congress on this subject.

Why is this important? For several reasons. For one, the evidence obtained thus far raises serious concerns about whether federal laws have been broken in the U.S. Attorney matter – including laws prohibiting obstruction of justice, laws like the Hatch Act against retaliating against federal employees for improper political reasons, and laws prohibiting misleading or obstructing Congress.

The courts have made clear that executive privilege is generally overcome when the information sought concerns government misconduct. Indeed, the court in the Espy case stated that when there is "any reason to believe government misconduct occurred," the deliberative process element of executive privilege "disappears altogether."[8]

In addition, obtaining more complete information on what happened in the U.S. Attorneys matter may well reveal problems warranting new legislation by Congress. This is a well-recognized ground for authorizing Congress to obtain Executive Branch information, as the Supreme Court stated in the case of McGrain v. Daugherty.[9]

Indeed, we have already passed legislation changing the rules for interim appointment of U.S. Attorneys as an outgrowth of our investigation so far.

The White House claims that Congress' role is limited because the appointment of U.S. Attorneys is done by the President with the Senate's approval. That is true, however, only because of a law passed by Congress itself.

Under the Constitution, both the courts and the Department itself have recognized that U.S. Attorneys are considered "inferior officers," and that rules for their appointment and

---

[8] In re Sealed Case, 121 F.3d at 746.

[9] 273 U.S. 135, 174 (1926).

removal are not vested in the sole discretion of the President, but can be set by Congress, just as we did recently in passing the law on interim appointment of U.S. Attorneys.[10]

Finally, even assuming it is never proven that any laws were broken here, the evidence already clearly indicates an abuse of power and legal authority by this Administration in the U.S. Attorneys matter. Investigating and exposing such abuses is clearly within the oversight authority of Congress and justifies obtaining the kind of information we seek.

As the Supreme Court ruled in the Watkins case fifty years ago, Congress has "broad" power to investigate "the administration of existing laws" and to "expose corruption, inefficiency, or waste" or similar problems in the Executive Branch.[11]

Regardless of whether laws were broken, it is clearly important for Congress and the American people to know, for example, whether any of these U.S. Attorneys were fired because they refused to bring vote fraud or other cases that Republicans wanted for partisan reasons, or because they pursued corruption or other cases against Republicans.

For all the foregoing reasons, I hereby rule that Ms. Miers's refusal to comply with the subpoena and appear at this hearing, and to answer questions and provide relevant documents regarding these concerns, cannot be properly justified on executive privilege or related immunity grounds.

These reasons are without prejudice to one another and to any other defects that may after further examination be found to exist in the asserted privilege.

---

[10] See, e.g., United States v. Sotomayor Vazquez, 69 F.Supp.2d 286 (D.Puerto Rico 1999); 2 U.S. Op. Off. Legal Counsel 58 (Feb. 28, 1978).

[11] Watkins v. United States, 354 U.S. 178, 187 (1957).

Exhibit 28

No. 08-409 (JDB)

/-1/-0/; 4:06PM;JONES DAY                                                ;202

# JONES DAY

1420 PEACHTREE STREET, N.E.  •  SUITE 800  •  ATLANTA, GEORGIA 30309-3053

GEORGE T. MANNING                                                    404-581-8400
PARTNER-IN-CHARGE

July 17, 2007

The Honorable John Conyers, Jr.
Chairman
U.S. House of Representatives
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

Re:    Congressional Inquiry Into U.S. Attorneys Matters

Dear Chairman Conyers:

I am responding to your letter of July 13, 2007.  Ms. Miers has received a subpoena from the Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, to appear before the Subcommittee, produce documents, and give testimony.  While Ms. Miers of course respects the authority and prerogatives of the Subcommittee, the Committee, and the U.S. House of Representatives, she is the former Counsel to the President of the United States and has been specifically directed by him not to appear, not to produce documents in response to the subpoena, and not to provide testimony.  The correspondence communicating these unequivocal directives has been provided previously to the Committee.  The Subcommittee has demanded that Ms. Miers do precisely what the President has prohibited her from doing.  In these circumstances, it cannot reasonably be asserted that "Ms. Miers . . . made her own decision to disregard" the Committee's subpoena.  Letter from Chairman Conyers to George T. Manning (July 13, 2007).  The Committee's dispute is not with Ms. Miers, but with the Executive Branch.

In fact, the cases cited in your letter confirm that the contempt statute is inapplicable to Ms. Miers.  None of these cases involves an assertion of the Executive privileges and immunities at issue here.  More importantly, as your letter acknowledges, these cases hold that the contempt statute does not apply where a witness has an "adequate excuse."  *United States v. Josephson*, 165 F.2d 82, 85 (2d Cir. 1947); *see also Townsend v. United States*, 95 F.2d 352, 361 (D.C. Cir. 1938).  The directives received by Ms. Miers from the President constitute a manifest "adequate excuse" in these circumstances.  The cases cited in your letter confirm what the Department of Justice has long held: "the criminal contempt of Congress statute does not apply to executive officials who assert claims of executive privilege at the direction of the President."  *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. Off. of Legal Counsel 101, 129 (1984)) (citing 1956 testimony of then Deputy Attorney General (subsequently Attorney General) William P. Rogers, *Hearings Before a Subcommittee of the House Committee on Government Operations*, 84th Cong., 2d Sess. 2933 (1956)).

7-17-07; 4:08PM;JONES DAY

**JONES DAY**

The Honorable John Conyers, Jr.
July 17, 2007
Page 2

Supreme Court cases foreclose any justifiable basis to support a determination that Ms. Miers is in contempt of the Congress. The contempt statute requires that Ms. Miers act "willfully." 2 U.S.C. § 192. The invocation of Executive privileges and immunities by the President in response to the subpoena to Ms. Miers forecloses such intent. *See United States v. Laub*, 385 U.S. 475, 487 (1967); *Raley v. Ohio*, 360 U.S. 423, 438 (1959); *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 674-75 (1973); *Cox v. Louisiana*, 379 U.S. 559, 571 (1965); *United States v. Levin*, 973 F.2d 463, 468-69 (6th Cir. 1992); *United States v. Barker*, 546 F.2d 940, 947-48 (D.C. Cir. 1976) (Wilkey, J., concurring); *id.* at 955 (Mehrige, J., concurring); *Townsend*, 95 F.2d at 359-60. The Supreme Court has explained that sanctioning "a citizen for exercising a privilege which the State clearly told him was available" would be "the most indefensible sort of entrapment by the State." *Raley*, 362 U.S. at 438.

I would also like to respond to Chairwoman Sanchez's assertion that the Executive privileges and immunities at issue here are inapplicable to former presidential advisers. *See* Ruling of Chairwoman Linda Sanchez on Related Executive Privilege and Immunity Claims ("Ruling"), at 2. The subpoena is directed exclusively to Ms. Miers' official duties as a senior adviser to the President, not as a private citizen. Therefore, like this entire dispute, this issue is between the Executive and Legislative branches. Regardless of who is correct, "*the President has directed*" Ms. Miers "not to produce any documents in response to the subpoena," Letter from Fred F. Fielding to George T. Manning (June 28, 2007) (emphasis added), "not to provide ... testimony" "relating to the possible dismissal or appointment of United States Attorneys," Letter from Fred F. Fielding to George T. Manning (July 9, 2007), and "not to appear" at the Committee hearing, Letter from Fred F. Fielding to George T. Manning (July 10, 2007). Surely the Committee would not force any citizen to disobey such a directive in order to avoid a contempt of Congress sanction.

In addition, as explained in the Department of Justice's opinion on this matter, Chairwoman Sanchez's position is inconsistent with the positions taken by presidents of both political parties for many decades. *See* Office of Legal Counsel Memorandum (July 10, 2007). As then-former President Truman explained when refusing to comply with a congressional subpoena from the House Committee on Un-American Activities: "The doctrine [of separation of powers] would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes." *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (holding that a current or former President may invoke executive privilege). Based on this, Attorney General Janet Reno noted in her opinion to President Clinton that "since '[a]n immediate assistant to the President may be said to serve as his alter ego . . . the same considerations that were persuasive to former President Truman [when he declined to comply with a congressional subpoena for his testimony] would apply to justify a refusal to appear by . . . a former staff member.'" *Assertion of Executive Privilege with Respect to Clemency Decision*,

**JONES DAY**

The Honorable John Conyers, Jr.
July 17, 2007
Page 3

23 Op. O.L.C. 1, n.2 (Sept. 16, 1999) (quoting *Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters*, at 6 (Office of Legal Counsel, Dec. 21, 1972)) (alterations in original); *see also Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, n.2 (Sept. 3, 1996) (same).

Chairwoman Sanchez's assertion that the President has not properly invoked Executive Privilege because he has acted through Counsel to the President is mistaken. *See* Ruling at 1. In *In re Sealed Case*, 121 F.3d 729 (1997), the D.C. Circuit held that President Clinton properly invoked the privilege where the "affidavit [of] former White House Counsel Abner J. Mikva stated 'the President . . . has specifically directed me to invoke formally the applicable privileges over those documents.'" *Id.* at 744 n.16. In any event, even if the 1973 district court decision upon which Chairwoman Sanchez relies were viable authority, it is inapposite. In that case the President did not himself assert the privilege. *See Ctr. on Corporate Responsibility, Inc. v. Schultz*, 368 F. Supp. 863, 870-73 (D.D.C. 1973).

As to the other bases of Chairwoman Sanchez's statement that there is no basis for the Executive Branch's directives to Ms. Miers, *see* Ruling at 2-5 (asserting that there is no legal basis for the directive not to appear at the hearing, that the information sought is not covered by Executive Privilege, that the White House has not provided a privilege log, and that Congress has a "compelling need" for the information), I respectfully refer the Committee to the reasoned opinions of the Department of Justice. More importantly, however, Chairwoman Sanchez's statement again underscores that this dispute has little to do with Ms. Miers, and much to do with our system of separated powers. It reaffirms that this dispute is between the Executive and Legislative branches.

I would like to clarify one other matter in the record. During the July 12 hearing, you stated that Ms. Miers "told [you] she was originally [coming to the hearing], and then somehow or someone changed her mind." As I explained in my letter to you of July 10, 2007, that is not accurate. As we are all aware, Ms. Miers' communications with the Committee about these matters appropriately have been through counsel. And, during my conversation with your staff member, Elliot Mincberg, I did not confirm that Ms. Miers would appear before the Committee at the July 12, 2007 hearing. Rather, at your staff member's request, I discussed some logistical arrangements should Ms. Miers appear. *See* Letter from George T. Manning to Chairman Conyers and Chairwoman Sanchez (July 10, 2007). Any representations made to you to the contrary are erroneous. I therefore respectfully request that you amend the record accordingly.

In light of the continuing directives to Ms. Miers and as previously indicated to your Committee, I must respectfully inform you that, directed as she has been to honor the Executive

JONES DAY

The Honorable John Conyers, Jr.
July 17, 2007
Page 4

privileges and immunities asserted in this matter, Ms. Miers will not appear before the
Committee or otherwise produce documents or provide testimony as set forth in the Committee's
subpoena.

Kind regards,

*George T. Manning* / n/F

George T. Manning

cc:     The Honorable Lamar S. Smith
        The Honorable Linda T. Sanchez
        The Honorable Chris Cannon
        Fred F. Fielding, Esq.

# Exhibit 29

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR. Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON THE JUDICIARY
2138 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6216
(202) 225–3951
http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR. Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

July 17, 2007

Mr. Fred Fielding
Counsel to the President
Office of Counsel to the President
The White House
1600 Pennsylvania Ave., NW
Washington, DC 20530

Dear Mr. Fielding:

We are writing to inform you that the Subcommittee on Commercial and Administrative Law will be meeting this Thursday, July 19, 2007, at 1:00 p.m. in Room 2141, Rayburn House Office Building, to consider the executive privilege claims you have raised in response to the subpoena issued on June 13 to Joshua Bolten, White House Chief of Staff, to produce documents. If those objections are overruled, you should be aware that the refusal to produce the documents called for in the subpoena could subject Mr. Bolten to contempt proceedings, including but not limited to proceedings under 2 U.S.C. § 194 and under the inherent contempt authority of the House of Representatives. We strongly urge you to reconsider, and to produce the documents called for by the subpoena.

Sincerely,

John Conyers, Jr.
Chairman

Linda T. Sánchez
Chairwoman, Subcommittee on Commercial
and Administrative Law

cc:    The Honorable Lamar S. Smith
       The Honorable Chris Cannon

# Exhibit 30

No. 08-409 (JDB)

JOHN CONYERS, JR., Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR. Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR. Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951
http://www.house.gov/judiciary

July 19, 2007

BY FAX AND U.S. MAIL

Mr. Fred F. Fielding
Counsel to the President
Office of the Counsel to the President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Mr. Fielding:

I am disappointed that the President's Chief of Staff Josh Bolten has continued to disobey the subpoena served on him on June 13, 2007, and has not produced the documents called for by that subpoena. Enclosed with this letter is a copy of the text of a ruling by Chairwoman Sánchez at today's meeting of the Subcommittee on Commercial and Administrative Law rejecting the claims of privilege that you have sought to raise in response to that subpoena. The ruling was sustained by a 7-3 vote of the Subcommittee..

This letter is to formally notify you that I must insist on compliance with the subpoena, and that Mr. Bolten's failure to promptly mitigate his noncompliance could result in contempt proceedings, including but not limited to proceedings under 2 U.S.C. §§ 192, 194 or under the inherent contempt authority of the House of Representatives. In light of Chairwoman Sánchez's ruling, we strongly urge immediate production of the responsive documents pursuant to the subpoena. Please let me know in writing by 10 a.m. on Monday July 23, 2007, whether Mr. Bolten will comply. If I do not hear from you in the affirmative by then, the Committee will have no choice but to consider appropriate recourse.

Mr. Fred Fielding
Page Two
July 19, 2007

Sincerely,

John Conyers, Jr.
Chairman

Enclosure

cc:    The Honorable Lamar S. Smith
       The Honorable Linda T. Sánchez
       The Honorable Chris Cannon

# Ruling of Chairwoman Linda Sánchez on White House Executive Privilege Claims

We have received letters from White House Counsel Fred Fielding on June 28 and July 9 refusing to produce documents concerning our U.S. Attorney investigation that were called for in our June 13 subpoena to White House Chief of Staff Joshua Bolten, and further refusing to even provide the necessary information to explain his purported executive privilege claim. On July 17, Chairman Conyers and I again wrote to Mr. Fielding, notified him we would formally consider those privilege claims today, and again urged compliance with the June 13 subpoena.

Let me say at the outset that we take executive privilege claims seriously, and treat them with the careful consideration we believe is appropriate. In this case, we have given the White House's privilege claims careful consideration, and the Chair is prepared to rule that those claims are not legally valid and that Joshua Bolten of the White House is required pursuant to subpoena to produce the documents called for.

After I make my ruling, I will entertain a motion to sustain it, but first I would like to set forth the legal grounds for it. A number of these grounds are similar to the grounds in the ruling sustained by this Subcommittee on July 12 overruling the related executive privilege and immunity claims sought to be raised by Harriet Miers through her counsel, and where appropriate, I will incorporate the reasoning and legal authorities by reference. The grounds for my ruling today are as follows:

**First**, the claims of executive privilege are not properly asserted. We have not received a statement from the President himself asserting the privilege, even though Chairman Conyers has specifically requested one. As stated in my July 12 ruling and as incorporated by reference herein, the courts have ruled that a personal assertion of executive privilege by the President is legally required for the privilege claim to be valid, as, for example, in the Shultz case.[1]

The **second** basis for my ruling is essentially the same as the fourth ground for my July 12 ruling as to Ms. Miers, which is incorporated by reference herein. The courts have required a party raising a claim of executive privilege as to documents to provide a "descriptive, full and specific itemization of the various documents being claimed as privileged" and "precise and certain reasons for preserving their confidentiality."[2] Such a privilege log has been specifically requested from the White House, both in the subpoena and in a subsequent letter, and the White House has specifically refused. In other words, the White House is refusing not only to produce documents pursuant to subpoena, but also to even explain why the documents are being withheld. In effect, the White House is asking Congress and the American people to simply trust on blind faith that the documents are appropriately being kept secret. Our system of government does not permit the White House to demand this type of blind faith and secrecy.

---

[1] Center on Corporate Responsibility v. Shultz, 368 F. Supp. 863, 872-73 (D.D.C. 1973).

[2] Smith v. FTC, 403 F. Supp. 1000, 1018 (D. Del. 1975); Black v. Sheraton Corp., 371 F.Supp. 97, 101 (D.D.C. 1974).

The **third** basis for my ruling is essentially the same as the third ground for my July 12 ruling as to Ms. Miers, which is incorporated by reference herein. The White House has failed to demonstrate that the documents we are seeking from the White House are covered by executive privilege, because they do not concern communications to or from the President, or to or from White House advisers "in the course of preparing advice for the President."[3] Indeed, the White House has unequivocally asserted that the President **never received any advice on, and was not himself involved in,** the U.S. Attorney firings. Therefore, under the Espy case and other relevant case law, the presidential communications privilege simply does not apply here.

The **fourth** basis for my ruling is essentially the same as the fifth ground for my July 12 ruling as to Ms. Miers, which is incorporated by reference herein. Even assuming that the information we have asked for falls within the scope of a properly asserted executive privilege, any such privilege is outweighed by the compelling need for the House and the public to have access to this information. In addition to my explanation for this basis for my ruling on July 12, it should also be noted that the White House claim is weakened by the fact that the Administration itself, through the Justice Department, has released a number of White House e-mails on this subject, including even internal White House e-mails, and that the White House has offered to make more such material available as part of its "all-or-nothing" proposal that certain White House aides be interviewed without either an oath or a transcript. How can it be credibly argued, therefore, that Executive Branch interests will be seriously harmed when a significant amount of the very same type of information has been, or has been offered to be, publicly released?

For all the foregoing reasons, I hereby rule that the refusal of Joshua Bolten of the White House to comply with the June 13 subpoena and produce documents as directed cannot be properly justified on executive privilege grounds and that Mr. Bolten is legally required to produce these documents.

These reasons are without prejudice to one another and to any other defects that may after further examination be found to exist in the asserted privilege.

---

[3] In re Sealed Case, 121 F.3d 729, 752 (D.C. Cir. 1997).

Exhibit 31

No. 08-409 (JDB)

**THE WHITE HOUSE**

WASHINGTON

July 23, 2007

Dear Chairman Conyers:

We have reviewed your July 19, 2007 letter requesting reconsideration of the President's decision not to produce documents in response to the House Committee on the Judiciary's June 13 subpoena. As stated in my letters of June 28, 2007 and July 9, 2007, the President has asserted Executive Privilege over the requested documents to protect fundamental Constitutional interests of the Presidency. Every President has the right to obtain counsel from advisors who will speak candidly and openly with him, among themselves, and with others. A President has particular need for advice of that character on subjects committed by the Constitution to his exclusive discretion such as the appointment and removal of United States Attorneys. Nothing in the July 19, 2007 communication from the Committee and Subcommittee diminishes the need to adhere to those principles. Nor has the Committee or Subcommittee chosen to accept our offer of accommodation. For these reasons, the President's position remains unchanged.

Sincerely,

Fred F. Fielding
Counsel to the President

The Honorable John Conyers, Jr.
United States House of Representatives
Washington, D.C. 20515

cc:    The Honorable Lamar S. Smith
       The Honorable Linda T. Sánchez
       The Honorable Chris Cannon

# Exhibit 32

No. 08-409 (JDB)

JOHN CONYERS, JR. Michigan
CHAIRMAN
————
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
MARTIN T. MEEHAN, Massachusetts
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR. Georgia
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ. Florida
KEITH ELLISON, Minnesota

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER
————
F. JAMES SENSENBRENNER, JR. Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY. California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER. Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951

http://www.house.gov/judiciary

July 25, 2007

<u>BY FAX AND U.S. MAIL</u>

Mr. Fred F. Fielding
Counsel to the President
Office of the Counsel to the President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

Dear Mr. Fielding:

     I am enclosing with this letter a copy of the report and resolution approved by the House Judiciary Committee today recommending that the House of Representatives cite Joshua Bolten and Harriet Miers for contempt of Congress for refusing to comply with the subpoenas issued to them on June 13.  As I explained before the Committee's vote, I regret that the Committee has had to take this step, and continue to hope that we can resolve with you the Committee's need for information from the White House in our investigation.  Indeed, as the Congressional Research Service noted in a recent report, in each of the eight cases in which House Committees alone have found executive branch officials in contempt for refusing to comply with subpoenas based on executive privilege since 1975, there was "full or substantial compliance with the demands of the committee" after the vote.

     Many possible paths are available to reach an agreement in this matter. Senator Leahy and I previously suggested that we begin by the White House providing copies of documents reflecting communications outside the White House, which was part of your offer in March. With respect to the Department of Justice, we and the Senate Judiciary Committee have conducted some 12 on-the-record interviews, and have subsequently called only one of those interviewees to testify before a Committee.  Just recently, in an attempt to resolve executive branch confidentiality concerns about documents relating to the tragic death of Corporal Patrick Tillman, the White House made available over 400 pages of documents for staff review to assess relevancy and to narrow differences between the White House and the House Committee on Oversight and Government Reform.

Mr. Fred F. Fielding
Page Two
July 25, 2007


As we have repeatedly explained, we stand ready to discuss these and all other possible constructive paths to resolve our need for information from the White House in the U.S. Attorneys matter. But make no mistake: If the White House continues to refuse to engage in any discussions beyond repeating its unacceptable "take it or leave it" offer, and if Mr. Bolten and Ms. Miers continue to refuse to comply altogether with our subpoenas, we will have no choice but to enforce those subpoenas by all appropriate legal means. In our system of government, no one is above the law.

Sincerely,



John Conyers, Jr.
Chairman


Enclosure


cc:     The Honorable Lamar S. Smith
        The Honorable Linda T. Sánchez
        The Honorable Chris Cannon

| 110th CONGRESS | | REPORT |
|---|---|---|
| *1st Session* | } HOUSE OF REPRESENTATIVES { | 110-XXX |

## RESOLUTION RECOMMENDING THAT THE HOUSE OF REPRESENTATIVES FIND HARRIET MIERS AND JOSHUA BOLTEN, CHIEF OF STAFF, WHITE HOUSE, IN CONTEMPT OF CONGRESS FOR REFUSAL TO COMPLY WITH SUBPOENAS DULY ISSUED BY THE COMMITTEE ON THE JUDICIARY

---

**July XX, 2007—Referred to the House Calendar and ordered to be printed**

---

**Mr. Conyers, from the Committee on the Judiciary**
**submitted the following**

# R E P O R T

**together with**

## ADDITIONAL VIEWS

The Committee on the Judiciary, having considered this Report, reports favorably thereon and recommends that the Report be approved.

The form of Resolution that the Committee on the Judiciary would recommend to the House of Representatives for citing former White House Counsel Harriet Miers and White House Chief of Staff Joshua Bolten for contempt of Congress pursuant to this Report is as follows:

*Resolved,* That pursuant to 2 U.S.C. §§192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to appear before the Subcommittee on Commercial and Administrative Law of the Committee on the Judiciary as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

*Resolved,* That pursuant to 2 U.S.C. §§192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to testify before the Subcommittee on Commercial and Administrative Law of the Committee on the Judiciary as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

*Resolved,* That pursuant to 2 U.S.C. §§192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to produce documents to the Subcommittee on Commercial and Administrative Law of the Committee on the Judiciary as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

*Resolved,* That pursuant to 2 U.S.C. §§ 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of White House Chief of Staff Joshua Bolten to produce documents to the Committee on the Judiciary as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Mr. Bolten be proceeded against in the manner and form provided by law.

## BACKGROUND AND EXPLANATION

### I. Background of Committee Investigation and Requests for Information from the White House and Harriet Miers

A. House Judiciary Committee Hearings

Beginning in March 2007, the House Judiciary Committee and its Subcommittee on Commercial and Administrative Law have held a number of hearings on the U.S. Attorney terminations and related issues. These have included:

U.S. Attorneys & William Moschella. On March 6, 2007, six of the terminated U.S. Attorneys[1] and William E. Moschella, Principal Associate Deputy Attorney General, U.S. Department of Justice, among others, testified before the Subcommittee.[2] At this hearing (and in private briefings on February 28 and March 5 to Subcommittee members and staff that preceded it), Mr. Moschella testified, inter alia, as to the Justice Department's then-claimed reasons for firing these U.S. Attorneys. The terminated U.S. Attorneys testified, inter alia, that they had not been given reasons for their firing and, among other matters, responded to some of the Department's asserted reasons for their firing, and discussed political and other factors that may have been related to their firing.

---

[1] *H.R. 580, Restoring Checks and Balances in the Confirmation Process of U.S. Attorneys: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary,* 110th Cong. (2007) (prepared statement of Carol C. Lam *et al*.). The six former U.S. Attorneys who testified were Ms. Lam, Mr. Iglesias, Mr. Cummins, Mr. McKay, Mr. Bogden and Mr. Charlton.

[2] The other witnesses included the following: Representative Darrell Issa (R-CA); former Representative Asa Hutchinson (R-AR); John A. Smietanka, a former United States Attorney for the Western District of Michigan; George Terwilliger, former Deputy Attorney General of the U.S. Department of Justice; T.J. Halstead, Legislative Attorney, American Law Division, Congressional Research Service; and Atlee W. Wampler, III, President of the National Association of Former United States Attorneys.

Ensuring Executive Branch Accountability. On March 29, 2007, the Subcommittee heard testimony about the validity of White House assertions concerning executive privilege in the U.S. Attorney controversy.[3] Beth Nolan, former White House Counsel under President Clinton, indicated that she testified four times before congressional Committees on matters directly related to her White House duties, including three times while she was serving in that position.[4]

James Comey. On May 3, 2007, former Deputy Attorney General James Comey testified before the Subcommittee.[5]

Alberto Gonzales. On May 10, 2007, Attorney General Gonzales appeared before the full Judiciary Committee for an oversight hearing that focused on the U.S. Attorneys controversy.[6]

Monica Goodling. After a grant of limited use immunity, Monica Goodling, former Senior Counsel to Attorney General Alberto Gonzales and the Department's White House Liaison, appeared before the full Committee on May 23, 2007.[7]

Paul McNulty. On June 21, 2007, Deputy Attorney General Paul McNulty testified before the Subcommittee.[8]

Harriet Miers. Former White House Counsel Harriet Miers refused to comply with a subpoena requiring her appearance before the Subcommittee on July 12, 2007.[9] Ms. Miers not

---

[3] *Ensuring Executive Branch Accountability: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary,* 110th Cong. (2007). The witnesses at the hearing included John Podesta, former White House Chief of Staff to President Bill Clinton; Beth Nolan, former White House Counsel to President Bill Clinton; Frederick A.O. Schwarz, Jr., Senior Counsel, Brennan Center for Justice; and Noel J. Francisco, former Associate Counsel to President George W. Bush.

[4] Id. (testimony of Beth Nolan, former White House Counsel to President Bill Clinton).

[5] *The Continuing Investigation into the U.S. Attorneys Controversy: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary,* 110th Cong. (2007) (testimony of James Comey, former Deputy Attorney General).

[6] *Oversight Hearing on the United States Department of Justice: Before the H. Comm. on the Judiciary,* 110th Cong. (2007) (testimony of Attorney General Alberto Gonzales).

[7] *The Continuing Investigation into the U.S. Attorneys Controversy and Related Matters: Hearing Before the H. Comm. on the Judiciary,* 110th Cong. (2007) (testimony of Monica Goodling, former Senior Counsel to Attorney General Alberto Gonzales and White House Liaison, U.S. Department of Justice).

[8] *The Continuing Investigation into the U.S. Attorneys Controversy and Related Matters: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary,* 110th Cong. (2007) (testimony of Paul McNulty, Deputy Attorney General).

[9] *The Continuing Investigation into the U.S. Attorneys Controversy and Related Matters: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary,* 110th Cong. (2007).

only failed to provide testimony or documents, but she also failed even to appear for the hearing. Subcommittee Chair Sánchez proceeded to overrule Ms. Miers' claims of immunity and privilege and her ruling was sustained by Subcommittee members in a recorded vote of 7-5.[10]

B. Justice Department Documents and Staff Interviews

On March 8, 2007, Chairman Conyers and Subcommittee Chair Sánchez wrote to the Attorney General requesting documents and interviews with Department of Justice personnel concerning the U.S. Attorney matter.[11] Pursuant to that request, the Committee has received and reviewed thousands of pages of Justice Department documents. Many documents were initially produced only in redacted form, with Committee staff being granted a limited right to review the unredacted documents on Department premises. Additional Committee efforts to obtain additional documents voluntarily, including letters of March 22, March 28, and April 2, 2007, were not successful.[12] On April 10, 2007, the Committee issued a subpoena to the Department for full production of all relevant documents in unredacted form. Negotiations to secure full compliance with the subpoena are continuing. A large number of additional documents have been produced as a result, and Committee staff expect a limited number of additional documents to be produced by the Department.

In addition to the initial Committee requests, Chairman Conyers, Subcommittee Chair Sánchez, Representative Zoe Lofgren, and Representative Keith Ellison have sent further requests for information pertinent to the U.S. Attorney controversies in Missouri[13] and Minnesota[14]. On July 17, 2007, Chairman Conyers, Subcommittee Chair Sánchez, Representative Artur Davis, and Representative Tammy Baldwin requested documents and

---

[10] Id.

[11] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, to Alberto Gonzales, Att'y Gen. of the United States (Mar. 8, 2007) (on file with the H. Comm. on the Judiciary).

[12] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, to Alberto Gonzales, Att'y Gen. of the United States (Mar. 22, 2007) (on file with the H. Comm. on the Judiciary); Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, to Alberto Gonzales, Att'y Gen. of the United States (Mar. 28, 2007) (on file with the H. Comm. on the Judiciary); and Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, to Richard Hertling, Acting Assitant Att'y Gen., Office of Legislative Affairs, U.S. Department of Justice (Apr. 2, 2007) (on file with the H. Comm. on the Judiciary).

[13] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, Linda Sánchez, Chair, Subcommittee on Commercial and Admin. Law, and Zoe Lofgren, Chair, Subcomm. on Immigration, Citizenship, Refugees, Border Security, and International Law, to Alberto Gonzales, Att'y Gen. of the United States (May 15, 2007) (on file with the H. Comm. on the Judiciary).

[14] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Keith Ellison, Member, H. Comm. on the Judiciary, to Alberto Gonzales, Att'y Gen. of the United States (May 8, 2007) (on file with the H. Comm. on the Judiciary).

4

information about several prominent prosecutions and convictions of Democratic officials or operatives in various parts of the country, in light of extensive allegations of selective, politically influenced prosecutions.[15]  In addition, Majority and Minority staff from both the House and Senate Judiciary Committees have so far jointly conducted on-the-record interviews of twelve current and former Department of Justice officials.[16]

C.  Requests for Information from the White House and Subpoenas Issued to Joshua Bolten and Harriet Miers

On March 21, 2007, the Subcommittee on Commercial and Administrative Law authorized Chairman Conyers to issue subpoenas to J. Scott Jennings, Special Assistant to the President, Office of Political Affairs; William Kelley, Deputy White House Counsel; Harriet Miers, former White House Counsel; Karl Rove, Deputy Chief of Staff and Senior Advisor to the President; Joshua Bolten, White House Chief of Staff; and Fred Fielding, White House Counsel, to obtain testimony and documents.[17]  Both before and after March 21, letters were exchanged between the Committee and the White House to seek to resolve voluntarily the Committee's requests for information from the White House, but those efforts were not successful. Committee letters (some of which were sent by Chairman Conyers and Senate Judiciary Committee Chairman Leahy) included letters of March 9, March 22, March 28, and May 21, 2007.[18]

On June 13, 2007, Chairman Conyers and Senate Judiciary Committee Chairman Patrick Leahy issued subpoenas to Joshua Bolten, White House Chief of Staff, or appropriate custodian,

---

[15]  Letter from John Conyers, Jr., Chair, H. Comm. on the Judiciary, Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, Artur Davis, Member, Comm. on the Judiciary, and Tammy Baldwin, Member, Comm. on the Judiciary, to Alberto Gonzales, Att'y Gen. of the United States (July 17, 2007) (on file with the H. Comm. on the Judiciary).

[16]  The Committee is also seeking to obtain documents from the Republican National Committee in this matter, consisting of e-mails on RNC servers sent by White House officials using RNC e-mail accounts, pursuant to a request on April 12, 2007, and a subpoena issued on July 13, 2007.  See Memorandum from Subcommittee Chair Sánchez to Members of Subcomm. on Commercial and Admin. Law Re. Meeting to Consider the Issuing of a Subpoena to the Republican National Committee (July 11, 2007) (on file with the H. Comm. on the Judiciary).

[17]  *Meeting to Consider Subpoena Authorization Concerning the Recent Termination of United States Attorneys and Related Subjects Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. (2007).  In addition, the Subcommittee authorized Chairman Conyers to issue a subpoena for D. Kyle Sampson, former Chief of Staff to the Attorney General.  Mr. Sampson has thus far voluntarily cooperated with the Committee's investigation.

[18]  Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, to Fred Fielding, Counsel to the President (Mar. 9, 2007);  Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, to Fred Fielding, Counsel to the President (Mar. 22, 2007); Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Patrick Leahy, Chairman, S. Comm. on the Judiciary, to Fred Fielding, Counsel to the President (Mar. 28, 2007); and  Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, to Fred Fielding, Counsel to the President (May 21, 2007).  All of these letters are on file with the House Committee on the Judiciary.

for relevant White House documents. The subpoenas were returnable on June 28, 2007. On June 13, the Chairmen also issued subpoenas to two former White House staffers: White House Counsel Harriet Miers was subpoenaed by Chairman Conyers for testimony and to produce documents before the Subcommittee on July 12, 2007, and White House Political Director Sara Taylor was subpoenaed by Chairman Leahy for testimony and to produce documents before the Senate Judiciary Committee on July 11, 2007.

On June 28, 2007, White House Counsel Fred Fielding wrote that the White House would refuse to produce any documents pursuant to the subpoena issued to Mr. Bolten based on executive privilege.[19]  Chairman Conyers and Chairman Leahy requested that the White House provide a privilege log to set forth the factual and legal basis for any claims of privilege as to each document being withheld, as well as a signed statement by the President asserting any privilege by July 9, 2007.[20]  In a letter dated July 9, 2007, Mr. Fielding declined.[21]

On July 9, Ms. Miers' counsel wrote to Chairman Conyers and Ranking Minority Member Smith stating that pursuant to letters received from Mr. Fielding, Ms. Miers intended not to produce any documents in her possession and not to provide testimony, as Mr. Fielding stated, concerning "White House consideration, deliberations, or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys."[22]  Chairman Conyers and Subcommittee Chair Sánchez wrote letters to counsel for Harriet Miers reiterating their understanding that Ms. Miers was required to appear before the Subcommittee as provided in the subpoena.  On July 10, Ms. Miers' counsel wrote that pursuant to another letter from Mr. Fielding, Ms. Miers would not appear at the hearing at all, based on a claim of absolute immunity raised by Mr. Fielding.[23]  In fact, she failed to appear, notwithstanding a July 11 letter from Chairman Conyers and Subcommittee Chair Sánchez

---

[19] Letter from Fred Fielding, Counsel to the President, to John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Patrick Leahy, Chairman, S. Comm. on the Judiciary (June 28, 2007) (on file with the H. Comm. on the Judiciary).

[20] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Patrick Leahy, Chairman, S. Comm. on the Judiciary, to Fred Fielding, Counsel to the President (June 29, 2007) (on file with the H. Comm. on the Judiciary).

[21] Letter from Fred Fielding, Counsel to the President, to John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Patrick Leahy, Chairman, S. Comm. on the Judiciary (July 9, 2007) (on file with the H. Comm. on the Judiciary).

[22] Letter from Fred Fielding, Counsel to the President, to George Manning, Attorney for Harriet Miers (July 9, 2007), quoted in and enclosed with Letter from George Manning to John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Lamar Smith, Ranking Member, H. Comm. on the Judiciary (July 9, 2007) (on file with the H. Comm. on the Judiciary). Mr. Manning's July 9 letter also enclosed a June 28 letter from Mr. Fielding indicating that documents in Ms. Miers' possession should not be produced.

[23] Letter from George Manning, Attorney for Harriet Miers, to John Conyers, Jr., Chairman, H. Comm. on the Judiciary and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law (July 10, 2007) (on file with the H. Comm. on the Judiciary).

urging that she appear, explaining that specific assertions of privilege would be considered at the hearing, and warning of the possibility of contempt,[24] and despite the fact that Sara Taylor had appeared before the Senate Judiciary Committee in compliance with her subpoena the day before.

On July 12, the Subcommittee met as scheduled. At that meeting, when Ms. Miers failed to appear, Subcommittee Chair Sánchez issued a ruling that rejected Ms. Miers' privilege and immunity claims, and the Subcommittee, by a vote of 7 to 5, sustained that ruling.[25] The ruling specifically covered Ms. Miers' refusal to appear at all (as now reflected in the first count of the Resolution), her refusal to testify (as now reflected in the second count of the Resolution), and her refusal to produce documents (as now reflected in the third count of the Resolution), as required by the subpoena issued to her. Chairman Conyers and Subcommittee Chair Sánchez sent Ms. Miers' counsel a letter enclosing a copy of the ruling, and again urging compliance and warning of the possibility of contempt.[26] On July 17, 2007, Ms. Miers' counsel reiterated his client's refusal to comply.[27]

On July 17, 2007, Chairman Conyers and Subcommittee Chair Sánchez wrote to Mr. Fielding, notified him that the Subcommittee would formally consider the White House's privilege claims with regard to White House documents at a July 19, 2007 meeting, and again urged compliance with the June 13 subpoena.[28] Notwithstanding that letter, Mr. Bolten still did not comply with his subpoena. The Subcommittee met on July 19, Subcommittee Chair Sánchez ruled against the privilege claims with respect to Mr. Bolten's refusal to produce any documents pursuant to the subpoena issued to him (as now reflected in the fourth count of the Resolution), and that ruling was upheld by a 7-3 vote.[29] Chairman Conyers wrote to Mr. Fielding on July 19 enclosing a copy of the ruling, urging compliance, warning again of the possibility of contempt, and stating that the Committee would assume that Mr. Bolten would not comply unless Mr.

---

[24] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law (July 11, 2007) (on file with the H. Comm. on the Judiciary).

[25] *The Continuing Investigation Into the U.S. Attorneys Controversy and Related Matters: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. (2007).

[26] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, to George Manning, Attorney for Harriet Miers, (July 13, 2007) (on file with the H. Comm. on the Judiciary).

[27] Letter from George Manning, Attorney for Harriet Miers, to John Conyers, Jr., Chairman, H. Comm. on the Judiciary (July 17, 2007) (on file with the H. Comm. on the Judiciary).

[28] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, and Linda Sánchez, Chair, Subcomm. on Commercial and Admin. Law, to Fred Fielding, White House Counsel (July 17, 2007) (on file with the H. Comm. on the Judiciary)

[29] *The Continuing Investigation Into the U.S. Attorneys Controversy and Related Matters: Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. (2007).

Fielding notified him otherwise by the morning of Monday, July 23, 2007.[30] On July 23, Mr. Fielding wrote Chairman Conyers and stated that the White House position remained unchanged.[31]

## II. Authority and Legislative Purpose

The Committee on the Judiciary is a standing Committee of the House of Representatives, duly established pursuant to the Rules of the House of Representatives, which are adopted pursuant to the Rulemaking Clause of the Constitution.[32] House Rule X grants to the Committee legislative and oversight jurisdiction over, inter alia, "judicial proceedings, civil and criminal," and "criminal law enforcement"; the "application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction"; the "operation of Federal agencies and entities having responsibilities for the administration and execution of laws and programs addressing subjects within its jurisdiction"; and "any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction."[33]

House Rule XI specifically authorizes the Committee and its subcommittees to "require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."[34] The Rule also provides that the "power to authorize and issue subpoenas" may be delegated to the Committee chairman.[35] The subpoenas discussed in this report were issued pursuant to this authority.

The investigation into the U.S. Attorney matter and related concerns is being undertaken pursuant to the authority delegated to the Committee under Rule X as described above. The legislative purposes of this investigation fall into two categories: 1) investigating and exposing any possible malfeasance, abuse of authority, or violation of existing law on the part of the Executive Branch related to these concerns, and 2) considering whether the conduct uncovered may warrant additions or modifications to existing federal law, such as more clearly prohibiting the kinds of improper political interference with prosecutorial decisions as have been alleged here.

---

[30] Letter from John Conyers, Jr., Chairman, H. Comm. on the Judiciary, to Fred Fielding, Counsel to the President (July 19, 2007) (on file with the H. Comm. on the Judiciary).

[31] Letter from Fred Fielding, Counsel to the President, to John Conyers, Jr., Chairman, H. Comm. on the Judiciary (July 23, 2007) (on file with the H. Comm. on the Judiciary).

[32] U.S. Const., art. I, §5, cl. 2.

[33] House Rule X(1)(k)(1) and (7); House Rule X(2)(b)(1)(A)-(C).

[34] House Rule XI(2)(m)(1)(B).

[35] House Rule XI(2)(m)(3)(A)(i).

## HEARINGS

In its investigation into U.S. Attorney terminations and related matters, the Committee's Subcommittee on Commercial and Administrative Law held 5 days of hearings, on March 6, March 29, May 3, June 21, and July 12, 2007. In addition, the full Committee held 2 days of hearings, on May 10 and May 23, 2007. More discussion of these hearings is contained in the background section of this Report.

## COMMITTEE CONSIDERATION

On July 25, 2007, the Committee met in open session and ordered this Report favorably reported, [with an] [without] amendment, by [a vote of ___ to ___] [voice vote], a quorum being present.

## COMMITTEE VOTES

In compliance with clause 3(b) of rule XIII of the Rules of the House of Representatives, the Committee advises that the following recorded votes took place:

[TO BE SUPPLIED]

## COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee advises that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this Report.

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 3(c)(2) of rule XIII of the Rules of the House of Representatives is inapplicable because this Report does not provide new budgetary authority or increased tax expenditures.

## COMMITTEE COST ESTIMATE

In compliance with clause 3(d)(2) of rule XIII of the Rules of the House of Representatives, the Committee believes that the cost incurred in carrying out the Report will be negligible.

## PERFORMANCE GOALS AND OBJECTIVES

The Committee states that pursuant to clause 3(c)(4) of rule XIII of the Rules of the

9

House of Representatives, the Report will assist the Committee and the House of Representatives in vindicating Congress's responsibility to conduct appropriate oversight of the Executive Branch and vindicating the rule of law.

## CONSTITUTIONAL AUTHORITY STATEMENT

Pursuant to clause 3(d)(1) of rule XIII of the Rules of the House of Representatives, the Committee finds the authority for this Report in article 1, section 1 of the Constitution.

## ADVISORY ON EARMARKS

In accordance with clause 9 of rule XXI of the Rules of the House of Representatives, this Report does not contain any congressional earmarks, limited tax benefits, or limited tariff benefits as defined in clause 9(d), 9(e), or 9(f) of Rule XXI.

## ADDITIONAL VIEWS

[TO BE SUPPLIED]

10

# Exhibit 33

No. 08-409 (JDB)

JOHN CONYERS, JR., Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C "HANK" JOHNSON, JR. Georgia
BETTY SUTTON, Ohio
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951
http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR., Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

November 5, 2007

Mr. Fred Fielding
Counsel to the President
Office of Counsel to the President
The White House
1600 Pennsylvania Ave., NW
Washington, DC 20530

Dear Mr. Fielding:

As you know, the Judiciary Committee has been seeking for more than six months to obtain information from the White House concerning the forced resignations of nine United States Attorneys in 2006 and related matters. This has included the Committee finding in July that *White House Chief of Staff Joshua Bolten and former White House Counsel Harriet Miers* were in contempt for refusing to comply with subpoenas issued to them for documents and testimony. Unfortunately, I have received no response to my July 25 letter to you, which again sought to resolve this issue. In fact, I have written to you on eight previous occasions attempting to reach agreement on this matter.[1] As we submit the Committee's contempt report to the full House, I am writing one more time to seek to resolve this issue on a cooperative basis.

In a number of my previous letters, I have offered several constructive paths in an effort to reach agreement. Let me now suggest another specific proposal based on these letters and previous offers, including your previous letter to us, and based specifically on previous agreements that this Administration has already reached with Congressional committees during this Congress.

---

[1] These eight letters, some of which were written with Senate Judiciary Committee Chair Patrick Leahy and Commercial and Administrative Law Subcommittee Chair Linda Sanchez, were written on March 9, March 22, March 28, May 21, June 29, July 17, July 19, and July 25.

Mr. Fred Fielding
Page Two
November 5, 2007

I propose that initially, the White House would provide the Committee with copies of documents reflecting communications between White House staff and persons outside the White House relating to the U.S. Attorney terminations and related matters. This was part of your conditional offer in March, and the White House agreed without such conditions to provide such documents to the House Committee on Oversight and Government Reform as part of its investigation into the death of Corporal Patrick Tillman. Second, the White House would make available for confidential staff review the remaining, internal White House documents relating to the same subjects, after which the Committee would identify what would most probably be a smaller number of such documents for production. This is precisely the procedure that the White House agreed to follow in the Tillman investigation, in which approximately 450 pages of internal White House documents were confidentially reviewed by Congressional staff and a smaller number were then requested by the Committee and produced by the White House, and that was followed with respect to documents initially withheld by the Justice Department in the U.S. Attorney investigation.

Finally, we would mutually identify relevant present and former White House staffers for on-the-record interviews, following the procedure agreed to by the Justice Department and successfully utilized in a dozen such interviews this year in the U.S. Attorney investigation. The area of questioning would be limited to the US Attorney terminations and related matters. These staff members would initially include those specified in your March 20 letter, and we are prepared to consider conducting these interviews without requiring that the witnesses be under oath, as occurred in the Justice Department interviews.

As the Congressional Research Service has reported, there are at least 74 instances since World War II where even sitting White House advisers, including White House counsel, have testified before Congress, and previous Administrations, even after initially asserting executive privilege, have reconsidered and agreed to "full or substantial compliance" with Congressional committee requests once there was a committee contempt vote. I very much hope that we can similarly avoid a constitutional confrontation in this case. This is not, and should not be treated as, a partisan or ideological issue, but instead a question of good government. As Republican former Attorney General Richard Thornburgh recently testified before our Committee, "citizens of the United States must have confidence" that the Department of Justice "is conducting itself in a fair and impartial" manner, "without actual political influence or the appearance of political influence."

I hope you will consider this offer in earnest and based upon the good faith with which it is delivered. Please respond at your earliest convenience, and in no event later than the end of this week, November 9. As always, responses and questions should be directed to the Judiciary

Mr. Fred Fielding
Page Three
November 5, 2007

Committee office, 2138 Rayburn House Office Building, Washington, D.C. 20515 (tel.: 202-225-3951; fax: 202-225-7680).

Sincerely,

John Conyers, Jr.
Chairman

cc:    Hon. Lamar S. Smith
       Hon. Linda T. Sánchez
       Hon. Chris Cannon
       Chris Freck

# Exhibit 34

# THE WHITE HOUSE

### WASHINGTON

November 9, 2007

Dear Chairman Conyers:

This is to acknowledge receipt and thank you for your letter of November 5, 2007 ("Letter"), advising that the Committee on the Judiciary of the House of Representatives ("the Committee") has submitted to the full House its report in support of a resolution to cite the President's Chief of Staff and former Counsel with contempt of Congress. Your letter further sets forth terms by which you suggest that the issues surrounding this resolution may be resolved without further confrontation. We completely agree with that goal and have sought to achieve it for over six months.

At the outset it should be noted and as the record makes clear, Mr. Bolten, as a custodian of records, and Ms. Miers, as a witness, have each acted at the President's direction, following his assertion of Executive Privilege, not to provide documents or testimony to the Committee concerning the replacement of certain United States Attorneys in 2006. Thus, taking an action to describe their actions as being contemptuous of the House of Representatives does not seem a just characterization.

From the very beginning of our many discussions and letters, the President attempted to chart a course of accommodation that would provide Congress with information it sought while protecting the Executive Branch's constitutional prerogatives. That is why on March 20, I wrote to you conveying the President's offer to provide the Committee with documents reflecting written communications related to this matter between White House personnel and persons external to the White House, including the Department of Justice, and to make available for interviews several high-ranking White House officials, including Ms. Miers and Karl Rove, the then-Deputy Chief of Staff and Senior Adviser to the President. In five subsequent letters we have reiterated this offer of information, and urged its acceptance.

Since March 20, the Committee has received an extraordinary amount of information from the Department of Justice relating to the dismissals of the United States Attorneys. DOJ has produced or made available for review more than 10,000 pages of documents, many of which reflect communications with the White House. Moreover, more than twenty present or former high-ranking DOJ officials, including the then-Attorney General, then-Deputy Attorney General, and former Chief of Staff to the Attorney General have testified publicly, submitted to committee staff interviews, or both. Not only has this process provided the Committee with abundant opportunities to obtain facts relating to the White House's U.S. Attorney-related communications with the Department of Justice, but also it has made clear there is no need for additional information that would be "demonstrably critical to the responsible fulfillment of the Committee's functions." *See* June 27, 2007 Letter from Solicitor General and Acting Attorney

General to the President, at 2 (quoting *Senate Select Comm. On Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc)).[1]

Your letter correctly confirms that you have written "on eight previous occasions," three of which letters contain or incorporate specific proposals involving terms for a possible agreement. Your March 22, 2007 letter rejects outright the President's March 20, 2007 proposal of accommodation without offering any proposal in response, and with all due respect, the remaining letters contain no suggestion of accommodation but instead make an unqualified request for *all documents* sought by the Committee.

However, more importantly, in those three letters which suggest avenues for further consideration, the proposals have been substantially the same and one-sided: they propose accommodations on the part of the White House without signaling any willingness on the part of the Committee to accommodate itself to the Presidential interests at stake here by, for example, agreeing to limit the scope of the Committee's demands or by forswearing an intention to insist on something less than total acquiescence with the Committee's original demands.

Your current Letter essentially repeats elements of these earlier proposals. And like the earlier proposals, the Letter proposes no ultimate limitation upon the Committee's demands, or an end to the requests.

Thus, the present state of the discussions appears to be this: the President's proposal – to provide the Committee with (i) a very substantial body of requested information through interviews of White House personnel and (ii) responsive, non-internal, White House email communications – is again answered with a proposal that the White House unilaterally commence an open-ended process of providing the information sought by the Committee, without limitation, and without any recognition or regard to the legitimate Executive Branch interests at stake in the controversy; namely, (1) the President's need for counsel from advisors who will speak candidly and openly with him, among themselves and others, and (2) the particular need for such advice where his constitutionally exclusive power to nominate and remove U.S. Attorneys is at issue.

We are therefore at a most regrettable impasse – one that each party to such a dispute is required by tradition and comity to strive to avoid. But to do so requires finding a path that accommodates and blends the needs of each into a solution that also respects and preserves the prerogatives of both. It is this very reason that led the President to seek the compromise that he has proposed. And in asserting Executive Privilege in this matter, the President has done so to defend institutional prerogatives transcending the momentary interests of this or any future Administration.

---

[1] The Acting Attorney General's opinion states further that in order to override a privilege claim, "the Committees must 'point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials.'" *Id.* at 3 (quoting Senate Select Comm., 498 F.2d at 733). As we have previously noted in correspondence with you, it remains unclear just how and why the Committee is unable to fulfill its legislative and oversight interests without the materials it continues to demand.

The President offered a very substantial accommodation to the Committee, for the purpose of avoiding an institutional confrontation between the Executive and Legislative branches. The Committee has neither accepted the President's proposed accommodation, nor proposed any course other than incremental Executive Branch abandonment of his constitutional obligations.

We respectfully urge the Committee, and the full House, to reconsider its proposed actions; we earnestly request that the path of confrontation be avoided even at this late hour, and exchanged for the proposed solution to provide information. Such would serve the short-term needs as perceived by the Committee, and the long-term interests of both Branches in their dealings with one another, thus better serving the public than any confrontation.

Respectfully yours,

Fred F. Fielding
Counsel to the President

The Honorable John Conyers
United States House of Representatives
Washington, DC 20515

cc:    The Honorable Lamar Smith

# Exhibit 35

No. 08-409 (JDB)

IV

110TH CONGRESS
2D SESSION

# H. RES. 979

Recommending that the House of Representatives find Harriet Miers and Joshua Bolten, Chief of Staff, White House, in contempt of Congress for refusal to comply with subpoenas duly issued by the Committee on the Judiciary.

---

## IN THE HOUSE OF REPRESENTATIVES

FEBRUARY 13, 2008

Mr CONYERS submitted the following resolution; which was referred to the Committee on the Judiciary

---

# RESOLUTION

Recommending that the House of Representatives find Harriet Miers and Joshua Bolten, Chief of Staff, White House, in contempt of Congress for refusal to comply with subpoenas duly issued by the Committee on the Judiciary.

1    *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

2  the Speaker of the House of Representatives shall certify

3  the report of the Committee on the Judiciary, detailing

4  the refusal of former White House Counsel Harriet Miers

5  to appear before the Subcommittee on Commercial and

6  Administrative Law as directed by subpoena, to the

7  United States Attorney for the District of Columbia, to

2

1   the end that Ms. Miers be proceeded against in the man-

2   ner and form provided by law; and be it further

3       *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

4   the Speaker of the House of Representatives shall certify

5   the report of the Committee on the Judiciary, detailing

6   the refusal of former White House Counsel Harriet Miers

7   to testify before the Subcommittee on Commercial and Ad-

8   ministrative Law as directed by subpoena, to the United

9   States Attorney for the District of Columbia, to the end

10   that Ms. Miers be proceeded against in the manner and

11   form provided by law; and be it further

12       *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

13   the Speaker of the House of Representatives shall certify

14   the report of the Committee on the Judiciary, detailing

15   the refusal of former White House Counsel Harriet Miers

16   to produce documents to the Subcommittee on Commercial

17   and Administrative Law as directed by subpoena, to the

18   United States Attorney for the District of Columbia, to

19   the end that Ms. Miers be proceeded against in the man-

20   ner and form provided by law; and be it further

21       *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

22   the Speaker of the House of Representatives shall certify

23   the report of the Committee on the Judiciary, detailing

24   the refusal of White House Chief of Staff Joshua Bolten

25   to produce documents to the Committee on the Judiciary

3

1  as directed by subpoena, to the United States Attorney

2  for the District of Columbia, to the end that Mr. Bolten

3  be proceeded against in the manner and form provided by

4  law.

○

.

# Exhibit 36

No. 08-409 (JDB)

# H. Res. 980

## *In the House of Representatives, U. S.,*

*February 14, 2008.*

*Resolved,* That the Chairman of the Committee on the Judiciary is authorized to initiate or intervene in judicial proceedings in any Federal court of competent jurisdiction, on behalf of the Committee on the Judiciary, to seek declaratory judgments affirming the duty of any individual to comply with any subpoena that is a subject of House Resolution 979 issued to such individual by the Committee as part of its investigation into the firing of certain United States Attorneys and related matters, and to seek appropriate ancillary relief, including injunctive relief.

SEC. 2. The Committee on the Judiciary shall report as soon as practicable to the House with respect to any judicial proceedings which it initiates or in which it intervenes pursuant to this resolution.

SEC. 3. The Office of General Counsel of the House of Representatives shall, at the authorization of the Speaker, represent the Committee on the Judiciary in any litigation pursuant to this resolution. In giving that authorization, the

2

Speaker shall consult with the Bipartisan Legal Advisory Group established pursuant to clause 8 of Rule II.

Attest:

*Clerk.*

Exhibit 37

No. 08-409 (JDB)

IV

# House Calendar No. 188

110TH CONGRESS
2D SESSION

# H. RES. 982

**[Report No. 110–526]**

Providing for the adoption of the resolution (H. Res. 979) recommending that the House of Representatives find Harriet Miers and Joshua Bolten, Chief of Staff, White House, in contempt of Congress for refusal to comply with subpoenas duly issued by the Committee on the Judiciary and for the adoption of the resolution (H. Res. 980) authorizing the Committee on the Judiciary to initiate or intervene in judicial proceedings to enforce certain subpoenas

---

## IN THE HOUSE OF REPRESENTATIVES

FEBRUARY 13, 2008

Ms SLAUGHTER, from the Committee on Rules, reported the following resolution; which was referred to the House Calendar and ordered to be printed

---

# RESOLUTION

Providing for the adoption of the resolution (H. Res. 979) recommending that the House of Representatives find Harriet Miers and Joshua Bolten, Chief of Staff, White House, in contempt of Congress for refusal to comply with subpoenas duly issued by the Committee on the Judiciary and for the adoption of the resolution (H. Res. 980) authorizing the Committee on the Judiciary to initiate or intervene in judicial proceedings to enforce certain subpoenas.

2

1    *Resolved,* That House Resolution 979 and House Res-

2    olution 980 are hereby adopted.

House Calendar No. 188

110TH CONGRESS
2D SESSION

# H. RES. 982

[Report No. 110–526]

# RESOLUTION

Providing for the adoption of the resolution (H. Res. 979) recommending that the House of Representatives find Harriet Miers and Joshua Bolten, Chief of Staff, White House, in contempt of Congress for refusal to comply with subpoenas duly issued by the Committee on the Judiciary and for the adoption of the resolution (H. Res. 980) authorizing the Committee on the Judiciary to initiate or intervene in judicial proceedings to enforce certain subpoenas.

FEBRUARY 13, 2008

Referred to the House Calendar and ordered to be printed

# Exhibit 38

No. 08-409 (JDB)



Nancy Pelosi
Speaker of the House

February 28, 2008

The Honorable Jeffrey A. Taylor
United States Attorney
District of Columbia

The undersigned, The Speaker of the House of Representatives of the United States, pursuant to the attached House Resolution 979, One Hundred Tenth Congress, hereby certifies to you the failure and refusal of Harriet Miers, former White House Counsel, to appear, testify, and furnish certain documents in compliance with a subpoena before a duly constituted subcommittee of the House of Representatives Committee on the Judiciary. The undersigned further certifies to you the failure and refusal of Joshua Bolten, White House Chief of Staff, to furnish certain documents in the custody of the White House in compliance with a subpoena before said committee. These failures and refusals are fully shown by the certified copy of the House Report 110-423 of said committee which is also hereto attached.

Witness my hand and seal of the House of Representatives of the United States, at the City of Washington, District of Columbia, this twenty-eighth day of February, 2008.

_____
Speaker of the House of Representatives

Attest:

_____
Clerk of the House of Representatives

# H. Res. 979

## *In the House of Representatives, U. S.,*

*February 14, 2008.*

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to appear before the Subcommittee on Commercial and Administrative Law as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to testify before the Subcommittee on Commercial and Administrative Law as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

2

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to produce documents to the Subcommittee on Commercial and Administrative Law as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of White House Chief of Staff Joshua Bolten to produce documents to the Committee on the Judiciary as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Mr. Bolten be proceeded against in the manner and form provided by law.

Attest:

*Clerk.*

•HRES 979 EH

# Exhibit 39

No. 08-409 (JDB)



Nancy Pelosi
Speaker of the House

February 28, 2008

The Honorable Michael B. Mukasey
The Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530-0001

**BY FACSIMILE (202-514-4507)**

Dear Mr. Attorney General:

     In accordance with 2 U.S.C. § 194 and the attached House Resolution 979 (adopted on February 14, 2008), I have today sent a certification to the United States Attorney for the District of Columbia, Jeffrey Taylor, advising him of the failure of former White House Counsel, Harriet Miers, to appear, testify and produce documents in compliance with a duly issued subpoena of a subcommittee of the House Judiciary Committee and of the failure of Joshua Bolten, White House Chief of Staff and custodian of White House documents, to produce documents in his custody as required by a duly issued subpoena of the House Judiciary Committee.

     Under section 194, Mr. Taylor is now required "to bring the matter before the grand jury for its action." The appropriate grand jury action is a criminal charge for violation of 2 U.S.C. § 192, which provides: "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers . . . willfully makes default . . . shall be deemed guilty of a misdemeanor" and shall be subject to a fine and "imprisonment in a common jail for not less than one month nor more than twelve months."

     According to the testimony of your predecessor, former Attorney General Alberto Gonzales, and your recent testimony before the House Judiciary Committee, the Justice Department intends to prevent Mr. Taylor from complying with the statute and enforcing the contempt citations against Ms. Miers and Mr. Bolten. You claimed that "enforcement by way of contempt of a congressional subpoena is not permitted when the President directs a direct adviser of his ... not to appear or when he directs any member of the executive not to produce documents." *Hearing on Oversight of the Dep't of Justice Before the H Comm. on the Judiciary*, 110th Cong. 87-88 (Feb. 7, 2008). You purported to base your view on a "long line of authority," but cited no court decision that supports this proposition.

The Honorable Michael B. Mukasey
February 28, 2008
Page Two

There is no authority by which persons may wholly ignore a subpoena and fail to appear as directed because a President unilaterally instructs them to do so. Even if a subpoenaed witness intends to assert a privilege in response to questions, the witness is not at liberty to disregard the subpoena and fail to appear at the required time and place. Surely, your Department would not tolerate that type of action if the witness were subpoenaed to a federal grand jury. Short of a formal assertion of executive privilege, which cannot be made in this case, there is no authority that permits a President to advise anyone to ignore a duly issued congressional subpoena for documents.

Your press spokesman has stated that you will "act promptly" to review this matter and reach a final decision. We will appreciate your acting with appropriate dispatch on this important matter. I strongly urge you to reconsider your position and to ensure that our nation is operating under the rule of law and not at presidential whim. If, however, you intend to persist in preventing Mr. Taylor from carrying out his statutory obligation to present this matter to the grand jury in the District of Columbia, we respectfully request that you inform us of that decision within one week from today, so that the House may proceed with a civil enforcement suit in federal district court.

Thank your for your prompt consideration and attention to this matter.

best regards,

NANCY PELOSI
Speaker of the House

Enclosure

# H. Res. 979

## *In the House of Representatives, U. S.,*

*February 14, 2008.*

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to appear before the Subcommittee on Commercial and Administrative Law as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to testify before the Subcommittee on Commercial and Administrative Law as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

2

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of former White House Counsel Harriet Miers to produce documents to the Subcommittee on Commercial and Administrative Law as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Ms. Miers be proceeded against in the manner and form provided by law; and be it further

*Resolved,* That pursuant to 2 U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the Committee on the Judiciary, detailing the refusal of White House Chief of Staff Joshua Bolten to produce documents to the Committee on the Judiciary as directed by subpoena, to the United States Attorney for the District of Columbia, to the end that Mr. Bolten be proceeded against in the manner and form provided by law.

Attest:

*Clerk.*

# Exhibit 40

No. 08-409 (JDB)



# Office of the Attorney General
Washington, D.C.

February 29, 2008

The Honorable Nancy Pelosi
Speaker
House of Representatives
Washington, D.C. 20515

Dear Madam Speaker:

As you know, the President, asserting executive privilege, directed that Joshua Bolten, Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, not release certain documents or provide related testimony subpoenaed by the Committee on the Judiciary of the House of Representatives. The President also directed Ms. Miers to invoke her constitutional immunity from compelled congressional testimony and to decline to appear before the Committee. These directives were based on legal opinions from the Department of Justice advising that the assertions of privilege and immunity were legally proper.

Notwithstanding the President's directives, on July 25, 2007, the House Committee on the Judiciary adopted a resolution recommending that the House of Representatives cite Mr. Bolten and Ms. Miers for contempt. On November 5, 2007, the Committee referred its report on the resolution to the full House. On February 14, 2008, the House adopted a contempt resolution, which you referred on February 28, 2008, to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).

As explained in our July 24, 2007, letter to Judiciary Committee Chairman Conyers, a copy of which is enclosed, the Department of Justice's longstanding position taken during Administrations of both parties is "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984). Further, as we also explained in the letter to Chairman Conyers, the same principles that preclude prosecuting an Executive Branch official for abiding by a presidential claim of executive privilege also preclude prosecuting a senior presidential adviser for lawfully invoking her constitutional immunity from compelled congressional testimony. Here, the President directed Ms. Miers to invoke her constitutional immunity, and the President's directive was based upon a legal opinion from the Department of Justice advising that such an invocation of immunity would be legally proper.

Accordingly, the Department has determined that the non-compliance by Mr. Bolten and Ms. Miers with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers.

Please do not hesitate to contact me if you would like to discuss this matter further.

Sincerely,

Michael B. Mukasey
Attorney General

Enclosure

cc:    The Honorable John Boehner
       The Honorable John Conyers, Jr.
       The Honorable Lamar Smith

2



**U.S. Department of Justice**

Office of Legislative Affairs

_____

Office of the Assistant Attorney General                    *Washington D C 20530*

July 24, 2007

The Honorable John Conyers, Jr.
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

    We understand that the Judiciary Committee is voting tomorrow on resolutions calling
for the House of Representatives to refer contempt of Congress citations against Josh Bolton, the
Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, to the
United States Attorney for the District of Columbia for prosecution pursuant to the criminal
contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).

    As you know, the President has asserted executive privilege and directed that certain
documents and related testimony not be provided in response to subpoenas issued by the
Judiciary Committee in connection with its inquiry into the decision of the Department of Justice
to request the resignations of several United States Attorneys in 2006. The President also
directed Ms. Miers to invoke her immunity from compelled congressional testimony and decline
to appear in response to a subpoena from the Judiciary Committee. These directives were based
on legal opinions from the Department advising that the assertion of privilege and immunity
were legally proper. *See* Letter for the President from Paul D. Clement, Solicitor General and
Acting Attorney General (June 27, 2007) (addressing assertion of executive privilege);
Memorandum for the Counsel to the President from Steven G. Bradbury, Principal Deputy
Assistant Attorney General, Office of Legal Counsel, *Re: Immunity of Former Counsel to the
President from Compelled Congressional Testimony* (July 10, 2007).

    As it considers the contempt resolutions, we think it is important that the Committee
appreciate fully the longstanding Department of Justice position, articulated during
Administrations of both parties, that "the criminal contempt of Congress statute does not apply to
the President or presidential subordinates who assert executive privilege." *Application of 28
U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. 350, 356 (1995). As
expressed by Office of Legal Counsel Assistant Attorney General Theodore B. Olson more than
twenty years ago, when an Executive Branch official complies in good faith with the President's
assertion of executive privilege, "a United States Attorney is not required to refer a contempt
citation . . . to a grand jury or otherwise to prosecute [the] Executive Branch official who is
carrying out the President's instruction . . . ." *Prosecution for Contempt of Congress of an
Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101,

102 (1984) ("*Prosecution for Contempt of Congress*"). Two legal conclusions support the longstanding Department position:

> First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred. Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

*Id.*

The position Mr. Olson articulated was based on prior Department positions and has been consistently followed ever since, including in an explicit statement in a published OLC opinion by Assistant Attorney General Walter Dellinger during the Clinton Administration, recognizing that "the criminal contempt of Congress statute does not apply" in this context, because "application of the contempt statute against an assertion of executive privilege would seriously disrupt the balance between the President and Congress." *Application of 28 U.S.C. § 458 to Presidential Appointment of Federal Judges*, 19 Op. O.L.C. at 356.

It is the Department's view that the same position necessarily also applies to Ms. Miers's lawful invocation of her immunity from compelled congressional testimony. The principles that protect an Executive Branch official from prosecution for declining to comply with a congressional subpoena based on a directive from the President asserting executive privilege similarly shield a current or former immediate adviser to the President from prosecution for invoking his or her immunity from compelled congressional testimony—especially when, as here, the President instructs the official to do so.

Please do not hesitate to contact us if you would like further information concerning the Department's position on the pending contempt of Congress resolutions. We would be pleased to provide a fuller explanation of our views on this important matter.

Sincerely,

Brian A. Benczkowski
Principal Deputy Assistant Attorney General

cc: The Honorable Lamar Smith

Exhibit 41

No. 08-409 (JDB)

- 35 -

WASHINGTON

July 22, 1976

Dear Mr. Lindholm:

Pursuant to agreement reached with the American Telephone and Telegraph Company, the Executive Branch of the United States Government has, from time to time, contracted for facilities and services necessary to secure information vital to the national defense and foreign policy of the United States. Given the unique position of the Company with respect to telephone and other communications lines in the United States, it has been necessary to use its services and to provide extremely sensitive information, in connection with each request for assistance. This information has been provided by the Executive Branch on condition that the Company is "not to disclose the existence of this request."

I have been advised that the Committee on Interstate and Foreign Commerce of the U. S. House of Representatives has subpoenaed records of the American Telephone and Telegraph Company containing information furnished to the Company by the Executive Branch of the Federal Government to carry out the services for which the Government has contracted with the Company. I have determined that compliance with this subpoena would not be in the public interest because of the sensitivity of this information to the national defense and foreign policy of the United States. Accordingly, you are not authorized, under your agreement with the Executive Branch of the United States Government, to provide this information to the Committee.

Sincerely,

*Gerald R. Ford*

Mr. W. L. Lindholm
President
American Telephone and
  Telegraph Company
195 Broadway
New York, New York   10007

EXHIBIT 5

Exhibit 42

No. 08-409 (JDB)



**U.S. Department of Justice**

Office of Legal Counsel

---

Office of the Principal Deputy Assistant Attorney General          *Washington, D.C. 20530*

July 10, 2007

## MEMORANDUM FOR THE COUNSEL TO THE PRESIDENT

*Re: Immunity of Former Counsel to the President from Compelled Congressional Testimony*

You have asked whether Harriet Miers, the former Counsel to the President, is legally required to appear and provide testimony in response to a subpoena issued by the Committee on the Judiciary of the House of Representatives. The Committee, we understand, seeks testimony from Ms. Miers about matters arising during her tenure as Counsel to the President and relating to her official duties in that capacity. Specifically, the Committee wishes to ask Ms. Miers about the decision of the Justice Department to request the resignations of several United States Attorneys in 2006. *See* Letter for Harriet E. Miers from the Hon. John Conyers, Jr., Chairman, House Committee on the Judiciary (June 13, 2007). For the reasons discussed below, we believe that Ms. Miers is immune from compulsion to testify before the Committee on this matter and, therefore, is not required to appear to testify about this subject.

Since at least the 1940s, Administrations of both political parties have taken the position that "'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee'" *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno) (quoting Memorandum from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977)). This immunity "is absolute and may not be overborne by competing congressional interests." *Id.*

Assistant Attorney General William Rehnquist succinctly explained this position in a 1971 memorandum:

> The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971) ("*Rehnquist Memo*"). In a 1999 opinion for President Clinton, Attorney General Reno concluded that the Counsel to the President "serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." *Assertion of Executive Privilege*, 23. Op. O.L.C. at 4.

The rationale for the immunity is plain. The President is the head of one of the independent Branches of the federal Government. If a congressional committee could force the President's appearance, fundamental separation of powers principles—including the President's independence and autonomy from Congress—would be threatened. As the Office of Legal Counsel has explained, "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, at 2 (July 29, 1982) ("*Olson Memorandum*").

The same separation of powers principles that protect a President from compelled congressional testimony also apply to senior presidential advisers. Given the numerous demands of his office, the President must rely upon senior advisers. As Attorney General Reno explained, "in many respects, a senior advisor to the President functions as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 5 [1] Thus, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned functions." *Id.*; *see also Olson Memorandum* at 2 ("The President's close advisors are an extension of the President.") [2]

The fact that Ms. Miers is a former Counsel to the President does not alter the analysis. Separation of powers principles dictate that former Presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers. Former President Truman explained the need for continuing immunity in November 1953, when he refused to comply with a subpoena directing him to appear before the House Committee on Un-American Activities. In a letter to that committee, he warned that "if the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting November 12, 1953 letter by President Truman). "The doctrine

---

[1] In an analogous context, the Supreme Court held that the immunity provided by the Speech or Debate Clause of the Constitution to Members of Congress also applies to congressional aides, even though the Clause refers only to "Senators and Representatives." U.S. Const. art. I, § 6, cl. 1. In justifying expanding the immunity the Supreme Court reasoned that "the day to day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos." *Gravel v. United States*, 408 U.S. 606, 616-17 (1972). Any other approach, the Court warned, would cause the constitutional immunity to be "inevitably ... diminished and frustrated." *Id.* at 617.

[2] *See also History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 771-72 (1982) (documenting how President Truman directed Assistant to the President John Steelman not to respond to a congressional subpoena seeking information about confidential communications between the President and one of his "principal aides").

2

would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes." *Id.* In a radio speech to the Nation, former President Truman further stressed that it "is just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Text of Address by Truman Explaining to Nation His Actions in the White Case,* N.Y. Times, Nov. 17, 1953, at 26.

Because a presidential adviser's immunity is derivative of the President's, former President Truman's rationale directly applies to former presidential advisers. We have previously opined that because an "immediate assistant to the President may be said to serve as his alter ego . . . the same considerations that were persuasive to former President Truman would apply to justify a refusal to appear [before a congressional committee] by . . . a former [senior presidential adviser], if the scope of his testimony is to be limited to his activities while serving in that capacity." Memorandum for the Counsel to the President from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972).

Accordingly, we conclude that Ms. Miers is immune from compelled congressional testimony about matters, such as the U.S. Attorney resignations, that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity, and therefore she is not required to appear in response to a subpoena to testify about such matters.

Please let me know if we may be of further assistance.

Steven G. Bradbury
Principal Deputy Assistant Attorney General

3

Exhibit 43

No. 08-409 (JDB)

FEB 5 1970

MEMORANDUM FOR THE HONORABLE JOHN D. EHRLICHMAN
Assistant to The President for Domestic Affairs

Re:  Power of Congressional Committee to Compel
     Appearance or Testimony of "White House
     Staff".

     This subject obviously raises the question of "Executive
Privilege", since generally speaking the power of a congres-
sional committee to investigate is an extremely broad one--as
broad as the potential power of Congress to legislate.  Baren-
blatt v. United States, 360 U.S. 109 (1959).  And the power to
investigate carries with it the power to compel the testimony
of a witness:

          "We are of the opinion that the power of inquiry--
     with process to enforce it--is an essential and ap-
     propriate auxiliary to the legislative function."
     McGrain v. Daugherty, 273 U.S. 135.

     Thus, if "White House Staff" 1/ personnel are to be exempt
from appearing or testifying before a congressional committee,
it is because they have some special immunity or privilege not
accorded others.  It may be helpful to mention several closely
related but not identical problems, any one of which could be
the subject of a learned discourse which it would be neither
possible nor profitable for you to read at length:

_____
1/  The term "White House Staff" is not used in any precise
or technical sense.  In view of the conclusions reached, no
useful purpose would be served in attempting to fashion a
definition of the term.

(a)  Cabinet officers in the past have refused to accept subpoenas, but nonetheless have appeared and testified voluntarily on the subject matters specified in the subpoena; the technical question of the manner in which testimony may be compelled, if it is compellable at all, would, I think, be of relatively little concern unless one were defending a contempt prosecution.  If a subpoena is insisted upon, and the committee has its back up, a subpoena will undoubtedly be sent, so that the presence or absence of a subpoena is not likely to be the critical element in a decision as to whether or not a presidential adviser should testify.

(b)  Another slight variant of the problem is the subpoena requiring appearance at a place away from the Seat of Government.  As you may recall, this question arose at the time of the trial of Aaron Burr for treason before John Marshall, sitting as a circuit judge in Richmond.  Marshall issued a subpoena to Thomas Jefferson, who was then President, requiring Jefferson to produce certain documents; Jefferson responded with a letter saying in effect that if the courts were free to summon the President from place to place throughout the United States, he would be at their mercy in a manner incompatible with the coordinate status of the Executive Branch of the Government.  That dispute between these two bitter enemies was not resolved--Jefferson did not in fact appear.

In the misdemeanor prosecution of Aaron Burr, Chief Justice Marshall, while adhering to his position that the President is subject to subpoena, conceded:

"In no case of this kind would a court be required to proceed against the president as against an ordinary individual.  The objections to such a course are so strong and so obvious that all must acknowledge them."  Robertson, Report of the Trials of Aaron Burr, Vol. 2, pp. 233, 236.

- 2 -

Everyone associated with the Executive Branch from then until now, so far as I know, has taken the position that the President himself is absolutely immune from subpoena by anyone, at the Seat of Government or away from it. [2/] This, of course, does not answer the question as to whether his immediate advisers are likewise exempt.

In 1806, a United States circuit court sitting in New York subpoenaed three Cabinet officers to appear and give testimony in a civil proceeding pending before that court. The three Cabinet officers declined to respond to the subpoena, advising the Court by letter that the press of their official duties prevented their absenting themselves from the Seat of Government, but offering to give testimony by deposition. United States v. Smith, 27 Fed. Cases 1194 (No. 16,342) (C.C. N.Y. 1806). A similar ruling involving a Cabinet officer was made by Attorney General Moody in 1905. 25 Ops. A.G. 326.

Thus, the Marshall-Jefferson precedent involved two very strong arguments in favor of privilege which may not be present in other situations. First, the President himself was sought to be subpoenaed; second, he was sought to be subpoenaed to a place away from the Seat of Government. When a lesser official in the Executive Branch is sought to be subpoenaed at the Seat of Government, the Jefferson precedent, in my opinion, cannot be regarded as controlling.

(c) Another related question is the obligation of the Executive Branch to furnish documents in its custody to a congressional investigating committee. This, too, involves a question of Executive privilege, and George Washington asserted such a privilege with respect to documents concerning the ill-fated St. Clair Expedition during

---

[2/] President Jackson repeatedly claimed immunity from the congressional subpoena power. Warren, Presidential Declarations of Independence, 10 Boston University Law Review 1, 8-12 (1930).

- 3 -

his Presidency, and it has been unvaryingly claimed by
his successors. But the claim of privilege for documents
is not necessarily co-extensive with the claim for per-
sonal immunity from subpoena which is the subject of this
memorandum. A claim for documents in the custody of the
Executive Branch necessarily involves Executive business,
whereas it cannot always be said to a certainty in advance
that a White House adviser will necessarily be interrogated
on a matter pertaining to his official duties. There is
here, I think, a certain analogy to judicial proceedings,
which have always made a distinction between a claim of
absolute immunity from even being sworn as a witness, and
a right to claim privilege in answering certain questions
in the course of one's testimony as a witness. The former
type of privilege, so far as I know, extends only to a
criminal defendant (and, under a recent ruling of the
Court of Appeals for the Ninth Circuit, of course, to
Earl Caldwell, a New York Times reporter); the second
type of privilege is available to attorneys, doctors,
those who claim that an answer may incriminate them, and
the like. But all of this second class must at least be
sworn as witnesses, and invoke privilege only with respect
to particular questions or particular lines of testimony.

On the other hand, the furnishing of a document to a
congressional committee involves little, if any, incon-
venience to the Executive Branch or to the President and
his advisers. The requirement of personal attendance of
a witness at a hearing, on the other hand, does involve
some degree of inconvenience, depending on the length of
time the witness is expected to be present, the place
the hearing is to be held, and the closeness of the rela-
tionship between the witness and the President. To this
extent, then, the requirement of personal attendance by a
witness is more burdensome to the Executive than is the
requirement that a document be furnished.

The practice with respect to past White House staff
members has been erratic, and the only examples I have
been able to find are ones concerning intimate advisers

- 4 -

of the President--people in the position such as you
occupy, as opposed to the positions occupied by those
who report to you.

On two occasions during the Administration of Presi-
dent Truman, a subcommittee of the House Committee on
Education and Labor issued subpoenas to John R. Steelman,
who held the title "Assistant to the President". In both
instances he returned the subpoena with a letter stating
that "In each instance the President directed me, in view
of my duties as his Assistant, not to appear before your
subcommittee."

In 1951, Donald Dawson, an Administrative Assistant
to President Truman, was requested to testify before a
Senate Subcommittee investigating the Reconstruction
Finance Corporation, one aspect of which concerned Dawson's
alleged wrongdoing. While President Truman felt that this
request constituted a violation of the principle of the
separation of powers, he nevertheless "reluctantly" per-
mitted Mr. Dawson to testify in order to give him an op-
portunity to clear his name.

In 1944, Jonathan Daniels, an Administrative Assist-
ant to President Roosevelt, refused to respond to a sub-
poena requiring him to testify with respect to his reported
attempts to compel the resignation of the Rural Electrifi-
cation Administrator. He grounded his refusal on the con-
fidential nature of his relationship to the President. The
subcommittee of the Senate Committee on Agriculture then
unanimously recommended that he be cited for contempt.
Thereupon Daniels wrote the Subcommittee Chairman that he
still believed that a legislative committee could not re-
quire either the President or his Administrative Assistant
to testify as to their conversations; that he had since
conferred with the President; that the latter did not think
in the particular matter his testimony would adversely af-
fect the public interest, and that Daniels was therefore
now willing to answer the subcommittee's questions.

- 5 -

Sherman Adams, during the Eisenhower Administration, declined to testify before a committee investigating the Dixon-Yates Power contract on the ground of his confidential relationship with the President, but at a later point in the Administration volunteered to testify with respect to his dealings with Bernard Goldfine.

During the hearings on the nomination of Abe Fortas to be Chief Justice of the United States, the Senate Judiciary Committee requested W. DeVier Pierson, Associate Special Counsel to the President, to appear and testify regarding the drafting of legislation authorizing Secret Service protection for Presidential candidates. It had been reported to the Committee that Justice Fortas had participated in the drafting of this legislation, at a time when he was sitting as Associate Justice of the Supreme Court. Pierson declined the invitation, writing Senator Eastland as follows:

> "As Associate Special Counsel to the President since March, 1967, I have been one of the 'immediate staff assistants' provided to the President by law. (3 U.S.C. 105, 106) It has been firmly established, as a matter of principle and precedents, that members of the President's immediate staff shall not appear before a congressional committee to testify with respect to the performance of their duties on behalf of the President. This limitation, which has been recognized by the Congress as well as the Executive, is fundamental to our system of government. I must, therefore, respectfully decline the invitation to testify in the hearings."

These precedents are obviously quite inconclusive, particularly if one seeks to apply them to lower level White House staff members. In a strictly tactical sense, the Executive Branch has a headstart in any controversy with the Legislative Branch,

- 6 -

since the Legislative Branch wants something the Executive
Branch has, and therefore the initiative lies with the former.
All the Executive has to do is maintain the status quo, and he
prevails. Congress, of course, has the authority to itself
attach and detain a witness whom it regards as contumacious,
and the threat to do this apparently prevailed in the Daniels
incident.

But the question of legal remedies is not the only one in-
volved, as you are well aware. When the President claims Execu-
tive privilege and refuses either to divulge a document or to
permit a witness to testify, he immediately draws to himself
some criticism for "withholding" relevant evidence from the
Congress or from the public. While a soundly determined claim
of Executive privilege is not only in the best interests of the
Executive Branch as an institution but of the President himself,
an inadequately justified claim of Executive privilege, hastily
made at the behest of its beneficiary, may be an actual dis-
service to the President. 3/ The Jonathan Daniels episode seems
to be such an example.

To the extent that any generalizations may be drawn from
the foregoing, they are necessarily tentative and sketchy. I
offer the following:

(1) The President and his immediate advisers--that is,
those who customarily meet with the President on a regular or
frequent basis--should be deemed absolutely immune from testi-
monial compulsion by a congressional committee. They not only
may not be examined with respect to their official duties, but
they may not even be compelled to appear before a congressional
committee. They are presumptively available to the President
24 hours a day, and the necessity of either accommodating a
congressional committee or persuading a court to arrange a more
convenient time, could impair that availability.

---

3/ During the Teapot Dome investigation President Coolidge
considered Attorney General Daugherty's recommendation to invoke
Executive privilege as to his activities in the Department of
Justice so ill-advised that he asked for his resignation. 101
Cong. Rec. 11461.

- 7 -

(2)  I do not think this principle can or ought to be extended to all "members" of the White House staff, whatever that group may include.  Whether one wants to classify on the basis of what appropriation their salaries are paid out of, the building in which they work, or otherwise, lower level White House staff members ought to have some form of testimonial privilege with respect to congressional investigating committees.  But I think it far more in accordance with related doctrines in the law to say that such a privilege is not one which enables them to wholly disregard a subpoena, or to entirely refuse to appear before a congressional committee; instead, it is a privilege to refuse to testify with respect to any matter arising in the course of their official position of advising or formulating advice for the President.

As a practical matter, this distinction may not be of great importance because if the Committee specifies the subject of the testimony in its request, and the subject is one with respect to which privilege may be claimed, the request itself could be declined on that basis.  But in terms of advancing a coherent set of defensible principles, I think the distinction is an important one. 4/

(3)  With respect to Cabinet members, the role of the Legislative Branch is somewhat more substantial; all hold offices and administer departments which are created by Act of Congress.  The Justice Department, for example, administers and enforces hundreds of statutes which are enacted by Congress.  Whether or not the Attorney General himself may be compelled to appear as a witness before a congressional committee to testify as to the manner in which the Department performs these tasks, I think there is no question but that the Department is obligated to furnish some knowledgeable witness in response to a

---

4/  The President can, of course, waive the privilege and permit either class of advisers to testify.  In view of this, the President should be advised of any instance in which a member of the White House staff is subpoenaed or requested to testify.

- 5 -

congressional request for testimony on this subject. On the other hand, I think it equally clear that no Cabinet officer could be interrogated at all with respect to what took place at a Cabinet meeting, or as to any portion of conferences or meetings which were called for the purpose of advising or formulating advice for the President.

(4) It is vital that a recommendation that the President assert privilege be a considered one, because the consequences of initially asserting the claim and then receding from it in the face of public criticism are obviously more hurtful than an initial decision not to assert the claim.

William H. Rehnquist
Assistant Attorney General
Office of Legal Counsel

- 5 -

# Exhibit 44

No. 08-409 (JDB)

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 96-4108-EALR

_____

IN RE: GRAND JURY SUBPOENA DUCES TECUM

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
_____

APPELLANT'S APPENDIX
_____

KENNETH W. STARR
Independent Counsel

JOHN D. BATES
W. HICKMAN EWING
Deputy Counsel

BRETT M. KAVANAUGH
Associate Counsel

Redding Building
1701 Centerview Drive, #203
Little Rock, Arkansas 72211
(501) 221-8700
(202) 514-8688

Attorneys for Appellant

APPENDIX

Grand Jury Subpoena #2006 to The White House
    (June 21, 1996) . . . . . . . . . . . . . . . . . . . . . . 1

Letter from Jane C. Sherburne to John D. Bates
    (June 20, 1996) . . . . . . . . . . . . . . . . . . . . . . 7

Letter from Jane C. Sherburne to John D. Bates
    (July 1, 1996) . . . . . . . . . . . . . . . . . . . . . . 8

Letter from Jane C. Sherburne to John D. Bates
    (July 9, 1996) . . . . . . . . . . . . . . . . . . . . . . 10

Letter from Jane C. Sherburne to John D. Bates
    (July 28, 1996) . . . . . . . . . . . . . . . . . . . . . . 12

Motion of the United States to Compel Production of Documents
    (August 19, 1996) . . . . . . . . . . . . . . . . . . . . . 13

Declaration of John D. Bates . . . . . . . . . . . . . . . . . 15

Declaration of Jane C. Sherburne . . . . . . . . . . . . . . . 20

Supplemental Declaration of Jane C. Sherburne . . . . . . . . 31

Affidavit of David E. Kendall . . . . . . . . . . . . . . . . 33

Supplemental Affidavit of David E. Kendall and Attachments
    Thereto . . . . . . . . . . . . . . . . . . . . . . . . . . 38



Office of the Independent Counsel

*1001 Pennsylvania Avenue, N.W.*
*Suite 490-North*
*Washington, D.C. 20004*
*(202) 514-8688*
*Fax (202) 514-8802*

June 21, 1996

Jane C. Sherburne
Special Counsel to the President
The White House
Washington, DC  20500

Dear Ms. Sherburne:

Enclosed please find a grand jury subpoena issued on behalf of the federal grand jury in the Eastern District of Arkansas for certain documents relating to meetings attended by attorneys from the Office of the Counsel to the President and Hillary Rodham Clinton.  Based on your letter of June 20, 1996, concerning certain notes taken by Miriam Nemetz on July 11, 1995, we recognize that you may decline to produce certain materials responsive to the enclosed subpoena.

If you decline production, we request that you provide us with a log of responsive documents and the basis for withholding production of any such documents.  We request that your response identify precisely any privilege or doctrine upon which you rely. In particular, please make clear whether you assert an attorney-client privilege, an Executive privilege, or the attorney work-product doctrine.  If you assert an attorney-client privilege, please specify the attorney-client relationship that forms the basis for your assertion.

Thank you for your cooperation.

Sincerely,

John D. Bates
Deputy Independent Counsel

# United States District Court

### EASTERN
————————— DISTRICT OF ————————— ARKANSAS

TO:     The White House
        c/o Jane Sherburne, Special
            Counsel to the President

### SUBPOENA TO TESTIFY
### BEFORE GRAND JURY

SUBPOENA FOR:

☐ PERSON    ☒ DOCUMENTS OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District
Court at the place, date, and time specified below.

| PLACE | | |
|---|---|---|
| Federal Grand Jury<br>U.S. Post Office & Courts Bldg., 4th Floor<br>600 West Capitol<br>Little Rock, Arkansas | **ROOM**<br>470 | |
| | **DATE AND TIME**<br>June 28, 1996<br>9:00 a.m. | |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

See attached rider.

☐ *Please see additional information on reverse*

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on
behalf of the court.

| CLERK<br><br>JAMES W. McCORMACK | DATE<br><br>June 21, 1996 |
|---|---|
| (BY) DEPUTY CLERK<br><br>*Rebecca Carpenter* | #2006 |

| This subpoena is issued upon application<br>of the United States of America | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY<br>Independent Counsel<br>Kenneth W. Starr   *KWS/sa*<br>2 Financial Centre, Suite 134<br>10825 Financial Centre Parkway<br>Little Rock, Arkansas  72211 (501) 221-8700 |
|---|---|

*If not applicable enter none

SUBPOENA RIDER

A.   All documents created during meetings attended by any attorney from the Office of the Counsel to the President and Hillary Rodham Clinton (regardless whether any other person was present) on the following dates:

> July 11, 1995
> July 17, 1995
> July 20, 1995
> July 21, 1995

B.   All documents created during any meeting attended by any attorney from the Office of the Counsel to the President and Hillary Rodham Clinton (regardless whether any other person was present), between January 1, 1993, and the present, which relate in any way to James B. McDougal, Madison Guaranty Savings & Loan, Whitewater Development Corporation, David L. Hale, or Capital Management Services, Inc.

C.   All documents created during any meeting attended by any attorney from the Office of the Counsel to the President and Hillary Rodham Clinton (regardless whether any other person was present), between July 20, 1993, and the present, which relate in any way to the death of Vincent W. Foster, Jr., documents in the office of Vincent W. Foster, Jr., at the time of his death, or events between July 20 and July 27, 1993.

D.   All documents reflecting the substance of any statement made at any meeting described in paragraphs A, B, or C.

If any of the above requested documents and/or communications have previously been produced, please so state and identify the documents and/or communications by Bates number.

### Definitions and Instructions

1.   Definitions

a.   The term "document" or "documents" as used in this subpoena means all records of any nature whatsoever within your possession, custody, or control or the possession, custody, or control of any agent, employee, representative, or other person acting or purporting to act for or on your behalf or in concert with you, including but not limited to memoranda, records, reports, notes, books, files, summaries or records of conversations, meetings, or interviews, summaries or records of telephone conversations, diaries, calendars, datebooks, telegrams, facsimiles, telexes, telefaxes, electronic mail, computerized records stored in the form of magnetic or electronic coding on computer media or on media capable of being read by computer or with the aid of computer related equipment, including but not limited to floppy disks or diskettes, disks, diskettes,

disk packs, fixed hard drives, removable hard disk cartridges,
mainframe computers, Bernoulli boxes, optical disks, WORM disks,
magneto/optical disks, floptical disks, magnetic tape, tapes,
laser disks, video cassettes, CD-ROMs, and any other media
capable of storing magnetic coding, microfilm, microfiche and
other storage devices, voicemail recordings, and all other
written, printed, or recorded or photographic matter or sound
reproductions, however produced or reproduced.

       The term "document" or "documents" also includes
any earlier, preliminary, preparatory, or tentative version of
all or part of a document, whether or not such draft was
superseded by a later draft and whether or not the terms of the
draft are the same as or different from the terms of the final
document.

       b.   The term "communication" or "communications"
is used herein in its broadest sense to encompass any
transmission or exchange of information, ideas, facts, data,
proposals, or any other matter, whether between individuals or
between or among the members of a group, whether face-to-face, by
telephone, or by means of electronic or other medium.

       c.   "Possession, custody, or control" means in
your physical possession and/or if you have the right to secure
or compel the production of the document or a copy from another
person or entity having physical possession, including, but not
limited to, your counsel.

       d.   The term "referring or relating" to any given
subject means anything that constitutes, contains, embodies,
reflects, identifies, states, refers to, deals with, or is in any
manner whatsoever pertinent to that subject including, but not
limited to, documents concerning the preparation of other
documents.

      2.   <u>Instructions</u>

       a.   The originals of all documents and
communications must be produced, as well as copies within your
possession, custody, or control.

       b.   If any original document cannot be produced
in full, produce such document to the extent possible and
indicate specifically the reason for your inability to produce
the remainder.

       c.   Documents shall be produced as they are kept
in the usual course of business, as organized in the files.

       d.   File folders, labels, and indices identifying
documents called for shall be produced intact with such
documents.  Documents attached to each other should not be
separated

e.    In reading this rider, the plural shall include the singular and the singular shall include the plural.

f.    The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.  The use of the word "including" shall be construed without limitation.

g.    In the event that any document, or portion thereof, called for by this subpoena is withheld on the basis of any claim of privilege or similar claim, that document shall be identified in writing as follows: (a) author; (b) the position or title of the author; (c) addressee; (d) the position or title of the addressee; (e) any indicated or blind copies; (f) date; (g) a description of the subject matter of the document; (h) number of pages; (i) attachments or appendices; (j) all persons to whom the document, its contents, or any portion thereof, has been disclosed, distributed, shown, or explained; and (k) present custodian.  Each basis you contend justifies the withholding of the document shall also be specified.  With respect to those documents or records as to which you may claim privilege, or attorneys' work product, set forth as to each such document the basis for such claim, including the purpose and circumstances surrounding the creation of the document, the identity of each person who has been privy to such communication reflected in the document, the identity of any person or entity instructing the subpoena recipient or the attorney of the subpoena recipient to withhold production of the document, and whether you will submit the document to the Court for an in camera determination as to the validity of the claim.  If the existence of a joint defense agreement or any agreement as to common interest is relevant to the assertion of any claim of privilege or similar claim, please provide a copy of that agreement; if any such agreement is not in writing, please set forth the date of the creation of the agreement, the identities of all parties to the agreement and the specific individuals who entered into the agreement on behalf of those parties, and the objects, purposes, and scope of the agreement.

h.    In the event that any document called for by this subpoena has been lost, destroyed, deleted, altered, or otherwise disposed of, that document shall be identified in writing as follows: (a) author; (b) the position or title of the author; (c) addressee; (d) the position or title of the addressee; (e) indicated or blind copies; (f) date; (g) a brief description of the subject matter of the document; (h) number of pages; (i) attachments or appendices; (j) all persons to whom the document, its contents, or any portion thereof, had been disclosed, distributed, shown or explained; (k) the date of the loss, destruction, deletion, alteration, or disposal and the circumstances thereof; and (l) the reasons, if any, for the loss, destruction, deletion, alteration, or disposal and the person or persons responsible.

    i.  If any information or data is withheld because such information or data is stored electronically, it is to be identified by the subject matter of the information or data and the place or places where such information is maintained.

THE WHITE HOUSE

WASHINGTON

June 20, 1996

BY FACSIMILE

John Bates
Deputy Independent Counsel
Office of the Independent Counsel
1001 Pennsylvania Avenue, N.W.
Suite 490-North
Washington, D.C.  20004

Dear John:

      I write in response to your request that the White House produce to your Office certain notes taken by Miriam Nemetz at a meeting with Mrs. Clinton on July 11, 1995.  Ms. Nemetz is an Associate Counsel to the President.  In addition to Mrs. Clinton and Ms. Nemetz, David Kendall, Mrs. Clinton's personal attorney, and I attended the meeting.

      This meeting constituted a privileged communication between Mrs. Clinton and lawyers representing her in personal and official capacities.  The notes are lawyer work product. Accordingly, we continue to withhold the notes from production.

      I apologize for the day's delay in responding to your letter and appreciate your indulgence.

      Sincerely yours,

Jane C. Sherburne
Special Counsel to the President

cc:  David E. Kendall, Esq.

APPENDIX — PAGE 7

THE WHITE HOUSE

WASHINGTON

July 1, 1996

BY FACSIMILE

John D. Bates
Deputy Independent Counsel
Office of the Independent Counsel
1001 Pennsylvania Avenue, N.W.
Suite 490 North
Washington, D.C.   20004

Re:   Subpoena #2006

Dear John:

In addition to documents previously produced or described to your office, we have identified the following documents responsive to subpoena #2006 dated June 21, 1996:

1.   Draft file memorandum dated June 17, 1994, from David Kendall memorializing Mrs. Clinton's June 12, 1994, Independent Counsel interview.

2.   Typed notes reflecting portions of the file memorandum described in Paragraph 1.

3.   Handwritten notes of Lloyd Cutler of Mrs. Clinton's June 12, 1994, Independent Counsel interview.

4.   Handwritten notes of Jane Sherburne of Mrs. Clinton's April 22, 1995, Independent Counsel interview.

5.   Facsimile dated July 28, 1995, from Nicole Seligman to Jane Sherburne attaching typed notes of Mrs. Clinton's July 22, 1995, Independent Counsel interview.

6.   Handwritten notes of Jane Sherburne of Mrs. Clinton's July 22, 1995, Independent Counsel interview.

7.   Handwritten notes of David Fein of Mrs. Clinton's July 22, 1995, Independent Counsel interview.

John D. Bates, Deputy Independent Counsel
July 1, 1996
Page 2

        8.    Handwritten notes of Jane Sherburne of meeting
             with Mrs. Clinton following Mrs. Clinton's January
             26, 1996, grand jury appearance.

      Document 8 is also responsive to subpoena #D543 dated
April 9, 1996, because it mentions Vincent Foster.  I regret the
delay in identifying this document as responsive to that
subpoena.

      As requested in your letter of June 28, 1996, we will
complete our response by no later than July 9, 1996.

      As with documents previously produced, we understand
that your office will treat the information conveyed in this
letter as confidential and entitled to all protection accorded by
law, including Federal Rule of Criminal Procedure 6(e), to
documents subpoenaed by a federal grand jury.

      Please feel free to call me if you have any questions.

                 Sincerely yours,

                 Jane C. Sherburne
                 Special Counsel to the President

THE WHITE HOUSE

WASHINGTON


July 9, 1996


BY FACSIMILE

John D. Bates
Deputy Independent Counsel
Office of the Independent Counsel
1001 Pennsylvania Avenue, N.W.
Suite 490-North
Washington, D.C.  20004

Dear John:

I am writing to complete our response to subpoena #2006 dated June 21, 1996, and your letter of June 28, 1996.

We have not identified any additional documents responsive to the subpoena.  Our bases for withholding the documents described in my letter of July 1, 1996, are as follows:

1.   Executive privilege; attorney work-product doctrine.

2.   Executive privilege; attorney work-product doctrine.

3.   Executive privilege; attorney work-product doctrine.

4.   Executive privilege; attorney work-product doctrine.

5.   Executive privilege; attorney work-product doctrine.

6.   Executive privilege; attorney work-product doctrine.

7.   Executive privilege; attorney work-product doctrine.

8.   Executive privilege; attorney work-product doctrine; attorney-client privilege (official and personal).

John D. Bates
July 9, 1996
Page 2


        The bases for withholding the notes described in my
letter of June 20, 1996, are executive privilege, the attorney
work-product doctrine, and the attorney-client privilege (both
official and personal).

        As with documents previously produced, we understand
that your Office will treat the information conveyed in this
letter as confidential and entitled to all protection accorded by
law, including Federal Rule of Criminal Procedure 6(e), to
documents subpoenaed by a federal grand jury.

        Please feel free to call me if you have any questions.

                        Sincerely yours,

                        Jane C. Sherburne
                        Special Counsel to the President

THE WHITE HOUSE

WASHINGTON

July 28, 1996

**BY TELECOPY**

John D. Bates
Deputy Independent Counsel
Office of the Independent Counsel
1001 Pennsylvania Avenue, N.W.
Suite 490 North
Washington, D.C.  20004

Re:  Subpoena #2006

Dear John:

You requested that I provide you with information about those present when I created the notes identified to you in Paragraph 8 of my July 1, 1996 letter.  I confirm the information I gave to you orally:  the notes were taken in two sittings; those present for the first at the Courthouse, in addition to myself and Mrs. Clinton, were Mrs. Clinton's private counsel David Kendall and Nicole Seligman and White House Counsel Jack Quinn; Mr. Quinn was not present during the second sitting, which took place in the White House Residence.

Please let me know if you have further questions.

Sincerely yours,

Jane C. Sherburne
Special Counsel to the President

# Exhibit 45

No. 08-409 (JDB)

<u>Democratic National Committee v. United States Department of Justice</u>

Civil Action No. 07-712 (ESH)
U.S. District Court
District of Columbia

<u>Vaughn Index</u>

Description of the records of the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General currently at issue, and protected in full and in part by FOIA Exemption 5 (deliberative process and presidential communications privileges). The withheld records are divided into groups and are described below.

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 3 | 3/21/2006 | One e-mail from the White House to the Department which forwards an e-mail regarding an impending Congressional hearing. The author of the e-mail solicits Department of Justice assistance with respect to the hearing. | Presidential communications privilege in full<br><br>Deliberative process privilege in part | 3 pages withheld in full |
| | 12/14/2005 | One e-mail chain comprising internal White House discussion regarding how to handle a response to an inquiry from the North Dakota Attorney General's Office. The inquiry itself and an attachment thereto have been released. | Deliberative process privilege in part | 2 pages withheld in part |

1

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 6 | 8/22/2006 to 5/14/2007 | E-mails from the White House to members of the Judicial Selection Committee (JSC) which advise of dates, times, and locations of upcoming JSC meetings, cancellations of meetings, and a list of the participants. | Presidential communications privilege in full | 18 pages withheld in full |
|  | 2/12/2007 | Portions of two e-mail communications discussing a proposed plan of action regarding nominations, which stemmed from an earlier meeting of the JSC. | Presidential communications privilege in part<br><br>Deliberative process privilege in part | 1 page withheld in part |
| 21 | 12/20/2006 | One e-mail chain comprising a discussion between the White House and the Department of Justice in which the Department assists the White House with the process of selecting a new United States Attorney. The authors discuss potential candidates and the development of a selection process. | Presidential communications privilege in full<br><br>Deliberative process privilege in part | 2 pages withheld in full |

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 25 | 2/16/2007 | Portions of two e-mail chains which consist of a back and forth discussion between the White House and the Department of Justice considering how to handle the Department's response to an issue in controversy regarding the nomination of a United States Attorney, including suggested revisions to a previously released statement. | Deliberative process privilege in part | 4 pages withheld in part |
| | 2/7/2007 | Portions of one e-mail chain which consist of discussion between the White House and the Department of Justice considering how to respond to a news article about the replacement of a United States Attorney. | Deliberative process privilege in part | 2 pages withheld in part |
| 26 | 8/11/2005 to 12/14/2006 | Various e-mails between the White House and the Department conferring on the impending appointment of United States Attorneys, including back and forth discussion on hiring issues and background information on candidates. | Presidential communications privilege in full  Deliberative process privilege in part | 23 pages withheld in full |

3

| Group Number | Date | Description | Privilege | Pages |
|---|---|---|---|---|
| 28 | 3/10/2005 to 5/9/2005 | Portions of e-mail communications discussing the hiring of a particular individual to the Department, including back and forth discussion of hiring considerations such as details about the interviewing process, the candidate's potential start date, placement of the candidate, and the general merits of bringing the individual into the Department. | Deliberative process privilege in part | 13 pages withheld in part |

4