# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY, UNITED           )
STATES HOUSE OF REPRESENTATIVES,             )
                                             )
                                Plaintiff,   )
                                             )
                v.                           )   Civil Action No. 1:08cv00409 (JDB)
                                             )
HARRIET MIERS and                            )
JOSHUA BOLTEN, in his capacity as custodian  )
of White House records,                      )
                                             )
                                Defendants.  )
_____    )

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

defendants respectfully move this Court for an order dismissing the Complaint (dkt. no. 1). The

grounds for defendants' Motion are set forth in the accompanying Memorandum of Points and

Authorities in Support of Defendants' Motion to Dismiss and in Opposition to Plaintiff's Motion

for Partial Summary Judgment on Counts I and II and exhibits.

Dated: May 9, 2008                    Respectfully submitted,

                                      GREGORY G. KATSAS
                                      Acting Assistant Attorney General

                                      CARL J. NICHOLS
                                      Principal Deputy Associate Attorney General

                                      JOHN C. O'QUINN
                                      Deputy Associate Attorney General

                                      JOSEPH H. HUNT
                                      Director, Federal Programs Branch

                                      /s/_____
                                      JOHN R. TYLER (D.C. Bar No. 297713)
                                      JAMES J. GILLIGAN (D.C. Bar No. 422152)
                                      NICHOLAS A. OLDHAM (D.C. Bar No. 484113)
                                      HELEN H. HONG (CA SBN 235635)
                                      STEPHEN J. BUCKINGHAM
                                      Attorneys
                                      United States Department of Justice
                                      Civil Division, Federal Programs Branch
                                      20 Massachusetts Avenue, N.W.
                                      Washington, DC  20530
                                      Telephone: (202) 514-2000

                                      ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> Plaintiff, <br><br> v. <br><br> HARRIET MIERS and JOSHUA BOLTEN, in his capacity as custodian of White House records, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 1:08cv00409 (JDB) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II

GREGORY G. KATSAS
Acting Assistant Attorney General

CARL J. NICHOLS
Principal Deputy Associate Attorney General

JOHN C. O'QUINN
Deputy Associate Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

JOHN R. TYLER (D.C. Bar No. 297713)
JAMES J. GILLIGAN (D.C. Bar No. 422152)
NICHOLAS A. OLDHAM (D.C. Bar No. 484113)
HELEN H. HONG (CA SBN 235635)
STEPHEN J. BUCKINGHAM
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ........................................................................................... 7

    A.    Congressional Demands for Executive Papers ........................................ 7

    B.    Demands For Information And Inter-branch Accommodations
         During The 110th Congress ............................................................ 10

    C.    The Committee's Investigation of the Dismissal of Nine
         U.S. Attorneys ........................................................................... 11

    D.    The President's Substantial Efforts To Accommodate Congress
         And Congress's Subpoenas ............................................................ 13

    E.    The President's Response To The Subpoenas ..................................... 16

    F.    Ms. Miers's Response To The Subpoena Directed To Her ................... 19

    G.    The Committee's Civil Action ........................................................ 20

ARGUMENT ............................................................................................ 22

I.    THE COMMITTEE LACKS ARTICLE III STANDING TO BRING
    THIS SUIT ............................................................................................ 23

    A.    The Committee Does Not Raise a Dispute of the Kind
         Traditionally Thought to be Capable of Judicial Resolution .............. 24

    B.    The Committee Has Not Demonstrated That It Has Suffered
         The Kind Of Injury Traditionally Redressed By Article III Courts ......... 28

    C.    The Committee Cites No Authority That Supports Its Assertion
         of Standing in Light of <u>Raines</u> ........................................................ 34

II.   THE COMPLAINT MUST BE DISMISSED BECAUSE THE
    COMMITTEE DOES NOT HAVE A CAUSE OF ACTION THAT
    AUTHORIZES THIS SUIT ...................................................................... 37

III.    THE COURT SHOULD DECLINE TO EXERCISE ANY
        JURISDICTION IT MAY HAVE UNDER THE
        DECLARATORY JUDGMENT ACT ........................................................................ 43

IV.    MS. MIERS IS ABSOLUTELY IMMUNE FROM THE COMPELLED
        TESTIMONY SOUGHT BY THE COMMITTEE ........................................................ 47

        A.    The President's Senior Advisers Are Absolutely Immune
              From Compelled Congressional Testimony ........................................................ 48

        B.    Ms. Miers Is Immune from Compelled Testimony Even
              Though She No Longer Serves As The President's Counsel ............................. 56

        C.    The Committee Does Not Have A Fundamental Or Comprehensive
              Need For The Compelled Testimony Of The President's Immediate
              Advisers ............................................................................................................ 59

V.    THERE IS NO LEGAL REQUIREMENT THAT THE WHITE HOUSE PRODUCE A
        PRIVILEGE LOG TO A CONGRESSIONAL COMMITTEE IN RESPONSE TO A
        REQUEST FOR DOCUMENTS .................................................................................... 62

        A.    No Law Exists Requiring The White House To Produce A Privilege
              Log To A Congressional Committee In Response To A Request For
              Documents ........................................................................................................ 63

        B.    Requiring the President And His Advisers To Provide Congress
              With A Privilege Log Would Violate The Separation of Powers ...................... 67

CONCLUSION ....................................................................................................................... 74

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                                    <u>PAGE(S)</u>

<u>Abbott Labs. v. Gardner</u>, 387 U.S. 136 (1967) ........................................................... 46

<u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001) ............................................... 4, 37, 39

<u>Allen v. Wright</u>, 468 U.S. 737 (1984) ........................................................... 24, 25

<u>Armstrong v. Bush</u>, 924 F.2d 282 (D.C. Cir. 1991) ................................................ 40

<u>Armstrong v. Executive Office of the President</u>, 1 F.3d 1274
    (D.C. Cir. 1993) .............................................................................. 55, 64, 65

<u>Ass'n of Amer. Physicians and Surgeons v. Clinton</u>, 997 F.2d 898
    (D.C. Cir. 1993) .............................................................................. 52

<u>Barenblatt v. United States</u>, 360 U.S. 109 (1959) .................................................. 34

<u>Barnes v. Kline</u>, 759 F.2d 21 (D.C. Cir. 1985) ..................................... 26, 30, 33, 70

<u>Bender v. Williamsport Area Sch. Dist.</u>, 475 U.S. 534 (1986) .............................. 28

<u>Braxton Cty. Ct. v. West Virginia ex rel. Dillon</u>, 208 U.S. 192 (1908) .................... 29

<u>Buck v. Am. Airlines, Inc.</u>, 476 F.3d 29 (1st Cir. 2007) ........................................ 4, 39

<u>Buckley v. Valeo</u>, 424 U.S. 1 (1976) ....................................................................... 38

<u>Cale v. City of Covington</u>, 586 F.2d 311 (4th Cir. 1978) ........................................ 38

<u>Califano v. Sanders</u>, 430 U.S. 99 (1977) ............................................................... 38

<u>Cheney v. United States District Court for the District of Columbia</u>,
    542 U.S. 367 (2004) .............................................................................. <u>passim</u>

<u>Chenoweth v. Clinton</u>, 181 F.3d 112 (D.C. Cir.1999) ............................... 26, 27, 34

<u>Chisolm v. Roemer</u>, 501 U.S. 380 (1991) ............................................................. 41

<u>Clinton v. Jones</u>, 520 U.S. 680 (1997) ............................................................. 57, 58

<u>DaimlerChrysler Corp. v. Cuno</u>, 126 S. Ct. 1854 (2006) ..................................... 24

Davis v. Passman, 442 U.S. 228 (1979) ............................................................ 38

Dellums v. Powell, 561 F.2d 242 (D.C. Cir. 1977) .................................. 63, 64, 72

Dellums v. Powell, 642 F.2d 1351 (D.C. Cir. 1980) ................................ 63, 64, 72

Democratic Nat'l Comm. v. U.S. Dep't of Justice, No. 07-712,
     2008 WL 803421 (D.D.C. March 27, 2008) ................................ 65

John Doe, Inc. v. DEA, 484 F.3d 561 (D.C. Cir. 2007) ............................ 35

Dow Jones & Co., Inc. v. Harrods, Ltd., 346 F.3d 357 (2d Cir. 2003) .................... 44

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1 (2004) ................................ 37

Emspak v. United States, 349 U.S. 190 (1955) ................................ 65, 66

FEC v. Akins, 524 U.S. 11 (1998) ........................................... 32

Gonzaga v. Doe, 536 U.S. 273 (2002) ........................................... 39

Gravel v. United States, 408 U.S. 606 (1972) ................................ 49, 52

Guerrero v. Clinton, 157 F.3d 1190 (9th Cir. 1998) ........................... 36

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) ......................... 32

Hutcheson v. United States, 369 U.S. 599 (1962) ............................. 65

Jackson v. Culinary Sch. of Washington, Ltd., 27 F.3d 573 (D.C. Cir. 1994) ........ 45, 47

Jones v. United States, 526 U.S. 227 (1999) ................................. 41

Loving v. United States, 517 U.S. 748 (1996) ................................ 48

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ........................ 25

Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803) ....................... 25

McGrain v. Dougherty, 273 U.S. 135 (1927) ................................. 33

Moore v. U.S. House of Representatives, 733 F.2d 946 (D.C. Cir. 1984) ......... passim

Myers v. United States, 272 U.S. 52 (1926) ................................. 58

<u>Nixon v. Administrator of General Services</u>, 433 U.S. 425 (1977) ............................... 49, 55, 67

<u>Nixon v. Fitzgerald</u>, 457 U.S. 731 (1982)  .......................................................... <u>passim</u>

<u>Nixon v. Sirica</u>, 487 F.2d 700 (D.C. Cir. 1973) ........................................................ 7, 37

<u>Okpalobi v. Foster</u>, 244 F.3d 405 (5th Cir. 2001) (emphasis added)  ......................... 39

<u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89 (1984)  ............................ 35

<u>Public Citizen v. U.S. Dep't of Justice</u>, 491 U.S. 440 (1989)  ..................................... 32

<u>Public Serv. Comm'n of Utah v. Wycoff Co.</u>, 344 U.S. 237 (1952) ............................. 44

<u>Quinn v. United States</u>, 349 U.S. 599 (1962)  ..................................................... 65, 66

<u>Raines v. Byrd</u>, 521 U.S. 811 (1997) ............................................................... <u>passim</u>

<u>Reed v. Cty. Commissioners of Delaware Cty, Pa.</u>, 277 U.S. 376 (1928)  ................. 42

<u>Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228 (D.C. Cir. 2003)  ......................... 40

<u>Rooney v. Secretary of Army</u>, 293 F. Supp. 2d 111 (D.D.C. 2003) ........................... 44

<u>Ryan v. Dep't of Justice</u>, 617 F.2d 781 (D.C. Cir. 1980) .................................... 55, 65

<u>Sanders v. McClellan</u>, 463 F.2d 894 (D.C. Cir. 1972)  ........................................... 67

<u>Schnapper v. Foley</u>, 667 F.2d 102 (D.C. Cir. 1981)  ............................................... 39

<u>In re Sealed Case</u>, 121 F.3d 729 (D.C. Cir. 1997)  ....................................... 28, 51, 52

<u>Senate Select Committee v. Nixon</u>, 498 F.2d 725 (D.C. Cir. 1974)  .................... <u>passim</u>

<u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26 (1976)  ....................................... 24

<u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83 (1998)  ..................................... 35

<u>Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.</u>, 128 S.Ct. 761 (2008)  ......... 38, 39

<u>Texas Indus. v. Radcliff Materials,  Inc.</u>, 451 U.S. 630 (1981) ........................... 39, 41

<u>Touche Ross & Co. v. Redington</u>, 442 U.S. 560 (1979)  ........................................... 40

<u>Townsend v. United States</u>, 95 F.2d 352 (D.C. Cir. 1938) ....................................... 53

U.S. House of Representatives v. U.S. Dep't of Commerce, 11 F. Supp. 2d 76
        (D.D.C. 1998), appeal dismissed, 525 U.S. 316, 344 (1999) ........................................ 35

United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) ............................................ 8, 28, 34, 45

United States v. AT&T, 567 F.2d 121 (D.C. Cir. 1977) ..................................................... 8, 9, 73

United States v. Nixon, 418 U.S. 683 (1974) ....................................................................... passim

United States v. Richardson, 418 U.S. 166 (1974) .............................................................. 26, 47

United States v. Tobin, 195 F. Supp. 588 (D.D.C. 1961),
        rev'd, 306 F.2d 270 (D.C. Cir. 1962) ............................................................................. 54

United States v. United States House of Representatives,
        556 F. Supp. 150 (D.D.C. 1983) .................................................................................... 45

Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,
        454 U.S. 464 (1982) .......................................................................................... 24, 28, 36

Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973) ...................................................................... 64

Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765 (2000) ....................... 25

Walker v. Cheney, 230 F. Supp. 2d 51 (D.D.C. 2002) ....................................................... passim

Watkins v. United States, 354 U.S. 178 (1957) ......................................................................... 61

Wheeldin v. Wheeler, 373 U.S. 647 (1963) ............................................................................... 38

Wilton v. Seven Falls Co., 515 U.S. 277 (1995) ....................................................................... 44

Zadvydas v. Davis, 533 U.S. 678 (2001) ............................................................................. 40, 63

## UNITED STATES CONSTITUTION

Art. I, § 6, cl. 1 ....................................................................................................................... 52

Art. II, § 3 ................................................................................................................................ 50

## STATUTES

2 U.S.C. § 192 ..................................................................................................... 43, 65

2 U.S.C. § 194 ..................................................................................................... 21, 43

2 U.S.C. § 288 ........................................................................................................... 41

2 U.S.C. § 288d(a) .................................................................................................... 42

5 U.S.C. § 552(b)(5) ................................................................................................. 55

28 U.S.C. § 1331 ....................................................................................................... 39

28 U.S.C. § 1345 ....................................................................................................... 38

28 U.S.C. § 1365 ....................................................................................................... 41

28 U.S.C. §§ 2201-2202 ...................................................................................... passim

28 U.S.C. § 2201(a) .................................................................................... 4, 39, 40, 44

## FEDERAL RULE OF CIVIL PROCEDURE

Fed. R. Civ. P. 26 ....................................................................................................... 6

Fed. R. Civ. P. 26(b)(5)(A)(ii) ................................................................................ 68

Fed. R. Civ. P. 26(c) ................................................................................................. 54

Fed. R. Civ. P. 53(a) ................................................................................................. 72

## FEDERAL RULE OF CRIMINAL PROCEDURE

Federal Rule of Criminal Procedure 17(c) ................................................................ 59

## LEGISLATIVE MATERIAL

4 Fed. Reg. 3864, Exec. Order No. 8248 (Sept. 9, 1938) ......................................... 51

H.R. Rep. No. 423, 110th Cong., 1st Sess. (2007) ............................................... 14, 20

U.S. Senate. Statements on Introduced Bills and Joint Resolutions S.2170. <u>Cong. Rec</u>. 94th Cong., 1st Sess., 1975, 121, no. 19 (July 24, 1975):24597-24600  ............................................  42

Congressional Right to Information Act,
    S. 2432, § 343, 93rd Cong., 1st Sess. (1973)  ..................................................................  42

S. Rep. No. 170, 95th Cong., 1st Sess. 89, 96 (1977), 1978 U.S.C.C.A.N. 4216, 4313 .............  42

## <u>MISCELLANEOUS</u>

3 Annals of Congress 493 (Mar. 27, 1792) ....................................................................................  7

5 J. Marshall, The Life of George Washington 200 (1807) ............................................................  8

8 Messages & Papers Pres. 381 (1898) .....................................................................................  8, 11

<u>Assertion of Executive Privilege With Respect to Clemency Decision</u>,
    23 Op. O.L.C. 1 (1999) .......................................................................................  <u>passim</u>

Harold C. Relyea, <u>The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide</u> 6 (Harold C. Relyea, ed. 1997)  ..............................................................  51

<u>Immunity of Former Counsel to the President From Compelled Congressional Testimony</u>, 31 Op. O.L.C. 1 (2007) .....................................................  19, 50

John R. Steelman & H. Dewayne Kreager, <u>The Executive Office as Administrative Coordinator</u>, 21 L. & Contemp. Probs. 688 (1956)  ........................................................  51

Mem. From John M. Harmon, Assistant Attorney General, Office of Legal Counsel, <u>Re:</u> <u>Executive Privilege</u> at 5 (May 23, 1977) .........................................................................  53

Presidential Advisers Testimony Before Congressional Committees:
    An Overview (April 14, 2004) ......................................................................................  51

Testimony of Sara Taylor, <u>S. Comm. on the Judiciary: Preserving Prosecutorial Independence</u> (July 11, 2007) .........................................................................................  12

Testimony of J. Scott Jennings, <u>S. Comm. on the Judiciary: Preserving Prosecutorial Independence</u> (August 2, 2007) .................................................................  12

<u>Texts of Truman Letter and Velde Reply</u>, N.Y. Times, Nov. 13, 1953 ........................................  57

## PRELIMINARY STATEMENT

This lawsuit and the relief it seeks are unprecedented.  Never in American history has a federal court ordered an Executive Branch official to testify before Congress, and never in American history has the Executive Branch been required by court order to produce documents or a privilege log to Congress.  For over two hundred years, when disputes have arisen between the political branches concerning the testimony of Executive Branch witnesses before Congress, or the production of Executive Branch documents to Congress, the branches have engaged in negotiation and compromise and, when necessary, have exercised the panoply of political tools at their disposal to resolve their differences through mutual accommodations.  Despite that history, Plaintiff Committee on the Judiciary of the U.S. House of Representatives ("Committee") asks this Court to place itself in the middle of such an inter-branch dispute.  If permitted to continue, this suit would fundamentally upset the separation of powers by fixing judicially enforceable rules for a process governed by political accommodations for over two centuries.

Far from presenting any reason to depart from the longstanding practice of requiring Congress and the Executive Branch to resolve such inter-branch disputes without judicial involvement, this case demonstrates the necessity and wisdom of that practice.  The Committee's demands strike at the heart of the President's ability to obtain candid advice from his most intimate advisers, and at the very core of his constitutional prerogatives.  The Committee does not seek to compel the testimony of just any Executive Branch employee, or the production of just any Executive Branch documents; rather, the Committee seeks the testimony of the President's Counsel and documents from his immediate White House Office created in the exercise (by the President's staff) of a core, constitutional power.  Nor has the Committee been stiff-armed by the Executive Branch:  the Department of Justice already has produced or made

available to Congress nearly 12,000 pages of documents, and fourteen current or former Department of Justice officials have testified or have been interviewed for over 120 hours.

This case arises in a context in which the Committee's need for White House documents and testimony is at its nadir because the Department's response provided the Committee with extraordinary access to the Department's deliberations and communications with the White House regarding the removal of the U.S. Attorneys. For the Committee to seek White House documents and testimony on top of all of that goes beyond exercising its oversight authority concerning how an Executive Department has carried out statutory functions given to it by Congress. Instead, the Committee's inquest goes directly to the power to nominate and remove officers of the Executive Branch – a quintessentially executive function vested in the President, and the President alone, by Article II of the Constitution. Indeed, the role created for the Congress by the Constitution regarding the nomination and replacement of these officers is a narrow one granted to the Senate, not the House of Representatives. And the Legislative Branch may vindicate its interests without enlisting judicial support: Congress has a variety of other means by which it can exert pressure on the Executive Branch, such as the withholding of consent for Presidential nominations, reducing Executive Branch appropriations, and the exercise of other powers Congress has under the Constitution.

Nor can the Committee rely on mere assertions of wrongdoing by the President or his senior advisers to justify judicial intervention. Article II commits to the Executive the criminal investigative powers, while Congress's "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 732 (D.C. Cir. 1974). If Congress believes Executive Branch

officials have broken the law, the Constitution makes clear that Congress cannot proceed to federal court on its own, but must refer those matters to the Executive Branch or exercise the ample powers it possesses under Article I of the Constitution.

In short, the Committee's claim for judicial relief ignores well-established constitutional limits on the Legislative Branch, as well as the judiciary, and would lead the courts into wholly uncharted waters.  It is therefore not surprising that at least three separate and independent grounds support dismissal of the entire Complaint as a matter of law.

*First*, under Raines v. Byrd, 521 U.S. 811 (1997), the Court lacks Article III jurisdiction to entertain this suit.  In holding that the plaintiff-Congressmen lacked standing in that case, Raines made clear that the consistent historical practice of resolving inter-branch disputes without resort to the federal courts is highly relevant to the Article III analysis, and that our constitutional regime "contemplates a more restricted role for Article III courts" with respect to disputes concerning the respective supremacy of the political Branches' powers.  Id. at 828.  As Justice Souter put it in his concurrence, "the fact that [this] dispute involve[s] only officials, and the official interests of those, who serve in the branches of the National Government, [lying] far from the model of the traditional common-law cause of action at the conceptual core of the case-or-controversy requirement," weighed decisively against plaintiffs' Article III standing.  Id. at 833 (Souter, J., concurring).  These principles apply with even greater force in this context – perhaps the prototypical example of a dispute left to the political branches – and make clear that the Court lacks Article III jurisdiction over this dispute.

The Committee attempts to establish its Article III standing, and therefore this Court's Article III jurisdiction, by claiming that it is suffering an "informational injury."  But this Court already has rejected an effort to turn a congressional interest in information into an Article III

injury.  In <u>Walker v. Cheney</u>, 230 F. Supp. 2d 51 (D.D.C. 2002), this Court held that the

Comptroller General lacked Article III standing to compel the release of documents concerning

the composition and conduct of the National Energy Policy Development Group chaired by the

Vice President.  The same result is required here.  The Committee – like the Comptroller General

in <u>Walker</u> – claims that it has been deprived of information to which it is entitled; contends that

it seeks that information in order to "assess[ ] the need for and merits of future legislative

changes"; and argues that the information is necessary to "assist Congress in the discharge of its

legislating and oversight functions." <u>Id.</u> at 67 (internal citation omitted); Compl. ¶ 27; Pl's

Mem. at 19-20.  But the claimed injury here, as in <u>Walker</u>, is not the kind of private,

individualized injury that Article III requires.  Rather, the asserted injury is an "abstract dilution

of institutional legislative power" – the kind of matter that is to be resolved in the give-and-take

of the accommodation process, not in the Article III courts.  <u>Walker</u>, 230 F. Supp. 2d at 67

(internal quotation marks and citation omitted).  Indeed, the "informational injury" alleged by

the Committee is one principally of its own creation, resulting from the Committee's decision to

reject the White House's offer to make available for interviews numerous White House staff,

including close advisers to the President such as the former Counsel to the President and the

Deputy Chief of Staff and Senior Adviser to the President.

     *Second*, the Complaint identifies no federal cause of action that authorizes this lawsuit.

A plaintiff must have a cause of action; a bare grant of jurisdiction will not suffice.  <u>See</u>

<u>Alexander v. Sandoval</u>, 532 U.S. 275, 286 (2001).  The only federal statute on which the

Committee relies as its basis for relief is the Declaratory Judgment Act, which does not create a

cause of action.  <u>See, e.g.</u>, <u>Buck v. Am. Airlines, Inc.</u>, 476 F.3d 29, 33 n.3 (1st Cir. 2007)

("Although the plaintiffs style 'declaratory judgment' as a cause of action, the provision that they cite, 28 U.S.C. § 2201(a), creates a remedy, not a cause of action.").

*Third*, the remedy provided by the Declaratory Judgment Act is an equitable one, and the courts possess the discretion to withhold such a remedy.  Avoiding a substantial reworking of the time-tested mechanism for resolving inter-branch disputes over documents and testimony is ample justification for withholding such relief.

Even if this Court somehow were to reach the merits of this case, Counts I and II  – together with those portions of Counts III and IV that seek Defendant Miers's testimony – should still be dismissed as a matter of law.  For fundamental separation-of-powers reasons, including the President's independence and autonomy from Congress, the President is absolutely immune from testimonial compulsion by Congress or any of its committees.  These same principles require that senior presidential advisers like the Counsel to the President also have absolute immunity from such testimony.  As Attorney General Reno stressed while advising President Clinton that the Counsel to the President is immune from compelled congressional testimony, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  <u>Assertion of Executive Privilege With Respect to Clemency Decision</u>, 23 Op. O.L.C. 1, 5 (1999), Ex. 24.  Absent immunity from such testimony, Congress could invade the President's autonomy and confidentiality by seeking to examine the President's advisers on any given subject in order to gain insight into the President's thinking or decisionmaking or possible future course of conduct.  Congress could also attempt to influence the President's decisionmaking by inquiring into certain areas or by probing into matters that are sensitive and ongoing.  That immunity is not

somehow lost because Defendant Miers no longer serves as Counsel to the President:  the

Committee seeks to compel Ms. Miers's testimony solely in relation to her responsibilities to the

President as his Counsel and close adviser, not in any individual or private capacity, and the

President's interest in protecting the autonomy and confidentiality of his Office concerning those

matters continues to exist even though Ms. Miers no longer works in the White House.

The Court should also dismiss Count II as a matter of law.  The Committee's claim that it

has a legal entitlement to a privilege log with "an itemized description of the documents

withheld," Pl.'s Mem. at 36, is without merit.  The Committee can point to no statutory or

constitutional source for this alleged entitlement because none exists, and the cases on which the

Committee relies (involving Freedom of Information Act requests and Rule 26 discovery

requests) have no bearing on the present context.  Indeed, obligating the President and his senior

advisers to provide to Congress detailed logs of their privileged communications any time

Congress serves a subpoena on the White House would impose significant burdens and would

violate the separation of powers.  In a similar context, the Supreme Court rejected the notion that

the Executive Branch at its highest level shall bear the initial burden in civil discovery "of

invoking executive privilege with sufficient specificity and of making particularized objections"

to discovery on a "line-by-line" basis in order to safeguard executive functions and maintain the

separation of powers.  Cheney v. U.S. Dist. Ct. for the Dist. of Columbia, 542 U.S. 367, 388

(2004).

Ultimately, consideration of the immunity and privilege log questions on the merits only

underscores the importance of the threshold obstacles to this unprecedented lawsuit.  A definitive

judicial resolution of these sensitive separation-of-powers issues – in favor of either party –

would forever alter the accommodation process that has served the Nation so well for over two

centuries.  So too, a definitive judicial resolution of these issues would invite further judicial

involvement in an area where it is well settled that courts should tread lightly, if at all.  Such a

resolution would be a precarious step toward what "is obviously not the regime that has obtained

under our Constitution to date."  Raines, 521 U.S. at 828.

     For all of these reasons, explained more fully below, the Court should grant Defendants'

Motion to Dismiss and deny the Committee's Motion for Partial Summary Judgment.

## BACKGROUND

**A.**    **Congressional Demands for Executive Papers**

     Disputes over Congressional demands for information from the Executive Branch date

back to the infancy of the United States.  In 1792, for example, the House empowered a

committee to "call for such persons, papers and records, as may be necessary to assist their"

investigation into a failed military campaign by General St. Clair against Indian tribes in Ohio.

See Nixon v. Sirica, 487 F.2d 700, 778 (D.C. Cir. 1973) (Wilkey, J., concurring in part and

dissenting in part) (generally describing history of Congressional demands for documents from

the Executive) (citing 3 ANNALS OF CONGRESS 493 (1972)).  President Washington assembled a

cabinet to advise him on how to respond to the legislative request for information, recognizing

that his response to this first congressional demand would set a precedent and therefore should

be well considered.  As reflected in Thomas Jefferson's notes, the cabinet advised

> First, that the House was an inquest and therefore might institute inquiries.
> Second, that they might call for papers generally.  Third, that the Executive ought
> to communicate such papers as the public good would permit, and ought to refuse
> those, the disclosure of which would endanger the public.  Fourth, that neither the
> committee nor the House had a right to call on the Head of a department, who and
> whose papers were under the President alone, but that the committee should
> instruct their chairman to move the House to address the President.

Id. (citing 1 WRITINGS OF THOMAS JEFFERSON 189-90 (1905)).  Although President Washington did not exercise his Executive prerogative in 1792 to maintain the information related to General St. Clair's campaign, he did determine in 1794 that diplomatic correspondence between the United States and France "should not be communicated," and he decided in 1796 that documents reflecting treaty negotiations with Great Britain should be withheld based on "a just regard to the constitution, and to the duty of my office."  Id. (citing 5 J. Marshall, THE LIFE OF GEORGE WASHINGTON 200, 658 (1807)).

Successor administrations likewise undertook the Constitutional exercise of determining what information could be released "for the public good," and what information covered by Executive Privilege should be protected from legislative demands.  When information was withheld, conflicts between the two branches would arise, but they consistently were resolved through negotiation and mutual deference and cooperation.  For example, President Cleveland refused legislative commands to provide all Department of Justice records relating to the removal of a U.S. Attorney, declaring that his "oath to support and defend the Constitution" required him to "refuse compliance with these demands."  8 MESSAGES & PAPERS PRES. 381 (1898), Ex. 26.  Although the Senate adopted a resolution condemning President Cleveland's refusal to produce information, it did not resort to judicial intervention for resolution of the inter-branch dispute.  There is thus a longstanding and consistent history of inter-branch negotiation, cooperation, and accommodation with respect to congressional demands for Executive Branch documents and testimony.

"Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme."  United States v. AT&T Co., 567 F.2d 121, 131 (D.C. Cir. 1977); see also United States v. AT&T Co., 551 F.2d 384, 394 (D.C. Cir. 1976)

("A compromise worked out between the branches is most likely to meet their essential needs and the country's constitutional balance."). This process generally results in the provision to Congress of substantial information, but both branches must calibrate the relative importance of a request for information against the Executive's needs for autonomy and confidentiality. Moreover, both Branches must consider the strength of their own positions as the nature of the congressional requests and Executive refusals go from informal (*e.g.*, informal requests and informal declinations) to more formal (*e.g.*, subpoenas and invocation of privilege). Congress, of course, has a variety of means by which it can exert pressure on the Executive Branch, such as the withholding of consent for Presidential nominations, reducing Executive Branch appropriations, and the exercise of other powers Congress has under the Constitution. Ultimately, how much information is conveyed is the result of negotiations in which the two branches attempt to accommodate Congress's legitimate information needs in a manner consistent with the legitimate institutional interests of the Executive Branch. This inter-branch negotiation, cooperation and accommodation "positively promotes the functioning of our system [of government]." AT&T, 567 F.2d at 131.

At no time during the long history of interbranch negotiations and accommodations has a court ordered an Executive Branch official – let alone one of the President's senior advisers – to testify before Congress, nor has the Executive Branch been required by court order to produce documents or a privilege log to Congress. This uniform past practice also has been followed with respect to congressional demands that senior White House advisers appear before congressional committees to justify the President's decisions. Although such advisers have, from time-to-time, appeared before Congress, at no time in the Nation's history has a court ordered a senior White House adviser to testify as a result of a congressional subpoena.

**B.     Demands For Information And Inter-branch
Accommodations During The 110th Congress**

Majority control in both Houses changed in 2007 with the 110th Congress.  During the

last sixteen months, Congress has continued to conduct extensive oversight of, and investigations

and inquiries concerning, the Executive Branch.  In fact, by the end of July 2007, Congress had

already conducted more than 300 investigations and inquiries directed at the Executive Branch;

more than 550 Executive Branch employees had given congressional testimony or submitted to

Congressional interviews; more than 600 oversight hearings had been held; and more than

430,000 pages of documents had been produced to Congress or made available for review.  See

Press Briefing by Tony Snow (July 25, 2007), available at www.whitehouse.gov/news/releases/

2007/07/20070725-3.html (last visited May 9, 2008).  Those activities have, of course, continued

over the last nine months.  In addition, there have been scores of less formal interactions between

the branches, such as briefings for individual Members and staffers, responses to informal

requests for assistance or information, and other ways in which the Executive Branch has

assisted Congress in gathering information.  Except for the present dispute, in none of the

numerous inquiries and investigations directed to the White House in this Congress has the

White House provided a privilege log detailing the documents sought by Congress.  But when it

has withheld materials from Congress, the White House has explained the nature of the

documents withheld with a degree of detail suitable to the circumstances of the specific request.

Indeed, during this period, the Executive Branch has devoted significant energy to the

accommodation process and, consistent with the Nation's longstanding history, has sought to

resolve potential disputes through negotiations and cooperation.  With the exception of the

present lawsuit, none of the hundreds of other inquiries made by this Congress has resulted in a suit filed by Congress.

### C.     The Committee's Investigation of the Dismissal of Nine U.S. Attorneys

It is against the backdrop of (or, more to the point, in the face of) two hundred years of Congressional forbearance from seeking judicial intervention, as well as the recent history of significant inter-branch efforts at accommodation, that the Committee brings the present suit. Just as the Senate in 1886 sought information from President Cleveland about the removal of a U.S. Attorney – a power in President Cleveland's view "vested in the President alone by the Constitution" and therefore inappropriate for legislative action or inquiry (8 MESSAGES & PAPERS PRES. 379, Ex. 26.) – in this case the Committee issued sweeping demands for information related to the dismissals of nine U.S. Attorneys in 2006 as well as information related to subsequent Executive Branch deliberations about their replacements.

On March 6, 2007, the Committee's Subcommittee on Commercial and Administrative Law ("Subcommittee") held a hearing and commenced a months-long investigation into the dismissals.  In order to accommodate the Committee's interests, the Executive has made available to Congress a very substantial number of witnesses and documents.

Beginning on March 6, 2007, the Executive Branch made then-Principal Associate Deputy Attorney General William Moschella available to Congress as a witness,[1] and subsequently made available thirteen additional Executive Branch witnesses for testimony or interviews, including the Attorney General, the Chief of Staff to the Attorney General, incumbent and former Deputy Attorneys General, and serving United States Attorneys.  In total,

---

[1] In addition to his testimony, Mr. Moschella provided private briefings to the Committee on February 28, 2007, and March 5, 2007.

these fourteen witnesses testified before or were interviewed by the Committee (or its staff) for

over 120 hours.  These witnesses and others also testified before the Senate Judiciary

Committee.  Among the other witnesses appearing before the Senate committee were Sara

Taylor, former Deputy Assistant to the President and Director of Political Affairs; J. Scott

Jennings, former Special Assistant to the President and Deputy Director of Political Affairs;[2] the

former Associate Counsel to the Director of the Executive Office for U.S. Attorneys; and the

Interim United States Attorney, Western District of Missouri.

 The Executive Branch also has provided Congress with a substantial volume of

documents regarding the removal of U.S. Attorneys.  The Department of Justice has given to

Congress over 7,850 pages of documents, including more than 2,200 pages from the Office of

the Attorney General and 2,800 pages from the Office of the Deputy Attorney General.[3]  The

Department also has made available for the Committee's review another 3,750 pages of

documents.  The nearly 12,000 pages of documents produced or otherwise made available to the

Committee have included both internal Departmental communications and communications

between the Department and members of the President's staff.  Thus, to the extent that the

Committee asserts a need for information concerning the White House's communications and

discussions with the Department of Justice, the Department already has given or made available

---

 [2] Ms. Taylor and Mr. Jennings each cited the President's assertion of Executive Privilege
in refusing to answer certain questions before the Senate Committee.  See Testimony of Sara
Taylor, S. Comm. on the Judiciary: Preserving Prosecutorial Independence (July 11, 2007);
Testimony of J. Scott Jennings S. Comm. on the Judiciary: Preserving Prosecutorial
Independence (August 2, 2007).  The Senate has not formally challenged these invocations.

 [3] The remaining documents were provided from the Office of the Associate Attorney
General, Office of Legislative Affairs, Executive Office for United States Attorneys, Office of
Public Affairs, Office of Legal Policy, and the Justice Management Division.  See, e.g., Letter
from Richard A. Hertling to John Conyers, Jr. and Patrick Leahy (April 13, 2007), Ex. 7.

to Congress the documents constituting such communications, and has made available for testimony and interviews many senior Department officials.

**D.    The President's Substantial Efforts To Accommodate Congress And Congress's Subpoenas**

On March 9, 2007, two days after requesting documents from the Department of Justice, the Committee wrote to the Counsel to the President, Fred F. Fielding, requesting documents from and interviews with members of the President's's staff regarding the dismissals of the U.S. Attorneys.  Mr. Fielding responded on March 20, noting that, on behalf of the President, he had been working with the Committee to "accommodate [its] interests, while at the same time respecting the constitutional prerogatives of the Presidency," and continued to seek "a reasonable accommodation so as to provide [the] Committee[] the information [it is] seeking in a way that will allow this President, and future Presidents, to continue to discharge their constitutional responsibilities effectively."  Letter from Fred F. Fielding to Patrick Leahy, John Conyers, Jr. and Arlen Specter (March 20, 2007), Ex. 3 at 1.

To that end, Mr. Fielding extended an offer to the Committee that was designed to provide the Committee with substantial information while protecting the President's constitutional prerogatives.  In particular, Mr. Fielding extended the President's offer to make available for interviews several senior Presidential advisers:  former Counsel to the President Harriet Miers; then-Deputy Chief of Staff and Senior Adviser Karl Rove; then-Deputy Counsel William Kelley; and J. Scott Jennings, Special Assistant in the Office of Political Affairs.  Id. Pursuant to that offer of accommodation, the Committee would have been free to question these senior advisers about their communications with persons outside of the White House, including the Department of Justice and Members of Congress, concerning the dismissals of the United

States Attorneys.  Id. at 1-2.  The offer also provided that "[s]uch interviews would be private and conducted without the need for an oath, transcript, subsequent testimony, or the subsequent issuance of subpoenas."  Id. at 2.  In addition to interviews, the President offered to provide the Committee with two categories of documents concerning the dismissals of the United States Attorneys:  (1) communications between the President's advisers and the Department, and (2) communications between the President's advisers and third parties, including Members of Congress or their staffs.  Id.

Notwithstanding the extraordinary nature of the President's offer, and notwithstanding the fact that these interviews and documents would have provided the Committee with substantial information, the next day the Subcommittee voted to authorize the Committee Chairman to issue subpoenas for the testimony of Messrs. Rove, Kelley, and Jennings, and Ms. Miers, as well as for documents.  See H.R. Rep. No. 110-423 at n.17 (2007).  By letter the following day, the Committee formally rejected the President's accommodation proposal, Letter from John Conyers, Jr. and Linda T. Sánchez to Fred F. Fielding (March 22, 2007), Ex. 4, and on March 28, 2007, demanded production of the documents that Mr. Fielding had offered to provide as part of an accommodation while the parties continued to negotiate over the remaining documents and witnesses.  Letter from Patrick Leahy and John Conyers, Jr. to Fred F. Fielding (March 28, 2007), Ex. 5.  The Committee's position was that the White House should provide the Committee with information but that the Committee would not provide anything in return (such as a commitment not to continue to seek certain information).  In response, Mr. Fielding noted that the President's accommodation proposal "reflects a series of balanced compromises designed to respect and accommodate [the Committee's] interests while also protecting the institution of the Presidency."  Letter from Fred F. Fielding to Patrick Leahy and John Conyers,

Jr. (April 12, 2007), Ex. 6 at 1.  He therefore declined the Committee's "suggestion to immediately produce the documents that [the President was] prepared to release as part of a carefully and thoughtfully considered package of accommodations designed to avoid shifting the dispute to ground on which [the parties] need not tread."  Id.  Mr. Fielding also observed that the Committee's "suggestion fails to credit fully the extraordinary nature of the disclosure" the President was prepared to authorize, "and might even prolong the dispute which the President is seeking to resolve in the most expeditious manner possible."  Id.

After continued negotiations, the parties were not able to reach a compromise, and on June 13, 2007, the Committee issued two exceptionally broad subpoenas that seek documents created in the exercise (by the President's staff) of a core, constitutional power – the President's Article II power to nominate and remove officers of the United States – as well as testimony regarding the same matters.  See Subpoena (Joshua Bolten), Ex. 19.  The first subpoena was directed to the President's Chief of Staff, Joshua Bolten, or the appropriate custodian of records, and requested "any and all documents in the possession, custody, or control of the White House related to the Committee's investigation into the preservation of prosecutorial independence and the Department of Justice's politicization of the hiring and firing of United States Attorneys, including possible misrepresentations to Congress and other violations of Federal Law."  Id.  The subpoena listed the following five broad categories as examples of the documents included within the subpoena's scope:

> a.  Any and all documents the White House Counsel agreed in the March 20, 2007, letter of Fred F. Fielding, Counsel to the President, to Chairman Leahy, Chairman Conyers, Ranking Member Specter, Ranking Member Smith, and Congresswoman Sánchez to produce in conjunction with off-the-record interviews, including documents consisting of or relating to all communications between any official or employee of the White House and any official or

employee of the Department of Justice or any third party "concerning the request for resignations of the U.S. Attorneys in question."

b.     Any and all documents related to the: 1) evaluation of or decision to dismiss former U.S. Attorneys David Iglesias, H.E. "Bud" Cummins, John McKay, Carol Lam, Daniel Bogden, Paul Charlton, Kevin Ryan, Margaret Chiara, Todd Graves, or any other U.S. Attorney(s) dismissed since President Bush's re-election (hereinafter "dismissed U.S. Attorneys"); 2) evaluation of any U.S. Attorney(s) considered for dismissal since President Bush's re-election (hereinafter "U.S. Attorneys considered for dismissal"); 3) the implementation of the dismissal and replacement of the dismissed U.S. Attorneys; and 4) the selection, discussion and evaluation of any possible replacement or interim or acting appointment to fill any vacancy with respect to dismissed U.S. Attorneys and U.S. Attorneys considered for dismissal.

c.     Any and all documents related to the involvement of Karl Rove, Harriet E. Miers, William Kelley, J. Scott Jennings, Sara M. Taylor, or any other current or former White House employee or official, in matters set forth in paragraph b, above.

d.     Any and all documents related to the testimony of any official at the Department of Justice to the United States Congress regarding any of the matters set forth in paragraph b, above.

e.     Any and all documents related to the "reviews by White House staff" that led the President to conclude as of March 20, 2007 . . . that there was no wrongdoing in the mass firings and replacements of U.S. Attorneys since President Bush's re-election, including any information that has led the President to discount evidence obtained by the investigating committees in documents and hearing testimony.

Id.

The second subpoena was directed to the former Counsel to the President Harriet Miers for testimony and documents in her possession, custody, or control regarding the same extremely broad general topics as the subpoena to Mr. Bolten.  Subpoena (Harriet Miers),  Ex. 20.

**E.     The President's Response To The Subpoenas**

By letter dated June 28, 2007, Mr. Fielding informed the Committee that the President would assert Executive Privilege over the subpoenaed information, and therefore that no documents would be produced in response to the subpoena to Mr. Bolten.  Letter from Fred F.

-16-

Fielding to Patrick Leahy and John Conyers, Jr. (June 28, 2007),  Ex. 9 at 1.  Mr. Fielding also

informed the Committee that Ms. Miers had been directed by the President, based on his

assertion of privilege, not to produce any documents.  Id.

      Mr. Fielding explained that the "President's assertion of Executive Privilege [was] not

designed to shield information in a particular situation, but to help protect the ability of

Presidents to ensure that decisions reflect and benefit from the exchange of informed and diverse

viewpoints and open and frank deliberations."  Id. at 3.  "Presidents would not be able to fulfill

their responsibilities," he observed, "if their advisers – on fear of being commanded to Capitol

Hill to testify or having their documents produced to Congress – were reluctant to communicate

openly and honestly in the course of rendering advice and reaching decisions."  Id. at 2.

Furthermore, he noted, "there [was] no demonstration that the documents and information [the

Committee] seek[s] by subpoena are critically important to any legislative initiatives that [the

Committee] may be pursuing or intending to pursue."  Id. at 1-2.  Mr. Fielding referred the

Committee to the opinion of Solicitor General and Acting Attorney General Paul Clement that

the documents gathered by the Counsel's Office as responsive to the subpoena fell within the

scope of Executive Privilege, and that Congress's interests in the documents and related

testimony would not be sufficient to override a privilege claim.  See Letter from Paul D. Clement

to the President (June 27, 2007), Ex. 8.

      The Acting Attorney General's opinion provides the Committee with significant

information regarding the documents and testimony over which the President had asserted

executive privilege.  For example, the opinion states that the "initial category of subpoenaed

documents and testimony consists of internal White House communications about the possible

dismissal and replacement of U.S. Attorneys," and that, among other things, "these

-17-

communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquires about the dismissals." Id. at 2.  The opinion also provides descriptions of the other two categories of documents and testimony over which the President asserted executive privilege: "communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals"; and "communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations." Id. at 5-6.

On July 9, 2007, the Counsel to the President further informed the Committee that the "President [felt] compelled to assert Executive Privilege with respect to the testimony sought from Harriet E. Miers," Letter from Fred F. Fielding to Patrick Leahy and John Conyers, Jr. (July 9, 2007), Ex. 10 at 2, and informed Ms. Miers, through her counsel, that "the President has directed [her] not to provide [the requested] testimony" to the Committee.  Letter from Fred F. Fielding to George T. Manning (July 9, 2007), Ex. 11.  Notwithstanding the Committee's unwillingness to offer any significant compromise from its position, and notwithstanding the Committee's issuance of the subpoenas, Mr. Fielding again renewed the President's offer to the Committee to provide documents and make available senior Presidential advisers for interviews. Letter from Fred F. Fielding to Patrick Leahy and John Conyers, Jr. (July 9, 2007), Ex. 10 at 2

The following day Mr. Fielding informed Ms. Miers, by letter to her counsel, "that the President has directed her not to appear at the House Judiciary Committee hearing on Thursday, July 12, 2007," based on the advice from the Department of Justice that Ms. Miers "has absolute

immunity from compelled Congressional testimony as to matters occurring while she was a senior adviser to the President." Letter from Fred F. Fielding to George T. Manning (July 10, 2007), Ex. 13. He attached the Department's legal opinion to his letter, which reiterated the Department's long-standing view that the "President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" because "[s]ubjecting a senior presidential adviser to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to his constitutionally assigned functions." See Immunity of Former Counsel to the President From Compelled Congressional Testimony, 31 Op. O.L.C. 1, Ex. 25 at 1-2 (internal quotation marks and citations omitted). The opinion also explained that Ms. Miers's status as the former Counsel to the President did not change the analysis: "Separation of powers principles dictate that former Presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." Id. at 3.

### F.    Ms. Miers's Response To The Subpoena Directed To Her

Ms. Miers, through her counsel, informed the Committee on July 9 and 10, 2007, that "in light of the President's assertion of Executive Privilege, Ms. Miers cannot provide the documents and testimony that the Committee seeks," Letter from George T. Manning to John Conyers, Jr. and Lamar S. Smith (July 9, 2007), Ex. 12, and that, on direction of the President, Ms. Miers would not appear before the Committee. Letter from George T. Manning to John Conyers, Jr. and Linda T. Sánchez (July 10, 2007), Ex. 14. On July 17, 2007, Ms. Miers's counsel explained in more detail that, "[w]hile Ms. Miers of course respects the authority and prerogatives of the Subcommittee, the Committee, and the United States House of

Representatives, she is the former Counsel to the President of the United States and has been specifically directed by him not to appear, not to produce documents in response to the subpoena, and not to provide testimony."  Letter from George T. Manning to John Conyers, Jr. (July 17, 2007),  Ex. 15 at 1.  Thus, "it cannot reasonably be asserted that 'Ms. Miers . . . made her own decision to disregard' the Committee's subpoena."  Id. (citation omitted).

### G.    The Committee's Civil Action

On July 25, 2007, the Committee voted to hold Mr. Bolten and Ms. Miers in contempt and, over three months later, on November 5, 2007, formally reported the contempt resolution to the full House.  H.R. Rep. No. 423, 110th Cong., 1st Sess. (2007).  Also on November 5, 2007, the Committee sent a letter to the White House setting forth what it termed a "specific proposal." Letter from John Conyers, Jr. to Fred F. Fielding (Nov. 5, 2007), Ex. 16.  Again, however, the Committee's offer did not include any compromise on its behalf.  Instead, under the Committee's proposal the President would "initially" provide the Committee with copies of documents reflecting communications between his advisers and persons outside the White House relating to the dismissal of the United States Attorneys, make available for Committee review all internal communications among his advisers covering the same topic, and consent to on-the-record interviews of present and former members of his staff.  Id. at 1-2.  The Committee made no commitment concerning what would happen after these "initial[ ]" steps.

Mr. Fielding responded on November 9, 2007, that, beginning in March 2007, the Committed had "reject[ed] outright the President's . . . proposal of accommodation without offering any proposal in response . . . instead mak[ing] . . . unqualified request[s] for *all documents* sought by the Committee."  Letter from Fred F. Fielding to John Conyers, Jr. (Nov. 9, 2007), Ex. 17.  Mr. Fielding also pointed out that in the Committee's prior correspondence

purporting to "suggest avenues for further consideration, the proposals ha[d] been substantially

the same and one-sided:  they propose[d] accommodations on the part of the White House

without signaling any willingness on the part of the Committee to accommodate itself to the

Presidential interests at stake . . . by, for example, agreeing to limit the scope of the Committee's

demands or by forswearing an intention to insist on something less than total acquiescence with

the Committee's original demands." Id. at 2.  Finally, Mr. Fielding observed that the proposal in

the Committee's November 5 letter, like its prior proposals, demanded "that the White House

unilaterally commence an open-ended process" of providing the information "without limitation,

and without any recognition or regard to the legitimate Executive Branch interests at stake in the

controversy." Id.  For these reasons, Mr. Fielding explained, the President was unable to accept

the Committee's November 5 "specific proposal." Id.

Despite the President's efforts to reach an accommodation, after waiting another three

months the full House voted to hold Mr. Bolten and Ms. Miers in contempt of Congress on

February 14, 2008.  See H. Res. 979, 982 (Feb. 14, 2008), Ex. 21.  On February 28, pursuant to 2

U.S.C. § 194, the Speaker of the House certified the report of contempt to the United States

Attorney for the District of Columbia.  However, the following day, the Attorney General

advised the Speaker that the Department "will not bring the congressional contempt citations

before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers."  Letter from

Michael B. Mukasey to Nancy Pelosi (Feb. 29, 2007), Ex. 18.  The Department's response was

consistent with its long-established position that the criminal contempt statute is inapplicable,

and therefore that it will not pursue criminal contempt prosecutions, where an Executive Branch

official in good faith relies on the President's assertion of Executive Privilege and testimonial

immunity.  E.g., Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101 (1984), Ex. 23.

On March 10, 2008, over a year after the Subcommittee held its first hearing on the dismissals of the United States Attorneys and four months after the parties' last correspondence, and having been provided with access to almost 12,000 pages of documents and the testimony and interviews of fourteen Executive Branch officials, the Committee filed this lawsuit pursuant to House Resolution 980.  See H. Res. 980 (Feb. 14, 2008), Ex. 22.

## ARGUMENT

The Committee asserts an unprecedented and virtually unbounded authority to seek information from the Executive Branch concerning deliberations among the President's closest advisers and to invoke the jurisdiction of federal courts to compel the production of such information to Congress.  Under longstanding precedent, however, Article III jurisdiction does not extend to judicial adjudication of inter-branch disputes concerning Congress's right to information held by the Executive Branch at its highest level.  Such disputes have historically been resolved through political accommodation and without judicial involvement, and the Committee's attempted invocation of this Court's jurisdiction goes beyond well-established limits on the judiciary's Article III authority.  In addition, even if the Court has Article III jurisdiction, the only statute on which the Committee relies as its basis for relief – the Declaratory Judgment Act – lacks any indication, let alone a clear indication, that the Act was intended to provide the Committee (and thus the House) with a cause of action to enforce subpoenas served on the Executive Branch.  And this case is surely an appropriate one in which to exercise the Court's discretion to withhold the equitable remedy under that Act.

Even if the Committee's claims could go forward, the Court should dismiss Counts I and II of the Complaint, as well as those portions of Counts III and IV that seek to compel Defendant Miers's testimony before the Committee.  Just as the President himself is absolutely immune from testimonial compulsion by a congressional committee, so too are his immediate advisers, including the Counsel to the President.  This immunity is constitutionally based on separation-of-powers principles and is necessary to protect the President's rights to autonomy and confidentiality in the performance of his functions and in his Office.  As to Count II, as the Committee implicitly recognizes, no statute, Federal Rule of Civil Procedure or congressional rule having the force or effect of law grants Congress an entitlement to a privilege log whenever it serves a subpoena on the Executive Branch.  Nor is there any reason to create such an entitlement.  Permitting Congress to exercise such authority over the Executive Branch at its highest level would violate the separation of powers by intruding upon the autonomy and confidentiality of the President's Office.

## I.    THE COMMITTEE LACKS ARTICLE III STANDING TO BRING THIS SUIT.

This Court lacks Article III jurisdiction over this suit.  For over two hundred years, inter-branch struggles have been resolved outside the scope of judicial review under Article III by the political branches exercising the political tools at their disposal to reach accommodation.  See, e.g., Raines, 521 U.S. at 826-28.  Because this case represents an effort to "judicialize" a "struggle between the branches that is historically unprecedented and that transcends both the specific information sought and the political identity of the Legislative and Executive Branch players involved," Walker, 230 F. Supp. 2d at 52-53, this lawsuit  "has no place in the law courts."  Moore v. U.S. House of Representatives, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring in result).  Courts sit "neither to supervise the internal workings of the executive and

-23-

legislative branches nor to umpire disputes between those branches regarding their respective powers."  Id.  The Committee has the burden of establishing that it has Article III standing to maintain this extraordinary action.  And it cannot satisfy that burden under Raines with respect to the constitutional questions laid before the Court because it does not assert an injury of the kind traditionally capable of vindication through the judicial process.  "[F]undamental separation of powers concerns relating to the restricted role of the Article III courts in our constitutional system of government ordain the outcome here."  Walker, 230 F. Supp. 2d at 53.

**A.    The Committee Does Not Raise a Dispute of the Kind Traditionally Thought to be Capable of Judicial Resolution.**

"The judicial power of the United States . . . is not an unconditioned authority to determine the constitutionality of legislative or executive acts," but is limited by Article III of the Constitution "to the resolution of 'cases' and controversies.'"  Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 471 (1982).  "No principle is more fundamental to the judiciary's proper role in our system of government," Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976), because "[t]he 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."  Allen v. Wright, 468 U.S. 737, 750 (1984).  That requirement assumes particular importance in ensuring that the Federal Judiciary respects the "'proper – and properly limited – role of the courts in a democratic society.'"  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quoting Allen, 468 U.S. at 737).  And it therefore has particular salience in this case, where the Committee asks the Court to disregard the political accommodation process that has been followed for centuries in resolving inter-branch disputes over requests for information and the like without involving the courts.

-24-

Among the required elements of an Article III case or controversy, a plaintiff's standing to sue "is perhaps the most important." Allen, 468 U.S. at 750. Standing is "an essential and unchanging part of the case-or-controversy requirement," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), assuring that the dispute is of a kind "traditionally thought to be capable of resolution through the judicial process." Allen, 468 U.S. at 752 ( internal quotation omitted).

To meet "the irreducible constitutional minimum of standing," Lujan, 504 U.S. at 560, the injury alleged must be "legally and judicially cognizable." Raines, 521 U.S. at 819. "This requires, among other things, that the plaintiff have suffered an invasion of a legally protected interest" and that the dispute be one "*traditionally thought to be capable of resolution through the judicial process*." Id. (emphasis added) (internal quotation marks omitted) (citing, *inter alia*, Lujan, 504 U.S. at 560); see Walker, 230 F. Supp. 2d at 63-64. Injury that does not give rise to a case or controversy "of the sort traditionally amenable to, and resolved by, the judicial process," Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 774 (2000) (internal quotation marks and citations omitted), as shown by "historical experience," Walker, 230 F. Supp. 2d at 65 (quoting Raines, 521 U.S. at 829), is not judicially cognizable.

"[T]he fact that [this] dispute involve[s] only officials, and the official interests of those, who serve in the branches of the National Government [lying] far from the model of the traditional common-law cause of action at the conceptual core of the case-or-controversy requirement," weighs decisively against any argument that the Committee has standing to maintain this action. Raines, 521 U.S. at 832-34 (Souter, J., concurring in the judgment); see id. at 827-28; Walker, 230 F. Supp. 2d at 740. As the Supreme Court observed in Raines, "[t]he irreplaceable value of the power articulated by Mr. Chief Justice Marshall [in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803),] lies in the protection it has afforded the

constitutional rights and liberties of *individual citizens and minority groups against oppressive or discriminatory government action*.  It is this role, *not some amorphous general supervision of the operations of government*, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests."  521 U.S. at 828-29 (emphasis added) (quoting United States v. Richardson, 418 U.S. 166, 192 (1974) (Powell, J., concurring)).  This is not a suit "between two individuals regarding action taken by them in their private capacities; nor a suit between an individual and an officer of one or another Branch of government regarding the effect of a governmental act or decree upon the individual's private activities."  Moore, 733 F.2d at 957 (Scalia, J., concurring in result).  Rather, the Committee requests the "direct intermediation of the courts in disputes between the President and the Congress."  Barnes v. Kline, 759 F.2d 21, 41 (D.C. Cir. 1985) (Bork, J., dissenting).[4]

   Such judicial intervention has been virtually unknown in American jurisprudence and was rejected by the founders as a proper role for courts to play under this understanding of the separation of powers, see id. at 54-57; Raines, 521 U.S. at 828 ("There would be nothing irrational about a system that granted standing in these cases; some European constitutional courts operate under one or another variant of such a regime.  *But it is obviously not the regime that has obtained under our Constitution to date. Our regime contemplates a more restricted*

---

[4]As this Court observed in Walker, "views that the role of the judiciary is properly limited to the adjudication of individual rights were expressed many years ago by two judges questioning this Circuit's now-defunct legislative standing doctrines."  230 F. Supp. 2d at 72 n.18 (citing Barnes, 759 F.2d at 42 (Bork, J., dissenting); Moore, 733 F.2d at 959 (Scalia, J., concurring in result)).  Those views were subsequently vindicated by the Supreme Court in Raines.  See, e.g., Chenoweth v. Clinton, 181 F.3d 112, 115-16 (D.C. Cir.1999) ("Consequently, the portions of our legislative standing cases upon which the current plaintiffs rely are untenable in the light of Raines.").

*role for Article III courts . . . .*") (emphasis added; citations omitted).  In Raines, the Supreme

Court observed that "historical practice appear[ed] to cut against" any notion that inter-branch

disputes are of a kind traditionally regarded as falling within the purview of Article III.  Id. at

826.  In light of the history of "analogous confrontations" between the Legislative and Executive

Branches where "no suit was brought on the basis of claimed injury to official authority or

power," in Raines the Court concluded that our constitutional regime "contemplates a more

restricted role for Article III courts" that does not encompass disputes between the political

branches concerning the respective supremacy of their powers.  521 U.S. at 826-, 828; see also

id. at 833 (Souter, J., concurring in the judgment) (contrasting "interbranch controvers[ies] about

calibrating the legislative and executive powers" with the traditional concept of a case or

controversy); Chenoweth v. Clinton, 181 F.3d 112, 113-14 (D.C. Cir. 1999) ("Historically,

political disputes between Members of the Legislative and the Executive Branches were resolved

without resort to the courts."); Walker, 230 F. Supp. 2d at 72-73.

    Here, too, whether viewed as a case about "informational injury" to Congress, as it is cast

by the Committee, or simply the impairment of Congress's ability to legislate, "the paucity of

evidence that [such a] lawsuit is of the sort traditionally amenable to, and resolved by, the

judicial process" demonstrates that the Committee lacks standing to litigate the highly important

constitutional questions presented by this case.  Id. at 73 (internal quotation omitted); Raines,

521 U.S. at 819.  Disputes between the Legislative and Executive Branches concerning access to

the records of the Executive Branch are perhaps the paradigmatic example of disputes that have

been resolved without resort to judicial process.  They have been recurrent since the earliest days

of the Republic, see Walker, 230 F. Supp. 2d at 70-71, yet the political Branches have

traditionally resolved their differences over access to information through negotiation,

accommodation, and compromise – without involving the Judiciary.  Consequently, "few

executive-congressional disputes over access to information have ended up in the courts," and

the courts, for their part, have been "reluctan[t] to interfere in [such] political battles," In re

Sealed Case, 121 F.3d 729, 739 (D.C. Cir. 1997), considering the "nerve-center constitutional

questions" raised by these inter-branch disputes.  United States v. AT&T, 551 F.2d 384, 394

(D.C. Cir. 1976).  As the Court observed in Walker, in no case has the Executive Branch ever

been required by court order to produce a document to Congress or its agents.  230 F. Supp. 2d at

70.  The same is true with respect to testimony of Executive Branch officials.  This case presents

no occasion to overturn 200-plus years of constitutional tradition by permitting the Committee to

proceed with a suit that could forever upset the separation of powers.

> **B.      The Committee Has Not Demonstrated That It Has Suffered
> The Kind Of Injury Traditionally Redressed By Article III Courts.**

The Supreme Court "ha[s] always insisted on strict compliance with this jurisdictional

standing requirement," Raines, 521 U.S. at 819, but as this Court recognized in Walker, the

standing inquiry must be "'especially rigorous' [when] reaching the merits of [the] dispute could

require deciding whether an action taken by one of the other branches of government was

unconstitutional."  230 F. Supp. 2d at 65 (quoting Raines, 521 U.S. at 819); see also Bender v.

Williamsport Area Sch. Dist., 475 U.S. 534, 541-42 (1986); Valley Forge, 454 U.S. at 471.

Indeed, the Supreme Court has emphasized repeatedly that a core purpose of Article III's

standing doctrine is to safeguard the proper separation of powers by preventing courts from

wading into disputes that are better resolved by the political branches of government.  See Valley

Forge, 454 U.S. at 474 (the judiciary must "refrain from passing upon the constitutionality of an

act [of the representative branches] unless *obliged* to do so in the proper performance of [the]

judicial function, when the question is raised by a party whose interests entitle him to raise it")
(quotation and alteration omitted) (emphasis added).

The Committee's assertion of standing does not come close to withstanding the
"especially rigorous" scrutiny required under the extraordinary circumstances of this case.  The
Committee maintains that it (and, by extension, the entire House of Representatives) has suffered
an "informational injury" that is sufficiently concrete and particularized to satisfy Article III
requirements, because it has been denied information that it believes to be "critical to its lawful
Investigation."  Pl.'s Mem. at 19.  The Supreme Court's decision in Raines, and this Court's
decision in Walker, demonstrate that this claim is insufficient to establish standing.

As an initial matter, whether cast as an "informational injury" or as an injury to its
legislative functions, the Committee lacks the traditional type of "personal injury" required
under Article III.  Historically, "personal rights" for the purposes of Article III did not attach to
"officers of the United States, of whatever Branch, [for they do not] exercise their governmental
powers as personal prerogatives in which they have a judicially cognizable private interest.
They wield those powers not as private citizens but only through the public office which they
hold."  Moore, 733 F.2d at 959 (Scalia, J. concurring in result); see also Raines, 521 U.S. at 827-
28.  The Committee here similarly maintains no personal right, but instead pursues an official,
"governmental right," purportedly to vindicate Congress's interest in Article I.  Nor does
Congress have the constitutional authority to "take care that the laws be faithfully executed" and
thereby vindicate "governmental rights" in court, which is assigned to the Executive in Article
II, Section 3.  Thus, Congress's purported interest does not satisfy Article III.  See Raines, 521
U.S. at 821; see also Braxton Cty. Ct. v. West Virginia ex rel. Dillon, 208 U.S. 192, 198 (1908)
("[T]he interest of [a party seeking relief] in this court should be a personal, and not an official,

-29-

interest.") (internal quotation omitted).  Further, the absence of a personal injury is not overcome

merely because an entire Committee – or for that matter an entire House – seeks to vindicate its

interests in court.  "The constitutional problems would seem to be identical."  <u>Barnes</u>, 759 F.2d

at 42 n.1 (Bork, J., dissenting) ("No reason appears why the Executive should oppose standing

for individual legislators but concede as to a House.").  That the committee itself – as opposed to

either an individual Member or the House as a whole – is seeking judicial resolution of the

dispute, <u>see</u> Pl's Mot. at 20, does not make its official need for information any more "personal"

in the constitutional sense.  <u>See, e.g.</u>, <u>Walker</u>, 230 F. Supp. 2d at 72 n.18.

Moreover, this Court has already rejected an effort to transform such an institutional

informational injury into a personal injury sufficient to satisfy Article III.  In <u>Walker</u>, the

Comptroller General, exercising his broad statutory authority to "carry out investigations and

evaluations for the benefit of Congress," <u>id.</u> at 53, brought suit to compel the release of

documents concerning the composition and conduct of the National Energy Policy Development

Group chaired by the Vice President.  <u>Id.</u> at 58.  Applying the analysis required by <u>Raines</u>, the

Court held that the Comptroller General, acting on behalf of Congress, lacked standing because

he had suffered no personal injury (his interests being "solely institutional"), and because his

"institutional injury" was "insufficient to confer standing."  <u>Id.</u> at 66.  The Court concluded that,

because the Comptroller General sought the records at issue to "assist Congress in determining

whether and to what extent future legislation" concerning energy policy or open government

"may be appropriate," and in "conducting oversight of the executive branch's administration of

existing laws," the alleged harm amounted at most to an impairment of Congress's general

interest in lawmaking and oversight, an "abstract dilution of institutional legislative power"

which was "too vague and amorphous to confer standing." Id. at 67-68 (quoting Raines, 521

U.S. at 821) (other internal quotations omitted).

The Committee alleges the same kind of injury. The Committee – much like the

Comptroller General in Walker – claims that it has been deprived of information to which it is

entitled; contends that it seeks that information in order to "assess[ ] the need for and merits of

future legislative changes," id. at 67; argues that the information is necessary to "assist Congress

in the discharge of its legislating and oversight functions"; and identifies various kinds of

legislation the Committee might want to consider. See Compl. ¶ 27. Indeed, just as the

Committee does here, in Walker the Comptroller General asserted harm to Congress's ability to

consider specific "future legislative changes." Walker, 230 F. Supp. 2d at 67. But here, as in

Walker, that purported injury is nothing more than an "abstract dilution of institutional

legislative power," not the kind of "concrete injury" that is sufficiently "distinct and palpable" to

establish plaintiff's standing. Id. at 67-68 (internal quotation marks and citation omitted); see

also Raines, 521 U.S. at 826. To be sure, in this case, unlike in Walker, the Committee has

served subpoenas and the House has authorized this suit. But while those facts may make the

dispute here riper than in Walker, they do not change the nature of the injury alleged by the

Committee which, as in Walker, is a claimed impairment to the legislative power.

Additionally, the Committee's asserted "informational" interest is both attenuated and at

its constitutional nadir in this case. The Executive Branch has already produced or otherwise

made available to Congress nearly 12,000 pages of documents – including both internal

Departmental communications and communications between the Department and members of

the President's staff – and fourteen Executive Branch officials have testified and been

interviewed by the Committee and others. In addition, the President offered to make available to

the Committee for interviews several senior Presidential advisers and to provide the Committee

with written communications between the President's advisers and the Department and

communications between the President's advisers and third parties, including Members of

Congress or their staffs.  Thus, to the extent that the Committee claims a need for information

concerning the White House's communications and discussions with the Department of Justice

regarding the removal of U.S. Attorneys, the Department already has produced or made available

to Congress documents in its possession reflecting such communications and has made available

for testimony and interviews many senior officials, while the President offered to provide the

Committee with substantial amounts of White House information concerning those

communications.  In a significant sense, then, the Committee's injury has been caused by its own

unwillingness to accept the White House's offer of additional information.

Moreover, the subpoenas the Committee seeks to enforce do not seek just any

information from any Executive Branch official; rather, the Committee seeks to probe the

President's inner-most circle of advisers for information pertaining to his exercise of his Article

II powers of nomination and removal.  Whatever informational injury Congress might be able to

assert in the abstract, its asserted interests in obtaining testimony and documents from the

President's senior-most advisers is far too attenuated to support standing in this case.

The Committee's attempt to rely on "informational injury" cases such as FEC v. Akins,

524 U.S. 11 (1998), Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440 (1989), and Havens

Realty Corp. v. Coleman, 455 U.S. 363 (1982), for the proposition that any plaintiff that has

been deprived of information has suffered an injury sufficient to satisfy Article III, is unavailing.

Indeed, this Court has already rejected an effort to rely on these cases to transform official injury

into the kind of traditional private injury that Article III requires.  See Walker, 230 F. Supp. 2d at

-32-

66 n.10.  In those cases Congress had enacted statutes providing private plaintiffs with

unqualified legal rights to information – regardless of need or the purpose for which information

was sought – and "the invasion" of those statutory rights was held to inflict a concrete and

particular injury supportive of the plaintiffs' standing.  See Akin, 524 U.S. at 21; Public Citizen,

491 U.S. at 449; Havens Realty, 455 U.S. at 373-74.  These statutes and cases thus hew closely

to the traditional common-law model of suits by individuals vindicating personal interests.  See

Raines, 521 U.S. at 832-34 (Souter, J., concurring in the judgment); cf. Barnes, 759 F.2d at 49

n.8 (Bork, J., dissenting) ("what is a sufficient injury in fact when asserted against a private

defendant may, for reasons of separation of powers and federalism, be deemed insufficient to

confer standing against a branch of the federal government.  It is precisely these reasons of

separation of powers and federalism that compel the parallel conclusion that injury to

governmental powers does not constitute an injury in fact or a judicially cognizable injury, as the

Supreme Court has elaborated those terms in connection with the article III standing

requirements."); see also Raines, 521 U.S. at 829; Moore, 733 F.2d at 957 (Scalia, J., concurring

in result).

     Here, of course, the Committee does not predicate its standing on a statutorily created

personal right, but the power bestowed by Article I "to investigate matters . . . within Congress's

legislative jurisdiction."  Compl., ¶ 20.  But it is well-settled that Congress is not invested by

Article I "with general power to inquire into private affairs and compel disclosures"; instead

Congress possesses only "such limited power of inquiry" as is necessary and appropriate "in aid

of [its] legislative function."  McGrain v. Dougherty, 273 U.S. 135, 173-75 (1927).  Congress,

therefore, has no freestanding right to information unrelated to the performance of its legislative

duties, see Barenblatt v. United States, 360 U.S. 109, 111-12 (1959), and thus its injury should

not be understood as a deprivation of information, but as an alleged impairment of its ability to evaluate the need for and to formulate legislation.  See Pl.'s Mem. at 2-3 ("[t]he Congress . . . cannot fulfill its legislative . . . functions if its subpoenas" are not enforced).  Indeed that is precisely how this Court construed the plaintiff's claimed injury in Walker, where the Comptroller General's inability to access documents – an informational injury – was nonetheless "too vague and amorphous to confer standing" when tied to Congress's legislative and oversight functions.  Walker, 230 F. Supp. 2d at 67.  The Committee's alleged injury here, of course, is precisely the type of injury that this Court held insufficient for Article III standing in Walker.

### C.    The Committee Cites No Authority That  Supports Its Assertion of Standing in Light of Raines.

The Committee boldly asserts that "this Circuit has repeatedly recognized that a House of Congress, or its authorized agent, has standing to bring suit to enforce a duly authorized and issued subpoena."  Pl.'s Mem. at 18.  But the Committee fails to recognize that those cases have limited viability, at best, in light of the Supreme Court's more recent decision in Raines.  See Chenoweth, 181 F.3d at 114-15.  For example, although AT&T, 551 F.2d at 391, did assert that "'the House as a whole has standing to assert its investigatory power,'" Pl.'s Mem. at 19, it contained no substantive analysis of the issue, and its conclusion cannot stand in light of Raines.  See Chenoweth, 181 F.3d at 115.  Moreover, in AT&T, the suit was also brought by the Executive Branch, not Congress, to prevent a private third party from disclosing information harmful to the national security, and it therefore has no bearing on the Committee's standing to initiate a suit to redress an asserted informational injury.

Similarly, Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974), was decided long before Raines, and never addressed the question of the plaintiff's Article III standing.  "[I]t is well settled that cases in which jurisdiction is assumed

*sub silentio* are not binding authority for the proposition that jurisdiction exists." John Doe, Inc.

v. DEA, 484 F.3d 561, 569 n.5 (D.C. Cir. 2007) (quotation omitted); see also Pennhurst State

Sch. & Hosp. v. Halderman, 465 U.S. 89, 119 (1984); Steel Co. v. Citizens for a Better Env't,

523 U.S. 83, 91 (1998) (describing unrefined jurisdictional dispositions as "drive-by

jurisdictional rulings" that should be accorded "no precedential effect").  And U.S. House of

Representatives v. U.S. Dep't of Commerce, 11 F. Supp. 2d 76 (D.D.C. 1998), appeal dismissed,

525 U.S. 316, 344 (1999), is "readily distinguishable," as this Court concluded in Walker, 230 F.

Supp. 2d at 73 n.19, because the Court found that the House of Representatives had suffered a

personal, concrete, and particularized injury because it had been denied census data without

which it could not perform a constitutionally mandated function (apportionment of its members

among the States) that would determine the composition of the House itself.  See id.; House of

Representatives, 11 F. Supp. 2d at 85-90.  Here, by contrast, the injury allegedly suffered as a

result of the Committee's inability to obtain further information from the defendants is a claimed

impairment of Congress's legislative function, an "abstract dilution of institutional legislative

power" that will not support plaintiff's standing to sue in this instance.  Raines, 521 U.S. at 826.

　　　　Finally, the Committee argues that "declin[ing] to rule on the merits of this suit" would

"sanction, and make unreviewable . . . unilateral claims of executive power."  Pl.'s Mem. at 4.

That argument proves too much.  The Committee's argument could be made in every case

challenging executive action or a federal statute (and often is), but it is well-settled that the

possibility that certain actions might not be reviewed by an Article III court is no reason to

dispense with Article III's limitations.  See Valley Forge, 454 U.S. at 471.  The argument also

ignores the reality that during the 110th Congress alone, there have been hundreds of requests for

information in which Congress and the Executive Branch have reached consensus through

traditional, political means of accommodation.  See supra at pp. 9-10.  What makes this case aberrational is the Committee's unprecedented attempt to probe the President's exercise of his own constitutional authority by means of his closest advisers.  That the Committee lacks standing to obtain judicial review of Executive exercise of core constitutional powers simply does not mean that Congress lacks the power necessary to exercise effective oversight.

The Committee is wrong to imply that, absent judicial intervention, Congress would be left with no remedy when its demands for information are met by Executive claims of privilege.  Especially in this context, the absence of a *judicial* remedy cannot be equated with the absence of a remedy or recourse.  Congress has a variety of means at its disposal – including powers of legislation, appropriation, and advice and consent – through which it can work its will on the Executive Branch.  See Guerrero v. Clinton, 157 F.3d 1190, 1196 (9th Cir. 1998) ("It scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives.").  With these tools at its disposal, for more than two centuries Congress has been able to resolve its differences with the Executive Branch over access to information through traditional methods of negotiation and compromise.  See Walker, 230 F. Supp. 2d at 68 n.12.[5]  The fact that "this is exactly the way matters have been for [219] years of our history, and the Republic still stands," goes to show that the "practical capacity" of the political Branches "to adjust to each other" without judicial intervention has been a "sufficient guide[ ] to responsible action" by both Branches.  Nixon v. Sirica, 487 F.2d 700, 799 (D.C. Cir. 1973) (Wilkey, J., dissenting); see also Raines, 521 U.S. at 829.

---

[5] It is no doubt true that in the Constitution's allocation of appointment-related power, the Senate has more tools than the House.  But that fact hardly strengthens the House's claim to standing.  Rather, it only underscores the aberrational nature of this lawsuit.

The Committee thus has it completely backwards when it argues that the Court "must reach and decide the merits of the Committee's suit" because of the "critical constitutional principles at stake." Pl.'s Mem. at 25-26. To the contrary, as this Court recognized in Walker, this is precisely the kind of case in which the Supreme Court "has required an 'especially rigorous' standing inquiry." Walker, 230 F. Supp. 2d at 74 (quoting Raines, 521 U.S. at 819). Article III's "command to guard jealously and exercise rarely [the] power to make constitutional pronouncements requires strictest adherence when matters of great national significance are at stake." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). Rather than strain to reach the merits of a case with the constitutional ramifications of this one, the Court should properly recognize the limits of jurisdiction imposed by Article III and hold that the Committee's asserted "injury" is not the kind traditionally capable of vindication through the judicial process, and thus that the Committee lacks Article III standing.

## II.    THE COMPLAINT MUST BE DISMISSED BECAUSE THE COMMITTEE DOES NOT HAVE A CAUSE OF ACTION THAT AUTHORIZES THIS SUIT.

Even if this Court had Article III jurisdiction, the Complaint must be dismissed for a separate and independent reason: the Complaint identifies no cause of action that authorizes this lawsuit. It is axiomatic that to pursue relief in federal court, a plaintiff must have a cause of action. See Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001) (rejecting plaintiff's claims because they did not have a cause of action to pursue their claims, and noting that absent statutory intent to create a cause of action, one "does not exist and courts might not create one, no matter how desirable that may be as a policy matter"); see also, e.g., Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 128 S.Ct. 761, 774 (2008) (holding that there is no private right of action against "secondary actors" under § 10(b) of the Securities Exchange Act of 1934, even though secondary actors are subject to that Act's substantive prohibitions). Whether a plaintiff

has a cause of action is a "question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." Davis v. Passman, 442 U.S. 228, 239 n. 18 (1979).

The Committee's Brief does not even address whether it has a cause of action to pursue its claims, although the Committee appears to rely on 28 U.S.C. § 1331, the general federal-question statute, as creating a cause of action. See Pl.'s Mem. at 14-16. Defendants do not dispute that the Court has statutory subject-matter jurisdiction under 28 U.S.C. § 1331.[6] But whether a court has subject-matter jurisdiction is a distinct question from whether a plaintiff has a cause of action, see, e.g., Califano v. Sanders, 430 U.S. 99, 104-07 (1977); Wheeldin v. Wheeler, 373 U.S. 647, 649 (1963), and 28 U.S.C. § 1331 does not create a cause of action. See Cale v. City of Covington, 586 F.2d 311, 313 (4th Cir. 1978); see also Texas Indus. v. Radcliff Materials, Inc., 451 U.S. 630, 640 (1981) ("vesting of jurisdiction in the federal courts" does not create a cause of action).[7] The Committee's reliance on 28 U.S.C. § 1331 does not, therefore, establish that it has a cause of action to bring this suit.

Although it is not mentioned in the Committee's Brief, the Complaint asserts that the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ("Act"), is the basis for the relief sought by the Committee. That Act, however, also does not create a cause of action. See, e.g., Buck v.

---

[6] Because statutory subject-matter jurisdiction exists under 28 U.S.C. § 1331, the Court need not address the Committee's alternative contention that this lawsuit qualifies as one "commenced by the United States" within the meaning of 28 U.S.C. § 1345. However, we note that the Committee's proposed construction of Section 1345 – under which congressional committees would have seemingly unlimited power to litigate on behalf of the United States – raises grave separation-of-powers concerns. See, e.g., Buckley v. Valeo, 424 U.S. 1, 138 (1976).

[7] Indeed, if 28 U.S.C. § 1331 created a cause of action, there would have been no need in cases like Sandoval and Stoneridge, in which there was indisputably subject-matter jurisdiction, for the Court to have considered whether a cause of action existed under other statutes.

-38-

Am. Airlines, Inc., 476 F.3d 29, 33 n.3 (1st Cir. 2007) ("Although the plaintiffs style

'declaratory judgment' as a cause of action, the provision that they cite, 28 U.S.C. § 2201(a),

creates a remedy, *not a cause of action.*") (emphasis added); Okpalobi v. Foster, 244 F.3d 405,

423 n.31 (5th Cir. 2001) (en banc) ("[T]he law makes clear that – although the Declaratory

Judgment Act provides a *remedy* different from an injunction – *it does not provide an additional*

*cause of action with respect to the underlying claim*.") (second emphasis added); see also

Schnapper v. Foley, 667 F.2d 102, 116 (D.C. Cir. 1981) (affirming denial of declaratory as well

as injunctive relief under Public Broadcasting Act "because that statute provides no private right

of action").

Nor can the Court infer a cause of action to permit this subpoena enforcement action,

under the Declaratory Judgment Act or otherwise. "Like substantive law itself, private rights of

action to enforce federal law must be created by Congress." Sandoval, 532 U.S. at 286. The

existence of an implied cause of action thus depends on whether Congress has somehow

manifested an intent to create such a cause of action, see, e.g., id.; Texas Industries, 451 U.S. at

639, and that question is "'definitively answered in the negative' where a 'statute by its terms

grants no private rights to any identifiable class.'" Gonzaga v. Doe, 536 U.S. 273, 283-84

(2002) (quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 576 (1979)); see also Sandoval,

532 U.S. at 288 (no implied cause of action absent "'rights-creating' language" in an applicable

substantive statute). Moreover, because the existence of a cause of action to enforce

congressional subpoenas against high-ranking presidential advisers would effect "a significant

alteration in the balance of power between Congress and the President," the courts must find

particularly "clear statements from Congress" before recognizing – much less inferring – any

such cause of action. See Roeder v. Islamic Republic of Iran, 333 F.3d 228, 237-38 (D.C. Cir.

2003) (citing Armstrong v. Bush, 924 F.2d 282, 289 (D.C. Cir. 1991) (no clear statement to subject close presidential advisers to the Freedom of Information Act)). And because the existence of any such cause of action would give rise to a slew of grave constitutional concerns (as explained in detail above and below), courts must avoid construing applicable law, if "fairly possibl[e]," to create such an action expressly or by implication. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 689 (2001). Needless to say, it is fairly possible to avoid finding a cause of action lurking in a statute that does not provide one expressly.

No provision of law gives rise to an implied right of action under these standards, and plaintiffs do not even attempt to contend otherwise. By its terms, the Declaratory Judgment Act simply authorizes the federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act thus provides a remedy to enforce rights arising under *other* provisions of law. It contains no rights-*creating* language to support an implied right of action at all, much less the kind of clear statement that would be necessary for Congress to upset the balance of power between the political branches, and thereby create constitutional questions, by permitting its own committees to pursue subpoena enforcement actions in federal court against top presidential advisers. Moreover, other provisions of law affirmatively foreclose any contention that *House* committees may bring such actions by implication. In particular, 2 U.S.C. § 288d(a) purports to authorize the Office of *Senate* Legal Counsel to "bring a civil action . . . to enforce . . . any subpoena or order issued by the Senate or a committee or a subcommittee" thereof. 2 U.S.C. § 288d(a). That provision confirms that Congress knows how to create not only rights of action in general, but also rights of action to enforce congressional subpoenas in

particular.[8]  Congress's striking refusal to extend that cause of action to the House – or to any of

its committees or counsel – reinforces the absence of any such right of action by implication.

See Texas Indus., 451 U.S. at 639 n.11 (rejecting implied right of action for contribution under

the Clayton Act: "[t]hat Congress knows how to define a right to contribution is shown by the

express actions for contribution" under other statutes).[9]

        Legislative history further confirms that the Committee has no express or implied cause

of action to enforce subpoenas against presidential advisers in federal court.  Nothing in the

legislative history of the Declaratory Judgment Act even remotely suggests the existence of, or

an intent to create, such a remarkable and unprecedented cause of action.   Such silence is itself

significant.  See, e.g., Jones v. United States, 526 U.S. 227, 234 (1999) ("Congress is unlikely to

intend any radical departures from past practice without making a point of saying so."); Chisolm

v. Roemer, 501 U.S. 380, 396 n.23 (1991) ("Congress' silence in this regard can be likened to

the dog that did not bark.").   Moreover, the legislative history of 2 U.S.C. § 288d affirmatively

confirms that no such cause of action exists.  In enacting that provision, Congress made clear its

view that, absent the kind of express "civil enforcement action" ultimately enacted for the Senate

Legal Counsel, there were only "two existing methods" for the enforcement of congressional

subpoenas – either criminal contempt proceedings under 2 U.S.C. § 192, or a "trial before the bar

---

    [8]  Whether the Senate would have Article III standing for an action brought pursuant to 2
U.S.C. § 288 is, of course, a separate question.

    [9]  Similarly, 28 U.S.C. § 1365 is an express grant of subject-matter jurisdiction for
actions "brought by the Senate or any authorized committee or subcommittee of the Senate to
enforce" subpoenas or orders issued by the Senate or its committees or subcommittees.  That
statute thus further demonstrates that Congress knows how to legislate expressly in this area
when it chooses to do so.  But even 28 U.S.C. § 1365 is inapplicable where, as here, "the refusal
to comply is . . . based on a governmental privilege or objection the assertion of which has been
authorized by the executive branch of the Federal Government."

of Congress."  S. Rep. No. 170, 95th Cong., 1st Sess. 89, 96 (1977), 1978 U.S.C.C.A.N. 4216,

4313.  Individual members of Congress reiterated that understanding in deliberations over the

proposed Congressional Right to Information Act, S. 2432, § 343, 93rd Cong., 1st Sess. (1973),

which would have created a cause of action against the Executive Branch on behalf of any

"committee of the Congress" to enforce its own subpoenas.  See, e.g., U.S. Senate. Statements on

Introduced Bills and Joint Resolutions S.2170. Cong. Rec. 94th Cong., 1st Sess., 1975, 121,

no. 19 (July 24, 1975) 24597-24600 ("If this bill becomes law, *we will have, for the first time in*

*our history*, an expeditious and equitable judicial procedure for Congress to obtain information it

needs without punishing individuals either through contempt of Congress or some other

alternative.") (emphasis added)); id. ("some remedy short of the drastic alternatives of contempt

of Congress or the power of the purse is necessary for proper congressional access to

information").  If this Committee somehow has an implied cause of action to enforce its own

subpoenas against the Executive Branch, those understandings would be incorrect, and both the

actual Section 288d and the proposed Congressional Right to Information Act would have been

wholly superfluous.  The Committee does not, and could not, cite anything remotely supporting

those startling conclusions.

     Finally, Supreme Court precedent counsels strongly against the recognition or

implication of any cause of action to enforce congressional subpoenas.  In Reed v. County

Commissioners of Delaware County, Pa., 277 U.S. 376 (1928), a Senate committee charged with

investigating allegedly improper influence on Senate candidates attempted to enforce its

subpoenas in court.  The committee had been authorized by resolution to issue subpoenas "and to

do such other acts as may be necessary in the matter of [its] investigation."  Id. at 387.  Despite

the breadth of that residual provision, and even assuming *arguendo* that a Senate resolution

could itself create a cause of action, the Supreme Court held that the committee at issue had

neither an express nor an implied cause of action to enforce its subpoena in federal court.  The

Court stressed that the governing resolution did not "specifically grant[]" the power to institute

suit.  Id. at 388.  Moreover, the Court refused to imply such a cause of action given the

"established practice" of congressional committees to rely on their own process for enforcing

subpoenas, id. at 388-89 (citing 2 U.S.C. §§ 192, 194), and given the dramatic differences

between those existing processes and enforcement through civil actions brought by

congressional entities.  Id. ("[T]he Senate may not reasonably be held to have intended to depart

from its established usage.  Authority to exert the powers of the Senate to compel production of

evidence differs widely from authority to invoke judicial power for that purpose.").  If a

sweeping authorization "to do such other acts as may be necessary" to aid an investigation does

not support the existence of a cause of action, then neither does any provision of law even

arguably applicable here.

     For all of these reasons, the Committee lacks a cause of action to enforce its subpoenas in

this case.  The Complaint accordingly must be dismissed in its entirety.

## III.    THE COURT SHOULD DECLINE TO EXERCISE ANY JURISDICTION IT MAY HAVE UNDER THE DECLARATORY JUDGMENT ACT.

     Even if this Court had Article III jurisdiction, and even if the Committee somehow had a

cause of action, the Court should exercise its discretion under the Act and decline to reach the

merits of the Committee's claims.

     The Declaratory Judgment Act provides merely that a court "*may* declare the rights and

other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a)

(emphasis added).  It does not require courts to issue declaratory judgments; rather, it "confers a

discretion on the courts rather than an absolute right upon the litigant."  Wilton v. Seven Falls

Co., 515 U.S. 277, 287 (1995); see also Rooney v. Sec'y of Army, 293 F. Supp. 2d 111, 121

(D.D.C. 2003) ("Even where an action satisfies the jurisdictional prerequisites for declaratory

judgment, the decision to entertain a claim under the DJA is committed to the discretion of the

district court.") (citing Wilton, 515 U.S. at 287).  "[T]he propriety of declaratory relief in a

particular case will depend upon a circumspect sense of its fitness informed by the teachings and

experience concerning the functions and extent of federal judicial power." Public Serv. Comm'n

of Utah v. Wycoff Co., 344 U.S. 237, 243 (1952).  As the Supreme Court has explained, "the

statute's textual commitment to discretion, and the breadth of leeway [it] . . . suggest[s],

distinguish the declaratory judgment context from other areas of the law in which concepts of

discretion surface."  Wilton, 515 U.S. at 286-87.  Although there is no rigid list of criteria a court

must consider in exercising this discretion, a court will consider whether "the use of a

declaratory judgment would increase friction between sovereign legal systems or improperly

encroach on the domain of a state or foreign court," Dow Jones & Co., Inc. v. Harrods, Ltd., 346

F.3d 357, 359-60 (2d Cir. 2003), "whether other remedies are available," and the equity of the

plaintiff's conduct.  Jackson v. Culinary Sch. of Washington, Ltd., 27 F.3d 573, 580 (D.C. Cir.

1994).

Avoiding a substantial reworking of the time-tested mechanism for resolving inter-branch

disputes over documents and testimony is ample justification to withhold such relief.  As we

have noted, for over 200 years the Executive and Legislative Branches have worked through the

political process to accommodate requests such as those at issue here; "[t]he legislative and

executive branches have a long history of settlement of disputes that seemed irreconcilable."

AT&T, 551 F.2d at 394.  Replacing the informal, political process of accommodation with hard

and fast judicial rules concerning sensitive separation-of-powers issues would forever alter the

accommodation process.  Instead of the accommodation and compromise that has occurred since our Nation's founding, and that has in the past sixteen months alone occurred with respect to hundreds of requests from the 110th Congress to the Executive Branch, see supra at pp. 9-10, rigid default rules would make such accommodation much more difficult, and it would be expected that both branches would increasingly turn to the judiciary to manage their disputes.[10] That "is obviously not the regime that has obtained under our Constitution to date," Raines, 521 U.S. at 828, and the Declaratory Judgment Act gives the Court the discretion to avoid creating such a regime.

Indeed, it was the existence and availability of the longstanding process of inter-branch accommodation that caused the court in United States v. House of Representatives of the United States, 556 F. Supp. 150 (D.D.C. 1983), to dismiss a suit filed by the Executive Branch seeking a declaratory judgment that it could validly assert privilege in response to congressional demands for documents.  The court observed that "[c]ompromise and cooperation, rather than confrontation, should be the aim of the parties," and therefore found "that to entertain this declaratory judgment action would be an improper exercise of the discretion granted by the Declaratory Judgment Act."  Id. at 153.

Likewise, in Moore v. U.S. House of Representatives, the Court of Appeals recognized that "the doctrine of remedial discretion permits the court to exercise judicial self-restraint in particular matters intruding upon a coordinate branch of government" and that the "exercise of this judicial discretion in actions by congressional plaintiffs for declaratory relief has given the courts the needed flexibility to consider separation-of-powers concerns in determining whether

---

[10] Moreover, even without a multiplication of litigation, definitive resolution of the kinds of issues raised here, such as immunity from legislative process, would forever alter the accommodation process.

- 45 -

relief properly should be granted." 733 F.2d 946, 954-55 (D.C. Cir. 1984). So too here. A definitive judicial resolution of these separation of powers issues – whatever the outcome – would forever and irrevocably alter the accommodations process under which the branches have operated since George Washington first occupied the presidency. It is for precisely this reason that the Court of Appeals has admonished that "[a] compromise worked out between the branches is most likely to meet their essential needs *and the country's constitutional balance*." AT&T, 551 F.2d at 394 (emphasis added).

The Court should also decline to reach the merits of this dispute because the hardship asserted by the Committee is attenuated relative to the kinds of injuries to private parties typically contemplated in the Court's exercise of jurisdiction under the Declaratory Judgment Act. See Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) (weighing "hardship to the parties of withholding court consideration"). As the Court recognized in Raines, the judicial role does not extend to "*some amorphous general supervision of the operations of government.*" 521 U.S. at 829 (emphasis added) (quoting Richardson, 418 U.S. at 192 (Powell, J., concurring)). Yet the "amorphous general supervision of the operations of government" is the very role that the Committee asks the Court to perform.[11]

There is another reason for the Court to exercise its discretion and decline to reach the merits. It is well established that it is appropriate to decline to exercise jurisdiction when "other remedies are available" to the plaintiff. Jackson, 27 F.3d at 580. Here, of course, Congress has a

---

[11] The Committee's alleged informational injury also is belied by the thousands of pages and one hundred-plus hours of testimony already obtained by the Committee directly from the Department of Justice, as well as the offers of accommodation extended by the President, pursuant to which the Committee would have received substantial numbers of documents and several witness interviews. That the Committee has rejected these accommodations undermines its assertion that it is aggrieved by a lack of "information."

variety of other means by which it can exert pressure on the Executive Branch through the exercise of powers it has under the Constitution.  The availability of those means, as well as the political and institutional constraints that operate on them, counsel in favor of judicial restraint, not against it.

## IV.  MS. MIERS IS ABSOLUTELY IMMUNE FROM THE COMPELLED TESTIMONY SOUGHT BY THE COMMITTEE.

For the foregoing reasons, the Committee lacks Article III standing and a statutory cause of action to pursue its claims and the Court should exercise its discretion not to hear this suit. Even if the Court were to disagree, however, Count I of the Complaint – together with those portions of Counts III and IV that seek Defendant Miers's testimony – must be dismissed for a separate and independent reason:  as a senior adviser to the President, Defendant Miers is absolutely immune from compelled congressional testimony.  For fundamental separation-of-powers reasons – including the President's independence and autonomy from Congress – the President is absolutely immune from testimonial compulsion by Congress or any of its committees relating to the President's actions while in Office.  These same principles require that senior presidential advisers like the Counsel to the President also have absolute immunity from such testimony.  As Attorney General Reno stressed, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."  Assertion of Executive Privilege With Respect to Clemency Decision, 23 Op. O.L.C. 1, 5 (1999), Ex. 24.  That immunity is not somehow lost because Defendant Miers no longer serves as the Counsel to the President:  the Committee seeks to compel her testimony solely in relation to her official responsibilities to the President as his Counsel and close adviser, and the President's interest in protecting the autonomy and confidentiality of his Office

- 47 -

concerning those matters continues to exist even though she no longer works in the White House.

### A.    The President's Senior Advisers Are Absolutely Immune From Compelled Congressional Testimony.

The Committee does not argue that a President may be compelled to testify before Congress or a congressional committee concerning his official duties and for good reason:  the Supreme Court has long recognized "the singularly unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article," United States v. Nixon, 418 U.S. at 715, and has long held that separation-of-powers principles require the safeguarding of the President's autonomy and confidentiality.  "The essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from the risk of control, interference, or intimidation by other branches."  Nixon v. Fitzgerald, 457 U.S. at 760-761.

These separation-of-powers principles do not mean that the "President is above the law." United States v. Nixon, 418 U.S. at 715.  Rather, they simply acknowledge that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated."  Cheney, 542 U.S. at 385.  The President is therefore constitutionally entitled to autonomy and confidentiality in the performance of his "'responsibilities'" and "'his office,'" and "'in the process of shaping policies and making decisions.'"  Nixon v. Admin. of Gen. Servs., 433 U.S. 425, 449 (1977) (quoting United States v. Nixon, 418 U.S. at 708).  That autonomy, it is clear, must be safeguarded from intrusion by the other Branches:  "Even when a branch does not arrogate power to itself, . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."  Loving v. United States, 517 U.S. 748, 757 (1996).

For these reasons, the Supreme Court held in <u>Nixon v. Fitzgerald</u> that a President is absolutely immune from civil actions arising from his official duties.  As the Court recognized, "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government," 457 U.S. at 751, and "the need to prevent large-scale invasion of the Executive function by the Judiciary far outweighs the need to vindicate the private claims." <u>Id.</u> at 762. This conclusion, the Court held, was consistent with its prior holding that "Members of both Houses of Congress – and their aides – must be totally free from judicial scrutiny for legislative acts; the public interest, in other words, outweighs the need for private redress of one claiming injury from legislative acts of a Member or aide of a Member." <u>Id.</u> (citing <u>Gravel v. United States</u>, 408 U.S. 606 (1972)).

For these same reasons, the President is absolutely immune from testimonial compulsion by Congress or any of its committees.  If a congressional committee could force the President's appearance, these fundamental separation-of-powers principles – including the President's independence and autonomy from Congress – would be threatened.  Indeed, the Constitution recognizes a limited obligation to report to Congress in Art. II, § 3, which contemplates that the President will "from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." Subjecting the President to compelled congressional testimony would be inconsistent with both separation-of-powers principles and Art. II, § 3.  Accordingly, administrations of both parties have long taken the position that the President is absolutely immune from testimonial compulsion by Congress.  <u>See generally</u> <u>Immunity of Former Counsel to the President From Compelled Congressional Testimony</u>, 31 Op. O.L.C. 1, 1 (2007), Ex. 25.

- 49 -

The same separation-of-powers principles that protect a President from compelled congressional testimony regarding acts while in Office also apply to senior presidential advisers like the Counsel to the President, and therefore those advisers are also absolutely immune from such testimony.  Given the numerous demands of his Office and in order to exercise the "executive Power" vested in him by Article II, the President must rely upon senior advisers. Senior White House advisers like the Counsel to the President have no operational authority. They do not issue executive orders or regulations, or prosecute or investigate wrongdoing. Rather, their sole function is to advise the President in the exercise of his constitutional responsibilities.  That is why Presidents of both political parties have consistently maintained that "the few individuals whose sole duty is to advise the President should never be required to testify because all of their duties are protected by executive privilege."  CRS Report for Congress, Presidential Advisers Testimony Before Congressional Committees: An Overview (April 14, 2004), at 27.

As Attorney General Reno explained while advising President Clinton that the Counsel to the President is immune from compelled congressional testimony, "in many respects, a senior adviser to the President functions as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities."  23 Op. O.L.C. at 5, Ex. 24.  Unique among Executive Branch personnel, the President's immediate advisers enjoy unparalleled access to the President because they "provide assistance of the most intimate sort to the President in carrying out the responsibilities of his office."  John R. Steelman & H. Dewayne Kreager, The Executive Office as Administrative Coordinator, 21 L. & Contemp. Probs. 688, 689 (1956).  Presidents have long relied on

- 50 -

confidential White House advisers, even more than the members of their Cabinet or other agency heads, to receive advice and assistance.[12]  <u>See, e.g.</u>, <u>In Re Sealed Case</u>, 121 F.3d at 750 ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers."). Thus, compelling the testimony of the President's closest White House advisers is tantamount to compelling the testimony of the President himself.

Because of the important role played by the President's senior advisers, it is well established that the ability of the President to consult with those advisers confidentially "is surely an important condition to the exercise of executive power." <u>Ass'n of Amer. Physicians & Surgeons v. Clinton</u>, 997 F.2d 898, 909 (D.C. Cir. 1993).  Without such confidentiality, "the President's performance of any of his duties – textually explicit or implicit in Article II's grant of executive power – would be made more difficult.  In designing the Constitution, the Framers vested the executive power in one man for the very reason that he might maintain secrecy in executive operations." <u>Id.</u>  The Court of Appeals has made clear that:

> the critical role that confidentiality plays in ensuring an adequate exploration of alternatives cannot be gainsaid.  If presidential advisers must assume they will be held to account publicly for all approaches that were advanced, considered but ultimately rejected, they will almost inevitably be inclined to avoid serious considerations of novel or controversial approaches to presidential problems.

<u>In re Sealed Case</u>, 121 F.3d at 750.

---

[12]  Harold C. Relyea, <u>The Executive Office of the President: A Historical, Biographical, and Bibliographical Guide</u> 6 (Harold C. Relyea, ed. 1997).  Upon enactment of the Reorganization Act of 1939, one of the components of the newly created Executive Office of the President was the "White House Office," also known as the "Office of the President," which was intended "to serve the President in an intimate capacity in the performance of the many detailed activities incident to his immediate office."  4 Fed. Reg. 3864, Exec. Order No. 8248 (Sept. 8, 1939).  The President's advisers within the Office of the President – including the Counsel to the President – continue to serve in this capacity.

As Attorney General Reno stressed, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." 23 Op. O.L.C. at 5, Ex. 24. Absent immunity from such testimony, Congress could invade the President's autonomy and confidentiality by seeking to examine the President's advisers on any given subject in order possibly to gain insight on the President's thinking or decisionmaking and possible future course of conduct. Congress could also attempt to influence the President's decisionmaking by inquiries into certain subject areas or by exposing, through the questions posed, matters that are sensitive and ongoing. If Congress could compel the attendance before it of the President's immediate advisers, it could effectively command the President, through the testimony of his advisers, to "justify" or explain executive actions, or to give an accounting of executive decisions. Allowing a coequal branch of government such authority or power of compulsion over another branch would clearly violate separation-of-powers principles.

For precisely these same considerations, the Supreme Court has extended immunity to congressional aides under the Speech or Debate Clause, Art. I, § 6, cl. 1 of the Constitution, even though the Clause mentions only "Senators and Representatives." Gravel, 408 U.S. at 616-17. As recognized by the Court, "the day-to-day work of such aides is so critical to the Member's performance that they must be treated as the latter's alter egos; and that if they are not so recognized, the central role of the Speech or Debate Clause – to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary – will inevitably be diminished and frustrated." Id. (citation omitted); see also id. at 616 ("it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost

constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants").

The President's immediate advisers, by virtue of their proximity to the President, are identified with him in a manner that his Cabinet officers and other inferior executive officials are not. Moreover, while there are 535 members of Congress and over 1,000 federal judges nationwide, there is only one President and he is an "easily identifiable target" for congressional inquiry due to his visibility and the vast area of responsibilities. Nixon v. Fitzgerald, 457 U.S. at 753. If Congress could compel the attendance before it of the President's close advisers in order to demand an "accountability" of executive actions and decisions, Gravel, 408 U.S. at 616, it could harass the President and frustrate his ability to perform his functions.[13] For these reasons and others, since at least the 1940s, administrations of both political parties have taken the position that the "'President *and his immediate advisers* are absolutely immune from testimonial compulsion by a Congressional committee.'" 23 Op. O.L.C. at 4, Ex. 24 (quoting Mem. From John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege at 5 (May 23, 1977)) (emphasis added)).[14]

---

[13] This proximity to the President distinguishes the Counsel to the President from Sara M. Taylor, who served at one time as the White House Political Director. As the Committee points out (Pl.'s Mem. at 32 n.17), immunity was not asserted on behalf of Ms. Taylor who, as a result, appeared before the Senate Committee on the Judiciary in connection with its inquiry into the resignations of the U.S. Attorneys and testified on a limited number of matters not covered by the President's assertion of Executive Privilege. Ms. Taylor was not a close adviser to the President, did not meet with him on a regular basis, and was not immediately responsible to the President in regard to the performance of his executive functions and constitutional responsibilities.

[14] The Committee relies on Townsend v. United States, 95 F.2d 352 (D.C. Cir. 1938), for the proposition that a congressional witness must first attend a legislative hearing and then claim privilege. Pl.'s Mem. at 31. But that case did not involve an Executive Branch official, and the court held only that a witness subject to a legislative subpoena cannot be excused from appearing just because privilege might apply to certain questions that would be asked. That holding is

The Committee argues that there have been instances since World War II in which close Presidential advisers, including Counsels and Special Assistants, have testified before congressional committees.  Pl.'s Mem. at 32.  But the Committee has identified no time in the Nation's history in which a senior presidential adviser has been forced to testify as the result of a congressional subpoena enforced by an Article III court.  Instead, each of the circumstances identified by the Committee was the result of a voluntary inter-branch accommodation, which has been the traditional method by which the Legislative and Executive Branches have resolved these disputes.  Indeed, certain Presidents – including Presidents Lincoln and Ford – have testified before Congress, and such voluntary testimony certainly does not mean that Congress could compel a President's testimony.

The inability adequately to protect the President and his advisers from "vexatious and unnecessary [legislative] subpoenas," United States v. Nixon, 418 U.S. at 714, also supports absolute immunity from testimonial compulsion for the President's most senior advisers.  In the criminal justice system, if a subpoena *duces tecum* has been directed to the President, there are multiple means by which the President's constitutional interests of autonomy and confidentiality can be protected short of granting him absolute immunity.  But presiding judges are not present in committee hearings to hear objections to potentially vexatious or oppressive questions, and the President would not otherwise be able to move for a protective order on behalf of his advisers to protect them, and in turn his own constitutional interests, "from annoyance, embarrassment, [or] oppression," as is possible in civil litigation under Fed. R. Civ. P. 26(c).  A potentially hostile

irrelevant to the question of whether a President's immediate adviser enjoys constitutional *immunity* from compelled testimony.  The Committee also relies on United States v. Tobin, 195 F. Supp. 588 (D.D.C. 1961), rev'd, 306 F.2d 270 (D.C. Cir. 1962), but that case concerned a contempt prosecution of a state employee for failure to comply with a legislative subpoena duces tecum, and thus has no bearing at all on the immunity issue.

legislative committee or any of its constituent members must be expected to assert a freedom to pursue questioning as the Committee deems fit.

Finally, the Committee appears to argue that compelled congressional testimony of senior Presidential advisers does not raise serious concerns because Executive Privilege can be asserted on a question-by-question basis. As an initial matter, the President's right to confidentiality and autonomy in "his office," in the performance of his "responsibilities," and "'in the process of shaping policies and making decisions,'" Nixon v. Admin. of Gen. Servs., 433 U.S. at 449 (quoting United States v. Nixon, 418 U.S. at 708, 711, 713), extends beyond the four corners of matters covered by Executive Privilege. More important, the Supreme Court and the Court of Appeals have made clear on several occasions that the ability of the President to invoke Executive Privilege does *not* mitigate constitutional concerns. Indeed, the likelihood of repeated invocations of Executive Privilege signals the presence, not the absence, of acute separation-of-powers concerns. In Cheney, for example, the Court rejected the argument that mandamus relief to consider petitioners' "claim of discovery immunity" was premature because "the Executive Branch can invoke executive privilege to maintain the separation of powers." 5423 U.S. at 383. Similarly, in Armstrong v. Executive Office of the President, 1 F.3d 1274, 1292 (D.C. Cir. 1993), relying in part on these separation of powers concerns, the Court of Appeals held that the Freedom of Information Act does not apply to certain components of the Executive Office of the President, even though FOIA expressly permits the invocation of Executive Privilege (through Exemption 5, See 5 U.S.C. § 552(b)(5)). See also Ryan, 617 F.2d at 788 n.19 (D.C. Cir. 1980) (noting that "[f]ailure to exempt presidential staff from the FOIA would raise a constitutional issue of separation of powers"). Indeed, the Supreme Court has made clear that assertion of

Executive Privilege should be the *last* resort because "[o]nce executive privilege is asserted, coequal branches of the Government are set on a collision course." Cheney, 542 U.S. at 389.

### B. Ms. Miers Is Immune from Compelled Testimony Even Though She No Longer Serves As The President's Counsel.

The Committee's primary argument seems to be that even if the President's *current* close advisers are absolutely immune from compelled congressional testimony, Ms. Miers has lost that immunity because she no longer serves as the Counsel to the President. According to the Committee, because she is no longer employed as the Counsel to the President, Ms. Miers must appear before the Committee, answer questions, and assert executive privilege on a question-by-question basis. Pl.'s Mem. at 30-35. That argument is plainly wrong.

As an initial matter, the Committee misunderstands the Executive's position, which is not that Ms. Miers is immune from congressional testimony merely because the President directed her not to appear. See Pl.'s Mem. at 27 (arguing that the "President has no power to require Ms. Miers not to appear"). Instead, our argument is that Ms. Miers holds a constitutional immunity from compelled congressional testimony based on her position as the Counsel to the President; that immunity, without more, makes the Committee's subpoena unenforceable against Ms. Miers.

More important, the Committee is wrong that the immunity held by Ms. Miers when she was the Counsel to the President is lost because she no longer serves in that position. The Committee seeks to compel Ms. Miers's testimony solely in relation to her responsibilities to the President as his Counsel and close adviser, not in any individual or private capacity. The President's interest in protecting the autonomy and confidentiality of his Office applies even though Ms. Miers no longer serves as his close adviser. Any compulsion of testimony from Ms. Miers concerning her duties on behalf of the President would invade the President's

constitutional prerogatives, the performance of his functions, and the process by which information is gathered on his behalf and decisions are made to the same degree as it would if she were still the Counsel to the President.

It has long been recognized that the need to protect these constitutional prerogatives extends beyond the term of a senior adviser's employment. President Truman, having left office, explained the need for continuing immunity in November 1953, when he refused to comply with a subpoena directing him to appear before the House Committee on Un-American Activities. In a letter to that committee, the former President warned that "if the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." Texts of Truman Letter and Velde Reply, N.Y. Times, Nov. 13, 1953, at 14 (reprinting Nov. 12, 1953 letter by President Truman), Ex. 27. "The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes." Id. These same concerns apply on behalf of a current President with respect to his close advisers even after they retire from public service. Indeed, the very purposes of testimonial immunity would be eviscerated if it disappeared as soon as a senior Presidential adviser left office.

Pointing to Clinton v. Jones, 520 U.S. 680 (1997), and to portions of a 1971 Office of Legal Counsel opinion authored by William Rehnquist, the Committee argues that a former senior adviser does not have immunity from compelled congressional testimony because there is no need for former advisers to be "available to the President 24 hours a day." Pl.'s Mem. at 34

(quoting Rehnquist Mem.).  This argument again misunderstands the constitutional

underpinnings of Ms. Miers's immunity, which is not based on the need for a former senior

adviser to be available to the President at all times – such a position would be illogical – but on

the President's need for autonomy and confidentiality in his exercise of his constitutional duties.

The Committee's heavy reliance on Clinton v. Jones is similarly misplaced.  There, the

Supreme Court held that the President does not have temporary immunity from the burdens of

private litigation arising from events occurring *before the President assumed office*.  In contrast

to Nixon v. Fitzgerald, 457 U.S. 731 (1982), which held that a sitting President is absolutely

immune from civil actions arising from his official duties – even civil actions filed long after he

has left office – the Court in Clinton found "no support for an immunity for *unofficial* conduct,"

explaining that "we have never suggested that the President, or any other official, has an

immunity that extends beyond the scope of any action taken in an official capacity."  520 U.S. at

694.  The Court thus concluded that, "[w]hatever the outcome of this case, there is no possibility

that the decision will curtail the scope of the *official powers* of the Executive Branch" because

the "litigation of questions that relate *entirely to the unofficial conduct of the individual who

happens to be the President imposes no perceptible risk of misallocation of either judicial power

or executive power.*"  Id. (emphases added).

Here, in contrast, the Committee seeks to compel the testimony of the Counsel to the

President concerning official matters that are committed to the President's exclusive authority,

*viz.*, the removal of Executive Branch employees.  See Myers v. United States, 272 U.S. 52, 122

(1926) ("The power of removal is incident to the power of appointment.").  For the reasons

demonstrated above, any such compulsion of the attendance and testimony of the President's

immediate advisers before a congressional committee regarding the functions of the Executive

Branch at its highest level would directly infringe upon the President's interest in maintaining

the autonomy and confidentiality of his Office, and would unnecessarily ensnare the judiciary in

an inter-branch dispute of the kind that has historically resolved itself by other means.

### C.    The Committee Does Not Have A Fundamental Or Comprehensive Need For The Compelled Testimony Of The President's Immediate Advisers.

The Committee lacks a fundamental or comprehensive need for the compelled testimony

of the President's immediate advisers that might overcome the President's paramount interest in

the autonomy and confidentiality of his Office and the performance of his responsibilities.  See

Nixon v. Fitzgerald, 457 U.S. at 754 (before exercising jurisdiction over the President, the courts

"must balance the constitutional weight of the interest to be served against the dangers of

intrusion on the authority and functions of the Executive Branch").  This case, in this respect, is

immediately distinguishable from United States v. Nixon, in which the Supreme Court

determined that "[t]he impediment that an absolute, unqualified privilege would place in the way

of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions

would plainly conflict with the function of the courts under Art. III."  418 U.S. at 707.

At issue in United States v. Nixon was a motion by the President to quash a subpoena

issued by the United States District Court for the District of Columbia pursuant to Federal Rule

of Criminal Procedure 17(c), directing the President to produce certain tape recordings and

documents relating to his conversations with aides and advisers.  The Supreme Court rejected the

President's claim of absolute privilege with respect to the tape recordings and documents,

finding that recognition of such a privilege on behalf of the President with respect to "a subpoena

essential to enforcement of criminal statutes . . . would upset the constitutional balance of 'a

workable government' and gravely impair the role of the courts under Art. III."  Id.  The Court

went on to address the issue of privilege within the context of "our historic commitment to the rule of law," id. at 708, explaining that:

> This is nowhere more profoundly manifest than in our view that 'the twofold aim (of criminal justice) is that guilt shall not escape or innocence suffer. * * * The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

Id. at 708-09.

None of these factors applies here. As an initial matter, never in the Country's history has a close adviser of a President been judicially compelled to testify before a legislative committee, much less regarding the exercise of a core Article II prerogative. This fact alone belies any notion that "it is *imperative* to the function of [the legislature] that compulsory [judicial] process be available for the production of evidence" from the President's immediate advisers before a legislative committee or subcommittee. Id. (emphasis added).

This is also not a criminal proceeding. The Supreme Court in Nixon stressed the "fundamental" and "comprehensive" need for "every man's evidence" in the criminal justice system, 418 U.S. at 709, making clear that "[w]e are not here concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation, nor with that between the [President's] confidentiality interest and congressional demands for information . . . ." Id. at 712 n.19. More recently in Cheney, the Supreme Court again underscored this point when distinguishing situations like this from criminal proceedings, explaining that "[w]ithholding materials from a tribunal in an ongoing criminal case when the information is necessary to the court in carrying out its tasks 'conflict[s]

- 60 -

with the function of the courts under Art. III.'"  542 U.S. at 384 (quoting in part United States v. Nixon, 418 U.S. at 707).

Moreover, in contrast to the "infrequent occasions" in which the President's "conversations will be called for in the context of a criminal prosecution," 418 U.S. at 712, legislative hearings inquiring into executive departments and actions are frequent and ongoing. It is hardly unreasonable to expect that an adversarial Congress might choose to exercise a power to compel the testimony of the President's immediate advisers regarding such matters on more than "infrequent occasions," thereby imposing great burdens on the President's Office.

Nor can Congress demonstrate a "fundamental" need for testimony from the President's immediate advisers that is "essential" to its legislative functions.  United States v. Nixon, 418 U.S. at 707, 709.  Congress, of course, has the power inherent "in the legislative process" to conduct inquiries "concerning the administration of existing laws as well as proposed or possibly needed statutes" and to probe into government agencies "to expose corruption, inefficiency or waste."  Watkins v. United States, 354 U.S. 178, 187 (1957).  Congress, however, is not "a law enforcement or trial agency."  Id.  As the Court of Appeals has explained, "[t]here is a clear difference between Congress's legislative tasks and the responsibility of a grand jury."  Senate Select Comm., 498 F.2d at 732.

> While fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events; Congress frequently legislates on the basis of conflicting information provided in its hearings.  In contrast, the responsibility of the grand jury turns entirely on its ability to determine whether there is probable cause to believe that certain named individuals did or did not commit specific crimes.

Id.

Indeed, Congress has ample means by which reasonably to inform its "legislative judgments" and to perform its legislative functions without the compelled interrogation of the President's immediate advisers over the President's objection and assertions of privilege and immunity. As it has done here in obtaining extensive testimony and documentation from the Department of Justice, Congress can obtain records from the executive departments and can receive the testimony of other executive officials. Any additional information that Congress might obtain from the compelled testimony of the President's immediate aides is too attenuated and too tangential to its legislative functions to overcome the President's paramount constitutional interests in preserving the autonomy and confidentiality of his Office and the performance of his executive functions. Cf. United States v. Nixon, 418 U.S. at 713 ("Without access to specific facts a criminal prosecution may be totally frustrated.").

## V.    THERE IS NO LEGAL REQUIREMENT THAT THE WHITE HOUSE PRODUCE A PRIVILEGE LOG TO A CONGRESSIONAL COMMITTEE IN RESPONSE TO A REQUEST FOR DOCUMENTS.

If the Court reaches the merits of this dispute, it should also dismiss Count II of the Complaint, which contends that the White House is legally obligated to provide the Committee with a privilege log in response to the subpoenas *duces tecum* that were served on defendants Harriet Miers and Joshua Bolten. See Compl. ¶ 81; Pl.'s Mem. at 35-45. The Committee points to no source of authority that expressly creates such an obligation, and none of the authorities on which the Committee relies can or should be read to create a rule on Congress's behalf that would require the White House to provide detailed accountings of presumptively privileged communications in response to any congressional demand for records. Indeed, any such rule would intrude upon the autonomy and confidentiality of the President's Office in clear violation of separation-of-powers principles. If Congress had a right to such logs, Congress could seek to

require the White House and Executive Branch agencies to identify and catalog privileged and potentially sensitive communications of the President and his advisers in response to any request for documents that might be made by any legislative committee on any given subject. Such a rule would impose manifestly unreasonable burdens on the Executive that would raise significant separation-of-powers concerns and that cannot be justified by any alleged need of the Committee for a privilege log. Here again, avoiding the constitutional thicket implicated by the Committee's requested relief is not only "fairly possible," but is commanded by a proper respect for the separation of powers. Zadvydas, 533 U.S. at 689.

> **A.    No Law Exists Requiring The White House To Produce A Privilege Log To A Congressional Committee In Response To A Request For Documents.**

As the Committee's brief implicitly recognizes, no statute, Federal Rule of Civil Procedure, or congressional rule having the force of law grants Congress an entitlement to a privilege log whenever it serves a subpoena on the Executive Branch. Instead, relying on Dellums v. Powell, 561 F.2d 242 (D.C. Cir. 1977) ("Dellums I") and Dellums v. Powell, 642 F.2d 1351 (D.C. Cir. 1980) ("Dellums II"), the Committee asserts an implied obligation to the effect that "even the *President himself* must produce a detailed privilege log when withholding documents on the ground of executive privilege." Pl.'s Mem. at 38 (emphasis added). But the Dellums decisions address demands for information in federal civil litigation, which are governed by, *inter alia*, the Federal Rules of Civil Procedure. The Committee points to no rule applicable to the legislative oversight process that has a similar force and effect.[15]

---

[15] In Dellums, the Court also stressed that "[i]t is of cardinal importance . . . that the claim of privilege is being urged solely by a former president, and there has been no assertion of privilege by an incumbent president . . . ." Dellums I, 561 F.2d at 247.

In addition, Dellums required a privilege log so that the courts could fulfill their institutional responsibility "to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves, as well as to produce a record that will render the District Court's decision capable of meaningful review on appeal." Dellums II, 642 F.2d at 1360. But whatever the role of the courts in acting pursuant to lawful authority to adjudicate a case properly before the courts, those principles have no application here. Courts have no inherent authority, and the Committee points to no additional authority, to require a privilege log to facilitate legislative proceedings. The very nature of the request – a committee of Congress enlisting the aid of the judiciary vis-a-vis the Executive to facilitate a Congressional investigation – is far removed from Dellums, and more fundamentally, raises core separation-of-powers issues.

The Committee also attempts to rely on FOIA for the proposition that the Executive Branch is routinely required "to provide privilege logs for documents withheld on the basis of executive privilege." Pl.'s Mem. at 39. To be sure, FOIA's unique statutory scheme imposes certain duties on those executive agencies subject to FOIA, including a duty at the summary judgment stage of a lawsuit seeking documents under FOIA to produce an index in support of the withholding of documents from public release pursuant to any of FOIA's specifically enumerated statutory exemptions. See Vaughn v. Rosen 484 F.2d 820, 825 (D.C. Cir. 1973) (finding that the burden of justifying the application of a statutory exemption "has been placed specifically by statute on the Government"). But FOIA does not apply to the President and his advisers. See, e.g., Armstrong v. Exec. Office of the Pres., 1 F.3d at 1292. Indeed, that conclusion was required, even though the statute did not expressly resolve the question, because "[f]ailure to exempt presidential staff from the FOIA would raise a constitutional issue of

separation of powers." <u>Ryan v. Dep't of Justice</u>, 617 F.2d 781, 788 n.19 (D.C. Cir. 1980).[16]  In

any event this is not a FOIA case.

Nor does the Committee receive help from cases such as <u>Quinn v. United States</u>, 349

U.S. 155 (1955), and <u>Emspak v. United States</u>, 349 U.S. 190 (1955), in which the Supreme Court

held that private citizens had properly invoked their Fifth Amendment privilege against self

incrimination in refusing to answer questions posed by a House subcommittee, and that they

could not be held criminally liable under 2 U.S.C. § 192 for refusing to answer questions absent

notice by the subcommittee that it had first rejected the witness's invocation of privilege.  In so

holding, the Court noted that "no ritualistic formula is necessary in order to invoke the privilege"

so long as "the committee [is] on notice of an apparent claim of the privilege."  <u>Quinn</u>, 349 U.S.

at 164.  "It then [becomes] incumbent on the committee either to accept the claim or to ask

petitioner whether he was in fact invoking the privilege."  <u>Id.</u>; <u>see also</u> <u>Emspak</u>, 349 U.S. at 195

("The way is always open for the committee to inquire into the nature of the claim before making

a ruling."); <u>Hutcheson v. United States</u>, 369 U.S. 599, 610-11 (1962) (holding that a petitioner

expressly waived his right to invoke the privilege against self-incrimination, and that he could

not escape the scope of such waiver by arguing that his refusal to testify was based upon due

process grounds and not privilege).

<u>Quinn</u>, <u>Emspak</u>, and <u>Hutcheson</u> thus stand for the unremarkable proposition that a

congressional investigatory committee is, at most, entitled to "notice of an apparent claim of

---

[16]  For these reasons, <u>Democratic Nat'l Comm. v. U.S. Dep't of Justice</u>, No. 07-712, 2008
WL 803421, at *2 (D.D.C. March 27, 2008), provides the Committee no support.  <u>See</u> Pl.'s
Mem. at 41.  There, consistent with its obligations under FOIA, the Department submitted a
<u>Vaughn</u> index in support of its withholding of information under FOIA's statutory exemptions.
2008 WL 803421 at *1.  As noted above, the President and his closest advisers, unlike the
Department, are exempt from FOIA's obligations.  <u>Armstrong</u>, 1 F.3d at 1292.

privilege." Nowhere do these cases identify any constitutional entitlement to a document-by-document invocation of the privilege itself. Nor do these cases address the separation-of-powers issues presented by this case.

Here, of course, the White House has satisfied any obligation it may have under Quinn, Emspak, and Hutcheson by specifically asserting executive privilege over the information described in Acting Attorney General Clement's June 27, 2007 letter. That letter provides the Committee with significant information regarding the documents and testimony over which the President had asserted executive privilege. For example, the letter states that the "initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys," and that among other things, "these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquires about the dismissals." Letter from Paul D. Clement to the President (June 27, 2007), Ex. 8 at 2. The letter also provides descriptions of the other two categories of documents and testimony over which the President asserted executive privilege: "communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals"; and "communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations." Id. at 5-6. The

Committee is therefore on notice of the Executive's claims of privilege; if the cases on which the Committee relies require anything in this case, the Executive already has provided it.[17]

**B.     Requiring the President And His Advisers To Provide Congress With A Privilege Log Would Violate The Separation of Powers.**

Even if the Committee could point to some law or rule obligating the production to Congress of a privilege log, applying that rule to the President and his advisers would violate the separation of powers.  As noted above, the Supreme Court has long recognized that "a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual,'" United States v. Nixon, 418 U.S. at 715, and has precluded invasion of the President's autonomy and confidentiality in the performance of his "'responsibilities'" and "'his office,'" and "'in the process of shaping policies and making decisions.'"  Nixon v. Admin. of Gen. Servs., 433 U.S. at 449 (quoting Nixon, 418 U.S. at 708, 711, 713).  If the President and his advisers were required to provide detailed accountings of their communications and activities to Congress in response to any legislative request for documents that might be made of them, the President's autonomy and independence from Congress would unquestionably be impaired.

The subpoenas at issue in this case exemplify these problems.  The subpoenas demand the production of documents created in the exercise (by the President's staff) of a core, constitutional power of the Executive, namely, the President's Article II power to nominate and

---

[17] Sanders v. McClellan, 463 F.2d 894 (D.C. Cir. 1972), on which the Committee also relies, is irrelevant to the issue whether the White House is legally compelled to produce a privilege log to Congress.  In Sanders, the D.C. Circuit declined to exercise its equitable jurisdiction based on plaintiff's First Amendment claims to order declaratory and injunctive relief preventing enforcement of a Senate subpoena *duces tecum.*  Id. at 899-903.  In deciding that the equities did not favor the plaintiff, the court simply noted that there were procedures in place for a witness to assert privileges in the course of a congressional investigation.  Id. at 899-900.

remove Officers of the United States, notwithstanding the Committee's limited (at best)

entitlement to materials involving these subjects.  In particular, the subpoenas demand the

production of documents relating to, *inter alia*, the "evaluation or decision to dismiss [nine

identified U.S. Attorneys]"; the "evaluation of any other U.S. Attorney(s) considered for

dismissal since [November 2004]"; the "implementation of the dismissal and replacement of the

dismissed U.S. Attorneys"; the "selection, discussion and evaluation of any possible replacement

or interim or acting appointment to fill any vacancy [relating to the dismissed U.S. Attorneys]";

and "any and all documents related to the involvement of . . . any current or former White House

employee or official" in any U.S. Attorney dismissal or replacement process.  Subpoena (Joshua

Bolten), Ex. 19.  The subpoenas then demand that, as to those documents, the White House must

provide a privilege log setting forth:

        a.      "the nature, source, and date of [each privileged] document";

        b.      "a description of the document's subject matter";

        c.      "the name and address of each recipient . . .  together with the date or
approximate date when each recipient received the document";

        d.      "the name and address of any other person to whom any of the contents of
the document have been disclosed, the date such disclosure took place,
and the means of such disclosure"; and

        e.      "the basis for withholding the document from the Committee. . . ."

Id.

These demands go beyond even the obligations generally imposed on civil litigants under

Rule 26(b)(5)(A)(ii) of the Federal Rules of Civil Procedure, which requires only that a party

claiming privilege to "describe the nature of the documents . . . in a manner . . . [that] will enable

other parties to assess the claim."  And by requiring the White House to describe its privileged

communications and reveal the name of "each recipient" of documents and the identity of "any

other person to whom any of the contents of the document have been disclosed," such a log could easily provide significant information regarding sensitive actions being contemplated by the President.  Indeed, the detail requested (or some of it) might itself be privileged, and thus the very act of providing such a log might undermine the protection of the privilege itself.

Moreover, owing to the high visibility of the Office of the President, it is an easily identifiable target for demands for information by Congress, with what would be a consequent demand for detailed privilege logs identifying sensitive communications and activities on a vast range of subjects.  If the Committee were to prevail on this claim, there would be no effective check on Congress's ability to demand an accounting of the President's communications.  See Cheney v. U.S. Dist. Ct. For the Dist. of Columbia, 542 U.S. 367, 386 (2004) (noting that, in contrast to the criminal justice system, where "there are various constraints, albeit imperfect, to filter out insubstantial legal claims, . . there are no analogous checks in the civil discovery process . . .").  In fact, the 110th Congress alone has conducted more than 300 inquiries and investigations of the Executive Branch.  See supra at pp. 9-10.  If Congress had a judicially created right to a privilege log every time that it sought documents from the Executive Branch, the burdens would be enormous:  the White House would need a full-time staff devoted to privilege issues, and senior advisers would be diverted from their primary duties to assist with the preparation of such logs.  (Of course, the fact that the White House itself has not produced a single privilege log in the 110th Congress demonstrates the absurdity of the Committee's claim that if the Court were to "absolve . . . [the White House] of the need to produce privilege logs . . . it would render nugatory Congress's authority to investigate matters within its legislative . . . jurisdiction."  Pl.'s Mem. at 35-36; see infra at pp. 72-74.)

A rule requiring a privilege log, moreover, would likely give rise to disputes between congressional committees and the White House concerning the adequacy of such privilege logs, as happens frequently in civil litigation.  Those disputes would inevitably find their way into court, with the attendant prospect of federal judges superintending the minutiae of a process that has historically been left to the give-and-take of accommodation.  Such an outcome would ensnare the Judiciary in such disputes and the possibility of an ultimate judicial resolution would diminish the likelihood that differences are resolved through the accommodation process.  See Barnes v. Kline, 759 F.2d 21, 61 (D.C. Cir. 1985) (Bork, J., dissenting) ("As the spectacle of public officials suing other public officials over abstract constitutional questions becomes familiar, the taint will wear off, and what seemed unattractive will appear inevitable.").

The Committee attempts to argue that the courts have not found an "itemized description of the documents withheld . . . to be overly burdensome, intrusive or unnecessary, and in fact, have held such procedures to be necessary to the fair disposition of disputes involving the Executive Branch."  Pl.'s Mem. at 36.  That is simply wrong with respect to the White House.  In Cheney, the Supreme Court rejected the notion that the Executive Branch at its highest level shall bear the initial burden in civil discovery "of invoking executive privilege with sufficient specificity and of making particularized objections" to discovery on a "line by line" basis in order to safeguard executive functions and maintain the separation of powers.  542 U.S. at 383. The withholding of information in a civil case, the Court determined, "does not hamper another branch's ability to perform its 'essential functions' in quite the same way" as in the criminal setting.  Id.  The Court also pointed out the differing considerations applicable in the criminal context, noting that because it is a "'primary constitutional duty of the Judicial Branch . . . to do justice in criminal prosecutions,'" the withholding of information "from a tribunal in an ongoing

criminal case when the information is necessary to the court in carrying out its tasks 'conflict[s] with the function of the courts under Article III.'" Id. at 384 (citations omitted). "Such an impairment of the 'essential functions of [another] branch' . . . is impermissible." Id. (citation omitted).

The Cheney Court's treatment of the separation-of-powers aspects of the information demands in that case has clear implications for this matter. The Committee's "essential functions" would not be impermissibly impaired if it could not compel the President and his advisers to identify privileged communications on a line-by-line basis regarding any given subject. As noted above, the Committee argues that were the Court to "absolve . . . [the White House] of the need to produce privilege logs . . . it would render nugatory Congress's authority to investigate matters within its legislative . . . jurisdiction." Pl.'s Mem. at 35-36. But that is nothing more than a flat assertion. It is contradicted by the fact that Congress has actively exercised its investigative authority even though the Executive provides such logs only infrequently, and is belied by the fact that the Committee points to only two circumstances (both more than ten years ago) in which the White House has provided Congress with a privilege log. See Pl.'s Mem. at 40-41 (identifying instances in 1996 and 1997 in which the White House voluntarily produced privilege logs to Congress). Certainly the fact that privilege logs have not often been provided in other contexts – and have not been provided at all by the White House during the 110th Congress – has not rendered Congress's investigative authority "nugatory."

In addition, as the Court of Appeals has observed, "[w]hile fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." Senate Select Committee, 498 F.2d at 732. The

Committee has not even come close to demonstrating how a detailed accounting of privileged White House communications is essential to its ability to make legislative judgments on the predicted consequences of proposed legislative actions.[18]

The Committee points to past occasions in which the White House *voluntarily* provided congressional committees with privilege logs in response to requests for documents. Pl.'s Mem. at 40-41. But the mere fact that the White House may voluntarily provide such a log does not mean that Congress has a right to compel a privilege log, and no court has ever compelled the Executive Branch to provide one to Congress. Instead, the examples of voluntary inter-branch cooperation identified by the Committee demonstrates the efficacy of the traditional method by which the Executive and Legislative Branches have resolved their disputes. As the Court of Appeals has noted, "[n]egotiation between the two branches should be thus viewed as a dynamic process affirmatively furthering the constitutional scheme." AT&T Co., 567 F.2d at 130. The

---

[18]   This fact distinguishes this case from the D.C. Circuit's decisions in Dellums on which the Committee relies. Dellums concerned the invocation of executive privilege by former President Nixon in response to a subpoena for White House communications that was served by plaintiffs in civil discovery in support of their claims for damages arising from alleged violations of their constitutional rights by former high level government officials. Ultimately, the court allowed limited review of putatively privileged material through the appointment of a Special Master, pursuant to Fed. R. Civ. P. 53(a), Dellums I, 561 F.2d at 250, and later required the production of a privilege log. Dellums II, 642 F.2d at 1359. But the court did not impose this burden without first weighing the respective interests involved. The court emphasized that "[i]t is of cardinal significance . . . that the claim of privilege is being urged solely by a former president, and there has been no assertion of privilege by an incumbent president . . . ." Dellums I, 561 F.2d at 247. The court further found that plaintiffs had demonstrated that the communications at issue "were not merely 'demonstrably relevant' but indeed substantially material to their case." Id. at 249. Lastly, the court stressed that there is "a strong constitutional value in the need for disclosure in order to provide the kind of enforcement of constitutional rights that is presented [here involving] . . . a charge of civil conspiracy among high officers of government to deny a class of citizens their constitution rights . . ." Id. at 247. No like "strong constitutional values" are present in this case to justify the compulsion of a privilege log from the White House.

process is flexible enough that it has resulted in the provision of a privilege log by the White

House in the past in certain circumstances, without creating an obligation more generally.

* * * * * * *

This nation has a long and consistent history of having disputes between the political

branches resolved through negotiation, compromise, and, when necessary, the exercise of

political tools at their disposal, but without resort to the judiciary.  Indeed, Congress has a

variety of means by which it can and has exerted pressure on the Executive Branch, including

the power of the purse and the ability to withhold consent for Presidential nominations.  A

resolution of this case on the merits would upset this historic practice by fixing judicially

enforceable rules regarding these important and sensitive inter-branch issues, rather than leaving

these issues to the give-and-take process that occurs every day between the branches.  Forever

altering the accommodation process that has served the Nation for over two centuries would be

unwise and unnecessary.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant Defendants' Motion to Dismiss and deny the Committee's Motion for Partial Summary Judgment.


Dated: May 9, 2008                          Respectfully submitted,

                                            GREGORY G. KATSAS
                                            Acting Assistant Attorney General

                                            CARL J. NICHOLS
                                            Principal Deputy Associate Attorney General

                                            JOHN C. O'QUINN
                                            Deputy Associate Attorney General

                                            JOSEPH H. HUNT
                                            Director, Federal Programs Branch

                                            /s/_____
                                            JOHN R. TYLER (D.C. Bar No. 297713)
                                            JAMES J. GILLIGAN (D.C. Bar No. 422152)
                                            NICHOLAS A. OLDHAM (D.C. Bar No. 484113)
                                            HELEN H. HONG (CA SBN 235635)
                                            STEPHEN J. BUCKINGHAM
                                            Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue, N.W.
                                            Washington, DC  20530
                                            Telephone: (202) 514-2000

                                            ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY, UNITED )
STATES HOUSE OF REPRESENTATIVES, )
                                              )
                            Plaintiff, )
                                              )
              v. )  Civil Action No. 1:08cv00409 (JDB)
                                              )
HARRIET MIERS and )
JOSHUA BOLTEN, in his capacity as custodian )
of White House records, )
                                            )
                          Defendants. )
_____ )

## EXHIBIT LIST

**EXHIBIT NAME**                                                     **EXHIBIT**

Letter from John Conyers, Jr. and Linda T. Sánchez to Alberto R. Gonzales
        (March 8, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Letter from Richard A. Hertling to John Conyers, Jr.
        (March 13, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Letter from Fred F. Fielding to Patrick Leahy, John Conyers, Jr. and Arlen Spector
        (March 20, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Letter from John Conyers, Jr. and Linda T. Sánchez to Fred F. Fielding
        (March 22, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Letter from Patrick Leahy and John Conyers, Jr. to Fred F. Fielding
        (March 28, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Letter from Fred F. Fielding to Patrick Leahy and John Conyers, Jr.
        (April 12, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Letter from Richard A. Hertling to John Conyers, Jr. and Patrick Leahy
        (April 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Letter from Paul D. Clement to the President
        (June 27, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Letter from Fred F. Fielding to Patrick Leahy and John Conyers, Jr.
(June 28, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Letter from Fred F. Fielding to Patrick Leahy and John Conyers, Jr.
(July 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Letter from Fred F. Fielding to George T. Manning
(July 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Letter from George T. Manning to John Conyers, Jr. and Lamar S. Smith
(July 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Letter from Fred F. Fielding to George T. Manning
(July 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Letter from George T. Manning to John Conyers, Jr. and Linda T. Sánchez
(July 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Letter from George T. Manning to John Conyers, Jr.
(July 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Letter from John Conyers, Jr. to Fred F. Fielding
(Nov. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Letter from Fred F. Fielding to John Conyers, Jr.
(Nov. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Letter from Michael B. Mukasey to Nancy Pelosi
(Feb. 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Subpoena (Joshua Bolten) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Subpoena (Harriet Miers) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

H. Res. 979, 982 (Feb. 14, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

H. Res. 980 (Feb. 14, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a
Claim of Executive Privilege,
8 Op. O.L.C. 101 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Assertion of Executive Privilege with Respect to Clemency Decision,

23 Op. O.L.C. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Immunity of Former Counsel to the President From Compelled Congressional Testimony,
    31 Op. O.L.C. 1, 1 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

8 Messages & Papers of the Presidents 379 (1898) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Texts of Truman Letter and Velde Reply, N.Y. Times, Nov. 13, 1953 . . . . . . . . . . . . . . . . . . . . 27

U.S. Senate: Statements on Introduced Bills and Joint Resolutions S. 2170, Cong. Rec.
    94th Cong., 1st Sess. 1975, 121, no. 19 (July 24, 1975), 24957-24600 . . . . . . . . . . . . 28

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 1

JOHN CONYERS, JR., Michigan
CHAIRMAN

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Tenth Congress

March 8, 2007

The Honorable Alberto R. Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Mr. Attorney General:

We write to follow up on the hearings held in the House and Senate Judiciary Committees this week concerning the forced resignations of six U.S. Attorneys. At these hearings, a number of important disclosures were made, several of which raise very troubling legal questions about the conduct of officials at the Justice Department. Because of these concerns, and in order to further our investigation, we ask that you make available to us certain officials at the Department for follow-up questioning next week and that you provide us with certain critical documents and information.

At our hearings we learned of a number of troubling matters. Among other things:

- Two of the fired U.S. Attorneys, Mr. Bogden and Mr. Charlton, testified that they were told by Mr. William Mercer, the Acting Associate Attorney General, that they were fired for political reasons in order to put others in those positions so they could build their resumes, contrary to the claim by Justice Department officials that they were fired for "performance related" reasons. Many of the rationales for the terminations offered by Mr. Moschella at our hearing do not appear to hold up to scrutiny. For example, Mr. McKay was allegedly terminated because of his promotion of an information sharing program, even though he was praised for this work and his program was selected to be a pilot program by the Department. Mr. Cummins was allegedly terminated in part because he was rumored to want to leave before his term was finished, even though he testified he had never told that to anyone at the Department prior to his resignation. Mr. Charlton was allegedly terminated because he wanted the FBI to tape the confessions of alleged child molesters to facilitate their convictions, even though the Deputy Attorney General's office had asked him not to resign over this issue and asked him to initiate a pilot program on this matter.

- Mr. Iglesias and Mr. McKay testified that there were several efforts made to influence their prosecutorial decisions. For example, Mr. Iglesias testified that he felt "leaned on" and "sickened" by *ex parte* congressional contacts, and Mr. McKay testified that he

The Honorable Alberto R. Gonzales
Page Two
March 8, 2007

received a call from a congressional representative apparently intended to pressure him to pursue a criminal vote fraud investigation, and subsequently stated that he was asked during an interview with White House Counsel Harriet Miers to explain why he had "mishandled" that issue. This testimony raises serious issues concerning possible undue influence and obstruction of justice.

- Mr. Cummins testified that he received a call from Michael Elston, Mr. McNulty's Chief of Staff, who informed him that voluntary testimony to Congress by Mr. Cummins or any of his colleagues would be seen as "a major escalation of the conflict meriting some kind of unspecified form of retaliation." On its face, this testimony raises the possibility that the Department may have sought to obstruct Congress' efforts to ascertain the truth concerning these firings.

In order to further our investigation and resolve the many contradictions between statements by the Department and the terminated U.S. Attorneys, we need to interview several employees at the Department, and accordingly ask that you make them available to us to interview within the next week. These individuals include:

- Paul McNulty, Deputy Attorney General;

- D. Kyle Sampson, Chief of Staff to the Attorney General;

- Michael Elston, Chief of Staff to the Deputy Attorney General;

- Michael Battle, Director, Executive Office for U.S. Attorneys;

- Monica Goodling, Senior Counsel to the Attorney General and Liaison to the White House; and

- William Mercer, United States Attorney for Montana and Acting Associate Attorney General.

The Honorable Alberto R. Gonzales
Page Three
March 8, 2007

    We will also require that you provide to us information and documents next week as well.[1] Specifically, we request that you supply the following documents and information in accordance with the definitions enclosed with this letter:

- copies of all documents (including but not limited to e-mails), either within the Department of Justice or relating to communications between anyone at the Department and the White House or any other person or entity, concerning the termination of the six U.S. Attorneys who testified at our hearing and the selection of their replacements. This includes, but is not limited to, any materials relating to the meetings held within the Justice Department on the subject, communications from or to the White House on the subject, any lists of U.S. Attorneys to be replaced, any lists of replacement candidates for their positions, the Justice Department and Administration responses to the controversy over the firings, and post-termination communications with the fired U.S. Attorneys;

- copies of all documents relating to communications between the Justice Department and Members of Congress concerning any of the terminated U.S. Attorneys in advance of their terminations;

- copies of all documents relating to communications that the Justice Department had with the terminated U.S. Attorneys during their tenure in office concerning any failure in their performance, including any failure to comply with the Justice Department's priorities or directives;

- the names of any Members of Congress who were given advance notification of the terminated U.S. Attorneys by anyone in the Justice Department, together with the dates of any such notification; and

- the names of all individuals in the White House and Justice Department who were in any respect involved in the decision to seek the resignation of the terminated U.S. Attorneys, in addition to those identified by Mr. Moschella in his testimony.

---

[1] Pursuant to a letter delivered to Mr. Moschella on Monday, March 5, 2007, we had hoped to receive certain requested documents and information in advance of the hearing. For purposes of this letter, any reference to the Justice Department encompasses all components thereof, e.g., the Executive Office for United States Attorneys.

The Honorable Alberto R. Gonzales
Page Four
March 8, 2007

     We request that you provide the requested documentary materials and other information to us by 6:00 p.m. on Thursday, March 15, 2007, and we will be in touch with your office concerning the above individuals.  Responses and questions should be directed to the Judiciary Committee office, 2138 Rayburn House Office Building, Washington, DC 20515 (tel: 202-225-3951; fax: 202-225-7680). Thank you for your cooperation in this matter.

Sincerely,

John Conyers, Jr.
Chairman

Linda T. Sánchez
Chairwoman, Subcommittee on Commercial
and Administrative Law

Enclosure

cc:   Hon. Richard A. Hertling
      Hon. Lamar S. Smith
      Hon. Christopher B. Cannon

Definitions

1.  The term "document" means any written, recorded or graphic matter of any
    nature whatsoever, regardless of how recorded, and whether original or
    copy, including, but not limited to, the following: memoranda, reports,
    manuals, instructions, working papers, records, notes, letters, notices,
    confirmations, telegrams, receipts, appraisals, pamphlets, magazine or
    newspaper articles, interoffice and intra-office communications, electronic
    mail (e-mail), contracts, cables, notations of any type of conversation,
    telephone calls, meetings or other communications, bulletins, printed matter,
    computer printouts, teletypes, transcripts, diaries, analyses, summaries,
    minutes, comparisons, messages, correspondence, press releases, circulars,
    reviews, opinions, studies and investigations, questionnaires and surveys,
    and work sheets (and all drafts, preliminary versions, alterations,
    modifications, revisions, changes, and amendments of any of the foregoing,
    as well as any attachments or appendices thereto), and graphic or oral
    records of any kind (including without limitation, photographs, charts,
    graphs, voice mails, microfiche, microfilm, videotape, recordings and
    motion pictures), and electronic and mechanical records or representations
    of any kind (including without limitation, tapes, cassettes, disks, computer
    files, computer hard drive files, CDs, DVDs, memory sticks, and recordings)
    and other written, printed, typed or other graphic or recorded matter of any
    kind of nature, however produced or reproduced, and whether preserved in
    writing, film, tape, disk, videotape or otherwise. A document bearing any
    notation not a part of the original text is to be considered a separate
    document. A draft or non-identical copy is a separate document within the
    meaning of this term.

2.  The term "communication" means each manner or means of disclosure or
    exchange of information, regardless of means utilized, whether oral,
    electronic, by document or otherwise, and whether face-to-face, in a
    meeting, by telephone, mail, e-mail, telexes, discussions, releases, personal
    delivery, or otherwise.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 2



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

March 13, 2007

The Honorable John Conyers, Jr.
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

This responds to your letter, dated March 8, 2007, which requested documents and other information relating to the Committee's hearing on the recent resignation of United States Attorneys. In accordance with our conversations with Committee staff, we expect that Department officials will be made available in response to your request.

Enclosed are documents that are responsive to your request, which were provided by the Office of the Attorney General and the Office of the Associate Attorney General. Many of them are copies of e-mail communications that we believe will include information that is central to the Committee's interest in this matter with respect to the process and discussions surrounding the removal of the eight U.S. Attorneys. A small amount of information has been redacted from these documents. Redacted information includes the following: home and cell telephone numbers; home addresses; social security numbers; and certain executive branch deliberative information that does not pertain to the eight U.S. Attorneys who were removed. We believe that these materials will substantially address the Committee's oversight interests in this matter, although we are continuing to search Department records and will supplement this response when additional documents become available.

We hope that this information is helpful. Please do not hesitate to contact this office if you would like additional assistance regarding this or any other matter.

Sincerely,

Richard A. Hertling
Acting Assistant Attorney General

Enclosures

cc:     The Honorable Lamar Smith
        Ranking Minority Member

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 3

**THE WHITE HOUSE**

WASHINGTON

March 20, 2007

Dear Chairman Leahy, Chairman Conyers, Ranking Member Specter, Ranking Member Smith, and Congresswoman Sánchez:

I write in response to the letter of Chairman Leahy and Senator Specter dated March 13, 2007, and Chairman Conyers' and Congresswoman Sánchez's letter of March 9, 2007, regarding the Department of Justice's decision to request the resignations of United States Attorneys in December 2006. As you know, I have been working over the last week with your Committees to accommodate your interests, while at the same time respecting the constitutional prerogatives of the Presidency. I very much appreciate the time and consideration that you and other Members of Congress have provided me in the course of these discussions.

In keeping with the President's commitment to ensure that Congress and the American people understand the resignations of the U.S. Attorneys, the Department of Justice has produced more than 3,000 pages of documents relating to this matter. These documents do not reflect that any U.S. Attorney was replaced to interfere with a pending or future criminal investigation or for any other improper reason. These documents, together with the interviews to be provided by Department officials, will provide extensive background on the decisions in question, including an account of communications between the Department and senior White House officials. Congress, in short, is receiving a virtually unprecedented window into personnel decision-making within the Executive Branch.

In the midst of this current debate, the President must remain faithful to the fundamental interests of the Presidency and the requirements of the constitutional separation of powers. We wish to reach a reasonable accommodation so as to provide your Committees the information they are seeking in a way that will allow this President, and future Presidents, to continue to discharge their constitutional responsibilities effectively.

In response to the invitations for interviews extended by the Committees, I am prepared to agree to make available for interviews the President's former Counsel; current Deputy Chief of Staff and Senior Advisor; Deputy Counsel; and a Special Assistant in the Office of Political Affairs. We are prepared to agree to the following terms, which, considering applicable constitutional principles relating to the Presidency and your Committees' interests, we believe are fair, reasonable, and respectful. We believe that such interviews should be a last resort, and should be conducted, if needed, only after Congress has heard from Department of Justice officials about the decision to request the resignations of the U.S. Attorneys.

Such interviews may cover, and would be limited to, the subject of (a) communications between the White House and persons outside the White House concerning the request for resignations of

the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests. Those interviews should be conducted by both Committees jointly. Questioning of White House officials would be conducted by a Member or limited number of Members, who would be accompanied by committee staff. Such interviews would be private and conducted without the need for an oath, transcript, subsequent testimony, or the subsequent issuance of subpoenas. A representative of the Office of the Counsel to the President would attend these interviews and personal counsel to the invited officials may be present at their election.

As an additional accommodation, and as a part of this proposal, we are prepared to provide to your Committees copies of two categories of documents: (a) communications between the White House and the Department of Justice concerning the request for resignations of the U.S. Attorneys in question; and (b) communications on the same subject between White House staff and third parties, including Members of Congress or their staffs on the subject.

We trust and believe that the accommodation we offer here, in addition to what the Department of Justice has provided, should satisfy the Committees' interests.

Sincerely,

Fred F. Fielding
Counsel to the President

The Honorable Patrick Leahy
United States Senate
433 Russell Senate Office Building
Washington, D.C. 20510

The Honorable John Conyers
United States House of Representatives
2426 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Arlen Specter
United States Senate
711 Hart Senate Office Building
Washington, D.C. 20510

The Honorable Lamar Smith
United States House of Representatives
2409 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Linda Sánchez
United States House of Representatives
1007 Longworth House Office Building
Washington, D.C. 20515

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 4

JOHN CONYERS, JR., Michigan
CHAIRMAN

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515–6216
#### One Hundred Tenth Congress

March 22, 2007

Mr. Fred F. Fielding
Counsel to the President
Office of Counsel to the President
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Mr. Fielding:

We are writing in response to your March 20 letter concerning our request for information relating to our investigation of the U.S. Attorney controversy. While we share the Administration's interest that the American people "hear the truth" concerning these matters, we cannot accept your proposal for a number of reasons, and would sincerely hope that your office will work with us to find a reasonable accommodation of the interests of both branches of government.

We write this because your proposal will not facilitate a full and fair inquiry. We believe the failure to permit any transcript of our interviews with White House officials is an invitation to confusion and will not permit us to obtain a straightforward and clear record. Also, limiting the questioning (and document production) to discussions by and between outside parties will further prevent our Members from learning the full picture concerning the reasons for the firings and related issues. As we are sure you are aware, limitations of this nature are completely unsupported by precedents applied to prior Administrations – both Democratic and Republican.

We would not be pursuing this matter absent the evidence of misconduct, misstatements and potential criminal wrongdoing that has already come to light. Among other things, the Department of Justice itself has acknowledged that its officials have misled Congress, with the Chief of Staff to the Attorney General resigning over his role in the matter. In addition, several U.S. Attorneys have testified that the firings may have been tied to improper contacts and threats. Evidence has also emerged that improper criteria may have been used not just for firing U.S. Attorneys, but also with decisions to retain them. Although there have been numerous and conflicting accounts concerning the process, there now appears to be little doubt that senior officials in the White House were involved in the firing plan, both in conception and implementation. Also, notwithstanding your characterization of the Department of Justice's provision of documentation and witnesses, the Department of Justice has failed to turn over a significant amount of critical information, and has not yet reached accord with us regarding witness interviews. Given these facts, it would be irresponsible if our Committee were to accept

Mr. Fred Fielding
Page Two
March 22, 2007

the limitations proposed in your letter, which would severely impede our ability to get to the truth on behalf of the American people.

We have approached this matter with a high degree of caution and seriousness. This is why we initiated the matter with a non-compulsory request for documents on March 9. We accepted your request to meet on March 13, and, again, at your request, deferred taking any further action, based on the expectation that documents would be made available to us and an appropriate arrangement for questioning White House officials agreed to by the March 16 deadline you suggested. Although we did not hear from you on that date, we again accepted your request to defer action until we could meet, at your further request, on March 20. At that time we received your official proposal that would impose unprecedented restrictions on our access to relevant officials and materials. In order to protect our prerogatives, the Commercial and Administrative Law Subcommittee of the Judiciary request authorized Chairman Conyers to issue subpoenas with regard to these matters; but even then, Mr. Conyers indicated that he would not issue the subpoenas pending further efforts to reach accommodation with the White House.

It is in that spirit that we remain committed to seeking a cooperative resolution to this matter on a voluntary basis, consistent with the oversight responsibilities of the House and the Senate. We would be pleased to discuss further proposals from you to achieve these objectives that provide us with the records and information we need to complete our investigation while respecting your needs and interests. In the meantime, we also ask that you ensure the preservation of relevant White House documents, as defined in our March 9 letter.

We would ask that you contact the House Committee on the Judiciary office at your very earliest convenience so that we may resolve this matter. If you are willing to work in good faith, we can assure you that we are as well.

Sincerely,

John Conyers, Jr.
Chairman

Linda T. Sánchez
Chairwoman, Subcommittee on Commercial
and Administrative Law

cc:    Hon. Lamar S. Smith
       Hon. Christopher B. Cannon

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 5

# Congress of the United States
### Washington, DC 20510

March 28, 2007

Fred Fielding, Esq.
Counsel to the President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

Dear Mr. Fielding:

When we met recently, each of us agreed to continue to talk and keep the lines of communication open. Nevertheless, we have not heard from you. It is now more than a week since the last set of meetings and almost a week since you received March 23rd letters from each of us inviting the White House to agree to provide the investigating committees of the Congress, both House and Senate, with access to witnesses, information and relevant documents.

As we have previously noted, political influence in federal law enforcement is a serious matter. We need to get to the bottom of what happened, why, how and who was involved in the mass firings of United States attorneys; the criteria used to retain U.S. Attorneys; and possible misstatements to Congress. The fact that recent disclosures have called into question previous statements made by the Attorney General and a high ranking Department of Justice official asserted her fifth amendment rights magnifies the need for a prompt, thorough, and fair investigation.

Allow us to share another step you might consider. At the most recent Senate Judiciary Committee business meeting, Senators from both sides of the aisle made a number of statements seeking White House cooperation. Senator Specter, the Committee's Ranking Republican, said that despite what you, the President and the President's spokesman have been saying, the President was, in fact, willing to negotiate. Senators Hatch and Sessions suggested that the Committee proceed with preliminary interviews of the White House senior staff and then consider whether to authorize subpoenas and compel testimony. Given the terms included in your March 20 letter, that seemed to us disingenuous, to appear to accept your limited proposal and then ultimately to ignore the limitation that there be no follow up testimony to the off-the-record interview you demanded.

Mr. Fred Fielding, Esq.
March 28, 2007
Page 2 of 3

We do believe your willingness to provide documents is worth pursuing. We hope that you will reconsider your "all or nothing" approach with respect to documents you identified that you would be willing to provide. We urge you to provide all relevant documents without delay. The White House documents to and from the Department of Justice and with third parties, such as Republican state party officials, should be provided without delay. You have acknowledged your willingness to provide those to us previously.

That would narrow the dispute over White House documents to those you refer to as "internal". We believe that these are important to our investigation, as well. For example, if there is a memorandum or an e-mail from Karl Rove to Harriet Miers initiating consideration of firing some United States attorneys in order to impede an investigation, that would be very important for the Committees to know. Thus, while we do not agree with you that what you describe as "internal" White House documents should be off limits, we recognize that you view them as a separate category and you disagree whether those should be shared with the Committees. Recognizing we have a dispute over those documents should not delay the Committees receiving the other documents that you indicate you are willing to provide.

If we can narrow our dispute, we may then be able to work through it by agreeing, for example, that we initially designate as "Committee Confidential" what you refer to as "internal" White House documents. We could then consider a process by which we would consult with you prior to making them public.

In addition, we have become increasingly sensitized over the last several days to the White House staff wearing several "hats" and using Republican National Committee and campaign e-mail addresses. In fact, as Chairman Waxman has recently pointed out, congressional investigations, including this one, "have uncovered evidence that White House staff have used nongovernmental e-mail accounts to conduct official government business."

As Chairman Waxman has also pointed out, many exchanges between Jack Abramoff and White House officials were conducted via non-government e-mail accounts. Indeed, he quotes exchanges that suggest that Mr. Abramoff and White House officials were using the nongovernmental accounts specifically to avoid creating a White House "record" of the communications.

Mr. Fred Fielding, Esq.
March 28, 2007
Page 3 of 3

We hope you agree that such sleight of hand should not be used to circumvent and compromise the comprehensiveness of our investigation. In this matter we have already received a document showing communications between D. Kyle Sampson, the Attorney General's former chief of staff, and J. Scott Jennings, the Special Assistant to the President and Deputy Director of Political Affairs at the White House (who you offered for an off-the-record interview), in which Mr. Jennings does not use his White House e-mail account but an e-mail account at the Republican National Committee designated "gwb43.com." There is another, similar use of a nongovernmental e-mail account in an exchange including Mr. Jennings and Monica Goodling, the Justice Department official who was the White House liaison and who recently invoked her privilege against self incrimination.

Accordingly, we trust that you will be collecting and producing e-mails and documents from all e-mail accounts, addresses and domains and that you are not artificially limiting your production to the official White House e-mail and document retention system.

Again, we urge you to continue to work with us so that we can achieve our mutual goal of getting to the truth in this matter

Sincerely,

PATRICK LEAHY
Chairman
Senate Judiciary Committee

JOHN CONYERS, JR.
Chairman
House Judiciary Committee

cc:  The Hon. Arlen Specter
     The Hon. Lamar Smith

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 6

**THE WHITE HOUSE**

WASHINGTON

April 12, 2007

Dear Chairman Leahy and Chairman Conyers:

I write in response to your joint letter of March 28, as well as your separate March 22 letters in which others joined, regarding the accommodation I outlined in separate meetings with each of you and in my letter of March 20. I appreciate your contacting me jointly on this matter. I also agree with the observation that we should keep the lines of communication open between us, and will be pleased to entertain any further discussions that might clarify our respective positions. There can be no doubt that you and your colleagues had devoted, as have we, a great deal of time and consideration to this matter, as to how best to expeditiously achieve our separate objectives, while avoiding a constitutional clash.

The President has made a commitment to ensure that Congress receives adequate and appropriate information regarding the circumstances surrounding the resignation of the U.S. Attorneys from his Administration. We continue to believe that the path proposed in my March 20 letter is a proper course to meet this commitment while respecting and protecting the constitutional prerogatives of the President. We hope that you will reconsider your rejection of the President's proposal – one constructed and tendered in a spirit of cooperation and accommodation, and designed to share information with your Committees.

In response to your suggestion and invitation in the March 28 letter to attempt to "narrow the dispute," I should affirm that the President's proposal was intended to reflect just such an effort. The proposal reflects a series of balanced compromises designed to respect and accommodate your interests in obtaining information while also protecting the institution of the Presidency. Although it consists of individual components, the proposal reflects a unified offer that, if accepted, would result in your Committees receiving a significant amount of information. We, therefore, respectfully decline your suggestion to immediately produce the documents that we are prepared to release as part of a carefully and thoughtfully considered package of accommodations designed to avoid shifting the dispute to ground on which we need not tread. With all respect, your suggestion fails to credit fully the extraordinary nature of the disclosure we are prepared to provide, and might even prolong this dispute which the President is seeking to resolve in the most expeditious manner possible.

At the end of your March 28 letter, you raised an additional question regarding the scope of the document production we are prepared to make as part of the total accommodation outlined in the March 20 letter. We are aware that certain e-mail accounts supplied by the Republican National Committee may have been used by White House officials in sending or receiving e-mails that might fall within the production contemplated in our letter. Please be assured that it was and remains our intention to collect e-mails and documents from those accounts as well as the

official White House e-mail and document retention system, for production under the terms we outlined.

We continue to believe that the accommodation we offered on March 20, in addition to what the Department of Justice has and will provide, will satisfy the Committees' interests.  It is hoped that upon reflection you may concur in that conclusion.

Sincerely,

Fred F. Fielding
Counsel to the President

The Honorable Patrick J. Leahy
United States Senate
Washington, D.C.  20510

The Honorable John Conyers, Jr.
United States House of Representatives
Washington, D.C.  20515

cc:    The Honorable Arlen Specter
       The Honorable Chris Cannon

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE  OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 7



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General        *Washington, D.C. 20530*

April 13, 2007

The Honorable John Conyers, Jr.
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

The Honorable Patrick Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

Dear Messrs. Chairmen:

This supplements our prior responses to your letters, dated March 8, 2007, and March 12, 2007, requesting documents in connection with the Committees' oversight investigation about the resignations of U.S. Attorneys. By a separate letter, we are responding to several questions raised in your more recent correspondence.

Enclosed are 2,394 pages of documents that originated in the Offices of the Attorney General, the Deputy Attorney General, Legislative Affairs, Legal Policy, Public Affairs and the Executive Office for United States Attorneys. In an effort to respond as quickly as possible to your expressed interest in an expeditious production, our previous searches focused upon those offices most directly connected with the resignations of the eight U.S. Attorneys, such as the Offices of the Attorney General and the Deputy Attorney General, plus the Executive Office for United States Attorneys. We have since expanded our response efforts by conducting searches in the Offices of Legislative Affairs, Legal Policy, and the Office of Public Affairs. We have also identified additional responsive documents in the files of components where we had previously conducted searches. In addition, we previously produced documents relating to preparations for congressional testimony on the U.S. Attorney matter, which included many documents prepared for congressional briefings. Consistent with that production, and in light of your subsequent letters, we are now producing additional documents identified as relating to preparations for congressional briefings. As noted, these documents include some duplication of prior productions because some materials were used for preparation for both the testimony and the briefings. Consistent with our prior productions, we have made some redactions in these materials and the unredacted documents are available for review.

We hope that this information is helpful. Please do not hesitate to contact this Office if you have any questions about today's production.

Sincerely,

Richard A. Hertling
Acting Assistant Attorney General

Enclosures

cc:    The Honorable Lamar Smith
       The Honorable Arlen Specter
       The Honorable Charles Schumer
       The Honorable Jeff Sessions
       The Honorable Linda Sanchez
       The Honorable Chris Cannon

-2-

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 8



**U. S. Department of Justice**

Office of the Solicitor General

---

Solicitor General

*Washington, D.C. 20530*

June 27, 2007

The President
The White House
Washington, D.C.  20500

Dear Mr. President,

The Senate Committee on the Judiciary and the House Committee on the Judiciary recently issued five subpoenas in connection with their inquiries into the resignation of several United States Attorneys in 2006.  Broadly speaking, four of the five subpoenas seek documents in the custody of current or former White House officials ("White House documents") concerning the dismissal and replacement of the U.S. Attorneys.  In addition, two of the five subpoenas demand testimony about these matters from two former White House officials, Harriet Miers, former Counsel to the President, and Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs.

You have requested my legal advice as to whether you may assert executive privilege with respect to the subpoenaed documents and testimony concerning the categories of information described in this letter.  It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and testimony.

### I.

The documents that the Office of the Counsel to the President has identified as responsive to the subpoenas fall into three broad categories related to the possible dismissal and replacement of U.S. Attorneys, including congressional and media inquiries about the dismissals: (1) internal White House communications; (2) communications by White House officials with individuals outside the Executive Branch, including with individuals in the Legislative Branch; and (3) communications between White House officials and Department of Justice officials.  The Committees' subpoenas also seek testimony from Ms. Miers and Ms. Taylor concerning the same subject matters, and the assertion of privilege with respect to such testimony requires the same legal analysis.

The Office of Legal Counsel of the Department of Justice has reviewed the documents identified by the Counsel to the President as responsive to the subpoenas and is satisfied that the documents fall within the scope of executive privilege.  The Office further believes that Congress's interests in the documents and related testimony would not be sufficient to override an executive privilege claim.  For the reasons discussed below, I concur with both assessments.

## A.

The initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys. Among other things, these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals. These types of internal deliberations among White House officials fall squarely within the scope of executive privilege. One of the underlying purposes of the privilege is to promote sound decisionmaking by ensuring that senior Government officials and their advisers speak frankly and candidly during the decisionmaking process. As the Supreme Court has explained, "A President and those who assist him must be free to explore alternatives in the process of shaping policies and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also* Letter for the President from John Ashcroft, Attorney General, *Re: Assertion of Executive Privilege with Respect to Prosecutorial Documents* at 2 (Dec. 10, 2001) (available at http://www.usdoj.gov/ olc/executiveprivilege/htm) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) ("[N]ot only does executive privilege apply to confidential communications to the President, but also to 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'") (quoting *Nixon*, 418 U.S. at 705). These confidentiality interests are particularly strong where, as here, the communications may implicate a "quintessential and nondelegable Presidential power," such as the authority to nominate or to remove U.S. Attorneys. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 2-3 (finding that executive privilege protected Department and White House deliberations related to decision to grant clemency).

Under D.C. Circuit precedent, a congressional committee may not overcome an assertion of executive privilege unless it establishes that the documents and information are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution.").

As a threshold matter, it is not at all clear that internal White House communications about the possible dismissal and replacement of U.S. Attorneys fall within the scope of *McGrain* and its progeny. The Supreme Court has held that Congress's oversight powers do not reach "matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults

2

with Members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.[1]  Consequently, there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision [because the decision to grant clemency is an exclusive Executive Branch function]."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain").

In any event, even if the Committees have oversight authority, there is no doubt that the materials sought qualify for the privilege and the Committees have not demonstrated that their interests justify overriding a claim of executive privilege as to the matters at issue.  The House Committee, for instance, asserts in its letter accompanying the subpoenas that "[c]ommunications among the White House staff involved in the U.S. Attorney replacement plan are obviously of paramount importance to any understanding of how and why these U.S. Attorneys were selected to be fired."  Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007).  But the Committees never explain how or why this information is "demonstrably critical" to any "legislative judgments" Congress might be able to exercise in the U.S. Attorney matter.  *Senate Select Comm.*, 498 F.2d at 732.  Broad, generalized assertions that the requested materials are of public import are simply insufficient under the "demonstrably critical" standard.  Under *Senate Select Committee*, to override a privilege claim the Committees must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials."  *Id.* at 733.

Moreover, any legitimate oversight interest the Committees might have in internal White House communications about the proposal is sharply reduced by the thousands of documents and dozens of hours of interviews and testimony already provided to the Committees by the Department of Justice as part of its extraordinary effort at accommodation.[2]  This information

---

[1]  *See, e.g., Public Citizen v. Department of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring) ("[T]he Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.'  No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment."); *Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

[2]  During the past three months, the Department has released or made available for review to the Committees approximately 8,500 pages of documents concerning the U.S. Attorney resignations.  The Department

has given the Committees extraordinary—and indeed, unprecedented—insight into the Department's decision to request the U.S. Attorney resignations, including the role of White House officials in the process. *See, e.g.*, *History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 758-59, 767 (1982) (documenting refusals by Presidents Jackson, Tyler, and Cleveland to provide information related to the decision to remove Executive Branch officials, including a U.S. Attorney).

In a letter accompanying the subpoenas, the House Committee references the alleged "written misstatements" and "false statements" provided by the Department to the Committees about the U.S. Attorney dismissals. *See* Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). The Department has recognized the Committees' interest in investigating the extent to which Department officials may have provided inaccurate or incomplete information to Congress. This interest does not, however, justify the Committees' demand for White House documents and information about the U.S. Attorney resignations. Officials in the Department, not officials in the White House, presented the challenged statements, and as noted, the Department has provided unprecedented information to Congress concerning, *inter alia*, the process that led to the Department's statements. The Committees' legitimate oversight interests therefore have already been addressed by the Department, which has sought to provide the Committees with all documents related to the preparation of any inaccurate information given to Congress.

Given the amount of information the Committees already possess about the Department's decision to remove the U.S. Attorneys (including the involvement of White House officials), there would be little additional legislative purpose served by revealing internal White House communications about the U.S. Attorney matter, and, in any event, none that would outweigh the

---

has included in its productions many sensitive, deliberative documents related to the resignation requests, including e-mails and other communications with White House officials. The Committees' staffs have also been interviewed, at length and on the record, a number of senior Department officials, including, among others, the Deputy Attorney General, the Acting Associate Attorney General, the Attorney General's former chief of staff, the Deputy Attorney General's chief of staff, and two former Directors of the Executive Office for U.S. Attorneys. During these interviews, the Committees' staffs explored in great depth all aspects of the decision to request the U.S. Attorney resignations, including the role of White House officials in the decisionmaking process. In addition, the Attorney General, the Deputy Attorney General, the Principal Associate Deputy Attorney General, the Attorney General's former chief of staff, and the Department's former White House Liaison have testified before one or both of the Committees about the terminations and explained, under oath, their understanding of such involvement.

The President has also made significant efforts to accommodate the Committees' needs. More than three months ago, the Counsel to the President proposed to make senior White House officials, including Ms. Miers, available for informal interviews about "(a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests," and he offered to give the Committees access to White House documents on the same subjects. Letter for the Hon. Patrick Leahy, United States Senate, et al., from Fred F. Fielding, Counsel to the President at 1-2 (Mar. 20, 2007). The Committees declined this offer. The Counsel to the President has since reiterated this offer of accommodation but to no avail. *See* Letter for the Hon. Patrick Leahy, United States Senate, and John Conyers Jr., United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1 (Apr. 12, 2007); Letter for the Hon. Patrick Leahy, United States Senate, the Hon. John Conyers Jr., United States House of Representatives, and the Hon. Linda T. Sanchez, the United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1-2 (June 7, 2007).

President's interest in maintaining the confidentiality of such internal deliberations. *See Senate Select Comm.*, 498 F.2d at 732-33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources). Consequently, I do not believe that the Committees have shown a "demonstrably critical" need for internal White House communications on this matter.

**B.**

For many of the same reasons, I believe that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege. Courts have long recognized the importance of information gathering in presidential decisionmaking. *See, e.g., In re Sealed Case*, 121 F.3d at 751-52 (describing role of investigation and information collection in presidential decisionmaking). Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch. This need is particularly strong when the decision involved is whether to remove political appointees, such as U.S. Attorneys, who serve in local districts spread throughout the United States. In those situations, the President and his advisers will be fully informed only if they solicit and receive advice from a range of individuals. Yet the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential. *See Nixon*, 418 U.S. at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."); *In re Sealed Case*, 121 F.3d at 751 ("In many instances, potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President. Without protection of her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability.").

That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests. The communications at issue occurred with the understanding that they would be held in confidence, and they related to decisionmaking regarding U.S. Attorney removals or replacements or responding to congressional or media inquiries about the U.S. Attorney matter. Under these circumstances, the communications retain their confidential and Executive Branch character and remain protected. *See In re Sealed Case*, 121 F.3d at 752 ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [presidential communications component of executive] privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").[3]

---

[3] Moreover, the Department has previously conveyed to the Committees its concern that there would be a substantial inhibiting effect on future informal confidential communications between Executive Branch and Legislative Branch representatives if such communications were to be produced in the normal course of congressional oversight.

Again, the Committees offer no compelling explanation or analysis as to why access to confidential communications between White House officials and individuals outside the Executive Branch is "demonstrably critical to the responsible fulfillment of the [Committees'] functions." *Senate Select Comm.*, 498 F.2d at 731. Absent such a showing, the Committees may not override an executive privilege claim.

### C.

The final category of documents and testimony concerns communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations. These communications are deliberative and clearly fall within the scope of executive privilege.[4] *See supra* at 2. In this case, however, the Department has already disclosed to Congress a substantial amount of documents and information related to White House communications about the U.S. Attorney matter. Consequently, in assessing whether it would be legally permissible to assert executive privilege, it is useful to divide this category into three subcategories, each with slightly different considerations: (1) documents and testimony related to communications between the Department and White House officials that have not already been disclosed by the Department; (2) documents concerning White House-Department communications previously disclosed to the Committees by the Department; and (3) testimony from current or former White House officials (such as the testimony sought from Ms. Miers or Ms. Taylor) about previously disclosed White House-Department communications. After carefully considering the matter, I believe there is a strong legal basis for asserting executive privilege over each of these subcategories.

The President's interest in protecting the confidentiality of documents and information about undisclosed White House-Department communications is powerful. Most, if not all, of these communications concern either potential replacements for the dismissed U.S. Attorneys or possible responses to inquiries from Congress and the media about the U.S. Attorney resignations. As discussed above, the President's need to protect deliberations about the selection of U.S. Attorneys is compelling, particularly given Congress's lack of legislative authority over the nomination or replacement of U.S. Attorneys. *See In re Sealed Case*, 121 F.3d at 751-52. The President also has undeniable confidentiality interests in discussions between White House and Department officials over how to respond to congressional and media inquiries about the U.S. Attorney matter. As Attorney General Janet Reno advised the President in 1996, the ability of the Office of the Counsel to the President to assist the President in responding to investigations "would be significantly impaired" if a congressional committee could review "confidential documents . . . prepared in order to assist the President and his staff in responding to an investigation by the [committee] seeking the documents." *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996). Despite extensive communications with officials at the Department and the White House, the

---

[4] To the extent they exist, White House communications approving the Department's actions by or on behalf of the President would receive particularly strong protection under executive privilege. *See, e.g., In re Sealed Case*, 121 F.3d at 752-53 (describing heightened protection provided to presidential communications).

Committees have yet to articulate any "demonstrably critical" oversight interest that would justify overriding these compelling confidentiality concerns.

There are also legitimate reasons to assert executive privilege over White House documents reflecting White House-Department communications that have been previously disclosed to the Committees by the Department. As discussed, these documents are deliberative in nature and clearly fall within the scope of executive privilege. The Department's accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications. The D.C. Circuit has recognized that each Branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). If the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations. Thus, in order to preserve the constitutional process of interbranch accommodation, the President may claim privilege over documents and information concerning the communications that the Department of Justice has previously disclosed to the Committees. Indeed, the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.

Here, the Committees' need for White House documents concerning these communications is weak. The Committees already possess the relevant communications, and it is well established that Congress may not override executive privilege to obtain materials that are cumulative or that could be obtained from an alternative source. *See Senate Select Comm.*, 498 F.2d at 732-33 (holding public release of redacted audio tape transcripts "substantially undermined" any legislative need for tapes themselves); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony"). Accordingly, the Committees do not have a "demonstrably critical" need to collect White House documents reflecting previously disclosed White House-Department communications.

Finally, the Committees have also failed to establish the requisite need for testimony from current or former White House officials about previously disclosed White House-Department communications. Congressional interest in investigating the replacement of U.S. Attorneys clearly falls outside its core constitutional responsibilities, and any legitimate interest Congress may have in the disclosed communications has been satisfied by the Department's extraordinary accommodation involving the extensive production of documents to the Committees, interviews, and hearing testimony concerning these communications. As the D.C. Circuit has explained, because "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability," Congress will rarely need or be entitled to a "precise reconstruction of past events" to carry out its legislative

7

responsibilities. *Senate Select Comm.*, 498 F.2d at 732.[5] On the other hand, the White House has very legitimate interests in protecting the confidentiality of this information because it would be very difficult, if not impossible, for current or former White House officials testifying about the disclosed communications to separate in their minds knowledge that is derived from the Department's disclosures from knowledge that is derived from other privileged sources, such as internal White House communications. Consequently, given the President's strong confidentiality interests and the Committees' limited legislative needs, I believe that White House information about previously disclosed White House-Department communications may properly be subject to an executive privilege claim.

## II.

In sum, I believe that executive privilege may properly be asserted with respect to the subpoenaed documents and testimony as described above.

Sincerely,

Paul D. Clement
Solicitor General and Acting Attorney General

---

[5] *See also Senate Select Comm.*, 498 F.2d at 732 (explaining that Congress "frequently legislates on the basis of conflicting information provided in its hearings"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").

8

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 9

THE WHITE HOUSE

WASHINGTON

June 28, 2007

Dear Chairman Leahy and Chairman Conyers:

On June 13, 2007, the White House received two subpoenas from your Committees requesting documents relating to the replacement of United States Attorneys, calling for the documents to be produced by June 28, 2007. I write at the direction of the President to advise and inform you that the President has decided to assert Executive Privilege and therefore the White House will not be making any production in response to these subpoenas for documents. In addition, Chairman Leahy subpoenaed documents from former Deputy Assistant to the President and Director of Political Affairs Sara M. Taylor, with the same return date of June 28, 2007. Chairman Conyers has subpoenaed documents from former Counsel to the President Harriet E. Miers, with a return date of July 12, 2007. Counsel for Ms. Taylor and Ms. Miers have been informed of the President's decision to assert Executive Privilege and have been asked to relay to Ms. Taylor and Ms. Miers a direction from the President not to produce any documents.

With respect, it is with much regret that we are forced down this unfortunate path which we sought to avoid by finding grounds for mutual accommodation. We had hoped this matter could conclude with your Committees receiving information in lieu of having to invoke Executive Privilege. Instead, we are at this conclusion.

At the outset of this controversy, the President attempted to chart a course of cooperation. It was his intent that Congress receives information in a manner that accommodated Presidential prerogatives. The Department of Justice, for its part, has produced or made available for review more than 8,500 pages of documents, including scores of documents containing communications with White House personnel. In addition, the Attorney General, Deputy Attorney General, Principal Associate Deputy Attorney General, Attorney General's former Chief of Staff, former White House Liaison, and other senior Department officials have testified in public hearings and, in some instances, submitted to interviews with Committee staff. As a result, your Committees have received an extraordinary amount of information regarding the U.S. Attorney replacement issue by way of accommodation.

In keeping with the established tradition of Congress and the Executive Branch working together to accommodate each others' interests, the President was willing to go even further in response to your inquiries. At his direction, we proposed and offered to provide you with documents containing communications between the White House and Department of Justice regarding the request for the resignation of the U.S. Attorneys in question, as well as documents containing communications on the same subject between the White House staff and third parties, including Congress. We also offered to make available for interviews the President's former Counsel; current Deputy Chief of Staff

and Senior Advisor; Deputy Counsel; former Director of Political Affairs; and a Special Assistant to the President in the Office of Political Affairs.

The President's offer reflected his desire to cooperate and accommodate. It was designed to provide your Committees with additional documents, and the rare opportunity to participate in interviews and question close advisors to the President about the matters under inquiry. With the benefit not only of the enormous amount of information you received from the Department of Justice, but also additional White House documents, you would have been able to further inquire about these matters.

To be sure, the President's offer also took care to protect fundamental interests of the Presidency and the constitutional principle of separation of powers. Specifically, the President was not willing to provide your Committees with documents revealing internal White House communications or to accede to your desire for senior advisors to testify at public hearings. The reason for these distinctions rests upon a bedrock Presidential prerogative: for the President to perform his constitutional duties, it is imperative that he receive candid and unfettered advice and that free and open discussions and deliberations occur among his advisors and between those advisors and others within and outside the Executive Branch. Presidents would not be able to fulfill their responsibilities if their advisors—on fear of being commanded to Capitol Hill to testify or having their documents produced to Congress—were reluctant to communicate openly and honestly in the course of rendering advice and reaching decisions. These confidentiality interests are especially strong in situations like the present controversy, where the inquiry seeks information relating to the President's powers to appoint and remove U.S. Attorneys – authority granted exclusively to the President by the Constitution.

The principles at stake here are of the utmost importance and find meaningful parallels in any number of other settings. For example, Messrs. Chairmen, I am sure you would wish to protect the confidentiality of deliberations between Members of Congress and their staff. So, too, do I believe that most judges would be quick to stress the importance to their decision-making processes of maintaining the confidentiality of their deliberations with their colleagues and law clerks. So, too, here: for the Presidency to operate consistent with the Constitution's design, Presidents must be able to depend upon their advisors and other Executive Branch officials speaking candidly and without inhibition while deliberating and working to advise the President. The doctrine of Executive Privilege exists, at least in part, to protect such communications from compelled disclosure to Congress, especially where, as here, the President's interests in maintaining confidentiality far outweigh Congress's interests in obtaining deliberative White House communications. I refer you to the attached opinion from the Acting Attorney General to the President, discussing this in further detail as well as informing him as to the appropriateness of an assertion of Executive Privilege in these circumstances.

Further, it remains unclear precisely how and why your Committees are unable to fulfill your legislative and oversight interests without the unfettered requests you have made in your subpoenas. Put differently, there is no demonstration that the documents and

information you seek by subpoena are critically important to any legislative initiatives that you may be pursuing or intending to pursue.

By contrast, the President has frequently, plainly, and completely explained that his position, and now his decision, is rooted in a need to protect the institution of the Presidency. The President's assertion of Executive Privilege is not designed to shield information in a particular situation, but to help protect the ability of Presidents to ensure that decisions reflect and benefit from the exchange of informed and diverse viewpoints and open and frank deliberations. Issuing subpoenas and seeking to compel the disclosure of information in lieu of accepting the President's reasonable offer of accommodation has led to confrontation.

Consistent with the analysis of the Acting Attorney General, the President is satisfied that the testimony sought from Sara Taylor and Harriet Miers is subject to a valid claim of Executive Privilege and is prepared to assert the Privilege with respect to that testimony if the matter cannot be resolved. However, the President has further instructed me to confirm that while unwilling to submit to subpoenas compelling the production of documents and testimony, in the absence of any subpoenas he continues to be willing to provide you with information as previously offered. In short, the President requests that your inquiry proceed in a balanced manner, respectful of important constitutional principles of both institutions, rather than through confrontation. It is hoped you will reconsider your present position, accept the President's offer, and bring closure to this controversy so we may all return to more productive activity on behalf of the Nation.

Respectfully yours,

Fred F. Fielding
Counsel to the President

Attachment

The Honorable Patrick J. Leahy
United States Senate
Washington, D.C. 20510

The Honorable John Conyers
United States House of Representatives
Washington, D.C. 20515

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 10

THE WHITE HOUSE

WASHINGTON

July 9, 2007

Dear Chairman Leahy and Chairman Conyers:

I write in response to your letter of June 29, 2007.

Let me begin by conveying a note of concern over your letter's tone and apparent direction in dealing with a situation of this gravity. We are troubled to read the letter's charge that the President's "assertion of Executive Privilege belies any good faith attempt to determine where privilege truly does and does not apply." Although we each speak on behalf of different branches of government, and perhaps for that reason cannot help having different perspectives on the matter, it is hoped you will agree, upon further reflection, that it is incorrect to say that the President's assertion of Executive Privilege was performed without "good faith."

As the letter from the Acting Attorney General explained in considerable detail, the assertion of Executive Privilege here is intended to protect a fundamental interest of the Presidency: the necessity that a President receive candid advice from his advisors and that those advisors be able to communicate freely and openly with the President, with each other, and with others inside and outside the Executive Branch. In the present setting, where the President's authority to appoint and remove U.S. Attorneys is at stake, the institutional interest of the Executive Branch is very strong. The Acting Attorney General's letter clearly identifies the subject matter of the deliberations and communications at issue and provides an extensive treatment of the issues implicated by the subpoenas and the legal basis for the President's assertion of Executive Privilege.

Your letter does not dispute these principles. It does not take issue with the practical fact that, in order to fulfill his constitutional functions, the President, no less than Members of Congress and federal judges, needs the protection of a principle that shields his close advisors from open-ended inquiry by another branch of government. The letter does not challenge the exclusive character of the President's appointment and removal power, nor does the letter attempt to establish a constitutional basis for the Committees' inquiry into this matter. Although the letter sets forth certain generalizations relating to Congress's investigatory authority, it does not explain how that authority extends to White House communications about the possible dismissal and replacement of U.S. Attorneys. And, even if Congress's authority might be deemed to extend that far, the question remains whether the Committees have demonstrated that the information sought here is demonstrably critical to the responsible fulfillment of the Committees' legislative functions.

In response to your inquiry concerning the mechanics of the President's assertion of the privilege, you may be assured that the President's assertion here comports with prior practices in similar contexts, and that it has been appropriately documented. I do hope that your Committees

will appreciate that I write on behalf of the President and therefore understand that my letter of June 28, 2007 precisely expresses the President's position on this matter.

Your letter also "direct[s]" the President to provide certain additional information to the Committees before 10:00 a.m. on July 9, 2007. The letter goes on to say that a very detailed "privilege log" is necessary "to facilitate ruling on" claims of Executive Privilege and your letter thereafter announces an intention to "take the necessary steps to rule on [the President's executive] privilege claims." We are aware of no authority by which a congressional committee may "direct" the Executive to undertake the task of creating and providing an extensive description of every document covered by an assertion of Executive Privilege. Given the descriptions of the materials in question that have already been provided, this demand is unreasonable because it represents a substantial incursion into Presidential prerogatives and because, in view of the open-ended scope of the Committees' inquiry, it would impose a burden of very significant proportions.

One final observation underscores the preordained futility of any White House compliance with this demand. When your letter states that your Committees "will take the necessary steps to rule on [the President's] privilege claims and appropriately enforce our subpoenas" and that *the Committees will enforce their subpoenas "[w]hether or not [they] have the benefit of the information"* (emphasis added), only one conclusion is evident: the Committees have already prejudged the question, regardless of the production of any privilege log. In such circumstances, we will not be undertaking such a project, even as a further accommodation.

As noted in my previous letter, as we remain at the present impasse, the President feels compelled to assert Executive Privilege with respect to the testimony sought from Sara M. Taylor and Harriet E. Miers covering White House consideration, deliberations or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys, including consideration of possible responses to congressional and media inquiries on the United States Attorneys matter, consistent with the advice provided by the Acting Attorney General. The President has instructed me to notify you and the counsel for Ms. Taylor and Ms. Miers of his decision and to inform counsel of his direction to Ms. Taylor and Ms. Miers not to provide this testimony.

I renew again the President's offer: in the absence of subpoenas he remains willing to provide you with information as previously offered. And I likewise convey the President's request that further interbranch relations in this matter be distinguished by respect for the constitutional principles of both institutions and marked by a presumption of goodwill on all sides.

Respectfully yours,

Fred F. Fielding
Counsel to the President

The Honorable Patrick J. Leahy
United States Senate
Washington, D.C.  20510

The Honorable John Conyers, Jr.
United States House of Representatives
Washington, D.C.  20515

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 11

**THE WHITE HOUSE**

WASHINGTON

July 9, 2007

Dear Mr. Manning:

As you are aware, on June 13, 2007, the House Judiciary Committee issued a subpoena to your client, Harriet E. Miers, seeking her appearance, on July 12, 2007, for testimony and production of documents in her possession, custody, or control concerning the dismissal and replacement of United States Attorneys.

Consistent with the advice provided by the Acting Attorney General in his letter to the President of June 27, 2007, the President has decided to assert Executive Privilege with respect to the testimony sought from Ms. Miers concerning White House consideration, deliberations, or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys, including consideration of possible responses to congressional and media inquiries on the United States Attorneys matter. Accordingly, I respectfully request that you inform Ms. Miers that the President has directed her not to provide this testimony.

In my letter of June 28, 2007, I informed you that the President had asserted Executive Privilege as to any documents that Ms. Miers possessed that would be responsive to the subpoena from the House Judiciary Committee. The President continues to assert Executive Privilege over any such documents and continues to direct Ms. Miers not to produce such documents.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 12

# JONES DAY

1420 PEACHTREE STREET, N.E.  •  SUITE 800  •  ATLANTA, GEORGIA 30309-3053

July 9, 2007

404-581-8400

GEORGE T. MANNING
PARTNER-IN-CHARGE

The Honorable John Conyers, Jr.
Chairman
U.S. House of Representatives
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

The Honorable Lamar S. Smith
Ranking Member
U.S. House of Representatives
Committee on the Judiciary
2142 Rayburn House Office Building
Washington, D.C. 20515

Re:    Congressional Inquiry Into U.S. Attorneys Matters

Dear Sirs:

I write in response to the subpoena issued to Harriet Miers by the House Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, on June 13, 2007 (the "Committee"). As I have advised your staff member Elliot Mincberg, we have been informed that the Executive Privilege has been asserted over all documents and testimony that would be responsive to the subpoena. In addition, we have been directed that Ms. Miers is "not to produce any documents in response to the subpoena," Letter from Fred F. Fielding to George T. Manning, June 28, 2007 (attached hereto), and not to provide "testimony … concerning White House consideration, deliberations, or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys," Letter from Fred F. Fielding to George T. Manning, July 9, 2007 (attached hereto). Ms. Miers is thus subject to conflicting commands, with Congress demanding the production of information that the Counsel to the President has informed her she is prohibited from disclosing.

Ms. Miers is, of course, respectful of her obligations to respond appropriately to the subpoena issued and served upon her. In these circumstances, however, as I am sure you know, Ms. Miers has no choice other than to comply with direction given her by Counsel to the President in his letters mentioned above. This is particularly so because, as the members of the Committee are aware, the assertion of the privilege in this circumstance is supported by the thorough and reasoned opinion of the Solicitor General of the United States. See Letter from Paul D. Clement, Solicitor General, to the President, June 27, 2007 (attached hereto).

Accordingly, and with all due respect, I must inform you that in light of the President's assertion of Executive Privilege, Ms. Miers cannot provide the documents and testimony that the Committee seeks.

Kind regards,

George T. Manning

ATLANTA  •  BEIJING  •  BRUSSELS  •  CHICAGO  •  CLEVELAND  •  COLUMBUS  •  DALLAS  •  FRANKFURT  •  HONG KONG  •  HOUSTON
IRVINE  •  LONDON  •  LOS ANGELES  •  MADRID  •  MENLO PARK  •  MILAN  •  MOSCOW  •  MUNICH  •  NEW DELHI  •  NEW YORK  •  PARIS
PITTSBURGH  •  SAN DIEGO  •  SAN FRANCISCO  •  SHANGHAI  •  SINGAPORE  •  SYDNEY  •  TAIPEI  •  TOKYO  •  WASHINGTON

JONES DAY

Enclosures

cc:    Mr. Fred F. Fielding, Esq.

THE WHITE HOUSE

WASHINGTON

June 28, 2007

HAND DELIVERED

Dear Mr. Manning:

As you are aware, on June 13, 2007, the House Judiciary Committee issued a subpoena to your client, Harriet E. Miers, seeking production, by July 12, 2007, of documents concerning the dismissal and replacement of United States Attorneys. On the same day, the White House received two subpoenas, one each from the Senate Judiciary Committee and the House Judiciary Committee, seeking substantially the same materials.

The President has decided to assert Executive Privilege with respect to documents gathered by the Office of Counsel to the President that are responsive to the subpoenas issued to the White House. Accordingly, I am writing to notify you that the President also has asserted Executive Privilege as to any documents that Ms. Miers may possess that would be responsive to the subpoena issued to her on June 13, 2007, by the House Judiciary Committee. I respectfully request that you inform Ms. Miers that the President has directed her not to produce any documents in response to the subpoena.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Avenue, NW
Washington, D.C. 20001

**THE WHITE HOUSE**

WASHINGTON

July 9, 2007

Dear Mr. Manning:

As you are aware, on June 13, 2007, the House Judiciary Committee issued a subpoena to your client, Harriet E. Miers, seeking her appearance, on July 12, 2007, for testimony and production of documents in her possession, custody, or control concerning the dismissal and replacement of United States Attorneys.

Consistent with the advice provided by the Acting Attorney General in his letter to the President of June 27, 2007, the President has decided to assert Executive Privilege with respect to the testimony sought from Ms. Miers concerning White House consideration, deliberations, or communications, whether internal or external, relating to the possible dismissal or appointment of United States Attorneys, including consideration of possible responses to congressional and media inquiries on the United States Attorneys matter. Accordingly, I respectfully request that you inform Ms. Miers that the President has directed her not to provide this testimony.

In my letter of June 28, 2007, I informed you that the President had asserted Executive Privilege as to any documents that Ms. Miers possessed that would be responsive to the subpoena from the House Judiciary Committee. The President continues to assert Executive Privilege over any such documents and continues to direct Ms. Miers not to produce such documents.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001



U. S. Department of Justice

Office of the Solicitor General

---

Solicitor General

Washington, D.C. 20530

June 27, 2007

The President
The White House
Washington, D.C. 20500

Dear Mr. President,

The Senate Committee on the Judiciary and the House Committee on the Judiciary recently issued five subpoenas in connection with their inquiries into the resignation of several United States Attorneys in 2006. Broadly speaking, four of the five subpoenas seek documents in the custody of current or former White House officials ("White House documents") concerning the dismissal and replacement of the U.S. Attorneys. In addition, two of the five subpoenas demand testimony about these matters from two former White House officials, Harriet Miers, former Counsel to the President, and Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs.

You have requested my legal advice as to whether you may assert executive privilege with respect to the subpoenaed documents and testimony concerning the categories of information described in this letter. It is my considered legal judgment that you may assert executive privilege over the subpoenaed documents and testimony.

## I.

The documents that the Office of the Counsel to the President has identified as responsive to the subpoenas fall into three broad categories related to the possible dismissal and replacement of U.S. Attorneys, including congressional and media inquiries about the dismissals: (1) internal White House communications; (2) communications by White House officials with individuals outside the Executive Branch, including with individuals in the Legislative Branch; and (3) communications between White House officials and Department of Justice officials. The Committees' subpoenas also seek testimony from Ms. Miers and Ms. Taylor concerning the same subject matters, and the assertion of privilege with respect to such testimony requires the same legal analysis.

The Office of Legal Counsel of the Department of Justice has reviewed the documents identified by the Counsel to the President as responsive to the subpoenas and is satisfied that the documents fall within the scope of executive privilege. The Office further believes that Congress's interests in the documents and related testimony would not be sufficient to override an executive privilege claim. For the reasons discussed below, I concur with both assessments.

## A.

The initial category of subpoenaed documents and testimony consists of internal White House communications about the possible dismissal and replacement of U.S. Attorneys. Among other things, these communications discuss the wisdom of such a proposal, specific U.S. Attorneys who could be removed, potential replacement candidates, and possible responses to congressional and media inquiries about the dismissals. These types of internal deliberations fall squarely within the scope of executive privilege. One of the underlying purposes of the privilege is to promote sound decisionmaking by ensuring that senior Government officials and their advisers speak frankly and candidly during the decisionmaking process. As the Supreme Court has explained, "A President and those who assist him must be free to explore alternatives in the process of shaping policies and to do so in a way many would be unwilling to express except privately." *United States v. Nixon*, 418 U.S. 683, 708 (1974); *see also* Letter for the President from John Ashcroft, Attorney General, *Re: Assertion of Executive Privilege with Respect to Prosecutorial Documents* at 2 (Dec. 10, 2001) (available at http://www.usdoj.gov/ olc/executiveprivilege/htm) ("The Constitution clearly gives the President the power to protect the confidentiality of executive branch deliberations."); *Assertion of Executive Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) ("[N]ot only does executive privilege apply to confidential communications to the President, but also to 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'") (quoting *Nixon*, 418 U.S. at 705). These confidentiality interests are particularly strong where, as here, the communications may implicate a "quintessential and nondelegable Presidential power," such as the authority to nominate or to remove U.S. Attorneys. *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 2-3 (finding that executive privilege protected Department and White House deliberations related to decision to grant clemency).

Under D.C. Circuit precedent, a congressional committee may not overcome an assertion of executive privilege unless it establishes that the documents and information are "demonstrably critical to the responsible fulfillment of the Committee's functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of Congress's legitimate legislative responsibilities. *See McGrain v. Daugherty*, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution.").

As a threshold matter, it is not at all clear that internal White House communications about the possible dismissal and replacement of U.S. Attorneys fall within the scope of *McGrain* and its progeny. The Supreme Court has held that Congress's oversight powers do not reach "matters which are within the exclusive province of one of the other branches of the Government." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). The Senate has the authority to approve or reject the appointment of officers whose appointment by law requires the advice and consent of the Senate (which has been the case for U.S. Attorneys since the founding of the Republic), but it is for the President to decide whom to nominate to such positions and whether to remove such officers once appointed. Though the President traditionally consults

2

with Members of Congress about the selection of potential U.S. Attorney nominees as a matter of courtesy or in an effort to secure their confirmation, that does not confer upon Congress authority to inquire into the deliberations of the President with respect to the exercise of his power to remove or nominate a U.S. Attorney.[1]  Consequently, there is reason to question whether Congress has oversight authority to investigate deliberations by White House officials concerning proposals to dismiss and replace U.S. Attorneys, because such deliberations necessarily relate to the potential exercise by the President of an authority assigned to him alone. *See Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 ("[I]t appears that Congress' oversight authority does not extend to the process employed in connection with a particular clemency decision, to the materials generated or the discussions that took place as part of that process, or to the advice or views the President received in connection with a clemency decision [because the decision to grant clemency is an exclusive Executive Branch function]."); *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 62 (1985) (congressional oversight authority does not extend to "functions fall[ing] within the Executive's exclusive domain").

In any event, even if the Committees have oversight authority, there is no doubt that the materials sought qualify for the privilege and the Committees have not demonstrated that their interests justify overriding a claim of executive privilege as to the matters at issue.  The House Committee, for instance, asserts in its letter accompanying the subpoenas that "[c]ommunications among the White House staff involved in the U.S. Attorney replacement plan are obviously of paramount importance to any understanding of how and why these U.S. Attorneys were selected to be fired." Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). But the Committees never explain how or why this information is "demonstrably critical" to any "legislative judgments" Congress might be able to exercise in the U.S. Attorney matter. *Senate Select Comm.*, 498 F.2d at 732. Broad, generalized assertions that the requested materials are of public import are simply insufficient under the "demonstrably critical" standard.  Under *Senate Select Committee*, to override a privilege claim the Committees must "point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials." *Id.* at 733.

Moreover, any legitimate oversight interest the Committees might have in internal White House communications about the proposal is sharply reduced by the thousands of documents and dozens of hours of interviews and testimony already provided to the Committees by the Department of Justice as part of its extraordinary effort at accommodation.[2]  This information

---

[1]  *See, e.g., Public Citizen v. Department of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring) ("[T]he Clause divides the appointment power into two separate spheres: the President's power to 'nominate,' and the Senate's power to give or withhold its 'Advice and Consent.' No role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for [the] appointment."); *Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

[2]  During the past three months, the Department has released or made available for review to the Committees approximately 8,500 pages of documents concerning the U.S. Attorney resignations.  The Department

3

has given the Committees extraordinary—and indeed, unprecedented—insight into the Department's decision to request the U.S. Attorney resignations, including the role of White House officials in the process. *See, e.g., History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress*, 6 Op. O.L.C. 751, 758-59, 767 (1982) (documenting refusals by Presidents Jackson, Tyler, and Cleveland to provide information related to the decision to remove Executive Branch officials, including a U.S. Attorney).

In a letter accompanying the subpoenas, the House Committee references the alleged "written misstatements" and "false statements" provided by the Department to the Committees about the U.S. Attorney dismissals. *See* Letter for Fred F. Fielding, Counsel to the President, from the Hon. John Conyers Jr., Chairman, House Judiciary Committee at 2 (June 13, 2007). The Department has recognized the Committees' interest in investigating the extent to which Department officials may have provided inaccurate or incomplete information to Congress. This interest does not, however, justify the Committees' demand for White House documents and information about the U.S. Attorney resignations. Officials in the Department, not officials in the White House, presented the challenged statements, and as noted, the Department has provided unprecedented information to Congress concerning, *inter alia*, the process that led to the Department's statements. The Committees' legitimate oversight interests therefore have already been addressed by the Department, which has sought to provide the Committees with all documents related to the preparation of any inaccurate information given to Congress.

Given the amount of information the Committees already possess about the Department's decision to remove the U.S. Attorneys (including the involvement of White House officials), there would be little additional legislative purpose served by revealing internal White House communications about the U.S. Attorney matter, and, in any event, none that would outweigh the

---

has included in its productions many sensitive, deliberative documents related to the resignation requests, including e-mails and other communications with White House officials. The Committees' staffs have also interviewed, at length and on the record, a number of senior Department officials, including, among others, the Deputy Attorney General, the Acting Associate Attorney General, the Attorney General's former chief of staff, the Deputy Attorney General's chief of staff, and two former Directors of the Executive Office for U.S. Attorneys. During these interviews, the Committees' staffs explored in great depth all aspects of the decision to request the U.S. Attorney resignations, including the role of White House officials in the decisionmaking process. In addition, the Attorney General, the Deputy Attorney General, the Principal Associate Deputy Attorney General, the Attorney General's former chief of staff, and the Department's former White House Liaison have testified before one or both of the Committees about the terminations and explained, under oath, their understanding of such involvement.

The President has also made significant efforts to accommodate the Committees' needs. More than three months ago, the Counsel to the President proposed to make senior White House officials, including Ms. Miers, available for informal interviews about "(a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those requests," and he offered to give the Committees access to White House documents on the same subjects. Letter for the Hon. Patrick Leahy, United States Senate, et al., from Fred F. Fielding, Counsel to the President at 1-2 (Mar. 20, 2007). The Committees declined this offer. The Counsel to the President has since reiterated this offer of accommodation but to no avail. *See* Letter for the Hon. Patrick Leahy, United States Senate, and John Conyers Jr., United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1 (Apr. 12, 2007); Letter for the Hon. Patrick Leahy, United States Senate, the Hon. John Conyers Jr., United States House of Representatives, and the Hon. Linda T. Sanchez, the United States House of Representatives, from Fred F. Fielding, Counsel to the President at 1-2 (June 7, 2007).

President's interest in maintaining the confidentiality of such internal deliberations. *See Senate Select Comm.*, 498 F.2d at 732-33 (explaining that a congressional committee may not obtain information protected by executive privilege if that information is available through non-privileged sources). Consequently, I do not believe that the Committees have shown a "demonstrably critical" need for internal White House communications on this matter.

## B.

For many of the same reasons, I believe that communications between White House officials and individuals outside the Executive Branch, including with individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys, and possible responses to congressional and media inquiries about the dismissals, fall within the scope of executive privilege. Courts have long recognized the importance of information gathering in presidential decisionmaking. *See, e.g., In re Sealed Case*, 121 F.3d at 751-52 (describing role of investigation and information collection in presidential decisionmaking). Naturally, in order for the President and his advisers to make an informed decision, presidential aides must sometimes solicit information from individuals outside the White House and the Executive Branch. This need is particularly strong when the decision involved is whether to remove political appointees, such as U.S. Attorneys, who serve in local districts spread throughout the United States. In those situations, the President and his advisers will be fully informed only if they solicit and receive advice from a range of individuals. Yet the President's ability to obtain such information often depends on the provider's understanding that his frank and candid views will remain confidential. *See Nixon*, 418 U.S. at 705 ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process."); *In re Sealed Case*, 121 F.3d at 751 ("In many instances, potential exposure of the information in the possession of an adviser can be as inhibiting as exposure of the actual advice she gave to the President. Without protection of her sources of information, an adviser may be tempted to forego obtaining comprehensive briefings or initiating deep and intense probing for fear of losing deniability.").

That the communications involve individuals outside the Executive Branch does not undermine the President's confidentiality interests. The communications at issue occurred with the understanding that they would be held in confidence, and they related to decisionmaking regarding U.S. Attorney removals or replacements or responding to congressional or media inquiries about the U.S. Attorney matter. Under these circumstances, the communications retain their confidential and Executive Branch character and remain protected. *See In re Sealed Case*, 121 F.3d at 752 ("Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the [presidential communications component of executive] privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.").[3]

---

[3] Moreover, the Department has previously conveyed to the Committees its concern that there would be a substantial inhibiting effect on future informal confidential communications between Executive Branch and Legislative Branch representatives if such communications were to be produced in the normal course of congressional oversight.

Again, the Committees offer no compelling explanation or analysis as to why access to confidential communications between White House officials and individuals outside the Executive Branch is "demonstrably critical to the responsible fulfillment of the [Committees'] functions." *Senate Select Comm.*, 498 F.2d at 731. Absent such a showing, the Committees may not override an executive privilege claim.

## C.

The final category of documents and testimony concerns communications between the Department of Justice and the White House concerning proposals to dismiss and replace U.S. Attorneys and possible responses to congressional and media inquiries about the U.S. Attorney resignations. These communications are deliberative and clearly fall within the scope of executive privilege.[4] *See supra* 2. In this case, however, the Department has already disclosed to Congress a substantial amount of documents and information related to White House communications about the U.S. Attorney matter. Consequently, in assessing whether it would be legally permissible to assert executive privilege, it is useful to divide this category into three subcategories, each with slightly different considerations: (1) documents and testimony related to communications between the Department and White House officials that have not already been disclosed by the Department; (2) documents concerning White House-Department communications previously disclosed to the Committees by the Department; and (3) testimony from current or former White House officials (such as the testimony sought from Ms. Miers or Ms. Taylor) about previously disclosed White House-Department communications. After carefully considering the matter, I believe there is a strong legal basis for asserting executive privilege over each of these subcategories.

The President's interest in protecting the confidentiality of documents and information about undisclosed White House-Department communications is powerful. Most, if not all, of these communications concern either potential replacements for the dismissed U.S. Attorneys or possible responses to inquiries from Congress and the media about the U.S. Attorney resignations. As discussed above, the President's need to protect deliberations about the selection of U.S. Attorneys is compelling, particularly given Congress's lack of legislative authority over the nomination or replacement of U.S. Attorneys. *See In re Sealed Case*, 121 F.3d at 751-52. The President also has undeniable confidentiality interests in discussions between White House and Department officials over how to respond to congressional and media inquiries about the U.S. Attorney matter. As Attorney General Janet Reno advised the President in 1996, the ability of the Office of the Counsel to the President to assist the President in responding to investigations "would be significantly impaired" if a congressional committee could review "confidential documents . . . prepared in order to assist the President and his staff in responding to an investigation by the [committee] seeking the documents." *Assertion of Executive Privilege Regarding White House Counsel's Office Documents*, 20 Op. O.L.C. 2, 3 (1996). Despite extensive communications with officials at the Department and the White House, the

---

[4] To the extent they exist, White House communications approving the Department's actions by or on behalf of the President would receive particularly strong protection under executive privilege. *See, e.g., In re Sealed Case*, 121 F.3d at 752-53 (describing heightened protection provided to presidential communications).

6

Committees have yet to articulate any "demonstrably critical" oversight interest that would justify overriding these compelling confidentiality concerns.

There are also legitimate reasons to assert executive privilege over White House documents reflecting White House-Department communications that have been previously disclosed to the Committees by the Department. As discussed, these documents are deliberative in nature and clearly fall within the scope of executive privilege. The Department's accommodation with respect to some White House-Department communications does not constitute a waiver and does not preclude the President from asserting executive privilege with respect to White House materials or testimony concerning such communications. The D.C. Circuit has recognized that each Branch has a "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). If the Department's provision of documents and information to Congress, as part of the accommodation process, eliminated the President's ability to assert privilege over White House documents and information concerning those same communications, then the Executive Branch would be hampered, if not prevented, from engaging in future accommodations. Thus, in order to preserve the constitutional process of interbranch accommodation, the President may claim privilege over documents and information concerning the communications that the Department of Justice has previously disclosed to the Committees. Indeed, the relevant legal principles should and do encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.

Here, the Committees' need for White House documents concerning these communications is weak. The Committees already possess the relevant communications, and it is well established that Congress may not override executive privilege to obtain materials that are cumulative or that could be obtained from an alternative source. *See Senate Select Comm.*, 498 F.2d at 732-33 (holding public release of redacted audio tape transcripts "substantially undermined" any legislative need for tapes themselves); *Assertion of Executive Privilege*, 23 Op. O.L.C. at 3-4 (finding that documents were not demonstrably critical where Congress could obtain relevant information "through non-privileged documents and testimony"). Accordingly, the Committees do not have a "demonstrably critical" need to collect White House documents reflecting previously disclosed White House-Department communications.

Finally, the Committees have also failed to establish the requisite need for testimony from current or former White House officials about previously disclosed White House-Department communications. Congressional interest in investigating the replacement of U.S. Attorneys clearly falls outside its core constitutional responsibilities, and any legitimate interest Congress may have in the disclosed communications has been satisfied by the Department's extraordinary accommodation involving the extensive production of documents to the Committees, interviews, and hearing testimony concerning these communications. As the D.C. Circuit has explained, because "legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability," Congress will rarely need or be entitled to a "precise reconstruction of past events" to carry out its legislative

responsibilities. *Senate Select Comm.*, 498 F.2d at 732.[5] On the other hand, the White House has very legitimate interests in protecting the confidentiality of this information because it would be very difficult, if not impossible, for current or former White House officials testifying about the disclosed communications to separate in their minds knowledge that is derived from the Department's disclosures from knowledge that is derived from other privileged sources, such as internal White House communications. Consequently, given the President's strong confidentiality interests and the Committees' limited legislative needs, I believe that White House information about previously disclosed White House-Department communications may properly be subject to an executive privilege claim.

## II.

In sum, I believe that executive privilege may properly be asserted with respect to the subpoenaed documents and testimony as described above.

Sincerely,

Paul D. Clement
Solicitor General and Acting Attorney General

---

[5] *See also Senate Select Comm.*, 498 F.2d at 732 (explaining that Congress "frequently legislates on the basis of conflicting information provided in its hearings"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) ("Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials.").

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 13

THE WHITE HOUSE

WASHINGTON

July 10, 2007

Dear Mr. Manning:

On behalf of your client, former Counsel to the President Harriet E. Miers, you have asked us whether, in view of the President's assertion of Executive Privilege over Ms. Miers' testimony relating to the U.S. Attorneys matter, she must appear at the House Judiciary Committee meeting scheduled for Thursday, July 12, 2007.

We have been advised by the Department of Justice that Ms. Miers has absolute immunity from compelled Congressional testimony as to matters occurring while she was a senior advisor to the President. *See* Attachment A (*Memorandum for the Counsel to the President re: Immunity of Former Counsel to the President from Compelled Congressional Testimony*, dated July 10, 2007). As the Department's opinion points out, "[t]he President and his immediate advisors are absolutely immune from testimonial compulsion by a Congressional committee." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno). That immunity arises from the President's position as head of the Executive Branch and from Ms. Miers' former position as a senior advisor to the President. Ms. Miers cannot be compelled to appear before Congress because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to his constitutionally assigned functions." 23 Op. O.L.C. at 5. As Congress is aware, this constitutional immunity exists to protect the institution of the Presidency and, as the Department's opinion illustrates, this position has been shared by numerous Administrations, Republican and Democratic, for more than 60 years.

Therefore, in view of this constitutional immunity, I respectfully request that you inform Ms. Miers that the President has directed her not to appear at the House Judiciary Committee hearing on Thursday, July 12, 2007.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 14

# JONES DAY

1420 PEACHTREE STREET, N.E. • SUITE 800 • ATLANTA, GEORGIA 30309-3053

gtmanning@jonesday.com
404-581-8400

GEORGE T. MANNING
PARTNER -IN- CHARGE

JP269370                          July 10, 2007

Honorable John Conyers, Jr.
Chairman, Committee on the Judiciary
U.S. House of Representatives
2138 Rayburn House Office Building
Washington, D.C. 20515

Honorable Linda T. Sanchez
Chairwoman, Subcommittee on Commercial and Administrative Law
U.S. House of Representatives
2138 Rayburn House Office Building
Washington, D.C. 20515

Re:   Congressional Inquiry into U.S. Attorneys Matters

Dear Mr. Conyers and Ms. Sanchez:

    I am in receipt of your July 10, 2007 letter. With all due respect, in my conversation with Elliot Mincberg, the majority committee counsel with whom I spoke, I did not confirm that Ms. Miers will appear on Thursday to testify before the Subcommittee on Commercial and Administrative Law. Rather, at committee counsel's suggestion, I discussed some logistical arrangements should Ms. Miers appear. The President's previous instructions to Ms. Miers are set forth in my July 9, 2007 letter. In addition, the Counsel to the President has recently informed Ms. Miers that in view of the immunity of the President's senior advisors "'from testimonial compulsion by a Congressional committee' ... the President has directed [Ms. Miers] not to appear at the House Judiciary Committee hearing on Thursday, July 12, 2007." Letter from Fred F. Fielding to George T. Manning, July 10, 2007 (attached hereto). Accordingly, I must respectfully inform you that Ms. Miers will not appear at the July 12, 2007 hearing.

                              Very truly yours,

                              George T. Manning

cc:   Hon. Lamar S. Smith
      Hon. Chris Cannon
      Fred F. Fielding, Esq.

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MENLO PARK • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SHANGHAI • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

**THE WHITE HOUSE**

WASHINGTON

July 10, 2007

Dear Mr. Manning:

On behalf of your client, former Counsel to the President Harriet E. Miers, you have asked us whether, in view of the President's assertion of Executive Privilege over Ms. Miers' testimony relating to the U.S. Attorneys matter, she must appear at the House Judiciary Committee meeting scheduled for Thursday, July 12, 2007.

We have been advised by the Department of Justice that Ms. Miers has absolute immunity from compelled Congressional testimony as to matters occurring while she was a senior advisor to the President. *See* Attachment A (*Memorandum for the Counsel to the President re: Immunity of Former Counsel to the President from Compelled Congressional Testimony*, dated July 10, 2007). As the Department's opinion points out, "[t]he President and his immediate advisors are absolutely immune from testimonial compulsion by a Congressional committee." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno). That immunity arises from the President's position as head of the Executive Branch and from Ms. Miers' former position as a senior advisor to the President. Ms. Miers cannot be compelled to appear before Congress because "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to his constitutionally assigned functions." 23 Op. O.L.C. at 5. As Congress is aware, this constitutional immunity exists to protect the institution of the Presidency and, as the Department's opinion illustrates, this position has been shared by numerous Administrations, Republican and Democratic, for more than 60 years.

Therefore, in view of this constitutional immunity, I respectfully request that you inform Ms. Miers that the President has directed her not to appear at the House Judiciary Committee hearing on Thursday, July 12, 2007.

Please contact me if you have any questions or would like to discuss these issues.

Sincerely,

Fred F. Fielding
Counsel to the President

George T. Manning, Esq.
Noel J. Francisco, Esq.
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE  OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 15

# JONES DAY

1420 PEACHTREE STREET, N.E. • SUITE 800 • ATLANTA, GEORGIA 30309-3053

GEORGE T. MANNING
PARTNER -IN- CHARGE

404-581-8400

July 17, 2007

The Honorable John Conyers, Jr.
Chairman
U.S. House of Representatives
Committee on the Judiciary
2138 Rayburn House Office Building
Washington, D.C. 20515

Re:    Congressional Inquiry Into U.S. Attorneys Matters

Dear Chairman Conyers:

I am responding to your letter of July 13, 2007. Ms. Miers has received a subpoena from the Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, to appear before the Subcommittee, produce documents, and give testimony. While Ms. Miers of course respects the authority and prerogatives of the Subcommittee, the Committee, and the U.S. House of Representatives, she is the former Counsel to the President of the United States and has been specifically directed by him not to appear, not to produce documents in response to the subpoena, and not to provide testimony. The correspondence communicating these unequivocal directives has been provided previously to the Committee. The Subcommittee has demanded that Ms. Miers do precisely what the President has prohibited her from doing. In these circumstances, it cannot reasonably be asserted that "Ms. Miers . . . made her own decision to disregard" the Committee's subpoena. Letter from Chairman Conyers to George T. Manning (July 13, 2007). The Committee's dispute is not with Ms. Miers, but with the Executive Branch.

In fact, the cases cited in your letter confirm that the contempt statute is inapplicable to Ms. Miers. None of these cases involves an assertion of the Executive privileges and immunities at issue here. More importantly, as your letter acknowledges, these cases hold that the contempt statute does not apply where a witness has an "adequate excuse." *United States v. Josephson,* 165 F.2d 82, 85 (2d Cir. 1947); *see also Townsend v. United States,* 95 F.2d 352, 361 (D.C. Cir. 1938). The directives received by Ms. Miers from the President constitute a manifest "adequate excuse" in these circumstances. The cases cited in your letter confirm what the Department of Justice has long held: "the criminal contempt of Congress statute does not apply to executive officials who assert claims of executive privilege at the direction of the President." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* 8 U.S. Op. Off. of Legal Counsel 101, 129 (1984)) (citing 1956 testimony of then Deputy Attorney General (subsequently Attorney General) William P. Rogers, *Hearings Before a Subcommittee of the House Committee on Government Operations,* 84th Cong., 2d Sess. 2933 (1956)).

JONES DAY

The Honorable John Conyers, Jr.
July 17, 2007
Page 2

Supreme Court cases foreclose any justifiable basis to support a determination that Ms. Miers is in contempt of the Congress. The contempt statute requires that Ms. Miers act "willfully." 2 U.S.C. § 192. The invocation of Executive privileges and immunities by the President in response to the subpoena to Ms. Miers forecloses such intent. *See United States v. Laub*, 385 U.S. 475, 487 (1967); *Raley v. Ohio*, 360 U.S. 423, 438 (1959); *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 674-75 (1973); *Cox v. Louisiana*, 379 U.S. 559, 571 (1965); *United States v. Levin*, 973 F.2d 463, 468-69 (6th Cir. 1992); *United States v. Barker*, 546 F.2d 940, 947-48 (D.C. Cir. 1976) (Wilkey, J., concurring); *id.* at 955 (Mehrige, J., concurring); *Townsend*, 95 F.2d at 359-60. The Supreme Court has explained that sanctioning "a citizen for exercising a privilege which the State clearly told him was available" would be "the most indefensible sort of entrapment by the State." *Raley*, 362 U.S. at 438.

I would also like to respond to Chairwoman Sanchez's assertion that the Executive privileges and immunities at issue here are inapplicable to former presidential advisers. *See* Ruling of Chairwoman Linda Sanchez on Related Executive Privilege and Immunity Claims ("Ruling"), at 2. The subpoena is directed exclusively to Ms. Miers' official duties as a senior adviser to the President, not as a private citizen. Therefore, like this entire dispute, this issue is between the Executive and Legislative branches. Regardless of who is correct, "*the President has directed*" Ms. Miers "not to produce any documents in response to the subpoena," Letter from Fred F. Fielding to George T. Manning (June 28, 2007) (emphasis added), "not to provide ... testimony" "relating to the possible dismissal or appointment of United States Attorneys," Letter from Fred F. Fielding to George T. Manning (July 9, 2007), and "not to appear" at the Committee hearing, Letter from Fred F. Fielding to George T. Manning (July 10, 2007). Surely the Committee would not force any citizen to disobey such a directive in order to avoid a contempt of Congress sanction.

In addition, as explained in the Department of Justice's opinion on this matter, Chairwoman Sanchez's position is inconsistent with the positions taken by presidents of both political parties for many decades. *See* Office of Legal Counsel Memorandum (July 10, 2007). As then-former President Truman explained when refusing to comply with a congressional subpoena from the House Committee on Un-American Activities: "The doctrine [of separation of powers] would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes." *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (holding that a current or former President may invoke executive privilege). Based on this, Attorney General Janet Reno noted in her opinion to President Clinton that "since '[a]n immediate assistant to the President may be said to serve as his alter ego . . . the same considerations that were persuasive to former President Truman [when he declined to comply with a congressional subpoena for his testimony] would apply to justify a refusal to appear by . . . a former staff member.'" *Assertion of Executive Privilege with Respect to Clemency Decision,*

JONES DAY

The Honorable John Conyers, Jr.
July 17, 2007
Page 3

23 Op. O.L.C. 1, n.2 (Sept. 16, 1999) (quoting *Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters*, at 6 (Office of Legal Counsel, Dec. 21, 1972)) (alterations in original); *see also Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308, n.2 (Sept. 3, 1996) (same).

Chairwoman Sanchez's assertion that the President has not properly invoked Executive Privilege because he has acted through Counsel to the President is mistaken. *See* Ruling at 1. In *In re Sealed Case*, 121 F.3d 729 (1997), the D.C. Circuit held that President Clinton properly invoked the privilege where the "affidavit [of] former White House Counsel Abner J. Mikva stated 'the President . . . has specifically directed me to invoke formally the applicable privileges over those documents.'" *Id.* at 744 n.16. In any event, even if the 1973 district court decision upon which Chairwoman Sanchez relies were viable authority, it is inapposite. In that case the President did not himself assert the privilege. *See Ctr. on Corporate Responsibility, Inc. v. Schultz*, 368 F. Supp. 863, 870-73 (D.D.C. 1973).

As to the other bases of Chairwoman Sanchez's statement that there is no basis for the Executive Branch's directives to Ms. Miers, *see* Ruling at 2-5 (asserting that there is no legal basis for the directive not to appear at the hearing, that the information sought is not covered by Executive Privilege, that the White House has not provided a privilege log, and that Congress has a "compelling need" for the information), I respectfully refer the Committee to the reasoned opinions of the Department of Justice. More importantly, however, Chairwoman Sanchez's statement again underscores that this dispute has little to do with Ms. Miers, and much to do with our system of separated powers. It reaffirms that this dispute is between the Executive and Legislative branches.

I would like to clarify one other matter in the record. During the July 12 hearing, you stated that Ms. Miers "told [you] she was originally [coming to the hearing], and then somehow or someone changed her mind." As I explained in my letter to you of July 10, 2007, that is not accurate. As we are all aware, Ms. Miers' communications with the Committee about these matters appropriately have been through counsel. And, during my conversation with your staff member, Elliot Mincberg, I did not confirm that Ms. Miers would appear before the Committee at the July 12, 2007 hearing. Rather, at your staff member's request, I discussed some logistical arrangements should Ms. Miers appear. *See* Letter from George T. Manning to Chairman Conyers and Chairwoman Sanchez (July 10, 2007). Any representations made to you to the contrary are erroneous. I therefore respectfully request that you amend the record accordingly.

In light of the continuing directives to Ms. Miers and as previously indicated to your Committee, I must respectfully inform you that, directed as she has been to honor the Executive

7-17-07; 4:06PM;JONES DAY

,202

**JONES DAY**

The Honorable John Conyers, Jr.
July 17, 2007
Page 4

privileges and immunities asserted in this matter, Ms. Miers will not appear before the
Committee or otherwise produce documents or provide testimony as set forth in the Committee's
subpoena.

Kind regards,

*George T. Manning* / *n ſ F*

George T. Manning

cc:     The Honorable Lamar S. Smith
        The Honorable Linda T. Sanchez
        The Honorable Chris Cannon
        Fred F. Fielding, Esq.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 16

JOHN CONYERS, JR., Michigan
CHAIRMAN

HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
MELVIN L. WATT, North Carolina
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
MAXINE WATERS, California
WILLIAM D. DELAHUNT, Massachusetts
ROBERT WEXLER, Florida
LINDA T. SÁNCHEZ, California
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
BETTY SUTTON, Ohio
LUIS V. GUTIERREZ, Illinois
BRAD SHERMAN, California
TAMMY BALDWIN, Wisconsin
ANTHONY D. WEINER, New York
ADAM B. SCHIFF, California
ARTUR DAVIS, Alabama
DEBBIE WASSERMAN SCHULTZ, Florida
KEITH ELLISON, Minnesota

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951
http://www.house.gov/judiciary

LAMAR S. SMITH, Texas
RANKING MINORITY MEMBER

F. JAMES SENSENBRENNER, JR., Wisconsin
HOWARD COBLE, North Carolina
ELTON GALLEGLY, California
BOB GOODLATTE, Virginia
STEVE CHABOT, Ohio
DANIEL E. LUNGREN, California
CHRIS CANNON, Utah
RIC KELLER, Florida
DARRELL E. ISSA, California
MIKE PENCE, Indiana
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio

November 5, 2007

Mr. Fred Fielding
Counsel to the President
Office of Counsel to the President
The White House
1600 Pennsylvania Ave., NW
Washington, DC 20530

Dear Mr. Fielding:

As you know, the Judiciary Committee has been seeking for more than six months to obtain information from the White House concerning the forced resignations of nine United States Attorneys in 2006 and related matters. This has included the Committee finding in July that *White House Chief of Staff Joshua Bolten and former White House Counsel Harriet Miers* were in contempt for refusing to comply with subpoenas issued to them for documents and testimony. Unfortunately, I have received no response to my July 25 letter to you, which again sought to resolve this issue. In fact, I have written to you on eight previous occasions attempting to reach agreement on this matter.[1] As we submit the Committee's contempt report to the full House, I am writing one more time to seek to resolve this issue on a cooperative basis.

In a number of my previous letters, I have offered several constructive paths in an effort to reach agreement. Let me now suggest another specific proposal based on these letters and previous offers, including your previous letter to us, and based specifically on previous agreements that this Administration has already reached with Congressional committees during this Congress.

---

[1] These eight letters, some of which were written with Senate Judiciary Committee Chair Patrick Leahy and Commercial and Administrative Law Subcommittee Chair Linda Sanchez, were written on March 9, March 22, March 28, May 21, June 29, July 17, July 19, and July 25.

Mr. Fred Fielding
Page Two
November 5, 2007

I propose that initially, the White House would provide the Committee with copies of documents reflecting communications between White House staff and persons outside the White House relating to the U.S. Attorney terminations and related matters. This was part of your conditional offer in March, and the White House agreed without such conditions to provide such documents to the House Committee on Oversight and Government Reform as part of its investigation into the death of Corporal Patrick Tillman. Second, the White House would make available for confidential staff review the remaining, internal White House documents relating to the same subjects, after which the Committee would identify what would most probably be a smaller number of such documents for production. This is precisely the procedure that the White House agreed to follow in the Tillman investigation, in which approximately 450 pages of internal White House documents were confidentially reviewed by Congressional staff and a smaller number were then requested by the Committee and produced by the White House, and that was followed with respect to documents initially withheld by the Justice Department in the U.S. Attorney investigation.

Finally, we would mutually identify relevant present and former White House staffers for on-the-record interviews, following the procedure agreed to by the Justice Department and successfully utilized in a dozen such interviews this year in the U.S. Attorney investigation. The area of questioning would be limited to the US Attorney terminations and related matters. These staff members would initially include those specified in your March 20 letter, and we are prepared to consider conducting these interviews without requiring that the witnesses be under oath, as occurred in the Justice Department interviews.

As the Congressional Research Service has reported, there are at least 74 instances since World War II where even sitting White House advisers, including White House counsel, have testified before Congress, and previous Administrations, even after initially asserting executive privilege, have reconsidered and agreed to "full or substantial compliance" with Congressional committee requests once there was a committee contempt vote. I very much hope that we can similarly avoid a constitutional confrontation in this case. This is not, and should not be treated as, a partisan or ideological issue, but instead a question of good government. As Republican former Attorney General Richard Thornburgh recently testified before our Committee, "citizens of the United States must have confidence" that the Department of Justice "is conducting itself in a fair and impartial" manner, "without actual political influence or the appearance of political influence."

I hope you will consider this offer in earnest and based upon the good faith with which it is delivered. Please respond at your earliest convenience, and in no event later than the end of this week, November 9. As always, responses and questions should be directed to the Judiciary

Mr. Fred Fielding
Page Three
November 5, 2007

Committee office, 2138 Rayburn House Office Building, Washington, D.C. 20515 (tel.: 202-225-3951; fax: 202-225-7680).

Sincerely,

John Conyers, Jr.
Chairman

cc:     Hon. Lamar S. Smith
        Hon. Linda T. Sánchez
        Hon. Chris Cannon
        Chris Freck

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 17

THE WHITE HOUSE

WASHINGTON

November 9, 2007

Dear Chairman Conyers:

This is to acknowledge receipt and thank you for your letter of November 5, 2007 ("Letter"), advising that the Committee on the Judiciary of the House of Representatives ("the Committee") has submitted to the full House its report in support of a resolution to cite the President's Chief of Staff and former Counsel with contempt of Congress. Your letter further sets forth terms by which you suggest that the issues surrounding this resolution may be resolved without further confrontation. We completely agree with that goal and have sought to achieve it for over six months.

At the outset it should be noted and as the record makes clear, Mr. Bolten, as a custodian of records, and Ms. Miers, as a witness, have each acted at the President's direction, following his assertion of Executive Privilege, not to provide documents or testimony to the Committee concerning the replacement of certain United States Attorneys in 2006. Thus, taking an action to describe their actions as being contemptuous of the House of Representatives does not seem a just characterization.

From the very beginning of our many discussions and letters, the President attempted to chart a course of accommodation that would provide Congress with information it sought while protecting the Executive Branch's constitutional prerogatives. That is why on March 20, I wrote to you conveying the President's offer to provide the Committee with documents reflecting written communications related to this matter between White House personnel and persons external to the White House, including the Department of Justice, and to make available for interviews several high-ranking White House officials, including Ms. Miers and Karl Rove, the then-Deputy Chief of Staff and Senior Adviser to the President. In five subsequent letters we have reiterated this offer of information, and urged its acceptance.

Since March 20, the Committee has received an extraordinary amount of information from the Department of Justice relating to the dismissals of the United States Attorneys. DOJ has produced or made available for review more than 10,000 pages of documents, many of which reflect communications with the White House. Moreover, more than twenty present or former high-ranking DOJ officials, including the then-Attorney General, then-Deputy Attorney General, and former Chief of Staff to the Attorney General have testified publicly, submitted to committee staff interviews, or both. Not only has this process provided the Committee with abundant opportunities to obtain facts relating to the White House's U.S. Attorney-related communications with the Department of Justice, but also it has made clear there is no need for additional information that would be "demonstrably critical to the responsible fulfillment of the Committee's functions." *See* June 27, 2007 Letter from Solicitor General and Acting Attorney

General to the President, at 2 (quoting *Senate Select Comm. On Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc)).[1]

Your letter correctly confirms that you have written "on eight previous occasions," three of which letters contain or incorporate specific proposals involving terms for a possible agreement. Your March 22, 2007 letter rejects outright the President's March 20, 2007 proposal of accommodation without offering any proposal in response, and with all due respect, the remaining letters contain no suggestion of accommodation but instead make an unqualified request for *all documents* sought by the Committee.

However, more importantly, in those three letters which suggest avenues for further consideration, the proposals have been substantially the same and one-sided: they propose accommodations on the part of the White House without signaling any willingness on the part of the Committee to accommodate itself to the Presidential interests at stake here by, for example, agreeing to limit the scope of the Committee's demands or by forswearing an intention to insist on something less than total acquiescence with the Committee's original demands.

Your current Letter essentially repeats elements of these earlier proposals. And like the earlier proposals, the Letter proposes no ultimate limitation upon the Committee's demands, or an end to the requests.

Thus, the present state of the discussions appears to be this: the President's proposal – to provide the Committee with (i) a very substantial body of requested information through interviews of White House personnel and (ii) responsive, non-internal, White House email communications – is again answered with a proposal that the White House unilaterally commence an open-ended process of providing the information sought by the Committee, without limitation, and without any recognition or regard to the legitimate Executive Branch interests at stake in the controversy; namely, (1) the President's need for counsel from advisors who will speak candidly and openly with him, among themselves and others, and (2) the particular need for such advice where his constitutionally exclusive power to nominate and remove U.S. Attorneys is at issue.

We are therefore at a most regrettable impasse – one that each party to such a dispute is required by tradition and comity to strive to avoid. But to do so requires finding a path that accommodates and blends the needs of each into a solution that also respects and preserves the prerogatives of both. It is this very reason that led the President to seek the compromise that he has proposed. And in asserting Executive Privilege in this matter, the President has done so to defend institutional prerogatives transcending the momentary interests of this or any future Administration.

---

[1] The Acting Attorney General's opinion states further that in order to override a privilege claim, "the Committees must 'point[] to . . . specific legislative decisions that cannot responsibly be made without access to [the privileged] materials.'" *Id.* at 3 (quoting *Senate Select Comm.*, 498 F.2d at 733). As we have previously noted in correspondence with you, it remains unclear just how and why the Committee is unable to fulfill its legislative and oversight interests without the materials it continues to demand.

The President offered a very substantial accommodation to the Committee, for the purpose of avoiding an institutional confrontation between the Executive and Legislative branches. The Committee has neither accepted the President's proposed accommodation, nor proposed any course other than incremental Executive Branch abandonment of his constitutional obligations.

We respectfully urge the Committee, and the full House, to reconsider its proposed actions; we earnestly request that the path of confrontation be avoided even at this late hour, and exchanged for the proposed solution to provide information. Such would serve the short-term needs as perceived by the Committee, and the long-term interests of both Branches in their dealings with one another, thus better serving the public than any confrontation.

Respectfully yours,

Fred F. Fielding
Counsel to the President

The Honorable John Conyers
United States House of Representatives
Washington, DC 20515

cc:    The Honorable Lamar Smith

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 18



# Office of the Attorney General
Washington, D.C.

February 29, 2008

The Honorable Nancy Pelosi
Speaker
House of Representatives
Washington, D.C. 20515

Dear Madam Speaker:

As you know, the President, asserting executive privilege, directed that Joshua Bolten, Chief of Staff to the President, and Harriet Miers, the former Counsel to the President, not release certain documents or provide related testimony subpoenaed by the Committee on the Judiciary of the House of Representatives. The President also directed Ms. Miers to invoke her constitutional immunity from compelled congressional testimony and to decline to appear before the Committee. These directives were based on legal opinions from the Department of Justice advising that the assertions of privilege and immunity were legally proper.

Notwithstanding the President's directives, on July 25, 2007, the House Committee on the Judiciary adopted a resolution recommending that the House of Representatives cite Mr. Bolten and Ms. Miers for contempt. On November 5, 2007, the Committee referred its report on the resolution to the full House. On February 14, 2008, the House adopted a contempt resolution, which you referred on February 28, 2008, to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194 (2000).

As explained in our July 24, 2007, letter to Judiciary Committee Chairman Conyers, a copy of which is enclosed, the Department of Justice's longstanding position taken during Administrations of both parties is "that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 102 (1984). Further, as we also explained in the letter to Chairman Conyers, the same principles that preclude prosecuting an Executive Branch official for abiding by a presidential claim of executive privilege also preclude prosecuting a senior presidential adviser for lawfully invoking her constitutional immunity from compelled congressional testimony. Here, the President directed Ms. Miers to invoke her constitutional immunity, and the President's directive was based upon a legal opinion from the Department of Justice advising that such an invocation of immunity would be legally proper.

Accordingly, the Department has determined that the non-compliance by Mr. Bolten and Ms. Miers with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers.

Please do not hesitate to contact me if you would like to discuss this matter further.

Sincerely,

Michael B. Mukasey
Attorney General

Enclosure

cc:    The Honorable John Boehner
       The Honorable John Conyers, Jr.
       The Honorable Lamar Smith

2

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 19

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

_To_  Joshua Bolten, White House Chief of Staff, or appropriate custodian of records, White House

You are hereby commanded to be and appear before the  Committee on the Judiciary

of the House of Representatives of the United States at the place, date and time specified below.

☐  **to testify** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____        Time: _____

☑  **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production:  2138 Rayburn House Office Building, Washington, D.C.  20515
>
> Date:  June 28, 2007        Time:  10:00 a.m.

_To_ _____

any authorized staff member of the Committee on the Judiciary _____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at the city of Washington, this  13th  day of  June  , 20 07 .

Attest: _____

_Clerk_

_____
_Chairman or Authorized Member_

# PROOF OF SERVICE

Subpoena for Joshua Bolten, White House Chf of Stff, or appropriate custodian of recds, White House

Address   White House, 1600 Pennsylvania Ave. N.W.

before the   Committee on the Judiciary

*U.S. House of Representatives*
*110th Congress*

---

Served by (print name)   *Elliot Mincberg*

Title   *Chief Counsel, Oversight and Investigations House Judiciary Comm*

Manner of service   *Via fax to Emmet T. Flood of White House*

*Counsel's office pursuant to telephone agreement*

Date   *6/13/07*

Signature of Server   *Elliot Mincberg*

Address   *2138 Rayburn House Office Building*

*Washington DC 20515*

### SCHEDULE OF
### DOCUMENT REQUESTS
### SUBPOENA TO THE WHITE HOUSE CHIEF OF STAFF
### JUNE 13, 2007

**Documents requested**

1. Complete and unredacted versions, including complete paper and electronic versions, of any and all documents in the possession, custody, or control of the White House related to the Committee's investigation into the preservation of prosecutorial independence and the Department of Justice's politicization of the hiring and firing of United States Attorneys, including possible misrepresentations to Congress and other violations of federal law. The documents produced shall include:

a.    Any and all documents the White House Counsel agreed in the March 20, 2007, letter of Fred F. Fielding, Counsel to the President, to Chairman Leahy, Chairman Conyers, Ranking Member Specter, Ranking Member Smith, and Congresswoman Sanchez to produce in conjunction with off-the-record interviews, including documents consisting of or relating to all communications between any official or employee of the White House and any official or employee of the Department of Justice or any third party "concerning the request for resignations of the U.S Attorneys in question."

b.    Any and all documents related to the: 1) evaluation of or decision to dismiss former U.S. Attorneys David Iglesias, H.E. "Bud" Cummins, John McKay, Carol Lam, Daniel Bogden, Paul Charlton, Kevin Ryan, Margaret Chiara, Todd Graves, or any other U.S. Attorney(s) dismissed since President Bush's re-election (hereinafter "dismissed U.S. Attorneys"); 2) evaluation of any U.S. Attorney(s) considered for dismissal since President Bush's re-election (hereinafter "U.S. Attorneys considered for dismissal"); 3) the implementation of the dismissal and replacement of the dismissed U.S. Attorneys; and 4) the selection, discussion and evaluation of any possible replacement or interim or acting appointment to fill any vacancy with respect to dismissed U.S. Attorneys and U.S. Attorneys considered for dismissal.

c.    Any and all documents related to the involvement of Karl Rove, Harriet E. Miers, William Kelley, J. Scott Jennings, Sara M. Taylor, or any other current or former White House employee or official, in matters set forth in paragraph b, above.

d.    Any and all documents related to the testimony of any official at the Department of Justice to the United States Congress regarding any of the matters set forth in paragraph b, above.

e.     Any and all documents related to the "reviews by White House staff" that led the President to conclude as of March 20, 2007, and to reiterate as recently as June 11, 2007, that there was no wrongdoing in the mass firings and replacements of U.S. Attorneys since President Bush's re-election, including any information that has led the President to discount evidence obtained by the investigating Committees in documents and hearing testimony.

# INSTRUCTIONS, DEFINITIONS, AND RULES OF CONSTRUCTION
## FOR SCHEDULE OF DOCUMENT REQUESTS
## SUBPOENA TO THE WHITE HOUSE CHIEF OF STAFF
## JUNE 13, 2007

### Instructions

1.   In complying with this Subpoena, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agent, employee, or representative acting on your behalf. You are also required to produce documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party. No records, documents, data, or information called for by this request shall be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

2.   Production with respect to each document shall include all electronic versions and data files from word processing, spreadsheet, e-mail, or instant messaging applications, and other electronic data repositories, and shall be provided to the Committee in its native file format and shall include all original metadata for each electronic document or data file. Productions shall be provided on CD, DVD, or USB external hard drive.

3    Any draft, preliminary version, modification, revision, or amendment of a document, and any version that otherwise differs in any respect, such as having marginalia, markings, other notations or attachments, or otherwise, shall be considered a separate document and shall also be furnished as responsive.

4.   In the event that any entity, organization, or individual denoted in this subpoena is or has been also known by any other name than that herein denoted, the subpoena shall be read also to include them under that alternative identification.

5.   Each form in which a document is produced shall be capable of being copied in that form.

6.   Documents shall be produced as they are kept in the usual course of your business, including with any file labels, dividers, or other identifying markers with which they were associated when this subpoena was served. Also identify to which paragraph from the subpoena such documents are responsive.

7.  It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same document.

8.  If compliance with the subpoena cannot be made in full, compliance shall be made to the fullest extent possible and shall include an explanation of how the compliance is less than full and why fuller compliance is not possible.

9.  In the event that any document which you have reason to believe the Committee might regard as responsive is being withheld for any reason, provide the following information concerning such document:

    a.  the nature, source, and date of the document;

    b.  a description of the document's subject matter;

    c.  the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

    d.  the name and address of any other person to whom any of the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure; and

    e.  the basis for withholding the document from the Committee, including the nature of any privilege or rule of law relied upon, the identity of the person or persons asserting any such privilege or rule, and the legal basis for asserting the privilege or rule.

10. In the event that any document which you have reason to believe the Committee might regard as responsive is claimed to have been destroyed or to otherwise be no longer within your possession, custody, or control, provide the following information concerning such document:

    a.  the nature, source, and date of the document;

    b.  a description of the document's subject matter;

    c.  the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

    d.    the name and address of any other person to whom any of the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure;

    e.    the date the document was destroyed, or ceased to be within your possession, custody, or control;

    f.    the person who ordered or authorized such destruction or removal from your possession, custody, or control;

    g.    the reason for the document's destruction or removal from your possession, custody, or control, and the policy and authority on which such destruction or removal was based; and

    h.    the custodian of the document on the date of such destruction or removal.

11.    If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

12.    All documents shall be bates-stamped sequentially and produced sequentially, with an indication as to which paragraph of the schedule it is responsive.

13.    This request is continuing in nature and applies to any newly-discovered information. Any document not produced because it has not been located or discovered by the return date shall be produced immediately upon location or discovery subsequent thereto.

14.    Two identical sets of responsive documents shall be delivered contemporaneously, one to the Majority Staff and one to the Minority Staff. Production sets shall be delivered to the Majority Staff in Room 2138, Rayburn House Office Building, and to the Minority Staff in Room 2142, Rayburn House Office Building.

## Definitions and Rules of Construction

As used anywhere in this subpoena or in the schedule, instructions, definitions, or rules of construction thereto –

1. The term "document" is meant to carry, without limitation, the full breadth of that term as it is used in the Federal Rules of Civil Procedure. It includes, as applicable, any memorialization, whether typed, written, recorded, printed or otherwise produced by hand, or produced by any electronic or digital process or otherwise. It includes, without limitation, agreements, contracts, letters or other correspondence, facsimile or e-mail transmissions, telephone messages, logs or records, memoranda, notes, diaries, graphs, formulas, models, bulletins, computer printouts, transcripts, analyses, returns, summaries, accounts, estimates, projections, comparisons, messages, press releases, circulars, reviews, opinions, offers, studies, photographs, investigations, questionnaires, surveys, work sheets, statistical data, reports, notebooks, manuals, charts or other graphic matter, plans, journals, ledgers, bank records, financial statements, summaries, analyses, commentary, expense reports, books, instructions, financial reports, working papers, records notes, notices, confirmations, telegrams, teletypes, interoffice or intra office communications, cables, and minutes or notations or other records of any type of any conversation, interview, telephone call, meeting, conference, discussion, or other communication. It includes any transmittal slip, attachment, appendix, or other document referenced therein. It includes, without limitation, any information contained on audiotape, videotape, microfilm, or microfiche, as well as any electronically stored information that has been created using, or is otherwise maintained on, digital repositories or other electronic media including, but not limited to, personal computers, office workstations, laptops, hard drives, handheld devices (such as Palm, Trio or Blackberry), phones (office, mobile and/or home), removable electronic storage devices (such as CDs, DVDs, and USB or thumb drives), shared network drives and servers (including e-mail and/or file servers) and back-up tapes (or other disaster recovery/archiving media).

2. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information which might otherwise be construed to be outside its scope. The singular includes the plural number, and vice versa, so that neither shall be construed as a limitation. The masculine, feminine, and neuter genders each include the others.

3. The terms "person", "persons", and "anyone" includes, without limitation, natural persons, firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, or other legal, business or

6

government entities, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

4.    The terms "referring," "relating," "related to," and "concerning," with respect to any given subject, shall be construed broadly to mean anything that constitutes, contains, embodies, reflects, identifies, concerns, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

5.    The terms "including" and "includes," with respect to any given subject, shall be construed broadly so that specification of any particular matter shall not be construed to exclude any documents that you have reason to believe the Committee might regard as responsive.

6.    The terms "Department of Justice" and "Department" include, without limitation, anyone presently or formerly employed there, suspended from employment there, or on administrative leave from employment there.

7.    The term "White House" includes, without limitation, anyone presently or formerly employed there, suspended from employment there, or on administrative leave from employment there.

8.    The terms "you" and "your" include you individually, in your capacity as Chief of Staff, or appropriate custodian of records, as the case may be, as well as the White House and, without limitation, anyone presently or formerly employed there, suspended from employment there, or on administrative leave from employment there.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 20

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

_To_  Harriet Miers

You are hereby commanded to be and appear before the  Committee on the Judiciary

Subcommittee on Commercial and Administrative Law

of the House of Representatives of the United States at the place, date and time specified below.

☑    **to testify** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:  2141 Rayburn House Office Building, Washington, D.C. 20515

Date:  July 12, 2007          Time:  10:00 a.m.

☑    **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production:  2141 Rayburn House Office Building (at hearing at which you are testifying)

Date:  July 12, 2007          Time:  10:00 a.m.

_To_  any authorized staff member of the Committee on the Judiciary (service via fax, per prior agreement with

Ms. Miers) _____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States,

at the city of Washington, this  13th  day of  June  , 20 07 .

_Chairman or Authorized Member_

Attest:

_Clerk_

## PROOF OF SERVICE

Subpoena for  Harriet Miers

Address   c/o Locke Liddell & Sapp, 2200 Ross Ave., Suite 2200, Dallas, TX  75201

before the  Committee on the Judiciary

Subcommittee on Commercial and Administrative Law

*U.S. House of Representatives*
*110th Congress*

Served by (print name) *Elliot Mincberg*

Title *Chief counsel, Oversight and Investigation, House Judiciary Comm.*

Manner of service *Via fax to George Manning pursuant to authorization*

*from Mr. Manning by phone on behalf of Ms. Miers as her attorney*

Date *6/13/07*

Signature of Server *Elliot Mincberg*

Address *2138 Rayburn House office Building*

*Washington DC. 20515*

**Schedule for Documents Sought in Subpoena**
**For Harriet Miers**
**Subcommittee on Commercial and Administrative Law**
**House Committee on the Judiciary**
**June 13, 2007**

## Items Requested

Complete and unredacted versions, including complete paper and electronic versions, of any and all documents in your possession, custody, or control related to the Committee's investigation into the preservation of prosecutorial independence and the Department of Justice's politicization of the hiring and firing of United States Attorneys, including possible misrepresentations to Congress and other violations of federal law. This includes any and all documents related to:

    1) the evaluation of or decision to dismiss former U.S. Attorneys David Iglesias, H.E. "Bud" Cummins, John McKay, Carol Lam, Daniel Bogden, Paul Charlton, Kevin Ryan, Margaret Chiara, Todd Graves, or any of them, or any other U.S. Attorney dismissed or considered for dismissal since President Bush's re-election;

    2) the implementation of the dismissal and replacement of any such U.S. Attorney;

    3) the selection, discussion, or evaluation of any possible replacement or interim or acting appointment to fill any vacancy with respect to dismissed U.S. Attorneys and U.S. Attorneys considered for dismissal; or

    4) the testimony of, or representations by, any official at the Department of Justice to the United States Congress regarding any of the matters set forth in (1) - (3).

## Definitions and Instructions

    (1) The term "document" is meant to carry, without limitation, the full breadth of that term as it is used in the Federal Rules of Civil Procedure. It includes, as applicable, any memorialization, whether typed, written, recorded, printed or otherwise produced by hand, or produced by any electronic or digital process or otherwise. It includes, without limitation, agreements, contracts, letters or other correspondence, facsimile or e-mail transmissions, telephone messages, logs or records, memoranda, notes, diaries, graphs, formulas, models, bulletins, computer printouts, transcripts, analyses, returns, summaries, accounts, estimates, projections, comparisons, messages, press releases, circulars, reviews, opinions, offers, studies, photographs, investigations, questionnaires, surveys,

work sheets, statistical data, reports, notebooks, manuals, charts or other graphic matter, plans, journals, ledgers, bank records, financial statements, summaries, analyses, commentary, expense reports, books, instructions, financial reports, working papers, records notes, notices, confirmations, telegrams, teletypes, interoffice or intra office communications, cables, and minutes or notations or other records of any type of any conversation, interview, telephone call, meeting, conference, discussion, or other communication.  It includes any transmittal slip, attachment, appendix, or other document referenced therein.  It includes, without limitation, any information contained on audiotape, videotape, microfilm, or microfiche, as well as any electronically stored information that has been created using, or is otherwise maintained on, digital repositories or other electronic media including, but not limited to, personal computers, office workstations, laptops, hard drives, handheld devices (such as Palm, Trio or Blackberry), phones (office, mobile and/or home), removable electronic storage devices (such as CDs, DVDs, and USB or thumb drives), shared network drives and servers (including e-mail and/or file servers) and back-up tapes (or other disaster recovery/archiving media).

(2)  The terms "including," "includes," and "related to" are used in the broadest sense of the term and specification of a particular matter included in a request is not meant to exclude any other documents that might be responsive to a specific request.

(3)  Use of either the singular or plural should not be deemed a limitation and the use of the singular should be construed, where applicable, the plural and vice versa.

(4)  The conjunctive form "and" and the disjunctive form "or" are mutually interchangeable and are meant to encompass each other.

(5)  In complying with this Subpoena, you are required to produce all responsive documents in your possession, custody, or control, whether held by you or by past or present agents or representatives, including documents you have placed in the temporary possession, custody, or control of a third party.  No documents requested herein shall be destroyed, modified, removed, transferred or otherwise made inaccessible to the Committee.

(6)  In complying with this subpoena, you are to include a copy of the original, as well as any copy that differs in any respect, such as one with marginalia or other notations.  You are also to include any markings, post-it notes, or other documents attached thereto, as well as any attachment relating to or incorporated by the document.

(7)  With respect to any and all documents requested herein that are being withheld on the ground of privilege, furnish a list specifying the following information:

•    the nature, source and date of the document;

•    a description of the document's subject matter;

- the name and address of each recipient of the original or a copy of the document, together with the date or approximate date when each recipient received the document;

- the names and addresses of all other persons to whom the contents of the document have been disclosed, the date such disclosure took place, and the means of such disclosure; and

- the nature of the privilege or rule of law relied upon, including the identity of the person or persons asserting the privilege or rule as well as the legal basis for asserting that privilege or rule, or other reason for non-production.

(8)  All electronic documents shall be provided in full on CD, DVD, or USB external hard drive, as well as in hard copy.

(9)  The obligations created by this document request are continuing and you shall supplement your production if you locate additional responsive documents in your possession, custody, or control.

(10)  Two separate sets of the documents shall be brought to 2141 Rayburn at the time of the hearing, one set for the Majority and one set for the Minority.  Documents discovered after the hearing shall be promptly delivered to the Majority at 2138 Rayburn and to the Minority at 2142 Rayburn.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 21

IV

110TH CONGRESS
2D SESSION

# H. RES. 979

Recommending that the House of Representatives find Harriet Miers and
Joshua Bolten, Chief of Staff, White House, in contempt of Congress
for refusal to comply with subpoenas duly issued by the Committee
on the Judiciary.

---

## IN THE HOUSE OF REPRESENTATIVES

FEBRUARY 13, 2008

Mr. CONYERS submitted the following resolution; which was referred to the
Committee on the Judiciary

---

# RESOLUTION

Recommending that the House of Representatives find Har-
riet Miers and Joshua Bolten, Chief of Staff, White
House, in contempt of Congress for refusal to comply
with subpoenas duly issued by the Committee on the
Judiciary.

1   *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

2   the Speaker of the House of Representatives shall certify

3   the report of the Committee on the Judiciary, detailing

4   the refusal of former White House Counsel Harriet Miers

5   to appear before the Subcommittee on Commercial and

6   Administrative Law as directed by subpoena, to the

7   United States Attorney for the District of Columbia, to

2

1   the end that Ms. Miers be proceeded against in the man-

2   ner and form provided by law; and be it further

3      *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

4   the Speaker of the House of Representatives shall certify

5   the report of the Committee on the Judiciary, detailing

6   the refusal of former White House Counsel Harriet Miers

7   to testify before the Subcommittee on Commercial and Ad-

8   ministrative Law as directed by subpoena, to the United

9   States Attorney for the District of Columbia, to the end

10   that Ms. Miers be proceeded against in the manner and

11   form provided by law; and be it further

12      *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

13   the Speaker of the House of Representatives shall certify

14   the report of the Committee on the Judiciary, detailing

15   the refusal of former White House Counsel Harriet Miers

16   to produce documents to the Subcommittee on Commercial

17   and Administrative Law as directed by subpoena, to the

18   United States Attorney for the District of Columbia, to

19   the end that Ms. Miers be proceeded against in the man-

20   ner and form provided by law; and be it further

21      *Resolved,* That pursuant to 2 U.S.C. 192 and 194,

22   the Speaker of the House of Representatives shall certify

23   the report of the Committee on the Judiciary, detailing

24   the refusal of White House Chief of Staff Joshua Bolten

25   to produce documents to the Committee on the Judiciary

3

1  as directed by subpoena, to the United States Attorney

2  for the District of Columbia, to the end that Mr. Bolten

3  be proceeded against in the manner and form provided by

4  law.

○

IV

# House Calendar No. 188

110TH CONGRESS
2D SESSION

# H. RES. 982

### [Report No. 110–526]

Providing for the adoption of the resolution (H. Res. 979) recommending
that the House of Representatives find Harriet Miers and Joshua Bolten,
Chief of Staff, White House, in contempt of Congress for refusal to
comply with subpoenas duly issued by the Committee on the Judiciary
and for the adoption of the resolution (H. Res. 980) authorizing the
Committee on the Judiciary to initiate or intervene in judicial proceedings
to enforce certain subpoenas.

---

## IN THE HOUSE OF REPRESENTATIVES

### FEBRUARY 13, 2008

Ms. SLAUGHTER, from the Committee on Rules, reported the following resolu-
tion; which was referred to the House Calendar and ordered to be printed

---

# RESOLUTION

Providing for the adoption of the resolution (H. Res. 979)
recommending that the House of Representatives find
Harriet Miers and Joshua Bolten, Chief of Staff, White
House, in contempt of Congress for refusal to comply
with subpoenas duly issued by the Committee on the
Judiciary and for the adoption of the resolution (H.
Res. 980) authorizing the Committee on the Judiciary
to initiate or intervene in judicial proceedings to enforce
certain subpoenas.

2

1      *Resolved,* That House Resolution 979 and House Res-

2   olution 980 are hereby adopted.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 22

IV

110TH CONGRESS
2D SESSION

# H. RES. 980

Authorizing the Committee on the Judiciary to initiate or intervene in judicial proceedings to enforce certain subpoenas.

---

## IN THE HOUSE OF REPRESENTATIVES

FEBRUARY 13, 2008

Mr. CONYERS submitted the following resolution; which was referred to the Committee on Rules

---

# RESOLUTION

Authorizing the Committee on the Judiciary to initiate or intervene in judicial proceedings to enforce certain subpoenas.

1    *Resolved,* That the Chairman of the Committee on the

2 Judiciary is authorized to initiate or intervene in judicial

3 proceedings in any Federal court of competent jurisdic-

4 tion, on behalf of the Committee on the Judiciary, to seek

5 declaratory judgments affirming the duty of any individual

6 to comply with any subpoena that is a subject of House

7 Resolution 979 issued to such individual by the Committee

8 as part of its investigation into the firing of certain United

9 States Attorneys and related matters, and to seek appro-

10 priate ancillary relief, including injunctive relief.

2

1    SEC. 2. The Committee on the Judiciary shall report

2    as soon as practicable to the House with respect to any

3    judicial proceedings which it initiates or in which it inter-

4    venes pursuant to this resolution.

5    SEC. 3. The Office of General Counsel of the House

6    of Representatives shall, at the authorization of the

7    Speaker, represent the Committee on the Judiciary in any

8    litigation pursuant to this resolution. In giving that au-

9    thorization, the Speaker shall consult with the Bipartisan

10    Legal Advisory Group established pursuant to clause 8 of

11    Rule II.

○

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 23

Westlaw.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                    Page 1


8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)

Office of Legal Counsel
U.S. Department of Justice

**1 *101 PROSECUTION FOR CONTEMPT OF CONGRESS OF AN EXECUTIVE BRANCH OFFICIAL WHO
HAS ASSERTED A CLAIM OF EXECUTIVE PRIVILEGE

May 30, 1984

As a matter of statutory construction and separation of powers analysis, a United
States Attorney is not required to refer a congressional contempt citation to a
grand jury or otherwise to prosecute an Executive Branch official who carries out
the President's instruction to invoke the President's claim of executive privilege
before a committee of Congress.

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

I.  Introduction

This memorandum memorializes our formal response to your request for our opinion
whether, pursuant to the criminal contempt of Congress statute, 2 U.S.C. ss 192,
194, a United States Attorney must prosecute or refer to a grand jury a citation
for contempt of Congress issued with respect to an executive official who has
asserted a claim of executive privilege in response to written instructions from
the President of the United States.  Your inquiry originally arose in the context
of a resolution adopted by the House of Representatives on December 16, 1982,
during the final days of the 97th Congress, which instructed the Speaker of the
House of Representatives to certify the report of the Committee on Public Works and
Transportation concerning the "contumacious conduct of the  Administrator, United
States Environmental Protection Agency, in failing and refusing to furnish certain
documents in compliance with a subpena duces tecum of a duly constituted
subcommittee of said committee . . . to the United States Attorney for the District
of Columbia, to the end that the Administrator . . . may be proceeded against in
the manner and form provided by law."  H.R. Res. 632, 97th Cong., 2d Sess. (1982).
[FN1]  Section 192 of Title 2, United States Code, provides, in general, that
willful failure to produce documents in response to a congressional subpoena shall
be a misdemeanor.  Section 194 provides that if such a failure is reported to
either house of Congress it "shall" be certified to the "appropriate United States
attorney whose duty it shall be to bring the matter before the grand jury for its
action."

*102 Your inquiry presents a number of complex issues that will be considered in
this memorandum.  The first issue is whether the Executive retains some discretion
with respect to referral of a contempt of Congress citation to a grand jury.  This

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

issue raises questions of statutory construction and the separation of powers with respect to the scope of the Executive's exercise of prosecutorial discretion.  The second issue is whether the criminal contempt of Congress statute applies to an Executive Branch official who, on the orders of the President, asserts the President's claim of executive privilege.  This issue also involves questions of statutory interpretation and the constitutional separation of powers.

As we have previously discussed with you, and as we explain in detail in this memorandum, we have concluded that, as a matter of both statutory construction and the Constitution's structural separation of powers, a United States Attorney is not required to refer a contempt citation in these circumstances to a grand jury or otherwise to prosecute an Executive Branch official who is carrying out the President's instruction in a factual context such as that presented by the December 16, 1982, contempt citation. First, as a matter of statutory interpretation reinforced by compelling separation of powers considerations, we believe that Congress may not direct the Executive to prosecute a particular individual without leaving any discretion to the Executive to determine whether a violation of the law has occurred.  Second, as a matter of statutory interpretation and the constitutional separation of powers, we believe that the contempt of Congress statute was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege in this context.

**2 Our conclusions are predicated upon the proposition, endorsed by a unanimous Supreme Court less than a decade ago, that the President has the authority, rooted inextricably in the separation of powers under the Constitution, to preserve the confidentiality of certain Executive Branch documents. The President's exercise of this privilege, particularly when based upon the written legal advice of the Attorney General, is presumptively valid. Because many of the documents over which the President may wish to assert a privilege are in the custody of a department head, a claim of privilege over those documents can be perfected only with the assistance of that official.  If one House of Congress could make it a crime simply to assert the President's presumptively valid claim, even if a court subsequently were to agree that the privilege claim were valid, the exercise of the privilege would be so burdened as to be nullified. Because Congress has other methods available to test the validity of a privilege claim and to obtain the documents that it seeks, even the threat of a criminal prosecution for asserting the claim is an unreasonable, unwarranted, and therefore intolerable burden on the exercise by the President of his functions under the Constitution.

Before setting out a more detailed explanation of our analysis and conclusions, we offer the caveat that our conclusions are limited to the unique circumstances that gave rise to these questions in late 1982 and early 1983. *103 Constitutional conflicts within the federal government must be resolved carefully, based upon the facts of each specific case.  Although tensions and friction between coordinate branches of our government are not novel and were, in fact, anticipated by the Framers of the Constitution, they have seldom led to major confrontations with clear and dispositive resolutions.

The accommodations among the three branches of the government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of <u>lines</u> of demarcation is to use an inapt figure.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

There are vast stretches of ambiguous territory.

Frankfurter and Landis, Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts, 37 Harv. L. Rev. 1010, 1016 (1924) (emphasis in original). "The great ordinances of the Constitution do not establish and divide fields of black and white." Springer v. Philippine Islands, 277 U.S. 189, 209 (1928) (Holmes, J., dissenting). Therefore, although we are confident of our conclusions, prudence suggests that they should be limited to controversies similar to the one to which this memorandum expressly relates, and the general statements of legal principles should be applied in other contexts only after careful analysis.

## II.  Background

Because the difficult and sensitive constitutional issues that we consider in this opinion could conceivably be resolved differently depending upon the specific facts of a controversy, this analysis is presented in the context of the December 16, 1982, actions of the House of Representatives.  The facts surrounding this dispute will be set out in detail in the following pages.

A.  EPA's Enforcement of the Superfund Act
**3 On December 16, 1982, the House of Representatives cited the Administrator of the Environmental Protection Agency (EPA) because she declined to produce, in response to a broad subcommittee subpoena, a small portion of the subpoenaed documents concerning the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. ss 9601, 9657 (Supp. V 1981) (Superfund Act).  The Superfund Act, adopted in December of 1980, authorizes the federal government to take steps to remedy the hazards posed by abandoned and inactive hazardous waste sites throughout the United States. [FN2]  The EPA, which was delegated part of the President's authority to enforce the Superfund Act in August of 1981, [FN3] has considerable flexibility with respect to **104 how this goal may be accomplished. EPA may request the Department of Justice to proceed immediately against those responsible for the hazardous waste sites to "secure such relief as may be necessary to abate" an " imminent and substantial endangerment to the public health or welfare or the environment." See 42 U.S.C. s 9606. Alternatively, EPA may initiate clean-up efforts itself by using funds from the $1.6 billion Superfund. See 42 U.S.C. s 9631.  If EPA itself implements the clean-up efforts, it may subsequently sue those responsible for the hazardous waste to recover the clean up cost and, in some instances, may obtain treble damages.  See 42 U.S.C. s 9607. These two basic enforcement mechanisms are supplemented by other broad enforcement powers, which authorize the issuance of administrative orders "necessary to protect the public health and welfare and the environment" and to require designated persons to furnish information about the storage, treatment, handling, or disposal of hazardous substances.  See 42 U.S.C. ss 9606, 9604(e)(1). Finally, the Superfund Act imposes criminal liability on a person in charge of a facility from which a hazardous substance is released, if that person fails to notify the government of the release.  See 42 U.S.C. s 9603.

Prior to the initiation of judicial proceedings, EPA must undertake intensive investigation and case preparation, including studying the nature and the extent of the hazard present at sites, identifying potentially responsible parties, and

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)    Page 4

evaluating the evidence that exists or that must be generated to support government action.  See Amended Declaration of Robert M. Perry, Associate Administrator for Legal and Enforcement Counsel and General Counsel, EPA, filed in United States v. House of Representatives, Civ. No. 82-3583 (D.D.C. Jan. 14, 1983).  Many sites apparently involve hundreds of waste generators; hence, the initial investigation of a site can take months and involve the examination of tens of thousands of documents.  Id.

Based on its initial investigations of hazardous waste sites throughout the country, EPA created a comprehensive national enforcement scheme and developed during 1982 an interim priorities list, which identified the 160 sites that posed the greatest risk to the public health and welfare and the environment.  [FN4]  EPA also promulgated enforcement guidelines to direct the implementation of the Superfund Act against these potentially hazardous sites.  See 47 Fed. Reg. 20664 (1982).

**4 Under this basic enforcement scheme, EPA commenced actual enforcement of the Superfund Act.  As part of the enforcement effort with respect to each site, EPA generally develops a strategy for conducting negotiations and litigation consistent with its overall enforcement goals and the individual facts of each particular case. Once a case strategy has been developed, EPA notifies responsible parties that it intends to take action at a site unless the parties undertake an adequate clean up program on their own. Following the issuance of notice letters, EPA typically negotiates with responsible parties to agree on a *105 clean up plan. These negotiations may involve hundreds of potentially responsible parties and millions of dollars in clean up costs.  Depending upon the strengths and weaknesses of individual cases and the effect on the overall enforcement effort, EPA may decide to settle with some but not all parties and proceed to litigation with a certain number of potential defendants.  If EPA decides to bring a lawsuit, it refers the case to the Land and Natural Resources Division of this Department, which is responsible for conducting the actual litigation. [FN5]

During EPA's enforcement of the Superfund Act, the agency created or received hundreds of thousands of documents concerning various aspects of the enforcement process.  Many of these documents concerned the facts relating to specific hazardous waste sites; others involved general agency strategy and policies with respect to the Superfund Act; still others, a small portion of the enforcement files, were attorney and investigator memoranda and notes that contained discussions of subjects such as EPA's enforcement strategy against particular defendants, analyses of the strengths and weaknesses of the government's case against actual or potential defendants, consideration of negotiation and settlement strategy, lists of potential witnesses and their anticipated testimony, and other litigation planning matters.  Enforcement officials at both the career and policy level at EPA and in the Land and Natural Resources Division at the Department of Justice determined that some of those documents, which concerned the legal merits and tactics with respect to individual defendants in open enforcement files, were particularly sensitive to the enforcement process and could not be revealed outside the agencies directly involved in the enforcement effort without risking injury to EPA's cases against these actual and potential defendants in particular and the EPA enforcement process in general. [FN6]

B.  The House Subcommittee's Demands for Enforcement Files

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In the midst of EPA's ongoing enforcement efforts under the Superfund Act, the Subcommittee on Oversight and Investigations of the House Committee on Public Works and Transportation (Public Works Subcommittee), chaired by Rep. Levitas, began hearings to review EPA enforcement of the Act.  In the course of these hearings, the Public Works Subcommittee first demanded access to, and then subpoenaed, a wide range of documents concerning enforcement of the Superfund Act with respect to the 160 sites that were on the **106 agency's interim priorities list.  The documents demanded by the Public Works Subcommittee included not only documents concerning the facts relating to these sites and EPA's general policies, but also the sensitive material contained in open case files that set out discussions concerning case strategy with respect to actual and potential defendants. [FN7] The Public Works Subcommittee subpoena was dated November 16, 1982, and was served on November 22, 1982. It called for production of the subpoenaed documents eleven days later on December 2, 1982.  The EPA Administrator responded to the Public Works Subcommittee's subpoena by offering to provide the Public Works Subcommittee with access to an estimated 787,000 pages of documents within the scope of the subpoena. [FN8]  The EPA and the Land and Natural Resources Division officials responsible for conducting EPA enforcement litigation determined, however, that release outside the enforcement agencies of a limited number of the most sensitive enforcement documents contained in open files concerning current and prospective defendants would impair EPA's ongoing enforcement efforts and prevent EPA and the Department of Justice from effectively implementing the Superfund Act.

**5 Therefore, in accordance with the explicit guidelines adopted by the President to govern possible claims of executive privilege, see Memorandum re: Procedures Governing Responses to Congressional Requests for Information (Nov. 4, 1982), EPA suggested that some of the documents be withheld under a claim of executive privilege and consulted with this Office and the Office of the Counsel to the President in order to determine whether such a claim might be asserted to avoid impairing the constitutional responsibility of the President to take care that the laws be faithfully executed.  A further review of the documents in question by enforcement officials at EPA and the Land and Natural Resources Division was then undertaken to confirm that the particular documents selected for consideration for an executive privilege claim were, in the judgment of those officials, sufficiently sensitive that their disclosure outside the Executive Branch might adversely affect the law enforcement process. The documents were then reviewed by officials in this Office and officials in the Office of the Counsel to the President to confirm that the documents were of the type described by the enforcement officials.  Various unsuccessful efforts were thereafter made to resolve the dispute short of a final confrontation.  The President, based upon the unanimous recommendation of all Executive Branch officials involved in the process, ultimately determined to assert a claim of executive privilege with respect to 64 documents from open enforcement files that had been identified as sufficiently enforcement sensitive **107 as of the return date of the subpoena that their disclosure might adversely affect pending investigations and open enforcement proceedings.  The President implemented this decision in a memorandum dated November 30, 1982, to the EPA Administrator, which instructed her to withhold the particularly  sensitive documents from disclosure outside the Executive Branch as long as the documents remained critical to ongoing or developing enforcement actions.  The legal basis for this decision was explained in letters from the Attorney General on November 30, 1982, to the House Public Works Subcommittee and one other House subcommittee. [FN9]  On December 2, 1982, 64 of the most sensitive documents were withheld from the Subcommittee. [FN10]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C.  The Contempt of Congress Proceedings in the House of Representatives

The President's assertion of executive privilege, and the Attorney General's explanation of the law enforcement considerations and constitutional justification for the decision not to release the documents outside the Executive Branch while enforcement proceedings were ongoing, did not dissuade the congressional subcommittees from pressing their demands for the withheld material.  After the EPA Administrator asserted the President's claim of privilege at a December 2, 1982, Public Works Subcommittee hearing, the Subcommittee immediately approved a contempt of Congress resolution against her. The full Committee did likewise on December 10, 1982, and rejected a further proposal by the Department of Justice to establish a formal screening process and briefings regarding the contents of the documents. [FN11]  The full House adopted the contempt of Congress resolution on December 16, 1982, [FN12] and the following**108  day Speaker O'Neill certified the contempt citation to the United States Attorney for the District of Columbia for prosecution under the criminal contempt of Congress statute.

D.  The Criminal Contempt of Congress Statute

**6 The criminal contempt of Congress statute contains two principal sections, 2 U.S.C. ss 192 & 194. [FN13]  Section 192, which sets forth the criminal offense of contempt of Congress, provides in pertinent part:

> Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House . . . or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

Section 194 purports to impose mandatory duties on the Speaker of the House or the President of the Senate, as the case may be, and the United States Attorney, to take certain actions leading to the prosecution of persons certified by a house of Congress to have failed to produce information in response to a subpoena.  It provides:

> Whenever a witness summoned as mentioned in section 192 of this title fails to appear to testify or fails to produce any books, papers, records, or documents, as required, or whenever any witness so summoned refuses to answer any question pertinent to the subject under inquiry before either House . . . or any committee or subcommittee of either House of Congress, and the fact of such failure or failures is reported to either House while Congress is in session or when Congress is not in session, a statement of fact constituting such failure is reported and filed with the President of the Senate or the Speaker of the House, it shall be the duty of the said President of the Senate or the Speaker of the House, as the case may be, to certify, and he shall so certify, the statement of facts aforesaid under the seal of the **109 Senate or House, as the case may be, to the appropriate United States attorney, whose duty it shall be to bring the matter before the grand jury for its action.

(Emphasis added.)

E.  The Department of Justice Civil Suit

Immediately after the House passed the resolution adopting the finding that the EPA

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                                Page 7

Administrator was in contempt of Congress, the Department of Justice filed a civil
suit in the United States District Court for the District of Columbia to obtain a
ruling that "insofar as the EPA Administrator . . . did not comply with the
Subpoena, her non- compliance was lawful" because of a valid Presidential claim of
executive privilege. [FN14]  The House moved to dismiss the Department's complaint
on jurisdictional grounds, and the Department cross moved for summary judgment on
the merits.  In a letter to Speaker O'Neill dated December 27, 1982, the United
States Attorney indicated that during the pendency of the lawsuit, he would take no
further action with respect to the Speaker's referral of the contempt citation.
The Speaker responded in a letter dated January 4, 1983, in which he took the
position that the United States Attorney must, as a matter of law, immediately
refer the matter to a grand jury.

**7 The trial court responded to the cross-motions for dismissal and summary
judgment by exercising its discretion under equitable rules of judicial restraint
not to accept jurisdiction over the lawsuit, and it dismissed the suit.  The court
concluded:
    When constitutional disputes arise concerning the respective powers of the
    Legislative and Executive Branches, judicial intervention should be delayed
    until all possibilities for settlement have been exhausted. . . .
    The difficulties apparent in prosecuting the Administrator . . . for contempt of
    Congress should encourage the two branches to settle their differences without
    further judicial involvement.
United States v. House of Representatives, 556 F. Supp. 150, 152-53 (D.D.C. 1983).
No appeal was taken. [FN15]

*110 F.  Resolution of the EPA Dispute

Subsequent to the trial court decision, the two branches engaged in negotiations to
reach a compromise settlement. The parties eventually reached an agreement under
which the Public Works Subcommittee would have limited access to the withheld
documents and would sponsor a resolution to "withdraw" the contempt citation
against the EPA Administrator.  Pursuant to the agreement, the Subcommittee
reviewed the documents, and the House later adopted a resolution withdrawing the
contempt citation.  H.R. Res. 180, 98th Cong., 1st Sess. (Aug. 3, 1983).  The issue
whether the House of Representatives in the 98th Congress could "withdraw" the
contempt citation of the House during the 97th Congress was never resolved.

During the pendency of the lawsuit and the subsequent settlement negotiations, the
United States Attorney for the District of Columbia refrained from referring the
contempt citation to the grand jury.  The United States Attorney took the position
that referral would have been inappropriate during that period and that the statute
left him with discretion to withhold referral.  See Testimony of Stanley S. Harris
before the House Committee on Public Works and Transportation, 98th Cong., 1st
Sess. 100-07 (June 16, 1983).  Following the passage of the resolution withdrawing
the contempt citation, "the relevant facts and documents were presented . . . to a
federal grand jury, which voted unanimously not to indict the EPA Administrator."
Letter from Stanley S. Harris, United States Attorney, District of Columbia, to
Honorable Thomas P. O'Neill, Jr., Speaker of the House of Representatives (Aug. 5,
1983).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   III.  Generally Applicable Legal Principles: The Separation of Powers, the Duties
of the Executive to Enforce the Law, and the Derivation and Scope of the Principles
                of Prosecutorial Discretion and Executive Privilege


A.  The Separation of Powers
The basic structural concept of the United States Constitution is the division of
federal power among three branches of government.  Although the expression
"separation of powers" does not actually appear in the Constitution, the Supreme
Court has emphasized that the separation of powers "is at the heart of our
Constitution," and has recognized "the intent of the Framers that the powers of the
three great branches of the National Government be largely separate from one
another."  Buckley v. Valeo, 424 U.S. 1, 119-20 (1976).  It needs little emphasis
that the separation of powers doctrine is vital to any analysis of the relative
responsibilities of the branches of our government, inter se.  In The Federalist
No. 47, James Madison, who believed that "no political truth is certainly of
greater intrinsic value, or is stamped with the authority of more enlightened
patrons of liberty" than the concept of the separation of powers, defended this
tripartite arrangement in the Constitution by citing *111 Montesquieu's well-known
maxim that the legislative, executive, and judicial departments should be separate
and distinct:
   **8 The reasons on which Montesquieu grounds his maxim are a further
   demonstration of his meaning. "When the legislative and executive powers are
   united in the same person or body," says he, "there can be no liberty, because
   apprehensions may arise lest the same monarch or senate should enact tyrannical
   laws to execute them in a tyrannical manner." Again: "Were the power of judging
   joined with the legislative, the life and liberty of the subject would be
   exposed to arbitrary control, for the judge would then be the legislator.  Were
   it joined to the executive power, the judge might behave with all the violence
   of an oppressor."
The Federalist No. 47, at 303 (J. Madison) (C. Rossiter ed. 1961); see Buckley v.
Valeo, 424 U.S. at 120-21. [FN16]


Of the three branches of the new government created in Philadelphia in 1787, the
legislature was regarded as the most intrinsically powerful, and the branch with
powers that required the exercise of the greatest precautions.


Madison warned that the "legislative department is everywhere extending the sphere
of its activity and drawing all power into its impetuous vortex." The Federalist
No. 48, supra, at 309. He admonished that because of their experiences in England,
the founders of the thirteen colonies had focused keenly on the danger to liberty
from an "overgrown and all-grasping prerogative of an hereditary magistrate,
supported and fortified by an hereditary branch of the legislative authority," but
had tended to ignore the very real dangers from "legislative usurpations, which, by
assembling all power in the same hands, must lead to the same tyranny as is
threatened by executive usurpations." Id. Reflecting the views of many of his
colleagues, Madison believed that although the risk of tyranny would naturally come
from the King in an hereditary monarchy, in a representative republic, like that
created by the constitutional convention, in which executive power was "carefully
limited, both in the extent and duration of its power," the threat to liberty would
come from the legislature,
   which is inspired, by a supposed influence over the people, with an intrepid
   confidence in its own strength; which is sufficiently numerous to feel all the

passions which actuate a multitude, yet not so numerous as to be incapable of pursuing the objects of its passions by means which reason prescribes; it is against the enterprising ambition of this department that the people ought to indulge all their jealousy and exhaust all their precautions.

Id.

**\*112** The Framers feared that the legislature's power over the purse would foster a dependence by the executive departments on the legislature "which gives still greater facility to encroachments" by the legislature on the powers of the Executive. Id. at 310. The concerns of the Framers with respect to the power of the legislature have been recognized by the Supreme Court. The Court, citing many of the above statements, has observed that because of the Framers' concerns about the potential abuse of legislative power, "barriers had to be erected to ensure that the legislature would not overstep the bounds of its authority and perform functions of the other departments." United States v. Brown, 381 U.S. 437, 444 (1965). Justice Powell noted that "during the Confederation, the States reacted by removing power from the executive and placing it in the hands of elected legislators. But many legislators proved to be little better than the Crown." INS v. Chadha, 462 U.S. 917, 961 (1983) (Powell, J. concurring). After citing several specific legislative abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." Id. at 962.

**\*\*9** Thus, the careful separation of governmental functions among three branches of government was a very deliberate and vital structural step in building the Constitution. The Framers understood human nature and anticipated that well-intentioned impulses would lead each of the branches to attempt to encroach on the powers allocated to the others. They accordingly designed the structure of the Constitution to contain intrinsic checks to prevent undue encroachment wherever possible. Particular care was taken with respect to the anticipated tendency of the Legislative Branch to swallow up the Executive. The Framers did not wish the Legislative Branch to have excessive authority over the individual decisions respecting the execution of the laws: "An elective despotism was not the government we fought for." T. Jefferson, Notes on the State of Virginia 120 (Univ. N.C. Press ed. 1955) [FN17] The constitutionally prescribed separation of powers creates enforceable abuses that had been of particular concern to the Framers, Justice Powell concluded that it "was to prevent the recurrence of such abuses that the Framers vested the executive, legislative, and judicial powers in separate branches." Id. The division of delegated powers was designed "to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." INS v. Chadha, 462 U.S. at 951. The doctrine of separated powers "may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally**\*113** assigned function. Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. Id. at 963 (Powell, J. concurring) (citations omitted). Although the Supreme Court has recognized that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively," it has also emphasized that the Court "has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decision of cases or controversies properly before it." Buckley v. Valeo, 424 U.S. at 121,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123.  Therefore, although the Constitution does not contemplate "a complete
division of authority between the three branches," each branch retains certain core
prerogatives upon which the other branches may not transgress.  Nixon v.
Administrator of Gen. Servs., 433 U.S. 425, 443 (1977).  Each branch must not only
perform its own delegated functions, but each has an additional duty to resist
encroachment by the other branches.  "The hydraulic pressure inherent within each
of the separate Branches to exceed the outer limits of its power, even to
accomplish desirable objectives, must be resisted."  INS v. Chadha, 462 U.S. at 951
(emphasis added).


B.  The Duties of the Executive to Enforce the Law
**10 The fundamental responsibility and power of the Executive Branch is the duty
to execute the law.  Article II, s 1 of the Constitution expressly vests the
executive power in the President.  Article II, s 3 commands that the President
"take Care that the Laws be faithfully executed."  Enforcement of the laws is an
inherently executive function, and by virtue of these constitutional provisions,
the Executive Branch has the exclusive constitutional authority to enforce federal
laws.  Since the adoption of the Constitution, these verities have been at the
heart of the general understanding of the Executive's constitutional authority.
During the debates on the Constitution, James Wilson noted that the "only powers he
conceived strictly executive were those of executing the laws." 1 M. Farrand, The
Records of the Federal Convention of 1787, at 65-66 (1937).  During the first
Congress, James Madison stated that "if any power whatsoever is in its nature
executive, it is the power of appointing, overseeing, and controlling those who
execute the laws."  1 Annals of Congress 481 (1789).  The Supreme Court has
recognized this fundamental constitutional principle.  In Springer v. Philippine
Islands, 277 U.S. 189 (1928), the Court observed:
    Legislative power, as distinguished from executive power, is the authority to
    make laws, but not to enforce them or appoint the agents charged with the duty
    of such enforcement.  The latter are executive functions.
Id. at 202.  More recently, Judge Wilkey, writing for a unanimous panel of the
United States Court of Appeals for the District of Columbia Circuit in a decision
later affirmed by the Supreme Court, recognized that the Constitution **114 prevents
Congress from exercising its power of "oversight, with an eye to legislative
revision," in a manner that amounts to "shared administration" of the law.
Consumer Energy Council of America v. Federal Energy Regulatory Commission, 673
F.2d 425, 474 (D.C. Cir. 1982), aff'd sub nom. Process Gas Consumers Group v.
Consumer Energy Council of America, 43 U.S. 1216 (1983).  It thus seems apparent
that the drafters of the Constitution intended clearly to separate the power to
adopt laws and the power to enforce them and intended to place the latter power
exclusively in the Executive Branch. [FN18]  As a practical matter, this means that
there are constitutional limits on Congress' ability to take actions that either
disrupt the ability of the Executive Branch to enforce the law or effectively
arrogate to Congress the power of enforcing the laws.


C.  The Derivation and Scope of Prosecutorial Discretion and Executive Privilege
The issues addressed by this memorandum involve two important constitutional
doctrines that spring from the constitutional limits imposed by the separation of
powers and the Executive's duty to enforce the laws: prosecutorial discretion and
executive privilege.


1.  Prosecutorial Discretion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The doctrine of prosecutorial discretion is based on the premise that because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress.  That principle was reaffirmed by the Supreme Court in Buckley v. Valeo, 424 U.S. 1 (1976), in which the Court invalidated the provision of the Federal Election Act that vested the appointment of certain members of the Federal Election Commission in the President pro tempore of the Senate and the Speaker of the House.  In so holding, the Court recognized the exclusively executive nature of some of the Commission's powers, including the right to commence litigation:

> **11 The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress.  A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to "take care that the laws be faithfully executed."  Art. II, s 3.

424 U.S. at 138.

*115 The Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive by directing the Executive Branch to prosecute particular individuals.  This principle was explained in Smith v. United States, 375 F.2d 243 (5th Cir.), cert. denied, 389 U.S. 841 (1967), in which the court considered the applicability of the Federal Tort Claims Act to a prosecutorial decision not to arrest or prosecute persons injuring plaintiff's business.  The court ruled that the government was immune from suit under the discretionary decision  exception of the Act on the ground that the Executive's prosecutorial discretion was rooted in the separation of powers under the Constitution:

> The President of the United States is charged in Article 2, Section 3, of the Constitution with the duty to "take Care that the Laws be faithfully executed." The Attorney General is the President's surrogate in the prosecution of all offenses against the United States. . . . The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or  to abandon a prosecution already started, is absolute. . . .  This discretion is required in all cases.
>
> We emphasize that this discretion, exercised in even the lowliest and least consequential cases, can affect the policies, duties, and success of a function placed under the control of the Attorney General by our Constitution and statutes.

375 F.2d at 246-47.  The court went on to state that this prosecutorial discretion is protected "no matter whether these decisions are made during the investigation or prosecution of offenses."  Id. at 248.

The limits and precise nature of the Executive's prosecutorial discretion are discussed in greater detail below.  At this point in our examination of the issues considered in this memorandum, it is sufficient to observe that meaningful and significant separation of powers issues are raised by a statute that purports to direct the Executive to take specified, mandatory prosecutorial action against a specific individual designated by the Legislative Branch.

2.  Executive Privilege

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                    Page 12

The doctrine of executive privilege is founded upon the basic principle that in order for the President to carry out his constitutional responsibility to enforce the laws, he must be able to protect the confidentiality of certain types of documents and communications within the Executive Branch.  If disclosure of certain documents outside the Executive Branch would impair the President's ability to fulfill his constitutional duties or result in the impermissible involvement of other branches in the enforcement of the law, then the President must be able to claim some form of privilege to preserve his constitutional prerogatives.**116**  This "executive privilege" has been explicitly recognized by the Supreme Court, which has stated that the privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." United States v. Nixon, 418 U.S. 683, 708 (1974).  We believe that it is beyond peradventure that the constitutionally mandated separation of powers permits the President to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege and that the ability to assert this privilege is fundamental to the President's ability to carry out his constitutionally prescribed duties.

**\*\*12** The Supreme Court has suggested that in some areas the President's executive privilege may be absolute and in some circumstances it is a qualified privilege that may be overcome by a compelling interest of another branch.  United States v. Nixon, 418 U.S. at 713; see also Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974) (en banc).  Nevertheless, the unanimous Supreme Court decision in Nixon clearly stands for the proposition that there is a privilege, that it stems from the separation of powers, and that it may be invoked (although perhaps overridden by a court) whenever the President finds it necessary to maintain the confidentiality of information within the Executive Branch in order to perform his constitutionally assigned responsibilities. [FN19]

The scope of executive privilege includes several related areas in which confidentiality within the Executive Branch is necessary for the effective execution of the laws.  First, as the Supreme Court has held, the privilege protects deliberative communications between the President and his advisors. The Court has identified the rationale for this aspect of the privilege as the valid need for protection of communications between high government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.  United States v. Nixon, 418 U.S. at 705 (footnotes omitted).

Another category of Executive Branch material that is subject to a President's claim of privilege is material necessary "to protect military, diplomatic, or sensitive national security secrets." United States v. Nixon, 418 U.S. 683, 706 (1974).  In Nixon, the Court stated:
    As to those areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities.  In **\*117**C. & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948), dealing with Presidential authority involving foreign policy considerations, the Court said:
    "The President, both as Commander-in-Chief and as the Nation's organ for foreign

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

affairs, has available intelligence services whose reports are not and ought not
to be published to the world.  It would be intolerable that courts, without the
relevant information, should review and perhaps nullify actions of the Executive
taken on information properly held secret."
In United States v. Reynolds, 345 U.S. 1 (1953), dealing with a claimant's demand
for evidence in a Tort Claims Act case against the Government, the Court said:
    "It may be possible to satisfy the court, from all the circumstances of the
    case, that there is a reasonable danger that compulsion of the evidence will
    expose military matters which, in the interest of national security, should not
    be divulged.  When this is the case, the occasion for the privilege is
    appropriate, and the court should not jeopardize the security which the
    privilege is meant to protect by insisting upon an examination of the evidence,
    even by the judge alone, in chambers."  Id. at 10.

**13 No case of the Court, however, has extended this high degree of deference to a
President's generalized interest in confidentiality. Nowhere in the Constitution,
as we have noted earlier, is there any explicit reference to a privilege of
confidentiality, yet to the extent this interest relates to the effective discharge
of a President's powers, it is constitutionally based.
418 U.S. at 710-11.

An additional important application of executive privilege, which, as noted
earlier, relates centrally to the discharge of the President's constitutional
duties, involves open law enforcement files.  Since the early part of the 19th
century, Presidents have steadfastly protected the confidentiality and integrity of
investigative files from untimely, inappropriate, or uncontrollable access by the
other branches, particularly the legislature.  [FN20] The basis for this
application *118 of the privilege is essentially the same as for all aspects of
executive privilege; the Executive's ability to enforce the law would be seriously
impaired, and the impermissible involvement of other branches in the execution and
enforcement of the law would be intolerably expanded, if the Executive were forced
to disclose sensitive information on case investigations and strategy from open
enforcement files.

  IV.  The Duty of the Executive Branch When an Executive Official Has Been Cited for
    Contempt of Congress for Asserting the President's Claim of Executive Privilege

  A.  Prosecutorial Discretion
The first specific question that is presented by the circumstances that gave rise
to this memorandum is whether the United States Attorney is required to refer every
contempt of Congress citation to a grand jury.  This question raises issues of
statutory construction as well as the constitutional limits of prosecutorial
discretion.  We deal first with the statutory questions.

As a preliminary matter, we note that s 194 does not on its face actually purport
to require the United States Attorney to proceed with the prosecution of a person
cited by a house of Congress for contempt; by its express terms the statute
discusses only referral to a grand jury.  Even if a grand jury were to return a
true bill, the United States Attorney could refuse to sign the indictment and
thereby prevent the case from going forward. United States v. Cox, 342 F.2d 167
(5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965); In re Grand Jury, January,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                    Page 14


1969, 315 F. Supp. 662 (D. Md. 1970). See Hamilton & Grabow, A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis. 145, 155 (1984). Thus, as a matter of statutory interpretation, there is no doubt that the contempt of Congress statute does not require a prosecution; the only question is whether it requires referral to the grand jury. [FN21]


**\*119** 1.   Previous Department of Justice Positions Concerning Prosecutorial Discretion Under the Contempt of Congress Statute
**\*\*14** In the past, the Department of Justice has taken the position that if Congress cited an executive officer for contempt because of an assertion of executive privilege and "the Department determined to its satisfaction that the claim was rightfully made, it would not, in the exercise of its prosecutorial discre- tion, present the matter to a grand jury." Testimony of Assistant Attorney General (now Solicitor General) Rex Lee, Hearings on Representation of Congress and Congressional Interests in Court, Before the Subcomm. on Separation of Powers of the Senate Committee on the Judiciary, 94th Cong., 2d Sess. 8 (1976).


This principle of prosecutorial discretion under the contempt of Congress statute was followed by the Department in the cases of three officials of the Port of New York Authority who were cited for contempt of Congress in 1960 for refusing to produce documents to the House Judiciary Committee.  As a part of  an investigation of the Port Authority, which had been established by an interstate compact approved by Congress, the Judiciary Committee subpoenaed a large number of documents concerning the Port Authority's operations, most of which the Port Authority declined to produce on the orders of the governors of New York and New Jersey (the states within which the Port Authority was located).  Because of the failure to produce the documents, the Committee recommended, and the House adopted, contempt resolutions against three principal officials of the Port Authority. [FN22] On August 23, 1960, these resolutions were referred to the United States Attorney for prosecution.  See N.Y. Times, Aug. 24, 1960, at 1.  The United States Attorney never referred any of these citations to the grand jury.  On November 16, 1960, the Department of Justice announced that it would proceed against the officials by information **\*120** rather than indictment, and therefore would not present the citations to a grand jury.  See N.Y. Times, Nov. 17, 1960, at 1.  On November 25, 1960, the Department announced that it would file an information against only one of the Port Authority officials, Executive Director Austin Tobin, and would not prosecute the remaining two officials.  See N.Y. Times, Nov. 26, 1960, at 1.  The trial began in January 1961 and continued under the supervision of the new Attorney General, Robert F. Kennedy, who never altered the decision not to prosecute the two remaining officials, in spite of a congressional request to do so.  Ultimately Tobin's conviction was reversed by the United States Court of Appeals for the District of Columbia Circuit. Tobin v. United States, 306 F.2d 270 (D.C. Cir.), cert. denied, 371 U.S. 902 (1962). [FN23]


In the foregoing instance, the Department (under two administrations) exercised its prosecutorial discretion not to refer contempt of Congress citations to a grand jury, notwithstanding the seemingly mandatory phrasing of the statute. [FN24]  For the reasons set forth more fully below, we continue to adhere to the conclusion that the Department retains prosecutorial discretion not to refer contempt citations to a grand jury.


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2.  Judicial Opinions Interpreting the Language of s 194
**15 Section 194 imposes similarly worded, nominally mandatory, referral
obligations on both the Speaker of the House (or the President of the Senate) and
the United States Attorney once a contempt of Congress resolution has been adopted
by the House or Senate:
> it shall be the duty of the said President of the Senate or the Speaker of the
> House as the case may be, to certify, and he shall so certify, the statement of
> facts aforesaid under the seal of the Senate or House, as the case may be, to
> the appropriate United States attorney, whose duty it shall be to bring the
> matter before the grand jury for itss action.
(Emphasis added.)

Although the language, "it shall be the duty of" and "whose duty it shall be,"
might suggest a nondiscretionary obligation, the United States Court of Appeals for
the District of Columbia Circuit has expressly held, at least with respect to the
Speaker of the House, that the duty is not mandatory, and that, in fact, the
Speaker has an obligation under the law, at least in some cases, to exercise his
discretion in determining whether to refer a contempt citation. Wilson v. United
States, 369 F.2d 198 (D.C. Cir. 1966).  In Wilson, the court reversed a conviction
for contempt of Congress on the ground that the Speaker had assumed that the
statute did not permit any exercise of discretion by him **121 and he had therefore
automatically referred a contempt citation to the United States Attorney while
Congress was not in session.  The court based its conclusion that the Speaker was
required to exercise his discretion on the longstanding practice of both the House
and Senate and on congressional debates on contempt citations in which the houses
had recognized their own discretion not to approve a contempt resolution.  The
court concluded that because full House approval of a contempt citation is
necessary when Congress was in session, the Speaker is required to exercise some
discretion when the House is not in session.  369 F.2d at 203-04.

Although the reasons underlying the court's decision not to impose a mandatory duty
on the Speaker in Wilson do not necessarily require the same conclusion with
respect to the United States Attorney, the decision at least supports the
proposition that the seemingly mandatory language of s 194 need not be construed as
divesting either the Speaker or the United States Attorney of all discretion.
[FN25]

In several cases, the United States Court of Appeals for the District of Columbia
Circuit has at least assumed that the United States Attorney retains discretion not
to refer a contempt of Congress citation to a grand jury.  In these cases, the
court refused to entertain challenges to congressional subpoenas, at least in part
on the ground that the prospective witnesses would  have adequate subsequent
opportunities to challenge a committee's contempt finding, including the
opportunity to persuade the United States Attorney not to refer the case to a grand
jury.  For example, in Ansara v. Eastland, 442 F.2d 751 (D.C. Cir. 1971), the court
declined to entertain a suit to quash a congressional subpoena on the ground that
it would be inappropriate, as a matter of the exercise of its equitable power, to
interfere with an ongoing congressional process.  The court stated that protections
were available "within the legislative branch or elsewhere," and then in a footnote
indicated that these protections resided "perhaps in the Executive Branch which may
decide not to present the matter to the grand jury (as occurred in the case of the
officials of the New York Port Authority); or perhaps in the Grand Jury which may

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decide not to return a true bill." 442 F.2d at 754 n.6 (emphasis added). [FN26]
See also *122 Sanders v. McClellan, 463 F.2d 894 (D.C. Cir. 1972). In United
States Servicemen's Fund v. Eastland, 488 F.2d 1252 (D.C. Cir. 1973), rev'd on
other grounds, 421 U.S. 491 (1974), the court agreed to review a challenge to a
congressional subpoena brought by a third party, and it distinguished Ansara and
McClellan on the ground that, because the congressional subpoena was issued to a
third party, the plaintiffs had no alternative means to vindicate their rights.
488 F.2d at 1260. Among the alternative means the court cited was the right to
"seek to convince the executive (the attorney general's representative) not to
prosecute." Id.


**16 These cases emphasize the particular significance of prosecutorial discretion
in the context of the contempt of Congress statute. In general, with respect to
any criminal allegation, prosecutorial discretion plays an important role in
protecting the rights of the accused by providing an additional level of review
with respect to the factual and legal sufficiency of the charges. This role is
even more important when dealing with the contempt of Congress statute because, as
the above cases demonstrate, witnesses generally have no opportunity to challenge
congressional subpoenas directly. Thus, as the cases indicate, prosecutorial
discretion serves a vital purpose in protecting the rights of the accused in
contempt cases by mitigating the otherwise stern consequences of asserting a right
not to respond to a congressional subpoena.


Thus, the practice of the Congress and the available judicial authority support the
proposition that the seemingly mandatory duties imposed on congressional officials
by 2 U.S.C. s 194 are and were intended to be discretionary. The practice of the
Executive Branch and the court decisions reflect a similarly discretionary role
under the statute for the United States Attorney. Because, as the balance of this
memorandum reveals, these interpretations are consistent with other common-law
principles and avoid conclusions that would be at odds with the separation of
powers, we believe that a correct reading of 2 U.S.C. s 194 requires recognition of
the prosecutor's discretion with respect to referral to a grand jury.


3. Common-Law Prosecutorial Discretion
In addition to the court decisions that suggest that the United States Attorney may
decide not to refer a contempt citation to a grand jury, the common-law doctrine of
prosecutorial discretion weighs heavily against and, in our opinion, precludes an
interpretation that the statute requires automatic referral. Because of the wide
scope of a prosecutor's discretion in determining which cases to bring, courts, as
a matter of law, do not ordinarily interpret a statute to limit that discretion
unless the intent to do so is clearly and unequivocally stated. The general rule
is that "the Executive Branch has exclusive authority and absolute discretion to
decide whether to prosecute a case." United States v. Nixon, 418 U.S. 683, 693
(1974). See also Confiscation Cases, 74 U.S. (7 Wall.) 454 (1869). The Attorney
General and his subordinates, including the United States Attorneys, have the
authority to exercise this discretion reserved to the Executive. United States v.
San Jacinto Tin Co., 125 U.S. 273 (1888); The *123 Gray Jacket, 72 U.S. (5 Wall.)
370 (1866). In general, courts have agreed with the view of Judge (now Chief
Justice) Burger:
    Few subjects are less adapted to judicial review than the exercise by the
    Executive of his discretion in deciding when and whether to institute criminal
    proceedings, or what precise charge shall be made, or whether to dismiss a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proceeding once brought.
**17 Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967).  See also United States v. Batchelder, 442 U.S. 114 (1979); Bordenkircher v. Hayes, 434 U.S. 357 (1978).

Courts have applied this general principle of prosecutorial discretion in refusing to interfere with a prosecutor's decision not to initiate a case, despite the specific language of 28 U.S.C. s 547, which states in part that "each United States Attorney, within his district, shall . . . prosecute for all offenses against the United States." (Emphasis added.)  For example, in Powell v. Katzenbach, 359 F.2d 234 (D.C. Cir. 1965), cert. denied, 384 U.S. 906 (1966), the court denied a mandamus petition that sought to force the Attorney General to prosecute a national bank.  The court ruled:  "It is well settled that the question of whether and when prosecution is to be instituted is within the discretion of the Attorney General. Mandamus will not lie to control the exercise of this discretion." Id. at 234. See also United States v. Brown, 481 F.2d 1035 (8th Cir. 1973); Bass Anglers Sportsman's Society v. Scholze Tannery, Inc., 329 F. Supp. 339 (E.D. Tenn. 1971); Pugach v. Klein, 193 F. Supp. 630 (S.D.N.Y. 1961); United States v. Brokaw, 60 F. Supp. 100 (S.D. Ill. 1945).

Courts exhibit the same deference to prosecutorial discretion even when the specific statute involved uses words that would otherwise have mandatory, nondiscretionary implications.  For example, 42 U.S.C. s 1987 states that United States Attorneys are "authorized and required . . . to initiate prosecutions against all persons violating any of the provisions of the federal criminal civil rights statutes." (Emphasis added.)  Although a number of cases have been initiated to force a United States Attorney to bring civil rights actions on the ground that this statute imposes a nondiscretionary duty to prosecute, see Note, Discretion to Prosecute Federal Civil Rights Crimes, 74 Yale L.J. 1297 (1965), the courts uniformly have rejected the contention that the statute limits a prosecutor's normal discretion to decide not to bring a particular case.  For example, in Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375 (2d Cir. 1973), the court ruled that the "mandatory nature of the word 'required' as it appears in s 1987 is insufficient to evince a broad Congressional purpose to bar the exercise of executive discretion in the prosecution of federal civil rights crimes." 477 F.2d at 381. The court noted that although similar mandatory language was contained in other statutes, "(s)uch language has never been thought to preclude the exercise of prosecutorial discretion." Id. Accord Peek v. Mitchell, 419 F.2d 575 (6th Cir. 1970); Moses v. Kennedy, 219 F. Supp. 762 (D.D.C. 1963), aff'd sub nom. Moses v. Katzenbach, 342 F.2d 931 (D.C. Cir. 1965).  The language employed in 2 U.S.C. s 194 is neither stronger **124 nor more clearly mandatory than the language of s 1987, which the courts have decided is insufficient to limit the normal prosecutorial discretion.

**18 In fact, there is nothing to distinguish the contempt of Congress statute from any other statute where the prosecutor retains discretion with respect to who shall be prosecuted. Since the early part of the 19th century, it has been recognized that offenses against Congress that are punishable by Congress through its inherent contempt power may also be violations of the criminal laws and, as such, offenses against the United States, with respect to which the normal rules governing criminal prosecutions apply. See 2 Op. Att'y Gen. 655 (1834) (concluding that an assault against a congressman could be prosecuted consistent with the Double

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                    Page 18

Jeopardy Clause under the criminal laws, even if the defendant had already been
punished by Congress, because the act created two separate offenses, one against
Congress and one against the United States).  This principle was adopted by the
Supreme Court when it upheld the constitutionality of the contempt of Congress
statute. In re Chapman, 166 U.S. 661 (1897).  In Chapman, the Court held that the
contempt statute did not violate the Double Jeopardy Clause even though a defendant
could be punished through Congress' inherent contempt power as well as under the
contempt statute.  The Court concluded that a refusal to testify involved two
separate offenses, one against Congress and one against the United States, and that

     it is quite clear that the contumacious witness is not subjected to jeopardy
     twice for the same offence, since the same act may be an offence against one
     jurisdiction and also an offence against another; and indictable statutory
     offenses may be punished as such, while the offenders may likewise be subjected
     to punishment for the same acts as contempts, the two being diverso intuitu and
     capable of standing together.

166 U.S. at 672.

The import of the Court's conclusion in this context is clear. Congress' inherent
contempt power is the remedy for the offense against Congress, and that remedy
remains within Congress' control. The crime of contempt of Congress, like any other
federal statutory crime, is an offense against the United States that should be
prosecuted as is any other crime.  This criminal offense against the United States
properly remains subject to the prosecutorial control of the Executive Branch.
Therefore, because the contempt statute should be treated as are other federal
criminal statutes, we do not believe that s 194 should be read to limit the common
law prosecutorial discretion of the United States Attorney.  There is nothing in
the legislative history of the contempt of Congress statute that is inconsistent
with this conclusion.  See 42 Cong. Globe, 34th Cong., 3d Sess. 4030-44 (1857).

4.  Constitutional Considerations
Our construction of s 194 is reinforced by the need to avoid the constitutional
problems that would result if s 194 were read to require referral to a *125 grand
jury.  As discussed above, the constitutionally prescribed separation of powers
requires that the Executive retain discretion with respect to whom it will
prosecute for violations of the law.  Although most cases expressly avoid this
constitutional question by construing statutes not to limit prosecutorial
discretion, the cases that do discuss the subject make it clear that common law
prosecutorial discretion is strongly reinforced by the constitutional separation of
powers.  See, e.g., Inmates of Attica Correctional Facility v. Rockefeller, 477
F.2d 375 (2d Cir. 1973); Powell v.  Katzenbach, 359 F.2d 234 (D.C. Cir. 1965),
cert. denied, 384 U.S. 906 (1966).

**19 A number of courts have expressly relied upon the constitutional separation of
powers in refusing to force a United States Attorney to proceed with a prosecution.
For example, in Pugach v. Klein, 193 F. Supp. 630 (S.D.N.Y. 1961), the court
declined to order the United States Attorney to commence a prosecution for
violation of federal wiretap laws on the ground that it was

     clear beyond question that it is not the business of the Courts to tell the
     United States Attorney to perform what they conceive to be his duties.
     Article II, s 3 of the Constitution, provides that "the President shall take
     Care that the Laws shall be faithfully executed." The prerogative of enforcing
     the criminal law was vested by the Constitution, therefore, not in the Courts,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nor in private citizens, but squarely in the executive arm of the government. 193 F. Supp. at 634. See also Goldberg v. Hoffman, 225 F.2d 463, 464-65 (7th Cir. 1955). [FN27]

The Fifth Circuit, sitting en banc, has underscored the constitutional foundations of prosecutorial discretion. United States v. Cox, 342 F.2d 167 (5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965). In Cox, the court overturned a district court's order that a United States Attorney prepare and sign an indictment that a grand jury had voted to return. The plurality opinion stated:
    The executive power is vested in the President of the United States, who is required to take care that the laws be faithfully executed. The Attorney General is the hand of the President in taking care that the laws of the United States in legal proceedings*126 and in the prosecution of offenses, be faithfully executed. The role of the grand jury is restricted to a finding as to whether or not there is probable cause to believe that an offense has been committed. The discretionary power of the attorney for the United States in determining whether a prosecution shall be commenced or maintained may well depend upon matters of policy wholly apart from any question of probable cause. Although as a member of the bar, the attorney for the United States is an officer of the court, he is nevertheless an executive official of the Government, and it is as an officer of the executive department that he exercises a discretion as to whether or not there shall be a prosecution in a particular case. It follows, as an incident of the constitutional separation of powers, that courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.
342 F.2d at 171 (footnotes omitted). See also id. at 182-83 (Brown, J. concurring); id. at 190-93 (Wisdom, J., concurring). Even the three dissenting judges in Cox conceded that, although they believed that the United States Attorney could be required to sign the indictment, "once the indictment is returned, the Attorney General or the United States Attorney can refuse to go forward." Id. at 179. See United States v. Nixon, 418 U.S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case") (citing, inter alia, Cox).

**20 Although prosecutorial discretion may be regulated to a certain extent by Congress and in some instances by the Constitution, the decision not to prosecute an individual may not be controlled because it is fundamental to the Executive's prerogative. For example, the individual prosecutorial decision is distinguishable from instances in which courts have reviewed the legality of general Executive Branch policies. See Nader v. Saxbe, 497 F.2d 676 (D.C. Cir. 1974); Adams v. Richardson, 480 F.2d 1159 (D.C. Cir. 1973) (en banc) (per curiam); NAACP v. Levi, 418 F. Supp. 1109 (D.D.C. 1976). In these cases the courts accepted jurisdiction to rule whether an entire enforcement program was being implemented based on an improper reading of the law. The cases expressly recognize, however, both that a decision to prosecute in an individual case involves many factors other than merely probable cause, and that "the balancing of these permissible factors in individual cases is an executive, rather than a judicial function which follows from the need to keep the courts as neutral arbiters in the criminal law generally . . . and from Art. II, s 3 of the Constitution, which charges the President to 'take Care that the Laws be faithfully executed.'' Nader v. Saxbe, 497 F.2d at 679 n.18. Similarly distinguishable are the cases concerning the constitutional limits on selective

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prosecution, which hold that prosecutorial discretion may not be exercised on the basis of impermissible factors such as race, religion, or the exercise of free **\*127** speech. See, e.g., Marshall v. Jerrico, Inc., 446 U.S. 238, 249 (1980); Oyler v. Boles, 368 U.S. 448 (1962).

If the congressional contempt statute were interpreted to divest the United States Attorney of discretion, then the statute would create two distinct problems with respect to the separation of powers. "The doctrine of separated powers is implemented by a number of constitutional provisions, some of which entrust certain jobs exclusively to certain branches while others say that a given task is not to be performed by a given branch." United States v. Brown, 381 U.S. 437, 443 (1965). Divesting the United States Attorney of discretion would run afoul of both aspects of the separation of powers by stripping the Executive of its proper constitutional authority and by vesting improper power in Congress.

First, as the cases cited above demonstrate, Congress may not deprive the Executive of its prosecutorial discretion. In areas where the President has specific executive authority, Congress may establish standards for the exercise of that authority, but it may not remove all Presidential authority. For example, Congress may require the President to make appointments to certain executive positions and may define the qualifications for those positions, but it may not select the particular individuals whom the President must appoint to those positions. See Buckley v. Valeo, 424 U.S. 1 (1976). Similarly, Congress may adopt the criminal provisions for which individuals may be prosecuted and impose certain qualifications on how the Executive should select individuals for prosecution, but it may not identify the particular individuals who must be prosecuted. The courts have declared that the ultimate decision with respect to prosecution of individuals must remain an executive function under the Constitution.

**\*\*21** Second, if Congress could specify an individual to be prosecuted, it would be exercising powers that the Framers intended not be vested in the legislature. A legislative effort to require prosecution of a specific individual has many of the attributes of a bill of attainder and would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based. See United States v. Brown, 381 U.S. 437 (1965); United States v. Lovett, 328 U.S. 303 (1946). The constitutional role of Congress is to adopt general legislation that will be applied and implemented by the Executive Branch. "It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 136 (1810); see United States v. Brown, 381 U.S. 437, 446 (1965). The Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals. As the Supreme Court stated in Lovett:

   Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons, because the legislature thinks them guilty of conduct which deserves punishment.

**\*128** 328 U.S. at 317. Justice Powell has echoed this concern: "The Framers were well acquainted with the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.'" INS v. Chadha, 462 U.S. 917, 961 (1983) (Powell, J. concurring). As we have shown above, courts may not require

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                                    Page 21

prosecution of specific individuals, even though the Judicial Branch is expressly assigned the role of adjudicating individual guilt.  A fortiori, the Legislative Branch, which is assigned the role of passing laws of general applicability and specifically excluded from questions of individual guilt or innocence, may not decide on an individual basis who will be prosecuted.

These constitutional principles of prosecutorial discretion apply even though the issue here is referral to the grand jury and not commencement of a criminal case after indictment.  A referral to a grand jury commences the criminal prosecution process. That step is as much a part of the function of executing the laws as is the decision to sign an indictment.  The cases expressly recognize that prosecutorial discretion applies at any stage of the investigative process, even to the decision whether to begin an investigation at all.  See Inmates of Attica Correctional Facility v. Rockefeller, 477 F.2d 375 (2d Cir. 1973); Smith v. United States, 375 F.2d 243, 248 (5th Cir.), cert. denied, 389 U.S. 841 (1967).  In the latter case, the court emphasized that prosecutorial discretion was protected "no matter whether these decisions are made during the investigation or prosecution of offenses." 375 F.2d at 248.  Moreover, if the Executive has already determined that, as a matter of law, no violation of the law has occurred, it would serve no practical purpose to refer a case to the grand jury. Given the importance of these constitutional principles and the fundamental need to preserve the Executive's power to enforce the laws, we see no reason for distinguishing between the decision to prosecute and the decision to refer to the grand jury in this case. [FN28]

**22 For all of the above reasons, as a matter of statutory construction strongly reinforced by constitutional separation of powers principles, we believe that the United States Attorney and the Attorney General, to whom the United States Attorney is responsible, retain their discretion not to refer a contempt of Congress citation to a grand jury.  It follows, of course, that we believe that even if the provision of a statute requiring reference to a grand jury were to be upheld, the balance of the prosecutorial process could not be mandated.

*129 B.  Whether the Criminal Contempt of Congress Statute Applies to an Executive Official Who Asserts, On Direct Orders of the President, the President's Claim of Executive Privilege
We next consider, aside from the issue of prosecutorial discretion, whether the criminal contempt of Congress statute is intended to apply, or constitutionally could be applied, to Presidential claims of executive privilege.

1.  Previous Department of Justice Interpretations of the Contempt of Congress Statute
The Department of Justice has previously taken the position that the criminal contempt of Congress statute does not apply to executive officials who assert claims of executive privilege at the direction of the President.  In 1956, Deputy Attorney General (subsequently Attorney General) William P. Rogers took this position before a congressional subcommittee investigating the availability of information from federal departments and agencies.  In a lengthy memorandum of law, Deputy Attorney General Rogers set forth the historical basis of executive privilege and concluded that in the context of Presidential assertions of the privilege, the contempt of Congress statute was "inapplicable to the executive departments."  See Hearings Before a Subcommittee of the House Committee on Government Operations, 84th Cong., 2d Sess. 2933 (1956). [FN29]  We are not aware

of any subsequent Department position that reverses or weakens this conclusion, and
we have found no earlier Department position to the contrary.

We believe that the Department's long- standing position that the contempt of
Congress statute does not apply to executive officials who assert Presidential
claims of executive privilege is sound, and we concur with it.  Our conclusion is
based upon the following factors:  (1) the legislative history of the contempt of
Congress statute demonstrates that it was not intended to apply to Presidential
assertions of executive privilege; and (2) if the statute were construed to apply
to Presidential assertions of executive privilege, it would so inhibit the
President's ability to make such claims as to violate the separation of powers.

2.  The Legislative History of the Contempt of Congress Statute
Neither the legislative history nor the historical implementation of the contempt
statute supports the proposition that Congress intended the statute to apply to
executive officials who carry out a Presidential assertion of executive privilege.
The criminal contempt statute was originally enacted in 1857 during proceedings in
the House of Representatives to consider a contempt of Congress citation against a
New York Times correspondent who had refused to **130 answer questions put to him by
a select committee appointed by the House to investigate charges of bribery of
certain Representatives.  As a result of the committee's unavailing efforts to
obtain the reporter's testimony, the committee chairman introduced a bill designed
"more effectually to enforce the attendance of witnesses on the summons of either
House of Congress, and to compel them to deliver testimony."  42 Cong. Globe 404
(1857).  The bill was supported as a necessary tool in the House's efforts to
investigate the allegations of bribery.  See id. at 405 (remarks of the Speaker),
426 (remarks of Sen. Toombs), 427 (remarks of Rep. Davis), 445 (remarks of Sen.
Brown).  The bill was rushed through Congress in less than a week in order to
permit the House to bring greater pressure on the reporter to reveal the alleged
source of the congressional corruption.  That the bill was sponsored by the select
committee, and not the Judiciary Committee, further demonstrates that the bill was
not the result of a general consideration of Congress' contempt power, but was
enacted as an expedient to aid a specific investigation.  Thus, the circumstances
of the bill's passage certainly do not affirmatively suggest that Congress
anticipated application of the statute to instances in which the President asserted
a claim of executive privilege.

**23 In fact, the sponsor of the bill disclaimed any such far-reaching
implications.  Representative Dunn asked the sponsor, Representative Orr, what
impact the proposed bill would have on diplomatic secrets, one of the principal
areas in which the President had historically asserted a privilege of
confidentiality.  Representative Dunn stated that use of the contempt statute by
Congress to force disclosure of such material "might be productive of great
mischief, and in time of war of absolute ruin of the country."  42 Cong. Globe 431
(remarks of Rep. Dunn). Representative Orr replied, "I can hardly conceive such a
case" and emphasized that the bill should not be attacked "by putting instances of
the extremest cases" because the "object  which this committee had in view was,
where there was corruption in either House of Congress, to reach it."  Id. at 431
(remarks of Rep. Orr).  The implication is that Congress did not intend the bill to
apply to Presidential assertions of privilege.  [FN30]

*131 In the years preceding the adoption of the statute, the President had, on a

number of occasions, withheld documents from Congress under a claim of executive
privilege, and many of these instances had been hotly contested in the public
arena, and at least five of these instances occurred within the decade immediately
preceding the enactment of the congressional contempt statute. See supra note 19
(collecting authorities).  In spite of these highly visible battles over the
subject of executive privilege, we have located no indication in the legislative
history of the criminal contempt statute that Congress intended the statute to
provide a remedy for refusals to produce documents pursuant to a Presidential claim
of executive privilege.

The natural inference to be drawn from this vacuum in the legislative history is
reinforced by Congress' failure, as far as we know, ever to utilize its inherent
power of arrest to imprison Executive Branch officials for contempt of Congress for
asserting claims of executive privilege, even though Congress had previously
asserted and exercised its clearly recognized right to do so with respect to other
instances of contempt by private citizens. See Anderson v. Dunn, 19 U.S. (6 Wheat.)
204 (1821); Ex Parte Nugent, 18 F. Cas. 471 (C.C.D.C. 1848).  The absence of any
congressional discussion of the use of the contempt power against Presidential
claims of executive privilege and Congress' previous failure ever to attempt to use
its inherent contempt power in such cases, strongly suggest that the statute was
not intended to apply to such assertions.

This conclusion is supported by the subsequent history of the congressional
contempt statute.  Since enactment of the statute in 1857, there have been numerous
instances in which the President has withheld documents from Congress under a claim
of executive privilege.  Despite the fact that many of these disputes were
extraordinarily controversial, until the citation of the EPA Administrator in
December 1982, 125 years after the contempt statute was enacted, neither house of
Congress had ever voted to utilize the contempt statute against a Presidential
assertion of executive privilege.  In fact, during congressional debates over
Presidential refusals to produce documents to Congress, there have been express
acknowledgements by members of Congress that Congress had no recourse against the
Executive if the President asserted executive privilege.  In 1886, the Senate
engaged in a prolonged debate over President Cleveland's order to his Attorney
General not to produce to Congress documents concerning the dismissal of a United
States Attorney.  The debate was intense, controversial, and memorable; 23 years
after the debate a Senator termed it the "most remarkable discussion which was ever
had upon this question of the President's right to withhold documents from
Congress."  43 Cong. Rec. 841 (1909) (remarks of Sen. Bacon).  During this debate,
even Senators who insisted upon the Senate's right to receive the documents
recognized that if the President ordered them not to be produced, "there is no
remedy." 17 Cong. Rec. 2800 (1886) (remarks of Sen. Logan); see also id. at 2737
(1886) (remarks of Sen. Voorhees). [FN31]

**24 *132 Congress' failure to resort to the contempt statute during any of the
multitude of robust conflicts over executive privilege during the previous century
and one quarter and Congress' own explicit recognition that it was without a remedy
should the President order the withholding of documents, strongly suggest that
Congress never understood the statute to apply to an executive official who
asserted the President's claim of executive privilege. [FN32]

3.  Prudential Reasons for Construing the Contempt Statute Not To Apply to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Presidential Assertions of Privilege
Courts traditionally construe statutes in order to avoid serious doubts about a
statute's constitutionality. Califano v. Yamasaki, 442 U.S. 682, 693 (1979);
Crowell v. Benson, 285 U.S. 22, 62 (1932).  As stated by the United States Court of
Appeals for the District of Columbia Circuit, "when one interpretation of a statute
would create a substantial doubt as to the statute's constitutional validity, the
courts will avoid that interpretation absent a 'clear statement' of contrary
legislative intent."  United States v. Brown, 483 F.2d 1314, 1317 (D.C. Cir. 1973)
(quoting United States v. Thompson, 452 F.2d 1333, 1337 (D.C. Cir. 1971), cert.
denied, 405 U.S. 998 (1972)).

When a possible conflict with the President's constitutional prerogatives is
involved, the courts are even more careful to construe statutes to avoid a
constitutional confrontation.  A highly significant example may be found in the
procedural history and holding of United States v. Nixon, 418 U.S. 683 (1974), in
which the Court construed the limitation in 28 U.S.C. s 1291 (that appeals be taken
only from "final" decisions of a district court) in order to permit the President
to appeal an adverse ruling on his claim of executive privilege without having to
place himself in contempt of court.  Although the plain language of that statute
seemed to preclude an appeal of a lower court's *133 interlocutory ruling on an
evidentiary matter, the Court construed the statute to permit an immediate appeal,
without going through the otherwise required contempt proceeding:
    The traditional contempt avenue to immediate appeal is peculiarly inappropriate
    due to the unique setting in which the question arises.  To require a President
    of the United States to place himself in the posture of disobeying an order of a
    court merely to trigger the procedural mechanism of the ruling would be
    unseemly, and would present an unnecessary occasion for constitutional
    confrontation between two branches of the government.
418 U.S. at 691-92.

Congress itself has previously recognized the impropriety of resolving executive
privilege disputes in the context of criminal contempt proceedings. During the
dispute over the Watergate tapes, Congress provided a civil enforcement mechanism
through which to test the President's claim of executive privilege. Senator Ervin,
the sponsor of the bill, noted in his explanatory statement to the Senate that the
use of criminal contempt "may be inappropriate, unseemly, or nonefficacious where
executive officers are involved." 119 Cong. Rec. 35715 (1973).  In defending the
civil enforcement procedure before the district court, Congress argued that in that
case the contempt procedures would be "inappropriate methods for the presentation
and resolution of the executive privilege issue," and that a criminal proceeding
would be "a manifestly awkward vehicle for determining the serious constitutional
question here presented."  Plaintiff's Memorandum of Points and Authorities in
Support of Motion for Summary Judgment, Senate Select Committee on Presidential
Campaign Activities v. Nixon, Civ. No. 1593-73, at 5 (D.D.C. Aug. 28, 1973).

**25 The United States Court of Appeals for the District of Columbia Circuit has
stated on several occasions that criminal contempt proceedings are an inappropriate
means for resolving document disputes, especially when they involve another
governmental entity. In Tobin v. United States, 306 F.2d 270 (D.C. Cir.), cert.
denied, 371 U.S. 902 (1962), the court reversed a contempt of Congress conviction
on the ground that the congressional subpoena had gone beyond the investigative
authority delegated to the committee that issued the subpoena. After deciding this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

issue, however, the court felt "inclined to add a few words in conclusion" concerning the problems involved in a criminal contempt of Congress case against a public official.  In dictum, the court noted that the "conflicting duality inherent in a request of this nature is not particularly conducive to the giving of any satisfactory answer, no matter what the answer should prove to be," and it cited the "eloquent  plea" of District Judge Youngdahl in the case below, which read in part:

> Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights.  **134** Moreover, to raise these issues in the context of a contempt case is to force the courts to decide many questions that are not really relevant to the underlying problem of accommodating the interest of two sovereigns.

306 F.2d at 276.  See also United States v. Fort, 443 F.2d 670, 677 78 (D.C. Cir. 1970), cert. denied, 403 U.S. 932 (1971).

The analysis contained in United States v. Nixon demonstrates that principles of the separation of powers compel the application of special rules when a Presidential claim of a constitutional privilege is in tension with the request of another branch for confidential Executive Branch records.  In discussing the issue of executive privilege in that case in response to a judicial subpoena, the Court stressed that the President's assertion of privilege was not to be treated as would a claim of a statutory or common law privilege by a private citizen.  418 U.S. at 708, 715. The President's constitutional role as head of one of three separate branches of government means that special care must be taken to construe statutes so as not to conflict with his ability to carry out his constitutional responsibilities. See, e.g., Myers v. United States, 272 U.S. 52 (1926) (upholding the President's removal power against limitations Congress sought to impose).  The same special attention is provided, of course, to the other two branches when  they assert responsibilities or prerogatives peculiar to their constitutional duties.  See, e.g., Gravel v. United States, 408 U.S. 606 (1972) (extending immunity of Speech and Debate Clause to congressional assistants); Pierson v. Ray, 386 U.S. 547 (1967) (granting absolute civil immunity for judges' official actions).

**26** In this case, the congressional contempt statute must be interpreted in light of the specific constitutional problems that would be created if the statute were interpreted to reach an Executive Branch official such as the EPA Administrator in the context considered here.  [FN33]  As explained more fully below, if executive officials were subject to prosecution for criminal contempt whenever they carried out the President's claim of executive privilege, it would significantly burden and immeasurably impair the President's ability to fulfill his constitutional duties.  Therefore, the separation of powers principles that underlie the doctrine of executive privilege  also would preclude an application of the contempt of Congress statute to punish officials for aiding the President in asserting his constitutional privilege. [FN34]

**135** 4.  The Constitutional Implications of Application of the Contempt of Congress Statute to Executive Branch

Officials Who Assert the President's Claim of Privilege

The Supreme Court has stated that, in determining whether a particular statute
    disrupts the proper balance between the coordinate branches, the proper inquiry
    focuses on the extent to which it prevents the Executive Branch from
    accomplishing its constitutionally assigned functions. United States v. Nixon,
    418 U.S. at 711-712. Only where the potential for disruption is present must we
    then determine whether that impact is justified by an overriding need to promote
    objectives within the constitutional authority of Congress.
Nixon v. Administrator of General Services, 433 U.S. 425, 443 (1977). Thus, in
analyzing this separation of powers issue, one must look first to the impact that
application of the congressional contempt statute to Presidential assertions of
executive privilege would have on the President's ability to carry out his
constitutionally assigned functions.  Then, if there is a potential for disruption,
it is necessary to determine whether Congress' need to impose criminal contempt
sanctions in executive privilege disputes is strong enough to outweigh the impact
on the Executive's constitutional role.

In this instance, at stake is the President's constitutional responsibility to
enforce the laws of the United States and the necessarily included ability to
protect the confidentiality of information vital to the performance of that task.
As explained earlier in this memorandum, the authority to maintain the integrity of
certain information within the Executive Branch has been considered by virtually
every President to be essential to his capacity to fulfill the responsibilities
assigned to him by the Constitution.  Thus, as discussed above, and as the Supreme
Court has recognized, the capacity to protect the confidentiality of some
information is integral to the constitutional role of the President.

For these reasons, the Supreme Court has ruled that the President's assertion of
executive privilege is presumptively valid and can be overcome only by a clear
showing that another branch cannot responsibly carry out its assigned
constitutional function without the privileged information. United States v.
Nixon, 418 U.S. at 708.  In Nixon, the Court stated that "upon receiving a claim
**136 of privilege from the Chief Executive, it became the further duty of the
District Court to treat the subpoenaed material as presumptively privileged." 418
U.S. at 713.  The United States Court of Appeals for the District of Columbia
Circuit has stated that this presumptive privilege initially protects documents
"even from the limited intrusion represented by in camera examination of the
conversations by a court." Senate Select Committee on Presidential Campaign
Activities v. Nixon, 498 F.2d 725, 730 (D.C. Cir. 1974) (en banc).  The court went
on to note:
    **27 So long as the presumption that the public interest favors confidentiality
    can be defeated only by a strong showing of need by another institution of
    government a showing that the responsibilities of that institution cannot
    responsibly be fulfilled without access to records of the President's
    deliberations we believed in Nixon v. Sirica, and continue to believe, that the
    effective functioning of the presidential office will not be impaired.
Id. at 730.  In order to overcome the presumptively privileged nature of the
documents, a congressional committee must show that "the subpoenaed evidence is
demonstrably critical to the responsible fulfillment of the Committee's functions."
Id. at 731 (emphasis added).  Thus, the President's assertion of executive
privilege is far different from a private person's individual assertion of
privilege; it is entitled to special deference due to the critical connection
between the privilege and the President's ability to carry out his constitutional

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duties.

Application of the criminal contempt statute to Presidential assertions of
executive privilege would immeasurably burden the President's ability to assert the
privilege and to carry out his constitutional functions.  If the statute were
construed to apply to Presidential assertions of privilege, the President would be
in the untenable position of having to place a subordinate at the risk of a
criminal conviction and possible jail sentence in order for the President to
exercise a responsibility that he found necessary to the performance of his
constitutional duty.  Even if the privilege were upheld, the executive official
would be put to the risk and burden of a criminal trial in order to vindicate the
President's assertion of his constitutional privilege.  As Judge Learned Hand
stated with respect to the policy justifications for a prosecutor's immunity from
civil liability for official actions,
     to submit all officials, the innocent as well as the guilty, to the burden of a
     trial and to the inevitable danger of its outcome, would dampen the ardor of all
     but the most resolute, or the most irresponsible, in the unflinching discharge
     of their duties. Again and again the public interest calls for action which may
     turn out to be founded on a mistake, in the face of which an official may later
     find himself hard put to it to sic satisfy a jury of his good faith.
Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949
(1950).  The Supreme Court has noted, with respect to the similar issue of **137
executive immunity from civil suits, that "among the most persuasive reasons
supporting official immunity is the prospect that damages liability may render an
official unduly cautious in the discharge of his official duties." Nixon v.
Fitzgerald, 457 U.S. 731, 752 n.32 (1982); see also Harlow v. Fitzgerald, 457 U.S.
800 (1982); Butz v. Economou, 438 U.S. 478 (1978).  Thus, the courts have
recognized that the risk of civil liability places a pronounced burden on the
ability of government officials to accomplish their assigned duties, and have
restricted such liability in a variety of contexts.  Id. [FN35] The even greater
threat of criminal liability, simply for obeying a Presidential command to assert
the President's constitutionally based and presumptively valid privilege against
disclosures that would impair his ability to enforce the law, would unquestionably
create a significant obstacle to the assertion of that privilege.  See United
States v. Nixon, 418 U.S. 683 (1974).

**28 By contrast, the congressional interest in applying the criminal contempt
sanctions to a Presidential assertion of executive privilege is comparatively
slight.  Although Congress has a legitimate and powerful interest in obtaining any
unprivileged documents necessary to assist it in its lawmaking function, Congress
could obtain a judicial resolution of the underlying privilege claim and vindicate
its asserted right to obtain any documents by a civil action for enforcement of a
congressional subpoena. [FN36]  Congress' use of civil enforcement power instead of
the criminal contempt statute would not adversely affect Congress' ultimate
interest in obtaining the documents.  Indeed, a conviction of an Executive Branch
official for contempt of Congress for failing to produce subpoenaed documents would
not result in any order for the production of the documents. [FN37]  A civil suit
to enforce the subpoena would be aimed at the congressional objective of obtaining
the documents, not at inflicting punishment on an individual who failed to produce
them. Thus, even if criminal sanctions were not available against an executive
official who asserted the President's claim of privilege, Congress would be able to
vindicate a legitimate desire to obtain documents if it could establish that its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

need for the records outweighed the Executive's interest in preserving
confidentiality.

The most potent effect of the potential application of criminal sanctions would be
to deter the President from asserting executive privilege and to make it difficult
for him to enlist the aid of his subordinates in the process.  Although **138** this
significant in terrorem effect would surely reduce claims of executive privilege
and, from Congress' perspective, would have  the salutary impact of virtually
eliminating the obstacles to the obtaining of records, it would be inconsistent
with the constitutional principles that underlie executive privilege to impose a
criminal prosecution and criminal penalties on the President's exercise of a
presumptively valid constitutional responsibility.  The in terrorem effect may be
adequate justification for Congress' use of criminal contempt against private
individuals, but it is an inappropriate basis in the context of the President's
exercise of his constitutional duties.  In this respect it is important to recall
the statement of Chief Justice Marshall, sitting as a trial judge in the Burr case,
concerning the ability of a court to demand documents from a President:  "In no
case of this kind would a court be required to proceed against the President as
against an ordinary individual." United States v. Burr, 25 F. Cas. 187, 192 (C.C.
Va. 1807). [FN38]  This fundamental principle, arising from the constitutionally
prescribed separation of powers, precludes Congress' use against the Executive of
coercive measures that might be permissible with respect to private citizens.  The
Supreme Court has stated that the fundamental necessity of maintaining each of the
three general departments of government entirely free from the control or coercive
influence, direct or indirect, of either of the others, has often been stressed and
is hardly open to serious question. So much is implied in the very fact of the
separation of the powers of these departments by the Constitution; and in the rule
which recognizes their essential equality.  Humphrey's Executor v. United States,
295 U.S. 602, 629-30 (1935).

**29** Congress' use of the coercive power of criminal contempt to prevent
Presidential assertions of executive privilege is especially inappropriate given
the presumptive nature of the privilege.  In cases involving congressional
subpoenas against private individuals, courts start with the presumption that
Congress has a right to all testimony that is within the scope of a proper
legislative inquiry. See Barenblatt v. United States, 360 U.S. 109 (1959); McGrain
v. Daugherty, 273 U.S. 135 (1927).  As noted above, however, the President's
assertion of executive privilege is presumptively valid, and that presumption may
be overcome only if Congress establishes that the requested information "is
demonstrably critical to the responsible fulfillment of the Committee's functions."
See Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d
at 731; see also United States v. Nixon, 418 U.S. at 708-09.  If Congress could use
the power of criminal contempt to coerce the President either not to assert or to
abandon his right to assert executive privilege, this clearly established
presumption would be reversed and the presumptive privilege nullified.

Congress has many weapons at its disposal in the political arena, where it has
clear constitutional authority to act and where the President has corresponding
political weapons with which to do battle against Congress on equal terms.  By
wielding the cudgel of criminal contempt, however, Congress seeks to invoke **139**
the power of the third branch, not to resolve a dispute between the Executive and
Legislative Branches and to obtain the documents it claims it needs, but to punish

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Executive, indeed to punish the official who carried out the President's
constitutionally authorized commands, [FN39] for asserting a constitutional
privilege.  That effort is inconsistent with the " spirit of dynamic compromise"
that requires accommodation of the interests of both branches in disputes over
executive privilege.  See United States v.  American Telephone & Telegraph Co., 567
F.2d 121, 127 (D.C. Cir. 1977).  In the AT&T case, the court insisted on further
efforts by the two branches to reach a compromise arrangement on an executive
privilege dispute and emphasized that
    the resolution of conflict between the coordinate branches in these situations
    must be regarded as an opportunity for a constructive modus vivendi, which
    positively promotes the functioning of our system.  The Constitution
    contemplates such accommodation. Negotiation between the two branches should
    thus be viewed as a dynamic process affirmatively furthering the constitutional
    scheme.
Id. at 130.  Congress' use of the threat of criminal penalties against an executive
official who asserts the President's claim of executive privilege, flatly
contradicts this fundamental principle. [FN40]

The balancing required by the separation of powers demonstrates that the contempt
of Congress statute cannot be constitutionally applied to an executive official in
the context under consideration. On the one hand, Congress has no **140 compelling
need to employ criminal prosecution in order to vindicate its rights.  The
Executive, however, must be free from the threat of criminal prosecution if its
right to assert executive privilege is to have any practical substance. Thus, when
the major impact on the President's ability to exercise his constitutionally
mandated function is balanced against the relatively slight imposition on Congress
in requiring it to resort to a civil rather than a criminal remedy to pursue its
legitimate needs, [FN41] we believe that the constitutionally mandated separation
of powers requires the statute to be interpreted so as not to apply to Presidential
assertions of executive privilege. [FN42]

**30 The construction of the statute that is dictated by the separation of powers
is consistent with the legislative history of the statute and the subsequent
legislative implementation of the statute. Although at the time the criminal
statute was enacted, Congress was well aware of the recurring assertions of the
right to protect the confidentiality of certain Executive Branch materials, it gave
no indication that it intended the contempt statute to tread upon that
constitutionally sensitive area.  In the many debates on executive privilege since
the adoption of the statute, Congress at times has questioned the validity of a
Presidential assertion of privilege, but, until December of 1982, it never
attempted to utilize the criminal contempt sanction to punish someone for a
President's assertion of privilege.  Regardless of the merits of the President's
action, the fundamental balance required by the Constitution does not permit
Congress to make it a crime for an official to assist the President in asserting a
constitutional privilege that is an integral part of the President's
responsibilities under the Constitution.  We therefore conclude that the contempt
of Congress statute does not apply to an executive official who carries out the
President's claim of executive privilege.

Nearly every President since George Washington has found that in order to perform
his constitutional duties it is necessary to protect the confidentiality of certain
materials, including predecisional Executive Branch deliberations, national

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)     Page 30

security information, and sensitive law enforcement proceedings, from disclosure to Congress.  No President has rejected the doctrine of executive privilege; all who have addressed the issue have either exercised the privilege, attested to its importance, or done both. Every Supreme Court Justice and every Judge of the United States Court of Appeals for the District of Columbia Circuit who has considered the question of executive privilege  has recognized its validity and importance in the constitutional scheme.  Executive privilege, properly asserted, is as important to the President as is the need for confidentiality*141  at certain times in the deliberations of the Justices of the Supreme Court and in the communications between members of Congress and their aides and colleagues. Congress itself has respected the President's need for confidentiality; it has never arrested an executive official for contempt of Congress for failing to produce subpoenaed documents and never, prior to the heated closing moments of the 97th Congress in December of 1982, did a House of Congress seek to punish criminally an executive official for asserting a President's claim of privilege.

Naturally, Congress has and always will resist claims of executive privilege with passion and vigor. Congress aggressively asserts its perceived institutional prerogatives, and it will surely oppose any effort by the President to withhold information from it. If it could eliminate claims of executive privilege by requiring that an official who asserts such a claim  on behalf of the President be prosecuted criminally, it would surely be in favor of doing so. Thus, the tension between the relative strengths and institutional prerogatives of Congress and the President necessarily reaches a high level of intensity in any case involving a claim of executive privilege. The specter of mandatory criminal prosecution for the good-faith exercise of the President's constitutional privilege adds a highly inflammatory element to an already explosive environment.  We believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, would surely conclude that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege is not consistent with the Constitution.  The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege. Nor could the Legislative Branch or the courts require or implement the prosecution of such an individual.

**31 In some respects, the tensions between the branches, which become exacerbated during these conflicts, and the pressure placed on the President and his subordinates in this context, call to mind the comments of Chief Justice Chase concerning the impeachment trial of President Andrew Johnson, over which the Chief Justice presided. One of the charges against President Johnson was that he had fired Secretary of War Stanton in violation of the Tenure of Office Act, which purported to strip the President of his removal power over certain Executive Branch officials. [FN43]  Chief Justice Chase declared that the President had a duty to execute a statute passed by Congress which he believed to be unconstitutional "precisely as if he held it to be constitutional."  However, he added, the President's duty changed in the case of a statute which

> directly attacks and impairs the executive power confided to him by the Constitution.  In that case it appears to me to be the clear duty of the President to disregard the law, so far at least as it may be necessary to bring the question of its constitutionality before the judicial tribunals.

*     *     *

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)                    Page 31

**\*142** How can the President fulfill his oath to preserve, protect, and defend the Constitution, if he has no right to defend it against an act of Congress, sincerely believed by him to have been passed in violation of it? [FN44]

If the President is to preserve, protect, and defend the Constitution, if he is faithfully to execute the laws, there may come a time when it is necessary for him both to resist a congressional demand for documents and to refuse to prosecute those who assist him in the exercise of his duty.  To yield information that he in good conscience believes he must protect in order to perform his obligation, would abdicate the responsibilities of his office and deny his oath.  To seek criminal punishment for those who have acted to aid the President's performance of his duty would be equally inconsistent with the Constitution.

In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt.  Congress does not have the statutory or constitutional authority to require a particular case to be referred to the grand jury.  In addition, because the Congress has an alternative remedy both to test the validity of the Executive's claim of privilege and to obtain the documents if the courts decide that the privilege is outweighed by a valid and compelling legislative need, a criminal prosecution and the concomitant chilling effect that it would have on the ability of a President to assert a privilege, is an unnecessary and unjustified burden that, in our judgment, is inconsistent with the Constitution.

**\*\*32** Theodore B. Olson
Assistant Attorney General
Office of Legal Counsel

FN1 Although the December 1982 dispute is now a matter of history, it raises recurring issues.

FN2 Another statute, the Resource Conservation and Recovery Act, 42 U.S.C. ss 6901 et seq., provides federal authority to deal with the current disposal of hazardous industrial wastes.

FN3 See Executive Order No. 12316, "Responses to Environmental Damage" (Aug. 14, 1981).

FN4 Subsequently, EPA published a proposed national priorities list (to replace the interim list), which identified the 418 sites that, in EPA's judgment, required priority in use of the Superfund to effect clean up.  See 47 Fed. Reg. 58476 (1982).

FN5 We understand that as of January 14, 1983, EPA had sent more than 1,760 notice letters, undertaken Superfund financed action at 112 sites involving the obligation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of in excess of $236 million, instituted Superfund claims in 25 judicial actions,
and obtained one criminal conviction.  As of the early months of 1983, EPA and the
Department of Justice had reached settlements in 23 civil actions providing for the
expenditure of more than $121 million to conduct clean up operations and were
actively negotiating with responsible parties concerning the clean up of 56 sites
throughout the country. See Amended Declaration of Robert M. Perry, Associate
Administrator for Legal and Enforcement Counsel and General Counsel of the EPA,
filed in United States v. House of Representatives, Civ. No. 82-3583 (D.D.C. Jan.
14, 1983).


FN6 Id.


FN7 The subpoena required the EPA Administrator to produce all books, records,
correspondence, memorandums, papers, notes and documents drawn or received by the
Administrator and/or her representatives since December 11, 1980 the date of
enactment of the Superfund Act, including duplicates and excepting shipping papers
and other commercial or business documents, contractor and/or other technical
documents, for those sites listed as national priorities pursuant to Section
105(8)(B) of the Superfund Act.
See United States v. House of Representatives, 556 F. Supp. 150, 151 (D.D.C. 1983).


FN8 See Testimony of Administrator Gorsuch before the Public Works Subcommittee,
attached as Exhibit C to Declaration of Robert M. Perry, supra.


FN9 See Letters to Hon. Elliott H. Levitas and Hon. John D. Dingell from Attorney
General William French Smith (Nov. 30, 1982).  The Subcommittee on Oversight and
Investigations of the House Energy and Commerce Committee (Energy and Commerce
Subcommittee), chaired by Representative John D. Dingell, was pursuing a parallel
demand for similar documents relating to enforcement of  the Superfund Act with
respect to certain specific sites that were among the 160 on the interim priorities
list.  While the Energy and Commerce Subcommittee sought documents relative to
three specific hazardous waste sites, the Public Works Subcommittee subpoena
demanded production of virtually all documents for all 160 sites.  The President's
assertion of executive privilege applied to both subpoenas. Although the Energy and
Commerce Subcommittee approved a contempt of Congress resolution against the EPA
Administrator, this resolution never reached the full Committee or the floor of the
House of Representatives.


FN10 As of that date, EPA had been able to examine only a portion of the hundreds
of thousands of pages of documents that had been subpoenaed.  The 64 documents that
were withheld were those among the subpoenaed documents that had been reviewed and
determined to fall within the President's instruction not to produce documents the
release of that would adversely affect ongoing enforcement proceedings.  See
Amended Declaration of Robert M. Perry, supra.


FN11 See Letter to Hon. Elliott H. Levitas from Robert A. McConnell, Assistant
Attorney General, Office of Legislative Affairs (Dec. 9, 1982).


FN12 The contempt resolution stated:
    Resolved, That the Speaker of the House of Representatives certify the report of
    the Committee on Public Works and Transportation as to the contumacious conduct

of Anne M. Gorsuch, as Administrator, United States Environmental Protection
Agency, in failing and refusing to furnish certain documents in compliance with
a subpena duces tecum of a duly constituted subcommittee of said committee
served upon Anne M. Gorsuch, as Administrator, United States Environmental
Protection Agency, and  as ordered by the subcommittee, together with all of the
facts in connection therewith, under seal of the House of Representatives, to
the United States attorney for the District of Columbia, to the end that Anne M.
Gorsuch, as Administrator, United States Environmental Protection Agency, may be
proceeded against in the manner and form provided by law.
128 Cong. Rec. 31754 (1982).

FN13 A third provision, 2 U.S.C. s 193, which denies the existence of any
testimonial privilege for a witness to refuse to testify on the ground that this
testimony would disgrace him, is not relevant to the issues discussed in this
memorandum.

FN14 See Amended Complaint in United States v. House of Representatives, Civ. No.
82-3583 (D.D.C. Dec. 29, 1982).

FN15 Although the United States Court of Appeals for the District of Columbia
Circuit previously had been willing to entertain a civil action to resolve a
conflict between a congressional subpoena for documents and a Presidential claim of
executive privilege when the action was brought by a congressional committee,
Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725
(D.C. Cir. 1974) (en banc), the trial court decision in the EPA matter casts some
doubt on the viability of such an action when Congress, as in this case, does not
wish to resolve the controversy in a civil suit.  We must assume, for the purpose
of this opinion, that a civil suit is an avenue that is open to Congress, but
closed to the Executive, absent a legislature willing to have the matter resolved
in a civil proceeding.
   Of course, the courts might be more amenable to a civil action challenging a
   contempt citation if they felt that a criminal prosecution in this context was
   untenable.  The district court judge in the EPA matter noted but did not attempt
   to consider in depth the "difficulties" of prosecuting an executive  official
   for carrying out the President's constitutional responsibility.

FN16 Madison characterized Montesquieu as the "oracle who is always consulted and
cited on (the) subject (of the separation of powers)."  See The Federalist No. 47,
supra, at 301.

FN17 It is noteworthy, at least from an historical perspective, that the House of
Representatives, because of its immense powers, was considered to be the
governmental body least vulnerable to encroachments by other segments of government
and, at the same time, because of its popular origin and frequent renewal of
authority by the people, the body whose encroachment on the other branches would be
least distrusted by the public.  The Supreme Court later noted:
   It is all the more necessary, therefore, that the exercise of power by this
   body, when acting separately from and independently of all other depositories of
   power, should be watched with vigilance, and when called in question before any
   other tribunal having the right to pass upon it that it should receive the most
   careful scrutiny.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Kilbourn v. Thompson, 103 U.S. 168, 192 (1881).

FN18 Of equal concern was the need to separate the judicial power from the
executive power.  The drafters intended to preserve the impartiality of the
judiciary as "neutral arbiters in the criminal law" by separating the judiciary
from the prosecutorial function.  Nader v. Saxbe, 497 F.2d 676, 679 n.18 (D.C. Cir.
1974).

FN19 Presidents have invoked the privilege throughout our history for a variety of
reasons.  See, e.g., "History of Refusals by Executive Branch to Provide
Information Demanded by Congress," 6 Op. O.L.C. 751 (1982); Memorandum from John
Harmon, Assistant Attorney General, Office of Legal Counsel, to Robert Lipschutz,
Counsel to the President (June 8, 1977); Position of the Executive Department
Regarding Investigative Reports, 40 Op. Att'y Gen. 45 (1941).

FN20 As explained by Attorney General (later, Supreme Court Justice) Robert Jackson
in April 1941:
    Disclosure of the reports could not do otherwise than seriously prejudice law
    enforcement.  Counsel for a defendant or prospective defendant, could have no
    greater help than to know how much or how little information the Government has,
    and what witnesses or sources of information it can rely upon.
40 Op. Att'y Gen. 45, 46 (1941).  As similarly expressed a few years later by
Deputy Assistant Attorney General Kauper:
    Over a number of years, a number of reasons have been advanced for the
    traditional refusal of the Executive to supply Congress with information from
    open investigational files.  Most important, the Executive cannot effectively
    investigate if Congress is, in a sense, a partner in the investigation.  If a
    congressional committee is fully apprised of all details of an investigation as
    the investigation proceeds, there is a substantial danger that congressional
    pressures will influence the course of the investigation.
Memorandum for the Deputy Counsel to the President from Deputy Assistant Attorney
General Kauper re: Submission of Open CID Investigation Files (Dec. 19, 1969).
This significant constitutional privilege provides a foundation for our discussion
below of the penalties that Congress may attach to the President's assertion of the
privilege in response to a congressional subpoena.

FN21 Although it is by no means certain as a matter of law, if the case were
referred to a grand jury, the United States Attorney might be required to take
certain steps short of signing the indictment, and the grand jury's decision might
well become public.  In Cox, a majority of the court (made up of the three
dissenting judges and one concurring judge) took the view that the United States
Attorney could be required to prepare an indictment for use by the grand jury.  In
addition, the district court in In re Grand Jury, supra, held that even though the
United States Attorney could not be required to sign an indictment, in the
circumstances of that case "the substance of the charges in the indictment should
be disclosed, omitting certain portions as to which the Court, in the exercise of
its discretion, concludes that the public interest in disclosure is outweighed by
the private prejudice to the persons involved, none of whom are charged with any
crime in the proposed indictment."  315 F. Supp. at 678-79.  Under this analysis,
if the contempt citation were to reach a grand jury and the grand jury were to vote
a true bill, a court might be able to require the United States Attorney to prepare
an indictment and then might order the disclosure of that indictment as voted by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the grand jury.  For the reasons set out in our discussion of prosecutorial discretion, the court could not, however, order the United States Attorney to prosecute.

Because the contempt of Congress statute does not require the United States Attorney to refer to a grand jury a citation for contempt of Congress issued to an executive official who has asserted the President's claim of executive privilege, we have not attempted to determine definitively what additional steps, if any, the United States Attorney could be required to take if such a matter were referred to a grand jury.

FN22 See 106 Cong. Rec. 17313 (1960) (citation against Austin J. Tobin, Executive Director of the Authority); id. at 17316 (citation against S. Sloan Colt, Chairman of the Board); id. at 17319 (citation against Joseph G. Carty, Secretary).  The contempt resolution in each case read as follows:

Resolved, That the Speaker of the House of Representatives certify the report of the Committee on the Judiciary as to the contumacious conduct of name in failing and refusing to furnish certain documents in compliance with a subpena duces tecum of a duly constituted subcommittee of said committee served upon him and as ordered by the subcommittee, together with all of the facts in connection therewith, under seal of the House of Representatives, to the United States attorney for the District of Columbia, to the end that name may be proceeded against in the manner and form provided by law.

FN23 The Court of Appeals ruled that the documents requested by the Committee went beyond the investigative authority delegated to the Committee by the House.

FN24 We know of at least two other individuals who were cited for contempt of Congress, but whose cases were not referred to a grand jury by the Department of Justice.  See Department of Justice File No. 51-51-484 (1956).  The file was closed because the Department concluded that there was an insufficient basis for prosecution.

FN25 In this respect, we believe that Wilson implicitly disapproved the dictum of Ex parte Frankfeld, 32 F. Supp. 915 (D.D.C. 1940), in which the district court stated:

It seems quite apparent that Congress intended to leave no measure of discretion to either the Speaker of the House or the President of the Senate, under such circumstances, but made the certification of facts to the district attorney a mandatory proceeding, and it left no discretion with the district attorney as to what he should do about it.  He is required, under the language of the statute, to submit the facts to the grand jury.

Id. at 916.  The Frankfeld court expressly linked the responsibilities of the Speaker and the United States Attorney. Wilson ruled that the Speaker's duty is discretionary, at least when the House is not in session.  Therefore, since the Speaker's duty is in pari materia with the duty of the United States Attorney, the law, at least in the District of Columbia Circuit, seems to be that both duties should be viewed as containing some elements of discretion.

FN26 Ansara v. Eastland was cited with approval three times by Judge Smith in United States v. House of Representatives, 556 F. Supp. 150, 152-53 (D.D.C. 1983).  Thus, although the opinion made a passing reference to the mandatory nature of

referral, Judge Smith must have recognized that the United States Attorney retained prosecutorial discretion.

FN27 These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action.  This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited.  See Rinaldi v. United States, 434 U.S. 22 (1977); United States v. Hamm, 659 F.2d 624 (5th Cir. 1981); United States v. Ammidown, 497 F.2d 615 (D.C. Cir. 1973).  The United States Court of Appeals for the Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place.  United States v. Cox, 342 F.2d 167 (5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965).  Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n, 228 F. Supp. 483 (S.D.N.Y. 1964).

FN28 These conclusions are not inconsistent with Rule 48(a) of the Federal Rules of Criminal Procedure, which requires leave of court before dismissal of a criminal action.  This provision is intended primarily to protect defendants against repeated prosecutions for the same offense, and a court's power to deny leave under this provision is extremely limited.  See Rinaldi v. United States, 434 U.S. 22 (1977); United States v. Hamm, 659 F.2d 624 (5th Cir. 1981); United States v. Ammidown, 497 F.2d 615 (D.C. Cir. 1973).  The Fifth Circuit has stated that the constitutionality of Rule 48(a) is dependent upon the prosecutor's unfettered ability to decide not to commence a case in the first place.  United States v. Cox, 342 F.2d 167 (5th Cir.) (en banc), cert. denied, 381 U.S. 935 (1965). Moreover, Judge Weinfeld has stated that even if a court denied leave to dismiss an indictment, a court "in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine." United States v. Greater Blouse, Skirt & Neckwear Contractors Association, Inc., 228 F. Supp. 483 (S.D.N.Y. 1964).

FN29 The memorandum cited, inter alia, a 1909 Senate debate over the issue of executive privilege in which Senator Dolliver questioned "where Congress gets authority either out of the Constitution or the laws of the United States to order an executive department about like a servant."  43 Cong. Rec. 3732 (1909). Other historical examples cited by the report are discussed below.

FN30 The legislative history contains one reference to the application of the statute against executive officials.  During the floor debates, Representative Marshall attacked the bill by claiming that it "proposes to punish equally the Cabinet officer and the culprit who may have insulted the dignity of this House by an attempt to corrupt a Representative of the people."  42 Cong. Globe at 429. This statement does not, however, suggest  that the statute was intended to apply to Presidential assertions of executive privilege.  Indeed, virtually all previous assertions of executive privilege against Congress had been made by the President himself, and Congress expressed no intent to utilize the criminal contempt

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provisions against the President.  Representative Marshall's statement, therefore,
simply lends support to the proposition, with which we agree, that there are
certain circumstances in which the congressional contempt statute might be utilized
against an executive official, such as instances in which an executive official,
acting on his own, engaged in disruptive and contumacious conduct during a
congressional hearing, or in which an executive official, acting on his own,
committed an offense.  See Marshall v. Gordon, 243 U.S. 521 (1917).  As the
remainder of Representative Marshall's remarks demonstrate, the principal force
driving the bill was Congress' desire to obtain an expeditious method for
investigating questions regarding the integrity of Congress and not to provide
Congress with a statute requiring the President to prosecute criminally those who
had asserted the President's constitutionally based claim of executive privilege.
We have found no evidence in the legislative history that supports an intention to
apply the proposed statute in such a context.

FN31 The only remedy then recognized by the Senators was the ultimate sanction of
impeachment.  See 17 Cong. Rec. 2737, 2800 (1886).  As we note below, a much more
effective and less controversial remedy is available -- a civil suit to enforce the
subpoena -- which would permit Congress to acquire the disputed records by judicial
order.  See also Senate Select Committee on Presidential Campaign Practices v.
Nixon, 498 F.2d 725 (D.C. Cir. 1974) (en banc).

FN32 Congress' practices with respect to the contempt statute and the absence of
any previous application of the statute to an Executive Branch official in these
circumstances are highly probative of the meaning and applicability of the
statute.  In general, the Supreme Court has examined historical practice to
determine the scope of Congress' powers. For example, in determining the scope of
Congress' power to call and examine witnesses, the Court looked to the historical
experience with respect to investigations and concluded that when Congress'
practice in the matter is appraised according to the circumstances in which it was
begun and to those in which it has been continued, it falls nothing short of a
practical construction, long continued, of the constitutional provisions respecting
their powers; and therefore should be taken as fixing the meaning of those
provisions, if otherwise doubtful.  McGrain v. Daugherty, 273 U.S. 135, 174
(1927); see also Fairbank v. United States, 181 U.S. 283, 308 (1901). Moreover, the
Court traditionally gives great weight to a contemporaneous construction of a
statute by the agency charged with its execution.  See Power Reactor Development
Co. v. Electricians, 367 U.S. 396, 408 (1961); Unemployment Compensation Comm'n v.
Aragon, 329 U.S. 143, 153 (1946).  In this instance, Congress is responsible for
taking the first step in implementing the contempt statute.  Therefore, Congress'
previous interpretations and past uses of the statute are analogous to the
contemporaneous construction of the agency charged with implementation of the
statute, and are of significance in determining the meaning of the statute.

FN33 The same principle applies to protect the constitutional functions of the
other branches.  The separation of powers would similarly seem to require that a
statute that made it a crime to disregard a statute passed by Congress be read not
to apply to a judge who struck down a congressional enactment as unconstitutional.

FN34 In addition to the encroachment on the constitutionally required separation of
powers that prosecution of an Executive Branch official in this context would
entail, there could be a serious due process problem if such an official were

subjected to criminal penalties for obeying an express Presidential order, an order which was accompanied by advice from the Attorney General that compliance with the Presidential directive was not only consistent with the constitutional duties of the Executive Branch, but also affirmatively necessary in order to aid the President in the performance of his constitutional obligations to take care that the law was faithfully executed.  See Cox v. Louisiana, 379 U.S. 559 (1965); Raley v. Ohio, 360 U.S. 423 (1959).

Furthermore, a person can be prosecuted under s 192 only for a "willful" failure to produce documents in response to a congressional subpoena.  See United States v. Murdock, 290 U.S. 389, 397 98 (1933); Townsend v. United States, 95 F.2d 352, 359 (D.C. Cir.), cert. denied, 303 U.S. 664 (1938).  There is some doubt whether obeying the President's direct order to assert his  constitutional claim of executive privilege would amount to a "willful" violation of the statute. Moreover, reliance on an explicit opinion of the Attorney General may negate the required mens rea even in the case of a statute without a willfulness requirement.  See Model Penal Code s 2.04(3)(b); United States v. Barker, 546 F.2d 940, 955 (D.C. Cir. 1976) (Mehrige J., concurring).


FN35 See also Barr v. Matteo, 360 U.S. 564 (1959); Spalding v. Vilas, 161 U.S. 483 (1896).  Some officials, such as judges and prosecutors, have been given absolute immunity from civil suits arising out of their official acts.   Imbler v. Pachtman, 424 U.S. 409 (1976); Pierson v. Ray, 386 U.S. 547 (1967).


FN36 It is arguable that Congress already has the power to apply for such civil enforcement, since 28 U.S.C. s 1331 has been amended to eliminate the amount in controversy requirement, which was the only obstacle cited to foreclose jurisdiction under s 1331 in a previous civil enforcement action brought by the Senate.  See Senate Select Committee on Presidential Campaign Activities v. Nixon, 366 F. Supp. 51 (D.D.C. 1973).  In any event, there is little doubt that, at the very least, Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases.  See Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974) (en banc); Hamilton and Grabow, A Legislative Proposal for Resolving Executive Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis. 145 (1984).


FN37 See Hamilton and Grabow, supra, 21 Harv. J. on Legis. at 151.


FN38 The Nixon Court thought this statement significant enough in the context of an executive privilege dispute to quote it in full at two separate places in its decision.   United States v. Nixon, 418 U.S. at 708, 715.


FN39 One scholar (former Assistant Attorney General for the Civil Division, and now Solicitor General, Rex Lee) has noted that

when the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted for conduct of his own.  He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress.  It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)

vindicating congressional investigative interests and for getting the legal
issues into court.

Lee, Executive Privilege, Congressional Subpoena Power, and Judicial Review:  Three
Branches, Three Powers, and Some Relationships, 1978 B.Y.U. L. Rev. 231, 259.


FN40 Even when a privilege is asserted by a cabinet official, and not the
President, courts are extremely reluctant to impose a contempt sanction and are
willing to resort to it only in extraordinary cases and only after all other
remedies have failed. In In re Attorney General, 596 F.2d 58 (2d Cir.), cert.
denied, 444 U.S. 903 (1979), the court granted the government's mandamus petition
to overturn a district court's civil contempt citation against the Attorney General
for failing to turn over documents for which he had asserted a claim of privilege.
The court recognized that even a civil contempt sanction imposed on an Executive
Branch official "has greater public importance, with separation of powers
overtones, and warrants more sensitive judicial scrutiny than such a sanction
imposed on an ordinary litigant." 596 F.2d at 64. Therefore, the court held that
holding the Attorney General of the United States in contempt to ensure compliance
with a court order should be a last resort, to be undertaken only after all other
means to achieve the ends legitimately sought by the court have been exhausted.
Id. at 65. In the case of a Presidential claim of executive privilege, there is
even more reason to avoid contempt proceedings because the privilege claim has been
made as a constitutionally based claim by the President himself and the sanction
involved is criminal and not civil contempt.  The use of criminal contempt is
especially inappropriate in the context under discussion because Congress has the
clearly available alternative of civil enforcement proceedings.


FN41 See Hamilton and Grabow, A Legislative Proposal for Resolving Executive
Privilege Disputes Precipitated by Congressional Subpoenas, 21 Harv. J. on Legis.
145 (1984).


FN42 We believe that this same conclusion would apply to any attempt by Congress to
utilize its inherent "civil" contempt powers to arrest, bring to trial, and punish
an executive official who asserted a Presidential claim of executive privilege.
The legislative history of the criminal contempt statute indicates that the reach
of the statute was intended to be coextensive with Congress' inherent civil
contempt powers (except with respect to the penalties imposed). See 42 Cong. Globe
406 (remarks of Rep. Davis). Therefore, the same reasoning that suggests that the
statute could not constitutionally be applied against a Presidential assertion of
privilege applies to Congress' inherent contempt powers as well.


FN43 The Tenure of Office Act was, of course, later declared to have been
unconstitutional. Myers v. United States, 272 U.S.  52 (1926).


FN44 R. Warden, An Account of the Private Life and Public Services of Salmon
Portland Chase 685 (1874). Chief Justice Chase's comments were made in a letter
written the day after the Senate had voted to exclude evidence that the entire
cabinet had advised President Johnson that the Tenure of Office Act was
unconstitutional.  Id. See M. Benedict, The Impeachment and Trial of Andrew Johnson
154-55 (1973). Ultimately, the Senate did admit evidence that the President had
desired to initiate a court test of the law.  Id. at 156.


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

 8 U.S. Op. Off. Legal Counsel 101, 1984 WL 178358 (O.L.C.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 24

Westlaw.

1999 WL 33490208 (O.L.C.)                                                    Page 1

1999 WL 33490208 (O.L.C.)

(Preliminary Print)

Office of Legal Counsel
U.S. Department of Justice

**\*1 ASSERTION OF EXECUTIVE PRIVILEGE WITH RESPECT TO CLEMENCY DECISION**

September 16, 1999

*Executive privilege may properly be asserted in response to a congressional sub-
poena seeking documents and testimony concerning the deliberations in connection
with President's decision to offer clemency to sixteen individuals.*

*Executive privilege may properly be asserted in response to a congressional sub-
poena seeking testimony by the Counsel to the President concerning the performance
of official duties on the basis that the Counsel serves as an immediate adviser to
the President and is therefore immune from compelled congressional testimony.*

THE PRESIDENT
THE WHITE HOUSE

MY DEAR MR. PRESIDENT: You have requested my legal advice as to whether executive
privilege may properly be asserted in response to several subpoenas issued by the
Committee on Government Reform and Oversight of the House of Representatives to
the White House, the Department of Justice, and certain White House and Department
officials seeking documents and testimony concerning your decision to offer clem-
ency to sixteen individuals.

I.

The documents and testimony proposed to be subject to a claim of executive priv-
ilege consist of (1) advice and other deliberative communications to the President
and (2) deliberative documents and communications generated within and between the
Department of Justice and the White House in connection with the preparation of
that advice. Documents falling into the former category consist of memoranda and
other documents submitted to you by officials and components of the Department and
offices within the White House concerning the clemency decision. The documents
falling into the latter category include documents containing confidential advice,
analysis, recommendations and statements of position that the Pardon Attorney gen-
erated in connection with the clemency review, or that other executive branch of-
ficials and employees submitted to the offices of the Pardon Attorney or the
Deputy Attorney General in connection with that review. For the reasons set forth
below, it is my legal judgment that executive privilege may properly be asserted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with respect to the foregoing documents and with respect to testimony by Department and White House officials concerning the deliberations in connection with your clemency decision.

Advice to the President and other deliberative communications and materials fall within the scope of executive privilege. See generally United States v. Nixon, 418 U.S. 683, 705-13 (1974); Nixon v. Administrator of General Services, 433 U.S. 425, 446-55 (1977). The Supreme Court has recognized

the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking. A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution.

*2 United States v. Nixon, 418 U.S. at 708. It is thus well established that not only does executive privilege apply to confidential communications to the President, but also to "communications between high Government officials and those who advise and assist them in the performance of their manifold duties." Id. at 705.

The White House staff and the Department of Justice act as confidential advisors to the President as part of the clemency review process, and executive privilege has long been understood to protect confidential advice generated during that process. Under controlling case law, in order to justify a demand for information protected by executive privilege, a congressional committee is required to demonstrate that the information sought is "demonstrably critical to the responsible fulfillment of the Committee's functions." Senate Select Committee on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). And those functions must be in furtherance of legitimate legislative responsibilities of Congress. See McGrain v. Daugherty, 273 U.S. 135, 160 (1927) (Congress has oversight authority "to enable it efficiently to exercise a legislative function belonging to it under the Constitution").

The Committee's letter to the Department, dated September 10, 1999, which requested the designation of a witness for the Committee's hearing, indicated that the hearing is entitled "Clemency for the FALN: A Flawed Decision?" and that the Committee is "specifically interested in hearing about information germane to the process of the . . . grant of executive clemency" regarding the sixteen individuals. A compelling argument can be made, however, that Congress has no authority whatever to review a President's clemency decision. "Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government." Barenblatt v. United States, 360 U.S. 109, 111-12 (1959). The granting of clemency pursuant to the pardon power is unquestionably an exclusive province of the Executive Branch. U.S. Const., Art. II, § 2,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cl. 1. <u>See</u> <u>United</u> <u>States</u> <u>v.</u> <u>Klein</u>, 80 U.S. (13 Wall.) 128, 147 (1871) ("To the ex-
ecutive alone is intrusted the power of pardon"); <u>see</u> <u>also</u> <u>Public</u> <u>Citizen</u> <u>v.</u> <u>De-
partment</u> <u>of</u> <u>Justice</u>, 491 U.S. 440, 485 (1989) (Kennedy, J., concurring)
(reaffirming that pardon power is "commit[ted] . . . to the exclusive control of
the President").

In exercising his clemency power, the President may seek to obtain the views of
various advisors as he deems appropriate. Historically, he has sought the advice
of the Department of Justice. In response to previous inquiries, the Department
has repeatedly emphasized the exclusivity of the President's pardon power. In a
letter responding to a request for pardon papers by the Chairman of the House Com-
mittee on Claims in 1919, the Attorney General refused to provide Congress with
the Attorney General's report, observing:
   *3 [T]he President, in his action on pardon cases, is not subject to the con-
   trol or supervision of anyone, nor is he accountable in any way to any branch
   of the government for his action, and to establish a precedent of submitting
   pardon papers to Congress, or to a Committee of Congress, does not seem to me
   to be a wise one.
Letter from A. Mitchell Palmer, Attorney General, to Hon. George W. Edmonds,
Chairman, House Committee on Claims (Sept. 25, 1919). This position was reasserted
by the Pardon Attorney in 1952 in response to an inquiry from Senator Styles
Bridges concerning the publication of details of clemency cases. Noting that "the
President's exercise of the pardoning power is not subject to statutory regulation
or control," the Pardon Attorney explained that,
   [i]n the exercise of the pardoning power, the President is amenable only to the
   dictates of his own conscience, unhampered and uncontrolled by any person or
   branch of Government. In my judgment it would be a serious mistake and highly
   detrimental to the public interest to permit Congress, or any Branch thereof,
   to encroach upon any prerogative, right or duty of the President conferred upon
   him by the Constitution, or to assume that he is in the slightest respect an-
   swerable to it for his action in pardon matters.
Letter from Daniel Lyons, Pardon Attorney, to Hon. Styles Bridges, U.S. Senator
(Jan. 10, 1952) (citation and internal quotation marks omitted). The Executive
Branch has on occasion provided Congress with information relating to particular
clemency decisions, but to our knowledge it has done so only voluntarily and
without conceding congressional authority to compel disclosure.

Accordingly, it appears that Congress' oversight authority does not extend to the
process employed in connection with a particular clemency decision, to the materi-
als generated or the discussions that took place as part of that process, or to
the advice or views the President received in connection with a clemency decision.
In any event, even if the Committee has some oversight role, I do not believe its
oversight needs would be viewed by the courts as outweighing the President's in-
terest in the confidentiality of the deliberations relating to his exercise of
this exclusive presidential prerogative. Conducting the balancing required by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case law, see Senate Select Committee, 498 F.2d at 729-30; United States v. Nixon,
418 U.S. at 706-07, I do not believe that access to documents relating to or
testimony about these deliberations would be held by the courts to be
"demonstrably critical to the responsible fulfillment of the Committee's func-
tions." Senate Select Committee, 498 F.2d at 731. Indeed, this conclusion is con-
firmed by the fact that the Committee can satisfy any oversight need to investig-
ate the impact of the clemency decision on law enforcement goals by obtaining in-
formation concerning the individuals offered clemency and any threat they might
pose through non-privileged documents and testimony.

II.

**\*4** The Counsel to the President is one of several individuals subpoenaed to
provide testimony to the Committee. Much, but not necessarily all, of what the
Counsel might be asked to testify about at the Committee's hearing would presum-
ably fall within the scope of information that would be covered by your assertion
of executive privilege over deliberations leading up to your clemency decision.
However, there is a separate legal basis that would support a claim of executive
privilege for the entirety of the Counsel's testimony, thereby eliminating any
need for her to appear at the hearing. Executive privilege is assertable in re-
sponse to a congressional subpoena seeking testimony by the Counsel to the Presid-
ent concerning the performance of official duties on the basis that the Counsel
serves as an immediate adviser to the President and is therefore immune from com-
pelled congressional testimony.

It is the longstanding position of the executive branch that "the President and
his immediate advisers are absolutely immune from testimonial compulsion by a Con-
gressional committee." [FN1] This position is constitutionally based. As Assistant
Attorney General Theodore Olson observed in 1982:
>    The President is a separate branch of government. He may not compel congressmen
>    to appear before him. As a matter of separation of powers, Congress may not
>    compel him to appear before it. The President's close advisors are an extension
>    of the President. [FN2]

Accordingly, "[n]ot only can the President invoke executive privilege to protect
[his personal staff] from the necessity of answering questions posed by a congres-
sional committee, but he can also direct them not even to appear before the com-
mittee." [FN3]

An often-quoted statement of this position is contained in a memorandum by then-
Assistant Attorney General William Rehnquist:
>    The President and his immediate advisers -- that is, those who customarily meet
>    with the President on a regular or frequent basis -- should be deemed abso-
>    lutely immune from testimonial compulsion by a congressional committee. They
>    not only may not be examined with respect to their official duties, but they
>    may not even be compelled to appear before a congressional committee. [FN4]

It is our understanding that the Counsel to the President falls within Assistant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1999 WL 33490208 (O.L.C.)

Attorney General Rehnquist's description of the type of Presidential advisers who are immune from testimonial compulsion.

Given the close working relationship that the President must have with his immediate advisors as he discharges his constitutionally assigned duties, I believe that a court would recognize that the immunity such advisers enjoy from testimonial compulsion by a congressional committee is absolute and may not be overborne by competing congressional interests. For, in many respects, a senior advisor to the President functions as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities. Subjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions. Because such a result would, in my view, violate the constitutionally mandated separation of powers principles, it would seem to follow that compelling one of the President's immediate advisers to testify on a matter of executive decision-making would also raise serious constitutional problems, no matter what the assertion of congressional need.

*5 At a minimum, however, I believe that, even if a court were to conclude that the immunity the Counsel to the President enjoys from testimonial compulsion by a congressional committee is subject to a balancing test, you may properly instruct the Counsel that she need not appear in response to the present congressional subpoena. In my view, a court would, at a minimum find that the constitutional interests underlying the immunity outweigh Congress' interest, if any, in obtaining information relating to the particular process followed, or the advice and other communications the President received, in connection with the President's exercise of his exclusive constitutional authority to grant clemency.

In conclusion, it is my legal judgment that executive privilege may properly be asserted with respect to the entirety of the testimony of the Counsel of the President, based on the immunity that position has with respect to compelled congressional testimony.

Janet Reno
Attorney General

FN1. Memorandum from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege, at 5 (May 23, 1977).

FN2. Memorandum from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, at 2 (Jul. 29, 1982) (discussing subpoena for testimony of the Counsel to the President). See also Memorandum from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

<u>Given</u> <u>President</u> <u>on</u> <u>Official</u> <u>Matters</u>, at 6 (Dec. 21, 1972) (since "[a]n immediate assistant to the President may be said to serve as his alter ego . . . the same considerations that were persuasive to former President Truman [when he declined to comply with a congressional subpoena for his testimony] would apply to justify a refusal to appear by . . . a former staff member"); Letter from Edward C. Schmults, Deputy Attorney General, at 2 (Apr. 19, 1983) ("[O]ur concern regarding your desire for the sworn testimony of [the Counsel to the President] is based upon important principles relative to the powers, duties and prerogatives of the Presidency. We share with previous Presidents and their advisers serious reservations regarding the implications for established constitutional doctrines arising from the separation of powers of a Congressional demand for the sworn testimony of close presidential advisers on the White House staff.").

FN3. Memorandum from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, <u>Re: Dual-purpose Presidential Advisers</u>, Appendix at 7 (Aug. 11, 1977).

FN4. Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, <u>Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"</u>, at 7 (Feb. 5, 1971).

1999 WL 33490208 (O.L.C.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 25

Westlaw.

2007 WL 5038035 (O.L.C.)

2

2007 WL 5038035 (O.L.C.)

(Preliminary Print)

Office of Legal Counsel
U.S. Department of Justice

IMMUNITY
OF
FORMER
COUNSEL
TO THE
PRESIDENT
FROM
COMPELLED
CONGRESSIONAL TESTIMONY

July 10, 2007

*The former Counsel to the President is immune from compelled congressional testimony about matters that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity and is not required to appear in response to a subpoena to testify about such matters.*

Memorandum Opinion for the Counsel to the President

You have asked whether Harriet Miers, the former Counsel to the President, is legally required to appear and provide testimony in response to a subpoena issued by the Committee on the Judiciary of the House of Representatives. The Committee, we understand, seeks testimony from Ms. Miers about matters arising during her tenure as Counsel to the President and relating to her official duties in that capacity. Specifically, the Committee wishes to ask Ms. Miers about the decision of the Justice Department to request the resignations of several United States Attorneys in 2006. *See* Letter for Harriet E. Miers from the Hon. John Conyers, Jr., Chairman, House Committee on the Judiciary (June 13, 2007). For the reasons discussed below, we believe that Ms. Miers is immune from compulsion to testify before the Committee on this matter and, therefore, is not required to appear to testify about this subject.

Since at least the 1940s, Administrations of both political parties have taken the position that "'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee.'" *Assertion of Executive*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Privilege With Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) (opinion of Attorney General Janet Reno) (quoting Memorandum from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Executive Privilege* at 5 (May 23, 1977)). This immunity "is absolute and may not be overborne by competing congressional interests." *Id.*

Assistant Attorney General William Rehnquist succinctly explained this position in a 1971 memorandum:

> The President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee. They not only may not be examined with respect to their official duties, but they may not even be compelled to appear before a congressional committee.

Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971) ("*Rehnquist Memo*"). In a 1999 opinion for President Clinton, Attorney General Reno concluded that the Counsel to the President "serves as an immediate adviser to the President and is therefore immune from compelled congressional testimony." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 4.

The rationale for the immunity is plain. The President is the head of one of the independent Branches of the federal Government. If a congressional committee could force the President's appearance, fundamental separation of powers principles-including the President's independence and autonomy from Congress-would be threatened. As the Office of Legal Counsel has explained, "[t]he President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("*Olson Memorandum*").

The same separation of powers principles that protect a President from compelled congressional testimony also apply to senior presidential advisers. Given the numerous demands of his office, the President must rely upon senior advisers. As Attorney General Reno explained, "in many respects, a senior advisor to the President functions as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 5.[FN1] Thus, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned functions." *Id.; see also Olson Memorandum* at 2 ("The President's close advisors are an extension of the President.").[FN2]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The fact that Ms. Miers is a former Counsel to the President does not alter the analysis. Separation of powers principles dictate that former Presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers. Former President Truman explained the need for continuing immunity in November 1953, when he refused to comply with a subpoena directing him to appear before the House Committee on Un-American Activities. In a letter to that committee, he warned that "if the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President." *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14 (reprinting November 12, 1953 letter by President Truman). "The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes." *Id.* In a radio speech to the Nation, former President Truman further stressed that it "is just as important to the independence of the Executive that the actions of the President should not be subjected to the questioning by the Congress after he has completed his term of office as that his actions should not be questioned while he is serving as President." *Text of Address by Truman Explaining to Nation His Actions in the White Case*, N.Y. Times, Nov. 17, 1953, at 26.

Because a presidential adviser's immunity is derivative of the President's, former President Truman's rationale directly applies to former presidential advisers. We have previously opined that because an "immediate assistant to the President may be said to serve as his alter ego .... the same considerations that were persuasive to former President Truman would apply to justify a refusal to appear [before a congressional committee] by ... a former [senior presidential adviser], if the scope of his testimony is to be limited to his activities while serving in that capacity." Memorandum for the Counsel to the President from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, *Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters* at 6 (Dec. 21, 1972).

Accordingly, we conclude that Ms. Miers is immune from compelled congressional testimony about matters, such as the U.S. Attorney resignations, that arose during her tenure as Counsel to the President and that relate to her official duties in that capacity, and therefore she is not required to appear in response to a subpoena to testify about such matters.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 26

# A COMPILATION

OF THE

# MESSAGES AND PAPERS

OF THE

# PRESIDENTS

1789 – 1897

PUBLISHED BY AUTHORITY OF CONGRESS

BY

JAMES D. RICHARDSON

A REPRESENTATIVE FROM THE STATE OF TENNESSEE

## VOLUME VIII

WASHINGTON
GOVERNMENT PRINTING OFFICE
1898

*Grover Cleveland*                                           375

a bill prepared by the Commissioner of Indian Affairs to amend the third section of the act of March 3, 1885, ''to provide for the sale of the Sac and Fox and Iowa Indian reservations in the States of Nebraska and Kansas, and for other purposes.''

The matter is presented for the consideration and action of Congress.

GROVER CLEVELAND.


EXECUTIVE MANSION, *February 16, 1886.*

*To the Senate of the United States:*

I transmit herewith, in response to a resolution of the Senate of the 9th instant, a statement showing the payments of awards of the commissioners appointed under the conventions between the United States and France concluded April 30, 1803, and July 4, 1831, and between the United States and Spain concluded February 22, 1819, prepared from the books in the Department of the Treasury, under the direction of the Secretary of the Treasury, at the request of the Secretary of State.

Also, for the further information of the Senate, a report prepared by direction of the Secretary of State, from the original records in his custody, of the awards made by the said commissioners in claims allowed by them.

GROVER CLEVELAND.


EXECUTIVE MANSION,
*Washington, D. C., March 1, 1886.*

*To the Senate of the United States:*

Ever since the beginning of the present session of the Senate the different heads of the Departments attached to the executive branch of the Government have been plied with various requests and demands from committees of the Senate, from members of such committees, and at last from the Senate itself, requiring the transmission of reasons for the suspension of certain officials during the recess of that body, or for the papers touching the conduct of such officials, or for all papers and documents relating to such suspensions, or for all documents and papers filed in such Departments in relation to the management and conduct of the offices held by such suspended officials.

The different terms from time to time adopted in making these requests and demands, the order in which they succeeded each other, and the fact that when made by the Senate the resolution for that purpose was passed in executive session have led to the presumption, the correctness of which will, I suppose, be candidly admitted, that from first to last the information thus sought and the papers thus demanded were desired for use by the Senate and its committees in considering the propriety of the suspensions referred to.

Though these suspensions are my executive acts, based upon considerations addressed to me alone and for which I am wholly responsible, I have had no invitation from the Senate to state the position which I have felt constrained to assume in relation to the same or to interpret for myself my acts and motives in the premises.

In this condition of affairs I have forborne addressing the Senate upon the subject, lest I might be accused of thrusting myself unbidden upon the attention of that body.

But the report of the Committee on the Judiciary of the Senate lately presented and published, which censures the Attorney-General of the United States for his refusal to transmit certain papers relating to a suspension from office, and which also, if I correctly interpret it, evinces a misapprehension of the position of the Executive upon the question of such suspensions, will, I hope, justify this communication.

This report is predicated upon a resolution of the Senate directed to the Attorney-General and his reply to the same. This resolution was adopted in executive session devoted entirely to business connected with the consideration of nominations for office. It required the Attorney-General ''to transmit to the Senate copies of all documents and papers that have been filed in the Department of Justice since the 1st day of January, 1885, in relation to the management and conduct of the office of district attorney of the United States for the southern district of Alabama.''

The incumbent of this office on the 1st day of January, 1885, and until the 17th day of July ensuing, was George M. Duskin, who on the day last mentioned was suspended by an Executive order, and John D. Burnett designated to perform the duties of said office. At the time of the passage of the resolution above referred to the nomination of Burnett for said office was pending before the Senate, and all the papers relating to said nomination were before that body for its inspection and information.

In reply to this resolution the Attorney-General, after referring to the fact that the papers relating to the nomination of Burnett had already been sent to the Senate, stated that he was directed by the President to say that—

The papers and documents which are mentioned in said resolution and still remaining in the custody of this Department, having exclusive reference to the suspension by the President of George M. Duskin, the late incumbent of the office of district attorney for the southern district of Alabama, it is not considered that the public interests will be promoted by a compliance with said resolution and the transmission of the papers and documents therein mentioned to the Senate in executive session.

Upon this resolution and the answer thereto the issue is thus stated by the Committee on the Judiciary at the outset of the report:

The important question, then, is whether it is within the constitutional competence of either House of Congress to have access to the official papers and documents in the various public offices of the United States created by laws enacted by themselves.

*Grover Cleveland*                                          377

I do not suppose that "the public offices of the United States" are regulated or controlled in their relations to either House of Congress by the fact that they were "created by laws enacted by themselves." It must be that these instrumentalities were created for the benefit of the people and to answer the general purposes of government under the Constitution and the laws, and that they are unencumbered by any lien in favor of either branch of Congress growing out of their construction, and unembarrassed by any obligation to the Senate as the price of their creation.

The complaint of the committee that access to official papers in the public offices is denied the Senate is met by the statement that at no time has it been the disposition or the intention of the President or any Department of the executive branch of the Government to withhold from the Senate official documents or papers filed in any of the public offices. While it is by no means conceded that the Senate has the right in any case to review the act of the Executive in removing or suspending a public officer, upon official documents or otherwise, it is considered that documents and papers of that nature should, because they are official, be freely transmitted to the Senate upon its demand, trusting the use of the same for proper and legitimate purposes to the good faith of that body; and though no such paper or document has been specifically demanded in any of the numerous requests and demands made upon the Departments, yet as often as they were found in the public offices they have been furnished in answer to such applications.

The letter of the Attorney-General in response to the resolution of the Senate in the particular case mentioned in the committee's report was written at my suggestion and by my direction. There had been no official papers or documents filed in his Department relating to the case within the period specified in the resolution. The letter was intended, by its description of the papers and documents remaining in the custody of the Department, to convey the idea that they were not official; and it was assumed that the resolution called for information, papers, and documents of the same character as were required by the requests and demands which preceded it.

Everything that had been written or done on behalf of the Senate from the beginning pointed to all letters and papers of a private and unofficial nature as the objects of search, if they were to be found in the Departments, and provided they had been presented to the Executive with a view to their consideration upon the question of suspension from office.

Against the transmission of such papers and documents I have interposed my advice and direction. This has not been done, as is suggested in the committee's report, upon the assumption on my part that the Attorney-General or any other head of a Department "is the servant of the President, and is to give or withhold copies of documents in his office according to the will of the Executive and not otherwise," but

because I regard the papers and documents withheld and addressed to me or intended for my use and action purely unofficial and private, not infrequently confidential, and having reference to the performance of a duty exclusively mine. I consider them in no proper sense as upon the files of the Department, but as deposited there for my convenience, remaining still completely under my control. I suppose if I desired to take them into my custody I might do so with entire propriety, and if I saw fit to destroy them no one could complain.

Even the committee in its report appears to concede that there may be with the President or in the Departments papers and documents which, on account of their unofficial character, are not subject to the inspection of the Congress. A reference in the report to instances where the House of Representatives ought not to succeed in a call for the production of papers is immediately followed by this statement:

> The committee feels authorized to state, after a somewhat careful research, that within the foregoing limits there is scarcely in the history of this Government, until now, any instance of a refusal by a head of a Department, or even of the President himself, to communicate official facts and information, as distinguished from private and unofficial papers, motions, views, reasons, and opinions, to either House of Congress when unconditionally demanded.

To which of the classes thus recognized do the papers and documents belong that are now the objects of the Senate's quest?

They consist of letters and representations addressed to the Executive or intended for his inspection; they are voluntarily written and presented by private citizens who are not in the least instigated thereto by any official invitation or at all subject to official control. While some of them are entitled to Executive consideration, many of them are so irrelevant, or in the light of other facts so worthless, that they have not been given the least weight in determining the question to which they are supposed to relate.

Are all these, simply because they are preserved, to be considered official documents and subject to the inspection of the Senate? If not, who is to determine which belong to this class? Are the motives and purposes of the Senate, as they are day by day developed, such as would be satisfied with my selection? Am I to submit to theirs at the risk of being charged with making a suspension from office upon evidence which was not even considered?

Are these papers to be regarded official because they have not only been presented but preserved in the public offices?

Their nature and character remain the same whether they are kept in the Executive Mansion or deposited in the Departments. There is no mysterious power of transmutation in departmental custody, nor is there magic in the undefined and sacred solemnity of Department files. If the presence of these papers in the public offices is a stumbling block in the way of the performance of Senatorial duty, it can be easily removed.

The papers and documents which have been described derive no official character from any constitutional, statutory, or other requirement making them necessary to the performance of the official duty of the Executive.

It will not be denied, I suppose, that the President may suspend a public officer in the entire absence of any papers or documents to aid his official judgment and discretion; and I am quite prepared to avow that the cases are not few in which suspensions from office have depended more upon oral representations made to me by citizens of known good repute and by members of the House of Representatives and Senators of the United States than upon any letters and documents presented for my examination. I have not felt justified in suspecting the veracity, integrity, and patriotism of Senators, or ignoring their representations, because they were not in party affiliation with the majority of their associates; and I recall a few suspensions which bear the approval of individual members identified politically with the majority in the Senate.

While, therefore, I am constrained to deny the right of the Senate to the papers and documents described, so far as the right to the same is based upon the claim that they are in any view of the subject official, I am also led unequivocally to dispute the right of the Senate by the aid of any documents whatever, or in any way save through the judicial process of trial on impeachment, to review or reverse the acts of the Executive in the suspension, during the recess of the Senate, of Federal officials.

I believe the power to remove or suspend such officials is vested in the President alone by the Constitution, which in express terms provides that ''the executive power shall be vested in a President of the United States of America,'' and that ''he shall take care that the laws be faithfully executed.''

The Senate belongs to the legislative branch of the Government. When the Constitution by express provision superadded to its legislative duties the right to advise and consent to appointments to office and to sit as a court of impeachment, it conferred upon that body all the control and regulation of Executive action supposed to be necessary for the safety of the people; and this express and special grant of such extraordinary powers, not in any way related to or growing out of general Senatorial duty, and in itself a departure from the general plan of our Government, should be held, under a familiar maxim of construction, to exclude every other right of interference with Executive functions.

In the first Congress which assembled after the adoption of the Constitution, comprising many who aided in its preparation, a legislative construction was given to that instrument in which the independence of the Executive in the matter of removals from office was fully sustained.

I think it will be found that in the subsequent discussions of this question there was generally, if not at all times, a proposition pending to in some way curtail this power of the President by legislation, which

furnishes evidence that to limit such power it was supposed to be necessary to supplement the Constitution by such legislation.

The first enactment of this description was passed under a stress of partisanship and political bitterness which culminated in the President's impeachment.

This law provided that the Federal officers to which it applied could only be suspended during the recess of the Senate when shown by evidence satisfactory to the President to be guilty of misconduct in office, or crime, or when incapable or disqualified to perform their duties, and that within twenty days after the next meeting of the Senate it should be the duty of the President "to report to the Senate such suspension, with the evidence and reasons for his action in the case."

This statute, passed in 1867, when Congress was overwhelmingly and bitterly opposed politically to the President, may be regarded as an indication that even then it was thought necessary by a Congress determined upon the subjugation of the Executive to legislative will to furnish itself a law for that purpose, instead of attempting to reach the object intended by an invocation of any pretended constitutional right.

The law which thus found its way to our statute book was plain in its terms, and its intent needed no avowal.  If valid and now in operation, it would justify the present course of the Senate and command the obedience of the Executive to its demands.  It may, however, be remarked in passing that under this law the President had the privilege of presenting to the body which assumed to review his executive acts his reasons therefor, instead of being excluded from explanation or judged by papers found in the Departments.

Two years after the law of 1867 was passed, and within less than five weeks after the inauguration of a President in political accord with both branches of Congress, the sections of the act regulating suspensions from office during the recess of the Senate were entirely repealed, and in their place were substituted provisions which, instead of limiting the causes of suspension to misconduct, crime, disability, or disqualification, expressly permitted such suspension by the President "in his discretion," and completely abandoned the requirement obliging him to report to the Senate "the evidence and reasons" for his action.

With these modifications and with all branches of the Government in political harmony, and in the absence of partisan incentive to captious obstruction, the law as it was left by the amendment of 1869 was much less destructive of Executive discretion.  And yet the great general and patriotic citizen who on the 4th day of March, 1869, assumed the duties of Chief Executive, and for whose freer administration of his high office the most hateful restraints of the law of 1867 were, on the 5th day of April, 1869, removed, mindful of his obligation to defend and protect every prerogative of his great trust, and apprehensive of the injury threatened the public service in the continued operation of these statutes

even in their modified form, in his first message to Congress advised their repeal and set forth their unconstitutional character and hurtful tendency in the following language:

It may be well to mention here the embarrassment possible to arise from leaving on the statute books the so-called "tenure-of-office acts," and to earnestly recommend their total repeal. It could not have been the intention of the framers of the Constitution, when providing that appointments made by the President should receive the consent of the Senate, that the latter should have the power to retain in office persons placed there by Federal appointment against the will of the President. The law is inconsistent with a faithful and efficient administration of the Government. What faith can an Executive put in officials forced upon him, and those, too, whom he has suspended for reason? How will such officials be likely to serve an Administration which they know does not trust them?

I am unable to state whether or not this recommendation for a repeal of these laws has been since repeated. If it has not, the reason can probably be found in the experience which demonstrated the fact that the necessities of the political situation but rarely developed their vicious character.

And so it happens that after an existence of nearly twenty years of almost innocuous desuetude these laws are brought forth—apparently the repealed as well as the unrepealed—and put in the way of an Executive who is willing, if permitted, to attempt an improvement in the methods of administration.

The constitutionality of these laws is by no means admitted. But why should the provisions of the repealed law, which required specific cause for suspension and a report to the Senate of "evidence and reasons," be now in effect applied to the present Executive, instead of the law, afterwards passed and unrepealed, which distinctly permits suspensions by the President "in his discretion" and carefully omits the requirement that "evidence and reasons for his action in the case" shall be reported to the Senate.

The requests and demands which by the score have for nearly three months been presented to the different Departments of the Government, whatever may be their form, have but one complexion. They assume the right of the Senate to sit in judgment upon the exercise of my exclusive discretion and Executive function, for which I am solely responsible to the people from whom I have so lately received the sacred trust of office. My oath to support and defend the Constitution, my duty to the people who have chosen me to execute the powers of their great office and not to relinquish them, and my duty to the Chief Magistracy, which I must preserve unimpaired in all its dignity and vigor, compel me to refuse compliance with these demands.

To the end that the service may be improved, the Senate is invited to the fullest scrutiny of the persons submitted to them for public office, in recognition of the constitutional power of that body to advise and consent to their appointment. I shall continue, as I have thus far done, to furnish, at the request of the confirming body, all the information I possess

touching the fitness of the nominees placed before them for their action, both when they are proposed to fill vacancies and to take the place of suspended officials. Upon a refusal to confirm I shall not assume the right to ask the reasons for the action of the Senate nor question its determination. I can not think that anything more is required to secure worthy incumbents in public office than a careful and independent discharge of our respective duties within their well-defined limits.

Though the propriety of suspensions might be better assured if the action of the President was subject to review by the Senate, yet if the Constitution and the laws have placed this responsibility upon the executive branch of the Government it should not be divided nor the discretion which it involves relinquished.

It has been claimed that the present Executive having pledged himself not to remove officials except for cause, the fact of their suspension implies such misconduct on the part of a suspended official as injures his character and reputation, and therefore the Senate should review the case for his vindication.

I have said that certain officials should not, in my opinion, be removed during the continuance of the term for which they were appointed solely for the purpose of putting in their place those in political affiliation with the appointing power, and this declaration was immediately followed by a description of official partisanship which ought not to entitle those in whom it was exhibited to consideration. It is not apparent how an adherence to the course thus announced carries with it the consequences described. If in any degree the suggestion is worthy of consideration, it is to be hoped that there may be a defense against unjust suspension in the justice of the Executive.

Every pledge which I have made by which I have placed a limitation upon my exercise of executive power has been faithfully redeemed. Of course the pretense is not put forth that no mistakes have been committed; but not a suspension has been made except it appeared to my satisfaction that the public welfare would be improved thereby. Many applications for suspension have been denied, and the adherence to the rule laid down to govern my action as to such suspensions has caused much irritation and impatience on the part of those who have insisted upon more changes in the offices.

The pledges I have made were made to the people, and to them I am responsible for the manner in which they have been redeemed. I am not responsible to the Senate, and I am unwilling to submit my actions and official conduct to them for judgment.

There are no grounds for an allegation that the fear of being found false to my professions influences me in declining to submit to the demands of the Senate. I have not constantly refused to suspend officials, and thus incurred the displeasure of political friends, and yet willfully broken faith with the people for the sake of being false to them.

Neither the discontent of party friends, nor the allurements constantly offered of confirmations of appointees conditioned upon the avowal that suspensions have been made on party grounds alone, nor the threat proposed in the resolutions now before the Senate that no confirmations will be made unless the demands of that body be complied with, are sufficient to discourage or deter me from following in the way which I am convinced leads to better government for the people.

GROVER CLEVELAND.

EXECUTIVE MANSION, *March 1, 1886.*

*To the Senate and House of Representatives:*

It is made the constitutional duty of the President to recommend to the consideration of Congress from time to time such measures as he shall judge necessary and expedient. In no matters can the necessity of this be more evident than when the good faith of the United States under the solemn obligation of treaties with foreign powers is concerned.

The question of the treatment of the subjects of China sojourning within the jurisdiction of the United States presents such a matter for the urgent and earnest consideration of the Executive and the Congress.

In my first annual message, upon the assembling of the present Congress, I adverted to this question in the following words:

The harmony of our relations with China is fully sustained.

In the application of the acts lately passed to execute the treaty of 1880, restrictive of the immigration of Chinese laborers into the United States, individual cases of hardship have occurred beyond the power of the Executive to remedy, and calling for judicial determination.

The condition of the Chinese question in the Western States and Territories is, despite this restrictive legislation, far from being satisfactory. The recent outbreak in Wyoming Territory, where numbers of unoffending Chinamen, indisputably within the protection of the treaties and the law, were murdered by a mob, and the still more recent threatened outbreak of the same character in Washington Territory, are fresh in the minds of all, and there is apprehension lest the bitterness of feeling against the Mongolian race on the Pacific Slope may find vent in similar lawless demonstrations. All the power of this Government should be exerted to maintain the amplest good faith toward China in the treatment of these men, and the inflexible sternness of the law in bringing the wrongdoers to justice should be insisted upon.

Every effort has been made by this Government to prevent these violent outbreaks and to aid the representatives of China in their investigation of these outrages; and it is but just to say that they are traceable to the lawlessness of men not citizens of the United States engaged in competition with Chinese laborers.

Race prejudice is the chief factor in originating these disturbances, and it exists in a large part of our domain, jeopardizing our domestic peace and the good relationship we strive to maintain with China.

The admitted right of a government to prevent the influx of elements hostile to its internal peace and security may not be questioned, even where there is no treaty stipulation on the subject. That the exclusion of Chinese labor is demanded in other countries where like conditions prevail is strongly evidenced in the Dominion of Canada, where Chinese immigration is now regulated by laws more exclusive than

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 27

# Texts of Truman Letter and Velde Reply

*Following are the texts, as supplied by The Associated Press, of a letter from Former President Truman to Representative Harold H. Velde rejecting a subpoena and of a statement issued in Washington by Mr. Velde, chairman of the House Committee on Un-American Activities:*

## Truman Letter

Dear Sir:

I have your subpoena dated Nov. 9, 1953, directing my appearance before your committee on Friday, Nov. 13, in Washington. The subpoena does not state the matters upon which you seek my testimony, but I assume from the press stories that you seek to examine me with respect to matters which occurred during my tenure of the Presidency of the United States.

In spite of my personal willingness to cooperate with your committee, I feel constrained by my duty to the people of the United States to decline to comply with the subpoena

In doing so, I am carrying out the provisions of the Constitution of the United States; and am following a long line of precedents, commencing with George Washington himself in 1796. Since his day, Presidents Jefferson, Monroe, Jackson, Tyler, Polk, Fillmore, Buchanan, Lincoln, Grant, Hayes, Cleveland, Theodore Roosevelt, Coolidge, Hoover and Franklin D. Roosevelt have declined to respond to subpoenas or demands for information of various kinds by Congress.

### Authority Is Cited

The underlying reason for this clearly established and universally recognized constitutional doctrine has been succinctly set forth by Charles Warren, one of our leading constitutional authorities, as follows:

"In this long series of contests by the Executive to maintain his constitutional integrity, one sees a legitimate conclusion from our theory of government. * * * Under our Constitution, each branch of the Government is designed to be a coordinate representative of the will of the people. * * * Defense by the Executive of his constitutional powers becomes in very truth, therefore, defense of popular rights—defense of power which the people granted to him.

"It was in that sense that President Cleveland spoke of his duty to the people not to relinquish any of the powers of his great office. It was in that sense that President Buchanan stated the people have rights and prerogatives in the execution of his office by the President which every President is under a duty to see 'shall never be violated in his person' but 'passed to his successors unimpaired by the adoption of a dangerous precedent.'

In maintaining his rights against a trespassing Congress, the President defends not himself, but popular government; he represents not himself but the people."

President Jackson repelled an attempt by the Congress to break down the separation of powers in these words:

"For myself I shall repel all such attempts as an invasion of the principles of justice as well as of the Constitution, and I shall esteem it my sacred duty to the people of the United States to resist them as I would the establishment of a Spanish Inquisition."

### Points to House Report

I might commend to your reading the opinion of one of the committees of the House of Representatives in 1879, House Report 141 March 3, 1879, Forty-fifth Congress, Third Session, in which the House Judiciary Committee said the following:

"The Executive is as independent of either house of Congress as either house of Congress is independent of him, and they cannot call for the records of his actions, or the action of his officers against his consent, any more than he can call for any of the journals or records of the House or Senate."

It must be obvious to you that if the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President.

The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes.

If your intention, however, is to inquire into any acts as a private individual either before or after my Presidency and unrelated to any acts as President, I shall be happy to appear.

Yours Very Truly,
HARRY S. TRUMAN.

## Velde Statement

Former President Harry S. Truman today notified the House Committee on Un-American Activities that he does not intend to respond to the subpoena issued by the committee for his appearance on Friday in connection with the case of Harry Dexter White, former Assistant Secretary of the Treasury, and later director of the International Monetary Fund.

I regret very much that Mr. Truman evidently does not intend to answer several pertinent questions which the committee desired to ask him, respecting his relationship with Harry Dexter White, described last week by Attorney General [Herbert] Brownell [Jr.] as a "spy" for the Soviet Union. These questions are in the minds of millions of American citizens today, and are not of a nature to be easily put aside with indeterminant references to freedom of religion and education.

The committee wished to ask several pertinent questions of Mr. Truman, questions which are entirely proper in the light of recent charges made, and questions to which answers may properly be required of any American citizen.

It is alleged that Mr. Truman, while President of the United States, received from the Federal Bureau of Investigation an adverse report on Harry Dexter White, which report indicated that White was releasing confidential information to Soviet agents. The committee wished to determine whether Mr. Truman actually had received this report personally, prior to the issuance by him of a strong letter of recommendation on White's behalf.

If Mr. Truman did not personally receive the report in time to alert the Senate committee, then acting on the White confirmation, the committee wanted to ascertain why the report did not come to the personal attention of President Truman, and what individuals or individual was responsible for what must be considered a dangerous dereliction of duty.

The personal loyalty of Mr. Truman has not been put in question but the collective security of the people of the United States was certainly jeopardized by failure on the part of some responsible authority in the previous Administration in failing to alert the Senate of the United States and the American people as to the nature of White's alleged activities, particularly in the face of written memoranda made available to a number of high Administration officials by the single agency of Government charged with the collection and evaluation of data respecting the loyalty of Federal public servants.

Mr. Truman's refusal to elaborate upon his knowledge of the White case leaves the entire matter in limbo. The committee has no intention of attempting to force the cooperation of those who, although shielded by an uncertain and ill-defined immunity, have a continuing and sacred duty to cooperate in all respects where the public safety and the public welfare are concerned.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

COMMITTEE ON THE JUDICIARY
UNITED STATES HOUSE OF REPRESENTATIVES
v. HARRIET MIERS, *et al.*, Case No. 1:08-cv-00409 (JDB)

# EXHIBIT 28

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
MAIN JUSTICE BUILDING
WASHINGTON, D.C. 20530



UNITED STATES              OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 94th CONGRESS
FIRST SESSION

## VOLUME 121—PART 19

JULY 22, 1975 TO JULY 26, 1975

(PAGES 23935 TO 25194)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1975

USA, to be lieutenant general. Lt. Gen. Donn Royce Pepke, USA, to be retired in that grade, and Maj. Gen. Sam Sims Walker, USA, to be lieutenant general. Lt. Gen. Donald Harry Cowles, USA, to be retired in that grade, and Maj. Gen. John William Vessey, Jr., USA, to be lieutenant general. Brig. Gen. Kenneth Albert Kuykendall, USA Reserve, to be major general, and Brig. Gen. Willard Phaup Milby, Jr., USA Reserve, to be major general, and Brig. Gen. William Bannister Pendlebury, USA Reserve, to be major general; and in the USA Reserve there are 19 appointments to grade of brigadier general and below. Rear Adm. Jon L. Boyes, USN, to be vice admiral. Maj. Gen. Lawrence F. Snowden, USMC, to be lieutenant general. Maj. Gen. Joseph C. Fegan, Jr., USMC, to be lieutenant general and Lt. Gen. Edward S. Fris to be retired in that grade. Lt. Gen. William J. Evans, USAF, to be general. Maj. Gen. George Rhodes, USAF, to be lieutenant general. Maj. Gen. Devol Brett, USAF, to be lieutenant general. Lt. Gen. Felix M. Rogers, USAF, to be general. Maj. Gen. John F. Gonge, USAF, to be lieutenant general. Maj. Gen. Raymond B. Furlong, USAF, to be lieutenant general. Maj. Gen. George G. Loving, Jr., USAF, to be lieutenant general. Maj. Gen. Robert T. Marsh, USAF, to be lieutenant general. Vice Adm. Stansfield Turner, USN, to be admiral. Vice Adm. George P. Steele, II, USN, to be retired in that grade. Lt. Gen. Herbert L. Beckington, USMC, to be retired in that grade.

In addition, there are 78 in the Navy and Naval Reserve in the grade of commander and below. There are 31 in the U.S. Marine Corps to permanent appointment in the grade of second lieutenant. There are in the Navy 3,863 nominations for permanent promotion to the grade of lieutenant. There are in the Army 1,884 to be appointed to lieutenant colonel. Since these names have already appeared in the CONGRESSIONAL RECORD and to save the expense of printing again, I ask unanimous consent that they be ordered to lie on the Secretary's desk for the information of any Senator.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The nominations ordered to lie on the Secretary's desk were printed in the CONGRESSIONAL RECORD of June 26, July 7, July 15, July 17, July 23, 1975, at the end of the Senate proceedings.)

## ENROLLED JOINT RESOLUTION PRESENTED

The Secretary of the Senate reported that today, July 24, 1975, he presented to the President of the United States the enrolled joint resolution (S.J. Res. 23) to restore posthumously full rights of citizenship to Gen. Robert E. Lee.

## HOUSE BILL REFERRED

The bill (H.R. 8773) making appropriations for the Department of the Interior and related agencies for the fiscal year ending June 30, 1976, and the period ending September 30, 1976, and for other purposes, was read twice by its title and

referred to the Committee on Appropriations.

## INTRODUCTION OF BILLS AND JOINT RESOLUTIONS

The following bills and joint resolutions were introduced, read the first time and, by unanimous consent, the second time, and referred as indicated:

By Mr. MUSKIE (for himself, Mr. ROTH, Mr. ABOUREZK, and Mr. JAVITS):

S. 2170. A bill to establish a procedure assuring Congress the full and prompt production of information requested from Federal officers and employees. Referred to the Committee on Government Operations.

By Mr. FORD:

S. 2171. A bill directing the Secretary of the Interior to include in the National Register the covered bridges within the Commonwealth of Kentucky. Referred to the Committee on Interior and Insular Affairs.

By Mr. MONDALE:

S. 2172. A bill to amend the Tax Reduction Act of 1975 to make permanent certain amendments to the Internal Revenue Code of 1954 effected by such Act, and for other purposes. Referred to the Committee on Finance.

By Mr. CANNON, from the Committee on Armed Services:

S. 2173. An original bill to fully explore and develop the naval petroleum reserves of the United States and to permit limited production with revenues derived therefrom to be placed in a special account, and for other purposes. Ordered placed on the Calendar.

By Mr. BROCK:

S. 2174. A bill to amend the Public Health Service Act to revise and extend the National Health Service Corps Program, and for other purposes. Referred to the Committee on Labor and Public Welfare.

S. 2175. A bill to amend the Internal Revenue Code of 1954 to provide for an increase in the amount of the corporate surtax exemption from $50,000 to $100,000 and to provide for annual adjustments of such amount to reflect changes in the Consumer Price Index. Referred to the Committee on Finance.

By Mr. BAKER (for himself and Mr. RANDOLPH):

S. 2176. A bill to amend the Highway Safety Act of 1966 to authorize appropriations, and for other purposes. Referred to the Committee on Public Works.

By Mr. KENNEDY (for himself and Mr. BROOKE):

S. 2177. A bill to make permanent the Cape Cod National Seashore Advisory Commission. Referred to the Committee on Interior and Insular Affairs.

By Mr. MAGNUSON:

S. 2178. A bill for the relief of Soledad G. Venegas. Referred to the Committee on the Judiciary.

By Mr. ALLEN:

S.J. Res. 113. A joint resolution to amend the Constitution of the United States to provide voluntary nondenominational prayer in public schools and buildings. Referred to the Committee on the Judiciary.

## STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS

By Mr. MUSKIE (for himself, Mr. ROTH, Mr. JAVITS, and Mr. ABOUREZK):

S. 2170. A bill to establish a procedure assuring Congress the full and prompt production of information requested from Federal officers and employees. Referred to the Committee on Government Operations.

THE CONGRESSIONAL RIGHT TO INFORMATION ACT

Mr. MUSKIE. Mr. President, today I am introducing, with Senators ROTH, ABOUREZK, and JAVITS, legislation which I believe will give the Congress the means to halt the steady erosion of its power by officials who arbitrarily withhold information needed to legislate and to oversee the workings of programs Congress has authorized.

Only 11 months ago, this Nation was embroiled in a conflict between two branches of the Government of such dimensions that it threatened the foundation of our system.

It is testimony to the durability, the resiliency and the lasting strength of our 200-year-old system of checks and balances, that the highest court in the land ordered the Chief Executive to produce material withheld under a claim of privilege; that the same order precipitated the first resignation of a U.S. President, and that we smoothly made the transition to a new administration with little or no disruption in the chain of governing authority.

Earlier in the sequence of events which also had brought the House of Representatives close to a vote on the question of impeachment, the district court for the District of Columbia said that the Senate Select Committee on Presidential Campaign Activities lacked standing to seek production of many of the same materials which were the subject of the later famous case of United States against Nixon, President of the United States.

The Congressional Right to Information Act would, for the first time in the history of our country, provide a practical and a just way to solve the controversies between the legislative and executive branches as to what information the Congress is entitled in order to carry out its constitutional functions.

If the Congress is to legislate, if the Congress is to conduct investigations, if the Congress is to appropriate funds for the operation of the Government, then the Congress must have all of the information in the possession of the executive branch of Government which it finds necessary to fulfill those responsibilities.

In his book on the subject of "Executive Privilege," Harvard law professor, Raoul Berger, observed:

He who controls the flow of information rules our destinies. . . . It was not the design of the Founders that the people and the Congress should obtain only so much information as the President concluded was fitting for them to have. As a partner—as the senior partner—in the conduct of our government, the Congress is entitled to share *all* the information that pertains to its affairs.

Certainly the experiences of Teapot Dome, of Vietnam, and of Watergate, have shown that the abuse of delegation authority cannot be discovered, disclosed, identified, or restrained if the disclosure of information itself is controllable only by the executive branch.

Mr. President, this legislation represents a truly moderate and restrained congressional response to the recent history of immoderate and unrestrained exercise of Executive authority in the form

of withholding information from the Congress.

The bill would direct the head of every Federal agency to keep the committees of the Congress fully informed on all matters within their jurisdictions.

It further would mandate every Federal official or employee to comply with congressional requests for information unless the President specifically instructs them in writing not to do so.

If a request for information is denied, a committee chairman would be authorized to issue subpenas to compel the production of the information sought. The committee would determine that the information is necessary to its legislative function, and the chairman could be authorized to issue a subpena, notwithstanding the Presidential instruction.

Should the Federal official refuse to comply with the subpena, the committee chairman could seek authorization from the particular House to initiate a civil action in the U.S. District Court for the District of Columbia to enforce the subpena.

The district court would be given jurisdiction over such actions and the power to enforce the subpenas by mandatory injunctions or other appropriate order. The court also could modify the subpenas or set them aside entirely.

Many Americans were shocked 2 years ago when Attorney General Kleindienst came before a joint hearing by the Government Operations Subcommittee on Intergovernmental Relations and the Judiciary Subcommittees on Separation of Powers and Administrative Practices and Procedures and asserted that the Congress could only obtain information the President consented to disclose. He maintained:

> Your power to know what the President knows, is in the President's hands.

We have attempted to answer that sweeping claim with this legislation. It is designed to implement the fundamental constitutional principle of the checks and balances between the three branches of Government.

I do not anticipate that many conflicts will arise. When they do, however, this legislation can help to assure a method for responsible congressional action—since no court suits can be initiated without the approval of at least one House—and to require that the executive branch also act responsibly in considering and setting forth its reasons for withholding information the Congress seeks.

Mr. President, the Congressional Right to Information Act is the product of legislative effort which extends back to the 92d Congress. It draws its provisions from other bills introduced in the 93d Congress by Senator Ervin (S.J. Res. 72), Senator Fulbright (S. 858), Senator Ervin and myself (S. Con. Res. 30), and Senators Ervin, Mathias, and Mansfield (S. 1923). Extensive hearings on the subject of withholding executive information from the legislative branch were held in both Congresses by the Senate Foreign Relations Committee, the Judiciary Subcommittees on Separation of Powers and Administrative Practices and Procedures, and the Government Oper-

ations Subcommittee on Intergovernmental Relations.

An identical bill, S. 2432, was reported out by the Committee on Government Operations and adopted by the Senate near the end of the first session of the 93d Congress. We are hopeful that this measure will meet with the interest and support in the House with which it was received in the Senate and soon will become public law.

In particular, I want to express my thanks to the distinguished Senator from Delaware (Mr. ROTH) for his leadership on this vital issue and for helping so much to make this legislation "a bipartisan approach" and to former Senator Ervin for the indispensable and excellent work he has contributed over the years in finding a means to resolve this serious constitutional problem.

At the request of Senator ROTH and myself, Senator Ervin was generous enough to provide us with his views on the importance of this legislative effort.

In a recent letter he said:

> My experiences as Chairman of the Senate Select Committee on Presidential Campaign Activities, and my long study of executive privilege have convinced me that some remedy short of the drastic alternatives of contempt of Congress or the power of the purse is necessary for proper congressional access to information. The Congressional Right to Information Act would have provided a very reasonable remedy.
>
> In the absence of a jurisdictional statute applicable to all committees, we are left with begging an executive agency to turn over information or resorting to more severe alternatives every time a committee needs information to carry out its legislative functions.

Even more recently, the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities has met with considerable resistance in its efforts to obtain information to carry out its mandate from the Senate.

Upon learning of our intention to reintroduce this bill, the distinguished chairman of that committee, Senator CHURCH, wrote:

> . . . I have come to appreciate the need for swift determination of controversies between the legislative and executive Branches over access to information in the hands of Federal agencies. The Select Committee and its staff have spent weeks, indeed, months, locked in debate with the federal intelligence agencies over this matter, and I cannot say that even now we have evolved procedures which will provide the Committee all the information it needs to fulfill its mandate.
>
> . . . had a bill with the purposes of the Congressional Right to Information Act been on the books, the Committee would have had the benefit of carefully refined procedures and the means to receive prompt judicial enforcement of its requests for information.

I ask unanimous consent that the letters from Senator Ervin and from Senator CHURCH be printed in the RECORD at the end of my remarks, together with the text of the bill.

Mr. President, the exercise of a privilege by one branch of the Government cannot be automatic at any level. It may be presumed but not bestowed by law. The hearings held on this issue demonstrated that there is no way to draw a

line and declare by law which Federal officials or Presidential intimates acting in what capacity on which policy matters are to be guaranteed confidentiality for their conduct.

Responsible government must insure accountability of public servants to the people through the political and legal processes. The legislation we introduce today does much to foster that accountability.

There being no objection, the bill and letters were ordered to be printed in the RECORD, as follows:

S. 2170

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Congressional Right to Information Act".

SEC. 2. (a) Title III of the Legislative Reorganization Act of 1970 is amended by adding at the end thereof the following new part:

"PART 4—KEEPING THE CONGRESS INFORMED

"INFORMING CONGRESSIONAL COMMITTEES

"SEC. 341. (a) The head of every Federal agency shall keep each committee of the Congress and the subcommittees thereof fully and currently informed with respect to all matters relating to that agency which are within the jurisdiction of such committee or subcommittee.

"(b) The head of a Federal agency, on request of a committee of the Congress or a subcommittee thereof or on request of two-fifths of the members thereof, shall submit any information requested of such agency head relating to any matter within the jurisdiction of the committee or subcommittee.

"PRODUCTION OF INFORMATION

"SEC. 342. (a) When an officer or employee of the United States is summoned to testify or to produce information, records, documents, or other material before either House of Congress or a committee of the Congress or subcommittee thereof, that officer or employee shall appear at the time and place specified and shall answer all questions propounded to him, or produce all information, including records, documents, and other material sought, unless, in the case of an officer or employee of a Federal agency in the executive branch, either within twenty days of the date of the summons, or in the case of any such information which was first requested at an appearance, within ten days after that appearance, the President formally and expressly instructs the officer or employee in writing to withhold the information requested, including answers to specific questions, or specific records, documents, or other material, in which event such Presidential instruction shall set forth the grounds on which it is based.

"(b) Each written Presidential instruction pursuant to subsection (a) shall be transmitted to the House of Congress or committee of the Congress or subcommittee thereof requesting the information, proposing the questions, or seeking the records, documents, or other material.

"SUBPENA OF INFORMATION

"SEC. 343. (a) If a House of Congress or a committee of Congress—

"(1) determines that an officer or employee of the United States has failed to comply with the provisions of section 342 (a); or

"(2) upon consideration of the Presidential instruction transmitted pursuant to section 342(b), determines that the information requested is needed to enable it to exercise a legislative function under the Constitution,

it shall prepare a written report setting forth such determination. In the case of a

*July 24, 1975*          CONGRESSIONAL RECORD — SENATE          24599

committee, the chairman is authorized, subject to the approval of the committee, to issue a subpena requiring such officer or employee to appear before the committee at a time specified and to provide the information requested by answering the question or questions propounded and to produce any information, including records, documents, or other material requested. In the case of a House of Congress, the majority or minority leader shall introduce a resolution citing such determination and authorizing the majority or minority leader of that House to issue a subpena requiring such officer or employee to appear before such House and to provide the information requested by answering the question or questions propounded and to produce any information, including records, documents or other material requested.

"(b)(1) If a committee of the Congress determines that an officer or employee of the United States has failed to comply with a subpena issued pursuant to subsection (a) within fifteen days after such officer or employee receives such subpena, the chairman of such committee is authorized, subject to the provisions of paragraph (2), to bring a civil action in the United States District Court for the District of Columbia to enforce such subpena.

"(2) If a committee of the Congress referred to in paragraph (1) determines that the chairman of such committee should institute a civil action in the United States District Court for the District of Columbia to enforce the subpena issued by it pursuant to subsection (a), the chairman shall introduce a resolution in the House or Houses of Congress concerned citing the failure to comply with the subpena of the committee and authorizing the chairman to bring a civil action in such court for such purpose. If such resolution is agreed to by the House or Houses of Congress concerned, the chairman shall institute a civil action in the United States District Court for the District of Columbia to enforce the subpena.

"(c) If a House of Congress determines that an officer or employee of the United States has failed to comply with a subpena issued pursuant to subsection (a) within fifteen days after such officer or employee receives such subpena, the majority or minority leader of that House shall introduce a resolution citing such failure to comply and authorizing the majority or minority leader of that House to bring a civil action in the United States District Court for the District of Columbia to enforce such subpena.

"(d)(1) A resolution introduced pursuant to subsection (a), (b)(2), or (c) shall not be referred to a committee and shall be privileged business for immediate consideration. It shall at any time be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the resolution. Such motion shall be highly privileged and not debatable. An amendment to the motion shall not be in order, and it shall not be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

"(2) If the motion to proceed to the consideration of the resolution is agreed to, debate thereon shall be limited to two hours, which shall be divided equally between those favoring and those opposing the resolution. A motion further to limit debate shall not be debatable. No amendment to, or motion to recommit, the resolution shall be in order, and it shall not be in order to move to reconsider the vote by which the resolution is agreed to or disagreed to.

"(3) Motions to postpone, made with respect to the consideration of the resolution, and motions to proceed to the consideration of other business, shall be decided without debate.

"(4) All appeals from the decisions of the Chair relating to the application of the rules of the Senate or the House of Representatives, as the case may be, to the procedure relating to the resolution shall be decided without debate.

"(e) The provisions of subsection (d) of this section are enacted by the Congress—

"(1) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they shall be considered as part of the rules of each House, respectively; and such rules shall supersede other rules only to the extent that they are inconsistent therewith; and

"(2) with full recognition of the constitutional right of either House to change such rules (so far as relating to the procedure in such House) at any time, in the same manner, and to the same extent as in the case of any other rule of such House.

"JUDICIAL REVIEW

"SEC. 344. (a) The United States District Court for the District of Columbia shall have original jurisdiction of actions brought pursuant to section 343 of this Act without regard to the sum or value of the matter in controversy. The court shall have power to issue a mandatory injunction or other order as may be appropriate, and to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the subpena issued pursuant to section 343 of this Act.

"(b) Any congressional party commencing or prosecuting an action pursuant to this section may be represented in such action by such attorneys as it may designate.

"(c) Appeal of the judgment and orders of the court in such actions shall be had in the same manner as actions brought against the United States under section 1346 of title 28, United States Code.

"(d) The courts shall give precedence over all other civil actions to actions brought under this part.

"PROTECTION OF INFORMATION

"SEC. 345. (a) Each House of Congress and each committee or subcommittee of the Congress shall take appropriate measures to insure the confidentiality of any information made available to it under this part which, in the judgment of the Federal agency providing it and the House of Congress or committee or subcommittee of the Congress receiving it, requires protection against disclosure which would endanger (1) personal privacy, (2) trade secrets or confidential commercial or financial information, or (3) the conduct of the national defense, foreign policy, or law enforcement activities.

"(b) The Select Committee on Standards and Conduct of the Senate shall investigate any breach of confidentiality of information made available under this part by a Member or employee of the Senate, and the Committee on Standards of Official Conduct of the House of Representatives shall investigate any breach of confidentiality of information made available under this part by a Member or employee of the House of Representatives. Such committee shall recommend appropriate action such as censure or removal from office or position.

"DEFINITIONS

"SEC. 346. For purposes of this part:

"(1) The term 'committee of the Congress' means any joint committee of the Congress or any standing committee, special committee, or select committee of either House of Congress.

"(2) The term 'Federal agency' has the same meaning given that term under section 207 of this Act, and includes the Executive Office of the President.

"SAVINGS PROVISIONS

"SEC. 347. (a) Nothing in this part shall be construed to require the furnishing or

production of any information, records, documents, or other material to either House of Congress if such furnishing or production is prohibited by an Act of Congress.

"(b) Nothing in this part shall be construed as in any way impairing the effectiveness or availability of any other procedure whereby Congress may obtain information needed to enable it to exercise a legislative function under the Constitution."

(b) Title III of the table of contents of the Legislative Reorganization Act of 1970 is amended by adding at the end thereof the following:

"PART 4—KEEPING THE CONGRESS INFORMED
"Sec. 341. Informing congressional committees.
"Sec. 342. Production of information.
"Sec. 343. Subpena of information.
"Sec. 344. Judicial review.
"Sec. 345. Protection of information.
"Sec. 346. Definitions.
"Sec. 347. Savings provisions.".

———

MORGANTON, N.C.,
*July 1, 1975.*
Hon. EDMUND S. MUSKIE,
*Chairman, Subcommittee on Intergovernmental Relations, Committee on Government Operations, U.S. Senate, Washington, D.C.*

DEAR ED: During the last Congress, it was my privilege to join with you in working for the successful Senate adoption of the Congressional Right to Information Act. It was with considerable disappointment, therefore, that upon my retirement from the Senate that the entire Congress had yet to adopt this important procedure whereby the Committees of the Congress could gain access to information in the possession of the Executive Branch.

My experiences as Chairman of the Senate Select Committee on President Campaign Activities, and my long study of executive privilege have convinced me that some remedy short of the drastic alternatives of contempt of Congress or the power of the purse is necessary for proper congressional access to information. The Congressional Right to Information Act would have provided a very reasonable remedy.

Had that legislation been public law in 1973, the Select Committee's job would have been much simpler. As you know, our initial lawsuit to enforce a subpoena of the Watergate tapes was dismissed by Judge Sirica on the grounds that his court did not have jurisdiction of such actions to enforce congressional subpoenas. After Judge Sirica's ruling was upheld upon appeal, Congress passed an act specifically granting jurisdiction of the Select Committee's suit to the District Court.

In the absence of a jurisdictional statute applicable to all committees, we are left with begging an executive agency to turn over information or resorting to more severe alternatives every time a committee needs information to carry out its legislative functions.

I am gratified to learn that you are again reintroducing this important legislation, and I hope that it will meet with both Senate and House approval in the 94th Congress.

With all kind wishes, I am,
Sincerely yours,

SAM J. ERVIN, Jr.

———

WASHINGTON, D.C., *July 22, 1975.*
Senator EDMUND S. MUSKIE,
*Senate Office Building,*
*Washington, D.C.*

DEAR ED: I am pleased to hear that you are reintroducing the Congressional Right to Information Act—the so-called "Executive Privilege" bill. That legislation, which passed

the Senate in the last Congress, would provide the Congress with a mechanism for prompt resolution by the courts of issues related to the withholding of information by Executive Branch agencies.

As Chairman of the Select Committee on Intelligence Activities, I have come to appreciate the need for swift determination of controversies between the Legislative and Executive Branches over access to information in the hands of federal agencies. The Select Committee and its staff have spent weeks, indeed months, locked in debate with the federal intelligence agencies over this matter, and I cannot say that even now we have evolved procedures which will provide the Committee all the information it needs to fulfill its mandate.

In the absence of legislation formalizing the relationship between the Legislative and Executive Branches with respect to access to information, the Committee is forced to formulate its own procedures without the benefit of a regular procedure recognized by the Courts. However, had a bill with the purposes of the Congressional Right to Information Act been on the books, the Committee would have had the benefit of carefully refined procedures and the means to receive prompt judicial enforcement of its requests for information.

I strongly support this legislation and hope that the Government Operations Committee and the Senate will move quickly to ratify their action in the last Congress.

Sincerely,

FRANK CHURCH,
*Chairman.*

Mr. ROTH. Mr. President, I am pleased to join Senator MUSKIE in reintroducing the Congressional Right to Information Act. In 1973, Senator MUSKIE, Senator ERVIN, and I worked closely together in our Intergovernmental Relations Subcommittee to develop this bill in a bipartisan manner. Although it was adopted by the Senate without dissent, it did not receive attention in the House.

This bill provides an expeditious and equitable means of deciding questions of executive privilege, but it is more than just an executive privilege bill. Had it been law during the Watergate controversy, the Watergate tapes would have become available sooner, ending this shabby chapter of our history at an earlier stage. It will also help solve a problem that has grown steadily with the growing size of bureaucracy—how Congress can obtain information it needs for legitimate legislative or oversight purposes from bureaucrats who want to withhold it to avoid revealing waste, inefficiency, corruption, or ineptitude. When I first came to Congress in 1967 and began working on a catalog of Federal domestic assistance programs, I was appalled at the way some Government agencies could almost just ignore legitimate requests for basic information about their programs. One agency even denied me a copy of a telephone book on the grounds that it was classified. It is my impression that even the White House cannot get all the information it wants from the "fourth branch"—the administrative bureaucracy.

Disputes over information are built into our constitutional system of separation of powers and checks and balances. They have been part of the history of this country since the beginning of the Republic. George Washington's administration, for example, complied with a congressional demand for information related to the ill-fated St. Clair expedition, but it rejected a request for papers relating to the negotiation of the Jay Treaty.

At one time or another, both the Congress and the Executive have made excessive claims. Former President Nixon's attempts to extend the doctrine of executive privilege to cover every employee of the executive branch and all activities of the President were totally unacceptable. I believe that there should be an area of executive privilege covering confidential policy advice a President receives from his advisers about matters involving the constitutional duties of the President. But I am absolutely opposed to any assertion of executive privilege to protect illegal activity, malfeasance, or wrongdoing by any member of the executive branch.

Congress, too, in the past has overstepped its proper bounds, most notably after the Civil War, but more recently in the early 1950's. The New York Times and Washington Post have praised President Eisenhower when he finally rejected Senator McCarthy's demands for personnel files and other executive branch information. In a book published in 1955, Alan Barth wrote:

It is the purpose of this book to show that the legislative branch has acquired a dominance which has become a peril to liberty. The imbalance has been brought about in large measure through an old and necessary instrument of legislative action which lately has got altogether out of hand—the congressional investigating committee. Congress has, increasingly during the past decade, used its indispensable investigating power in ways that encroach upon the jurisdiction of the executive branch of government . . .

Each branch must protect its own prerogatives from excessive incursions from the other. It is no better to have a strong Congress and a weak President than to have a weak Congress and a strong President. The country needs a strong President and a strong Congress.

I believe the Congressional Right to Information Act gives Congress the power it needs to get information for the full functioning of its constitutional responsibilities, while protecting the President and executive branch from any overreaching demands from Congress. The bill does not try to define either the scope of the congressional right to obtain information or an executive prerogative to withhold; it does establish a procedure under which there can be a speedy court determination of cases involving legitimately conflicting and countervailing powers. Under this bill, no one in the executive branch can legitimately withhold information from Congress except by explicit instruction of the President, and committees may challenge withholding sanctioned by the President in the courts. The bill, however, authorizes such a challenge only when the committee chairman has obtained a resolution authorizing the challenge from a full House of Congress. This is to insure that just as the executive branch cannot lightly withhold information neither can the Congress lightly go to court to challenge him.

If this bill becomes law, we will have, for the first time in our history, an expeditious and equitable judicial procedure for Congress to obtain the information it needs without punishing individuals either through contempt of Congress or some other alternative. I hope the Congressional Right to Information Act will receive speedy attention.

Mr. ABOUREZK. Mr. President, I join with Senator MUSKIE in introducing S. 2170, the Congressional Right to Information Act, to help preserve the separation of powers and to insure to the Congress the means of acquiring that information necessary to its legislative function.

The Subcommittee on Separation of Powers, which I now chair, has long been concerned with the problem of governmental information practices, particularly the asserting of executive privilege. The exercise of this so-called privilege not only encroaches upon congressional prerogatives but erects a bar to the effective acquisition by the Congress of information needed to perform its designated tasks. Under the aegis of Sam Ervin, the subcommittee first held hearings in 1971 on executive privilege and the withholding of information by the Executive. Then in 1973, in joint hearings with the Subcommittee on Administrative Practice and Procedure of the Judiciary Committee and the Subcommittee on Intergovernmental Relations of the Committee on Government Operations, we inquired into executive privilege, secrecy in Government, and freedom of information. The Separation of Powers Subcommittee will continue to play an active role in the consideration of the executive privilege issue, and will work closely with the Government Operations Subcommittee on this legislation.

The problem of determining the limits of executive privilege can no longer be considered a subject suitable only for esoteric treatment in the law journals. The difficulties encountered by the Congress in ferreting out the scope of executive activities in connection with the Watergate episode vividly illustrate the practical aspects of the issue.

The doctrine of executive privilege has developed without constraint, exacerbated both by the enormous expansion of the size and the powers of the executive branch and by the failure of the legislative branch to assert its constitutional powers. By this abdication, Congress has actively encouraged the aggrandizement of Executive power.

Separation of powers is the hallmark of our constitutional Government, but recognizing that strict separation, if scrupulously followed, would be unproductive, the framers provided for separate but balanced power. Governmental responsibility must be shared if the plan envisioned by the framers is to be accomplished. The bill we propose today establishes an obligation in the head of every Federal agency to keep congressional committees and subcommittees informed with respect to all matters relating to that agency which are within the jurisdiction of such committee or subcommittee. In addition, the head of each Federal agency shall, on the request of such committee or subcommittee, sub-

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 1:08cv00409 (JDB) |
| | ) |
| HARRIET MIERS and JOSHUA BOLTEN, in his capacity as custodian of White House records, | ) ) ) ) |
| Defendants. | ) ) ) |

**[PROPOSED] ORDER**

HAVING CONSIDERED the plaintiff's Motion for Partial Summary Judgment and accompanying filings thereto, and defendants' Motion to Dismiss and in Opposition to Plaintiff's Motion for Partial Summary Judgment and accompanying filings thereto, it is hereby this ____ day of _____ 2008, **ORDERED** that plaintiff's Motion for Partial Summary Judgment is **DENIED** and defendants' Motion to Dismiss is **GRANTED**.

_____
JOHN D. BATES
UNITED STATES DISTRICT JUDGE