**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

COMMITTEE ON THE JUDICIARY,      )
UNITED STATES HOUSE OF           )
REPRESENTATIVES                  )
                                 )
                    Plaintiff,   )
                                 )
          v.                     )      **Case No. 1:08-cv-00409 (JDB)**
                                 )
HARRIET MIERS, et al.            )
                                 )
                    Defendants.  )
_____)

**UNOPPOSED MOTION OF AMICI CURIAE THE RUTHERFORD INSTITUTE,**
**JUDICIAL WATCH,**
**CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, AND**
**THE BRENNAN CENTER FOR JUSTICE**
**FOR LEAVE TO FILE A MEMORANDUM OF LAW AMICI CURIAE IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

The Rutherford Institute, Judicial Watch, Citizens for Responsibility and Ethics in

Washington ("CREW"), and the Brennan Center for Justice respectfully request the Court's

leave to participate as amici curiae in the above-captioned case in opposition to Defendants'

motion to dismiss for the reasons discussed below.  Pursuant to Local Civil Rule 7(m), counsel

for amici has conferred with counsel for Plaintiff, who consents to this motion, and counsel for

Defendants, who takes no position on this motion.  At least one other group has filed an amicus

brief in this case that no party opposed.

        1.      Amici organizations are dedicated to advocating for the Constitution's Separation

of Powers.  The Rutherford Institute is an international civil liberties organization that specializes

in providing legal representation without charge to individuals whose civil liberties are

threatened or violated.  The Rutherford Institute is a staunch advocate of government accountability, believing that the best guarantee of freedom is, in the words of Abraham Lincoln, a government "of the people, by the people, for the people."  Judicial Watch is a not-for-profit, educational organization that seeks to promote integrity, transparency, and accountability in government and fidelity to the rule of law.  Judicial Watch is participating as amicus curiae in this matter because it has an active and longstanding interest in issues involving the assertion and scope of the presidential communications privilege.  CREW is a non-profit corporation that seeks to promote accountability, transparency and integrity in government officials and the government decision-making process.  CREW has experienced a disturbing trend away from government openness that includes an effort by the Executive to thwart groups such as CREW from using the federal courts to resolve its claims of executive misconduct.  CREW seeks to participate as an amicus here to ensure the fullest presentation of important issues of Separation of Powers that this lawsuit raises.  The Brennan Center for Justice is a nonpartisan organization that seeks to protect and defend the institutions of American Democracy.  We fight to set meaningful limits on the exercise of executive power and to preserve the Constitution's checks and balances.  Our work has taught us that maintaining the effective functioning of the Constitution's scheme of separated powers is necessary for the preservation of essential liberties.

2. "[T]he court has broad discretion to permit [an organization]'s participation in [a] suit as an amicus curiae." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 519 F.Supp. 2d 89, 93 (D.D.C. 2007).  "Generally, a court may grant leave to appear as an amicus if the information offered is timely and useful." *Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996) (internal quotation marks omitted).  When amici "have a special interest

in th[e] litigation as well as a familiarity and knowledge of the issues raised therein that could aid in the resolution of th[e] case," this Court has granted amici leave to participate. *Id.*

3.      Since early 2007, the U.S. House of Representatives Committee on the Judiciary has been investigating the forced resignations of nine United States Attorneys.  The investigation was launched to ascertain the facts concerning allegations of improper conduct by Executive Branch officials and to consider whether any existing law ought to be changed.  Pursuant to this investigation, the Committee issued subpoenas to two executive officials who, at the President's instruction and based on a claim of absolute privilege, declined to appear before Congress as directed.  Amici address the question whether the President's claim of absolute privilege for aides can be subjected to judicial review.  We believe it can, and that grave harm would be inflicted on the constitutional Separation of Powers otherwise.

4.      Amici organizations together have substantial experience working on issues arising from Separation-of-Powers disputes and congressional investigations into misconduct. Amici are deeply concerned about the impact that the President's claim of executive privilege will have on Congress's ability to oversee effectively Executive Branch conduct.  Amici have differing ideological orientations and often diverge on substantive policy issues.  They stand united, however, in their belief that the Constitution's checks and balances are this Nation's greatest contribution to democracy.  Amici's decades of experience on these issues bear directly on the questions raised by this case.  They therefore submit the attached brief to illuminate the dangers posed by the arguments set forth in Defendants' motion to dismiss.

5.      Accordingly, amici request leave of the Court to participate in this matter as amici curiae.

A proposed order permitting amici to file the attached Memorandum of Law is submitted herewith.

Respectfully submitted,

/s/ Sidney S. Rosdeitcher
SIDNEY S. ROSDEITCHER
(D.C. Bar # 094532)
    Counsel of Record
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

FREDERICK A.O. SCHWARZ JR.
AZIZ HUQ
ERIC LANE
DAVID UDELL
JONATHAN HAFETZ
EMILY BERMAN[*]
The Brennan Center for Justice
at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 998-6730

Dated: May 29, 2008                         Counsel for Amici Curiae

---

[*] Admission pending.

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2008, amici's motion for leave, proposed order granting leave, and amici's memorandum of law in opposition to Defendants' motion to dismiss are being file electronically with the Clerk of Court by e-mail (dcd_cmecf@dec.uscourts.gov) for filing with the Court's CM/ECF system, which will generate automatic service of such filing upon all parties registered to receive such notice.

In addition, electronic copies were sent via e-mail to the following:

Irvin B. Nathan
Office of the General Counsel
219 Cannon House Office Bldg.
Washington, DC 20515
202-225-9700
irv.nathan@mail.house.gov

John Russell Tyler
U.S. Department of Justice
20 Massachusetts Avenue, NE
Washington, DC 20530
202-514-2356
john.tyler@usdoj.gov

/s/ Sidney S. Rosdeitcher
Sidney S. Rosdeitcher

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

COMMITTEE ON THE JUDICIARY,               )
UNITED STATES HOUSE OF                    )
REPRESENTATIVES                           )
                                          )
          Plaintiff,               )
                                          )
          v.                       )    **Case No. 1:08-cv-00409 (JDB)**
                                          )
HARRIET MIERS, et al.                     )
                                          )
          Defendants.              )
_____)

### MEMORANDUM AMICI CURIAE OF THE RUTHERFORD INSTITUTE, JUDICIAL WATCH, CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, AND THE BRENNAN CENTER FOR JUSTICE

### IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

SIDNEY S. ROSDEITCHER
   Counsel of Record
    (D.C. BAR # 094532)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

FREDERICK A.O. SCHWARZ JR.
AZIZ HUQ
ERIC LANE
DAVID UDELL
JONATHAN HAFETZ
EMILY BERMAN[*]
The Brennan Center for Justice
   at NYU School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
(212) 998-6730
May 29, 2008                 Counsel for Amici Curiae

_____

[*] Admission Pending

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES................................................................................................. ii

INTERESTS OF THE AMICI CURIAE .................................................................................. 1

PRELIMINARY STATEMENT ........................................................................................... 3

ARGUMENT .................................................................................................................. 6

    I.    Declining To Exercise Jurisdiction Would Undermine The Separation Of Powers........... 6

        A.  The Court Must Exercise Jurisdiction Here To Preserve Congress's Core Constitutional Role Under The Separation Of Powers ................................................. 6

        B.  Declining To Exercise Jurisdiction Would Work Grave Harm To The Separation Of Powers.................................................................................................................. 9

        C.  Declining To Exercise Jurisdiction Would Undermine The Traditional Process of Interbranch Negotiation ...................................................................................... 13

    II.    Historical Practice And Precedent Support Adjudication Of This Case.......................... 15

        A.  Precedent Supports The Exercise Of Jurisdiction...................................................... 15

        B.  Historical Practice Does Not Support Threshold Dismissal ....................................... 17

    III.  The Ultimate Merits Question Here Is A Legal Question Fit For Judicial Resolution..... 20

CONCLUSION ................................................................................................................ 23

**TABLE OF AUTHORITIES**

## Cases

*Baker v. Carr*, 369 U.S. 186 (1962) ......................................................... 22

*Barenblatt v. United States*, 360 U.S. 109 (1959) ...................................... 7

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) ................................ 9

*Chisom v. Roemer*, 501 U.S. 380 (1991) ................................................. 18

*Clinton v. Jones*, 520 U.S. 681 (1997) ................................................ 13, 21

*Coleman v. Miller*, 307 U.S. 433 (1939) ................................................... 10

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975) ........................ 6, 10

*Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792) ............................................ 10

*In re Grand Jury Proceedings*, 5 F. Supp. 2d 21 (D.D.C. 1998) ...................... 21

*In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997) ..................... 7, 21, 22

*INS v. Chadha*, 462 U.S. 919 (1983) ........................................................ 21

*Judicial Watch v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004) .......... 20, 22

*Jurney v. MacCracken*, 294 U.S. 125 (1935) ............................................ 10

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ......................................... 6, 11

*Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984) ...................... 17

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................. 10, 12

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977) ................................. 21

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ................................................. 11

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) ..................................... 21, 22

*Raines v. Byrd*, 521 U.S. 811 (1997) ................................................. passim

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) ............................................... 14, 15, 21, 22

*U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76
    (D.D.C. 1998) .............................................................................. 9, 16

*United States v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977) ("*AT&T II*") .............. 14, 15, 19

*United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*") ................... passim

*United States v. Nixon*, 418 U.S. 683 (1974) .......................................................................... passim

*United States v. Rayburn House Office Bldg., Room 2113, Washington, D.C.*,
   497 F.3d 654   (D.C. Cir. 2007) .............................................................. 16

*United States v. U.S. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) .................... 16

*Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002) ............................................................ 9, 17

*Watkins v. United States*, 354 U.S. 178 (1957) ........................................................................... 6

**Statutes**

28 U.S.C. § 1331 ........................................................................................................................... 15

28 U.S.C. § 1331 (1976) ............................................................................................................... 15

**Legislative Material**

S. Rep. No. 95-170 (1977) ............................................................................................................ 18

H.R. Rep. No. 110-423 (2007) .............................................................................................. 3, 7, 19

H.R. Res. 980, 110th Cong. (2008) ................................................................................................ 9

**Other Authorities**

5 Op. Off. Legal Counsel 27 (1981) ............................................................................................. 19

Prosecution for Contempt of Congress of an Executive Branch Official Who Has
   Asserted a Claim of Executive Privilege, 8 Op. Off. Legal Counsel 101 (1984) ................. 8, 19

10 Op. Off. Legal Counsel 68 (1986) ........................................................................................... 19

Letter from Michael Mukasey, Attorney General, to Nancy Pelosi, Speaker of the House of
   Representatives (Feb. 29, 2008) ............................................................................................... 8

The Federalist No. 10 (James Madison) (Isaac Kramnick ed., 1987) .................................... 11, 13

The Federalist No. 51 (James Madison) (Isaac Kramnick ed., 1987) .............................................. 6

The Federalist No. 78 (Alexander Hamilton) (Isaac Kramnick ed., 1987) .................................. 12

Louis Fisher, *The Politics of Executive Privilege* (2004) ....................................................... 14, 20

Mark J. Rozell, *Presidential Power, Secrecy, and Accountability* (2002) ................................... 20

**INTERESTS OF THE AMICI CURIAE**

Amici public interest organizations submit this brief in support of Plaintiff Committee on the Judiciary for the United States House of Representatives ("Committee") and urge this Court to deny Defendants' motion to dismiss.  Amici organizations are dedicated to advocating for the Constitution's Separation of Powers.  They believe the Separation of Powers is best served by allowing this suit to proceed to judicial resolution.  Their decades of experience have yielded ample proof that executive officials of any political party will try to evade accountability.  If today's President hails from one party and the congressional majority from another, in the future these institutions' partisan affiliation will surely change.  But the core principle—that Congress must have effective tools to hold the Executive accountable—endures regardless of who controls either branch.  If courts decline to enforce this principle, the nation will feel the consequences far into the future.

The Rutherford Institute is an international civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its President, John W. Whitehead, the Institute specializes in providing legal representation without charge to individuals whose civil liberties are threatened or violated.  The Institute also educates the public about constitutional and human rights issues.  Attorneys affiliated with The Rutherford Institute have represented numerous parties before the U.S. Supreme Court.  The Institute has also filed briefs as an amicus of the Court in cases dealing with critical constitutional issues.  The Rutherford Institute is a staunch advocate of government accountability, believing that the best guarantee of freedom is, in the words of Abraham Lincoln, a government "of the people, by the people, for the people."

Judicial Watch is a not-for-profit, educational organization that seeks to promote integrity, transparency, and accountability in government and fidelity to the rule of the law.

Judicial Watch regularly initiates and prosecutes lawsuits, monitors legal decisions and significant developments in the law, and files amicus curiae briefs on issues of public concern, among other activities.  Judicial Watch is participating as amicus curiae in this matter because it has an active and longstanding interest in issues involving the assertion and scope of the presidential communications privilege.

Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW seeks to promote accountability, transparency, and integrity in government officials and the government decision-making process.  CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to empowering citizens to have an influential voice in government decisions through the dissemination of information.  Toward that end, CREW uses a combination of research, litigation, and advocacy to advance its mission. CREW's public interest litigation includes lawsuits brought against the Executive and executive branch agencies to prevent abuses of executive power.  CREW has experienced a disturbing trend away from government openness that includes an effort by the Executive to thwart groups such as CREW from using the federal courts to resolve its claims of executive misconduct. CREW seeks to participate as an amicus here to ensure the fullest presentation of important issues of the Separation of Powers that this lawsuit raises.

The Brennan Center for Justice at New York University School of Law is a non-partisan organization that seeks to protect and defend the institutions of American democracy.  We fight to set meaningful limits on the exercise of executive power and to preserve the Constitution's checks and balances.  Our work has taught us that maintaining the effective functioning of the Constitution's scheme of separated powers is necessary for the preservation of essential liberties.

## PRELIMINARY STATEMENT

This case concerns Congress's ability to investigate effectively grave charges that the White House misused the federal criminal justice system to influence prosecutions for partisan purposes and to disadvantage political opponents. It raises questions about Congress's powers to obtain information necessary to restore public confidence in the administration of justice and to assess the need for legislation to prevent recurrence of wrongdoing. The issue presented by Defendants' motion to dismiss is whether the federal judiciary has a role in determining whether the President can frustrate such a congressional investigation. Amici insist that it does.

On a motion to dismiss, the Committee's allegations are accepted as true. Independently, however, substantial evidence already suggests that the criminal justice system may have been perverted for the purpose of securing partisan political advantage. *See, e.g.*, Compl. at ¶ 2; H.R. Rep. No. 110-423, at 2 (2007); *id.* at 22-54 (Additional views of Chairman Conyers and Subcommittee Chair Sánchez). Yet to date Congress's important investigation has been blocked by an unprecedented White House refusal to negotiate access to critical information about the ultimate source of possible improprieties. By insisting on conditioning access to Defendants in ways that thwart further investigation into alleged wrongdoing, the White House has broken sharply with a tradition of interbranch cooperation and left a cloud over the administration of federal justice. Its actions create a troubling precedent that future Administrations of either party may follow.

Congress's invocation of federal court jurisdiction to enforce a subpoena is thus particularly appropriate in this case. If Congress cannot test the legality of Defendants' executive privilege claims here—when it has already explored reasonable alternatives, when it

faces unprecedented executive intransigence, and when the credibility of federal criminal law enforcement hangs in the balance—the Constitution's Separation of Powers stands in grave peril.

Amici curiae agree with the Committee that this Court should adjudicate the controversy raised by Defendants' refusal to comply with its subpoenas. Plaintiff demonstrates that this suit constitutes an Article III "case or controversy" in which the Committee has a direct, personal, and concrete stake; that the absence of a statutory cause of action does not preclude the Committee's suit; that equitable considerations weigh overwhelmingly in favor of the exercise of jurisdiction; and that Defendants have no absolute immunity from compulsory disclosure. Amici submit this brief to address an argument that runs throughout Defendants' motion to dismiss: the proposition that our system of Separation of Powers requires this Court to abdicate its Article III and statutory jurisdiction to resolve this case. To the contrary, a decision by this Court to decline to entertain this dispute would severely undermine the Constitution's system of checks and balances as well as the rule of law.[1]

Specifically, dismissal at this juncture is inappropriate for three reasons. *First*, this Court must act to preserve the Constitution's checks and balances. Contrary to Defendants' claims, it would be this Court's *refusal* to adjudicate this case that would harm the Separation of Powers. The Committee's inquiry is at the core of Congress's power to investigate for purposes of legislating and overseeing execution of its legislative acts. Judicial refusal to enforce properly sanctioned congressional subpoenas issued in the course of this investigation would impermissibly invade Congress's constitutional prerogatives; it would destabilize the incentives that foster interbranch negotiations; and it would perversely reward the White House for discarding the tradition of negotiation in favor of a new and worrying disrespect for a coordinate

---

[1] This brief is directed only to Defendants' motion to dismiss and does not address Plaintiff's motion for summary judgment.

branch.  Past judicial involvement in interbranch disputes demonstrates that Defendants are plainly wrong to claim that exercise of such jurisdiction reduces the political branches' incentives to negotiate.  To the contrary, the prospect of involvement by the federal courts hastens equitable resolution of interbranch conflict.

*Second*, this Court's exercise of jurisdiction is warranted in light of both historical and judicial precedent.  History shows that Congress and the Executive each have understood that congressional subpoenas of executive branch officials may be enforced by civil actions.  Negotiating with the safety net of eventual judicial resolution, Congress has been successful in securing access to necessary information when serious claims of wrongdoing are at issue such that only a minority of disputes concerning executive privilege has ended in litigation.  This history should not, however, count against Congress.  Rather, history suggests that what is unprecedented here is White House stonewalling to prevent a full investigation into allegations of partisan corruption of the Department of Justice.

*Finally*, the merits questions to be settled here are no different in character from legal issues routinely raised in and resolved by federal courts.  They are questions of law fully fit for judicial resolution.

In sum, the fact that this case involves "a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict." *United States v. AT&T*, 551 F.2d 384, 390 (D.C. Cir. 1976) ("*AT&T I*") (*citing United States v. Nixon*, 418 U.S. 683 (1974)).  Principle, history, and binding precedent all confirm that this suit should proceed to resolution on the merits.

**ARGUMENT**

I.     **Declining To Exercise Jurisdiction Would Undermine The Separation Of Powers**

    A.    **The Court Must Exercise Jurisdiction Here To Preserve Congress's Core Constitutional Role Under The Separation Of Powers**

This Court must assist Congress in carrying out its constitutional obligations.  In our Separation of Powers, it is the duty of Congress, as well as the judiciary, to check abuses of power by the Executive.  As "the great security against a gradual concentration of the several powers in the same department," the Framers gave "to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."  The Federalist No. 51, at 319 (James Madison) (Isaac Kramnick ed., 1987).  The Constitution thus "divide[s] and arrange[s] the several offices in such a manner as that each may be a check on the other."  *Id.* at 320.  Here, the Committee's investigation is an effort to carry out its constitutional responsibility to ensure that the Executive stays within constitutional and legal bounds.  Absent judicial intervention to resolve the legal question whether the Executive's claim of executive privilege is lawfully valid, Congress has concluded that it cannot fulfill this responsibility.  Availability of a judicial forum to resolve this impasse is essential to the Constitution's checks and balances.

Article I of the Constitution vests Congress with inherent authority to investigate for the purpose of legislation and to issue subpoenas in the course of such inquiries.  *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) ("[T]he power to investigate is inherent in the power to make laws.");  *Watkins v. United States*, 354 U.S. 178, 187 (1957) ("[Congress's constitutional power to investigate] encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. . . .  It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste.");  *McGrain*

*v. Daugherty*, 273 U.S. 135, 174 (1927) ("[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function.").

Congress's power to investigate reaches its zenith in this case.  The Committee is investigating allegations that partisan operatives commandeered Congress's criminal laws and the machinery of the Department of Justice for improper purposes.  *See* Compl. at ¶ 2; H.R. Rep. No. 110-423, at 2; *see also id.* at 22-54 (Additional views of Chairman Conyers and Subcommittee Chair Sánchez); Mem. of P. & A. in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Br.") at 7-10.[2]  Yet critical pieces of what happened are still unknown.  Information supplied by federal officials has been riddled with gaps and inconsistencies, raising the possibility that the Committee and the public have been misled.  *See* Pl.'s Br. 9-11 & n.7; H.R. Rep. No. 110-423, at 36-41 (Additional views of Chairman Conyers and Subcommittee Chair Sánchez).  These gaps and inconsistencies mean it is simply not known who, if anyone, sanctioned partisan manipulation.  Defendants' assertions that Congress's interest is "attenuated" and "tangential" are simply inaccurate.  Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss and in Opp'n to Pl.'s Mot. for Partial Summ. J. on Counts I and II ("Defs.' Br.") at 62.  Rather, critical questions remain unanswered.

Congress can obtain these missing facts only from executive officials who may be implicated in or privy to the misconduct alleged—the very officials subpoenaed.  Congress cannot go elsewhere for the necessary information.  And there is no private litigant to challenge executive nondisclosure should this Court close the courthouse door.  *Cf. Raines v. Byrd,* 521 U.S. 811, 834 (1997) (Souter, J., concurring) (noting that dismissal in that case was appropriate given "the certainty [of] another [private litigant's] suit"); *In re Sealed Case (Espy)*, 121 F.3d

---

[2] Precedent shows that Congress has *less* legitimate interest in parsing the affairs of a private citizen than it does scrutinizing the exercise of power delegated to the Executive.  *See, e.g.*, *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959).

729, 754 (D.C. Cir. 1997) (a party seeking even concededly privileged evidence may overcome the privilege if the evidence is "not available with due diligence elsewhere").

Yet the White House has blocked all meaningful access to these officials and the documents they possess by a presidential assertion of "absolute" immunity coupled with a refusal to permit any meaningful questioning. *See* Defs.' Ex. 13, Letter from Fred Fielding, White House Counsel, to George Manning, Attorney for Harriet Miers (July 10, 2007).[3]  And the very branch under scrutiny has barred the usual method of enforcing a subpoena—criminal contempt. *See* Letter from Michael Mukasey, Attorney General, to Nancy Pelosi, Speaker of the House of Representatives (Feb. 29, 2008); *see also* Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. Off. Legal Counsel 101 (1984) (asserting that the Justice Department is not required to prosecute executive officials cited by Congress for contempt for failure to comply with congressional subpoenas based on executive privilege).

The Framers crafted the Constitution so that each branch would police and check the abuses of the others.  Here, credible allegations of partisan abuse of executive authority linger unresolved due to unprecedented stonewalling by the very persons under investigation. Congress has concluded that absent a full understanding of the facts, it cannot fulfill its constitutional obligation to determine if it must legislate to prevent future corruption.  Under these circumstances, this Court must act.

---

[3] Defendants protest that the White House offered to make testimony available under reasonable terms. *See* Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss and in Opp'n to Pl.'s Mot. for Partial Summ. J. on Counts I and II ("Defs.' Br.") at 16-17.  But the terms under which the White House offered to make witnesses available would have rendered any interview with them completely ineffectual.  Compl. at ¶ 34; *see also* Mem. Amici Curiae of Former U.S. Attorneys at 12 n.6.

**B.**    **Declining To Exercise Jurisdiction Would Work Grave Harm To The Separation Of Powers**

Invoking Separation-of-Powers concerns, Defendants argue that this action should be dismissed before the lawfulness of their executive privilege claims is determined. *See, e.g.*, Defs.' Br. at 1, 22. But far from shoring up the Separation of Powers, threshold dismissal would work grave harm to the Separation of Powers in two distinct ways.

*First*, threshold dismissal of this case would entail unwarranted judicial second-guessing of a legislative decision that lies at the heart of Congress's Article I powers. This Court should not intrude on Congress's prerogatives by dictating when and how Congress should conduct its legislative inquiries. Indeed, to do so now would risk deepening the conflict between the political branches.

Congress has chosen to pursue its legitimate investigatory aims through civil enforcement of its subpoenas and consequently authorized this suit. H.R. Res. 980, 110th Cong. (2008). It is plain that a house of Congress may invoke federal court jurisdiction by filing a civil suit. *See, e.g.*, *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998) (three-judge panel) (finding properly filed a House of Representatives challenge to Census Bureau's plan to use statistical sampling in 2000 census); *see also Raines*, 521 U.S. at 829 (dismissing case, in part *because* legislative plaintiffs "[had] not been authorized to represent their respective Houses of Congress"); *accord Walker v. Cheney*, 230 F. Supp. 2d 51, 68 (D.D.C. 2002). The House resolution authorizing civil proceedings in this matter is a conclusive determination that such resolution is best pursued through a civil action. *See* H.R. Res. 980.[4]

---

[4] The Committee and the full House of Representatives opted to pursue this matter judicially because the instant dispute with the Executive Branch concerns a question of law that is amenable to judicial resolution. *See infra* Section III. Unlike differences over executive-branch interpretations of statutes, or legislative dissatisfaction with executive orders, this dispute cannot be resolved by enactment of legislation. Unlike in prior cases, a new law cannot achieve the goal Congress seeks here. *See Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999) (noting

In seeking dismissal, however, Defendants argue that Congress should use other, political means to secure the information it needs.  *See, e.g.*, Defs.' Br. at 7-9, 22.  Accepting Defendants' argument would require this Court to second-guess Congress's judgment that judicial enforcement of its subpoenas is the most effective and least disruptive means for obtaining information as well as Congress's conclusion that resort to political devices—e.g., limiting appropriations or initiating impeachment proceedings—would result in unacceptable harm to the public.[5]  The exercise of Congress's "inherent" investigative authority is constitutionally committed to Congress.  *Eastland*, 421 U.S. at 504.  This Court has no role dictating to Congress how such legislative business should be accomplished.  *Cf. Morrison v. Olson*, 487 U.S. 654, 695 (1988) (stating that judges may not exercise non-judicial duties); *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792) (same).[6]

Worse, judicial abdication here may well push the political branches closer to potential crisis.  Historically, Congress has enforced subpoenas through its inherent contempt power by seizing and detaining individuals who failed to comply with them.  *See, e.g.*, *Jurney v. MacCracken*, 294 U.S. 125 (1935) (recognizing congressional power to use inherent contempt to

that "courts should refrain from interfering in disputes arising out of the legislative process *when a political remedy is available from within that process*") (emphasis added).  Unlike the scenarios in *Chenowith* and *Raines*, here Congress cannot undo the disfavored executive action by legislation.

[5] As the hypotheticals developed by Defendants' amici illustrate, it is always possible to imagine a new avenue of investigation or an untried tactic to escalate political pressure.  *See* Mem. Amici Curiae of Representatives John Boehner et al. at 23-29.  It is *always* possible to re-interview a witness, to await another investigation's findings, to criticize an earlier line of investigation for insufficient vigor, or to conceive of a settlement offer different from the ones that were made.  *Id.*  Yet Congress has already pursued alternative lines of inquiry.  It has already offered to negotiate with the Executive over testimony.  *See* Pl.'s Br. at 11-14.  Only when those efforts failed did the House determine that judicial action was necessary.

[6] As Defendants' amici demonstrate, a threshold dismissal would interfere in legislative business in another way as well:  It would in effect permit a legislative minority to use this Court to defeat a prevailing majority of the House.  *See* Mem. Amici Curiae of Representatives Hon. John Boehner et al. at 2 (noting that all amici opposed the contempt resolution).  Without discernable irony, Defendants' amici ask this Court to give them what they failed to get in the democratic process.  But in *Raines v. Byrd*, the Court declined to allow a legislative minority to undo a majority decision via the federal courts.  521 U.S. at 824 (distinguishing *Raines* plaintiffs from legislators in *Coleman v. Miller*, 307 U.S. 433 (1939), in part on the ground that the latter won the relevant vote).  Respect for democratic outcomes here, unlike in *Raines*, counsels *against* threshold dismissal.

punish for failure to comply with a subpoena); *McGrain*, 273 U.S. at 168-69 (recognizing validity of congressional subpoenas).  Since the Executive has already blocked statutory criminal contempt proceedings, the practical effect of refusing jurisdiction thus may well be an escalation toward measures such as inherent contempt or even impeachment.  This Court's refusal to act hence may well invite greater friction between the branches, undermining further any possibility of settlement.

In the past, courts have prudently chosen to refrain from settling legal questions while there is a plausible chance that the political branches will reach negotiated settlement.  *See, e.g.*, *AT&T I*, 551 F.2d at 386-87.  But no federal court has *ever* stated that such disputes are categorically unfit for judicial resolution.  To the contrary, the Supreme Court has insisted that "when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance . . . the exercise of jurisdiction has been held warranted."  *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982).  To reach the unprecedented conclusion that a dispute between the political branches is not suitable for judicial resolution where Congress's constitutional interest is so clearly urgent, and when the Executive consistently has declined to negotiate, would inflict grave harm on the Separation of Powers.

*Second*, threshold dismissal would lead to the unacceptable consequence of concentrating power in the Executive by allowing that branch to decide conclusively when to turn over evidence of its own wrongdoing.  To not decide this case, in fact, would be to decide it in favor of the Executive, and in so doing, to render the Executive branch a "judge in [its] own cause" when it came to testimonial privileges.  Federalist No. 10, at 124 (James Madison) ("No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment. . .

.").  But the proper bounds of executive secrecy should be resolved by a branch that lacks an interest in the outcome:

> [W]here the issue pertains to separation of powers, and the political branches are (as here) in disagreement, neither can be presumed correct.  The reason is stated concisely by Madison: "The several departments being perfectly co-ordinate by the terms of their common commission, neither of them, it is evident, can pretend to an exclusive or superior right of settling the boundaries between their respective powers . . . ."

*Morrison*, 487 U.S. at 704-05 (Scalia, J., dissenting) (*quoting* Federalist No. 49) (James Madison); *see also* The Federalist No. 78 (Alexander Hamilton), at 437 ("The judiciary . . . has no influence over either the sword or the purse . . . but merely judgment. . . .").

To accept blindly the Executive's determination of the bounds of its own privilege would corrode the checks and balances of constitutional governance.  Absent judicial scrutiny, any information could be withheld, no matter how vital to Congress's legitimate legislative or investigative efforts, and no matter how serious the misconduct alleged.  As in this case, concededly non-privileged information might be withheld.  *See* Defs.' Br. at 14 (describing withheld documents that cannot be subject to executive privilege as they contain communications between executive officials and individuals either outside the White House or outside the Executive Branch altogether).  What the Executive disclosed would hinge not on law, but on political happenstance or the inclinations of a White House counsel.  This result contradicts the basic principle that ours is "a government of laws and not of men."  *Morrison*, 487 U.S. at 697 (Scalia, J., dissenting) (*quoting* Mass. Const. of 1780, Part the First, art. XXX). Such a dismissal, indeed, would signal to future presidents that they could hide behind executive privilege regardless of whether their legal claim was weak or strong—or even baseless.

Unsurprisingly, the Supreme Court rejects this troubling concentration of executive secrecy.  *See United States v. Nixon*, 418 U.S. 683, 713 (1974).  Rather, it has instructed that

"when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997). This Court should not ignore the principles applied in *Clinton* and *Nixon*. Instead it should proceed to merits adjudication of this case.

### C.    Declining To Exercise Jurisdiction Would Undermine The Traditional Process of Interbranch Negotiation

Defendants are incorrect to claim that a decision on the merits of this case would destabilize the usual process of interbranch negotiation and would inundate the federal courts with Congress-Executive disputes. To the contrary, a decision from this Court declining to resolve this dispute would signal that intransigence pays. It would eliminate future Administrations' incentive for good-faith negotiation. And it would thereby promote harmful stalemate rather than productive settlement.

Threshold dismissal here would guarantee that whatever information Congress sought, however strong the evidence of misconduct, and however untenable the claim of executive privilege, future Presidents would have no cause to reach a fair accommodation with Congress. A determination that this case does not belong in the courts signals that a refusal of reasonable congressional information requests has no cost—because ultimately, no neutral arbiter will assess the bona fides of the claim. This outcome—in which the people must rely on the good faith of elected officials to resist self-dealing—finds no support in the Constitution. *Cf.* The Federalist No. 10 (James Madison), at 123 (acknowledging that in the absence of the Constitution's checks and balances "our governments are too unstable, and that the public good is disregarded in the conflicts of the rival parties").

Moreover, the contrary claim, Defs.' Br. at 44-45, that adjudication of this case would undermine the political branches' incentive to negotiate and would precipitate a flood of political

cases is plainly disproved by history.  More than thirty years ago, this Court and the Court of Appeals for the District of Columbia Circuit confronted a similar dispute over executive privilege, albeit one filed initially by the Executive.  *See United States v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977) ("*AT&T II*"); *AT&T I*, 551 F.2d at 384.  The court never doubted its jurisdiction or the case's justiciability.  *See AT&T I*, 551 F.2d at 389; *AT&T II*, 567 F.2d at 127 ("[N]either the traditional political question doctrine nor any close adaptation thereof is appropriate where neither of the conflicting political branches has a clear and unequivocal constitutional title, and it is or may be possible to establish an effective judicial settlement.").  Just three years earlier, moreover, the same Court of Appeals made clear that a suit filed by Congress would be equally justiciable.  *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 727 (D.C. Cir. 1974) ("*Senate Select Committee*").

Nor would the mere *prospect* of judicial resolution discourage negotiation.  As the procedural history of the *AT&T* litigation demonstrates, judicial involvement can actually *expedite* resolution of interbranch informational disputes.  *See AT&T I*, 551 F.2d at 386.  Had the court not retained jurisdiction over that case, thus preserving the possibility of a judicially mandated resolution in the future, the parties would have had much less incentive to achieve compromise.  Fisher, *The Politics of Executive Privilege* 247 (2004).

Although *AT&T* and *Senate Select Committee* clearly signaled the availability of a judicial forum, the past thirty years have not seen a flood of cases concerning executive privilege or congressional subpoena enforcement.  To the contrary, Defendants themselves concede—as they must—that interbranch negotiation remains generally vigorous.  *See* Defs.' Br. at 10.  As the past thirty years demonstrate, Defendants are plainly wrong to imagine that judicial resolution of this case invites a flood of congressional litigation.

## II.    Historical Practice And Precedent Support Adjudication Of This Case

Defendants' brief repeats variations on the theme that no court has ever entertained a dispute between Congress and the Executive about a subpoena.  *See, e.g.*, Defs.' Br. at 23.  But Defendants ignore directly relevant precedent that flatly contradicts their claim and then misread the relevant history.  While history demonstrates that Congress and the Executive have certainly reached negotiated outcomes in disputes over information, Defendants point to no evidence that either Congress or the Executive have ever believed or asserted that such disputes are not amenable to judicial resolution.  To the contrary, not only have courts previously resolved such disputes, both Congress and the Executive have endorsed their power to do so.

### A.    Precedent Supports The Exercise Of Jurisdiction

When past executive privilege disputes reached the courts, federal judges resolved the interbranch conflict or indicated that such disputes are amenable to judicial resolution.  *Senate Select Committee on Presidential Campaign Activities v. Nixon* was a suit brought by a Senate Committee to enforce a subpoena against President Nixon for tapes of several Oval Office conversations.  498 F.2d 725, 727 (D.C. Cir. 1974).  The court heard the suit, eventually finding in the President's favor on the merits.  *Id*. at 733.[7]

In the *AT&T* litigation, the Court of Appeals underscored the holding that interbranch disputes over information were amenable to judicial resolution.  *AT&T I*, 551 F.2d at 389; *AT&T II*, 567 F.2d at 127.  The *AT&T* litigation established that if private persons attempt to comply with Congress's subpoenas, the Executive can enlist the courts to ascertain whether executive privilege renders such compliance unlawful.  If the Justice Department can call upon the

---

[7] *Senate Select Committee* is entirely analogous to the current action.  The only difference is that in that case Congress passed a specific jurisdictional statute to allow the case to go forward.  This action was necessary, however, only because of the amount-in-controversy requirement that was, at the time, still part of federal question jurisdiction.  *See* 28 U.S.C. § 1331 (1976).  That requirement has since been repealed.  *See* 28 U.S.C. § 1331.  Thus, as Defendants concede, Defs.' Br. at 38, this court has federal question jurisdiction over this case.

judiciary to adjudicate whether executive privilege should prevent a third party from complying with a subpoena, there is no reason why Congress cannot similarly request a judicial determination whether that assertion of executive privilege is valid.

The House of Representatives also has exercised its authority to enforce its constitutional rights—e.g., the issuance of subpoenas—in federal court even when the Executive was the opposing litigant. *See U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998) (three-judge panel) (House of Representatives suit against the Department of Commerce to vindicate its constitutional rights regarding the taking of the 2000 census). In *United States v. U.S. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983), the Justice Department sought a declaratory judgment that the EPA Administrator could not be convicted of criminal contempt for non-compliance with a congressional subpoena based on executive privilege. *Id.* at 151. The court dismissed the case as asking it to reach the constitutional question prematurely. In so doing, it explicitly assumed that either a criminal prosecution or a congressional enforcement action would enable judicial resolution of the executive privilege issue. *Id.* at 153 ("Judicial resolution of this constitutional claim, however, will never become necessary unless [the EPA Administrator] becomes a defendant in *either a criminal contempt proceeding or other legal action taken by Congress*.") (emphasis added). Hence, the court observed, "[i]f these two co-equal branches maintain their present adversarial positions, the Judicial Branch will be required to resolve the dispute by determining the validity of the Administrator's claim of executive privilege." *Id.* at 152.[8]

Defendants suggest, Defs.' Br. at 34, that the Supreme Court overruled these precedents in *Raines v. Byrd,* 521 U.S. 811 (1997), which dismissed a challenge to the constitutionality of

---

[8] This principle was recently affirmed in a suit that directly pitched Congress against the Executive Branch. *See United States v. Rayburn House Office Bldg., Room 2113, Washington, D.C.*, 497 F.3d 654 (D.C. Cir. 2007). That litigation affirms the availability of a judicial forum even in cases involving the two branches as litigants.

the Line Item Veto Act brought by six *individual* Members of Congress.  But *Raines* neither cites

nor discusses cases that confirm jurisdiction over suits brought at the behest of Congress, or one

of its Houses, to enforce its subpoenas.  On the contrary, *Raines* strongly suggests that such

properly authorized congressional suits, like this one, may go forward.  In dismissing the *Raines*

plaintiffs' claim, Chief Justice Rehnquist explicitly relied on the fact that they "ha[d] not been

authorized to represent their respective Houses of Congress."  *Raines*, 521 U.S. at 829; *accord*

*Walker*, 230 F. Supp. 2d at 68.

In any event, *Raines* presents a very different set of facts from this case: a losing

legislative minority seeking to use the courts to undo their democratic loss in the Congress.[9]

Allowing that case to go forward would have encouraged losing legislative minorities to seek do-

overs of legislative fights in the courts.  This suit, which has the approving imprimatur of the

House of Representatives, stands on a wholly different footing.  *Raines*, in short, does not

control.

## B.    Historical Practice Does Not Support Threshold Dismissal

Nothing in the historical record suggests that either Congress or the Executive has ever

understood the Constitution to preclude judicial settlement of disputes over allegedly privileged

information.  To the contrary, history suggests that interbranch negotiations have worked so well

precisely because of the understanding that any unresolved disputes could be submitted to an

impartial court.

As an initial matter, Congress's historic ability to employ successfully alternate

mechanisms to secure necessary information provides neither a basis to limit its power to invoke

jurisdiction nor evidence that any previous decision not to litigate flowed from a belief that the

---

[9] Courts in this Circuit have repeatedly refused to hear cases for that reason, which is not applicable here.  *See, e.g.*, *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984) (dismissing action brought by individual members of the House of Representatives challenging a statute's constitutionality).

Constitution barred such litigation.  It would be perverse to treat Congress's *success* in resolving privilege disputes as a reason for *depriving* the legislature of power to seek judicial review. Historical silence cannot be read for this sweeping proposition.  *See Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting) (noting "the questionable wisdom of assuming that dogs will bark when something important is happening," and therefore counseling not to read any conclusions into congressional silence).

For similar reasons, the history of non-action relied upon in *Raines v. Byrd* is not salient here.  *See* 521 U.S. at 826-29.  That discussion enumerated multiple instances where a political branch whose preferred policy was *thwarted* by another branch failed to seek judicial redress. *Id.*  But the history of inaction on the part of *unsuccessful* political actors relied upon by *Raines* cannot provide relevant historical precedent to oust jurisdiction from underneath a *successful* Congress.  A victorious political branch has no need to seek out judicial relief; that it has not done so thus cannot be historically significant.

When Congress has spoken directly to judicial resolution of interbranch informational disputes, moreover, it has stressed its assumption that congressional subpoenas can be enforced in civil actions.  In 1977, for example, the Senate recognized that courts have the power to "review the validity of congressional subpenas (sic) and orders."  S. Rep. No. 95-170, at 41 (1977).  Even when exempting executive officers from the reach of a statute providing for civil enforcement of Senate subpoenas, Congress stressed that "[t]his exception . . . is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpena (sic) against an officer or employee of the Federal Government."  *Id.* at 91-92.

Even more tellingly, the Justice Department has opined repeatedly that "Congress could obtain a judicial resolution of [an executive] privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena." 8 Op. Off. Legal Counsel 101, 137 (1984); *see also* 10 Op. Off. Legal Counsel 68, 87 (1986) ("The most likely route for Congress to take would be to file a civil action seeking enforcement of the subpoena."). Only now—and without reference to these opinions—has the Department of Justice abandoned that position. Until this recent departure, there has been consensus between the political branches that Congress can enforce its subpoenas through a civil action.

The only unprecedented feature of this case is the Executive's utter refusal to engage in the traditional process of interbranch negotiation. Historically, the Executive has recognized Congress's legitimate needs for information and strived to accommodate them in harmony with its constitutional obligations. *See, e.g.*, 5 Op. Off. Legal Counsel 27, 31 (1981) ("It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch."); *AT&T II*, 567 F.2d at 127 ("[E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation."). Here, the Executive has simply declined to negotiate. *See* H.R. Rep. No. 110-423, at 4-5; Compl. at ¶ 34-40. Despite repeated overtures from Congress for further negotiations, *see id.*, the White House has not moved from its original offer, which would not permit effective discovery of the facts or any effective future use of the information. Compl. at ¶ 34; *see also* Mem. Amici Curiae of Former U.S. Attorneys at 12 n.6. Faced with this failure of respect for a coordinate branch, a civil contempt action constitutes a tempered response. This case is thus a sharp departure by the Executive from a historical pattern of respectful negotiation and

accommodation. *See, e.g.*, Rozell, *Presidential Power, Secrecy, and Accountability* 81-82, 100, 102, 126 (2002) (describing past accommodations when executive official cited for or threatened with contempt); Fisher, *The Politics of Executive Privilege* 124-26 (2004) (describing compromise over documents sought from then-Interior Secretary James Watt that did not include restrictions on future use).

In sum, historical practice does not support Defendants' argument. To accept their position would, to the contrary, reward the Executive's novel refusal to show respect for a coordinate branch with an unwarranted immunity. That position would not merely allow troubling allegations of corruption in the federal government to fester uninvestigated, it would encourage similar intransigence in future cases of hidden executive branch malfeasance.

### III.    The Ultimate Merits Question Here Is A Legal Question Fit For Judicial Resolution

On the merits, this case presents this Court with a purely legal issue, the resolution of which falls within the heartland of Article III. It would be inappropriate for this Court to evade its obligation to decide this case for reasons already developed. Such resolution involves no more and no less than the core judicial obligation "'to say what the law is' with respect to the claim of privilege." *United States v. Nixon*, 418 U.S. at 704-05 (*quoting Marbury v. Madison*, 1 U.S. (Cranch) 137, 177 (1803)).

This case is a dispute about two subpoenas and claims of privilege lodged in response. Courts daily resolve cases presenting claims of privilege involving competing interests in investigation and non-disclosure. And this case, while it may pose more complex questions than most assertions of privilege, is neither unique nor outside the main run of litigation about privilege disputes.

Courts have resolved disputes about the scope and validity of executive privilege since the 1970s.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977) (whether executive privilege claim defeated statutorily mandated disclosure of presidential papers); *United States v. Nixon*, 418 U.S. at 683 (whether executive privilege excused non-compliance with Special Prosecutor's subpoena); *Judicial Watch v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004) (whether executive privilege was a valid justification for withholding information in a Freedom of Information Act suit); *In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997) (whether executive privilege extends to communications among presidential advisors); *Senate Select Committee*, 498 F.2d at 725 (whether executive privilege excused compliance with a congressional subpoena); *AT&T I*, 567 F.2d at 121 (whether the Justice Department could prevent compliance with a congressional subpoena on executive privilege grounds); *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) (en banc) (per curiam) (whether executive privilege compelled the quashing of a grand jury subpoena); *In re Grand Jury Proceedings*, 5 F. Supp. 2d 21 (D.D.C. 1998) (whether, *inter alia*, executive privilege applied to the First Lady's communications).[10]

In each of these cases, federal judges have settled questions of law threaded by delicate questions of political judgment.   Such political overtones have never been successfully marshaled to silence the courts.  As Chief Justice Burger has explained:

> [C]ourts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated political exceeds constitutional authority. . . . The court's duty in these cases, as Chief Justice Marshall declared in *Cohens v. Virginia*, is clear:  Questions may occur which we would gladly avoid; but we cannot avoid them.  All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

---

[10] Defendants attempt to make much of the time that has passed without resolution of congressional challenges to executive privilege.  *See, e.g.*, Defs.' Br. at 1, 73.   The executive could have lodged this same argument when executive privilege first was adjudicated in the courts in the 1970s, *United States v. Nixon*, 418 U.S. 683 (1974), or in the first civil suit filed against a sitting president for actions he took prior to taking office, *Clinton v. Jones*, 520 U.S. 681 (1997).  Then, as now, the lapse of time does not signal that an issue is unfit for judicial resolution.

*INS v. Chadha*, 462 U.S. 919, 943-44 (1983) (citations and internal quotations omitted); *accord Baker v. Carr*, 369 U.S. 186, 211 (1962) ("Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.").

It is certain that resolution of this case asks this Court to answer two hard legal questions—whether executive privilege has been properly invoked and whether it can be overcome in light of Congress's interest. But however this Court decides these questions, it is clearly established that executive privilege is not absolute. *United States v. Nixon*, 418 U.S. at 713. The Court of Appeals has stated plainly that executive privilege has bounds, and not every communication claimed as privileged is in fact protected. *E.g.*, *Judicial Watch*, 365 F.3d at 1113-24; *Espy*, 121 F.3d at 746-53.

Moreover, even with respect to documents that are privileged, the Supreme Court has held that a sufficient showing of need overcomes assertion of the privilege. *See, e.g.*, *United States v. Nixon*, 418 U.S. at 713; *accord Senate Select Committee*, 498 F.2d at 730-33; *Sirica*, 487 F.2d at 716-17. Defendants, in short, cannot be correct in asserting "absolute immunity." Defs.' Br. at 47-58. Rather, it is incumbent on them to demonstrate that withheld information falls within the scope of the privilege and that the Committee's need for that information is insufficient to overcome any applicable privilege. These legal questions, however, are no different in kind from the sort of privilege disputes that federal courts routinely resolve.

In sum, the federal courts have clear "authority to interpret claims with respect to powers alleged to derive from [constitutionally] enumerated powers" such as executive privilege.

*United States v. Nixon*, 418 U.S. at 704.  Resolution of such claims falls into the heartland of Article III authority.

## CONCLUSION

For all the foregoing reasons, this Court should deny Defendants' motion to dismiss and proceed to the merits.

Respectfully submitted,

/s/ Sidney S. Rosdeitcher

FREDERICK A.O. SCHWARZ JR.  
AZIZ HUQ  
ERIC LANE  
DAVID UDELL  
JONATHAN HAFETZ  
EMILY BERMAN[*]  
The Brennan Center for Justice  
   at NYU School of Law  
161 Avenue of the Americas, 12th Floor  
New York, NY 10013  
(212) 998-6730  
Counsel for Amici The Rutherford Institute,  
   Judicial Watch, CREW and the Brennan Center

SIDNEY S. ROSDEITCHER  
   Counsel of Record  
   (D.C. BAR # 094532)  
Paul, Weiss, Rifkind, Wharton & Garrison LLP  
1285 Avenue of the Americas  
New York, NY 10019-6064  
(212) 373-3000

ANNE L. WEISMANN  
   (D.C. Bar # 298190)  
MELANIE SLOAN  
   (D.C. Bar # 434584)  
Citizens for Responsibility and Ethics  
   in Washington  
1400 Eye Street, N.W., Suite 450  
Washington, D.C. 20005  
Phone: (202) 408-5565  
Fax: (202) 588-5020  
Counsel for Amicus CREW

---

[*] Admission pending.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

COMMITTEE ON THE JUDICIARY,      )
UNITED STATES HOUSE OF           )
REPRESENTATIVES                  )
                                 )
                    Plaintiff,   )
                                 )
            v.                   )      **Case No. 1:08-cv-00409 (JDB)**
                                 )
HARRIET MIERS, et al.            )
                                 )
                    Defendants.  )
_____)

**[PROPOSED] ORDER**

The Court, this ___ day of ___, 2008, hereby grants organizations The Rutherford

Institute, Judicial Watch, Citizens for Responsibility and Ethics in Washington, and the Brennan

Center for Justice leave to file a memorandum amici curiae in opposition to Defendants' motion

to dismiss.

IT IS SO ORDERED.


                                        _____
                                        John D. Bates
                                        United States District Judge