# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
COMMITTEE ON THE JUDICIARY,                   )
UNITED STATES HOUSE                           )
OF REPRESENTATIVES,                           )
                                              )     **Case No. 1:08-cv-00409 (JDB)**
                    *Plaintiff*,              )
                                              )
            v.                                )
                                              )
HARRIET MIERS, *et al.*                       )
                                              )
                                              )
                    *Defendants*.             )
_____)


### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel
CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR, D.C. Bar # 476240
Assistant Counsel
RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel
KATHERINE E. MCCARRON, D.C. Bar # 486335
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff Committee on the Judiciary
of the U.S. House of Representatives

Dated: May 29, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ...............................................................................................1

RESTATEMENT OF THE FACTS .....................................................................7

SUMMARY OF ARGUMENT ..........................................................................12

ARGUMENT ......................................................................................................19

    I.    THE COMMITTEE HAS STANDING TO SEEK TO ENFORCE ITS SUBPOENAS ...........................................................................................19

        A.  The Committee Has Standing to Under the Precedents of This Circuit ............20

             1.  The *AT&T* Case Is Controlling Here ...................................................20

             2.  *Raines* and *Walker,* to the Extent They Apply at All Here, *Support* the Committee's Standing to Sue.............................................................23

        B.  The Committee Has Suffered a Concrete and Particularized Injury-in-Fact.....25

             1.  The Committee's Injury Is Sufficiently Particularized for Purposes of Article III ...........................................................................................26

             2.  The Committee's Informational Injury Is Sufficiently Concrete........28

        C.  Courts Routinely Review the Actions of the Political Branches, Both Individually and in the Context of Inter-Branch Disputes................................30

    II.    THIS CASE IS RIPE FOR REVIEW ....................................................32

    III.  THE COMMITTEE HAS A RIGHT OF ACTION ...............................33

        A.  The Committee Has a Right of Action Under the Declaratory Judgment Act ..34

        B.  Congress Possesses an Implied Power Under the Constitution to Enforce Its Subpoenas Through Judicial Means .................................................................39

             1.  All of Congress's Authority to Investigate, and to Utilize Compulsory Process in Furtherance of that Authority, Is Implied in Article I of the Constitution.......................................................................................39

             2.  The Authorities Defendants Cite Are Inapposite................................41

3.  No Statute or Case Suggests That the Committee Does Not Possess the Right to Invoke the Jurisdiction of This Court ............................43

a.  *Reed* Does Not Support the Defendants' Position ....................43

b.  2 U.S.C. § 288d(a) Does Not Preclude Implying a Right of Action Under the Constitution in this Case ...............................44

IV.  THE COURT SHOULD EXERCISE ITS DISCRETION UNDER THE ACT TO REACH THE MERITS OF THE COMMITTEE'S CLAIMS ................................47

V.  MS. MIERS AND MR. BOLTEN ARE NOT ABSOLUTELY IMMUNE FROM CONGRESSIONAL PROCESS ..............................................................55

A.  Presidential Advisers Must Comply With Congressional Subpoenas ..............55

1.  For Immunity Purposes, the Case Law Unequivocally Distinguishes Between a President and His Advisers ................................................56

2.  The Policy Justifications Defendants Advance Do Not Support an Absolute Immunity for Presidential Advisers....................................57

3.  Absolute Immunity for Presidential Aides Would Undermine Separation of Powers Principles and the Public Interest ...................59

B.  The President Is Not Immune From Congressional Process; *A Fortiori*, Neither Are His Aides ...................................................................................60

1.  The Courts Have Repeatedly Rejected the President's Absolute Immunity Claims ..............................................................................60

2.  Congress Has a Highly Significant Interest in, and Extensive Responsibility for, Overseeing Executive Branch Matters................62

C.  A Former Presidential Aide Cannot Be Immune From Congressional Process ............................................................................................................64

VI.  MS. MIERS AND MR. BOLTEN MUST PRODUCE PRIVILEGE LOGS ..........66

A.  Ms. Miers and Mr. Bolten are Legally Required to Produce Privilege Logs ....67

B.  Production of Privilege Logs Does Not Violate Separation of Powers Principles..........................................................................................................72

CONCLUSION..........................................................................................................77

# TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 277 (1937) ........................................................ 35, 36-37

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ....................................................................... 41-42

*Anderson v. Dunn*, 19 U.S. 204 (1821) ................................................................................ 39-40

*Anderson v. Marion County Sherriff's Dep't*, 220 F.R.D. 555 (S.D. Ind. 2004) ........................ 78

*Ansara v. Eastland*, 349 U.S. 190 (1955) ................................................................................ 69

*Ass'n of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898 (D.C. Cir. 1993) ........................ 58

*Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1 (D.D.C. 1999) ........................................ 67

*Barenblatt v. United States*, 360 U.S. 109 (1959) ............................................................... 29, 69

*Barnes v. Kline*, 759 F.2d 21 (D.C. Cir.) 1985 ................................................................... 25, 27

*Black v. Sheraton Corp. of Am.*, 371 F. Supp. 97 (D.D.C. 1974) ............................................. 67

*Bowsher v. Synar*, 478 U.S. 714 (1986) .................................................................................. 32

*Braxton County Court v. W. Va. ex rel. Dillon*, 208 U.S. 192 (1908) ........................................ 27

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................................... 73

*Butz v. Economou*, 438 U.S. 478 (1978) ................................................................................. 56

*C&E Services, Inc. of Washington v. D.C. Water and Sewer Auth.*, 310 F.3d 197 (D.C. Cir. 2002) ........................................................................................................................... 39

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) .................................................................. 42

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367 (2004) .............................. 75

*Clinton v. Jones*, 520 U.S. 681 (1997) .................................................................................... 61

*Coffman v. Breeze Corp.*, 323 U.S. 316 (1945) ....................................................................... 35

*Davis v. Passman*, 442 U.S. 228 (1979) ............................................................................. 42-43

*Dellums v. Powell*:

    561 F.2d 242 (D.C. Cir. 1977) ("*Dellums I*") .......................................................... 76

    642 F.2d 1351 (D.C. Cir. 1980) ("*Dellums II*") ........................................................ 76

*Deseret Mgmt. Corp. v. United States*, 76 Fed. Cl. 88 (Fed. Cl. 2007) ................................. 77-78

*Dow Jones & Co., Inc. v. Harrods, Ltd.*, 346 F.3d 357 (2d Cir. 2003) ......................................... 53

*\*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) .................................. 29, 59, 67-68-69

*Edmonds Inst. v. U.S. Dep't of the Interior*, 383 F. Supp. 2d 105 (D.D.C. 2005) ......................... 77

*Emspak v. United States*, 349 U.S. 190 (1955) ............................................................................. 71

*Enigwe v. Bureau of Prisons*, No. 06-457, 2006 WL 3791379 (D.D.C. Dec. 22, 2006) .............. 39

*FEC v. Akins*, 524 U.S. 11 (1998) ................................................................................................ 27

*Ferry v. Ramsey*, 277 U.S. 88 (1928) ........................................................................................... 41

*Gonzaga v. Doe*, 536 U.S. 273 (2002) .......................................................................................... 42

*Gravel v. United States*, 408 U.S. 606 (1972) ........................................................................ 59, 68

*Gregg v. Barrett*, 771 F.2d 539 (D.C. Cir. 1985) ........................................................................ 19

*Halperin v. Kissinger*, 606 F.2d 1192 (D.C. Cir. 1979) .............................................................. 57

*\*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................. 2, 17, 57, 59

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................................... 27

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ...................................................... 32

*Hutcheson v. United States*, 369 U.S. 599 (1962) ....................................................................... 71

*In re Apollo Group, Inc., Securities Litigation*, No. 04-2147, 2007 WL 778653 (D.D.C. 2007) ...................................................................................................................................... 71-72

*In re Debs*, 158 U.S. 564 (1895) .................................................................................................. 20

*In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997) ..................................... 55

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998) ...........................................................76

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) .................................. 54, 55, 57-58, 62

*INS v. Chadha*, 462 U.S. 919 (1983) ........................................................................32

*Interstate Commerce Comm'n v. Brimson*, 154 U.S. 447 (1894) ........................... 21-22

*Judicial Watch, Inc. v. U.S. Dep't of Justice*, No. 01-639,
    2006 WL 2038513 (D.D.C. July 19, 2006) ...........................................................72

*Jurney v. MacCracken*, 294 U.S. 125 (1935) ...........................................................39

*Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974) ...............................................32

*Kilbourn v. Thompson*, 103 U.S. 168 (1880) ...........................................................74

*Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002) ................................................25

*Lardner v. U.S. Dep't of Justice*, No. 04-6230, 2005 WL 758267 (D.D.C. Mar. 31, 2005) .....2, 24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................19, 27

*Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990)...................................................19

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)....................................................1

*Marshall v. Gordon*, 243 U.S. 521 (1917) ...............................................................40

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941) ...........................35

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ...................................................... 42-43

*\*McGrain v. Daugherty*, 273 U.S. 135 (1927) ...........................................8, 26, 29, 39, 40, 59, 68

*Mittleman v. U.S. Dep't of the Treasury*, 919 F. Supp. 461 (D.D.C. 1995) .................48

*Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984) ........................ 28, 53-54

*Morrison v. Olson*, 487 U.S. 654 (1988) .................................................................32

*Myers v. United States*, 272 U.S. 52 (1926).............................................................32

*Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 670 F. Supp. 424 (D.D.C. 1987).................48

*National Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003) ............................32

*Navegar Inc. v. United States*, 103 F.3d 995 (D.C. Cir. 1997) ......................................................38

*Network Project v. Corp. for Pub. Broad.*, 561 F.2d 963 (D.C. Cir. 1977) .................................38

*Nixon v. Admin. of Gen. Servs.*, 433 U.S.425 (1977)..........................................61, 62, 73-74, 76-77

*\*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)........................................................... 17, 18, 57, 61-62

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) .......................................................................2, 32

*Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984) ............................67

*Nuvio Corp. v. FCC*, 473 F.3d 302 (D.C. Cir. 2006)..............................................................41, 70

*Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726 (1998) .....................................................32

*Pentagen Techs. Int'l, Ltd. v. Comm. on Approps.*, 20 F. Supp. 2d 41 (D.D.C. 1998)................68

*President v. Vance*, 627 F. 2d 353 (D.C. Cir. 1980)......................................................................48

*Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) .......................................................27

*Quinn v. United States*, 349 U.S. 155 (1955)...............................................................................71

*\*Raines v. Byrd*, 521 U.S. 811 (1997) ......................................... 13, 20, 24-25, 27, 28, 31

*Reed v. County Comm'rs*, 277 U.S. 376 (1928)......................................................................43, 44

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)......................2, 24

*Rusack v. Harsha*, 470 F. Supp. 285 (M.D. Pa. 1978)..................................................................68

*Schapper v. Foley*, 667 F. 2d 102 (D.C. Cir. 1981) ......................................................................38

*Schilling v. Rogers*, 363 U.S. 666 (1960) ..............................................................................35, 39

*Senate Select Comm. on Ethics v. Packwood*, 845 F. Supp. 17 (D.D.C. 1994)............................63

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*:

    366 F. Supp. 51 (D.D.C. 1973) ("*S. Select Comm. I*") ...........................................................45

    498 F.2d 725 (D.C. Cir. 1974) ("*S. Select Comm. III*").............................................3, 23, 45, 60

vii

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968)............................................................39

*Sierra Club v. EPA*, 322 F.3d 718 (D.C. Cir. 2003)....................................................................24

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950)..................................................35

*Stoneridge Inv. Partners v. Scientific-Atlanta*, Inc., 128 S. Ct. 761 (2008)..................................42

*Tierney v. Schweiker*, 718 F.2d 449 (D.C. Cir. 1983)..................................................................16

*Townsend v. United States*, 95 F.2d 352 (D.C. Cir. 1938)

*\*U.S. House of Representatives v. U.S. Dep't of Commerce*,
11 F. Supp. 2d 76 (D.D.C. 1998) .................................................13, 21, 23, 24, 27, 33

*\*United States v. AT&T*:

    419 F. Supp. 454 (D.D.C. 1976) ....................................................................................22

    551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*") ..........................2, 3, 13, 20-21, 22, 32

    567 F.2d 121 (D.C. Cir. 1977) ("*AT&T II*") ..............................................................6

*United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973)................................................................68

*United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991).........................................................63

*United States v. House of Representatives*, 556 F. Supp. 150
(D.D.C. 1983) ("Gorsuch")..................................................................................5, 53, 54

*United States v. Lee*, 106 U.S. 196 (1882)..................................................................................56

*United States v. Legal Sevs. For N.Y. City*, 249 F.3d 1077 (D.C. Cir. 2001) ..............................76

*\*United States v. Nixon*, 418 U.S. 683 (1974) ...............2, 15-16, 31, 32, 54, 55, 59, 60, 61, 62, 73

*United States v. O'Neil*, 11 F.3d 292 (1st 1993)..........................................................................69

*United States v. Rayburn House Office Building, Room 2113*, 497 F.3d 654 (D.C. Cir.
2007) .......................................................................................................................5

*\*Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002)....................................20, 21, 22-23, 30-31

*Warth v. Seldin*, 422 U.S. 490 (1975) ....................................................................................7, 19

*Watkins v. United States*, 354 U.S. 178 (1957)................................................................32, 40, 69

*Wilton v. Seven Falls Co.*, 515 U.S. 277) (1995) .......................................................................48

**Statutes and Rules**

2 U.S.C. § 192 (2006) ...........................................................................................17, 27, 41

2 U.S.C. § 194 (2006) ...............................................................................17, 27, 41, 51, 53

2 U.S.C. § 288 (2006) (Ethics in Government Act) ...............................................43, 45, 46, 47

5 U.S.C. § 551, et seq. (2006) ................................................................................................70

28 U.S.C. § 41(1) (2006) ..........................................................................................................44

28 U.S.C. § 1331 (2006) ...........................................................................12, 15, 35, 37, 41, 45

28 U.S.C. § 1345 (2006) ..........................................................................................................44

28 U.S.C. § 2201 (2006) ........................................................................................14, 34-35, 48, 51

28 U.S.C. § 2202 (2006) ................................................................................................14, 34

Fed. R. Civ. P. 26 ..............................................................................................................67, 70

Fed. R. Civ. P. 45(d)(2)(ii) ...........................................................................................................18

Fed. R. Civ. P. 57 ..............................................................................................35, 48-49, 51-52

Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, 121
     Stat. 224 (2007) ...........................................................................................................29

**Legislative Materials**

69 Con. Rec. 1683 (1928) ...................................................................................................38

94 Cong. Rec. 24,600 (daily ed. July 24, 1975) ..................................................................47

119 Cong. Rec. 36,472 (daily ed. Nov. 9, 1973) ..............................................................45-46

S. Conf. Rep. No. 93-1200 (1974) .......................................................................................70

S. Rep. No. 95-170 (1997) ...............................................................................................46-47

S. Res. 262, 70th Cong. (1928) ...........................................................................................44

**Other Authorities**

Bernard Schwartz, *A Reply to Mr. Rogers:  The Papers of the Executive Branch*, 45
 A.B.A.J. 467 (1959).................................................................................................63

Carlin Meyer, *Imbalance of Powers: Can Congressional Lawsuits Serve As
 Counterweight?*, 54 U. Pitt. L. Rev. 63 (1992)......................................................25

David Iglesias, *In Justice:  Inside the Scandal that Rocked the Bush Administration*
 (2008)........................................................................................................................9

Dan Froomkin, *Rove Subpoenaed Again*, Washingtonpost.com (May 23, 2008) *available at*
 *http://www.washingtonpost.com/wp-dyn /content/blog/2008/05/23 /BL2008052301 438.html*10-11

Donald L. Doernberg & Michael B. Mushlin, *The Trojan Horse:  How the Declaratory
 Judgment Act Created a Cause of Action and Expanded Federal Jurisdiction While
 the Supreme Court Wasn't Looking*, 36 U.C.L.A. L. Rev. 529, (1989) ...................37

Developments in the Law, *Declaratory Judgments – 1941-49*, 62 Harv. L. Rev. 787
 (1949).......................................................................................................................37

Edwin Borchard, *Declaratory Judgments* (2nd ed. 1941) ....................................... 48-49

4 James D. Richardson, *A Compilation of the Messages and Papers of the Presidents*
 (1897).......................................................................................................................64

1 Laurence H. Tribe, *American Constitutional Law* (3d ed.) ........................................43

Louis Fisher, *Politics and Policy: Executive Privilege and the Bush Administration*, 52
 Duke L.J. 323 (2002) ................................................................................................5

Max B. Baker, *Harrier Miers Says Her Clash With Congress Will Outlast Bush*, Ft.
 Worth Star Telegram May 13, 2008, *available at* www.mcclatchydc.com/251/v-
 print/story/36946.html ........................................................................................... 5-6

Note, *Standing in the Way of Separation of Powers: The Consequences of* Raines v.
 Byrd, 112 Harv. L. Rev. 1741 (1999) .....................................................................25

President George W. Bush, Remarks on the Department of Justice and an Exchange with
 Reporters (Mar. 20, 2007), *available at* http://frwebgate.access.gpo.gov/cgi-
 bin/getdoc.cgi?dbname=2007_presidential_documents&docid=pd26mr07_txt-11.................11

Press Briefing by Dana Perino, Acting White House Press Secretary (Mar. 27, 2007)
 *available at* http://www.whitehouse.gov/news/releases/2007/03/20070327-4.html ...............12

Reply Br. For the U.S., *United States v. Rayburn House Office Building, Room 2113*, 128

S. Ct. 1738 (2008) (No. 07-816), *cert. denied* ..........................................................5

*Response to Congressional Request for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 U.S. Op. Off. Legal Counsel 68 (1986) (Charles J. Cooper, Asst. Att'y Gen.) .......................................................................................47

1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* (4th ed. 2007) ................................................................................... 64-65

Statement by the Press Secretary, The White House (Feb. 14, 2008), *available at* http://www.whitehouse.gov/news/releases/2008/02/20090212-7.html ......................................4

Woodrow Wilson, Congressional Government at 297 (1885).......................................................76

## <u>INTRODUCTION</u>

The Department of Justice ("Department"), by its meritless motion to dismiss this action and its untenable opposition to the limited relief sought by the Plaintiff Committee on the Judiciary of the U.S. House of Representatives ("Committee") in its motion for partial summary judgment, aims to impair the constitutionally mandated power of Congress to investigate and expose possible malfeasance, abuse of authority and violations of existing laws by the Executive Branch, and to propose legislative solutions, if necessary.  The Department's motion and opposition, on behalf of Harriet Miers and Joshua Bolten ("Defendants") are the culmination of a series of actions – false and misleading public statements by Department officials, including the former Attorney General; White House refusals to negotiate in good faith; and Defendants' contumacious disobedience to validly issued and served congressional subpoenas – to cover-up Executive Branch activities and to inhibit core functions of the Legislative Branch.  Those functions include conducting oversight, informing the public and considering whether the conduct revealed by its investigations warrant changes to existing federal law, such as more clearly prohibiting the kinds of improper political interference with prosecutorial decisions that allegedly motivated the mass forced resignations of nine United States Attorneys ("U.S. Attorneys").

The Department's brief is emblematic of the Administration's stonewalling throughout the Committee's investigation into these forced resignations ("Investigation").  Just as the White House shielded its files and personnel from the Legislative Branch, the Department has, in its motion and opposition, sought to prevent the Judicial Branch from performing *its* essential functions, which include emphatically the duty "to say what the law is."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  As the Committee noted in its initial Memorandum, a

fundamental proposition of law is that no one, including a former White House official, "is above the law's commands." *Nixon v. Sirica*, 487 F.2d 700, 711 (D.C. Cir. 1973) (en banc) (per curiam).

Through more than 70 pages, 2,000 lines of text and 25,000 words, the Department dedicated less than one paragraph to the *single dispositive case* with respect to its motion to dismiss: *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976) ("*AT&T I*"). *AT&T I* not only dictates that the Committee has standing and a claim for relief to enforce its subpoenas in this case, but also it provides the Court with a comprehensive blueprint for how to resolve the issues raised. In the face of this controlling precedent, all the Department can muster is a passing claim that the Court should treat *AT&T I* as being overruled by the Supreme Court *sub silencio*, despite the fact that the Circuit Court has never done so and this Court does not have the power to do so. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Lardner v. U.S. Dep't of Justice*, No. 04-6230, 2005 WL 758267, at *15 (D.D.C. Mar. 31, 2005).

The Department fares no better with regard to its opposition to the limited relief sought by the Committee in its motion for partial summary judgment. Once again, the case law makes perfectly clear that Executive Privilege is qualified and does not bestow any "immunity" from valid process, and certainly not upon a former White House aide who was not even in Government service at the time the subpoena was served. *See United States v. Nixon*, 418 U.S. 683 (1974); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The Department's only defense is an abstract, impractical notion of "separation of powers," that purportedly relegates each branch to its own sandbox.

Fortunately, our Nation was designed so that no one branch can arrogate such power to itself. Thus, in advocating for the Court to avoid reaching the merits of the case and thus

preclude the Congress, on presidential aide immunity grounds, from completing its Investigation, the Department is really just asking the Court to look the other way. To do so, however, the Court, expressly or impliedly, would have to do the following things:

1. *Disregard the Case Law.* This Circuit has already conclusively determined that a House of Congress has standing to enforce its subpoenas in court. A court cannot be any more explicit and direct than the Court of Appeals was in *AT&T I*: "It is clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." 551 F.2d at 391. As noted above, the Department treats this binding precedent as a mere inconvenience, dedicating only *two sentences* in its 73-page Memorandum to this controlling case. Instead, the Department devotes nearly all of its efforts to advancing a reactionary view of the law espoused, not by any panel majority in a court of appeals or the Supreme Court, but by a *dissenting* judge in one case and a *concurring* judge in another, that would forbid Congress *ever* to bring an action in federal court.

2. *Disregard "Precedent."* The word "unprecedented" appears in the Department's Memorandum half a dozen times. The Department doth protest too much. Not only has *this* type of case been brought in and resolved by courts in several other instances – most notably in *AT&T* and in a series of cases culminating in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) ("*S. Select Comm. III*") – but also every aspect of this case involves issues that courts routinely adjudicate. At bottom, this is a *subpoena enforcement case*. As this Court is well aware, courts are called upon by the Department regularly to enforce grand jury, criminal and civil subpoenas and those issued by administrative agencies created and authorized by the Congress. This is also a case involving the review of the Congress's power to compel testimony and documents by subpoena. The Supreme Court has

injected itself into that arena for nearly 100 years.  And finally, this is a case involving a purely legal question regarding the distribution of power between the branches.  Even though courts have shown restraint and have not weighed in on such issues unnecessarily, there are countless occasions on which courts have determined legal issues to set the boundaries of power between the political branches and even between the courts and one or both of the other branches.

3. *Disregard the Role of Congress Under the Constitution*.  Perhaps what is most striking about the Department's submission is that it so egregiously minimizes the power of Congress, a co-equal branch of the Government.  The Supreme Court has described *in the most expansive terms* Congress's ability to investigate pursuant to its oversight and legislative duties under the Constitution.  Congress is tasked with, among other things, conducting oversight, informing the public as to the manner in which its laws are being administered and ensuring, through legislation, that Executive Branch malfeasance, such as that alleged to have occurred in this case, is circumscribed.

4. *Disregard What Is at Stake in the Committee's Investigation*.  Incredibly, there is not one line in the Department's Memorandum about the fundamental issues underlying the Committee's Investigation.  Indeed, it concedes all of the underlying facts.  It should be clear to the Court that, if it were to allow the White House to block the doors to the courthouse as it has vowed[1] and done with respect to its own files and information possessed by Ms. Miers, the American people will not know whether some of the President's closest advisers, among others, were involved in a perversion of the criminal justice system.  Even past Presidents have recognized how important this kind of congressional inquiry is.  As Andrew Jackson once told the Congress, if it could "'point to any case where there is the slightest reason to suspect

---

[1] *See* Statement by the Press Secretary, The White House (Feb. 14, 2008), *available at* http://www.whitehouse.gov/news/releases/2008/02/20080214-7.html.

corruption or abuse of trust . . . . [t]he offices of all the departments will be opened to you, and *every proper facility furnished* for this purpose.'"  Louis Fisher, *Politics and Policy: Executive Privilege and the Bush Administration*, 52 Duke L.J. 323, 334 (2002) (citation omitted) (alteration in Fisher) (emphasis added).

5.  *Disregard the Department's Own Previous Positions.*  The Department itself has brought this type of case to court before.  *AT&T I* was the case *it* brought.  The Department argued in *United States v. U.S. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) ("Gorsuch"), that it had standing and a right of action to bring a suit to determine the power of congressional subpoenas.  It also recently sought *certiorari* in *United States v. Rayburn House Office Building, Room 2113*, 497 F.3d 654 (D.C. Cir. 2007), *cert. denied* 128 S. Ct. 1738 (2008), specifically claiming "the urgent need for [the Supreme] Court's guidance" in determining for the political branches the constitutional boundaries of searches and seizures involving the offices of Members of Congress.  *See* Reply Br. for the U.S. at 1, *United States v. Rayburn House Office Building, Room 2113*, 128 S. Ct. 1738 (2008) (No. 07-816), *cert. denied.*  The Department also has opined in previously released official memoranda by former Assistant Attorneys General Theodore Olson and Charles Cooper that suits exactly like this one should be brought by the Congress and should be heard by the courts.  And even Ms. Miers, reflecting more candor than the Department's brief, recently explained in a speech to her Law Day audience that a resolution to this matter is "in the hands of the judiciary, which is the way the system works," and that "[t]his is a real issue and it's being litigated by the courts," which is "the design of our Constitution."  Max B. Baker, *Harriet Miers Says Her Clash With Congress Will Outlast Bush*, Ft. Worth Star-Telegram, May 13, 2008, *available at* www.mcclatchydc.com/ 257/story/ 36946.html.

5

6.  *Disregard the Implications of Declining Review.*  Rather than have this Court rule on the limited legal issue of whether a current and a former White House aide are "absolutely immune" from congressional subpoenas, the Department suggests that Congress instead use its political tools such as initiating impeachment proceedings, stopping funding for important Department programs or even sending out the House Sergeant-at-Arms to arrest Ms. Miers and Mr. Bolten, try them in the House and imprison them until the subpoenas are satisfied.  Such "political" approaches could be disruptive to the country and the functioning of our federal government and may well have adverse collateral consequences on uninvolved third parties, all of which could be spared by a judicial ruling.

Moreover, as the Committee noted in its Memorandum, the D.C. Circuit has recognized the adverse consequences that may occur when courts refrain from resolving otherwise justiciable legal issues:

> Where the dispute consists of a clash of authority between the two branches . . . judicial abstention does not lead to orderly resolution of the dispute. . . . If negotiation fails as in a case where one party, because of chance circumstance, has no need to compromise, a stalemate will result, with the possibility of detrimental effect on the smooth functioning of government.

*United States v. AT&T*, 567 F.2d 121, 126 (D.C. Cir. 1977) ("*AT&T II*").  Unless the courts are prepared to accept their obligation to resolve legal issues that divide the branches and that even the Department admits arises under the Constitution, one side or the other would have no reason to negotiate in good faith, take valid constitutional positions or compromise.

All of the above elements should make clear that, despite the Department's concerted and comprehensive attempt to ward off the Congress and the Judiciary from reviewing its actions, its underlying contentions have no merit and are inconsistent with its own prior views and actions. It is precisely these inconsistencies and the great importance of the underlying issue at stake that

is underscored by the filing in support of the Committee's position of four powerful and thoughtful *amicus* briefs from a wide swath of professionals and academics, including a bipartisan group of former U.S. Attorneys (including those appointed by Presidents Johnson, Nixon, Carter, Reagan, George H.W. Bush, Clinton, and George W. Bush); a bipartisan group of current and former Senators and Congressmen (including those with hands-on experience in investigating executive malfeasance during the Watergate era); a coalition of conservative and liberal public interest organizations concerned with an accountable and law-abiding government; and four of the most prominent scholars on the history and proper functioning of the Congress and executive privilege. The Court should recognize the sound positions set forth by these *amici* and the Committee, that there are no material facts in dispute and that the positions taken by the Department are legally untenable and contradictory by dismissing the Department's motion and granting the Committee's motion for partial summary judgment.

## RESTATEMENT OF THE FACTS

While all of the allegations in the Complaint (and all fair inferences from them) must be accepted as true for purposes of Defendants' motion to dismiss, *see Warth v. Seldin*, 422 U.S. 490, 501 (1975), and while Defendants have not contested any of the material facts warranting the grant of Plaintiff's motion for partial summary judgment, the factual omissions, distortions and sleight-of-hand in the Department's Memorandum require a brief restatement of the critical facts.

First and foremost, there is no denial that in response to the duly authorized and properly served congressional committee subpoenas, Ms. Miers failed even to appear, as required, to testify, and both she and Mr. Bolten refused to comply with the subpoena to produce even a single document or the demanded privilege log for the documents withheld.

The Department's brief devotes no attention to the importance and significance of the Committee's Investigation or the critical information in the hands of these two subpoena recipients. The Committee's Investigation focuses on the alleged maladministration of the federal criminal justice system, the potential abuse of that system against perceived political enemies and the possible violation of federal criminal laws, including obstruction of justice. This is precisely the kind of congressional investigation the Supreme Court envisioned when it asserted that the "two houses of Congress . . . possess, not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make the express powers effective." *McGrain v. Daugherty*, 273 U.S. 135, 173 (1927). And although Congress need not justify why it has undertaken a particular investigation to either of the other branches (other than whether the Committee was authorized to do so), there is more than ample support for this particular investigation. Here, several highly praised and effusively evaluated U.S. Attorneys, including John McKay, Carol Lam and David Iglesias, were forced to resign while their offices were either investigating political allies or appointees of the President, declining despite great political pressure to pursue baseless criminal charges against political opponents, or resisting entreaties from powerful presidential allies in the Congress to expedite a criminal case against political opponents so that an indictment could be returned before a congressional election. No senior Department official is claimed to have specifically recommended the resignation of any of these three U.S. Attorneys. And the post-hoc, uncorroborated and unrecorded explanations offered to Congress for the forced resignations are inherently incredible. Some of the purported reasons were unknown to anyone at the Department prior to the resignations (as in the case of Mr. Iglesias) or post-dated to the time the

8

U.S. Attorney was put on the list for termination (as in the case of Mr. McKay) or otherwise do not pass the smell test (as is the case of Ms. Lam and many others).

The Department does not deny in its Memorandum that Ms. Miers, as Counsel to the President, played an important role in developing, over a period of two years, the changing list of those U.S. Attorneys to be forced out. *See* Compl. ¶ 41. The Solicitor General admitted that the subpoenaed White House documents withheld relate to the "possible dismissal and replacement of U.S. Attorneys," "including the wisdom of such a proposal" and "possible responses to congressional and media inquiries about the dismissals"; "communications between White House officials and individuals outside of the Executive Branch, including individuals in the Legislative Branch, concerning the possible dismissal and replacement of U.S. Attorneys"; and "communications between the Department of Justice and the White House" concerning these matters. Pl.'s Mem., Exh. 15 (Clement letter of June 27, 2007). Without Ms. Miers's testimony and access to these documents, the Committee will be stymied in its Investigation and unable to reach judgments and make fully informed legislative proposals. *See* David Iglesias, *In Justice: Inside the Scandal That Rocked the Bush Administration* 202 (2008) (recounting the widespread "allegations that the White House was hiding a good deal of relevant material" in an effort to obfuscate the truth about the motivations behind the forced resignations).[2]

Defendants argue (Defs.' Mem. at 11-13) that White House documents and testimony are not necessary because the Committee received hundreds of hours of testimony and thousands of pages of documents from the Department. The Department's Memorandum, however, does not deny that evidence gathered by the Committee to date contains false and misleading testimony

---

[2] Iglesias also notes that "[t]he origins and intent" of White House officials "have never been clearly delineated," primarily because of the Administration's unwillingness to cooperate with Congress. *Id.* He adds that "there were allegations that the White House was hiding a good deal of relevant material by having aides and officials use their private e-mail accounts instead of sending messages through the official, and traceable, channels," and the details of the White House's involvement "still remains a mystery." *Id.*

from the Department and that there are material gaps in the record.  For example, the testimony

of more than fifteen senior Department officials revealed that *none* of them could identify who at

the Department had recommended the termination of many of those U.S. Attorneys on the list.

The Department's Memorandum does not deny that Department officials appear to have made

false and misleading statements to Congress, including those which sought to minimize the role

of White House personnel in the forced resignations.  Certainly, the test is not the quantity of

documents that have been provided (in any event, fewer than three bankers' boxes from the

Department) but the content of what is missing.  Thus, it was not a question of how many tapes

the Nixon White House produced in Watergate but what was missing from the eighteen-and-a-

half-minute gap.

As the record to date reveals, no one has adequately explained who made the decisions

regarding the individual U.S. Attorneys and the real reasons for those decisions.  This is not a

mere detail; this is the essence of the Investigation.  In addition, the Investigation is necessary

not only as a prelude to proposed legislation but also to serve the equally important informing

function of the Congress.  Without the information solely in the hands of Ms. Miers and Mr.

Bolten, the public will have no idea of the magnitude of the politicization of this process, and the

electorate will not be fully informed to try to prevent future recurrence.

Defendants also contend (Defs.' Mem. at 13) that the Administration has made

"substantial efforts to accommodate Congress."  Nothing could be further from the truth.[3]  The

---

[3] Without affidavit or any other verifiable proof, the Department's Memorandum at p. 10 cites a welter of
statistics released by the White House press office purporting to document how cooperative the Executive
Branch has been with the Congress this session.  Whether or not these statistics are accurate, they do not in any
way justify a flat refusal to comply with a congressional subpoena or suggest that the White House has been
reasonable in refusing to comply with requests for information in connection with the U.S. Attorney issue.
More to the point is the unprecedented number of congressional subpoenas to White House aides that have
been disobeyed by the Administration.  *See* Dan Froomkin, *Rove Subpoenaed Again*, Washingtonpost.com
(May 23, 2008), *at http://www.washingtonpost.com/wp-dyn/content/blog/2008/05/23/BL2008052301438.html.*

White House offered to make witnesses available on terms that no investigator could accept: only a limited number of Members (and no professional staff) could conduct unsworn interviews with no record and no questions regarding any internal White House staff communications in return for a guarantee that no subsequent testimony or issuance of subpoenas would follow regardless of what was learned.  Pl.'s Mem., Exh. 5 (Fielding letter of Mar. 20, 2007).  As a sweetener, the White House offered to release to the Committee clearly unprivileged documents reflecting communications between the White House and third parties.  Even though the President himself promised to provide those documents to the Committee and did not assert privilege as to them, *see* President George W. Bush, Remarks on the Department of Justice and an Exchange with Reporters (Mar. 20, 2007), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=2007_presidential_documents& docid=pd26mr07_txt-11, the Counsel to the President has held these documents hostage to the unreasonable and unacceptable demand regarding the limited, off-the-record interviews of White House staff.  The White House never compromised, negotiated or deviated from its initial position.

The Committee, on the other hand, tried repeatedly to reach an accommodation, proposing a series of alternatives.  *See* Compl. ¶¶ 36-40; Pl.'s Mem., Exh. 32, 33.  The White House flatly rejected each overture and repeatedly reiterated its initial offer.  Defendants maintain (Defs.' Mem. at 20) that the Committee's offers "did not include any compromise on its behalf."  To the contrary, for example, the Committee offered to settle for confidential staff review of documents and unsworn testimony of witnesses.  *See* Pl.'s Mem., Exh. 33.  This offer was refused.  Therefore, it is patently false to argue that the White House made "substantial efforts" to accommodate Congress.

---

This is the first Administration since that of President Nixon where any Executive Branch official has steadfastly refused to comply with a congressional subpoena.

Finally, the Department's brief is written as if the President were an integral part of the process to force the resignations of, and as if the President actually fired, the U.S. Attorneys. Thus, the Memorandum claims (Defs.' Mem. at 1) that "the Committee's demands strike at the heart of the President's ability to obtain candid advice from his most intimate advisers." It also suggests (Defs.' Mem. at 15) that the case involves "the President's Article II power to nominate and remove officers of the United States." Both assertions are belied by the undisputed facts in this case.

The White House has insisted publicly throughout this Investigation that the President was not involved in any way, that he did not receive advice from his aides about the U.S. Attorneys and he did not make a decision to fire any of them. *See* Compl. ¶ 9; Press Briefing by Dana Perino, Acting White House Press Secretary (Mar. 27, 2007), *available at* http://www.whitehouse. gov/news/releases/2007/ 03/20070327-4.html. The Complaint is fully consistent with those assertions. This case involves a subpoena to testify of a former White House aide – who purportedly did not communicate with the President on this topic – to determine her first-hand knowledge of the facts and circumstances surrounding the forced resignations in which she played a prominent role and a subpoena for White House documents that were not prepared by, prepared for, or even seen by the President.

## SUMMARY OF ARGUMENT

After conceding that the Court has subject matter jurisdiction under 28 U.S.C. § 1331 and that the parties are at an "impasse" creating a real case or controversy arising under the Constitution, Defendants claim that the Committee lacks standing to proceed with its suit because it has not suffered the requisite injury. This argument was rejected by the Court of Appeals in *AT&T I* – a decision which is binding on this Court – where the D.C. Circuit ruled

that the House, which specifically authorized the Committee to file this suit, "has standing [in court] to assert its investigatory power." 551 F.2d at 391. The Department's contention that this ruling was overruled by the Supreme Court in *Raines v. Byrd*, 521 U.S. 811 (1997), is simply wrong. Raines does not even mention *AT&T*, much less purport to overrule it, and no Circuit Court decision has ever suggested that *AT&T* does not remain valid and binding law. *Raines* involved individual Members of Congress who lost a legislative battle with their colleagues and subsequently sought assistance from the courts to help overturn an enacted piece of legislation. It had absolutely nothing to do with a suit brought by a congressional committee which had the authorization of the full House following an extensive and pointed investigation into alleged malfeasance within the Administration, which culminated in the issuance of subpoenas to Ms. Miers and Mr. Bolten. Indeed, one year after *Raines* was decided, a three-judge panel of this Court expressly recognized the vitality of *AT&T I* in *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998), and held that the House had standing and had suffered the requisite injury when it was deprived of information needed to carry out its official functions.

The Committee sees no reason why, on the one hand, the Department may apply to the courts to have its subpoenas enforced – ostensibly on the ground that they have suffered an "informational injury" – and Congress may not. The same is true for administrative agencies, which, like Congress and indeed by the authorization of Congress, issue their own subpoenas. Courts routinely entertain enforcement actions brought by those agencies, which at best suffer an injury equal to that of the Congress, but likely less significant because the one sustained by Congress emanates from its duties under the Constitution.

The Department next contends that, even though the Court has subject matter jurisdiction, even though the Constitution provides Congress with an implied right to issue and enforce subpoenas, and the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201-02, provides a remedy, the Committee lacks a cause of action to invoke the aid of the Court. This is pure sophistry. The Committee has both an implied right of action under the Constitution to enforce its subpoenas and an express one under the DJA to obtain a judicial ruling on "the rights and other legal relations" of the parties and to obtain "further necessary or proper relief" to enforce those rights, including injunctive relief. As to the latter right of action, this suit contains every element of what the Supreme Court has said is required to bring an action under the DJA, including jurisdiction (which is conceded), an "actual controversy," a substantive right provided by the Constitution, and the fact that a decision by the Court will definitively declare the legal relations at issue between the parties (*i.e.*, will not yield an advisory opinion).

As noted, Congress possesses an implied right of action under the Constitution to bring a subpoena enforcement action. Such a claim for relief must be implied because the Supreme Court has already found the Constitution to provide implicitly Congress's power to compel witnesses to testify and produce documents, to require witnesses to comply with these congressional subpoenas and to authorize at least one non-exclusive and more substantial remedy – inherent contempt – to effectuate those powers. Clearly, within the previously implied powers is the lesser included remedy of seeking the assistance of the very courts that recognized these powers under the Constitution. In this instance, obtaining declaratory and injunctive relief is far preferable to setting into motion Congress's much greater and more coercive power of detaining, trying and ultimately imprisoning Ms. Miers and Mr. Bolten. Moreover, the cases cited by Defendants to establish that no right of action exists are inapposite, as they all involve the issue

14

of implied private rights of action from statutes enacted by the Congress. In such cases, where Congress has erected another system – administrative or otherwise – to enforce its statutes, courts will not imply rights of action for private parties on the ground that they would be contrary to the remedial systems that Congress created. Defendants, apparently oblivious to the irony of their position, seek to rely on a canon of statutory construction that turns on Congress's intent as a way of keeping out of the courts a Congress that is clearly intent on being in court and has specifically authorized the Committee and its counsel to bring this suit to this Court. And finally, Defendants' attempt to conjure up significance from the statute creating the Office of Senate Legal counsel plainly reads the legislative history out of context. The legislative history makes clear that the Senate understood itself to have a pre-existing Constitutionally derived right of action and that the statute was designed primarily to ensure that the Court had *jurisdiction* to hear the suit and to make clear who was authorized to bring such suits on behalf of the Senate and its committees. Jurisdiction is not at issue here, as Defendants have conceded that this Court has jurisdiction under 28 U.S.C. § 1331.

The only other ground asserted by the Department for the dismissal of the Complaint is the Court's discretion under the DJA. But the compelling circumstances presented by the instant action demonstrate that it would be an abuse of that discretion *to dismiss* this action under the DJA. As a result of Defendants' extreme negotiating posture, the parties may reasonably clarify their existing legal relations only through the courts. The Committee's position is that, a President and his advisers are not one and the same under the Constitution for purposes of executive privilege and immunity, and even if they were, as explained in *United States v. Nixon*, 418 U.S. at 707, the President has only a *qualified privilege* from process. Under Defendants' view, however, the President and his former and current aides are indistinguishable and all

15

possess a lifetime *immunity* from having to appear, testify or produce documents (or privilege

logs) to the Congress.  Not only is this a clear legal dispute amenable to judicial resolution, but

also its ramifications, if left unsettled and unresolved are staggering.  If the Defendants' defiance

of their subpoenas is allowed to stand, then there will be no limit on a future President's ability

to cloak any aide or indeed any executive official with "absolute immunity" and preclude any

committee of the Congress from receiving necessary information.  This would also eliminate the

need for a privilege, qualified or otherwise, since the subpoenaing party will not even be

permitted to put questions to the aide.  It is an understatement that a ruling in this matter would,

as suggested by the case law, "'serve a useful purpose in clarifying the legal relations in issue.'"

*Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C. Cir. 1983) (citation omitted).

      Moreover, the matter presented is one of overriding national importance.  If Congress and

the American people cannot learn what motivated these forced resignations, public confidence in

the fairness and impartiality of our federal criminal justice system will be seriously eroded and

Congress will be inhibited from passing specific prophylactic legislation (or affirmatively refrain

from doing so).  If these involuntary departures were in fact motivated by partisan concerns and

were designed to send a signal to the remaining U.S. Attorneys that political allies of the

President should be protected and political foes should be prosecuted, immediate corrective

legislative action may be needed.  If no answers are forthcoming and questions linger, people

may lose faith in the system, with extremely damaging collateral consequences.

      All other reasonable avenues have been exhausted.  Despite all of the Committee's efforts

at compromise, the negotiations are, in the words of the current Counsel to the President, at an

"impasse."  The Committee and the full House have voted for contempt; the matter was referred

to the U.S. Attorney for the District of Columbia pursuant to 2 U.S.C. §§ 192, 194, and at the

direction of the Attorney General, he declined to follow the law to put this matter before a grand jury. This situation is unlike that presented in the Gorsuch case, when the Department sought a declaratory judgment to prevent the House from certifying the contempt in the case of Ms. Gorsuch (now Ms. Burford). As the Court noted there, the parties had not completed their negotiations, the contempt had not yet been certified, the matter had not yet been presented to the grand jury and the House had not yet brought an enforcement action in court. Here, there is absolutely nothing further for either side to do and the legal issue is squarely presented. Both the Committee and the Nation will suffer grievous hardship if the Court declines to entertain this action.

On the merits, the Department offers not a single judicial precedent that supports its position that White House aides are "absolutely immune" from congressional subpoenas. No case suggests that the aides do not have to appear in response to such subpoenas and assert executive privilege to specific questions or may refuse to provide any documents without providing a privilege log or a similar detailed description of the documents withheld. To the contrary, it is well established in the law that even where a witness has an "absolute" privilege, such as the attorney-client privilege, the subpoenaed witness must appear and assert the privilege where appropriate and answer other questions, including those testing whether the privilege obtains. The distinction between the President and his aides was made crystal clear in *Nixon v. Fitzgerald,* 457 U.S. 731 (1982), and *Harlow v. Fitzgerald*, 457 U.S. 800, where the Supreme Court determined that while the President possesses an immunity in the limited instance of private civil suits for damages for actions taken in the President's official capacity, his aides do not. *Nixon v. Fitzgerald* noted that "[t]he President's unique status under the Constitution distinguishes him from other executive officials," 457 U.S. at 750, and *Harlow v. Fitzgerald*

17

made plain that White House officials do not enjoy the same constitutional status as the President.

As to the need for a privilege log, it is undisputed that Congress has the power under the Constitution to issue and enforce subpoenas for documents. If it has the power to compel the production of documents, it must have the power to prescribe the responsibilities of the respondents if they decline on any basis to produce those documents. The greater power clearly includes the lesser. A party who issues subpoenas – whether a grand jury, for criminal trial or in civil discovery – has a right to demand and expect that a privilege log will be provided at least where the privilege claimed is qualified so that there can be orderly review of the claim of privilege. Further, now that the Committee has been forced to bring this civil litigation, the Federal Rules of Civil Procedure control, and they expressly provide in Rule 45(d)(2)(ii) that anyone withholding subpoenaed information under a claim of privilege must "describe the nature of the withheld documents . . . in a manner that . . . will enable the parties to assess the claim." If this Court is ultimately to consider the qualified executive privilege and balance the Committee's need for the information against the President's need for confidentiality, it will require a privilege log, just as the Committee demanded and deserved, to assess the claims. By requesting a privilege log, the Committee is giving the custodians of records a last chance to justify their claims of privilege with respect to some of the documents and thereby potentially reduce the number of documents and perhaps issues in controversy. The Committee would have thought this approach would be more in keeping with the Department's theme of compromise and accommodation than its absolutist approach to produce not a single piece of paper or any meaningful description of a single document withheld.

For the reasons set forth in our opening brief and as amplified further below, the House requests that the Court deny the motion by Ms. Miers and Mr. Bolten to dismiss the Complaint and grant the motion for partial summary judgment in accordance with the proposed order previously presented to the Court.

## ARGUMENT

Defendants move to dismiss the Committee's Complaint on the grounds that the Committee lacks standing, the Committee has no cause of action and the Court should decline to exercise its discretion under the Declaratory Judgment Act. Defs.' Mem. at 23-47. Four Republican Members of the House, as *amici curiae*, argue – although Defendants do not – that the case is not ripe. Memorandum Amici Curiae of Representatives John Boehner, Roy Blunt, Lamar Smith and Chris Cannon (May 9, 2008) ("Members' *Amici*"). In ruling on the motion to dismiss as well as on *amici*'s ripeness argument, this Court "must accept as true all material allegations of the complaint, . . . must construe the complaint in favor of the [plaintiff]," *Warth*, 422 U.S. at 501, and must "'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)); *see also Gregg v. Barrett*, 771 F.2d 539, 547 (D.C. Cir. 1985) ("For purposes of determining whether a plaintiff has failed to state a cause of action, the factual allegations of the complaint must be taken as true, and any ambiguities or doubts must be resolved in favor of the pleader.").

## I.    THE COMMITTEE HAS STANDING TO SEEK TO ENFORCE ITS SUBPOENAS.

As the Committee explained in its Memorandum, the Committee clearly has standing under the precedents of this Circuit. Pl.'s Mem. at 18-21. Indeed, on each occasion the federal courts have addressed the standing question in the context of a case involving the enforcement of

a congressional subpoena, they have either expressly or implicitly determined that the plaintiffs have Article III standing; and, in cases where the issue was not squarely presented, they have opined that a committee of Congress would have standing to bring such an action. Thus, "[i]t is clear that the House as a whole has standing to assert its investigatory power." *AT&T I*, 551 F.2d at 391.

Defendants' claim that *Raines v. Byrd*, 521 U.S. 811, and, by extension, *Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002), altered this jurisprudential landscape is simply wrong. Moreover, the Court must reject the Department's related suggestion that this Court rework more than 200 years of standing jurisprudence by holding that only suits directly raising issues of so-called "private" rights are justiciable. "Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other." *In re Debs*, 158 U.S. 564, 584 (1895).

A.    **The Committee Has Standing Under the Precedents of This Circuit.**

1.    ***The AT&T* Case Is Controlling Here.**

No court has ever held that either House of Congress (or a committee thereof), or a party directly subject to or with a direct interest in the material or testimony sought by a congressional subpoena, does not have Article III standing to seek to enforce, or enjoin the enforcement of, a subpoena. In *AT&T I*, where the Executive Branch sought to enjoin enforcement of a congressional subpoena, the D.C. Circuit clearly held that "the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." 551 F.2d at 391. The Court, after fully considering the acute separation of powers concerns at issue, developed a comprehensive blueprint for when adjudication is appropriate. *Id.* at 388-95; Pl.'s Mem. at 22-23.

Adhering to this principle, this Court more recently noted that it is

> well established that a legislative body suffers a redressable injury
> when that body cannot receive information necessary to carry out
> its constitutional responsibilities.  This right to receive information
> arises *primarily in subpoena enforcement cases*, where a house of
> Congress or a congressional committee seeks to compel
> information in aid of its legislative function.

*U.S. House of Representatives*, 11 F. Supp. 2d at 86 (emphasis added); *see also Walker*, 230 F.

Supp. 2d at 68 (noting that "authority in this Circuit indicat[es] that a House of Congress or a

committee of Congress [has] standing to sue to retrieve information to which it is entitled").

This is consistent with Supreme Court decisions finding standing in cases where Executive

Branch agencies sue to enforce administrative subpoenas.  For example, in holding that a suit

to enforce an administrative subpoena "is a 'case' or 'controversy,' within the meaning of the

constitution," *see Interstate Commerce Comm'n v. Brimson*, 154 U.S. 447, 469 (1894), a

majority of the Supreme Court explained:

> Whether the commission is entitled to the evidence it seeks, and
> whether the refusal of the witness to testify or to produce books,
> papers, etc., in his possession, . . . are the distinct issues between
> that body and the witness.
>
> Thus has arisen a dispute involving rights or claims asserted by the
> respective parties to it; and the power to determine it directly, and,
> as between the parties, finally, must reside somewhere. It cannot
> be that the general government, with all the power conferred upon
> it by the people of the United States, is helpless in such an
> emergency, and is unable to provide some method, judicial in form
> and direct in its operation, for the prompt and conclusive
> determination of this dispute.

*Id.* at 476-77.  Thus, as was the case in *AT&T I*, the Supreme Court in *Brimson* recognized that

when a governmental entity has a practical need to sue, the Court will grant standing.

As is clear, all authority directly on point and from directly related contexts supports

the Committee's standing to enforce its subpoenas in this case.  The Committee knows of no

case, and Defendants certainly cite none, holding that the issuer of a subpoena lacks standing to enforce the subpoena in court.  *None*.  That should be the end of the matter.

Defendants claim that *AT&T I* is distinguishable because, in that case, the "suit was . . . brought by the Executive Branch, not Congress, to prevent a private third party from disclosing information harmful to the national security."  Defs.' Mem. at 34.  It is of no moment, however, that the suit was originally filed against a private party (AT&T) because both the District Court and the Court of Appeals expressly viewed the suit as a dispute between the Executive and Legislative Branches.  *See AT&T I*, 551 F.2d 388-89 ("Although this suit was brought in the name of the United States against AT&T, AT&T has no interest in this case . . . ."); *United States v. AT&T*, 419 F. Supp. 454, 458 (D.D.C. 1976) ("[T]he action is one against the power of the Subcommittee and should be treated as such.").  For standing purposes, there is also no principled distinction between a suit brought by the Executive Branch to enjoin enforcement of a congressional subpoena and one brought by the Congress to enforce it.

Defendants try to dismiss *U.S. House of Representatives* by noting that the *Walker* Court asserted that the *Walker* case was "'readily distinguishable'" from *U.S. House of Representatives* because, in the latter case, the injury was concrete as a result of it being a deprivation of  "'a constitutionally mandated function.'"  Defs.' Mem. at 35 (citing *Walker*, 230 F. Supp. 2d at 73 n.19).  This argument is both misleading and irrelevant.  It is misleading because the principal "distinguishing" factor cited by the *Walker* Court was that "the House of Representatives as a whole – not individual congressmen or a congressional agent" brought the suit in *U.S. House of Representatives*.  230 F. Supp. 2d at 73 n.19.  The same thing is obviously true here.  Defendants' argument is also misleading because it places far too much

emphasis on the words "constitutionally mandated function."  In fact, the *U.S. House of Representatives* Court expressly did not reach the House's claim in that case that "it has a mandatory constitutional duty to ensure that an actual enumeration is taken every ten years, and that the House membership is apportioned in accordance with that enumeration."  11 F. Supp. 2d at 84-85.  Instead, the Court based its finding of informational injury on the House's "*right* to timely receive from the President census information that complies with the Census Act and the Constitution."  *Id.* at 84 (emphasis added).  That right, for purposes of determining an injury-in-fact, is no different than the Committee's right under the Constitution to compel testimony and the production of documents from witnesses in furtherance of its legislative and oversight responsibilities.  Finally, Defendants' argument is irrelevant because the *U.S. House of Representatives* Court used unqualified language to describe the injury suffered:  "The inability to receive information which a person is entitled to by law is sufficiently concrete and particular to satisfy constitutional standing requirements."  *Id.* at 85.[4]

> **2.    *Raines* and *Walker*, to the Extent They Apply at All Here, *Support* the Committee's Standing To Sue.**

Defendants next advance the extreme and unprecedented argument that *AT&T I*'s standing determination "cannot stand in light of *Raines*."  Defs.' Mem. at 34.  *Raines* never discussed, however – let alone expressly overruled – *AT&T I* or, for that matter, any other case involving the enforcement of congressional subpoenas.  "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [court] should follow the case which directly controls, leaving to [the

---

[4] Defendants also question (Defs.' Mem. at 34-35) the import of *S. Select Comm. III*, 498 F.2d 725, which the Committee cited earlier as another instance in which the D.C. Circuit entertained a similar action on behalf of a committee of Congress.  This Court has noted, however, that *Senate Select Committee* supports the Committee's standing argument.  *See Walker*, 230 F. Supp. 2d at 68 (citing *Senate Select Committee* as "some authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled").

Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. at 484; *see also Sierra Club v. EPA*, 322 F.3d 718, 725 (D.C. Cir. 2003); *Lardner v. U.S. Dep't of Justice*, No. 04-6230, 2005 WL 758267, at *15.

Moreover, Justice Souter expressly noted in his concurrence in *Raines* that "it is also possible that the impairment of certain official powers may support standing for Congress, or one House thereof, to seek the aid of the Federal Judiciary." *Raines*, 521 U.S. at 831 n.2 (Souter, J., concurring). It also bears noting that following *Raines*, the three-judge panel in *U.S. House of Representatives* expressly relied on *AT&T I*. *See* 11 F. Supp. 2d at 86; *see Lardner*, No. 04-6230, 2005 WL 758267, at *15 (noting the significance of the fact that the district court continued to rely on cases as governing law even after the purported superseding Supreme Court case at issue).

While there are any number of factual distinctions between *AT&T I* and *Raines*,[5] what ultimately separates them is that *Raines* reflected the Supreme Court's concern about injecting itself into "an intrabranch dispute between segments of Congress itself." 521 U.S. at 833. "[T]he alleged cause of [Member plaintiffs'] injury is not [the Executive's] exercise of legislative power but the actions of their own colleagues in Congress in passing the [Line Item Veto] Act." *Id.* at 830 n.11. Separation of powers principles, the Court held, counsel against the judiciary involving itself in matters internal to one of the political branches, especially when those individuals bringing suit already had an opportunity to vindicate their

---

[5] The *U.S. House of Representatives* Court noted one such distinction: "the virtue of denying standing [in *Raines*] . . . was only confirmed by the certainty that a private suit would surely follow." 11 F. Supp. 2d at 89. Here, of course, as in *AT&T I*, there is no other party that could vindicate the Committee's constitutional interests. "Consequently, if the House does not have standing, this question might evade review." *Id.*

constitutional interests through the recognized internal channels (*i.e.*, voting), and still possessed other reasonable means of convincing their colleagues to support their position.  *Id.*[6]

Finally, there is great danger in reading *Raines* too broadly, as Defendants do.  Despite repeatedly trumpeting separation of powers concepts, Defendants fail to recognize that while "*Raines v. Byrd* is best understood as a decision seeking to preserve separation of powers by restricting congressional standing," taken too far "such special restrictions might result in *inadequate* enforcement of the principle of separation of powers."  Note, *Standing in the Way of Separation of Powers:  The Consequences of* Raines v. Byrd, 112 Harv. L. Rev. 1741, 1758 (1999) (emphasis added).  *See also* Carlin Meyer, *Imbalance of Powers:  Can Congressional Lawsuits Serve As Counterweight?*, 54 U. Pitt. L. Rev. 63, 73 (1992) ("Many, if not most, congressional lawsuits are aimed at ensuring that our government remains a government of three branches in the face of the rise of executive power, which was so feared by the Framers.").

### B.    The Committee Has Suffered a Concrete and Particularized Injury-in-Fact.

As to the specific elements of standing, there should be no serious question over whether the Committee has suffered – and continues to suffer – an injury-in-fact as a result of Ms. Miers's failure to appear and Ms. Miers's and Mr. Bolten's failure to produce documents and/or privilege logs.  In the course of a focused oversight investigation into allegations of malfeasance in, and the politicization of, the administration of the federal criminal justice system, a series of contradictory statements and unexplained memory lapses on the part of Department officials,

---

[6] *See also Barnes v. Kline*, 759 F.2d 21, 28 (D.C. Cir. 1985) ("[A] concern for the separation of powers has led this court consistently to dismiss actions by individual congressmen whose real grievance consists of their having failed to persuade *their fellow legislators* of their point of view . . . ."); *Kucinich v. Bush*, 236 F. Supp. 2d 1, 17-18 (D.D.C. 2002) (noting that the "delicate balance of powers under the Constitution" would be "undermined" by hearing such intra-branch matters, because they "might encourage congressmen to run to court any time they disagreed with Presidential action").

among other things, has raised serious questions regarding the White House's participation in, and the motivations for, the unprecedented forced mid-Administration resignations of the nine U.S. Attorneys. Ms. Miers's and Mr. Bolten's refusal to comply with their subpoenas, which were aimed at developing information to answer these questions, has denied the Committee critical information, without which it cannot complete its lawful investigation and fulfill its constitutional obligations. This injury, which Defendants do not dispute as a factual matter, is particularized and concrete.

**1.    The Committee's Injury Is Sufficiently Particularized for Purposes of Article III.**

The Committee's injury is particularized (*i.e.*, personal) *to the Committee*. The Committee conducted its Investigation pursuant to its constitutional authority and issued subpoenas to vindicate that authority to Ms. Miers and Mr. Bolten (among others). Congress undoubtedly has a right to compel testimony and the production of documents, *see McGrain*, 273 U.S. at 175, and thus has a right (and an implicitly recognized need) for such information. When Ms. Miers and Mr. Bolten ignored their subpoenas, the *Committee* suffered an injury by being denied access to information it deemed essential to its Investigation. No other entity sustained it, and it was not claimed by an individual acting in an "official" capacity. Under these circumstances, the Committee's injury is sufficiently particularized. "Standing depends considerably upon whether the *plaintiff* is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused *him* injury." *U.S. House of Representatives*, 11 F. Supp. 2d at 89 (quoting *Lujan*, 504 U.S. at 561 (emphasis

added).[7]  Here, unlike in *Raines*, the plaintiff (the Committee) is undeniably the "object" of Defendants' contumacious refusal to comply with the Committee's subpoenas. [8]

Defendants, however, contend that in the wake of *Raines* the Committee's injury is not sufficiently "personal," because at issue is only "an official, 'governmental right.'"  Defs.' Mem. at 29.  *Raines*, however, *never* made a personal/governmental distinction.  Indeed, *Raines* never uses the phrase "governmental right," as Defendants suggest.  Rather, *Raines* focuses on the distinction between personal and *official* rights, *i.e.*, whether an individual Member of Congress can sue in his personal capacity to vindicate an "official right."  *Raines*, 521 U.S. at 821-22.

Moreover, Defendants' argument – which, at bottom, is that public officials and the political branches themselves *never* have standing to sue to vindicate an institutional interest – advocates an extreme view of governmental standing that has never been endorsed by any court, contradicts long-standing Supreme Court precedent, defies common sense, and relies exclusively on a dissenting opinion in *Barnes v. Kline*, 759 F.2d 21 (Bork, J., dissenting), and a concurring opinion in *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984) (Scalia, J., concurring).  The Department's argument must be rejected for the following reasons.

*First*, there is no principled reason that the courts should only decide constitutional issues to which a private individual or entity is a party.  In limited instances, such as here, where the functioning of a branch of the Government is being threatened *and no other party* may vindicate

---

[7]  That the Committee was injured is buttressed by the fact that it referred to the House charges of contempt against Ms. Miers and Mr. Bolten.  The House confirmed its belief that the Committee had been injured by holding both Ms. Miers and Mr. Bolten in contempt and authorizing the Speaker to refer the matter to the U.S. Attorney for prosecution pursuant to 2 U.S.C. §§ 192, 194.

[8]  Other cases cited by Defendants also highlight this distinction.  *See, e.g., Braxton County Court v. W. Va. ex rel. Dillon*, 208 U.S. 192, 198 (1908) (tax auditor who was "testing the constitutionality of the law purely in the interest of third persons, *viz.*, the taxpayers," was not suing to protect his *personal* interest).  While the Department takes issue with the Committee's alleged use of *FEC v. Akins*, 524 U.S. 11 (1998), *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989), and *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) to further demonstrate injury, (1) the Committee never cited those cases, and (2) they apply regardless.

the interest in question, the courts are required (when asked) to enforce the Constitution and prevent this impairment from occurring. It simply cannot be the case that the Framers intended to sacrifice the efficacy of our Constitution on the notion that neither the Congress nor the President may ever resort to the courts. Article III certainly says nothing of the sort.

*Second*, it is no answer to suggest, as the Department does (Defs.' Mem. at 26-27), that the political branches have the tools necessary to resolve all such disputes. The Framers, we think, would not have thought it proper for Congress to impeach the President, or eliminate funding for portions of the Executive Branch (with consequent collateral damage to third parties, including "private" parties), anytime a dispute over information reached an impasse or because of concerns about the "public esteem" of the courts. *Raines*, 521 U.S. at 829 (citation omitted). To suggest these things, as Defendants do, is to suggest that the Framers were ideologues who were unaware of and unmoved by the messy realities of divided government. In any event, the Committee is not "ask[ing] the Court to disregard the political accommodation process that has been followed for centuries in resolving inter-branch disputes." Defs.' Mem. at 24. Rather, it seeks the Court's assistance to *ensure the continued viability* of that process. The Executive Branch's resort to untenable legal positions in an effort to undermine the Constitution's separation and balance of powers has effectively rendered inoperable the traditional process of "accommodation" to which Defendants pay so much homage.

### 2.    The Committee's Informational Injury Is Sufficiently Concrete.

Defendants also assert (Defs.' Mem. at 31) that the Committee's injury is insufficiently "concrete" for Article III purposes. This argument falls short for at least three reasons.

*First*, the Committee has already demonstrated at length why Ms. Miers's testimony and the documents in Mr. Bolten's possession are necessary, and why the White House Counsel's one settlement offer – the *lone* offer – was embarrassingly inadequate. *See* Report at 55-64, Pl.'s

Mem. at 11-12; Pl.'s Mem, Exh. 1.  Given that "[t]he scope of [the Committee's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) (quoting *Barenblatt v. United States*, 360 U.S. 109, 111 (1959)) (alteration in *Eastland*), the significance of Defendants' refusals to comply is undeniable.  Defendants cannot realistically maintain that denying the Committee information to which it is constitutionally entitled does not constitute a concrete injury.

*Second*, Defendants' suggestion (Defs.' Mem. at 32) that the Committee's interest in the information it seeks is limited because the conduct at issue involves the President's "exercise of his Article II powers of nomination and removal," is a complete red herring.  In addition to the fact that the Committee has jurisdiction to probe all matters concerning the administration of the Department of Justice, *see McGrain*, 273 U.S. at 177, and that the House has a role in the appointment of U.S. Attorneys generally, *see, e.g.,* Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, 121 Stat. 224 (2007), it is uncontested that *the President had no involvement whatsoever* in the forced resignations.  *See* Compl. ¶ 9; White House Briefing, *supra*.  Thus, unless Defendants claim that they may independently wield the President's Article II powers, their argument is wholly specious and must be disregarded.

*Third*, Defendants mischaracterize the Committee's injury as identical to that of the Comptroller General in *Walker*.  Defs.' Mem. at 31, 34.  *Walker* found that the harm to the Comptroller General's "principal, the Congress," was too vague and amorphous because the Comptroller General asserted a general interest in gathering information – *i.e.*, for no particular sanctioned investigation – "to 'aid Congress.'"  230 F. Supp. 2d at 67.  *Walker* then went on to state:

> Granted, the potential impact upon Congress here may be more concrete than the injury in *Raines* in one sense – any harm here relates to a reasonably well-defined set of information. Indeed, there is some authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled. *But here* the record reflects that Congress as a whole has undertaken no effort to obtain the documents at issue, that no committee has requested the documents, and that no congressional subpoena has been issued. Thus, an injury with respect to any congressional right to information remains wholly "'conjectural' or 'hypothetical,'" and Congress retains alternate means to seek the information – a factor cited by the Supreme Court in *Raines*.

*Id*. at 68 (citations omitted) (emphasis added).  Here, of course, the Committee seeks "a reasonably well-defined set of information," *and* the House "as a whole has undertaken [an] effort to obtain the documents at issue, . . . [a] committee has requested the documents, and . . . [a] congressional subpoena has been issued."  This is a stark contrast to the Comptroller General's inquiry which was instituted as a general investigation at the request of two individual Members of Congress without the imprimatur of a committee or the full House.[9]

### C.    Courts Routinely Review Actions of the Political Branches, Both Individually and in the Context of Inter-Branch Disputes.

Finally, Defendants fall back on the generic argument that "judicial intervention [in a case like this] has been virtually unknown in American jurisprudence and was rejected by the founders as a proper role for courts to play."  Defs.' Mem. at 26.  *See also id*. at 25 ("'dispute [must] be one 'traditionally thought to be capable of resolution through the judicial process'")

---

[9] Defendants respond that the excerpt on page 68 of the *Walker* decision merely "make[s] the dispute here *riper* than in *Walker*."  Defs.' Mem. at 31.  That fanciful notion has no basis in the language of the opinion which is framed entirely in terms of standing.  Indeed, the fact that a committee had not undertaken those steps led the *Walker* Court to conclude (in the same paragraph) that the Comptroller Generals' purported injury "remain[ed] wholly 'conjectural' or 'hypothetical.'"  *Walker*, 230 F. Supp. 2d at 68 (internal quotation marks omitted).

(quoting *Raines*, 521 U.S. at 819).  In fact, the elements making up this case are some of the most basic and common to this country's conception of what courts do.

*First*, courts routinely enforce subpoenas – their own, those of grand juries, and those of federal administrative agencies.  No one doubts that the Department has "standing" to enforce these subpoenas when it is denied the information the Department seeks to present to a grand or petit jury.  Its standing is identical to the Committee's standing in this action and thus presents "the kind of controversy courts traditionally resolve."  *United States v. Nixon*, 418 U.S. at 696. As the Supreme Court explained:

> Here at issue is the production or nonproduction of specified evidence . . . . sought by one official of the Executive Branch within the scope of his express authority; it is resisted by the Chief Executive on the ground of his duty to preserve the confidentiality of the communications of the President. Whatever the correct answer on the merits, these issues are "of a type which are traditionally justiciable." The independent Special Prosecutor with his asserted need for the subpoenaed material in the underlying criminal prosecution is opposed by the President with his steadfast assertion of privilege against disclosure of the material. This setting assures there is "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."

*Id.* at 696-97 (citations omitted).

*Second*, the courts have routinely reviewed the validity of congressional inquiries, similar to the one at issue here.  *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 182 (1957) (accepting jurisdiction in a case concerning a congressional subpoena where "[t]he controversy thus rests upon fundamental principles of the power of the Congress and the limitations upon that power").

*Third*, the courts have decided countless cases that involve the allocation of power *between* the political branches (not to mention between the political branches and the judiciary). *See, e.g., Myers v. United States*, 272 U.S. 52 (1926) (scope of President's removal power *viz.* Congress); *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) (same); *Bowsher v.*

*Synar*, 478 U.S. 714 (1986) (role of Comptroller General *viz.* the Executive Branch); *Morrison v. Olson*, 487 U.S. 654 (1988) (constitutionality of independent counsel statute); *INS v. Chadha*, 462 U.S. 919 (1983) (constitutionality of one-house legislative veto). "It seems to be assumed that these cases, dealing with the powers and relations of the branches of the United States, are maintainable in federal court . . . ." *AT&T I*, 551 F.2d at 389 (citing *United States v. Nixon*, 418 U.S. 683, *Nixon v. Sirica*, 487 F.2d 700, *Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974)).

## II.    THIS CASE IS RIPE FOR REVIEW.

Defendants do not contend that this case is not ripe. Indeed, they acknowledge this case may be "riper than *Walker*." Defs.' Mem. at 31. The *amici*, however, do argue that the Complaint should be dismissed as not ripe. Members' *Amici* at 1-2. This argument reflects a serious misunderstanding of the ripeness doctrine.

Ripeness concerns the fitness of a matter for judicial resolution. A case is ripe when the facts have been developed to the point that there is a concrete case or controversy which presents a discrete legal issue for adjudication. *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 811-12 (2003); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 736-37 (1998). This is plainly such a case. The issues here – described in Counts I and II of the Committee's Complaint – concern Ms. Miers's obligation to appear in response to her subpoena and Ms. Miers's and Mr. Bolten's obligation to provide privilege logs. Those issues are ripe by virtue of the fact that the Committee issued subpoenas to both Defendants; Defendants disregarded their subpoenas; the House held both Defendants in contempt; and the Attorney General refused to present the matter to a grand jury.

Accordingly, *amici*'s suggestion (Members' *Amici* at 10-14) that this case is not ripe because the Committee could have re-interviewed Department witnesses, completely misses the point. As a purely factual matter, the Committee has already obtained all available information

from Department sources, as a result of which there remained key unanswered questions which necessitated documents and testimony from Ms. Miers and Mr. Bolten. *See* Pl.'s Mem. Exh. 1. And the notion that additional interviews of witnesses, who had little or no information the first time around about the White House's role in the forced resignations, would have furthered the investigation, or obviated the need for subpoenas to Ms. Miers and Mr. Bolten, is meritless.

Moreover, as a legal matter, there is nothing in the ripeness doctrine that requires the Committee to run down every conceivable lead no matter how speculative the possibility of obtaining additional information, or to continue beating its head against a wall once the White House decided to stonewall the Committee. Courts do not require further factual development when the questions presented are purely legal and additional facts "will not help the court better grasp the relevant statutes and constitutional provisions." *U.S. House of Representatives*, 11 F. Supp. 2d at 94 (citations omitted).

The Committee notes that the arguments advanced by *amici* – two of whom, Congressmen Smith and Cannon, subscribed to the Minority Views to the Committee's report – are inconsistent with those Minority Views. The Minority reviews state very clearly that no more documents or interviews are necessary. *See* Report (Minority Views) at 140, Pl.'s Mem., Exh. 1. Indeed, the Minority Views specifically urge the Committee to pursue a civil enforcement action, *id*. at 140-41, while the *amici* urge that the suit *they* recommended be dismissed before the merits are reached.

## III.    THE COMMITTEE HAS A RIGHT OF ACTION.

By virtue of the Committee's implied power under the Constitution to issue subpoenas, and the corresponding implied constitutional obligation of subpoena recipients to comply with such subpoenas, the Committee has a right of action to enforce its subpoenas in court. Even beyond its implied power, because there is an actual controversy, the Committee has an

enforceable right under the Constitution to compel testimony and the production of documents, the matter has been presented in an appropriate pleading and because this Court concededly has jurisdiction and an appropriate remedy, the DJA permits the Court to issue declaratory, injunctive and other appropriate ancillary relief.

### A.    The Committee Has a Right of Action Under the Declaratory Judgment Act.

Contrary to Defendants' suggestion, the Committee has a right of action under 28 U.S.C. §§ 2201-02 to bring this suit.  The plain language of the statute, its legislative history and purpose and the Supreme Court's unwavering application of the statute (even where no other right of action exists) – all make clear that the Committee has a right to bring this suit under the DJA.

At the outset, the Committee's right to be in court is evident from the plain language of the statute.  It states:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57.  Thus, in order to be entitled to bring suit under the DJA, a party needs to demonstrate:  (1) "a case of actual controversy," *i.e.*, standing; (2) that the court has jurisdiction under 28 U.S.C.§ 1331; and (3) that "an appropriate pleading," *i.e.*, Plaintiff's detailed Complaint, was filed.  The statute also expressly states that a party establishing those three elements may have their "legal relations" declared "whether or not further relief is available."  *Id.*  In this case, the "legal relations" stem from the right granted to the Congress under the Constitution, as definitively interpreted by the Supreme Court.

The Supreme Court, which has *never* held that the DJA does not create a right of action – and, in fact, has proceeded for more than sixty years under the basic premise that it does – has

expressed only two limitations upon the DJA.  *First*, the Court has made clear that the DJA does

not provide federal courts with an independent source of *jurisdiction*.  *Schilling v. Rogers*, 363

U.S. 666, 677 (1960) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).

*Second*, the Court has discussed at great length the need for an "actual controversy" before

reviewing a party's action under the DJA.

> The declaratory judgment procedure is available in the federal
> courts only in cases involving an actual case or controversy, where
> the issue is actual and adversary, and it may not be made the
> medium for securing an advisory opinion in a controversy which
> *has not arisen*.

*Coffman v. Breeze Corp.*, 323 U.S. 316, 324 (1945) (emphasis added) (citations omitted); *see

also Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941) ("Basically, the

question in each case is whether the facts alleged, under all the circumstances, show that there is

a substantial controversy, between parties having adverse legal interests, of sufficient immediacy

and reality to warrant the issuance of a declaratory judgment."); *Aetna Life Ins. Co. of Hartford,

Conn. v. Haworth*, 300 U.S. 227, 240-41 (1937) ("The controversy must be definite and

concrete, touching the legal relations of parties having adverse legal interests.").  There can be no

doubt that there is an "actual controversy" here between the Committee and these two former

and current White House aides.

     Nowhere in Supreme Court jurisprudence, however, does the Court express any doubt

about whether a party who meets all of the above elements may bring suit and obtain declaratory

and necessary ancillary relief.  Indeed, it regularly entertains suits where no traditional right of

action would accrue.  For example, in the first case to reach the Supreme Court to test the

constitutionality of the DJA, the Court was faced with an action brought by an insurer to secure a

declaration that several policies held by the defendant had lapsed and that the insurer was only

responsible for a minimum payment upon the defendant's death (which had not yet occurred).

*Haworth*, 300 U.S. at 237-38.  The Court held that the DJA provided the petitioner with a right to seek a declaratory judgment in court.  As Chief Justice Hughes explained:

> There is here a dispute between parties who face each other in an adversary proceeding.  The dispute relates to legal rights and obligations arising from the contracts of insurance.  The dispute is definite and concrete, not hypothetical or abstract.  Prior to this suit, the parties had taken adverse positions with respect to their existing obligations.  Their contentions concerned the disability benefits which were to be payable upon prescribed conditions.  On the one side, the insured claimed that he had become totally and permanently disabled and hence was relieved of the obligation to continue the payment of premiums and was entitled to the stipulated disability benefits and to the continuance of the policies in force. . . . It was a claim of a present, specific right.  On the other side, the company made an equally definite claim that the alleged basic fact did not exist, that the insured was not totally and permanently disabled and had not been relieved of the duty to continue the payment of premiums, that in consequence the policies had lapsed, and that the company was thus freed from its obligation either to pay disability benefits or to continue the insurance in force.  Such a dispute is manifestly susceptible of judicial determination.  *It calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.*

*Id.* at 242.  With each of the prerequisites met, the Court concluded that "the complaint presented a controversy to which the judicial power extends and that authority to hear and determine it has been conferred upon the District Court by the Declaratory Judgment Act."  *Id.* at 244.

This suit brought by the Committee presents nearly identical elements.  "On the one side," the Committee claims that it has a "present, specific right" to Ms. Miers's testimony and documents and to Mr. Bolten's documents.  "On the other side," Defendants assert that they have an absolute immunity, and thus are not required to provide any information.  Defendants have also conceded that the Court has jurisdiction under 28 U.S.C. § 1331, and the Committee has demonstrated that it has standing.  The Complaint is the "appropriate pleading" that brings this matter clearly and unequivocally to the Court.  Under the terms of the statute, *nothing else is*

36

*necessary*. This case is "manifestly susceptible of judicial determination. It calls . . . for an adjudication of present right upon established facts." *Haworth*, 300 U.S. at 242. The statute also makes abundantly clear that no other cause of action needs to exist, when it states that the relief is available, "whether or not further relief is or could be sought." A declaration of the "rights and . . . legal relations" between two law-abiding parties should be dispositive.

One of the primary reasons the Act came into being was to "sanction[] the trial of controversies *before* a conventional cause of action has accrued and another remedy has become available." *Developments in the Law: Declaratory Judgments – 1941-49*, 62 Harv. L. Rev. 787, 808 (1949) (emphasis added); *see also* Donald L. Doernberg & Michael B. Mushlin, *The Trojan Horse: How the Declaratory Judgment Act Created a Cause of Action and Expanded Federal Jurisdiction While the Supreme Court Wasn't Looking*, 36 U.C.L.A. L. Rev. 529, 582-83 (1989) (explaining how the Act provided a cause of action where none existed before). This view is also supported by the legislative history. During the debates over the DJA in the House prior to its enactment, it was clear that one of the primary purposes of the DJA was to replace the need for a cause of action with the requirement of an "actual controversy." One of the bill's defenders confirmed that in a case where "even though . . . there is no existing cause of action upon which a hearing could be had at the time; but there is a substantial controversy as to the [legal rights involved]," the federal courts could entertain the matter. 69 Cong. Rec. 1683 (1928).

The Committee's suit is precisely the type of case where the DJA can be operative. Just as the DJA permits a business that intends to pursue a certain course of conduct that the Department threatens to prosecute criminally to seek declaratory relief under the DJA, *see, e.g., Navegar, Inc. v. United States*, 103 F.3d 994, 998-99 (D.C. Cir. 1997), so too the Committee is entitled to obtain a declaratory ruling without awaiting a court action initiated by Defendants

37

after an inherent contempt trial. Indeed, if the House were to exercise its right to arrest and try

Defendants, they would have the right to seek *habeas corpus* review in this Court, and thus

exactly the same legal issues would be presented here. Just as the business is entitled to seek

declaratory relief before it is charged with a crime, so too the Committee is entitled to seek

declaratory relief without going through an extremely disruptive and acrimonious trial before the

bar of the House, and without waiting for Defendants to seek *habeas* relief in the court.

  The cases Defendants cite only highlight the distinctions between this case and those

where resort to § 2201 has been denied. For example, *Schnapper v. Foley*, 667 F.2d 102 (D.C.

Cir. 1981), held that declaratory (and other) relief was unauthorized because "Congress had

erected numerous statutory safeguards against [the type of conduct from which relief was

sought]," and because "the statutory mandates are to be enforced *exclusively* by Congress."

*Network Project v. Corp. for Pub. Broad.*, 561 F.2d 963, 974-75 (D.C. Cir. 1977). This

comports with other Circuit and Supreme Court cases that recognize that when Congress

expressly "*excludes* a judicial remedy," the DJA cannot provide one. *See, e.g* ., *Schilling v.

Rogers*, 363 U.S. at 676; *C&E Servs., Inc. of Wash. v. D.C. Water and Sewer Auth.*, 310 F.3d

197, 201-02 (D.C. Cir. 2002); *Enigwe v. Bureau of Prisons*, No. 06-457, 2006 WL 3791379, at

*3 n.2 (D.D.C. Dec. 22, 2006). Here, there is no scheme – statutory or otherwise – that excludes

a judicial remedy for the Committee. Indeed, the Supreme Court has expressly recognized that

Congress is not limited to any of the remedies it currently possesses – whether under the

Constitution or federal statute – to ensure that its rights are protected. *See Jurney v.

MacCracken*, 294 U.S. 125, 151 (1935). Therefore, the Committee has a right of action under

the DJA.

**B.    Congress Possesses an Implied Power Under the Constitution to Enforce Its Subpoenas Through Judicial Means.**

**1.    All of Congress's Authority to Investigate, and to Utilize Compulsory Process in Furtherance of that Authority, Is Implied in Article I of the Constitution.**

"It is settled that 'the power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function.'"  *Shelton v. United States*, 404 F.2d 1292, 1296 (D.C. Cir. 1968) (quoting *McGrain*, 273 U.S. at 174).  As part of that power of inquiry, the Supreme Court has implied a right of Congress to compel testimony and the production of documents:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – *recourse must be had to others who do possess it.* . . . [S]ome means of compulsion are essential to obtain what is needed.

*McGrain*, 273 U.S. at 175 (emphasis added); *cf. Anderson v. Dunn*, 19 U.S. 204, 225 (1821) (finding the power of Congress to punish those who do not respect its process essential to effective exertion of other powers expressly granted, and therefore as implied).  Indeed, "the constitutional provisions which commit the legislative function to the two houses are intended to include this attribute to the end that the function may be effectively exercised."  *McGrain*, 273 U.S. at 175.  To further effectuate these wide-ranging powers, the Court has also implied in the Constitution an "unremitting obligation" on those called to testify and produce documents to Congress to do so.  *Watkins*, 354 U.S. at 187.

*Marshall v. Gordon*, 243 U.S. 521 (1917), establishes a framework for implying remedies pursuant to Congress's powers under Article I:

> What does this implied power [of inherent contempt] embrace? is thus the question. In answering, it must be borne in mind that the

39

> [implied] power rests simply upon the implication that the right has
> been given to do that which is essential to the execution of some
> other and substantive authority expressly conferred.  The power is
> therefore but a force implied to bring into existence the conditions
> to which constitutional limitations apply.  It is a means to an end,
> and not the end itself.  *Hence it rests solely upon the right of self-
> preservation to enable the public powers given to be exerted.*
>
> . . . . the implied power . . . rests only upon the right of self-
> preservation; that is, the right to prevent acts which, in and of
> themselves, inherently obstruct or prevent the discharge of
> legislative duty or the refusal to do that which there is an inherent
> legislative power to compel in order that legislative functions may
> be performed.

*Id.* at 541-42 (emphasis added).  This passage makes clear that inherent contempt is only one

remedy implied under the Constitution to effectuate Congress's ability to exercise its legislative

powers.  The same constitutional logic also counsels in favor of permitting the Congress, under

certain circumstances (*i.e.*, when a case is otherwise justiciable), to enforce its subpoenas civilly

through the courts.

Indeed, it would be wholly anomalous to hold, on the one hand, that federal courts can

review (a) Congress's exercise of its inherent contempt power (which the courts have implied

from the Constitution), by which Congress may enforce its demands for the production of

information in aid of its power to investigate (which the courts have also implied from the

Constitution), and (b) which information Congress demands from witnesses who have an

"unremitting obligation" to comply with such demands (which obligation the courts have also

implied from the Constitution) and then to hold, on the other hand, that the *very same courts* lack

the authority to entertain a civil action by which Congress seeks to enforce those very same

rights and obligations.  Accordingly, this Court should recognize that the Committee has a

constitutionally implied right of action to seek declaratory and injunctive relief to enforce its subpoenas.[10]

The law has long recognized in many contexts that the greater power includes the lesser, known by its Latin maxim *a moiré ad minus*.  *See Ferry v. Ramsey*, 277 U.S. 88, 94 (1928) (Holmes, J.); *Nuvio Corp. v. FCC*, 473 F.3d 302, 311 (D.C. Cir. 2006) (Kavanaugh, J., concurring)).  Clearly, if the Congress has the power and right to try and imprison a contumacious subpoena recipient without resort to the courts (albeit with judicial review available to the respondent), then the same Congress has the lesser included authority to take the less complex action of applying to the Courts for judicial relief to compel in a far less coercive manner the identical relief.

### 2.    The Authorities Defendants Cite Are Inapposite.

Virtually all the cases Defendants cite in support of their contention that the Committee does not possess a "cause of action" involve *private* rights of action.  Defs.' Mem. at 37-39 (citing *Alexander v. Sandoval*, 532 U.S. 275 (2001); *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008); *Gonzaga v. Doe*, 536 U.S. 273 (2002)).  When a party seeks to imply a private right of action under a federal statute, the courts must discern whether Congress gave a particular class of persons a right enforceable in court.  A key component of that analysis is whether or not Congress sought to protect a intended right through means other than private litigation.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 748-49 (1979) (Powell, J., dissenting).

---

[10]  An implied cause of action is particularly important here, where the Attorney General has refused to present the matter of Defendants' contempt to the grand jury, as he is obligated to do pursuant to 2 U.S.C. §§ 192, 194.  In effect, Congress's intent to vindicate one aspect of its right to compel testimony has been foreclosed by the very branch the Committee seeks to investigate.

We also note that, contrary to Defendants' suggestion (Defs.' Mem. at 38), the Committee has never asserted that 28 U.S.C. § 1331 provides it with a cause of action nor that the Declaratory Judgment Act creates jurisdiction.

In *Sandoval*, for example, the Court defined its task as "interpret[ing] the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." 532 U.S. at 286. In concluding that no such right of action existed for the plaintiff class under Title VI of the Civil Rights Act of 1964, the Court explained that Congress's "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 290. Similarly, in *Gonzaga*, the Court not only determined that the Family Educational Rights and Privacy Act "entirely lack[ed] the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights," but also that Congress "chose to provide" for a different "mechanism . . . for enforcing [those] provisions." 536 U.S. at 287, 289.

Here, however, Congress's right to compel testimony and the production of documents is rooted in the *Constitution*, not congressional enactments. And "the question of who may enforce a statutory right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Davis v. Passman*, 442 U.S. 228, 241 (1979). As the Supreme Court explained in *Davis*:

> Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner. For example, statutory rights and obligations are often embedded in complex regulatory schemes, so that if they are not enforced through private causes of action, they may nevertheless be enforced through alternative mechanisms, such as criminal prosecutions or other public causes of actions. In each case, however, the question is the nature of the legislative intent informing a specific statute . . . .
>
> The Constitution, on the other hand, does not "partake of the prolixity of a legal code." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819). It speaks instead with a majestic simplicity. One of "its important objects," *ibid.*, is the designation of rights. And in

> "its great outlines," *ibid.*, the judiciary is clearly discernible as the primary means through which these rights may be enforced.

*Id.* (internal citations omitted).  Moreover:

> When a plaintiff asserts constitutional rather than statutory rights, the Court is more willing to imply a private right to sue, both on the theory that defining the means for the enforcement of constitutional rights is the federal judiciary's special focus, and because these cases lack the separation-of-powers concern that the judiciary might find itself essential rewriting congressional legislation by tacking on implied remedies that Congress could have enacted specifically but did not.

1 Laurence H. Tribe, *American Constitutional Law* 483-84 (3d ed.).

### 3.    No Statute or Case Suggests That the Committee Does Not Possess the Right to Invoke the Jurisdiction of This Court.

Defendants advance two specific challenges to the Committee's claim that it has an implied right of action under the Constitution, neither of which has merit.  First, they misread *Reed v. County Comm'rs*, 277 U.S. 376, 388 (1928), as foreclosing the argument that an implied right of action under the Constitution exists for congressional subpoena enforcement.  Second, they read out of context the legislative history of § 705 of the Ethics in Government Act of 1978 to claim that Congress itself has asserted that it may not sue without a statutory basis.

### a.    *Reed* Does Not Support the Defendants' Position.

Defendants assert, citing *Reed*, that the Supreme Court has already held that a Senate committee "had neither an express nor an implied cause of action to enforce its subpoena in federal court."  Defs.' Mem. at 43.  That is incorrect.

*Reed* involved an attempt by a Senate committee to bring suit to enforce a subpoena for ballot boxes following a disputed senatorial election.  When one Pennsylvania county refused to comply with the committee's request, the committee brought suit to enforce its subpoena.  When the case arrived at the Supreme Court, the issue was whether the federal courts had *jurisdiction*

43

to hear the case under 28 U.S.C. § 41(1) – a predecessor to 28 U.S.C. § 1345. Section § 41(1) provided "that the District Courts shall have original jurisdiction 'of all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof authorized by law to sue.'" 277 U.S. at 386 (quoting § 41(1)). By virtue of its consideration of the question of its jurisdiction, by no means did the Court reach or even discuss whether or not the committee had a right of action. The Senate petitioners asserted that a Senate resolution which created the committee and authorized it "to do such other acts as may be necessary in the matter of said investigation," constituted "authoriz[ing] by law to sue" for purposes § 41(1). The Supreme Court disagreed, holding that the resolution language did not *expressly* grant the committee the right to sue, that it was thus not "authorized by law to sue," and that the case had to be dismissed for *lack of jurisdiction*.

    *Reed* says *nothing* about implied causes of action and, accordingly, is not an impediment to the Court's implying a right of action in this case. Indeed, the very next day after *Reed* was decided, the Senate passed a resolution specifically authorizing the committee to file suit. *See* S. Res. 262, 70th Cong. (1928). It is evident that the Senate assumed that it had a right of action, because the only action it took was to authorize a suit for jurisdiction under § 41(1) on the heels of *Reed*. Further, we note that *Reed* was decided a decade before the Congress passed the DJA, establishing an express right of action under the circumstances presented here.

> **b.    2 U.S.C. § 288d(a) Does Not Preclude Implying a Right of Action Under the Constitution in this Case.**

    Defendants also claim that, in enacting 2 U.S.C. § 288d(a) – which instructs the Senate Legal Counsel to "bring a civil action . . . to enforce [or] secure a declaratory judgment concerning the validity of . . . any subpena or order issued by the Senate" when "directed to do so" – Congress recognized that it could only sue to enforce its subpoenas by statute. However,

the text of the statute, its legislative history, and the Department's own prior interpretations make clear that § 288d(a) did nothing of the sort.

*First*, neither § 288d, nor any part of Chapter 9D creating of the Office of Senate Legal Counsel in § 705 of the Ethics in Government Act of 1978, was aimed at creating a "cause of action" for the Senate to bring civil actions to enforce its subpoenas. Rather, the legislative history of § 705 makes clear that it was enacted largely to provide *jurisdiction* and *in-house counsel* for Senate actions like the one previously undertaken in the *Senate Select Committee* cases. Specifically, § 705 was designed to be a permanent answer to the District Court's denial of jurisdiction in *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F. Supp. 51, 59-60 (D.D.C. 1973) (*"S. Select Comm. I"*), which held that 28 U.S.C. § 1331 did not provide the court with jurisdiction over a Senate committee subpoena enforcement action, not because the committee lacked a "cause of action," but because it could not satisfy the then-$10,000-amount-in-controversy requirement. Immediately thereafter, Congress enacted a statute giving the District Court for the District of Columbia jurisdiction over the Senate Select Committee suits. *See S. Select Comm. III*, 498 F.2d at 727; *see also* 119 Cong. Rec. 36,472 (daily ed. Nov. 9, 1973) (Ervin Statement) ("The amendment is necessary because Judge Sirica held that the District Court of the District of Columbia had no jurisdiction to entertain the original suit of the select committee. The substitute amendment is *to cure this defect in jurisdiction*.") (emphasis added). Following President Nixon's resignation, the Senate worked to enact a more permanent fix to the jurisdictional issue raised by Judge Sirica, a fix which eventually appeared as § 705, which specifically emphasized that there would be no monetary requirement. This statute was passed at the time that an amount in controversy was still necessary for federal question jurisdiction.

*Second*, § 288d(a), on its face is not designed to provide the Senate with a "cause of action." Congress understood that a right of action already existed. Instead, that section merely describes *who* would represent the Senate in such an action. That is, it is merely a direction to the *Senate Legal Counsel* as to what is required of that office when it is "directed to" bring a civil action by a committee or subcommittee of the Senate. Section 288d is included in Chapter 9D of Title 2, entitled "Office of Senate Legal Counsel," which concerns the *inner workings* of the Office of Senate Legal Counsel. *See, e.g*., 2 U.S.C. § 288 (composition of staff), § 288a (group to whom it is accountable), § 288c (scope of duties), § 288e (when it may intervene in case and who it must notify *internally*), § 288n (regulation of travel expenditures).

*Third*, Defendants take out of context (Defs.' Mem. at 41-42) a statement made in a Senate Report that "[p]resently, Congress can seek to enforce a subpoena only by use of criminal proceedings or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate." S. Rep. No. 95-170, at 16 (1997). As Defendants well know, however, in the *same* report, when discussing the provision of the statute that restricted enforcement through § 705 for subpoenas issued to executive officers, Congress made clear that "[t]his exception . . . is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the federal government." S. Rep. No. 95-170, at 91-92. The former excerpt merely explains that those options were the only two available at the time *as a result of* Judge Sirica's *S. Select Comm. I* decision (effectively precluding civil enforcement because of lack of jurisdiction).[11]

---

[11]   The same rationale explains Senator Roth's assertion (Defs.' Mem. at 42). When the Senator stated that "[i]f this bill becomes law, we will have, for the first time in our history, an expeditious and equitable judicial procedure for Congress to obtain information it needs," 94 Cong. Rec. 24,600 (daily ed. July 24, (1975)), he

*Fourth*, the legislative history of § 288d(a) makes clear that the statute was not designed to limit Congress's existing remedies. As the Department's Office of Legal Counsel has opined:

> The argument could be made that [§ 705] provides the exclusive route for either House to bring a civil action to enforce its subpoenas. . . . The legislative history of these statutes, however, counsels against that conclusion. The legislative history specifically notes that the jurisdictional exception for executive branch subpoenas "is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the Federal Government," but rather was intended specifically to provide the Senate with a less drastic remedy than criminal contempt for refusals by private citizens to comply with subpoenas, and to avoid reliance on the Department of Justice to enforce such subpoenas.

*Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 U.S. Op. Off. Legal Counsel 68, 92 n.31 (1986) (Charles J. Cooper, Asst. Att'y Gen.). "Thus, although the civil enforcement route has not been tried by the House, it would appear to be a viable option." *Id.* at 88.

## IV. THE COURT SHOULD EXERCISE ITS DISCRETION UNDER THE ACT TO REACH THE MERITS OF THE COMMITTEE'S CLAIMS.

Defendants assert, correctly, that relief under the DJA is discretionary with the Court. Defs.' Mem. at 43-44 (citing 28 U.S.C. § 2201(a), *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995), other citations omitted). However, they are incorrect in suggesting that it is not appropriate for this Court to exercise its discretion to reach the merits of the Committee's claims here. Defs.' Mem. at 44-47.

"Two criteria are ordinarily relied upon to determine whether a court should, in its discretion, render a declaratory judgment: (1) whether the judgment will 'serve a useful purpose in clarifying the legal relations in issue' or (2) whether the judgment will 'terminate and afford

---

was clearly referring to the statute's satisfaction of the jurisdictional component found missing in *S. Select Comm. I.*

relief from the uncertainty, insecurity, and controversy, giving rise to the proceeding.'" *Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 670 F. Supp. 424, 431 (D.D.C. 1987) (citing *President v. Vance*, 627 F.2d 353, 364 n. 76 (D.C. Cir. 1980)).  More recently, this Court held that:

> The factors bearing on the granting of declaratory judgment include:  whether [declaratory relief] would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of 'procedural fencing'; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided.

*Mittleman v. U.S. Dep't of the Treasury*, 919 F. Supp. 461, 470 (D.D.C. 1995) (citations omitted).[12]  All of these factors weigh heavily in favor of the Court's exercising its discretion here to grant the declaratory relief the Committee is seeking.

*First*, the Court's rendering a declaratory judgment here plainly would "serve a useful purpose in clarifying the legal relations in issue."  The dispute in this case revolves around two radically different views of the limits and proper application of the qualified executive privilege in the context of congressional subpoenas.  By declaring (i) whether Ms. Miers is obliged to appear before the Committee in response to the subpoena issued to her, or whether she is absolutely immune from having to appear; (ii) whether Ms. Miers is obliged to assert executive privilege in the presence of the Committee on a question-by-question basis, or whether she may assert a blanket privilege before any questions have been put to her; (iii) whether Ms. Miers is

---

[12]  *See also* Advisory Committee Note to Fed. R. Civ. P. 57 ("A declaratory judgment is appropriate when it will 'terminate the controversy' giving rise on undisputed or relatively undisputed facts."); Edwin Borchard, Declaratory Judgments 296 (2nd ed. 1941) (To exercise its authority to grant declaratory relief, "the court must have concluded that its judgment will 'terminate the uncertainty or controversy giving rise to the proceeding' and that it will serve a useful purpose in stabilizing legal relations.").

obliged to answer questions that do not seek privileged information; (iv) whether Ms. Miers and Mr. Bolten are obliged to provide the Committee with privilege logs identifying all documents withheld on grounds of executive privilege or any other basis, or whether they may simply assert a blanket privilege as to all documents responsive to their congressional subpoenas; and (v) whether Ms. Miers and Mr. Bolten are obliged to produce forthwith all responsive documents that are not privileged – which is the declaratory relief that the Committee seeks at this time – the Court will definitively resolve the controversy between the parties as to the limits and application of executive privilege as that doctrine relates to congressional subpoenas.

*Second*, and for exactly the same reasons, the Court's rendering a declaratory judgment here will terminate the "uncertainty, insecurity, and controversy, giving rise to the proceeding." Once the limits and application of executive privilege have been declared, the parties will know how to proceed. If Ms. Miers is absolutely immune from appearing before the Committee, or is entitled to assert a blanket privilege before any questions have been put to her, then that will end the matter as to her testimony. If she is not absolutely immune and not entitled to assert a blanket privilege, then presumably she, as an officer of the Court, will not defy the Court's order but will appear before the Committee, assert executive privilege on a question-by-question basis, and answer questions that do not seek privileged information. If Ms. Miers and Mr. Bolten are not obliged to provide privilege logs, then that will end the privilege log dispute. If they are, then presumably Ms. Miers and Mr. Bolten will not defy the Court's order but will expeditiously provide the Committee with privilege logs and produce forthwith all responsive documents that are not privileged.[13]

---

[13] There could, of course, be further disputes about whether Ms. Miers has properly asserted executive privilege in response to particular questions, or whether Ms. Miers and Mr. Bolten have properly asserted executive privilege as to particular documents. Those matters, however, are not before Court at this time inasmuch as the Committee has only sought summary judgment on Courts I and II of the Complaint.

*Third*, the issues raised by the Committee's Complaint are unquestionably of great public importance. This case marks the first instance since the Supreme Court determined in 1974 (in *United States v. Nixon*) that executive privilege is qualified, that Executive Branch officials have asserted that they are absolutely immune from congressional process, that they need not appear in response to a congressional subpoena, and that they may assert blanket claims of privilege. These breathtakingly expansive and overreaching claims, if allowed to stand, will redefine the limits and application of a privilege the Supreme Court has defined as merely qualified, and will severely curtail Congress's ability to exercise oversight over the Executive Branch.

*Fourth*, the Committee's conduct in this matter has been exemplary. Indeed, it has gone to extraordinary lengths to attempt to reach an accommodation with the White House. *See* Compl. ¶¶ 32-40, Statement ¶¶ 12-25.

*Fifth*, the convenience factor clearly augurs in favor of this Court's exercising its discretion to resolve, in this proceeding, what are quintessentially legal issues in dispute between the parties. The Committee and the House have already exhausted their normal remedies, including reasonable efforts to negotiate and reach an accommodation with the White House, Pl.'s Mem. at 25, and referring Ms. Miers's and Mr. Bolten's contemptuous conduct to the U.S. Attorney for prosecution, pursuant to 2 U.S.C. § 194 – a prosecution the U.S. Attorney refused to undertake, notwithstanding his statutory obligation to present the matter to a grand jury. Pl.'s Mem. at 13-14. While the Committee does have one other remedy theoretically available to it – the exercise of Congress's inherent contempt power – that remedy is very unwieldy and has not been used for seven decades. If the House were to arrest the Defendants and try them before the bar of the House or the Committee, it would, among other things, divert congressional resources and attention from other pressing legislative matters and almost certainly escalate tensions

between the political branches.  Moreover, if the House were to imprison the Defendants – either during the pendency of or at the conclusion of such an inherent contempt trial – they undoubtedly would petition this Court for writs of habeas corpus, which would simply bring the matter full circle, and once again place the legality of their actions squarely before this Court. Finally, and in any event, the DJA itself makes clear that declaratory relief is available "whether or not further relief is [available] or could be sought."  28 U.S.C. § 2201(a).  *See also* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude declaratory judgment that is otherwise appropriate."); Advisory Comm. Note to Rule 57 ("The fact that declaratory judgment may be granted 'whether or not further relief could be prayed' indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary. . . . [T]he fact that another remedy would be equally effective affords no grounds for declining declaratory relief.").[14]

Defendants' principal argument is that "for over 200 years the Executive and Legislative Branches have worked through the political process to accommodate requests such as those at issue here" and the judicial branch should stay away because "[r]eplacing the informal, political process of accommodation with hard and fast judicial rules concerning sensitive separation-of-powers issues would forever alter the accommodation process."  Defs.' Mem. at 44-45.  This argument, which underlies their entire response to the Committee's Motion, makes little sense practically or legally.

Practically, of course, this lawsuit is a direct result of the fact that the Defendants have *refused* to work through the political process to accommodate the Committee's need for

---

[14]  In fact, as we pointed out earlier, the Department's own Office of Legal Counsel has asserted that the appropriate method to resolve these kinds of disputes is through a civil action initiated by the Congress.  Pl.'s Mem. at 22.

information, both by asserting extraordinarily expansive views of executive privilege that have

no basis in the law, and by refusing to negotiate in good faith. Pl.'s Mem. at 25. Thus, a

decision by this Court to decline to exercise its authority to grant declaratory relief, far from

promoting the process of accommodation between the branches, would do just the opposite.

Such a declination would effectively vest the Executive Branch with an absolute and

unchallengeable immunity from congressional process and would, thereby, remove all incentives

for the Executive Branch to negotiate and attempt to reach accommodations with the legislative

branch regarding the latter's requests for information. On the other hand, if the Court exercises

its discretion to reach the merits of the Committee's claims, it will necessarily clarify the limits

and proper application of the qualified executive privilege in the context of congressional

subpoenas. That, in turn, makes negotiation and accommodation through the political process

more likely, not less, because clarity in the law, and the recognized availability of a judicial

remedy, will both significantly reduce the incentives for one branch to stake out an unsustainable

legal position, which is exactly what has happened here.[15]

---

[15] Defendants' related suggestion that the Congress can utilize a "variety of other means . . . [to] exert pressure
on the Executive Branch," Defs.' Mem. at 47 – by which they presumably mean appropriations, legislation
and/or withholding consent to executive appointments – cannot be taken seriously. Given the extent of
Congress's oversight role, and the amount of information the Congress necessarily seeks from the executive
branch on regular and on-going basis, the notion that Congress should respond to overreaching assertions of
executive privilege and refusals to negotiate – both of which will undoubtedly increase if the Court declines to
provide declaratory relief here – by withholding appropriations and the like in an effort to extort cooperation is
an invitation to permanent political warfare between the branches. That would not be good for the country,
and it certainly would not be good for inter-branch relations.

Similarly, Defendants' citation to *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 346 F.3d 357 (2d Cir.
2003), for the proposition that a court should consider whether exercising its authority to grant declaratory
relief "would increase friction between sovereign legal systems or improperly encroach on the domain of a
state or foreign court," is misplaced. *See* Defs.' Mem. at 44 (citing *Dow* Jones, 346 F.3d at 359-60). The
Miers and Bolten case does not concern competing sovereign legal systems (or state or foreign courts).
Moreover, and in any event, this Court's *declining* to exercise its jurisdiction would have the effect of
increasing friction between the executive and legislative branches, as explained above.

Legally, the two cases Defendants cite – the Gorsuch case and *Moore v. U.S. House of Representatives* – are factually distinguishable and neither supports their position.  The Gorsuch matter involved Executive Branch official Anne Gorsuch's efforts to obtain declaratory relief in response to a congressional subpoena, *before* the Speaker had certified the House's contempt resolution to the U.S. Attorney pursuant to 2 U.S.C. § 194.  That fact drove the Court's determination that it needed to "defer to established statutory procedures for deciding challenges to congressional contempt citations."  556 F. Supp. at 152.  As the Court observed, "[j]udicial resolution of [Ms. Gorsuch's] constitutional claim . . . will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding *or other legal action taken by Congress*."  *Id.* at 153 (emphasis added).  The case now before this Court, of course, presents precisely the situation as to which *U.S. House of Representatives* contemplated that "judicial resolution" of the constitutional claims raised by executive branch officials' disregard of congressional subpoenas *would* be required:  the statutory referral under § 194 has already taken place, and the executive branch officials are defendants in "other legal action taken by Congress." *Id.*

*Moore* involved an intra-branch dispute.  The plaintiffs – 18 individual Members of the House – sued the House itself, the Senate, the Speaker of the House, the President of the Senate, the Clerk of the House, and the Secretary of the Senate, alleging that the Tax Equity and Fiscal Responsibility Act of 1982, which originated in the Senate, violated the Origination Clause of the U.S. Constitution.  733 F.2d at 948.  Although the United States intervened as a defendant, the Court properly regarded the matter as an intra-branch dispute and, on that basis, exercised its discretion not to reach the merits of plaintiffs' request for declaratory relief:

> Congressional actions pose a real danger of misuse of the courts by members of Congress whose *actual dispute is with their fellow*

> *legislators. We are reluctant to meddle in the internal affairs of the legislative branch*, and the doctrine of remedial discretion properly permits us to consider the prudential, separation-of-powers concerns posed by a suit for declaratory relief against the complainant's colleagues in Congress. . . . [The individual Members' dispute] *is primarily a controversy with other members of Congress.*

*Id.* at 956 (citation omitted) (emphasis added). The case now before this Court, of course, is entirely different. This is an inter-branch dispute involving not the internal legislative processes of the Congress, but the limits and application of executive privilege, an issue the Courts have had no problem resolving in the past. *See, e.g., United States v. Nixon*, 418 U.S. 683; *In re Sealed Case,* 121 F.3d 729 (D.C. Cir. 1997). Accordingly, *Moore* simply is not relevant here.

Finally, Defendants also argue (Defs.' Mem. at 46) that the Court should not exercise its discretion here because "the hardship asserted by the Committee is attenuated relative to the kinds of injuries to private parties typically contemplated in the Court's exercise of jurisdiction under the Declaratory Judgment Act." *See also id.* (suggesting that Committee is asking Court to conduct "'some amorphous general supervision of the operations of government'" (citation omitted)). This argument is flat out wrong. The Committee clearly is *not* asking the Court for "some amorphous general supervision of the operations of government." Rather, it is asking for specific declaratory relief that concerns the limits and proper application of the qualified executive privilege. That is a quintessentially judicial role. *See, e.g.*, *Nixon*, 418 U.S. at 706; *In re Sealed Case,* 121 F.3d 729. Moreover, the Committee will suffer severe hardship if the Court declines to exercise its discretion here, as we have previously explained. *See* Pl.'s Mem. at 19-20. Without a judicial resolution here, the Committee will be unable to complete its Investigation or render conclusions, and the incompleteness of the Investigation will hinder its ability to propose appropriate corrective legislation. *See* Report at 7. Indeed, if the Court were

to decline to exercise its discretion here, the hardship to the Committee would extend far into the future and far beyond this particular Investigation because, as noted above, the Court would thereby tacitly sanction unilateral and unchecked claims of executive power to control access to information.  *Cf. In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997).

## V.    MS. MIERS AND MR. BOLTEN ARE NOT ABSOLUTELY IMMUNE FROM CONGRESSIONAL PROCESS.

Presidential advisers are not immune from congressional process.  Pl.'s Mem. at 26-35. No court has ever suggested that such immunity exists, and Defendants provide no persuasive justification for creating such a far-reaching rule here.  Even if the Court were to accept Defendants' misguided contention that Presidential advisers are conceptually inseparable from the President, the case law conclusively establishes that *even a President* is not immune from congressional process.  And finally, even if, contrary to all existing precedent, this Court were to conclude that some Presidential advisers are immune from congressional process, there is no basis for holding that *former* presidential advisers, like Ms. Miers, enjoy an unlimited and timeless immunity from congressional process.

### A.    Presidential Advisers Must Comply with Congressional Subpoenas.

Defendants' argument that Ms. Miers and Mr. Bolten are absolutely immune from congressional process hinges almost entirely on the antecedent claim that the President is absolutely immune from such process.  While that antecedent claim is demonstrably untrue, *see* Part V.B *infra*, this  Court need not reach that issue because, even assuming the President himself cannot be compelled to appear before, or produce documents to, the Congress, the Supreme Court has recognized a constitutional and dispositive divide between the President and his aides.

      1.      **For Immunity Purposes, the Case Law Unequivocally Distinguishes Between a President and His Advisers.**

In *Butz v. Economou*, 438 U.S. 478, 487 (1978), the Supreme Court rejected, as "contrary to the course of decision in this Court from the very early days of the Republic," the Secretary of Agriculture's claim that he was absolutely immune from damages actions.

> Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law:
>
>> "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it."

*Id*. at 506 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)).

Defendants nevertheless contend that they are the President's "alter egos," and enjoy the same level of protection from judicial and congressional inquiry that the President does. This argument, however, is foreclosed by *Butz*, as well as by *Harlow v. Fitzgerald*, 457 U.S. at 811 n.17:

> [T]he recognition of absolute immunity [from civil damages] for all of a President's acts in office [as announced in *Nixon v. Fitzgerald*] derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials – *including Presidential aides* – generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself.

The Court, while noting that it had previously recognized an absolute immunity for "legislators, in their legislative functions, and of judges in their judicial functions, . . . . [and for] prosecutors and similar officials," it steadfastly maintained that "[f]or executive officials in general . . . our

cases make plain that *qualified* immunity represents the norm." *Id.* at 807 (emphasis added) (citation omitted). *See also Halperin v. Kissinger*, 606 F.2d 1192, 1208 (D.C. Cir. 1979).[16]

With regard to *congressional* inquiries, the D.C. Circuit has simply assumed that presidential aides would not be entitled to a freestanding congressional immunity. For example, in *In re Sealed Case*, 121 F.3d 729, on which Defendants' rely, the Court of Appeals asserted that its

> determination of how far down into the executive branch the presidential communications privilege goes is limited to the context before us, namely where information generated by close presidential advisers is sought for use in a judicial proceeding, and we take no position on how the institutional needs of Congress and the President should be balanced.

*Id.* at 753. The notion that *some* balancing of the "institutional needs" of the political branches must be conducted presupposes the non-existence of any categorical immunity for presidential advisers.[17]

### 2. The Policy Justifications Defendants Advance Do Not Support an Absolute Immunity for Presidential Advisers.

Lacking case law support, Defendants advance a litany of policy justifications for their view that they should be immune from congressional process. For example, they say that "[b]ecause of the important role played by the President's senior advisers," the President must be able to consult with those advisers confidentially, and that without such an ability "'the

---

[16] It is telling that on the same day the Supreme Court recognized, for the first and only time, an absolute presidential immunity – in *Nixon v. Fitzgerald*, 457 U.S. 731, for damages actions concerning the President's official conduct – it *denied* in *Harlow* that immunity to the President's advisers under the same circumstances.

[17] This analysis mirrors Acting Attorney General Clement's June 27, 2007, letter to the President on which Defendants' absolute immunity claim is based. *See* Pl.'s Mem., Exh. 15. Notably, however, Clement's letter assumes that a balancing will take place and concludes only that the Executive Branch has a valid claim of *qualified privilege*. The letter makes no claim for immunity for Presidential aides and does not suggest that Ms. Miers would be justified in failing to appear before the Committee.

President's performance of any of his duties . . . would be made more difficult.'"  Defs.' Mem. at

51 (quoting *Ass'n of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993).

While these observations are correct, they do not counsel in favor of an absolute *immunity*.

Rather, they confirm the correctness of the presumptive executive privilege doctrine which

already protects confidential presidential communications, except to the extent that the

confidentiality interest is outweighed by an appropriate showing of need.

This case presents an excellent example of this principle in action.  Defendants concede

that the President was not involved in the plan to force the resignations of the nine U.S.

Attorneys.  As a result, the presidential communications privilege does not apply here, *see In re

Sealed Case*, 121 F.3d at 751-52, and Defendants are protected, at most, only by the much

weaker deliberative process prong of executive privilege which the Court can adjudicate if

necessary.  If Defendants' position were accepted, they would possess a blanket immunity even

though their involvement in this matter *never* concerned the President himself.

The Department also says that Congress will have undue influence over the Executive

Branch if it is permitted to question the President's aides.  The questioning of Executive Branch

officials, however, is already constitutionally permissible under Article I which vests the

Legislative Branch with the authority to investigate the inner workings of the Executive Branch.

*See McGrain*, 273 U.S. at 174.  Indeed, the Constitution contemplates that Congress will inquire

into the administration, and the administrators, of the laws it passes so that it can enact

legislation that better effectuates its policy goals and more effectively advances the welfare of

the Nation.

Defendants' argument that the Speech or Debate Clause counsels an absolute immunity

for Presidential aides is contrary to law.  The constitutionally explicit Speech or Debate Clause

has long been held to be absolute, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. at 501, while

the judicially implied executive privilege is only *qualified*.  *See, e.g., Nixon*, 418 U.S. at 706.

More importantly, the Speech or Debate Clause is absolute for reasons and concerns that are

peculiar to the operation of the legislative branch, *Gravel v. United States*, 408 U.S. 606, 616-17

(1972), and the Supreme Court has expressly determined that the two privileges do not directly

correlate.  In *Harlow*, the President's advisers argued that "the rationale of *Gravel* mandates a

similar 'derivative' immunity for the chief aides of the President of the United States.  *Harlow*,

457 U.S. at 810.  The Court rejected this argument, however, asserting that "it sweeps too far"

and therefore found that presidential aides do not, by virtue of their position, share the same

immunity as their counterparts under the Speech or Debate Clause.  *Id.*

Finally, the Department contends that "[t]he inability adequately to protect the President

and his advisers from 'vexatious and unnecessary [legislative] subpoenas,' also supports absolute

immunity from testimonial compulsion for the President's most senior advisers."  Defs.' Mem. at

54 (quoting *Nixon*, 418 U.S. at 714).  This is a red herring.  The potential for innumerable

damages claims arising out of the President's official actions, noted in *Nixon*, is far more serious

and daunting than a congressional inquiry on any given matter (most of which inquiries do not

involve the White House in any event).  Particularly in light of the long history of cooperation

and good faith negotiation between the branches regarding the congressional appearances of key

Executive Branch personnel, there simply is no justification for a blanket immunity from all

congressional investigations for presidential advisers.

### 3. Absolute Immunity for Presidential Aides Would Undermine Separation of Powers Principles and the Public Interest.

The Committee does not seek to prevent Defendants from invoking executive privilege, if

and when appropriate.  Defendants' ability to assert the privilege addresses all Defendants'

concerns because it allows for a case-by-case evaluation of their claims. When the claims are valid, they will be upheld. When they are not, the information the Committee seeks to fulfill its Article I responsibilities will be released and the public interest will thereby be served. Indeed, judicial weighing of presidential privileges against Congress's need for information has historically protected the prerogatives of both branches. *See S. Select Comm. III*, 498 F.2d at 733; *Nixon*, 418 U.S. at 715.

An absolute immunity for Presidential advisers, on the other hand, would undermine the public interest by placing all congressional subpoenas for information – including those that are undoubtedly within the public interest – out of reach of both the Congress and the courts, and ultimately the American people. Absolute immunity would also undermine the separation of powers doctrine by placing the Executive Branch – and particularly non-elected Presidential aides – *above* the Legislative Branch, and by preventing Congress from fulfilling its constitutionally mandated investigative and legislative functions.

### B.    The President Is Not Immune from Congressional Process; *A Fortiori*, Neither Are His Aides.

As the Committee pointed out earlier, even if Presidential advisers enjoyed a "protection" identical to that available to the President, they would not be absolutely immune from congressional process. Pl.'s Mem. at 30-35. Defendants' arguments do not alter that conclusion.

### 1.    The Courts Have Repeatedly Rejected the President's Absolute Immunity Claims.

In *United States v. Nixon*, the Supreme Court rejected the President's claim that he was absolutely immune from having to respond to a subpoena *duces tecum* for presidential tapes. "[N]either the doctrine of separation of powers, nor the need for confidentiality of high level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *418 U.S.* at 706. In *Nixon v. Adm'r of*

*Gen. Servs.*, 433 U.S. 425, 441 (1977), the Court, in holding that a statutory regulation of

presidential materials did not constitute, without more, a violation of separation of powers

principles, reaffirmed its rejection of sweeping claims of executive immunity that would place a

serious impediment on a coordinate branch of government.  In *Clinton v. Jones*, 520 U.S. 681,

691-706 (1997), the Court reiterated that the separation of powers doctrine does not by itself

confer on a sitting President an absolute immunity from suit by a private party, and observed that

the burden on the President's time and attention in responding to a lawsuit was insufficient as a

matter of law to constitute a violation of the separation of powers doctrine.  And even in *Nixon v.

Fitzgerald*, the only case to recognize an absolute Presidential immunity – "from civil damages

liability for his official acts" – the Court indicated that such immunity may be overridden by

"explicit affirmative action by Congress."  457 U.S. at 748 n.27.

The same thing is true in the context of congressional process.  *United States v. Nixon*

recognized that, when faced with a dispute over information demanded from the President by

Congress, the Court would have to balance the interests involved.  418 U.S. at 712 n.19.  *In re

Sealed Case*, as noted above, assumed that a balancing would occur between "the institutional

needs of Congress and the President."  121 F.3d at 753.  And in *Administrator of General

Services*, after noting that it had previously "rejected the argument that the Constitution

contemplates a complete division of authority between the three branches," 433 U.S. at 443, the

Court held that the Presidential Recordings and Materials Preservation Act – the enforcement of

which former President Nixon sought to enjoin – was valid, at least in part, because Congress,

pursuant to its "broad investigative power" could seek the "preservation" of such presidential

materials to "aid the legislative process."  *Id.* at 453.  In effect, the Court recognized Congress's

right to compel the production of information from the Executive Branch.  And clearly, if a

private party, as in *Clinton v. Jones,* has the judicially enforceable authority to compel a sitting

President to provide a deposition in a civil suit in a private matter, then surely the Congress has

such authority to compel attendance when matters of great State importance are involved.

      2.      **Congress Has a Highly Significant Interest in, and Extensive Responsibility for Overseeing, Executive Branch Matters.**

Defendants say the precedents discussed above are distinguishable because they do not

balance *Congress's* needs against Executive Branch interests. They assert – again without

support – that the balance tilts towards the executive when measured against Congress's need for

information, a theory that ignores Congress's essential functions under Article I of the

Constitution, and would result in an Executive Branch that is largely unrestrained by the checks

and balances crucial to the effective operation of our federal government under our Constitution.

Congress's power to compel the production of information from the Executive Branch is, if

anything, even greater than that of the grand jury in *Nixon* and the trial court in *In re Sealed*

*Case*. While judicial matters normally concern the interests of one individual or entity only, a

congressional investigation normally concerns matters affecting, and having consequences for,

the entire nation. *See* Bernard Schwartz, *A Reply to Mr. Rogers: the Papers of the Executive*

*Branch*, 45 A.B.A.J. 467, 469 (1959) ("Here it is not merely the rights of individual litigants that

are at stake. The elected representatives of the people are asserting their need for information on

behalf of the nation itself, so that their legislative power may be guided in its exercise by

knowledge of what needs to be known."). Congress's power to inquire and investigate, and the

concomitant obligation of witnesses to provide information, are essential features of Congress's

Article I responsibilities. If Executive Branch officials can routinely ignore a valid congressional

inquiry because of a blanket immunity, Congress will never have access to certain kinds of

information and, to that extent, will necessarily legislate with incomplete facts and an imperfect understanding, to the detriment of the Nation.[18]

Defendants also claim (Defs.' Mem. at 62) that "Congress has ample means by which reasonably to inform its 'legislative judgments' and to perform its legislative functions without the compelled interrogation of the President's immediate advisers over the President's objection and assertions of privilege and immunity."  That statement, however, does not support an absolute immunity for current or former presidential aides.  At most, it counsels in favor of a *qualified* privilege.  There is no way to know in advance of every congressional investigation that "Congress has ample means" to reasonably inform itself without recourse to presidential aides.  The most obvious example is Watergate.  If President Nixon's closest advisers had not ultimately testified before Congress, the country never would have understood the extent of criminal activity that had infected the highest reaches of the Executive Branch, and it would not have been able to free itself from a corrupt administration.

Other Presidents have unequivocally acknowledged Congress's right to compel the President and his aides to produce materials relevant to certain investigations.  In 1846, President James K. Polk stated:

> If the House of Representatives, as the grand inquest of the nation, should at any time have reason to believe that there has been malversation in office by an improper use or application of the

---

[18]  At the very least, the Congress's need for information is at least as strong as that of a grand jury.   In *Senate Select Committee on Ethics v. Packwood*, 845 F. Supp. 17, 21 (D.D.C. 1994), the Court explained that at the early stages of an investigation, the Committee is "performing the office of a legislative branch equivalent of a grand jury."

> [i]t is well-established that such investigative bodies enjoy wide latitude in pursuing possible claims of wrongdoing, and the authority of the courts to confine their investigations is extremely limited.  "The function of the grand jury is to inquire about all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred."

*Id.* (quoting *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991)).

> public money by a public officer, and should think proper to
> institute an inquiry into the matter, all the archives and papers of
> the Executive Departments, public or private, would be subject to
> the inspection and control of a committee of their body and every
> facility in the power of the Executive be afforded to enable them to
> prosecute the investigation.

4 James D. Richardson, *A Compilation of the Messages and Papers of the Presidents* 435 (1897).

President Polk also maintained that a House inquiry could "penetrate into the most secret

recesses of the Executive Departments. It could command the attendance of any and every agent

of the Government, and compel them to produce all papers, public or private, official or

unofficial, and to testify on oath to all the facts within their knowledge." *Id.* at 434.[19]

This is a case in which Congress cannot adequately inform itself without access to the

President's advisers. The information provided by Department officials to date has left many

questions unanswered, and it has raised many others, including questions about the extent of

White House involvement in the politicization of the federal criminal justice system.

Accordingly, the Committee *must* have access to the information Ms. Miers and Mr. Bolten can

provide in order to carry out its constitutional responsibilities.

### C.    A Former Presidential Aide Cannot Be Immune from Congressional Process.

The Committee noted in its initial Memorandum (Pl.'s Mem. at 12-13) that Ms. Miers's

counsel stated she would not appear because she was so "directed" by the Counsel to the

President, and that this justification was no justification at all because only Ms. Miers could

determine whether she would appear; the President has no power to direct her in this matter.

Defendants respond (Defs.' Mem. at 56) that "the Committee misunderstands the Executive's

---

[19] It is also of note, in the context of a subpoena to a *former* presidential aide, that President John Tyler testified, pursuant to a subpoena, before a House select committee following his term and President John Quincy Adams gave a deposition pursuant to a subpoena before a House select committee after his term had expired. *See* 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* 948-49 (4th ed. 2007).

position, which is not that Ms. Miers is immune . . . merely because the President directed her

not to appear," rather, "Ms. Miers holds a constitutional immunity from compelled congressional

testimony based on her position as the Counsel to the President."

It is not entirely clear from Defendants' Memorandum whether Ms. Miers's position is

that she holds an independent immunity that is *hers*, or whether the President holds the keys to

her immunity and may invoke it when he sees fit. The former would appear to vest her with

complete discretion, unbounded in time, to determine how to exercise that immunity, even in the

face of a presidential determination that the public interest would *be served* if she testified before

the Committee. The latter would raise the issues argued by the Committee in its initial

Memorandum that the President has no independent authority to compel Ms. Miers to do

anything. *See* Pl.'s Mem. at 27-30. As the Committee noted above, the latter scenario opens the

door to suits similar to this one if a former aide *wants* to testify, but the President seeks an

injunction from the courts to prevent his or her testimony. Ostensibly, the Executive would

argue that it has standing and a right of action – which are both satisfied here.

It also bears noting that the Department beat a hasty retreat from the two-and-a-half page

memorandum issued by Steven G. Bradbury, the Principal Deputy Assistant Attorney General in

OLC that purported to justify immunity for Ms. Miers. *See* Pl.'s Compl., Exh. 42. In the

Committee's initial Memorandum, it noted (Pl.'s Mem. at 33) that not only did Mr. Bradbury fail

to cite a single judicial decision for his conclusion that former presidential aides are absolutely

immune from congressional process, but he relied primarily on a 1971 OLC memorandum by

former OLC head (and later Chief Justice) William H. Rehnquist that rationalized immunity for

*current* presidential advisers on the ground that they "are presumptively available to the

President 24 hours a day," Rehnquist Memorandum, Pl.'s Mem., Exh. 43, and thus requiring

them to testify would be contrary to the Constitution.  The Committee pointed out (Pl.'s Mem. at 34-35) the obvious flaw in this reasoning insofar as former aides are concerned and that its reasoning has since been superseded by *Clinton v. Jones*.

The Department's only response (Defs.'s Mem. at 58) is to engage in a bit of misdirection; it suggests that *the Committee's* main argument is predicated on presidential adviser availability (*i.e.*, that former advisers do not have to be available), and therefore the Committee "misunderstands the constitutional underpinnings of Ms. Miers's immunity, which is not based on the need for a former senior adviser to be available to the President at all times." What the Department fails to realize is that this *was its "illogical" argument*, as Mr. Bradbury cited directly to Mr. Rehnquist's since discredited view of executive privilege.

## VI.    MS. MIERS AND MR. BOLTEN MUST PRODUCE PRIVILEGE LOGS.

In the judicial context, privilege logs have "become, by now, the universally accepted means of asserting privileges."  *Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, *1 (D.D.C. 1999).  Such logs not only enable the "demanding party to contest the claim," *id*., they also deter overly broad claims of privilege, permit the ready identification of privilege claims that are facially unfounded, and assist courts in resolving privilege disputes without the need for burdensome in camera review.  *See* Fed. R. Civ. P. 26(b)(5), Advisory Committee Note to 1993 Amendments.

The same thing is true in the congressional context.  Congressional subpoenas, including those issued to Defendants, routinely direct their recipients to provide information, in the form of a privilege log, for any documents withheld on the basis of privilege.  Recipients of congressional subpoenas – including many members of the Executive Branch – have complied routinely with such directives.  *See* Pl.'s Mem. at 41.  The production of privilege logs in response to congressional subpoenas enables investigating and oversight committees to carry out

their constitutional responsibilities, *id*. at 42-43, just as the production of privilege logs in the judicial context enables courts to carry out theirs.

Privilege logs, in both contexts, are particularly essential to the resolution of qualified privileges, like executive privilege, because the "need for the information cannot be balanced against its sensitive and critical role in the government's decision making process without any indication of what the information is." *Northrop Corp. v. McDonnell Douglas Corp*., 751 F.2d 395, 405 (D.C. Cir. 1984); *see also Black v. Sheraton Corp. of Am*., 371 F. Supp. 97, 101 (D.D.C. 1974).[20]

Defendants' response to these self-evident propositions is that they cannot be compelled to produce privilege logs here because (1) no law requires them to provide a privilege log in response to a congressional subpoena (Defs.' Mem. at 63-67) and (2) requiring them to provide privilege logs would violate separation of powers principles (Defs.' Mem. at 67-73). Defendants are wrong on both counts.

## A.    Ms. Miers and Mr. Bolten are Legally Required to Provide Privilege Logs.

The Constitution itself provides all the authority necessary for the Committee to require Defendants to produce privilege logs because such logs are a necessary concomitant of Congress's inherent power of inquiry:

> the power of inquiry – with the process to enforce it – is an essential and appropriate auxiliary to the legislative function. . . .

---

[20] There are exceptions to the privilege log requirement, of course. For example, privilege logs are not appropriate in the context of the constitutionally explicit Speech or Debate Clause privilege because that privilege is absolute, *Eastland*, 421 U.S. at 501, 503, 509; because it is designed, in part, to "prevent intimidation of legislators . . . before a possibly hostile judiciary," *Gravel*, 408 U.S. at 617; and because the privilege is activity-based, rather than communications-based, *Eastland*, 421 U.S. at 504, so that a document-by-document log is not useful as a practical matter. Instead of a privilege log, Members asserting the Speech or Debate privilege make  representations – sufficient to enable the court and parties to know what has been withheld and why – about the nature of the documents withheld and the purpose of the activities reflected in those documents, and courts routinely and appropriately defer to these representations. *See, e.g.*, *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973); *Pentagen Techs. Int'l, Ltd. v. Comm. on Approps.*, 20 F. Supp. 2d 41, 44 (D.D.C. 1998); *Rusack v. Harsha*, 470 F. Supp. 285, 295 n.17 (M.D. Pa. 1978).

> Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed. All this was true before and when the Constitution was framed and adopted. In that period the power of inquiry, with enforcing process, was regarded and employed as a necessary and appropriate attribute of the power to legislate – indeed, was treated as inhering in it. Thus there is ample warrant for thinking, as we do, that the constitutional provisions which commit the legislative function to the two houses are intended to include this attribute *to the end that the function may be effectively exercised.*

*McGrain*, 273 U.S. at 174-75 (emphasis added); *see also Eastland*, 421 U.S. at 504-05 ("The power to investigate and to do so through compulsory process plainly falls within that [the legitimate legislative sphere]."). This power to inquire is "broad," *Watkins*, 354 U.S. at 187, "penetrating and far-reaching," *Barenblatt*, 360 U.S. at 111, and often relies on "[t]he issuance of a subpoena," which is "an indispensable ingredient of lawmaking" *Eastland*, 421 U.S. at 504-05.

Defendants do not – because they cannot – deny that the Committee has the inherent constitutional authority to compel the production of information from the Executive Branch through the use of compulsory process. Nevertheless, their argument – that Ms. Miers and Mr. Bolten may block the Committee's ability to gather information merely by asserting that all documents responsive to their subpoenas are subject to a generalized claim of a qualified executive privilege – if allowed to stand, would severely hinder Congress's ability to exercise its constitutional authority to investigate and conduct oversight over the Executive Branch and to propose meaningful legislation where appropriate. Accordingly, the Committee's authority to require, in the form of a privilege log, sufficient information to enable the Committee to determine in the first instance the validity of their privilege claims is inherent in the Committee's

Article I power of inquiry.[21]   Once again, the greater power includes the lesser.  *See United States v. O'Neil*, 11 F.3d 292, 296 (1st Cir. 1993) ("The principle that the grant of a greater power includes the grant of a lesser power is a bit of common sense that has been recognized in virtually every legal code from time immemorial.").  Since Congress has an inherent right, recognized by the Supreme Court to issue and enforce subpoenas to compel the production of documents, it has the lesser included right to set the terms and conditions when a party asserts a privilege to withhold some of those documents.  *Cf. Nuvio Corp. v. FCC*, 473 F.3d at 311 (Kavanaugh, J., concurring) (asserting that because the Federal Communications Commission has the "greater authority" to ban a certain form of telecommunications sales, that authority "necessarily includes the lesser power" to prescribe when such sales may be banned).

Defendants' appear to misconstrue the Committee's discussion (Pl.'s Mem. at 36-40) of the impact of the D.C. Circuit's Freedom of Information Act ("FOIA", 5 U.S.C. § 551, *et seq.*) and Rule 26 cases on this issue.  In its initial Memorandum, the Committee used those examples to illustrate both the limitations on executive privilege, and that it is routine for courts to order and for Executive Branch officials to produce logs that itemize executive privilege claims. Defendants do not dispute that executive privilege – even in its presidential communications form – is limited and qualified, and that it does not shield Executive Branch officials from providing privilege logs in the FOIA and Rule 26 contexts.  It is, therefore, anomalous to suggest, as Defendants effectively do, that (1) a privilege that is limited and qualified in every

---

[21]   Needless to say, privilege logs also serve the salutary purpose of enhancing the likelihood that privilege disputes between subpoenaing committees and the Executive Branch can be resolved through negotiation and accommodation – which Defendants repeatedly insist they favor.  For example, when a congressional committee has the information a privilege log provides, it can better determine whether it actually needs the documents at issue and whether the asserted bases for the withholding of particular documents is legitimate. *See, e.g., Ansara v. Eastland*, 442 F.2d 751, 753-54 (D.C. Cir. 1971) ("This court cannot assume . . .  that the members of the committee will fail to give consideration to constitutional claims they consider may have merit. . . . [T]he presentation of constitutional claims . . . might lead a committee to modify its demand.") (citations omitted); *see also* Pl.'s Mem. at 41.  Absent a privilege log, conflict is virtually certain.

context is effectively absolute and unreviewable when the Article I branch of government seeks

information from the Executive Branch, and (2) the Executive Branch, which must itemize in log

form documents it claims are privileged in the FOIA and civil litigation contexts, is not required

to do so when the Congress requires one in carrying out two of its most fundamental

constitutional responsibilities under Article I, *i.e.*, investigating the excesses of, and conducting

oversight over, the Executive Branch, and proposing legislation that would benefit society.[22]

Defendants also suggest, in discussing *Quinn v. United States*, 349 U.S. 155 (1955),

*Emspak v. United States*, 349 U.S. 190 (1955), and *Hutcheson v. United States*, 369 U.S. 599

(1962), that those cases only "stand for the unremarkable proposition that a congressional

investigatory committee is, at most, entitled to 'notice of an apparent claim of privilege' . . . [not]

a document-by-document invocation of the privilege." Defs.' Mem. at 65-66 (quoting *Quinn*,

349 U.S. at 164). Defendants completely miss the significance of these cases which, because

they only involved witnesses who refused to testify, did not specifically address the issue of

privilege logs. Those cases stand for the general proposition that the "way is always open for [a]

committee to inquire into the nature of the claim [of privilege] before making a ruling." *Quinn*,

349 U.S. at 164; *see also Emspak*, 349 U.S. at 195 (same); *Hutcheson*, 369 U.S. at 611

(committee "entitled to be clearly apprised of the grounds on which a witness asserts the right of

---

[22] Defendants observe, correctly, that the President and his advisers do not have to produce privilege logs under FOIA. Defs.' Mem. at 64-65. That is not, however, because executive privilege applies differently to the President and his advisers, but only because the President and his advisers do not fall within the statutory definition of "agencies" to which FOIA's requirements apply. 5 U.S.C. § 551. *See also* S. Conf. Rep. No. 93-1200, at 14 (1974).

The dearth of cases that involve the operation of executive privilege in the context of congressional investigations does not demonstrate that the privilege operates differently or is somehow stronger in this context. Rather, it simply illustrates that most administrations past – in stark contrast to the extreme, inflexible and blatantly unlawful positions taken by this Administration – have complied with their constitutional obligations when Congress has sought information from the executive branch or, at the very least, have attempted to negotiate in good faith with the Congress.

refusal to answer").  In the context of documents withheld on privilege grounds in response to a subpoena *duces tecum*, a privilege log (or its functional equivalent) is required to enable a committee "to inquire into the nature of the claim" of privilege.  Absent such a log, a committee simply cannot know what is being withheld, and does not have adequate information to evaluate responsibly the claim of privilege.[23]

Finally, we note that, even if (a) the Committee did not have the inherent authority under Article I to require the Defendants to produce privilege logs (which it does), and (b) Ms. Miers and Mr. Bolten did not have a legal obligation to obey their subpoenas' commands to produce privilege logs (which they do), this case is currently pending in a federal court.  Here, the Committee seeks, among other things, the Court's assistance in resolving disputes about the limits of executive privilege and its application to particular documents withheld by Ms. Miers and Mr. Bolten.  *See* Compl. ¶ 12 (requesting injunction directing Ms Miers and Mr. Bolten to produce all responsive documents that are not privileged), *id*. ¶ 12 (requesting injunction directing Ms. Miers and Mr. Bolten to produce all responsive documents as to which the claim of executive privilege is outweighed by the Committee's compelling need for the information sought).  And the Court certainly has the inherent authority to order the Defendants to produce

---

[23]  Defendants state (Defs.' Mem. at 66) that Acting Attorney General Clement's June 27, 2007 letter – which was sent to the President and not to the Committee – is adequate to satisfy Ms. Miers's and Mr. Bolten's obligations under *Quinn*, *Emspak* and *Hutcheson*.  That argument is wrong because those cases obligate the Defendants to provide *sufficient* information to enable the Committee to inquire into the nature of their privilege claims, and the meager information contained in Clement's letter is certainly not even remotely adequate for that purpose.  *See* Pl.'s Mem., Ex. 15 at 1 (description of documents); *see also In re Apollo Group, Inc., Sec. Litig.*, No. 04-2147, 2007 WL 778653 at *7 (D.D.C. Mar. 12, 2007) (noting that a broadly described list of the documents was "far too general to allow either Apollo or the Court to determine whether the documents withheld are, in fact covered by the various privileges asserted"); *Judicial Watch v. U.S. Dep't of Justice*, No. 01-639, 2006 WL 2038513 at *2 (D.D.C. July 19, 2006) (noting, in context of case involving withholding of documents on executive privileged grounds, that the agency's affidavits supporting the *Vaughn* Index must not be conclusory or too broadly sweeping").

privilege logs as a step that is both ancillary, and necessary, to its ability to render a final

judgment on the Committee's claims for injunctive relief.

### B.     Production of Privilege Logs Does Not Violate Separation of Powers Principles.

Defendants contend (Defs.' Mem. at 67) that any "law or rule obligating the production

to Congress of a privilege log . . . [by] the President and his advisers would violate the separation

of powers."   That argument is completely refuted by the cases that have required a privilege log

from the Executive Branch when private parties seek the documents withheld and the courts, a

co-equal branch, require the production of such a log for its adjudicative purposes.   Here, too, the

Committee's authority to require a privilege log of withheld documents is rooted in the

Constitution itself.   It is axiomatic that the Committee's valid exercise of its constitutional

authority cannot violate separation of powers principles.

Moreover, Defendants' argument fails on its own terms.   They assert that the Supreme

Court "has precluded invasion of the President's autonomy and confidentiality in the

performance of his 'responsibilities' and 'his office' and 'in the process of shaping policies and

making decisions.'"   Defs.' Mem. at 67 (quoting *United States v. Nixon*, 418 U.S. at 708, 711,

713; *Nixon*, 433 U.S. at 449).   The Supreme Court, of course, has held no such thing.   Indeed, it

has held just the opposite:

> [N]either the doctrine of separation of powers nor the need for
> confidentiality of high-level communications, without more, can
> sustain an absolute, unqualified Presidential privilege of immunity
> from judicial process under all circumstances. . . .[W]hen the
> privilege depends solely on the *broad, undifferentiated claim* of
> public interest in the confidentiality of such conversations, a
> confrontation with other values arises. . . . The impediment that an
> absolute unqualified, privilege would place in the way of the
> primary constitutional duty of the Judicial Branch . . . would
> plainly conflict with the function of the courts under Art. III.   *In
> designing the structure of our Government and dividing and*

> *allocating the sovereign power among three co-equal branches,*
> *the Framers of the Constitution sought to provide a comprehensive*
> *system, but the separate powers were not intended to operate with*
> *absolute independence.*

*Nixon*, 418 U.S. at 706-07 (emphases added); *see also Buckley v. Valeo*, 424 U.S. 1, 121 (1976)

(per curiam) (asserting that the Framers "saw that a hermetic sealing off of the three branches of

Government from one another would preclude the establishment of a Nation capable of

governing itself effectively").

Similarly, as noted in Part V, in *Nixon v. General Services Administration*, the Supreme

Court applied a *qualified* executive privilege to the former President:

> [The former President] may legitimately assert the Presidential
> privilege, of course, only as to those materials whose contents fall
> within the scope of the privilege recognized in *United States v.*
> *Nixon* . . . there is no reason to believe that the restriction on public
> access ultimately established by regulation will not be adequate to
> preserve executive confidentiality.   An absolute barrier to all
> outside disclosure is not practically or constitutionally necessary. .
> . .there has never been an expectation that the confidences of the
> Executive Office are absolute and unyielding.

433 U.S. at 449-50.  In so holding, the Court rejected out of hand the former President's

separation of powers challenge to the statute:  "congressional power to regulate Executive

Branch documents exists in this instance, a power that is augmented by the important interests

that the Act seeks to attain."  *Id*. at 445-46.  Accordingly, Defendants' conclusion (Defs.' Mem.

at 67) that "if the President and his advisers were required to provide detailed accountings of

their communications and activities to Congress in response to any legislative request for

documents that might be made of them, the President's autonomy and independence from

Congress would unquestionably be impaired," has no basis in the Constitution.

Defendants' suggestion (Defs.' Mem. at 69) that privilege logs might be burdensome

because "the Office of the President . . . is an easily identifiable target for demands for

73

information by Congress," and its related suggestion that "[i]f the Committee were to prevail on this claim, there would be no effective check on Congress's ability to demand an accounting of the President's communications," are not arguments directed at the separation of powers implications of privilege logs, of which there are none. These arguments are precluded by the Constitution itself, which both vests Congress with the responsibility for conducting broad and robust oversight, and limits that authority to matters "in aid of the legislative function." *Kilbourn v. Thompson*, 103 U.S. 168, 189 (1880). In any event, Congress only rarely seeks information directly from the White House and, in this case, it is clear that production of a privilege log will not be burdensome because the responsive documents have already been identified and reviewed. *See* Compl., Exh. 15.

Defendants also cite *Cheney v. United States Dist. Court for the Dist. of Columbia*, 542 U.S. 367 (2004), for the proposition that the qualified executive privilege operates differently when asserted by the Vice President and similar Executive Branch officials. Defs.' Mem. at 69-71. *Cheney*, however, stands only for the limited proposition that, with respect to inappropriately broad discovery requests propounded by private civil litigants, the Executive Branch does not "bear the burden of invoking executive privilege with sufficient specificity and of making particularized objections." 542 U.S. at 388. That determination has no application here. *Cheney* specifically reiterated *Nixon's* holding "that the President *cannot,* through the assertion of a 'broad [and] undifferentiated' need for confidentiality and the invocation of an 'absolute, unqualified' executive privilege, withhold information in the face of subpoena orders." *Id*. (emphasis added). Moreover, as the Court made clear:

> the only consequence from respondents' inability to obtain discovery they seek is that it would be more difficult for *private complainants* to vindicate Congress' policy objectives under

FACA. . . . [I]t does not follow that *a court's Article III authority or Congress' central Article I powers* would be impaired.

*Id*. at 384-85 (emphases added).

Defendants' remaining arguments are off the mark. *First*, Defendants argue (Defs.' Mem. at 72) that the "Committee has not even come close to demonstrating how a detailed accounting of privileged White House communications is essential to its ability to make legislative judgments on the predicted consequences of proposed legislative actions." This argument puts the cart before the horse. The Committee is not required to make any showing of need – indeed it cannot – until it knows what kinds of documents are in the executive's possession. In the absence of the information sought, a privilege log is necessary because that is the only means a committee would have of assessing to what degree it has a "right" to certain documents. *See United States v. Legal Servs. for N.Y. City*, 249 F.3d 1077 (D.C. Cir. 2001) ("those asserting" a privilege must make "a showing that the privilege applies to each communication for which it is asserted"); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) ("A blanket assertion of the privilege will not suffice. Rather, '[t]he proponent must conclusively proved each element of the privilege.'" (citation omitted)). If no documents or privilege logs are provided, however, then the Committee is stopped dead in its tracks and cannot fulfill its constitutional obligations. Defendants appear to suggest that Congress, in exercising its oversight authority, does not need and is not entitled to complete, true and accurate information and that approximate truth or partial fact is close enough for Congress to perform its legislative functions. This is simply false:

Quite as important as legislation is vigilant oversight of administration; . . . It is the proper duty of a representative body to look *diligently* into every affair of government and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents. . . . The informing

> function of Congress should be preferred even to its legislative
> function.

Woodrow Wilson, Congressional Government 195, 198 (1981) (emphasis added).[24]

*Second*, Defendants describe (Defs.' Mem. at 72) as merely "voluntary" the past examples cited by the Committee of the White House's providing privilege logs in response to congressional subpoenas. This argument ignores the fact that these privilege logs were, as the Committee noted (Pl.'s Mem. at 40-41), provided in response to congressional *subpoenas* that *compelled* the production of documents and demanded a privilege log for documents withheld on the ground of privilege. Moreover, these past examples confirm that the production of a privilege log is not overly burdensome.

*Third*, Defendants contend (Defs.' Mem. at 69) that "providing such a log might undermine the protection of the privilege itself." There is no reason, however, that this should be so, and it will not be so if Defendants' attorneys do their jobs properly. *Cf. Edmonds Inst. v. U.S. Dep't of the Interior*, 383 F. Supp. 2d 105, 107-08 (D.D.C. 2005) ("The [*Vaughn*] index must provide 'as much information as possible without thwarting the [asserted] exemption's purpose.'") (citation omitted). Privilege logs are routinely provided in many other litigation

---

[24]  Defendants further seek to characterize this particular argument as a "fact" in the hope of discounting the value of the D.C. Circuit decisions in *Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977) (*Dellums* I) and *Dellums v. Powell*, 642 F.2d 1351 (D.C. Cir. 1980) (*Dellums* II). Defs.' Mem. at 72 n.18. As noted above, cases of executive privilege assertions in the context of civil litigation, including *Dellums* I and *Dellums* II, extensively illustrate the limitations of the privilege – the same privilege Defendants assert here – and the susceptibility of the privilege to and need for privilege logs. *See supra* at 69-70. Nevertheless, Defendants argue that no "'strong constitutional values' are present in this case to justify compulsion of a privilege log from the White House." Defs.' Mem. at 72 N.18. Given that Congress's authority to conduct oversight and obtain information by subpoena is an inherent and indispensable power rooted in Congress's legislative authority under the Constitution, *see supra* at 67-68, Defendants' argument is completely unfounded. Likewise, Defendants attempt to distinguish the *Dellums* decisions as only involving an assertion of executive privilege by a former President is unsupported. The Supreme Court has made clear that a former president "may legitimately assert" executive privilege, and the lack of support from a sitting president merely "detracts from the weight of" the former President's assertion. *Administrator of General Services*, 433 U.S. at 449.

contexts, including those involving the absolute attorney-client privilege, without undermining or impinging on the privilege which is sought to be protected.

*Fourth*, Defendants assert (Defs.' Mem. at 70) that producing privilege logs will result in more litigation and less accommodation. Defendants have it exactly backwards. This litigation is principally a function of Defendants' refusal to negotiate in good faith and refusal to provide logs that would have enabled the Committee to evaluate properly their privilege claims. Adequately prepared logs likely would have led to additional discussions that might well have resulted in an accommodation between the two branches. *Cf. Deseret Mgmt. Corp. v. United States*, 76 Fed. Cl. 88, 97 (Fed. Cl. 2007) (noting, with respect to deliberative process privilege assertion, that "'the time to make the showing that certain information is privileged is [therefore] at the time the privilege is asserted, not months later when the matter is before the Court on a motion to compel. This requirement is to allow parties to try and resolve discovery disputes prior to Court intervention.'" (quoting *Anderson v. Marion County Sherriff's Dep't*, 220 F.R.D. 555, 562 n.5 (S.D. Ind. 2004)). This is the aim of the Committee, and the Court is in a position to help restart a fruitful negotiating process.

## CONCLUSION

For all of the foregoing reasons and those contained in the Committee's initial submission to the Court and based on the entire record herein, the Court should deny the Defendants' Motion to Dismiss and grant Plaintiff's Motion for Partial Summary Judgment.

Respectfully submitted,

/s/ Irvin B. Nathan_____
IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel

CHRISTINE M. DAVENPORT
Assistant Counsel
JOHN D. FILAMOR, D.C. Bar # 476240
Assistant Counsel
RICHARD A. KAPLAN, D.C. Bar # 978813
Assistant Counsel
KATHERINE E. MCCARRON, D.C. Bar # 486335
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff Committee on the Judiciary
of the U.S. House of Representatives

Dated: May 29, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

COMMITTEE ON THE JUDICIARY,          )
UNITED STATES HOUSE                  )
OF REPRESENTATIVES                   )
                                     )
                                     )
                    *Plaintiff*,     )
                                     )    Case No. 1:08-cv-00409 (JDB)
HARRIET MIERS, et al.                )
                                     )
                    *Defendants*.    )
_____)


## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of May, 2008, a copy of the foregoing Plaintiff
Committee on the Judiciary's Unopposed Motion to File Brief Exceeding Page Limit and
Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss
and in Reply to Defendants' Opposition to Plaintiff's Motion for Partial Summary
Judgment were filed electronically.  Notice of this filing will be sent to all parties by
operation of the Court's electronic filing system.  Parties may access this filing through
the Court's system.


                              _____/s/ Richard A. Kaplan_____
                              RICHARD A. KAPLAN, D.C. Bar # 978813