# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY, UNITED          )
STATES HOUSE OF REPRESENTATIVES,            )
                                            )
                          Plaintiff,        )
                                            )
              v.                            )  Civil Action No. 1:08cv00409 (JDB)
                                            )
HARRIET MIERS and                           )
JOSHUA BOLTEN, in his capacity as custodian )
of White House records,                     )
                                            )
                          Defendants.       )
_____     )

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

GREGORY G. KATSAS
Acting Assistant Attorney General

CARL J. NICHOLS
Principal Deputy Associate Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

JOHN R. TYLER (D.C. Bar No. 297713)
JAMES J. GILLIGAN (D.C. Bar No. 422152)
NICHOLAS A. OLDHAM (D.C. Bar No. 484113)
HELEN H. HONG (CA SBN 235635)
STEPHEN J. BUCKINGHAM
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

ATTORNEYS FOR DEFENDANTS

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.    THE COMMITTEE LACKS ARTICLE III STANDING TO BRING THIS SUIT . . . . . 7

    A.    This Dispute Is Not Of The Kind Traditionally
        Thought To Be Capable Of Judicial Resolution . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Neither An Alleged Impairment Of Congress's Legislative Function
        Resulting From A Deprivation of Information Nor The Other
        Injuries Claimed By The Committee Constitutes A Cognizable Injury . . . . . . . 12

    C.    The Committee Cannot Predicate Its Standing
        On United States v. AT&T Or Other Pre-Raines Precedents . . . . . . . . . . . . . . . 16

II.   THE COMMITTEE DOES NOT HAVE A CAUSE OF ACTION UNDER
    THE DECLARATORY JUDGMENT ACT OR THE CONSTITUTION . . . . . . . . . . 18

    A.    The Declaratory Judgment Act Does Not
        Provide Any Right to Judicial Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    Article I, § 1 Of The Constitution Does Not
        Provide The Committee With A Cause Of Action . . . . . . . . . . . . . . . . . . . . . . . 25

        1.    The Committee Cannot Rely On Article I, § 1 As
            The Source Of Its Cause Of Action Because It Does Not
            Provide A Judicially-Enforceable Right To Vindicate In Court . . . . . . . 25

        2.    The Presence Of Special Factors Counseling Hesitation
            Demonstrates That The Committee Cannot Rely On
            Article I, § 1 To Establish An Entitlement To Relief . . . . . . . . . . . . . . . 31

III.  THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLINE
    ANY JURISDICTION IT MIGHT HAVE UNDER
    THE DECLARATORY JUDGMENT ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

IV.   PURSUANT TO SEPARATION OF POWERS PRINCIPLES,
    CONGRESS DOES NOT HAVE THE POWER TO COMPEL THE
    PRESIDENT OR HIS IMMEDIATE ADVISERS TO TESTIFY BEFORE IT . . . . . . . 39

A.    The President And His Closest Advisers Are Absolutely
Immune From Compulsion To Testify Before Congress  . . . . . . . . . . . . . . . . . . 40

B.    There Is No Fundamental Or Comprehensive Need For Congress
To Compel The Testimony Of The President's Closest Advisers . . . . . . . . . . . 47

C.    Ms. Miers Is Immune Even Though She Has Left Office . . . . . . . . . . . . . . . . . 50

V.    THE WHITE HOUSE IS NOT REQUIRED TO PRODUCE A PRIVILEGE
LOG IN RESPONSE TO A CONGRESSIONAL REQUEST FOR DOCUMENTS . . . 51

A.    The Constitution Does Not Provide Congress
With An Inherent Entitlement To A Privilege Log . . . . . . . . . . . . . . . . . . . . . . . 52

B.    Requiring The President And His Advisers To Provide Congress
With A Privilege Log Would Violate The Separation Of Powers . . . . . . . . . . . 54

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE(S)**

Aetna Life Ins. Co. v. Haworth, 300 U.S. 227 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Alexander v. Sandoval, 532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

Allen v. Wright, 468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Barenblatt v. United States, 360 U.S. 109 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Baker v. Carr, 369 U.S. 186 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

Barnes v. Kline, 759 F.2d 21 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 33

Bell v. Hood, 327 U.S. 678 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971) . . . . . . . . . . .  4, 26, 31, 34

Bowsher v. Synar, 478 U.S. 714 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 31

Buckley v. Valeo, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 31

Bush v. Lucas, 462 U.S. 367 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 31

Butz v. Economou, 438 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-46, 54

C&E Serv., Inc. v. District of Columbia Water & Sewer Auth.,
        310 F.3d 197 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 22

Cannon v. Univ. of Chicago, 441 U.S. 677 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26

Carlson v. Green, 446 U.S. 14 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Chapman v. Houston Welfare Rights Org., 441 U.S. 600 (1979) . . . . . . . . . . . . . . . . . . . . . .  28

Chappell v. Wallace, 462 U.S. 296 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Cheney v. U.S. Dist. Court for the Dist. of Columbia, 542 U.S. 367 (2004) . . . . . . . . . . . . . .  40

Chenoweth v. Clinton, 181 F.3d 112 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Clinton v. Jones, 520 U.S. 681 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

Coffman v. Breeze Corp, 323 U.S. 316 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Corr. Serv. Corp. v. Malesko, 534 U.S. 61 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Davis v. Passman, 442 U.S. 228 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 31

Dellums v. Powell, 642 F.2d 1351 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Dennis v. Higgins, 498 U.S. 439 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Eastland v. U.S. Servicemen's Fund, 421 U.S. 491 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Emspak v. United States, 349 U.S. 190 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

FDIC v. Meyer, 510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Flast v. Cohen, 392 U.S. 83 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fletcher v. Peck, 10 U.S. (6 Cranch) 87 (1810) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Garcia v. Brownell, 236 F.2d 356 (9th Cir. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91 (1979) . . . . . . . . . . . . . . . . . . . . . . . 15

Gonzaga Univ. v. Doe, 536 U.S. 273 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Gravel v. United States, 408 U.S. 606 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 46

Harlow v. Fitzgerald, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

Humphrey's Executor v. United States, 295 U.S. 602 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . 10

Hutcheson v. United States, 369 U.S. 599 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Hutchinson v. Proxmire, 443 U.S. 111 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ICC v. Brimson, 154 U.S. 447 (1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

INS v. Chadha, 462 U.S. 919 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Jewish War Veterans of U.S., Inc. v. Gates, 522 F. Supp. 2d 73 (D.D.C. 2007) . . . . . . . . . . . 23

Jones v. United States, 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Jurney v. MacCracken, 294 U.S. 125 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Legal Envtl. Assistance Found., Inc. v. Pegues, 904 F.2d 640 (11th Cir. 1990) . . . . . . . . . . . 28

In re Lindsey, 158 F.3d 1263 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Loving v. United States, 517 U.S. 748 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 34

Marshall v. Gordon, 243 U.S. 521 (1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

McGrain v. Daugherty, 273 U.S. 135 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 S. Ct. 764 (2007) . . . . . . . . . . . . . . 21

Metro. Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise,
    501 U.S. 252 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1 (1981) . . . . . . . 34

Miller v. Gammie, 335 F.3d 889 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Miller v. Transamerican Press, Inc., 709 F.2d 524 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . 13

Moore v. U.S. House of Representatives, 733 F.2d 946 (D. C. Cir. 1984) . . . . . . . 18, 23, 27, 29

Morrison v. Olson, 487 U.S. 654 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Myers v. United States, 272 U.S. 52 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 48

Nixon v. Administrator of General Services, 433 U.S. 425 (1977) . . . . . . . . . . . . . . . . . . . . . 43

Nixon v. Fitzgerald, 457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Powell v. McCormack, 395 U.S. 486 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237 (1952) . . . . . . . . . . . . . . . . . . . . 21

Quinn v. United States, 349 U.S. 155 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Raines v. Byrd, 521 U.S. 811 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Reed v. County Commissioners of Delaware County, Pa., 277 U.S. 376 (1928) . . . . . . . .  23, 29

Roeder v. Islamic Republic of Iran, 333 F.3d 228 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . .  23

Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989) . . . . . . . . . .  17

SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118 (3d Cir. 1981) . . . . . . . . . . . . . . . . .  11

Sanchez-Espinoza v. Reagan, 770 F.2d 202 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . .  31

Scheslinger v. Reservists Comm. to Stop the War, 418 U.S. 208 (1974) . . . . . . . . . . . . . . . . .  11

Schilling v. Rogers, 363 U.S. 666 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 22

Schweiker v. Chilicky, 487 U.S. 412 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

In re Sealed Case, 121 F.3d 729 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.,
        502 F. Supp. 2d 50 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Senate Select Comm. on Presidential Campaign Activities v. Nixon,
        498 F.2d 725 (D.C. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Senate Select Committee on Ethics v. Packwood, 845 F. Supp. 17 (D.D.C. 1994) . . . . . . . . .  49

Skelly Oil Co. v. Phillips Petroleum, 339 U.S. 667 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 19

Steel Co. v.  Citizens for a Better Env't, 523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . .  16

Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc., 128 S. Ct. 761 (2008) . . . . . . . .  25

Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car, Inc.,
        Civ. No. 89-0300, 1989 WL 39393 (D.D.C. Apr. 13, 1989) . . . . . . . . . . . . . . . . . . . . .  19

United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

United States v. Lovett, 328 U.S. 303 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

United States v. Nixon, 418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

United States v. Nourse, 34 U.S. (9 Pet.) 8 (1835) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

United States v. Pritchett, 496 F.3d 537 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

United States v. Richardson, 418 U.S. 166 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Stanley, 483 U.S. 669 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. U.S. House of Representatives, 556 F. Supp. 150 (D.D.C. 1983) . . . . 4, 21, 34

U.S. House of Representatives v. U.S. Dep't of Commerce, 11 F. Supp. 2d 76
    (D.D.C. 1998), appeal dismissed, 525 U.S. 316, 344(1999) . . . . . . . . . . . . . . . . . . . . . . . . . .18

Vt. Agency of Natural Res. v. United States ex rel Stevens, 529 U.S. 765 (2000) . . . . . . . passim

Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172 (1965) . . . . . . . . . 20

Walker v. Cheney, 230 F. Supp. 2d 51 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Warth v. Seldin, 442 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Watkins v. United States, 354 U.S. 178 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Wilkie v. Robbins, 127 S. Ct. 2588 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32

Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## UNITED STATES CONSTITUTION

U.S. Const., Art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const., Art. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const., Art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## STATUTES

2 U.S.C. § 192 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2 U.S.C. § 288d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

**LEGISLATIVE MATERIAL**

H.R. Rep. No. 110-423  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

S. 2073, 93d Cong., 1st Sess. (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

S. 2170, 94th Cong., 1st Sess. (1975)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

S. Rep. No. 170, 95th Cong., 1st Sess. 41 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**MISCELLANEOUS**

1 Annals of Cong. 439 (1789) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

1 Writings of Thomas Jefferson (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Archibald Cox, Executive Privilege, 122 U. Penn. L. Rev. 1383 (1974) . . . . . . . . . . . . . . passim

Assertion of Executive Privilege With Respect to Clemency Decision,
        23 Op. O.L.C. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

House Rule XI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 27

Prosecution for Contempt of Congress of an Executive Branch Official
        Who Has Asserted a Claim of Executive Privilege, 23 Op. O.L.C. 1 (1999) . . . . . . . . 41

## PRELIMINARY STATEMENT

Plaintiff Committee on the Judiciary ("Committee") asks this Court to assume a role that has never been exercised by an Article III court by accepting jurisdiction over an inter-branch dispute over access to information from the President's closest advisers. The Committee bases that request on the assertion of a novel and breathtaking power that would permit either House of Congress to invoke the jurisdiction of the Article III courts in the pursuit of information from any source, including the President himself. That claimed power finds no support in existing precedent, is inconsistent with the fundamental structure of the Constitution, and contravenes more than 200 years of constitutional tradition. Indeed, the Committee does not dispute that never in American history has a federal court ordered an Executive Branch official (let alone a close adviser to the President) to testify before Congress, nor does the Committee dispute that the Executive Branch has never been required by court order to produce documents or a privilege log to Congress. The Committee's claimed power also would irrevocably alter the longstanding accommodation process for resolving disputes between the Executive and Legislative Branches, thereby ensuring that the Judiciary is drawn into future disputes and is forever required to police the lines between the political branches. That is "obviously not the regime that has obtained under our Constitution to date," Raines v. Byrd, 521 U.S. 811, 828 (1997), and the Court should decline the Committee's invitation to create it now.

Because this lawsuit lacks constitutional, historical, and statutory support, it should not be surprising that at least three separate and independent grounds require dismissal. *First*, the Committee lacks Article III standing to pursue this action. This dispute is not of the kind "traditionally thought to be capable of resolution through the judicial process." Raines, 521 U.S. at 819. Indeed, even though the political branches have been involved in disputes over

information for more than two hundred years, see Defs.' Mem. 7-9, the historical record is entirely devoid of evidence that the present dispute is "of the sort traditionally amenable to, and resolved by, the judicial process."  Vt. Agency of Natural Res. v. United States ex rel Stevens, 529 U.S. 765, 777 (2000) (also noting that history was "well nigh conclusive" regarding the standing question there); see also Walker v. Cheney, 230 F. Supp. 2d 51, 73 (D.D.C. 2002) ("In the end, given that the Article I and Article II Branches have been involved in disputes over documents for more than two hundred years, what is most striking about the historical record is the paucity of evidence that the instant lawsuit is of the sort traditionally amenable to, and resolved by, the judicial process.") (internal quotation marks and citations omitted).

Notwithstanding this clear historical record, the Committee claims that its generalized interest in obtaining information on which to make predictive legislative judgments is sufficient to satisfy Article III standing.  Pl.'s Reply at 25-30.  But that alleged injury is nothing more than an "abstract dilution of institutional legislative power," not the kind of "concrete injury" that is sufficiently "distinct and palpable" to establish the Committee's standing.  Walker, 230 F. Supp. 2d at 67-68 (internal quotation marks and citation omitted); see also Raines, 521 U.S. at 826.

The Committee takes the remarkable position that its standing to seek judicial enforcement of its subpoenas is equivalent to that of law enforcement officials and administrative agencies.  See Pl.'s Reply at 13 ("The Committee sees no reason why, on the one hand, the Department may apply to the courts to have its subpoenas enforced—ostensibly on the ground that they have suffered an 'informational injury'—and Congress may not.").  That assertion only underscores how dramatically the Committee's request would transform the separation of powers.  Under the fundamental structure of our Constitution, Congress is not "a law enforcement or trial agency.  These are functions of the executive and judicial departments

of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." Watkins v. United States, 354 U.S. 178, 187 (1957). Thus, Congress is not entitled to perfect information or a "precise reconstruction of past events," Senate Select Comm. on Presidential Campaign Activities v. Nixon, 498 F.2d 725, 732 (D.C. Cir. 1974), but only to information "in aid of its legislative function." McGrain v. Daugherty, 273 U.S. 135, 173-75 (1927). Any harm to Congress's "limited power of inquiry" in aid of that legislative function is neither sufficiently concrete nor of a nature traditionally thought amenable to judicial resolution, and does not support standing. McGrain, 273 U.S. at 175; see Walker, 230 F. Supp. 2d at 67-68.

Nor does United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976), on which the Committee heavily relies, establish its standing. AT&T was not a lawsuit brought by Congress, but instead was filed by the Executive Branch against a private party to prevent a disclosure that would have been detrimental to national security. The Court of Appeals thus was not faced with the issue presented here—whether a House of Congress can initiate suit in federal court to compel the testimony of an Executive Branch official or to require the production of information (or a privilege log) from the Executive Branch in the interest of avoiding an abstract informational injury. Moreover, the Court of Appeals has expressly recognized that its early jurisprudence on legislative standing both preceded the Supreme Court's "plac[ing] greater emphasis upon the separation of powers concerns underlying the Article III standing requirement," and was rendered "untenable" by Raines. Chenoweth v. Clinton, 181 F.3d 112, 114, 115-16 (D.C. Cir. 1999). Raines, not AT&T, is controlling here.

*Second*, even if the Court had Article III jurisdiction, the Committee lacks a cause of action on which to proceed. The Committee implicitly concedes, as it must, that it needs a cause

of action to pursue its claims, citing the Declaratory Judgment Act. But that statute does not purport to create a cause of action; rather, it is merely "procedural." Skelly Oil Co. v. Phillips Petroleum, 339 U.S. 667, 671 (1950). Perhaps recognizing the futility of relying on the Declaratory Judgment Act, the Committee also asserts an implicit constitutional "right" to pursue judicial enforcement of its subpoenas. But whatever implied subpoena power Congress may have, nothing in the text or structure of the Constitution supplies the kind of "rights-creating language" from which a cause of action may be implied. The history and tradition of accommodation, the availability of alternative remedies at Congress's disposal, and the separation of powers all represent the kinds of special factors that counsel hesitation in implying a cause of action directly from the Constitution itself. See Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 396 (1971).

_Third_, even if this Court were to conclude that it has jurisdiction and that the Committee has a cause of action, the Court should exercise its discretion to dismiss the case. The Committee concedes that the Court has the authority to do so and, as in United States v. U.S. House of Representatives, 556 F. Supp. 150 (D.D.C. 1983), the Court should do so. This case resides far from the heartland of the traditional jurisdiction of Article III courts, which is to "decide on the rights of individuals." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803). It involves anything but a run-of-the-mill subpoena and arises in a context where Congress has substantial alternate remedies at its disposal, including the power of the purse, which the Framers deemed "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance," The Federalist No. 58 (Madison), the appointment power and other Article I powers. There are numerous instances in American history where nominations have failed, or programs have not

been funded, for Congress's want of information that the Executive was unwilling to provide.

For these reasons, constitutional scholars have concluded that history contains "little evidence

that the nation has suffered from the want of legal power to compel the President to satisfy the

demands of Congress to information in the Executive Branch."  Archibald Cox, <u>Executive</u>

<u>Privilege</u>, 122 U. Penn. L. Rev. 1383, 1431 (1974).

At bottom, as the Committee candidly states, this is a case about the raw "distribution of

power between the branches," and that is good reason *not* to decide it.  <u>Id.</u> at 4.  And although

the Committee asserts a broad need for information, the Committee does not identify what

difference any particular piece of information it seeks might make with respect to any legislative

proposal it might consider.  That is not surprising because Congress already has received

substantial amounts of information from the Executive Branch, including voluminous documents

and extensive interviews from the Department and sworn testimony from the then-sitting

Attorney General of the United States.  <u>See</u> Defs.' Mem. at 11-13.  While the Committee's briefs

struggle to demonstrate a serious need for the additional information it seeks, this case (and the

positions advocated by the Committee) could have a tremendous impact on the President's

ability to protect his closest advisers (and, by extension, himself) from harassment and

interference in the performance of his constitutional functions.  Courts avoid the resolution of

constitutional questions unless it is necessary to resolve them; here there are ample reasons why

the Court should dispose of this case without reaching its merits, thereby leaving in place the

robust system of accommodation that has operated for over 200 years.

In any event, should the Court reach the merits, Counts I and II, together with those

portions of Counts III and IV that seek Defendant Miers's testimony, should be dismissed as a

matter of law.  With respect to Ms. Miers's testimony, courts have long recognized the

President's unique role as the sole indispensable person in our constitutional scheme, and have enforced the separation of powers to protect the President against encroachment on his autonomy and confidentiality by the other branches.  As the Supreme Court observed in <u>Nixon v. Fitzgerald</u>, "[t]he essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches."  457 U.S. 731, 760-61 (1982).  Nevertheless, the Committee asserts the power to bring the President before Congress to answer for his exercise of his own constitutional prerogatives.  Pl.'s Reply at 55.  Ours, however, is not a parliamentary system in which the Congress may compel the President to sit for the equivalent of "Prime Minister's Questions."  Instead, the President must be free from compelled testimony, lest Congress attempt to invade the President's autonomy and confidentiality by seeking to examine him either to intrude into, or to influence, Presidential thinking or the Executive's decisionmaking process.  Because of the important role played by the President's senior advisers, <u>see</u> Defs.' Mem. at 48-56, compelling the testimony of the President's closest White House advisers is tantamount to compelling the testimony of the President himself, and thus his immunity from compelled congressional testimony must be accorded to his most senior advisers as well.

     With respect to the Committee's privilege log claim, the Committee appears to fundamentally misunderstand Defendants' position.  Defendants do not argue that the White House is "immune" from producing documents to Congress in response to subpoenas *duces tecum*.  <u>Compare</u> Pl.'s Reply at 15-16 (claiming that Defendants' position is that they have "*immunity* from having to appear, testify, *or produce documents* (or privilege logs) to the Congress.") (first emphasis in original), <u>with</u> Defs.' Mem. at 67-71.  Instead, Defendants'

position is that the subpoenas in this case seek documents over which the President has validly asserted executive privilege, and which therefore have been appropriately withheld from the Committee; that there is no statutory or constitutional source of authority permitting the Committee to require a privilege log merely because it purports to require one in the subpoena itself; and that a contrary rule would raise serious separation of powers issues.

For all of these reasons, explained more fully below and in Defendants' opening brief, the Court should grant Defendants' Motion to Dismiss.

## **ARGUMENT**

## I.    **THE COMMITTEE LACKS ARTICLE III STANDING TO BRING THIS SUIT.**

As Defendants have established, see Defs.' Mem. at 23-37, the Committee lacks Article III standing to insist on a judicial determination of the constitutional questions it has laid before this Court. This dispute is not of a kind "traditionally thought to be capable of resolution through the judicial process": for more than 200 years the political branches have resolved their disputes over congressional requests for information without Congress invoking the aid of the federal judiciary to adjudicate Congress's claims. Raines, 521 U.S. at 819 (internal quotation marks and citations omitted). In addition, a deprivation of information that Congress seeks for the purpose of informing its legislative judgments amounts at most to an "abstract dilution of institutional legislative power," id. at 826, that is insufficiently "distinct and palpable" to confer standing. Walker, 230 F. Supp. 2d at 68. Thus, both the historical record and the Committee's asserted injury demonstrate that the Committee lacks standing. See, e.g., Vt. Agency, 529 U.S. at 777-78.

The Committee's arguments to the contrary cannot be reconciled with traditionally accepted limits on the judicial power. The Committee does not, and cannot, dispute the

historical record.  Nor has the Committee suffered a concrete and particularized injury to its own

interests; just like the Comptroller General in <u>Walker</u>, it sues as an agent of the House of

Representatives to vindicate the interests of its principal in obtaining information that the House

deems necessary to carry out its legislative and oversight functions.  230 F. Supp. 2d at 66.  But

as recognized in <u>Walker</u>, <u>id.</u> at 67, an impairment of that interest is precisely the kind of vague

and amorphous injury that is not cognizable under Article III; it does not become sufficient for

purposes of Article III just because the Committee acts with the "imprimatur" of the full House.

Perhaps most remarkably, the Committee argues that its standing to seek judicial

enforcement of its subpoenas is equivalent to that of law enforcement officials and

administrative agencies.  <u>See</u> Pl.'s Reply at 13.  This argument ignores the fundamental

separation of powers embodied in the Constitution; after all, the Constitution gives the President

the responsibility to execute the laws.  U.S. Const., Art. II, § 3.  The fact that the Executive

Branch has the Article II power to initiate prosecutions and enforce subpoenas is not a reason to

infer such a congressional power under Article I; it is the very reason that Congress lacks it.

### A.    This Dispute Is Not Of The Kind Traditionally Thought To Be Capable Of Judicial Resolution.

The Committee lacks standing not only because its injury is insufficiently concrete and

distinct, <u>see</u> <u>infra</u> at 12-15, but also because this dispute is not of the sort "traditionally thought

to be capable of resolution through the judicial process."  <u>Raines</u>, 521 U.S. at 819; <u>see also</u>

<u>Vt. Agency</u>, 529 U.S. at 777.  The political branches have historically reconciled their

differences over congressional requests for information through negotiation and compromise,

with Congress wielding the tools of political persuasion at its disposal—its powers of legislation,

appropriation, and advice and consent, among others—to induce cooperation by the Executive

Branch. Even though those disputes have been legion during our history, see Defs.' Mem. at 7-9, for almost 200 years (from 1792 until the early 1970s), Congress never once initiated suit in federal court to compel the disclosure of information held by the Executive Branch. As a result, in the 200-year history of our Constitution, the Executive Branch has never been compelled by court order to provide documents (or testimony) to the Congress. This history is "well nigh conclusive with respect to the question before us." Vt. Agency, 529 U.S. at 777.

The Committee's argument that "the courts have routinely reviewed the validity of congressional inquiries," and "decided countless cases that involve the allocation of power *between* the political branches," Pl.'s Reply at 31, is true so far as it goes, but entirely misses the point of the standing inquiry. It is the nature of the underlying "dispute," not just the *issues* it presents for decision, that must be "traditionally thought to be capable of [judicial] resolution" in order to meet the requirements of Article III. Raines, 521 U.S. at 819 (recognizing that "historical practice appears to cut against" the notion that inter-branch disputes are of a kind traditionally resolved by Article III courts). Each case on which the Committee relies, Pl.'s Reply at 30-32—including those cases recognizing Congress's implied subpoena authority—involved a dispute concerning "the constitutional rights and liberties of individual citizens . . . against oppressive or discriminatory government action," precisely the kinds of dispute traditionally thought to lie within the proper scope of the judicial power. Id. at 829.[1]

---

[1] See McGrain, 273 U.S. 135 (suit filed by individual to seek relief from congressional subpoena and contempt); Eastland v. U.S. Servicemen's Fund, 421 U.S. 491 (1975) (same); Barenblatt v. United States, 360 U.S. 109 (1959) (same); see also Morrison v. Olson, 487 U.S. 654, 667-68 (1988) (motion by subjects of independent counsel investigation to quash grand jury subpoenas); Bowsher v. Synar, 478 U.S. 714 (1986) (civil action by government employees whose cost-of-living raises were suspended by the Balanced Budget Act); INS v. Chadha, 462 U.S. 919, 928 (1983) (petition by alien of deportation order issued at the direction of the House of Representatives); Watkins, 354 U.S. at 181 (prosecution for contempt of Congress);

This case, in contrast, involves "only officials, and the official interests of" the political branches, and thus "lies far from the model of the traditional common-law cause of action at the conceptual core of the case-or-controversy requirement." Id. at 833 (Souter, J., concurring).

The Committee also argues that the Executive Branch's long-exercised authority to seek enforcement of subpoenas in law enforcement contexts "is identical to the Committee's standing in this action." Pl.'s Reply at 31; see also id. at 13. This argument reflects a fundamental misconception of the respective roles of the branches under the separation of powers. Article II assigns to the Chief Executive as his "most important constitutional duty" the responsibility "to 'take Care that the Laws be faithfully executed.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 577 (1992) (quoting U.S. Const., Art. II, § 3). In turn, the "[i]nvestigation and prosecution of federal crimes is one of the [Executive's] most important and essential functions within that constitutional responsibility," In re Lindsey, 158 F.3d 1263, 1272 (D.C. Cir. 1998), which the Executive could not "adequately or efficiently" perform "[w]ithout the aid of judicial process." ICC v. Brimson, 154 U.S. 447, 485 (1894).

In contrast, when Congress exercises its implied constitutional power to issue subpoenas, it is not performing as "a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress." Watkins, 354 U.S. at 188. That "legitimate task," of course, is the legislative function itself. McGrain, 273 U.S. at 173-75. Such legislative functions clearly differ from "the responsibility of a grand jury, or any institution engaged in like

_____

Humphrey's Executor v. United States, 295 U.S. 602, (1935) (suit for unpaid salary by estate of FTC commissioner removed from office by the President); Myers v. United States, 272 U.S. 52, 106-08 (1926) (suit for unpaid salary by former postmaster removed on order of the President).

functions," which "turns entirely on its ability to determine whether . . . certain named

individuals did or did not commit specific" acts, and requires "the most precise evidence"

available, for which there is "no comparable need in the legislative process." Senate Select

Comm., 498 F.2d at 732. Congress has no need for a "precise reconstruction of past events."

Id.; see also Scheslinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 221 n.10 (1974)

("The legislative function is inherently general rather than particular[.]").

Although the "demands of and the resistance to [a] subpoena present an obvious

controversy in the ordinary sense," "that alone is not sufficient to meet constitutional standards"

for an Article III controversy. United States v. Nixon, 418 U.S. 683, 696 (1974). Instead, the

conflict must also be "the kind of controversy courts traditionally resolve." Id. In Nixon, for

example, the enforcement of a grand jury subpoena arose "in the regular course of a federal

criminal prosecution," which was "within the traditional scope of Article III power." Id. at 697.

Indeed, although the Committee quotes the Nixon decision, it omits through the use of ellipses

the fact that the Supreme Court was discussing the unique circumstances of a criminal

prosecution. Pl.'s Reply at 31. That Nixon was decided in a traditional Article III proceeding is

a fundamental difference with this case. Compare Pl.'s Reply at 31 with Nixon, 418 U.S. at 696-

97 ("Here at issue is the production or nonproduction of specified evidence *deemed by the

Special Prosecutor to be relevant and admissible in a pending criminal case*.") (emphasis

added).[2]

--------

[2] Likewise, "it has been clear" for more than a century, since ICC v. Brimson, 154 U.S.
447 (1894), "that in passing on the [government's] application for enforcement of [an
administrative] subpoena, [a] court acts judicially in a case or controversy." SEC v. Wheeling-
Pittsburgh Steel Corp., 648 F.2d 118, 123-24 (3d Cir. 1981). An administrative agency, like a
federal prosecutor, issues subpoenas for the production of documents, or the testimony of
witnesses, "to obtain full and accurate information of all matters involved in the enforcement" of
the law, Brimson, 154 U.S. at 473, and disputes concerning the agency's entitlement to the

**B.    Neither An Alleged Impairment Of Congress's Legislative Function
Resulting From A Deprivation of Information Nor The Other
Injuries Claimed By The Committee Constitutes A Cognizable Injury.**

The injury asserted by the Committee is the alleged impairment of the ability to legislate

on the subject of appointing and removing U.S. Attorneys, and the related oversight of the

Department of Justice, resulting from the claimed lack of additional information beyond the

thousands of pages of documents, and the hundreds of hours of testimony, the Committee has

already received.  See Defs.' Mem. at 33-34.  As this Court recognized under similar

circumstances in Walker, that injury is precisely the kind of "abstract dilution of institutional

legislative power" that Raines held inadequate to confer standing.  230 F. Supp. 2d at 67-68

(citing Raines, 521 U.S. at 826).

The Committee's argument that *it* has suffered injury of a "personal" nature, as required

to establish its standing, see Raines, 521 U.S. at 818-19, is legally misguided and confuses the

standing analysis.  Contrary to the Committee's arguments, Pl.'s Reply at 26, it has no

"constitutional authority" of its own to conduct an investigation, or do anything else.  Article I

does not mention, much less confer, authority upon congressional committees.  Article I confers

authority on the two Houses of Congress to legislate, U.S. Const., Art. I, § 1, and, as an inherent

attribute thereof, "such limited power of inquiry" as is necessary and appropriate "in aid of

[their] legislative function," McGrain, 273 U.S. at 173-75—authority the House has delegated to

---

evidence it seeks, and the duties of a witness who refuses to provide it, give rise to proceedings
for the determination of rights between the United States and its citizens in which the issues "are
so presented that the judiciary is capable of acting on them."  Id. at 476-77, 487; see United
States v. Nourse, 34 U.S. (9 Pet.) 8, 28-29 (1835).  Thus, quite unlike the political clash between
the elected branches of government presented here, the precedents relied on by the Committee in
support of its argument each involved matters of individual right, or the enforcement of the
Nation's laws, of a sort "traditionally amenable to, and resolved by, the judicial process."
Vt. Agency, 529 U.S. at 777.

the Committee.  House Rule XI.1(b)(1), XI.2(m)(1)(B).  Thus, like the Comptroller General in

Walker, the Committee "acts as an agent" for the House "to assist [the House] as a whole" in

making informed legislative judgments.  230 F. Supp. 2d at 66; see Watkins, 354 U.S. at 200

("[t]he theory of a committee inquiry is that the committee . . . serv[es] as the representative[ ] of

the parent assembly in collecting information for a legislative purpose").  Like the Comptroller

General, the Committee sues not on its own behalf, but on behalf of its principal, asserting a

deprivation of information that the House claims is necessary for the optimal performance of its

legislative duties.  Accordingly, the Committee's claimed injury must be evaluated in those

terms, Walker, 230 F. Supp. 2d at 66-67; there is nothing "personal" about it.

    The Committee also makes scattershot references throughout its opposition brief to

Congress's supposed function of "informing the public as to the manner in which its laws are

being administered."  Pl.'s Reply at 4; see also id. at 10, 16-17.  But Article I says nothing about

an "informing function" of Congress, id. at 10, and as settled in Hutchinson v. Proxmire, 443

U.S. 111, 132-33 (1979), the sole "informing function of Congress" that may be implied under

Article I "is that of informing itself about subjects susceptible to legislation, not that of

informing the public."  Miller v. Transamerican Press, Inc., 709 F.2d 524, 531 (9th Cir. 1983)

(citing Hutchinson).  Incidental benefits to public awareness may accrue when Congress gathers

information on topics of legislative concern, but an injury to that public interest is no injury to

Congress and, in any event, would be no more than a "'generalized grievance'" insufficient to

establish Article III standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 575-77 (1992)

(quoting United States v. Richardson, 418 U.S. 166, 171, 176-77 (1974)).[3]

---

[3] The Committee takes issue with Defendants' observation that, because the subjects of
the Committee's probe involve the President's exercise of his authority under the Appointment
Clause, any claim of injury to Congress's legitimate legislative interests is even more attenuated

Finally, the Committee maintains that this case can be distinguished from <u>Walker</u> on two grounds.  The Committee argues first that this Court held in <u>Walker</u> that the injury to Congress's interests was "too vague and amorphous" because the Comptroller General had asserted nothing more than a "general interest in gathering information." Pl.'s Reply at 29.  That argument misstates both the Comptroller General's allegations and this Court's holding in <u>Walker</u>.  The Comptroller General requested particular records showing the names and titles of persons who worked for, or attended meetings of, the National Energy Policy Development Group, and the dates and locations of, and any information presented or minutes taken at, those meetings.  Morever, as the Court observed, the Comptroller General sought these records to "assist Congress in determining whether and to what extent *future legislation, relating, for example, to national energy policy or openness in government, may be appropriate*." 230 F. Supp. 2d at 67 (emphasis added).  The Comptroller General's request was certainly no less targeted than the Committee's expansive demands for testimony and  "any and all documents""related to the Committee's investigation," Bolten Subpoena (Defs.' Mem., Ex. 19); Miers Subpoena (Defs.' Mem., Ex. 20), and no less related to a specific legislative purpose than the Committee's mandate to "consider[ ] whether the conduct uncovered" as a result of the Investigation "may warrant additions or modifications to existing Federal law" to prevent "improper political interference with prosecutorial decisions."  H.R. Rep. No. 110-423 at 7 (Pl.'s Ex. 1).  The

than in <u>Walker</u> or <u>Raines</u>.  <u>See</u> Defs.' Mem. at 31-32.  The Committee fails to appreciate, however, that its inquiry does not simply concern "the administration of the Department of Justice," Pl.'s Reply at 29, or any other federal agency—about which Congress might legislate—but the manner in which the President may permit the exercise of his "quintessential" power of appointment and removal, <u>In re Sealed Case</u>, 121 F.3d 729, 752 (D.C. Cir. 1997), and rely on the confidential advice and assistance of his closest aides in doing so.  Congress's power of inquiry on this subject is necessarily circumscribed.  <u>See</u> <u>United States v. Nixon</u>, 418 U.S. 683, 708, 715 (1974); <u>Loving v. United States</u>, 517 U.S. 748, 757 (1996) ("one branch of the Government may not intrude upon the central prerogatives of another").

informational interest here is the same as that asserted in <u>Walker</u>: "regardless of how specifically [the Committee] attempts to couch Congress's interest" in the information sought, its purpose is to "assist Congress in the discharge of its legislating and oversight functions." 230 F. Supp. 2d at 67.

Second, the Committee relies on the fact that its investigation in this case, unlike the Comptroller General's, bears "the imprimatur" of the full House. Pl.'s Reply at 30. To be sure, the Court in <u>Walker</u> attached "some importance" to the fact that "Congress as a whole ha[d] undertaken no effort to obtain the documents at issue," 230 F. Supp. 2d at 68, because it meant that the asserted injury to Congress's interests was not only too vague and amorphous to confer standing, but too "conjectural" and "hypothetical" as well. <u>Id.</u> However, even though the House, by expressly authorizing this action, may have removed any doubt that it considers itself aggrieved, <u>see</u> Pl.'s Reply at 27 n.7, the asserted injury to its interests is the same, and remains an abstract dilution of its legislative power that is insufficient by its nature to satisfy Article III, no matter by whom asserted.[4] Neither the House, nor even Congress as a whole, can "abrogate the Art[icle] III minima" of standing. <u>Gladstone Realtors v. Village of Bellwood</u>, 441 U.S. 91, 100 (1979).[5]

---

[4] In <u>Walker</u>, the Court noted that it was not presented with a case where a committee requested documents and a subpoena had been issued. 230 F. Supp. 2d at 68. Now that it is, these differences should not change the analysis that the asserted "informational injury" is insufficient to establish Article III standing.

[5] Defendants do not maintain, as the Committee contends, that "courts should only decide constitutional issues to which a private individual or entity is a party," or that neither Congress, the President, nor any other public officials "may ever resort to the Courts" to vindicate their institutional interests. Pl.'s Reply at 27-28. Indeed, in appropriate (albeit limited) circumstances the Supreme Court has held otherwise. <u>See, e.g.</u>, <u>Powell v. McCormack</u>, 395 U.S. 486, 548 (1969); <u>Raines</u>, 521 U.S. at 821-23 (discussing <u>Coleman v. Miller</u>, 307 U.S. 433 (1939)).

### C.    The Committee Cannot Predicate Its Standing
       On United States v. AT&T Or Other Pre-Raines Precedents.

The Committee relies heavily on the D.C. Circuit's opinion in United States v. AT&T,
551 F.2d 384 (D.C. Cir. 1976), to establish its standing.  According to the Committee, the Court
of Appeals' single statement in that case—that "the House [of Representatives] as a whole has
standing to assert its investigatory power," id. at 391—is of its own force "dispositive" and
"conclusive[ ]" of the standing issue in this case.  Pl.'s Reply at 2, 3; see id. at 20-22.  AT&T
cannot bear the weight the Committee places on it.

AT&T was an action brought by the Executive Branch to enjoin the defendant telephone
company from disclosing information about warrantless national security wiretaps, the
production of which a House subcommittee, considering the need for legislation to limit the use
of such wiretaps, had demanded by subpoena.  551 F.2d at 385.  Indeed, because of the unique
circumstances (in which a third party was the custodian of information that the Executive sought
to protect), the Executive was, as a practical matter, required to act in order to initiate the inter-
branch accommodation process.  The Court of Appeals was thus not confronted with the issue
presented in this case—whether a House of Congress can initiate suit in federal court to compel
the testimony of an Executive Branch official or the production of information (or a privilege
log) from the Executive Branch.  Instead, the Court of Appeals focused on the standing of the
subcommittee chairman, all the while assuming that the "House as a whole ha[d] standing to
assert its investigatory power, and [could] designate a member to act on its behalf."  Id. at 391;
see id. at 385.  The focus of the Court of Appeals' one-sentence discussion was thus solely on
the chairman's standing, and the Court of Appeals did not engage in any further analysis on the
question of whether the House itself had standing in the first instance.  See, e.g., Steel Co. v.

-16-

Citizens for a Better Env't, 523 U.S. 83, 91 (1998) ("We have often said that drive-by jurisdictional rulings of this sort … have no precedential effect."); United States v. Pritchett, 496 F.3d 537, 542, 547 (6th Cir. 2007) (statements concerning jurisdiction that are unsupported by analysis should not be given precedential effect).

In any event, whatever precedential value AT&T might once have had on the standing issue presented here was eviscerated by Raines. As the Court of Appeals itself has recognized, its early jurisprudence on legislative standing both preceded the Supreme Court's "plac[ing] greater emphasis upon the separation of powers concerns underlying the Article III standing requirement," Chenoweth, 181 F.3d at 114 (comparing Flast v. Cohen, 392 U.S. 83 (1968) with Warth v. Seldin, 422 U.S. 490 (1975), and Allen v. Wright, 468 U.S. 737 (1984)), and was rendered "untenable in the light of Raines." Chenoweth, 181 F.3d at 115. And as this Court recognized in Walker, Raines compels the conclusion that an alleged impairment of Congress's legislative function, resulting from the withholding of requested information, is too abstract an injury to establish Article III standing. 230 F. Supp. 2d. at 67-68.

The Committee responds that this Court must nevertheless treat AT&T as dispositive of the standing question because neither Raines, nor any subsequent decision by the Court of Appeals, has expressly overruled it. See Pl.'s Reply at 2, 23-24. But the doctrine on which the Committee relies—that lower courts must follow precedents of *the Supreme Court* having "direct application in a case," even if it appears that their reasoning has been rejected in another line of decisions, id. at 23-24 (citing Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989))—does not apply here. The question here is the extent to which district courts are bound by *circuit precedent* that has been "effectively overruled" by "higher authority"; a subsequent decision by the Supreme Court "closely on point" is controlling if it has

so undercut the theory or reasoning of an earlier circuit decision as to render the two cases

irreconcilable.  See, e.g., Miller v. Gammie, 335 F.3d 889, 899-900 (9th Cir. 2003).[6]  Raines is

thus controlling here, not AT&T.

 The Committee also relies on the fact that the Court in U.S. House of Representatives v.

U.S. Dep't of Commerce cited AT&T as support for its conclusion that "a legislative body

suffers redressable injury when that body cannot receive information necessary to carry out its

constitutional responsibilities."  11 F. Supp. 2d 76, 86 (D.D.C. 1998), appeal dismissed, 525 U.S.

316, 344 (1999).  But House of Representatives was decided before Chenoweth; made only

passing reference to Raines, see id. at 83; did not attempt to reconcile AT&T with the analysis

mandated by Raines, see id. at 85-86; and, in any event, is a case that is "readily distinguishable"

from this one.  Walker, 230 F. Supp. 2d at 73 n.19.  In view of the foregoing, the district court's

opinion in House of Representatives does not establish that the Committee has standing.

## II. THE COMMITTEE DOES NOT HAVE A CAUSE OF ACTION UNDER THE DECLARATORY JUDGMENT ACT OR THE CONSTITUTION.

 The Committee implicitly concedes that it needs a cause of action for this suit, and

contends that it has one under either the Declaratory Judgment Act ("Act") or Article I of the

Constitution itself.  Neither claim withstands scrutiny.

---

 [6]  The Committee makes a fleeting (and easily rebutted) attempt to distinguish Raines
from AT&T, on the purported ground that Raines concerned only "an intrabranch dispute"
among members of Congress itself, as opposed to the inter-branch dispute presented here.  Pl.'s
Reply at 24 (quoting Raines, 521 U.S. at 833 (Souter, J., concurring)).  But Justice Souter's
concurrence, from which the Committee quotes, expressly described the case as "in substance an
interbranch controversy . . . as well as an intrabranch dispute."  521 U.S. at 833.

-18-

**A.    The Declaratory Judgment Act Does Not
       Provide Any Right to Judicial Relief.**

It is well-settled that "the availability of [declaratory] relief presupposes the existence of

a judicially remediable right." Schilling v. Rogers, 363 U.S. 666, 677 (1960).  But the Act

creates no judicially remediable rights, and nothing in the Committee's brief is to the contrary.

As the Supreme Court has explained, the Act is "*procedural only*." Skelly Oil Co., 339 U.S. at

671 (emphasis added).  Through the provisions of the Act, Congress did not enlarge the "kinds

of issues which give right to entrance to federal courts," or "impliedly repeal[] or modif[y]" the

"limited subject matters which alone Congress had authorized the District Courts to adjudicate."

Id. at 672.  Rather, Congress simply "enlarged the range of *remedies* available in federal court"

and only for *existing* judicially remediable issues. Id. (emphasis added); see also C&E Serv.,

Inc. v. District of Columbia Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002); Seized

Prop. Recovery, Corp. v. U.S. Customs & Border Prot., 502 F. Supp. 2d 50, 64 (D.D.C. 2007)

("Although Plaintiff purports to bring this claim under the [Act], it does not specify any cause of

action *through which* the Court may exercise subject matter jurisdiction and grant declaratory

relief."); Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car, Inc., Civ. No. 89-0300, 1989 WL

39393, *3 (D.D.C. Apr. 13, 1989) (explaining that the Act "provides no independent cause of

action.  The plaintiff must assert an interest in itself, *which the law recognizes.*  In other words,

the plaintiff must first have a cognizable cause of action under the contracts, which is precisely

what defendants claim does not exist.").

Through its Complaint and briefs, the Committee consistently fails to identify any

"judicially remediable right" upon which it can rest its request for declaratory relief.  The

Committee does not attempt to point to another statute that purports to create such a right, and as

-19-

explained below, infra at 25-31, the Committee cannot locate any "judicially remediable right" in Article I. This case thus stands in direct contrast with Aetna Life Ins. Co. v. Haworth, 300 U.S. 227 (1937), despite the Committee's claim that the two cases present "nearly identical elements." Pl.'s Reply at 36. In Haworth, the plaintiff presented a "present, specific right" grounded in a judicially recognizable claim: "legal rights and obligations arising from the contracts of insurance." 300 U.S. at 242. As the Court there explained, it is the "nature of the controversy, not the method of its presentation or the particular party who presents it, that is determinative" of the availability of declaratory relief. Id. at 244. And there was "no question that the controversy [there] was of a justiciable nature." Id. at 243.

Recognizing that it has no conventional right of action, the Committee instead misinterprets case law permitting putative defendants to raise declaratory judgment complaints in anticipation of a complaint raising traditional causes of action. See Pl.'s Reply at 37. In the course of deciding that it could entertain the insurer's declaratory judgment action in Haworth, for example, the Supreme Court did note that had the insured filed his traditional cause of action first, "there would have been no question that the controversy was of a justiciable nature." 300 U.S. at 243. But the insurer also had a contract right, and by recognizing the insurer's anticipatory contract claim, the Court did not somehow provide a vehicle for cases presenting no justiciable rights. Indeed, the Act does not create a "cause of action" in such anticipatory cases, it merely switches the posture of the parties in adjudicating a reasonably anticipated cause of action. See, e.g., Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 176 (1965) (one likely to be sued for patent infringement "need not await the filing of a threatened suit by the patentee; the validity of the patent may be tested under the [Act]").

-20-

Indeed, not all anticipated future disputes may be adjudicated under the Act.  In Coffman

v. Breeze Corp., for example, the Court rejected a plaintiff's effort to adjudicate the validity of a

statutory provision that would properly arise only as a defense in another, later actual

controversy.  323 U.S. 316, 323-24 (1945).  Such actions would be "but a request for an advisory

opinion as to the validity of a defense to a suit for recovery of the royalties," and the Supreme

Court rejected use of declaratory judgments as means "for securing an advisory opinion in a

controversy which has not arisen."  Id.; see also Public Serv. Comm'n of Utah v. Wycoff Co.,

344 U.S. 237, 248 (1952) (in declaratory judgment context, "it is the character of the threatened

action, and not of the defense, which will determine whether there is federal-question

jurisdiction in the District Court").  Likewise, in order for anticipatory actions to be justiciable,

the Court has required a "genuine threat of enforcement," MedImmune, Inc. v. Genentech, Inc.,

549 U.S. 118, 127 S. Ct. 764, 772 (2007), and definite and concrete controversies.

The Committee cannot rely on the possibility that "if the House were to exercise its right

to arrest and try Defendants, they would have the right to seek *habeas corpus* review in this

Court, and thus [present] exactly the same legal issues."  Pl.'s Reply at 38 (emphasis added).  As

the Committee itself acknowledges, such action is not imminent, but is only "theoretically

available" as a remedy to the Committee, which the Committee has disclaimed as "unwieldy"

and politically cumbersome.  Pl.'s Reply at 6, 50.  The mere possibility of such action is

insufficient to support declaratory relief.  See, e.g., Md. Cas. Co. v. Pac. Coal & Oil Co., 312

U.S. 270, 273 (1941); Garcia v. Brownell, 236 F.2d 356 (9th Cir. 1956); cf. House of

Representatives, 556 F. Supp. at 153 ("Judicial resolution of this constitutional claim, however,

will never become necessary unless Administrator Gorsuch becomes a defendant in either a

criminal contempt proceeding or other legal action taken by Congress.").[7]  Moreover, any habeas

action would not present identical issues, but would raise other significant Constitutional

questions concerning the scope of Congress's asserted inherent contempt power and whether it

would even countenance the arrest of the President or his closest aides for refusing to testify or

provide privileged documents, at the President's direction—itself a dubious proposition.

See, e.g., Prosecution for Contempt of Congress of an Executive Branch Official Who Has

Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101, 140 n.42 (1984); cf. United States v.

Lovett, 328 U.S. 303, 317 (1946).

    In any event, the Committee's attempt to distinguish those cases where courts have

denied relief under the Act because of the availability of other remedial schemes is wholly

unavailing.  See Pl.'s Reply at 38.  As the Court of Appeals has made clear, the existence of

alternative remedies for conflict resolution, even including administrative ones where damages

and injunctive relief may not be available, precludes a right to proceed under the Act.  C&E

Servs., 310 F.3d at 201; see also Schilling, 363 U.S. at 677.  The fact that a preferred (or even

less "unwieldy") remedy may be unavailable does not mean that the Act provides an independent

cause of action.  As we have explained, the historical remedy for any inter-branch dispute over

information is one of accommodation and the exercise of political tools available to the

branches, and Congress has a panoply of other remedies at its disposal that should not be lightly

disregarded in assessing the availability of relief under the Act.  See infra Part II.B.2.  That is the

constitutional scheme that the Framers intended and that was not disturbed *sub silentio* through

the Act.  See, e.g., U.S. Const., Art. III, § 2 (setting forth the original jurisdiction of the Supreme

---

[7] At most the Committee's argument suggests that *the Defendants* might have cause to
seek declaratory relief in advance of such an action, but not the Committee itself.

Court but omitting inter-branch disputes); see also Barnes v. Kline, 759 F.2d 21, 57 (D.C. Cir.

1984) (Bork, J. dissenting) (discussing the same).[8]

Notwithstanding the robust history of inter-branch accommodation and the other tools

available to Congress, the Committee would have the Court find a congressional cause of action

for inter-branch disputes in the general language of the Act. Such a result, however, would be

contrary to the canon that particularly "clear statements from Congress" are required before

courts may effect "a significant alteration in the balance of power between Congress and the

President." Roeder v. Islamic Republic of Iran, 333 F.3d 228, 238 (D.C. Cir. 2003). Nothing in

either the Act's text or its legislative history remotely suggests the existence of, or an intent to

create, a cause of action for Congress to bring its disputes with the President in court. See, e.g.,

Jones v. United States, 526 U.S. 227, 234 (1999) ("Congress is unlikely to intend any radical

departures from past practice without making a point of saying so.").[9] Indeed, history forecloses

---

[8] The Committee chastises Defendants for citing the dissenting opinion in Barnes and the concurring opinion of now-Justice Scalia in Moore v. U.S. House of Representatives, 733 F.2d 946, 951 (D. C. Cir. 1984). See Pl.'s Reply at 3. However, as this Court observed in Walker, "views that the role of the judiciary is properly limited to the adjudication of individual rights were expressed many years ago by two judges questioning this Circuit's *now-defunct legislative standing doctrines*." 230 F. Supp. 2d at 72 n.18 (emphasis added). Far from being "reactionary," as the Committee contends, see Pl.'s Reply at 3, these opinions have withstood the test of time. See Raines, 521 U.S. 811; Chenoweth, 181 F.3d at 115-16.

[9] The requirement of a clear statement to create a congressional cause of action is supported by Reed v. County Commissioners of Delaware County, Pa., 277 U.S. 376 (1928). Reed did not solely address the question of jurisdiction, as the Committee suggests, but evaluated whether a Senate Resolution provided a "suit of a civil nature . . . brought by the United States, or by any officer thereof authorized by law to sue." Id. at 386. The Supreme Court explained that the petitioners there did "not claim that any act of Congress authorizes the committee or its members, collectively or separately, to sue," and required more than a general authority to "do such other acts as may be necessary in the matter of [its] investigation" to support a cause of action. Id. at 388. And while setting forth a necessary condition for suit—a clear statement of authority to sue—the Supreme Court did not hold that a clear resolution would provide a sufficient condition to sue. Id. ("The suit cannot be maintained unless the committee or its members were authorized to sue by Resolutions 195 and 324, *even if it be assumed that the Senate alone may give that authority*.") (emphasis added). In any event, as this Court has since made clear, resolutions do not have the force of law outside of Congress itself. See Jewish War Veterans of U.S., Inc. v. Gates, 522 F. Supp. 2d 73, 78 n.3 (D.D.C. 2007) ("Thus, the House

the argument that Congress intended the Act to provide it with a cause of action to pursue such disputes. Since the 1970s, Congress has considered numerous proposals that purport to create for itself a specific cause of action to seek information from the Executive, all of which would have been redundant had it already done so in the Act. Some have become law—most notably 2 U.S.C. § 288d, which is not even aimed at enforcing subpoenas against the Executive—but most have not. See, e.g., S. 2170, 94th Cong., 1st Sess. (1975); S. 2073, 93d Cong., 1st Sess. (1973).

The Committee attempts to brush these statutes and proposals aside as simply housekeeping over *who* may go to court and also contends that they are merely jurisdictional in nature, see Pl.'s Reply at 45-46, all the while assuming the existence of an unprecedented right of action. But the text of 2 U.S.C. § 288d(c)(2)(D)—which refers to having to detail the comparative effectiveness of "bringing a *civil action under this section* [288d], certification of a criminal action for contempt of Congress, and initiating a contempt proceeding before the Senate"—is certainly inconsistent with the Committee's position, while the contemporary record confirms that Congress was contemplating the express creation of a new cause of action to supplement the "two present enforcement procedures" then available to enforce subpoenas, i.e., criminal contempt proceedings under 2 U.S.C. § 192 and Congress's inherent contempt authority to conduct a trial before the bar of Congress. S. Rep. No. 170, 95th Cong., 1st Sess. 41 (1977). Had a cause of action already existed under the Declaratory Judgment Act, there would have been no need to debate and contemplate any new right to seek civil enforcement of subpoenas or prescribe the exacting details of what would be required before a civil action could be initiated. See 2 U.S.C. § 288d(c).

---

Rules do not have the force of law outside of the House itself as they are not enacted legislation within the meaning of the Presentment Clause.").

**B.    Article I, § 1 Of The Constitution Does Not
Provide The Committee With A Cause Of Action.**

In its oposition, the Committee asserts that the Court may imply a right of action from

Congress's Article I, § 1 power to legislate.  However, the Supreme Court has never implied a

right of action for Congress from such structural constitutional provisions.  Rather, the Court has

been reluctant to recognize implied rights of action and, when it has done so, only recognized

them where there is express *rights-creating language* in the Constitution itself.  Yet, even then

the Committee identifies no case in which a right has been implied for Congress.  Whatever the

ultimate scope of Congress's *powers* under Article I, Congress has no judicially enforceable

"rights," as traditionally understood, under Article I, § 1.  As such, the Committee may not rely

on Article I to manufacture an unprecedented cause of action.

**1.    The Committee Cannot Rely On Article I, § 1 As
The Source Of Its Cause Of Action Because It Does Not
Provide A Judicially-Enforceable Right To Vindicate In Court.**

It is axiomatic that courts may not infer causes of action absent clear language

establishing both a federal right and remedy.  In a consistent line of cases beginning with

Cannon v. Univ. of Chicago, 441 U.S. 677 (1979), the Court has made clear that absent language

that clearly creates judicially-enforceable rights, courts must not imply a cause of action.

Indeed, the Supreme Court recently emphasized that implying rights of action "runs contrary to

the established principle that the jurisdiction of the federal courts is carefully guarded against

expansion by judicial interpretation."  Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc.,

128 S. Ct. 761, 772-73 (2008) (internal quotation marks and citation omitted).  Accordingly,

absent an intent to create a judicially-enforceable right, "a cause of action does not exist and

courts may not create one, no matter how desirable that might be as a policy matter[.]"

Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001).

In assessing whether a judicially-enforceable right was in fact intended, the Court looks for the existence of *explicit* "right or duty-creating language"; has repeatedly made clear the critical difference between "'rights-creating' language" and language granting powers or giving "directive[s] to federal agencies," Sandoval, 532 U.S. at 288-89; and has found rights-creating language only in text "phrased in terms of the persons benefitted." Cannon, 441 U.S. at 690 n.13; see also Sandoval, 532 U.S. at 288-89. Thus, it is "*rights*, not the broader or vaguer 'benefits' or 'interests,'" which may be judicially enforced. Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002).

Contrary to the Committee's suggestion, this requirement does not apply only to whether a federal *statute* creates a private right of action. Pl.'s Reply at 41-43. Instead, the principle applies with even greater force to the question of whether a party has an implied *constitutional* cause of action; after all, Congress can rectify an erroneous decision concerning a statute. Thus, although the Supreme Court has implied causes of action directly under the Constitution, it is reluctant to do so—even where the result leaves the plaintiff only with "unwieldy" alternatives for recourse. See, e.g., Wilkie v. Robbins, 127 S. Ct. 2588, 2600, 2604-05 (2007) (rejecting implied cause of action under the Constitution even where the alternative "forums of defense and redress open to [plaintiff] are a patchwork" and "discrete, incident-by-incident remedies" may be inadequate). And the Court has made clear that implied causes of action under the Constitution arise only where there is a constitutionally-explicit *right* to be vindicated. See, e.g., Bivens, 403 U.S. at 392 ("'*[W]here federally protected rights* have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'") (emphasis added) (quoting Bell v. Hood, 327 U.S. 678, 684 (1946)); see also Bush v. Lucas, 462 U.S. 367, 372 (1983); Carlson v. Green, 446 U.S. 14, 17-18 (1980).

Rather than undermine this principle, the Supreme Court's decision in <u>Davis v. Passman</u>, 442 U.S. 228 (1979), on which the Committee relies, illustrates it.  <u>See</u> Pl's Reply at 42-43.  In <u>Davis</u> the Court addressed a sex discrimination claim that rested "directly on the Due Process Clause of the Fifth Amendment."  442 U.S. at 243.  The Court found the Fifth Amendment to contain rights-creating language and focused on the Court's role in enforcing those rights, observing that the judiciary was intended by the Framers to be "the primary means through which" rights "presented [in] the Bill of Rights" would be guarded.  <u>Id.</u> at 241.  As James Madison stated when he presented the Bill of Rights to the Congress:

> If [these rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner guardians of those *rights*; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon *rights expressly stipulated for in the Constitution by the declaration of rights*.'  1 Annals of Cong. 439 (1789).

<u>Davis</u>, 442 U.S. at 241-42 (emphases added).  The judicial role of protecting *rights* express in the Constitution, and specifically of "justiciable constitutional rights," is underscored throughout the Court's opinion in <u>Davis</u>.  <u>See</u> 442 U.S. at 241-243.

Article I of the Constitution, however, creates no congressional "rights," much less justiciable ones, upon which the Committee may rely for an implied cause of action.[10]  The text of Article I speaks of the "legislative *Powers* . . . vested in the Congress of the United States," not of "rights" in any meaningful sense of the term.  U.S. Const., art. I, § 1 (emphasis added); <u>see also</u> <u>Moore</u>, 733 F.2d at 958 (Scalia, J., concurring in result) (explaining that the "exercise of (or participation in the exercise of) a political power" is different from rights understood to be justiciable).  Indeed, Article I is fundamentally the stuff of governmental *structure*, not "rights."

---

[10] Nor may the Committee rely on its Resolutions or House Rule XI as the source of any rights for declaratory judgment relief.  This Court has made clear that such resolutions do not have the force of law outside of Congress itself.  <u>See</u> <u>supra</u> at n.9.

As Justice Kennedy has observed, the provisions of Article I have been interpreted to be "structural provision[s] allocating authority."  Dennis v. Higgins, 498 U.S. 439, 453 (1991) (Kennedy, J., dissenting).  Simply put, Article I "does not purport to secure rights" to Congress, but rather "prerogatives."  Id.  The Court has similarly rejected claims attempting to transform the structural power and protection afforded by the Supremacy Clause into a substantive source of justiciable rights.  See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 613-15 (1979); see also Legal Envtl. Assistance Found., Inc. v. Pegues, 904 F.2d 640, 643-44 (11th Cir. 1990) (rejecting implied cause of action under Supremacy Clause because "[t]he Supremacy Clause does not secure rights to individuals; it states a fundamental structural principle of federalism.  While that clause is the reason why a state law that conflicts with a federal statute is invalid, it is the federal statute that confers whatever rights the individual is seeking to vindicate.").  Without a predicate justiciable constitutional right provided expressly in the Constitution, no right of action may be inferred for the Committee.

The Committee willingly acknowledges that this action seeks to vindicate the asserted congressional *power* of inquiry (which itself is not expressly identified in the Constitution, but must be implied as appurtenant to the legislative function).  See Pl.'s Reply at 39-41.  Indeed, the cases discussing Congress's implied powers have all been couched in terms of power, not rights. In McGrain, for example, the question was whether a House of Congress "has *power, through its own process*, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution," and the Court determined that "the two houses of Congress, in their separate relations, possess, not only such *powers* as are expressly granted to them by the Constitution, but such *auxiliary powers* as are necessary and appropriate to make the express powers effective." 273 U.S. at 154, 173 (emphases added).  The Court did not, however, hold (or otherwise suggest)

that Article I vests Congress with justiciable *rights* to validate in courts.  Similarly, in Marshall v. Gordon, the question before the Court was "[w]hether the House had *power* under the Constitution to deal with the conduct of the district attorney in writing the letter as a contempt of its authority, and to inflict punishment upon the writer for such contempt as a matter of legislative *power*."  243 U.S. 521, 532 (1917) (emphasis added); see also Jurney v. MacCracken, 294 U.S. 125, 147-48 (1935); Reed, 277 U.S. at 388.

Whatever the ongoing vitality of Marshall and McGrain today, and whether or not the inherent power of contempt that they contemplate as appurtenant to the legislative function could be construed to reach the innermost workings of the Presidency (given that this asserted power has never been exercised as to close presidential advisers), what is clear is that neither case involved the assertion or vindication of congressional "rights" under Article I or any other constitutional provision.  The existence of any "auxiliary" implied *powers* to effectuate Congress's express Article I powers therefore reveals nothing about Congress's asserted "right" to seek judicial enforcement.  Pl.'s Reply at 40; cf. Moore, 733 F.2d at 960 (Scalia, J., concurring in result).  Indeed, the Supreme Court in Reed expressly distinguished the congressional power to seek information from a right to seek judicial enforcement of those powers, 277 U.S. at 388:  the power to seek information "comes within the jurisdiction of the *House to deal with directly* under its implied power to preserve its functions, and therefore *without resort to judicial proceedings* under the general criminal law."  Marshall, 243 U.S. at 544 (emphasis added).

The Committee makes much of the "greater power includes the lesser" argument, and repeatedly asserts that Congress's implied power of inherent contempt necessarily encompasses the so-called "lesser included power" to seek judicial enforcement of its subpoenas.  See, e.g., Pl.'s Reply at 33, 40-41.  But this greater/lesser argument misses the mark.  The power of

inherent contempt (which exists only as a means to the specific and limited end of legislating) is neither greater nor lesser than a right to seek judicial review—it is different in kind.  Invoking the courts' jurisdiction to enforce legislative prerogatives is not a lesser-included power to legislate in the first instance.  Indeed, under the Committee's theory, a right to legislate would encompass the "lesser included right" to ensure that the Executive (or perhaps Congress itself directly) enforced those laws in a manner consistent with congressional interests, or to directly seek an interpretation from the courts so that Congress may ensure it has done what it sought to do in legislating.  That is not our constitutional design.  Indeed, such claims have been roundly rejected under the separation of powers doctrine.  See, e.g., Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 136 (1810) ("It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments.").  In Buckley v. Valeo, 424 U.S. 1 (1976), for example, the Supreme Court invalidated a statutory scheme that allowed the Federal Elections Commission to file enforcement actions because, as the FEC was then constituted, several of its members had been appointed by Congress.  The Court admitted that those legislative agents could act in aid of legislative action, but for them to seek judicial relief would violate separation of powers principles:

> The Commission's enforcement power, exemplified by its discretionary power to seek judicial relief, is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress.  *A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to Congress*, that the Constitution entrusts responsibility to "take Care that the Laws be faithfully executed."

Id. at 138 (emphasis added).

In any event, implying a right of action under which Congress may proceed to court directly under Article I, § 1 would run afoul of the Constitution's "textually demonstrable . . .

commitment" of relying on the Executive Branch to enforce the laws. Davis, 442 U.S. at 242 (noting that courts should hesitate in implying causes of action if such "demonstrable commitment exists"). Article II, § 3 of the Constitution vests the Executive exclusively with the authority to invoke the power of the courts to "take care that the laws be faithfully executed," and the Supreme Court has repeatedly made clear that the power to file a lawsuit on behalf of the government to vindicate public interests is quintessentially an executive power. See, e.g., Bowsher v. Synar, 478 U.S. 714, 726 (1986); see also Metro. Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, 501 U.S. 252, 276 (1991); Buckley, 424 U.S. 1. It follows from the Constitution's "textually demonstrable commitment" to the Executive of the power to bring an enforcement action to vindicate public interests that it would be improper to imply a corresponding right of action under Article I.

> 2.     **The Presence Of Special Factors Counseling Hesitation Demonstrates That The Committee Cannot Rely On Article I, § 1 To Establish An Entitlement To Relief.**

Although courts have fashioned remedies for violations of the Constitution, the Supreme Court has cautioned against inferring relief to vindicate constitutional rights if "special factors counsel[] hesitation." Bivens, 403 U.S. at 396; see also Bush v. Lucas, 462 U.S. at 377. The Supreme Court has "consistently refused to extend" the provision of such constitutional remedies "to any new context or new category of defendants." Corr. Serv. Corp. v. Malesko, 534 U.S. 61, 68 (2001); see also FDIC v. Meyer, 510 U.S. 471 (1994); Schweiker v. Chilicky, 487 U.S. 412 (1988); Bush v. Lucas, 462 U.S. 367. Moreover, the Court has been particularly reluctant to permit the fashioning of remedies under the Constitution where doing so raises separation of powers concerns. See, e.g., United States v. Stanley, 483 U.S. 669 (1987) (noting military setting); Chappell v. Wallace, 462 U.S. 296 (1983) (same); see also Sanchez-Espinoza v. Reagan, 770 F.2d 202 (D.C. Cir. 1985) (Scalia, J.) (noting foreign affairs setting). Here, the

separation of powers concerns are obvious.  Thus, even assuming the possibility that a

congressional right could be inferred from Article I, special factors counseling hesitation

abound.

  *First*, the existence of "alternative, existing process for protecting [an] interest amounts

to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding

remedy" here.  Wilkie, 127 S. Ct. at 2598; see also Corr. Servs., 534 U.S. at 69 ("So long as the

plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed

judicial imposition of a new substantive liability.").  The Committee's assertion that Congress's

power over "appropriations, legislation and/or withholding of consent to executive

appointments" "*cannot be taken seriously*" as an adequate remedy for its alleged injury is

remarkable.  Pl.'s Reply at 52 n.15 (emphasis added).  After all, that is *precisely* the remedy

contemplated by the Framers at the time of the founding.  As James Madison observed in

The Federalist No. 58, the "power over the purse may, in fact, be regarded as *the most complete*

*and effectual weapon* with which any constitution can arm the immediate representatives of the

people, for obtaining *a redress of every grievance*, and for carrying into effect every just and

salutary measure" (emphasis added).  Indeed, as Professor Archibald Cox notes, history

"contains little evidence that the nation has suffered from the want of legal power to compel the

President to satisfy the demands of Congress to information in the Executive Branch.  *Congress*

*has powerful political weapons*."  Cox, Executive Privilege, 122 U. Penn. L. Rev. at 1431

(emphasis added).  Thus, "[t]he assertion of executive privilege in the Dixon-Yates case led to

the defeat of the nomination of Admiral Strauss to be Secretary of Commerce," and the "threat to

withhold appropriations produced information concerning mismanagement of foreign aid" from

the Eisenhower Administration.  Id.  It is undoubtedly true that the Senate, rather than the House,

has the power of advice and consent over presidential appointments; but that fact simply illustrates the aberrational nature of this lawsuit brought by the House.

Indeed, it would be anomalous to think that the Framers intended Congress to invoke a judicial remedy rather than pursue the exercise of its own prerogatives in response to disagreements with the Executive Branch given that the Constitution does not grant the Supreme Court original jurisdiction over such inter-branch disputes—even though the Framers "singled out especially sensitive categories of judicial power for the original jurisdiction of the Supreme Court" such as "'all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a party.'"  Barnes, 759 F.2d at 57 (Bork, J., dissenting).  Moreover, Article III "contemplated that 'inferior federal courts' might not be established at all.  In fact, federal question jurisdiction was not given to the lower federal courts for almost a century after the framing of the Constitution."  Id.  These facts demonstrate that the Framers simply could not have contemplated that Congress would have an implied justiciable remedy for disputes with the Executive under Article I.

*Second*, the Committee concedes it has not exhausted its alternative remedies (which is self-evidently true, given the Committee's failure to make any meaningful counteroffer to the Executive's accommodation proposals).  It asserts that it retains "inherent contempt power," and contends that exercising other remedies would be "unwieldy" and politically "disruptive."  Pl.'s Reply at 50, 6.  It is no answer, however, to say that alternative means are not politically "preferable," id. at 14, or are politically "disruptive," id. at 6, or that they are otherwise cumbersome, id. at 52 n.15.  That is simply an admission that they have not been pursued.  Because the presence of alternative remedial schemes forecloses a private cause of action to enforce even those statutes that admittedly create substantive private rights, it cannot be that a

remedy should be *implied* for Congress when alternatives abound.  See, e.g., Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19-20 (1981).

*Third*, the Constitution's express provision of the "take care" power to the Executive, with no corresponding assignment to Congress, is yet another special factor counseling hesitation.  See supra at 29-31.  That this authority is granted to the Executive certainly suggests, at the least, that it would be inappropriate to recognize judicially created remedies for the Legislature's enforcement of a subpoena (particularly given that Congress's investigatory power is, itself, not found in constitutional text but must also be implied).

For these reasons, and the others set forth above, the court may not imply a right to relief under Article I, § 1 of the Constitution.  See Bivens, 403 U.S. at 396.

## III.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DECLINE ANY JURISDICTION IT MIGHT HAVE UNDER THE DECLARATORY JUDGMENT ACT.

The Committee concedes, as it must, that even if the Court had Article III jurisdiction, and even if the Committee had a cause of action to pursue its claims, the Court has the authority to exercise its discretion to decline to decide this case.  See Pl.'s Reply at 47 (citing Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995)).  For the reasons set forth in Defendants' opening memorandum and below, and as in House of Representatives, 556 F. Supp. 150, the Court should do so.

As an initial matter, this case resides far from the heartland of the traditional jurisdiction of the Article III courts, which is to "decide on the rights of individuals."  Marbury, 5 U.S. (1 Cranch) at 170.  As we have noted, this dispute certainly is not of a kind "traditionally thought to be capable of resolution through the judicial process" because for more than 200 years the political branches have resolved their disputes over congressional requests for information without Congress invoking the aid of the federal judiciary to adjudicate Congress's claims.

See, e.g., Defs.' Mem. at 7-9. Nor does this case involve a run-of-the-mill subpoena. This case presents fundamental questions that, if answered, would inexorably alter the separation of powers and forever change how the political branches deal with each other and the nature of accommodation, if any, between them. So too, a definitive judicial resolution of these issues would invite further judicial involvement in an area where it is well settled that courts should tread lightly, if at all. The Committee also has failed to identify with any specificity any real harm. Although asserting a general need for "information," the Committee offers not a hint of what difference any particular piece of information might make with respect to any legislative proposal. Indeed, entirely absent from the Committee's briefs is any specific discussion of a particular piece of legislation that cannot be meaningfully considered without the information the Committee seeks through its subpoena.

The Committee argues that declining to decide these issues would "minimize[ ] the power of Congress," Pl.'s Reply at 4; asserts that if the subpoenas are not enforced there will be "no limit on a future President's ability to cloak *any* aide or indeed any executive official with 'absolute immunity,'" id. at 16 (emphasis added); and claims that declining to decide this matter "would effectively vest the Executive Branch with an absolute and unchallengeable immunity," thereby "remov[ing] all incentives for the Executive Branch to negotiate and attempt to reach accommodations with the legislative branch," id. at 52. These hyperbolic claims ignore reality. After all, with respect to the very matters at dispute in this case, the Executive Branch has produced significant numbers of documents to Congress, and has made numerous witnesses available for testimony or interviews—including the then-sitting Attorney General of the United States and two White House aides. See Defs.' Mem. at 13-16. This case is thus an apt example of the observation that "[t]he problem of [disclosing sensitive Executive Branch information] lends itself better to solutions negotiated through the political process than to an 'either-or'

judicial determination."  Cox, Executive Privilege, 122 U. Penn. L. Rev. at 1427-28;

see also Mem. of Amici Curiae of the Rutherford Inst. at 17 (recognizing "Congress's historic

ability to employ successfully alternate mechanisms to secure necessary information").

Nor can the Committee rely on any supposed "useful purpose," "convenience," or

"certainty" from adjudication of this constitutional dispute.  Pl.'s Reply at 48, 49, 50.  Through

the structure of the Constitution, the Framers sacrificed some usefulness, convenience and

expedience for the checks and balances prescribed by the separation of powers.  As this Court

has recognized, "[n]o doubt it appears more convenient to let congressmen sue directly and at

once; in [actuality], that convenience is purchased at the cost of subverting the constitutional

roles of our political institutions."  Walker, 230 F. Supp. 2d at 72 n.18 (internal quotation marks

and citations omitted).  Indeed, the Framers contemplated through the structural protections of

the Constitution that the political branches would be required to prioritize "congressional

resources and attention from other pressing legislative matters," no matter how "unwieldy" or

politically "disruptive."  Pl.'s Reply at 50, 6.  That a judicial resolution mechanism would be less

costly and politically expedient does not support the Court's exercise of discretion, but cuts

against it.  Courts should not insert themselves into inherently political disputes simply because

it is more convenient for one of the political branches.[11]

Although Defendants have explained how a definitive judicial resolution of these

separation of powers issues would irrevocably alter the accommodation process, see Defs.'

---

[11] It is likely that courts would then have to judge whether the branches had engaged in
adequate negotiations—and were truly at an impasse—to pass the test contemplated in AT&T I,
551 F.2d at 394.  Courts would then be confronted with the serious problem of formulating and
applying standards to determine whether further compromise between the branches is possible,
or if the parties truly "required" a judicial referee.  See, e.g., Cox, Executive Privilege, 122 U.
Penn. L. Rev. at 1430 (asking "[h]ow is a court to decide" the proper balance).  The absence of
ascertainable standards to apply in making the determination would seem to present questions
more appropriate for political struggle, which in turn suggests that the Court should properly
decline to resolve the matter.  Cf. Baker v. Carr, 369 U.S. 186, 217 (1962).

Mem. at 44-47, the Committee suggests that just the opposite would be true because the Court would supposedly "vest the Executive Branch with an absolute and unchallengeable immunity from congressional process, . . . remov[ing] all incentives for the Executive Branch to negotiate and attempt to reach accommodations with the legislative branch regarding the latter's requests for information."  Pl.'s Reply at 52.  Two hundred years of history, however, have shown otherwise.  Notwithstanding the absence of *any* case ordering the President or his closest advisers to provide documents or testimony to Congress, the Executive Branch has routinely accommodated legislative requests for information.  The Executive Branch has, since the presidency of George Washington, "communicate[d] such papers as the public good would permit," while exercising the Presidential prerogative to protect documents from disclosure that "would endanger the public."  1 WRITINGS OF THOMAS JEFFERSON 189-90 (1905).  In the 110th Congress alone, the Executive Branch had furnished through July 2007 over 430,000 pages of documents, and more than 550 Executive Branch employees for congressional testimony or interviews, see Defs.' Mem. at 10, and with respect to matters at issue in this case, the Executive Branch has provided Congress nearly 12,000 pages of documents and over 120 hours of testimony.  Id. at 12.  To argue that the Executive Branch would stake out "unsustainable legal position[s]" in the absence of judicial intervention is to forget that the Executive Branch is accountable to political pressure and the gravity of holding public office.  Pl.'s Reply at 52.

The Committee's claim that the issues presented in its Complaint are "of great public importance" counsels hesitation, not a rush to judicial resolution of disputes that have been left to the political branches for over 200 years. Id. at 50.  The Supreme Court has made clear that a court's analysis should be "especially rigorous," with due regard for "keeping the Judiciary's power within its proper constitutional sphere," when presented with significant constitutional issues between the branches.  Raines, 521 U.S. at 819-20.  Accepting the Committee's invitation

to resolve matters of "great public importance" would be, as this Court has stated, an "excursion by the judiciary [that] would be unprecedented and would fly in the face of the restricted role of the federal courts under the Constitution."  Walker, 230 F. Supp. 2d at 75.  Under the Declaratory Judgment Act, this Court maintains the discretion not to do so.

Finally, the Committee's characterization of its "exemplary" conduct is not borne out by the record.  Pl.'s Reply at 50.  The President's offer of accommodation was met, not with a counter-offer, but with outright rejection.  See Defs.' Mem., Ex. 4.  The Committee's so-called counter-proposals never involved any binding concessions on the part of the Committee; rather, they required disclosures by the White House, after which the Committee reserved all of its rights to demand more.  See id., Exs. 5, 6, 16.  In essence, the Committee offered for the Executive Branch to negotiate against itself, as each step in the "accommodation" became a new floor from which the Committee could "bargain."  Offering to "settle" for "confidential staff review of documents," Pl.'s Reply at 11, after which the Committee would decide whether to make the information public, or "unsworn" but transcribed testimony (and thus no different from sworn testimony under 18 U.S.C. § 1001), is no "settlement" offer at all, and would have provided no accommodation to the President's legitimate interest in protecting his closest advisers "from reprisals on Capitol Hill," where hearings are "often the preserves of individual Senators and Congressmen not all of whom are invariably characterized by judicious self-restraint," Cox, Executive Privilege, 122 U. Penn. L. Rev. at 1429.  In any event, as Defendants established and amici Boehner, et al., confirm, the Committee has had at its disposal ample means to continue its investigation and procure information relevant to its legitimate legislative ends.  See, e.g., Senate Select Comm., 498 F.2d at 732.  These additional avenues by which Congress may reasonably inform its legislative judgments without the compelled interrogation of the President's immediate advisers, coupled with the President's paramount interest in

preserving the autonomy and confidentiality of his Office, weigh decisively in favor of dismissing this case.

## IV.    PURSUANT TO SEPARATION OF POWERS PRINCIPLES, CONGRESS DOES NOT HAVE THE POWER TO COMPEL THE PRESIDENT OR HIS IMMEDIATE ADVISERS TO TESTIFY BEFORE IT.

In support of its argument that Defendant Miers may be compelled to testify on matters relating to her official duties as Counsel and close adviser to the President, the Committee makes the extraordinary contention that the Congress may compel the President himself to testify before Congress.  See Pl.'s Reply at 60.  That argument is plainly wrong, as is the Committee's attempt to conflate Defendants' claim of immunity in this case (which applies only to *compelled appearances* for testimony of the President and his senior advisers) with executive privilege (which applies to the content of documents and testimony sought by the Committee from the White House).  There can be no question that, for fundamental separation of powers reasons, the President is absolutely immune from testimonial compulsion by Congress or any of its committees.  That immunity must apply to the President's closest advisers in order to protect the autonomy of the Office of the President and to enable the President to have confidence that he will obtain from his advisers candid advice without fear of reprisal or interrogation by Congress. The Committee's remaining contention that Ms. Miers enjoys no such immunity because she no longer serves in government misses the point.  For separation of powers reasons, Congress is without authority to compel Ms. Miers to testify regarding her responsibilities to the President as his Counsel and close adviser.  The fact that Ms. Miers no longer serves in the Office of the President does not mean she can be compelled to testify about those matters now.

### A.   The President And His Closest Advisers Are Absolutely Immune From Compulsion To Testify Before Congress.

The Committee cannot dispute any of the fundamental separation of powers principles on which Defendant Miers's immunity from testimonial compulsion by Congress is based.  The "singularly unique role under Art. II of a President's communications and activities" is beyond question, and the Supreme Court has long held that the judiciary must be especially vigilant in recognizing that separation of powers principles require safeguarding the autonomy and confidentiality of the President's Office and operations.  Cheney v. U.S. Dist. Court for the Dist. of Columbia, 542 U.S. 367, 389 (2004); United States v. Nixon, 418 U.S. at 715.  It is therefore remarkable for the Committee to assert that Congress has the power to compel the President himself to testify before it or any of its committees about the activities of his Office and the performance of his executive duties under Article II.  Pl.'s Reply at 55.  Any such power of compulsion over the President would obviously threaten his independence and autonomy from Congress in violation of separation of powers principles.  See Nixon v. Fitzgerald, 457 U.S. 731, 760-61 (1982) ("The essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from the risk of control, interference, or intimidation by other branches.").  Congress can no more command the President to testify before it about his executive functions than it can command the Chief Justice of the United States or any sitting judge (or his law clerks) to appear before it to explain rulings in any particular case.  For the same reason, the President cannot compel the Senate to explain its failure to act on his pending nominations.

These same principles apply just as clearly to the President's closest advisers.  The Committee does not (and could not) contest the fact that Presidents have long relied on confidential White House advisers, even more than Cabinet members or other agency officials,

for advice and assistance.  See Defs.' Mem. at 50.  Indeed, unlike Cabinet members and agency officials, senior White House advisers have no operational authority over government agencies. Their sole function is to advise and assist the President in the exercise of his duties.  Given the numerous demands of his Office, the President must rely on his advisers to assist in the performance of his Article II functions in much the same way that members of Congress rely on their legislative aides.  See Gravel v. United States, 408 U.S. 606, 616-17 (1972) ("the day-to-day work of such aides is so critical to the Member's performance that they must be treated as the latter's alter egos" and therefore be extended absolute immunity under the Speech or Debate Clause in order "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary"); Assertion of Executive Privilege With Respect to Clemency Decision, 23 Op. O.L.C. 1, 4-6 (1999).

The Committee posits that "the Speech or Debate Clause is absolute for reasons and concerns that are peculiar to the operation of the legislative branch," but gives no explanation in support of this proposition because none exists.  Pl.'s Reply at 59.  By its terms, however, the Clause does not even reach congressional staff.  Nor does the Committee contest that if Congress were able to compel the attendance before it of the President's closest advisers in order to demand a "justification" or "accountability" of executive actions and decisions, Gravel, 408 U.S. at 616, it could harass the President and frustrate his ability to perform his Article II functions. After all, compelled testimony can easily be used to gain insight into the President's thinking and future course of conduct.  If anything, these concerns are greater with respect to the President, who as the sole head of the Executive Branch is a far more easily identifiable target for inquiry than any of the 535 members of Congress.  And the Committee expressly agrees that, in order to exercise his constitutional duties, the President must be able to consult with his closest advisers confidentially, and that without such confidentiality, the President's

performance of his duties would be made more difficult.  See Pl.'s Reply at 58 (stating that these "observations are correct").

Rather than rebut any of these bases in support of immunity, the Committee argues that the courts have repeatedly rejected the claim Defendants make here, but that is plainly incorrect. See id. at 60.  United States v. Nixon, on which the Committee principally relies, rejected President Nixon's claim of absolute executive privilege in response to a criminal subpoena *duces tecum* for tape recordings and documents.  In so holding, the Supreme Court made clear that it was not concerned with congressional demands for information but only with "the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials," 418 U.S. at 712 n.19; see id. at 696-97 ("Here at issue is the production or nonproduction of specified evidence *deemed by the Special Prosecutor to be relevant and admissible in a pending criminal case*.") (emphasis added)—a critical distinction omitted by the Committee.  See Pl.'s Reply at 31.[12]  As the Court of Appeals has noted, "'[t]he President's ability to withhold information from Congress

_____

[12]  Other decisions relied on by the Committee concerning the application of executive privilege to documents sought in judicial proceedings are also inapposite for this same reason. In In re Sealed Case, 121 F.3d 729 (D.C. Cir. 1997), for example, the Court of Appeals addressed the applicability of the presidential communication privilege to documents that had been subpoenaed by a federal grand jury, and emphasized that its opinion "should not be read as in any way affecting the scope of the privilege in the congressional-executive context . . . ." Id. at 753.  At issue here, of course, is whether the President's closest advisers are immune from having to testify in a legislative setting, which implicates the constitutional considerations addressed above, not whether records sought in a judicial proceeding are subject to executive privilege.  The unique circumstances of compelled congressional testimony render irrelevant many of the Committee's arguments, including its erroneous assertion that the presidential communications privilege does not apply in this case because the President himself was not ultimately involved in the resignation of the United States Attorneys.  Pl.'s Reply at 58.  Even if that were a correct statement of the law, which it is not, see In re Sealed Case, 121 F.3d at 751-52 (applying the presidential communications privilege to presidential advisers), it is irrelevant to whether the President's closest advisers can be compelled to testify before Congress.

implicates different constitutional considerations than the President's ability to withhold evidence in judicial proceedings." In re Sealed Case, 121 F.3d 729, 753 (D.C. Cir. 1997).

Congressional demands for information pose a far greater threat to the President's autonomy and confidentiality. "The need for access to executive papers and communications arises too seldom in traditional forms of civil or criminal proceeding for the judicial rulings to have much impact upon the effectiveness of the Presidency," while "the occasions upon which Congress may demand information are virtually unlimited." Cox, Executive Privilege, 122 U. Penn. L. Rev. at 1426. Were the President's closest advisers subject to compelled testimony there would be no end to the demands that effectively could be placed upon the President himself. Immunity from compelled congressional testimony thus serves an important and distinct function—a function quite different from the assertion of executive privilege in a judicial proceeding.

The Committee also gets no help from Nixon v. Administrator of General Services, 433 U.S. 425 (1977). The Presidential Recordings and Materials Preservation Act at issue there did not require the disclosure of information while the President was in office, but only after the Administration had ended and thus when a former President's interests (beyond the assertion of executive privilege) are more attenuated. Additionally, the Court in its separation of powers analysis found it "highly relevant that the Act provides for custody of the materials in *officials of the Executive Branch* and that employees of that branch have access to the materials only 'for lawful Government use, subject to the [Administrator's] regulations.'" Nixon, 433 U.S. at 443-444 (emphasis added). In this case, in contrast, a congressional committee insists that it has the power to interrogate the President's advisers (indeed, the President himself) regarding executive

functions at the highest level of government.  No court, of course, has ever affirmed or enforced this remarkable assertion of power.[13]

Relying on Butz v. Economou, 438 U.S. 478 (1978), and Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Committee argues that, "even assuming the President himself cannot be compelled to appear before . . . the Congress, the Supreme Court has recognized a constitutional and dispositive divide between the President and his aides."  Pl.'s Reply at 55.  But in those cases the Supreme Court decided only that Executive Branch officials (other than the President) should not as a general rule be granted absolute immunity from personal liability for damages arising from unconstitutional conduct where the officials knew or should have known that they were acting outside of the law.  See Butz, 438 U.S. at 506-507 (agency officials as a general rule are entitled to qualified, not absolute immunity from civil suit for damages); Harlow, 457 U.S. at 802 (the President's aides and advisers are entitled to qualified immunity from civil suit for damages alleging unconstitutional conduct).  As the Court in Harlow explained:  "The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative.  In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees."  457 U.S. at 813-814.  "It is this recognition that has required the denial of absolute immunity to most public officers."  Id.

---

[13]  Certainly Clinton v. Jones, 520 U.S. 681 (1997), offers no support for the Committee. The Committee argues that the Supreme Court in that case "reiterated that the separation of powers doctrine does not by itself confer on a sitting President an absolute immunity from suit by a private party."  See Pl.'s Reply at 61.  But as Defendants noted in their opening memorandum, Defs.' Mem. at 58, Clinton v. Jones holds only that a President does not enjoy temporary immunity from the burdens of civil litigation arising from events occurring *before* he assumed office, which precluded the possibility that any decision in the civil litigation "will curtail the scope of the official powers of the Executive Branch."  520 U.S. at 701.  The "litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be President imposes no perceptible risk of misallocation of either judicial power or executive power."  Id.  At issue here, in contrast, is whether a congressional committee can compel the testimony of the President's closest advisers regarding their official duties on behalf of the President, which would clearly result in a violation of separation of powers principles.

These considerations do not apply here. In contrast to <u>Butz</u> and <u>Harlow</u>, this case does not present the need to protect individual rights against the unconstitutional acts of government officials, for which a suit in damages may provide the only possible remedy. Instead, this case concerns Congress's generalized need to inform its legislative judgment, for which it has ample alternative means to accomplish this function. <u>See</u> Defs.' Mem. at 59-62. In addition, civil suits against a President's senior advisers arising from unconstitutional conduct are very rare, and even then a President's advisers are entitled to qualified immunity which "avoid[s] excessive disruption of government and permit[s] the resolution of . . . insubstantial claims on summary judgment." <u>Harlow</u>, 457 U.S. at 818. In significant contrast, the Committee's view of the proper scope of congressional inquiry is virtually limitless; congressional inquiries into Executive Branch actions are common; and no neutral arbiter is present to serve a gate-keeping function. Absent immunity, such demands would predictably increase, and there would be no effective brake on Congress's discretion to compel the testimony of the President's advisers at the highest level of government.

Absolute immunity on behalf of the President's closest advisers from legislative compulsion to testify is fully consistent with the Supreme Court's "functional" approach to questions of immunity in judicial proceedings. <u>Harlow</u>, 457 U.S. at 810-811. Under that approach, judges and prosecutors enjoy absolute immunity from civil suit "not because of their particular location within the Government but because of the special nature of their responsibilities." <u>Butz</u>, 438 U.S. at 511. The need for absolute immunity "stems from the characteristics of the judicial process" and the recognition that "controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree." <u>Id.</u> at 512. Because losing parties in a judicial proceeding not infrequently bring suit against the participants of that proceeding in another forum, "[a]bsolute immunity is . . . necessary to assure that judges,

advocates, and witnesses can perform their respective functions without harassment or intimidation." Id. And the President himself is absolutely immune from civil suits because of, *inter alia*, his high visibility, the singular importance of his duties and "the need to prevent large-scale invasion of the Executive function by the Judiciary [which] far outweighs the need to vindicate . . . private claims." Nixon v. Fitzgerald, 457 U.S. at 762.

Consistent with these principles, immunity for Defendant Miers from compelled congressional testimony is necessary in order to protect the *President's* functions and the autonomy of his Office. The President, as noted above, must rely on his close advisers to assist in the performance of his Article II functions in much the same way that members of Congress rely on their aides. Gravel, 408 U.S. at 616-617. The President must accordingly have confidence that he will obtain necessary assistance and advice from his advisers without fear of reprisal or interrogation by Congress. Just as the President himself is an "easily identifiable target" for congressional inquiry due to his high visibility and vast range of responsibilities, Nixon v. Fitzgerald, 457 U.S. at 753, so too are his closest advisers because they function on behalf of, and are closely identified with, the President in a manner that his Cabinet officers and other government officials are not. See also Cox, Executive Privilege, 122 U. Penn. L. Rev. at 1429 (observing that the "need to protect aides and subordinates from reprisals on Capitol Hill" is "a thousand-fold greater in the case of congressional inquiry" than in civil actions). For the same reason, the Court of Appeals has concluded that the presidential communications privilege extends not only to communications with the President himself, but also to communications with key presidential aides and advisers that are in support of the President's exercise of his prerogatives. In re Sealed Case, 121 F.3d 729, 751-52 (D.C. Cir. 1997).

The Committee argues that there is no need to protect the President's advisers from vexatious congressional subpoenas "in light of the long history of cooperation and good faith

negotiations between the branches regarding the congressional appearances of key Executive Branch personnel."  Pl.'s Reply at 59.  But a definitive ruling from this Court would surely alter these negotiations.  The Committee's contention is also belied by the fact that, rather than relying on good faith negotiations and cooperation (including the President's offer that Ms. Miers appear for an interview), the Committee has invoked this Court's jurisdiction to judicially *compel* Ms. Miers's attendance and sworn testimony at a public hearing.  And the Committee makes plain that it reserves to itself (and Congress) the unfettered discretion to subpoena the President's closest aides regarding any matter it might deem worthy of inquiry.  Id. at 8 (stating that the Committee does not need to "justify" to the other branches of government "why it has undertaken a particular investigation").  All of these considerations compel the recognition of absolute immunity on behalf of Ms. Miers against legislative compulsion to testify regarding her responsibilities to the President as his adviser and Counsel.

**B.    There Is No Fundamental Or Comprehensive Need For Congress To Compel The Testimony Of The President's Closest Advisers.**

The Committee broadly asserts that "absolute immunity for Presidential advisers . . . would undermine the public interest by placing *all* congressional subpoenas for information— including those that are undoubtedly within the public interest—out of reach of both the Congress and the courts, and ultimately the American people."  Pl.'s Reply at 60 (emphasis added).  The Committee overstates Defendants' position as well as what is at stake for Congress.  Congress has been able to obtain testimony and documents from all Departments and agencies of the Executive Branch on any matter of public importance, as this case itself demonstrates.  It is undisputed that, beginning in March 2007, fourteen Department of Justice officials, including the Attorney General and the Deputy Attorney General, appeared and testified before Congress regarding the resignation of the U.S. Attorneys.  Two White House officials testified as well,

Sara Taylor, former Deputy Assistant to the President and Director of Political Affairs, and J. Scott Jennings, former Special Assistant to the President and Deputy Director of Political Affairs, which further highlights the narrowness of Defendants' claim of immunity. Id. Thus, the question of immunity presented in this case is very narrow, concerning only whether Congress can, consistent with separation of powers principles, compel the appearance and testimony of one of the President's closest advisers over his express objection. Indeed, this issue is narrower still because the Committee asks the Court's assistance to compel the testimony of Ms. Miers in regard to the President's removal power, one of his core constitutional prerogatives.[14] There is nothing routine about the information sought here or the person from whom it is sought.

The Committee additionally contends that Congress's need "to compel the production of information from the Executive Branch is, if anything, even greater than that of the grand jury in Nixon and . . . In re Sealed Case" because, whereas "judicial matters normally concern the interests of one individual, . . . congressional investigations normally concern[] matters affecting . . . the entire nation." Pl.'s Reply at 62. The Supreme Court in United States v. Nixon, however, was not concerned with the interests of one individual as opposed to the interests of the Nation when it overruled President Nixon's claim of absolute privilege over certain documents. Rather, the Court emphasized the comprehensive and fundamental need for the Judiciary to obtain every person's evidence in criminal cases in order to perform its core Article III functions: "[t]he need to develop *all* relevant facts *in the adversary system* is both fundamental and comprehensive." 418 U.S. at 709 (emphasis added). The Court emphasized that "[t]he very

_____

[14] Myers v. United States, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment, and when the grant of the executive is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal.").

integrity of the judicial system and public confidence in the system depend on full disclosure of all facts," and that "[t]o ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." Id. at 709.

There is no similar "fundamental," "comprehensive," or "imperative" need for a congressional committee to obtain a "full disclosure of all facts" in order to perform its legislative functions. "While fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." Senate Select Comm., 498 F.2d at 732. Although the Committee asserts in a footnote that "Congress's need for information is at least as strong as that of a grand jury," Pl.'s Reply at 63 n.18, that is plainly incorrect: although Congress has the inherent power "in the legislative process" to probe into government agencies "to expose corruption, inefficiency or waste," Congress is not "a law enforcement or trial agency." Watkins, 354 U.S. at 187.[15]  The Committee otherwise broadly contends that "[t]his is a case in which Congress cannot adequately inform itself without access to the President's advisers" without giving any real explanation why this is purportedly true. Pl.'s Reply at 64. To the contrary, the Committee, as

---

[15] Senate Select Committee on Ethics v. Packwood, 845 F. Supp. 17 (D.D.C. 1994), on which the Committee relies, has no bearing on this case. That case concerned the enforcement of a Senate subpoena for Senator Robert Packwood's diaries as part of a Senate Ethics Committee investigation into allegations about the Senator. As noted by the court, the Constitution itself, Art. I., § 5, cl. 2, "confers upon the Senate the power to discipline its Members for 'disorderly [b]ehaviour.'" Id. at 21. It was within that specific context that the court remarked that the Ethics Committee was "performing the office of a legislative branch equivalent of a grand jury, *in furtherance of an express constitutional grant of authority to Congress to keep its own house in order.*" Id. (emphasis added). The Committee in this case is not acting pursuant to that same constitutional grant of authority but rather pursuant to the House's implied power under Article I to obtain information in support of its legislative function, which does not confer upon it law enforcement or grand jury authority. Watkins, 354 U.S. at 187.

-49-

evidenced in its "Restatement of Facts," has clearly reached strongly-held conclusions about why certain U.S. Attorneys resigned from office, which should be more than enough to inform its legislative judgment without obtaining Ms. Miers's testimony.  Pl.'s Reply at 8-9.

The Committee lastly proposes that the President's advisers are entitled at most to qualified immunity.  Pl.'s Reply at 63.  But even if the immunity of the President's advisers from congressional subpoena were to be viewed as qualified rather than absolute, the balance clearly tips in favor of immunity here.  The Committee has failed to identify a compelling need for Ms. Miers's testimony in the face of the information it has already obtained.  Nor, as noted above, has the Committee articulated with any specificity how any information it might obtain would influence a specific legislative proposal.  The Committee has had virtually limitless access to information from the Department.  By contrast, compelled interrogation of the President's senior advisers over the President's objection would deeply intrude upon his Executive functions regarding a core constitutional prerogative and invade the autonomy of his Office and the confidentiality of his functions.

It bears emphasizing that never in the Country's history has a close adviser to the President been judicially compelled to testify before a legislative committee, much less regarding the exercise of a core Article II prerogative.  The Committee makes no showing why today, contrary to over two centuries of practice, it has allegedly become "imperative to the function of [the legislature] that compulsory [judicial process] be available for the production of evidence" from the President's immediate advisers before a congressional committee.  United States v. Nixon, 418 U.S. at 709.

**C.     Ms. Miers Is Immune Even Though She Has Left Office.**

The Committee contends that Ms. Miers, as a private citizen, cannot be granted immunity from compulsion to testify before Congress pursuant to separation of powers principles, Pl.'s

-50-

Reply at 64-66, which is clearly incorrect.  The Committee does not deny that it seeks to compel Ms. Miers's testimony solely in relation to her responsibilities to the President as his Counsel and close adviser, not in any individual or private capacity.  The Committee additionally does not deny that the President's interest in protecting the autonomy and confidentiality of his Office remains even though Ms. Miers no longer serves as his Counsel.  The Committee, instead, asserts that "the President has no independent authority to compel Ms. Miers to do anything." Pl.'s Reply at 65.  But this argument misses the point, which is that Congress is without authority for separation of powers reasons to compel Ms. Miers to testify regarding her responsibilities to the President as his Counsel and close adviser during the time she served in government.  If the current Counsel to the President cannot be compelled to testify before the Committee regarding his official duties, then for the same reasons Ms. Miers cannot be compelled to testify regarding her official duties.  The Committee makes no argument that contradicts this conclusion.

## V.    THE WHITE HOUSE IS NOT REQUIRED TO PRODUCE A PRIVILEGE LOG IN RESPONSE TO A CONGRESSIONAL REQUEST FOR DOCUMENTS.

The Court should also dismiss the Committee's claim in Count II that it is entitled to a privilege log.  The Committee points to no law expressly granting Congress a right to a privilege log anytime it demands documents, and fails to demonstrate that such a right implicitly arises under Article I.  Privilege logs are creatures of litigation justified by the Judiciary's unique responsibility to adjudicate the merits of specific privilege claims, a function that Congress does not share.  In addition, the privilege-log-production rule that the Committee asks this Court to fashion on Congress's behalf would undeniably invade the autonomy and confidentiality of the President's Office, and would impose manifestly unreasonable burdens on that Office in violation of separation of powers principles.

**A.     The Constitution Does Not Provide Congress
With An Inherent Entitlement To A Privilege Log.**

Relying on its greater-includes-the-lesser syllogism, the Committee contends that it is

entitled to a privilege log based on Congress's general power of inquiry.  Pl.'s Reply at 67-69.

This argument is without merit.  Although the Supreme Court has held that "the power of

inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative

function," McGrain, 273 U.S. at 174, the Committee cites no authority supporting the different

proposition that it has a judicially-enforceable right to a detailed privilege log from the White

House.  To the contrary, privilege logs are derived from—and are essential to—the judiciary's

institutional need to adjudicate specific claims of privilege.  See, e.g., Dellums v. Powell, 642

F.2d 1351, 1360 (D.C. Cir. 1980) (requiring privilege log so that the courts can perform their

judicial responsibility "to make a rational decision whether the withheld material must be

produced without actually viewing the documents themselves, as well as to produce a record that

will render the District Court's decision capable of meaningful review on appeal").  Congress

does not have this same adjudicative function, and the Committee is therefore wrong to rely on

its contention that privilege logs enable "oversight committees to carry out their constitutional

responsibilities . . . just as the production of privilege logs in the judicial context enables courts

to carry out theirs."  Pl.'s Reply at 66-67.

Relying on Freedom of Information Act cases and "Rule 26 cases," the Committee also

makes the unremarkable assertion that executive privilege, including the presidential

communications privilege, "is limited and qualified, and . . . does not shield Executive Branch

officials from providing privilege logs in the FOIA and Rule 26 contexts."  Pl.'s Reply at 69.

That observation, however, has no relevance whatsoever to the issue before the Court; after all,

this is not a FOIA suit, and Rule 26 applies only when the Court permits discovery concerning

an otherwise justiciable claim.

Even further off the mark is the Committee's continued reliance on <u>Quinn v. United</u>

<u>States</u>, 349 U.S. 155 (1955), <u>Emspak v. United States</u>, 349 U.S. 190 (1955), and <u>Hutcheson v.</u>

<u>United States</u>, 369 U.S. 599 (1962).  Pl.'s Reply at 70-71.  Although the Committee candidly

acknowledges that those decisions "did not specifically address the issue of privilege logs," the

Committee claims that the "cases stand for the general proposition that the 'way is always open

for [a] committee to inquire into the nature of the claim [of privilege] before making a ruling.'"

<u>Id.</u> at 70 (quoting <u>Quinn</u>, 349 U.S. at 164).  That proposition can only be manufactured by

severing the language the Committee relies on from the actual context and holdings of the cases.

Most significantly, the Committee misleadingly truncates the quote from <u>Quinn</u>.  The

Court specifically held:

> When a witness declines to answer a question because of constitutional objections
> and the language used is not free from doubt, the way is always open for the
> committee to inquire into the nature of the claim before making a ruling.  If the
> witness unequivocally and intelligently waives any objection based on the *Self-
> Incrimination Clause*, or if the witness refuses a committee request to state
> whether he relies on the *Self-Incrimination Clause*, he cannot later invoke its
> protection in a prosecution for contempt for refusing to answer that question.

349 U.S. at 164-65; <u>see also</u> <u>Emspak</u>, 349 U.S. at 195; <u>Hutcheson</u>, 369 U.S. at 610-11.  These

cases thus deal with the question of whether a congressional committee is "*on notice of an*

*apparent claim of the privilege*," <u>Quinn</u>, 349 U.S. at 164 (emphasis added); <u>see also</u> Defs.' Mem.

at 65-66, and have nothing to say about whether a committee has a right to demand a privilege

log from the White House so that it can evaluate the merits of executive privilege claims.  Nor

do these cases address the separation of powers issues presented here.

Finally, this Court should reject the Committee's alternative argument that, even if

Congress does not have the inherent authority to demand a privilege log, the Court should

nevertheless order a log "as a step that is both ancillary, and necessary, to its ability to render a final judgment on the Committee's claims for injunctive relief." Pl.'s Reply at 71-72. The Committee's argument ignores the separate Counts in its Complaint and the fact that it has moved for partial summary judgment on Counts I and II only. Count II of the Complaint does not require the Court to rule on the assertion of privilege by the Executive with respect to specific documents, but instead seeks a declaration that Congress has the authority, enforceable in court, to command the White House to produce a privilege log in response to a legislative demand. Unless and until the Court decides that it can and should proceed to adjudicate specific claims of executive privilege, it is premature to decide whether the production of a privilege log is necessary or appropriate for the Court's adjudication.

###    B.    Requiring The President And His Advisers To Provide Congress With A Privilege Log Would Violate The Separation Of Powers.

The Committee's proposed privilege log rule would invade the autonomy and confidentiality of the President's Office. If credited, the Committee's claim would enable Congress to command the White House to identify privileged and potentially sensitive communications regarding any matter that Congress might deem worthy of "investigation" or review. There would, moreover, be no inherent checks on Congress's power to command such productions. Unlike judicial proceedings, in which litigants are subject to various constraints, see, e.g., Butz, 438 U.S. 507-508 ("firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits"), Congress could command the White House at will to produce privilege logs in relation to any Executive function without any need to justify its actions.

The Committee argues that Defendants' arguments are "completely refuted by cases that have required a privilege log from the Executive Branch when private parties seek the

documents withheld and the courts . . . require the production of such a log for its adjudicative purposes." Pl.'s Reply at 72. But that assertion misses the point. Congressional committees do not perform judicial functions and do not adjudicate claims of privilege.[16] The cases relied on by the Committee that address the adjudication of privilege issues in litigation are irrelevant to the separation of powers issues presented here. It is irrefutable that the Office of the President, owing to its high visibility, is an easily identifiable target for demands for information by Congress. If the Committee's position were adopted, the White House would be obligated to undertake the task of creating and providing detailed descriptions of documents subject to executive privilege whenever Congress made a demand for information. The enormous potential burdens are manifest, not the least of which would be diverting senior advisers from their primary duties to assist with the preparation of logs. See Defs.' Mem. at 69.

The Committee contends that "[t]hese arguments are precluded by the Constitution itself, which both vests Congress with the responsibility for conducting broad and robust oversight, and limits that authority to matters 'in aid of the legislative function.'" Pl.'s Reply at 74 (citation omitted). The Committee's claimed responsibility to conduct "robust oversight," however, does not give it the authority to invade at will the autonomy and confidentiality of the President's Office. Indeed, the Committee's argument that these potential burdens are of little concern because Congress's oversight authority is limited to matters in aid of its legislative function is belied both by the Committee's contention that it has broad and far-reaching investigative authority, as well as its claim that it "need not justify why it has undertaken a particular investigation to either of the other branches." Id. at 8.

---

[16] When a committee chairman issues a ruling on whether to accept a claim of privilege, that is not an "adjudication," but rather simply a committee's determination as to its view of the privilege claim.

Equally unpersuasive is the Committee's contention that the burdens on the White House would be light because "Congress only rarely seeks information directly from the White House." Id. at 74. The White House's experience with congressional oversight in this Congress makes that quite debatable. In any event, the Committee asks the Court to fashion a privilege-log-production rule that would for the first time in history give Congress a judicially-enforceable right to command the Executive Branch at its highest level to produce privilege logs in response to any demand for records by a congressional committee. If the Committee were to succeed on this claim, it can reasonably be predicted that an adversarial Congress would aggressively use its newly-minted authority to demand information from the White House. It can also reasonably be predicted that Congress's use of its new authority would inevitably give rise to disputes between the two branches about the adequacy of White House privilege logs, as happens frequently between parties in civil litigation. Such disputes would transform what have always been matters of negotiation between the two branches into issues to be decided by the courts, thereby ensnaring the Judiciary in this process.

The Committee argues that the failure of the White House to produce privilege logs in response to congressional commands "would severely hinder Congress' ability to exercise its constitutional authority to investigate and conduct oversight over the Executive Branch and to propose meaningful legislation where appropriate." Pl.'s Reply at 68. But the Committee fails entirely to demonstrate what legislation it cannot meaningfully consider absent a privilege log in this matter. After all, Congress's legislative judgment does not depend on a precise construction of events, Senate Select Comm., 498 F.2d at 732, and "Congress frequently legislates on the basis of conflicting information provided in its hearings." Id.

The Committee lastly argues that a rule compelling the White House to produce privilege logs would result in increased accommodation among the political branches, which is plainly not

true. Pl.'s Reply at 77. The two branches have since the beginning of the Republic consistently resolved their differences on such matters through the process of accommodation. Were the Court to fashion for the first time a compulsory rule of production on behalf of Congress, as the Committee asks, it would clearly alter the separation of powers between the branches and diminish their incentive and capacity to reach accommodation by informal means.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.


Dated: June 12, 2008                    Respectfully submitted,

                                        GREGORY G. KATSAS
                                        Acting Assistant Attorney General

                                        CARL J. NICHOLS
                                        Principal Deputy Associate Attorney General

                                        JOHN C. O'QUINN
                                        Deputy Assistant Attorney General

                                        JOSEPH H. HUNT
                                        Director, Federal Programs Branch

                                        /s/_____
                                        JOHN R. TYLER (D.C. Bar No. 297713)
                                        JAMES J. GILLIGAN (D.C. Bar No. 422152)
                                        NICHOLAS A. OLDHAM (D.C. Bar No. 484113)
                                        HELEN H. HONG (CA SBN 235635)
                                        STEPHEN J. BUCKINGHAM
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Avenue, N.W.
                                        Washington, DC  20530
                                        Telephone: (202) 514-2356
                                        Email: John.Tyler@usdoj.gov

                                        ATTORNEYS FOR DEFENDANTS