# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**COMMITTEE ON THE JUDICIARY,**         )
**UNITED STATES HOUSE**                 )
**OF REPRESENTATIVES,**                 )
                                        )
    **Plaintiff,**               )
                                        )
    **v.**                       )          **Civil No. 1:08-cv-00409 (JDB)**
                                        )
**HARRIET MIERS,** *et al.*,            )
                                        )
    **Defendants.**              )
_____)


## MEMORANDUM OF *AMICI CURIAE* IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


Barry Coburn, D.C. Bar No. 358020
Jeffrey Carll Coffman, D.C. Bar No. 493826


Coburn & Coffman PLLC
1244 19th Street, N.W.
Washington, DC 20036


Counsel for *Amici Curiae*
Thomas E. Mann
  *The Brookings Institution*
Norman J. Ornstein
  *American Enterprise Institute*
Mark J. Rozell
  *George Mason University*
Mitchel A. Sollenberger
  *University of Michigan–Dearborn*


Dated: May 29, 2008

## TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

Introduction and Summary of Argument ..................................................................1

I.    Historical Context .............................................................................................2

II.   The Question of Accommodation .....................................................................6

III.  Executive Privilege/Absolute Immunity.........................................................9

IV.  Legal Argument ..............................................................................................11

     A.    Congress Has Subpoena Authority .....................................................12

     B.    The Case is Justiciable ........................................................................13

     C.    Standing ..............................................................................................14

     D.    Cause of Action...................................................................................16

     E.    The Court Should Reach the Merits....................................................16

V.   Conclusion.......................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000)..........................................................**14**

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) ....................................................**14**

*Clinton v. Jones*, 520 U.S. 681 (1997) ...............................................................................**14**

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) ..............................................**13**

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ............................................................**12, 13**

*Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984).......................**14**

*Morrison v. Olson*, 487 U.S. 654 (1988) ...........................................................................**14**

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) ................................................................**17**

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) ......................................**16**

*Raines v. Byrd*, 521 U.S. 811 (1997) ..........................................................................**14, 15**

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974)......................................................................**13, 14, 17, 18**

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
370 F. Supp. 521 (D.D.C. 1974)..........................................................**13, 14, 15, 17**

*United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976) ("AT&T I") .........................**14, 15**

*United States v. AT&T*, 567 F.2d 121 (D.C. Cir. 1977) ("AT&T II") ............................**14**

*United States v. Nixon*, 418 U.S. 683 (1974) ..............................................................**10, 17**

*United States v. U.S. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) ............**9**

*U.S. House of Representatives v. U.S. Dep't of Commerce,* 11 F. Supp. 2d 76 (D.D.C.
1998) ....................................................................................................................................**16**

*Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002)...............................................**15, 16**

*Warth v. Seldin*, 422 U.S. 490 (1975) ...............................................................................**14**

## STATUTES

28 U.S.C. § 2201(a) ............................................................................................................**16**

## SECONDARY SOURCES

3 Annals of Cong. 493 (1792)................................................................................................**7**

Anne M. Burford, Are You Tough Enough? (1986) ..............................................................**9**

Louis Fisher, *Congressional Access to Information: Using Legislative Will and Leverage*,
52 Duke L.J. 323 (2002) ....................................................................................................**7, 8**

Louis Fisher, The Politics of Executive Privilege (2004)......................................................**8**

Jack Goldsmith, The Terror Presidency: Law and Judgment Inside the Bush
Administration 89 (2007).......................................................................................................**5**

Thomas E. Mann and Norman J. Ornstein, The Broken Branch: How Congress is Failing
America and How to Get It Back on Track (2006)   .......................................**1, 2, 3, 13, 17**

Nelson W. Polsby, *Legislatures in* Handbook of Political Science: Governmental
Institutions and Processes, (Fred I. Greenstein and Nelson W. Polsby, eds., vol. 5, 1975) 2

Mark J. Rozell, Executive Privilege: Presidential Power, Secrecy, and Accountability (2d ed. 2002) ....................................................................................................................1, 5, 20

Mark J. Rozell and Mitchel A. Sollenberger, *Executive Privilege and the U.S. Attorneys Firings*, 38 Presidential Studies Q. 315 (2008) .........................................................1, 4, 11

The Honorable Patricia Wald, Address to the Alliance for Justice (May 28, 2008), *at* http://afj.org/check-the-facts/multimedia-library/pat-walds-speech.html ........................10

32 The Writings of George Washington 15 (John C. Fitzpatrick ed., 1939)......................**7**

1 The Writings of Thomas Jefferson 303 (Lipscomb ed., 1905) ........................................7

*Amici Curiae* Thomas E. Mann, Norman J. Ornstein, Mark J. Rozell, and Mitchel A. Sollenberger through undersigned counsel, respectfully submit this brief in opposition to the Defendants' motion to dismiss this action.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* have devoted much of their professional lives to academic study of Congress, its uniquely critical role in our constitutional firmament, and its interaction with the other two branches of government.  In *The Broken Branch*, Mann and Ornstein documented grave concerns over the weakening of Congress in recent years.[1]  They described an encroaching congressional passivity, partisanship and tendency to allow itself to be dominated by an overweening executive branch, which raise troubling issues relating to the continued vitality of our democratic republic. Mark J. Rozell of George Mason University has written the definitive study on executive privilege,[2] and he and his colleague—and fellow *amicus* Mitchel A. Sollenberger—have written an analysis of executive privilege in the context of congressional investigations in the case of the forced resignations of U.S. Attorneys.[3]

This case arises at a critical historical juncture.  If the House of Representatives' legitimate attempt to elicit testimony, documents and a privilege log from the executive branch relating to the firings of nine United States Attorneys is ratified and given effect by the judicial branch, it may present a turning point from which Congress could reemerge as the vigorous, co-equal check on the executive branch envisioned by the framers of the Constitution. Alternatively, if the courts sanction the President's unprecedented broad deployment of the

---

[1] Thomas E. Mann and Norman J. Ornstein, The Broken Branch: How Congress is Failing America and How to Get it Back on Track (2006) [hereinafter *The Broken Branch*].
[2] Mark J. Rozell, Executive Privilege: Presidential Power, Secrecy, and Accountability (2d. ed., revised, 2002).

1

doctrine of absolute immunity based on executive privilege here and rebuff the attempt by the House to obtain this information, it would disarm the legislative branch and tend to validate and facilitate the decline of Congress as a co-equal branch of government, with long-term consequences that are difficult to predict but are highly troubling.

Our examination of this case leaves us with serious doubt, from both legal and policy perspectives, as to the substance of the contention by the Defendants and their A*mici* that this case should be dismissed.  For reasons set forth herein, we urge the Court to decline to allow this constitutionally significant action to be short-circuited based on doctrines such as standing or ripeness, and instead allow this case to proceed so that it may be addressed on the merits.

I. <u>**HISTORICAL CONTEXT**</u>

Congress, for us, has always been the linchpin of the American constitutional system.  Its legislative politics and processes are the essence of democracy in the United States.  Congress is "The First Branch of Government," empowered and described in Article I of the Constitution. Its placement there reflects the framers' unambiguous intent that Congress was to be the first among equals of the three branches of government, a powerful, independent body expected to represent a large and diverse republic.  As Professor Polsby observed, the framers intended Congress to be a transformative legislature with independent authority, not simply an arena in which external forces work their will.  Nelson W. Polsby, *Legislatures*, *in* Handbook of Political Science: Governmental Institutions and Processes, vol. 5, 257-319 (Fred I. Greenstein and Nelson W. Polsby, eds., 1975).

As described in detail in *The Broken Branch*, the Constitution was designed to foster a

---

[3] Mark J. Rozell and Mitchel A. Sollenberger, *Executive Privilege and the U.S. Attorneys Firings*, 38 Presidential Studies Q. 315 (2008).

healthy rivalry between the legislative and executive branches as co-equal branches subordinate to the law.  In recent years, the executive branch has attempted to transform the founding governing structure by subordinating the law to its political and policy goals.  We are concerned at the course the relationship between Congress and the president has taken over the past twenty years.  These concerns arose near the end of a more than thirty-year period of Democratic majority and were exacerbated following the advent of the Republican majority following the 1994 election.  We have seen and chronicled the escalation of the permanent campaign, the collapse of the center in Congress, the growing ideological polarization of the parties and a decline in accountability.

*The Broken Branch* describes a long course of congressional institutional decline and a disregard of its powers by the executive branch.  Key among the causes of this decline was the disappearance of meaningful congressional oversight of the executive and a new and excessive tolerance of executive branch secrecy.  *See* The Broken Branch at 151-62.  Moreover:

> Serious congressional oversight of the executive largely disappeared, and long-standing norms of conduct in the House and Senate were shredded to fulfill the larger goal of implementing the president's program.  The attitude of majority party leaders that the president's program trumped everything, including institutional comity and basic fairness, accompanied a general decline in institutional identity. . . .  A very aggressive assertion of executive power was met with institutional indifference in Congress.  The majority abandoned their institutional identity and independence with barely a second's thought.

*The Broken Branch* at xi.  The passivity of Congress to its independent and assertive role has, in recent years, dovetailed well with the Bush administration's assertive and protective attitude toward executive power and its aversion to sharing information with Congress and the public. Two months after the advent of the Bush administration, then-White House Counsel Alberto Gonzales blocked the release of 68,000 pages of records from the Reagan presidency, which had

been scheduled to be made public pursuant to the Presidential Records Act of 1978.  Later the

same year, President Bush issued an executive order granting former presidents, vice presidents,

or their representatives designated by family members, the right to block the release of

documents "reflecting military, diplomatic, or national security secrets, Presidential

communications, legal advice, legal work, or the deliberative processes of the President and the

President's advisers."  Rozell and Sollenberger have also noted that "President George W.

Bush's penchant for secrecy is widely acknowledged by his detractors and even many of his

supporters."  Mark J. Rozell & Mitchel A. Sollenberger, *Executive Privilege and the U.S.*

*Attorneys Firings*, 38 Presidential Studies Q. 315, 315 (2008).

       This approach to executive branch secrecy quickly became the norm.  The administration

rebuffed efforts by members of Congress to invoke the Federal Advisory Committee Act to

compel Vice President Cheney to divulge information about his energy task force.  The

administration contended that the Federal Advisory Committee Act was unconstitutional in that

it authorized "extreme interference" and "unwarranted intrusion" into executive responsibility.

Similarly, in October 2001, Attorney General Ashcroft announced a new policy for addressing

requests pursuant to the Freedom of Information Act, invoking an unprecedented expansion of

agencies' ability to resist disclosure of information.  The administration also substantially

increased the number of documents it classified, decreased the number it declassified, blocked

release of documents and briefs requested by Congress relating to the terrorist attacks on

September 11, 2001, and refused a House committee request for numbers adjusted for

undercounting in the 2000 census.  Other examples of this new executive approach to secrecy

abound.  The Bush administration invoked executive privilege in denying Congress access to

information concerning the FBI misuse of organized crime informants in Boston; refused to

share information with a Senate subcommittee overseeing a missile defense system project; delayed sending to Congress full cost estimates for the Medicare drug bill before it was signed into law; denied the Senate Governmental Affairs Committee information about undisclosed meetings between Enron executives and top administration officials; and restricted congressional access to environmental records.

The Bush administration's penchant for secrecy reflects the fact that its approach to Congress is not merely partisan, but aggressively executive-centered. As the former head of the Office of Legal Counsel Jack Goldsmith noted, the quest of "presidential power for its own sake" has been the primary goal for every Bush administration action during his tenure. Jack Goldsmith, The Terror Presidency: Law and Judgment Inside the Bush Administration 89 (2007). Vice President Cheney has long espoused expansive views of presidential power. *See* Rozell, Executive Privilege, at 149-50. This partisan and executive-centered approach to governance shaped the way in which Congress defined its role. The institutional rivalry designed by the framers gave way to a relationship in which Congress, in part through political deadlock and the lack of institutional will, assumed a position subordinate to the executive, where party trumped institution, the President set the congressional agenda, and made clear his expectation that the Republican leaders in Congress would "deliver."

Congress was largely supine in responding to the president's aggressive denial of information that members thought essential to its work. Members of both political parties have made clear to us the utterly dismissive attitude, indeed the contempt, with which the President and Vice President greeted congressional requests for information and documents. Republican Senate committee chairs such as Charles Grassley and Susan Collins often were deeply frustrated by the resistance of the administration to their requests for information, as were John

5

McCain and Lindsey Graham in the battles they fought to obtain information they felt was critical to congressional oversight of the wars in Afghanistan and Iraq. Former House Government Reform Committee Chair Dan Burton had to subpoena documents related to his investigation of the FBI and threaten to sue the Department of Justice before the administration relented and provided them. Representative Chris Shays, while chairing the Subcommittee on National Security, Emerging Threats and International Relations, encountered stonewalling in response to his request to the Department of Defense for audits of the Development Fund for Iraq, which finances rebuilding there. Relatively rare exceptions to congressional institutional passivity such as these typically were met with unprecedented presidential resistance.

## II. <u>THE QUESTION OF ACCOMMODATION</u>

The Defendants in this action, and *Amici* supporting them, suggest that Congress should have resolved through negotiation its attempts to obtain testimony and documents from the administration relating to the U.S. Attorney firings. Our examination of the recent history of Congress' interactions with the executive indicates, to the contrary, that this litigation results from a virtually unprecedented penchant for secrecy and intransigence on the part of the executive.

It most certainly is the case that, since the early days of the Republic, when Congress sought information, the release of which was thought by the President to be contrary to the public interest, the two branches engaged in negotiations and came to reasonable compromises. As early as March 27, 1792, the House established a committee to investigate the failed military campaign of Major General Arthur St. Clair. The House authorized the committee "to call for such persons, papers, and records, as may be necessary to assist their inquiries." 3 Annals of Cong. 493 (1792). The committee sought papers from President Washington regarding General

St. Clair's expedition. The President, along with his closest advisers, considered whether it would be in the public interest to release such papers, and concluded "that there was not a paper which might not be properly produced." 1 The Writings of Thomas Jefferson 303 (Lipscomb ed., 1905). Washington then instructed Secretary of War Henry Knox to "lay before the House of Representatives such papers from your Department, as are requested by the enclosed resolution." 32 The Writings of George Washington 15 (John C. Fitzpatrick ed., 1939).

Numerous other examples of accommodation exist. As Louis Fisher documented in his seminal paper on the topic, political settlements decide most information disputes between the branches. *See* Louis Fisher, *Congressional Access to Information: Using Legislative Will and Leverage*, 52 Duke L. J. 323, 336-37 (2002). In 1972, the Senate held up President Richard Nixon's nomination of Richard Kleindienst to be Attorney General because Columnist Jack Anderson charged that Kleindienst had lied in disclaiming any role in the Department of Justice's out-of-court settlement of antitrust cases against International Telephone and Telegraph Corporation (ITT).

> The Senate wanted Peter Flanigan, a presidential aide and the chief White House figure involved in the controversy, to testify. However, on April 12, 1972, White House Counsel John Dean wrote to the committee that the doctrine of executive privilege would protect Flanigan and other White House aides from testifying before congressional committees: 'Under the doctrine of separation of powers and the long-established historical precedents, the principle that members of the President's immediate staff not appear and testify before congressional committees with respect to the performance of their duties is firmly established.' By party-line votes, the committee rejected three motions. Nevertheless, Senator Sam Ervin made it clear that the Senate should not vote on Kleindienst 'so long as those fellows aren't coming up here and the White House is withholding information.' With a filibuster looming, the White House within a few days retreated from Dean's theory and Flanigan appeared at the hearings on April 20. Following committee action, the Senate confirmed Kleindienst by a vote of sixty-four to nineteen.

*Id*. at 336-37.

7

Another example of accommodation occurred when President Reagan sought to elevate Justice William Rehnquist to Chief Justice. The White House refused to give the Senate certain internal memoranda that Rehnquist had written when he was serving at the Department of Justice from 1969 to 1971.

> The memoranda were withheld to protect the confidentiality and candor of the legal advice submitted to presidents and their assistants. … With Democrats on the Senate Judiciary Committee threatening to subpoena the papers, the dispute prevented action on the nomination of Antonin Scalia to be Associate Justice. In an effort to move those to nominations, President Reagan agreed to allow the Committee to read twenty-five to thirty documents that Rehnquist had written while with the DOJ. Later, the committee requested and received additional documents prepared by Rehnquist while in the DOJ. The Senate then confirmed Rehnquist and Scalia.

*Id*. at 337.

One notable instance where traditional accommodation did not occur, however, closely mirrors the events leading to this litigation. During the Reagan Administration, it was clear to some members of the Administration that White House Counsel Fred Fielding, who also currently occupies that position, sought to create a "test case" for a sweeping theory of executive privilege. His first attempt notably failed, when Secretary of the Interior James Watt, who had originally agreed to serve as the Administration's guinea pig in a fight over executive privilege with Congress, backed down after the House Committee on Energy and Commerce, which had subpoenaed him for documents, had voted him in contempt. *See* Louis Fisher, The Politics of Executive Privilege 124-26 (2004).

In Fielding's second bite at the apple, he recruited EPA Administrator Anne Burford (née Gorsuch), to withhold documents from a congressional subcommittee. As Burford recounts in her autobiography, Fielding and lawyers from the Department of Justice "eagerly enlisted" her participation in an "executive privilege fight." *See* Anne M. Burford, Are You Tough Enough?

8

148 (1986). Burford wrote that they thought the case was "superb" and was "going all the way up to the Supreme Court." *Id*. at 152. When a subcommittee of the House Public Works Committee sought documents on the EPA's enforcement of the "Superfund" program, Burford was prepared to release them, but Fielding withheld the documents on executive privilege grounds. *Id*. at 153. Thereafter, the House found Burford in contempt; the Speaker certified the facts, and referred them to the U.S. Attorney for presentation to a grand jury; the Department of Justice brought a civil action in district court; and the court dismissed the government's suit, *United States v. U.S. House of Representatives*, 556 F. Supp. 150, 152 (D.D.C. 1983). After the dust settled, the administration agreed to release the contested documents to the Committee. *See* Fisher at 128-29.

Twenty-three years later, the same White House Counsel, Fred Fielding, is again attempting to test his aggressive view of executive privilege through the courts. Again, the administration is displaying an unwillingness to negotiate in good faith with Congress over congressional requests for information critical to its oversight role. This tendency by the executive is what is historically unique here, not the attempt by the House to obtain the information it needs to pursue oversight of the administration of justice.

## III.  UNDERLINE[EXECUTIVE PRIVILEGE/ABSOLUTE IMMUNITY]

Critical to the functioning of all three branches of government is an independent, accountable judiciary, one willing to maintain its independence and to guard its critical role as a check on the other two branches of government. "A robust democracy is defined by a robust judiciary, with courts wielding powers fairly but fearlessly, reinforcing our constitutional integrity, and fending off overreaching by other branches of government." The Honorable Patricia Wald, Address to the Alliance for Justice (May 28, 2008) *at* http://www.afj.org/check-

the-facts/multimedia-library/pat-walds-speech.html. Ratifying broad claims of executive privilege such as those here, which run counter to legal and historical precedent, would tend to subvert the vitality of both the judicial and legislative branches of government.

The Bush Administration asserts a claim of absolute immunity based on executive privilege in this case that goes well beyond what the Supreme Court recognized in *United States v. Nixon*, and that is reminiscent of the extreme view of executive privilege advanced by the Nixon Administration in the early 1970s. "President Nixon offered the most far-reaching, comprehensive definition of executive privilege imaginable under our constitutional system." *Id*. at 62. Among his claims, President Nixon argued that:

> [T]he privilege is not confined to specific kinds of subject matter . . . nor to particular kinds of communications. Reason dictates a much broader concept, that the privilege extends to all of the executive power vested in the president by Article II and that it reaches any information that the president determines cannot be disclosed consistent with the public interest and the proper performance of his constitutional duties.

*Id*. at 62-63 (quoting Brief of Richard M. Nixon in Opposition, *In re Grand Jury Subpoena Duces Tecum to Nixon*, 360 F. Supp. 1 (D.D.C. 1973), 12-13).

A dogmatic view of executive privilege does not present an accurate assessment of the separation of powers system. Mark J. Rozell, Executive Privilege: Presidential Power, Secrecy, and Accountability 158 (2d ed. 2002). "The resolution to the dilemma of executive privilege is not simply to allow the president to determine for himself the scope and limits of his own authority." *Id*. at 159. "President Nixon's view of executive privilege lacks constitutional and historical validity. In its unanimous decision in *United States v. Nixon* decision, the Supreme Court made it abundantly clear that executive privilege is not an unlimited, unfettered presidential power." *Id*. at 69. Judicial oversight here is critical to delineating its limits and to

10

ratifying the right of Congress to issue subpoenas in furtherance of its oversight function. Rozell

and Sollenberger recently observed:

> Just as presidents have legitimate needs to keep information secret, Congress has a legitimate need to access information in order to carry out its duty to investigate executive branch actions. Moreover, in a democratic republic, the presumption strongly favors openness. Despite Solicitor General Paul D. Clement's suggestion that congress has failed to show a 'demonstrable critical' need for information on the U.S. attorney firings, the burden generally rests with the president to prove that he requires secrecy rather than with Congress to show that it has a right to investigate.

Rozell & Sollenberger, U.S. Attorney Firings, *supra*, at 317.

## IV. LEGAL ARGUMENT

Defendants contend that the relief sought in this action is "unprecedented" in that courts

have not previously ordered executive branch officials to testify before Congress or produce

documents or a privilege log to Congress. Defendants' Memorandum in Support of Motion to

Dismiss at 1. From our point of view, what is unprecedented here is the degree of intransigence

and unwillingness to seek accommodation displayed by the executive branch.

Defendants' brief raises a number of jurisdictional issues in an attempt to prevent this

court from reaching the merits of the underlying dispute. In so doing, the executive branch is

attempting to stonewall this court much as it stonewalled Congress' legitimate investigation into

the forced resignations of nine U.S. Attorneys. This court should not allow the executive branch

to prevent the judicial branch from fulfilling its rightful constitutional role. Courts play a critical

role in the separation of powers because they adjudicate disputes between the political branches

and maintain a healthy balance of power. Regardless of which branch's conduct is more

unusual, the law appears to compel the conclusion that this lawsuit should proceed to a

resolution on the merits.

11

A.      **Congress Has Subpoena Authority.**

Article I indisputably imbues Congress with the authority to investigate and to issue

subpoenas in pursuit of its investigative function.  The Supreme Court so stated, unambiguously,

in 1927:

> We are of opinion that the power of inquiry-with process to enforce it-is
> an essential and appropriate auxiliary to the legislative function.  It was so
> regarded and employed in American Legislatures before the Constitution was
> framed and ratified. Both houses of Congress took this view of it early in their
> history-the House of Representatives with the approving votes of Mr. Madison
> and other members whose service in the convention which framed the
> Constitution gives special significance to their action-and both houses have
> employed the power accordingly up to the present time. . . .
>
> We are further of opinion that the provisions are not of doubtful meaning,
> but, as was held by this court in the cases we have reviewed, are intended to be
> effectively exercised, and therefore to carry with them such auxiliary powers as
> are necessary and appropriate to that end.  While the power to exact information
> in aid of the legislative function was not involved in those cases, the rule of
> interpretation applied there is applicable here.  A legislative body cannot legislate
> wisely or effectively in the absence of information respecting the conditions
> which the legislation is intended to affect or change; and where the legislative
> body does not itself possess the requisite information-which not infrequently is
> true-recourse must be had to others who do possess it.  ***Experience has taught
> that mere requests for such information often are unavailing, and also that
> information which is volunteered is not always accurate or complete; so some
> means of compulsion are essential to obtain what is needed.***  All this was true
> before and when the Constitution was framed and adopted. In that period the
> power of inquiry, with enforcing process, was regarded and employed as a
> necessary and appropriate attribute of the power to legislate-indeed, was treated
> as inhering in it.  Thus there is ample warrant for thinking, as we do, that the
> constitutional provisions which commit the legislative function to the two houses
> are intended to include this attribute to the end that the function may be
> effectively exercised.

*McGrain v. Daugherty*, 273 U.S. 135, 174-75 (1927) (emphasis added).  *Accord, Eastland v.*

*U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) ("The power to investigate and to do so

through compulsory process plainly falls within" the integral activities of members of Congress).

Defendants and their supporting *Amici* believe that Congress' constitutional subpoena power is a

weak and unimportant stepsister to the courts' power to elicit testimony and documents via compulsory process, but this view is in error.

Indeed, it is remarkable that House Minority Leader John Boehner and other *Amici* supporting Defendants would take the position that congressional subpoenas are entitled to so little weight that there is no enforcement mechanism for them, at least in this context. The party that is in the minority now may well be in the majority in a future election cycle, and – as observed by Mann and Ornstein in *The Broken Branch* – will, if experience is any guide, seek to make aggressive use of the congressional oversight and subpoena power against any Democratic president. Were the position they urge in this litigation adopted by this Court, it could establish an unfortunate precedent that would render largely ineffectual congressional compulsory process against a recalcitrant executive branch recipient.

### B.    This Case is Justiciable.

The proposition that the instant dispute is non-justiciable runs counter to binding precedent in this Circuit. In *Senate Select Committee*, our Court of Appeals deemed just such a dispute – one between Congress and the executive regarding a subpoena *duces tecum* and an assertion of executive privilege – justiciable on the merits. *See Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.D.C. 1974), *aff'd on other grounds* 498 F.2d 725 (D.C. Cir. 1974). And in *United States v. AT&T*, 551 F.2d 384, 389-90 (D.C. Cir. 1976) ("AT&T I"), the Court of Appeals squarely decided that a "clash of the powers of the legislative and executive branches of the United States," with regard to the enforceability of a subpoena issued by the House of Representatives that had been met with a claim of executive privilege, was justiciable. *Accord, Clinton v. Jones*, 520 U.S. 681, 703 (1997); *Morrison v. Olson*, 487 U.S. 654, 670 (1988). *Raines v. Byrd*, 521 U.S. 811 (1997), is not in any sense to the

13

contrary; the result in that case was predicated on the lack of standing of *individual members* of Congress, acting without authorization of either House of Congress, to challenge the constitutionality of a statutory enactment.

### C.    Standing.

Underlying the Article III standing requirement are concerns about the separation of powers. The standing requirement is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Where the parties' dispute is fully susceptible to a political resolution, courts will dismiss the complaint to avoid "meddl[ing] in the internal affairs of the legislative branch." *Chenoweth v. Clinton*, 181 F.3d 112, 116 (D.C. Cir. 1999) (quoting *Moore v. U.S. House of Representatives*, 733 F.2d 946, 956 (D.C. Cir. 1984)); *see also Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000). However, "[w]here "the dispute consists of a clash of authority between two branches . . ., judicial abstention does not lead to orderly resolution of the dispute." *United States v. AT&T*, 567 F.2d 121, 126 (D.C. Cir. 1977) ("AT&T II"). The political branches rely on the courts to decide legal issues and set baseline rules to prevent either branch from unduly aggregating power. Without the courts to set boundaries, the result will depend on whichever party or branch has political power at a particular historical moment.

Applying this separation of powers analysis, the court should find that Congress has standing to bring this civil action. Congress is not aggregating power to itself. Rather, it is exercising its enumerated powers under the Constitution to investigate and propose legislation. Moreover, Congress is not bringing a political dispute into a judicial forum. Unlike clearly distinguishable cases in which Members from the losing side of legislation seek redress in court, *see e.g. Raines v. Byrd*, this case is brought by a congressional committee with the authorization

of the full House, following an extensive investigation, which culminated in the issuance of subpoenas to White House aides for a resolution of a legal issue in the context of a subpoena enforcement action. "It is clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf." *AT&T I,* 551 F.2d at 391. During Watergate, a district court found that the issues presented in a similar suit to enforce a Congressional subpoena against the President were justiciable. *See Senate Select Committee,* 370 F. Supp. at 522. Likewise, the court should find that it does not upset the balance of power to hold that Congress has standing to enforce its subpoenas.

*Walker v. Cheney* is entirely consistent with the existence of standing and exercise of jurisdiction here. In declining to require the Vice President to produce information to the Comptroller General, this Court observed:

> [T]his case, *in which neither a House of Congress nor any congressional committee has issued a subpoena for the disputed information or authorized this suit*, is not the setting for such unprecedented judicial action. [Emphasis added.]

*Walker v. Cheney*, 230 F. Supp. 2d 51, 52 (D.D.C. 2002). The distinction between those facts and those presently at hand is plain. As this Court expressly observed in *Walker*:

> [T]here is some authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon,* 498 F.2d 725 (D.C. Cir. 1974) (en banc); *United States House of Representatives v. United States Dep't of Commerce,* 11 F. Supp. 2d 76 (D.D.C. 1998), *appeal dismissed,* 525 U.S. 316, 344, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999).

*Id*. at 68.

As for the doctrine of ripeness invoked by Defendants' *Amici*, what is at issue here is the enforceability of duly issued congressional subpoenas, a situation that could not be more

15

different from that presented in *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998). If this case is found non-justiciable by the Court, it would present a significant hardship for Congress and cause imminent harm insofar as it would prevent the House of Representatives from carrying out its oversight function and responsibility to investigate the forced resignations of the nine U.S. Attorneys. Furthermore, we are unaware of any case in which the enforceability of a subpoena was not adjudicated because the dispute was deemed unripe.

### D.    Cause of Action

Defendants' argument that Plaintiff's case must be dismissed because "the Complaint identifies no cause of action that authorizes this lawsuit" is a red herring. Defendants' Memorandum in Support of Motion to Dismiss at 37. As Defendants concede, the Complaint asserts that the Declaratory Judgment Act is the basis for the relief sought by the Committee. *Id*. at 38. As the Defendants also concede, the Declaratory Judgment Act provides this court with discretion to "declare the rights and other legal restrictions of any interested party seeking such declaration." *Id*. at 43 (citing 28 U.S.C. § 2201(a)). Given the grave constitutional issues raised by the executive branch's assertion of unreviewable absolute immunity, this court should use its discretion under the Declaratory Judgment Act to reach the merits of the underlying suit.

### E.    This Court Should Reach the Merits

In light of critical separation of powers issues raised by this case, this court should not dismiss on jurisdictional grounds, but rather, should reach the merits. Upon reaching the merits, this Court should reject the Executive's claim of absolute immunity, which is contrary to historical precedent, as well as the law of the Supreme Court and this Circuit.

The Executive Branch has not made such sweeping claims of absolute immunity since Watergate. As Mann and Ornstein recall:

16

> For anyone not around Washington in 1973, it is hard to convey how tense the atmosphere was. We were into uncharted territory. Many people saw the impeachment process as a test for the constitutional system—a test in which it was not foreordained that the system and the Constitution as we knew it would prevail. There was dark talk, and not by the usual conspiracy theorists, of a constitutional coup. It could easily have degenerated into partisan warfare or into a challenge to the role and power of Congress. But several key people stepped up to the plate and ensured that Congress and the country survived it without a hitch—indeed, with a greater commitment to the rule of law.

*The Broken Branch* at 119. At the time, the Nixon administration attempted to argue for an absolutist view of executive privilege that would have denied Congress the documents and testimony of any person working for the executive branch. The Supreme Court, D.C. Circuit, and this court roundly rejected that argument. *See United States v. Nixon*, 418 U.S. 683, 697 (1974); *Nixon v. Sirica*, 487 F.2d 700, 708 (D.C. Cir. 1973) (en banc); *Senate Select Committee*, 370 F. Supp. at 522 (D.D.C. 1974), *aff'd on other grounds*, 498 F.2d 725 (D.C. Cir. 1974).

The courts rejected the Administration's claim of absolute immunity and defused the constitutional crisis by balancing the needs of the two political branches. The law requires balancing presidential privilege with Congress's "demonstrated, specific need" for evidence. *See Senate Select Committee*, 498 F.2d at 731 (holding in the context of a Congressional inquiry, the privilege for Presidential communications may be overcome when the subpoenaed evidence is "demonstrably critical to the responsible fulfillment of the Committee's function.").

## V. **CONCLUSION**

This court has an historic opportunity to fulfill its constitutional role and maintain the balance of power. It should reject the White House's claim of absolute immunity for presidential advisers, affirm that the executive branch is co-equal to, not above the scrutiny of, Congress, and entertain this action and grant the Committee's motion to enforce the subpoenas.

17

Respectfully submitted,


/s/ Barry Coburn_____
Barry Coburn, D.C. Bar # 358020
Jeffrey C. Coffman, D.C. Bar # 493826

COBURN & COFFMAN, PLLC
1244 19th Street, NW
Washington, D.C. 20036
(202) 657-4490

Counsel for *Amici Curiae*
Thomas E. Mann
   *The Brookings Institution*
Norman J. Ornstein
   *American Enterprise Institute*
Mark J. Rozell
   *George Mason University*
Mitchel A. Sollenberger
   *University of Michigan–Dearborn*

Dated: May 29, 2008

18