# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| HARRIET MIERS, et al., | ) ) |
| Defendants. | ) ) ) |

Case No. 1:08-cv-00409 (JDB)

**BRIEF OF SENATORS DANIEL K. INOUYE AND SHELDON WHITEHOUSE, FORMER SENATOR WILLIAM S. COHEN AND FORMER REPRESENTATIVES MICKEY EDWARDS AND THOMAS B. EVANS, JR. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

James Hamilton, D.C. Bar # 108928
Robert V. Zener,  D.C. Bar # 197699
BINGHAM MCCUTCHEN, LLP
2020 K Street, N.W.
Washington, D.C. 20006
(202) 373-6001

Counsel for *Amici Curiae*

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) ............... 17

*Association of America Physicians and Surgeons v. Clinton*, 997 F.2d 898
   (D.C.Cir. 1993) ...................................................................................................... 16

*Barenblatt v. United States*, 360 U.S. 109 (1959) .............................................. 18

*Bowsher v. Synar*, 478 U.S. 714 (1986) ........................................................... 12

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................ 11

*Cheney v. U.S. District Ct. for the District of Columbia*, 542 U.S. 367 (2004) ............... 15

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), *cert. denied*, 529 U.S. 1012
   (2000) ...................................................................................................................... 7

*Clinton v. City of New York*, 524 U.S. 417 (1998) ............................................ 11

*Clinton v. Jones*, 520 U.S. 681 (1997) ............................................................. 14

*Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952) ..................................... 20

*Doe v. McMillan*, 412 U.S. 306 (1973) ............................................................. 10

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975) ................... 6

*Gravel v. United States*, 408 U.S. 606 (1972) .................................................... 10

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................. 14, 15

*Hutcheson v. United States*, 369 U.S. 599 (1962) ........................................ 18, 19

*Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983) ................... 11

*Marbury v. Madison*, 1 Cranch 137 (1803) ............................................... 4, 10

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ............................................... 6, 19

*Metropolitan Washington Airports Authority v. Citizens for the Abatement of
   Aircraft Noise*, 501 U.S. 252 (1991) ................................................................. 11

*Morrison v. Olsen*, 487 U.S. 654 (1988) ......................................................... 16

*Cases on which counsel chiefly relies.

**TABLE OF AUTHORITIES**
(Cont.)

*Myers v. United States*, 272 U.S. 52 (1926) ........................................................... 19

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) .................................... 16

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ............................................................. 14

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) ................................................... 3, 9, 14

*Raines v. Byrd*, 521 U.S. 811 (1997) .................................................................. 6, 7

*Ryan v. Department of Justice*, 617 F.2d 781 (D.C.Cir. 1980) ......................................... 17

*Senate Select Committee on Presidential Campaign Activities v. Nixon*, 370 F. Supp. 521 (D.D.C.), *aff'd on other grounds*, 498 F.2d 725 (D.C. Cir. 1974).......... 8, 20

*Senate Select Committee v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) ......... 3, 8, 10, 15, 17,18

*Sheet Metal Workers' Int'l Association v. Lynn*, 488 U.S. 347 (1989) ............................. 19

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ................................................. 11

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 95 (1998) ........................... 9

*United States v. American Telegraph & Telegraph Co.*, 567 F.2d 121 (D.C. Cir. 1977) ............................................................................................. 7,12

*United States v. Brewster*, 408 U.S. 501 (1972) .................................................. 10

*United States v. Bryan*, 339 U.S. 323 (1950) ..................................................... 10

*United States v. Corrick*, 298 U.S. 435 (1936) .................................................... 9

*United States v. Johnson*, 383 U.S. 169 (1966) ................................................... 10

*United States v. Nixon*, 418 U.S. 683 (1974) ........................................ 3, 5, 10, 11, 13, 14

*United States v. North*, 910 F.2d 843 (D.C.Cir. 1990) ............................................. 21

*United States v. Rayburn House Office Building, Room 2113*, 497 F.3d 654 (D.C.Cir. 2007), *cert. denied* --- S.Ct. --- (2008) ...................................... 11

*Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002) .............................................. 6

*Watkins v. United States*, 345 U.S. 178 (1957) .......................................... 10, 18, 20

*Cases on which counsel chiefly relies.

**TABLE OF AUTHORITIES**
**(Cont.)**

**FEDERAL STATUTES**

2 U.S.C. § 190d(a) ............................................................................................21

**MISCELLANEOUS**

F.R.C.P. 81(a)(5) ................................................................................................6

Fisher, *The Politics of Executive Privilege* (2004) .........................................21

Jackson, *The Struggle for Judicial Supremacy* (Knopf, 1941) .........................5

Dorsen and Shattuck, *Executive Privilege, The Congress and the Courts,* 35 Ohio
   State L.J. 1 (1974) ........................................................................................21

Hamilton, *The Power to Probe: A Study of Congressional Investigations*
   (Random House 1975) .............................................................................19, 21

*Note, Landrum-Griffin and the Trusteeship Imbroglio,* 71 Yale L.J. 1460, 1473
   (1962) ............................................................................................................18

Hamilton, Muse and Amer, *Congressional Investigations, Politics and Process,*
   44 Am. Crim. L. Rev. 1115 (2007) ..............................................................15

United States Senate, *Hearings before the Subcommittee on Intergovernmental
   Relations et al.,* "Executive Privilege, Secrecy in Government, Freedom of
   Information," 93rd Cong. 1st Sess. (April 10, 1973), Vol. I .........................3

*Cases on which counsel chiefly relies.

## TABLE OF CONTENTS

Page

INTEREST OF THE AMICI...................................................................................1

INTRODUCTION AND SUMMARY....................................................................2

ARGUMENT...........................................................................................................6

    I.     ENFORCEMENT OF SUBPOENAS IS A TRADITIONAL JUDICIAL
          FUNCTION, WELL WITHIN THE ARTICLE III JURISDICTION OF
          THE  FEDERAL COURTS....................................................................6

    II.    WHEN DECIDING CASES WITHIN THEIR ARTICLE III
          JURISDICTION, FEDERAL COURTS HAVE THE AUTHORITY AND
          OBLIGATION TO DECIDE ALL RELEVANT LEGAL ISSUES,
          INCLUDING ISSUES RELATING TO CONFLICTS BETWEEN THE
          EXECUTIVE AND LEGISLATIVE BRANCHES ...............................8

    III.   PRESIDENTIAL ADVISERS DO NOT HAVE AN ABSOLUTE
          PRIVILEGE  AGAINST COMPELLED TESTIMONY OR DOCUMENT
          PRODUCTION. ....................................................................................13

CONCLUSION .....................................................................................................22

i

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, ) ) ) ) | |
| Plaintiff, ) | Case No. 1:08-cv-00409 (JDB) |
| v. ) | |
| HARRIET MIERS, et al., ) | |
| Defendants. ) | |

**BRIEF OF SENATORS DANIEL K. INOUYE AND SHELDON WHITEHOUSE, FORMER SENATOR WILLIAM S. COHEN AND FORMER REPRESENTATIVES MICKEY EDWARDS AND THOMAS B. EVANS, JR. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## INTEREST OF THE AMICI

The amici are current or former Members of Congress. Two were involved significantly in Congress' investigation of the Watergate scandal. Daniel K. Inouye, a Democrat, is United States Senator from Hawaii. He was a member of the Senate Select Committee on Presidential Campaign Activities, which was established in February, 1973 to investigate the Watergate scandal. William S. Cohen, a Republican, is a former Senator from Maine and Secretary of Defense. In 1974, he was a Member of the House Judiciary Committee, which reported articles of impeachment against President Nixon. Sheldon Whitehouse, a Democrat, is Senator from Rhode island and currently a member of the Senate Judiciary Committee, which also is investigating the forced resignation of several U.S. attorneys in late 2006. Mickey Edwards, a

Republican, was a Representative from Oklahoma, who served from 1977 to 1993 and was

Chairman of the House Republican Policy Committee. Mr. Edwards was a founding Trustee of

the Heritage Foundation and a national chairman of the American Conservative Union, and he is

the author of a recent book, "Reclaiming Conservatism," which addresses among other things the

need for checks and balances to preserve separation of powers and the necessity of effective

Congressional oversight of the excessive use of Presidential authority. Thomas B. Evans, Jr., a

Republican, was a Representative from Delaware, who served from 1977 to 1983. He also

served as co-chair and chief operating officer of the Republican National Committee from 1971

until 1973, during the Watergate era.

Amici recognize the great public importance of the effective exercise of Congressional

oversight regarding the operations of the Executive Branch, in order to protect against

maladministration, abuse of power and failure to enforce laws fairly and impartially. They

believe strongly that Congressional authority could be frustrated unless Presidential claims of

executive privilege are subject to meaningful judicial review. In particular, they oppose the

absolutist view of executive privilege advanced by defendants in this case.

## INTRODUCTION AND SUMMARY

At issue here is whether the Congress effectively can investigate credible allegations that

the Executive Branch has interfered with law enforcement for partisan gain. Here, as during the

Watergate scandal, the Executive Branch, claiming a absolute executive privilege, has thrown up

a roadblock.

In April, 1973, as the Watergate scandal was developing, then-Attorney General Richard

Kleindienst appeared before a joint session of three subcommittees of the Senate Government

- 2 -

Operations and Judiciary Committees to present the Nixon Administration's views on executive privilege. His testimony put forth an absolutist view of executive privilege soon to be rejected by decisions of this Court, the D.C. Circuit, and, most notably, the Supreme Court. *United States v. Nixon,* 418 U.S. 683, 697 (1974); *Nixon v. Sirica,* 487 F.2d 700, 708 (D.C. Cir. 1973) (en banc); *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 370 F. Supp. 521, 522 (D.D.C.), *aff'd on other grounds,* 498 F.2d 725 (D.C. Cir. 1974).

Mr. Kleindienst took the position that "[t]he doctrine of executive privilege denotes the constitutional authority of the President in his discretion to withhold certain documents or information in his possession or in the possession of the executive branch from compulsory process of the legislative or judicial branch of the Government, if he believes disclosure would impair the proper exercise of his constitutional functions."[1] This meant, he explained, that "if the President directs anybody who has a document or information or directs anyone not to appear, that person would have the power not to comply with the congressional request."[2] He added that the "President has implied power under the Constitution to deny to the Congress the testimony of any person working for the executive branch of the Government or any document in the possession of anybody working for the Government."[3]

Defendants in this case have adopted Mr. Kleindienst's position concerning the testimony of Presidential advisers and documents in custody of the White House. In that context, defendants adhere to the absolutist position taken by President Nixon, maintaining that if the President asserts a privilege and directs his advisers not to appear or produce documents in response to a subpoena, that is the end of the matter. That position is contrary to Watergate era

---

[1] United States Senate, *Hearings before the Subcommittee on Intergovernmental Relations et al.,* "Executive Privilege, Secrecy in Government, Freedom of Information," 93d Cong. 1st Sess. (April 10, 1973), Vol. I, p. 20.

[2] *Id.* at 51.

[3] *Id.*

- 3 -

judicial decisions, binding on this President and this Court, that also involved materials in White House custody and Presidential advisers, and yet held that the President must respond to a subpoena issued by another Branch of government, so that the courts, rather than the President, will have the final say on whether a Presidential assertion of privilege should prevail. As the D.C. Circuit observed, "[i]f the claim of absolute privilege was recognized, its mere invocation by the President or his surrogates could deny access to all documents in all the Executive departments to all citizens and their representatives, including Congress. . . . Support for this kind of mischief simply cannot be spun from incantation of the doctrine of separation of powers." *Nixon v. Sirica*, 487 F.2d 700, 715 (D.C. Cir. 1973).

Perhaps recognizing the weakness of their case on the merits, defendants present a panoply of jurisdictional defenses, the effect of which would deprive the courts of ability to rule on inter-branch conflicts concerning access to information. Defendants argue that ruling on inter-branch conflicts is beyond the traditional role of Article III federal courts, and that the Committee's injury is not of the type that traditionally is redressable by the courts. But all the Court is being asked to do in this case is to enforce two subpoenas. Enforcement of subpoenas is a traditional judicial function, unquestionably within the jurisdiction of the federal judiciary under Article III. And the injury suffered by the subpoena-issuing authority, when it fails to obtain the information sought, traditionally is redressable in subpoena enforcement actions.

Because this case is within its jurisdiction, the Court has the authority and duty to rule on the legal issues presented, including the claim of executive privilege. Even with respect to a Presidential claim of privilege, "[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *United States v. Nixon,* 418 U.S. at 703, quoting *Marbury v. Madison,* 1 Cranch 137, 177 (1803). As Justice Jackson once observed, "[s]ome arbitrer is

- 4 -

almost indispensable when power . . . is . . . balanced between different branches, as the legislature and the executive . . . . Each unit cannot be left to judge the limits of its own power." Jackson, *The Struggle for Judicial Supremacy* (Knopf, 1941), p. 9.

On the merits, there is no foundation for defendants' argument that there is an absolute privilege protecting Presidential advisers and White House documents from a Congressional subpoena. *United States v. Nixon* establishes that, absent the need to protect military, diplomatic or national security secrets (where the President's claim of privilege is entitled to the "utmost deference"), the President's privilege as to Presidential communications is "presumptive" only, nor absolute. Upon a sufficient showing of need, Presidential documents and testimony of Presidential advisers may be required.

There has been a sufficient showing of need here. The possible exertion of political influence on federal criminal investigations is a matter of serious public concern and an entirely appropriate subject for Congressional investigation. The evidence adduced to date from non-White House sources demonstrates that there was some White House involvement in the forced resignation of several U.S. Attorneys, which may have been motivated by the perceived political consequences of decisions taken in federal criminal investigations. But the evidence leaves unanswered who was the source of the initial recommendations for some of these resignations. The Committee demonstrated a significant need to pursue its investigation further, sufficient to require the Administration to respond to the subpoenas so that its claims of executive privilege can be evaluated in the context of specific documents or specific questions.

- 5 -

## ARGUMENT

I.   **ENFORCEMENT OF SUBPOENAS IS A TRADITIONAL JUDICIAL FUNCTION, WELL WITHIN THE ARTICLE III JURISDICTION OF THE FEDERAL COURTS.**

In this suit the House Committee on the Judiciary seeks enforcement of subpoenas it issued to the defendants. Defendants argue that the case is beyond this Court's Article III jurisdiction. But enforcement of subpoenas issued by the Executive Branch is a routine activity of the federal judiciary and indisputably within its Article III jurisdiction. See F.R.C.P. 81(a)(5) (Federal Rules apply to proceedings to enforce subpoenas issued by United States officer or agency). Subpoena enforcement meets the tests for Article III jurisdiction, because the issuing agency suffers a "legally and judicially cognizable" injury from non-compliance, and disputes over subpoena enforcement have been "traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 819 (1997).

Enforcement of subpoenas issued by the Legislative Branch stands on the same footing with respect to the federal judiciary's Article III jurisdiction. Just as the power to issue subpoenas is a necessary part of the Executive Branch's authority to execute federal laws, so also "the power of inquiry -- with process to enforce it -- is an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty,* 273 U.S. 135, 174 (1927). *See also Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 505 (1975) ("issuance of a subpoena pursuant to an authorized investigation is . . . an indispensable ingredient of lawmaking.").

Relying on *Walker v. Cheney,* 230 F. Supp. 2d 51 (D.D.C. 2002), defendants argue that the Committee's "informational injury" from non-compliance with the subpoenas is not sufficient to create Article III standing. Def. Brief at 28-31. But in *Walker* "neither a House of Congress nor any congressional committee ha[d] issued a subpoena for the disputed information

- 6 -

or authorized this suit. . . ." *Id.,* 230 F. Supp. 2d at 53. Where, as here, an authorized committee issues a subpoena and the House ordains a suit to enforce it, the federal court has no less jurisdiction than it does to enforce a duly authorized subpoena issued by the Executive Branch.

Defendants also rely on *Raines v. Byrd*, 521 U.S. 811 (1997), which held that individual Members of Congress lacked standing to challenge the Line Item Veto Act. But the claim of standing there was "based on a loss of political power" by the individual Members who brought suit. *Id.,*. at 821. By contrast, the Committee's standing here rests on its claim that defendants have failed to comply with subpoenas the Committee issued -- which is precisely the injury on which the standing of *any* governmental body rests when it seeks judicial enforcement of a subpoena it issued. In *Raines,* the plaintiffs were seeking to involve the court in "some amorphous general supervision of the operations of government," which is not an appropriate role for the judiciary. *Id.*, at 829. Here, by contrast, all plaintiffs seek is enforcement of subpoenas -- which is well within the traditional role of the judiciary.[4]

The fact that the subpoenas were issued by a Congressional Committee and seek testimony and documents from the Executive Branch does not deprive the Court of Article III jurisdiction. In *United States v. American Tel. & Tel. Co.,* 567 F.2d 121 (D.C. Cir. 1977), the Executive Branch sued AT&T to enjoin it from complying with a Congressional subpoena seeking records of government-requested wiretaps. The Chairman of the Subcommittee that issued the subpoena "intervened on behalf of the House, as the real party in interest." *Id.,* at 123. In essence, therefore, AT&T was a mere stakeholder, and the disputing parties were the

---

[4]     The same analysis applies to *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), *cert. denied*, 529 U.S. 1012 (2000), on which defendants also rely. *Chenoweth* was a suit by individual Members of Congress challenging a program the President initiated by an Executive Order, which plaintiffs argued was in violation of various statutes. As in *Raines v. Byrd*, the plaintiffs alleged that the President's illegal action deprived them of their right to debate and vote on the issues presented by the allegedly unauthorized program. As in *Raines,* this was viewed as a political injury, quite unlike the injury suffered by a governmental body when the subject of a subpoena it issued fails to comply.

- 7 -

Executive Branch and the House. Nevertheless, the Court of Appeals concluded that "[t]he simple fact of a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution." *Id.,* at 126. Similarly here, the Court has jurisdiction to consider the issues presented in a contest over subpoena enforcement, even though these issues involve "a conflict between the legislative and executive branches." *Id.*

## II.    WHEN DECIDING CASES WITHIN THEIR ARTICLE III JURISDICTION, FEDERAL COURTS HAVE THE AUTHORITY AND OBLIGATION TO DECIDE ALL RELEVANT LEGAL ISSUES, INCLUDING ISSUES RELATING TO CONFLICTS BETWEEN THE EXECUTIVE AND LEGISLATIVE BRANCHES.

Defendants argue that a Congressional subpoena issued against Executive Branch officials cannot be judicially enforced, because it involves "inter-branch disputes concerning Congress' right to information held by the Executive Branch at the highest level" -- disputes that "have historically been resolved through political accommodation and without judicial involvement." Def. Brief 22. That argument fails because the federal judiciary, in cases otherwise within its Article III authority, has the authority and duty to declare what the relevant law is as to Executive Branch/Congressional conflicts. Indeed, throughout our history, the federal judiciary -- recognizing "the province and duty of the judicial department to say what the law is"[5] -- has exercised its authority in cases properly before it under Article III to resolve issues of law involving inter-branch disputes.

Defendants' argument is squarely contrary to *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 370 F. Supp. 521, 522 (D.D.C. 1974), *aff'd on other grounds* 498 F.2d 725 (D.C. Cir. 1974), where Judge Gesell held that the issues presented in a suit to enforce

---

[5]    *Marbury v. Madison,* 1 Cranch 137 (1803), quoted in *United States v. Nixon,* 418 U.S. 683, 703 (1974).

- 8 -

a Congressional subpoena against the President were justiciable. And while the Court of

Appeals did not discuss the justiciability issue, it reached the merits of the case.

"[I]f the record discloses that the lower court was without jurisdiction this court will

notice the defect, although the parties make no contention concerning it." *United States v.*

*Corrick*, 298 U.S. 435, 440 (1936), quoted in *Steel Co. v. Citizens for a Better Environment*, 523

U.S. 83, 95 (1998). Because the Court of Appeals in *Senate Select Committee* had the authority

and obligation to consider its Article III jurisdiction *sua sponte,* the fact that it reached the merits

is a strong indication that it agreed with Judge Gesell that it had jurisdiction to do so. This

conclusion is supported by Judge Wilkey's separate opinion, where he expressed the view that

the case presented a "political question and therefore [was] notjusticiable" but nonetheless

deferred to the court's previous opinion in *Nixon v. Sirica. Senate Select Committee,* 498 F.2d at

734 (Wilkey, J. concurring). Clearly, the court in *Senate Select Committee* considered the issue

of justiciability and decided it was appropriate to reach the merits.

As Judge Gesell pointed out, the D.C. Circuit previously had rejected the argument that

the federal judiciary lacked jurisdiction to enforce a grand jury subpoena directed to the

President because of separation of powers issues. The D.C. Circuit had noted  that the federal

courts' "legal power to compel production of evidence within the possession of the Executive

surely stands on firm footing." *Nixon v. Sirica*, 487 F.2d at 709. And while "the President's

special interests may warrant a careful judicial screening of subpoenas after the President

interposes an objection, . . . some subpoenas will nevertheless be properly sustained by judicial

orders of compliance." *Id.*, at 710.

Shortly thereafter, the Supreme Court concluded that the issues presented by the

President's assertion of privilege against a grand jury subpoena presented "issues [that] are 'of a

- 9 -

type which are traditionally justiciable.'" *United States v. Nixon,* 418 U.S. 683, 697

(1974)(citations omitted).  The Supreme Court emphasized that, in the course of exercising its

authority to enforce the subpoena, the district court was bound by the principle of *Marbury v.*

*Madison* that "[i]t is emphatically the province and duty of the judicial department to say what

the law is.'" *United States v. Nixon,* 418 U.S. at 703, quoting *Marbury v. Madison*, 1 Cranch

137, 177 (1803).  In *Senate Select Committee,* Judge Gesell correctly observed that the reasoning

of *Nixon v. Sirica,* later followed by the Supreme Court in *United States v. Nixon,* "is equally

applicable to the subpoena of a congressional committee."  370 F. Supp. at 522.  That is fully

consistent with Supreme Court case law, which stresses the importance of the citizen's

"unremitting obligation" to comply with legislative as well as judicial subpoenas.[6]

　　　Defendants argue that this case is non-justiciable because it requires the Court to address

legal issues involving the respective authorities of the Executive and Legislative Branches --

issues that, defendants contend, have "historically been resolved through political

accommodation and without judicial involvement."  Def. Brief at 22.  But it is simply not true

that the federal courts have refrained from deciding legal issues involving possible conflicting

authorities of the Executive and Legislative Branches, even where those conflicts involve the

right to information.  For example, as the Supreme Court pointed out in *United States v. Nixon,*

"[i]n a series of cases, the Court interpreted the explicit immunity conferred by express

provisions of the Constitution on Members of the House and Senate by the Speech or Debate

Clause."  418 U.S. at 703-4, citing *Doe v. McMillan*, 412 U.S. 306 (1973); *Gravel v. United*

*States*, 408 U.S. 606 (1972); *United States v. Brewster*, 408 U.S. 501 (1972); *United States v.*

*Johnson*, 383 U.S. 169 (1966).  Recently, the D.C. Circuit addressed the issue of whether the

---

[6]　　*Watkins v. United States*, 354 U.S. 178, 187 (1957); *see United States v. Bryan,* 339 U.S. 323, 331 (1950) ("public duty" to respond to subpoenas is a "necessary concession[] to the public interest in the orderly operation of *legislative and judicial* machinery.") (emphasis added).

- 10 -

Speech or Debate Clause protected a Congressman's office from a search by FBI agents -- a

clear example of an "informational" dispute between the two Branches. *United States v.*

*Rayburn House Office Bldg., Room 2113,* 497 F.3d 654 (D.C.Cir. 2007), *cert. denied* --- S.Ct. ---

(2008). As the Supreme Court observed in *United States v. Nixon,* the Speech or Debate Clause

is an "express provision" of the Constitution creating an "explicit immunity" for Members of the

House and Senate. *Id.,* 418 U.S. at 704. "[I]t must follow that the Court has authority to

interpret claims [such as the President's claim of privilege in *United States v. Nixon*] with respect

to powers alleged to derive from enumerated powers." *Id.*[7]

The Supreme Court has decided several other issues involving potentially conflicting

constitutional powers of the Legislative and Executive Branches, where such issues were

properly raised in cases otherwise within the federal judiciary's Article III jurisdiction. For

example, the Supreme Court decided  whether the President's exercise of a line-item veto is

invalid because it does not observe the requirements of the Presentment Clause;[8] whether

legislation may validly authorize one House of Congress to veto action taken by the Executive

Branch;[9] whether legislation creating a review board, composed of Members of Congress, to

supervise a local airport authority violates separation of powers by vesting executive authority in

an agent of Congress;[10] whether legislation vesting in Congressional leaders authority to appoint

members of the Federal Election Commission violates the Appointments Clause's provision

vesting authority in the President to appoint officers of the United States;[11] and whether

---

[7]        *See also Soucie v. David,* 448 F.2d 1067, 1071 n. 11 (D.C. Cir. 1971) ("If the Government asserts
a constitutional privilege on remand, the court will not thereby be deprived of jurisdiction, for the judicial power
extends to resolving the questions of separation of powers raised by the constitutional claim.")

[8]        *Clinton v. City of New York,* 524 U.S. 417 (1998).

[9]        *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919 (1983).

[10]        *Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise,* 501 U.S.
252 (1991).

[11]        *Buckley v. Valeo,* 424 U.S. 1 (1976).

- 11 -

legislation vesting budget authority in the Comptroller General is an unconstitutional intrusion by Congress into the executive function.[12]

In all those cases, the Supreme Court did not hesitate to decide the constitutional issues presented once it was convinced that it had jurisdiction under Article III, even though these issues involved whether the Executive or Legislative Branch had impermissibly intruded on the other Branch's authority. In the present case as well, the Court has before it an action that is well within its Article III jurisdiction.. In such a case, the Court has the authority and duty to decide the constitutional issues presented, even though they involve the contention that the Legislative Branch is intruding on the Executive Branch's authority.

Ignoring this history and precedent, defendants contend that the proper and traditional way to resolve interbranch disputes is by negotiation and compromise. But negotiation is far more likely to be successful if the courts have established baseline rules and the parties understand that failure to reach a compromise may result in a judicially-imposed solution. As Judge Leventhal pointed out, "[w]here "the dispute consists of a clash of authority between two branches . . ., judicial abstention does not lead to orderly resolution of the dispute." *United States v. American Tel. & Tel. Co.*, 567 F.2d 121, 126 (D.C. Cir. 1977). Instead, "[i]f negotiation fails as in a case where one party, because of chance circumstance, has no need to compromise a stalemate will result, with the possibility of detrimental effect on the smooth functioning of government." *Id.* That is exactly the result here -- because the Administration feels "no need to compromise," there is a stalemate and a legitimate Congressional investigation has been stymied.

---

[12]     *Bowsher v. Synar*, 478 U.S. 714 (1986).

A/72534357.4

### III.   PRESIDENTIAL ADVISERS DO NOT HAVE AN ABSOLUTE PRIVILEGE AGAINST COMPELLED TESTIMONY OR DOCUMENT PRODUCTION.

Defendants assert that the President's senior advisers are absolutely immune from compelled Congressional testimony. They also contend that they have the absolute right to claim privilege in response to a subpoena for White House documents, without even producing a log of the withheld documents so that the claimed privilege may be evaluated.

But the Watergate-related litigation put to final rest the claim that the President himself -- let alone his advisers -- has an absolute privilege. Instead, the privilege for Presidential communications is qualified. And when a Congressional Committee shows a sufficient need for documents or testimony, Presidential advisers must comply with Congressional subpoenas by producing logs describing the documents as to which privilege is claimed, or by appearing personally to give testimony, so that any claims of privilege may be evaluated by the Committee (and by the courts, if necessary) in the context of specific questions or specific documents.

1.    In *United States v. Nixon*, 418 U.S. 683, 703-16 (1974), the Supreme Court decisively rejected the President's claim of absolute privilege, even though the claim was made with respect to conversations in the Oval Office with the President himself. Instead, the Court held that, "[a]bsent a claim of need to protect military, diplomatic, or sensitive national security secrets," the President's privilege is only "presumptive," and, upon a showing of need, materials responsive to a subpoena must be made available to the court so that it may evaluate any claim of Presidential privilege. *Id.*, at 706.

*United States v. Nixon* involved a request for tapes and documents rather than testimony. Defendants argue that the President is absolutely immune from testimonial compulsion by Congress, and the same principles must also apply to senior Presidential advisers. Def. Brief 47.

- 13 -

However, whatever the rule may be with respect to compelled Presidential testimony,[13] the

courts have drawn a distinction between the President and Presidential advisers with respect to

immunity. Thus the Supreme Court has held that, while Presidents are absolutely immune from

civil damage suits for official actions, Presidential aides have only qualified immunity. *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 809 (1982); *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Under

the balancing test that *United States* v. *Nixon* requires for the President's presumptive privilege, a

Congressional subpoena seeking the personal appearance of the President likely would be subject

to a particularly stringent requirement of need, including a demonstration that the Committee's

legitimate need could be satisfied only by the personal appearance of the President rather than

Presidential advisers. The Court, however, does not have to reach that issue here, because the

Committee is not seeking the personal appearance of the President.

     *United States v. Nixon* involved judicial proceedings. But *Senate Select Committee v.*

*Nixon*, 498 F.2d 725 (D.C. Cir. 1974), establishes that the same principle applies when an

authorized Congressional Committee seeks documents or testimony. That case involved an

attempt by a Senate Committee to subpoena tape recordings of five conversations between the

President and his Counsel. To decide the case, the D.C. Circuit adopted "[t]he staged decisional

structure established in *Nixon v. Sirica* [487 F.2d 700 (D.C. Cir. 1973) (en banc)]" -- and later

confirmed by *United States v. Nixon* -- reagrding a grand jury subpoena seeking documents and

other materials as to which the President claims privilege. *Senate Select Committee*, 498 F.2d at

730-31. Under that structure, if the Committee makes a sufficient showing of need, the President

has an "obligation to submit subpoenaed materials to the Court, together with particularized

claims that the Court will weigh against whatever public interests disclosure might serve." *Id.*, at

---

[13]     *See Clinton v. Jones*, 520 U.S. 681, 704 (1997) ("Sitting Presidents have responded to court orders
to provide testimony and other information with sufficient frequency that such interactions between the Judicial and
Executive Branches can scarcely be thought a novelty.")

731. As the D.C. Circuit made clear in *Nixon v. Sirica*, such a submission must include a log as to materials for which privilege is claimed -- i.e., an "analysis [which] should contain descriptions specific enough to identify the basis of the particular claim or claims." *Nixon v. Sirica*, 487 F.2d at 721.

Ignoring *Senate Select Committee*, defendants argue that the Legislative Branch does not have the same right as the Judicial Branch to seek documents or testimony from Presidential advisers. They seek to justify this position in part by claiming that a Congressional Committee has a greater ability to harass a witness than would be possible in a criminal or civil federal court proceeding Def. Brief 54-55. That statement overlooks, *e.g.,* the rigors of grand jury proceedings and also the various protections available to witnesses appearing before Congress.[14] For example, a Presidential adviser could invoke executive privilege in response to specific document requests or specific questions from the Committee. And because (as here) the Executive Branch likely would not prosecute an Executive Branch official cited for contempt of Congress, the matter would be resolved through civil litigation if negotiation fails, just as a controversy as to a subpoena issued during civil litigation would be resolved.[15]

Defendants rely on *Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367 (2004), where the Vice President and his advisers claimed immunity from discovery in a civil case. Def. Brief p. 71. But *Cheney* held only that, in considering the claimed immunity, the lower courts did not have to wait for assertion of executive privilege with respect to specific documents as a "necessary precondition to the Government's separation-of-powers objections."

---

[14]    *See generally* Hamilton, Muse and Amer, *Congressional Investigations: Politics and Process,* 44 Am. Crim. L. Rev. 1115, 1137-50 (2007).
[15]    Defendants also argue that the President is absolutely immune from testimonial compulsion, citing *United States v. Nixon* and *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). However, as previously noted, under *United States v. Nixon* a President's privilege is only "presumptive." 418 U.S. at 706. And the absolute privilege recognized by *Nixon v. Fitzgerald* extends only to "damages liability." 457 U.S. at 749. Moreover, different rules apply to the President's aides. *Harlow v. Fitzgerald,* 457 U.S. at 749.

542 U.S. at 391.  Instead, "the courts should be mindful of the burdens imposed on the Executive

Branch in any future proceedings." *Id.*  But being "mindful" of the burdens imposed on the

Executive Branch describes the obligation of a court in connection with a qualified, not an

absolute, privilege.  The Committee in this case already has addressed separation-of-powers

concerns -- which require the Committee to show that the subpoenaed materials are "critical to

the performance of its legislative functions"[16] -- by its initial showing that the subpoenaed

materials are needed for its legitimate inquiry into the true causes of the forced U.S. Attorney

resignations.

    Defendants also cite *Ass'n of Am. Physicians and Surgeons v. Clinton*, 997 F.2d 898

(D.C.Cir. 1993), which construed the Federal Advisory Committee Act ("FACA") not to apply

to deliberations of the President's Task Force on Health Care Reform, concluding that its

application would raise constitutional issues.  However,  the decision explained that, if the

FACA were to apply to the Task Force, determination of its constitutionality as so applied would

have required the court to "*balance* how much the interference with the President's executive

power prevents the President 'from accomplishing his constitutionally assigned functions' . . .

against the 'overriding need to promote objectives within the constitutional authority of

Congress.'"  *Id.* at 910, quoting *Morrison v. Olsen,* 487 U.S. 654, 695 (1988), and *Nixon v.

Adm'r of Gen. Servs.,* 433 U.S. 425, 443 (1977) (emphasis added).  The court's assumption that

such a balancing test would apply to legislative interference with Presidential deliberations

confirms that the court views these deliberations as protected by a qualified rather than an

absolute privilege.  Had an absolute privilege applied, the court would have viewed *any*

application of FACA to the Health Care Task Force as constitutionally proscribed, regardless of

"balancing.".

---

[16]    *Senate Select Committee v. Nixon,* 498 F.2d 725, 732 (D.C. Cir. 1974).

Finally, defendants cite cases holding that the Freedom of Information Act does not apply to certain components of the Executive Office of the President, with the result that Presidential advisers are relieved of the need to respond to FOIA requests and never reach the stage of making privilege claims for particular documents. Def. Brief at 55, citing *Armstrong v. Executive Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) and *Ryan v. Dep't of Justice*, 617 F.2d 781 (D.C.Cir. 1980). But, under the FOIA *any member of the public* may request documents and the requester does not have to show a need for the document. Application of the FOIA to records of Presidential advisers thus would raise a far greater potential for harassment than Congressional subpoenas, where a Committee vote is required and the Committee must make an initial showing of need to obtain privileged documents. *Senate Select Committee v. Nixon,* 498 F.2d 725, 730-31 (D.C. Cir. 1974)

      2.      The Committee has made an ample showing of need to obtain the subpoenaed documents and testimony. As the Committee's brief explains (at pp. 7-11), nine U.S. Attorneys were asked to resign; some of them had been contacted by politicians concerning possible prosecutions that might affect congressional or gubernatorial elections; documents and testimony from Department of Justice officials indicated that they had been in communication with the White House concerning whether certain U.S. Attorneys should be asked to resign and that they had regularly consulted with Ms. Miers on this subject. Defendants argue that the Committee received ample testimony and documents from the Department of Justice, which should have been sufficient. Def. Brief at pp. 12-13. But defendants do not dispute the Committee's assertion that "the testimony of more than fifteen senior Department officials revealed that *none* of them could identify who at the Department had recommended the termination of many of those U.S. attorneys on the list." Committee Brief at p. 10.

- 17 -

The possible attempt of Presidential aides to exert political influence over the decisions of United States Attorneys with respect to criminal prosecutions is a legitimate matter of Congressional concern. Chief Justice Warren's description in 1957 of the "broad" scope of Congressional power to conduct investigations remains valid today:

> It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste.

*Watkins v. United States*, 354 U.S. 178, 187 (1957). Congressional power to investigate "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United* States, 360 U.S. 109, 111 (1959). It is clearly a matter of legitimate interest to the Congress if "the administration of existing laws" involves U.S. Attorneys being threatened with loss of their jobs for making decisions concerning criminal investigations that are politically "wrong." Congress legitimately could view such a situation as a "defect" in our system of criminal justice and as a form of possible "corruption."

Defendants argue that the Committee does not have a sufficient need to find out whether the firing of U.S. Attorneys was politically motivated, because "Congress's 'legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events.'" Def. Brief at 2, 61, quoting *Senate Select Committee on Presidential Campaign Activities v. Nixon,* 498 F.2d 725, 732 (D.C. Cir. 1974). However, "it does not lie with this Court to say when a congressional committee should be deemed to have acquired sufficient information for its legislative purposes." *Hutcheson v. United States*, 369 U.S. 599, 618-9 (1962), Moreover, there are occasions in which the occurrence of specific events may be an important factual predicate of

- 18 -

legislation. For example, the Labor-Management Reporting and Disclosure Act of 1959 was enacted largely in response to findings of a Senate Committee based on testimony concerning abuses by union officers in the uses of union funds. *Hutcheson v. United States*, 369 U.S. at 616.[17] There are numerous other examples of Congressional investigations of alleged criminal activity, including the Senate investigation of John Brown's raid on Harper's Ferry; the investigations of the Credit Mobilier scandal in the 1870's and the Teapot Dome scandal of the 1920's; the inquiry of the Special Committee to Investigate Organized Crime in Interstate Commerce chaired by Senator Estes Kefauver; and a Senate Committee investigation in the 1960's into the activities of the Ku Klux Klan. *See* Hamilton, *The Power to Probe: A Study of Congressional Investigations* (Random House 1975) Chap. IV ("Investigating Criminal Conduct: The Doctrine of Legislative Purpose").[18]

In this case as well, the facts developed could be important for legislative purposes. Defendants suggest that the removal of Executive Branch employees is constitutionally committed to the President's exclusive authority. Def. Brief 58-59, citing *Myers v. United States*, 272 U.S. 52, 122 (1926). But the Committee has stated that there are several subjects of legislation that may be considered as a result of its investigation, several of which would not affect the President's appointment authority. Complaint ¶ 27.[19] And to the extent that any legislation affected the appointment authority, the factual predicate for the legislation could be

---

[17] "The LMRDA's trusteeship provisions . . . [were] a response to the findings of the Senate Select Committee on Improper Activities in the Labor or Management Field . . . which 'exposed the details of the sad state of democracy in large sections of the labor movement and provided numerous examples of abuses of the trusteeship power.'" *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 357 n. 8 (1989), quoting Note, Landrum-Griffin and the Trusteeship Imbroglio, 71 Yale L.J. 1460, 1473 (1962).

[18] The Supreme Court sustained the authority of Congress to investigate alleged criminal activity connected to the Teapot Dome scandal in *McGrain v. Daugherty*, 273 U.S, 135 (1927).

[19] For example, the Complaint alleges that the Committee may consider legislation "to address issues that arise when elected or appointed political officials lobby Executive Branch officials for action on particular criminal investigations or for replacement of particular U.S. Attorneys" and may consider "whether existing laws adequately prevent prosecutorial powers from being used to serve improper political ends; [and] whether existing penalties for obstruction of justice should be strengthened." Complaint ¶ 27.

A/72534357.4

particularly important. In *Morrison v. Olsen*, 487 U.S. 654, 686-93 (1988), the Court sustained a

"good cause" restriction on removal of the Independent Counsel, after concluding that "the

congressional determination to limit the removal power of the Attorney General was essential, in

the view of Congress, to establish the necessary independence of the office." Similarly,

Congress is entitled to compile a complete factual record concerning the forced resignation of

the U.S. attorneys before determining whether legislative intervention is essential to preserve the

freedom of federal prosecutors from political influence.

Moreover, entirely apart from possible legislation, Congress has an important "informing

function," pursuant to which it may legitimately conduct investigations:

> [There is a] power of the Congress to inquire into and publicize
> corruption, maladministration or inefficiency in agencies of the
> Government. That was the only kind of activity described by
> Woodrow Wilson in Congressional Government when he wrote:
> 'The informing function of Congress should be preferred even to
> its legislative function.' From the earliest times in its history, the
> Congress has assiduously performed an 'informing function' of
> this nature.

*Watkins v. United States*, 345 U.S. 178, 200 (1957) (citations omitted). Where public officials

may have been involved in improper or illegal conduct, "the investigative function of Congress

has its greatest utility: Congress is informing itself so that it may take appropriate legislative

action; it is informing the Executive so that existing laws may be enforced; and it is informing

the public so that democratic processes may be brought to bear to correct any disclosed executive

laxity." *Delaney v. United* States, 199 F.2d 107, 115 (1st Cir. 1952). Possible improper political

influence in criminal law enforcement is certainly a legitimate subject for the Congress'

"informing function." The Congressional Watergate and Iran-Contra investigations, which

involved criminal matters, are prominent examples of Congress fulfilling its "informing

function." *United States v. North*, 910 F.2d 843 (D.C.Cir. 1990); *Senate Select Committee on Presidential Campaign Activities v. Nixon, supra.*.

Moreover, the Legislative Reorganization Act of 1946 directs "each standing committee of . . . the House of Representatives [to] review and study, on a continuing basis, the application, administration, and execution of those laws, or parts of laws, the subject matter of which is within the jurisdiction of that committee." 2 U.S.C. § 190d(a). Possible improprieties in the forced resignation of U.S. Attorneys fall well within the House Judiciary Committee's authority.[20]

In March, 1973, shortly after establishment of the Senate Select Committee on Presidential Campaign Activities, President Nixon took the position that he would not allow his Counsel, John Dean, to appear before the Committee on the ground that compelled testimony of Presidential staff would violate separation of powers. Fisher, *The Politics of Executive Privilege* (2004) at 59, citing Public Papers of the Presidents, 1973, at 160, 185. He later backed down and allowed White House aides to testify, including not only Mr. Dean but also Messrs. Ehrlichman, Haldeman and Butterfield (who disclosed the existence of the White House tapes). Fisher, *supra* at 60; Hamilton, *supra*, at 160. The information revealed by this testimony turned out to be of great public significance. The remarks of two commentators at the time of Watergate are as relevant now as they were then:

> [T]he denial of information to Congress must, finally, be regarded as a more serious threat to the balance of government than the denial of evidence to a prosecutor, because the Congress can neither legislate, nor investigate, nor impeach, if it lacks information to determine when to exercise these political powers, which ultimately are the only effective checks on a runaway Executive.

---

[20] *See also* House Rule X.2(b)(1),, which requires each standing committee to "review and study on a continuing basis --- (A) the application, administration, execution, and effectiveness of laws and programs addressing subjects within its jurisdiction; . . . " Rules of the House of Representatives, 110th Congress.

Dorsen and Shattuck, "Executive Privilege, The Congress and the Courts," 35 Ohio State L.J. 1, 8 (1974).

## CONCLUSION

The Court should grant the House Judiciary Committee's Motion for Partial Summary Judgment.

Dated:  May 29, 2008

Respectfully submitted,

James Hamilton, D.C. Bar # 108928
Robert V. Zener,  D.C. Bar # 197699
BINGHAM MCCUTCHEN, LLP
2020 K Street, N.W.
Washington, D.C. 20006
(202) 373-6001

Counsel for Amici Curiae

A/72534357.4