UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


COMMITTEE ON THE JUDICIARY    .
OF THE UNITED STATES          .
HOUSE OF REPRESENTATIVES,     .
                              .   CA No. 08-0409 (JDB)
        Plaintiff,            .
                              .
    v.                        .   Washington, D.C.
                              .   Monday, June 23, 2008
HARRIET MIERS,                .   10:00 a.m.
JOSHUA BOLTEN,                .
                              .
        Defendants.           .
                              .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          IRVIN B. NATHAN, ESQ.
                            Office of General Counsel
                            219 Cannon House Office Building
                            Washington, D.C. 20515
                            202-225-9700


For the Defendants:         CARL NICHOLS, ESQ.
                            U.S. Department of Justice
                            20 Massachusetts Avenue, NW
                            Washington, D.C. 20530
                            202-514-2356


Court Reporter:             Bryan A. Wayne, RPR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 6714
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            202-354-3186


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

PDF created with pdfFactory Pro trial version www.pdffactory.com

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have Civil Action 08-409, Committee on the Judiciary of the House of Representatives versus Harriet Miers, et al.  We have Mr. Irvin Nathan representing the plaintiff, we have Mr. Carl Nichols representing the defendants.

MR. NICHOLS:  Good morning, Your Honor.

THE COURT:  All right.  Good morning.  We're here on two motions.  We've got a motion for partial summary judgment from the plaintiff and a motion to dismiss from the defendants, and I'm going to hear first from you, Mr. Nathan.  I've already indicated the approximate amount of time I expect to have this hearing take, but I'll have a few questions along the way.

MR. NATHAN:  I suspect you will.  Good morning, Your Honor.  May it please the Court, I'm honored to have been authorized by the United States House of Representatives to appear here for the House Judiciary Committee before you in the committee's lawsuit to compel former White House aide Harriet Miers and current White House Chief of Staff Joshua Bolten to comply with subpoenas issued to them by the committee.

With me at counsel table today is the chairman of the House Judiciary Committee, John Conyers, Jr., as well as counsel from that committee, Elliott Mincberg, and assistant counsel from the House General Counsel's Office, Richard Kaplan.

I appear here today in support of our motion for partial

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    summary judgment, and of course in opposition to the motion to

2    dismiss filed by the Department of Justice on behalf of the two

3    individual defendants.  Our motion for relief at this stage is

4    quite limited.

5         We seek only a declaration and an injunction that the

6    witnesses must comply with the subpoenas, Ms. Miers by appearing

7    at a hearing before the Judiciary Committee, answering questions

8    that do not call for privileged information, and invoking the

9    qualified executive privilege if appropriate and applicable to

10   specific questions.

11        THE COURT:  Give me some examples of questions you

12   think Ms. Miers would receive that would not be subject to a

13   colorable assertion of executive privilege.

14        MR. NATHAN:  I believe that an unsolicited --

15        THE COURT:  I don't mean questions to say "Who are

16   you," I mean substantive questions that get substantive answers.

17        MR. NATHAN:  I believe that questions that talk about

18   unsolicited calls from political operatives in states about the

19   activities of the U.S. Attorneys is not colorably privileged.

20        THE COURT:  You mean not colorably privileged because

21   balancing eventually would mean it's not privileged?  Or you

22   mean not even a colorable claim?

23        MR. NATHAN:  There's no colorable claim of an

24   unsolicited communication from a political operative that is a

25   state political committee figure in a state saying the U.S.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    Attorney out here is not prosecuting Democrats as quickly as we

2    would like, or on voter fraud claims, and those communications

3    go to Ms. Miers.  I believe that there is no possibility that

4    that is a privileged communication.  And I suggest to you,

5    Your Honor, that the White House counsel doesn't believe that

6    either.

7         THE COURT:  And that's because of the unsolicited

8    nature of it, or because if you look at In Re: Sealed case, for

9    example, even though that's specifically not addressing

10   congressional situations, but that case certainly indicates that

11   presidential advisors should be able to gather information

12   within the umbrella of the presidential communications

13   privilege.

14        MR. NATHAN:  That is, Your Honor, so long as it is for

15   preparation of advice to the President under In Re: Sealed case,

16   and that seems to me another legitimate question to ask here.

17   Just as in a case where you're dealing with the attorney-client

18   privilege and you have the attorney appear before you and he

19   says the information is privileged, you are allowed to ask, of

20   course, Well, who else was in the room when the communication

21   was made?  And obviously, if there were outsiders there, then

22   there's no privilege.

23        And if here the answers are, as has been stated by the

24   press officers of the White House, that the President had

25   nothing to do with this matter, wasn't involved in it, and the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   communications among the White House aides were not for the

2   purpose of communicating to the President, then under In Re:

3   Sealed case these would not be privileged either.

4        And those are exactly the kinds of questions that seem to

5   me are appropriate questions that are either not -- that don't

6   invade the privilege, or questions that relate to the facts

7   surrounding the claim of privilege so that in the first instance

8   the committee can make a judgment about it, and ultimately that

9   the Court, if we come to that, and if we come to the second

10  stage, the Court would have to decide, A, whether these are

11  privileged at all, and B, if they are privileged, whether the

12  privilege is outweighed by the needs of the committee.  But

13  we're not there yet, Your Honor.

14       THE COURT:  I understand.  You mentioned presidential

15  involvement.  What's your understanding of the record before me

16  with respect to that issue?

17       MR. NATHAN:  Well, I understand the record before

18  you -- and of course it's a little unclear because we're here on

19  a motion to dismiss where all the facts of the complaint must be

20  accepted as true and all the inferences from that on the motion

21  to dismiss must be accepted as true.  And with respect to that,

22  the complaint alleges that the President was not involved in any

23  way in this matter.

24       And the source of that allegation in the complaint, which

25  is what is in the record before you, is also in our moving

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    papers, and those are public statements made by the press office

2    of the White House that says the President had nothing to do

3    with this matter, wasn't involved.

4         Now, that is the state of the record, and that I think is

5    what this court must accept for purposes of these motions today.

6    Whether that's true, don't forget, Mr. Gonzales, the Attorney

7    General, told the public that he was not involved in these

8    matters either; he didn't attend any meetings or see any papers,

9    and that turned out not to be true.

10        For present purposes, for the purpose of these motions, I

11   think it's important to stress that the President has said, and

12   we accept this assertion, that he was not involved in this

13   matter in any way, and there is no evidence in this record that

14   the communications by the White House aides, including Ms. Miers

15   or Mr. Bolten -- we're not seeking Mr. Bolten's testimony, only

16   the documents.  There will be others -- there are subpoenas out

17   for Mr. Rove, for others -- that none of those communications

18   were either to the President, for the President, or for the

19   purpose of providing advice to the President.

20        And you've cited In Re: Sealed case, which I think is a

21   very significant case in this circuit on this point because that

22   case talks in several places about the balancing that would have

23   to be done in congressional matters as well.  It doesn't say

24   what that balance is as contrasted with a grand jury but notes

25   that this issue arises often in congressional matters, which it

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    does, and suggests that there needs to be a balancing.  It is

2    premature for us to get here today into what that balance will

3    be.

4             THE COURT:  Let's throw out this picture in terms of

5    materials.  Give me some examples of documents -- and I'm not

6    sure -- well, give me some examples of documents pursuant to the

7    subpoena to Mr. Bolten that would not be subject to colorable

8    claims of executive privilege, because as I understand it, the

9    then acting attorney general, former Solicitor General Clement,

10   in addition to OLC, reviewed all the materials and determined

11   that they were properly subject to an executive privilege claim.

12            MR. NATHAN:  To a claim of executive privilege, that's

13   correct.  You know, I think the proof is in the pudding here,

14   and I'm glad you're raising this point early.  The White House

15   has offered to produce documents that are now being withheld.

16        They've said we'll give you the documents that relate to

17   third- party communications, we'll give you the documents that

18   relate to communications between the White House aides and the

19   Department of Justice, between White House aides and Capitol

20   Hill, between White House aides and the political operatives in

21   the states dealing with this issue.  What we don't want to give

22   you at this stage, they say, are the internal communications of

23   the aides among themselves.

24        Now, it seems to me that, first of all, if you're willing

25   to give them -- they have not given them, and they're not

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   privileged; they're not claiming they're privileged.  They're

2   willing to give them over.

3          THE COURT:  Excuse me?  I thought they --

4          MR. NATHAN:  Well, they say --

5          THE COURT:  I thought the Clement letter did claim

6   they were privileged.

7          MR. NATHAN:  Well, they claim they're privileged, but

8   obviously you have to wonder if this is privileged if they're

9   willing to provide them.  And not only are they willing to

10  provide them --

11         THE COURT:  That may be a bit too great a leap.

12  I mean, you talk about a process here for negotiation/

13  accommodation, which I think everyone agrees is the preferred

14  process, the political branches working things out.

15     That process is going to involve some compromises, and the

16  fact that some compromise might be disclosing materials as to

17  which the executive branch believes there is a valid privilege

18  claim does not mean there's no privilege claim.

19         MR. NATHAN:  Your Honor, I agree with your point, but

20  I think you have to look at the facts in context here.  In

21  addition to those documents that you asked for, they have made

22  the offer from the beginning -- and this is the only offer

23  they've made -- that you can meet with Harriet Miers and you can

24  ask her, and Karl Rove, and you can ask her about these

25  communications with third parties, with the Hill, with the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   political operatives, and even with the Department of Justice.

2   You just can't write it down.  It can't be under oath, you can't

3   have a record, you can't have staff there, or you can't have

4   staff ask questions.  So basically you can't use it, really, but

5   we'll tell you.

6        Well, how privileged -- what kind of an assertion of

7   privilege is that when you're willing to provide it in a way

8   that can't be used, and of course the key issue is that you

9   can't have any follow-up.  You can't ask follow-up questions;

10   you can't have another session; you can't issue subpoenas; you

11   can't have a public testimony; you can't make a record of this

12   for use in a congressional matter.

13        I suggest to you, Your Honor, that that is not a good-faith

14   negotiation.  And when you couple it with, and what is the key

15   issue in this case, and the issue that is before you today is

16   this claim of absolute immunity, the ability of a private

17   citizen, a former White House aide, to defy a congressional

18   subpoena and say, I'm not showing up; I'm not answering any

19   questions; I'm not even giving you my name in answer to a

20   question; I'm not telling you what positions I held when I was

21   at the White House.

22        That claim is so out of the mainstream, the law.  It's not

23   only that there's no support for it, it's not only that there's

24   no case that supports it, it's not only that there's nothing in

25   the Constitution and nothing in the statute, it is contrary to

PDF created with pdfFactory Pro trial version www.pdffactory.com

1      35 years of precedents in the Supreme Court and in this circuit

2      and in this district court in a variety of contexts.

3           Not only --

4                THE COURT:  But not the context that we're dealing

5      with here, which is the congressional context, because I don't

6      think you have any case.

7                MR. NATHAN:  I do have a case.

8                THE COURT:  Just a second.  Let me finish first, okay?

9      Do you have a case -- I'll ask it that way -- where there's a

10     holding that a close presidential advisor does not have absolute

11     immunity from responding to congressional subpoenas?

12               MR. NATHAN:  Yes.

13               THE COURT:  What case?

14               MR. NATHAN:  The Select Committee case says -- the

15     Court of Appeals case says that the presidential privilege is a

16     qualified privilege and that it requires balancing between the

17     assertion of the privilege and the need of Congress for the

18     information.  And that holding in that Senate Select case covers

19     both testimony and documents -- obviously, that was for

20     documents, but there's no distinction that is drawn and no

21     distinction that's drawn for a presidential aide.

22          And there is no case, there is no case that suggests that a

23     presidential aide has immunity, or absolute immunity.  Even in

24     the cases where they deal with immunity from damage actions,

25     civil damage actions, the aides are treated differently from the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    President.

2         Now, they try to make a point that we're trying to subpoena

3    the President.  That is not the case.  There's no subpoena for

4    the President.  As I say, the President says through a spokesman

5    he's not involved in this matter and there's no reason to do

6    that.  This is a subpoena to a private citizen who was once a

7    White House counsel.

8         And I want to, if I can go on with my beginning, I want to

9    make clear certain facts that I think the Court should be aware

10   of.  The first fact that I think is important to put this in

11   context is what is involved in this pending investigation.  The

12   investigation relates to the possible politicization of the

13   federal criminal justice system.

14        The committee has credible allegations that the forced

15   resignations in mid-administration of many of these nine U.S.

16   Attorneys was the result of improper partisan political

17   considerations, specifically that they were forced to resign

18   because of their investigation and prosecution of political

19   allies of the President or the President's party, or because

20   they were not moving or moving fast enough to bring charges

21   against political opponents of the President or his party in

22   time to impact the 2006 elections.

23        As Your Honor is well aware, if these allegations are true,

24   nothing could be more devastating to the fair and impartial

25   administration of the criminal justice system and the faith and

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    confidence of our citizens in that system, and in turn, the

2    outcomes of the criminal trials that are held before you and

3    other federal courts in our country.

4        It is also undisputed, Your Honor, that the committee's

5    investigation is pursuant to lawful authority to legislate on

6    matters concerning the Department of Justice and the

7    administration of the criminal justice system.

8            THE COURT:  How closely should I look into the

9    legitimacy of the congressional purpose here?

10           MR. NATHAN:  Well, I think that you need to examine

11   that this is a legitimate inquiry.  If it was a, you know, a

12   matter dealing with the personal affairs of Harriet Miers or

13   someone else, that might be a question.  But once you see that

14   this is a --

15           THE COURT:  Congress does occasionally look into the

16   personal affairs of even the President, doesn't it?

17           MR. NATHAN:  Yes, but this is not that case,

18   Your Honor.  This is a case, and I think that all you have to do

19   for present purposes -- I view this -- basically, we have

20   bifurcated our complaint, and we are seeking at this stage an

21   order that they have to comply with the subpoenas, they don't

22   have any absolute immunity, they have to appear, answer

23   questions and assert the privilege, the executive privilege

24   where appropriate and provide a privilege log.  And, by the way,

25   provide the documents that are not even colorably privileged.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    For that purpose, for those purposes, this court only needs to

2    know that this was a legitimate investigation into an authorized

3    topic.

4         Once we have the privilege log and we have the questions

5    that the witness has asserted a privilege to -- and we're not

6    suggesting that by not appearing she's waived the privilege or

7    the President's waived the privilege -- then there will be a

8    weighing process.  It's possible, of course, at that point, once

9    we get this dispositive legal ruling on this I believe

10   completely unfounded and contrary-to-law assertion of absolute

11   immunity, then it's possible that the negotiations, the

12   compromise, the things that the Department of Justice speaks

13   about in its briefs, will prevail, and it's possible that that

14   would end the matter and end the Court's involvement.

15        THE COURT:  It may be optimistic to think that the

16   decision of a lowly district judge will be the dispositive

17   ruling.

18        MR. NATHAN:  I think a highly respected district judge

19   can make a lot of difference in this connection, Your Honor.

20        THE COURT:  I'm sorry for that line that I gave you a

21   chance to use.

22        (Laughter)

23        MR. NATHAN:  But I believe that it's possible that we

24   can resolve it.  If we can't resolve it after that, and I'm not

25   ruling out that there will be appeals on either side depending

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    on what the court's ruling is, that then we would come back to

2    the Court and then the weighing would take place.  And then I

3    think there would be more significance for the Court to

4    examine --

5              THE COURT:  And it's at that point that you would have

6    to show the demonstrably critical need for legitimate

7    legislative responsibilities?

8              MR. NATHAN:  Well, I don't know exactly what the test

9    is, but, yes, as to the need --

10             THE COURT:  Well, you relied on the Senate Select

11   Committee a moment ago.  That comes from the Senate Select

12   Committee as well, I think.

13             MR. NATHAN:  I understand.  That's in the Senate

14   Select Committee case.  And yes, there would be a balancing.

15   I'm not prepared today to talk about what the test is exactly,

16   but there has to be a balance between the needs of the

17   committee, which we would have to demonstrate for you at that

18   time, against the needs of confidentiality in the context of

19   what we're dealing with.

20        Are we dealing with -- which we don't know.  Are we dealing

21   with presidential communications as -- in the In Re: Sealed

22   case, which Your Honor has raised, the distinction is drawn

23   between presidential communications and deliberative

24   communications in the executive branch.

25        And we don't know what privilege is being asserted, and we

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    don't know what the basis for it is, and that would be

2    established once we have the witness and we have the privilege

3    log, and then, when we know what the privilege is that we're

4    dealing with and then --

5              THE COURT:  You mean what component of executive

6    privilege.

7              MR. NATHAN:  Yes, exactly.  What component of

8    executive privilege.

9              THE COURT:  It's certainly not the national security

10   component --

11             MR. NATHAN:  Exactly.

12             THE COURT:  But arguably there could be a difference

13   indeed among different categories of documents, between

14   presidential communications privilege and deliberative process.

15             MR. NATHAN:  Precisely.  And the balancing may be

16   different in the two examples, and that's what the In Re: Sealed

17   case suggests.  So that we need to know what component, I agree,

18   of the executive privilege we're dealing with, and then at the

19   appropriate time we will deal with the weighing.  But that's not

20   before you today.

21             THE COURT:  I know you have an order to your argument

22   and I don't want to disrupt it too much, but certainly the

23   arguments raised by the defendants in their motion to dismiss

24   interject this demonstrably critical test, if you'll accept that

25   for a moment, as they're looking at reasons why the Court should

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    not assume jurisdiction or should in its discretion not act

2    pursuant to the Declaratory Judgment Act.

3        So just humor me for a second and assume that they're right

4    and that those are relevant considerations.  Tell me how these

5    materials -- and you can use the three categories in the Clement

6    letter -- how these materials are demonstrably critical to

7    legitimate legislative responsibilities.

8            MR. NATHAN:  I will tell you that, Your Honor.  What I

9    think is an important consideration in this is the record is

10   undisputed that we have false and misleading testimony about

11   this matter from the Department of Justice.

12       And one of the falsehoods -- and these falsehoods are

13   established not only by documents that we have been presented

14   but also by admissions by former representatives of the

15   Department of Justice.  And where we had false testimony about

16   this matter, about where this originated, where the resignations

17   originated and what the reasons were for them, the reasons that

18   we have received are demonstrably false.

19       There is no question, for example, that in the case of

20   David Iglesias, the former U.S. Attorney in New Mexico, the

21   reason proffered before this committee was that he was an

22   absentee landlord of a U.S. Attorney.  No one at the Department

23   of Justice had any reason to believe that he was an absentee

24   landlord until after he was terminated and they were talking to

25   a candidate to be his successor, the first assistant, and they

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    asked him, Can you handle this job?  And he said, Sure, I handle

2    it all the time when David Iglesias is away.

3         Oh, he's away?  Where does he go?  They didn't follow it

4    up.  They said he was away, so they said that's our reason.

5    They got that information between the time they asked for his

6    resignation and the time they came to explain it.  Now, that

7    could not possibly be the reason that his resignation was

8    sought.

9         And we have interviewed -- the committee has interviewed

10   every person at the Department of Justice who was involved in

11   this matter.  No one can recall who recommended that David

12   Iglesias be terminated, be asked to resign.  They all said, I

13   didn't do it.  I didn't make that recommendation.

14        Well, if they didn't make that recommendation, then someone

15   did.  And the question is who did and why.  And you ask why this

16   is critical.  Your Honor, this is a subject for appropriate

17   legislation.  I want to remind the Court that the U.S. Attorneys

18   are inferior officers.  Their appointment and their removal is

19   subject to congressional control.  The Congress can draft

20   legislation --

21             THE COURT:  Senate control more than House control.

22             MR. NATHAN:  Well, it's the Congress.  I'm not talking

23   about the approval process for them, the confirmation, I'm

24   talking about the legislation that governs their appointment and

25   their removal.  There can be legislation on that topic.  And the

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1   question is, in considering what that legislation should be --
 2           THE COURT:  Indeed, there has been legislation that
 3   has arisen out of this very investigation.
 4           MR. NATHAN:  Exactly.  There already have been changes
 5   in the legislation based on this investigation, absolutely, and
 6   there could be more.  And in order to consider whether to
 7   legislate or not to legislate, not only to consider it but to
 8   convince fellow legislators that this is the right legislation
 9   to pass dealing with the issues that have arisen, and later on
10   to defend any resulting statute in a court case, there needs to
11   be a record, a factual record that will support the legislation,
12   convince people to support it -- and by the way, not only
13   convince them to support it, but in sufficient numbers to
14   override a possible presidential veto on the subject because it
15   deals with a power that's going to involve the President, and
16   they may not agree to this.  So that you need to --
17           THE COURT:  Whoever the President is.
18           MR. NATHAN:  I'm sorry?
19           THE COURT:  Whoever the President is.
20           MR. NATHAN:  Whoever the President is, right.  And so
21   the question is -- and this is a quintessentially legislative
22   judgment -- that is, you have to decide how much information you
23   need, information to support legislation, whether you need it or
24   not, what's the legislation, in order to gather support both in
25   the public and with your fellow legislators, and to support it
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    in the event of a challenge in court to the legislation.

2        To do that, the Congress needs the facts.  And right now it

3    doesn't -- not only does it not have the facts from the White

4    House, it has false and misleading facts from former

5    representatives of the Department of Justice.

6        THE COURT:  But the position of the defendants and

7    some of the amici is that you've got enough facts because

8    Congress doesn't need precise facts; in the legislative arena

9    Congress can operate on even conflicting facts.  What's your

10   response to that?

11       MR. NATHAN:  Well, again, I say to you, you remember

12   what Senator Moynihan said, everyone's entitled to their

13   opinion, but not everyone is entitled to their own facts.  And

14   here it is a judgment of the committee that it needs the facts

15   in order for it first to decide what is appropriate and what to

16   recommend, and second, what to try and convince its fellow

17   legislators in both parties what the legislation should be.

18       And that is a judgment that, with all due respect, it has

19   to be the Congress to make that judgment.  That is not one that

20   can be second-guessed by amici, by the Department of Justice, or

21   even, with all due respect, Your Honor.

22       I think Your Honor has to look at the legal questions here:

23   Is this a lawful investigation?  And what is the appropriate

24   response to the subpoena?

25       THE COURT:  I wanted to give you a chance to finish

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    your answer if you had more you needed to say in response to the

2    demonstrably critical question I had.

3          MR. NATHAN:  Well, I think that is what I need to say

4    on what's demonstrably critical about it.  But I think, again,

5    that is not the issue before the Court today, and that's not a

6    decision for the Court to make, and frankly, it's not a decision

7    for the Department of Justice or any amici to make for the

8    committee.

9          THE COURT:  Let's talk about other decisions for a

10   moment.  Let's talk about the office of legal counsel.  We have

11   two memoranda, one from then Attorney General Reno in 1999, and

12   then a recent memorandum, which was actually for the White House

13   counsel, not for the President, from Mr. Bradbury, both -- in

14   his role as assistant attorney general, acting assistant

15   attorney general.

16       Now, the Reno memo concludes in essence that immediate

17   presidential advisors, and specifically in that instance White

18   House counsel, are absolutely immune from testimonial compulsion

19   by Congress and therefore need not even appear in response to a

20   subpoena from a congressional committee.  What's your response

21   to that and then the subsequent Bradbury opinion that simply

22   adopts that view?

23         MR. NATHAN:  My response to both of those memos is

24   that there is absolutely no support in the law for those

25   propositions.  Those are self-serving statements by responsible

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    people in the executive branch, but they have no cases to

 2    support it.

 3          THE COURT:  No cases, but they do look back to prior

 4    OLC memos.

 5          MR. NATHAN:  Yes, they do, and that's exactly right.

 6    First of all, every one of those memos, every one of them, and

 7    they all start with the William Rehnquist memo in 1972 in which

 8    he says this is a sketchy idea, I don't have any support for it

 9    but this is my preliminary thinking, which by the way he

10    refuted, he disavowed when he testified a few months later

11    before the Congress and said, yes, witnesses have to appear --

12          THE COURT:  That was because he based it -- well, I

13    don't know if it was because, but he based it in part on the

14    busy schedule of --

15          MR. NATHAN:  Absolutely.  And that is all he based it

16    on.  And that memo and the Reno memo are speaking in terms of

17    current White House aides, high-ranking White House aides, and

18    the premise is that they are just too busy 24-7 serving the

19    President, and if they had to respond and go up and answer

20    questions, they would disrupt the operations of the White House

21    and therefore they're immune.

22          I want to make it clear, I don't accept that proposition.

23    There's nothing in the law that says that they are immune.  But

24    even assuming just for argument's sake that there was any merit

25    to that, that absolutely has no bearing on a former White House
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    aide.

2         She, Harriet Miers, is not available 24-7 for the

3    President.  She is practicing law in Dallas, Texas, and in

4    Washington, D.C., and having her come there and assert the

5    privilege with respect to anything that is even colorably

6    privileged will give the White House everything it needs.

7    There's nothing here that the privilege, which is the law, would

8    not satisfy.  And there is no legitimate purpose to asserting

9    the privilege as to -- or the immunity as to a former aide.

10        And in that regard, I think it's very important --

11             THE COURT:  You're distinguishing now, are you not,

12   between asserting executive privilege for particular pieces of

13   testimony or documents, because you concede that a former

14   official can do that on direction from the President.

15             MR. NATHAN:  Absolutely.

16             THE COURT:  But you're focusing instead now on the

17   absolute immunity claim.

18             MR. NATHAN:  Correct.  I'm saying the absolute

19   immunity claim doesn't apply to anyone -- any aide to the

20   President, but most certainly does not apply to a former aide on

21   the rationale that Mr. Rehnquist provided back in '72.

22        And in that connection, I think, because Your Honor has

23   mentioned both of these things, the opinion by the acting

24   Solicitor General in this case, if you look at that opinion,

25   it's a thoughtful opinion, and it says that both the testimony

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    and the documents are subject to a claim of executive privilege.

2    And it goes further and says that if it's tested and if there's

3    a weighing, they claim that the weighing would come out on the

4    side of the executive branch.

5        I don't agree with that part, but the point is that is what

6    the opinion was talking about of the Solicitor General.  And

7    when Mr. Fielding first wrote to Mr. Manning, who is Harriet

8    Miers's private counsel, he said that the testimony relating to

9    the following topics are subject to a claim of executive

10   privilege and therefore you should not testify to those topics.

11       It was after that, a day or two after that, that apparently

12   Mr. Manning raised a question with Mr. Fielding.  And we can

13   only infer what must have happened here, but there may be some

14   question that Ms. Miers or through her counsel suggested that,

15   okay, even asserting privilege as to those, there are other

16   topics here that might prove troublesome, so I want to know from

17   you, do I have to actually appear.

18       And by giving a letter that says you can't testify on these

19   topics, he's suggesting that of course you're going to appear

20   but you can't -- on those topics you have to assert privilege.

21   But now we have a letter a day later that says you're immune and

22   you don't have to appear at all.  And in that connection, we

23   have this great OLC opinion by Mr. Bradbury --

24            THE COURT:  Generated at that time?

25            MR. NATHAN:  It's dated that same day.  It's dated the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    day of July 10, and it is such a -- it's obviously cobbled

2    together without much consideration, and it basically parrots

3    the original Rehnquist memo.  And the Rehnquist memo was

4    designed for current aides.  There's no distinction in the

5    Bradbury memo; it says this covers former aides as well.  It

6    doesn't give any reason why it should cover former aides.  It

7    doesn't deal with that.

8          And I want you to notice that when we noted this in our

9    briefs, in the latest brief by the Department of Justice,

10   there's no mention of the Bradbury OLC opinion.  That doesn't

11   appear because they recognized it has completely no validity

12   whatsoever with respect to a former aide, and it makes no sense.

13         The privilege gives the White House everything it needs

14   with respect to the allegedly confidential communications.

15   What's happened here is that they have asserted this absolute

16   immunity as to which there is no law, and not only there's no

17   law but it's been rejected repeatedly in many different

18   contexts.

19         It started in U.S. against Nixon in the criminal context.

20   That is true.  But in footnote 19 the Supreme Court said that

21   this may arise in civil cases, it may arise in congressional

22   cases, and it said there will be a balancing in those cases, in

23   civil cases and in congressional cases.  It also suggested that

24   with respect to state secrets, which is not involved, there

25   won't be any balancing; you can assert it and there won't be any

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   testimony about it.

2        So they recognized in that case -- and then, five years

3   later, in the <u>Nixon against GSA</u> case, a case that raises the

4   confidentiality in the context of congressional legislation.  It

5   is not a subpoena for documents, but it is in the context of a

6   congressional need for the information.

7        And the Supreme Court once again said in this context,

8   there is no expectation of immunity.  There's no expectation of

9   absolute immunity for presidential communications.  It is a

10  qualified privilege.  There will be a weighing as to what can be

11  revealed against the needs of those who are seeking the

12  information.

13       And then in the <u>Dellums</u> case and in the <u>Sun Oil</u> case, it's

14  been applied by appellate courts in this circuit in connection

15  with private civil litigation that there is no absolute

16  immunity; there is only a qualified privilege that needs to be

17  weighed against the requester, whether it's a private civil

18  party, whether it's the Congress of the United States, whether

19  it's a grand jury, whether it's a trial in a civil or criminal

20  case.

21       Your Honor, this is not a new thing.  When I went back this

22  weekend to prepare for this argument and went to read <u>Marbury</u>

23  <u>against Madison</u>, the case that I think is what really

24  establishes that it is not only the province but the duty of

25  this court to declare what the law is when a matter is properly

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    raised -- and I will get to standing and the other claims that

2    the Department has raised --

3            THE COURT:  That principle was confirmed in

4    United States v. Nixon.

5            MR. NATHAN:  Absolutely, but I know that Your Honor

6    has focused on historical traditions in the Walker against

7    Cheney case.  And I want to go back to 1803, which I think takes

8    us back pretty far, and pretty near the beginning.

9        In that case, you read Marbury against Madison, this very

10   issue arose.  That was a civil trial.  You will recall that that

11   was an original litigation in the Supreme Court.  There was a

12   trial before the Supreme Court, and the issue was what happened

13   to Mr. Marbury's commission.

14       The plaintiff called two representatives of the executive

15   branch.  Those -- they were from the State Department.  They

16   said we cannot be sworn in because we have confidential

17   information, including presidential information, and we can't

18   disclose that, so we're not going to be sworn in.

19       And what did the Supreme Court do?  It's in the opinion.

20   What they said was, you must be sworn in, you must testify, and

21   if you have a privilege for specific questions, you can assert

22   the privilege.  And that's exactly what happened.  That's what

23   they did, and some of the privilege was sustained in part,

24   although mostly it was on rulings on irrelevance.  They said the

25   questions were not relevant, but they ordered them to appear and

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    testify.

2         And that's in a civil case; it's not in a criminal case.

3    And it was presidential communications that were -- that the

4    State Department official -- now the State Department officials

5    are in a different posture from the White House counsel.  I'm

6    not suggesting they are in the exact same, but the principle,

7    that's the principle that governs this case.

8         And it's not -- I have to confess too that notwithstanding

9    all the briefs, and I think we have provided the Court with

10   considerable cases, but there's one case we left out, and I want

11   to bring it to the Court's attention now, and it raises the same

12   issue, and it does it in the late 20th century, to show that the

13   principle remains the same.

14        This is a case involving the judicial investigation of

15   Alcee Hastings by the 11th Circuit.  And in that case -- and the

16   cite is 783 F.2d 1488.  In that case there were three judges

17   from different circuits.  The chief judge of the First Circuit

18   presided, and there was a judge from the Second Circuit and a

19   judge from the Seventh Circuit, very respected jurists.

20        And in the case it turned out -- they wanted to find the

21   facts.  The committee which was assigned to do the

22   investigation, which had subpoena power, wanted to find out what

23   had happened in connection with Alcee Hastings.  And they

24   subpoenaed two of his judicial aides, two of the staff members.

25        Those staff members refused to appear, and they said

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1    because judicial communications are privileged and said they're
2    absolute privileged and we don't have to appear, we're not
3    showing up.  The unanimous court said that they had to appear,
4    they had to testify, and they had to assert privilege as to
5    specific questions which they said would be governed by the
6    judicial privilege, which they said is the same as executive
7    privilege.  That is, it's a qualified privilege, it is not
8    absolute, and there is no absolute executive privilege; there is
9    no absolute judicial privilege.  And the order was that the
10   committee's subpoenas --
11        THE COURT:  I'm not sure you're right in your
12   terminology that there's no absolute judicial privilege.  There
13   is --
14        MR. NATHAN:  There's immunity for judges in suits for
15   damages, absolutely.  Correct.  But with respect to
16   communications between a judge and his staff in an area where
17   there's a legitimate inquiry -- and here there was a question of
18   misconduct by the judge -- the court ruled that there's no
19   absolute privilege, it's a qualified privilege, and it would be
20   governed by a balancing test as is executive privilege.  I'm not
21   saying it's exactly the same balancing, but --
22        THE COURT:  Is that true for the legislative branch?
23        MR. NATHAN:  No.  It is not true for the legislative
24   branch, but let me just read what the order was in the judicial
25   case.  It says, "The committee's subpoenas directed to the
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   appellants are enforceable despite appellants' invocation of a

2   privilege protecting communications among the judge and his

3   staff, and those witnesses are hereby ordered to comply with the

4   committee's subpoenas at a time and place to be prescribed by

5   the committee."   That is precisely what we seek here.

6       And now let me turn to the speech or debate clause that

7   Your Honor has raised by the last question.   The speech or

8   debate clause is an absolute privilege; it is not a qualified

9   privilege.   It is explicit in the Constitution.   The executive

10  privilege is, first of all, implied by the courts from the

11  Constitution, from the needs of the President's position, and it

12  is qualified.   The courts have ruled repeatedly in many contexts.

13       THE COURT:   Depending on who claims it.   If it's the

14  President, it may be presumptive at least.

15       MR. NATHAN:   I think it is presumptive.   I agree that

16  when the President invokes it, it is presumptive, and the burden

17  is on the party seeking to override it.   I don't think there's

18  any question about that.

19       Now, with respect to speech or debate, what I think is the

20  important point here, even though the speech or debate clause is

21  in the Constitution, it is absolute.   It is unqualified.

22  Nevertheless, it is the courts that decide the scope and

23  applicability of the privilege.

24       They decide, the courts decide, because that's the holding.

25  That's what the Nixon case is all about, that no man is the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    judge of his own privilege.  You don't say that this is

2    absolute.  The courts say what the privilege is and whether it

3    is -- whether it's properly invoked and whether the needs are

4    overridden.  This is a judicial decision.  It is not one for the

5    President.

6        And with respect to legislators, it's an absolute

7    privilege, but when there's a request for information from the

8    legislature, as this court well knows, there's a judicial

9    determination which we accept, that whether or not it applies is

10   the appropriate decision, even when it's absolute.  And so it

11   seems to me --

12       THE COURT:  May have accepted it a little reluctantly.

13   Mr. Kirschner is sitting behind --

14       MR. NATHAN:  Courts can get it wrong, and we could

15   take appeals, but we don't go outside of the judicial system.

16   We're not saying it's a decision to be made by the congressman

17   or the Congress.  It is a matter -- and in that connection,

18   Your Honor, this is what I have a very hard time comprehending.

19       As Your Honor well knows, requests dealing with --

20   subpoenas dealing with speech or debate can be brought by

21   private citizens, as it could be with the executive privilege,

22   but it could also be brought by the other branch of the

23   government.  It could be brought by -- and I deal with this in

24   my current job quite frequently -- demands by the executive

25   branch for materials that we think are protected by the speech

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    or debate clause.

2          And when that happens, we go to court, and that's the right

3    place to resolve this dispute over information, an informational

4    dispute between the executive branch and the legislative branch.

5    And no court has had any trouble, including the Supreme Court,

6    in reaching these decisions and deciding either the privilege

7    applies when it's a legislative act or it doesn't apply when

8    it's outside of the appropriate legislative arena.  Does it

9    apply to aides?  That's a question that the Supreme Court

10   decided in <u>Gravel</u>.  Those are the issues that courts decide.

11         In this very -- within weeks of my arriving in this job, we

12   got a petition by the Department of Justice to the Supreme Court

13   saying with respect to a dispute we have over information

14   between the executive branch and the legislative branch, in the

15   search warrant in Congressman Jefferson's office, we need the

16   courts to lay down what the rules are and what the parameters

17   are, and that's exactly what we are seeking here.

18         And the notion that the Department of Justice keeps raising

19   with you that, you know, you don't get the courts involved, the

20   courts should not be involved, well, of the three cases that

21   have occurred since 1975, all of which I think are relevant to

22   this discussion where there is a debate over information that

23   the Congress has sought from the executive branch, two of those

24   cases are brought by the Department of Justice to seek the aid

25   of the Court in not having to produce the documents.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          And Your Honor asks about OLC opinions.  What I think are

2     the important OLC opinions are the opinions of Ted Olson and

3     Chuck Cooper that say that the proper way to go about this

4     matter is through judicial proceedings, a civil enforcement

5     action by the Congress.

6          And Your Honor, in the case that, the first case that was

7     brought, in 1983 -- not the first case but a case that is cited

8     here, the United States against House of Representatives that

9     came before Judge Hart, I think it's very important for the

10    Court to look at what Judge Hart said in the reason that he

11    declined in that case.

12         He said that the Congress has expressed an interest in

13    proceeding in this matter through the criminal process, through

14    criminal contempt, which is clearly a -- there are three ways to

15    deal with the enforcement of congressional subpoenas.  All of

16    them, as you know, come back to the Court, as we've explained in

17    our brief, and I'll be happy to elaborate.

18              THE COURT:  Criminal referral, inherent contempt, and

19    civil enforcement.

20              MR. NATHAN:  Exactly.  And every one of those comes to

21    the Court.  If we did inherent contempt, if we went out and

22    arrested Harriet Miers, which in my view is exactly within the

23    rights of this committee, then Ms. Miers would have a right to

24    petition for a writ of habeas corpus.  It would come to this

25    court or a district court, and there would be a review of

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    whether or not she is immune based on executive privilege.

2         So exactly the same issues would come up, but they would

3    come up in the context of an arrest.  And just picture that

4    arrest, of the sergeant at arms going out and arresting her or

5    arresting Mr. Bolten, and having the Secret Service or the

6    Marshals Service in a standoff over the arrest of this

7    individual.  You know, Judge Leventhal --

8         THE COURT:  Well, it may be something that Congress

9    should very reluctantly employ, but isn't that the idea in the

10   hurly-burly of the legislative and executive branch political

11   discussions and resolutions?  Why isn't that inherent contempt

12   authority and possibility sufficient to allow that process to

13   work itself out?

14        MR. NATHAN:  It is not sufficient.  It is available.

15   But, Your Honor, Judge Leventhal, whose picture I see up there,

16   in the AT&T second case said, I find it very strange that the

17   judges could review a contempt of Congress for a witness who

18   didn't show up where there's been complete refusal and there's

19   been this kind of arrest, as opposed to an orderly proposed

20   resolution of the legal issue, as was proposed in the AT&T case.

21        And that's exactly what we have here.  Your Honor, we have

22   a situation in which there are, as I say, three ways to go about

23   this.  Every one of them, whether it's the criminal contempt,

24   whether it's the inherent contempt, or whether it's the judicial

25   civil action for enforcement, every one comes back to the Court.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    The Court is going to have to decide that issue.

2         You were talking about the hurly-burly.  If we were to do

3    that, Your Honor, we would first of all alienate the relations,

4    cause a great deal of grief and problems, and then we would

5    still have the legal issue to be resolved that we are seeking to

6    have resolved in a sensible and orderly way now.  And I suggest

7    that to do all that would be quite against the interests of the

8    country.

9         THE COURT:  And you believe that Ted Olson and Chuck

10   Cooper in their OLC opinions agree with that proposition.

11        MR. NATHAN:  I do.  And their opinions are written

12   after the Senate Select Committee case, and they are recognizing

13   that this is the way to proceed, in a sensible, orderly way.

14   And I noticed that the Department of Justice, which after all

15   brought the U.S. case against the House of Representatives in

16   the Gorsuch Burford matter, and didn't have any problem getting

17   the Court involved in that, didn't have any problem in the AT&T

18   case in getting them involved, but now, they ignore those OLC

19   opinions.

20        They like the opinions.  They have no citation to authority

21   that they're absolutely immune, but one is written on one day's

22   notice, and don't give any consideration to the fact that

23   Ms. Miers is a former employee of the White House.  But they

24   ignore and can't deal with the Cooper and Olson memos that say

25   this is the right way to proceed.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          THE COURT:  What weight should I give any of these OLC

2     opinions?  What do they mean for me?

3          MR. NATHAN:  I think you should give the weight that

4     the reasoning and the precedents that are cited in them deserve.

5     They are no more than briefs by an interested party here.  They

6     should be reviewed and considered.  They are written by people

7     of stature, and they're doing it in an official capacity.  But

8     if there's no merit to the positions taken, if you read it and

9     it is not convincing, if there's not a citation of authority

10    that is supportive, and recognizing that it is done for a

11    self-serving purpose, the Court should reject it.

12         THE COURT:  But aren't they more than briefs?  It

13    seems to me that they are authority, not binding authority, not

14    the same as either a Supreme Court case certainly or even a D.C.

15    Circuit case.

16         MR. NATHAN:  Not even a district court case,

17    Your Honor, I would say.

18         THE COURT:  Maybe, depending upon their reasoning.

19    Now, you need to be conscious of the time and covering what

20    issues you want to cover.  There are a lot of issues in this

21    case.

22         MR. NATHAN:  There are.  I wanted to mention the U.S.

23    against House of Representatives case with Judge Hart, because I

24    wanted you to look carefully at that opinion where he says that

25    the reason I'm dismissing now is the parties haven't reached an

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    impasse, they haven't even certified the matter for contempt

2    over to the U.S. Attorney's Office, and that's how they want to

3    proceed.  And then he says this:  He says we will have an

4    opportunity to review this matter when the defendant, that is

5    when the respondent is a defendant either in a criminal contempt

6    proceeding or in another civil action brought by the Congress.

7        And that seems to me -- and that follows, of course, the

8    Senate Select Committee.  This is after that.  It seems to me a

9    recognition by this court that all three options are available,

10   and I urge the Court to take the most sensible option.

11       Now, you know that the criminal contempt option, which the

12   Congress wanted to pursue, has been in my view inappropriately

13   taken away by the Department of Justice.

14          THE COURT:  But it is nonetheless foreclosed, whether

15   appropriate or not.

16          MR. NATHAN:  Exactly.  Whether it is appropriate or

17   not, it is foreclosed.  I've given you the reasons why I think

18   that inherent contempt doesn't make sense, and therefore that

19   leaves this appropriate and orderly resolution.

20       Very briefly, with respect to the legal issues.  With

21   respect to standing, I think that that is a preposterous claim.

22   The Court of Appeals in AT&T has said unequivocally that the

23   House has standing.  This court, in Walker against Cheney,

24   mentioned and cited the AT&T case, recognized it's still viable

25   law.  There's no suggestion by any court, certainly by any

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    appellate court, certainly not the Supreme Court in <u>Raines</u>, that

2    that's not still binding law.

3        <u>Raines</u> never mentioned it.  No case has considered it not

4    binding.  Judge Lamberth applied it a year after <u>Raines</u> and

5    considered the implications of <u>Raines</u> and still applied it, and

6    said that an informational injury by the House gave it standing

7    to bring the case.

8            THE COURT:  Now, with all due respect, and indeed it

9    is due for Judge Leventhal, the rationale underlying that

10   one-sentence conclusion is not very extensive in the opinion.

11           MR. NATHAN:  It's not very extensive, but it's very

12   significant because, as Your Honor will remember, AT&T did not

13   appeal that decision.  So the only petitioner that was before

14   the Court of Appeals was the House representative,

15   Representative Moss.  So if he didn't have standing, there would

16   be no appeal, and there would be no case.

17       And the court expressly dealt with the question of

18   justiciability and dealt with the question of standing and

19   recognized that there was standing there.

20       More fundamentally, Your Honor, in the <u>Nixon</u> case the

21   Supreme Court said that those who issue the subpoenas have the

22   standing to enforce them.  They have -- this is a traditional

23   matter for courts to deal with, the enforcement of subpoenas.

24           THE COURT:  Well, I don't think that's exactly what

25   <u>U.S. v. Nixon</u> focuses on.  When it's talking about the disputes

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    that courts traditionally resolve, it doesn't focus on the

2    subpoena aspect of the case; it focuses on the criminal

3    prosecution context of the case.  That's what U.S. v. Nixon

4    seems to feel is the important context for determining whether

5    it's the kind of dispute that courts traditionally resolve.

6    What's the similar context here?

7         MR. NATHAN:  Well, the similar context is, first of

8    all, it's an enforcement of a subpoena, and that is what the

9    cause of action is.  It's an enforcement of a subpoena.

10        THE COURT:  And that was true in U.S. v. Nixon as

11   well, but I don't think that's what the Court focused on when

12   talking about the kind of dispute.

13        MR. NATHAN:  In the beginning of the opinion it

14   focuses on that enforcement of subpoenas is a matter

15   traditionally done by the courts and that the parties here will

16   bring the matter with sufficient particularity and concreteness

17   to resolve it, and we'll get a good argument on both sides of

18   all the factual issues and legal issues in the matter.

19        Then they analyze, does it meet the standards for a trial

20   subpoena, and says, yes, it meets the standards, and then it

21   deals with the privilege question and says, I'm rejecting the

22   President's claim that there's absolute privilege, that it's a

23   qualified privilege, and under the circumstances here says it

24   balances.

25        That's what the Nixon case stands for.  And then it cites

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    in the footnote, footnote 19, that if this may apply -- the

2    balancing rule apply, maybe a different balancing, but balancing

3    in civil and congressional matters, and that's the way it's been

4    interpreted throughout in all of the other cases.

5         The main point I want to make, however, is that in

6    Your Honor's opinion in Walker against Cheney, which I have read

7    carefully, as you might expect, I counted 10 times, 10 times in

8    the opinion the Court mentioned that in that case there was no

9    subpoena and no authorization from the House.  In fact, the body

10   had suggested that they were not supporting that lawsuit.

11        And in my view that's what the Raines case is about.  It's

12   about individual legislators, particularly minority legislators,

13   ones who did not prevail on their vote in the House, in the

14   legislation, going to court to challenge the legislation that

15   was passed by their fellow legislators.

16        And I view the Walker against Cheney case in the same way,

17   which is this was a request ultimately by two minority

18   congressmen who were using the controller general to make a

19   request on their behalf when there was no committee that was

20   seeking the information and there was no subpoena.  No one could

21   agree on a subpoena for the information, no committee was

22   considering that need for that information, and the House was

23   not authorizing the lawsuit.  And this court, as the Raines case

24   said, noted that there had been no authorization in that case as

25   well.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1        THE COURT:  Certainly a fair distinction between those

2   two cases and this case.  But let's turn to the arguments that

3   defendants also make.  Where's the personal injury to the

4   committee here or to the House?  And isn't such a traditional

5   type of personal injury required under Article III?  And as

6   well, I guess the question would be, isn't the claimed injury

7   here the same kind of abstract dilution or impairment of

8   institutional legislative power that was found deficient by this

9   court in Walker?

10       MR. NATHAN:  Absolutely not, Your Honor.  It's quite

11  distinct.  Here there is a demand for specific information,

12  information which is needed to make a legislative judgment in a

13  matter that is properly before this committee.

14       It's information which seeks to refute false and misleading

15  information that the committee has received from former

16  representatives of the Department of Justice in this very

17  matter, information that is essential, as I said before, to

18  deciding on what is the appropriate legislation and convincing

19  other legislators as to what's appropriate.

20       In the census case, Judge Lamberth said and ruled that

21  information, or depriving of the type of information that the

22  House is authorized to receive, is entitled to receive for its

23  legislative purposes, or there for the census purposes, is an

24  injury.

25       And that's what we have here.  We have specific information

PDF created with pdfFactory Pro trial version www.pdffactory.com

1     that is sought by the committee in connection with a specific

2     investigation.  It is sought by subpoena, and it is authorized

3     by a vote -- the House vote was something like 223 to 32 -- to

4     hold them in contempt and to authorize this suit.

5           THE COURT:  That's because a lot of members voted with

6     their feet.

7           MR. NATHAN:  Exactly.  But that's the bottom line, an

8     overwhelming vote and a vote by the full body.  And when the

9     full body says that we need this information for our legislative

10    purpose and it doesn't get the information, it has suffered an

11    injury.  And beyond that, Your Honor, there is an institutional

12    injury here, and it's not a diffuse injury.  It's a question of

13    the enforceability of a subpoena.

14         And the notion that someone is absolutely immune, there's

15    no question that the Supreme Court has held that not only does

16    the Congress have a right to issue subpoenas to get information

17    which is essential to its functioning, but every citizen, every

18    citizen without exception has an unremitting obligation to

19    comply with the subpoena.

20         Now, that could include, obviously could include coming and

21    asserting a privilege to specific questions.  That's possible,

22    but it is not possible to ignore the subpoena.  And if this

23    court refuses to entertain this action, it will send a message

24    that subpoenas do not have to be complied with, that you will

25    not get taken to court, you can't get taken to court, we'll be

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    back in inherent contempt or statutory contempt, and that's not

2    what we need here.

3         We need a clear and resounding indication from the -- they

4    make the point that they're there to enforce the laws.  These

5    are from the people who are required to enforce the laws of our

6    country.  And for them to take the position that is absolutely

7    lawless and that defies the law and says that obligation is for

8    everybody but not for us, we're above the law, that cannot

9    stand.  And I urge this Court to accept our motion for partial

10   summary judgment, to reject all of the grounds that are --

11            THE COURT:  All right.  You don't have to be closing

12   out now, if you were about to close out.  I still want to

13   explore the other issues.

14            MR. NATHAN:  Okay.

15            THE COURT:  The cause of action issue does seem to me

16   to be a little bit of a sticky issue.  How do you respond to the

17   circuit court, not from this circuit but from the First Circuit

18   and the Fifth Circuit in particular, authority that holds that

19   the Declaratory Judgment Act does not create an independent

20   cause of action?

21            MR. NATHAN:  I think they misspoke.  I don't think

22   that's an accurate statement of the law.  It is true -- there

23   are two things that the declaratory judgment action does not

24   provide.  One, it does not provide jurisdiction.  So if you

25   don't have subject matter jurisdiction, you can't use the --

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          THE COURT:  That's not in dispute here.

2          MR. NATHAN:  And that's not in dispute.  The second is

3    it doesn't give you a substantive right -- it doesn't give you a

4    right in relation to the defendant in the case.  You have to

5    have that from an independent source.  And that's what I think

6    they're meaning when they say it doesn't create a cause of

7    action.  It doesn't give you a substantive right that you have

8    against a defendant that you name.

9          But because -- you know, the plain language is very clear

10   that once you have all -- you have the case cert controversy,

11   which is required for jurisdictional purposes, and you have

12   standing.  You have a remedy that's available, but you have to

13   have a legal right.  You have to have some duty or some

14   relationship to the party you're suing in order to make the

15   declaratory judgment effective.

16         We have that here from the Constitution, because the

17   Constitution as interpreted by the Supreme Court repeatedly is,

18   we have a right to issue and enforce subpoenas, and a corollary

19   of that is that individuals, all individuals, whether they're in

20   the executive branch or otherwise, have an unremitting

21   obligation to comply with those subpoenas.  So since we have the

22   right, therefore we have a cause of action under the declaratory

23   judgment statute to get a declaration.

24         Obviously, for example, in cases where -- let me give you

25   an example.  Where someone wants to use the declaratory judgment

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    action to get a declaration that the conduct he's about to take

2    is lawful and cannot be prosecuted, he does not have a cause of

3    action in the absence of the declaratory judgment statute.  He

4    would have to wait for the prosecution -- take the action, have

5    the prosecution prosecute him, and then use it as a defense.

6    But it was contemplated --

7         THE COURT:  Although there might be an exception in

8    certain First Amendment contexts.

9         MR. NATHAN:  Yes.  But the notion is that to allow

10   businessmen to know what conduct that they can pursue or any

11   individual as to what he can pursue, and he says I have a right

12   to do it and to do it in this way and not be prosecuted for it,

13   he can bring that action for a declaratory judgment in advance

14   of a situation in which he would be the defendant in the case.

15        So therefore you have a situation which can result in

16   litigation.  You have an operative set of facts that could

17   result in litigation in which the Court has to make a decision.

18   And that's what we have here.  We could -- obviously you said

19   that the criminal cases have been taken off the table, but it

20   was certainly a possibility that -- before the Attorney General

21   refused it -- that there could be a prosecution and then this

22   issue would be before the Court.

23        Similarly if we did inherent contempt.  That would be the

24   same thing.  We'd take the action, then we'd have a habeas, and

25   then we have the same issue.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          We are seeking to have this in an orderly, sensible way, as

2     Judge Leventhal said, and the declaratory judgment is one way.

3     I also want to make --

4          THE COURT:  If, either through an implied right or

5     through the Declaratory Judgment Act, there was already a cause

6     of action or a right, whichever you believe is the right

7     terminology with respect to what's needed, if that's true, then

8     why all the trouble on the Senate side to enact Section 288?

9     Why was that necessary if either house already could proceed?

10          MR. NATHAN:  Well, it was necessary at the time --

11     this was in 1978 -- because of the decision by Judge Sirica with

12     respect to the $10,000 in controversy, and that remained in the

13     law, in the federal question jurisdiction statute, as of 1978.

14          So they were concerned, having just been through that and

15     bitten by it, and said we don't have the jurisdictional amount,

16     to pass a statute that said with respect to this particular kind

17     of federal question -- that is, enforcement of a subpoena from

18     the Senate -- we do not need the jurisdictional amount.  And

19     when they passed that law in '78, the federal question

20     jurisdiction statute continued to have a minimum amount.

21          The second thing was that, unlike the House, the Senate did

22     not have counsel.  There was no counsel for the Senate at that

23     time.  They wanted to enact a statute that said we're creating

24     the Office of Senate Counsel, and they wanted to establish the

25     standards by which the Senate counsel would bring these kind of

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    -- he would be the person to bring these enforcement actions and

2    under what circumstances.

3         So that's why in that time period this was a concern, and

4    that's why 288 got enacted.  The House had no such problems

5    because, number one, it had counsel, and number two, it had not

6    at that point brought these actions.  It wasn't that concerned

7    about the jurisdictional amount.  Subsequently, the

8    jurisdictional amount was out of the 1331, so it became a moot

9    point.

10        In the legislative history, it is absolutely clear that the

11   Congress says that nothing we are doing here deprives us of the

12   pre-existing rights that we have.  And it was believed, and

13   certainly in 1978 it was believed that because of the Senate

14   Select Committee in 1974, that the Congress, a committee of the

15   Congress that had issued subpoenas, could go to court and

16   enforce those subpoenas, assuming the jurisdictional amount was

17   not in question, and do it with respect to the executive branch

18   and do it with respect to a balancing.

19        And so this was not an imperative for the House, and it's

20   not part of it, and that statute has nothing to do with the

21   House and nothing to do with our ability to seek to enforce

22   these subpoenas.

23             THE COURT:  Let's talk for a moment -- I want to bring

24   this to a close, this phase of this morning's arguments.  This

25   is on the implied cause of action, if you will.  Do you have any

PDF created with pdfFactory Pro trial version www.pdffactory.com

case -- well, there are two settings that have been discussed in
the briefs.  One is the statutory setting.  Alexander v. Sandoval
is the prime example.

MR. NATHAN:  For private rights.

THE COURT:  Basically for private rights, but it's a
statutory cite.  And the other is the Bivens damages setting.
Do you have any case that deals with implying an injunctive or
declaratory cause of action from the Constitution?

MR. NATHAN:  Yes.  Well, I would say this.  First of
all, obviously, the cases that say, like McGrain, that there is
the authority, the implied authority to issue and enforce
subpoenas, that's a Supreme Court case --

THE COURT:  That's the underlying principle, that
there is some kind of a right there.  Any case that deals with
implying cause of action?

MR. NATHAN:  Well, let me say, obviously in the AT&T
case, which was brought by the executive branch for declaratory
judgment and for injunctive relief and where they got both a
declaratory judgment and an injunction, there's no --

THE COURT:  What they really got in the AT&T case was
an instruction to go back and talk about it some more.

MR. NATHAN:  That's one way to look at it.  They did
get that, but they got an injunction and the injunction was
upheld by the Court of Appeals on two occasions.  So the court
took the case; the court said that it would hear it.  And I

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    think that that's a case, while it didn't discuss it, suggested

2    that there is an implied right of action here by the executive

3    to take action that's ancillary to its views.  And that's the

4    same thing that of course the In Re: Debs case said in the 19th

5    century, that --

6          THE COURT:  Those cases, and indeed I think you can

7    cite some others, are examples where logically there must have

8    been a cause of action even though the courts didn't discuss it.

9          MR. NATHAN:  Exactly.

10          THE COURT:  Any case that actually discusses it and

11    implies an injunctive or declaratory cause of action from the

12    Constitution?

13          MR. NATHAN:  I don't have a case that discusses the

14    implied --

15          THE COURT:  Why isn't there any?

16          MR. NATHAN:  Well, I don't think that this -- well,

17    let me say this.  I don't think it has happened before that

18    we've had a situation in which the executive branch has taken as

19    extreme a position as we have in this case.  There's not a

20    single case before this in which the executive branch has said

21    that a former member, a former employee of our administration

22    has absolute immunity, and has said that not only does she have

23    absolute immunity and will not appear but we won't give you the

24    documents, we won't give you the interviews, we won't do

25    anything until you accede to this unconstitutional

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    interpretation.

2        So I think we have here a very unique circumstance, that we

3    have a situation in which we do not have good-faith bargaining.

4    And by the way, on that issue of good-faith bargaining, I must

5    say I take a little umbrage at the Department of Justice arguing

6    in its motion to dismiss that they've been reasonable.

7        First of all, they have not been reasonable, but second of

8    all, this is on a motion to dismiss and the allegations that are

9    in our complaint must be accepted as true, that we have

10    attempted to compromise, and we have put in the documents that

11    show those compromises that we have offered to do this.

12        And they have stuck to this one position, which is

13    absolutely indefensible.  It is based on an unconstitutional

14    interpretation, and basically they're holding hostage

15    information that they say they're willing to turn over, to our

16    acceding to an unconstitutional demand.

17        So in this unique circumstance, I think you may understand

18    why there are not cases dealing with this implied remedy.  But

19    let me say this.  In McCulloch against Maryland and in the

20    Marshall against Gordon case, the Supreme Court has said

21    repeatedly that once you have express powers of the Congress,

22    that the Congress can make a judgment as to what implied rights

23    it has on that, and it can pursue any that it thinks is

24    reasonable so long as it is not prohibited by the Constitution.

25        And it seems to me -- and I recognize that they're mainly

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    talking about legislative actions there, but the language is

2    broader and deals with taking actions pursuant to express

3    powers, doing it to effect the means; every institution has to

4    have a right of self-preservation to take the actions that are

5    inherent and implied in what is expressed so long as they are

6    reasonable and so long as they are not prohibited by the

7    Constitution.

8         Nothing prohibits the Congress from bringing this action,

9    from having an action.  A subpoena, after all, Your Honor, began

10   as a writ of subpoena from the courts.  It's what distinguishes

11   if from an invitation.  It says it's under penalty of law if you

12   don't comply.  And in our society and particularly in the 21st

13   century, penalties are more appropriately applied by the courts

14   than they are by the Congress.

15        That's what was recognized in the mid-19th century when

16   they said, okay, we have inherent contempt but we're going to

17   take it to the courts.  We're going to have a criminal statute,

18   criminal contempt which, as Your Honor said, is taken out of the

19   picture in this case.

20        So if it is in the courts that the writ of subpoena is to

21   be enforced, it should be enforced at the instance of those who

22   issue the subpoena.  There is no case, no case in this country

23   where the party who is authorized to issue a subpoena does not

24   have standing and does not have a cause of action to enforce

25   that subpoena, and that's what we're doing here.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    My time's up, but I'd like you to ask Mr. Nichols when he

2    gets up, do you have any case where someone, an entity which is

3    authorized to issue a subpoena, does not have authority to come

4    to the Court, whether it's an administrative agency -- which by

5    the way does not always get subpoenas to enforce the law, but

6    for other purposes too, like issuing licenses and other reasons.

7        It is true our reasons for issuing subpoenas are different

8    from the executive branch.  We're not enforcing the law with

9    respect to our -- we're getting information essential for our

10   legislative purpose.  But we have the right to subpoena.  It's

11   in the Constitution, it's been interpreted that way by the

12   Supreme Court, and we have the right to go to court to enforce

13   it.  That's what we ask you to rule in this matter.

14       THE COURT:  Let me ask you one last question.  On the

15   discretionary issues with respect to exercising the Court's

16   authority and jurisdiction under the Declaratory Judgment Act,

17   there may be more you'll have to say in response to Mr. Nichols'

18   argument, but one issue I want to touch on.

19       The House is not a continuing legislative body, so when the

20   House expires, the subpoena will expire, I assume.  And there

21   will be -- not only going to be a new Congress but there will be

22   a new President and executive administration.  And I suppose it

23   would be folly to try to predict how either body, Congress or

24   the executive branch, would want to proceed with this

25   litigation, which in all likelihood will still be going on if

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    appeals are taken.  And I think there's virtually a certainty of

2    appeals, but I've been wrong before.  We do have, therefore,

3    this issue of --

4          MR. NATHAN:  A really persuasive opinion wight well

5    not be appealed, Your Honor, but we'll see.

6          (Laughter)

7          THE COURT:  We do have, therefore, this mootness issue

8    that lurks on the somewhat distant horizon, unlike in AT&T where

9    it was really only, I think, four or five days away that

10    mootness was going to appear.  And like in AT&T, I think the

11    case is not moot now, and therefore I don't have to resolve this.

12          But as I look at this discretionary issue of whether the

13    Court should jump in, through a Declaratory Judgment Act

14    proceeding or otherwise, jump into this fray between the

15    political branches, shouldn't I take into account the fact that

16    this may all be mooted out at some point in the not-too-distant

17    future?

18          MR. NATHAN:  No, I really don't think so, Your Honor.

19          THE COURT:  Why not?

20          MR. NATHAN:  I think you should give thought to two

21    questions.  One is whether a useful purpose will be served in

22    clarifying the legal relations here, because this issue is not

23    going away, as Your Honor recognizes, even in the next Congress,

24    and --

25          THE COURT:  We don't know that for sure.  A lot may

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    depend on what happens in November.

2             MR. NATHAN:  Exactly.  I would expect -- first of all,

3    we do have six months left of this legislative session.  I very

4    much hope that we can get a prompt decision, and I hope that the

5    parties can accept it.  Obviously, there is the possibility of

6    appeals.  I recognize that, and we certainly, if we're appealing

7    we'll seek expedited appellate consideration and hope to deal

8    with this in this Congress.

9         As to what happens in the next Congress -- this Congress

10   expires on January 3 of next year.  As Your Honor's made clear,

11   that depends on what happens in November, and we'll have an

12   opportunity to deal with it sometime before the Congress

13   adjourns, to deal with that question.

14        But I think that this is not moot now; it's not about to

15   become moot.  In our view, it won't be moot even when the next

16   Congress takes over.  As Your Honor had pointed out, in AT&T

17   that decision by -- the first decision by the Court of Appeals

18   was on December 30, 1976, and the Court noted that this was a

19   plus, that there would be a new administration, which it knew

20   what that administration would be, and there would be a new

21   Congress, and the case was continued and the negotiations

22   continued, and the case came back in the spring of 1977 with a

23   new administration.

24        So that happened in AT&T.  There's no reason to think that

25   won't happen here, and therefore there's no reason to avoid it.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    But more importantly, this is a critical matter of national

2    importance, on two fronts.  It's important that the committees

3    of the House be allowed to issue subpoenas and to have the chief

4    law enforcement officer of the United States abide and follow

5    the law with respect to those subpoenas.

6         And it's important that that be understood in the context

7    of the negotiations that Your Honor refers to.  It is true that

8    most of this is handled by negotiations, but it is in the

9    context -- under the shadow of the law, it's in the context of

10   understanding what the law is and what would happen if you go to

11   court to dispute it.

12        If the Court refuses to or declines to entertain

13   jurisdiction, you will alter the balance with respect to those

14   negotiations not only in this case but in other cases dealing

15   with the relations between Congress and the executive branch.

16        THE COURT:  Each side has their argument on that and

17   says that if I do what the other side is asking, it's going to

18   alter the balance in a terrible way.

19        MR. NATHAN:  Yeah, but you know, in that connection, I

20   know both sides can argue that, but what I'm arguing is -- and I

21   think the Court can read the cases and see that this is the

22   case -- the position that the executive branch is taking in this

23   matter is contrary to I think 200 years of law, but certainly to

24   35 years of law with respect to executive privilege in this

25   country.  And if that is going to be the position that they're

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    going to take and there's no answer to it, there's no response

2    from the courts, that is not going to help the future

3    negotiations.  It's important to have that resolved.

4            THE COURT:  All right.  Thank you, Mr. Nathan.

5            MR. NATHAN:  Thank you very much, Your Honor.

6            THE COURT:  Mr. Nichols.

7            MR. NICHOLS:  Good morning, Your Honor.  May it please

8    the Court, Carl Nichols on behalf of the defendants.

9    Your Honor, the relief sought by the committee is unprecedented

10   and would fundamentally alter the separation of powers.

11           THE COURT:  And by the way, I recognize the other

12   people at counsel table, including the White House counsel,

13   Mr. Fielding.

14           MR. NICHOLS:  Thank you, Your Honor.

15       Although interbranch disputes over information are as old

16   as the nation, for 200 years those differences have been

17   resolved through negotiation, compromise, and, where

18   appropriate, through the use of the various political tools at

19   the branches' disposal.  For the vast majority of that history,

20   as the committee concedes, Congress never once sued the

21   executive to compel the disclosure of information, and never in

22   that history, as the committee also concedes --

23           THE COURT:  Although the executive sued Congress to

24   prevent the disclosure of information, did it not?

25           MR. NICHOLS:  That is correct.  But my point was, for

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    the vast majority of history, until the 1970s, there was no

2    lawsuit brought on anyone's behalf to preclude or to compel the

3    disclosure of information to Congress, and never in that

4    history, as the committee also concedes, has a federal court

5    ever ordered an executive branch official, let alone a close

6    advisor to the President, to testify before Congress or to

7    produce documents or a privilege log.

8         THE COURT:  And likewise, there is no case that really

9    says to the contrary.

10        MR. NICHOLS:  There is no case that has addressed the

11   question, Your Honor, of whether a close presidential advisor is

12   immune from compelled congressional testimony, and we'll

13   certainly get to the immunity discussion, I think.  But it's

14   clear that if Your Honor were to order Ms. Miers to appear for

15   testimony, or if Your Honor were to order that a privilege log

16   be produced to Congress, Your Honor would be the first court to

17   ever order such release.

18        If this suit is permitted beyond this stage, Congress would

19   be free to sue the executive branch in federal court any time it

20   claimed that the executive's response to a subpoena was somehow

21   inadequate, even if the information sought was, like here, held

22   by the office of the President and related to the exercise of

23   one of the President's core constitutional powers.

24        Such a regime would ensure that the judiciary is drawn into

25   similar future disputes.  As the Supreme Court put it in <u>Raines</u>,

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    that is certainly not the regime that has obtained under our

2    Constitution to date.

3              THE COURT:  Let's get clarity on one issue that came

4    up in Mr. Nathan's argument.  What is the record with respect to

5    presidential involvement in this matter?

6              MR. NICHOLS:  Your Honor, I think --

7              THE COURT:  Is it just what Ms. Perino said, which is

8    basically that the President was not involved and did not

9    receive any advice from aides and didn't make any decision?

10             MR. NICHOLS:  Your Honor, I think that Mr. Nathan

11   substantially overstates the record on this point.  The record

12   does reflect at this stage that the President was not involved

13   in decisions about who would be asked to resign from the

14   department.

15       The record does not reflect that the President had no

16   future involvement, and in fact, Ms. Perino said, "No.  I've

17   said on the record for several weeks now that there's no

18   indication that the President knew about any of the ongoing

19   discussions over the two years" -- and that was the two-year

20   period leading up to the request for resignations -- "nor did he

21   see a list or a plan before it was carried out."  And this was

22   referring to the plan that preceded the requests for

23   resignations.

24       So the record is limited to presidential involvement in the

25   discussions about whether to seek resignations of certain U.S.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    Attorneys, but beyond that --

2            THE COURT:  So Ms. Perino was not correct when she was

3    trying to communicate the proposition that the President had no

4    involvement and received no materials or advice?

5            MR. NICHOLS:  I think Ms. Perino's statement is

6    limited to the question of whether the President was involved in

7    seeking resignation of certain U.S. Attorneys, but I don't think

8    Ms. Perino even purported to state one way or the other whether

9    the President had any involvement in other issues and --

10           THE COURT:  What's other issues?  What do you mean by

11   that?

12           MR. NICHOLS:  For example, who might replace a

13   particular U.S. Attorney after a resignation, A, and B, what the

14   White House's response to the ongoing controversy and other

15   issues that would arise thereafter would be, and --

16           THE COURT:  Obviously, part of that response was to

17   claim executive privilege, and one would assume that the

18   President had some role in that.

19           MR. NICHOLS:  And it's important to note, though,

20   Your Honor, that the subpoenas at issue here don't just seek

21   information about the decisions to seek resignations of the U.S.

22   Attorneys.  Both the Miers and the Bolten subpoenas seek

23   information concerning the selection, discussion, or evaluation

24   of any possible replacement or interim or acting appointment to

25   fill any vacancy.  That's Miers subpoena, topic 3, Bolten topic

PDF created with pdfFactory Pro trial version www.pdffactory.com

1     1B4.   And beyond that, the subpoenas also seek information

2     concerning reviews by White House staff that led the President

3     to conclude that there was no wrongdoing, including any

4     information, quote, "that has led the President to discount

5     evidence obtained by the investigating committees in documents

6     and hearing testimony."

7          So on the one hand, I think the record reflects only that

8     the President wasn't involved in the initial decisions to seek

9     resignations, but the record is --

10               THE COURT:  And of whom.

11               MR. NICHOLS:  And of whom.  And beyond that, the

12     subpoenas seek additional information that -- as to which the

13     record is silent on presidential involvement.

14               THE COURT:  All right.  Let me explore that just a

15     little bit.  So what you're saying is that some of the

16     documents -- and let's just use as the universe of documents

17     those that are addressed in the Clement letter.  Some of those

18     documents may well be documents that involved advice to the

19     President or even presidential decisions.

20               MR. NICHOLS:  They may well.  They may well.

21               THE COURT:  But some may not.

22               MR. NICHOLS:  That is correct.

23               THE COURT:  Indeed, some do not.

24               MR. NICHOLS:  That is correct, Your Honor.

25               THE COURT:  And if you divide out the decisions here,

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   or the issues, into the removal versus who was to be appointed

2   to replace people, versus handling the whole matter, the sort of

3   after-the-removal problems with Congress, then those may have

4   different degrees of presidential involvement.

5          MR. NICHOLS:  I think that's fair, Your Honor, but as

6   you indicate in your questions to Mr. Nathan, Sealed case makes

7   quite clear that executive privilege covers not just

8   communications directly with the President but senior advisors

9   gathering information either to advise or to assist the

10  President in the conduct of his --

11         THE COURT:  But that's the fudge here, and I don't

12  mean that derogatorily.  The term "executive privilege" does

13  include all of those, but the components of executive privilege

14  include national security, which we don't have here, and there's

15  several other, local law enforcement files -- we don't have that

16  here -- but we do have two things, arguably.  We have

17  presidential communication, and we have deliberative process.

18  And they may be assessed under different standards.

19        Indeed, the D.C. Circuit has indicated that they are

20  assessed under different standards.  But right now neither the

21  Congress nor certainly this court has sufficient information

22  with respect to the materials to engage in that kind of

23  differentiated assessment based on the different components of

24  executive privilege.

25         MR. NICHOLS:  No.  That is certainly the case,

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
1    Your Honor.  Unless and until Your Honor decides that you have

2    before you live claims about documents in counts 3 and 4, we are

3    not in the world of applying the Senate Select Committee

4    demonstrably critical standard for Congress's need against the

5    executive's assertion of privilege.

6         But I'd like to step back because I do think a fair amount

7    of Mr. Nathan's presentation confused privilege, which we're

8    asserting only as to documents, and immunity, which we are

9    asserting as to Ms. Miers's testimony at this stage.

10              THE COURT:  Well, that doesn't mean that Ms. Miers

11   wouldn't assert privilege with respect to some questions.

12              MR. NICHOLS:  No.  Absolutely not, Your Honor.  If you

13   were to order and if the Court of Appeals were to affirm or

14   there otherwise would --

15              THE COURT:  Ah, there's the appeal.

16        (Laughter)

17              MR. NICHOLS:  I certainly wouldn't want to suggest

18   that if you were to order Ms. Miers to appear -- in other words,

19   that she wasn't immune from compelled congressional testimony --

20   that the next step necessarily would be a hearing at which she

21   asserts privilege, or privilege is asserted on a

22   question-by-question basis, only that there could be an appeal.

23   And I didn't hear anything Mr. Nathan said that would suggest

24   that the opposite wouldn't be true, which is to say if we were

25   to win, that they wouldn't appeal.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    My point is that in assessing the immunity claim, the

2    question isn't whether privilege might govern particular

3    questions or not; it's whether the President's senior advisors

4    are immune from compelled congressional testimony.  That is the

5    long-standing position of the executive branch.

6        It's reflected in OLC opinions from both administrations,

7    Your Honor.  And it is based not merely on the need for

8    confidentiality and the need to protect executive privilege, but

9    also on the need to protect the President's autonomy in the

10   conduct of his constitutional duties and obligations.

11           THE COURT:  But if you look instead of at OLC

12   opinions, at the judicial opinions, they seem to support

13   something less than an absolute immunity.

14           MR. NICHOLS:  Well, on the one hand --

15           THE COURT:  Indeed, there's no case that really

16   supports the absolute immunity proposition that you have before

17   this court.

18           MR. NICHOLS:  I'm not sure that's fair, Your Honor,

19   and here's why I think it's not fair.  Nixon v. Fitzgerald

20   certainly reflects that the President needs absolute immunity

21   for his official acts.  There's no question that is a case on

22   which we rely.  Then the question is, does that immunity, at

23   least in the context of compelled congressional testimony, can

24   it and should it extend to the President's closest advisors.

25       What the committee says is, no, it can't, because Harlow

PDF created with pdfFactory Pro trial version www.pdffactory.com

1     cuts that line.   It says the President is entitled to absolute

2     immunity; senior advisors are entitled only to qualified

3     immunity.

4          But I don't think Harlow applies here, Your Honor.   Harlow

5     was concerned, as it makes quite clear and as commentators have

6     made quite clear and interpreters have made quite clear, was

7     limited to the circumstance of a civil lawsuit filed against an

8     advisor where the civil remedy for unconstitutional conduct was

9     the only remedy available to the plaintiff.

10         The backup in Harlow is qualified immunity, and what that

11    enables the courts to do is serve as a gatekeeper, to weed out

12    meritorious claims that shouldn't be allowed to be litigated

13    against senior advisors.   We don't have that here.

14              THE COURT:   Well, certainly this is not Harlow,

15    because that's a question of immunity from money damages and

16    it's a different context.   But why isn't Harlow at a minimum

17    instructive with respect to the issues raised here?   Why doesn't

18    the reasoning underlying that decision really foreclose the

19    claim that's made here by the executive branch for absolute

20    immunity?

21         Virtually all, if not all, of the reasons that are raised

22    here in support of absolute immunity were raised in that context

23    as well and were rejected by the Supreme Court.   And isn't the

24    certainly more frequent possibility of financial ruin through

25    monetary claims, isn't that going to carry a larger risk of the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    chilling effect on candid advice within presidential advisors

2    than does the rare -- and I would use your concept of it as well

3    as the House's concept of it -- the rare possibility of

4    compelled congressional testimony, especially if it has to

5    follow a committee subpoena and a full vote of the House?

6              MR. NICHOLS:  I actually think --

7              THE COURT:  It seems to me that Harlow says a lot

8    that's helpful or instructive here, even though I agree with you

9    it is not determinative on the issue.

10             MR. NICHOLS:  No.  My point is more than just it's not

11   determinative, but I think some of those factors actually cut in

12   our favor.  Harlow was concerned with civil suits for alleged

13   unconstitutional conduct where the only remedy for the

14   individual was a civil suit.  That was one of the most important

15   factors that Harlow pointed to.  There is no such problem here.

16   The other thing --

17             THE COURT:  What's the other remedy?

18             MR. NICHOLS:  The other remedy are, as we've indicated

19   in our briefs, all of the things that Congress has been able to

20   do for 200 years without filing a lawsuit.  It can exercise all

21   of the Article I powers it has at its disposal.  It can

22   legislate.  It can decline to appropriate money.  It can refuse

23   nominations.  It can exercise inherent contempt power.

24        All of those powers are things that individual citizens

25   don't have against the executive branch.  That's one thing that

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    really does contrast this with Harlow.  An individual harm by

2    executive-branch conduct really has only one remedy, and that's

3    to file a lawsuit.  And even then, those lawsuits, the courts

4    serve as a gatekeeper at the qualified immunity stage to weed

5    out the meritorious from the nonmeritorious.

6        In contrast, A, Congress has a wealth of powers other than

7    filing lawsuits in federal court; B, there is really no

8    limitation to the scope of congressional investigations.  In

9    fact, as Mr. Nathan said this morning, essentially the courts

10   and the executive branch can't look behind the purposes for a

11   congressional investigation.  As long as Congress says it needs

12   it, the information, or that it needs to legislate in an area,

13   the courts and the executive branch have to defer to that.

14       THE COURT:  This is sort of a floodgates argument, and

15   of course that existed in Harlow as well, where you're opening

16   the floodgates to all of the citizenry to file suits against

17   presidential advisors.  Here it's really one entity, Congress,

18   through an authorized committee.  So the floodgate by definition

19   is a little bit smaller to begin with.

20       But the thing that concerns me about the floodgates

21   argument is that we really have a history here that doesn't

22   reflect a lot of these actions by Congress, a lot of these

23   impasses between the political branches over the past 35 years

24   or so.  And if you accept the House's view, that's with the

25   backdrop of judicial involvement and judicial resolution of

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    these matters with Congress being able to not only issue but

2    enforce the subpoenas through the courts being available.

3         Your view is that hasn't really been available and this

4    would change it.  But if they're right, then I don't see where

5    the floodgates argument gets you, because it hasn't happened

6    over the past 35 years.

7              MR. NICHOLS:  Well, could I actually take it in two

8    parts?

9              THE COURT:  You can take it in six parts, which I

10   think my question had.

11             MR. NICHOLS:  There's at least two, I think.  There's

12   a floodgates issue with respect to the question of immunity,

13   which is where we started, which is to be sure more of a merits

14   question.  The question there is not the -- part of the reason I

15   think that there has been accommodation and compromise through

16   the years for over 200 years is because there hasn't been a

17   judicial resolution of the question of whether a senior advisor

18   to the President is immune from compelled congressional

19   testimony.  The courts haven't resolved that question.

20        I think if Your Honor were to resolve that question against

21   the executive branch, then there really is a floodgates problem,

22   because now what the courts have said is there is no such

23   immunity, and now the Congress knows and you've set in stone

24   what the rule is.  So I do think there's a floodgates problem

25   that hasn't existed to date, so you can't point to past

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    historical practice vis-a-vis senior advisors, because there

2    hasn't been a judicial resolution of the question.  That's on

3    the immunity side.

4         Then there's the Article III question, and the question is,

5    if Your Honor were to hold that Congress has standing and can

6    pursue these claims, would that create a floodgates problem.  I

7    think, Your Honor, the -- more important than again saying there

8    haven't been lawsuits throughout history is to say, well, if you

9    create a new rule, if the courts say Congress can in fact go to

10   court, sue the executive branch, they have standing, they have

11   implied causes of action --

12        THE COURT:  There's an argument that that's not a new

13   rule given the language in AT&T by the D.C. Circuit.

14        MR. NICHOLS:  That is their argument, and I would love

15   to address AT&T in a minute, Your Honor.  But I don't think you

16   can say that the floodgates problem is resolved one way or the

17   other by looking at the past, because once you create hard and

18   fast rules, I think that does change how the parties behave

19   going forward.

20        If I could go to standing, though, because I think even if

21   Your Honor wanted to decline to exercise jurisdiction here, I

22   think you do have to address the question of Article III

23   standing under Steel Co.  So if I could begin there.

24        Your Honor, in cases like Vermont Agency and Raines, the

25   Supreme Court has made clear that the historical record can be,

PDF created with pdfFactory Pro trial version www.pdffactory.com

as the court put it in <u>Vermont Agency</u>, well nigh conclusive of

the standing inquiry.  And I think there are two ways to look at

history here.  One is to look at it in a general way, as the

<u>Raines</u> court did, which is interbranch disputes over official

power.  And I think <u>Raines</u> was quite clear that there is no

historical record of such interbranch disputes being litigated

and adjudicated in Article III courts.

        If you don't look at it in a general way, if you look at it

in a specific way, the question is is there a historical record

of the Article III courts resolving lawsuits brought by Congress

seeking information from the executive branch.  And again, as I

indicated at the beginning, there is no such history.

        For almost 200 years, about 185 years, Congress never once

filed such a lawsuit, and to date no federal court has ever

ordered the disclosure of information to Congress, whether in

the form of testimony from a senior executive branch official or

in the form of documents or a privilege log.

        So the historical record, Your Honor, I think is quite

clear that there has not been such lawsuits and that these

lawsuits are certainly not of the kind traditionally thought

resolvable in the Article III courts.

                THE COURT:  Well, let's talk about it in terms of

subpoena enforcement action.  There are lots of those brought by

the executive branch, agencies included, and let's talk about it

in terms of the couple of cases that do deal with this

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    situation.  But the suits involved happen to be brought by the

2    executive branch as opposed to by Congress, although the issue

3    is joined between the two branches, AT&T being the prime

4    example.

5         How is the standing of the executive branch or executive

6    agencies in subpoena enforcement actions generally, or

7    specifically with respect to congressional subpoenas, really any

8    different than the House committee here?  You have the three

9    parts of standing, injury, traceability, and redressability.  I

10   assume your argument is only focused on injury.

11        MR. NICHOLS:  Our argument is focused only on injury.

12   There's no question --

13        THE COURT:  How is the injury any different?

14   Congress, just like the executive branch, when it is raising

15   these issues in court, is contending that it is seeking

16   materials through a subpoena, and it is being denied those

17   materials.  And you have to assume in a standing context that

18   they're going to win the case, basically.  That's how you assess

19   it, and that's going to redress their grievance.  Why is it any

20   different than the executive branch seeking to compel response

21   to a subpoena to acquire the information?

22        MR. NICHOLS:  I think you almost have to step back

23   again, and at its fundamental --

24        THE COURT:  You'll have me out the door pretty soon.

25        (Laughter)

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          MR. NICHOLS:  How about up?  At a level of generality,

2     Your Honor, I think there are only two ways for Article III

3     courts to adjudicate disputes before them.  One is through

4     lawsuits brought on behalf of individuals aggrieved by the

5     conduct of the defendant, whether it be another individual or

6     the government.

7          The other way is for the executive branch to enforce

8     federal statutes, under its express power under Article II, to

9     take care that the laws be faithfully executed.  There is no

10    third way.  And so I don't even know whether the courts

11    necessarily apply a standing analysis when the executive branch

12    sues in federal court.  I think it's the tradition that the

13    executive branch can prosecute or otherwise enforce federal

14    statutes and federal laws in the Article III courts.

15          THE COURT:  So the answer in part is that in this

16    dispute, as in prior disputes between the two political

17    branches, over a congressional subpoena, the executive branch

18    can take it to court and get a resolution because the executive

19    branch has standing, but Congress cannot take it to court

20    because Congress doesn't have standing.  That's part of the

21    answer?

22          MR. NICHOLS:  I think there's a significant difference

23    between a lawsuit filed --

24          THE COURT:  But the proposition that I just expressed,

25    is that a proposition that you agree with?

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          MR. NICHOLS:  Well, Your Honor, I'm not sure whether

2    an executive-branch lawsuit against Congress to, for example,

3    preclude Congress from enforcing a subpoena through its inherent

4    contempt authority would be permitted under Raines, because then

5    again you would have an interbranch dispute over claimed

6    official authority, and it may well be that the courts would

7    say, whether or not it's a standing analysis, that's not the

8    kind of dispute traditionally amenable to Article III

9    adjudication.

10          But we don't even have that here.  What we have is not the

11    Article II branch using its express authority under the

12    Constitution but the Article I branch implying a power under

13    Article I, appurtenant to its legislative authority to sue the

14    executive branch in the Article III courts, which is about as

15    acute an interbranch dispute as one could have.  And when you

16    apply the standing analysis, either of Raines or of Walker v.

17    Cheney, I think you have to conclude that the committee lacks

18    injury in fact, and --

19          THE COURT:  And you think they changed the law on the

20    subject?  For instance, legal minds that I assume you respect

21    the same way I do, which include Ted Olson and Chuck Cooper, had

22    no trouble concluding that civil enforcement action was

23    available to Congress, and saw no problems, at least they raised

24    no problems, in very lengthy, well documented, well supported

25    OLC opinions, raised no problems with standing or cause of

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    action.  They're wrong because of Raines?

 2              MR. NICHOLS:  Well, I think there are a few things,

 3    Your Honor.  First, as you mentioned, the OLC opinions don't

 4    even address, let alone conclude, that Congress would have

 5    standing in this circumstance.

 6              THE COURT:  Except one of the opinions does go through

 7    a litany of what problems might exist, and they found no problem

 8    in terms of standing or cause of action.

 9              MR. NICHOLS:  That is correct, but they're silent.

10    It's not as if the executive branch analyzed the standing

11    question and said, yes, Congress would have standing.  In some

12    respects, the OLC opinions are a little bit like a drive-by

13    jurisdictional ruling.  In that sense they're silent.

14         But more to the point, Your Honor, I think that with -- and

15    I don't want to be too flip about this, but with time does come

16    wisdom.  At the same time those OLC opinions were being written,

17    the executive branch was conceding standing in cases like Barnes

18    v. Kline.  If you look at footnote 16 of the majority opinion,

19    the executive branch conceded standing there.  Then of course

20    Raines comes along and, as Chenoweth makes clear, Raines

21    rendered untenable the D.C. Circuit's standing analysis in the

22    legislative context from the 1980s --

23              THE COURT:  Legislative standing.

24              MR. NICHOLS:  Legislative standing.  So I think it's

25    fair to say that Raines is the big change here.  It does effect
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    a significant shift in analysis vis-a-vis legislative standing.

2    Chenoweth, a couple of years after Raines, makes that clear, and

3    then --

4            THE COURT:  But again, speaking of -- we use the term

5    legislative, but the cases that it's addressing are really

6    legislator standing, individual legislators, in all of which

7    there's no committee action or House or Senate action.

8            MR. NICHOLS:  That is true, Your Honor, but I don't

9    think that matters, for a few reasons.  The injury here is still

10   the same.  Whether or not the House issued a subpoena, whether

11   or not the House authorized this lawsuit, the injury here is

12   exactly the same injury as that asserted in Walker v. Cheney.

13   It's the deprivation of information that the House believes it's

14   entitled to in order to help it consider whether legislation is

15   appropriate.  The injury is exactly the same.

16      What might be different is whether or not you would

17   speculate that the House believes it's aggrieved.  And as you

18   concluded in Walker v. Cheney, the fact that there's no

19   subpoena -- was no subpoena there and no resolution made the

20   injury there more conjectural.  We acknowledge that the House

21   certainly believes it's aggrieved and it's not conjecture to say

22   that the House believes that it's aggrieved.  But the injury,

23   the nature of the injury is still the same kind of abstract and

24   diffuse kind of information that you found was insufficient in

25   Walker v. Cheney.

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1          THE COURT:  Almost the same.  I mean,
 2    nonresponsiveness to a subpoena is in some ways a little more
 3    concrete than the Walker situation.
 4          MR. NICHOLS:  I think the concreteness comes from the
 5    failure to have information, and that's what you talked about in
 6    Walker v. Cheney.  That's true here.  Just as in Walker, the
 7    committee is deprived of information it says it's entitled to.
 8    Just as in Walker, the committee says we need that information
 9    in order to consider legislation, without which we can't do our
10    jobs.  That is exactly the kind of diffuse, abstract and
11    nonpersonal injury that you concluded was insufficient in Walker
12    v. Cheney.
13          THE COURT:  Raines doesn't address AT&T, and to the
14    extent that I address it in Walker, I said it exists and it's
15    circuit precedent.  If you take the Court of Appeals at its
16    word, it's a pretty definitive statement that the House would
17    have standing.
18      How can I ignore that, even in light of Raines, when Raines
19    doesn't address AT&T and the context is different?  If in no
20    other way it's different because Raines dealt with individual
21    legislators and AT&T dealt with the same situation as here,
22    which is a committee and a House vote.
23          MR. NICHOLS:  But I think AT&T is, in an important
24    way, different from this case.  That was not a lawsuit brought
25    on behalf of Congress.  That was a lawsuit brought by the
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    executive branch to preclude information from being produced to

2    Congress.

3              THE COURT:  But the Court of Appeals viewed it as a

4    suit between, or as a contest, if you will, between the

5    legislative and executive branches.  And indeed, before the

6    Court of Appeals, isn't that all, in terms of parties, that was

7    still in the case?

8              MR. NICHOLS:  Yes.  To be sure, that's correct,

9    Your Honor.  But I do think that it's important to look at that

10   context and think, okay, in that very different procedural

11   context, the committee would have you believe that in a single

12   sentence, which is frankly a little bit vague -- it doesn't say

13   Article III standing, it doesn't say injury in fact, it doesn't

14   say Article III case or controversy -- in a single sentence,

15   without analysis, without citation, that that opinion

16   essentially changed 200 years of practice, which was no lawsuits

17   brought by Congress in Article III courts.  But in any event --

18             THE COURT:  District courts are a little reluctant to

19   say, well, the Court of Appeals' rationale or its definitive

20   statement is not really all that great, so I'm going to reject

21   it.

22             MR. NICHOLS:  But it's not even clear to me that it is

23   a definitive statement, Your Honor.  It is vague.  It doesn't

24   discuss Article III standing.  My understanding is that the

25   issue of Article III standing was not briefed in front of the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   courts.  It's very difficult to even say that is a holding on

2   Article III standing, as opposed to either a statement about the

3   relationship between the individual congressmen and the House,

4   and a conclusion that, hey, we have the individual congressman

5   in front of us, but that's okay because he's here with the full

6   support of the House.

7       But I do think ultimately the question is does <u>Raines</u>

8   change the analysis, and there's no question that <u>Raines</u> does.

9   There's no requirement that, unlike when the Supreme Court

10  decides an issue and doesn't overrule an older case, that the

11  Supreme Court must go through all of the Court of Appeals

12  decisions decided before it, and say, okay, these 10 are

13  overruled and these 12 aren't overruled, and we don't know about

14  these eight so we're going to leave it for the --

15      THE COURT:  Although let's stick to the context here,

16  which is part of your point.  You don't have 10, eight, and 12;

17  you have a very small handful.

18      MR. NICHOLS:  Sure.  But I don't even think the

19  Supreme Court went through that handful of cases and said, well,

20  <u>Barnes v. Kline</u>, that's probably still good law or not, or <u>Moore</u>

21  is good law or not.  The Supreme Court decided the case, and it

22  set up a set of principles and analysis that the lower courts

23  should apply going forward.

24      THE COURT:  But just as compelling an analysis for

25  your point would be that the Supreme Court didn't address AT&T

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    and any other cases in that line, because that wasn't the issue

2    they were dealing with.  They were dealing with individual

3    legislator standing, not with the question of whether a

4    committee with a House vote would have standing, and indeed,

5    they noted that as a very important fact with respect to the

6    Raines decision, as I did in Walker.

7         MR. NICHOLS:  They did note that, Your Honor, and we

8    certainly acknowledged that the Court reserved that question and

9    you reserved that question in Walker v. Cheney.  My point was

10   only to say that just because a Court of Appeals decision is out

11   there, and the Supreme Court in Raines didn't go out of its way

12   to say, oh, that one Court of Appeals decision that's actually a

13   slightly different issue is overruled by implication here; that

14   doesn't mean that the theory of Raines doesn't overrule AT&T or

15   doesn't mean that Your Honor shouldn't consider how Raines

16   applies to this case independent of AT&T.

17        Your Honor, I know we've been here a long time, so I'd like

18   to move to the cause of action section if I could.  I think the

19   committee essentially conceded it doesn't have a cause of action

20   under the Declaratory Judgment Act this morning.

21        THE COURT:  But it didn't concede that it needs one.

22        MR. NICHOLS:  It didn't concede that it needs, it just

23   conceded that it doesn't have one.  I think the committee

24   concedes in its briefs, at least implicitly, that it needs a

25   cause of action, and then Mr. Nathan I believe conceded this

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    morning they don't have one under the Declaratory Judgment Act.

2            THE COURT:  I'm not sure he went that far, but let's

3    ask the question this way.  The Declaratory Judgment Act sets

4    out a couple of things that are necessary which the committee

5    argues are all satisfied here.

6        If you look to cases like Coffman v. Breeze Corporation,

7    there are a couple of things set out with respect to a

8    declaratory judgment: the availability of declaratory judgment,

9    including an actual case or controversy, that the issue is

10   actual and adversarial and there's not an attempt to get an

11   advisory opinion.  And the committee says it satisfies all

12   those.

13       Why isn't that enough here?

14           MR. NICHOLS:  Well, I think, Your Honor --

15           THE COURT:  Why do you need more?

16           MR. NICHOLS:  Well, I think you need more for a few

17   reasons.  First, if you didn't need more, then all the Supreme

18   Court's jurisprudence about implied rights of action and the

19   need to have clear rights-creating language would be essentially

20   unnecessary, because in cases like Alexander v. Sandoval you had

21   an actual case or controversy --

22           THE COURT:  That's a statutory session.  That's a

23   little different than the constitutional setting.

24           MR. NICHOLS:  Noted.  But my point is that if all one

25   needed under the Declaratory Judgment Act were the three things

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   you articulated -- if I have them correctly: actual case or

2   controversy, actual and adversarial nature of the case, and I

3   forgot the --

4           THE COURT:  Not seeking advisory opinion.  That's just

5   coming from Coffman v. Breeze.

6           MR. NICHOLS:  Right.  No advisory opinion.

7           THE COURT:  Those aren't the three things under

8   declaratory judgment.

9           MR. NICHOLS:  No, absolutely.  But if those are the

10  only three things you need, Alexander v. Sandoval had all of

11  those.  So the plaintiffs there wouldn't have had to try to find

12  a cause of action under Title 6 or Title 7; they would have

13  said, well, we have the Declaratory Judgment Act, and we have

14  adversity and actual case or controversy and we're not seeking

15  advisory opinion.  I think you need more.

16      And I think the Schilling case from the Supreme Court makes

17  that clear.  The Court said the availability of declaratory

18  relief under the Declaratory Judgment Act presupposes -- this is

19  a quote, "presupposes the existence of a judicially remediable

20  right."  And then there are cases, as you indicated, back from

21  the First Circuit and the Fifth Circuit that have said that the

22  Declaratory Judgment Act creates a remedy, not a cause of

23  action.

24          THE COURT:  And they agree with you on that need for a

25  pre-existing right.  I think Mr. Nathan said that in his

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    presentation.

2            MR. NICHOLS:  And that's what I was referring to when

3    I said that they essentially conceded that that doesn't come

4    from the Declaratory Judgment Act.  What they say is it comes

5    from Article I.  And Your Honor, you asked whether any court has

6    held that there is a judicial enforceable right under Article I.

7            THE COURT:  Injunctive or declaratory, or anything

8    actually, I suppose.

9            MR. NICHOLS:  Well, I think the one thing is clear,

10   that no court has come close to holding that Congress has an

11   implied cause of action, an implied right of action under

12   Article I of the Constitution --

13           THE COURT:  No court has said it doesn't either,

14   right?

15           MR. NICHOLS:  That is correct, Your Honor, but all of

16   the cases on which the committee relies, cases like McGrain and

17   Barenblatt, Marshall v. Gordon, they talk about powers, not

18   rights.  There is no discussion in those cases about a

19   congressional right to information.  And in that respect, I do

20   think this case is different from a lawsuit brought under the

21   Bill of Rights.

22       I do think the courts have either implicitly or in some

23   respects explicitly said, yes, an individual has an implied

24   cause of action for injunctive declaratory relief against the

25   government if it's infringing on his First Amendment rights.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          But that's under the Bill of Rights, and I think that's a

2     significant difference because the Supreme Court, to be sure, in

3     the statutory context, has drawn a significant distinction

4     between rights-creating language and other language.  And

5     there's certainly no language in Article I that creates a right

6     to come to federal court.

7          And the committee's ultimate response to all of this is to

8     say the greater power --

9               THE COURT:  It's not a right to come to federal court

10    that we're really looking for; it's some right that you have

11    that arises out of the Constitution.

12              MR. NICHOLS:  That's true, Your Honor.

13              THE COURT:  Could be a right to due process on the

14    Bill of Rights side, or a right to enforce subpoenas on the

15    Article I side.

16              MR. NICHOLS:  Right.  But I do think that the

17    committee's ultimate response is to say we have Article I power

18    to legislate.  Implied in that is the power to investigate, and

19    implied in that power is a set of other powers including

20    inherent contempt power, the ability to issue subpoenas --

21              THE COURT:  Seems to me that McGrain and Eastland and

22    other cases do pretty much stand for that.

23              MR. NICHOLS:  They stand for that, but what the

24    committee then says and which no court has ever held, is that

25    those implied powers also include the implied power to bring

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    lawsuits in federal court.  No court has certainly ever adopted

 2    that position.  And their ultimate analysis or syllogism is

 3    those greater powers must necessarily include the lesser.

 4            THE COURT:  But I don't think you need an implied

 5    power to bring lawsuits.  If you have an implied right, then in

 6    combination with the Declaratory Judgment Act, you have the

 7    ability to bring the lawsuit.

 8            MR. NICHOLS:  Yeah, and I think that whatever the

 9    terminology one uses, that their view is we have these implied

10    powers, or call them rights, to investigate.  But implied in

11    them, or the lesser right or power of those greater rights and

12    powers is the ability to sue in federal court.  But I think that

13    that syllogism --

14            THE COURT:  The ability to enforce their subpoenas,

15    some mechanism to enforce their subpoenas, and then in

16    combination with the Declaratory Judgment Act, their position

17    is, you have the access to the federal courts.

18            MR. NICHOLS:  Some ability --

19            THE COURT:  As long as you have 1331 jurisdiction.

20            MR. NICHOLS:  Some ability to enforce subpoenas in

21    federal court, yes.  But I do think that the syllogism, the

22    greater includes the lesser, whatever its validity might be in

23    other contexts, ignores the fact that those powers or rights are

24    different.  The Supreme Court made clear in Reed, although it

25    was a statutory case or an interpretation of a resolution, that
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1  there's a significant difference between the authority to exert

2  the powers of the Senate to compel production and "the authority

3  to invoke judicial power for that purpose."  They drew a

4  distinction in Reed, Your Honor.

5          And I think that's also implied, if not expressed, in

6  Buckley, which talks about the distinction between taking care

7  and the executive's ability to file civil lawsuits on the one

8  hand and Congress's inability to do so on the other.

9          I think at the end of the day, though, A, no court has ever

10  held that Congress has the right or power to enforce subpoenas

11  in federal court, independent of standing, but that they have a

12  right to invoke the aid of Article III courts implied in Article

13  I.  All of the cases on which they rely talk about inherent

14  powers to investigate, not to sue.

15          And so again, Your Honor, if you were to adopt their view,

16  you would be the first court to hold you don't need a separate

17  statutory cause of action, 288d was irrelevant -- and I'd like

18  to mention one thing about 288d in a minute.  But Congress,

19  notwithstanding all this legislative debate in the '70s, all of

20  that was irrelevant because Congress, either house always had

21  the authority to sue in federal court anytime it felt aggrieved

22  by the failure to have information.

23          THE COURT:  There's no case, as you've recognized, and

24  as Mr. Nathan agreed when I asked the question again, that

25  really deals expressly with this question of implying an

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    injunctive or declaratory cause of action from the Constitution,

2    as opposed to the statutory setting or the Bivens damages

3    setting.  But don't you think it's easier to imply that

4    injunctive or declaratory cause of action than it is to imply a

5    damages remedy under the Constitution?  And indeed, hasn't the

6    Supreme Court really said as much?

7              MR. NICHOLS:  I do think that the Court has recognized

8    a distinction between injunctive relief cases on the one hand

9    and damages cause of action on the other.  But those cases were

10   always lawsuits brought by individuals bringing the sort of

11   traditional common law dispute that the Article III branches

12   always resolved.

13       I think the question here is, is there constitutional

14   authority for the Article I branch to sue the Article II branch,

15   and the Article III branch to have the Article III branch to

16   order the executive branch to disclose information to Congress.

17             THE COURT:  In terms of our separation of powers, why

18   is it so much worse for the Article I branch to sue the Article

19   II branch before the Article III branch, than for the Article II

20   branch to sue the Article I branch before the Article III

21   branch?

22             MR. NICHOLS:  And as I said before, Your Honor, it's

23   not clear to me that after Raines, which talks not about the

24   posture of the case but about the fact that courts haven't

25   historically resolved interbranch disputes over official power,

PDF created with pdfFactory Pro trial version www.pdffactory.com

1      I don't know where the Supreme Court would come out with respect

2      to cases brought by the executive branch against Congress.

3      Cases like United States v. U.S. House didn't actually resolve

4      the Article III question.  Judge Smith decided --

5              THE COURT:  What if Congress went ahead, as you

6      suggest is an alternative -- whether it's better or not we'll

7      leave alone -- but went ahead and exercised its inherent

8      contempt power and somehow had the ability to seize and arrest

9      Ms. Miers and --

10             MR. NICHOLS:  Or Mr. Bolten.

11             THE COURT:  -- or Mr. Bolten, and hold one or the

12     other of them in the cell that exists in our congressional

13     establishments.  Could the executive branch come to court to

14     seek the release of that individual?

15             MR. NICHOLS:  To sue Congress seeking to release?

16             THE COURT:  Yeah.

17             MR. NICHOLS:  I think the more traditional way for

18     that lawsuit to be resolved would be for Ms. Miers or Mr. Bolten

19     to file a habeas petition.  That is a traditional Article III

20     case or controversy.  Their claim would be that they were being

21     unlawfully held.  It would raise some of the issues presented

22     here but not all of them.

23             THE COURT:  Let's use Mr. Bolten as the example there,

24     because he would be a current official and therefore really is

25     just an official.  Why is that any different when he files that

PDF created with pdfFactory Pro trial version www.pdffactory.com

1  suit than the executive branch filing the suit?  He's filing it

2  as a senior executive branch official.  It's the same thing.

3           MR. NICHOLS:  I think, Your Honor, it's not quite the

4  same as Congress filing this lawsuit, whether it's the executive

5  branch suing Congress seeking release or Mr. Bolten seeking

6  release.  The injury is different.  Mr. Bolten's being held

7  personally.  He's being deprived of a liberty interest.  Liberty

8  interests are exactly the kinds of things that the courts have

9  said that they are there to resolve.  So I think that the injury

10 there, which is I'm being held in a cell and I can't leave --

11          THE COURT:  So his cause of action, you're saying,

12 would be a due process type cause of action, as opposed to a I

13 have a privilege; I don't have to give this information up or

14 even appear?

15          MR. NICHOLS:  Well, I think it would be a habeas

16 petition, and the courts have recognized that habeas petitions

17 are appropriate there.  In fact, I think McGrain v. Daugherty

18 was a habeas petition brought on behalf of an individual.  I

19 can't recall whether the individual there was an executive

20 branch official, but there's no question that was a habeas

21 petition.

22      Courts have certainly permitted habeas petitions to be

23 adjudicated throughout history.  I'm not aware of any court that

24 has said no cause of action for a habeas petition.  Whether

25 that's inherent in the suspension clause or a common law right

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    to habeas, or the federal statutes that permit habeas, I'm not

2    quite sure, but I do think it's significantly different.  The

3    injury would be different, and I do think you would find a cause

4    of action in one of the several sources that I mentioned,

5    Your Honor.

6        If I could turn to your discretion.  This assumes, of

7    course, that you've concluded that you have -- that you have

8    Article III jurisdiction over this dispute.  It assumes that the

9    committee has a cause of action.  The committee concedes at page

10   47 of their reply that you do have discretion to decline to

11   decide this lawsuit.  I do think, Your Honor, that there are

12   several reasons why you should exercise that discretion.

13       First, as we've been discussing, this isn't the traditional

14   model of common law lawsuits brought by individuals harmed

15   either by government actions or other individuals.  This is far

16   from that traditional Article III model, as Justice Souter I

17   think recognized in his concurrence in Raines.

18       Second, if you get to the point where you're deciding the

19   merits questions here, the immunity question, the privilege log

20   question and the ultimate executive privilege question, I think

21   resolving those issues would substantially rework the

22   accommodation process.  As I mentioned earlier --

23           THE COURT:  This is one of the difficulties I have,

24   because both sides have that same point, whatever I do, whether

25   I rule for the executive branch, just to put it in a very

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    inaccurate but pristine terms, rule for the executive branch or

2    rule for the legislative branch, that somehow I am going to

3    disrupt the balance that has existed.

4        Focus the question on you.  We have the political branches

5    operating over the past several decades at least, in light of

6    the AT&T decision, Senate Select Committee, other cases, and OLC

7    opinions, and they negotiate in that context of presumptive, if

8    you will, judicial review through civil enforcement actions by

9    Congress.

10       Why isn't it the case that ruling your way will disrupt the

11   balance as opposed to confirming those authorities?  Whatever

12   their weight, they are the authorities, judicial and internal

13   executive branch authorities, in the OLC opinions by then-

14   Assistant Attorney General Olson and Cooper.

15       MR. NICHOLS:  I think you have to take it issue by

16   issue.  I don't think you can avoid addressing the Article III

17   question; under Steel Co. you have to reach that.

18       THE COURT:  Concededly.

19       MR. NICHOLS:  And, Your Honor, I think that once the

20   committee decided to file this lawsuit, it became fairly clear

21   that there would be a thumb placed on the scale one way or the

22   other.  I do think that the Article III question has been an

23   open one, at least since Raines, over the last 11 years.  I

24   don't think one could assume that these lawsuits would in fact

25   be proper in the Article III courts.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1       So if you were to hold that Congress does have standing in

2  these circumstances, it would put a thumb on the scale of the

3  committee in a way that hasn't existed since <u>Raines</u>.  And to be

4  sure, the opposite is true.  To the extent that the committee

5  has operated on the assumption that not withstanding <u>Raines</u> it

6  had standing to sue in the federal courts and you were to hold

7  that the committee lacked standing, that would put a thumb on

8  the other side of the scale.

9       I do think that the cause of action question is one you

10 could avoid, Your Honor, and if you were to hold that the

11 committee doesn't have a cause of action under the Declaratory

12 Judgment Act, together with implied Article I, that would put a

13 little thumb on the scale, but that's a fixable problem.  I

14 mean, Congress can attempt to pass a cause of action as it

15 considers --

16       THE COURT:  The Senate could be proceeding with this

17 suit, right?

18       MR. NICHOLS:  The Senate could be proceeding with the

19 suit.  And I do want to mention one thing that Mr. Nathan said.

20 Mr. Nathan suggested that 2 U.S. Code 288d, the provision we

21 pointed to, was somehow jurisdictional.  That's quite clearly

22 wrong.  The jurisdictional provision is 1365 which gives the

23 federal courts jurisdiction over certain suits brought by Senate

24 legal counsel.  This kind of suit would be carved out.

25       There's no question that 2 U.S. Code 288d is

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    nonjurisdictional.  But the cause of action, even if you were to

2    hold that the committee lacked a cause of action, that's a

3    fixable problem.  If you were to hold, Your Honor, that you lack

4    jurisdiction over this dispute, because of the nature of the

5    dispute, perhaps because of how late it comes in this Congress,

6    notwithstanding the fact that the subpoenas were issued well

7    over a year ago, and notwithstanding the fact that the committee

8    waited some seven months to bring this action, if you were to

9    hold that that is good reason for you to hold off and to see

10   whether in the next administration and the next Congress,

11   whether there's going to be a subpoena enforcement action, I

12   don't think that holding would put a thumb on the scale for

13   either side, frankly.

14       Once you get to the merits, if you hold that there's

15   Article III standing, that there is a cause of action, and that

16   you're not going to exercise your discretion, once you're

17   addressing the question of close advisor immunity, I think it

18   really will rework the accommodation process.

19       The executive branch for over 30 years has taken the

20   consistent position that there is such testimonial immunity, it

21   is negotiated with Congress, and the accommodation process has

22   assumed from the executive branch's perspective that it has that

23   immunity.  If you were to hold that there is not such immunity,

24   I think that would alter the accommodation process.  And then

25   with respect --

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          THE COURT:  Is there any prior situation where a

2    senior -- I'll use that term to include not just presidential

3    advisors but cabinet-level officials -- where a senior executive

4    branch official, in response to a subpoena, has simply declined

5    to appear and Congress has challenged that declination?

6          MR. NICHOLS:  I'm not aware of any, Your Honor.  In

7    the course of working --

8          THE COURT:  Indeed, even Ms. Gorsuch appeared, did she

9    not?

10          MR. NICHOLS:  Ultimately she did, yes.  But I think

11    that that's partly a reflection on the fact that the

12    accommodation process has worked.  Notwithstanding the fact that

13    the Clinton Justice Department took the position that senior

14    advisors were immune from compelled congressional testimony,

15    including counsel to the President, the counsel to President

16    Clinton did voluntarily show up and testify.

17          THE COURT:  It looks like the accommodation process

18    works almost always with the individual appearing.

19          MR. NICHOLS:  But I think it depends on the strength

20    of the interests involved.  And one of the advantages to

21    requiring disputes like this to be worked out in the political

22    arena as opposed to the Article III courts is it requires the

23    Article I and Article II branches to calibrate how important the

24    dispute is to them.  It may have been that in the Clinton

25    Administration, that the administration concluded that the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    President's interests in autonomy and confidentiality weren't

2    sufficiently important vis-a-vis Congress's need.

3        But that's exactly what the branches should be doing, is

4    calibrating that.  Congress, rather than filing this lawsuit,

5    should be thinking to itself, how important is this information

6    to us vis-a-vis executives' assertion of privilege and autonomy?

7    If it's really important to Congress, they have a host of powers

8    available to it.

9        They can say we're not going to appropriate money for the

10   Justice Department this year unless you give us this

11   information, White House.  We can say, this nomination for

12   Assistant Attorney General, we're not going to confirm this

13   person until you give us this information.

14       It has a host of powers available to it that it hasn't

15   really exercised here.  The advantage there is the exercise of

16   those powers, because it puts significant pressure on the

17   executive, requires the executive branch to say, well, in light

18   of the assertion of those powers, how important is it to us to

19   protect confidentiality, executive privilege, and autonomy?

20           THE COURT:  Some of that probably has happened, not

21   explicitly in terms of the relations between the two branches,

22   but is it your view that there is no circumstance where courts

23   should get involved in these types of disputes between the

24   executive and legislative branches over the provision of

25   information by the executive branch pursuant to a subpoena?

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          MR. NICHOLS:  If the subpoena seeks information in aid

2     of legislation, the general interest in legislation, yes, Your

3     Honor, I think that under --

4          THE COURT:  Because there's always going to be

5     something else Congress can do, for instance, the power of the

6     purse.

7          MR. NICHOLS:  I think that that is the conclusion from

8     <u>Raines</u> and <u>Walker v. Cheney</u>, that the Congress lacks Article III

9     standing when it's suing the executive branch --

10         THE COURT:  <u>Raines</u> and <u>Walker</u> didn't deal with

11    Congress lacking standing.  It dealt with legislators,

12    individual --

13         MR. NICHOLS:  I didn't say that they compelled the

14    result here, but the analysis.  The analysis in <u>Raines</u> and the

15    analysis of Your Honor's opinion in <u>Walker v. Cheney</u> made clear,

16    I think, that Congress here lacks standing because its injury is

17    too diffuse, nonconcrete, and abstract.

18         So I do think the implication of our position is that

19    Congress cannot sue the executive branch in federal court

20    seeking information it has subpoenaed from the executive branch

21    in aid of its legislative function.  I do concede that,

22    Your Honor.

23         If I could, and I know time -- we've been here a long time.

24    We did discuss the testimonial immunity point.  I do think it's

25    important to stress that --

PDF created with pdfFactory Pro trial version www.pdffactory.com

1        THE COURT:  And that merges to some extent with this

2   discretionary issue, because that's part of the reason you think

3   the Court should not exercise its discretion.  We have a

4   backdrop here of not only what we've already discussed but

5   another thing we discussed, and that is, under Marbury and

6   United States v. Nixon, pretty clear expression by the Supreme

7   Court that it is the judiciary that is the ultimate arbiter of

8   what the law is, and specifically in United States v. Nixon,

9   claims of executive privilege.

10       Now, your contention is that an Article III court should

11  not intervene.  Isn't that somewhat inconsistent with that core

12  principle of our separation of powers?

13       MR. NICHOLS:  On the question of immunity, no, Your

14  Honor, and here's why.  I think that it flows logically from

15  Nixon v. Fitzgerald.  Nixon v. Fitzgerald created absolute

16  immunity on behalf of the President, notwithstanding Marbury,

17  notwithstanding U.S. v. Nixon, in order to protect the President

18  in his autonomy and his ability to discharge his official

19  duties.

20       That's not to say that once you get to the question of

21  immunity, we're not saying you have no role.  We're saying you

22  have to recognize the absolute immunity of the President's close

23  advisors.

24       THE COURT:  But all the other cases didn't accept

25  absolute immunity for the President or for the President's

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    advisors.

2         MR. NICHOLS:  That is correct.  <u>Nixon v. Fitzgerald</u> is

3    the one case that recognizes --

4         THE COURT:  That's in the money damages context.

5         MR. NICHOLS:  That is in the money damages context,

6    but I don't think that --

7         THE COURT:  And even in that context the Supreme Court

8    has been just as clear that senior presidential advisors do not

9    have absolute immunity.

10        MR. NICHOLS:  That is correct, but I don't think that

11   recognizing that senior advisors have absolute immunity is the

12   same thing as what the Court in <u>U.S. v. Nixon</u> or <u>Marbury</u> said:

13   The courts should not defer to the executive branch; we

14   shouldn't just give them a blank check.

15        We're asking Your Honor to recognize absolute immunity for

16   a very small group of persons based on what we think are

17   constitutionally important principles about autonomy and

18   confidentiality.  I don't think that's the same as saying our

19   claims are unreviewable.

20        In the right case, assuming you had Article III

21   jurisdiction and there were a cause of action, there might be a

22   case where the assertion of absolute immunity, depending on who

23   the advisor was, was something that you could adjudicate.  But I

24   don't think this is a <u>Marbury v. Madison</u> case.

25        The other difference between <u>Marbury v. Madison</u> is the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    Court made clear that it had to have before it the kind of case

2    or controversy that is traditionally resolved by Article III

3    courts, and we just don't have that here.

4        At the end of the day, though, Your Honor, with respect to

5    immunity, it is for a very small cadre of senior advisors.  We

6    are not seeking carte blanche to have absolute immunity for

7    anyone who's in the White House.

8            THE COURT:  So you don't include cabinet officials in

9    that?

10           MR. NICHOLS:  We do not, Your Honor.

11           THE COURT:  And why is that?  Why is it that the

12   Secretary of State or the Secretary of Defense, who I think

13   you'll concede is a very close advisor of the President, would

14   have less in the way of immunity than a third-level, let's say,

15   deputy White House counsel would have?

16           MR. NICHOLS:  I don't want to suggest that a

17   third-level deputy White House counsel would necessarily have

18   immunity here.  You don't have to reach that question.  I should

19   say that if Your Honor were to agree that some senior advisors

20   to the President do have immunity, the committee doesn't argue

21   that the counsel to the President doesn't fall within that small

22   group.  I think if they're a senior advisor, immunity --

23           THE COURT:  That may be, but answer my hypothetical

24   question.

25           MR. NICHOLS:  I was going to get there; I just wanted

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    to make that clear, that we weren't conceding or arguing that

2    the third-level White House advisor has immunity.  But I think

3    the difference is that, as the OLC opinions have recognized for

4    the last 37 years, senior advisors, unlike cabinet officials'

5    sole function is to advise and assist the President.  This

6    immunity is derived from the President, and it's to protect his

7    autonomy.  These advisors are in effect his alter egos.

8        Cabinet officials are different.  Yes, they advise the

9    President from time to time, but they have a whole host of

10    operational and independent, in the sense that it's statutorily

11    created, obligations.

12        So it is the case that the senior advisors to the President

13    stand in an important and an importantly different position than

14    cabinet-level officials, and that is why we're not asserting in

15    this case that cabinet-level officials would have such immunity.

16            THE COURT:  Well, here's the rub or at least one rub

17    with the absolute immunity position.  That claim of absolute

18    immunity from compelled testimony or appearance before a

19    congressional committee, here for the White House counsel as a

20    senior presidential advisor, runs the risk, does it not, of

21    transforming the underlying basis of the claim, which is a

22    presidential communications privilege, into an absolute

23    privilege because it would be then untested by the courts?  The

24    executive could simply assert it, there's nothing Congress could

25    do about it, and nothing the courts would ever be able to do

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    about it because in your view it's absolute.

2         Isn't that at odds with the law, in similar contexts at

3    least, that makes it only a qualified privilege, perhaps

4    presumptively valid for the President and for presidential

5    advisors but only a qualified privilege for presidential

6    advisors?  And indeed, even for the President, in United States

7    v. Nixon, it's only a presumptively valid executive privilege

8    that can be overcome.  But you would transform it, would you

9    not, through this absolute immunity in these contexts into an

10   absolute privilege?

11        MR. NICHOLS:  I think I need to break that question up

12   some, Your Honor.  I think implicit in that question is the

13   assumption that our argument for immunity for senior advisors is

14   based only on the need to protect presidential communications or

15   presidential communication privilege.

16        THE COURT:  I don't mean to have that be implicit.

17   You can base it on anything you want.

18        MR. NICHOLS:  Yes, but I think our briefs make clear

19   that the need for immunity is based not just on the need to

20   protect the President's interest in confidentiality, which can

21   be protected at least in some ways by executive privilege, but

22   also the ability to protect the President's autonomy and how he

23   exercises his constitutional duties and obligations.  And I

24   think the courts have made clear that you have to be very

25   careful that the courts and Congress not be permitted to

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    essentially invade the President's autonomy.

2        And that's exactly what would happen here if either the

3    President, on the one hand, or his advisors could be hauled

4    before Congress to testify about any matter that Congress

5    decided it wanted presidential or advisor testimony about,

6    and --

7        THE COURT: But you're effectively -- and this may

8    indeed be your position. You're effectively saying that whereas

9    presidential advisors and perhaps even the President only have a

10   limited privilege claim, and therefore limited immunity when

11   you're dealing with the courts seeking information. When it's

12   Congress seeking information, the rules are different and the

13   President and presidential advisors should have an absolute

14   immunity that is asserted by the executive, and nothing can be

15   done about it.

16       It's a different set of rules when Congress seeks the

17   information than in United States v. Nixon, In Re: Sealed case,

18   many settings where the information is being sought not by

19   Congress but by the courts or even the executive branch through

20   a special prosecutor. Different set of rules when Congress

21   seeks the information, right?

22       MR. NICHOLS: Yeah, and I think it's important, and

23   this was going to be the next part of my response. You talked

24   about U.S. v. Nixon. I think Nixon turned very much on the

25   context of that case, that you had a criminal case, and the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    court went to great pains to talk about the need for every man's

2    evidence in a criminal case.

3        I think the commentators, people like Archibald Cox, have

4    made quite clear that the likelihood that there would be

5    information sought from the President or his closest advisors in

6    the criminal context, where you need perfect information, you

7    need every man's evidence, is much different from the

8    congressional context where, as Senate Select has made clear,

9    Congress doesn't need perfect information.  They don't sit as a

10   grand jury; they sit in order to have enough information to make

11   general legislative and predictive judgments.

12       So I think that's a significant difference between the

13   criminal context and the congressional context.  And the other

14   is the potential number, nature, and scope of, on the one hand

15   criminal cases -- I'm aware of very few criminal cases

16   throughout the years in which information has been sought from

17   the executive branch, let alone from the Executive Office of the

18   President, and on the other hand, congressional inquiries.

19            THE COURT:  There was one just a year or two ago,

20   wasn't there?

21            MR. NICHOLS:  There was one just a year or two ago.

22   But on the other hand, we know from this Congress that there are

23   Congress requests of the executive branch and of the Executive

24   Office of the President for information.  And so what you have

25   is on the one hand criminal cases that are much less frequent,

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    and grand juries need perfect information as the Court has made

2    clear, and on the other, the potentially essentially unlimited

3    scope and number of congressional inquiries --

4         THE COURT:  Except that you may not ever have a

5    congressional inquiry that can reach the Court unless, let's

6    just assume that this is the way the courts decide it, unless

7    there is a committee subpoena that is actually sought and voted

8    out by the committee and the entire house, be it the House of

9    Representatives or the Senate, concurs with that.  That's going

10   to limit the circumstances.  Indeed, if you look historically,

11   you can see how limited those circumstances are.

12        MR. NICHOLS:  It might, Your Honor.  But the other

13   thing I wanted to stress when I was distinguishing the Nixon

14   criminal context and the congressional context is to make clear

15   what we're talking about with respect to immunity and privilege.

16   We are not arguing that there is immunity from document

17   subpoenas.  A lot of what Mr. Nathan argued this morning was

18   about cases about documents and the fact that privilege can be

19   overcome with respect to documents.

20        We are not arguing today that we are immune from document

21   subpoenas.  The immunity we're talking about relates only to

22   oral testimony compelled by subpoena.

23        THE COURT:  So if I get -- if I were to decide against

24   you on the standing, cause of action, and discretionary issues,

25   then what happens with respect to the subpoena to Mr. Bolten?

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1              MR. NICHOLS:  To Mr. Bolten --

 2              THE COURT:  Yes, document subpoena.

 3              MR. NICHOLS:  The document subpoena you have before

 4    you --

 5              THE COURT:  And the part of the subpoena to Ms. Miers

 6    that only seeks documents.

 7              MR. NICHOLS:  You have before you a live claim by the

 8    committee that we have a present obligation that's judicially

 9    enforceable by the committee to provide a privilege log.  But

10    thereafter, however you resolve that question -- I'd like to

11    discuss that in a minute -- we would be in the world of the

12    assertion of the executive privilege with respect to those

13    documents and weighing that against Congress's need.

14         We're not there yet.  That would be the next stage in the

15    litigation.  But for now what's before you if you get past the

16    threshold issues is, A, is Ms. Miers immune from oral testimony

17    before Congress?  And there again, that's another distinction,

18    Your Honor.  I think there's a significant difference between

19    executive privilege assertions in the context of documents where

20    you have a lot more control over the documents, and protecting a

21    senior advisor through the assertion of privilege, which is

22    never perfect in an oral setting, especially in a committee room

23    with lights and the pressure that comes to bear from committee

24    questions.  So I think --

25              THE COURT:  We expect our senior government officials
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    to be able to stand up to that kind of pressure, don't we?

2            MR. NICHOLS:  Yes, we do.

3            THE COURT:  It's part of your job responsibilities is

4    to be able to handle those pressure-packed situations, whether

5    in your office or in a more public setting.

6            MR. NICHOLS:  We certainly do, Your Honor.  My point

7    was only that there are different considerations when one is

8    talking about the question of documents.  Mr. Nathan was talking

9    about Dellums and Sun Oil.  Those are all document cases, and

10   whether a particular document was privileged and whether

11   Congress's need or the litigants' need for a particular piece of

12   information in a document outweighed the need.  I think there

13   are different considerations --

14           THE COURT:  I think that's an important point, an

15   important distinction for you to make, between Ms. Miers's

16   appearance for oral testimony and the document subpoenas, which

17   are to Mr. Bolten and also to Ms. Miers, and the fact that

18   you're only asserting this absolute immunity claim with respect

19   to Ms. Miers showing up in Congress.

20           MR. NICHOLS:  For oral testimony, compelled oral

21   testimony.  If I could go to the last live issue before you

22   right now, which is the privilege log claim.  As I mentioned

23   before, the committee has not moved for summary judgment on the

24   question of whether particular pieces of information are

25   privileged or not and whether they've demonstrated that the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    information is demonstrably critical to their legislative

2    efforts.

3        What they have moved for summary judgment on is what they

4    say is an independent right to require the executive branch to

5    produce a privilege log.  All the cases on which the committee

6    relies --

7            THE COURT:  Before the case even gets to court.

8            MR. NICHOLS:  Before the case even gets to court and

9    before the Court has decided how it would like to have the

10   privilege issues briefed.  I mean, we concede that if we get to

11   the point where Your Honor is considering whether particular

12   documents are privileged or not and whether Congress's need for

13   those documents outweigh the privilege, the balancing approach

14   that does apply with respect to documents, that at that point

15   Your Honor could -- we would hope we would convince you to the

16   contrary, but Your Honor could, if it would help you sift

17   through that information, require us to produce a privilege log.

18       But we're not there yet, Your Honor.  There's no -- no

19   court has ever held that Congress has an independent judicially

20   enforceable right to a privilege log.  You shouldn't create one

21   here, Your Honor.  A privilege log in this setting would be

22   incredibly burdensome.  It would enable Congress, once it had

23   that rule from you, to say every time it served a subpoena on

24   the executive branch, you must give us a privilege log.

25       That would require incredible amounts of resources from the

PDF created with pdfFactory Pro trial version www.pdffactory.com

Executive Office of the President and, depending on the

information sought by Congress in the privilege log, as we have

here, it could actually require the disclosure of information

that the executive branch would think is privileged, how many

times an issue was confronted, who confronted the question, all

of the things that one has to worry about in the context of

producing privilege logs.

THE COURT:  And I understand your argument, and I

think it has some force.  The other side of that argument is

that some further definition is going to be helpful in the

negotiation and accommodation process that both sides think is

the first and best choice for these kinds of political branch

disputes.

For example, what if we had this kind of situation, with

more precise descriptions of the categories in former Solicitor

General's Clement's letter?  If we had a more precise

description of category 3, which are the White House-Department

of Justice communications, that might convince the committee

that it has no need for those materials.  Either it already has

them or there's nothing really there, given a further

description, there's nothing there of value.

And for category 2, which are the White House

communications with the legislative branch and others outside of

the executive branch.  Maybe only -- let's say there's 30

documents identified in that category; it may be only two the

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    House committee feels that it needs.  And then on category 1,

2    perhaps the most important category, the internal White House

3    communications, the committee still seeks three out of the five

4    subcategories of those documents, but if produced, it agrees

5    that Ms. Miers does not have to appear to testify.

6        Why isn't that process of -- don't call it a privilege log

7    but call it what the cases have called it, more in terms of

8    particularized description, that enables analysis and

9    decision-making and compromise, why isn't that the kind of

10   narrowing that would be very helpful to the negotiation and

11   accommodation process, and indeed makes a better chance for

12   resolution either between the political branches or if it

13   eventually comes to court?

14       And here you have -- this is a many-parted question.  And

15   here you have minimal, if any, burden on the executive branch

16   because the documents have already been identified, gathered,

17   and assessed for privilege purposes.  So why isn't that the

18   better course?

19           MR. NICHOLS:  Your Honor, I think it's fair to say

20   that we would have been willing to discuss those very things as

21   part of the accommodation process, and you've identified a

22   number of reasons why, as part of the accommodation process, the

23   parties should get together, try to narrow their disputes,

24   perhaps talk about further descriptions of the documents and the

25   like, but we are not in the accommodation process right now.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    What we have is the question whether the committee can force --

2            THE COURT:  But I could play AT&T and send you back

3    into that process with some direction.

4            MR. NICHOLS:  You certainly could, Your Honor, and I

5    don't want to suggest that if you said I really think there

6    should be further discussions here, that we wouldn't be willing

7    to engage in those discussions.  We do believe we've made

8    extraordinary offers to the committee in the past.  But if you

9    were to say I think there need to be more discussions, we would

10   do so.

11       But whether or not a privilege log, and in the context

12   of -- or even just a further description of the information

13   would make sense in the accommodation process, there has to be a

14   give and take.  There has to be a willingness on the other side

15   to say, okay, if you give us a little bit more information,

16   we'll take something off the table.  That never happened here.

17       I think it's very important to recognize that we made an

18   offer.  The committee's willingness to take the information that

19   we had offered was always without prejudice to the committee's

20   ability to seek everything, including Ms. Miers's testimony,

21   including every single document.  And Mr. Nathan's suggestion

22   early in the day that somehow our privilege claim is undermined

23   by our willingness to make an accommodation offer I think is

24   unfounded.  And in fact if you were to adopt such a rule --

25           THE COURT:  I didn't really react too favorably to

PDF created with pdfFactory Pro trial version www.pdffactory.com

1  that proposition.  It does seem to me that both sides have shown

2  a little bit of intransigence -- that's not unusual in this day

3  and age, at least in Washington -- and have tried to protect

4  their options while limiting the options of the other side.

5  That's why we're here.

6          MR. NICHOLS:  That's right.  But if I could close,

7  Your Honor, what you identified with respect to the

8  accommodation process I think makes perfect sense.  If the

9  parties are willing to discuss and if the committee said give us

10  a limited description and we might be willing to take some

11  things off the table, I suspect that 12 months ago the President

12  and the executive branch would have been willing to listen to

13  that.

14      But at this point the question is a much different one.

15  The question is can the committee have Your Honor enter an

16  injunction that forces us to produce a privilege log of any

17  nature, let alone one that asks for all the committee asks for.

18          THE COURT:  I'm only being asked to do something like

19  that because of where the executive and legislative branches

20  have wound up on this.  I didn't volunteer for this

21  responsibility.  You're the ones who brought it to me.

22          MR. NICHOLS:  We actually didn't bring it to you, Your

23  Honor.

24          THE COURT:  You're the ones who brought it to me

25  through your inability to resolve the issues.

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          MR. NICHOLS:  That's true, but I don't think you can

2     certainly place all the blame at our feet.

3          THE COURT:  I'm not.  I cast a fairly wide net here.

4          MR. NICHOLS:  But just in conclusion, Your Honor, with

5     respect to the privilege log, I agree with you that in the

6     accommodation process there are times where the parties are

7     willing to negotiate, compromise, and otherwise discuss, that

8     the provision of a little additional information might actually

9     help the parties narrow their disputes if the other side is

10    willing to take things off the table.  That didn't happen here.

11        But in any event, whether you think that's the right thing

12    to have happen in the accommodation process, we're at a

13    different stage, and the question is can the committee compel a

14    privilege log through an order from this court.

15         THE COURT:  Another thing that impresses me here, and

16    I say this with all due respect to the officials involved, is

17    that some of the materials -- and again, we'll use the Clement

18    letter as the rough definition of the materials that exist --

19    under D.C. Circuit law, some of those materials -- for some of

20    those materials a privilege claim could not be sustained.

21         It might be true in the literal terms of the letter that a

22    privilege claim can be made, but it couldn't be sustained, and

23    the documents that I'll carve out and focus on are the documents

24    that are simply the duplicates of the documents that have

25    already been produced by the Department of Justice.

PDF created with pdfFactory Pro trial version www.pdfactory.com

1          The law in this circuit, under <u>In Re: Sealed</u> case, the <u>Espy</u>

2     case, it's pretty clear that specifically disclosed materials,

3     materials that have been specifically released, you cannot

4     continue to claim an executive privilege, whether it's

5     presidential communications or deliberative process work.  It's

6     not a sustainable position.  Do you disagree with that?

7               MR. NICHOLS:  I do disagree, Your Honor.

8               THE COURT:  Because you don't accept <u>In Re: Sealed</u>

9     case or because you think it's just limited to contexts other

10    than Congress?

11              MR. NICHOLS:  I think it's limited to contexts other

12    than Congress.

13              THE COURT:  I don't think the waiver analysis is any

14    different with Congress.

15              MR. NICHOLS:  The executive branch has a long-standing

16    policy that the disclosure of information to Congress, say from

17    the Department of Justice, does not waive or abrogate, insert

18    the verb you'd like to insert, the executive privilege quality

19    of the documents.  So I think that is a position that we would

20    take if and when we were at the position of litigating the

21    executive privilege claims, Your Honor, but we're not there yet.

22              THE COURT:  But that may be the silliness of this

23    whole thing.  Is it really true that a court would be called on

24    to resolve an issue as to whether this copy of this document

25    that the executive branch already decided to give to Congress

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    should not be given to Congress?  That seems, does it not, like
 2    a pretty silly issue?
 3              MR. NICHOLS:  I don't know which side the silliness
 4    falls on.  I mean --
 5              THE COURT:  Well, it may fall on both sides.
 6              MR. NICHOLS:  Right.  If Congress already has those
 7    documents, then isn't it a little silly to ask Your Honor to
 8    resolve the question of whether those documents remain
 9    privileged, notwithstanding the fact that they already have
10    them?
11              THE COURT:  I think that's why they haven't focused
12    really on that issue.
13              MR. NICHOLS:  Right.  If you were to look at the
14    Senate Select analysis where it talks about the fact that
15    information that was being sought there already -- certain
16    committees already had the information, with respect to that
17    category, the committee already has those documents.  So if
18    there's any silliness, it may be asking Your Honor to sort that
19    issue out when for 200-some-odd years the federal courts have
20    not gotten involved in these disputes.
21              Thank you, Your Honor.
22              THE COURT:  Thank you, Mr. Nichols.  All right.
23    Mr. Nathan, a few minutes.
24              MR. NATHAN:  How much?
25              THE COURT:  A few.  You need me to define it, I will.
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          MR. NATHAN:  Sorry?

2          THE COURT:  If you need me to define it, I will.

3      (Laughter)

4          MR. NATHAN:  I'll try and keep it brief, but there's a

5  lot of material to cover.  The first and most important point,

6  Your Honor, is what is the record with respect to how it has

7  been understood over the last 35 years with respect to

8  responding to subpoenas by the executive branch.

9      We put in the record, Your Honor, the report by the

10  Congressional Research Service that shows that 75 top officials

11  of administrations have testified before Congress.  We went

12  beyond that and we examined how many of them were pursuant to

13  subpoena.  I can represent to the Court and I can provide an

14  affidavit today, this morning, that 25 of those have appeared

15  pursuant to subpoena, and among those 25 are White House

16  counsel, chiefs of staff, and deputy White House counsel.

17      That reflects an understanding over the last 35 years, in

18  light of the rulings by the Court, that there's no immunity,

19  there's no absolute immunity for even incumbent White House

20  counsel, chiefs of staff, or other top aides to the President.

21      They have recognized after the <u>Nixon</u> case that there's an

22  obligation to comply with subpoenas.  And there is a qualified

23  privilege, but there's no immunity of any kind, certainly not

24  absolute immunity.

25          THE COURT:  If you think I should rely on that, then

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    you better file an affidavit addressing that.  Not an argument,

2    just the facts, please.

3            MR. NATHAN:  No, no.  Just an affidavit stating the

4    facts and showing exactly who has testified pursuant to

5    subpoena.  I think that's critical, Your Honor, to understand

6    this business about lifting the thumb on the scale, because if

7    this court were to rule and abstain from getting involved in the

8    case, then there would be no review of this in the Congress or

9    in the courts.

10           And while Mr. Nichols very politely says today, well, this

11   is just for these top officials, what's to prevent that from

12   happening to deputy White House counsel, from other aides?  In

13   fact, that's what happened here.  The same order went out, the

14   same instruction went out --

15           THE COURT:  That's sort of how these things get

16   resolved, gradually in terms of line drawing.  If someone's

17   clearly within a category, the courts, for example, don't

18   necessarily reach down and draw a definitive line.  They just

19   deal with the person who's clearly within the category.  Why

20   wouldn't that be --

21           MR. NATHAN:  But if the Court can't hear the case,

22   then there's no categories and there's nothing to limit what the

23   executive branch can say.  They're saying we are the determiners

24   of how far this immunity goes.  Today we're saying it's this

25   far.  We're saying you shouldn't enter the case, and when you

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    don't enter the case and when there's an order that the Court is

2    not going to get involved, then that line can go quite further

3    down.  And so it's quite inappropriate, and it is certainly

4    inappropriate for a former official.

5            He says that this would destroy the autonomy of the

6    President.  I'm very puzzled by how this happens.  The notion is

7    there's a qualified privilege to protect the communications.

8    That's what the Supreme Court has said repeatedly.  Haven't said

9    anything about any immunity.  The Fitzgerald case --

10           THE COURT:  Any immunity?

11           MR. NATHAN:  Immunity for anybody in the White House

12   not to appear in response to a subpoena, including the

13   President.  The President is subject to subpoenas.  That's what

14   Clinton against Jones is about.  That's what the Nixon case is

15   about.  That's what the GSA case is about.  This is about

16   providing information.  This is not about a damage action.

17           In the Fitzgerald case, that's about a damage action.

18   That's about money from the President.  They said the President

19   is immune from a damage action, a civil damage action of private

20   people for his official actions.  And in that connection -- and

21   that's all it's about, damage actions -- they say the aides

22   don't have the same immunity.  They have a qualified immunity.

23   They have to appear and show that they acted in good faith.

24           But here we're not dealing with damage actions.  We're

25   dealing with a subpoena for information.  And the notion that

PDF created with pdfFactory Pro trial version www.pdffactory.com

1   they could just assert an immunity and not answer the questions

2   means that a lot of the questions that you asked about the

3   presidential involvement never get answered, because there's no

4   opportunity.  If you're immune, you don't have to respond.  The

5   privilege is all about protecting the confidentiality.  That's

6   what the cases talk about.

7        I don't see anything in the cases about the autonomy of the

8   President.  And in any event, even if there were anything about

9   the autonomy of the President and his office, it's not affected

10  by having a former aide who's in private law practice appear

11  before a committee and, following the President's instruction,

12  responding on a question-by-question basis to a privilege issue

13  and saying, well, I can't testify to that; that's privileged,

14  and then knowing exactly what the question is, and then having

15  review first by the committee and then by the courts, if that's

16  necessary.

17       So the notion of immunity, A, it's unjustified, and B, it's

18  inconsistent with everything that has been asserted, and it's

19  inconsistent with the record of 35 years.  And of course these

20  subpoenas go back further than that, but I'm taking the 35 years

21  because that's the period of time during which the cases have

22  arisen.

23       And the parties have understood -- both the Congress and

24  the President and the executive branch have understood that they

25  are required to appear in response to subpoenas and assert, when

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    appropriate, privilege.  And that of course, as I pointed out

 2    before, has been the law in this country since the early 19th

 3    century.

 4         With respect to the presidential involvement, I'm really

 5    quite taken by these answers, because we alleged in the

 6    complaint that there was no presidential involvement in this

 7    matter.  On the motion to dismiss, and that's what we're arguing

 8    here with respect to the standing and with respect to the cause

 9    of action and with respect to the discretion, this court must

10    accept that assertion, that there was no presidential

11    involvement, which in turn we obtained from the White House,

12    from their public statements.

13         Now, if they want to come in and say that the facts are

14    different in the first place before this court, they need to

15    file an affidavit.  There's nothing in response to our complaint

16    or the motion or even our motion for summary judgment to say

17    that there's any involvement here.  But if there were any

18    involvement, that only goes to the importance of finding out

19    what the facts are and the importance of not claiming immunity

20    but having someone show up and answer the question.

21         I think it's a perfectly valid question to ask Harriet

22    Miers: Was the President involved?  I'm not asking what he said;

23    I'm not asking what he did.  Was he involved?  Did you prepare a

24    memo for the President?  Were any of your conversations with

25    Karl Rove or the others, were they designed to give advice to
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    the President?

2              THE COURT:  With respect to removal.

3              MR. NATHAN:  With respect to anything here.

4              THE COURT:  Well, you don't mean with respect to how

5    to handle this matter.

6              MR. NATHAN:  No, exactly, but I'm talking about --

7              THE COURT:  But those are some of the materials.

8              MR. NATHAN:  They may be some of the materials, but of

9    course we don't have a privilege log, so we don't know exactly

10   what the materials are.  But you're exactly right, and I'm

11   talking about the removals:  And when you had the conversations,

12   first with the people on the Hill or with political operatives,

13   was that in connection with providing advice to the President?

14             THE COURT:  Here's what I think you're relying on and

15   what Mr. Nichols referred to.  It was a press conference and

16   Ms. Perino speaking at the press conference.  She was asked the

17   question as follows:  "Are you aware of how many conversations

18   the President had about the eight U.S. Attorneys in question

19   prior to them being dismissed?"

20       Ms. Perino responded:  "No.  I have said on the record for

21   several weeks now that there is no indication that the President

22   knew about any of the ongoing discussions over the two years,

23   nor did he see a list or a plan before it was carried out."

24       Now, there are three parts to that response.  The first is

25   no with respect to whether she's aware of how many conversations

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    occurred.   The second is that there's no indication that the

2    President knew about any of the ongoing discussions over the two

3    years, and the third is that he didn't see a list or a plan

4    before it was carried out.

5        Seems to me that the middle part of that is probably the

6    most important, that there's no indication the President knew

7    about any of the ongoing discussions over the two years.

8        MR. NATHAN:   Right.   And I think it's a perfectly

9    valid question to find out if that's true.   This statement's at

10   a press conference, Your Honor, and we've accepted it for

11   purposes of pleading in our complaint.   But in terms of finding

12   out what the facts are in relation to asserting a privilege,

13   it's important to get the underlying facts.   And those are

14   legitimate questions.   That's why a witness has to show up and

15   answer questions that are pertinent to the applicability of the

16   privilege.

17       And if the President had no involvement with it, that

18   creates one set of circumstances.   If these were prepared for

19   the President's consideration, that's a different question and

20   the Court would find a different aspect of the executive

21   privilege.   That's why the immunity is absolutely outrageous and

22   untenable.

23       THE COURT:   There is a process under our local rule

24   structure for a summary judgment motion that if followed might

25   have helped here a little bit in terms of statements of material

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    fact and then a responding statement of genuine issues.

2          MR. NATHAN:  We filed such a statement, Your Honor.

3    We filed a statement of --

4          THE COURT:  Does it include that fact as being a

5    material fact for resolution of -- not of the motion to dismiss

6    but of the motion for partial summary judgment?

7          MR. NATHAN:  I don't think it does, and I think

8    that's -- and if you need to have that corrected, we can correct

9    that.  But that is in our view an uncontested statement.  I'm

10   not clear if that's material to the immunity question because I

11   don't think that there is any immunity, and therefore I don't

12   think that there's any issue there that the Court, assuming that

13   it had jurisdiction, that there's standing, that there's a cause

14   of action, that the law is absolutely crystal clear, couldn't be

15   clearer, from Marbury v. Madison through today, that no

16   privilege -- there's no privilege that says you don't show up.

17   Even with respect to the Fifth Amendment in the grand jury,

18   there's a requirement to appear and assert it, not just to phone

19   it in.

20        And by the way, on this notion of the immunity and just

21   being for the testimony, that is false.  That is absolutely

22   false, in two respects.  First, the letter Mr. Manning sent to

23   the committee said he was told by the White House that they're

24   immune and therefore we're not showing up, we're not producing

25   documents, we're not giving you a privilege, we're doing

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    nothing.  We're ignoring your subpoena because we're immune from

2    it, and that includes the document part.

3        And with respect to Mr. Bolten, here also, in court here

4    today they're saying, well, we're not really immune; we're just

5    asserting the privilege.  But they are saying they're immune

6    because that subpoena demanded a privilege log as part of it,

7    and they said you can go pound sand.  We're not responding to

8    your subpoena.  We're immune from subpoenas.  We don't have to

9    carry out your instructions in a subpoena.

10       And I say to you, Your Honor, that that is an imperative

11   part of any process, that when -- we have a right to issue

12   subpoenas.  The law is clear on that from the Supreme Court.

13   When you have a right to issue a subpoena, you have the right to

14   set the conditions, and one of those conditions is that there be

15   a privilege log.

16       And when they say we're not going to do it, just the way

17   they respond to subpoenas where they show up to testify in the

18   Congress, they're required to respond to that subpoena and that

19   requirement.

20       THE COURT:  You have prudential and practical

21   arguments that are fairly strong with respect to this privilege

22   log point.  But what is the legal basis for compelling -- for

23   Congress compelling the executive to file a privilege log in

24   response to a subpoena?  Anything in any statute, case, rule,

25   that you can refer to?

PDF created with pdfFactory Pro trial version www.pdffactory.com

1          MR. NATHAN:  No.  There's no statute or case law on

2     this, Your Honor.  There is a practice.  There is a practice.

3     Often privilege logs have been supplied upon demand by a

4     subpoena from the Congress.  The executive has carried out and

5     has provided a privilege log --

6          THE COURT:  And this is a very pragmatic utility --

7          MR. NATHAN:  Exactly.  It's a very pragmatic thing,

8     exactly relating -- I mean, it's so ironic.  They're the ones

9     who are saying, well, negotiations and compromise, that's the

10    way to do it, and they take steps that prevent that kind of a

11    step because they won't provide a statement of what these

12    documents are which would lead to discussions about it.  They're

13    saying it here in court that they're going to do that, but that

14    is contrary to the position that they've taken repeatedly in

15    their letters.

16         THE COURT:  Anything further you want to really focus

17    on as you conclude?

18         MR. NATHAN:  Well, there are a large number of things.

19    With respect to the --

20         THE COURT:  That is what I feared.

21      (Laughter)

22         MR. NATHAN:  I'll try to keep it as short as I can.

23      Your Honor, with respect to the floodgates that you raised,

24    I think it's pretty obvious that in the 35 years, that has been

25    pretty clear that there's only a qualified privilege and that

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    there are reviews in court based on the three cases that have

2    been cited here, including the Senate Select Committee, that

3    there has not been the floodgate.

4         And that is -- and for pretty obvious reasons.  There are a

5    lot of practical considerations here, and Your Honor has pointed

6    to some of them in terms of the duration of the House session,

7    in terms of the political atmosphere in which they operate, and

8    the public opinion, in terms of the need not to have these kinds

9    of lawsuits, which I assure you are not what the Congress is

10   interested in, which is extremely time-consuming, expensive,

11   disruptive.  We're not looking to come to court on a repeated

12   basis.  That hasn't happened, and it's not going to happen.

13        But we need some baseline rules that the executive branch

14   can't say the law is something that it clearly is not, that

15   there's absolute immunity for former officials of the White

16   House and they can ignore with impunity congressional subpoenas.

17   That is an intolerable situation, and that's why this is one of

18   those rare cases that we've had to come to court.

19        I will close, Your Honor, with Raines.  I just want to make

20   this absolutely clear.  The Raines case has nothing to do with a

21   subpoena for information.  As Your Honor has said, that had to

22   do with legislators, individual legislators who lost in the

23   legislative branch, were seeking to reverse that in the courts

24   and seeking to challenge the resulting legislation.

25        And what's important about that is that not only is there a

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    remedy in the legislature for that, which there is not here --

2    there's no remedy in the legislature for the enforcement of the

3    subpoena.   This requires coming to court, in the absence of the

4    inherent contempt or the criminal prosecution, in order to get

5    that resolved.

6        And the second thing that's very important that the Court

7    pointed out in Raines and was the case, and Your Honor pointed

8    out in Cheney v. Walker, there's somebody else out there to

9    bring that action.  If the line-item veto is unconstitutional,

10   there will be individuals who will be affected by it; they can

11   bring the challenge, and they brought the challenge and were

12   successful.

13       But on a congressional subpoena, on a subpoena for

14   information that is authorized by the committee and authorized

15   by the House for both contempt and for a lawsuit, there's nobody

16   else, and that's what the executive branch wants.  They want

17   nobody else there.

18       They don't want to answer to the courts.  They don't want

19   to answer to Congress.  They don't agree that we have a system

20   of checks and balances in this country.  They want to be a

21   unilateral and unreviewed and unchecked body, and that is not

22   consistent with our Constitution.

23       And I urge the Court to reject their claim that the

24   Congress cannot review their actions and the Court cannot review

25   their demonstrably wrong and unconstitutional positions on such

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    things as immunity and the privilege log.

2         And for those reasons, Your Honor, we ask you to deny the

3    motion to dismiss, to grant our motion for partial summary

4    judgment, order that Ms. Miers must appear, as has happened

5    repeatedly in this country on assertions of privilege, assert

6    the privilege as to questions that fairly call for it, answer

7    the other questions, and then maybe we can resolve this matter

8    without coming back here.   Thank you, Your Honor.

9         THE COURT:   Thank you, Mr. Nathan.

10        Mr. Nichols, I'm not going to give you another opportunity

11   because we need to bring this to a close, but I do have two

12   questions for you, if you could come up to the lectern, please.

13        The first is just a question about your position on

14   absolute immunity.   I seemed to read in your reply brief, the

15   final brief, that if no absolute immunity, then qualified

16   immunity from responding or appearing.   Is that your view?

17        MR. NICHOLS:   Your Honor, our view is certainly that

18   Ms. Miers is absolutely immune.   That was really a response to

19   the committee.   We were saying -- the committee had argued that

20   if there's no absolute immunity, that's not a problem because

21   there's qualified immunity.

22        Our argument is, to the extent that Your Honor rejected

23   absolute immunity, agreed with the committee that qualified

24   immunity applied here and qualified immunity in fact would

25   attach, because the committee had not established the compelling

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
 1    need for the information --

 2            THE COURT:  I can read the papers, Mr. Nathan.  You

 3    don't need to stand up and say what your papers say.

 4            MR. NATHAN:  I'm not saying for qualified immunity.

 5    That's for damages action.  I'm talking about qualified

 6    privilege.

 7            THE COURT:  But on the immunity question, on absolute

 8    immunity, is there a backup position that the executive branch

 9    is articulating, that if the Court were to reject absolute

10    immunity from appearing and testifying, that there then should

11    be an assessment by the Court as to whether there's a qualified

12    immunity from appearing and testifying?

13            MR. NICHOLS:  Sure.  I don't want to bid against

14    myself --

15            THE COURT:  You're not bidding against yourself;

16    you're just helping me understand your arguments.

17            MR. NICHOLS:  I think the answer is yes, Your Honor.

18    If there is no absolute immunity, then you do need to undertake

19    a qualified immunity --

20            THE COURT:  I'm worried about that because it seems to

21    me that that assessment of a qualified immunity in that context

22    would draw the Court into the same balancing as would take place

23    on the merits of the privilege claim.

24            MR. NICHOLS:  That's why our view is that absolute

25    immunity is certainly the better position, and in some respects
```

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    this was a response to a position they were articulating.  I do

2    think at the end of the day our view is if you reject the

3    absolute immunity argument, qualified immunity is a very

4    difficult thing to assess in this context.

5         I do think that under a traditional Senate Select analysis

6    we would win it, but it's a unique, weird context because you

7    also have executive privilege lurking out there where you don't

8    have that in the civil context.

9              THE COURT:  All right.  The last question I have, and

10   excuse me for asking this question; I just feel that I should.

11   We have no issue here, do we, over the preservation of

12   responsive materials?  All responsive materials with respect to

13   the subpoena, including things that are mentioned in

14   Mr. Fielding's various letters, which would include e-mails that

15   are on other accounts or computers, all of those are being and

16   will be preserved through the life of this suit, even if the

17   suit is still alive when this administration leaves office?  Am

18   I correct?

19             MR. NICHOLS:  I have confirmed that responsive

20   materials have been and are being preserved.  They of course

21   will continue to be preserved during the pendency of this

22   litigation, and I commit to Your Honor --

23             THE COURT:  How about during the time after this

24   administration leaves office?

25             MR. NICHOLS:  We will commit to Your Honor to ensure

PDF created with pdfFactory Pro trial version www.pdffactory.com

1    that those materials continue to be preserved in a way that if,

2    as, and when there's a requirement that we disclose that

3    information to the committee, that we could do so.

4         THE COURT:  I would have expected no less, and I

5    appreciate your saying that.

6         I want to thank you and Mr. Nathan for the excellence of

7    the arguments and all of you for the briefing as well.  I thank

8    the amici for the very helpful briefs that have been submitted.

9    I have read them closely and will continue to consult them as I

10   deal with this matter.

11        And it is an important case, obviously, and I will deal

12   with it as quickly as I can.  But giving the time and attention

13   that the case warrants, which is confirmed by the presence, and

14   I acknowledge you again, Representative Conyers, Mr. Fielding,

15   and everyone else for being here.  Thank you.

16        (Proceedings adjourned at 1:00 p.m.)

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory Pro trial version www.pdffactory.com

```
            *   *   *   *   *   *

                  CERTIFICATE

        I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.


                    _____

                    BRYAN A. WAYNE
```

PDF created with pdfFactory Pro trial version www.pdffactory.com