**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
U.S. HOUSE OF REPRESENTATIVES,

    Plaintiff,

        v.                                    Civil Action No.  08-0409 (JDB)

HARRIET MIERS, et al.,

    Defendants.

## MEMORANDUM OPINION

This dispute pits the political branches of the federal government against one another in a case all agree presents issues of extraordinary constitutional significance.  The heart of the controversy is whether senior presidential aides are absolutely immune from compelled congressional process.  But as is often true of lawsuits that raise important separation of powers concerns, there are many obstacles to the invocation of the jurisdiction of the federal courts that must first be addressed.

The Committee on the Judiciary ("Committee"), acting on behalf of the entire House of Representatives, asks the Court to declare that former White House Counsel Harriet Miers must comply with a subpoena and appear before the Committee to testify regarding an investigation into the forced resignation of nine United States Attorneys in late 2006, and that current White House Chief of Staff Joshua Bolten must produce a privilege log in response to a congressional

subpoena.  Ms. Miers and Mr. Bolten (collectively "the Executive")[1] have moved to dismiss this action in its entirety on the grounds that the Committee lacks standing and a proper cause of action, that disputes of this kind are non-justiciable, and that the Court should exercise its discretion to decline jurisdiction.  On the merits, the Executive argues that sound principles of separation of powers and presidential autonomy dictate that the President's closest advisors must be absolutely immune from compelled testimony before Congress, and that the Committee has no authority to demand a privilege log from the White House.

Notwithstanding that the opposing litigants in this case are co-equal branches of the federal government, at bottom this lawsuit involves a basic judicial task -- subpoena enforcement -- with which federal courts are very familiar.  The executive privilege claims that form the foundation of the Executive's resistance to the Committee's subpoenas are not foreign to federal courts either.  After all, from Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) ("[i]t is emphatically the province and duty of the judicial department to say what the law is"), through United States v. Nixon, 418 U.S. 683, 705 (1974) (the judiciary is the ultimate arbiter of claims of executive privilege), to Boumediene v. Bush, 553 U.S. ---, 128 S. Ct. 2229, 2259 (2008) (rejecting regime in which the political branches may "switch the Constitution on or off at will" and, rather than the judiciary, "say 'what the law is'"), the Supreme Court has confirmed the fundamental role of the federal courts to resolve the most sensitive issues of separation of powers.  In the thirty-four years since United States v. Nixon was decided, the courts have routinely considered questions of executive privilege or immunity, and those issues are now "of a

---

[1] The Court will refer to the defendants in this action, and to the executive branch and the current administration generally, as "the Executive."

type that are traditionally justiciable" in federal courts, United States v. Nixon, 418 U.S. at 697 (citation omitted), and certainly not unprecedented, as the Executive contends.

Indeed, the aspect of this lawsuit that is unprecedented is the notion that Ms. Miers is absolutely immune from compelled congressional process. The Supreme Court has reserved absolute immunity for very narrow circumstances, involving the President's personal exposure to suits for money damages based on his official conduct or concerning matters of national security or foreign affairs. The Executive's current claim of absolute immunity from compelled congressional process for senior presidential aides is without any support in the case law. The fallacy of that claim was presaged in United States v. Nixon itself (id. at 706):

> neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial [or congressional] process under all circumstances.

It is important to note that the decision today is very limited. To be sure, most of this lengthy opinion addresses, and ultimately rejects, the Executive's several reasons why the Court should not entertain the Committee's lawsuit, but on the merits of the Committee's present claims the Court only resolves, and again rejects, the claim by the Executive to absolute immunity from compelled congressional process for senior presidential aides. The specific claims of executive privilege that Ms. Miers and Mr. Bolten may assert are not addressed -- and the Court expresses no view on such claims. Nor should this decision discourage the process of negotiation and accommodation that most often leads to resolution of disputes between the political branches. Although standing ready to fulfill the essential judicial role to "say what the law is" on specific assertions of executive privilege that may be presented, the Court strongly

encourages the political branches to resume their discourse and negotiations in an effort to

resolve their differences constructively, while recognizing each branch's essential role.  To that

end, the Court is reminded of Justice Jackson's observations in his concurring opinion in

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952):

> While the Constitution diffuses power the better to secure liberty, it also
> contemplates that practice will integrate the dispersed powers into a workable
> government.  It enjoins upon its branches separateness but interdependence,
> autonomy but reciprocity.  Presidential powers are not fixed but fluctuate, depending
> upon their disjunction or conjunction with those of Congress.

## BACKGROUND[2]

At the outset, the Court recognizes that this case is in an odd procedural posture.  For

purposes of the Executive's motion to dismiss, the Court must accept the Committee's factual

assertions as true, but that is not so for purposes of the Committee's own motion for partial

summary judgment.  Fortunately, however, the operative facts are not significantly in dispute,

notwithstanding each side's attempt to put its own gloss on the relevant events.

In early December 2006, the Department of Justice ("DOJ") requested and received

---

[2] Several organizations and individuals have participated in this proceeding as amici
curiae.  The minority leadership in the House of Representatives, Representatives John Boehner,
Roy Blunt, Lamar Smith, and Chris Cannon (hereinafter "House GOP amici"), filed a brief in
support of the Executive.  Four amici briefs were submitted in support of the Committee.  Those
briefs were filed by: (1) a group of former U.S. Attorneys who have served under Presidents
ranging from Lyndon Johnson to George W. Bush; (2) a group of current and former Members of
Congress, represented by Senator Inouye, Senator Whitehouse, former Senator Cohen, and
former Representatives Edwards and Evans; (3) the Rutherford Institute, Judicial Watch, Citizens
for Responsibility and Ethics in Washington, and the Brennan Center for Justice, which are
organizations spanning the political spectrum that advocate for separation of powers in the
federal government; and (4) Thomas Mann, Norman J. Ornstein, Mark J. Rozell, and Mitchel A.
Sollenberger, hailing from the Brookings Institute, the American Enterprise Institute, George
Mason University, and the University of Michigan-Dearborn, respectively.  The Court thanks all
of the amici for their thoughtful contributions to this proceeding.

resignations from seven U.S. Attorneys: Daniel Bogden (D. Nev.), Paul K. Charlton (D. Ariz.), Margaret Chiara (W.D. Mich.), David Iglesias (D. N.M.), Carol Lam (S.D. Cal.), John McKay (W.D. Wash.), and Kevin Ryan (N.D. Cal.).  See Pl.'s Stmt. of Facts ¶ 7.[3]  At some point earlier in the year, DOJ had also asked for and received resignations from two other U.S. Attorneys: H.E. "Bud" Cummins III (E.D. Ark.) and Todd Graves (W.D. Mo.).  Id.  The circumstances surrounding these forced resignations aroused almost immediate suspicion.  Few of the U.S. Attorneys, for instance, were given any explanation for the sudden request for their resignations. Many had no reason to suspect that their superiors were dissatisfied with their professional performance; to the contrary, most had received favorable performance reviews.

Additional revelations further fueled speculation that improper criteria had motivated the dismissals.  Carol Lam, for example, had successfully prosecuted Republican Congressman Randy "Duke" Cunningham for bribery following a high-profile investigation and was "in the midst" of pursuing additional high-ranking Republican officials when she was terminated.  See Pl.'s Mot. at 8; see also Report of the Committee on the Judiciary, House of Representatives, H.R. Rep. No. 110-423 (2007) (hereinafter "Contempt Report"), at 17.  John McKay had refused requests by Republican officials to pursue accusations of voter fraud during the 2004 Washington gubernatorial race.  Id.  Similarly, David Iglesias was contacted by two Republican Members of Congress from New Mexico (Senator Pete Domenici and Representative Heather Wilson) who were disappointed to learn that Iglesias had no plans to seek indictments against members of the opposing political party in the run-up to the 2006 congressional elections.  Pl.'s Mot. at 8; see

_____

[3] The Court will cite to the Committee's statement of material facts.  The Executive's responses to that statement reveal that these facts are essentially undisputed.

also Contempt Report at 25.

As these events came to light, the Committee on the Judiciary -- a standing Committee of the House of Representatives -- commenced an investigation into the forced resignations in early 2007.  See Pl.'s Stmt. of Facts ¶ 8.  Citing its authority under House Rule X, which provides that the Judiciary Committee's oversight responsibilities extend to issues relating to judicial proceedings and criminal law enforcement, the Committee declared that it aimed to:

(1) investigat[e] and expos[e] any possible malfeasance, abuse of authority, or violation of existing laws on the part of the Executive Branch related to these concerns, and (2) consider[] whether the conduct uncovered may warrant additions or modifications to existing Federal Law, such as more clearly prohibiting the kinds of improper political interference with prosecutorial decisions as have been alleged here.

Id. ¶ 10 (quoting Contempt Report at 7).  The Committee heard the testimony of six of the dismissed U.S. Attorneys during the first hearing held on March 6, 2007.  Id. ¶ 11.  Shortly thereafter, Committee Chairman John Conyers, Jr., and Linda T. Sanchez, Chairwoman of the Subcommittee on Commercial and Administrative Law, wrote to officials at DOJ and the White House requesting that certain individuals, among them Ms. Miers, be made available for questioning by the Committee.  Id. ¶¶ 12-13.

In response, the Executive, "[i]n order to accommodate the Committee's interests . . . [,] made available to Congress a very substantial number of witnesses and documents."  See Def.'s Mot. to Dismiss & Opp'n to Summ. J. (hereinafter "Def.'s Mot. & Opp'n") at 11.  Thus, the Executive made "then-Principal Associate Deputy Attorney General William Moschella available to Congress as a witness, and subsequently made available thirteen additional Executive Branch witnesses for testimony or interviews, including the Attorney General, the

Chief of Staff to the Attorney General, incumbent and former Deputy Attorneys General, and serving U.S. Attorneys." Id. Mr. Moschella testified that "the forced resignations were all performance related and that any White House involvement was minimal and occurred only at the end of the process." Pl.'s Mot. at 9 (citing Contempt Report at 19). Similarly, then-Attorney General Alberto Gonzales initially indicated that he was not involved in the process at all but later testified that he had very little recollection of the entire matter.[4]

On May 23, 2007, Monica Goodling, former Senior Counsel to Attorney General Gonzales and DOJ's White House Liaison, testified before the Committee pursuant to limited use immunity. See Pl.'s Stmt. of Facts ¶ 24. Similarly, on July 11, 2007, former White House Political Director Sara M. Taylor testified before the Senate Committee on the Judiciary pursuant to a duly issued subpoena. Id. ¶ 42. Ms. Taylor invoked executive privilege as necessary on a question-by-question basis. Id. Moreover, in addition to the live testimony provided, DOJ produced to Congress "over 7,850 pages of documents, including more than 2,200 pages from the Office of the Attorney General and 2,800 pages from the Office of the Deputy Attorney General." See Defs.' Mot. & Opp'n at 12. DOJ made available another 3,750 pages of documents, bringing the total number of pages produced to Congress to "nearly 12,000." Id.

According to the Committee, however, "[s]ubsequent testimony and documents provided by Department officials . . . suggested that the Gonzales and Moschella statements were false and misleading, thus still leaving unresolved precisely what the reasons were for the terminations and what role the White House played in them." See Pl.'s Mot. at 9-10. Most importantly, none of

---

[4] Indeed, by one count Mr. Gonzales testified no fewer than sixty-four times that he could not recall particular details concerning the events in question. See Eric Lichtblau, Bush's Law 295-96 (2008); see also Pl.'s Mot. at 9 n. 7.

the DOJ officials who testified before the Committee could identify <u>who</u> at DOJ had recommended the dismissal of the majority of the terminated U.S. Attorneys. <u>Id.</u> at 10 (citing Contempt Report at 43). Former Deputy Attorney General James B. Comey, who had supervised the dismissed U.S. Attorneys, had not recommended their removal -- with the apparent exception of Kevin Ryan -- and "could not credit the reasons offered for the terminations of the others." <u>Id.</u> (citing Contempt Report at 45-46). The Committee concluded that it is "well established that, in the opening days of President Bush's second term, then Senior Presidential Advisor Karl Rove raised the idea with officials in the White House Counsel's office of replacing some or all U.S. Attorneys." <u>See</u> Contempt Report at 43. The Committee has not been able to determine, however, "why Mr. Rove was interested in this issue." <u>Id.</u> Similarly, the Committee determined that "[n]ewly installed White House Counsel Harriet Miers apparently took up Mr. Rove's idea, and over the next two years received repeated drafts of the firing list." <u>Id.</u> at 43-44. But likewise, "the Committee has learned very little as to why Ms. Miers believed that an effort to replace sitting U.S. Attorneys should be launched." <u>Id.</u> at 44.

After deciding that Ms. Miers had played a significant personal role in the termination decision-making, the Committee intensified its efforts to obtain her testimony. Ms. Miers, however, had not responded to the initial letter from the Committee requesting a voluntary interview. <u>See</u> Pl.'s Stmt. of Facts ¶¶ 13-14. Hence, on March 9, 2007, Chairman Conyers and Chairwoman Sanchez wrote to Fred F. Fielding, Counsel to the President, requesting that the administration produce documents relating to the investigation and "make certain White House officials available for interviews and questioning." <u>Id.</u> ¶ 15.

Mr. Fielding responded by letter dated March 20, 2007. He indicated that the White

House was willing to "make available for interviews the President's former Counsel; current Deputy Chief of Staff and Senior Advisor; Deputy Counsel; and Special Assistant in the Office of Political Affairs." Id. ¶ 16 (quoting Pl.'s Mot. Ex. 5).  That offer was conditioned, however, upon several terms and restrictions.  To begin with, the interviews were to be limited to "the subject of (a) communications between the White House and persons outside the White House concerning the request for resignations of the U.S. Attorneys in question; and (b) communications between the White House and Members of Congress concerning those reports." Pl.'s Mot. Ex. 5.  Moreover, the Executive indicated that the interviews were to be "private and conducted without the need for an oath, transcript, subsequent testimony, or the subsequent issuance of subpoenas." Id.  The White House also offered to provide to the Committee two categories of documents: "(a) communications between the White House and the Department of Justice concerning the request for resignations for the U.S. Attorneys in question; and (b) communications on the same subject between White House staff and third parties, including Members of Congress or their staffs on the subject." Id.

The Committee did not receive Mr. Fielding's offer warmly.  In particular, the Committee viewed the proposal as "unreasonably restrictive" in part because "no matter what was revealed [through the document production or interviews], no other testimony or documents could be requested from the White House." See Contempt Report at 61.  Moreover, the documents the White House offered to produce "excluded all *internal* White House communications regarding the firing of the U.S. Attorneys, even though some documents reflecting such internal communications had already been provided by the Justice Department." Id. (emphasis in original).  Thus, pursuant to House rules, on March 21, 2007, the Subcommittee voted to

authorize Chairman Conyers to "issue subpoenas for the testimony of former White House

Counsel Harriet Miers . . . and other specified White House officials." Id. at 61-62.  In addition,

the Subcommittee also authorized Chairman Conyers to issue "subpoenas for documents in the

custody or control of . . . White House Chief of Staff Joshua Bolten." Id. at 62.

Chairman Conyers and Chairwoman Sanchez wrote to Mr. Fielding on March 22, 2007 to

inform him that the Committee could not "accept your proposal for a number of reasons." Id.

Specifically, the letter stated that:

> [T]he failure to permit any transcript of our interviews with White House officials
> is an invitation to confusion and will not permit us to obtain a straightforward and
> clear record.  Also, limiting the questioning (and document production) to
> discussions by and between outside parties will further prevent our Members from
> learning the full picture concerning the reasons for the firings and related issues.  As
> we are sure you are aware, limitations of this nature are completely unsupported by
> precedents applied to prior Administrations -- both Democratic and Republican.

Id.  Nevertheless, the Committee indicated that it remained "committed to seeking a cooperative

resolution to this matter on a voluntary basis." Pl.'s Mot. Ex. 6.  For that reason, Chairman

Conyers refrained from immediately issuing subpoenas in the hope that a negotiated solution

would obviate the need to rely upon compulsory process.  Id.

Chairman Conyers and Senator Leahy, Chairman of the Senate Committee on the

Judiciary, wrote to Mr. Fielding again on March 28, 2007 in an effort to reach an agreeable

accommodation.  The Chairmen requested that the White House abandon its "all or nothing"

approach and instead produce the documents that it had already offered to make available.  Pl.'s

Mot. Ex. 7.  They also suggested that the parties narrow the dispute to "internal" White House

documents and then focus on developing a process to deal with production.  Id.  Mr. Fielding

responded by letter dated April 12, 2007.  He asked the Committees to "reconsider [their]

-10-

rejection of the President's proposal." Pl.'s Mot. Ex. 9.  Mr. Fielding also "respectfully

decline[d] [the Chairmen's] suggestion to immediately produce the documents that we are

prepared to release." Id.  In conclusion, he indicated that the Executive "continue[d] to believe

that the accommodation we offered on March 20 . . . will satisfy the Committees' interests." Id.

Finally, Chairman Conyers and Chairwoman Sanchez wrote to Mr. Fielding on May 21,

2007 to "make one last appeal for . . . voluntary cooperation." Pl.'s Mot. Ex. 10.  They indicated

that the Committee had been "willing and able to meet to consider other means of resolving our

dispute, but we have received no response to our letters or proposals to you." Id.  Explaining that

"it is becoming increasingly clear that we will not be able to complete our investigation absent

full and complete cooperation from the White House," they emphasized the Committee's

willingness to work out a voluntary resolution to the dispute but noted that it would "be

constitutionally irresponsible to accept your 'all or nothing' limitations that would completely

preclude any access to on-the-record statements by current and former White House personnel or

access to internal White House communications." Id.  Thus, they stated that absent an effort by

the White House to accommodate the Committee's request, "we will have no alternative but to

begin to resort to compulsory process to carry out our oversight responsibilities." Id.

Mr. Fielding responded to Chairman Leahy, Chairman Conyers, and Chairwoman

Sanchez on June 7, 2007.  He noted that the Executive had "made efforts to resolve our

differences on this issue in a mutually acceptable fashion" by meeting with members from both

Committees to discuss proposals. Pl.'s Mot. Ex. 12.  Moreover, he cited to various disclosures

made by DOJ without objection from the White House.  In addition, Mr. Fielding expressed his

aspiration to "avoid the prospect of 'subpoenas' and 'compulsory process' referred to in your

recent letters and statement." Id.  He concluded by reiterating, once again, the terms of the

Executive's initial proposal, explaining that "[i]t is difficult to see how this proposal will not

provide your Committees with all information necessary to evaluate the White House's

connection to the Department's request for U.S. Attorney resignations." Id.

       Apparently viewing Mr. Fielding's June 7, 2007 letter as evidence of the Executive's

intransigence, the Committee issued subpoenas to Mr. Bolten and Ms. Miers on June 13, 2007.

Pl.'s Stmt. of Facts ¶¶ 26-27.  Mr. Bolten was directed to produce responsive documents to the

Committee by June 28, 2007 and to deliver a privilege log with respect to any documents

withheld on the grounds of privilege. Id. ¶ 26.  Ms. Miers was directed to appear to testify before

the Committee on July 12, 2007 and to produce relevant documents in her possession; she, too,

was advised to supply a privilege log for any documents withheld as privileged. Id. ¶ 27.

       On June 27, 2007, Solicitor General and then-Acting Attorney General Paul Clement

wrote to the President indicating that "[i]t is my considered legal judgment that you may assert

executive privilege over the subpoenaed documents and testimony." Pl.'s Mot. Ex. 15.  Mr.

Clement explained that the "Office of Legal Counsel of the Department of Justice . . . reviewed

the documents identified by the Counsel to the President as responsive to subpoenas." Id.  Those

responsive documents fell into "three broad categories": "(1) internal White House

communications; (2) communications by White House officials with individuals outside the

Executive Branch, including with individuals in the Legislative Branch; and (3) communications

between White House officials and Department of Justice officials." Id.  Mr. Clement concurred

with the conclusion of the Office of Legal Counsel ("OLC") that the documents "fall within the

scope of executive privilege . . . [and] that Congress's interests in the documents and related

testimony would not be sufficient to override an executive privilege claim." Id.

Based upon Mr. Clement's letter and OLC's analysis, Mr. Fielding wrote to Chairmen Leahy and Conyers on June 28, 2007 advising them that the "President has decided to assert Executive Privilege and therefore the White House will not be making any production in response to these subpoenas for documents." Pl.'s Stmt. of Facts ¶ 30. In addition, Mr. Fielding indicated that the President had also directed Ms. Miers not to produce any responsive documents to the Committee; George Manning, counsel for Ms. Miers, confirmed that instruction by letter dated June 28, 2007. Id. ¶¶ 30-31.

Mr. Bolten did not provide any documents to the Committee when his response date came due on June 28, 2007. The next day, Chairmen Leahy and Conyers wrote to Mr. Fielding seeking to obtain the specific bases for the Executive's assertion of privilege. Id. ¶ 33. They also requested that the White House provide a personal signed statement by the President confirming that he had decided to invoke executive privilege. Id. Mr. Fielding denied both requests on July 9, 2007. Id. ¶ 34. On that same day, Mr. Fielding wrote to counsel for Ms. Miers informing him that the President had decided to assert executive privilege over the substance of Ms. Miers's testimony, and hence she was instructed not to provide any testimony before the Committee. Pl.'s Mot. Ex. 20. In a July 10, 2007 letter to Mr. Manning, Mr. Fielding explained that OLC had concluded that Ms. Miers was absolutely immune from compelled congressional testimony. Pl.'s Mot. Ex. 23. He again directed Mr. Manning to ensure that Ms. Miers did not appear to testify before the Committee on July 12, 2007, and attached a copy of OLC's opinion -- also dated July 10, 2007 -- to his letter. Id.

Mr. Manning promptly informed the Committee that Ms. Miers had been instructed not to

provide any testimony in response to her subpoena. Chairman Conyers and Chairwoman Sanchez objected to this development, urging Mr. Manning that "[w]e are aware of absolutely no court decision that supports the notion that a former White House official has the option of refusing to even appear in response to a Congressional subpoena." Pl.'s Mot. Ex. 25. They warned that Ms. Miers ran the risk of being held in contempt of Congress if she declined to appear. Id. By letter dated July 11, 2007, Mr. Manning confirmed that Ms. Miers would not appear to testify before the Committee on July 12, 2007. Pl.'s Mot. Ex. 26.

When Ms. Miers failed to appear on July 12th, Chairwoman Sanchez decided to reject "Ms. Miers's privilege and immunity claims." Pl.'s Stmt. of Facts ¶ 44. The Subcommittee sustained that determination by a vote of 7-5. Chairman Conyers then delivered a copy of that ruling to Mr. Manning, along with a letter again warning that Ms. Miers could face contempt of Congress charges if she did not comply with the substance of the subpoena. Id. ¶ 45. In response, Mr. Manning restated that Ms. Miers would not appear to testify before the Committee or produce any responsive documents. Id. ¶ 46. On July 19, 2007, Chairman Sanchez again rejected Mr. Bolten's claims of executive privilege and his refusal to produce a privilege log. Id. ¶ 48. That decision was also sustained by the Subcommittee. Chairman Conyers then provided Mr. Fielding with a copy of that ruling and inquired as to whether the White House would comply with the subpoena. Id. ¶ 49. On July 23, 2007, Mr. Fielding informed Chairman Conyers that "the President's position remains unchanged." Pl.'s Mot. Ex. 31.

Frustrated by the Executive's actions, the full Committee met on July 25, 2007 and adopted a resolution "recommending that the House of Representatives find that former White House Counsel Harriet Miers and White House Chief of Staff Joshua Bolten be cited for

contempt of Congress for refusal to comply with subpoenas issued by the Committee." See 153 Cong. Rec. D1051-01 (2007).  Chairman Conyers provided Mr. Fielding with a copy of the Committee's report in the hope that it might prompt the White House voluntarily to change its position.  See Pl.'s Stmt. of Facts ¶ 52.  He received no response.  So, on November 5, 2007, the Committee filed its report with the full House of Representatives.  Id. ¶ 54.  Once again, Chairman Conyers wrote to Mr. Fielding to inform him of that development and to reiterate that the Committee still hoped "to resolve the issue on a cooperative basis"; Chairman Conyers even included "a proposal for resolving the dispute."  Id. ¶ 55.  This time, Mr. Fielding responded by rejecting Chairman Conyers's offer, explicitly noting that "[w]e are therefore at a most regrettable impasse."  Pl.'s Mot. Ex. 34.  He urged the Committee to "reconsider its proposed actions" and to accept the President's initial proposal.  Id.

With no negotiated solution in sight, the full House of Representatives voted to hold Ms. Miers and Mr. Bolten in contempt of Congress on February 14, 2008 by a vote of 223-32.  Pl.'s Stmt. of Facts ¶ 57.[5]  The House also passed three accompanying resolutions -- H. Res. 979, 980, and 982 -- that were meant to guide the next steps in the process.  Resolution 979, for instance, provided that the Speaker of the House shall certify a copy of the Contempt Report "to the U.S. Attorney for the District of Columbia, 'to the end that Ms. Miers be proceeded against in the manner and form provided by law.'"  Pl.'s Stmt of Facts ¶ 58 (quoting H. Res. 979, 110th Cong. (Feb. 14, 2008)).  It also provided analogous treatment for Mr. Bolten.  Resolution 980 authorized Chairman Conyers to initiate a civil action in federal court to seek declaratory and injunctive relief "affirming the duty of any individual to comply with any subpoena."  Id. ¶ 59

[5] The Republican Members boycotted the vote.

-15-

(quoting H. Res. 980, 110th Cong. (Feb. 14, 2008)).[6]

On February 28, 2008, Speaker of the House Nancy Pelosi certified the Contempt Report to Jeffrey A. Taylor, U.S. Attorney for the District of Columbia. Id. ¶ 60. Pursuant to the terms of 2 U.S.C. §§ 192 and 194, Mr. Taylor was directed to present the contempt charges against Ms. Miers and Mr. Bolten to a grand jury. See 2 U.S.C. § 194. On that same day, Speaker Pelosi wrote to Attorney General Michael B. Mukasey. Pl.'s Stmt. of Facts ¶ 62. The Attorney General had previously indicated that he would not permit Mr. Taylor to bring the contempt citations before a grand jury, and Speaker Pelosi "urged him to reconsider his position." Id. The next day, however, the Attorney General responded that because Ms. Miers and Mr. Bolten were acting pursuant to the direct orders of the President, "the Department has determined that non-compliance . . . with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers." Pl.'s Mot. Ex. 40. With criminal enforcement of its subpoenas foreclosed, the Committee -- invoking Resolution 980 -- filed this action seeking a declaratory judgment and other injunctive relief. See Pl.'s Mot. at 14.

The undisputed factual record, then, establishes the following. Notwithstanding a prolonged period of negotiation,[7] the parties reached a self-declared impasse with respect to the document production and testimony at issue here. Faced with that reality, the full House of

---

[6] Resolution 982 adopted the terms of H. Res. 979 and 980. See H. Res. 982, 110th Cong. (Feb. 14, 2008).

[7] Mr. Fielding's final letter to Chairman Conyers reveals that the Chairmen had "written 'on eight previous occasions,' three of which letters contain or incorporate specific proposals involving terms for a possible agreement." See Pl.'s Mot. Ex. 34.

Representatives voted to hold Ms. Miers and Mr. Bolten in contempt of Congress and certified

the Contempt Report to the U.S. Attorney for the District of Columbia to pursue criminal

enforcement of the contempt citations.  The Attorney General then directed the U.S. Attorney not

to proceed against Ms. Miers and Mr. Bolten.  The Committee, then, filed this suit seeking civil

enforcement of its subpoena authority by way of declaratory and injunctive relief.

The only real factual "dispute" here is which party is responsible for the impasse.

Unsurprisingly, each side blames the other.  The Committee contends that the Executive

proposed an untenable "take it or leave it" offer that would have significantly curtailed the

Committee's capacity to perform its oversight duties, and then would not budge from its initial

position.  The Executive insists that the Committee's proposals "have been substantially the

same and one-sided: they propose accommodations on the part of the White House without

signaling any willingness on the part of the Committee to accommodate itself to the Presidential

interests at stake."  Pl.'s Mot. Ex. 34.  Hence, it is the Committee (in the Executive's view) that

has stonewalled the accommodation process by pressing unreasonable demands that, if accepted,

would amount to "incremental Executive Branch abandonment of [the President's] constitutional

obligations."  Id.  Although it is relevant that the political branches have reached an impasse, it is

not important to assign blame for purposes of the motions now before the Court.

## DISCUSSION

Because the Executive's motion to dismiss raises threshold issues that may preclude the

need to reach the merits of the Committee's claims, the Court will address its motion first.  There

is one preliminary matter to discuss briefly however.  Both sides concede, and the Court agrees,

that 28 U.S.C. § 1331 provides subject matter jurisdiction over this lawsuit.[8]  Because this

dispute concerns an allegation that Ms. Miers and Mr. Bolten failed to comply with duly issued

congressional subpoenas, and such subpoena power derives implicitly from Article I of the

Constitution, this case arises under the Constitution for purposes of § 1331.  In Senate Select

Comm. on Presidential Campaign Activities v. Nixon, 366 F. Supp. 51 (D.D.C. 1973) ("Senate

Select Comm. I"), the court indicated that federal question jurisdiction was properly invoked in a

suit by a Senate committee to enforce a subpoena issued to President Nixon provided that the

then-existing statutory amount in controversy requirement was satisfied.  Id. at 59-61.  Although

the court ultimately dismissed the case for failure to meet the monetary threshold, that

requirement no longer exists and there is no other impediment to invoking § 1331 subject matter

jurisdiction here.[9]  Indeed, in United States v. AT&T, 551 F.2d 384 (D.C. Cir. 1976) ("AT&T

I"), a case similar to this one, the D.C. Circuit found subject matter jurisdiction pursuant to §

1331 owing to the "fundamental constitutional rights involved."  Id. at 388-89.

I.      **The Executive's Motion to Dismiss**

      The Executive launches three distinct attacks in its motion to dismiss, raising

considerations of standing, cause of action, and equitable discretion.  The Court will address each

---

      [8] See, e.g., Defs.' Mot. & Opp'n at 38 ("Defendants do not dispute that the Court has statutory subject-matter jurisdiction under 28 U.S.C. § 1331.").

      [9] The Committee also suggests that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 because this lawsuit qualifies as one "commenced by the United States."  It is not necessary to decide that question, however, due to the parties' apparent agreement -- and the Court's independent determination -- that § 1331 provides subject matter jurisdiction here.

contention in turn, but none provides a basis to dismiss this action.[10]

       A.    *Standing*

       Standing is "'an essential and unchanging' predicate to any exercise of jurisdiction" by an

Article III federal court.  See Am. Chemistry Council v. Dep't of Transp., 468 F.3d 810, 814

(D.C. Cir. 2006) (quoting Florida Audubon Soc. v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)).

"[T]he irreducible constitutional minimum of standing contains three elements." Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560 (1992).  "First, the plaintiff must have suffered an

injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized

---

      [10] Although the Executive does not press the argument, the House GOP amici urge the Court to dismiss this case on the ground of ripeness.  According to the House GOP, this case is not ripe because the Committee has failed to exhaust alternative avenues that may conceivably be available to obtain the same information it seeks from Ms. Miers and Mr. Bolten.  Moreover, forthcoming reports to be issued by the Inspector General and the Office of Professional Responsibility at DOJ, as well as the Senate Ethics Committee, may alleviate the Committee's asserted injuries or otherwise moot them by revealing that no impropriety occurred concerning the dismissals.  Thus, the Court should refrain from entertaining the case at this time.

      The Court disagrees.  The doctrine of ripeness is a "justiciability doctrine designed" to prevent premature adjudication of disputes.  See Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807 (2003).  It has both Article III and prudential dimensions.  Id.  "Determining whether . . . action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  Id. at 808.  Put another way, a court "must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

      This case is ripe for adjudication. The factual record is fully developed -- there are no gaps that the Court would be required to "fill-in" -- the issues are purely legal, there is no further administrative action that the Court would interfere with, and the Committee would most certainly suffer in the event of delayed judicial review.  One issue that the House GOP highlights -- that the Committee has not demonstrated a sufficient need to overcome the invocation of executive privilege -- goes solely to the merits of the privilege assertion and has no bearing on the ripeness inquiry.  The upshot of the House GOP's remaining arguments is that the Committee has not sufficiently exhausted its negotiating options.  Putting aside the fact that the Executive itself declared an impasse, the Committee is correct that it is not required to run down every conceivable, but highly speculative, lead.  See Pl.'s Opp'n & Reply at 33.

. . . and (b) actual or imminent, not conjectural or hypothetical." Id. (internal quotations and citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." Id. (internal quotations and alterations omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (internal quotations omitted). Significantly, the Supreme Court has stressed that the standing inquiry is "especially rigorous" where -- as here -- important separation of powers concerns are implicated by a dispute. See Raines v. Byrd, 521 U.S. 811, 819-20 (1997). In this context, a plaintiff must demonstrate that "the dispute is 'traditionally thought to be capable of resolution through the judicial process.'" Id. at 819 (quoting Flast v. Cohen, 392 U.S. 83, 97 (1968)).

Here, the principal debate concerns the injury-in-fact prong of the standing analysis.[11] The Executive's argument has two constituent parts: first, that the Committee has not suffered a cognizable personal injury that is required for Article III standing; and second, that this is not the type of dispute traditionally capable of resolution before an Article III court.

"[T]he Committee lacks the traditional type of 'personal injury' required under Article III," the Executive insists, id. at 29, and this Court held just that in Walker v. Cheney, 230 F. Supp. 2d 51 (D.D.C. 2002). Here, the Committee's injury is "governmental" rather than "personal," the argument goes. The fact that the Committee speaks for the entire House of Representatives, rather than for only some Members in their individual capacity, does not

---

[11] At oral argument the Executive conceded that the Committee can satisfy the causation and redressability elements. See Transcript of Oral Argument at 69 ("Our argument is focused only on injury.").

transform the underlying nature of the Committee's asserted injury into the appropriate "individual rights" action. That, the Executive says, is the upshot of the Supreme Court's decision in <u>Raines</u>, which jettisoned the concept of so-called "legislative" standing. <u>Raines</u>, 521 U.S. at 820, 829. Like the plaintiffs in <u>Raines</u>, the Committee's "institutional injury . . . is wholly abstract and widely dispersed . . . [and its] attempt to litigate this dispute at this time and in this form is contrary to historical experience." <u>Id.</u> at 829.

Nor can the Committee rely upon the notion of "informational injury" espoused in <u>FEC v. Akins</u>, 524 U.S. 11 (1998), and <u>Public Citizen v. U.S. Dep't of Justice</u>, 491 U.S. 440 (1989).

> In those cases Congress had enacted statutes providing private plaintiffs with unqualified legal rights to information -- regardless of the need or the purpose for which information was sought -- and 'the invasion' of those statutory rights was held to inflict a concrete and particular injury supportive of the plaintiffs' standing.

<u>See</u> Defs.' Mot. & Opp'n at 33. There is no such statutory grounding for the Committee's informational injury here. And Article I supplies no "freestanding right to information" but rather merely establishes the general power to perform Congress's legislative function. <u>Id.</u> Once again, the Executive maintains that this Court deemed precisely this asserted injury -- impairment of Congress's ability to legislate due to inability to access documents and testimony -- as inadequate in <u>Walker</u>. The Executive urges the same result here.

The Executive also steadfastly maintains that this dispute is not one traditionally thought to be amenable to judicial resolution. Instead, historical experience demonstrates that the Article III judiciary has been concerned primarily with adjudication concerning individual rights rather than "'some amorphous general supervision of the operations of government.'" <u>See</u> Defs.' Mot. & Opp'n at 26 (quoting <u>United States v. Richardson</u>, 418 U.S. 166, 192 (1974) (Powell, J.,

concurring)).  The type of direct judicial intervention in a dispute between the two political

branches requested by the Committee in this case, the Executive argues, "has been virtually

unknown in American jurisprudence."  Id.  As the Executive would have it, this controversy is

"perhaps the paradigmatic example of [a] dispute that ha[s] been resolved without resort to

judicial process."  Id. at 27.  The political branches have instead traditionally resolved their

differences by the process of negotiation and accommodation.  To the Executive, this "200-plus

years of constitutional tradition," id. at 28, strongly suggests that the Committee's case is not the

type normally amenable to judicial resolution, which in turn implies that the Committee lacks

standing to bring the action.

        In response, the Committee argues that binding authority establishes that it has standing

to enforce congressional subpoenas.  In AT&T I, the Committee notes, the D.C. Circuit held that

"[i]t is clear that the House as a whole has standing to assert its investigatory power, and can

designate a member to act on its behalf."  551 F.2d at 391.  That holding conclusively resolves

the issue of standing, in the Committee's view.  More recently, a three-judge court reiterated that

basic principle in U.S. House of Representatives v. U.S. Dep't of Commerce:

>       [I]t [is] well established that a legislative body suffers a redressable injury when that
>       body cannot receive information necessary to carry out its constitutional
>       responsibilities.  This right to receive information arises primarily in subpoena
>       enforcement cases, where a house of Congress or a congressional committee seeks
>       to compel information in aid of its legislative function.

11 F. Supp. 2d 76, 86 (D.D.C. 1998).

        Raines and Walker are not to the contrary, the Committee contends, because both are

distinguishable.  In Raines, the Supreme Court was reluctant to intervene in an intra-branch

dispute, but the plaintiffs there were individual Members of Congress who were not authorized to

sue on behalf of either House -- indeed, both Houses opposed the lawsuit.  Raines, 521 U.S. 829

("We attach some importance to the fact that appellees have not been authorized to represent

their respective Houses of Congress in this action, and indeed both Houses actively oppose their

suit.").  There is no such concern here, the Committee points out.  The same goes for Walker.

There, the Comptroller General sought information on behalf of certain individual Members of

Congress; as in Raines, neither House of Congress had authorized the Comptroller General to file

a lawsuit.  Walker, 230 F. Supp. 2d at 68 ("[I]t is of some importance that, like the plaintiffs in

Raines, the Comptroller General here has not been expressly authorized by Congress to represent

its interests in this lawsuit.") (internal citations omitted).  Here, the argument goes, the asserted

injury -- "being denied access to information" that is the subject of a subpoena, see Pl.'s Reply at

26 -- runs to the Committee and it, authorized by the full House, is suing to vindicate an injury

that is concrete and personalized to the Committee.  Id.

       The Court concludes that the Committee has standing.  The Committee and several

supporting amici are correct that AT&T I is on point and establishes that the Committee has

standing to enforce its duly issued subpoena through a civil suit.  Moreover, Raines and

subsequent cases have not undercut either the precedential value of AT&T I or the force of its

reasoning.  Finally, United States v. Nixon and Senate Select Comm. on Presidential Campaign

Activities v. Nixon, 498 F.2d 725 (D.C. Cir. 1974) ("Senate Select Comm. III"), illustrate that

this sort of dispute is traditionally amenable to judicial resolution and consequently justiciable.

       The starting point for this analysis is AT&T I.  A House subcommittee issued a subpoena

to AT&T demanding documents concerning warrantless wiretapping that had been undertaken by

the company at the request of the FBI.  See 551 F.2d at 385.  The executive branch then

interceded and engaged the subcommittee in a series of negotiations designed to obviate the need for compulsory process. Id. at 386-87. When negotiations ultimately failed, President Ford directed AT&T -- "as an agent of the United States" -- to ignore the congressional subpoena, but the company indicated that it would comply because it believed that it was legally obligated to do so. Id. at 385-87. "The Justice Department therefore brought an action in the name of the United States . . . and obtained a temporary restraining order prohibiting AT&T from complying with the Subcommittee subpoena." Id. at 387. Thereafter, the chairman of the subcommittee intervened as a defendant. Id. The district court issued a permanent injunction against compliance with the subpoena, deferring to the President's determination that execution of the subpoena would pose unacceptable risks of the disclosure of extremely sensitive intelligence information and would be detrimental to the national security. Id. at 387-88.

On appeal, the D.C. Circuit found jurisdiction pursuant to § 1331, noting that "[a]lthough this suit was brought in the name of the United States against AT&T, AT&T has no interest in this case, except to determine its legal duty." Id. at 388-89. Instead, the lawsuit was more properly viewed "as a clash of the powers of the legislative and executive branches of the United States." Id. at 389. On the question of justiciability, the court reasoned that Senate Select Comm. and United States v. Nixon established that "the mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict." Id. at 390. Because the court remanded the case for further negotiations between the branches, however, it had no occasion to "balance the constitutional interests raised by the parties, including such factors as the strength of Congress's need for the information in the request letters . . . and the seriousness of the harm to national security" from

the potential leak of that information.  Id. at 391.[12]  The court did conclude, however, that "[i]t is

clear that the House as a whole has standing to assert its investigatory power, and can designate a

member to act on its behalf."  Id.

     In the face of that clear statement, the Executive attempts both to distinguish AT&T I

from this case and to argue that subsequent decisions have eviscerated its precedential weight.

Neither attempt is persuasive.  To begin with, the Executive argues that AT&T I is inapposite

because it did not involve compelling executive branch officials to testify before Congress in

response to a subpoena.  That is technically true, but the Executive overlooks the court's express

conclusion that -- in a contest between the executive and legislative branches over compliance

with a duly issued congressional subpoena -- the House has standing to invoke the federal

judicial power to aid its investigative function.  There is no suggestion whatsoever in AT&T I

that the House's standing in that capacity is limited to situations where the ultimate subpoena

respondent is a private party.  Moreover, the Executive ignores the fact that President Ford

explicitly referred to AT&T as "an agent of the United States" in AT&T I.  Id. at 387.  That may

not be precisely the same as a senior presidential aide, but AT&T was at the very least regarded

as a constructive member of the executive branch for purposes of the D.C. Circuit's analysis.

     The Executive next argues that Raines undermines the holding of AT&T I and that this

Court's decision in Walker confirms as much.  Contrary to the Executive's contentions, however,

_____

     [12] The mere fact that the D.C. Circuit contemplated exercising jurisdiction over the merits
of the dispute in AT&T I significantly undermines the Executive's argument here.  There, both
parties conceded that important questions of national security were potentially raised with respect
to the warrantless wiretapping at issue.  AT &T I, 551 F.2d at 391.  In this case, no such grave
concern is identified by the Executive.  Instead, as discussed more fully below, the Executive's
asserted interests here are in confidentiality and presidential "autonomy," which do not rise to the
same level as national security.

Raines did not overrule or otherwise undermine AT&T I, and neither Raines nor Walker is inconsistent with AT&T I. The issue in Raines was whether the doctrine of "legislative standing" passed Article III muster. 521 U.S. at 820-21. Six disgruntled Members of Congress who had voted against the Line Item Veto Act, which was enacted and signed into law, filed suit seeking a declaratory judgment that the Act was unconstitutional. Id. at 814-17. Following the D.C. Circuit's legislative standing doctrine, the district court concluded that the Members had "standing to challenge measures that affect their constitutionally prescribed lawmaking powers." Id. at 816 (internal citations omitted). The Members' claim that the Act "dilute[d] their Article I voting power was sufficient to confer Article III standing." Id. at 817.

On direct appeal, the Supreme Court reversed. The Members had declared that their injury was "a loss of a political power, not the loss of any private right." Id. at 821. Thus, the asserted injury actually ran to the institution of Congress, not to the individual Members who brought suit. Id. at 829. Put another way, the Members had suffered no injury that granted them individual standing because the actual injury was incurred by the institution. Significantly, the Supreme Court noted that it "attach[ed] some importance to the fact that [plaintiffs] have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suits." Id.

Raines and AT&T I are consistent. In AT&T I, the House intervened to defend its institutional interest in compliance with duly issued congressional subpoenas. Thus, the intervenor in AT&T I -- the chairman of the subcommittee that had issued the subpoena -- was authorized to act on behalf of the House to vindicate the House's institutional right that had been challenged by the executive branch. The chairman, then, represented the institution and sought

-26-

to remedy a potential institutional injury.  That was not the case in Raines.  There, individual Members sought to ameliorate Congress's institutional injury without the consent of the institution itself -- and the approach was rejected by the Supreme Court.[13]  But the Court has never held that an institution, such as the House of Representatives, cannot file suit to address an institutional harm.  Because the issues presented by Raines and AT&T I were not the same, one cannot conclude that Raines overruled or undermined AT&T I.  See U.S. House of Representatives, 11 F. Supp. 2d at 86 (citing AT&T I with approval post-Raines).

Other factors also distinguish Raines from AT&T I.  In Raines, the asserted injury was to Congress's vaguely defined "political power."  The harm was not tied to a specific instance of diffused voting power; rather, the injury was conceived of only in abstract, future terms.  By contrast, in AT&T I, a House subcommittee had issued a valid subpoena in connection with a specific investigation and DOJ was attempting to invalidate it.  The injury to the House was evident: the validity and efficacy of that particular subpoena was in jeopardy, as was the utility of the subcommittee's investigation.  So, too, in this case.  Moreover, the fact that the House in AT&T I was engaged in a specific investigation of warrantless wiretapping made its asserted interest more concrete than the situation in Raines, where the purported injury was wholly hypothetical.  Likewise here.

Walker and AT&T I are also consistent with one another.  In Walker, the Comptroller General requested certain information from the Vice President at the prompting of four Senators. 230 F. Supp. 2d at 57-58.  The Comptroller General sought to enforce his right to acquire

---

[13] Indeed, the now-defunct doctrine of "legislative standing" is more accurately described as "legislator standing."

information to conduct an appropriate investigation in order to "aid Congress in considering proposed legislation." Id. at 66-67. Relying on Raines, this Court indicated that the "general interests in legislating and oversight that are allegedly impaired by defendant's failure to produce the requested records . . . [are] too vague and amorphous to confer standing." Id. at 67. The Court noted that "there is some authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled." Id. at 68. But Congress had "undertaken no effort to obtain the documents at issue, . . . no committee had requested the documents, and no congressional subpoena ha[d] been issued." Id. Hence, "an injury with respect to any congressional right to information remain[ed] wholly conjectural or hypothetical." Id. (internal citations and quotations omitted).

This case stands in marked contrast to Walker. Indeed, all of the missing factors identified in Walker are present here: the Committee has plainly undertaken efforts to obtain the documents and testimony at issue pursuant to an official investigation, a congressional subpoena has been issued seeking precisely that information, and the full House has specifically authorized filing suit. Just as in Raines, this Court in Walker attached significance to the fact that "the Comptroller General has not been expressly authorized by Congress to represent its interests in this lawsuit." Id. at 68. Although Congress may have suffered some form of institutional injury in Walker, it had not designated the Comptroller General to vindicate that interest on Congress's behalf. Because he was not authorized to proceed on the part of Congress, the Comptroller General was left with no personal injury to confer standing. In this case, of course, the Committee (through Chairman Conyers) has been expressly authorized by House Resolution to proceed on behalf of the House of Representatives as an institution. That is precisely the

scenario that -- in AT&T I -- the D.C. Circuit stated would satisfy the standing requirement.

  Contrary to the Executive's suggestion, the fact that the House has issued a subpoena and explicitly authorized this suit does more than simply "remove[] any doubt that [the House] considers itself aggrieved." See Defs.' Reply at 15. It is the key factor that moves this case from the impermissible category of an individual plaintiff asserting an institutional injury (Raines, Walker) to the permissible category of an institutional plaintiff asserting an institutional injury (AT&T I, Senate Select Comm.). Simply put, the Executive's position that the "Committee cannot predicate its standing on United States v. AT&T or other pre-Raines precedents," see Defs.' Reply at 16, is mistaken. The precedential value and force of AT&T I survive Raines. A House committee has issued a subpoena to certain members of the executive branch who have refused to comply with it, and the House has authorized the Committee to proceed to court. The injury incurred by the Committee, for Article III purposes, is both the loss of information to which it is entitled and the institutional diminution of its subpoena power. As one amicus aptly put it, that is "precisely the injury on which the standing of any governmental body rests when it seeks judicial enforcement of a subpoena it issued." See Brief of Senator Inouye, et al. at 7.

  The Executive also maintains that this dispute is not the sort that is traditionally amenable to judicial resolution. The Court disagrees for two primary reasons: (1) in essence, this lawsuit merely seeks enforcement of a subpoena, which is a routine and quintessential judicial task; and (2) the Supreme Court has held that the judiciary is the final arbiter of executive privilege, and the grounds asserted for the Executive's refusal to comply with the subpoena are ultimately rooted in executive privilege. Whatever merit there once was to the contention that questions of executive privilege are inherently non-justiciable, it can no longer be maintained in light of

United States v. Nixon and its progeny.

Courts, as the Committee points out, routinely enforce subpoenas, whether they are grand jury subpoenas, deposition or trial subpoenas to compel testimony or produce documents pursuant to Fed. R. Civ. P. 45, or subpoenas issued by administrative agencies of the United States pursuant to Fed. R. Civ. P. 81(a)(5). That enforcement authority is deeply rooted in the common law tradition, as first explained by Chief Justice Marshall in United States v. Burr, 25 F. Cas. 30 (C.C. Va. 1807). Moreover, courts have entertained subpoena enforcement actions (or motions to quash subpoenas) where the political branches have clashed over congressional subpoenas: AT&T I and Senate Select Comm. III are the prime examples.[14]

The mere fact that the President himself -- let alone his advisors, as here -- is the subject of the subpoena in question has not been viewed historically as an insurmountable obstacle to judicial resolution. See United States v. Nixon, 418 U.S. at 686; Burr, 25 F. Cas. at 32. Indeed, in Burr, Chief Justice Marshall explained that "the obligation [to comply with a subpoena] . . . is general; and it would seem that no person could claim an exemption from [it]." Id. at 34. "The guard" that protects the Executive from "vexatious and unnecessary subpoenas," in Chief Justice Marshall's view, "is . . . the conduct of a court after those subpoenas have issued; not in any circumstance which is to precede their being issued." Id. (emphasis added). Any claim that compliance with a subpoena would jeopardize national security or privileged presidential information "will have its due consideration on the return of the subpoena," Chief Justice

---

[14] In a related context, courts have also entertained cases involving the propriety of search warrants issued by the executive branch against Members of Congress that implicate issues concerning Speech or Debate Clause immunity. See United States v. Rayburn House Office Bldg., Room 2113, Washington, D.C. 20515, 497 F.3d 654 (D.C. Cir. 2007).

Marshall noted. Id. at 37. Thus, federal precedent dating back as far as 1807 contemplates that even the Executive is bound to comply with duly issued subpoenas. The Supreme Court emphatically reaffirmed that proposition in United States v. Nixon in 1974. See Clinton v. Jones, 520 U.S. 681, 696 n. 23 (1997) ("[T]he prerogative [President] Jefferson claimed [in Burr] was denied him by the Chief Justice in the very decision Jefferson was protesting, and this Court has subsequently reaffirmed that holding.").

The Committee correctly points out that "courts have decided countless cases that involve the allocation of power between the political branches (not to mention between the political branches and the judiciary)." Pl.'s Opp'n & Reply at 31. The Committee cites a litany of cases in support of that proposition, all of which deal with important separation of powers concerns in their own right. See, e.g., Morrison v. Olson, 487 U.S. 654 (1988) (removal); Bowsher v. Synar, 478 U.S. 714 (1986) (execution of laws); INS v. Chadha, 462 U.S. 919 (1983) (legislative veto); Humphrey's Executor v. United States, 295 U.S. 602 (1935) (removal); Myers v. United States, 272 U.S. 52 (1926) (removal). Hence, in the Committee's view, federal courts have a long history of resolving cases that involve significant (and often contentious) separation of powers disputes between the branches of the federal government, thus refuting the Executive's assertion that this dispute is non-justiciable because it is not amenable to judicial resolution.

The Executive makes two arguments to rebut these points, neither of which is convincing. First, the Executive contends, United States v. Nixon is limited to the context of grand jury subpoenas and thus does not inform the present case. Grand jury proceedings, the argument goes, fall well within the traditional scope of an Article III court whereas this dispute does not. The Court disagrees. To be sure, the Supreme Court in United States v. Nixon explicitly cabined

its opinion to the criminal arena.  See 418 U.S. at 711 n. 19 ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.").  But in identifying "the kind of controversy courts traditionally resolve," id. at 696, the Court focused on the issue of the production of specific evidence deemed to be relevant, and the resolution of a claim of executive privilege raised to resist production -- noting that "these issues are 'of a type which are traditionally justiciable.'" Id. at 697 (quoting United States v. ICC, 337 U.S. 426, 430 (1949)). Although the setting here is a civil subpoena enforcement proceeding, the issues parallel those in Nixon and the setting is sufficient to ensure sharp presentation of the issues.  Id. (citing Baker v. Carr, 369 U.S. 186, 204 (1962)).  To paraphrase the Court in United States v. Nixon, "since the matter is one arising in the regular course of a federal [subpoena enforcement proceeding], it is within the traditional scope of Art. III power." Id.  A privilege claim raised to resist a subpoena is certainly "the kind of controversy courts traditionally resolve," and the fact that the litigants are the political branches of our government is not a barrier to the Committee's standing and a justiciable controversy.  Id.

Moreover, as the D.C. Circuit has observed, "the remaining Nixon cases . . . address the scope of the presidential communications privilege in other contexts" beyond the grand jury.  In re Sealed Case, 121 F.3d 729, 743 (D.C. Cir. 1997).  Thus, the Court of Claims found that "the presidential communications privilege could be overcome by the evidentiary demands of a civil trial." Id. at 744 (citing Sun Oil Co. v. United States, 514 F.2d 1020, 1024 (Ct. Cl. 1975)).  The D.C. Circuit reached the same conclusion in Dellums v. Powell, 561 F.2d 242 (D.C. Cir. 1977), where it held that "a formal claim of privilege based on the generalized interest of presidential

confidentiality, without more" does not "work[] an absolute bar to discovery of presidential conversations in civil litigation." Id. at 246.   Instead, there can often be "strong constitutional value in the need for disclosure in order to provide the kind of enforcement of constitutional rights" often implicated by civil litigation.  Id. at 247; see also In re Sealed Case, 121 F.3d at 744 (noting that Dellums stands for the proposition that "an adequate showing of need in a civil trial would also defeat the privilege").  And in Nixon v. Adm'r of Gen. Services, 433 U.S. 425 (1977), the Supreme Court addressed a clash between enacted congressional legislation and claims of presidential privilege.  There, "substantial public interests . . . led Congress to seek to preserve [President Nixon's] materials . . . to restore public confidence in our political processes by preserving the materials as a source for facilitating a full airing of the events leading to [his] resignation." Id. at 453.  Congress also had a "need to understand how . . . political processes had in fact operated in order to gauge the necessity for remedial legislation." Id.  "Thus by preserving [the President's] materials," Congress acted consistently with its "broad investigative power." Id.  Therefore, the Court held that "the claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes." Id. at 454.

It is readily apparent, then, that the justiciability principles underlying the Supreme Court's decision in United States v. Nixon have been extended beyond the limited realm of grand jury subpoenas.  Most significantly, of course, the D.C. Circuit has confronted this issue in precisely the context presented by the instant case.  In Senate Select Comm. III, a Senate committee brought a civil action to enforce subpoenas that it had issued to President Nixon to produce certain taped recordings of conversations between President Nixon and his White House

counsel.  498 F.2d at 727.  President Nixon declined to comply with the subpoena, asserting

absolute executive privilege.  Id.  Relying heavily upon Nixon v. Sirica, 487 F.2d 700 (D.C. Cir.

1973),[15] the court rejected President Nixon's claim of absolute privilege and instead held that he

was entitled only to a presumptive privilege.  498 F.2d at 729-31.  The court ultimately

concluded that the Select Committee had not satisfied the "demonstrably critical" showing

required to overcome the presumptive privilege because: (1) the House Judiciary Committee,

which had "begun an inquiry into presidential impeachment," had already received copies of the

tapes, thus rendering the Select Committee's oversight investigation "merely cumulative"; and

(2) the Select Committee had already received written transcripts of the recordings and its

asserted interest in ensuring the accuracy of the transcripts was not powerful enough to overcome

the President's interest in confidentiality.  Id. at 732-33.

　　Putting the outcome aside, the D.C. Circuit's reasoning in Senate Select Comm. III is of

relevance here.  The court's analysis addressed the merits of the Committee's showing of need

with respect to the presumptive privilege, which confirms that the D.C. Circuit viewed the

dispute between the Committee and the President to be justiciable because the court would have

had no occasion (or authority) to discuss the particulars of the Committee's need for the

subpoenaed recordings if the case was non-justiciable at the outset.  Indeed, the district court

expressly found that "[t]he reasoning of [Nixon v. Sirica] involving a grand jury subpoena is

equally applicable to the subpoena of a congressional committee . . . [and there is] no doubt that

---

[15] The D.C. Circuit's opinion in Nixon v. Sirica pre-dates the Supreme Court's decision in United States v. Nixon.  The Supreme Court, however, adopted the D.C. Circuit's general approach.  See 418 U.S. at 708; see also In re Sealed Case, 121 F.3d 743-44 (referring to Nixon v. Sirica as one of the cases that established the contours of justiciability relating to presidential privilege claims).

-34-

the issues presented in the instant controversy are justiciable." <u>Senate Select Comm. on Presidential Campaign Activities v. Nixon</u>, 370 F. Supp. 521, 522 (D.D.C. 1974) ("<u>Senate Select Comm. II</u>").  The D.C. Circuit evidently agreed because it proceeded directly to the merits of the controversy.  Indeed, both this Court in <u>Walker</u> and the three-judge court in <u>U.S. House of Representatives</u>, 11 F. Supp. 2d at 86, cited to <u>Senate Select Comm. III</u> for the proposition that "a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled."  <u>Walker</u>, 230 F. Supp. 2d at 68.  The Executive has no ready way to distinguish <u>Senate Select Comm. III</u>.

The Executive also takes issue with the Committee's assertion that the Executive's standing to seek or challenge the enforcement of subpoenas is identical to the Committee's standing here.  That argument is mistaken, the Executive says, because the Constitution entrusts to the Executive alone the responsibility to "take Care that the Laws be faithfully executed," U.S. Const., Art. II, § 3, a charge that implies that the Executive must be permitted to invoke the aid of the judicial process in order to carry out its constitutional mandate.  <u>See</u> Defs.' Reply at 10.

Although most certainly correct, this argument is beside the point.  The salient fact here is that in <u>AT&T I</u> the Executive was <u>not</u> undertaking <u>enforcement</u> action.  Instead, the executive branch filed a civil lawsuit in an effort to convince a federal court to declare that a congressional subpoena was invalid.[16]  That suit was not brought pursuant to the Executive's duty to execute

----

[16] The same is true of <u>United States v. U.S. House of Representatives</u>, 556 F. Supp. 150 (D.D.C. 1983).  There, the executive branch sought a declaratory judgment that EPA Administrator Anne Gorsuch had lawfully refused to comply with a congressional subpoena on the grounds of executive privilege.  <u>Id.</u> at 150-51.  The court exercised its discretion to decline jurisdiction pursuant to the Declaratory Judgment Act because Congress "indicated a preference for established criminal procedures" under 2 U.S.C. §§ 192 & 194 to run their course first.  <u>Id.</u> at 152.  Noting that "[c]ourts have been extremely reluctant to interfere with . . . statutory

the laws.  The Executive's posture in that case, then, mirrors that of the Committee here in asking the Court to declare its subpoena valid.[17]  There may well be instances where "different rules," so to speak, apply to enforcement actions brought before a federal court by the Executive than govern civil actions initiated by Congress.  But this is not such a case.

In any event, although Congress does not have the authority to enforce the laws of the nation, it does have the "power of inquiry."  See McGrain v. Daugherty, 273 U.S. 135, 174 (1927).  And according to the Supreme Court, "the power of inquiry -- with process to enforce it -- is an essential and appropriate auxiliary to the legislative function."  Id.  Indeed, the Court has indicated that the "issuance of a subpoena pursuant to an authorized investigation is . . . an indispensable ingredient of lawmaking."  See Eastland v. United States Servicemen's Fund, 421 U.S. 491, 505 (1975).  "Just as the power to issue subpoenas is a necessary part of the Executive Branch's authority to execute federal laws," see Brief of Senator Inouye, et al., at 7, so too is Congress's need to enforce its subpoenas a necessary part of its power of inquiry.

Two significant OLC opinions issued during the Reagan administration warrant examination at this point.  In 1984, an opinion by Acting Assistant Attorney General Theodore Olson confirmed the viability of a federal civil suit brought by a House of Congress to enforce

---

scheme[s] by considering cases brought by recalcitrant witnesses seeking declaratory or injuctive relief," id., the court dismissed the Executive's complaint.  But the court noted that "[j]udicial resolution of this constitutional claim [of executive privilege]. . . will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding or other legal action taken by Congress," id. at 153 (emphasis added), thereby implying that Congress would have the ability to proceed by "other legal action," such as the civil suit here.

[17] At oral argument, counsel for the Executive suggested that even the Executive might be precluded from bringing such a suit in light of Raines.  See Tr. at 71.  As explained above, however, this Court is not persuaded that Raines undermined AT&T I.

subpoenas issued to executive officials.  See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 U.S. Op. Off. Legal Counsel 101, 137 (1984) (hereinafter "Olson OLC Opinion").  As OLC opined, Congress has three options available to enforce a subpoena against a recalcitrant respondent: (1) referral to the U.S. Attorney for prosecution of a criminal contempt of Congress charge; (2) detention and prosecution pursuant to Congress's inherent contempt authority; or (3) a civil action to enforce the subpoena in a federal district court.  When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the "contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt."  Id. at 142 (emphasis added).  That conclusion is rooted in concerns over both the Executive's traditional prosecutorial discretion, see id. at 140, as well as the "concomitant chilling effect" that might impair presidential advice if the possibility of criminal prosecution loomed over the President's close advisors, see id. at 142.  Significantly, OLC also determined that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well."  Id. at n. 42.  Thus, neither criminal prosecution nor inherent contempt could be employed against a recalcitrant executive branch official, as OLC saw it.

Instead, "Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena."  Id. at 137.  As OLC put it, a civil action would be superior because:

Congress has a legitimate and powerful interest in obtaining any unprivileged

> documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate its legitimate desire to obtain documents if it could establish that its need for the records outweighed the Executive's interest in preserving confidentiality.

Id.  In fact, after examining Senate Select Comm. III, OLC concluded that "there is little doubt that, at the very least, Congress may authorize civil enforcement of its subpoenas and grant jurisdiction to the courts to entertain such cases." Id. at 137 n. 36.  There is no suggestion whatsoever in the Olson OLC Opinion that such a civil suit would encounter any Article III obstacles because Congress (or a committee) would lack standing or because the dispute would not be considered traditionally amenable to judicial resolution.  To the contrary, OLC rather emphatically concluded that a civil action would be the least controversial way for Congress to vindicate its investigative authority.

A 1986 OLC opinion authored by Assistant Attorney General Charles Cooper reached the same conclusion.  See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 U.S. Op. Off. Legal Counsel 68 (1986) (hereinafter "Cooper OLC Opinion").  In that opinion, OLC restated its position that Congress may institute "a civil suit seeking declaratory enforcement of [a] subpoena." Id. at 83.  Likewise, OLC indicated that although inherent contempt is theoretically available to Congress and could ultimately be challenged by the executive branch through a writ of habeas corpus brought by the detained official, "it seems most unlikely that Congress could dispatch the Sergeant at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege." Id. at 86.

Ultimately, OLC concluded that "although the civil enforcement route has not been tried

by the House, it would appear to be a viable option." Id. at 88; see also id. at 88 n. 33 ("Any notion that the courts may not or should not review [subpoena enforcement disputes between the political branches] is dispelled by United States v. Nixon . . . in which the Court clearly asserted its role as ultimate arbiter of executive privilege questions.").  In fact, the Cooper OLC Opinion stated that the "rationale used by the Department [in AT&T I] would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena against executive privilege claims." Id. at 88 (emphasis added).  There can be no doubt, then, that at least one prior administration regarded a civil suit by Congress to enforce a subpoena as presenting a justiciable controversy -- and, indeed, to be the preferred method for resolving such inter-branch disputes. See id. at 88 n. 33 ("[O]nly judicial intervention can prevent a stalemate between the other two branches that could result in a particular paralysis of government operations.").

The Executive also insists that the Committee cannot rely on "informational standing" to satisfy the Article III threshold because informational standing can only arise where Congress has passed a law that specifically provides an unqualified right to receive certain information.  There is no such law in this case.  Moreover, the Executive argues, the Committee cannot rest on an implied right to investigate derived from Article I because the underlying subject matter here -- removal of executive officials -- is an issue on which Congress has no authority to legislate and thus no corresponding right to investigate.  See McGrain, 273 U.S. at 173-75 (noting that the power of inquiry is limited to investigation "in aid of [the] legislative function").

Once again, the Court disagrees.  In McGrain, the Supreme Court explained that the "power of inquiry -- with process to enforce it -- is an essential and appropriate auxiliary to the legislative function." Id. at 174.  Indeed, in Eastland the Supreme Court further noted that the

"[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate. . . . The issuance of a subpoena pursuant to an authorized investigation is similarly an indispensible ingredient of lawmaking."  421 U.S. at 504-05.  "The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution."  Barenblatt v. United States, 360 U.S. 109, 111 (1959).  So long as the Committee is investigating a matter on which Congress can ultimately propose and enact legislation, the Committee may issue subpoenas in furtherance of its power of inquiry.

Turning to the legitimacy of this investigation, McGrain itself is enlightening.  There, the investigation at issue involved:

> [T]the administration of the Department of Justice -- whether its functions were being properly discharged or were being neglected or misdirected, and particularly whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings to punish crimes and enforce appropriate remedies against the wrongdoers.

Id. at 177.  The Court held that such a "subject [is] one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit."  Id.  So, too, here -- in fact, it is nearly the identical subject matter that the Committee is investigating.  Simply put, the Executive characterizes the Committee's investigation far too narrowly.  It is not merely an investigation into the Executive's use of his removal power but rather a broader inquiry into whether improper partisan considerations have influenced prosecutorial discretion.  Similarly, in Nixon v. Adm'r Gen. Services, the Supreme Court indicated that Congress's "need to understand how . . . political processes had in fact operated in order to gauge the necessity for remedial legislation" was a legitimate topic for investigation.  433 U.S. at 453.  Once again, the same can be said of the Committee's investigation.  It defies

both reason and precedent to say that the Committee, which is charged with oversight of DOJ generally, cannot permissibly employ its investigative resources on this subject. Indeed, given its "unique ability to address improper partisan influence in the prosecutorial process . . . [n]o other institution will fill the vacuum if Congress is unable to investigate and respond to this evil." Brief of Former United States Attorneys at 10-11. With the legitimacy of its investigation established, there is no need to belabor the argument concerning informational standing -- non-compliance with a duly issued subpoena is a quintessential informational injury.

    To recap, the Committee has issued subpoenas to two high-ranking executive branch officials who have refused to comply, citing executive privilege. The Committee's attempt to pursue criminal prosecution of its contempt of Congress citation was thwarted by the Executive. Exercise of Congress's inherent contempt power through arrest and confinement of a senior executive official would provoke an unseemly constitutional confrontation that should be avoided. Cf. United States v. Nixon, 418 U.S. at 691-92 (concluding that forcing the President to disobey a court order to obtain appellate review would create an unseemly, unnecessary constitutional confrontation between the branches). Thus, the Committee filed this suit to vindicate both its right to the information that is the subject of the subpoena and its institutional prerogative to compel compliance with its subpoenas. A harm to either interest satisfies the injury-in-fact standing requirement. Clear judicial precedent, along with persuasive reasoning in OLC opinions, establishes that the Committee has standing to pursue this action and, moreover, that this type of dispute is justiciable in federal court. Consequently, the Executive's motion to dismiss for lack of standing will be denied.

B.    *Cause of Action*

Even if the Committee can satisfy the Article III prerequisites to bringing a case in federal

court, the Executive argues, the complaint must nonetheless be dismissed because there is no

cause of action that authorizes this lawsuit.  Although the complaint identifies the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 - 2202 ("DJA" or "Act"), as the basis for the Committee's

requested relief, <u>see</u> Compl. ¶ 18, the Executive insists that the Act "does not create a cause of

action."  Defs.' Mot. & Opp'n at 38.  Moreover, the Executive urges, this Court should decline to

recognize an implied cause of action in favor of the Committee derived from the Constitution.

### (1) Declaratory Judgment Act

Relying on a series of cases that stand for the proposition that the Declaratory Judgment

Act is merely procedural and does not create a free-standing cause of action, the Executive

maintains that the Act cannot supply a basis to support the Committee's requested relief.  In

relevant part, the Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not further
> relief is or could be sought.

<u>See</u> 28 U.S.C. § 2201(a).  To begin with, the Executive points out that the Supreme Court has

explained that the Act is "'procedural only.'"  <u>Skelly Oil Co. v. Phillips Petroleum Co.</u>, 339 U.S.

667, 671 (1950) (quoting <u>Aetna Life Ins. Co. of Hartford, Conn. v. Haworth</u>, 300 U.S. 227, 240

(1937)).  The term "jurisdiction" used in the Act, according to the Supreme Court, "means the

kinds of issues which give right of entrance to federal courts . . . in the sense of a federal right or

diversity."  <u>Id.</u>  The Act did not "impliedly repeal[] or modify[] . . . the requirements of

jurisdiction" in federal court.  Id. at 671-72.  In that sense, "the Declaratory Judgment Act 'is not

an independent source of federal jurisdiction.'"  C&E Servs., Inc. of Washington v. D.C. Water &

Sewer Autho., 310 F.3d 197, 201 (D.C. Cir. 2002).  Instead, "the availability of [Declaratory

Judgment Act] relief presupposes the existence of a judicially remediable right."  Schilling v.

Rogers, 363 U.S. 666, 677 (1960).

Against that backdrop, the Executive's argument on this point breaks down into two

parts.  First, the Executive contends, the DJA does not itself create an independent cause of

action.  Instead, it merely enables anticipatory review for existing causes of action.  Second, even

assuming that the DJA can be utilized as an independent cause of action, the Committee here has

identified no "judicially remediable right" that entitles it to invoke the DJA -- there is no

statutory basis for such a right, nor can Article I fairly be said to create a judicially enforceable

right accruing to Congress.

For its part, the Committee responds that the "plain language of the statute" reveals that

"the Committee's right to be in court is evident."  Pl.'s Opp'n & Reply at 34.  Under that text,

only three elements are required to satisfy the statutory threshold: (1) "a case of actual

controversy"; (2) an independent basis for federal jurisdiction; and (3) an "appropriate pleading."

Id. at 34 (quoting 28 U.S.C. § 2201(a)).  Once those three conditions are met, the Committee

contends, a party "may have [its] 'legal relations' declared 'whether or not further relief is

available.'"  Id. (quoting 28 U.S.C. § 2201(a)).  And the Committee argues that it has established

all three elements here.  First, this is a "case of actual controversy" for the same reasons that the

Committee has Article III standing to bring this suit.  Second, both parties agree that federal

jurisdiction exists pursuant to 28 U.S.C. § 1331.  Finally, the Committee's complaint in this case

is the requisite "appropriate pleading." "Under the terms of the statute, *nothing else is necessary*," id. at 36-37 (emphasis in original), and the Committee is now entitled to have its "legal relations" defined by this Court; and "[i]n this case, [those] 'legal relations' stem from the right granted to Congress under the Constitution, as definitively interpreted by the Supreme Court," id. at 34.  Hence, the Court should decide whether Ms. Miers and Mr. Bolten are legally required to respond to Congress's duly issued subpoenas or whether, as the Executive contends, they are absolutely immune from such process.

As the Committee would have it, the "Supreme Court, which has *never* held that the DJA does not create a right of action -- and, in fact, has proceeded for more than sixty years under the basic premise that it does -- has expressed only two limitations upon the DJA."  Id. at 34-35.  According to the Committee, those two limitations, which do not apply here, are: (1) the DJA cannot supply an independent basis for federal jurisdiction; and (2) it cannot be used as a vehicle to secure an advisory opinion.  Id. at 35.

There is some force to the Committee's textual argument on this point.  After all, the wording of the statute does not indicate that any independent cause of action is required to invoke the DJA.  Instead, the statute is framed in terms of declaring "rights" and "legal relations" in a justiciable case within federal jurisdiction.  See 28 U.S.C. § 2201(a).  Moreover, there is some support for the Committee's position found in early case law analyzing the DJA in terms of "remediable rights."  In Coffman v. Breeze Corp., 323 U.S. 316 (1945), the Supreme Court held that declaratory judgments are available in federal court: (1) in disputes involving an actual case or controversy; (2) where the issue is actual and adversarial; and (3) when the action is not merely a medium for securing an advisory opinion.  Id. at 324.  Those requirements are satisfied

here.[18]  In addition, in <u>Skelly</u> (and subsequent decisions), the Supreme Court emphasized that the

DJA is not a substitute for proper federal jurisdiction.  <u>See</u> 339 U.S. at 671-72.  Here, because

jurisdiction exists pursuant to 28 U.S.C. § 1331, there is no concern that the Committee is

seeking to utilize the DJA to circumvent normal requirements of federal jurisdiction.

On the other hand, the Executive identifies authority that casts some doubt upon the

Committee's contentions.  In <u>Buck v. Am. Airlines, Inc.</u>, 476 F.3d 29 (1st Cir. 2007), the First

Circuit observed that the DJA "creates a remedy, not a cause of action."  <u>Id.</u> at 33 n.3.  For that

proposition, the court in <u>Buck</u> cited to <u>Muirhead v. Mecham</u>, 427 F.3d 14 (1st Cir. 2005).  But

that case indicated only that the DJA does not provide a "'<u>jurisdictional</u> basis for actions under

federal law, but merely defines the scope of available declaratory relief.'"  <u>Muirhead</u>, 427 F.3d at

17 n. 1 (quoting <u>Progressive Consumers Fed. Credit Union v. United States</u>, 79 F.3d 1228, 1230

(1st Cir. 1996)) (emphasis added).  The use of the term "jurisdictional" in <u>Muirhead</u>, and its

omission in <u>Buck</u>, may suggest that the <u>Buck</u> court misread <u>Muirhead</u>.  The focus in <u>Muirhead</u> is

on the jurisdictional requirement of the DJA, not any cause of action requirement.

Similarly, in <u>Okpalobi v. Foster</u>, 244 F.3d 405 (5th Cir. 2001), a case also cited by the

Executive, the Fifth Circuit stated that the "law makes clear that . . . [the DJA] provides a <u>remedy</u>

different from an injunction . . . [but] it does not provide an additional cause of action with

respect to the underlying claim."  <u>Id.</u> at 423 n. 31 (emphasis in original).  The Fifth Circuit cited

to <u>Earnest v. Lowentritt</u>, 690 F.2d 1198 (5th Cir. 1982), in support of that assertion.  But <u>Earnest</u>

merely held that the DJA "does not provide an independent cause of action for determination of

_____

[18] Indeed, apart from its standing argument, the Executive wisely does not appear to
contest that this dispute presents an actual and adversarial case that would not result in an
advisory opinion.

the constitutionality of a statute, but rather is only an avenue for relief in a 'case of actual controversy within (the court's) jurisdiction.'" Id. at 1203 (citing 28 U.S.C. § 2201). Because "federal jurisdiction [was] lacking," the only remaining issue in Earnest involved the application of a Louisiana statute. Id. That presented "an issue of state rather than federal law," and there was thus no federal case or controversy with which to invoke federal jurisdiction and correspondingly the DJA. As in Buck, then, the broad language in Okpalobi rests upon a somewhat more ambiguous statement from a prior case. Nevertheless, both Buck and Okpalobi do lend some support to the Executive's proposed reading of the DJA.

So, too, does a recent opinion by Magistrate Judge Kay. In Seized Property Recovery Corp. v. U.S. Customs & Border Protection, 502 F. Supp. 2d 50 (D.D.C. 2007), the court held that the plaintiff's DJA action failed because the complaint did "not specify any cause of action *through which* the Court may exercise subject matter jurisdiction and grant declaratory relief." Id. at 64 (emphasis in original). To reach that conclusion, Magistrate Judge Kay relied (in part) upon C&E Servs., which held that the DJA is not an independent source of jurisdiction but rather "presuppose[s] the existence of a judicially remediable right." 310 F.3d at 201 (citations omitted). In Seized Property, however, the plaintiff failed to identify any right to the requested relief -- a declaration that United States Customs and Border Protection was required "by statute to include names and addresses . . . when publishing forfeiture notices pursuant to . . . 19 U.S.C. § 1607." 502 F. Supp. 2d at 64. Significantly, the plaintiff made "no reference to arguable sources of jurisdiction such as the Administrative Procedure Act . . . or the Due Process Clause of the Fifth Amendment." Id. Therefore, because the plaintiff had proffered neither any right to the relief it requested nor any source of jurisdiction, the DJA claim was deficient.

In this case, however, the Committee does not claim that the DJA is the basis for its asserted substantive right. It is the Constitution, according to the Committee, that is the source of that right. The question, then, is whether an independent cause of action must supply the underlying right for DJA purposes or whether, as the Committee contends, the Constitution may be that source. At oral argument, counsel for the Committee stated that courts have "misspoke[n]" when they have stated that the DJA does not create a separate cause of action. See Tr. at 42 ("I think they misspoke. I don't think that's an accurate statement of the law."). What those courts actually meant instead, the Committee suggests, is that the DJA does not itself provide the underlying substantive right to be adjudicated. Id. at 43 ("[T]hat's what I think they're meaning when they say it doesn't create a cause of action. It doesn't give you a substantive right that you have against a defendant that you name."). Moreover, the Committee contends, the "cause of action" references from those opinions can also be interpreted as statements that the DJA cannot confer subject matter jurisdiction. There is some force to this position. It is conceivable that courts may at times employ the terms "cause of action" and "jurisdiction" interchangeably;[19] after all, the Supreme Court has stated that historically "'[j]urisdiction . . . is a word of many, too many, meanings.'" Arbaugh v. Y&H Corp., 546 U.S. 500, 510 (2006) ("This Court, no less than other courts, has sometimes been profligate in its use of the term [jurisdiction].").

To be sure, in most cases a plaintiff would need to identify a statutory (or a common law) cause of action to proceed in federal court, as otherwise there would be no basis for the plaintiff's

---

[19] The statements from the First and Fifth Circuits are contained in footnotes and cannot be interpreted as critical passages in either Buck or Okpalobi.

asserted right to relief.  The Constitution itself does not confer in most settings the sort of

affirmative right that the Committee is claiming exists here; instead, the asserted right arises

from some other source of law.  But where the Constitution is the source of the right allegedly

violated, no other source of a right -- or independent cause of action -- need be identified.  The

parties point to no case -- and the Court is aware of none -- in which a court declined to hear a

case requesting declaratory relief where subject matter jurisdiction was present and a plaintiff's

constitutional rights were arguably implicated simply because the plaintiff did not have an

independent cause of action apart from the DJA.  By contrast, there is at least one case where a

court applied the DJA in circumstances nearly identical to those present here.  See United States

v. House of Representatives, 556 F. Supp. at 153.

        The Court is satisfied that the Committee's case can proceed pursuant to the DJA,

particularly in light of case law indicating that the Act "should be liberally construed to achieve

the objectives of the declaratory remedy."  See McDougald v. Jenson, 786 F.2d 1465, 1481 (11th

Cir. 1986); see also 10B Wright, Miller & Kane, Federal Practice & Procedure § 2754 (3d ed.

1998) ("The Declaratory Judgment Act and Rule 57 must be liberally construed to attain the

objectives of the declaratory remedy.").  Given the ambiguity surrounding the applicable case

law, the Court finds the plain text of the statute instructive.  As explained above, the Committee

has satisfied the conditions set out in the text of the Act itself: this is a "case of actual

controversy within [the Court's] jurisdiction" and the Committee has filed the "appropriate

pleading" seeking a declaration relating to its "rights and other legal relations."  See 28 U.S.C. §

2201.  Moreover, there is no reason to conclude that the Committee is seeking an advisory

opinion here -- indeed, the Committee seeks actual compliance with the subpoenas.  Thus, the

Committee's claim also satisfies the criteria identified by the Supreme Court in Coffman.  In the end, two key facts distinguish this case: there is an independent basis for federal subject matter jurisdiction and there is a constitutional right at stake.  These factors alleviate most, if not all, of the concerns that some courts have identified with respect to utilizing the DJA.

Employing the DJA in this case would also further one of the Act's primary purposes: enabling anticipatory review in order to eliminate the necessity of litigation in the defensive posture.  As one commentator put it, an important goal of the DJA was to "sanction[] the trial of controversies before a conventional cause of action has accrued and another remedy has become available."  Developments in the Law: Declaratory Judgments -- 1941-49, 62 Harv. L. Rev. 787, 808 (1949).  That view was confirmed by Members of Congress in floor statements during the debates over the Act.  See Pl.'s Opp'n & Reply at 37 (quoting 69 Cong. Rec. 1638 (1928) (noting that the DJA would enable a federal court to hear a case "even though . . . there is no existing cause of action upon which a hearing could be had at the time; but there is a substantial controversy as to the [legal rights involved]")).  Indeed, the Executive apparently agrees with that assessment: in "anticipatory cases, [the Act] merely switches the posture of the parties in adjudicating a reasonably anticipated cause of action," see Defs.' Reply at 20.  The Supreme Court has also endorsed this view of the Act.  See, e.g., Franchise Tax Bd. of State of Cal. v. Const. Laborers Vac. Trust for S. Cal., 463 U.S. 1, 19 n. 19 (1983) (noting that "the nature of the declaratory remedy itself . . . was designed to permit adjudication of either party's claims of right") (citing E. Borchard, Declaratory Judgments 15-18, 23-25 (1934)).

A frequent setting in which the DJA is put to use is potential patent infringement cases. See, e.g., id. ("For instance, federal courts have consistently adjudicated suits by alleged patent

infringers to declare a patent invalid, on the theory that an infringement suit by the declaratory judgment defendant would raise a federal question over which the federal courts have exclusive jurisdiction.").  When a party looks to engage in a course of conduct that may conceivably incur patent infringement liability, there are two common paths to obtain judicial resolution of the patent's validity.  The traditional defensive option is to await an infringement suit and then defend that suit on the basis that the patent is invalid.  But another option is made available by the DJA: a party may sue preemptively to test the validity of the patent in federal court.  See, e.g., Hanes Corp. v. Millard, 531 F.2d 585, 592 (D.C. Cir. 1976), superseded by statute on other grounds ("Certainly one of the most common and indisputably appropriate uses of the declaratory judgment procedure is to enable one who has been charged with patent infringement to secure a binding determination of whether proposed conduct will infringe a patent in question without waiting until he becomes the defendant in an actual infringement suit.  The purpose of granting declaratory relief to one potentially liable for infringement is to allow him to know in advance whether he may legally pursue a particular course of conduct.").

This case is somewhat analogous to an anticipatory patent infringement case.  As noted above, one power that Congress has at its disposal is inherent contempt.  Following a citation for congressional contempt, Congress could dispatch the Sergeant-at-Arms to detain Ms. Miers and Mr. Bolten in preparation for a trial before Congress.  See Morton Rosenberg, Cong. Research Serv., Congress's Contempt Power: Law, History, Practice, and Procedure, No. 34-097, at 15 (2008), available at http://www.au.af.mil/au/awc/awcgate/crs/rl34097.pdf.  In response to such action, both sides here appear to agree (see Tr. at 85) that Ms. Miers and Mr. Bolten would likely file a writ of habeas corpus with this Court to challenge the legality of their detention, raising the

central issue of the scope and nature of Congress's subpoena power -- precisely the issue presented by the instant action.[20]  By invoking the DJA to gain anticipatory review of that same question, the Committee can obtain judicial resolution regarding its subpoena power without the unseemly scenario of the arrest and detention of high-ranking executive branch officials, which would carry the possibility of precipitating a serious constitutional crisis.  That would seem to be just the sort of process sanctioned by the DJA.[21]

Although the Court concludes that the Committee need not identify a cause of action apart from the DJA, that does not end the matter.  The Committee must still identify a judicially remediable right that may be enforced through the DJA.  Fortunately, the Supreme Court has already spoken to whether Article I provides Congress with an implied right to issue subpoenas and enforce them judicially.  To be sure, "there is no [constitutional] provision expressly investing either house with power to make investigations and exact testimony, to the end that it may exercise its legislative function advisedly and effectively."  McGrain, 273 U.S. at 161.  The

---

[20] The Executive is certainly correct that there would also be a host of other issues raised by the habeas corpus petition, such as "the scope of Congress's asserted inherent contempt power and whether it would even countenance the arrest of the President or his closest aides for refusing to testify or provide privileged documents at the President's direction."  See Defs.' Reply at 21-22.  But it is also true that the contours of Congress's subpoena power would be implicated, just as here.  The fact that the habeas corpus action might present additional issues does not suggest that the Committee cannot receive "anticipatory" adjudication on the question of its subpoena power through the DJA.

[21] Indeed, the defendants in this case -- Ms. Miers and Mr. Bolten -- would be the petitioners in the habeas corpus proceeding, a posture somewhat analogous to the situation where "the defendant in the declaratory-judgment action could have brought a coercive action in the federal courts."  See 10B Wright, Miller & Kane, Federal Practice & Procedure § 2767; see also Const. Laborers, 463 U.S. at 19 ("Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.").

question, then, is "whether this power is so far incidental to the legislative function as to be implied." Id.  In McGrain, the Supreme Court answered that question in the affirmative, noting that the power of inquiry was well-established at the time of the founding:

> We are of the opinion that the power of inquiry -- with process to enforce it -- is an essential and appropriate auxiliary to the legislative function.  It was so regarded and employed in American Legislatures before the Constitution was framed and ratified.  Both houses of Congress took this view of it early in their history.

Id. at 174.  Indeed, the Necessary and Proper Clause gives rise to Congress's implied right to issue and enforce subpoenas found in Article I: Congress must have "auxiliary powers as are necessary and appropriate to [the legislative] end." Id. at 175.  "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information . . . recourse must be had to others who do possess it." Id.  Moreover, when "mere requests for such information . . . are unavailing . . . some means of compulsion are essential to obtain what is needed." Id.

In short, there can be no question that Congress has a right -- derived from its Article I legislative function -- to issue and enforce subpoenas, and a corresponding right to the information that is the subject of such subpoenas.[22]  Several Supreme Court decisions have confirmed that fact.  See, e.g., Eastland, 421 U.S. at 504-05 ("The power to investigate and to do so through compulsory process plainly falls within [the] definition [of Congress's legislative function].");  Barenblatt, 360 U.S. at 111 ("The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the

_____

[22] As discussed above, this power is of course limited to a legitimate legislative purpose, which is plainly present here.

Constitution."); <u>Watkins v. United States</u>, 354 U.S. 178, 187-88 (1957) ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.  It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees, and to testify fully with respect to matters within the province of proper investigations."); <u>McGrain</u>, 273 U.S. at 175 ("[T]he constitutional provisions which commit the legislative function to the two houses are intended to include this attribute to the end that the function may be effectively exercised.").

The Court can identify no reason why that right cannot be vindicated by recourse to the federal courts through the DJA.  After all, courts routinely enforce subpoenas in favor of parties with rights to information.  The mere fact that this case involves a dispute between the political branches -- or that such disputes are normally settled through negotiation and accommodation -- is not sufficient to render the Committee's right non-judicially remedial.  That argument is foreclosed by precedent dating back to <u>United States v. Nixon</u> including case law involving subpoena disputes between the two political branches.

For example, <u>United States v. House of Representatives</u> stands for the proposition that the DJA provides a ground for the Committee's requested relief before this Court.  There, the Administrator of the EPA brought a civil action pursuant to the DJA seeking a declaration that she lawfully refused to comply with a subpoena issued by a House subcommittee on the ground of executive privilege.  <u>See</u> 556 F. Supp. at 151.  There is no additional cause of action mentioned in the opinion, and the court plainly contemplated that the DJA <u>could</u> supply the basis for hearing the claim notwithstanding the absence of an independent cause of action and the fact that the dispute concerned "the scope of the congressional investigatory power."  <u>Id.</u> at 152.

-53-

Nevertheless, because the court concluded that the parties had not yet exhausted all "possibilities for settlement," id., it determined that "entertain[ing] this declaratory judgment action would be an improper exercise of the discretion granted by the Declaratory Judgment Act," id. at 153. The difference between that case and this one is that the parties are reversed; here, the House stands in the position of the plaintiff and the Executive is the defendant. This Court fails to see why that fact should alter the DJA analysis in any material respect.[23]

The Executive presents a litany of contrary arguments, all of which are unavailing. Some relate to the scope and nature of any rights emanating from Article I, which are addressed in the implied cause of action section below. For present purposes, the Court will focus on two arguments raised specifically against the application of the DJA.

The Executive has asserted that the Committee's interpretation of the DJA would circumvent the Supreme Court's implied cause of action doctrine represented by cases such as Alexander v. Sandoval, 532 U.S. 275 (2001). The Court does not agree. Sandoval involved implying a cause of action from a statute rather than directly from the Constitution. There are important differences between those two contexts, most notably the fact that the former inquiry turns primarily on congressional intent whereas the latter does not. Furthermore, in Sandoval the Supreme Court held that the pertinent portion of Title VI relied upon by the plaintiffs did not contain any "rights-creating" language and thus did not "'confer rights on a particular class of persons.'" Id. at 288-89 (quoting California v. Sierra Club, 451 U.S. 287, 294 (1981)). Thus,

---

[23] Similarly, there is no suggestion whatsoever in AT&T I, the Olson OLC Opinion, or the Cooper OLC opinion that the lack of any independent cause of action would be an impediment to a suit by Congress under the DJA to enforce its subpoena. Indeed, it is not clear what cause of action the executive branch utilized in AT&T I in seeking to enjoin the subcommittee's subpoena.

even if the Sandoval plaintiffs had attempted to invoke the DJA -- which they did not -- their effort would have failed due to the lack of an underlying substantive right accruing to them. In this case, by contrast, the Committee has identified a substantive right that it has and that has been previously recognized by the Supreme Court. And at a higher level of generality, concluding that Congress may utilize the DJA to test the validity of its subpoena power suggests nothing whatsoever about whether private plaintiffs may imply a federal cause of action for damages or injunctive relief from various federal statutes.

The Executive also contends that 2 U.S.C. § 288d negates the notion that the DJA is a sufficient cause of action. That provision states that the Senate Counsel

> [w]hen directed to do so . . . shall bring a civil action under any statute conferring jurisdiction on any court of the United States . . . to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened failure or refusal to comply with, any subpena or order issued by the Senate or a committee or a subcommittee of the Senate authorized to issue a subpena or order.

2 U.S.C. § 288d(a). The relevant committee must issue a report concerning "the comparative effectiveness of bringing a civil action under this section, certification of a criminal action for contempt of Congress, and initiating a contempt proceeding before the Senate." Id. § 288d(c)(2)(D). Those passages, according to the Executive, create a civil action by which the Senate may enforce or confirm the validity of issued subpoenas. Because the Senate saw fit to pass this statute to enable that civil action, the Executive argues, it must be the case that the DJA did not already provide an avenue to pursue a civil action on the basis of some other cause of action. Significantly, the House has no analog to § 288d.

For its part, the Committee contends that § 288d was passed specifically to respond to the district court's decision in Senate Select Comm. I, which found that the Select Committee's suit

failed for lack of subject matter jurisdiction because it did not satisfy the then-existing amount in controversy requirement.[24]  Thus, § 288d was enacted to confer such jurisdiction on the federal courts.  Moreover, the Committee maintains, before § 288d became law, the Senate (unlike the House) did not have an Office of Legal Counsel.  Consequently, the Committee urges the Court to read this provision as part of a larger statutory scheme that established the Office of Senate Legal Counsel and then merely specified when the Senate Counsel could bring suit.

　　　The Court is not persuaded that § 288d suggests that the DJA is not a sufficient cause of action in this case.  The Committee is correct that § 288d is one component of a larger statutory structure that establishes and outlines the responsibilities of the Office of Senate Legal Counsel.  See 2 U.S.C. § 288a - n.  Although § 288d appears to create a cause of action to proceed in federal court, it does so in the context of instructing the Senate Counsel on the necessary conditions that must be satisfied prior to bringing suit.  See 2 U.S.C. § 288d(a).  In any event, the fact that § 288d may create an independent cause of action for the Senate does not establish that the Senate (or the House) could not proceed under the DJA.  Section 288d can simply be viewed as a more specific application of the general relief made available by the DJA.  Moreover, the use of the term "enforce" suggests that § 288d(a) may authorize coercive relief beyond the declaratory measures provided by the DJA.  Additionally, 28 U.S.C. § 1365 provides jurisdiction for actions that also likely fall within the scope of 28 U.S.C. § 1331 -- hence, the Senate can likely proceed on either basis where appropriate.  Thus, to the extent that they overlap, the possible presence of redundancy between § 288d and the DJA does not imply that the latter

_____

　　　[24] Indeed, the initial provision enacted in 1973 applied only to the Senate Select Committee on Presidential Campaign Activities.  See Pub. L. No. 93-190 (1973).

cannot be used by the Committee here.  That conclusion is consistent with statements found in a contemporaneous Senate Report indicating that "the statute is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subpena against an officer or employee of the federal government."  <u>See</u> S. Rep. No. 95-170, at 91-92 <u>reprinted in</u> 1978 U.S.C.C.A.N. 4216, 4307-08.[25]

That brings us to the interesting matter of the Senate Select Committee disputes.  After the district court dismissed the Senate's claim in <u>Senate Select Comm. I</u> for lack of subject matter jurisdiction, Congress enacted Pub. L. No. 93-190.  That provision conferred subject matter jurisdiction in this district court over "any civil action heretofore or hereafter brought by the Senate Select Committee on Presidential Campaign Activities . . . to enforce or secure a declaration concerning the validity of any subpoena . . . issued by said Committee to the President or the Vice President or any other officer of the United States."  Pub. L. No. 93-190. The phrasing of the statute is admittedly somewhat vague, but it is apparent that the Senate's main concern was addressing a lack of jurisdiction rather than any cause of action defect.  It is not clear, then, that the provision was meant to create an independent cause of action along with the special jurisdictional designation.  Indeed, the fact that Pub. L. No. 93-190 applied to "any

_____

[25] Indeed, that Report confirms that 28 U.S.C. § 1365 was designed to "leave no question that Congress intends for the District Court for the District of Columbia to have jurisdiction to hear civil actions to enforce congressional subpenas."  S. Rep. No. 95-170, at 91, 1978 U.S.C.C.A.N. at 4307.  Moreover, although (as the Executive points out) the Report also states that "[p]resently, Congress can seek to enforce a subpena only by use of criminal proceedings or by the impractical procedure of conducting its own trial before the bar of the House of Representatives or the Senate," S. Rep. No. 95-170, at 16, 1978 U.S.C.C.A.N. at 4232, the Committee is correct that the rationale underlying that statement was lack of <u>jurisdiction</u> rather than the absence of a cause of action.  <u>See</u> S. Rep. No. 95-170 at 20, 1978 U.S.C.C.A.N. at 4236 (explaining that the Senate's standing order authorizing all Senate committees to bring suit "has . . . been held not to confer jurisdiction on the courts to hear a subpena enforcement action").

civil action <u>heretofore</u> or hereafter brought by the Senate Select Committee" suggests that Congress believed that the Select Committee had already utilized an appropriate cause of action.

In <u>Senate Select Comm. I</u>, the cause of action identified by the court was the DJA.  <u>See</u> 366 F. Supp. at 54-55 ("The case presents a battery of issues including . . . invocation of the declaratory judgment statute.").  The court did not address the application of the DJA due to its jurisdictional holding.  And in <u>Senate Select Comm. II</u>, the court noted that the jurisdictional defect had been cured by the "statute placing special jurisdiction in this Court," and stated that the Committee "seeks a declaratory judgment clarifying its rights and an affirmative injunction directing compliance with the subpoena."  370 F. Supp. at 522.  There is no further cause of action discussion in <u>Senate Select Comm. II</u>.  However, the court ultimately exercised its equitable discretion to decline to hear the case, which is consistent with application of the DJA. <u>Id.</u> at 524 ("[W]hen its equitable jurisdiction is invoked, [the Court] can and should exercise its discretion not to enforce a subpoena which would exacerbate the pretrial publicity in areas that are specifically identified with pending criminal charges.").  That fact, coupled with the court's explicit reference to the DJA in <u>Senate Select Comm. I</u>, supports the conclusion that the cause of action was the DJA.  It is worth noting, then, that neither the district court nor the D.C. Circuit took issue with the sufficiency of that cause of action.

In any event, this Court concludes that the Committee may invoke the DJA because it has identified a sufficient right that is judicially remediable through the DJA.  It is the Constitution, and not any independent cause of action, that supplies the basis for Congress's right to invoke the DJA here.  The Court therefore rejects the Executive's argument that the DJA does not permit the Committee to have its day in court.

(2) Implied Cause of Action

In the alternative, the Committee also contends that it has an implied cause of action derived from Article I to seek a judicial declaration concerning the validity of its subpoena power. The Executive objects to that proposition on several grounds. To begin with, the Executive argues, Article I does not contain the sort of explicit "rights creating" language required to imply a cause of action from the Constitution. Instead, Article I deals primarily with "powers" of Congress rather than "rights" enforceable by the judiciary. Moreover, even assuming that Article I confers upon Congress a sufficient right, the Executive urges that special factors concerning the separation of powers counsel against fashioning a judicial remedy. As explained below, the Court is not persuaded by the Executive's assertions.

A few preliminary points are in order before addressing the Executive's contentions. Numerous Supreme Court decisions, such as Alexander v. Sandoval, establish that plaintiffs seeking to imply a cause of action from a federal statute bear the heavy burden of proving that Congress clearly meant for the statute to provide a private right to a class of individuals and that Congress also intended the statute to create a private federal remedy. See 532 U.S. at 288-90. The inquiry involved in implying a cause of action from the Constitution itself, however, is much different. In Davis v. Passman, 442 U.S. 228 (1979), the Supreme Court noted that "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." Id. at 241 (emphasis in original). Whereas the question in the statutory arena revolves around determining Congress's intent with respect to a specific legislative act, the Constitution "speaks . . . in great outlines . . . with majestic simplicity." Id. (quotations omitted). It is the judiciary, rather than Congress, that is traditionally

-59-

regarded as the arbiter of constitutional rights and it is self-evident why courts do not look to

congressional intent when construing the Constitution.  Thus, "the judiciary is clearly discernible

as the primary means through which [constitutional] rights may be enforced," and consequently

"[a]t least in the absence of a 'textually demonstrable constitutional commitment of [an] issue to

a coordinate political department,' . . . we presume that justiciable constitutional rights are to be

enforced through the courts."[26] Id. at 242 (citing Baker v. Carr, 369 U.S. at 217).  The Court

went on to indicate that:

> Traditionally, therefore, "it is established practice for this Court to sustain the
> jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the
> Constitution and to restrain individual state officers from doing what the 14th
> Amendment forbids the State to do." . . . Indeed, this Court has already settled that
> a cause of action may be implied directly under the equal protection component of
> the Due Process Clause of the Fifth Amendment in favor of those who seek to
> enforce this constitutional right.

Id. at 242 (emphasis added) (quoting Bell v. Hood, 327 U.S. 678, 684 (1946)).

In the context of implying a private cause of action for damages from the Constitution,

Bivens v. Six Unkown Fed. Narcotics Agents, 403 U.S. 388 (1971), provides the starting point.

As in the statutory context, a plaintiff must first identify a protected right that is violated by the

defendant's conduct.  Once that is established, the Supreme Court has clarified that "on the

assumption that a constitutionally recognized interest is adversely affected by the actions of

federal employees, the decision whether to recognize a Bivens remedy may require two steps,"

---

[26] The Executive seizes on this passage to argue that "the authority to invoke the power of
the courts to 'take care that the laws be faithfully executed'" is textually committed to the
Executive.  See Defs.' Reply at 31.  As explained above, however, this is not an enforcement
action taken by the government against a private citizen.  While that task is surely vested in the
Executive, see Buckley v. Valeo, 424 U.S. 1, 138 (1976), there is no corresponding constitutional
provision that precludes the Committee from bringing a lawsuit to resolve a dispute between two
co-equal branches of the federal government.

Wilkie v. Robbins, --- U.S. ---, 127 S. Ct. 2588, 2598 (2007):

> In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. . . . But even in the absence of an alternative, a Bivens remedy is a subject of judgment: the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hestitation before authorizing a new kind of federal litigation.

Id. (internal citations and quotations omitted).

This is not a damages action. Thus, Bivens and its progeny are not strictly on point. There is some direction to be gleaned from those cases, but they are not a close fit for the current controversy. The parties have not directed the Court to any significant case law pertaining to implied constitutional causes of action for injunctive or declaratory relief against federal officials, and the Court has not identified much authority on that subject.

Against that backdrop, the Committee's argument is straightforward. Article I, the Committee asserts, provides Congress with an implied right to investigate in furtherance of its legislative function. That right has been recognized by the Supreme Court, which has also held that it carries with it a necessary corollary that Congress may rely upon compulsory process to enforce its investigative authority. Indeed, according to the Committee the Supreme Court has already "establishe[d] a framework for implying remedies pursuant to Congress's powers under Article I." See Pl.'s Opp'n & Reply at 39. In Marshall v. Gordon, 243 U.S. 521 (1917), the Court explained that Congress's implied inherent contempt authority "rests solely upon the right of self-preservation to enable the public powers given to be exerted." Id. at 541. This implied power derives "from the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty." Id. at 542. For the same reasons that the Supreme

Court implied a power of inherent contempt in <u>Marshall</u>, the Committee argues, this Court should imply a cause of action to vindicate the right of Congress to carry out its legislative duty.[27]

 In response, the Executive insists that the Supreme Court "has made clear that implied causes of action under the Constitution arise only where there is a constitutionally-explicit *right* to be vindicated." <u>See</u> Defs.' Reply at 26 (emphasis in original). Article I, the Executive says, creates no such explicit right. True enough, but the Executive overlooks the fact that the Supreme Court has already construed Article I in <u>McGrain</u>, <u>Eastland</u>, and other cases to find an implied right of investigation, and indeed an implied right to compel compliance with that investigative power, accruing to Congress. <u>See, e.g.</u>, <u>Eastland</u>, 421 U.S. at 504-05 ("The power to investigate and to do so through compulsory process plainly falls within [the] definition [of Congress's legislative function]."). This Court is equally bound by constitutional constructions issued by the Supreme Court as it is by the text of Article I itself.

 That Congress's right may be implied rather than explicit under the Constitution does not defeat the Committee's action. With respect to 42 U.S.C. § 1983, the Supreme Court has observed that the fact "[t]hat the right at issue . . . is an implied right under the Commerce Clause does not diminish its status as a 'right, privilege, or immunity' under § 1983." <u>Dennis v. Higgins</u>, 498 U.S. 439, 448 n. 7 (1991) ("Indeed, we have already rejected a distinction between express and implied rights under § 1983 in the statutory context."). And the Court has also indicated that "[a] court's role in discerning whether personal rights exist in the § 1983 context

---

 [27] Indeed, as the Committee would have it, the Supreme Court's implied remedy in <u>Marshall</u> -- inherent contempt -- is more drastic than the civil cause of action that the Committee pursues here, and hence this Court should take comfort in the fact that the Supreme Court has already crafted a more severe remedy.

should . . . not differ from its role in discerning whether personal rights exist in the implied right

of action context." Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002). If an implied

constitutional right suffices for purposes of § 1983, there is no reason it should not suffice here.

        After undertaking an analogous examination of Article I, the Supreme Court has held that

there is a judicially enforceable right implied in the Commerce Clause notwithstanding that there

is no explicit textual basis for that right. In Dennis, the Court rejected the argument that "the

Commerce Clause merely allocates power between the Federal and State Governments and does

not confer 'rights.'" 498 U.S. at 447. Indeed, "[t]he Court has often described the Commerce

Clause as conferring a 'right' to engage in interstate trade free from restrictive state regulation."

Id. at 448. No less is true of Congress's right and power to investigate as part of its legislative

function; indeed, in Marshall the Supreme Court pointed to Congress's "right to . . . discharge

[its] legislative duty" as the source of its inherent contempt authority. 243 U.S. at 542. The

existence of a judicially remediable right derived from the Commerce Clause, then, provides

strong support for a similarly cognizable investigation right in Congress. Moreover, the Court

has also indicated that "individuals injured by state action that violates . . . the Commerce Clause

may sue and obtain injunctive and declaratory relief." Dennis, 498 U.S. at 447 (citing McKesson

Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regulation of Florida, 496 U.S.

18, 31 (1990)). So, too, can the Committee sue for declaratory relief concerning its right to issue

and enforce subpoenas to obtain testimony and documents.

        The Executive next makes the related argument that "Article I is fundamentally the stuff

of government structure, not 'rights.'" See Defs.' Reply at 27. That, however, is exactly the

argument rejected by the Supreme Court in Dennis and the Court finds that decision instructive

here as well.  Undeterred, the Executive notes that Article I itself refers to the "powers" of Congress rather than to the "rights" of Congress.  And to the extent that the Supreme Court has made various statements concerning Congress's investigatory role, it has indicated that there is a "congressional *power* of inquiry (which itself is not expressly identified in the Constitution, but must be implied as appurtenant to the legislative function)."  Id. at 28.  "The Court did not, however, hold (or otherwise suggest) that Article I vests Congress with justiciable *rights* to validate in courts."  Id. at 28-29.

The Executive makes far too much of the difference between rights and powers, apparently attempting to draw on the well-established concept that, for implied cause of action or § 1983 purposes, only "rights" -- as distinct from "benefits or interests" -- are judicially enforceable.  See, e.g., Gonzaga Univ., 536 U.S. at 283.  The "rights versus powers" assessment, however, does not fit into that dichotomy.  Instead, rights and powers are inherently related concepts.  The exercise of Congress's investigative "power," which the Executive concedes that Congress has, creates rights.  For instance, by utilizing its power to issue subpoenas and proceed with an investigation via compulsory process, Congress creates a legal right to the responsive information that those subpoenas will yield.  To hold that Congress's ability to enforce its subpoenas in federal court turns on whether its investigative function and accompanying authority to utilize subpoenas are properly labeled as "powers" or "rights" would elevate form over substance.  The Court declines to do so.[28]

Even assuming that Congress has an implied constitutionally-recognized interest, the

_____

[28] Not all rights or privileges are express in the Constitution.  Of note here, the Constitution makes no reference to executive privilege or absolute immunity either.

Executive nonetheless contends that "'alternative, existing process[es] for protecting [that] interest amount[] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy' here," particularly where the Committee has failed to exhaust those remedies.  See Defs.' Reply at 32 (quoting Wilkie, 127 S. Ct. at 2598).  Of course, the Committee's attempt to proceed with a criminal contempt prosecution was thwarted by the executive branch.  That option, which was one of the three available routes to achieve enforcement of a congressional subpoena, has now been foreclosed.

Still, the Executive takes the Committee to task for failing to utilize its inherent contempt authority.  But there are serious problems presented by the prospect of inherent contempt, not the least of which is that the Executive is attempting to have it both ways on this point.  To begin with, prosecution pursuant to inherent contempt is a method of "inflicting punishment on an individual who failed" to comply with a subpoena.  See Olson OLC Opinion at 137.  As OLC has recognized, a civil action, by contrast, is directed towards "obtaining any unprivileged documents necessary to assist [Congress's] lawmaking function."  Id.  Put another way, the two remedies serve different purposes, although it is true that threatening prosecution under inherent contempt may lead to the production of documents.  But unlike a civil action for subpoena enforcement, that is not the primary goal of inherent contempt.  Second, imprisoning current (and even former) senior presidential advisors and prosecuting them before the House would only exacerbate the acrimony between the two branches and would present a grave risk of precipitating a constitutional crisis.  Indeed, one can easily imagine a stand-off between the Sergeant-at-Arms and executive branch law enforcement officials concerning taking Mr. Bolten into custody and detaining him.  See Cooper OLC Opinion at 86 ("[I]t seems most unlikely that Congress could

dispatch the Sergeant at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege."). Such unseemly, provocative clashes should be avoided, and there is no need to run the risk of such mischief when a civil action can resolve the same issues in an orderly fashion. Third, even if the Committee did exercise inherent contempt, the disputed issue would in all likelihood end up before this Court, just by a different vehicle -- a writ of habeas corpus brought by Ms. Miers and Mr. Bolten. In either event there would be judicial resolution of the underlying issue.

Indeed this administration, along with previous executive administrations, has observed that inherent contempt is <u>not</u> available for use against senior executive branch officials who claim executive privilege. In this very case, the Executive has questioned "whether [inherent contempt] would even countenance the arrest of the President or his closest aides for refusing to testify or provide privileged documents . . . at the President's direction." <u>See</u> Defs.' Reply at 22. The Executive has described that possibility as a "dubious proposition." <u>Id.</u> Previous administrations have gone even further. The Olson OLC Opinion explained that "the same reasoning that suggests that the [criminal contempt] statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." <u>See</u> Olson OLC Opinion at 140 n. 42. The Cooper OLC Opinion concurred: the inherent contempt alternative "may well be foreclosed by advice previously rendered by this Office." <u>See</u> Cooper OLC Opinion at 83. Thus, there are strong reasons to doubt the viability of Congress's inherent contempt authority vis-a-vis senior executive officials. To be sure, the executive branch's opinion is not dispositive on this question, and the Court need not decide the issue. At the very least, however, the Executive cannot simultaneously question the sufficiency and availability of an

alternative remedy but nevertheless insist that the Committee must attempt to "exhaust" it before a civil cause of action is available.

The remaining alternative suggested by the Executive branch -- the process of accommodation and negotiation, including the exercise of other political tools such as withholding appropriations -- is not sufficient to remedy the injury to Congress's investigative power. Whether or not these types of disputes are traditionally settled by negotiation and accommodation -- and the Court will assume that they are -- it is evident that those processes have failed in this case. Indeed, both parties agree that the political branches have reached a stalemate. And both sides invested much effort in that process over a lengthy period. When faced with a similar situation in AT&T I, the executive branch did not hesitate to repair to federal court in order to protect its institutional interests. The Court can identify no reason why the Committee should not be able to do the same here. Moreover, the appropriations process is too far removed, and the prospect of successful compulsion too attenuated, from this dispute to remedy the Committee's injury to its investigative function in a manner similar to a civil action for declarative relief.[29]

---

[29] The Executive suggests that the power over the confirmation process is an alternative at Congress's disposal, but must concede that it is not one available to the Committee in this case because "the Senate, rather than the House, has the power of advice and consent over presidential appointments." See Defs.' Reply at 32-33. With respect to appropriations, the Executive points out that the "power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." The Federalist No. 58 (James Madison). Indeed, at oral argument the Executive suggested that the House could decline "to appropriate money for the Justice Department this year unless" the White House agreed to permit Ms. Miers to testify. See Tr. at 92. The Committee derides that suggestion, stating that "an effort to extort cooperation is an invitation to permanent political warfare between the branches." See Pl.'s Opp'n & Reply at 52 n. 15. Ultimately, the Executive's argument sweeps too broadly. Short of withholding all

Finally, noting that "the [Supreme] Court has been particularly reluctant to permit the fashioning of remedies under the Constitution where doing so raises separation of powers concerns," the Executive contends that special factors counseling hesitation "demonstrate[] that the Committee cannot rely on Article I, § 1 to establish an entitlement to relief." See Defs.' Reply at 31. The Executive's primary point is that "the Constitution's express provision of the 'take care' power to the Executive with no corresponding assignment to Congress, is yet another special factor counseling hesitation." Id. at 34.[30] But it is difficult to see how unique separation of powers issues are raised by implying a congressional cause of action from Article I in this context. First off, the Senate already has a statutory right to proceed with such an action that presents no apparent separation of powers concern. It is not clear why the mere act of implying a constitutional cause of action for the House runs afoul of separation of powers principles when the Senate already has an analogous statutory right of action. Moreover, permitting the Committee to proceed with an implied cause of action in this case would have virtually no impact on the Executive's general authority and discretion to take care that the laws are faithfully executed. The proposed implied action would only permit the House to enter federal court in order to vindicate

appropriations entirely and shutting down the federal government, the Executive could always claim that the House has alternative remedies that it has failed to explore. The notion that the Framers contemplated that Congress would be required to shut down the operations of government before an Article III court could exercise its traditional role of resolving legal disputes is an odd one. Moreover, as federal appropriations occur far in advance, the House would potentially be forced to wait before it could even credibly threaten to withhold funding for any particular executive branch function, which further underscores the inability of the appropriations process to serve as an expedient means to vindicate Congress's right to information.

[30] In addition to the separation of powers contention, the Executive argues that the Committee's failure to exhaust alternative remedies is another factor counseling hesitation here. For the reasons explained earlier, the Court disagrees.

its institutional right to information in settings where the Executive has refused to comply with a House subpoena. It would not otherwise authorize the House to take enforcement action or bring suit in any other situation.

Indeed, there are few reasons for hesitation in the context of implying a cause of action for declaratory relief on the part of <u>Congress</u> as compared to the typical <u>Bivens</u> damages suit. In the latter context, recognizing an implied cause of action does two things: (1) it opens the gates of federal courts to an entire <u>class</u> of plaintiffs; and (2) it permits that class to pursue monetary damages against executive branch officials. The proposed cause of action for the Committee does neither. This cause of action for the House would not open the door to federal court for any plaintiffs except the House or its authorized committees. Thus, this is not the sort of scenario where one could imagine a new <u>Bivens</u> remedy leading to a deluge of additional litigation. Moreover, the relief authorized by this implied cause of action would not authorize monetary damages from executive branch officials but would simply permit the Committee to seek enforcement of information subpoenas. Hence, there is little risk of any negative impact on the conduct of government employees or operations. These distinctions from ordinary <u>Bivens</u> cases suggest that the Court should have less hesitation in recognizing an implied cause of action here.

The Court concludes that the Committee has an implied cause of action derived from Article I to seek a declaratory judgment concerning the exercise of its subpoena power. The Court is cognizant of the fact that the Supreme Court has exhibited a general reluctance to imply new causes of action in instances that might implicate separation of powers issues. <u>See, e.g.</u>, <u>United States v. Stanley</u>, 483 U.S. 669, 683-84 (1987) (declining to extend a <u>Bivens</u> remedy for "injuries that arise out of or are in the course of activity incident to [military] service") (internal quotations

omitted).  Hence, the Court will proceed with caution.  But ultimately the cause of action

recognized here is exceedingly narrow.  Indeed, it effectively applies only in this precise

circumstance.  The Court is therefore convinced that acknowledging an implied cause of action in

this very limited scenario does not present the same set of concerns that are ordinarily presented

by Bivens damages actions.

>           C.      Equitable Discretion

That leaves the Executive's final basis for dismissal.  Even if the Committee has either the

requisite right pursuant to the DJA or an implied cause of action, the Executive contends that this

Court nevertheless has the discretion to decline to hear the case, and should do so here.  The

Executive is correct that the Court has such discretion.  The DJA provides that a court "may

declare the rights and other legal relations of any party seeking such declaration."  See 28 U.S.C. §

2201(a) (emphasis added).  The Supreme Court has held that the Act's textual commitment to

discretion indicates that "district courts possess discretion in determining whether and when to

entertain an action under the Declaratory Judgment Act, even when the suit satisfies subject

matter jurisdictional prerequisites."  Wilton v. Seven Falls, 515 U.S. 277, 283 (1995); see also

Hanes Corp., 531 F.2d at 591 ("There is no absolute right to a declaratory judgment in the federal

courts. . . . [Whether one is granted] in a particular case is a matter of judicial discretion.").

Similarly, the Court has discretion with respect to any implied cause of action that arises from

equitable powers and the Supreme Court's instruction that a "remedy for a claimed constitutional

violation has to represent a judgment about the best way to implement a constitutional guarantee."

Wilkie, 127 S. Ct. at 2597.  The Committee does not dispute that, but urges instead that

adjudicating this dispute would be an appropriate exercise of discretion.  Thus, the question here

is not whether the Court <u>can</u> entertain this suit, but whether it <u>should</u> do so.

There are no dispositive factors to consider in this analysis. Instead, there are several factors that help to guide the Court's determination:

> Among the factors relevant to the propriety of granting a declaratory judgment are the following: whether it would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of "procedural fencing"; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided.

<u>Hanes Corp.</u>, 531 F.2d at 591 n. 4. The D.C. Circuit "has placed some emphasis on the likelihood that a controversy -- particularly one of questionable vitality -- will recur." <u>Id.</u> at 592.

The Executive presents a litany of reasons why the Court should decline to decide this case.[31] But the crux of the Executive's position is that the federal judiciary should not enter into this dispute between the political branches. "[F]or more than 200 years," the Executive asserts, "the political branches have resolved their disputes over congressional requests for information without Congress invoking the aid of the federal judiciary to adjudicate Congress's claims." <u>See</u> Defs.' Reply at 34. And if this Court were to reach the merits of the case, a decision "would inexorably alter the separation of powers and forever change how the political branches deal with each other and the nature of accommodation, if any, between them." <u>Id.</u> at 35. Moreover, a "definitive judicial resolution of these issues would invite further judicial involvement in an area where it is settled that courts should tread lightly, if at all." <u>Id.</u> In short, according to the

---

[31] One of those reasons can quickly be rejected. As noted in <u>Hanes Corp.</u>, one relevant factor to consider is the availability of alternative remedies. 531 F.2d at 591 n. 4. This Court has already assessed whether the Committee has adequate alternative remedies. Suffice it to say that the Court does not believe that any other remedies conceivably available to the Committee, such as they are, dictate that the Court should decline to adjudicate this case.

Executive, this Court should leave this dispute to resolution by the political process, which is what the Framers intended.

There is some force to the Executive's position, but the Court is not persuaded. To begin with, whatever way this Court decides the issues before it may impact the balance between the political branches in this and future settings, as the Court has already noted. See Tr. at 87-88 ("This is one of the difficulties I have, because both sides have that same point, whatever I do, whether I rule for the executive branch . . . or rule for the legislative branch, that somehow I am going to disrupt the balance that has existed."). Hence, a decision to foreclose access to the courts, as the Executive urges, would tilt the balance in favor of the Executive here, the very mischief the Executive purports to fear. Moreover, the Executive is mistaken in the contention that judicial intervention in this arena at the request of Congress would be unprecedented in the nation's history. The 1974 decision by the Supreme Court in United States v. Nixon adjusted this balance by clarifying that the judiciary must be available to resolve executive privilege claims. Thereafter, the D.C. Circuit issued a judicial resolution on the merits of the executive's presumptive privilege claim at the Senate's prompting. And it was the executive branch that invoked the aid of the federal judiciary in United States v. House of Representatives; so, too, in AT&T I, where the executive branch filed a lawsuit that challenged the validity of a congressional subpoena after negotiations with Congress designed to avoid the subpoena had failed. The Court does not understand why separation of powers principles are more offended when the Article I branch sues the Article II branch than when the Article II branch sues the Article I branch.[32]

_____

[32] Although it is true that the court's ruling in United States v. House of Representatives was motivated in part by the gravity of a suit between the political branches, the basis for the decision to decline to hear the case was that the issue was not yet ripe. See 586 F. Supp. at 153.

OLC itself has noted that the Supreme Court confirmed in United States v. Nixon that the judiciary is the ultimate arbiter of claims of executive privilege.  Ever since then, it has been apparent that issues relating to claims of executive privilege are subject to at least some judicial oversight.  Moreover, the judiciary has a long history of deciding cases that involve various separation of powers issues and, indeed, cases such as AT&T I, United States v. House of Representatives, and Senate Select Comm. III mark judicial involvement in congressional subpoena disputes between the executive and legislative branches.  The status quo in the light of which the political branches have operated -- at least since United States v. Nixon -- is the availability of ultimate judicial intervention in exactly this sort of controversy.  That fact was made abundantly clear in both the Olson and Cooper OLC opinions, and things have not changed since then.  Put another way, the historical record dating back to United States v. Nixon suggests that the political branches have negotiated with one another against the backdrop of presumptive judicial review, mindful of that very real possibility.  Thus, contrary to the Executive's contention, declining to decide this case would be the action most likely to "alter" the accommodations process between the political branches.

Nor would hearing this case open the floodgates for similar litigation that would overwhelm the federal courts and paralyze the accommodations process between the political branches.  Prior cases, particularly United States v. Nixon, AT&T I, and Senate Select Comm. III, have already paved the way for claims of this type.  Notwithstanding that fact, there have been very few lawsuits brought in federal court raising this issue -- certainly no rush to the courthouse by either political branch is evident.  The process of negotiation between the executive and legislative branches has functioned as always.  Indeed, there are powerful reasons to believe that

most disputes of this nature will continue to be resolved through the informal processes of negotiation and accommodation. Resort to the judicial process is, after all, not a particularly expedient way to obtain prompt access to sought-after information, especially if a full House or Senate resolution is a necessary part of the process. The lengthy delays in the history of this case are a testament to the inefficiency of resort to the judicial process. Finally, the prospect of ultimate judicial resolution will help to ensure that the parties continue to negotiate in good faith rather than rewarding intransigence.

Citing to the Hanes Corp. criteria, the Committee presents persuasive reasons why the Court should exercise its discretion to decide the issues raised in its motion for partial summary judgment. First, judicial resolution would settle this dispute between the parties as to whether Ms. Miers is absolutely immune from congressional process and whether Mr. Bolten must respond further. Resolution of the immunity issue will determine the next steps (if any) the parties must take in this matter. Second, contrary to the Executive's suggestion that the Committee did not make any serious counter-offers, see Defs.' Reply at 38, the record reflects that it was the Executive and not the Committee that refused to budge from its initial bargaining position. Mr. Fielding himself stated that the Committee had written to him "on eight previous occasions, three of which letters contain or incorporate specific proposals involving terms for a possible agreement." See Pl.'s Mot. Ex. 34. The Executive, by contrast, apparently continued to adhere to its original proposal without modification. Thus, the "equity of the conduct of the declaratory judgment plaintiff," Hanes Corp., 531 F.2d at 591 n. 4, supports the exercise of the Court's

discretion in favor of the Committee.[33]  Third, the record is fully developed for purposes of the

issues presented by these motions.  Significantly, immunity is strictly a legal issue, and it is the

judiciary that must "say what the law is" with respect to that matter.  Marbury v. Madison, 5 U.S.

(1 Cranch) at 177-78; see also Nixon v. Sirica, 487 F.2d at 714-715 ("Whenever a privilege is

asserted, even one expressed in the Constitution, such as the Speech and [sic] Debate privilege, it

is the courts that determine the validity of the assertion and the scope of the privilege. . . . To

leave the proper scope and application of Executive privilege to the President's sole discretion

would represent a mixing, rather than a separation, of Executive and Judicial functions.").  Fourth,

the parties are most surely sufficiently adverse.  Fifth, both sides agree that this case raises issues

of enormous "public importance."  Hanes Corp., 531 F.2d at 591 n. 4.  Finally, there is a strong

possibility that this sort of dispute could routinely "recur."  Id. at 592.  Indeed, it already has: on

July 10, 2008, former White House advisor Karl Rove asserted absolute immunity in response to a

congressional subpoena and on July 30, 2008 the Committee voted to hold him in contempt.  See

Beth Sussman, Rove Defies Subpoena, Skips House Hearing, The Hill, July 10, 2008,

http://thehill.com/leading-the-news/rove-defies-subpoena-skips-house-hearing-2008-07-10.html;

David Stout, Democrats Call for Contempt Charges Against Rove, N.Y. Times, July 31, 2008,

http://www.nytimes.com/2008/07/31/washington/31justice.html?hp.

      Still, the timing of this dispute gives the Court some pause.  The 110th Congress expires

on January 3, 2009.  Unlike the Senate, the House is not a continuing body.  See AT&T I, 551

---

      [33] The Court does not pass judgment on the propriety of either party's negotiating
position, and does not suggest that there was anything improper about the Executive's staunch
position in this matter.  For present purposes, however, there is nothing in the Committee's
course of conduct that is a cause for concern regarding exercising the Court's discretion here.

F.2d at 390.  Thus, this House ends on January 3, 2009.  Significantly, the subpoenas issued by

this House will also expire on that date.  Id.  Moreover, a new executive administration will take

office in January 2009 following the presidential elections that will be held in November.

There is, therefore, the question of mootness possibly looming on the horizon that

threatens both parties here.  On the Committee's side, the entire House -- and thus any outstanding

subpoenas -- will lapse on January 3, 2009, and the basis of this lawsuit will cease to exist.  To be

sure, the incoming House of Representatives may elect to re-issue similar subpoenas, but that

remains speculative at this juncture.  Similarly, the incoming executive administration may

decline to pursue the assertions of immunity and executive privilege that form the foundation of

this dispute.  A former President may still assert executive privilege, but the claim necessarily has

less force, particularly when the sitting President does not support the claim of privilege.  See

Nixon v. Adm'r Gen. Servs., 433 U.S. at 449.  As with the incoming Congress, there is no way to

predict whether the new administration will support the assertions of privilege made in this case.

There is also the likelihood of appeal of this decision and, given the significance of the issues

involved, a stay pending appeal is at least possible.  Thus, although proceedings before this Court

could be concluded prior to January 2009, any appeals process may not run its course before that

date.  At that point, the case would arguably become moot.

Nevertheless, the Court concludes that this concern does not counsel against entertaining

this case.  As was the case in AT&T I, in which only a few days remained before the new

Congress, this "case is not now technically moot."  551 F.3d at 390.  Indeed, unlike in AT&T I,

this case is not about to become moot either; there are over five months of live controversy

remaining.  Furthermore, this mootness concern is likely to be present in nearly every controversy

of this nature.  Because the Congress expires every two years, and a subpoena issued by the House

remains valid only for the duration of that Congress, it would be difficult for any House subpoena

dispute to fit into that two-year window once the time for appeal is factored into the equation.

The process contemplates a long period of negotiation with resort to the judiciary, if at all, only in

the case of a legitimate impasse.  The combination of the congressional process and litigation time

(including appeal) means that every subpoena dispute of this nature would likely run up against

the two-year window.  That may present a problem that is capable of repetition yet evading

review, a well-recognized exception to mootness.  But in any event, it is not necessary to decide

that question now because this case is not presently moot and, significantly, neither side has asked

the Court to stay its hand due to mootness considerations.

  The Court re-emphasizes its limited involvement at this point.  The Court has addressed

only traditional legal issues -- standing, causes of action, equitable discretion -- and has not yet

been asked to rule on any particular assertion of executive privilege.  In litigation terms, this

proceeding has not yet even progressed to the point that the D.C. Circuit reached in Senate Select

Comm. III.  Indeed, the ultimate disposition that the Court reaches today -- that Ms. Miers is not

absolutely immune from congressional process and that Mr. Bolten must produce more detailed

documentation concerning privilege claims -- still does not address the merits of any particular

assertion of presidential privilege.  Hence, this Court's intervention is strikingly minimal, and it is

the Court's sincere desire that it stays that way.  The Court strongly encourages the parties to

reach a negotiated solution to this dispute.  Quite frankly, this decision does not foreclose the

accommodations process; if anything, it should provide the impetus to revisit negotiations.

  As the Cooper OLC Opinion put it, "only judicial intervention can prevent a stalemate

between the other two branches that could result in a particular paralysis of government operations." See Cooper OLC Opinion at 88 n. 33.  Although the identity of the litigants in this case necessitates that the Court proceed with caution, that is not a convincing reason to decline to decide a case that presents important legal questions.  Rather than running roughshod over separation of powers principles, the Court believes that entertaining this case will reinforce them. Two parties cannot negotiate in good faith when one side asserts legal privileges but insists that they cannot be tested in court in the traditional manner.  That is true whether the negotiating partners are private firms or the political branches of the federal government.  Accordingly, the Court will deny the Executive's motion to dismiss.

## II.   The Committee's Motion for Partial Summary Judgment

The Executive cannot identify a single judicial opinion that recognizes absolute immunity for senior presidential advisors in this or any other context.  That simple yet critical fact bears repeating: the asserted absolute immunity claim here is entirely unsupported by existing case law. In fact, there is Supreme Court authority that is all but conclusive on this question and that powerfully suggests that such advisors do not enjoy absolute immunity.  The Court therefore rejects the Executive's claim of absolute immunity for senior presidential aides.

### A.   Absolute Immunity

The Committee's primary argument on this point is incredibly straight-forward.  Ms. Miers was the recipient of a duly issued congressional subpoena.  Hence, she was legally obligated to appear to testify before the Committee on this matter, at which time she could assert legitimate privilege claims to specific questions or subjects.  The Supreme Court has made it abundantly clear that compliance with a congressional subpoena is a legal requirement.  United

States v. Bryan, 339 U.S. 323, 331 (1950).  Indeed, the Court noted:

> A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase.  If that were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity.  We have often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned.

Id. (emphasis added).  With her duty to appear thus established, the Committee asserts that the burden rests with Ms. Miers to explain why compliance was excused in this instance.[34]

The Executive maintains that absolute immunity shields Ms. Miers from compelled testimony before Congress.  Although the exact reach of this proposed doctrine is not clear, the Executive insists that it applies only to "a very small cadre of senior advisors."  See Tr. at 96.  The argument starts with the assertion that the President himself is absolutely immune from compelled congressional testimony.  There is no case that stands for that exact proposition, but the Executive maintains that the conclusion flows logically from Nixon v. Fitzgerald, 457 U.S. 731 (1982), where the Supreme Court held that the President "is entitled to absolute immunity from damages liability predicated on his official acts."  Id. at 749.  "Any such [congressional] power of compulsion over the President," the Executive asserts, "would obviously threaten his independence and autonomy from Congress in violation of separation of powers principles."  See

---

[34] At the motions hearing in this case, counsel for the Executive stated that the absolute immunity contention applies only to the oral testimony of Ms. Miers and not to the document subpoena issued to Mr. Bolten.  See Tr. at 101 ("We are not arguing today that we are immune from document subpoenas.  The immunity we're talking about relates only to oral testimony compelled by subpoena.").  In a similar vein, the Executive takes issue with the Committee's reliance on existing case law concerning document subpoenas.  Those cases, the Executive says, are not instructive on issues relating to live testimony.  The Court disagrees.  There is no suggestion in any of the cases in this area that claims of presidential privilege should be evaluated differently in the context of compelled oral testimony as opposed to responses to document subpoenas, and the Court cannot identify any reason to do so.

Defs.' Reply at 40.  The Executive then contends that "[those] same principles apply just as clearly to the President's closest advisers."  Id.  Because senior White House advisers "have no operational authority over government agencies . . . [t]heir sole function is to advise and assist the President in the exercise of his duties."  Id. at 41.  Therefore, they must be regarded as the President's "alter ego."  In a similar context, the Supreme Court has extended Speech or Debate Clause immunity to legislative aides who work closely with Members of Congress.  See Gravel v. United States, 408 U.S. 606, 616-17 (1972).   Accordingly, forcing close presidential advisors to testify before Congress would be tantamount to compelling the President himself to do so, a plainly untenable result in the Executive's view.  Indeed, as the Executive would have it, "[w]ere the President's closest advisers subject to compelled testimony there would be no end to the demands that effectively could be placed upon the President himself."  See Defs.' Reply at 43.

       Unfortunately for the Executive, this line of argument has been virtually foreclosed by the Supreme Court.  In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the plaintiff sued "senior White House aides" for civil damages arising out of the defendants' official actions.  Id. at 802.  The defendants argued that they were "entitled to a blanket protection of absolute immunity as an incident of their offices as Presidential aides."  Id. at 808.  The Supreme Court rejected that position.  Notwithstanding the absolute immunity extended to legislators, judges, prosecutors, and the President himself, the Court emphasized that "[f]or executive officials in general, however, our cases make plain that qualified immunity represents the norm."  Id. at 807.  Although there can be no doubt regarding "the importance to the President of loyal and efficient subordinates in executing his duties of office, . . . these factors, alone, [are] insufficient to justify absolute immunity."  Id. at 808-09 (discussing Butz v. Economou, 438 U.S. 478 (1978)).

In <u>Harlow</u> the Supreme Court rejected the analogy to legislative aides that the Executive now invokes here. There, the defendants "contend[ed] that the rationale of <u>Gravel</u> mandates a similar 'derivative' immunity for the chief aides of the President of the United States." <u>Id.</u> at 810. The Court brushed that argument aside, explaining that it "sweeps too far." <u>Id.</u> Even Members of the Cabinet, the Court reasoned, "whose essential roles are acknowledged by the Constitution itself," are not entitled to absolute immunity. <u>Id.</u> There is no reason to extend greater protection to senior aides based solely on their proximity to the President, the Court concluded.

The defendants in <u>Harlow</u> also attempted to rely upon the "special functions" of White House aides, as distinct from the formality of their title. The Court explained that such an inquiry "accords with the analytical approach of our cases" but then indicated that the "burden of justifying absolute immunity rests on the official asserting the claim." <u>Id.</u> at 811-12. Sensitive matters of "discretionary authority" such as "national security or foreign policy" may warrant absolute immunity in certain circumstances, but they do not justify a "blanket recognition of absolute immunity for all Presidential aides in the performance of all of their duties." <u>Id.</u> at 812.

> In order to establish entitlement to absolute immunity a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability. He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted.

<u>Id.</u> at 812-13. If both of those conditions are not satisfied, the official in question is only entitled to the lesser protection of qualified immunity. <u>Id.</u> at 813.

There is nothing left to the Executive's primary argument in light of <u>Harlow</u>. This case, of course, does not involve national security or foreign policy, and the Executive does not invoke that mantra. The derivative, "alter ego" immunity that the Executive requests here due to Ms.

Miers's and Mr. Bolten's close proximity to and association with the President has been explicitly and definitively rejected, and there is no basis for reaching a different conclusion here. Indeed, the Executive asks this Court to recognize precisely the type of blanket derivative absolute immunity that the Supreme Court declined to acknowledge in Harlow.

The Executive makes one wholly unavailing attempt to reckon with Harlow. That case, the argument goes, did not entirely dispense with the concept of absolute immunity. Instead, it held open the possibility of such protection in limited circumstances. That is correct, but this case does not implicate the very narrow window left open by Harlow. Again, there is no suggestion whatsoever that the decisions in question here involve national security or other particularly sensitive function that Harlow indicates may warrant absolute immunity. Instead, the Executive simply states that the President "must rely on his close advisers to assist in the performance of his Article II functions in much the same way that members of Congress rely on their aides." See Defs.' Reply at 46. But that was equally true in Harlow, 457 U.S. at 808-09, and the Supreme Court rejected that contention as a basis for absolute immunity from money damages for presidential advisors. The same holds true here.

The fact that Harlow was an action for civil damages does not help the Executive either. To the contrary, it provides greater support for this Court's conclusion. One of the Executive's primary justifications for absolute immunity is that the President will not be able to receive candid advice from his close advisors if they can be compelled to testify before Congress regarding their actions. But civil suits for money damages present a greater potential for such a chilling effect; after all, the risk of financial ruin involved in defending a civil suit is a significant consideration that can understandably shape behavior. Harlow, however, held that such suits are not precluded

by absolute immunity with respect to senior presidential aides.  On the other hand, the prospect of

being hauled in front of Congress -- daunting as it may be -- would not necessarily trigger the

chilling effect that the Executive predicts.  Senior executive officials often testify before Congress

as a normal part of their jobs, and forced testimony before Congress does not implicate the same

concern regarding personal financial exposure as does a damages suit.  Significantly, the

Committee concedes that an executive branch official may assert executive privilege on a

question-by-question basis as appropriate.  That should serve as an effective check against public

disclosure of truly privileged communications, thereby mitigating any adverse impact on the

quality of advice that the President receives.

        The Executive's concern that "[a]bsent immunity . . . there would be no effective brake on

Congress's discretion to compel the testimony of the President's advisers at the highest level of

government" is also unfounded.  See Defs.' Reply at 45.  To begin with, the process of negotiation

and accommodation will ensure that most disputes over information and testimony are settled

informally.  Moreover, political considerations -- including situations where Congress or one

House of Congress is controlled by the same political party that holds the Presidency -- will surely

factor into Congress's decision whether to deploy its compulsory process over the President's

objection.  In any event, the historical record produced by the Committee reveals that senior

advisors to the President have often testified before Congress subject to various subpoenas dating

back to 1973.  See Auerbach Decl. ¶¶ 2-3.  Thus, it would hardly be unprecedented for Ms. Miers

to appear before Congress to testify and assert executive privilege where appropriate.  Still, it is

noteworthy that in an environment where there is no judicial support whatsoever for the

Executive's claim of absolute immunity, the historical record also does not reflect the wholesale

compulsion by Congress of testimony from senior presidential advisors that the Executive fears.

Significantly, although the Supreme Court has established that the President is absolutely immune from civil suits arising out of his official actions, even the President may not be absolutely immune from compulsory process more generally. In United States v. Nixon, the Supreme Court held that the President is entitled only to a presumptive privilege that can be overcome by the requisite demonstration of need. 418 U.S. at 707-08. There, the Supreme Court indicated that "an absolute, unqualified privilege would place [an impediment] in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions . . . [and] would plainly conflict with the function of the courts under Art. III." Id. at 707. Seizing on that passage, the Executive insists that this case is distinguishable because it does not involve a core function of another constituent branch but rather a peripheral exercise of Congress's power. That is mistaken. As discussed above, Congress's power of inquiry is as broad as its power to legislate and lies at the very heart of Congress's constitutional role. Indeed, the former is necessary to the proper exercise of the latter: according to the Supreme Court, the ability to compel testimony is "necessary to the effective functioning of courts and legislatures." Bryan, 339 U.S. at 331 (emphasis added). Thus, Congress's use of (and need for vindication of) its subpoena power in this case is no less legitimate or important than was the grand jury's in United States v. Nixon. Both involve core functions of a co-equal branch of the federal government, and for the reasons identified in Nixon, the President may only be entitled to a presumptive, rather than an absolute, privilege here.[35] And it is certainly the case that if the President is entitled only to a presumptive

---

[35] The Executive also contends that United States v. Nixon has no force outside of the criminal context. For the reasons set forth above, the Court disagrees -- indeed, the D.C. Circuit has rejected that view. See In re Sealed Case, 121 F.3d at 743-45 ("It fell to the remaining Nixon

privilege, his close advisors cannot hold the superior card of absolute immunity.

The interest in presidential autonomy proffered by the Executive does not support the assertion of absolute immunity here. In <u>Nixon v. Sirica</u>, the D.C. Circuit explained:

> If the claim of absolute privilege was recognized, its mere invocation by the President or his surrogates could deny access to all documents in all the Executive departments to all citizens and their representatives, <u>including Congress</u>, the courts as well as grand juries, state governments, state officials and all state subdivisions. The Freedom of Information Act could become nothing more than a legislative statement of unenforceable rights. Support for this kind of mischief simply cannot be spun from incantation of the doctrine of separation of powers.

487 F.2d at 715 (emphasis added). That passage rather plainly contemplates that executive privilege is not absolute even when Congress -- rather than a grand jury -- is the party requesting the information. And a claim of absolute <u>immunity</u> from compulsory process cannot be erected by the Executive as a surrogate for the claim of absolute executive privilege already firmly rejected by the courts. Presidential autonomy, such as it is, cannot mean that the Executive's actions are totally insulated from scrutiny by Congress. That would eviscerate Congress's historical oversight function.

To be sure, the D.C. Circuit acknowledged that "wholesale public access to Executive deliberations and documents would cripple the Executive as a co-equal branch." <u>Id.</u> That, however, is merely "an argument for recognizing Executive privilege and for according it great weight, not for making the Executive the judge of its own privilege." <u>Id.</u> But that is exactly what

---

cases to address the scope of the presidential communications privilege in other contexts. . . . [Those] cases established the contours of the presidential communications privilege. The President can invoke the privilege when asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential. If the President does so, the documents become presumptively privileged. However, the privilege is qualified, not absolute, and can be overcome by an adequate showing of need.").

the Executive requests here: to be the judge of its own privilege through the assertion of absolute immunity. At bottom, the Executive's interest in "autonomy" rests upon a discredited notion of executive power and privilege. As the D.C. Circuit and the Supreme Court have made abundantly clear, it is the judiciary (and not the executive branch itself) that is the ultimate arbiter of executive privilege. Permitting the Executive to determine the limits of its own privilege would impermissibly transform the presumptive privilege into an absolute one, yet that is what the Executive seeks through its assertion of Ms. Miers's absolute immunity from compulsory process. That proposition is untenable and cannot be justified by appeals to Presidential autonomy.

Tellingly, the only authority that the Executive can muster in support of its absolute immunity assertion are two OLC opinions authored by Attorney General Janet Reno and Principal Deputy Assistant Attorney General Steven Bradbury, respectively. See Assertion of Executive Privilege With Respect to Clemency Decision, 1999 WL 33490208 (O.L.C. 1999); Immunity of Former Counsel to the President From Compelled Congressional Testimony, 2007 WL 5038035 (O.L.C. 2007). Those opinions conclude that immediate advisors to the President are immune from compelled congressional testimony. The question, then, is how much credence to give to those opinions. Like the Olson and Cooper OLC opinions, the Reno and Bradbury opinions represent only persuasive authority. Hence, the Court concludes that the opinions are entitled to only as much weight as the force of their reasoning will support.

With that established, the Court is not at all persuaded by the Reno and Bradbury opinions. Unlike the Olson and Cooper OLC opinions, which are exhaustive efforts of sophisticated legal reasoning, bolstered by extensive citation to judicial authority, the Reno and Bradbury OLC opinions are for the most part conclusory and recursive. Neither cites to a single judicial opinion

recognizing the asserted absolute immunity. Indeed, the three-page Bradbury OLC opinion was

hastily issued on the same day that the President instructed Ms. Miers to invoke absolute

immunity, and it relies almost exclusively upon the conclusory Reno OLC opinion and a

statement from a memorandum written by then-Assistant Attorney General William Rehnquist in

1971. See 2007 WL 5038035 at *1. Mr. Rehnquist wrote:

> The President and his immediate advisers -- that is, those who customarily meet with
> the President on a regular or frequent basis -- should be deemed absolutely immune
> from testimonial compulsion by a congressional committee. They not only may not
> be examined with respect to their official duties, but they may not even be compelled
> to appear before a congressional committee.

See Pl.'s Mot. Ex. 43. Mr. Rehnquist also wrote that the rationale supporting the proposed

immunity for senior advisors is grounded in the fact that those individuals "are presumptively

available to the President 24 hours a day, and the necessity of either accommodating a

congressional committee or persuading a court to arrange a more convenient time, could impair

that availability." Id.

Significantly, Mr. Rehnquist referred to his conclusions as "tentative and sketchy," see id.,

and then later apparently recanted those views. See U.S. Government Information Policies and

Practices -- The Pentagon Papers: Hearings Before the Subcomm. on Foreign Operations and

Gov't Info. of the H. Comm. on Gov't Operations, 92nd Cong. 385 (1971) (testimony of William

H. Rehnquist, Assistant Att'y Gen.) ("[M]embers[s] of the executive branch . . . have to report,

give [their] name and address and so forth, and then invoke the privilege."). In Clinton v. Jones,

then-Chief Justice Rehnquist joined in holding that even the demands of the President's schedule

could not relieve him of the duty to give a civil deposition. 520 U.S. at 706 ("The burden on the

President's time and energy that is a mere byproduct of such review surely cannot be considered

as onerous as the direct burden imposed by judicial review and the occasional invalidation of his

official actions.  We therefore hold that the doctrine of separation of powers does not require

federal courts to stay all private actions against the President until he leaves office.").  Whatever

force the Rehnquist memorandum[36] had when written, then, it retains little vitality in light of

Clinton v. Jones.  If the President[37] must find time to comply with compulsory process in a civil

lawsuit, so too must his senior advisors for a congressional subpoena.

At oral argument, counsel for the Executive stated that, as a fall back position, even if Ms.

Miers is not entitled to absolute immunity, a qualified immunity analysis should apply.  See Tr. at

125-26.  That was, after all, the ultimate disposition in Harlow: senior presidential advisors are

entitled to qualified immunity against damages actions.  The qualified immunity inquiry, however,

does not fit comfortably in the present context.  Nevertheless, qualified immunity might

conceivably be appropriate in some situations involving national security or foreign affairs.

Similarly, it might apply where Congress is not utilizing its investigation authority for a legitimate

---

[36] The Rehnquist memorandum actually provides no support for absolute immunity for Ms. Miers because at the time she received her subpoena she was no longer an executive branch official, thereby relieving her of the need to be available to the President twenty-four hours a day.

[37] There is some ambiguity over the scope of the President's involvement in the decision to terminate the U.S. Attorneys in this case.  The Committee contends that the White House has asserted that the "President was not involved in any way . . . and that he did not receive advice from his aides about the U.S. Attorneys and he did not make a decision to fire any of them."  See Pl.'s Opp'n & Reply at 12.  That assertion is based on a statement made by Acting White House Press Secretary Dana Perino on March 27, 2007.  The Executive, however, now maintains that the Committee "substantially overstates the record on this point."  See Tr. at 57.  As the Executive sees it, the record simply indicates that "the President was not involved in decisions about who would be asked to resign from the department," but "does not reflect that the President had no future involvement" in any capacity.  Id.  Given the Court's limited decision here, it is unnecessary to address this factual dispute at this time.  The Court notes, however, that the degree and nature of the President's involvement may be relevant to the proper executive privilege characterization under In re Sealed Case, 121 F.3d at 746-49.

purpose but rather aims simply to harass or embarrass a subpoenaed witness.

In any event, the Court need not decide whether qualified immunity can be applied as a general matter in a setting involving declaratory relief and congressional subpoenas because, even assuming that it can, Ms. Miers is not entitled to such immunity. It bears repeating that this inquiry does not involve the sensitive topics of national security or foreign affairs. Congress, moreover, is acting pursuant to a legitimate use of its investigative authority. Notwithstanding its best efforts, the Committee has been unable to discover the underlying causes of the forced terminations of the U.S. Attorneys. The Committee has legitimate reasons to believe that Ms. Miers's testimony can remedy that deficiency. There is no evidence that the Committee is merely seeking to harass Ms. Miers by calling her to testify. Importantly, moreover, Ms. Miers remains able to assert privilege in response to any specific question or subject matter. For its part, the Executive has not offered any independent reasons that Ms. Miers should be relieved from compelled congressional testimony beyond its blanket assertion of absolute immunity. The Executive's showing, then, does not support either absolute or qualified immunity in this case.

The Court once again emphasizes the narrow scope of today's decision. The Court holds only that Ms. Miers (and other senior presidential advisors) do not have absolute immunity from compelled congressional process in the context of this particular subpoena dispute. There may be some instances where absolute (or qualified) immunity is appropriate for such advisors, but this is not one of them. For instance, where national security or foreign affairs form the basis for the Executive's assertion of privilege, it may be that absolute immunity is appropriate. Similarly, this decision applies only to advisors, not to the President. The Court has no occasion to address whether the President can be subject to compelled congressional process -- the Supreme Court

held in <u>Harlow</u> that the immunity inquiries for the President and senior advisors are analytically distinct. Similarly, there is no need to address here whether the Vice President could be subject to compelled congressional process. Most importantly, Ms. Miers may assert executive privilege in response to any specific questions posed by the Committee. The Court does not at this time pass judgment on any specific assertion of executive privilege.

There are powerful reasons supporting the rejection of absolute immunity as asserted by the Executive here. If the Court held otherwise, the presumptive presidential privilege could be transformed into an absolute privilege and Congress's legitimate interest in inquiry could be easily thwarted. Indeed, even in the Speech or Debate context -- which has an explicit textual basis and confers absolute immunity -- Members of Congress must still establish that their actions were legislative in nature before invoking the protection of the Clause. <u>See, e.g.</u>, <u>Rayburn</u>, 497 F.3d at 660; <u>Jewish War Veterans of the U.S. of Am. v. Gates</u>, 506 F. Supp. 2d 30, 54 (D.D.C. 2007). Members cannot simply assert, without more, that the Speech or Debate Clause shields their activities and thereby preclude all further inquiry. Yet that is precisely the treatment that the Executive requests here.

Similarly, if the Executive's absolute immunity argument were to prevail, Congress could be left with no recourse to obtain information that is plainly <u>not</u> subject to any colorable claim of executive privilege. For instance, surely at least some of the questions that the Committee intends to ask Ms. Miers would not elicit a response subject to an assertion of privilege; so, too, for responsive documents, many of which may even have been produced already. The Executive's proposed absolute immunity would thus deprive Congress of even non-privileged information. That is an unacceptable result.

-90-

Clear precedent and persuasive policy reasons confirm that the Executive cannot be the judge of its own privilege and hence Ms. Miers is not entitled to absolute immunity from compelled congressional process. Ms. Miers is not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made. Instead, she must appear before the Committee to provide testimony, and invoke executive privilege where appropriate.[38] And as the Supreme Court has directed, the judiciary remains the ultimate arbiter of an executive privilege claim, since it is the duty of the courts to declare what the law is. See United States v. Nixon, 418 U.S. at 703-05; see also Marbury v. Madison, 5 U.S. (1 Cranch) at 177.

B.    *Privilege Log Production*

That leaves one final issue -- whether Ms. Miers and Mr. Bolten are legally obligated to

---

[38] Relying on Cheney v. United States District Court for the District of Columbia, 542 U.S. 367 (2004), the Executive insists that invocation of executive privilege on a question-by-question basis is insufficient protection for its institutional interests. The Executive, however, misreads Cheney. There, the issue was whether "the assertion of executive privilege is a necessary precondition to [entertaining] the Government's separation-of-powers objections" to civil subpoenas that were unacceptably overbroad. See 542 U.S. at 391. Because the assertion of executive privilege sets "coequal branches of the Government . . . on a collision course," id. at 389, the Court explained that a district court may entertain separation of powers objections to overly broad document requests prior to the formal invocation of executive privilege, id. Here, however, the Executive attempts to utilize absolute immunity, the basis of which is rooted in notions of executive privilege. The "collision course" that the Supreme Court feared in Cheney, then, has already been set in motion by the Executive. In any event, the Court indicated only that "the Executive Branch [does not] bear the onus of critiquing . . . unacceptable discovery requests line by line." Id. at 388. Indeed, the D.C. Circuit had already determined that the "discovery requests [were] anything but appropriate." Id. In Cheney, the Supreme Court focused on the heavy burden imposed by the wide breadth of the request for information. There is no similar burden created by Ms. Miers invoking executive privilege in response to specific, targeted questions. Here, the Executive does not claim that the Committee's questions will be overly broad; instead, it asserts that Ms. Miers need not provide any response whatsoever. That contention finds no support in Cheney.

produce privilege logs in response to the Committee's subpoenas.  The Court will not belabor this point.  At oral argument, counsel for the Committee candidly admitted that there is "no statute or case law" that dictates that those individuals must produce privilege logs.  See Tr. at 120-21. Instead, the Committee asserts that producing a privilege log is simply a very pragmatic practice that should be required here.

The Committee is certainly correct that privilege logs have great practical utility.  Beyond their legal usefulness, the Court believes that a more detailed description of the documents withheld and the privileges asserted would be a tremendous aid during the negotiation and accommodation process.  A more fulsome description, for instance, may lead the Committee to conclude that it has no need for certain categories of documents, thus helping to narrow the dispute between the parties and enhance the possibility of resolution.  Notwithstanding such obvious benefits, however, in the absence of an applicable statute or controlling case law, the Court does not have a ready ground by which to force the Executive to make such a production strictly in response to a congressional subpoena.  But the Court need not decide that question here because this case is no longer confined to that posture.

Now that the dispute is before this tribunal and the Court has denied the Executive's claim of absolute immunity, both the Court and the parties will need some way to evaluate privilege assertions going forward in the context of this litigation.  More specifically, if the Court is called upon to decide the merits of any specific claim of privilege, it will need a better description of the documents withheld than the one found in Mr. Clement's letter of June 27, 2007.  But the Court will stop short of requiring the Executive to produce a full privilege log.  Instead, the Executive should produce a more detailed list and description of the nature and scope of the documents it

-92-

seeks to withhold on the basis of executive privilege sufficient to enable resolution of any

privilege claims.  The Executive may use Fed. R. Civ. P. 45(d)(2)(A)(ii) as a guide, but it should

exercise its judgment in this matter consistent with the twin goals of: (1) facilitating the parties'

(and the Court's) needs in the context of this litigation; and (2) obviating the necessity for

additional action by the Court on this issue.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court will deny the Executive's motion to dismiss and grant

the Committee's motion for partial summary judgment.  A separate Order accompanies this

Memorandum Opinion.

_____
/s/
JOHN D. BATES
UNITED STATES DISTRICT JUDGE

Date: July 31, 2008