**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br>                       *Plaintiff*, <br><br>               v. <br><br> HARRIET MIERS, *et al.*, <br><br><br>                    *Defendants*. | **Case No. 1:08-cv-00409 (JDB)** |

**PLAINTIFF'S MOTION TO REQUIRE HARRIET MIERS TO RETAIN
POSSESSION OF SUBPOENAED DOCUMENTS AND JOSHUA BOLTEN,
UPON HIS DEPARTURE FROM OFFICE, TO LEAVE THE SUBPOENAED
DOCUMENTS WITH HIS SUCCESSOR AS WHITE HOUSE CHIEF OF STAFF**

Plaintiff Committee on the Judiciary of the U.S. House of Representatives

("Committee"), by and through counsel, hereby moves the Court for entry of an order requiring

Harriet Miers to retain her congressionally subpoenaed documents and Joshua Bolten to (1) leave

all of the subpoenaed documents in the offices where they were located on June 23, 2008, when

the Department of Justice ("Department"), as his counsel, represented to the Court and Plaintiff

that the documents would be preserved and available for orders of this Court upon a change in

Administration[1]; and (2) take all steps necessary to ensure that the congressionally subpoenaed

---

[1] During oral argument on the Committee's motion for partial summary judgment and
Defendants' motion to dismiss, the Court asked defense counsel whether "[a]ll responsive
materials with respect to the subpoena . . . are being and will be preserved through the life of this
suit, *even if the suit is still alive when this administration leaves office*?" Tr. 126 (emphasis
added). Defense counsel responded:

documents shall be, as of January 20, 2009, in the possession, custody and control of Mr. Bolten's successor as White House Chief of Staff.  A proposed order is attached.

Two primary factors urgently warrant this Court to grant the Committee's motion.  *First*, the opportunity for (1) a negotiated resolution to this matter; (2) the new Administration to assert its views as to the merits of the lawsuit (as expressly encouraged by the Court of Appeals); and (3) compliance with this Court's order, once it is, as we believe likely, affirmed on appeal, and all future orders, will all be severely impaired if the outgoing Administration transfers the subpoenaed materials to the Archivist of the United States ("Archivist") pursuant to the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201-2207.  Despite the authority of the incoming Administration to recall documents from the Archivist under certain circumstances, the recall process may take weeks or months, thereby interfering with the ability of the new Administration to assess this matter and prepare its legal position, thus diminishing the prospect of settlement prior to the commencement of briefing in the Court of Appeals in February.  There is simply no way in which the new Administration can promptly and effectively evaluate the merits of the litigation prior to the due date of the opening appellate brief on February 18, 2009, without a full understanding of the materials at issue.

*Second*, recent media reports stemming from a published report of the Government Accountability Office ("GAO") have revealed that fundamental flaws exist in the procedures for transfer, receipt, cataloging and retrieval of presidential records sent from the White House to the

---

I have confirmed that responsive materials have been and are being preserved. They of course will continue to be preserved during the pendency of this litigation. . . . We will commit to Your Honor to ensure that those materials continue to be preserved in a way that if, as, and when there's a requirement that we disclose that information to the committee, that we could do so.

Tr. 126-27.

Archivist. These reports suggest that documents, particularly electronic records, may be lost, altered and made difficult to locate for future production after they have been transferred to the archives. Given these concerns, it makes good sense not to transfer these documents so as to avoid any potential document loss or undue delay in retrieving them. Moreover, maintaining the documents at the White House and the Department is consistent with the intent and purpose of the PRA and the representations made by the Department to this Court.

Both this Court and the Court of Appeals have made clear that a negotiated solution is far preferable to continued litigation between the Committee on the one hand and Ms. Miers and the Executive Branch on the other. As this Court noted in its decision on the Committee's motion for partial summary judgment, "[t]he Court strongly encourages the parties to reach a negotiated solution to this dispute." *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d. 53, 98 (D.D.C. 2008). This comports with the longstanding view of the D.C. Circuit that in cases concerning the respective powers of the political branches, negotiated settlements are far preferable to continued litigation. *See United States v. AT&T*, 551 F.2d 384, 394 (D.C. Cir. 1976).

The Court of Appeals also has recognized in this case, as well as in others, the value of obtaining the views of a new Administration and Congress in litigation between the branches, where possible. In its opinion granting the Department's motion for a stay pending appeal, the Court of Appeals asserted that by postponing consideration of the matter until 2009, the Court would have "the additional benefit of permitting the new President and the new House an opportunity to express their views on the merits of the lawsuit." *Comm. on the Judiciary v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008). This comports with the Court of Appeals' prior statement in *United States v. AT&T*, which noted the "fortuitous[] advantage" of its decision postponing ultimate judicial resolution because "negotiations can be conducted not only by a

3

new House but by a new President." *AT&T*, 551 F.2d at 390.[2]  Moreover, by adopting the

Committee's suggested briefing schedule on appeal last month – allowing for the opening brief

of appellants Miers and Bolten to be filed approximately one month after the new President takes

office – the Court of Appeals confirmed that the new Administration should have time to review

its position on the lawsuit, which undoubtedly includes assessing the propriety and advisability

of asserting privilege over the subpoenaed documents.

None of these valued objectives would be easily achieved, however, if the Court were to

permit the Department to transfer the subpoenaed documents to NARA.  Even though, as the

Department notes, the President has the authority to recall transferred records "if such records

contain information that is needed for the conduct of current business," 44 U.S.C. § 2205(2)(B),

there is no guarantee that a recall would be immediate or even timely.  Without the documents

themselves, there is no way to be certain that the new Administration would have immediate

access to the information necessary to evaluate the basic underpinnings and legal positions of the

lawsuit and to negotiate with the Committee, as envisioned by this Court and the Court of

Appeals.

Indeed, a number of recent reports have detailed serious problems with various aspects of

the transfer of documents from the White House to NARA.  As reported by Robert Pear and

Scott Shane in *The New York Times*, questions have emerged about the "archives' capacity" and

there have been "growing doubts about whether [the National Archives'] new $144 million

---

[2]  It bears noting that the House has expressed its intent to continue the lawsuit and its pursuit of the withheld information by the resolution passed January 6, 2009, authorizing, among other things, "the Committee on the Judiciary of the 111th Congress to act as the successor in interest to the Committee on the Judiciary of the 110th Congress with respect to the civil action Committee on the Judiciary v. Harriet Miers et al.," and "the chair of the Committee on the Judiciary (when elected), on behalf of the Committee on the Judiciary, and the Office of General Counsel to take such steps as may be appropriate to ensure continuation of such civil action." H.R. Res. 5, 111th Cong. § 4(f)(1)(A)-(B) (2009), attached as Exhibit C.

computer system can cope with the vast quantities of digital data it will receive when President

Bush leaves office on Jan. 20." Robert Pear & Scott Shane, *Bush Data Threatens to Overload*

*Archives*, *N.Y. Times*, Dec. 27, 2008, at A10, attached as Exhibit A. The authors also report that,

because the archives will be dealing with a "'monstrous volume of material,'" "that would be

about 50 times the volume of electronic records left by the Clinton White House in 2001,"

"[a]rchivists said it could be weeks or months before these files could be indexed and searched."

*Id.* This report is in line with the assessment of the GAO, which noted the significant risk that

NARA would not have the capability to process the outgoing Administration's records based in

part on the "ongoing uncertainty about the format and volume of records to be transferred." *The*

*National Archives and Records Administration's Fiscal Year 2008 Expenditure Plan* at 5 (GAO-

08-1105 Sept. 2008), *available at* http://www.gao.gov/new.items/d081105.pdf. The *Washington*

*Post* also reported that the outgoing Archivist stated that NARA likely faces "a serious shortage

of trained staff." R. Jeffrey Smith, *Bush E-Mails May Be Secret a Bit Longer; Legal Battles,*

*Technical Difficulties Delay Required Transfer*, Wash. Post., Dec. 21, 2008, at A1, attached as

Exhibit B. This problem is compounded by the fact that Archivist Allen Weinstein resigned

effective December 19, 2008, and an Acting Archivist will serve until a new one is appointed

under 44 U.S.C. § 2103(c). *See* Press Release, National Archives, National Archivist Allen

Weinstein Resigns (Dec. 9, 2008), *available at* http://www.archives.gov/press/press-

releases/2009/nr09-29.html.

Based on all these factors, it is clear that the documents should remain at the White

House and, if copies were there in June 2008, at the Department as well.[3] There is simply no

---

[3] In a letter to the President dated June 27, 2007, then-Solicitor General Paul Clement indicated
that he had reviewed all of the documents responsive to the Committee's subpoena. *See*
Committee's Mot. for Part. Summ. J., Exh. 15 (Clement Letter). Thus, it is likely that a full set

reason to introduce an additional step in the process.  The Committee's motion also fully comports with the intent and purpose behind the passage of the PRA.  The statute requires Presidential records, such as those that were subpoenaed by the Committee long before the end of the Administration, to remain in the possession, custody and control of the United States.  44 U.S.C. § 2202.  Further, not only the incoming President but also the Congress and its committees and subcommittees are to have access to these records when, as here, they "contain information that is needed for the conduct" of their business and are not "otherwise available." *Id.* § 2205(2)(B).  All of these express goals are furthered by this motion and the attached order. Accordingly, the Committee respectfully requests that the Court grant its motion in full.

Respectfully submitted,

_____/s/_____

IRVIN B. NATHAN, D.C. Bar # 90449
General Counsel
KERRY W. KIRCHER, D.C. Bar # 386816
Deputy General Counsel

CHRISTINE M. DAVENPORT
JOHN D. FILAMOR, D.C. Bar # 476240
RICHARD A. KAPLAN, D.C. Bar # 978813
KATHERINE E. MCCARRON, D.C. Bar # 486335
Assistant Counsels

Office of General Counsel
U.S. House of Representatives

---

of the documents was in the possession of the Department and should stay there.  In addition, a 358-page report on the forced resignations at issue, authored by the Department Offices of the Inspector General and Professional Responsibility, indicates that the Department's Office of Legal Counsel had in its possession a memorandum developed for White House Counsel containing a timeline of events surrounding the forced resignations.  (This document was not provided even to the Executive Branch investigators.)  *See* An Investigation into the Removal of Nine U.S. Attorneys in 2006, U.S. Dep't of Justice, at 4 (Sept. 2008), *available at* http://www.usdoj.gov/oig/special/s0809a/final.pdf.  This memorandum, which is responsive to the Bolten subpoena, should remain in the possession of the Department as well.

219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

Counsel for Plaintiff
Committee on the Judiciary of the
U.S. House of Representatives

Dated:  January 7, 2009

# Exhibit A
## Case No. 1:08-cv-00409 (JDB)

# The New York Times

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



PRINTER-FRIENDLY FORMAT
SPONSORED BY

**December 27, 2008**

# Bush Data Threatens to Overload Archives

### By ROBERT PEAR and SCOTT SHANE

WASHINGTON — The National Archives has put into effect an emergency plan to handle electronic records from the Bush White House amid growing doubts about whether its new $144 million computer system can cope with the vast quantities of digital data it will receive when President Bush leaves office on Jan. 20.

The technical challenge was an inevitable result of the explosion in cybercommunications, which will make the electronic record of the Bush years about 50 times as large as that left by the Clinton White House in 2001, archives officials estimate. The collection will include top-secret e-mail tracing plans for the Iraq war as well as scenes from the likes of Barney Cam 2008, a White House video featuring the first pet.

Under federal law, the government has "complete ownership, possession and control" of presidential and vice-presidential records. The moment Mr. Bush leaves office, the National Archives becomes legally responsible for "the custody, control and preservation" of the records.

Archives officials who disclosed the emergency plan said it would mean that the agency would initially take over parts of the White House storage system, freezing the contents on Jan. 20. Only later, after further study, will archivists try to move the records into the futuristic computer system they have devised as a repository for digital data.

Questions about the archives' capacity have added a new element to the uneasiness felt by open-government advocates and historians, who already fear that departing White House officials, particularly Vice President Dick Cheney, may not turn over everything. Mr. Cheney asserted this month in a court case that he had absolute discretion to decide which of his records are official and which are personal, and thus do not have to be transferred to the archives,

The National Archives has already begun trucking boxes of paper records from the White House to a warehouse it is leasing in Lewisville, Tex., not a great distance from where Mr. Bush's presidential library is to be built, at Southern Methodist University in Dallas.

The archives invoked its emergency plan to deal with problems in transferring two types of electronic files: a huge collection of digital photographs and the "records management system," which provides an index to most of the textual records generated by Mr. Bush and his staff members in the last eight years.

Archivists said it could be weeks or months before these files could be indexed and searched.

In their plan, archives officials wrote, the transition poses "unique challenges" because of the huge volume of electronic records, some of them in "formats not previously dealt with." Even though archivists have been working with the White House to survey the documents, "there is always a possibility that some electronic records may be overlooked," the officials wrote.

If the electronic records of the Bush White House total 100 terabytes of information, as archives officials estimate, that would be about 50 times the volume of electronic records left behind by the Clinton White House in 2001 and some five times the contents of all 20 million catalogued books in the Library of Congress.

"It's a monstrous volume of material, and some people wonder if the system can absorb it," said Lee White, executive director of the National Coalition for History, a collection of 60 archival and historical groups.

Sam Watkins, a transition liaison officer at the archives, said his agency was expecting to receive 20 to 24 terabytes of e-mail alone from the Bush White House. By contrast, Mr. Watkins said, the volume of e-mail from the Clinton White House was less than one terabyte.

While some routine messages may be of little interest to historians, the law does not generally permit White House officials to pick which messages to preserve. And for an administration not documented by the tapes that captured the inside story of the Johnson and Nixon White Houses, e-mail may provide a substitute, historians say.

The archives said it had "a high level of confidence" that it could bring the e-mail into its electronic record-keeping system and retrieve messages in response to requests from Congress and the courts.

But Thomas S. Blanton, director of the nonprofit National Security Archive, a plaintiff in several lawsuits seeking Bush administration records, said the National Archives' track record did not justify such a claim.

"Their confidence is inexplicable," Mr. Blanton said.

Archives officials said they might have been better prepared for the transition if the White House had cooperated earlier.

Millions of White House e-mail messages created from 2003 to 2005 appear to be missing and may not be recoverable. And in September 2007, the top lawyer at the National

Archives wrote in a memorandum that he had "made almost zero progress" planning the transition because the White House had ignored repeated requests for information about the volume and formats of electronic records.

In May of this year, the Government Accountability Office, an investigative arm of Congress, found that "the administration has not yet provided specific information on the volume and types of data to be transferred" to the archives. Linda D. Koontz of the accountability office warned in May and again in September that the National Archives might not be ready for the torrent of electronic records on Jan. 20.

Questions remain about how quickly the archives will be able to make the records accessible to Congress, the courts and researchers, said Paul Brachfeld, the archives' inspector general.

"The electronic records archives system may be able to take in a tremendous amount of e-mail and other records," Mr. Brachfeld said. "But just because you ingest the data does not mean that people can locate, identify, recover and use the records they need."

The contingency plan, quietly approved by the National Archives on Nov. 7, emphasizes the difficulties posed by large numbers of White House records created with proprietary commercial software.

Proprietary products can create problems because they quickly become obsolete, as anyone who has weathered the transition from VHS tape to DVDs can attest. The National Archives seeks to preserve electronic records in a form that can be used for decades to come.

Even if the technology were perfect, some historians, librarians and watchdog groups say they do not fully trust the administration to preserve its records.

Their worries were heightened by a filing by Mr. Cheney's lawyers this month in a lawsuit filed by the National Security Archive, Citizens for Responsibility and Ethics in Washington and other interest groups. The filing said neither the National Archives nor the court "may supervise the vice president or his office" for compliance with the Presidential Records Act.

"There's some anxiety, particularly given the attitude of the office of the vice president toward records preservation and disclosure," said Steven Aftergood, of the Federation of American Scientists, who is editor of the online publication Secrecy News.

A Cheney spokesman, Megan M. Mitchell, said that his office had been handing over records to the archives "for some time now" and that concerns about the vice president's intentions were misplaced.

"We will do everything we can under the law to preserve records," Ms. Mitchell said.

But J. William Leonard, who stepped down in January as the top archives official overseeing classified records, said there was ample reason for skepticism.

Mr. Leonard, who clashed while in government with the vice president's office, noted a remark that Mr. Cheney made in September 2007, at the presidential library of <u>Gerald R. Ford</u>, for whom Mr. Cheney once worked as White House chief of staff.

"I'm told researchers like to come and dig through my files, to see if anything interesting turns up," Mr. Cheney said. "I want to wish them luck, but the files are pretty thin. I learned early on that if you don't want your memos to get you in trouble some day, just don't write any."

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

# Exhibit B
## Case No. 1:08-cv-00409 (JDB)

# washingtonpost.com

# Bush E-Mails May Be Secret a Bit Longer

Legal Battles, Technical Difficulties Delay Required Transfer to Archives

By R. Jeffrey Smith
Washington Post Staff Writer
Sunday, December 21, 2008; A01

The required transfer in four weeks of all of the Bush White House's electronic mail messages and documents to the National Archives has been imperiled by a combination of technical glitches, lawsuits and lagging computer forensic work, according to government officials, historians and lawyers.

Federal law requires outgoing White House officials to provide the Archives copies of their records, a cache estimated at more than 300 million messages and 25,000 boxes of documents depicting some of the most sensitive policymaking of the past eight years.

But archivists are uncertain whether the transfer will include all the electronic messages sent and received by the officials, because the administration began trying only in recent months to recover from White House backup tapes hundreds of thousands of e-mails that were reported missing from readily accessible files in 2005.

The risks that the transfer may be incomplete are also pointed up by a continuing legal battle between a coalition of historians and nonprofit groups over access to Vice President Cheney's records. The coalition is contesting the administration's assertion in federal court this month that he "alone may determine what constitutes vice presidential records or personal records" and "how his records will be created, maintained, managed, and disposed," without outside challenge or judicial review.

Eventual access to the documentary record of the Bush presidency has been eagerly anticipated by historians and journalists because the president and his aides generally have sought to shield from public disclosure many details of their deliberations and interactions with outside groups.

"We are worried," said Arnita A. Jones, executive director of the American Historical Association, which sued the White House several years ago seeking wider access to presidential records than President Bush had said in a 2001 executive order that he wanted the government to provide. "There is a context that is not reassuring," she said.

The National Archives and Records Administration is supposed to help monitor the completeness of the historical record but has no enforcement powers over White House records management practices. Speaking

Advertisement
Ads by Pulse 360

**Oprah's Flat Stomach Rule: Obey**
Oprah Cut Down 2 lbs of Stomach Fat Per Week by Obeying this 1 Rule
MichellesWeightLos.

**1 Rule of a Flat Stomach**
Cut down 25 lbs of stomach fat in - 1 month by obeying this 1 rule
KimsDietPlan com

**AARP Auto Insurance From The Hartford**
Over 50? Save $363 on Your Auto Insurance In Minutes w/ The Hartford
AARP TheHartford com

**1 Rule of a Flat Stomach:**
Cut down 25 lbs of Stomach Fat in 1 month by obeying this 1 rule
JennysDietBlog com

**Rachel Ray's Diet Works**
Read how I lost 44 pounds without a diet. As seen on CNN, MSNBC.
BeckysWeightLoss.com

Get listed here

of the missing e-mails, Archives' general counsel Gary M. Stern said in an interview last week that "we hope and expect they all will exist on the system or be recoverable," even in coming weeks. "We can't say for sure."

White House spokesman Scott M. Stanzel said last week that "we are making significant progress in accounting for the e-mail records stored on our computer network." But he declined to say how many e-mails remain missing or to predict how long the recovery will take because the issue is the subject of ongoing litigation.

The National Security Archive, a historical research group, and Citizens for Responsibility and Ethics in Government, a nonprofit watchdog organization, filed lawsuits in September 2007 to compel the White House to preserve backup e-mail tapes. In November 2007, U.S. District Judge Henry H. Kennedy Jr. ordered White House officials to preserve such tapes and "not transfer said media out of their custody or control without leave of this court."

In the case of the vice president's records, the White House has promised a different federal judge that it will comply with a Nixon-era law requiring the preservation and transfer of all documents related to the vice president's official duties, but the coalition has drafted a filing for the court on Monday that accuses Cheney of subtly seeking to circumscribe the legal definition of what those official duties encompass to such a degree that he will be able to take home or destroy countless documents related to policymaking that historians want to see.

Anne Weisman, the counsel for the plaintiffs, called Cheney's assertion that only those records related to tasks specially assigned by Bush need to be preserved "a loophole . . . large enough to drive truckloads of documents through." It means, she said, that Cheney would not have to surrender documents related to legislation or "advice he gives the president on his own initiative and the influence he has over the president's decisions."

The scramble to find missing e-mails and copy them in a digital form that the Archives can comprehend amounts to a replay of the confusion that capped the transfer of President Bill Clinton's records at the end of his administration in 2001. Then, a series of defects in the White House e-mail archiving system led to congressional subpoenas and the administration's expenditure of $12 million to recover hundreds of missing e-mails from backup tapes. The effort was not completed until after Clinton left office.

Stanzel said the White House is also still "working to acquire" e-mails involving official government business that were transmitted by presidential aides through accounts operated by the Republican National Committee, a problem also first publicized almost three years ago. "We continue to be in communication with RNC officials about recovering official records," he said without offering details. Such records are subject to the Presidential Records Act, which requires their transfer to the Archives at noon on Jan. 20.

Thomas S. Blanton, the National Security Archive director, said controversy surrounding the last-minute handling of e-mails by retiring presidents -- including intervention by the courts -- is hardly exceptional.

Blanton wrote in a 1995 book that Ronald Reagan tried to order the erasure of all electronic backup tapes during his final week in office; the current president's father struck a secret deal with the U.S. archivist shortly

before midnight on his final day in office to seal White House e-mails and take them with him to Texas; and Clinton asserted in 1994 that the National Security Council was not an agency of the government so he could keep its e-mails beyond public reach.

Blanton said last week that "the situation is exponentially worse" under the current administration because the volume of electronic records at stake from Bush's tenure is higher than in previous administrations. If some of the records are manipulated, even for a short while, he said, "the problem and the cost to the taxpayers is going to be exponentially worse, [as well as] the delay and the lag time before journalists and historians are going to be able to see this."

The transfer of some White House records officially got under way a few weeks ago with the first air shipments of documents to a leased warehouse north of Dallas, near the projected site of the Bush library, and the transport by truck of some digital records to a remote Navy research center in the mountains of West Virginia. The bullhorn used by Bush at the World Trade Center site in New York is among the objects set to go to Texas.

At the Navy base, all the electronic data are supposed to be "ingested" by a new electronic system meant to allow such efficient cataloguing, indexing and searching that millions of documents can eventually be provided to researchers and citizens online.

The system, which has been under development for a decade by Lockheed Martin and other contractors at a cost of $67.5 million, will rely on software created after the collapse of Enron, when that company's creditors demanded new tools for quickly sorting its e-mail trove to find damaging information.

But there are obstacles to gaining such ready access to files created by Bush and his appointees. Technical troubles, cost overruns and inadequate funding caused the system to be sharply scaled back at the outset, according to Archives officials and the Government Accountability Office. The result is that it will take years of work -- and an additional $70 million -- to put in place the features that the Archives initially sought.

"The ingestion of Bush data has just begun," said Archives spokeswoman Susan Cooper, adding that she is unsure how smoothly it has gone.

The Archives hopes to finish much of its work on the new archival system by 2013, when by law the Bush White House records can begin to be accessed under the Freedom of Information Act.

But Archivist Allen Weinstein and other officials say they may still face a serious shortage of trained staff. Out of the Archives' 3,000 employees at 40 facilities, only a few are assigned to process requests by historians, citizens and others -- 10 at the Reagan library, eight at the first Bush library and 10 at the Clinton library.

The result has been a steady growth in delays for processing data requests, from a wait of a year and a half in 2001 at the Reagan library to a current wait of six and a half years. The new Bush library is slated to have 18 archivists.

"I tried -- half-whimsically -- to ban the word 'backlog' in favor of discussing NARA's 'surplus' of documents, which sounds better but which remains today an intractable problem," Weinstein said in a recent speech.

# Exhibit C
## Case No. 1:08-cv-00409 (JDB)

# H. Res. 5

## *In the House of Representatives, U. S.,*

*January 6, 2009.*

*Resolved,* That the Rules of the House of Representatives of the One Hundred Tenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Tenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Eleventh Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in sections 3, 4, and 5.

### SEC. 2. CHANGES TO THE STANDING RULES.

(a) INSPECTOR GENERAL AUDITS.—Amend clause 6(c)(1) of rule II to read as follows:

> "(1) provide audit, investigative, and advisory services to the House and joint entities in a manner consistent with government-wide standards;".

(b) HOMELAND SECURITY.—In clause 3(g) of rule X, designate the existing text as subparagraph (1) and add thereafter the following new subparagraph:

2

"(2) In addition, the committee shall review and study on a primary and continuing basis all Government activities, programs, and organizations related to homeland security that fall within its primary legislative jurisdiction.".

(c) ADDITIONAL FUNCTIONS OF THE COMMITTEE ON HOUSE ADMINISTRATION.—In clause 4(d)(1) of rule X—

(1) redesignate subdivisions (B) and (C) as subdivisions (C) and (D) and insert after subdivision (A) the following new subdivision:

"(B) oversee the management of services provided to the House by the Architect of the Capitol, except those services that lie within the jurisdiction of the Committee on Transportation and Infrastructure under clause 1(r);"; and

(2) in subdivision (D) (as redesignated) strike "(B)" and insert "(C)".

(d) TERMS OF COMMITTEE CHAIRMEN.—In clause 5 of rule X—

(1) amend paragraph (a)(2)(C) to read as follows:

"(C) A Member, Delegate, or Resident Commissioner may exceed the limitation of subdivision (B) if elected to serve a second consecutive Congress as the

3

chair or a second consecutive Congress as the ranking minority member."; and

(2) in paragraph (c)—

(A) strike the designation of subparagraph (1); and

(B) strike subparagraph (2).

(e) CALENDAR WEDNESDAY.—

(1) In clause 6 of rule XV—

(A) in paragraph (a)—

(i) strike "the committees" and insert "those committees"; and

(ii) strike "unless two-thirds" and all that follows and insert "whose chair, or other member authorized by the committee, has announced to the House a request for such call on the preceding legislative day."; and

(B) strike paragraphs (c), (d), and (f) (and redesignate paragraph (e) as paragraph (c)).

(2) In clause 6(c) of rule XIII, strike subparagraph (1) and the designation "(2)".

(f) POSTPONEMENT AUTHORITY.—In clause 1 of rule XIX, add the following new paragraph:

"(c) Notwithstanding paragraph (a), when the previous question is operating to adoption or passage of a measure pursuant to a special order of business, the

4

Chair may postpone further consideration of such measure in the House to such time as may be designated by the Speaker.".

(g) INSTRUCTIONS IN THE MOTION TO RECOMMIT.—In clause 2(b) of rule XIX—

(1) designate the existing sentence as subparagraph (1);

(2) in subparagraph (1) (as so designated)—

(A) strike "if"; and

(B) strike "includes instructions, it"; and

(3) add the following new subparagraph at the end:

"(2) A motion to recommit a bill or joint resolution may include instructions only in the form of a direction to report an amendment or amendments back to the House forthwith.".

(h) CONDUCT OF VOTES.—In clause 2(a) of rule XX, strike "A record vote by electronic device shall not be held open for the sole purpose of reversing the outcome of such vote.".

(i) GENERAL APPROPRIATION CONFERENCE REPORTS.—In clause 9 of rule XXI—

(1) insert after paragraph (a) the following new paragraph (and redesignate succeeding paragraphs accordingly):

5

"(b) It shall not be in order to consider a conference report to accompany a regular general appropriation bill unless the joint explanatory statement prepared by the managers on the part of the House and the managers on the part of the Senate includes—

"(1) a list of congressional earmarks, limited tax benefits, and limited tariff benefits in the conference report or joint statement (and the name of any Member, Delegate, Resident Commissioner, or Senator who submitted a request to the House or Senate committees of jurisdiction for each respective item included in such list) that were neither committed to the conference committee by either House nor in a report of a committee of either House on such bill or on a companion measure; or

"(2) a statement that the proposition contains no congressional earmarks, limited tax benefits, or limited tariff benefits."; and

(2) in paragraph (c) (as redesignated)—

(A) in the first sentence, after "paragraph (a)" insert "or (b)"; and

(B) amend the second sentence to read as follows:

"As disposition of a point of order under this paragraph or paragraph (b), the Chair shall put the question of consid-

6

eration with respect to the rule or order or conference report, as applicable.".

(j) PAYGO.—

(1) Amend clause 10 of rule XXI to read as follows:

"10.(a)(1) Except as provided in paragraphs (b) and (c), it shall not be in order to consider any bill, joint resolution, amendment, or conference report if the provisions of such measure affecting direct spending and revenues have the net effect of increasing the deficit or reducing the surplus for either the period comprising—

"(A) the current fiscal year, the budget year set forth in the most recently completed concurrent resolution on the budget, and the four fiscal years following that budget year; or

"(B) the current fiscal year, the budget year set forth in the most recently completed concurrent resolution on the budget, and the nine fiscal years following that budget year.

"(2) The effect of such measure on the deficit or surplus shall be determined on the basis of estimates made by the Committee on the Budget relative to baseline estimates supplied by the Congressional Budget Office consistent with section 257 of the Balanced Budget and Emergency Deficit Control Act of 1985.

7

"(b) If a bill, joint resolution, or amendment is considered pursuant to a special order of the House directing the Clerk to add as new matter at the end of such measure the provisions of a separate measure as passed by the House, the provisions of such separate measure as passed by the House shall be included in the evaluation under paragraph (a) of the bill, joint resolution, or amendment.

"(c)(1) Except as provided in subparagraph (2), the evaluation under paragraph (a) shall exclude a provision expressly designated as an emergency for purposes of pay-as-you-go principles in the case of a point of order under this clause against consideration of—

"(A) a bill or joint resolution;

"(B) an amendment made in order as original text by a special order of business;

"(C) a conference report; or

"(D) an amendment between the Houses.

"(2) In the case of an amendment (other than one specified in subparagraph (1)) to a bill or joint resolution, the evaluation under paragraph (a) shall give no cognizance to any designation of emergency.

"(3) If a bill, a joint resolution, an amendment made in order as original text by a special order of business, a conference report, or an amendment between the Houses includes a provision expressly designated as an emergency for

8

purposes of pay-as-you-go principles, the Chair shall put the question of consideration with respect thereto.".

(2) In clause 7 of rule XXI, strike "the period comprising the current fiscal year and the five fiscal years beginning with the fiscal year that ends in the following calendar year or the period comprising the current fiscal year and the ten fiscal years beginning with the fiscal year that ends in the following calendar year" and insert "period described in clause 10(a)".

(k) DISCLOSURE BY MEMBERS OF EMPLOYMENT NEGOTIATIONS.—In clause 1 of rule XXVII, strike "until after his or her successor has been elected,".

(l) GENDER NEUTRALITY.—

(1) In the standing rules—

(A) strike "chairman" each place it appears and insert "chair"; and

(B) strike "Chairman" each place it appears and insert "Chair" (except in clause 4(a)(1)(B) of rule X).

(2) In rule I—

(A) in clause 1 strike "his";

(B) in clause 7, strike "his" and insert "such";

(C) in clause 8—

(i) in paragraph (b)(1) strike "his"; and

9

(ii) in paragraph (b)(3)(B), strike "his election and whenever he deems" and insert "the election of the Speaker and whenever"; and

(D) in clause 12—

(i) in paragraph (c) strike "he" and insert "the Speaker"; and

(ii) in paragraph (d) strike "his opinion" and insert "the opinion of the Speaker".

(3) In rule II—

(A) in clause 1—

(i) strike "his office" and insert "the office";

(ii) strike "his knowledge and ability" and insert "the knowledge and ability of the officer"; and

(iii) strike "his department" and insert "the department concerned";

(B) in clause 2—

(i) in paragraph (b) strike "he is required to make" and insert "required to be made by such officer";

(ii) in paragraph (g) strike "his temporary absence or disability" and insert "the temporary absence or disability of the Clerk"; and

10

(iii) in paragraph (i)(1) strike "Whenever the Clerk is acting as a supervisory authority over such staff, he" and insert "When acting as a supervisory authority over such staff, the Clerk"; and

(C) in clause 3—

(i) in paragraph (a) strike "him" and insert "the Sergeant-at-Arms";

(ii) in paragraph (b) strike "him" and insert "the Sergeant-at-Arms";

(iii) in paragraph (c) strike "his employees" and insert "employees of the office of the Sergeant-at-Arms"; and

(iv) in paragraph (d)—

(I) strike "; and" and insert "and,"; and

(II) strike "he".

(4) In rule III—

(A) in clause 1 strike "he has" and insert "having"; and

(B) in clause 2(a)—

(i) strike "his vote" and insert "the vote of such Member"; and

(ii) strike "his presence" and insert "the presence of such Member".

11

(5) In rule IV—

(A) in clause 4(a) strike "he or she" and insert "such individual"; and

(B) in clause 6(b) strike "his family" and insert "the family of such individual".

(6) In rule V—

(A) strike "administer a system subject to his direction and control" each place it appears and insert "administer, direct, and control a system";

(B) strike "he" each place it appears and insert "the Speaker"; and

(C) in clause 3 strike "his" and insert "the".

(7) In rule VI, strike "he" each place it appears and insert "the Speaker".

(8) In clause 7 of rule VII, strike "his office" each place it appears and insert "the office of the Clerk".

(9) In clause 6(b) of rule VIII, strike "he" and insert "the Speaker".

(10) In clause 2(a)(1) of rule IX, strike "his" and insert "an".

(11) In rule X—

(A) in clause 4(f)(1), strike "President submits his budget" and insert "submission of the budget by the President";

(B) in clause 5—

12

(i) in paragraph (a)(4)—

(I) strike "his designee" each place it appears and insert "a designee"; and

(II) strike "his respective party" each place it appears and insert "the respective party of such individual";

(ii) in paragraph (b)(1) strike "he was"; and

(iii) in paragraph (c) strike "chairman-ship" and insert "chair";

(C) in clause 8—

(i) strike "his expenses" each place it appears and insert "the expenses of such individual"; and

(ii) strike "he" each place it appears;

(D) in clause 10(a) strike "he is"; and

(E) in clause 11—

(i) in paragraph (a)(3) strike "member of his leadership staff to assist him in his capacity" and insert "respective leadership staff member to assist in the capacity of the Speaker or Minority Leader";

(ii) in paragraph (e)(1) strike "his employment or contractual agreement" and insert

13

"the employment or contractual agreement of such employee or person"; and

(iii) in paragraph (g)(2)—

(I) in subdivision (B)—

(aa) strike "he" and insert "the President"; and

(bb) strike "his"; and

(II) in subdivision (C) strike "his".

(12) In rule XI—

(A) in clause 2—

(i) in paragraph (c)(1) strike "he" and insert "the chair"; and

(ii) in paragraph (k)(9) strike "his testimony" and insert "the testimony of such witness";

(B) in clause 3—

(i) in paragraph (a) strike "his duties or the discharge of his responsibilities" each place it appears and insert "the duties or the discharge of the responsibilities of such individual";

(ii) in paragraph (b)—

(I) in subparagraph (2)(B) strike "he" and insert "such Member, Delegate, or Resident Commissioner"; and

14

(II) in subparagraph (5) strike "disqualify himself" and insert "seek disqualification";

(iii) in paragraph (g)—

(I) in subparagraph (1)(B) strike "he is";

(II) in subparagraph (1)(E) strike "his or her employment or duties with the committee" and insert "the employment or duties with the committee of such individual"; and

(III) in subparagraph (4)—

(aa) strike "his or her personal staff" and insert "the respective personal staff of the chair or ranking minority member"; and

(bb) strike "he" and insert "the chair or ranking minority member";

(iv) in paragraph (p)—

(I) in subparagraph (2) strike "his counsel" and insert "the counsel of the respondent";

(II) in subparagraph (4)—

15

(aa) strike "his or her counsel" and insert "the counsel of the respondent"; and

(bb) strike "his counsel" and insert "the counsel of the respondent";

(III) in subparagraph (7) strike "his counsel" and insert "the counsel of a respondent"; and

(IV) in subparagraph (8) strike "him" and insert "the respondent"; and

(v) in paragraph (q) strike "his or her" and insert "the".

(13) In rule XII—

(A) in clause 2(c)(1) strike "he" and insert "the Speaker"; and

(B) in clause 3 strike "he shall endorse his name" and insert "the Member, Delegate, or Resident Commissioner shall sign it".

(14) In clause 6(d) of rule XIII, strike "his".

(15) In clause 4(c)(1) of rule XVI strike "his discretion" and insert "the discretion of the Speaker".

(16) In rule XVII—

(A) in clause 1(a) strike "himself to 'Mr. Speaker'" and insert "the Speaker";

16

(B) in clause 6 strike "his discretion" and insert "the discretion of the Chair"; and

(C) in clause 9 strike "he" each place it appears and insert "such individual".

(17) In clause 6 of rule XVIII, strike "he" each place it appears and insert "the Chair".

(18) In rule XX—

(A) in clause 5—

(i) in paragraph (b) strike "him" and insert "the Sergeant-at-Arms";

(ii) in paragraph (c)(3)(B)(I) strike "his" and insert "a"; and

(iii) in paragraph (d) strike "he" and insert "the Speaker"; and

(B) in clause 6(b)—

(i) strike "he" and insert "the Member"; and

(ii) strike "his" and insert "such".

(19) In clause 7(c)(1) of rule XXII, strike "his".

(20) In rule XXIII—

(A) in clause 1 strike "conduct himself" and insert "behave";

(B) in clause 3—

17

(i) strike "his beneficial interest" and insert "the beneficial interest of such individual"; and

(ii) strike "his position" and insert "the position of such individual";

(C) in clause 6—

(i) in paragraph (a)—

(I) strike "his campaign funds" and insert "the campaign funds of such individual"; and

(II) strike "his personal funds" and insert "the personal funds of such individual"; and

(ii) in paragraph (c) strike "his campaign account" and insert "a campaign accounts of such individual";

(D) in clause 8—

(i) in paragraph (a) strike "he" and insert "such employee"; and

(ii) in paragraph (c)—

(I) in subparagraph (1)(A) after "his spouse" insert "the spouse of such individual"; and

18

(II) in subparagraph (1)(B) strike "his spouse" and insert "the spouse of such employee";

(E) in clause 10—

(i) strike "he is a" and insert "such individual is a";

(ii) strike "his innocence" and insert "the innocence of such Member"; and

(iii) strike "he is reelected" and insert "the Member is reelected"; and

(F) in clause 12(b)—

(i) strike "advises his employing authority" and insert "advises the employing authority of such employee"; and

(ii) strike "from his" and insert "from such"; and

(G) in clause 15 strike "his or her family member" each place it appears and insert "a family member of a Member, Delegate, or Resident Commissioner".

(21) In rule XXIV—

(A) in clause 1—

(i) in paragraph (a) strike "his use" and insert "the use of such individual"; and

19

(ii) in paragraph (b)(1) strike "his principal campaign committee" and insert "the principal campaign committee of such individual";

(B) in clause 7 strike "he was";

(C) in clause 8 strike "he is" and insert "such individual is"; and

(D) in clause 10 strike "he was" and insert "such individual was".

(22) In rule XXV—

(A) in clause 2(b) strike "his name" and insert "the name of such individual";

(B) in clause 4—

(i) in paragraph (c) strike "his residence or principal place of employment" and insert "the residence or principal place of employment of such individual"; and

(ii) in paragraph (d)(1)—

(I) in subdivision (B) strike "he" and insert "such individual";

(II) in subdivision (C) strike "him" and insert "such individual"; and

(III) in subdivision (D)—

20

(aa) strike "he or his family" and insert "such individual or the family of such individual"; and

(bb) strike "him" and insert "such individual";

(C) in clause 5—

(i) strike "his official position" each place it appears and insert "the official position of such individual";

(ii) strike "his actual knowledge" each place it appears and insert "the actual knowledge of such individual";

(iii) strike "his duties" each place it appears and insert "the duties of such individual";

(iv) in paragraph (a)(3)(D)(ii)(I) strike "his relationship" and insert "the relationship of such individual"; and

(v) in paragraph (a)(3)(G)(i) strike "his spouse" and insert "the spouse of such individual";

(D) in clause 6—

(i) strike "he acts" and insert "acting"; and

(ii) strike "he is"; and

21

(E) in clause 8 strike "his or her" and insert "the".

(23) In clause 1 of rule XXVI, strike "him" and insert "the Clerk".

(24) In clause 2 of rule XXVII, strike "he or she" and insert "such individual".

(25) In clause 2 of rule XXIX, strike "the masculine gender include the feminine" and insert "one gender include the other".

(m) TECHNICAL AND CODIFYING CHANGES.—

(1) In clause 2(h) of rule II, strike "not in session" and insert in lieu thereof "in recess or adjournment".

(2) In clause 4(b) of rule IV, strike "regulations that exempt" and insert in lieu thereof "regulations to carry out this rule including regulations that exempt".

(3) In clause 5(c) of rule X—

(A) strike "temporary absence of the chairman" and insert in lieu thereof "absence of the member serving as chair"; and

(B) strike "permanent".

(4) In clause 7(e) of rule X, strike "signed by" and all that follows, and insert in lieu thereof "signed by the ranking member of the committee as it was constituted at the expiration of the preceding Congress who is a member of the majority party in the present Congress.".

22

(5) In clause 8(a) of rule X, strike "clauses 6 and 8" and insert in lieu thereof "clause 6".

(6) In clause 2(a) of rule XIII—

(A) in subparagraph (1), strike "as privileged"; and

(B) in subparagraph (2), insert "(other than those filed as privileged)" after "reported adversely".

(7) In clause 5(c)(3) of rule XX, strike "clause 5(a) of rule XX" and insert "paragraph (a)".

(8) In clause 6(c) of rule XX, after "yeas and nays" insert "ordered under this clause".

(9) In clause 7(c)(3) of rule XXII, strike "motion meets" and insert in lieu thereof "proponent meets".

(10) In clause 1(b)(2) of rule XXIV, strike "office space, furniture, or equipment, and" and insert in lieu thereof "office space, office furniture, office equipment, or".

(11) In clause 5(i)(2) of rule XXV, strike "paragraph (1)(A)" and insert "subparagraph (1)(A)".

## SEC. 3. SEPARATE ORDERS.

(a) BUDGET MATTERS.—

(1) During the One Hundred Eleventh Congress, references in section 306 of the Congressional Budget Act of 1974 to a resolution shall be construed in the

23

House of Representatives as references to a joint resolution.

(2) During the One Hundred Eleventh Congress, in the case of a reported bill or joint resolution considered pursuant to a special order of business, a point of order under section 303 of the Congressional Budget Act of 1974 shall be determined on the basis of the text made in order as an original bill or joint resolution for the purpose of amendment or to the text on which the previous question is ordered directly to passage, as the case may be.

(3) During the One Hundred Eleventh Congress, a provision in a bill or joint resolution, or in an amendment thereto or a conference report thereon, that establishes prospectively for a Federal office or position a specified or minimum level of compensation to be funded by annual discretionary appropriations shall not be considered as providing new entitlement authority within the meaning of the Congressional Budget Act of 1974.

(4)(A) During the One Hundred Eleventh Congress, except as provided in subsection (C), a motion that the Committee of the Whole rise and report a bill to the House shall not be in order if the bill, as amended, exceeds an applicable allocation of new budget authority

24

under section 302(b) of the Congressional Budget Act of 1974, as estimated by the Committee on the Budget.

(B) If a point of order under subsection (A) is sustained, the Chair shall put the question: "Shall the Committee of the Whole rise and report the bill to the House with such amendments as may have been adopted notwithstanding that the bill exceeds its allocation of new budget authority under section 302(b) of the Congressional Budget Act of 1974?". Such question shall be debatable for 10 minutes equally divided and controlled by a proponent of the question and an opponent but shall be decided without intervening motion.

(C) Subsection (A) shall not apply—

(i) to a motion offered under clause 2(d) of rule XXI; or

(ii) after disposition of a question under subsection (B) on a given bill.

(D) If a question under subsection (B) is decided in the negative, no further amendment shall be in order except—

(i) one proper amendment, which shall be debatable for 10 minutes equally divided and controlled by the proponent and an opponent, shall not be subject to amendment, and shall not be subject

25

to a demand for division of the question in the House or in the Committee of the Whole; and

(ii) pro forma amendments, if offered by the chair or ranking minority member of the Committee on Appropriations or their designees, for the purpose of debate.

(b) CERTAIN SUBCOMMITTEES.—Notwithstanding clause 5(d) of rule X, during the One Hundred Eleventh Congress—

(1) the Committee on Armed Services may have not more than seven subcommittees;

(2) the Committee on Foreign Affairs may have not more than seven subcommittees; and

(3) the Committee on Transportation and Infrastructure may have not more than six subcommittees.

(c) EXERCISE FACILITIES FOR FORMER MEMBERS.— During the One Hundred Eleventh Congress—

(1) The House of Representatives may not provide access to any exercise facility which is made available exclusively to Members and former Members, officers and former officers of the House of Representatives, and their spouses to any former Member, former officer, or spouse who is a lobbyist registered under the Lobbying Disclosure Act of 1995 or any successor statute or agent of a foreign principal as defined in clause 5 of rule XXV. For purposes of this section, the term "Member" in-

26

cludes a Delegate or Resident Commissioner to the Congress.

(2) The Committee on House Administration shall promulgate regulations to carry out this subsection.

(d) NUMBERING OF BILLS.—In the One Hundred Eleventh Congress, the first 10 numbers for bills (H.R. 1 through H.R. 10) shall be reserved for assignment by the Speaker.

(e) MEDICARE COST CONTAINMENT.—Section 803 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 shall not apply during the One Hundred Eleventh Congress.

## SEC. 4. COMMITTEES, COMMISSIONS, AND HOUSE OFFICES.

(a) SELECT COMMITTEE ON ENERGY INDEPENDENCE AND GLOBAL WARMING.—

(1) ESTABLISHMENT; COMPOSITION.—

(A) ESTABLISHMENT.—There is hereby established a Select Committee on Energy Independence and Global Warming (hereinafter in this section referred to as the "select committee").

(B) COMPOSITION.—The select committee shall be composed of 15 members appointed by the Speaker, of whom 6 shall be appointed on the recommendation of the Minority Leader. The Speaker shall designate one member of the select committee as its chair. A vacancy in the membership of the se-

27

lect committee shall be filled in the same manner as the original appointment.

(2) JURISDICTION; FUNCTIONS.—

(A) LEGISLATIVE JURISDICTION.—The select committee shall not have legislative jurisdiction and shall have no authority to take legislative action on any bill or resolution.

(B) INVESTIGATIVE JURISDICTION.—The sole authority of the select committee shall be to investigate, study, make findings, and develop recommendations on policies, strategies, technologies and other innovations, intended to reduce the dependence of the United States on foreign sources of energy and achieve substantial and permanent reductions in emissions and other activities that contribute to climate change and global warming.

(3) PROCEDURE.—(A) Except as specified in paragraph (2), the select committee shall have the authorities and responsibilities of, and shall be subject to the same limitations and restrictions as, a standing committee of the House, and shall be deemed a committee of the House for all purposes of law or rule.

(B)(i) Rules X and XI shall apply to the select committee where not inconsistent with this resolution.

28

(ii) Service on the select committee shall not count against the limitations in clause 5(b)(2) of rule X.

(4) FUNDING.—To enable the select committee to carry out the purposes of this section—

(A) the select committee may use the services of staff of the House; and

(B) the select committee shall be eligible for interim funding pursuant to clause 7 of rule X.

(5) REPORTING.—The select committee may report to the House from time to time the results of its investigations and studies, together with such detailed findings and recommendations as it may deem advisable. All such reports shall be submitted to the House by December 31, 2010.

(b) HOUSE DEMOCRACY ASSISTANCE COMMISSION.—House Resolution 24, One Hundred Tenth Congress, shall apply in the One Hundred Eleventh Congress in the same manner as such resolution applied in the One Hundred Tenth Congress.

(c) TOM LANTOS HUMAN RIGHTS COMMISSION.—Sections 1 through 7 of House Resolution 1451, One Hundred Tenth Congress, shall apply in the One Hundred Eleventh Congress in the same manner as such provisions applied in the One Hundred Tenth Congress, except that—

29

(1) the Tom Lantos Human Rights Commission may, in addition to collaborating closely with other professional staff members of the Committee on Foreign Affairs, collaborate closely with professional staff members of other relevant committees; and

(2) the resources of the Committee on Foreign Affairs which the Commission may use shall include all resources which the Committee is authorized to obtain from other offices of the House of Representatives.

(d) OFFICE OF CONGRESSIONAL ETHICS.— Section 1 of House Resolution 895, One Hundred Tenth Congress, shall apply in the One Hundred Eleventh Congress in the same manner as such provision applied in the One Hundred Tenth Congress, except that the Office of Congressional Ethics shall be treated as a standing committee of the House for purposes of section 202(i) of the Legislative Reorganization Act of 1946 (2 U.S.C. 72a(i)).

(e) EMPANELLING INVESTIGATIVE SUBCOMMITTEE OF THE COMMITTEE ON STANDARDS OF OFFICIAL CONDUCT.— The text of House Resolution 451, One Hundred Tenth Congress, shall apply in the One Hundred Eleventh Congress in the same manner as such provision applied in the One Hundred Tenth Congress.

(f) CONTINUING AUTHORITIES FOR THE COMMITTEE ON THE JUDICIARY AND THE OFFICE OF GENERAL COUNSEL.—

30

(1) The House authorizes—

(A) the Committee on the Judiciary of the 111th Congress to act as the successor in interest to the Committee on the Judiciary of the 110th Congress with respect to the civil action Committee on the Judiciary v. Harriet Meirs et al., filed by the Committee on the Judiciary in the 110th Congress pursuant to House Resolution 980; and

(B) the chair of the Committee on the Judiciary (when elected), on behalf of the Committee on the Judiciary, and the Office of General Counsel to take such steps as may be appropriate to ensure continuation of such civil action, including amending the complaint as circumstances may warrant.

(2)(A) The House authorizes—

(i) the Committee on the Judiciary to take depositions by a member or counsel of the committee related to the investigation into the firing of certain United States Attorneys and related matters; and

(ii) the chair of the Committee on the Judiciary (when elected), on behalf of the Committee on the Judiciary, to issue subpoenas related to the investigation into the firing of certain United States Attorneys and related matters including for the

31

purpose of taking depositions by a member or counsel of the committee.

(B) Depositions taken under the authority prescribed in this paragraph shall be governed by the procedures submitted for printing in the Congressional Record by the chair of the Committee on Rules (when elected) or by such other procedures as the Committee on the Judiciary shall prescribe.

(3) The House authorizes the chair of the Committee on the Judiciary (when elected), on behalf of the Committee on the Judiciary, and the Office of General Counsel to petition to join as a party to the civil action referenced in paragraph (1) any individual subpoenaed by the Committee on the Judiciary of the 110th Congress as part of its investigation into the firing of certain United States Attorneys and related matters who failed to comply with such subpoena or, at the authorization of the Speaker after consultation with the Bipartisan Legal Advisory Group, to initiate judicial proceedings concerning the enforcement of subpoenas issued to such individuals.

### SEC. 5. SPECIAL ORDERS OF BUSINESS.

(a) LILLY LEDBETTER FAIR PAY ACT.—Upon the adoption of this resolution it shall be in order to consider in the House the bill (H.R. 11) to amend title VII of the Civil

32

Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Americans With Disabilities Act of 1990, and the Rehabilitation Act of 1973 to clarify that a discriminatory compensation decision or other practice that is unlawful under such Acts occurs each time compensation is paid pursuant to the discriminatory compensation decision or other practice, and for other purposes. All points of order against the bill and against its consideration are waived except those arising under clause 9 or 10 of rule XXI. The bill shall be considered as read. The previous question shall be considered as ordered on the bill to final passage without intervening motion except: (1) one hour of debate equally divided and controlled by the Majority Leader and the Minority Leader or their designees; and (2) one motion to recommit.

(b)(1) PAYCHECK FAIRNESS ACT.—Upon the adoption of this resolution it shall be in order to consider in the House the bill (H.R. 12) to amend the Fair Labor Standards Act of 1938 to provide more effective remedies to victims of discrimination in the payment of wages on the basis of sex, and for other purposes. All points of order against the bill and against its consideration are waived except those arising under clause 9 or 10 of rule XXI. The bill shall be considered as read. The previous question shall be considered as ordered on the bill to final passage without intervening motion except: (1) one hour of debate equally divided and controlled by the

33

Majority Leader and the Minority Leader or their designees; and (2) one motion to recommit.

(2) In the engrossment of H.R. 11, the Clerk shall—

(A) add the text of H.R. 12, as passed by the House, as new matter at the end of H.R. 11;

(B) conform the title of H.R. 11 to reflect the addition to the engrossment of H.R. 12;

(C) assign appropriate designations to provisions within the engrossment; and

(D) conform provisions for short titles within the engrossment.

(3) Upon the addition of the text of H.R. 12 to the engrossment of H.R. 11, H.R. 12 shall be laid on the table.

Attest:

*Clerk.*